# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### TYLER DIVISION

|  |  |
|---|---|
| STATE OF TEXAS;<br>STATE OF IDAHO;<br>STATE OF ALABAMA;<br>STATE OF ARKANSAS;<br>STATE OF FLORIDA;<br>STATE OF GEORGIA<br>STATE OF IOWA;<br>STATE OF KANSAS;<br>STATE OF LOUISIANA;<br>STATE OF MISSOURI;<br>STATE OF NORTH DAKOTA;<br>STATE OF OHIO;<br>STATE OF SOUTH CAROLINA;<br>STATE OF SOUTH DAKOTA;<br>STATE OF TENNESSEE;<br>STATE OF WYOMING,<br><br>    *Plaintiffs*,<br><br>v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY; ALEJANDRO<br>MAYORKAS, in his official capacity as<br>Secretary for DHS; UR JADDOU, in her<br>official capacity as Director of USCIS;<br>TROY MILLER, in his official capacity as<br>the Acting Commissioner of CBP;<br>PATRICK J. LECHLEITER, in his official<br>capacity as the Acting Director of ICE; the<br>OFFICE OF MANAGEMENT AND BUDGET;<br>SHALANDA YOUNG in her official capacity<br>as the Director of the Office of Management<br>and Budget,<br><br>    *Defendants.* | No. 6:24-cv-00306 |

## Original Complaint

1.      This is a challenge to unlawful agency action taken by the Department of Homeland Security (DHS) to create a program that will grant hundreds of thousands of illegal aliens parole in place (PIP). *See generally* Implementation of Keeping Families Together, 89 Fed. Reg. at 67,459 (Aug. 20, 2024) (PIP Program).

2.      Longstanding federal law prohibits aliens who entered the United States unlawfully from obtaining most immigration benefits. This includes obtaining lawful permanent resident status—without first leaving the United States and waiting outside the United States for the requisite time—based on an approved family-based or employment-based visa petition.

3.      These provisions of law established by Congress serve as powerful disincentives for individuals to cross the border unlawfully. Indeed, were they not present, there would be no practical reason for any alien to abide by the law, wait his or her turn, and only come to the United States when the law provides.

4.      But the Biden-Harris Administration—dissatisfied with the system Congress created, and for blatant political purposes—has yet again attempted to create its own immigration system in two new ways.

5.      Claiming that it has "unfettered discretion," Implementation of Keeping Families Together, 89 Fed. Reg. at 67,465, DHS has announced the creation of a program that effectively provides a new pathway to a green card and eventual citizenship; announcing that it would allow more than 1.3 million aliens who are unlawfully present in the United States—more than 200,000 of whom live in Texas—to circumvent the processes established by Congress to apply for permanent residency. Indeed, DHS aims to accomplish this end-run around the law by unlawfully exercising the textually limited authority set forth in 8 U.S.C. § 1182(d)(5), which states that the DHS Secretary may "parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5) (emphasis added).

6.      Specifically, DHS has announced a new PIP Program that would allow aliens who have been unlawfully present in the United States for ten or more years to receive a grant of

"parole"—without leaving the United States and attempting to come back and apply for admission at a port of entry—if the alien is the spouse or stepchild of a U.S. citizen. *See* Implementation of Keeping Families Together, 89 Fed. Reg. 67,461.

7.     But the parole "authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Biden v. Texas*, 597 U.S. 785, 806 (2022) (quoting 8 U.S.C. §1182(d)(5)(A)). DHS "cannot use that power to parole aliens en masse,"[1] which is precisely what PIP amounts to. Further, because the parole power may only be exercised to allow an alien to come "into" the United States, it may not be lawfully exercised for aliens already present in the country.

8.     This action incentivizes illegal immigration and will irreparably harm the Plaintiff States.

## PARTIES

### I. Plaintiffs

9.     Plaintiff State of Texas is a sovereign State of the United States of America.

10.    Plaintiff State of Idaho is a sovereign State of the United States of America.

11.    Plaintiff State of Alabama is a sovereign State of the United States of America.

12.    Plaintiff State of Arkansas is a sovereign State of the United States of America.

13.    Plaintiff State of Florida is a sovereign State of the United States of America.

14.    Plaintiff State of Georgia is a sovereign State of the United States of America.

15.    Plaintiff State of Iowa is a sovereign State of the United States of America.

16.    Plaintiff State of Kansas is a sovereign State of the United States of America.

17.    Plaintiff State of Louisiana is a sovereign State of the United States of America.

18.    Plaintiff State of Missouri is a sovereign State of the United States of America.

19.    Plaintiff State of North Dakota is a sovereign State of the United States of America.

20.    Plaintiff State of Ohio is a sovereign State of the United States of America.

---

[1] *Texas v. Biden*, 20 F.4th 928, 997 (5th Cir. 2021), *rev'd in part on other grounds, Biden*, 597 U.S. at 785.

21.     Plaintiff State of South Carolina is a sovereign State of the United States of America.

22.     Plaintiff State of South Dakota is a sovereign State of the United States of America.

23.     Plaintiffs State of Tennessee is a sovereign State of the United States of America.

24.     Plaintiff State of Wyoming is a sovereign State of the United States of America.

**II. Defendants**

25.     Defendant U.S. Department of Homeland Security is a cabinet-level federal executive agency that oversees the Defendants, U.S. Citizenship and Immigration Services (USCIS), U.S. Customs and Border Protection (CBP), and U.S. Immigration and Customs Enforcement (ICE), which are constituent agencies of DHS. DHS and its constituent agencies must enforce the Immigration and Nationality Act (INA).

26.     Defendant Alejandro Mayorkas is the Secretary of DHS. The Plaintiff States sue him in his official capacity.

27.     Defendant Ur Jaddou is the Director of USCIS. The Plaintiff States sue her in her official capacity.

28.     Defendant Troy Miller is the Acting Commissioner of CBP. The Plaintiff States sue him in his official capacity.

29.     Defendant Patrick J. Lechleitner is the Acting Director of ICE. The Plaintiff States sue him in his official capacity.

30.     Defendant Office of Management and Budget (OMB) is an office within the Executive Office of the President of the United States.

31.     Defendant Shalanda Young is the Director of the Office of Management and Budget. She is sued in her official capacity.

## JURISDICTION AND VENUE

32.     The Court has jurisdiction over this dispute because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§ 1331, 1346, 1361; 5 U.S.C. §§ 702–703. It has

jurisdiction under 5 U.S.C. §§ 705–706 and 28 U.S.C. §§ 1361 and §§ 2201–2202 to render the declaratory and injunctive relief that the Plaintiff States request.

33.     This district is a proper venue because the State of Texas resides in this district and a substantial part of the events and omissions giving rise to the claim occurred here. 28 U.S.C. § 1391(b), (e).

## FACTS

### I. Statutory provisions governing the PIP Program.

#### A.   The Parole Authority.

34.     The INA details the specific instances when the government may use its authority to parole individuals into the United States who otherwise would not be lawfully permitted to enter or who are otherwise subject to mandatory detention. *See* 8 U.S.C. § 1182(d)(5).

35.     Specifically, Congress has directed that parole may only be granted on a case-by-case basis, and even then, only for "urgent humanitarian reasons or significant public benefit." *Id.* at § 1182(d)(5)(A); *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021).

36.     In the past, the federal government's parole authority was textually broader, and its use was approved "for emergent reasons or for reasons deemed strictly in the public interest." Congress, however, substantially narrowed this provision in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), adding the "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "significant public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009–689 (1996).

37.     In IIRIRA, Congress "specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" precisely because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011).

38.     Congress made crystal clear its intent that its 1996 amendment to the parole statute was a limit on the use of parole: the section heading in IIRIRA that makes this amendment is titled "LIMITATION ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat 3009, § 602 (1996) (emphasis added); *see also Ram v. I.N.S.*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles "may be used to interpret its meaning").

39.     Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—in part because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, *and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States.* This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

40.     Congress has also emphasized that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B); *see also Texas v. Biden*, 20 F.4th at 994.

41.     As the Fifth Circuit has stated, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *Texas v. Biden*, 20 F.4th at 947. But the power is not unlimited: "DHS cannot use that power to parole aliens en masse; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *Id.* at 997.

42.     The Supreme Court recently affirmed the limited nature of the parole power, noting that it "is not unbounded: DHS may exercise its discretion to parole applicants 'only on a

6

case-by-case basis for urgent humanitarian reasons or significant public benefit.' … And under the [Administrative Procedure Act], DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Texas*, 597 U.S. at 806–07.

**B. Adjustment of Status.**

43.     Certain categories of aliens who are present in the United States may adjust their status to that of a lawful permanent resident (LPR).[2] Specifically, only aliens present in the United States who were "inspected and admitted or paroled into the United States" and aliens who have self-petitioned under the Violence Against Women Act (VAWA) may adjust their status to that of LPR. 8 U.S.C. § 1255(a).

44.     Otherwise, all aliens who entered the United States unlawfully after April 30, 2001 (except for the relatively small number of aliens self-petitioning under VAWA) who want to adjust their status to LPR are required to leave the United States and apply for an immigrant visa at a U.S. consulate or embassy overseas. *See* 8 U.S.C. § 1255(i).

**C. Inadmissibility to the United States of Unlawfully Present Aliens.**

45.     Aliens who have been unlawfully present in the United States for more than one year are inadmissible for admission to the United States and are also ineligible for visas for ten years after the "alien's departure or removal from the United States." 8 U.S.C. § 1182(a)(9)(B)(i)(II).

46.     The ten-year inadmissibility for admission to the United States may be waived "in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the [DHS Secretary] that the refusal of admission to such immigrant alien would result in *extreme hardship* to the citizen or lawfully resident spouse or parent of such alien." 8 U.S.C. § 1182(a)(9)(B)(v) (emphasis added).

---

[2] Also commonly referred to as becoming a green card holder.

47.     If an unlawfully present alien does not qualify for an extreme hardship waiver, he or she must remain outside of the United States for ten years before applying for an immigrant visa to the United States and obtaining LPR status.

48.     The ten-year ineligibility for the issuance of non-immigrant visas may be waived upon "a recommendation by the Secretary of State or by the consular officer that the alien be admitted *temporarily* despite his inadmissibility." 8 U.S.C. § 1182(d)(3)(A) (emphasis added). But for such waivers, the INA requires that the DHS Secretary "shall prescribe conditions, including exaction of such bonds as may be necessary, to control and regulate the admission and return of inadmissible aliens applying for *temporary* admission under this paragraph." *Id.* (emphasis added).

49.     Accordingly, waivers of visa ineligibility for non-immigrant visas are only permissible for aliens applying for temporary admission to the United States.

## II. The PIP Program.

50.     On July 17, 2024, the White House website published a document entitled "FACT SHEET: Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Family Has a Fair Shot at the American Dream" (The "July 17 Fact Sheet").[3]

51.     The document describes actions the Biden-Harris Administration is taking "to ensure that all Latino families and communities can achieve greater opportunity." *Id.*

52.     The document announced the PIP Program, explaining that:

> On June 18th, the President announced a new process to help U.S. citizens with noncitizen spouses and children who have been here for 10 years or more keep their families together. This new action – which will help certain noncitizen spouses and children apply for lawful permanent residence without leaving the country – is expected to apply to approximately half a million spouses of U.S. citizens, and 50,000 noncitizen children whose parent is married to a U.S. citizen. And today, the President is announcing that beginning on August 19, 2024, eligible spouses and children will be able

---

[3] The White House, Fact Sheet: Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Family Has a Fair Shot at the American Dream, THE WHITE HOUSE (July 17, 2024), https://tinyurl.com/yyrnft5b.

to apply for this process to obtain legal status while remaining with their families.

*Id*.

53.     The Biden-Harris Administration's expectation of only 550,000 beneficiaries of the PIP Program is likely a significant underestimate.

54.     For example, the Migration Policy Institute estimates that 1,314,000 unlawfully present aliens are married to U.S. citizens.[4]

55.     On August 16, DHS's United States Citizenship and Immigration Services (USCIS) announced the official start of the PIP Program and that it had published "a new electronic form, Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens" that would become available on August 19.[5]

56.     USCIS also announced that it had published a "Filing Guide for Form I-131F" (the "Filing Guide").[6] The Filing Guide announced the following criteria for PIP Program eligibility, explaining that aliens qualify for the PIP Program if they:

- Are present in the United States without admission or parole;

- Have been continuously physically present in the United States:

    o   Since June 17, 2014, if seeking parole in place as the spouse of a U.S. citizen; or

    o   Since June 17, 2024, if seeking parole in place as the stepchild of a U.S. citizen;

- Have:

    o   A legally valid marriage to a U.S. citizen as of June 17, 2024, if seeking parole in place as the spouse of a U.S. citizen; or

    o   A noncitizen parent who had a legally valid marriage to a U.S. citizen on or before June 17, 2024, and before the stepchild's 18th birthday, if seeking parole in place as the stepchild of a U.S. citizen;

---

[4] *Profile of the Unauthorized Population: United States*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 8, 2024), https://tinyurl.com/98kbtwaf.
[5] *USCIS Publishes Filing Guide for Keeping Families Together*, USCIS, (Aug. 16, 2024), https://perma.cc/EL6Z-2AUE.
[6] *Id.*

- Do not have any disqualifying criminal history; and

- Do not pose a threat to national security and public safety.[7]

57.     The Filing Guide does not list "urgent humanitarian reasons" or "significant public benefit" as one of the requirements to qualify for the program.[8]

58.     The Filing Guide imposes only five requirements of proof that must be supplied by an applicant:

- "Evidence of Your Identity" (providing a school-issued ID satisfies this requirement)

- "Evidence of Your Spouse/Stepparent's Citizenship"

- "Evidence of Your Relationship" with the U.S.-citizen spouse or stepparent

- "Evidence of Physical Presence"

- "Evidence Regarding Criminal Charges"[9]

59.     The Filing Guide also gives aliens the *option* to provide "[o]ther Evidence . . . demonstrating the significant public benefit or urgent humanitarian reasons that warrant granting you parole."[10]

60.     On August 20, 2024, DHS issued a notice entitled "Notice of implementation of the Keeping Families Together Process" establishing the PIP Program. *See generally* Implementing of Keeping Families Together, 89 Fed. Reg. 67,459 (Notice).

61.     The Notice officially announces the PIP Program and claims that USCIS has "unfettered discretion in administering this process and prioritizing requests consistent with the statute and any applicable regulations." 89 Fed. Reg. 67,465

62.     The Notice was not a rulemaking and claimed to be exempt from notice-and-comment because, in DHS's view, it was "a general statement of policy" and even if it were a

---

[7] *Filing Guide for Form I-131F* at 2, USCIS, (Aug. 16, 2024), https://perma.cc/664U-C2T2.
[8] *Id.*
[9] *Id.* at 13-15.
[10] *Id.* at 16.

legislative rule subject to notice-and-comment, the foreign affairs exemption would apply. *Id*. at 67488–89.

63.    The Notice admits that the new Form I-131F had *not* undergone the required statutory procedures for approval under the Paperwork Reduction Act, 44 U.S.C. §§ 3501–3521. *See id.* at 67489.

64.    Rather, the Notice states that "USCIS has submitted, and OMB has approved, the request for emergency authorization of the new Form I-131F (under 5 CFR 1320.13) for a period of 6 months. Within 60 days of publication of this notice at the Federal Register, USCIS will begin normal clearance procedures under the PRA to obtain three-year approval for this collection. *Id*. at 67489–90.

65.    The Notice did not make any specific claims that the PIP Program fulfills the "urgent humanitarian reasons" prong of Section 1182(d)(5).

66.    The Notice justified the PIP Program entirely based on generalized claims, without valid evidence, that the PIP Program would afford the following five claimed "significant public benefits": (1) "promot[ing] family unity"; (2) "advanc[ing] U.S. economic and labor interests by enabling paroled noncitizens to work lawfully in the United States"; (3) "further[ing] critical U.S. diplomatic interests and U.S. foreign policy objectives of managing migration, increasing economic stability, and fostering security in the United States and in partner countries in the region; (4) "preserv[ing] limited resources across U.S. government agencies that may otherwise be expended on consular processing and removal proceedings"; (5) "further[ing] national security, public safety, and border security objectives by encouraging noncitizens to provide information for background and security checks." *Id.* at 67,465.

67.    Notably, all five of the claimed benefits were programmatic benefits—none of the claimed reasons were related to a significant public benefit resulting from an individual grant of parole in a specific case.

68.    The Notice provides lengthy and detailed instructions about the specific characteristics that make an alien eligible for the PIP Program and about application processing

instructions for DHS officers. *Id.* at 67,469–74. Those instructions take up 5,283 words. Among all those words, there is one short subsection titled "Case-by-Case Consideration for Parole." *Id.* at 67,473.

69.     That section contains only the following perfunctory 63-word statement to DHS officers to instruct them about the case-by-case requirement:

> Noncitizens who meet the criteria listed in this notice may be considered for a discretionary grant of parole on a case-by-case basis. USCIS may grant parole in place to the requestor if USCIS determines that there is a significant public benefit or urgent humanitarian reason for parole and that the requestor merits a favorable exercise of discretion in the totality of the circumstances.

*Id.*

70.     DHS pays only lip service to the case-by-case requirement, devoting to it only 1.2% of the 5,283 words used to outline program eligibility and processing.

71.     The message to DHS officers is obvious: they are expected to rubber-stamp all qualifying applications.

72.     This is nothing new. DHS has become notorious for creating such programs. For example, DHS's CHNV Program for granting parole to aliens from Cuba, Haiti, Nicaragua, and Venezuela, which has similar eligibility criteria and processing requirements, has an "an approval rate of 97.5 percent." *Texas v. DHS*, --- F.Supp.3d ----, 2024 WL 1021068, at *2 (S.D. Tex. Mar. 8, 2024).

**III. Irreparable Harm to the Plaintiff States.**

73.     The number of parolees in the Plaintiff States will cause quantifiable financial harm to the States, and the exact magnitude of those harms will become clear in discovery when the federal government produces statistics about the number of PIP-qualifying aliens in the Plaintiff States. For present purposes, however, that matters little as even "a dollar or two" of injury satisfies Article III. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008).

74.     The Plaintiff States cannot recover their increased costs from the federal government, which they would otherwise not incur if the federal government enforced the law. This affects each State's sovereign interests in its territory and its ability to properly carry out such interests on behalf of its citizens.

75.     Further, under federal law, aliens who have been paroled into the United States become eligible for a variety of benefits after five years.[11] These State benefits, which impose significant costs on the State, include Medicaid, SNAP (commonly referred to as "food stamps"), and TANF (commonly referred to as welfare payments).[12]

76.     During a July 28, 2022, deposition of U.S. Border Patrol Chief Raul Ortiz, Chief Ortiz admitted that since President Biden's election, the number of aliens attempting illegally to enter the United States has increased and that internal Customs and Border Patrol documents state that "since President Biden was elected . . . aliens illegally entering the United States perceive that they will be able to enter and remain in the United States." *Florida. v. United States*, No. 21-CV-1066, ECF No. 78-3 at 59:12-60:5 (N.D. Fla. 2022) (Deposition of Raul Ortiz, Chief of the U.S. Border Patrol, "Ortiz Depo.")

77.     Chief Ortiz also agreed that "aliens who cite favorable immigration policy as a reason to come to the United States are perceiving what actually is happening in the United States." *Id.* at 67:22–68:5.

78.     Chief Ortiz further explained that it is essential to detain and remove aliens who illegally enter the United States because when there are no consequences, the number of illegal crossings increases; that "if migrant populations are told that there's a potential that they may be released, that yes, you can see increases [in illegal crossings]"; and that if DHS is not detaining

---

[11] *See* 8 U.S.C.A. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit . . . 5 years" after "the date of the alien's entry into the United States").
[12] *Id.*

and removing aliens who cross illegally, the flow of illegal crossers "will increase." *Id.* at 171:13–172:9, 173:7–12.

**A. Texas**

79.     Migration Policy Institute (MPI) estimates that there are 204,000 unlawfully present aliens in the State of Texas who are married to U.S. citizens[13] and who would, therefore, be eligible for the PIP Program

80.     The PIP Program harms Texas. Texas spends significant amounts of money providing services to paroled and illegal aliens because of the federal government's violations of and refusal to enforce federal law. These include education, healthcare, and many other social services. Federal law requires Texas to include paroled and illegal aliens in some of these programs. As the number of paroled and illegal aliens in Texas increases, the number of paroled and illegal aliens receiving such services likewise increases.

81.     For example, the Emergency Medicaid program provides health coverage for low-income children, families, seniors, and the disabled. Federal law requires Texas to include illegal aliens in its Emergency Medicaid program. The program costs Texas tens of millions of dollars annually.

82.     The Texas Children's Health Insurance Program (CHIP) offers low-cost health coverage for children from birth through age 18. Texas spends tens of millions of dollars each year on CHIP expenditures for illegal aliens.

83.     Texas spends hundreds of millions of dollars each year for uncompensated care provided by state public hospital districts to paroled and illegal aliens.

84.     Also, Texas spends tens of millions of dollars each year for increased law enforcement as its citizens suffer increased crime, unemployment, environmental harm, and social disorder due to illegal immigration.

---

[13] *Profile of the Unauthorized Population: Texas*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 16, 2024), https://perma.cc/G9JR-SX2Z.

85.     Texas spends millions of dollars each year on public education costs to educate illegal aliens, which puts a strain on its system for citizens and which costs are uncompensated by the federal government. Texas also spends significant amounts of money on program and administration costs for paroled aliens receiving Medicaid, SNAP, and TANF.

86.     If the Defendants continue to incentivize increased illegal immigration into Texas, then the harm will only grow over time.

87.     This increase strains Texas's resources and ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services.

88.     Additionally, because the PIP Program beneficiaries and recipients of Waiver Eligibility Expansion will be entitled to work authorization, these additional workers will drive down the wages of Texas residents, directly harming the State and its citizens.

**B. Idaho**

89.     MPI estimates that there are 4,000 unlawfully present aliens in the State of Idaho who are married to U.S. citizens[14] and who would, therefore, be eligible for the PIP Program.

90.     The PIP Program harms Idaho. Idaho spends significant amounts of money providing services to paroled and illegal aliens because of the federal government's violations of and refusal to enforce federal law. These include education, healthcare, and many other social services. Federal law requires Idaho to include paroled and illegal aliens in some of these programs. As the number of paroled and illegal aliens in Idaho increases, the number of paroled and illegal aliens receiving such services likewise increases.

91.     Idaho also spends significant amounts of money on program and administration costs for paroled aliens receiving Medicaid, SNAP, and TANF.

92.     If the Defendants continue to incentivize increased illegal immigration into Idaho, then the harm will only grow over time.

---

[14] *Profile of the Unauthorized Population: Idaho*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 16, 2024), https://perma.cc/P5TG-JS3Z.

93.     This increase strains Idaho's resources and ability to provide essential services, such as emergency medical care, education, driver's licenses, and other public safety services.

94.     Additionally, because the PIP Program beneficiaries will be entitled to work authorization, these additional workers will drive down the wages of Idaho residents, directly harming the State and its citizens.

**C. Alabama**

95.     Alabama will also be irreparably harmed by the PIP Program.

96.     MPI estimates that there are 7,000 unlawfully present aliens in the State of Alabama who are married to U.S. citizens[15] and who would, therefore, be eligible for the PIP Program.

97.     Alabama spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Alabama to include paroled and illegal aliens in those programs and requires Alabama to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

98.     The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Alabama increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

99.     Alabama has approximately 62,000 illegal aliens living in the State, and they cost its taxpayers more than $324.9 million a year.[16]

**D. Arkansas**

100.     Arkansas will also be irreparably harmed by the PIP Program.

---

[15] *Profile of the Unauthorized Population: Alabama*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/BS63-SR3Z.
[16] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

101.     MPI estimates that there are 6,000 unlawfully present aliens in the State of Arkansas who are married to U.S. citizens[17] and who would, therefore, be eligible for the PIP Program.

102.     Arkansas spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Arkansas to include paroled and illegal aliens in those programs and requires Arkansas to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

103.     The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Arkansas increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

104.     Arkansas has approximately 58,000 illegal aliens living in the State, and they cost its taxpayers more than $339.4 million a year.[18]

**E. Florida**

105.     Florida will also be irreparably harmed by the PIP Program.

106.     MPI estimates that there are 93,000 unlawfully present aliens in the State of Florida who are married to U.S. citizens[19] and who would, therefore, be eligible for the PIP Program.

107.     Florida spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Florida to include paroled and illegal aliens in those programs and requires Florida to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

---

[17] *Profile of the Unauthorized Population: Arkansas*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/E2NL-SCRD.

[18] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

[19] *Profile of the Unauthorized Population: Florida*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/HYG3-WXTQ.

108.     The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Florida increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

109.     Florida has approximately 772,000 illegal aliens living in the State, and they cost its taxpayers more than $4.7 billion a year.[20]

110.     Florida's state prison system spends more than $100 million per year incarcerating criminal aliens who commit crimes in Florida. Only a small fraction of this expenditure is reimbursed by the federal government under 8 U.S.C. § 1231(i).

111.     Florida spends more than $8,000 per student each year on public-school education, which it provides regardless of immigration status.

112.     Florida's Department of Children and Families provides a variety of public services to illegal aliens at the State's expense, including providing shelter to victims of domestic violence, providing care to neglected children, and providing substance abuse and mental health treatment.

113.     Florida frequently pays the cost of emergency medical services for the uninsured, which includes expenses related to the provision of medical services to illegal aliens.

114.     Florida provides unemployment benefits to aliens who are eligible for work authorization, including parolees.

**F. Georgia**

115.     Georgia will also be irreparably harmed by the PIP Program.

116.     MPI estimates that there are 34,000 unlawfully present aliens in the State of Georgia who are married to U.S. citizens[21] and who would, therefore, be eligible for the PIP Program.

---

[20] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.
[21] *Profile of the Unauthorized Population: Georgia*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/YH5C-S8YX.

117.    Georgia spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Georgia to include paroled and illegal aliens in those programs and requires Georgia to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

118.    The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Georgia increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

119.    Georgia has approximately 339,000 illegal aliens living in the State, and they cost its taxpayers more than $1.86 billion a year.[22]

**G. Iowa**

120.    Iowa will also be irreparably harmed by the PIP Program.

121.    MPI estimates that there are 6,000 unlawfully present aliens in the State of Iowa who are married to U.S. citizens[23] and who would, therefore, be eligible for the PIP Program.

122.    Iowa spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Iowa to include paroled and illegal aliens in those programs and requires Iowa to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

123.    The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Iowa increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

---

[22] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.
[23] *Profile of the Unauthorized Population: Iowa*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/2JYG-ZR78.

124.     Iowa has approximately 37,000 illegal aliens living in the State, and they cost Iowa taxpayers more than $203.7 million a year.[24]

125.     Iowa has been identified as a hot spot for trafficking activity due to the junction of Interstate 35 and Interstate 80. Traffickers bring illegal immigrants to and through the State. Proactively, in 2020, Iowa became one of the first states in the country to pass legislation to require motel and hotel staff to receive training in human-trafficking prevention. Iowa bears the additional costs of combating trafficking associated with illegal immigration.

**H. Kansas**

126.     Kansas will also be irreparably harmed by the PIP Program.

127.     MPI estimates that there are 9,000 unlawfully present aliens in the State of Kansas who are married to U.S. citizens[25] and who would, therefore, be eligible for the PIP Program.

128.     Kansas spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Kansas to include paroled and illegal aliens in those programs and requires Kansas to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

129.     The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Kansas increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

130.     Kansas has approximately 69,000 illegal aliens living in the State, and they cost its taxpayers more than $376.9 million a year.[26]

---

[24] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.
[25] *Profile of the Unauthorized Population: Kansas*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/G7SM-5TLL.
[26] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

131.   The program will result in increased crime and drug trafficking in Kansas communities, requiring additional expenditures by Kansas law enforcement. This is because the Program will incentivize at least some aliens to come to Kansas. That means more people in Kansas, at least some proportion of whom will engage in illegal activity and whom law-enforcement officials will inevitably encounter.[27]

132.   The PIP Program will force Kansas to expend its limited resources on education, healthcare, public assistance, and general government services on even more individuals who are not U.S. citizens.[28]

**I. Louisiana**

133.   Louisiana will also be irreparably harmed by the PIP Program.

---

[27] *See, e.g.*, *United States v. Salinas-Calderon*, 728 F.2d 1298, 1299–1300 (10th Cir. 1984) (recounting details of a traffic stop conducted by a Kansas Highway Patrol Trooper who encountered six individuals in the bed of a pickup truck who admitted they were unlawfully present in the U.S.); *see also* Tim Hrenchir, *City settles police SUV crash lawsuit for $335K*, TOPEKA CAPITAL-JOURNAL, Mar. 12, 2021, at A4 ("Topeka's city government has agreed to pay $335,000 to settle a lawsuit over an April 2016 crash in which a vehicle driven by an [illegal alien] was hit by a Topeka police SUV, which allegedly went through a red light while responding to a call with its lights and siren on."); Glenn E. Rice, *Man Who Heard Voices Charged With Murdering Tattoo Artist*, KAN. CITY STAR (May 22, 2018), https://bit.ly/3wpXqca, (discussing an illegal alien who allegedly shot and killed another motorist while driving in Kansas City, shot and wounded two men minutes apart in Clay County, and burglarized a residence, stole firearms, and tampered with a motor vehicle in Jackson County); ASSOCIATED PRESS, *Murder & Abduction Suspect Living in U.S. Illegally*, CBS NEWS DFW (Nov. 24, 2016), https://perma.cc/X2B5-ZKBJ ("A Texas woman accused of [travelling to Wichita, Kansas and] killing a [Wichita] mother and taking her baby was in the U.S. illegally when she was released from [Sedgwick County (KS) Jail] this summer before immigration officials had a chance to request she be held, law enforcement authorities said.").

[28] *See Plyler v. Doe*, 457 U.S. 202, 223–30 (1982) (establishing that undocumented school-age children are entitled to a free public education); KAN. STATE DEPT. OF EDUC., EXPENDITURES PER PUPIL: 2020–2021 at 8 (Jan. 2021) (2020–2021 school year expenditures per pupil were approximately with $15,869), https://perma.cc/WGD4-S6Q3; KANCARE OMBUDSMAN, KANCARE GEN. INFO. FACT SHEET (updated Nov. 19, 2020), https://perma.cc/5ES3-FLDF ("KanCare Eligible Non-Citizens[:] To be considered eligible [for] any of the KanCare medical assistance programs, non-U.S. citizens must hold (1) legal residency in the U.S. for 5 years or more or (2) hold a certain immigration status."); KAN. DEPT. OF HEALTH & ENVT., DIV. OF HEALTH CARE FIN., MKEESM MANUAL §§ 2142, 2146 (Jan. 2023), https://perma.cc/7RXY-K4NY (pertaining to "Qualified Non-Citizen Status" and "Documentation of Legal Status"); KAN. DEPT. OF HEALTH & ENVT., DIV. OF HEALTH CARE FIN., A-1 NON-CITIZEN QUALIFICATION CHART 1 (Jan. 2023), https://perma.cc/U2V4-M7EF ("The purpose of this chart is to provide policy guidance for eligibility staff when addressing requests for coverage when the individual attests to being a non-citizen and provides supporting documentation.").

134.    MPI estimates that there are 7,000 unlawfully present aliens in the State of Louisiana who are married to U.S. citizens[29] and who would, therefore, be eligible for the PIP Program.

135.    Louisiana spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Louisiana to include paroled and illegal aliens in those programs and requires Louisiana to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

136.    The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Louisiana increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

137.    Louisiana has approximately 70,000 illegal aliens living in the State, and they cost its taxpayers more than $362.2 million a year.[30]

138.    Louisiana spends more than $10,000 per student on public schooling.[31] Additional aliens enrolled in public schools increase Louisiana's education expenditures. *See Plyler*, 457 U.S. at 223–30.

139.    Defendant DHS has previously recognized that Louisiana "is directly and concretely affected by changes to DHS rules and policies that have the effect of easing, relaxing, or limiting immigration enforcement. Such changes can negatively impact [Louisiana's] law enforcement needs and budgets, as well as its other important health, safety, and pecuniary interests of the State of Louisiana." Mem. of Understanding Between DHS & La. Dept. of Justice at 1–2. DHS has also recognized that "rules, policies, procedures, and decisions that could result in significant increases to the number of people residing in a community" will "result in direct and

---

[29] *Profile of the Unauthorized Population: Louisiana*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/S8FU-9FYP.
[30] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.
[31] Melanie Hanson, *U.S. Pub. Educ. Spending Statistics*, EDUC. DATA INITIATIVE (Jun. 15, 2022), https://perma.cc/Q85E-SM86,

concrete injuries to [Louisiana], including increasing the rate of crime, consumption of public benefits and services, strain upon the healthcare system, and harm to the environment, as well as increased economic competition with the State of Louisiana's current residents for, among other things, employment, housing, goods and services." *Id*. at 3.

### J. Missouri

140.    Missouri will also be irreparably harmed by the PIP Program.

141.    MPI estimates that there are 9,000 unlawfully present aliens in the State of Missouri who are married to U.S. citizens[32] and who would, therefore, be eligible for the PIP Program.

142.    Missouri spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Missouri to include paroled and illegal aliens in those programs and requires Missouri to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

143.    The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Missouri increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

144.    Missouri has approximately 50,000 illegal aliens living in the State, and they cost its taxpayers more than $273.4 million a year.[33]

145.    Recent studies have established that significant numbers of illegal aliens who enter the United States end up residing in Missouri. *See Texas v. Biden*, 554 F. Supp. 3d 818, 838 (N.D. Tex. 2021), *aff'd*, 20 F.4th 928 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022).

---

[32] *Profile of the Unauthorized Population: Missouri*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/PY8M-AB88.
[33] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

146.     Missouri is also a destination State and hub for human-trafficking crimes within the United States, due to its situation at the confluence of several major interstate highways. *See Texas*, 554 F. Supp. 3d at 839 ("Missouri is … a destination and transit State for human trafficking of migrants from Central America who have crossed the border illegally."). Illegal aliens are disproportionately the victims of these crimes. Some illegal aliens also commit crimes. Human-trafficking and other crimes committed by or against illegal aliens inflict irreparable costs on Missouri, both in law-enforcement costs and in providing resources for victims. *See id.* (finding that "[h]uman trafficking" arising from and involving increases in unlawful immigration "causes fiscal harm to … Missouri").

147.     Additionally, Missouri is suffering a "fentanyl crisis" that is "worsening."[34] "St. Louis ranks among the deadliest cities in the country for overdose deaths among African Americans, and … the Black community seems caught between organized crime's fentanyl push and ineffective efforts to stop it."[35] Drug smugglers unlawfully entering the United States through the southern border are critical suppliers for distributors of any land other illegal substances in Missouri and elsewhere in the United States.[36] In addition to devastating the lives and health of Missouri's citizens, drug-related and other crimes committed by or against illegal aliens impose major healthcare and law-enforcement costs on the State. An increased influx of illegal aliens will exacerbate these problems. *See Texas*, 554 F.Supp.3d at 839 (finding that 204,000"[s]ome aliens who… are being released or paroled into the United States… will commit crimes in…Missouri").

148.     An increased influx of illegal aliens will also affect Missouri's labor market and reduce job opportunities for U.S. citizens and aliens lawfully present in Missouri, as illegal aliens frequently compete for jobs at lower wages than workers who are lawfully present. Missouri has a

---

[34] Alex Smith, *Missouri's Fentanyl Crisis is Worsening, But Patients Can't Get Treatment for Substance Abuse*, ST. LOUIS PUBLIC RADIO (Apr. 5, 2022), https://perma.cc/6SLU-WKCN.
[35] *Id.*
[36] *See* Anna Giaritelli, *Is America's Immigration Crisis Causing the Fentanyl Epidemic?*, WASHINGTON EXAMINER, (July 13,2022), https://perma.cc/VJM5-TFAX.

large agricultural sector. Illegal aliens unlawfully present in Missouri distort Missouri's labor market and inflict irreparable injury on both the State and its citizens.

**K. North Dakota**

149.    North Dakota will also be irreparably harmed by the PIP Program.

150.    There are unlawfully present aliens in the State of North Dakota who are married to U.S. citizens and who would, therefore, be eligible for the PIP Program.

151.    North Dakota spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires North Dakota to include paroled and illegal aliens in those programs and requires North Dakota to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

152.    The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in North Dakota increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

153.    North Dakota has approximately 5,000 illegal aliens living in the State, and they cost its taxpayers more than $27.3 million a year.[37]

**L. Ohio**

154.    Ohio will also be irreparably harmed by the PIP Program.

155.    MPI estimates that there are 14,000 unlawfully present aliens in the State of Ohio who are married to U.S. citizens[38] and who would, therefore, be eligible for the PIP Program.

156.    Ohio spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education

---

[37] *Unauthorized Immigrant Population Profiles*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://tinyurl.com/2mas2vnf; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

[38] *Profile of the Unauthorized Population: Ohio*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/BK9F-38LN.

services and emergency healthcare, as well as many other social services. Federal law requires Ohio to include paroled and illegal aliens in those programs and requires Ohio to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

157.    The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Ohio increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

158.    Ohio has approximately 89,000 illegal aliens living in the State, and they cost its taxpayers more than $485.8 million a year.[39]

**M. South Carolina**

159.    South Carolina will also be irreparably harmed by the PIP Program.

160.    MPI estimates that there are 9,000 unlawfully present aliens in the State of South Carolina who are married to U.S. citizens[40] and who would, therefore, be eligible for the PIP Program.

161.    South Carolina spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires South Carolina to include paroled and illegal aliens in those programs and requires South Carolina to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

162.    The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in South Carolina increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

---

[39] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.
[40] *Profile of the Unauthorized Population: South Carolina*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/KN5N-LKC5.

163.     South Carolina has approximately 88,000 illegal aliens living in the State, and they cost its taxpayers more than $471.3 million a year.[41]

**N. South Dakota**

164.     South Dakota will also be irreparably harmed by the PIP Program.

165.     There are unlawfully present aliens in the State of South Dakota who are married to U.S. citizens and who would, therefore, be eligible for the PIP Program.

166.     South Dakota spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires South Dakota to include paroled and illegal aliens in those programs and requires South Dakota to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

167.     The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in South Dakota increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

168.     South Dakota has approximately 7,000 illegal aliens living in the State, and they cost its taxpayers more than $27.6 million a year.[42]

**O. Tennessee**

169.     Tennessee will also be irreparably harmed by the PIP Program.

170.     MPI estimates that there are 12,000 unlawfully present aliens in the State of Tennessee who are married to U.S. citizens[43] and who would, therefore, be eligible for the PIP Program.

---

[41] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

[42] *Unauthorized Immigrant Population Profiles*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://tinyurl.com/2mas2vnf; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

[43] *Profile of the Unauthorized Population: Tennessee*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://perma.cc/2NGW-H25F.

171.     Tennessee spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Tennessee to include paroled and illegal aliens in those programs and requires Tennessee to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

172.     The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Tennessee increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

173.     Tennessee has approximately 128,000 illegal aliens living in the State, and they cost its taxpayers more than $593.8 million a year.[44]

174.     Tennessee spends thousands of dollars per student each year on public school education, which the State provides to students regardless of their immigration status. Tennessee spends approximately $5.5 billion of state funds on K–12 education, a portion of which is already spent on students regardless of immigration status, and additional funding will be required due to the PIP Program.

175.     Tennessee spends thousands of dollars per student each year on public school education, which the State provides to students regardless of their immigration status. Tennessee spends approximately $5.5 billion of state funds on K–12 education, a portion of which is already spent on students regardless of immigration status, and additional funding will be required due to the PIP Program.

**P. Wyoming**

176.     Wyoming will also be irreparably harmed by the PIP Program.

177.     There are unlawfully present aliens in the State of Wyoming who are married to U.S. citizens and who would, therefore, be eligible for the PIP Program.

---

[44] *Id.*; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

178.     Wyoming spends substantial sums of money providing services to paroled and illegal aliens due to the federal government's abuses of federal law. Those services include education services and emergency healthcare, as well as many other social services. Federal law requires Wyoming to include paroled and illegal aliens in those programs and requires Wyoming to include paroled aliens in programs such as S-CHIP, Medicaid, and SNAP.

179.     The PIP Program will incentivize increased illegal immigration into the State. As the number of paroled and illegal aliens in Wyoming increases, the number of aliens receiving such services likewise increases, and so too the burden on the public increases.

180.     Wyoming has approximately 7,000 illegal aliens living in the State, and they cost its taxpayers more than $26.1 million a year.[45]

**V. Plaintiffs Have Standing to Challenge the PIP Program**

181.     The States suffer substantial harm—both to their sovereignty[46] and public fiscs—when the federal government paroles aliens under the PIP Program.

**A.  Plaintiffs stand to suffer a direct injury caused by the PIP Program.**

182.     "For standing purposes, even 'a dollar or two' of injury suffices." *Texas v. Biden*, 694 F. Supp. 3d 851, 859 (S.D. Tex. 2023) (Tipton, J.) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008)); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

---

[45] *Unauthorized Immigrant Population Profiles*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 22, 2024), https://tinyurl.com/2mas2vnf; *The Fiscal Burden of Illegal Immigration*, FEDERATION FOR AMERICAN IMMIGRATION REFORM, (2017), https://perma.cc/2CP9-LA5P.

[46] Controlling immigration "is an inherent attribute of sovereignty" and it is questionable whether the States would have ratified the Constitution if it had stated that limits on immigration "will be enforced only to the extent the President deems appropriate" because the States "jealously guarded" their sovereignty during the Constitutional Convention. *Arizona*, 567 U.S. 422, 436 (Scalia, J., concurring in part and dissenting in part).

183.     Plaintiffs are suffering concrete and particularized injuries attributable to the Defendants' actions. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000).

184.     Plaintiffs have incurred and will incur considerable financial injuries on education, healthcare, and law-enforcement costs that they would not otherwise incur but for the PIP Program *See Texas,* 3d at 628–30. These costs arise because the PIP Program incentivizes aliens—who would otherwise be unlawfully present and unauthorized to work—to remain in the country, thereby causing Plaintiffs to incur those additional financial costs. *Id.* at 634–35.

185.     "Federal law affirmatively requires the States to make some of these expenditures" on aliens present in the State. *Texas v. Biden* (*MPP*), 20 F.4th 928, 969 (5th Cir. 2021) (citing 42 C.F.R. § 440.255(c) (Emergency Medicaid).

186.     The financial injury to the states that they must spend money on government programs and services for paroled aliens whom they otherwise would not, due to the Defendants' unlawful PIP Program, is an injury to a legally protected interest. *DAPA*, 809 F.3d at 152–54.

187.     Even if certain financial injuries may increase at the termination of the Final Rule or be "offset" at its continuation, courts do not examine such information in an Article III standing analysis because courts do not engage in such "accounting exercise[s]." *DACA*, 50 F.4th at 518. Rather, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Id.* (quoting *DAPA*, 809 F.3d at 155–56).

188.     Thus, any hypothetical financial gains to Plaintiffs caused by the PIP Program are irrelevant for determining whether they have standing. Accordingly, these injuries and costs show that Plaintiffs have also established injury they suffer from the Final Rule. *See DACA*, 50 F.4th at 517–20.

189.     Vacatur of the PIP Program would "cause some recipients to leave, thereby reducing the financial burdens on the State." *Id.* at 519.

190.   In other words, Vacatur of the PIP program will redress Plaintiffs' injury. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *DACA*, 50 F.4th at 519–20 (cleaned up). "With special solicitude, however, . . . [t]he standard is met if there is some possibility that the requested relief will reduce the harm." *Id*. at 520 (cleaned up).

191.   The aliens currently subject to the PIP Program would be removable if the PIP Program were vacated, "providing incentives for some if not many to leave the United States, including Texas. . . and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520. For example, the PIP Program allows aliens who are "*currently in removal proceedings*" to request PIP. 89 Fed. Reg. at 67,465 (emphasis added).

**B.  Plaintiffs are entitled to special solicitude because the PIP Program affects their quasi-sovereign interests in classifying aliens.**

192.   Because "States are not normal litigants for the purposes of invoking federal jurisdiction," they may be entitled to "special solicitude"—a doctrine that allows a State to establish standing "without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514 (*citing Massachusetts v. E.P.A.*, 549 U.S. 497, 517–18, 520 (2007)). Under this special solicitude standard, a State will establish standing "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *DACA*, 50 F. 4th at 514 (quoting *Massachusetts*, 549 U.S. at 518).

193.   Plaintiffs have satisfied the special solicitude standing because they have shown (1) that there is "a procedural right to challenge the action in question" and (2) that the challenged action "affect[ed] on of the State's quasi-sovereign interests." *DACA*, 50 F.4th at 520 (citing *Texas v. United States* ("*DAPA*"), 809 F.3d 134, 151–52 (5th Cir. 2015)).

194.   Plaintiffs in this case established a procedural right to challenge the Final Rule under the APA because they have suffered a legal wrong and been adversely affected or aggrieved by the promulgation of the Final Rule. *See* 5 U.S.C. § 702.

195.    As in *DACA*, Plaintiffs here use their procedural right to "challenge[] DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *See DACA*, 50 F.4th at 514. Further like *DACA*, Plaintiffs' procedural right under the APA in this case does not evaporate because of their status as States; instead, "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the states fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). Plaintiffs thus satisfy the first element of special solicitude.

196.    Plaintiffs also satisfy the second element of special solicitude because the Final Rule affects the quasi-sovereign interests of Plaintiffs.

197.    The Supreme Court and the Fifth Circuit have defined a "quasi-sovereign interest" as "a judicial construct that does not lend itself to a simple or exact definition." *DACA*, 50 F.4th at 514 (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982)). While "sovereign interests, proprietary interests, or private interests pursued by the State as a nominal party" are not considered quasi-sovereign interests, there are several interests that do satisfy that definition, including the "set of interests that the State has in the well-being of its populace"; the State's interest in "the health and well-being—both physical and economic—of its residents"; and the State's interest in "not being discriminatorily denied its rightful status in the federal system." *DACA* at 514 (quoting *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 602, 607).

198.    "'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quoting *Massachusetts*, 549 U.S. at 519). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain "sovereign prerogatives [that] are now lodged in the Federal Government." *Id.* (quoting *Massachusetts*, 549 U.S. at 519).

199.    For example, in *DACA*, the Fifth Circuit concluded that the State's interest in classifying aliens was a quasi-sovereign interest. *Id.* Specifically, the Fifth Circuit reasoned that the State's "interest in classifying aliens was analogous to the interest in regulating emissions that the

Supreme Court deemed a quasi-sovereign interest in *Massachusetts v. EPA*." *Id.* And because the States "surrendered some of their sovereign prerogatives over immigration" upon entering the union, including their power to "establish their own classifications of aliens," they relied on the federal government to protect their interests and were analogous to the plaintiffs in *Massachusetts*. *Id.*

200.    Thus, the Fifth Circuit determined that "DACA implicate[d] Texas's quasi-sovereign interest in classifying aliens." *Id.* The Fifth Circuit also recognized that "a State's inability to legislate around DACA can create a quasi-sovereign interest," meaning that "a quasi-sovereign interest could arise based on 'federal preemption of state law.'" *Id.*

201.    Indeed, the Fifth Circuit acknowledged these federal preemption concerns in *DACA*. The Fifth Circuit concluded that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *See DACA*, 50 F.4th at 516; *see also Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 536 (5th Cir. 2013) (en banc); *Galvan v. Press*, 347 U.S. 522, 531 (1954). The Fifth Circuit reasoned that "[a]n attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *DACA*, 50 F.4th at 516 (citing *Arizona v. United States*, 567 U.S. 387, 409 (2012)).

202.    The PIP Program implicates these same quasi-sovereign interests. If Plaintiffs sought to change the classifications of parole recipients to alleviate their injuries, they would be threatened with federal preemption.

203.    In the same way, Plaintiffs seek to protect their citizens' "economic and commercial interests" from labor-market distortion caused by its inability to classify aliens under the PIP Program. *Alfred L. Snapp & Son, Inc.*, 458 U.S. at 609. Plaintiffs seek such protection because, if the PIP Program were to stay in effect, it would create a distorted labor market and thereby injure the economic well-being of Plaintiffs' lawful workers by making it harder for them to obtain jobs.

204.   For instance, the PIP Program would enable eligible aliens to compete with lawful workers for jobs in Texas by granting lawful presence status and requiring that USCIS accept applications for work authorizations. *See Texas v. United States*, 549 F. Supp. 3d 572, 592 (S.D. Tex. 2021), *aff'd in part, vacated in part, remanded,* 50 F.4th 498 (5th Cir. 2022), *Texas v. United States,* 691 F. Supp. 3d 763 (S.D. Tex. 2023). But if this Court vacates the PIP Program, then legal residents of Texas would not have to compete with as many eligible workers.

205.   Plaintiffs' special solicitude is doubly relaxed here since Plaintiffs suffer a separate procedural injury from being deprived of the notice and comment process.

206.   Here, Plaintiffs are asserting "procedural right[s] to protect [their] concrete interests." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 572 n.7 (1992). The States can thus assert their procedural rights under the APA "'without meeting all the normal standards for redressability and immediacy.'" *Massachusetts*, 549 U.S. at 498 (quoting *Lujan*, 504 U.S. at 572 n.7).

207.   Plaintiffs suffer procedural injuries from the Notice because it did not undergo notice-and-comment rulemaking. "A violation of the APA's notice-and-comment requirements is one example of a deprivation of a procedural right." *Texas v. Equal Empl. Opportunity Comm'n*, 933 F.3d 433, 447 (5th Cir. 2019) (citing *Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012)).

**C. Plaintiffs have standing because the PIP Program represents an abdication of Defendants' statutory responsibilities.**

208.   The PIP Program represents a total disregard of Congress's limits on the parole authority and thus constitutes an abdication of Defendants' statutory responsibilities.

209.   "[A] plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *United States v. Texas*, 599 U.S. 670, 682 (2023) (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)); *see also Texas v. United States*, 691 F. Supp. 3d 763, 780 (S.D. Tex. 2023) (finding DHS's "abdicat[ion] or abandon[ment] of its "enforcement duties" as "another reason that the . . . States have standing. . .").

34

210.    The PIP Program is just such an extreme example that constitutes abdication of the Defendants' statutory responsibilities to grant parole only on a case-by-case basis for significant public benefit or urgent humanitarian reasons. "Deciding to parole aliens *en masse* is the opposite of . . . case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse.*" *Id.* at 997. Yet the Program relies on precisely the type of programmatic parole that the INA expressly prohibits.

## VI. Plaintiffs Have a Cause of Action Since Plaintiffs' Interests are Within the Zone of Interests Protected by Immigration Statutes and the APA.

211.    Plaintiffs have a cause of action under the APA because their interests are at least arguably within the zone of interests protected by immigration statutes and the APA. *See Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 (2012) (explaining that the inquiry is "not especially demanding").

212.    "The [zone of interests] test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n,* 479 U.S. 388, 399 (1987)). Here, the interests or purposes of the INA and the immigration statutes are to provide "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F. 4th at 521 (internal quotations omitted) (quoting *Chamber of Com. v. Whiting*, 563 U.S. 582, 587 (2011)).

213.    But the PIP Program violates this intricate statutory scheme set up by Congress. Thus, Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *DACA*, 50 F. 4th at 521 (citing first *Arizona*, 567 U.S. at 397, then *DAPA*, 809 F.3d at 163). Indeed, this entire lawsuit is about the rule of law. Plaintiffs also have an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate their standing. And in

line with the rule of law, this lawsuit seeks to have the Executive Branch fulfill its duty to take care that the law is faithfully executed—substantive immigration law and procedural administrative law alike.

214.     Accordingly, Plaintiffs satisfy the lenient zone-of-interests test by showing that their interests in upholding immigration statutes and the APA are arguably within the zone of interests protected by those statutes. *See DACA*, 50 F.4th at 520–21.

## VII. The Court Should Vacate the PIP Program, Declare it Unlawful, and Enjoin the Defendants Nationwide.

215.     For the reasons explained above, the Court should set aside the PIP Program and enter a declaratory judgment that it is unlawful. This Court should also enjoin Defendants from accepting or adjudicating application to the PIP Program and from adjusting the status of unlawfully present aliens pursuant to the PIP Program.

216.     The injunction should be nationwide.

217.     Both the Constitution and Congress have directed that the country needs a uniform, nationwide immigration policy. *See DAPA*, 809 F.3d at 187–88. Specifically, "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *DACA*, 50 F.4th at 531 (quoting *Texas v. United States*, 40 F.4th 205, 229 n.18 (5th Cir. 2022)). In contrast, a more limited remedy would "detract[] from the integrated scheme of regulation created by Congress." *Id.* (cleaned up).

218.     Further, "[t]here is a substantial likelihood that a geographically-limited [remedy] would be ineffective," as aliens who had their status changed on account of the PIP Program would be free to move among the States. *Texas. v. United States*, 40 F.4th at 229 n.18 (citing *DAPA*, 809 F.3d at 188); *see also Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (nationwide injunction appropriate in part "because of the constitutional command for 'uniform' immigration laws").

219.     Finally, the same scope of relief is independently justified on the basis that the "default rule [in the Fifth Circuit] is that vacatur is the appropriate remedy." *Data Mktg. Partnership, LP v. U.S. Dept. of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022).

220.    The APA allows a reviewing court to "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). "'When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'" *Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n. 21 (D.C. Cir. 1989)).

221.    After "a provision is declared invalid, it "cannot be lawfully enforced against others." *Barr v. Am. Ass'n of Pol.* Consultants*, Inc.*, 591 U.S. 610, 627 n.8.

## CLAIMS FOR RELIEF

### Count I
### Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)
### Rule in Excess of Defendants' Statutory Authority
### (PIP Program – Urgent Humanitarian Reasons / Significant Public Benefit, 8 U.S.C. § 1182(d)(5).)

222.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

223.    The PIP Program is final agency action reviewable under the APA. *See* 5 U.S.C. § 701(a).

224.    Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory . . . authority[] or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

225.    The PIP Program is not in accordance with law and exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5).

226.    Specifically, the Notice's claim that it satisfies the "urgent humanitarian reasons or significant public benefit" requirement violates 8 U.S.C. § 1182(d)(5)(A) or, alternatively, is an unreasonable construction of it. Implementation of Keeping Families Together, 89 Fed. Reg. at 67461.

37

227.    The Defendants, therefore, have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018) (quoting *NLRB v. Local 32B-32J Sev. Emps. Int'l Union*, 353 F.3d 197, 202 (2d Cir. 2003)). And they are especially powerless to disregard express statutory commands. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016).

**Count II**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Rule in Excess of Defendants' Statutory Authority**
**(PIP Program – Case-by-Case Determinations, 8 U.S.C. § 1182(d)(5).)**

228.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

229.    Even if the government's understanding of "urgent humanitarian reasons" or "significant public benefit" were accurate (it is not), the PIP Program is also not in accordance with law and exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5) because it fails to satisfy the "case-by-case" requirement.

230.    The government cannot parole aliens *en masse*, and none of its rationales for the PIP Program satisfy the exceedingly high standards in 8 U.S.C. § 1182.

231.     A program that, with the stroke of a pen, makes more than a million aliens eligible for parole is not what Congress had in mind when it amended that provision to add the case-by-case requirement. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 199 n.15 (2d Cir. 2011) (explaining that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy").

**Count III**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Rule in Excess of Defendants' Statutory Authority**
**(PIP Program – Parole Into the United States, 8 U.S.C. §§ 1182(d)(5) and 1255.)**

232.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

233.    The PIP Program is also not in accordance with law and exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5) because the government cannot confer parole status on aliens already present in the United States.

234.    Section 1182(d)(5)(A) only allows for an alien to be "parole[d] *into* the United States." (emphasis added).

235.    An alien who is already physically present in the United States cannot be paroled "into" the country.

236.    Similarly, 8 U.S.C. § 1255 only allows an alien to adjust to LPR status without leaving the United States if the alien "was inspected and admitted or paroled into the United States."

237.    Even if the Defendants could lawfully confer parole status on aliens already present in the United States, those aliens could not lawfully adjust status to that of LPR without leaving the United States since they would not have been paroled "into" the United States, as required by 8 U.S.C. § 1255.

**Count IV**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Rule in Excess of Defendants' Statutory Authority**
**(PIP Program – Temporary Requirement - 8 U.S.C. § 1182(d)(5))**

238.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

239.    The PIP Program is also not in accordance with law and exceeds the Defendants' statutory parole authority under 8 U.S.C. § 1182(d)(5) because parole may only be used to allow aliens "temporarily" "into" the United States.

240.    Yet, even though parole status may only be granted to allow aliens into the United States temporarily, the PIP Program has as its explicitly stated intent allowing the program beneficiaries to remain permanently in the United States.

**Count V**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Rule in Excess of Defendants' Statutory Authority**
**(PIP Program – INA and 8 U.S.C. §§ 1182 and 1255)**

241.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

242.    The PIP Program is also not in accordance with law and exceeds the Defendants' statutory parole authority under the INA, 8 U.S.C. § 1101, *et seq.*, and 8 U.S.C. §§ 1182, 1255, because the PIP Program is designed to circumvent the immigration system established by Congress, including the statutory requirements for an alien to qualify for a waiver of inadmissibility or visa ineligibility and to circumvent the statutory requirements for adjustment of status.

243.    The PIP Program is designed to circumvent the statutory requirements that unlawfully present aliens may not adjust their status within the United States but must instead depart and apply for an immigrant visa at a U.S. embassy or consulate overseas.

244.    The PIP Program, therefore, is unlawful because it seeks to replace the immigration system established by Congress.

40

245.    Congress would not have created an avenue for the Executive to ignore established immigration channels by way of the parole power. Under the Major Questions Doctrine, an executive action is unlawful if it presents a question of "vast 'economic and political significance,'" where Congress has not expressly assigned to the Executive Branch the power to take that action. *See Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764 (2021) ("We expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance.") (cleaned up); *West Virginia v. EPA*, 597 U.S. 697, 721 (2022); *King v. Burwell*, 576 U.S. 473, 486 (2015); *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

246.    The PIP Program is part of the Biden-Harris Administration's ongoing efforts to facilitate and incentivize illegal immigration into the United States. Congress never authorized the PIP Program. It circumvents the detailed immigration scheme that Congress established.

**Count VI**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**
**Arbitrary and Capricious Agency Action**
**(PIP Program)**

247.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

248.    Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

249.    "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750–52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017).

250.    For starters, an agency cannot "entirely fail[ ] to consider an important aspect of the problem." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983);

*see also Am. Wild Horse*, 873 F.3d at 931 ("the Service's Finding of No Significant Impact not only failed to take a 'hard look' at the consequences of the boundary change, it averted its eyes altogether") (quoting *Sierra Club v. Van Antwerp*, 661 F.3d 1147, 1154 (D.C. Cir. 2011); *Gresham v. Azar*, 363 F. Supp. 3d 165, 177 (D.D.C. 2019) ("The bottom line: the Secretary did no more than acknowledge—in a conclusory manner, no less—that commenters forecast a loss in Medicaid coverage").

251.     Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered. . . is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (quoting *Getty v. Fed. Sav. & Loan Ins. Corp.,* 805 F.2d 1050, 1055 (D.C. Cir. 1986)). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

252.     The PIP Program is arbitrary and capricious for several independently sufficient reasons.

253.     *First*, the Defendants arbitrarily did not consider and account for the Plaintiff States' legally recognized reliance interests in the enforcement of federal immigration statutes.

254.      The government is obligated to "turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (quoting *St. Regis Paper Co. v. United States*, 368 U.S. 208, 229 (2020) (Black, J., dissenting). When an agency changes course, as the Defendants have done here, they must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 30 (quoting *Encino Motorcars,* 579 U.S. at 221–22 (2016). In fact, "[i]t would be arbitrary and capricious to ignore such matters." *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

255.     States have overwhelming reliance interests in federal enforcement of immigration law. Plaintiffs' budgets and resource allocations are determined in reliance on the Defendants' continued enforcement of immigration law. The Defendants did not consider whether the States relied on the continuation of the immigration system when the Plaintiff States determined how they would marshal and distribute their resources to deal with the number of aliens entering their

States and claiming benefits. The PIP Program is arbitrary and capricious because it utterly ignores these reliance interests. *See Regents of the Univ. of Cal.*, 591 U.S. at 29–32.

256.    The Defendants failed to consider Plaintiffs' reliance interests by creating a program that circumvents the statutorily required process for adjustment of status of unlawfully present aliens. The PIP Program ignores costs to the States, *Michigan v. EPA*, at 752–53, and fails to account for their reliance interests nor considers lesser alternatives, *Regents of the Univ. of California*, 591 U.S. at 30.

257.    The Notice claims that "DHS considered the potential impact of the proposed process on State budgets," however a few sentences later, it admits that DHS did no such thing. Implementation of Keeping Families Together, 89 Fed. Reg. at 67478 Specifically, the Notice claims that "[a] comprehensive quantified accounting of local and State fiscal impacts specifically due to this parole in place process is not possible. . . . DHS cannot predict with the available information the impact these noncitizens might have on State and local programs or the degree they will contribute to State and local budgets." *Id.*

258.    Agencies must actually analyze the relevant factors. "'Stating that a factor was considered. . . is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th at 556 (quoting *Getty*, 805 F.2d at 1055). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC,* 579 U.S. at 224. The Notice, therefore, does not evidence any consideration whatsoever of the States' legitimate reliance on the ongoing enforcement of our immigration laws, nor of the costs imposed by undermining that reliance.

259.    *Second*, the Defendants also did not seriously consider whether the PIP Program will create a perception among potential migrants that illegally entering the United States will result in eventual amnesty and, therefore, whether the policy is exacerbating the border crisis.

260.    Third, the Defendants also fail to provide any reasoned explanation for their policy change, a per se violation of administrative law's reason-giving requirements. *See New York*, 588 U.S. at 224 ("The reasoned explanation requirement . . . is meant to ensure that agencies offer

43

genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public."); *Encino Motorcars, LLC*, 579 U.S. at 221 ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

261.   The Defendants failed to justify their deviation from prior practice. The APA prohibits Defendants from "whistl[ing] past [this] factual graveyard" to "evade[]" their "established pattern of agency conduct and formalized positions." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 927; *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (quoting *Ramaprakesh v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) (APA requirements ensure that an agency's "prior policies and standards are being deliberately changed, not casually ignored"). Yet the Defendants fail to grapple with their prior actions and act as if their prior positions don't exist.

262.   *Fourth*, the Defendants ignored statutory factors, and relied upon factors Congress did not direct it to consider, by completely failing to address the immigration consequences of the PIP Program. IIRIRA was designed to reduce crossings. Yet, the Notice utterly ignores this aspect of the problem.

263.   *Fifth*, the PIP Program is arbitrary and capricious because its rationales are obviously pretextual. The PIP Program circumvents the nation's immigration laws and essentially grants immigration amnesty to more than one million unlawfully present aliens in violation of the clear requirements of the INA.

264.   *Sixth*, the PIP Program makes it significantly easier for unlawfully present aliens to get work authorization, and it fails to consider the effect that this change will have on illegal immigration rates, unemployment rates for citizens and authorized aliens, costs for unemployment benefits paid by the States, and the effect on wages.

265.   The Notice fails to recognize that Congress has enacted a "comprehensive framework for combating the employment of illegal aliens," *Arizona v. United States*, 567 U.S. 387, 404 (2012), and "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Hoffman Plastic Compounds v. N.L.R.B.*, 535 U.S. 137, 147 (quoting *INS v.*

44

*Nat'l Cent. for Immigrants' Rts.*, 502 U.S. 183, 194, n.8 (2002)) (cleaned up). And "as Congress [has] explained, '[a]liens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others.'" *Demore v. Kim*, 538 U.S. 510, 518 (2003) (quoting S.Rep. No. 104–249, at 7 (1996)). Indeed, "a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Nat'l. Ctr. for Immigrants' Rts.*, 502 U.S. 183, 194 (1991) quoting *Sure-Tan, Inc. V. NLRB*, 467 U.S. 883, 893 (1984)).

266.    The articulated reasons for the PIP Program fail to consider Congress's framework, "undermining Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country." *DAPA*, 809 F.3d at 181. "[B]ecause agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up). The rationale for agency action reflected in the Notice contradicts those purposes.

267.    An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *Motor Vehicle Mfrs. Ass'n. of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Congress did not intend Defendants to consider purported positive effects of what it has forbidden by statute—the employment of illegal aliens. Instead, Congress allowed employment authorization for certain categories of illegal aliens while they were not removable, not to encourage the continued (or increased) presence of removable illegal aliens.

268.    Courts must also "set aside any action premised on reasoning that fails to account for relevant factors or evinces a clear error of judgment." *MPP*, 20 F.4th at 989 (quoting *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475 (5th Cir. 2021)). Failing to consider the effects on American workers of employment authorization of PIP Program recipients is arbitrary and capricious. And failing to consider the legality of such employment authorization in light of the limited nature of Congress's provisions for such authorizations for different categories of aliens suffers from the same flaw.

**Count** VII
**Administrative Procedure Act, 5 U.S.C. § 706(2)(D)**
**Lack of Notice and Comment**
**(PIP Program)**

269.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

270.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

271.    The APA requires agencies to publish notice of all "proposed rule making" in the Federal Register, 5 U.S.C § 553(b), and to "give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments," 5 U.S.C. § 553(c). Thus, the Notice can be issued, if at all, only via notice-and-comment rulemaking under the APA. 5 U.S.C. § 553.

272.    Such requirements "are not mere formalities" but rather "are basic to our system of administrative law." *Nat'l Highway Traffic Safety Admin.*, 894 F.3d at 115. "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quoting *Batterton v. Marshall*, 648 F.2d 694, 705 (D.C. Cir. 1980)); *see also NRDC*, 894 F.3d at 115 (notice and comment serves "the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking"); *Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment "ensures fairness to affected parties[] and provides a well-developed record that enhances the quality of judicial review") (cleaned up).

273.    The PIP Program is not an interpretive rule, general statement of policy, or a rule of agency organization, procedure, or practice otherwise exempt from notice-and-comment

rulemaking. The PIP Program significantly affected rights and obligations and, at a minimum, required notice and comment. *See Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 172–73 (2007); *Chrysler Corp. v. Brown*, 441 U.S. 281, 302–03 (1979). Nevertheless, the Notice was issued and became effective without notice and comment in violation of the APA.

274.    The Secretary of Homeland Security has not articulated sufficient reasons why the foreign affairs exception is applicable to the PIP Program. Nor does the foreign affairs exception to the APA's notice-and-comment requirement apply. "[T]he foreign affairs exception requires the Government to do more than merely recite that the Rule 'implicates' foreign affairs." *East Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775 (9th Cir. 2018). A mere "reference in [a] Rule . . . to our 'southern border with Mexico' is not sufficient." *Id.* Thus, "the foreign affairs exception applies in the immigration context only when ordinary application of the public rulemaking provisions will provoke definitely undesirable international consequences…. [I]t would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." *Id.* at 775–76 (cleaned up) (citations and quotation marks omitted).

275.    In the immigration context, the foreign affairs exception only applies if "the public rulemaking provisions [w]ould provoke definitely undesirable international consequences"; otherwise, "the foreign affairs exception would become distended." *Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) (citation omitted), *superseded by statute on other grounds, by* 8 U.S.C. § 1101(a)(42).

276.    In the Notice, the Defendants attempt to invoke the foreign affairs exception merely by making the obvious and unexceptional disclosure that the PIP Program involves "ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration." Implementation of Keeping Families Together, 89 Fed. Reg. at 67,489. This weak attempt to invoke the foreign affairs exception is insufficient. That the United States is engaged in "ongoing conversations with key foreign partners about migration management," *id*, does not

entitle the Defendants to except the Notice from the APA's procedures. There is no evidence that complying with the APA's rulemaking procedures would cause a diplomatic incident.

277.     Under these circumstances, Defendants' failure to comply with the APA's notice and comment provisions is fatal to the Rule. *United States v. Johnson*, 632 F.3d 912, 928–29 (5th Cir. 2011) ("Without good cause, we must enforce Congress's choice in favor of the traditional, deliberative rulemaking process.").

**Count VIII**
**Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C)**
**Agency Action that is Arbitrary and Capricious and**
**in Excess of Defendants' Statutory Authority**
**(PIP Program – Form I-131F / Paperwork Reduction Act,**
**44 U.S.C. §§ 3506, 3507, 5 C.F.R. § 1320.13)**

278.     Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

279.     Under the APA, a court must "hold unlawful and set aside agency action" that is arbitrary or capricious or otherwise not in accordance with law or contrary to the Constitution. 5 U.S.C. § 706(2)(A).

280.     Under the Paperwork Reduction Act ("PRA"), "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information" the agency complies with a number of requirements, including a review of the information to be collected, publication in the Federal Register of the intent to collect information, a 60-day notice-and-comment period, approval by OMB, and then publication in the Federal Register by OMB with an additional 30-day notice-and-comment period.  44 U.S.C. §§ 3506, 3507.

281.     The Defendants have failed to follow any of these PRA-required procedures.

282.     The PRA and OMB's implementing regulations allow "OMB to authorize emergency processing of submissions of collections of information." 5 C.F.R. § 1320.13; 44 U.S.C. § 3507(j).

283.    However, emergency processing is only permitted in narrow circumstances: when the information "is needed prior to the expiration of time periods established under" the PRA; the information "is essential to the mission of the agency"; and "the agency cannot reasonably comply with the provisions of this subchapter because" "public harm" will result, "an unanticipated event has occurred," or the information collection is needed sooner to comply with statutory or court deadlines. 44 U.S.C. § 3507(j)(1); *see also* 5 C.F.R. § 1320.13(a).

284.    "The power to utilize [the emergency processing] authority under these provisions is not unlimited. Such emergency requests are only appropriate upon an agency head's determination that public harm is reasonably likely to result if normal clearance procedures are followed." *Texas Blockchain Council v. Dep't of Energy*, No. W-24-CV-00099-ADA, 2024 WL 990067, at *2 (W.D. Tex. Feb. 23, 2024).

285.    When "the facts alleged by Defendants to support an emergency request fall far short of justifying such an action," the emergency processing "determination likely violates the APA as 'arbitrary, capricious, [or] an abuse of discretion.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

286.    The Notice fails to allege any of the circumstances required for emergency processing of Form I-131F.

287.    None of the circumstances required for emergency processing are present here.

288.    Because the Defendants do not qualify for emergency processing under the PRA, they have violated the Act, and their approval and use of Form I-131F is unlawful and arbitrary and capricious under the APA.

**Count IX**
**Violation of the Take Care Clause of Art. II, Sec. 3**
**of the U.S. Constitution**

289.    Article II, Section 3 of the Constitution provides that "[t]he President has a constitutional duty to "take care that the laws be faithfully executed." U.S. CONST. art. II, § 3.

290.     The PIP Program dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful, thereby violating the Take Care Clause.

291.     Beyond that, the PIP Program violates the Take Care Clause because it dispenses with certain immigration statutes by granting U.S. citizenship or a pathway to citizenship to aliens who would otherwise be unlawfully present but for the PIP Program.

292.     The Take Care Clause has its roots in the dispute between Parliament and King James II, who was overthrown in the Glorious Revolution of 1688. Parliament was infuriated at King James's use of his purported power to suspend or dispense with Parliament's laws. Zachary Price, *Enforcement Discretion and Executive Duty*, 67 VAND. L. REV. 671, 676, 690–91 (2014). As a result, the subsequent monarchs, William and Mary, agreed to the English Bill of Rights, which stripped the monarchy of all suspending and dispensing authority. *See* Bill of Rights 1688, 1 W. & M. Sess. 2 c. 2 (Eng.).

293.     Considering this historical background, the Framers of the U.S. Constitution unanimously rejected a proposal to grant dispensing powers to the President.

294.     Indeed, the Fifth Circuit recently had occasion to examine the Executive's inability to dispense with the laws. *MPP*, 20 F.4th at 978–82. In short, "[t]he Framers agreed that the executive should have neither suspending nor dispensing powers." *Id.* at 980.

295.     The Supreme Court has held likewise. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Id.* at 613. Any other conclusion would "vest[] in the President a dispensing power." *Id.*

296.     In this case, the PIP Program dispenses with certain immigration statutes. Just as King James attempted to make unlawful office-holding lawful, Price, *supra*, at 691, the Executive sought to make unlawful presence lawful through the promulgation and implementation of the PIP Program.

297.    Rewriting the laws to match the Executive's policy is precisely what the PIP Program does. The PIP Program contravenes the law and the Constitution.

298.    Thus, the PIP Program is a programmatic decision to confer benefits on hundreds of thousands of aliens.

299.    In other words, no matter how "unfettered" Defendants think their discretion is, 89 Fed. Reg. at 67,465, the PIP Program is plainly "incompatible with the express or implied will of Congress." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring).

300.    Thus, the PIP Program violates the Take Care Clause because it dispenses with certain immigration statutes.

**Count X**
**Non-Statutory Cause of Action**
***Ultra Vires***
**(PIP Program)**

301.    Plaintiffs incorporate by reference the preceding allegations as if fully set forth herein.

302.    A plaintiff may "institute a non-statutory review action" against an agency head "for allegedly exceeding his statutory authority." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1327 (D.C. Cir. 1996). Such non-statutory causes of action survive displacement by the APA. *Id.* at 1329 (citing *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 690–91 (1949)).

303.    The PIP Program exceeds the Defendants' statutory authorities under 8 U.S.C. §§ 1182 and 1255 and the INA.

**DEMAND FOR RELIEF**

For these reasons, the Plaintiff States ask that the Court:

a.   Temporarily restrain, preliminarily enjoin, or stay Defendants' implementation of the PIP Program and the approval of the Form I-131F;

b.   Following a trial on the merits, decree that the PIP Program, as well as the Notice, the Filing Guide, and the Form I-131F, were issued in violation of the APA and vacate them, set them aside, and permanently enjoin the Defendants from implementing it;

c.   Declare that the PIP Program, including the Notice, the Filing Guide, and the Form I-131F, exceeds the Defendants' statutory authority under 8 U.S.C. § 1182 and 8 U.S.C. § 1255;

d.   Award the Plaintiff States their attorneys' fees and costs of court; and

e.   Award the Plaintiff States all other relief to which they may be entitled.

Dated: August 23, 2024.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085
Ryan.Walters@oag.texas.gov

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415
Kathleen.Hunker@oag.texas.gov

**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**GENE P. HAMILTON**
Virginia Bar No. 80434

**JAMES ROGERS**
Arizona Bar no. 027287

**RYAN GIANNETTI**
DC Bar no. 1613384

America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org
James.Rogers@aflegal.org
Ryan.Giannetti@aflegal.org

**COUNSEL FOR PLAINTIFF**
**STATE OF TEXAS**

**RAUL R. LABRADOR**
Idaho Attorney General

*/s/ Alan Hurst*
Alan Hurst
Solicitor General
Michael A. Zarian
Deputy Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov
Michael.Zarian@ag.idaho.gov
Counsel for State of Idaho

**STEVE MARSHALL**
Attorney General of Alabama

*/s/ Robert M. Overing*
Robert M. Overing
Deputy Solicitor General
Robert.Overing@AlabamaAG.gov
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
Counsel for State of Alabama


**TIM GRIFFIN**
Attorney General of Arkansas

Nicholas J. Bronni
 Solicitor General
*/s/ Dylan L. Jacobs*
Dylan L. Jacobs*
 Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2007
Dylan.jacobs@arkansasag.gov
Counsel for State of Arkansas
*\*admission application forthcoming*

**ASHLEY MOODY**
Attorney General of Florida

*/s/ James Percival*
James H. Percival
Chief of Staff
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
James.percival@myfloridalegal.com
Counsel for State of Florida

**CHRISTOPHER M. CARR**
Attorney General of Georgia

*/s/Stephen J. Petrany*
Stephen J. Petrany
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
Counsel for State of Georgia
*\*PHV Application Forthcoming*


**BRENNA BIRD**
Attorney General of Iowa

*/s/ Eric H. Wessan*
Eric H. Wessan
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
Counsel for State of Iowa

**KRIS W. KOBACH**
Attorney General of Kansas

*/s/Abhishek S. Kambli*
Abhishek S. Kambli*
Deputy Attorney General – Special Litigation
& Constitutional Issues Division
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Phone: (785) 296-6109 | Fax: (785) 221-3938
abhishek.kambli@ag.ks.gov
Counsel for State of Kansas
*\*admission application forthcoming*

**ELIZABETH B. MURRILL** Attorney General of Louisiana

*/s/J. Benjamin Aguiñaga*
J. Benjamin Aguiñaga*
Solicitor General
Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov
Counsel for State of Louisiana
*admission application forthcoming*

**ANDREW BAILEY**
Attorney General of Missouri
/s/ Samuel C. Freedlund
_____

Samuel C. Freedlund,
 *Deputy Solicitor General*
Office of the Attorney General 815
Olive St., Suite 200
St. Louis, MO 63188
Phone: (314) 340-4869
Fax (573) 751-1774
Samuel.Freedlund@ago.mo.gov
Counsel for the State of Missouri

**DREW H. WRIGLEY**
Attorney General of North Dakota

*/s/ Philip Axt*
PHILIP AXT*
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
pjaxt@nd.gov
Counsel for State of North Dakota
*PHV application forthcoming*

**DAVE YOST**
Attorney General of Ohio

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER*
Ohio Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
614.466.5087 fax
thomas.gaiser@ohioago.gov
Counsel for State of Ohio
*PHV Forthcoming*

**MARTY JACKLEY**
Attorney General of South Dakota
*/s/ Clifton E. Katz*
CLIFTON E. KATZ
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-Mail: clifton.katz@state.sd.us
Counsel for State of South Dakota

**ALAN WILSON**
Attorney General of South Carolina

*s/ J. Emory Smith, Jr.*
JAMES EMORY SMITH, JR.
Deputy Solicitor General
Email:  esmith@scag.gov
Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3642
Fax: (803) 734-3677
Counsel for State of South Carolina
*Application for Admission Forthcoming*

**JONATHAN SKRMETTI**
Attorney General of Tennessee

*/s/Whitney D. Hermandorfer*
Whitney D. Hermandorfer
*Director of Strategic Litigation*
Tennessee Bar. No. 041054
Whitney.Hermandorfer@ag.tn.gov
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726
Counsel for State of Tennessee

**BRIDGET HILL**
Attorney General of Wyoming

*/s/Ryam Schelhaas*
Ryan Schelhaas*
Chief Deputy Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov
Counsel for State of Wyoming
**motion for pro hac vice admission forthcoming*