## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al. | | |
| *Plaintiffs,* | | |
| v. | | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY; ALEJANDRO MAYORKAS, in his official capacity as Secretary for DHS; UR JADDOU, in her official capacity as Director of USCIS; TROY MILLER, in his official capacity as the Acting Commissioner of CBP; PATRICK J. LECHLEITNER, in his official capacity as the Acting Director of ICE; the OFFICE OF MANAGEMENT AND BUDGET; SHALANDA YOUNG in her official capacity as the Director of the Office of Management and Budget, | | No. 6:24-cv-00306 |
| *Defendants.* | | |

---

## Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Stay of Agency Action

---

TABLE OF CONTENTS

**Page(s)**

Table of Contents .................................................................................................................. i

Table of Authorities ............................................................................................................. ii

Introduction ......................................................................................................................... 1

Background ........................................................................................................................... 3

    I.      Congress has granted the Executive a limited parole authority and has precluded certain categories of illegal aliens from adjusting their status. ............................... 3

    II.     The Administration rolls out the PIP Program. ......................................... 4

Standard of Review ............................................................................................................. 6

Argument .............................................................................................................................. 7

    I.      Plaintiffs are likely to succeed on the merits. ........................................... 7

        A.     The PIP Program is contrary to law because it violates the parole statute, the INA, and IIRIRA and contravenes the text and intent of existing immigration law. .................. 8

        B.     The PIP Program was promulgated without lawful authority. ............................... 19

        C.     The challenged regulations were promulgated without the requisite notice and opportunity to comment. ......................................... 24

        D.     The challenged regulation is arbitrary and capricious ............................. 30

        E.     The PIP Program violates the Take Care Clause. ...................................... 38

    II.     Plaintiffs are within the zone of interests and have a cause of action. ........................... 38

    III.    The PIP Program is reviewable. ................................................................. 39

        A.     The PIP Program is final agency action ................................................. 39

        B.     The PIP Program is reviewable under the APA. ....................................... 42

    IV.    Plaintiffs have standing and will suffer irreparable injury ............................. 44

    V.     The public interest and the balance of equities favor relief ......................... 49

    VI.    Relief should be universal and nationwide. ............................................. 49

Conclusion .......................................................................................................................... 50

Certificate of Conference ................................................................................................. 56

Certificate of Service ......................................................................................................... 56

TABLE OF AUTHORITIES

**CASES**                                                                                 **PAGE(S)**

*Affinity Healthcare Servs., Inc. v. Sebelius*,
  720 F. Supp. 2d 12 n.4 (D.D.C. 2010) ...................................................................... 8

*Ala. Ass'n of Realtors v. HHS*,
  594 U.S. 758 (2021) ................................................................................................ 21

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................................................ 25

*Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*,
  751 F.2d 1239 (Fed. Cir. 1985) .............................................................................. 29

*Am. Wild Horse Pres. Campaign v. Perdue*,
  873 F.3d 914 (D.C. Cir. 2017) ........................................................................ 31, 34

*Amador v. Meeker*,
  No. 8:11-CV-1977, 2011 WL 4502092 (M.D. Fla. Sept. 28, 2011) ......................... 13

*Arizona v. United States*,
  567 U.S. 387 (2012) ....................................................................................... passim

*Barrick Goldstrike Mines Inc. v. Browner*,
  215 F.3d 45 (D.C. Cir. 2000) .................................................................................. 41

*Batterton v. Marshall*,
  648 F.2d 698 (D.C. Cir. 1980) ............................................................................... 26

*Benisek v. Lamone*,
  585 U.S. 155 (2018) ................................................................................................ 46

*Bennett v. Spear*,
  520 U.S. 154 ........................................................................................................... 41

*Biden v. Texas*,
  597 U.S. 785 (2022) ....................................................................................... passim

*Block v. Cmty. Nutrition Inst.*,
  467 U.S. 340 (1984) ................................................................................................ 44

*Career Colleges & School of Texas v. United States Dep't of Education*,
  98 F.4th 220 (5th Cir. 2024) .................................................................................. 51

*Chamber of Commerce v. Whiting*,
  563 U.S. 582 (2011) ................................................................................................ 40

*City of Arlington, Tex. v. FCC*,
  569 U.S. 290 (2013) ............................................................................................ 9, 25

*City of N.Y. v. Permanent Mission of India to United Nations*,
  618 F.3d 172 (2d Cir. 2010) .............................................................................. 29, 30

*Clark v. Richard*,
  812 F.2d 991 (5th Cir. 1987) ................................................................................... 8

*Clarke v. Commodity Futures Trading Comm'n,*
  74 F.4th 627 (5th Cir. 2023)..................................................................28, 41, 42

*Cruz-Miguel v. Holder,*
  650 F.3d 189 & n.15 (2d Cir. 2011) ....................................................... 9, 14

*Ctr. for Auto Safety v. NHTSA,*
  452 F.3d 798 (D.C. Cir. 2006) ....................................................................43

*Cuomo v. U.S. Nuclear Regulatory Comm'n,*
  772 F.2d 972 (D.C. Cir. 1985) ..................................................................... 8

*Czyzewski v. Jevic Holding Corp.,*
  580 U.S. 451 (2017) ...................................................................................... 48

*Data Mktg. P'ship, LP v. United States Dep't of Lab.,*
  45 F.4th 846 (5th Cir. 2022) ...................................................... 28, 41, 42, 51

*Demore v. Kim,*
  538 U.S. 510 (2003) ......................................................................................36

*Dennis Melancon, Inc. v. City of New Orleans,*
  703 F.3d 262 (5th Cir. 2012) ...................................................................... 46

*Dep't of Com. v. New York,*
  588 U.S. 752 (2019) ......................................................................................35

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ....................................................................................32, 43

*Dillmon v. Nat'l Transp. Safety Bd.,*
  588 F.3d 1085 (D.C. Cir. 2009) ..................................................................34

*E. Bay Sanctuary Covenant v. Biden,*
  993 F.3d 640 (9th Cir. 2021)....................................................................... 49

*E. Bay Sanctuary Covenant v. Trump,*
  932 F.3d 742 ....................................................................................... 28, 30

*Encino Motorcars, LLC v. Navarro,*
  579 U.S. 211 (2016)....................................................................31, 32, 33, 34

*Enhanced Commc'ns of N. New England Inc. v. Pub. Utils. Comm'n,*
  2017 ME 178, 169 A.3d 408, 413 n.4 (Me. 2017)..................................... 11

*Est. of Cowart v. Nicklos Drilling Co.,*
  505 U.S. 469 (1992) ......................................................................................17

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ......................................................................................32

*FDA v. Brown & Williamson Tobacco Corp.,*
  529 U.S. 120 (2000) ..................................................................................... 22

*Fedn. of Americans for Consumer Choice, Inc. v. U.S. Dep't of Lab.,*
  2024 WL 3554879 (E.D. Tex. July 25, 2024) (Kernodle, J.) ....................51

*Florida v. Mayorkas,*
  672 F. Supp. 3d 1206 (N.D. Fla. 2023)......................................................16

*Florida. v. United States,*
  660 F. Supp. 3d 1239 ...................................................................................................16

*Garcia v. Peery,*
  No. CV 15-6273, 2016 WL 6304647 (C.D. Cal. Aug. 26, 2016) .................................13

*Getty v. Fed. Sav. & Loan Ins.,*
  805 F.2d 1050 (D.C. Cir. 1986) .................................................................................33

*GLO v. Biden,*
  71 F.4th 264 (5th Cir. 2023) ....................................................................................... 2

*Heckler v. Chaney,*
  470 U.S. 821 (1985) ............................................................................................43, 45

*Hornof v. United States,*
  No. 2:19-cv-198, 2023 WL 5627631 (D. Me. Aug. 31, 2023) ....................................12

*Humana, Inc. v. Jacobson,*
  804 F.2d 1390 (5th Cir. 1986) ...................................................................................45

*INS v. Nat'l Ctr. for Immigrants' Rights,*
  502 U.S. 183 (1991) ...................................................................................................36

*Interox Am. v. PPG Indus., Inc.,*
  736 F.2d 194 (5th Cir. 1984) ..................................................................................... 46

*Jean v. Nelson,*
  711 F.2d 1455 (11th Cir. 1983), *vacated and rev'd on other grounds,* 727 F.2d 957 (11th Cir. 1984)
  (en banc) ................................................................................................................... 29

*Jennings v. Rodriguez,*
  583 U.S. 281 (2018) (Breyer, J., dissenting) ........................................................12, 18

*Jimenez v. Quarterman,*
  555 U.S. 113 (2009) ...................................................................................................16

*Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts,*
  50 F.3d 1318 (5th Cir. 1995) .....................................................................................41

*Jonaitiene v. Holder,*
  660 F.3d 267 (7th Cir. 2011) .....................................................................................13

*Judulang v. Holder,*
  565 U.S. 42 (2011) .....................................................................................................37

*Kendall v. United States ex rel. Stokes,*
  37 U.S. 524 (1838) .....................................................................................................39

*King v. Burwell,*
  576 U.S. 473 (2015) ...............................................................................................21, 22

*La. Pub. Serv. Commn. v. FCC,*
  476 U.S. 355 (1986) ................................................................................................... 8

*League of Women Voters of the U.S. v. Newby,*
  838 F.3d 1 ..................................................................................................................25

*Lexon Ins. Co., Inc. v. Fed. Deposit Ins.*,
    7 F.4th 315 (5th Cir. 2021) ............................................................................17

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) ....................................................................... 50

*Louisiana v. CDC*,
    603 F. Supp. 3d 406 (W.D. La. 2022) ........................................................... 28

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ..................................................................................39, 40

*Michigan v. EPA*,
    576 U.S. 743 ...................................................................................................31

*Miss. Band of Choctaw Indians v. Holyfield*,
    490 U.S. 30 (1989) .....................................................................................11, 16

*Mock v. Garland*,
    75 F.4th 563 (5th Cir. 2023) ............................................................26, 27, 28

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.*,
    463 U.S. 29 (1983) .............................................................................31, 37, 45

*Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*,
    894 F.3d 95 (2d Cir. 2018) ..........................................................................25, 26

*Nat'l Council for Adoption v. Blinken*,
    4 F.4th 106 (D.C. Cir. 2021) ..........................................................................43

*Nat'l Fedn. of Indep. Bus. v. Dept. of Lab.*,
    595 U.S. 109 (2022) (per curiam) ................................................................... 8

*Nat'l Pork Producers Council v. EPA*,
    635 F.3d 738 (5th Cir. 2011) ...........................................................................41

*Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*,
    No. 3:23-CV-1471-L, 2024 WL 1349307 (N.D. Tex. Mar. 29, 2024) ...................... 48

*Nken v. Holder*,
    556 U.S. 418 (2009) ....................................................................................... 50

No. 3:16-MC-00099, 2016 WL 1305120 (D. Conn. Apr. 1, 2016), *aff'd sub nom. Giammarco v. Kerlikowske*, 665 F. App'x 24, 25 (2d Cir. 2016) ........................................................14

*opinion withdrawn on reh'g*,
    838 F.3d 511 (5th Cir. 2016) ..........................................................................43

*Ortega-Cervantes v. Gonzales*,
    501 F.3d 1111 (9th Cir. 2007) ..........................................................................18

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ......................................................................................... 26

*POET Biorefining, LLC v. EPA*,
    970 F.3d 392 (D.C. Cir. 2020) ........................................................................43

*Prof'ls & Patients for Customized Care v. Shalala*,
  56 F.3d 592 (5th Cir. 1995),
  *aff'd*, 579 U.S. 547 (2016)..................................................................25

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008)............................................................... 28

*Ram v. I.N.S.*,
  243 F.3d 510 n.3 (9th Cir. 2001) .........................................................10

*Ramprakesh v. FAA*,
  346 F.3d 1121 (D.C. Cir. 2003) ...........................................................34

*Regents of the Univ. of Cal. v. DHS*,
  140 S. Ct. 1891 (2020) .......................................................................33

*Rest. L. Ctr. v. U.S. Dep't of Lab.*,
  66 F.4th 593 (5th Cir. 2023) ....................................................... 46, 48

*Richards v. United States*,
  369 U.S. 1 (1962) .............................................................................. 11

*Roe v. Mayorkas*,
  No. 22-CV-10808-ADB, 2023 WL 3466327  (D. Mass. May 12, 2023)................................... 44

*Sackett v. EPA*,
  566 U.S. 120 (2012) ...........................................................................41

*Spring Corp. v. FCC*,
  315 F.3d 369 (D.C. Cir. 2003)............................................................ 26

*St. Regis Paper Co. V. United States*,
  368 U.S. 208 (1961) (Black, J., dissenting) .........................................32

*State of N.C. v. Hudson*,
  665 F. Supp. 428 (E.D.N.C. 1987)...................................................... 11

*State v. Biden*,
  10 F.4th 538 (5th Cir. 2021) ........................................................ 31, 33

*Succar v. Ashcroft*,
  394 F.3d 8 n.7 (1st Cir. 2005)...................................................... 12, 13

*Syncor Int'l Corp. v. Shalala*,
  127 F.3d 90 (D.C. Cir. 1997) ..............................................................41

*Texas v. Biden*
  20 F.4th 928 (5th Cir. 2021) ...................................................... passim

*Texas Blockchain Council v. Dep't of Energy*,
  No. W-24-cv-99, 2024 WL 990067 (W.D. Tex. Feb. 23, 2024) (Albright, J.) ...........................38

*Texas v. EEOC*,
  827 F.3d 372..................................................................................43

*Texas v. EEOC*,
  933 F.3d 433 (5th Cir. 2019) ...................................................40, 41, 43

*Texas v. EPA*,
  829 F.3d 405 (5th Cir. 2016) ......................................................................... 8, 46, 48

Texas v. U.S. Dep't of Homeland Sec.,
  No. 6:23-CV-0007, 2024 WL 1021068 (S.D. Tex. Mar. 8, 2024) ........................................ 15

*Texas v. United States (100-Day Pause)*,
  524 F. Supp. 3d 598 (S.D. Tex. 2021) ................................................................ passim

*Texas v. United States*,
  328 F. Supp. 3d 662 (S.D. Tex. 2018) ................................................................ 27, 36

*Texas v. United States*,
  40 F.4th 205 (5th Cir. 2022) (per curiam) ................................................................32

*Texas v. United States*,
  549 F. Supp. 3d 572 (S.D. Tex. 2021) ................................................................ passim

*Texas v. United States*,
  787 F.3d 733 (5th Cir. 2015) ...................................................................... 50

*Texas v. United States*,
  50 F.4th 498 (5th Cir. 2022) ....................................................................... passim

*Texas v. United States*,
  809 F.3d 134 (5th Cir. 2015) ....................................................................... passim

*Thunder Basin Coal Co. v. Reich*,
  510 U.S. 200 ..................................................................................... 46

*Torres-Balderas v. Lynch*,
  806 F.3d 1157 (8th Cir. 2015) ...................................................................... 13

*U.S. Army Corps of Eng'rs v. Hawkes*,
  578 U.S. 590 (2016) ................................................................................ 41

*U.S. Dep't of Labor v. Kast Metals Corp.*,
  744 F.2d 1145 n.17 (5th Cir. 1984) .................................................................. 26

*United States v. Blanco*,
  392 F.3d 382 (9th Cir. 2004) ....................................................................... 13

*United States v. Calderon-Lopez*,
  268 F. App'x 279 (5th Cir. 2008) ................................................................... 13

*United States v. Clements*,
  686 F. App'x 849 (11th Cir. 2017) .................................................................. 13

*United States v. Jumaev*,
  20 F.4th 518 n.17 (10th Cir. 2021) ................................................................. 13

*United States v. Kahre*,
  No. CR-S-05-0121, 2007 WL 9757487 (D. Nev. Apr. 20, 2007) ........................................ 13

*United States v. Mills*,
  334 F. App'x 946 (11th Cir. 2009) .................................................................. 13

*United States v. Williams*,
  571 F. App'x 887 (11th Cir. 2014) .................................................................. 13

*Util. Air Regul. Grp. v. EPA,*
   573 U.S. 302 (2014) .................................................................8, 21

*Uzuegbunam v. Preczewski,*
   141 S. Ct. 792 ................................................................................ 48

*Wages & White Lion Invs., L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..................................................... 46

*W. Virginia v. Envtl. Prot. Agency,*
   597 U.S. 697 S. Ct. 2587 (2022) ................................................. 22

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ............................................................................ 8

*Yassini v. Crosland,*
   618 F.2d 1356 n.4 (9th Cir. 1980) ............................................... 30

*Zhang v. Slattery,*
   55 F.3d 732 (2d Cir. 1995) ........................................................... 30

## CONSTITUTIONAL PROVISIONS & STATUTES

U.S. Const. art. II, § 3 ........................................................................39

U.S. Const. art. 1, § 8 ................................................................. 20, 34

5 U.S.C. § 551(4) ................................................................................45

5 U.S.C. § 553(a)(1) .......................................................................... 29

5 U.S.C. § 553(b) & (c) ..................................................................... 28

5 U.S.C. § 553(b)(A) .......................................................................... 25

5 U.S.C. § 701(a) ............................................................................... 44

5 U.S.C. § 701(a)(1) ........................................................................... 44

5 U.S.C. § 704 ................................................................................... 40

5 U.S.C. § 705 .............................................................................8, 51

5 U.S.C. § 705 .............................................................................8, 51

5 U.S.C. § 706 (2)(A) ......................................................................... 31

5 U.S.C. § 706(2) ................................................................................. 9

5 U.S.C. § 706(2)(A) ..........................................................................38

5 U.S.C. § 706(2)(D) ..........................................................................25

8 U.S.C. § 1182 ..................................................................................18

8 U.S.C. § 1182 & 1255 ................................................................................................ 20

8 U.S.C. § 1182(a)(1)(ii) ............................................................................................... 24

8 U.S.C. § 1182(a)(4) & 1183a ..................................................................................... 24

8 U.S.C. § 1182(a)(9)(A) ...............................................................................................32

8 U.S.C. § 1182(a)(9)(B) ...............................................................................................32

8 U.S.C. § 1182(a)(9)(B)(i) ........................................................................................... 24

8 U.S.C. § 1182(a)(9)(B)(i)(II) ....................................................................................... 4

8 U.S.C. § 1182(a)(9)(B)(v) ...................................................................................5, 24, 25

8 U.S.C. § 1182(d)(5) ............................................................................................. passim

8 U.S.C. § 1182(d)(5) & 1255 .......................................................................................16

8 U.S.C. § 1182(d)(5)(A) ....................................................................................3, 4, 9, 10

8 U.S.C. § 1182(d)(5)(B) ...............................................................................................10

8 U.S.C. § 1202(e) ........................................................................................................ 24

8 U.S.C. § 1226(a) .........................................................................................................18

8 U.S.C. § 1252(a)(2)(B)(ii) .......................................................................................... 44

8 U.S.C. § 1255 ..............................................................................................................18

8 U.S.C. § 1255 ..............................................................................................................18

8 U.S.C. § 1255(a) ......................................................................................................... 4

8 U.S.C. § 1255(i) ......................................................................................................... 4

8 U.S.C. § 1601 ............................................................................................................. 40

44 U.S.C. § 3506 ...........................................................................................................38

44 U.S.C. § 3507 ...........................................................................................................38

44 U.S.C. § 3507(j) ........................................................................................................38

44 U.S.C. § 3507(j)(1) & 5 .............................................................................................38

Idaho Code § 33-3717B(3)(b) ........................................................................................47

Idaho Code § 67-7903 ...................................................................................................47

Tex. Admin. Code § 21.24(a) & (d)(4) ...........................................................................47

## RULES & REGULATIONS

5 C.F.R. § 1320.13 ...................................................................................38

22 C.F.R. § 40.1–46.7 .............................................................................23

42 C.F.R. § 34.1 ....................................................................................... 24

42 C.F.R. § 440.255(c) ...........................................................................47

42 C.F.R. ¶ 10 .......................................................................................... 48

42 C.F.R. ¶¶ 6–7 ..................................................................................... 48

47 Fed. Reg. 30,044, 30,044–45 ( July 9, 1982).................................12

89 Fed. Reg.  67,472–73 ..........................................................................27

89 Fed. Reg. 67,465 ...........................................................................7, 49

89 Fed. Reg. 67,466–67 ..........................................................................36

89 Fed. Reg. 67,489 ................................................................................ 28

89 Fed. Reg. 67459 (Aug. 20, 2024) .....................................................7

89 Fed. Reg. 67466, 67483, 67487 ......................................................35

89 Fed. Reg. 67473 ..................................................................................19

89 Fed. Reg. 67478 ..................................................................................32

89 Fed. Reg. ¶ 12 ................................................................................... 50

89 Fed. Reg. 67,468 ................................................................................ 24

89 Fed. Reg. 67,469–74 ..........................................................................27

89 Fed. Reg. 67,472–74 ..........................................................................15

89 Fed. Reg. 67,473 ................................................................................15

89 Fed. Reg. 67479 ..................................................................................34

89 Fed. Reg. 67489 ................................................................................ 30

### INTRODUCTION

This agency action is nothing less than mass amnesty cloaked in purported executive discretion—a sweeping, last-minute ploy by an administration bent on rewriting immigration laws without Congress. Not only does this recent move strip away the legal requirement for illegal aliens to leave the country before obtaining green cards, it also shamelessly hands out work permits and other taxpayer-funded benefits to millions who have sidestepped the lawful immigration process. In effect, Defendants are trying to make illegal immigration legal through administrative fiat.

Indeed, this is just the latest example of a calculated effort to encourage illegal immigration by rewarding those who break our Nation's laws. *See Texas v. United States* (*DAPA*), 809 F.3d 134 (5th Cir. 2015) (program giving legal status to illegal aliens who were parents of citizens or lawful permanent residents); *Texas v. Biden* (*MPP*), 20 F.4th 928 (5th Cir. 2021) (DHS terminating program which returned certain illegal aliens to Mexico during their removal proceedings); *Texas v. United States* (*DACA*), 50 F.4th 498, 508 (5th Cir. 2022) (program directing that removal of certain aliens who entered the U.S. illegally as children should be deferred); *GLO v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023) (DHS diverting funds away from the construction of a border wall, resulting in a "fivefold" increase in southwest border encounters).

Longstanding federal law prohibits aliens who entered the United States unlawfully from obtaining most immigration benefits. This includes obtaining lawful permanent resident status—without first leaving the United States and waiting outside the United States for the requisite time—based on an approved family-based or employment-based visa petition. These provisions of law established by Congress serve as powerful disincentives for individuals to cross the border unlawfully. Indeed, were they not present, there would be no practical reason for any alien to abide by the law, wait his turn, and only come to the United States when the law provides.

But the Biden-Harris Administration—dissatisfied with the system Congress created, and for blatant political purposes—has yet again attempted to create its own immigration system.

The Department of Homeland Security (DHS) has announced the creation of a new Parole in Place (PIP) Program that would allow aliens who have been unlawfully present in the United States for ten or more years to receive a grant of "parole"—without leaving the United States and attempting to come back and apply for admission at a port of entry—if the alien is the spouse or stepchild of a U.S. citizen. Absent court intervention, this program will effectively provide a new pathway to a green card and eventual citizenship, allowing more than 1.3 million aliens who are unlawfully present in the United States—more than 200,000 of whom live in Texas—to circumvent the processes established by Congress to apply for permanent residency.

DHS aims to accomplish this end-run around the law by exceeding the textually limited authority set forth in 8 U.S.C. § 1182(d)(5), which states that the DHS Secretary may "parole *into the United States temporarily* under such conditions as he may prescribe only on a *case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5) (emphasis added). But the Supreme Court has emphasized that the parole "authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.'" *Biden v. Texas*, 597 U.S. 785, 806 (2022) (quoting 8 U.S.C. §1182(d)(5)(A)). DHS "cannot use that power to parole aliens *en masse*," *MPP*, 20 F.4th at 997, which is *precisely* what PIP amounts to. Further, because the parole power may only be exercised to allow an alien to come "into" the United States, it may not be lawfully exercised for aliens already present in the country.

These actions encourage illegal immigration and will irreparably harm the Plaintiff States. The Court should temporarily restrain the operation of the PIP Program to allow it time to consider entering a preliminary injunction or stay of agency action under the Administrative Procedure Act (APA).

BACKGROUND

**I.   Congress has granted the Executive a limited parole authority and has precluded certain categories of illegal aliens from adjusting their status.**

The Secretary of Homeland Security may parole into the United States an otherwise inadmissible alien. *See* 8 U.S.C. § 1182(d)(5). But he may do so only on a "case-by-case basis" for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Congress added each of those restrictions to the parole power in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act, commonly called IIRIRA, because the executive branch had abused that parole power "to admit entire categories of aliens who do not qualify for admission under any other category in immigration law." H.R. Rep. No. 104-469, at 140 (1996).

Certain categories of aliens who are present in the United States may adjust their status to that of a lawful permanent resident (LPR).[1] Only aliens present in the United States who were "inspected and admitted or paroled *into* the United States" or aliens who have self-petitioned under the Violence Against Women Act (VAWA) may adjust their status to that of LPR. 8 U.S.C. § 1255(a) (emphasis added). Otherwise, all aliens who entered the United States unlawfully after April 30, 2001 (except for the few aliens self-petitioning under VAWA) who want to adjust their status to LPR are required to leave the United States and apply for an immigrant visa at a U.S. consulate or embassy overseas. *See* 8 U.S.C. § 1255(i).

Aliens who have been unlawfully present in the United States for more than one year are inadmissible for admission to the United States and are also ineligible for visas for ten years after the "alien's departure or removal from the United States." 8 U.S.C. § 1182(a)(9)(B)(i)(II). The ten-year inadmissibility for admission to the United States may be waived "in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the [DHS Secretary] that the refusal of admission to such immigrant alien would result in *extreme hardship* to the citizen or

---

[1] Also commonly referred to as becoming a green card holder.

3

lawfully resident spouse or parent of such alien." 8 U.S.C. § 1182(a)(9)(B)(v) (emphasis added).

If an unlawfully present alien does not qualify for an extreme hardship waiver, he or she must remain outside of the United States for ten years before applying for an immigrant visa to the United States and obtaining LPR status.

## II.     The Administration rolls out the PIP Program.

On July 17, 2024, the White House website published a document entitled "FACT SHEET: Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Family Has a Fair Shot at the American Dream" (the "July 17 Fact Sheet").[2] The document describes actions the Biden Administration is taking "to ensure that all Latino families and communities can achieve greater opportunity." *Id.*

The July 17 Fact Sheet announced the PIP Program, explaining that:

> On June 18th, the President announced a new process to help U.S. citizens with noncitizen spouses and children who have been here for 10 years or more keep their families together. This new action— which will help certain noncitizen spouses and children apply for lawful permanent residence without leaving the country—is expected to apply to approximately half a million spouses of U.S. citizens, and 50,000 noncitizen children whose parent is married to a U.S. citizen. And today, the President is announcing that beginning on August 19, 2024, eligible spouses and children will be able to apply for this process to obtain legal status while remaining with their families.

But the Biden Administration's expectation of only 550,000 beneficiaries of the PIP Program is likely a significant underestimate. For example, the Migration Policy Institute estimates that 1,314,000 unlawfully present aliens are married to U.S. citizens.[3]

On August 16, DHS's United States Citizenship and Immigration Services (USCIS) announced the official start of the PIP Program and that it had published "a new electronic form, Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of

---

[2] The White House, Fact Sheet: *Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Family Has a Fair Shot at the American Dream*, THE WHITE HOUSE ( July 17, 2024), https://perma.cc/93ZX-3M7M.

[3] *Profile of the Unauthorized Population: United States*, MIGRATION POLICY INSTITUTE, (accessed on Aug. 8, 2024), https://perma.cc/JT43-RUCB.

U.S. Citizens" that would become available on August 19.[4] USCIS also announced that it had published a "Filing Guide for Form I-131F."[5] The Filing Guide announced the following criteria for PIP Program eligibility, explaining that aliens qualify for the PIP Program if they:

- Are present in the United States without admission or parole;
- Have been continuously physically present in the United States:
  - Since June 17, 2014, if seeking parole in place as the spouse of a U.S. citizen; or
  - Since June 17, 2024, if seeking parole in place as the stepchild of a U.S. citizen;
- Have:
  - A legally valid marriage to a U.S. citizen as of June 17, 2024, if seeking parole in place as the spouse of a U.S. citizen; or
  - A noncitizen parent who had a legally valid marriage to a U.S. citizen on or before June 17, 2024, and before the stepchild's 18th birthday, if seeking parole in place as the stepchild of a U.S. citizen;
- Do not have any disqualifying criminal history; and
- Do not pose a threat to national security and public safety.[6]

The Filing Guide does not list "urgent humanitarian reasons" or "significant public benefit" as one of the requirements to qualify for the program.[7] The Filing Guide imposes only five requirements of proof that the applicant must supply:

- "Evidence of Your Identity" (the guide states that providing a school-issued ID satisfies this requirement)
- "Evidence of Your Spouse/Stepparent's Citizenship"
- "Evidence of Your Relationship" with the U.S.-citizen spouse or stepparent
- "Evidence of Physical Presence"
- "Evidence Regarding Criminal Charges"[8]

The Filing Guide also gives aliens the option to provide "[o]ther Evidence . . . demonstrating the significant public benefit or urgent humanitarian reasons that warrant granting you parole."[9]

On August 20, 2024, DHS issued a Federal Register notice entitled "Notice of

---

[4] USCIS Publishes Filing Guide for Keeping Families Together, USCIS, (Aug. 16, 2024), https://perma.cc/EL6Z-2AUE.

[5] *Id.*

[6] *Filing Guide for Form I-131F* at 2, USCIS, (Aug. 16, 2024), https://perma.cc/664U-C2T2.

[7] *Id.*

[8] *Id.* at 13–15.

[9] *Id.* at 16.

implementation of the Keeping Families Together Process," 89 Fed. Reg. 67459 (Aug. 20, 2024) ("Notice"). Claiming that it has "unfettered discretion," to administer the parole process, 89 Fed. Reg. 67,465, DHS says the quiet part out loud.  Indeed, illustrating the insincerity of DHS's claim that it will review each application and exercise discretion on a "case-by-case" basis, DHS began approving applications and granting parole the same day.[10] The Notice was not a notice-and-comment rulemaking , claiming to be exempt from that requirement because, in DHS's view, it was merely "a general statement of policy" and even if it were a legislative rule subject to notice-and-comment, the foreign affairs exemption would apply. *Id.* at 6748–89.

The Notice did not make any specific claims that the PIP Program fulfills the "urgent humanitarian reasons" prong of Section 1182(d)(5). Rather, the Notice justified the PIP Program entirely based on generalized claims, without evidence, that the PIP Program would afford the following five claimed "significant public benefits": (1) "promot[ing] family unity"; (2) "advance[ing] U.S. economic and labor interests by enabling paroled noncitizens to work lawfully in the United States"; (3) "further[ing] critical U.S. diplomatic interests and U.S. foreign policy objectives of managing migration, increasing economic stability, and fostering security in the United States and in partner countries in the region; (4) "preserv[ing] limited resources across U.S. government agencies that may otherwise be expended on consular processing and proceedings"; (5) "further[ing] national security, public safety, and border security objectives by encouraging noncitizens to provide information for background and security checks." *Id.* at 67461–62.

All five of the claimed benefits were programmatic benefits—none of the claimed reasons related to a significant public benefit resulting from an individual grant of parole in a specific case.

STANDARD OF REVIEW

Plaintiffs seeking a temporary restraining order or preliminary injunction must establish

---

[10] Armando Garcia, *Immigrants begin receiving relief from deportation under new Biden executive order*, ABC News (Aug. 21, 2024) https://perma.cc/TAC8-JWUZ.

(1) that they are likely to succeed on the merits of their claims; (2) "that [they] [are] likely to suffer irreparable harm in the absence of preliminary relief;" (3) that the balance of equities tips in [their] favor," and (4) "that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The standards for securing a temporary restraining order or preliminary injunction are substantively the same. *Clark v. Richard*, 812 F.2d 991, 993 (5th Cir. 1987); *Texas v. United States (100-Day Pause)*, 524 F. Supp. 3d 598, 651 (S.D. Tex. 2021).

Section 705 of the APA, meanwhile, "authorizes reviewing courts to stay agency action pending judicial review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

## ARGUMENT

Plaintiffs' request satisfies all four elements of the Preliminary Injunction / Temporary Restraining Order (PI/TRO) inquiry, and all four elements demonstrate the overwhelming necessity of immediate injunctive relief pending trial, when permanent injunctive relief can be issued.

### I.    Plaintiffs are likely to succeed on the merits.

Because administrative agencies are creatures of statute, they possess only the authority that Congress has provided. *Nat'l Fedn. of Indep. Bus. v. Dept. of Lab.*, 595 U.S. 109, 117 (2022) (per curiam); *La. Pub. Serv. Commn. v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act ... unless and until Congress confers power upon it."). And it is a core principle that an agency may not rewrite statutory terms to suit its own sense of how the law should operate. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014). When agencies exceed their statutory authority,

7

those actions are unlawful and *ultra vires. See City of Arlington, Tex. v. FCC,* 569 U.S. 290, 297 (2013); 5 U.S.C. § 706(2).

The PIP Program exceeds Defendants' authority, lacked the required notice and comment, and is arbitrary and capricious. The States are, therefore, likely to succeed on the merits.

**A. The PIP Program is contrary to law because it violates the parole statute, the INA, and IIRIRA and contravenes the text and intent of existing immigration law.**

The PIP Program is contrary to preexisting, controlling immigration law.

**i.    The parole power is limited by statute.**

The Secretary of Homeland Security may parole into the United States an otherwise inadmissible alien. *See* 8 U.S.C. § 1182(d)(5). But he may do so only on a "case-by-case basis" for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

Historically, the federal government's parole authority was textually broader, and its use was approved "for emergent reasons or for reasons deemed strictly in the public interest." But Congress substantially narrowed this authority in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), adding a "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "*significant* public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, 110 Stat. 3009–689 (emphasis added).

In IIRIRA, Congress "specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" precisely because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011). Congress made crystal clear its intent that its 1996 amendment to the parole statute was a limit on the use of parole: the section heading in IIRIRA that makes this amendment is titled "LIMITATION ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat 3009, § 602

(1996); *see also Ram v. I.N.S.*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles in a law "may be used to interpret its meaning").

Congress added those restrictions—the case-by-case basis for urgent humanitarian reasons or significant public benefit—in part because:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, *and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States.* This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140 (1996) (emphasis added).

Congress has also emphasized that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B); *see also MPP*, 20 F.4th at 994.

The Supreme Court recently affirmed the limited nature of the parole power, noting that it "is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' . . . And under the [Administrative Procedure Act], DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 597 U.S. at 806–07.

### ii. The PIP Program violates Section 1182(d)(5)'s "urgent humanitarian reasons or significant public benefit" requirement.

The PIP Program fails to satisfy the "urgent humanitarian reasons or significant public benefit" requirement of 8 U.S.C. § 1182(d)(5)(A).[11] Congress chose not to define in IIRIRA the

---

[11] Congress also did not explain its decision to remove the term "public interest" and instead use the term "public benefit," but it is likely that the change has little legal consequence, as "[a]bstract, often interchangeably used terms such as 'public benefit,' [and] 'public interest,' . . . are often used in public policy." Mary D. Fan, *The Right to Benefit from Big Data as a Public Resource*, 96 N.Y.U. L. Rev. 1438, 1473 (2022); *see also, e.g., State of N.C. v. Hudson*, 665 F.

terms "significant public benefit" and "urgent humanitarian reasons." But Congress provided a strong direction as to their intended meaning by coupling the word "significant" with the phrase "public benefit." Thus, interpreting the import of IIRIRA's amendment to the parole statute hinges on the meaning of "significant." "[I]n the absence of a statutory definition [courts] 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 (1989) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). Black's Law Dictionary defines "significant" as meaning "[o]f special importance; momentous, as distinguished from insignificant. *Significant*, Black's Law Dictionary (12th ed. 2024). Similarly, the American Heritage Dictionary defines "significant" to mean "[h]aving or likely to have a major effect; important," and also "[f]airly large in amount or quantity." *Significant*, American Heritage Dictionary (5th ed. 2018).

Since the prior version of the statute already limited the grant of parole to situations "in the public interest" Congress's decision to add "significant" means that post-IIRIRA, the benefit to the public must be greater than it used to be. Before IIRIRA was enacted, Congress and the executive branch had both provided specific examples of situations in which an alien would qualify for parole under the old, more forgiving "public interest" standard. An INS rulemaking from 1982 summarizes those examples:

> The legislative history of the parole provision shows a Congressional intent that parole be used in a restrictive manner. The drafters of the Immigration and Nationality Act of 1952 *gave as examples situations where parole was warranted in cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution.* H. Rep. No. 1365,82nd Cong., 2d Sess., at 52 (1952). In 1965, a Congressional committee stated that the parole provisions "were designed to authorize the Attorney General to act only in emergent, individual, and *isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law.*" S. Rep. No. 748, 89th Cong., 1st Sess., at 17 (1965). Finally, in the Refugee Act of 1980, Congress removed the Attorney General's authority to parole groups of aliens as refugees.

Supp. 428, 445 (E.D.N.C. 1987) (using "public interest" and "public benefit" as synonyms) (cleaned up)); *Enhanced Commc'ns of N. New England, Inc. v. Pub. Utils. Comm'n*, 2017 ME 178, 169 A.3d 408, 413 n.4 (Me. 2017) (cleaned up) (same).

Pub L. 96-212,96th Cong., 2d Sess., 94 Stat. 108 (1980).[12]

Thus, under the prior, less stringent standard, Congress gave as classic examples of valid exercises of the parole power "cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution" and "isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law." *Id.*

The PIP Program falls far outside what would have been allowed even pre-IIRIRA, let alone the stricter standard imposed by IIRIRA. Post-IIRIRA court decisions illustrate that the PIP Program falls miles outside the carefully circumscribed boundary of allowable situations where the parole statute is properly applied. When describing "Congress' provision of parole," Justice Breyer provided two examples of what Congress had in mind: "release for the purpose of medical care or to testify in a court proceeding." *Jennings v. Rodriguez*, 583 U.S. 281, 348 (2018) (Breyer, J., dissenting). The Fifth Circuit likewise has explained, "[q]uintessential modern uses of the parole power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947.

The District of Maine explained that "there are various types of parole, including port of entry parole, which applies to a wide variety of situations and is used at the discretion of the supervisory immigration inspector, usually to allow short periods of entry. Other types of parole include humanitarian parole, granted in instances of medical emergency; and public interest parole, granted for aliens participating in legal proceedings." *Hornof v. United States*, No. 2:19-cv-198, 2023 WL 5627631, at *25 n.49 (D. Me. Aug. 31, 2023) (cleaned up) (quoting *Succar v. Ashcroft*, 394 F.3d 8, 15 n.7 (1st Cir. 2005)).

"The Government often utilizes significant public benefit parole to secure testimony from

---

[12] Detention and Parole of Inadmissible Aliens; Interim Rule with Request for Comments, 47 Fed. Reg. 30,044, 30,044–45 ( July 9, 1982) (emphasis added), https://perma.cc/F7BH-F4UJ.

noncitizens—who otherwise would not have legal status to be in the United States—in criminal proceedings."[13] *Id.* at \*25 (granting summary judgment to the federal government in action by aliens who were paroled into the United States against their will and then detained to compel their testimony). The government also paroles into the United States the family members of cooperating witnesses. *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) (explaining that "the United States government brought the children [of a cooperating witness] and [the witness's] mother to the United States temporarily under Significant Public Benefit Parole").

Aliens have been granted "'significant public benefit parole' to remain in the country because of . . . work as a confidential source" for the FBI. *United States v. Williams*, 571 F. App'x 887, 890 (11th Cir. 2014); *see United States v. Clements*, 686 F. App'x 849, 851 (11th Cir. 2017) (referring to "Significant Public Benefit Parole program, which allows illegal aliens who are informants for law enforcement to gain lawful status in the United States"); *Torres-Balderas v. Lynch*, 806 F.3d 1157, 1158 (8th Cir. 2015) (stating that alien who had assisted "the St. Louis Police Department as well as the FBI in matters concerning false documents" received "[i]n exchange ... a one-year Significant Public Benefit Parole"); *United States v. Mills*, 334 F. App'x 946, 947 (11th Cir. 2009) (referring to "application for a Significant Public Benefit Parole" filed by DEA on behalf of informant); *United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004) (referring to "public benefit parole" received by paid confidential informant).

Perhaps the most telling examples of public benefit parole come from DHS's own explanations. One such example is from *Milardo v. Kerlikowske*, in which two "deportees seeking

---

[13] *See also United States v. Jumaev*, 20 F.4th 518, 547 n.17 (10th Cir. 2021) (referring to "Significant Public Benefit Parole so that [a witness] could remain in the U.S." (cleaned up)); *United States v. Calderon-Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008) (explaining that an ICE special agent had "requested Significant Public Benefit Paroles in order to facilitate ... reentry into the United States" for witnesses); *Garcia v. Peery*, No. CV 15-6273, 2016 WL 6304647, at \*5 (C.D. Cal. Aug. 26, 2016) (describing efforts by DHS special agent to obtain testimony of crime victim by "secur[ing] a 'Significant Public Benefit Parole'"); *Amador v. Meeker*, No. 8:11-CV-1977, 2011 WL 4502092, at \*1 (M.D. Fla. Sept. 28, 2011) (explaining that alien who had "agreed to cooperate with [a] federal investigation and testify against" defendants "was granted 'significant public benefit' parole"); *United States v. Kahre*, No. CR-S-05-0121, 2007 WL 9757487, at \*1 (D. Nev. Apr. 20, 2007) (noting that "the I.R.S. is attempting to obtain a significant public benefit parole into the U.S. for" a "Special Circumstances Witness" in criminal trial).

to comply with the legislative subpoenas" from the Connecticut legislature sued to contest ICE's denial of their parole applications. No. 3:16-MC-00099, 2016 WL 1305120, at *1 (D. Conn. Apr. 1, 2016), *aff'd sub nom. Giammarco v. Kerlikowske*, 665 F. App'x 24, 25 (2d Cir. 2016). ICE provided to the aliens a letter that explained: "Significant public benefit parole 'is a temporary measure generally used to provide a legal mechanism for informants, witnesses, criminals, and defendants' to 'assist with ongoing investigations, prosecutions or testify as witnesses in proceedings.'" *Id.* at *2 (quoting text of ICE letter).

The PIP Program does not fit within any of these established examples of the lawful exercise of the parole power.

### iii.   The PIP Program violates Section 1182(d)(5)'s "case-by-case" requirement.

The government cannot confer automatic parole eligibility on 1.3 million aliens with the stroke of a pen (nor, for that matter, on the low-end 550,000 estimate Defendants offer). As the Fifth Circuit has explained, "DHS cannot use [its] power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *MPP*, 20 F.4th at 997. The the PIP Program was exactly what Congress was trying to *prevent* when it adopted IIRIRA. "[T]his change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel*, 650 F.3d at 199 n.15.

As the Northern District of Texas has previously observed, although "the parole statute does not set any limit on the number of individuals DHS can decide to release on parole," "the number of aliens paroled each month ... gives rise to a strong inference that the Government is not really making these parole decisions on a case-by-case basis." *Texas v. Biden*, 646 F. Supp. 3d 753, 775 (N.D. Tex. 2022) (Kacsmaryk, J.) (cleaned up) (quoting *Biden*, 597 U.S. 785, 825–26 (Alito, J., dissenting)), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). A program that confers parole eligibility on 1.3 million aliens at once gives rise to the same inference that the case-by-case requirement has not been followed.

13

The Notice provides detailed instructions about the specific characteristics that make an alien eligible for the PIP Program and about application processing instructions for DHS officers. 89 Fed. Reg. 67,472–74. Those instructions take up 5,283 words. Among all those words, there is one short subsection titled "Case-by-Case Consideration for Parole." That section contains only the following perfunctory 63-word statement to DHS officers to instruct them about the case-by-case requirement:

> Noncitizens who meet the criteria listed in this notice may be considered for a discretionary grant of parole on a case-by-case basis. USCIS may grant parole in place to the requestor if USCIS determines that there is a significant public benefit or urgent humanitarian reason for parole and that the requestor merits a favorable exercise of discretion in the totality of the circumstances.

89 Fed. Reg. 67,473. The message to DHS officers is obvious: they are expected to rubber-stamp all qualifying applications. In practice, within hours of PIP being noticed in the Federal Register, it was already clear that such rubber-stamping without meaningful case-by-case analysis was precisely how DHS is implementing the PIP Program. The very day DHS published its notice it also began sending out parole approvals to applicants who had spent as little as 20 minutes filling out the cursory PIP applications.[14]

This is nothing new. The Biden Administration has become notorious for creating such programs. For example, DHS's CHNV Program for granting parole to aliens from Cuba, Haiti, Nicaragua, and Venezuela, which has similar eligibility criteria and processing requirements, has an "an approval rate of 97.5 percent." *Texas v. DHS*, --- F. Supp. 3d ----, 2024 WL 1021068, at *2 (S.D. Tex. Mar. 8, 2024).

Further, the lack of information that Defendants collect about each alien applying for parole established that a case-by-case determination is impossible. The Northern District of Florida made this point about another similar parole program, and it is just as true here:

---

[14] Armando Garcia, *Immigrants begin receiving relief from deportation under new Biden executive order*, ABC News (Aug. 21, 2024).

However, like the Parole+ATD policy, the new policy does not explain how a meaningful evaluation of the criteria that determine whether the policy may be utilized (e.g., the alien's "national security risk" and "public safety threat") could possibly occur in light of the evidence in [the Florida Parole+ATD case], which established that DHS "has no idea whether [the arriving aliens] have criminal histories or not" because it "has no way to determine if an alien has a criminal history in his home country unless that country reports the information to the U.S. government or the alien self-reports." Moreover, whenever the policy discusses individual, case-by-case consideration of each alien, it does so with reference to overcrowding and the CBP's resource constraints, not with regard to any characteristics of that specific alien that might constitute a legally sufficient reason for parole, which strongly suggests that the repeated "case-by-case," "individualized" language is (as it was in the Parole+ATD policy) pretextual.

*Florida v. Mayorkas*, 672 F. Supp. 3d 1206, 1213 (N.D. Fla. 2023) (quoting *Florida. v. United States*, 660 F. Supp. 3d 1239, 1259, 1280–81 (N.D. Fla. 2023)).

### iv.   The PIP Program violates the requirements of 8 U.S.C. §§ 1182(d)(5) and 1255 that aliens be paroled "into" the United States.

Section 1182(d)(5)(A) only allows for an alien to be "parole[d] *into* the United States." (emphasis added). Because PIP Program beneficiaries are already inside the United States, they cannot be paroled "into" it. "[A]ny question of statutory interpretation . . . begins with the plain language of the statute. It is well established that, when the statutory language is plain, [courts] must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citations omitted). Applying "the ordinary meaning of the words used," *Mississippi Miss. Band of Choctaw Indians*, 490 U.S. at 47 (cleaned up), the meaning of "into" is clear.

An alien who is already physically present in the United States cannot be paroled "into" the country. Dictionary definitions confirm this. For example, the Oxford English Dictionary (OED) defines "into" as meaning "[t]o a position within a space or thing having material extension; to a point within the limits of; to the interior of; so as to enter." *Into*, Oxford English Dictionary (Mar. 2024). Similarly, the American Heritage Dictionary defines "into" as meaning "[t]o the inside or interior of: went into the house." *Into*, American Heritage Dictionary (5th ed.). It is only possible to move "inside" or to the "interior" of something by first starting outside of it. So "into

the United States" in Section 1182(d)(5) only permits the parole power to be exercised for aliens who are *outside* the United States when parole is granted.

Similarly, 8 U.S.C. § 1255 only allows an alien to adjust to LPR status without leaving the United States if the alien "was inspected and admitted or paroled into the United States." The legislative history makes clear that Congress added this language to Section 1255 in 1960 specifically to prevent the adjustment of status of aliens who had entered the United States unlawfully. The Senate report explaining the reasons for adopting the 1960 amendment to Section 1255 stated that one of its purposes was "to broaden the existing procedure for the adjustment of the status ... to include all aliens (other than crewman) who have been inspected at the time of their entry into the United States or *who have been paroled into the United States*." S. Rep. No. 86–1651 (1960), as reprinted in 1960 U.S.C.C.A.N. 3124, 25 (capitalization standardized) (emphasis added). The Senate Report also explained that "the wording of the amendment is such as not to grant eligibility for adjustment of status to alien crewmen and *to aliens who entered the United States surreptitiously*." *Id.* at 3137 (capitalization standardized) (emphasis added).

The plain language and legislative history of Section 1255 make clear that aliens who unlawfully entered the United States are not eligible to adjust status from within the United States. Therefore, the phrase "paroled into the United States" in Section 1255 literally means that the alien must have been granted parole while physically entering the United States.

Section 1182(d)(5) uses nearly the same language as Section 1255: "parole into the United States." It is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Lexon Ins. Co., Inc. v. Fed. Deposit Ins.*, 7 F.4th 315, 324 (5th Cir. 2021) (quoting *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992)). If Congress made clear that it meant for "paroled into the United States" in Section 1255 to mean a grant of parole at the time of physical entry, then the nearly identical phrase "parole into the United States" in Section 1182(d)(5) in the

INA should be interpreted to mean the same thing.[15]

Further, Section 1255's prohibition on adjustment of status within the United States for aliens who entered unlawfully contradicts the stated purpose of the PIP Program. Even if Defendants could lawfully confer parole status on aliens already present in the United States, those aliens could not lawfully adjust status to that of LPR without leaving the United States since they would not have been physically paroled "into" the United States, as required by 8 U.S.C. § 1255.

Congress has specifically authorized parole of aliens already present in the United States in only one context: military families. The National Defense Authorization Act for Fiscal Year 2020 (NDAA 2020) authorizes parole in place, but only for a "covered individual," as that term is defined in the Act, which requires that the person "(1) is a member of the Armed Forces; (2) is the spouse, son, or daughter of a member of the Armed Forces; (3) is the parent of a member of the Armed Forces who supports the request of such parent for parole in place; or (4) is the widow, widower, parent, son, or daughter of a deceased member of the Armed Forces." NDAA 2020. Pub. L. 116-92, § 1758 (2019) (8 U.S.C. 1182 note). Under the venerable *expressio unius* canon, "[t]he expression of one thing implies the exclusion of others." *Jennings* 583 U.S. at 300. Thus, Congress's authorization of parole in place *only* in the limited circumstance of military families means that it has *not* authorized it in any other circumstance.

###### v. The PIP Program violates Section 1182(d)(5)'s temporariness requirement.

Parole may be used only to allow aliens "temporarily" "into" the United States. 8 U.S.C. § 1182(d)(5). Yet even though parole status may be granted only to allow aliens into the United States temporarily, the explicitly stated intent of the PIP Program is to allow beneficiaries to remain

---

[15] The Notice cites a Ninth Circuit opinion, *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1117 (9th Cir. 2007), as support for interpreting "into the United States" as not requiring physical entry and thus allowing for parole to be conferred on aliens already present in the United States. That opinion, however, readily acknowledges that the legislative history of Section 1255 clearly shows that the 1960 amendment to Section 1255 forbad the adjustment of status of aliens who entered unlawfully. *Id.* Nevertheless, *Ortega-Cervantes* states that the court could "see nothing that would preclude the government from paroling such an alien into the United States." *Id.* at 1116. However, this portion of the court's decision was dicta because the court ultimately concluded the alien petitioner in the case had not been paroled under Section 1182(d)(5), but had received conditional parole under 8 U.S.C. 1226(a).

permanently in the United States.[16] Indeed, Defendants have a long track record of instituting "temporary" programs for allowing aliens into the country that never end.

The INA does not define "temporarily." Black's Law Dictionary defines "temporary" to mean "[l]asting for a time only; existing or continuing for a limited (usu. short) time; transitory." *Temporary*, Black's Law Dictionary (12th ed. 2024). The OED defines it as meaning "[l]asting for a limited time; existing or valid for a time (only); not permanent; transient; made to supply a passing need." *Temporary*, Oxford English Dictionary (Sept. 2023). There is nothing limited about the duration of the PIP Program beneficiaries' presence in the United States, and parole cannot be used to help aliens remain permanently in the United States.

The Notice grants a three-year parole period for PIP Program beneficiaries. 89 Fed. Reg. 67473. But DHS has a mechanism in place for any recipient of parole to apply for a renewal of their parole, which DHS calls "re-parole." As DHS explains on its public-facing website for parolees and parole applicants, "Although parole is temporary in nature, in some instances, an individual may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States."[17] Indeed, the procedure for applying for re-parole is trivially simple: an alien simply files "a new Form I-131, Application for Travel Document," checks the proper box, and then finishes by "[w]riting 're-parole' across the top of the application." *Id.* The Notice does not exempt aliens in the PIP Program from DHS's normal re-parole application process.

DHS virtually always renews such "temporary" parole programs. Parole under the PIP Program will be permanent. The federal government's Afghan parole program is instructive. With the federal government's military withdrawal from Afghanistan in the summer of 2021, Secretary Mayorkas issued a memo instituting a parole program for Afghans that "instructed the CBP Acting

---

[16] *See, e.g.*, July 17 Fact Sheet ("This new action . . . will help certain noncitizen spouses and children apply for lawful permanent residence without leaving the country . . . ").

[17] *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*, U.S. Citizenship and Customs Servs. (May 2, 2023), https://perma.cc/L64A-H28L.

Commissioner to parole eligible Afghan nationals into the United States for 2 years."[18] When those two-year grants of parole were set to expire, DHS went into action to ensure the program participants could remain in the United States. DHS didn't just authorize "re-parole" on an individualized basis but set up a re-parole program. Secretary Mayorkas announced a "new streamlined and fee-exempt process" so that "eligible Afghan nationals will be able to continue living and working here as they pursue a permanent status."[19] DHS has an entire webpage dedicated to helping Afghan parolees navigate the re-parole process.[20] Secretary Mayorkas appears to consider their permanent presence in the United States a foregone conclusion. There is no reason to believe DHS will treat aliens in the PIP Program any differently.

Given the sheer volume of aliens that DHS will parole under the PIP Program, the availability of re-parole generally, and the very recent history of a programmatic "re-parole" scheme for tens of thousands of aliens from one country, there is every reason to conclude that Defendants will do the same here.

### B. The PIP Program was promulgated without lawful authority.

The Constitution explicitly allocates the power "[t]o establish an uniform Rule of Naturalization" to Congress, U.S. CONST. art. 1, § 8, but the Biden-Harris Administration seems determined to create its own immigration system. Defendants had no authority to promulgate the PIP Program, so the programs would be unlawful even if they did not violate established statutory law.

The PIP Program is also not in accordance with law and exceeds Defendants' statutory parole authority under the INA and 8 U.S.C. §§ 1182 and 1255 because it is designed to circumvent the immigration system established by Congress, including the statutory requirements for an alien

---

[18] Dep't of Homeland Sec. Off. of Inspector Gen., *The Unified Coordination Group Struggled to Track Afghan Evacuees Independently Departing U.S. Military Bases*, Dep't of Homeland Sec. (Sept. 29, 2022), https://perma.cc/37BP-THB6.

[19] Press Release, *DHS Announces Re-parole Process for Afghan Nationals in the United States*, DEP'T OF HOMELAND SEC. (June 8, 2023), https://perma.cc/QTA2-2NG2.

[20] *Re-Parole Process for Certain Afghans*, U.S. IMMIGR. AND CUSTOMS SERVS. (Sept. 27, 2023), https://perma.cc/NT7B-DKFU.

to qualify for a waiver of inadmissibility or visa ineligibility and to circumvent the statutory requirements for adjustment of status. *See Texas*, 549 F. Supp. 3d at 614 (DACA unlawful because its "grant of advance parole eligibility … allows DACA recipients to travel abroad and then return to the United States without complying with" the ten-year bar imposed by Congress).

The PIP Program is designed to circumvent the statutory requirements that unlawfully present aliens may not adjust their status within the United States but must instead depart and apply for an immigrant visa at a U.S. embassy or consulate overseas. It "is foreclosed by Congress's careful plan; the program is manifestly contrary to the statute." *DACA*, 50 F.4th at 528. "Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system." *Id.* at 511 (quoting *Texas*, 549 F. Supp. 3d at 614). Congress specifically defined classes of aliens who are eligible for deferred action and discretionary relief from removal. *Id.* at 525–26 & nn.196–97. In addition, Congress enacted immigration classifications for lawful and unlawful presence. *Id.* at 525–26 & n.195. Congress also allowed for work authorization for specific categories of illegal aliens. *Id.* at 525–26 & n.198.

The PIP Program is thus unlawful since it seeks to replace the immigration system established by Congress. Congress would not have created an avenue for the Executive to ignore established immigration channels by way of the parole power.

Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021). The Major Questions Doctrine is a principle of statutory interpretation under which courts will not assume that Congress has assigned to the Executive Branch questions of "deep 'economic and political significance'" unless Congress has done so expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In *West Virginia v. EPA,* the Supreme Court explained that the Major Questions Doctrine required applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at

issue.... Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." 597 U.S. 697, 722–23 (2022) (cleaned up).

A central characteristic of our constitutional republic is that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* Thus, the Supreme Court explained that "Congress typically [does not] use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme.... We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also King*, 576 U.S. at 486; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Here, the federal government is doing exactly what the Supreme Court said the executive cannot do. It is using the PIP Program to ignore and circumvent the channels of immigration that Congress has established. Congress manifestly did *not* expressly or clearly authorize the PIP Program when it adopted Section 1182(d)(5). The very structure of the INA makes this abundantly clear. In Section 1255, Congress established a clear requirement that aliens who are unlawfully present in the United States may *not* adjust status from within the United States but must leave the country and apply for an immigrant visa at an overseas U.S. embassy or consulate, going through the entire visa process overseas. And yet, the explicitly stated intent of the PIP Program is do exactly what Congress made unlawful by allowing unlawfully present aliens to circumvent the requirements of the INA and instead adjust status without leaving the United States.

Congress would not have adopted dozens of statutory sections setting forth immigration requirements in great detail, just for one small subparagraph to confer on the executive the authority to replace all of that with its own alternate system. The statutory scheme that Congress created to establish our visa system is intricate and detailed. The PIP Program copies some of those elements, complete with application forms for aliens. But at every step of the process, the PIP Program omits significant elements and requirements that Congress has imposed and instead replaces them with far less stringent requirements; often replacing them with nothing at all and

21

merely eliminating those congressional requirements. If Congress had meant for something like the PIP Program to be established, it would have set it up. It didn't. The PIP Program is, therefore, illegal.

As explained above, the PIP Program only requires submission of very basic biographical information and evidence sufficient to establish that the alien's spouse or stepparent is a citizen and that the alien has been present in the United States long enough to qualify for the Program. The Program requirements are so flimsy that even a student ID card is enough to "confirm" the alien's identity—no passports or government IDs required. In contrast, at every step of the process, the visa process imposed by Congress is much more rigorous, extensive, and reliable. For example, Congress has imposed specific requirements for the documents aliens must have to enter the United States. *E.g. id.* § 1181 (imposing documentary requirements for admission of immigrant aliens); *id.* §§ 1201, 1204 (imposing standards and requirements for issuance of visas); *id.* § 1202 (imposing requirements for visa applications); *id.* § 1203 (imposing requirements for reentry permits).

Congress has also empowered the Secretary of State, and *not* the DHS Defendants, to issue regulations for the issuance of entry documents into the United States. *See, e.g.,* § 1202 (making nine references to regulations "prescribed" or "issued" related to issuance of visas and specifically providing for "regulations issued by the Secretary of State" and empowering the Secretary of State with discretion to establish different "application forms for the various classes of nonimmigrant admissions"). Indeed, the Secretary of State has established an elaborate regulatory scheme for the issuance of visas, including detailed visa application forms, and procedures for the assessment of aliens for ineligibility for admission into the United States and for national security and public health and safety. 22 C.F.R. §§ 40.1–46.7.

The requirements that an alien must fulfill to get a visa are extensive. For example, to get an immigrant visa, aliens must pay a substantial fee of between $205 and $345 for each applicant applying for an immigrant visa, and an identical fee must be paid for every member of a family,

including children.[21] Then, aliens must complete a detailed visa application.[22] And finally, aliens must appear in person for a visa interview with a Department of State consular officer at an embassy or consulate. 8 U.S.C. § 1202(e). Aliens applying for immigrant visas also must submit to many other requirements, such as comprehensive medical exams, 42 C.F.R. § 34.1 et seq.; strict vaccination requirements, 8 U.S.C. § 1182(a)(1)(ii); and must provide conclusive proof that they have the financial means to support themselves. 8 U.S.C. §§ 1182(a)(4) and 1183a.The PIP Program requires none of this—no interviews with consular officers, no medical exams, no visa security requirements, and no need to prove financial support. PIP Program participants do not even need to provide their foreign passport to prove their identity and nationality. The PIP Program circumvents the process that Congress has created for immigration into the United States, completely evading the many limits that Congress has imposed.

The PIP Program creates an entirely new and parallel immigration system that was never authorized by Congress. As if that were not bad enough, this new system lacks most of the procedures and protections that Congress has carefully created and imposed. DHS itself admits in the Notice that one of the purposes of the PIP Program is to replace "the overlapping, lengthier, and more complex Form I-601A, Application for Provisional Unlawful Presence Waiver." 89 Fed. Reg. 67,468. Thus, DHS touts the PIP Program as "requir[ing] fewer resources" because the alternative "is a more complex adjudication involving the determination of various factors, including whether the noncitizen has met their[sic] burden to show they would be inadmissible only under [8 U.S.C. § 1182(a)(9)(B)(i)] at the time of their consular interview, and whether they[sic] have demonstrated extreme hardship to a qualifying relative as required under" 8 U.S.C. § 1182(a)(9)(B)(v). *Id*. Yet this reduction in required resources only comes at the expense of failing to apply the requirements of the INA, which only allow unlawful presence to be waived in very specific circumstances. The PIP Program essentially creates a new waiver with much more

---

[21] *Fees for Visa Services*, DEP'T OF STATE, (accessed Sept. 25, 2023) https://perma.cc/92JU-BARM
[22] *Form DS-260*, U.S. DEP'T OF STATE, (Oct. 2019), https://perma.cc/B99K-2VND

forgiving standards than what Congress imposed. DHS lacks the authority to replace requirements imposed by Congress with less onerous ones more to its liking.

DHS also boasts that the PIP Program will save Department of State resources because consular officers will no longer be required to conduct a "immigrant visa interview at a U.S. embassy or consulate" and thus will also no longer be required to "determine[]" whether the alien is "otherwise eligible for an immigrant visa in light of the approved provisional waiver." *Id.* But these are *requirements* imposed by Congress. DHS has no authority to waive them.

Defendants have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress" gives it to them. *Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). And they are especially powerless to disregard express statutory commands. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016). "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). The executive branch has no authority to conjure up a new extra-statutory immigration system more to its liking.

### C. The challenged regulations were promulgated without the requisite notice and opportunity to comment.

Under the Administrative Procedure Act (APA), rules promulgated by the Executive Branch are subject to the notice-and-comment rulemaking process unless they fall within one of the APA's limited exceptions, 5 U.S.C. § 553(b)(A), which "must be narrowly construed." *DAPA*, 809 F.3d at 171 (quoting *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)) (affirming order granting preliminary injunction against illegal DHS immigration policy), *aff'd*, 579 U.S. 547 (2016). The Notice was promulgated with neither notice nor any opportunity for interested parties to comment, both of which are required under the APA. The Court, therefore, has a duty to "hold unlawful and set aside agency action, findings and conclusions" that, like the challenged regulations, were promulgated "without observance of procedures required by law." 5 U.S.C. § 706(2)(D).

The APA's requirements "are not mere formalities" but rather "are basic to our system of administrative law." *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 115 (2d Cir. 2018). "Section 553 was enacted to give the public an opportunity to participate in the rule-making process. It also enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those who are regulated." *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 n.17 (5th Cir. 1984) (quoting *Batterton v. Marshall*, 648 F.2d 698, 705 (D.C. Cir. 1980)); *see also NRDC*, 894 F.3d at 115 (notice and comment serves "the public interest by providing a forum for the robust debate of competing and frequently complicated policy considerations having far-reaching implications and, in so doing, foster reasoned decisionmaking"); *Spring Corp. v. FCC*, 315 F.3d 369, 373 (D.C. Cir. 2003) (notice and comment process "ensures fairness to affected parties[] and provides a well-developed record that enhances the quality of judicial review") (cleaned up).

### i.     The Notice is legislative in nature, not a mere policy statement.

"Legislative rules are ones with the 'force and effect of law.'" *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)). Generally, the difference between a rule and a policy statement depends on two criteria: "whether the [agency action] (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *DAPA*, 809 F.3d at 171 (cleaned up). A court making that determination should be "mindful but suspicious of the agency's own characterization," and its primary consideration is whether the action "has binding effect on agency discretion or severely restricts it." *Id.* (quoting *Prof'ls & Patients*, 56 F.3d at 595).

The Notice imposes rights and obligations by instructing DHS officials on how to exercise their discretionary parole authority, setting new criteria for granting parole, affecting the States' obligations to provide benefits to certain aliens, affecting the federal government's obligations to provide benefits to certain aliens, and establishing a framework for the showing required to parole hundreds of thousands or millions of aliens into the country (or into a new status, in direct

25

contravention of the unambiguous language of the parole statute, since they are already in the country). *See, e.g.*, *Texas v. United States*, 328 F. Supp. 3d 662, 731 (S.D. Tex. 2018) (DACA was not a policy statement for many of the same reasons the PIP Program is a legislative rule).

The federal government's own statements highlight the new rights created for illegal aliens who take advantage of this program: they will have a new process to apply for parole and a new set of criteria by which to be evaluated for parole, and "[i]f parole is granted, noncitizens who are eligible to apply for lawful permanent residence based on their marriage to a U.S. citizen will be able to do so without having to leave the United States," regardless of what explicit statutory law might say to the contrary.[23] Whether a rule "will produce significant effects on private interests'" has been treated in the Fifth Circuit as "the primary means to look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Mock*, 75 F.4th at 581 (cleaned up). The Notice's "significant effects on private interests" are the explicit purpose of the PIP program, spelled out in no uncertain terms in the Notice and the federal government's public statements.

Courts do not look at "the agency's self-serving label" of its action, but instead "look[] to the contents of the agency's *action*." *DACA*, 50 F.4th at 522 (cleaned up) (emphasis added). Courts are thus "mindful but suspicious of the agency's own characterization of what it has done." *Id.* (cleaned up). The "primary focus is whether the rule has binding effect on agency discretion or severely restricts it." *Id.* (cleaned up). The Notice sets forth criteria that binds the agency. 89 Fed. Reg. 67,469–74.

DHS argues that this is a mere exercise of discretion. 89 Fed. Reg.  67,472–73. The federal government argued the same thing about *DACA* that the Notice claims for the PIP Program, claiming "that DACA is a general statement of policy exempt from notice and comment." *DACA*, 50 F.4th at 522. The Fifth Circuit was not convinced, holding that "DACA is not a policy

---

[23] *Reminders on the Process to Promote the Unity and Stability of Families*, U.S. Citizenship and Immigr. Servs. ( July 17, 2024), https://perma.cc/W587-DBJZ.

statement." *Id.* at 524. Generally, when an agency "loses discretion" because of an agency action, "[t]hat's textbook final agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 854. Even if the agency action only removes "*some* of the [agency's] discretion," it still satisfies the second prong of finality. *Clark*, 74 F.4th at 638 (emphasis added). Stated differently, "the existence of some amount of discretion is not determinative." *Texas v. United States*, 549 F. Supp. 3d 572, 602 (S.D. Tex. 2021).

In short, Plaintiffs are likely to prevail on the merits because the PIP Program is a legislative rule that became effective without the notice and comment required by the APA, nor any opportunity for interested parties to participate in the policymaking process, so it is unlawful. *See* 5 U.S.C. § 553(b) and (c); *Mock*, 75 F.4th at 583.

### ii.    The foreign affairs exemption does not apply.

"As with other exceptions to the notice-and-comment requirements, the foreign affairs exception 'must be narrowly construed.'" *Louisiana v. CDC*, 603 F. Supp. 3d 406, 437 (W.D. La. 2022) (quoting *DAPA*, 809 F.3d at 171). And even "in the immigration context," the government must make a strong showing that allowing even a short notice-and-comment period "will provoke definitely undesirable international consequences." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76 (9th Cir. 2018).

In the Notice, Defendants attempt to invoke the foreign affairs exception merely by making the obvious and unexceptional disclosure that the PIP Program is part of an "ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration." 89 Fed. Reg. 67,489. This weak attempt to invoke the foreign affairs exception is insufficient. That the United States is engaged in "ongoing conversations with key foreign partners about migration management," *id.*, does not entitle Defendants to except the Notice from the APA's procedures. There is no evidence that complying with the APA's rulemaking procedures would cause a diplomatic incident.

Multiple circuits have adopted the "definitely undesirable international consequences" standard. *See Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008) ("For the exception to apply…

27

[there must be] *definitely undesirable international consequences*." (emphasis added) (citation omitted)); *see also Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) (holding that "'the exception should be construed narrowly to include only those 'affairs' which ... would clearly provoke definitely undesirable international consequences.") (cleaned up), *vacated and rev'd on other grounds*, 727 F.2d 957 (11th Cir. 1984) (en banc); *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985) (holding that exception applied *because* "disclosure . . . would 'provoke definitely undesirable international consequences.'" (citation omitted)).

The Fifth Circuit does not appear to have addressed the "foreign affairs" exception yet. But there is no reason to believe that it would split from, and adopt a less-stringent standard than, the four circuits have adopted the "definitely undesirable consequences" standard. And even if the Fifth Circuit were to adopt a less stringent standard, Defendants' attempt to invoke the exception still fails.

To begin, this is not the first time that an administration has attempted to invoke the "foreign affairs" exception in the immigration context—which courts have frequently and repeatedly struck down. The APA provides an exception to notice-and-comment requirements for "foreign affairs function[s]." 5 U.S.C. § 553(a)(1). It has no such exception for immigration functions. *Id.* "The dangers of an expansive reading of the foreign affairs exception in [the immigration] context are manifest." *City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010).

Immigration matters, by their very nature, affect "foreign affairs." But if those implications alone sufficed, federal courts would effectively recognize a *de facto* immigration exception to notice-and-comment requirements that Congress refused to create. Thus, federal courts have long ago made clear that such implications do not provide generalized immunity from notice-and-comment requirements: "The foreign affairs exception would become distended if applied to INS actions generally, even though immigration matters typically implicate foreign affairs." *Yassini v. Crosland*,

618 F.2d 1356, 1360 n.4 (9th Cir. 1980); *see also Zhang v. Slattery*, 55 F.3d 732, 744 (2d Cir. 1995) (quoting *Yassini*) (holding that "the foreign affairs exception would become distended" without the "definitely undesirable" standard), *superseded by statute on other grounds* . "[I]t would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." *City of N.Y.*, 618 F.3d at 202. Accordingly, courts have routinely "disapproved[] the use of the foreign affairs exception where the Government has failed to offer evidence of consequences that would result from compliance with the APA's procedural requirements." *E. Bay*, 932 F.3d at 776 (collecting cases).

The government's invocation of the foreign affairs exception does not identify *any* potential "undesirable international consequences"—let along ones that will "definitely" occur. That rationale is thus insufficient on its face. Indeed, it is *exactly* what courts have made clear does not suffice: "the foreign affairs exception requires the Government to do more than merely recite that the Rule 'implicates' foreign affairs." *E. Bay*, 932 F.3d at 775. But that is all Defendants have done here, with the slight modification of swapping the word "implicates" with the vague, unsupported claim that notice-and-comment rulemaking would "complicate ongoing conversations with key foreign partners." 89 Fed. Reg. 67489. Just as the "reference in the Rule that refers to our 'southern border with Mexico' [was] not sufficient" in *East Bay*, the mere allusion to discussions with Mexico and Colombia, and unspecified other counties does not suffice here. 932 F.3d at 775.

Accepting the government's threadbare rationale here would have particularly pernicious effects. It would effectively permit any agency to avoid notice-and-comment rulemaking through the expedient of *talking* perfunctorily with foreign nations about the same subject—which is all that the government says here. In other words, the executive branch could avoid any obligation to give notice to, and take comments from, the *American* public by talking to a foreign government or two instead. If that were the law, why would an agency *ever* trouble itself with intentionally burdensome notice-and-comment requirements when it could instead engage in a cursory and *un*burdensome conversation with a foreign government? Thankfully, federal courts have never permitted such

29

naked circumvention of the APA under the foreign-affairs exception, and there is no reason for this case to be the first.

### D.  The challenged regulation is arbitrary and capricious.

Plaintiffs are also likely to prevail on the merits because the regulation that created the PIP program is arbitrary and capricious, which is independently sufficient for the regulations to be set aside. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A). "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750–52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Further, agencies must actually analyze the relevant factors. "'Stating that a factor was considered . . . is not a substitute for considering it.'" *State v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

### i.    The PIP Program is arbitrary and capricious.

The PIP Program is arbitrary and capricious for several independently sufficient reasons. Plaintiff's Complaint offers an initial list, which Plaintiffs incorporate here by reference, *see* Complaint, ECF 1 at ¶¶ 247–268, of Defendants' failures to "consider[ ] important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983), but, in support of preliminary injunctive relief, Defendants' failures merit further discussion here.

*First*, Defendants arbitrarily failed to consider the States' interest in reliance on the prior regime and the disruption caused by paroling, by the most conservative estimate, at least 550,000 aliens *en masse*. The States establish their budgets months or years in advance and the PIP Program threatens to upend that planning by imposing substantial unexpected liabilities and legal obligations

30

on the state. As federal courts have recognized in recent years, "a sudden shift in immigration policy could cause immediate, unexpected, and acute harm to the State's budget. The potential for suffering such harm is direct and substantial." *100-Day Pause*, 524 F. Supp. 3d at 630.

The government is obligated to "turn square corners in dealing with the people." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 24 (2020) (quoting *St. Regis Paper Co. V. United States*, 368 U.S. 208, 229 (1961) (Black, J., dissenting)). When an agency changes course, as Defendants have done here, they must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Id.* at 30 (quoting *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222 (2016)). In fact, "[i]t would be arbitrary and capricious to ignore such matters." *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The PIP Program, in particular, creates major liabilities for the States by transforming—without lawful authority—at least 550,000 illegal aliens into "parolees," thereby making them eligible for a vast swath of expensive government benefits. These programs also incentivize illegal migration by subverting statutorily mandatory disincentives, *see* 8 U.S.C. 1182(a)(9)(B),[24] thereby increasing illegal migration and the myriad financial and social costs that accompany it.

The Notice claims that "DHS considered the potential impact of the proposed process on State budgets," however a few sentences later, it admits that DHS actually did no such thing: "[a] comprehensive quantified accounting of local and State fiscal impacts specifically due to this parole in place process is not possible . . . . DHS cannot predict with the available information the impact these noncitizens might have on State and local programs or the degree they will contribute to State and local budgets." 89 Fed. Reg. 67478. It offers a "dismissive analysis, which dots 'i's and crosses 't's' without actually saying anything." *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam) (failure to actually "quantify or at least reasonably describe the costs of this policy to

---

[24] This section of the INA discourages illegal migration by requiring that aliens who had been unlawfully present in the United States for more than 180 days but less than one year are inadmissible for three years after the date of their departure from the U.S. Those who had been unlawfully present for over one year are inadmissible for ten years. This presumes voluntary departure; aliens previously *removed* face up to twenty years of inadmissibility. 8 U.S.C. § 1182(a)(9)(A).

the States" did not satisfy requirement to consider them)..

Agencies must actually analyze the relevant factors. "'Stating that a factor was considered . . . is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (quoting *Getty v. Fed. Sav. & Loan Ins.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC v. Navarro*, 579 U.S. at 224. The Notice, therefore, does not evidence any consideration whatsoever of the States' legitimate reliance on the ongoing enforcement of our immigration laws, nor of the costs imposed by undermining that reliance.

*Second*, related to the complete neglect of the States' reliance interests, the Notice does not evidence any meaningful consideration of the financial costs the PIP Program will impose on the States. "The Supreme Court has recognized that border states 'bear[ ] many of the consequences of unlawful immigration.' It therefore follows that a 'potential reliance interest' that DHS must consider includes Texas." *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021) (per curiam) (citing *Arizona v. United States*, 567 U.S. 387, 397 (2012)). And the "consideration [of any reliance interests] must be undertaken by the agency in the first instance," *MPP*, 20 F.4th at 990 (quoting *Regents of the Univ. of Cal. v. DHS*, 140 S. Ct. 1891, 1913 (2020))—"agencies 'must assess the strength of reliance interest (even *weak* interests, it seems) 'in the first instance.'" *Id.* (quoting *Regents*, 140 S. Ct. at 1913).

The costs are detailed elsewhere and so will not be recapped here, but they are extensive, they are not budgeted for, they are not compensated by the federal government, and there is no evidence that any of these costs were seriously considered by DHS, let alone how there could be any reason why imposing these costs by contravening statutory law is justified.

*Third*, Defendants show no evidence of having considered the incentive structures built into our immigration laws. As detailed above, the INA, augmented by IIRIRA, actively discourages illegal immigration by making it harder for those who have broken American immigration law to obtain the status of a legal resident without first leaving the country and by imposing waiting

periods between departing the country and being eligible to be considered admissible for purposes of lawful reentry.

The flip side of what Defendants present as an urgent crisis of family unity and security in need of a solution, no matter what the Constitution might say about the legislature's role in making substantive immigration law,[25] is that the "harm" Defendants purport to solve with the PIP Program is also a strong disincentive to entering this country illegally. Reducing disincentives against bad behavior (like unlawful migration) tends to increase that bad behavior.

Despite the obvious impact that undermining the statutory scheme, removing disincentives, and creating incentives for illegal migration is likely to have on illegal immigration (specifically: it will increase illegal immigration), Defendants failed to seriously consider incentives or the risk of increased illegal immigration in any way before promulgating the Notice. Instead, Defendants weakly claim that "DHS does not believe this process will meaningfully affect or create incentives for noncitizens to enter the United States" merely because it imposes a ten-year residency requirement. 89 Fed. Reg. 67479.

*Fourth*, Defendants fail to address the shift from their prior position. We don't know why Defendants have deviated from their prior position, policy, and practice, because no reasoned explanation was provided—a per se violation of APA requirements. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) ("Agencies are free to change their existing policies as long as they provide a reasoned explanation for the change.").

The APA prohibits Defendants from "whistl[ing] past [this] factual graveyard" to "evade[]" their "established pattern of agency conduct and formalized positions." *Am. Wild Horse Pres. Campaign*, 873 F.3d at 923–27; *see also Dillmon v. Nat'l Transp. Safety Bd.*, 588 F.3d 1085, 1089 (D.C. Cir. 2009) (APA requirements ensure that an agency's "prior policies and standards are being deliberately changed, not casually ignored") (quoting *Ramprakesh v. FAA*, 346 F.3d 1121, 1125 (D.C. Cir. 2003)).

---

[25] *See* U.S. CONST. art. 1, § 8.

33

*Fifth*, the PIP Program is arbitrary and capricious because its rationales are pretextual. Although courts are loath to investigate "the mental processes of administrative decisionmakers," there is an exception for "bad faith or improper behavior" that can justify such an inquiry, along with extra-record discovery. *Dep't of Com. v. New York*, 588 U.S. 752, 781, 785 (2019) (affirming finding of pretext where "explanation for agency action . . . is incongruent with what the record reveals about the agency's priorities and decisionmaking process").

The PIP Program essentially grants amnesty and a path to "lawful permanent residence"[26] and, eventually, citizenship for *at least* 550,000 people (in reality, likely well over one million) and vastly expands the parole power, without any statutory authorization, by, among other things, virtually eliminating "urgent humanitarian reasons or significant public benefit" as substantial limitations, including aliens already present in the United States, and permitting mass paroles of hundreds of thousands or millions of aliens at a time.

Mass amnesty for illegal immigrants, along with an increase in migration opportunities, has long been a policy priority of the Biden administration. *See, e.g.*, U.S. Citizenship Act of 2021, H.R. 1177, 117th Cong. (2021) (rejected proposal for amnesty and a path to citizenship for an estimated 11 million illegal aliens). The Biden-Harris Administration has also sought to expand the parole power via legislation to permit him to grant amnesty to massive numbers of illegal aliens. For example, in 2021, the Administration tried (unsuccessfully) to incorporate a massive expansion of the parole power into the economic stimulus package nicknamed "Build Back Better."[27]

*Sixth*, the Notice repeatedly treats illegal aliens being participants in the U.S. workforce as a positive. *See, e.g.*, 89 Fed. Reg. 67466, 67483, 67487. This contradicts Congress's "comprehensive framework for combating the employment of illegal aliens," which has "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Arizona v. United States*, 567 U.S. 387, 404 (2012) (cleaned up). And "as Congress [has] explained, '[a]liens who enter or

---

[26] DHS Fact sheet.

[27] Rebecca Beitsch, *House Outlines Immigration Provisions in Latest Build Back Better Package*, THE HILL (Nov. 3, 2021), https://perma.cc/J2LR-FRYE.

remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others.'" *Demore v. Kim*, 538 U.S. 510, 518 (2003) (quoting S. Rep. No. 104–249, p. 7 (1996)). Indeed, "a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 194 (1991).

Judge Hanen in the DACA litigation twice examined the laws prohibiting the employment of illegal aliens and specific statutory exceptions to that general feature of immigration law. *See Texas*, 328 F. Supp. 3d at 716–18; *Texas*, 549 F. Supp. 3d at 610–12. Where Congress has permitted employment authorization, it has done so for limited categories of illegal aliens who—unlike the DACA recipients or PIP Program beneficiaries—have been deemed non-removable for various reasons set forth by statute. *See Texas*, 549 F. Supp. 3d at 610 & nn.48–49 (citing statutes setting forth various categories, including human-trafficking victims and asylum applicants). The Notice never addresses the existence of these specific, congressionally delineated categories, much less how DACA's employment authorization can be squared with them—and this despite a federal court's previous rulings on this issue.

The PIP Program disregards both Congress's determinations that employment of illegal aliens harms American workers and the negative incentives to hire American workers created by the Affordable Care Act. Instead, the PIP Program adopts a cost-benefit analysis that relies on potential downstream effects that could help some American workers despite harms to those directly competing with PIP recipients. 89 Fed. Reg. 67,466–67.

The articulated reasons for the PIP Program fail to consider Congress's framework, "undermining Congress's stated goal of closely guarding access to work authorization and preserving jobs for those lawfully in the country." *DAPA*, 809 F.3d at 181. "[B]ecause agency action must be based on non-arbitrary, relevant factors, the agency's approach must be tied, even if loosely, to the purposes of the immigration laws or the appropriate operation of the immigration

system." *Judulang v. Holder*, 565 U.S. 42, 55 (2011) (cleaned up). The rationale for agency action reflected in the PIP Program contradicts those purposes.

An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Congress did not intend Defendants to consider purported positive effects of what it has forbidden by statute—the employment of illegal aliens. Instead, Congress allowed employment authorization for certain categories of illegal aliens while they were not removable, not to encourage the continued (or increased) presence of removable illegal aliens.

*Seventh*, there is no sign that Defendants considered lawful alternatives to the PIP Program. Defendants did not consider whether de-prioritizing enforcement against illegal aliens married to U.S. citizens might have been a less disruptive (and unlawful) method of promoting family unity. Defendants did not consider whether any statutory authorities might legitimately facilitate opportunities for families to maintain physical proximity without the U.S. citizen spouse being put in a difficult position. And Defendants did not consider whether the best policy might be to allow those who break our laws (or marry lawbreakers) to keep their families united outside the United States until they have completed the requirements to be lawfully re-admitted.[28]

Any of those reasons are independently sufficient for the court to find that PIP is arbitrary and capricious and, thus, unlawful.

> ii.  **The approval and use of Form I-131F violates the Paperwork Reduction Act and is arbitrary and capricious.**

Under the Paperwork Reduction Act (PRA), "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information," the agency complies with a number of requirements, including a review of the information to be collected, publication in the Federal Register of the intent to collect information,

---

[28] Incidentally, the third option is more lenient than what U.S. citizens who break our criminal laws typically subject their families to: they must endure separation for the duration of the legal consequences of their actions without a lawful opportunity to simply move elsewhere as a unified family.

a 60-day notice-and-comment period, approval by OMB, and then publication in the Federal Register by OMB with another 30-day notice-and-comment period. 44 U.S.C. §§ 3506, 3507.

 Defendants have followed none of these PRA-required procedures. Therefore, ordinarily, the earliest that Form I-131F could be approved is 90 days from when it is first published in the Federal Register.

There is one exception to the PRA's normal requirements: the PRA and OMB's implementing regulations allow "OMB to authorize emergency processing of submissions of collections of information." 5 C.F.R. § 1320.13; *see also* 44 U.S.C. § 3507(j). But emergency processing is only permitted in narrow circumstances: when the information "is needed prior to the expiration of time periods established under" the PRA; the information "is essential to the mission of the agency"; and "the agency cannot reasonably comply with the provisions of this subchapter because" "public harm" will result, "an unanticipated event has occurred," or the information collection is needed sooner to comply with statutory or court deadlines. 44 U.S.C. § 3507(j)(1) and 5 C.F.R. § 1320.13(a).

"The power to utilize [the emergency processing] authority under these provisions is not unlimited. Such emergency requests are only appropriate upon an agency head's determination that public harm is reasonably likely to result if normal clearance procedures are followed." *Texas Blockchain Council v. Dep't of Energy*, No. W-24-cv-99, 2024 WL 990067, at *2 (W.D. Tex. Feb. 23, 2024) (Albright, J.). When "the facts alleged by Defendants to support an emergency request fall far short of justifying such an action," the emergency processing "determination likely violates the APA as 'arbitrary, capricious, [or] an abuse of discretion.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

The Notice fails to allege any of the circumstances required for emergency processing of Form I-131F, and none of the circumstances required for emergency processing are present here. Because Defendants do not qualify for emergency processing under the PRA, they have violated the Act, and the approval and use of Form I-131F is unlawful and arbitrary and capricious under the APA.

### E.  The PIP Program violates the Take Care Clause.

Since our Founding, "both courts and the executive branch itself have recognized the president's inability to suspend or dispense with the law." *MPP,* 20 F.4th at 981. "The Framers agreed that the executive should have neither suspending nor dispensing powers." *Id.* at 980. The Supreme Court has held likewise. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Id.* at 613. Any other conclusion would "vest[] in the President a dispensing power." *Id.*

Through its adoption of the policies of the PIP Program, the Executive dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful, thereby violating the Take Care Clause. U.S. Const. art. II, § 3 ("[The president] shall take Care that the Laws be faithfully executed …"). Moreover, the PIP Program further violates the Take Care Clause because it dispenses with certain immigration statutes by granting a pathway to citizenship to aliens who would otherwise be unlawfully present but for the PIP Program. As Justice Scalia properly noted, the similar DACA program involved "biennial requests for *dispensation*" from immigration statutes. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part) (emphasis added).

## II.  Plaintiffs are within the zone of interests and have a cause of action.

Plaintiffs have a cause of action under the APA because their claims are within the zone of interests protected by the INA. The zone-of-interest test is satisfied if the claims are "*arguably* within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521 (citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (internal quotations omitted)

38

(quoting *Patchak*, 567 U.S. at 225).

In this case, the interests or purposes of the INA and related immigration statutes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *See id*. at 521 (citing *Arizona*, 567 U.S. at 397, and *DAPA*, 809 F.3d at 163). Plaintiffs also have an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate their standing and irreparable injury. *Id.*

Plaintiffs fall within the zone of interests of the INA, which is the proper reference for actions under the APA, rather than any particular section. *MPP*, 20 F.4th at 975–76. One reason the INA was enacted was the "concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'"—benefits such as the ones Plaintiffs must furnish under the Emergency Medicaid program and their obligation to furnish a public education. *DAPA*, 809 F.3d at 163 (quoting 8 U.S.C. § 1601). Plaintiffs' interests in not "spending millions of dollars to subsidize" illegal aliens are within the zone of interests protected by the INA. *Id.* By strictly limiting the exercise of the parole power, Section 1182(d) ensures that aliens are not released into the United States to impose costs on American citizens and taxpayers. Plaintiffs' injuries flow from just that problem and it may use the APA to protect their interests.

III.   **The PIP Program is reviewable.**

   A.   **The PIP Program is final agency action.**

As the Fifth Circuit's most relevant precedent instructs, the issue of final agency action should be addressed first because "that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Finality finds its origins in the Administrative Procedure Act ("APA"), which only allows judicial review of "final" agency action. 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: (1) the agency action

"mark[s] the consummation of the agency's decisionmaking process" and is not "merely tentative or interlocutory [in] nature," and (2) the action determines "rights or obligations" and imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *EEOC*, 933 F.3d at 441 (cleaned up). Both finality prongs are satisfied here.

        i.    **The Notice marks the consummation of DHS's decisionmaking because it is neither tentative nor interlocutory.**

The Fifth Circuit recognizes that even "guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011). "[T]he key question [for the first finality prong] is whether [the agency action] is 'subject to further agency review.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 638 (5th Cir. 2023); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022); *Sackett v. EPA*, 566 U.S. 120, 127 (2012).

Indeed, where "the challenged action is a definitive statement of the agency's position," the "agency action is final." *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995); *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute 'final agency action'") (citation omitted). And one way that courts have held that agency "guidance" documents like the Notice constitute final and reviewable agency actions under the APA is if they "bind" the agency and its employees "to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule—really any rule—and a general statement of policy . . . turns on whether an agency intends to bind itself to a particular legal position."); *accord DAPA*, 809 F.3d at 171 ("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up). Action "bind[ing]" an "agenc[y]" to a legal view "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (citation omitted).

The Notice is final even though it will be implemented through particular grants of applications for parole. A rule that will result in orders applying it constitutes final agency action despite the application to individual cases having yet to be completed. *See Biden*, 597 U.S. at 809 n.7 ("The fact that the agency could not cease implementing MPP, as directed by the October 29 Memoranda" until the occurrence of a contingent event "did not make the October 29 Memoranda any less the agency's final determination of its employees' obligation to do so once such judicial authorization had been obtained."). All "rules" must be eventually applied via "orders" under the APA, but that does not mean that rules are not subject to judicial review.

### ii.    The Notice binds DHS and imposes legal consequences.

In addition to the first prong of finality, the Notice also satisies the second prong of finality when it binds Defendants and their employees to a particular legal position and cause significant legal consequences for Texas and the other Palkintiff States. Generally, when an agency "loses discretion" because of an agency action, "[t]hat's textbook final agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 854. Even if the agency action only removes "*some* of the [agency's] discretion," it still satisfies the second prong of finality. *Clarke*, 74 F.4th at 638 (emphasis added). Stated differently, "the existence of some amount of discretion is not determinative." *Texas*, 549 F. Supp. 3d at 602.

Here, the action reflected in the Notice binds the agencies and imposes legal consequences because it explicitly cabins discretion. The PIP Program also alters the rights of aliens by creating a program where the agency adjudicates applications for parole, and parole makes aliens eligible for federal and State benefits. *See DACA*, 50 F.4th at 521–24 (DACA is a substantive rule because it provides "affirmative immigration relief . . . following extensive proceedings that are effectively adjudications" and "eligibility for benefits"); *DAPA*, 809 F.3d at 173 n.137 ("[P]lac[ing] a cost on the states" is also a sign that a rule is binding).

The Notice does not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties, "chang[ed] the text" of the statute it "profess[ed] to interpret," and

41

effects[ed] a substantive change in existing law or policy," and is therefore a substantive (or "legislative") rule. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). And because those agency documents do not "genuinely leave[] the agency and its decisionmakers free to exercise discretion," it is also a substantive rule. *Texas*, 549 F. Supp. 3d at 600 (citation omitted). And as all substantive rules are, "by definition, final agency action," *EEOC*, 933 F.3d at 441, the Notice here constitutes final agency action.

Further, the Notice constitutes a substantive rule because no statutory authority "compels or logically justifies" its provisions. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021). That's because "the [action] does not simply repeat the relevant provisions of [the parole statute]. Instead, the [action] purports to interpret authoritatively [those statutory requirements]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA." *Texas v. EEOC*, 827 F.3d 372, 385–86 (5th Cir. 2016), *opinion withdrawn on reh'g,* 838 F.3d 511 (5th Cir. 2016).

Even policy statements may sometimes be final agency actions due to their effects. *See MPP*, 20 F.4th at 949; *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006). What matters is the actual effect of the challenged actions, not how Defendants label them. *See Shalala*, 56 F.3d at 596.

### B.  The PIP Program is reviewable under the APA.

The APA establishes a "basic presumption of judicial review for one suffering legal wrong because of agency action." *Regents of the Univ. of Cal.*, 591 U.S. at 16–17. "That presumption can be rebutted by a showing that the relevant statute precludes review, or that the agency action is committed to agency discretion by law [as explained by *Heckler v. Chaney*, 470 U.S. 821 (1985)]." *Id.* (cleaned up). Neither exception applies in the current action. Establishing unreviewability is a heavy burden, and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *DAPA*, 809 F.3d at 164 (cleaned up). "Whether and to what extent a particular statute precludes judicial review is

determined not only from its express language, but also from the structure of the statutory scheme, its objectives, its legislative history, and the nature of the administrative action involved." *Id.* (quoting *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 345 (1984)).

There is a well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action. *DAPA*, 809 F.3d at 163 (quotation omitted). Only a narrow group of matters are regarded as "committed to agency discretion," such that they are exempt from review under the APA under 5 U.S.C. § 701(a)—an agency's decision not to institute enforcement proceedings, for example, or statutes drawn in such broad terms that "there is no law to apply." *DAPA*, 809 F.3d at 163. That is not the case here, where Congress set forth both specific legal criteria for eligibility for parole and a specific process for determining whether those criteria are met. *See* 8 U.S.C. § 1182(d)(5).

### i.   No statute bars review.

No "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). Courts have consistently rejected the claim that 8 U.S.C. § 1252(a)(2)(B)(ii) bars review of the type of programmatic challenge the States assert here. "To the contrary, the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *MPP*, 20 F.4th at 977 (rejecting argument that "an *entire program*—operating across an international border and affecting thousands or millions of people and dollars—is rendered unreviewable by § 1252(a)(2)(B)(ii)) (emphasis in original); *see also Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *8–9 (D. Mass. May 12, 2023) ("the Court agrees with Plaintiffs that § 1252(a)(2)(B)(ii) does not bar all judicial review of agency action taken under § 1182(d)(5)(A)" and collecting cases holding the same thing); *id.* at *9 (DHS parole policies at issue in the case were reviewable under the APA, because "the guidelines in § 1182(d)(5)(A) provide sufficient guidance such that the [Federal] Defendants' actions are not unreviewable under the narrow exception articulated in § 701(a)(2).").

### ii.   The PIP Program is not committed to agency discretion by law.

The Parole Program is a "rule" under the APA. A rule is "an agency statement of general

... applicability and future effect" that either "prescribe[s] law or policy" or "describe[s] [agency] organization, procedure, or practice requirements. 5 U.S.C. § 551(4). "*Heckler* does not apply to agency rules." *MPP*, 20 F.4th at 978. Courts "apply *Heckler*, if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Id.* at 984. Such one-off enforcement decisions would include, for example, a particular decision to grant (or not grant) parole to a specific alien. Plaintiffs here do not challenge such decisions. Thus, this Court need proceed no further—the PIP Program is reviewable under the APA.

Even if *Heckler* could apply to the PIP Program as a rule, it wouldn't apply because of what the rule does. The operation of the Program "would trigger eligibility for federal benefits and state benefits that would not otherwise be available to illegal aliens." *DAPA*, 809 F.3d at 166. "[T]o be reviewable agency action, [the challenged action] need not directly confer public benefits—removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them 'provides a focus for judicial review.'" *Id.* at 167 (quoting *Heckler*, 470 U.S. at 832). The removal of that bar "provides a focus for judicial review." *Heckler*, 470 U.S. at 832; *accord DAPA*, 809 F.3d at 167.

Even if *Heckler*'s presumption against reviewability applied, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *MPP*, 20 F.4th at 982. That rebuttal holds here. The Supreme Court in *Biden*, 597 U.S. at 806–07, recently stated that parole authority "is not unbounded" because of its case-by-case limitation and limit to urgent humanitarian reasons or significant public benefit and "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." (quoting landmark APA case *State Farm*, 463 U.S. 29).

## IV.    Plaintiffs have standing and will suffer irreparable injury.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable," *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986); rather, Plaintiffs need only demonstrate that they are "likely to suffer

irreparable harm in the absence of preliminary relief." *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (quotation marks omitted). As detailed above, the Plaintiff States face an imminent, irreparable, sovereign injury from the PIP Program, which purports to preempt any contrary state law. In addition, while financial injuries are generally reparable, here, sovereign immunity is a bar to Plaintiffs' recovery. *Texas v. EPA*, 829 F.3d at 434; *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Accordingly, that injury "cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012); *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984).

The States will suffer irreparable harm without prompt injunctive relief. States "bear[ ] many of the consequences of unlawful immigration," *Arizona*, 567 U.S. at 397, and those consequences in this case are both harmful and irreparable. The burdens are not merely hypothetical and will be balloon by Defendants' current mass parole of illegal aliens "into"[29] the United States. Although monetary costs are often considered recoverable, "[e]ven purely economic costs may count as irreparable harm where they cannot be recovered in the ordinary course of litigation." *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (internal quotation omitted). In this case, there is no mechanism in this litigation by which the States could recover from the federal government, meaning that the costs the States incur because of Defendants' illegal actions are irreparable. "Indeed 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'" *Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part and in the judgment)); *see also Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th at 597 ("Under our precedent, the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm.").

States will suffer irreparable injury from increased education costs that cannot be recouped

---

[29] As discussed above, the PIP Program, contrary to the parole statute, does not parole immigrants into the United States; it retroactively changes the status of immigrants already unlawfully present.

through litigation. For example, Texas law defines residents "entitled to pay resident tuition at all institutions of higher learning" to include illegal aliens. *See* 19 TEX. ADMIN. CODE § 21.24(a) and (d)(4). At the University of Texas at Austin, the distinction costs the State-funded university approximately $30,000–$35,000 per academic year, per student.[30]

Also, the annual cost of educating unaccompanied alien children—a subset of illegal aliens eligible for public education, costs Texas hundreds of millions of dollars annually, and approximately $232.77 million in FY 2023 and $213.85 million in FY 2024. Amy Copeland Decl. ¶ 4. "Texas incurs real financial costs in providing public education to unaccompanied children. And the harm is imminent because Texas is currently providing public education to unaccompanied children and demonstrates plans to continue doing so in the future." *100-Day Pause*, 524 F. Supp. 3d at 621. Idaho similarly limits public benefits, including in-state tuition, to residents able to "verify [their] lawful presence." IDAHO CODE §§ 33-3717B(3)(b), 67-7903. At both the University of Idaho and Boise State University, the difference that the State-funded university system must account for is just under $19,000.[31] None of the savings that otherwise ineligible aliens can extract from the States' public university systems can be recovered in this litigation.

Additionally, Texas funds two healthcare programs that require significant expenditures to cover illegal aliens that would not be present if PIP Program beneficiaries were removed or otherwise left the United States: the Emergency Medicaid Program and the Texas Children's Health Insurance Program (CHIP). Susan Bricker Decl. ¶ 5. None of these costs are recoverable. Texas is required by federal law to include illegal aliens in its Emergency Medicaid Program. See 42 C.F.R. § 440.255(c). "The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; $95.0 million in CY2022; and $97.5 million

---

[30] *Cost of Attendance*, UNIVERSITY OF TEXAS AT AUSTIN, https://perma.cc/7NG3-TUYU (last accessed Aug. 15, 2024).
[31] *See Cost of Attendance*, UNIVERSITY OF IDAHO, https://perma.cc/E9F2-DKJ2 (last accessed Aug. 15, 2024); *Cost of Attendance*, BOISE STATE UNIVERSITY, https://perma.cc/U5RU-N8UX (last accessed Aug. 15, 2024).

in 2023." Susan Bricker Decl. ¶ 8. Texas also spends millions of dollars per year on CHIP for prenatal coverall for illegal aliens, including over $31 million in 2023. TEXAS_0006–08.

Texas also faces serious injuries from the crime and associated costs caused by the PIP Program. From July 1, 2022, to June 30, 2023, the Texas Department of Criminal Justice (TDCJ) housed 7,768 illegal criminal aliens for a total of 2,208,639 days. Rebecca Waltz Decl. ¶ 6. That cost more than $171,147,436, but the federal government has yet to reimburse Texas. *Id.* ¶¶ 6–7. The amounts of unreimbursed expenses will likely increase if more illegal aliens are paroled under the PIP Program. *Id.* ¶ 10. Criminal activity by aliens would not occur had they not been present in the State imposes a significant cost on Texans, not only because of the irreparable harm resulting from criminal activity, but also because of the significant financial cost of the criminal justice system. These costs are sufficient for standing because "Texas's claimed injury from unanticipated detention costs is sufficiently concrete and imminent. The harm is concrete or *de facto* because Texas incurs real financial costs in detaining criminal aliens. And the harm is imminent because Texas is currently operating a detention system that holds criminal aliens and has demonstrated plans to continue doing so in the future." *100-Day Pause*, 524 F. Supp. at 620–21.

But the fact that the economic losses the States will suffer are likely in the millions is not the salient point for TRO or PI analysis. Rather, "[i]n determining whether costs are irreparable, the key inquiry is 'not so much the magnitude but the irreparability.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th at 597 (quoting *Texas v. EPA*, 829 F.3d at 433–34). The amount of irreparable harm must be greater than de minimis to sustain injunctive relief, but federal courts in this Circuit have found that amounts as low as $200 were sufficient to meet that standard. *See, e.g.*, *Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms and Explosives*, No. 3:23-CV-1471-L, 2024 WL 1349307 at *10 (N.D. Tex. Mar. 29, 2024). "For standing purposes, a loss of even a small amount of money is ordinarily an injury." *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) (quotation omitted); *see also Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 801–02 (2021) (nominal damages sufficient for standing's redressability prong).

47

Indeed, perhaps most striking, the PIP Program permits aliens who are "*currently in removal proceedings*" to request PIP. 89 Fed. Reg. 67,465 (emphasis added). An increased incentive for illegal aliens to remain in the United States imposes massive costs on the States. The States will need to spend more money on law enforcement, education, and Emergency Medicaid. Due to sovereign immunity, the States cannot recover damages from the federal government, so the States' injuries constitute irreparable harm. *See, e.g.*, *MPP,* 20 F.4th at 1001; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021). That's why the Fifth Circuit has squarely recognized economic harms resulting from unlawful federal immigration policy to constitute irreparable harm. *See DAPA*, 809 F.3d at 186.

The States are also harmed, as *parens patriae* and quasi-sovereign entities, when citizens and lawfully present aliens are victimized by increased crime, accidents, and other social costs associated with illegal immigration.

DHS is committed to mass-paroling hundreds of thousands or millions of aliens as rapidly as possible, so the States cannot wait for injunctive relief without suffering ongoing and steadily increasing harm. Indeed, DHS had opened the online application portal for aliens to apply for parole the day *before* it posted notice of the program in the Federal Register and began accepting applications and granting parole within hours of publishing the notice.[32] An immediate TRO is necessary because DHS *is currently* issuing unlawful grants of parole.

Relief against the PIP Program will redress Plaintiffs' injuries. Aliens currently subject to the PIP Program would be removable if the PIP Program were vacated, "providing incentives for some if not many to leave the United States, including Texas. . . and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520. Aliens may return to their home countries when they are not incentivized to stay via work authorizations and protection from removal. For

---

[32] Armando Garcia, *Immigrants begin receiving relief from deportation under new Biden executive order*, ABC NEWS (Aug. 21, 2024).

example, a national survey found 22.3% of DACA recipients stated that they were likely or very likely to leave the U.S. if they were not given DACA status. Lloyd B. Potter Decl. ¶ 10. Even illegal aliens who have been in the U.S. for ten years or longer "return to their countries of origin at a rate of 1% each year." *Id.* ¶ 12.

## V.    The public interest and the balance of equities favor relief.

When governmental action is implicated, the third and fourth factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). To preserve the relative positions of the parties until a trial on the merits, federal courts regularly enjoin federal agencies from implementing and enforcing new regulations pending litigation challenging them. *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015). An injunction promotes and protects the public interest by avoiding the myriad harms that Defendants' lawlessness will bring. There is "no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (cleaned up).

Finally, even if the program could meaningfully be said to benefit the illegal aliens at issue, immediate injunctive relief cannot be reasonably said to cause them any harm. The Notice itself illustrates the hollowness of any claims about the urgency of the regulations. The primary population they target is people who have been unlawfully present in this country for at least 10 years (on average 23 years)[33]—there's no rush. At worst, even if there is some way that these regulations could be lawful (there is not), immediate injunctive relief would mean a short delay in program implementation while this litigation runs its course for people who have already spent at least a decade in this country without parole.

Because the government has no interest in immediately enacting an illegal regulation and any possible harm to potential beneficiaries of the programs is, at most, minimal, the balance of equities and public interest strongly favor this Court issuing immediate injunctive relief.

## VI.    Relief should be universal and nationwide.

Should the Court issue injunctive relief, the orders granting either a TRO or a PI should be

---

[33] DHS Fact Sheet.

49

effective nationwide, not just in the Plaintiff States who bring this motion. "[T]he Fifth Circuit's precedent in this area is applicable and controlling." *100-Day Pause*, 524 F. Supp. 3d at 667. As in other immigration cases, "a geographically-limited injunction would be ineffective" since once migrants cross into the United States, they are "free to move among states." *DAPA*, 809 F.3d at 188. Further, "immigration policy" is supposed to be "a comprehensive and *unified* system." *Id.* (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012). Because Texas has the largest share of the southwestern border, injunctive relief limited to Texas would merely divert the most direct and immediate of the harms caused by the program to Texas's sister States.

Plaintiffs also seek a stay of the PIP Program under 5 U.S.C. § 705, which provides that a "reviewing court" may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colleges & School of Texas v. United States Dep't of Education*, 98 F.4th 220, 255 (5th Cir. 2024); *see also Fedn. of Americans for Consumer Choice, Inc. v. U.S. Dep't of Lab.*, 2024 WL 3554879, at *17 (E.D. Tex. July 25, 2024) (Kernodle, J.) (issuing a stay under § 705 and not limiting the scope of relief "to the parties in [the] case"). Indeed, "[t]he default rule is that vacatur is the appropriate remedy." *Data Mktg. Partn., LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 859 (5th Cir. 2022). Thus, "[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *Career Colleges*, 98 F.4th at 255.

## CONCLUSION

For the reasons explained above, Plaintiffs respectfully request immediate injunctive relief to halt Defendants' implementation of the illegal PIP Program, including the Notice, the Filing Guide, and the Form I-131F. Specifically, Plaintiffs respectfully request that this Court issue a

temporary restraining order prohibiting Defendants from implementing the illegal PIP program, accepting applications pursuant to the PIP Program, or granting parole to PIP applicants.

Further, in order to ensure full compliance with the Court's orders, *see MPP*, 554 F. Supp. 3d at 857–58, Plaintiffs respectfully request that Defendants be required to report regularly on the status of implementation, including, from the date the application became available to potential applicants (August 19, 2024), (1) the number of applications for parole associated with the PIP Program received, (2) the number of applications for parole adjudicated, (3) the number of applications for parole approved, (4) the number of applications for parole denied, (5) the number of applicants for parole who had previously filed for some form of immigration benefits or relief (including the I-601A Application for Provisional Unlawful Presence Waiver), (6) the number of applicants who had previously submitted biometric or other personal information that was used to adjudicate a PIP application, and (7) any other information the Court believes is necessary to evaluate the nature of the program, its implementation, and Defendants' compliance with the Court's orders regarding the program.

Dated: August 23, 2024.

Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**GENE P. HAMILTON**
Virginia Bar No. 80434

**BRENT WEBSTER**
First Assistant Attorney General

**JAMES ROGERS**
Arizona Bar no. 027287

**RALPH MOLINA**
Deputy First Assistant Attorney General

**RYAN GIANNETTI**
DC Bar no. 1613384

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org
James.Rogers@aflegal.org
Ryan.Giannetti@aflegal.org

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085
Ryan.Walters@oag.texas.gov

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415
Kathleen.Hunker@oag.texas.gov

**COUNSEL FOR PLAINTIFF**
**STATE OF TEXAS**

**RAUL R. LABRADOR**
Idaho Attorney General

**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov

*/s/ Alan Hurst*
Alan Hurst
Solicitor General
Michael A. Zarian
Deputy Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov
Michael.Zarian@ag.idaho.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**COUNSEL FOR STATE OF IDAHO**

**STEVE MARSHALL**
Attorney General of Alabama

*/s/ Robert M. Overing*
**ROBERT M. OVERING**
Deputy Solicitor General
Robert.Overing@AlabamaAG.gov
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400

**COUNSEL FOR STATE OF ALABAMA**


**TIM GRIFFIN**
Attorney General of Arkansas

Nicholas J. Bronni
Solicitor General

*/s/ Dylan L. Jacobs*
**DYLAN L. JACOBS***
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2007
Dylan.jacobs@arkansasag.gov
Counsel for State of Arkansas
*admission application forthcoming*


**ASHLEY MOODY**
Attorney General of Florida

*s/ James Percival*
**JAMES H. PERCIVAL**
Chief of Staff
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
James.percival@myfloridalegal.com

**COUNSEL FOR STATE OF FLORIDA**


**CHRISTOPHER M. CARR**
Attorney General of Georgia

*/s/Stephen J. Petrany*
**STEPHEN J. PETRANY**
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
**COUNSEL FOR STATE OF GEORGIA**
*PHV Application Forthcoming*


**BRENNA BIRD**
Attorney General of Iowa

*/s/ Eric H. Wessan*
**ERIC H. WESSAN**
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
**COUNSEL FOR STATE OF IOWA**


**KRIS W. KOBACH**
Attorney General of Kansas

*s/ Abhishek S. Kambli*
**ABHISHEK S. KAMBLI ***
Deputy Attorney General – Special Litigation &
Constitutional Issues Division
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Phone: (785) 296-6109 | Fax:  (785) 221-3938
abhishek.kambli@ag.ks.gov
**COUNSEL FOR STATE OF KANSAS**
*admission application forthcoming*

ELIZABETH B. MURRILL
Attorney General of Louisiana

s/ J. Benjamin Aguiñaga
J. BENJAMIN AGUIÑAGA*
Solicitor General
Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov
COUNSEL FOR STATE OF LOUISIANA
*admission application forthcoming


ANDREW BAILEY
Attorney General of Missouri

/s/ Samuel C. Freedlund
SAMUEL C. FREEDLUND, 73707MO
 Deputy Solicitor General
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, MO 63188
Phone: (314) 340-4869
Fax (573) 751-1774
Samuel.Freedlund@ago.mo.gov
COUNSEL FOR THE STATE OF MISSOURI


DREW H. WRIGLEY
Attorney General of North Dakota

/s/ Philip Axt
PHILIP AXT*
Solicitor General
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
pjaxt@nd.gov

COUNSEL FOR STATE OF NORTH DAKOTA

*PHV application forthcoming


DAVE YOST
Attorney General of Ohio

/s/ T. Elliot Gaiser
T. ELLIOT GAISER*
Ohio Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
614.466.5087 fax
thomas.gaiser@ohioago.gov
COUNSEL FOR STATE OF OHIO
*PHV Application Forthcoming


MARTY JACKLEY
Attorney General of South Dakota

/s/ Clifton E. Katz
CLIFTON E. KATZ
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-Mail: clifton.katz@state.sd.us

COUNSEL FOR STATE OF SOUTH DAKOTA


ALAN WILSON
Attorney General of South Carolina

s/ J. Emory Smith, Jr.
JAMES EMORY SMITH, JR.
Deputy Solicitor General
Email:  esmith@scag.gov
Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3642
Fax: (803) 734-3677

COUNSEL FOR STATE OF SOUTH CAROLINA

*Application for Admission Forthcoming

**JONATHAN SKRMETTI**
Attorney General of Tennessee

*/s/ Whitney D. Hermandorfer*
**WHITNEY D. HERMANDORFER**
*Director of Strategic Litigation*
Tennessee Bar. No. 041054
Whitney.Hermandorfer@ag.tn.gov
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726

**BRIDGET HILL**
Attorney General of Wyoming

*/s/ Ryan Schelhaas*
**RYAN SCHELHAAS\***
Chief Deputy Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov
**COUNSEL FOR STATE OF WYOMING**

\**motion for pro hac vice admission forthcoming*

**CERTIFICATE OF CONFERENCE**

I certify that I conferred on August 22, 2024, via phone with Erez R. Reuveni and Joseph A. Darrow of the U.S. Department of Justice regarding the relief requested in this motion.  Counsel for Defendants stated that they oppose the motion. Counsel for Defendants also stated that they plan to file a proposal for how to proceed with this case today.

*/s/Ryan D. Walters*
RYAN D. WALTERS


**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on August 23, 2024. I also served a copy of this document via email to the following attorneys at the U.S Department of Justice:

Erez R. Reuveni at erez.r.reuveni@usdoj.gov
Brian C. Ward at Brian.C.Ward@usdoj.gov
Elissa P. Fudum at Elissa.P.Fudim@usdoj.gov
Joseph A. Darrow at Joseph.A.Darrow@usdoj.gov
Erin T. Ryan at Erin.T.Ryan@usdoj.gov

*/s/Ryan D. Walters*
RYAN D. WALTERS