# EXHIBIT A

## DECLARATION OF LLOYD B. POTTER, PH.D.

1. My name is Lloyd B. Potter, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise in the matters stated herein.

2. I was appointed State Demographer of Texas in June of 2010. I hold degrees of Ph.D. in sociology from The University of Texas at Austin, a Master of Public Health in epidemiology from Emory University, a Master of Science in Education from the University of Houston at Clear Lake, and a Bachelor of Science in sociology from Texas A&M University. I have worked as an Assistant Professor at Fordham University, a post-doctoral fellow at Emory University and Centers for Disease Control and Prevention, a Behavior Scientist at the Centers for Disease Control and Prevention, and as a Research Scientist at the non-profit company Education Development Center, Inc. I am currently a professor in the Department of Sociology and Demography at The University of Texas at San Antonio. I also serve as the director of the Institute for Demographic and Socioeconomic Research (IDSER). I have extensive experience working as an applied demographer, and my current work focuses on public policy-related research and training applied demographers.

3. Based on my education, qualifications, experience, and knowledge of the relevant literature, I believe the following statements are true and accurate.

4. Using data from the American Community Survey, FWD.US estimated that there are about 155,000 undocumented immigrants married to U.S. Citizens in the State of Texas in 2021 (FWD.US, 2024). Another study by the Migration Policy Institute, employed different methodology from the FWD.US study, used the U.S. Census Bureau's Survey of Income and Program Participation (SIPP) and the American Community Survey, estimated that there were about 204,000

      unauthorized immigrants married to U.S. citizens in the State of Texas in 2019. (Migration Policy Institute, 2019). The methodologies used in both estimates seem reasonable, given data limitations, and the estimates are consistent with other estimates.

5. Economic factors are strongly associated with many migrant flows. For example, differences in economic growth, wages, and the employment situation between the United States and Mexico are critical determinants of immigration, and migration of labor out of Mexico (Aguila, 2012). Most unlawful migrants coming to the U.S. are doing so to work. Massey et.al. found that that undocumented migration from Mexico appears to reflect U.S. labor demand and access to migrant networks (Massey, Durand, & Pren, 2014).

6. Kennan and Walker found that interstate migration decisions are influenced to a substantial extent by income prospects. Their research suggests that the link between income and migration decisions is driven both by geographic differences in mean wages and by a tendency to move in search of a better locational match when the income realization in the current location is unfavorable (Kennan & Walker, 2011).

7. In part, the Immigration Reform and Control Act (IRCA) is intended to restrict unauthorized immigration into to the United States by making it illegal for employers to hire unauthorized immigrants and imposing sanctions on employers who employ unauthorized immigrants (Wishnie, 2007). Several States have adopted laws to require E-Verify to make hiring of unlawful immigrants more difficult. Orrenius and Zadvodny found that possible unauthorized immigrants in States that had implemented such efforts may have more difficulty working and more difficulty changing jobs (Orrenius & Zavodny, 2016). They also found some evidence suggesting "… that most of the drop in the number of already-present unauthorized immigrants in [S]tates that adopt

universal E-Verify laws is due to them leaving the USA entirely." (Orrenius & Zavodny, 2016).

8. While unlawful immigrants are motivated to stay in the United States, it is reasonable to conclude that some will return to their country of origin if they lose or are not given permission to work in the United States. The causes of return migration are difficult to assess because there is limited research and understanding of return migration.

9. In a study of young immigrants to the United States, Regan and Olsen found they were less likely than older immigrants to return to their country of origin (Reagan & Olsen, 2000). Child and young immigrants who migrated later in their childhood (having spent more time in their country of origin) were more likely to return to their country of origin than those who immigrated when they were younger. They also found that immigrants with college degrees were more likely to return to their country of origin than those without.

10. In a national survey, Wong, et al., found that 22.3% of recipients of deferred action and work authorization under the Deferred Action for Childhood Arrivals (DACA) program stated that they were likely or very likely to leave the United States without DACA status. (Wong, et al., 2017).

11. In a study of characteristics associated with emigration of foreign-born persons in the United States (return migration), Van Hook and Zhang found that "indicators of economic integration (home ownership, school enrollment, poverty) and social ties in the United States (citizenship, having young children, longer duration in the United States) deter emigration." (Van Hook & Zhang, 2011). They found that indicators favoring return migration to country of origin included having connections with the sending society, such having a spouse or close family there.

12. Although unlawful immigrants who have been in the United States for a shorter period

are more likely to voluntarily return to their country of origin, some who have been in the United States for 10 years or longer also voluntarily return. Fazel-Zarandi, Feinstein, & Kaplan note that the consensus estimate is that unlawful immigrants who have been in the United States for more than 10 years return to their countries of origin at a rate of 1% each year. (Fazel-Zarandi, Feinstein, & Kaplan, 2018).

13. Without permission to work in the United States, some unlawful immigrants could be expected to migrate out of the United States back to their country of origin or to another country where they would be able to work. Those unlawful immigrants who migrated to the United States when they were older, who have strong family relationships in their country of origin, those who had met savings goals, and those who had achieved higher levels of education would be more likely to emigrate under conditions of not being able to work in the United States.

14. In addition to some number of unlawful immigrants voluntarily departing the United States if they lack work authorization or lawful presence, a number of such unlawful immigrants would be removed from the United States if they lacked such protections. This can be seen with former DACA recipients who were subsequently removed—during the second term of the Obama Administration, 365 persons who formerly had DACA status were removed from the United States. (Jarvie, 2017).

15. References:

16. Aguila, E. (2012). United States and Mexico: Ties That Bind, Issues That Divide (2 ed.). Santa Monica, CA: RAND.

17. Ihrke, D. (2014). Reason for Moving: 2012 to 2013. Current population reports. Washington, DC: US Census Bureau, 20, 574.

18. Fazel-Zarandi, M, Feinstein, J., & Kaplan, E. (2018). The number of undocumented immigrants in the United States: Estimates based on demographic modeling with data from 1990 to 2016. PLOS ONE 13(9): e0201193. https://doi.org/10.1371/journal.pone.0201193.

19. FWD.US, (2024). Millions of long-term undocumented residents could be protected by the Biden Administration, available at https://www.fwd.us/news/undocumented-immigrants/.

20. Jarvie, Jenny, 2017. "Deportations of 'Dreamers' who've lost protection have surged under Trump." "Deportations of 'Dreamers' who've lost protection have surged under Trump." Los Angeles Times, April 19.

21. Kennan, J., & Walker, J. R. (2011). The Effect of Expected Income on Individual Migration Decisions. Econometrica, 79(1), 211-251. doi:doi:10.3982/ECTA4657.

22. Massey, D. S., Durand, J., & Pren, K. A. (2014). Explaining Undocumented Migration to the U.S. International Migration Review, 48(4), 1028-1061. doi:doi:10.1111/imre.12151

23. Migration Policy Institute (2019), *Profile of the Unauthorized Population: Texas*, available at https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX .

24. Orrenius, P. M., & Zavodny, M. (2016). Do state work eligibility verification laws reduce unauthorized immigration? IZA Journal of Migration, 5(1), 5. doi:10.1186/s40176-016-0053-3

25. Reagan, P. B., & Olsen, R. J. (2000). You can go home again: Evidence from longitudinal data. Demography, 37(3), 339-350. doi:10.2307/2648046

26. Van Hook, J., & Zhang, W. (2011). Who Stays? Who Goes? Selective Emigration Among the Foreign-Born. Population Research and Policy Review, 30(1), 1-24. doi:10.1007/s11113-010-9183-0

27. Wishnie, M. J. (2007). Prohibiting the employment of unauthorized immigrants: The experiment fails. U. Chi. Legal F., 193.

28. Wong, T., et al. (2017). 2017 National DACA Study, available at https://www.americanprogress.org/wp-content/uploads/sites/2/2017/11/2017

_DACA_study_economic_report_updated.pdf.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of August 2024.

_____
LLOYD POTTER, PH.D.