**Exhibit 1:** Declaration of Oscar Silva Perez

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> *Defendants*. | No.: 6:24-cv-0306 |

**DECLARATION OF OSCAR MARTIN SILVA PEREZ**
**(pursuant to 28 U.S.C. § 1746)**

## DECLARATION OF OSCAR MARTIN SILVA PEREZ

I, Oscar Martin Silva Perez, upon my personal knowledge, hereby declare as follows:

1. I was born in San Luis Potosí, Mexico in 2000. I am a national of Mexico.

2. I currently live in Denton, Texas with my spouse, Natalie Ann Taylor. I have lived in Texas for more than 20 years.

3. My parents told me that I was brought to the United States from Mexico in 2000 when I was an infant. I personally don't have any memory of Mexico or of coming to the U.S., as my earliest memory is from preschool in Garland, Texas. The U.S. is the only country I have ever called home.

4. Since 2000, I have resided continuously in the United States. I have not been admitted or paroled into the U.S. When I was younger, I didn't know exactly what it meant to be undocumented, I just knew that my parents were always afraid when we left the house. They warned me not to talk to strangers and to avoid the police because the police could take them away from me. When I got to high school, however, the challenges of being undocumented really hit me. At 16, I watched my classmates get summer jobs, get their driver's licenses, and study abroad, and I realized I couldn't do any of those things. It all made me feel extremely scared and anxious about what my future would look like.

5. My older sister is a Deferred Action for Childhood Arrivals ("DACA") recipient, so I thought I could apply for that protection too. However, in 2017, right when I was preparing to apply, the federal government rescinded the DACA program. Shortly thereafter, due to litigation challenging the termination, United States Citizenship and Immigration Services ("USCIS") resumed accepting requests to renew existing grants of DACA, but new requests like mine were still not accepted. For more than two years, I monitored the court cases and political news updates closely to see when I would have my chance to apply. Finally, in late 2020, USCIS started accepting new DACA

3

applications again, so I submitted mine as quickly as I could, along with an application for work authorization. As I waited to find out if they would be granted, I started making plans to find a job after college and started dreaming about what protection from deportation would mean for me, for Natalie, and for our life together. Sadly, my hope was short-lived. Only six or seven months later, a federal court in Texas blocked new DACA applications yet again. Since then, my applications have remained pending with USCIS, and I don't know when, if ever, they will get reviewed.

6. I am grateful that, despite my lack of immigration status, I have still been able to pursue some of my dreams in the U.S. I recently obtained my undergraduate degree from the University of North Texas ("UNT") in economics, with a minor in mathematics, making me the first person in my family to go to college. I am currently still a student at UNT, where I am working toward a master's in accounting. Through my studies, I have realized that I have a passion for accounting, and I hope to work as a Certified Public Accountant ("CPA") in the future. Without work authorization, however, I don't know when or how I will be able to get there. Without immigration status, I cannot even sit for the CPA exam in Texas. I have big dreams, and I am willing to work hard for them, but there are barriers in front of me that are out of my control.

7. In 2016, I met my spouse, Natalie. We were 15 years old and freshmen in high school in Garland, Texas. We were good friends first for a couple years. Natalie came into my life right at the time that I was trying to fully grasp what it meant for me to be undocumented, so she has always known about my status. From the beginning, she was supportive, listened to me share about the challenges my status posed, and helped me feel more optimistic about my options.

8. Natalie and I started dating in 2018, during the summer before our senior year. On our first date, we went to Six Flags Over Texas and spent a warm July day spinning on a carousel of swings. We dated through our last year of high school, went to our senior prom together, and then we both chose to go to UNT for college. We moved to Denton together in 2019. In college, I was part of Delta Sigma Pi, a professional business fraternity, where I connected with a lot of business students who inspired my interest in accounting.

9. On February 12, 2022, while we were still in college, Natalie and I got married at the courthouse in Garland, Texas. We only invited family and a few close friends to join us. We are planning to have a bigger wedding in May 2025, but we wanted to keep the first celebration intimate and keep the news private for a while.

10. Natalie and I have now been together for six years and married for two and a half. We have been filing our taxes together since we've been married. Our lives have been intertwined since we were 17, and we continue to live life hand-in-hand. Natalie is my best friend and continues to be my main supporter and my rock. She has never faltered in her support and love for me despite the obstacles that we have faced due to my immigration status. In Denton, we have also built a strong community together. We have a lot of friends that we love spending time with, and we both have family close by that we visit. I often go and see my mom and my sisters, as I lived with them while I was in high school, and we are very close. I also spend time outside of school connecting with other undocumented students and helping them navigate the college process. At UNT, I helped start the Eagle Dreamers Program, an organization aimed at supporting and providing resources to undocumented students. As a first-generation college student, I often felt overwhelmed, lost, and afraid when I first started at UNT, and I had to figure

out a lot of things on my own. I formed the Eagle Dreamers Program so that others wouldn't need to struggle like I did. I also try to participate in Get Out the Vote activities and other political activism whenever possible. The last couple years, I have been advocating for immigration reform and work authorization with the American Business Immigration Coalition ("ABIC").

11. Although we enjoy our lives in Denton, the constant uncertainty around the DACA program, and the lack of other avenues for me to obtain a work permit and relief from deportation, have made it difficult to plan for the future. I feel like we are living our lives in six-month increments, given how often the political and court landscape shifts and how those changes directly impact my options for finding a job or even remaining in the U.S. long term. This makes it impossible to plan our careers and our futures. Natalie, who graduated in 2022 and now works full-time as a ninth-grade biology teacher, is currently the sole breadwinner in our family. After school, on the weekends, and during the summer, she also works as a tutor and at a local water park to provide us with more financial support. She wants to go back to school to obtain a graduate degree in science and pursue a career in genetics or biochemistry, but since I do not have work authorization, it isn't realistic for her to do that. We also want to have children, but we can't plan for that either while my immigration status is so uncertain. Natalie and I try to remain optimistic, and we always keep our love for each other at the core of every day and every decision we make. Still, it is hard knowing that my status stands in the way of so many dreams of ours. Given how much Natalie does for the both of us now, I look forward to the day that I can give her all the support she deserves as well.

12. There are also daily challenges that we experience because I am undocumented. Now that we are married, I have been able to access dental and vision care by joining Natalie's

employer-based insurance plans. However, we can't afford to add me to her medical plan, so I still don't have medical insurance and cannot access doctor's appointments or other healthcare. Previously, I could not get any kind of health insurance, so growing up I never had dental or doctor appointments. Additionally, in Texas, I can't get a driver's license, so Natalie has to drive us wherever we need to go. Both in Texas and when we travel around the U.S., we also have the constant fear that I could be detained and face deportation back to Mexico. We also can't travel internationally together. Since I have no memories of Mexico, one day I want to have travel authorization to see the place my family and I are from. I have an older brother in Mexico whom I have never met, so I would love to meet him, as well as uncles and aunts who are there. I want to share this experience with Natalie so that she can also meet my family members and learn about my heritage with me.

13. Based on a consultation with an immigration attorney, I know that the only barrier for me to adjust status is the fact that I entered without inspection in 2000 when I was brought here as a young child. Natalie filed an I-130, Petition for Alien Relative, for me that was approved in January 2024, and she will also support me in later applying for adjustment of status. However, before the new process for parole-in-place ("Keeping Families Together Parole") was announced, the only way that I could satisfy the requirement for adjustment of status of being "inspected and admitted" or "inspected and paroled" was to leave the United States and seek an immigrant visa abroad through consular processing. To do that without triggering the ten-year bar on reentry in current U.S. immigration law, I would need to obtain an I-601A Provisional Unlawful Presence Waiver.

14. Natalie and I were recently working together to prepare the documents and information needed to apply for an I-601A waiver, but we were worried about how burdensome and

risky the process would be. Even if, after the more than 40-month waiting period for my application to be processed, I am granted a waiver, there is a significant risk that when I leave the U.S. for consular processing, I will get stranded there and not be able to come back to Natalie and our community for months, if not years. Since the Consulate has the discretion to still deny my visa even with an approved I-601A, there is no guarantee that it will be issued. Further, if my visa is denied, I would then be subject to the ten-year reentry bar before I could be allowed back into the U.S. This kind of prolonged separation from my wife and life in the U.S. would be devastating.

15. If Natalie and I were separated, either because I was deported or forced to leave the country to do consular processing, it would only exacerbate the already extreme uncertainty we have about our futures and cause us a lot of anxiety. We would be forced to completely put all our life plans, education, and community involvement on pause to think only about how to survive day-to-day without each other. I would also be ripped from the rest of my family in the U.S., including my parents and my siblings. I would miss seeing my sisters grow up and miss their big life milestones, like high school graduations and career accomplishments. This would break my heart.

16. Right as we were preparing the I-601A waiver application and weighing these risks, the Biden Administration announced Keeping Families Together Parole. I first heard about the new process through ABIC, as we had for years been advocating with ABIC for work authorization for mixed status families. The morning that I found out, I was thrilled and immediately texted Natalie the news. She was at work, so we celebrated over text message, and later that day we watched President Biden and First Lady Dr. Jill Biden speak about the importance of the new process. We were truly overjoyed that the government was making Keeping Families Together Parole and its benefits a reality.

17. Upon hearing about the announcement, I immediately began preparing to be able to apply for Keeping Families Together Parole the moment applications are accepted. I looked up the requirements, reviewed the fact sheets released by the government multiple times, and began gathering the documents I need to show that I meet all the criteria. Since I was preparing to apply for the I-601A waiver, I already had a lot of the necessary documents on hand, including some school records, passports, our marriage license, and more. I had the documents and information ready so that I could submit them as soon as possible.

18. Keeping Families Together Parole is the most ideal solution available for me to adjust status because it will allow both Natalie and me to fully pursue our dreams in the U.S. and build toward our future without the risk of being torn apart and without having to put school, work, and life on pause. On August 19, 2024, the day the new parole process opened for applications, I submitted Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, to USCIS in order to be considered for Keeping Families Together Parole. In addition to my biographical information, the form asked for details about my immigration history, any criminal history, and my marriage. I was also required to submit supporting documentation showing I meet the eligibility criteria for Keeping Families Together Parole. This documentation included proof that I have been continuously present in the United States for at least ten years and that I am legally married to my spouse, a U.S. citizen. To my knowledge, I meet the eligibility criteria for Keeping Families Together Parole. My application is now filed and pending.

19. Receiving Keeping Families Together Parole would be life-changing for me and Natalie. It would open so many opportunities that we have been afraid to hope for or unable to work toward. It would allow me to become a CPA and find work doing what I love. It

would also allow me to continue to contribute to my community through my work on voting rights for U.S. citizens, immigration reform, and support for undocumented students.

20. Keeping Families Together Parole would provide long-awaited relief to my wife and the rest of my family. Natalie would no longer have to worry about the threat of being separated from her husband at any moment, for an indefinite period of time. We would also finally be able to travel together to meet my family in Mexico and eventually explore the world. I would be able to see my sisters grow up, take care of my parents, and finally return the kind of love and support my family and friends have always provided to me.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed in Denton, Texas on August __25__, 2024.

*Oscar Martin Silva Perez*
_____
Oscar Martin Silva Perez

10