**Exhibit 3:** Declaration of Salvador Doe

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> *Defendants*. | No.: 6:24-cv-0306 |

**DECLARATION OF SALVADOR DOE**
**(pursuant to 28 U.S.C. § 1746)**

**DECLARATION OF SALVADOR DOE**

I, Salvador Doe, upon my personal knowledge, hereby declare as follows:

1. I was born in Cerano, Yuriria, Mexico in 1981. I am a national of Mexico.

2. I currently live in Reading, Pennsylvania with my husband, Justin. I come from a large family—I am one of 11 children—and most of my immediate family members live in the Reading area, too. I have lived here for twenty years, since 2004.

3. I came to the United States from Mexico in 2004, when I was 22, and I have been here ever since. I have not been admitted or paroled into the United States. I came to the United States because I wanted to build a better life for myself. My goal at the time was to look for better opportunities for myself, in a place where three of my siblings already were. But as I came to recognize and accept my identity as a gay man it also became essential to my safety to stay here. It became essential to my safety to stay here due to rampant anti-LGBTQ+ sentiment and discrimination in Mexico.

4. I am currently working in home renovations in the area. In Mexico, I worked in accounting, but I knew when I came to the United States that I would have to work any job that was available to me. I also know that I could not really get the full benefit of getting an education given my status. So when I came here, my brother was working in home renovation and brought me along with him to his job, and I worked with him for about two years after I arrived in this country. Over time, I realized I liked the work, and I began adding new skills I was learning from each project I was on. I learned a lot from my brother during that time and I'm grateful that he was there to help me as I started out in home renovation.

5. In 2005, about a year after I arrived in the United States, I began to discover and recognize my identity as a gay man. I realized that members of the LGBTQ+ community

3

were more accepted here than in Mexico, and that made me feel more comfortable as I continued to build my life and my own community here. But I did not come out publicly until years later as it took me some time to accept my truth.

6. Around my 27th birthday, it all just broke down in me. I was sad to be living a life I didn't want to be living, where I kept rejecting my full identity. So, on my 27th birthday, I decided to start living my true and full life. Soon after, I went to a gay bar in the area for the first time, where I met my husband, Justin. We have been together and inseparable ever since. In 2014, we bought our first home, where we love to just enjoy each other's company and entertain our family and friends when they come over.

7. We got married in March of 2017 in Reading, Pennsylvania. We had a small wedding at a Victorian mansion that is now a bed and breakfast in the area, with only six people in attendance. Before then, we had been talking about marriage for a while, and we knew what we had together and the love we had for one another. We wanted to spend the rest of our lives together, so we were ready to take this step and get married.

8. Justin and I have created a wonderful life together. We have melded our friends, families, and communities together. We do not have any children, but I have a lot of family here in the Reading area. I am a proud uncle to several nieces and nephews of all different ages, many of whom live in the same area as we do.

9. Around 2016, my sister was having a difficult time. We wanted to support her, so my sister and her two young children moved in with us for five years. During that time, Justin and I helped raise her children by feeding them every day, doing school pick-up and drop-off, and being a support system for all of them during that time.  While we had a lot of extra obligations in helping raise my sister's children at that time, we were glad to

be there for my sister when she needed it. They are still a big part of our lives, and we care for them to this day. I am like a second father to my sister's children because of that experience.  Overall, I am really close to my family, and we all support each other however and whenever we can.

10. We both have strong ties to our broader community as well. Our neighborhood is very active and holds events and gatherings year-round that we are regularly part of, like tours of the community garden, a party in the park for the community with food and live music, LGBTQ+ Pride events, and seasonal events like handing out candy to children in the park during Halloween and a Christmas tree lighting during the wintertime.

11. As long-time residents of our neighborhood, Justin and I are very invested in the community and committed to making it one that is welcoming and open, diverse, and preserves the architectural integrity of the neighborhood. For example, I frequently volunteer by helping salvage older building materials and items that can be recycled and repurposed for renovations and other uses in the community.

12. Justin and I have now been together for almost sixteen years and married for over seven years, and I feel so lucky to have found him. But because I am undocumented, it has always been at the back of my mind that one day everything could change and I could be separated from my whole life here: my family, my community, and my husband. We have dreams of traveling internationally one day, specifically to France, and we hope that one day we can resolve my immigration status so we can do this together as a couple. We have been working with an immigration attorney who has been helping me explore what options I have in addressing my immigration status.

13. A few days after President Biden announced the new parole-in-place process ("Keeping Families Together Parole") in June, my immigration attorney called me to let me know about it. Since my immigration attorney was familiar with my history and case, she mentioned right away that we would likely meet the qualifications for this parole process. I felt excited about the possibility that this could allow me to get on a path to adjusting my status without having to leave the country. I set up an appointment with her and began to gather all the documents we needed for the application. We then met with my immigration attorney on Sunday, August 18, the day before the Keeping Families Together applications opened, so we could make sure we were ready to submit our application as soon as the United States Citizenship and Immigration Services ("USCIS") began accepting applications the next day, on Monday, August 19.

14. On August 19, we submitted to USCIS a Form I-131F, Application for Parole in Place for Certain Noncitizens Spouses and Stepchildren of U.S. Citizens, so I can be considered for Keeping Families Together Parole. In addition to my biographical information, the form asked for details about my immigration history, any criminal history, and my marriage. I was also required to submit supporting documents to show that I meet the eligibility criteria for Keeping Families Together Parole. These documents include proof that I have been continuously present in the United States for at least ten years and that I am legally married to my husband, Justin, a U.S. citizen. To my knowledge, I meet the eligibility criteria for Keeping Families Together Parole.

15. My husband has filed an I-130 petition for me that has been approved, and he will support me in later applying for adjustment of status so I can get on a path to hopefully become a U.S. citizen one day. Long after arriving in this country in 2004, I learned that I

had a removal order pending against me. I worked with my immigration attorney to file a motion to reopen that old order, which was recently granted by the Philadelphia Executive Office for Immigration Review ("EOIR"). To my knowledge, the only barrier for me to adjust my status in removal proceedings—or before USCIS, if those proceedings are terminated—is the fact that I was not "admitted or paroled" into the United States when I initially came here.

16. I have not applied for an I-601A Provisional Unlawful Presence Waiver because my motion to reopen was still pending with the immigration court until very recently and that needed to be resolved first. If I were to leave the country for consular processing while my motion to reopen was pending, even with the I-601A waiver, this could present a serious risk of getting stuck outside the United States and not being able to return to my husband and family possibly for years.

17. The Keeping Families Together Parole process presents an incredible opportunity for me for many reasons. First, a grant of parole under Keeping Families Together would greatly benefit me in my path in seeking lawful permanent residency. Now that my old removal order has been terminated, I have an immigration court date in March of 2025. If I were to receive a grant of parole under Keeping Families Together, then the judge in my immigration case could terminate my case to allow me to adjust status before USCIS or could adjudicate my adjustment application herself. That would be ideal for me because the other possible avenues for relief, like cancellation of removal, would likely be more complex and take longer to complete. It would also take fewer resources on the part of EOIR or USCIS because my adjustment is a straightforward application.

18. Also, if I were granted parole, I would be allowed to remain in the United States with my husband, family, and larger community, instead of potentially getting stranded in Mexico while waiting for a visa through consular processing. The thought of returning to Mexico and getting stuck there due to delays or a bar on returning, alone and without my support system here, is scary to think about, especially considering that it would be more dangerous for me in Mexico as someone that's part of the LGBTQ+ community and who could also be targeted for returning from the United States. My main ties in Mexico are in my small hometown within Cerano, and back when I lived there, I witnessed this type of harassment of LGBTQ+ people. Unfortunately, based on what I have heard from my family and friends who are still connected to the area and live in the area, homophobia and crime due to drug cartels are prevalent in that area now.

19. Lastly, Keeping Families Together Parole would allow me to benefit from work authorization for the first time since coming to this country. I have always been working while here and contributing to the economy but never had the security that comes with work authorization. With work authorization, I could have more security in my work, expand my client base in home renovation, and possibly be able to save for retirement one day.

20. I have lived in this country all my adult life; this country has been my true home and is where almost all my family resides. That is why the Keeping Families Together Parole process would mean a lot to me. Even after being here for twenty years, it is still scary to think that something could happen that could separate me from my husband, family, and the incredible life we have here. My ability to remain in the United States with Justin and

continue living the life we've built together as I work to become a U.S. citizen would be life-changing and provide such peace of mind for the both of us.

21. I decided to join this intervention because I believe Keeping Families Together Parole has the power to help so many mixed-status couples and families—including me and my husband and extended family—stay together in the United States without fear of being deported or separated from their loved ones when going through consular processing. I also believe sharing my story about how this parole process could benefit me and my family is important in ensuring that it remains open.

22. But still, because of the highly personal information disclosed in this declaration and further information that may be disclosed throughout the course of this litigation, including information about my husband's and my sexuality and relationship, I am afraid of using my real name. Because both my husband and I are heavily involved in our community, we have both been featured and identified together in public online sources that identify us together by name, so if our real names were connected to this lawsuit and someone who was anti-LGBTQ+ or anti-immigrant were to search for our real names, it would be very easy to identify us and figure out where we live.

23. I am aware of the fact that if Keeping Families Together Parole is blocked from continuing, my only remaining option to obtain lawful permanent residency would be to do consular processing. Because of this real possibility, I fear I could be targeted in Mexico because of my sexuality, which is not accepted well in the area where I come from and in other areas of Mexico. Also, if my involvement in this lawsuit were public and I used my real name in this lawsuit, which involves the states and the U.S. federal government, it's very possible I could also be subjected to potential kidnapping or ransom

by drug cartels or even gangs if I were ever back in Mexico due to my involvement in this lawsuit.

24. Given that this litigation concerns a nationwide program that is public on a national level, I fear that if my real name and connection with this intervention is publicly known, I could be at risk of anti-LGBTQ+ and anti-immigrant harassment or discrimination, as could my family.

25. Although I feel strongly that it is important for me to stand up for the opportunities and benefits Keeping Families Together Parole represents for me and for others like me, I am cognizant that my involvement in this litigation will identify me to others in my state and in this country who agree with the Plaintiff States and do not care about whether I am forced to live in fear of being deported, or whether being removed will tear my life or family apart, the life and family I have worked so hard to build up with my husband and family here in the United States. I want to protect myself, my husband, and my family from that.

26. For this reason, I respectfully ask the court to allow me to proceed as a defendant intervenor in this lawsuit under a pseudonym, to protect myself and my family.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Reading, Pennsylvania on August 25, 2024.



Salvador Doe