**Exhibit 7:** Declaration of Ricardo Ocampo Hernandez

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> *Defendants*. | No.: 6:24-cv-0306 |

**DECLARATION OF RICARDO OCAMPO HERNANDEZ**
**(pursuant to 28 U.S.C. § 1746)**

## DECLARATION OF RICARDO OCAMPO HERNANDEZ

I, Ricardo Ocampo Hernandez, upon my personal knowledge, hereby declare as follows:

1. I was born in Morelos, Mexico in 1989. I am a national of Mexico. I have lived in the U.S. since 1992, when I came here with my parents at the age of two.

2. My wife Jessika Ocampo Hernandez and I live in Las Vegas, Nevada with our two sons, who are two and nine years old. I also have a 15-year-old son from a previous marriage. We have lived in the same home since Jessika and I got married in 2014. I have a huge family in Las Vegas; my grandfather, parents, two surviving siblings, ten aunts and uncles, and around 32 cousins all live here, along with the children of my cousins, who also number around 32 at this point. Nearly everyone in my extended family is a U.S. citizen or Lawful Permanent Resident.

3. I have never left the U.S. since arriving here in 1992. I have not been admitted or paroled into the United States.

4. I attended public school in Las Vegas from kindergarten through the 12th grade. I have had Deferred Action for Childhood Arrivals ("DACA") since 2013.

5. I met my wife Jessika in 2013. At the time, I was navigating a period of self-discovery and searching for my faith, and fate intervened through a mutual friend who invited me to church. It was there that I met Jessika, who was the volunteer coordinator in the kids' ministry department. What began as a simple visit to church quickly turned into something much deeper. I found myself returning week after week, drawn not only by my spiritual journey but by the warmth and kindness that Jessika exuded. We began dating. That summer, I would drive 40 miles just to see her, even though my car's AC was broken, and the heat was unbearable. But none of that mattered—every mile was worth it to be with her. Jessika is an extraordinary woman. We became serious very quickly.

When I learned that she never attended her high school prom, I knew I had to change that. With the help of her friend, I planned the prom she always deserved, a moment to show her how much she means to me.

6. From the very beginning, Jessika knew about my undocumented status, but she never let it define our relationship. She loved me for who I am, and her acceptance gave me the courage to envision a future together, despite the uncertainties we faced. The day I asked Jessika to marry me was one of the best days of my life. I arranged for a private driver to pick her up from her apartment, and as she journeyed through the city, she collected roses and clue cards from places that held special memories for us—the location where we first met, the spot where I asked her to be my girlfriend, and finally, the place where we shared our first kiss. It was there, surrounded by the memories of our love, that I proposed to her. Thankfully, she said yes! We ended that magical day with a helicopter tour over Las Vegas and a celebratory dinner, looking forward to the life we would build together.

7. We got married in 2014 in the same church where she worked. I had employment authorization by then, so we were able to rent our own home. Since then, Jessika has blessed me with two incredible children, making our family complete. Living in a mixed-status home has been extremely difficult, and it has taken a toll on Jessika. Despite these challenges, she has always stuck by my side. We will continue to fight for our family to remain together so that we no longer have to live in limbo. Our story is a testament to the belief that love conquers all and that families belong together, no matter the challenges they may face.

8. Getting DACA was life-changing for me and Jessika. Before that, I was working at a meat factory making minimum wage. The week after my employment authorization came, I was able to get a new job at a nonprofit, and I have worked at nonprofits ever since. My first job was helping young victims of abuse, neglect, and mental afflictions by providing rehabilitative mental health interventions. My second job was supporting homeless youth. Now I am the organizing director with Make the Road Nevada, a nonprofit that organizes and advocates on behalf of low-income and immigrant communities. This work is my passion, and it has also allowed me to provide more for my family. Employment authorization also allowed me to get health insurance for the first time in my life.

9. Even with DACA, I am still undocumented, and my lack of permanent immigration status is very difficult for my family. It weighs on all of us. Despite having DACA, I have had trouble accessing financial services. I could not open a joint account with my wife for several years because of the bank's rules for DACA holders. I also have to renew DACA every two years, and particularly now, with the program under attack, it has been really hard to map out my life and my family's lives given that we have to plan in two-year increments. We are living in limbo – without permanent status, you can't plan or develop long-term goals. Thinking about buying a home is out of the question because I don't know if I am going to be here to ensure my family stays in the home.

10. I also worry constantly about losing my employment authorization and health insurance, and how detrimental that would be to my family. My wife stopped working in 2022 to stay home to take care of our children, so I am the sole provider. If I couldn't work or if I were deported, they would face hardship in every way, shape and form.

11. I also think about health insurance and how important it is for my family not to lose that. I know what will happen if I get sick and don't have insurance. In 2006, my older brother, Carlos, who was 17 at the time and also undocumented, was diagnosed with pancreatic cancer. Because he was undocumented and uninsured, he didn't have the treatment and care he needed to fight his diagnosis, and he ended up passing away. The thing that still haunts me is that after he died, the medical bills my mother and father were left with totaled over $300,000. They tried to pay it off, but when they could not make the necessary payments, the hospital put a lien on our home and took it away. I was in high school at the time. We not only had to cope with the death of my brother, and my parents with the death of their son, but we lost our home. This was all because of our immigration status and not having access to health insurance in this country. So, I know firsthand the damages and the economic impact that not having work authorization or health insurance can have, and what that can do to a family and to children.

12. My children have also gone through a traumatic experience due to having a parent without status. My oldest son from my previous marriage is 15 years old and my situation has affected him very negatively. The unpredictability has caused him mental health breakdowns and even suicidal thoughts. He lives with a lot of fear.

13. My 9-year-old son is just starting to understand the uncertainty our family faces. He is getting to the point where he knows his dad is different from other dads. There are moments where I have to sit down, just him and I, and I have to let him know that I am doing everything possible to stay with him. But it is still an ongoing process and so much remains uncertain.

14. Jessika and I have tried for many years to adjust my status, but it has been nearly impossible. I tried to get advance parole to travel outside the U.S. in 2018, but I was unable to. Because I was never admitted or paroled into the U.S., my wife and I will have to resort to a risky process called "consular processing," which requires that I leave the country so that a U.S. consulate abroad can adjudicate my permanent residency application—and means facing a risk that I will face years of delay and may not be allowed to return for ten years. My wife and I have never felt safe with consular processing because we have seen people get stuck outside the U.S for years on end, even if they are eventually allowed to come back. My mother consular processed and had to spend around nine months in Mexico. She missed the birth of my son, her second grandchild. I see the ten-year bar on returning to the U.S. as one of the most cruel forms of punishment you can give any parent or family.

15. In total I think we have spent over $15,000 trying to navigate this complicated process. It has been a huge expense for our family. We have had some negative experiences with lawyers failing to relay correspondence or to give us correct information. Jessika filed an I-130 application for me, which was approved but later learned it was no longer current with the National Visa Center (NVC). Around 2020, we explored filing an I-601A waiver, but we gave up after learning the I-130 was no longer current with the NVC. We have been through a lot of ups and downs at great financial expense.

16. I began hearing about a possible new parole-in-place process for families earlier this year. Then in June, when the announcement was made at an event at the White House, I was monitoring every detail. Based on the information I could find about the process, I realized that I checked every box. Jessika and I felt excitement and relief but also a

somberness, because we have seen how DACA is being threatened and heard politicians say they will challenge this program too. Until we have something in hand, my family is going to remain in limbo.

17. The day that it became possible to apply for Keeping Families Together Parole, I was up before 6:00 a.m. ready to file. With the help of my attorney, I submitted a Form I-131F to United States Citizenship and Immigration Services ("USCIS") within hours, in order to be considered for the new parole process. To my knowledge, I meet all the eligibility criteria. I have been present since 2014 and I have paid income taxes every year since then. I have always been careful to keep documents so I was confident I could show my presence for the past ten years, but I still spent a significant amount of time gathering, scanning and organizing my documents well before the deadline so I would be able to apply right away once applications began. My application is now filed and pending.

18. Receiving Keeping Families Together parole would be life changing for us. Unlike consular processing, Keeping Families Together Parole would allow me to remain here with my family. It gives me that satisfaction of knowing I will be able to put my kids to bed the next day, and of not worrying about whether my wife will have to pick up the pieces if I am stuck in another country for who knows how long.

19. If I were to get parole and finally be able to adjust my status, I would love the opportunity to become a homeowner.

20. It's also always been a dream of mine to eventually obtain citizenship and see what a voting machine looks like in person. For the past five years, I have volunteered doing voter support and protection outside of polling places, like offering water and snacks to voters and providing them information. But as part of a voter protection team, you are

always on the outside of the voting locations; you don't go inside. I'd love to go inside. I want to do my civic duty one day and participate in local, state and federal elections. That's a big dream of mine. I want to be able to vote with my wife and my kids.

21. Accessing parole-in-place would finally allow me to obtain permanent residence based on the marriage and the family I have built with Jessika. We've been married for 10 years, and I can't imagine my life without her or my children. This process would change our lives. The biggest relief would be the security of knowing that I will never have to live in increments, the way I do with DACA. Since DACA is now under threat, there is always the threat of deportation in our lives. It's scary and it haunts me every day. If I can eventually become a U.S. citizen, I'll never have that fear again. I'll finally be certain that my family can stay together.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Las Vegas, NV on August 25, 2024.

_____
Ricardo Ocampo Hernandez