**Exhibit 8:** Declaration of Foday Turay

1

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*,  *Plaintiffs*,  v.  UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*,  *Defendants*. | No.: 6:24-cv-0306 |

**DECLARATION OF FODAY TURAY**
**(pursuant to 28 U.S.C. § 1746)**

## DECLARATION OF FODAY TURAY

I, Foday Turay, upon my personal knowledge, hereby declare as follows:

1. I was born in Freetown, Sierra Leone in 1996. I am a national of Sierra Leone.

2. I am currently an Assistant District Attorney with the Philadelphia District Attorney's Office. I live in Philadelphia, Pennsylvania with my spouse, Jaxhiel Turay, and our one-year-old son. I have lived in Pennsylvania for four years. Before that, I lived in Maryland.

3. When I was four years old, my father was killed by rebels that invaded our community during the civil war in Sierra Leone. Fearing for our own lives, my mother, grandmother, and I were forced to flee our home country for Guinea, where we spent months in a refugee camp with thousands of other people, very little food, and poor sanitation. We saw many people dying around us in the camp.

4. After several months, my mother received news that the United States government had accepted an application for refugee status that she had submitted more than four years prior, before she knew she was pregnant with me. The application only permitted her to go to the U.S., and my grandmother and I urged her to go. After she left, however, we were unable to maintain contact. In the months that followed, my grandmother got sick and passed away. At six years old, I was left on my own in Guinea, with no family around me and no way to get in touch with my mother.

5. I worked at a restaurant in Guinea to support myself, and I got to know the restaurant owner. She helped post my picture on an online forum for displaced children from Sierra Leone, and miraculously my family saw the posting and got in contact.

6. I came to the United States from Guinea in 2003, on my seventh birthday, by crossing the Southern border into Mexico. I have been here ever since, so I have lived in the U.S. for more than 20 years. I have not been admitted or paroled into the United States.

7. Growing up in the United States, I felt that my future was becoming brighter, and I became motivated to pursue the American dream by becoming the first person in my family to graduate from university. However, when I was sixteen and wanted to get my driver's license, my mom told me for the first time that I was undocumented. It was one of the worst days of my life. I felt like my dreams were again out of reach. It was only when I found out a couple years later that I qualified for Deferred Action for Childhood Arrivals ("DACA") that I felt like I had another chance to thrive in America.

8. I applied for and was granted DACA, and I currently still have DACA status. DACA has allowed me to attend college and obtain my bachelor's in government and politics with a minor in law and society. I then got a full scholarship to Penn State Dickinson School of Law, where I obtained my law degree.

9. DACA has also allowed me to obtain work authorization and find stable employment as an Assistant District Attorney. I have been paying taxes in the U.S. since 2016. I went to law school so that I could fight for justice, and now, as a lawyer, I work hard every day to advocate for those who are underserved or denied a voice. I am motivated by my own experiences as a refugee to seek justice for those who cannot fight for themselves, and for those who cannot afford to pay for an attorney.

10. Despite DACA being such a critical lifeline for me for so many years, not having a green card or U.S. citizenship has also caused me to miss out on many opportunities. I had dreams of working for the U.S. government as a Judge Advocate General's Corps (JAG) attorney for the Marine Corps, of working for United States Citizenship and Immigration Services ("USCIS"), and of clerking for a federal court, but I could not because of my immigration status. Additionally, I still have loved ones in Sierra Leone, and I have not been able to go back and see them for over two decades, or to bring my wife back to meet

them. Family members have passed away abroad, and I have not been able to go back and pay my respects. This has been very emotionally difficult for me.

11. In 2022, while I was in law school, I met my spouse, Jaxhiel Turay. We met through an online Christian dating community, as we were both looking for a partner who shared our commitment to centering faith in our lives. On our first date, we had an instant connection and ended up spending over ten hours talking together. From there, we started dating long distance while I finished law school, as Jaxhiel lived in New Jersey at the time. We would make the 3-hour drive to see each other, sometimes just for a day. But it was worth it, because we knew that we were committed to each other.

12. We got married on June 17, 2023, in New Jersey. We had a small church wedding and a backyard reception. The size or luxury of our wedding did not matter to us. All that mattered was that we were making a commitment to each other in front of God, to be together through whatever life throws at us. After we were married, we moved in together, and on August 17, 2023, our son was born. He is now one year old, and being a good father to him is one of my top priorities in life. In November 2023, Jaxhiel and I purchased our first home together.

13. Outside of work, I spend as much time as I can with Jaxhiel and our son. Faith continues to be a big focus of our lives as well, even though it is more difficult to attend church in person now that we have a young child. Previously, we would attend church in person regularly. Now, we still stay connected to our church community, but we more often attend services virtually. I am also involved with the Philadelphia Bar Association, and I do advocacy with American Families United (AFU), an organization that supports noncitizens married to U.S. citizens, and FWD.us, an organization that works for immigration reform.

14. We have now been married two years, and we continue to grow not only as a couple but as a family. Jaxhiel and I have merged our lives, and we make all decisions together. Jaxhiel has always been incredibly supportive of me in my career goals and dreams, and I am so grateful for our partnership. It makes me sad that, because of my immigration status, I am not able to fully support Jaxhiel in all her aspirations for our family. For example, she wants to take me to the Dominican Republic to meet her family there, but I am not able to travel internationally. I worry that if I am not able to adjust status and later naturalize, my immigration status will get in the way of my son reaching all his goals in the future as well.

15. Given that DACA is a status that could go away and given the challenges that I face to get my green card, my family and I still live each day in this country we call home with a fear that we could be separated.

16. Based on consulting with an immigration attorney and doing legal research on my own, I know that the only barrier for me to adjust status is the fact that I entered without inspection all those years ago when I came here as a young child. When I was younger, my mother, who was able to become a naturalized U.S. citizen, filed an I-130, Petition for Alien Relative, for me that was approved. Unfortunately, I still could not apply for adjustment of status because I was not "inspected and admitted" or "inspected and paroled" into the United States.

17. Jaxhiel intends to file an I-130 for me as soon as possible, and she will also support me in later applying for adjustment of status so I can get on the path to U.S. citizenship. However, before the new process for parole-in-place ("Keeping Families Together Parole") was announced, the only way that I could satisfy the requirement for adjustment of status of being "inspected and admitted" or "inspected and paroled" was to leave the

United States and seek an immigrant visa abroad through consular processing. I would need to leave my family behind for an indefinite amount of time, which would cause my wife and son a great burden.

18. I have therefore not applied for an I-601A Provisional Unlawful Presence Waiver, because even if it were granted, there is a significant risk that when I leave for consular processing abroad, I will get stuck there and not be able to come back to my family for months, if not years. Since the issuance of a visa by the Consulate is discretionary, there is no guarantee that it will be issued in a timely fashion or at all. Many members of AFU have experienced the trauma of departing the U.S. with an I-601A waiver only to get stranded waiting for their visa to be approved by the Consulate abroad. I have heard of members whose spouses have been stuck abroad for up to seven years. I cannot risk this kind of prolonged separation from my wife and young child.

19. If our family was separated because I was deported or forced to leave the country to do consular processing, my wife would not be able to pay our mortgage on her own, so we would lose our house. I am the primary breadwinner, so without my income, Jaxhiel would also struggle to pay for childcare, food, and other basic needs for our son and for herself. Jaxhiel is also the primary caregiver for her mother, so without my financial, emotional, and physical support, she would struggle to balance everything herself. Her life and our son's life would be turned upside down. In addition, I would miss out on my son growing up. He would not have a father with him during one of the most important times of his life.

20. The Keeping Families Together Parole process is therefore the best option for me to adjust status because it will allow me to continue to pursue my dreams in America and build my life with my family and community without having to be separated from those I

love, and without having to put my work and life on pause. I first heard from AFU and FWD.us that the process was being announced. We had been advocating for a parole-in-place process like this for over a year, so I was thrilled to hear that the government was implementing it. It felt like an answered prayer.

21. Upon hearing about the announcement, I immediately began preparing to be able to apply for Keeping Families Together Parole the moment applications are accepted. I looked up the requirements, and then I began gathering all the documents I need to show that I meet them. This included contacting all the schools I have attended, from elementary school to law school, to get records of my attendance, as well as gathering pay stubs, tax documents, passports, our marriage license, our son's birth certificate, and more. I uploaded copies of these documents and saved them into a folder on my computer.

22. On August 19, 2024, the day that the Keeping Families Together Parole process opened for applications, I submitted to USCIS Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, in order to be considered for the process. In addition to my biographical information, the form asked for details about my immigration history, any criminal history, and my marriage. I was also required to submit supporting documentation showing I meet the eligibility criteria for Keeping Families Together Parole. This documentation included proof that I have been continuously present in the United States for at least ten years and that I am legally married to my spouse, a U.S. citizen. To my knowledge, I meet the eligibility criteria for Keeping Families Together Parole. My application is now filed and pending.

23. Keeping Families Together Parole would be a beacon of hope for my family. It would allow me to continue to work as an attorney and contribute to my community by doing

8

what I love. It would allow me to pursue even bigger dreams of serving as an attorney for the federal government, including as an Assistant U.S. Attorney.

24. Keeping Families Together Parole would provide long-awaited relief to my wife and son as well. They would no longer have to worry that their husband and father could be taken away. We would also finally be able to travel together to visit my wife's family.

25. Knowing I would never have to be separated from my family would be the most incredible feeling in the world. I would never have to put my son's future in the U.S. at risk again. I already feel like an American in my heart, but I would finally be an American on paper as well.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed in Philadelphia, Pennsylvania on August  19 , 2024.

*Foday Turay*

Foday Turay