**Exhibit 12:** Declaration of Angelica Salas

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br> *Plaintiffs*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br> *Defendants*, | No.: 6:24-cv-0306 |

DECLARATION OF ANGELICA SALAS, EXECUTIVE DIRECTOR
OF THE COALITION FOR HUMANE IMMIGRANT RIGHTS ("CHIRLA")

I, Angelica Salas, upon my personal knowledge, hereby declare as follows:

1. I am the Executive Director of the Coalition for Humane Immigrant Rights ("CHIRLA"). I have held this position since 1999. In this capacity, I oversee all of CHIRLA's program areas and am responsible for strategic planning and CHIRLA's annual budget.

2. CHIRLA is a nonprofit organization headquartered in Los Angeles, California, with eight offices throughout California and a national policy office in Washington, D.C. CHIRLA was founded in 1986 and its mission is to advance the human and civil rights of immigrants and refugees and ensure immigrant communities are fully integrated into our society with full rights and access to resources.

2

3. Today, CHIRLA is the largest statewide immigrant rights organization in California, with fourteen unique departments and over 185 staff members who help provide a range of services that reach tens of thousands of Californians each year. For example, over the last three years, CHIRLA's education programs have reached over 820,000 people through more than 7,800 events and its legal department has assisted approximately 30,000 people. The assistance hotline that CHIRLA operates fields on average 15,000 calls per year.

4. CHIRLA is a membership organization, with approximately 50,000 active members across California. Our membership is diverse, and includes U.S. citizens, non-U.S. citizens with lawful status, and non-U.S. citizens without lawful status. Many of our members belong to mixed-status families—that is, families consisting of both individuals with citizenship or lawful status and individuals without. Most of our members are low-income. CHIRLA educates its membership as well as our broader community through know-your-rights trainings, workshops, social media and educational literature about a variety of social services and benefits, including immigration law, financial literacy, workers' rights, and civic engagement.

5. In 2012, CHIRLA launched its legal services program to support its members and others in the community in seeking the benefits and protections of Deferred Action for Childhood Arrivals ("DACA"). Since then, we have expanded our legal services program, first by representing clients in applying for permanent residence and citizenship as well as other applications before U.S. Citizenship and Immigration Services ("USCIS"), and then expanding in 2017 to representing individuals in removal proceedings in immigration court. We now have two main components within the Department of Legal Services: 1) Programs and Subcontract Administration and 2) Legal Programs, with over sixty staff members across the components.

Subcontract Administration oversees funding from the California Department of Social Services, the County of Los Angeles, and the City of Los Angeles, and in this way helps ensure wider access across the State of California to legal services. Among the subcontractors are other nonprofit organizations as well as California State Universities Chico, Humboldt, Sacramento, and Sonoma. Within Legal Programs, we have distinct Removal Defense, Clinical, Worker Rights and Labor as well as Family Unity units. During the past three years, CHIRLA has conducted nearly 30,000 legal consultations, including dozens of consular processes, hundreds of I-130 family petitions and attendant adjustments of status, over 200 Military Parole in Place cases and several 601(a) provisional waivers.

6. In addition to its education initiatives and legal services, CHIRLA engages in policy advocacy efforts on behalf of its members at the local, state, and national levels. One long-standing advocacy effort has been to push for legislative and executive pathways to permanent status for the organization's members and the larger community. The most prominent current effort is the All in for Registry campaign, which advocates for an update to the Immigration and Nationality Act's Registry provision ("INA" § 249), which would render long-term residents eligible for legal permanent resident status. Additionally, we have pushed for executive actions such as the expansion of parole-in-place to provide alternative pathways to more stable status here in the United States. Such pathways are critical for family unity, which is at the core of CHIRLA's mission to promote the wellbeing of immigrant communities.

7. The newly announced parole-in-place process for certain noncitizen spouses and stepchildren of U.S. citizens ("Keeping Families Together Parole") is one such pathway. At least forty CHIRLA members and clients have applied for Keeping Families Together Parole, and

additional members and clients stand to benefit as the family members of eligible individuals. A grant of parole would provide beneficiaries with work authorization—in some cases, for the first time—and would open the door to lawful permanent status. Although many CHIRLA members have been in the United States for much of their lives, pay taxes, and have deep community ties, eligible individuals and their families live in fear that their lives could be uprooted. Lawful permanent status provides stability and thus improves families' overall wellbeing. These benefits extend even beyond the parole beneficiaries' families: Communities as a whole benefit when its members gain the security and opportunity that obtaining lawful permanent status provides.

8. In particular, research across the country, including by the UCLA Latino Policy and Politics Institute and the White House Council of Economic Advisers, highlights how permanent protections lead to higher incomes for individuals, a growth in jobs overall, increased tax revenues at the local, state and federal levels and a larger Gross Domestic Product ("GDP") across the years. CHIRLA's experience with the implementation of the DACA program, starting in 2012, has provided us with more than a decade of experience on how that lawful status created educational opportunities and career possibilities otherwise not available to those DACA beneficiaries. In addition, we have seen how these individuals have become less vulnerable to exploitation by unscrupulous employers and more inclined to report this and other crimes to law enforcement. We have no doubt that Keeping Families Together Parole would have a similar impact for the beneficiaries of that process.

9. Announcements about new pathways like Keeping Families Together Parole create interest and motivate action among individuals and families to explore possible immigration relief and benefits. Individuals who have never connected with CHIRLA before are inspired to

come to our offices to determine if they are eligible. Even if they are found not to meet the specific Keeping Families Together Parole criteria, once they have connected with us, we may be able to identify other pathways to relief or other benefits for which they are eligible. Based on past experience when we provide these types of services to new clients, they often become CHIRLA members.

10. As expected, once Keeping Families Together Parole was announced in June, CHIRLA began receiving inquiries about the process through our public immigrant assistance hotline and from walk-ins to our offices. To date, in addition to engagement via social media, workshops and webinars, CHIRLA has received over 100 external specific inquiries at our headquarters in Los Angeles about Keeping Families Together Parole. Many of our organizers across California have also been fielding questions about the process. In response to the announcement and interest in the process, we set out to educate our members and their families and communities, including by creating and maintaining a dedicated, bilingual webpage about Keeping Families Together Parole with information about the process and frequently asked questions.

11. Our community education efforts around Keeping Families Together Parole include, but are not limited to, training our immigrant assistance hotline staff to respond appropriately, hosting in-person workshops and online webinars, partnering with additional community organizations, creating numerous social media posts across multiple platforms with accurate community-facing graphics and information, and focusing several episodes of our weekly "CHIRLA en tu Casa" Facebook live program on providing the latest information on the process while allowing the public to ask questions. Across all these platforms, we have reached over 107,000 unique individuals. With the precise Keeping Families Together Parole eligibility

criteria now known, we expect these numbers to keep increasing. On August 24, 2024, CHIRLA hosted its largest membership celebration during which we were able to further spread the word about this process. During the week of August 26, 2024, we are sending a mass membership electronic message to our entire membership about KFT.

12. Once we learned the tentative eligibility criteria for Keeping Families Together Parole, our legal staff began working to determine which of our existing members and clients might be eligible. Initially, we identified around 15 existing CHIRLA clients—some of whom are CHIRLA members—who appeared to meet the eligibility criteria, and out of those, approximately ten have ultimately been determined to be eligible. We are also working to screen CHIRLA members for eligibility and, if eligible, help them apply. On August 12, we began hosting triweekly informational sessions at CHIRLA's headquarters, as well as in our San Bernardino, California office, to pre-screen and educate CHIRLA members as well as other community members about the process, including the types of evidence that they should be gathering. We plan to host these sessions every Monday, Wednesday, and Friday for as long as the need exists. On Saturday, August 24, 2024, due to the overwhelming demand, a few of our staff set up an extra session increase our screening capacity. In addition, depending on the need, we may expand to additional weekend clinics and conduct online webinars to reach more eligible individuals beyond the geographic reach of our own offices.

13. On August 19, 2024, when the Keeping Families Together Parole became operational, we held a press conference in the morning followed by an afternoon informational session during which we began the formal process of helping members and other clients determined to be eligible submit their applications via USCIS.gov. As the official preparers of their applications,

our legal services staff have encountered and overcome various technical and other challenges. Due to the online-only nature of the Keeping Families Together Parole application, CHIRLA has taken on a key role as the provider of reliable internet services needed by the community to complete the applications. To date, we have screened over sixty individuals at the sessions and successfully submitted over forty applications, many from our own CHIRLA members.

14. Among those already screened are CHIRLA members with additional members waiting on their appointed times for legal consultations and others assessing their possible eligibility for Keeping Families Together. These include:

15. Jane Doe 1 is a member of CHIRLA. She lives in Los Angeles, has been in the United States for 31 years, and is married to a U.S. citizen. She has been a DACA recipient since 2012 and filed her Keeping Families Together application with the hope of adjusting her status, providing the stability needed to plan for a future with children.

16. Jane Doe 2 is a member of CHIRLA. She is also married to a U.S. citizen, has two U.S. citizen children, and is a current DACA recipient. With DACA, she has been able to pay for, and obtain, a graduate degree. In applying for Keeping Family Together, her family and her hope to achieve the protections needed to dispel their fear of separation.

17. John Doe 1 is married to a U.S. citizen and is planning to apply. He is finding it challenging to get time off work in order to come in for a legal consultation at CHIRLA, but he plans to do so at the earliest opportunity.

18. I understand that on August 23, 2024, sixteen states in total, led by Texas, filed a lawsuit challenging Keeping Families Together Parole. If the challenge is successful, CHIRLA's members would experience significant negative impacts. Many members or their family

members would lose the opportunity to apply for Keeping Families Together Parole if the process is enjoined before they can submit their applications, or would lose the opportunity for their applications to be adjudicated if the process is enjoined while their applications are pending. For many, this process is the best—if not the only—pathway to work authorization, and sometimes to lawful permanent residence, and the resulting stability and family unity. The alternative for these families is uncertainty and pain, including years of potential separation upon departure from the U.S., and/or applying for a waiver for unlawful presence concurrently with a visa to return as a legal permanent resident. Such separation harms elderly, minor, and other dependents by depriving them of caregiving while exacting economic hardship on families, employers and the community. If the process is enjoined, it would also cause significant confusion among CHIRLA's members and their communities and could even generate mistrust. In our experience, when a process is announced but later blocked by litigation, directly impacted individuals become less likely to come forward in the future to seek help or to apply for other benefits or programs for which they may qualify. The harm and confusion are particularly acute for those Keeping Families Together applicants who currently have DACA, which is also subject to a legal challenge by the State of Texas and others.

19. For CHIRLA's members, as well as their families and communities, Keeping Families Together Parole represents the realization of dedicated advocacy to improve individual lives and avoid harmful family separation. Spouses and stepchildren of U.S. citizens could now be eligible for a parallel process similar to the permanent protections available to military members and their families via that parole in place program. Such protections would enable them to better provide for the wellbeing of their families, communities, and the country at large while also

spurring on continued advocacy for additional relief for their neighbors and immigrants across the United States.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on August 25, 2024 at Los Angeles, California.

_____

Angelica Salas