**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:24-cv-00306 |
| | ) | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| *Defendants.* | ) | |

**DEFENDANTS' MOTION AND MEMORANDUM IN SUPPORT TO VACATE
ADMINISTRATIVE STAY AND OPPOSITION TO A STAY PENDING A
CONSOLIDATED HEARING ON THE MERITS**

# TABLE OF CONTENTS

INTRODUCTION......................................................................................................................1

BACKGROUND .......................................................................................................................3

    Parole ..................................................................................................................................3

    Adjustment of Status...........................................................................................................4

    The Notice ...........................................................................................................................5

ARGUMENT .............................................................................................................................6

I.      The Court Lacks Authority to Issue Equitable Relief Under the AWA and Cannot Further Extend the Administrative Stay Without Complying with Rule 65 ..............7

II.     This Court Lacks Jurisdiction Because Plaintiffs Lack Article III Standing. ..........10

       A.    Plaintiffs Have Not Asserted a Cognizable Injury.................................................10

       B.    Plaintiffs' Claimed Injury is Too Speculative and Attenuated to be Cognizable. ...............................................................................................................15

       C.    Plaintiffs' Injuries Are Not Redressable.................................................................22

III.    Plaintiffs Cannot Obtain APA Review of Their Claims.................................................23

      Zone of Interests ...............................................................................................................23

      Committed to Agency Discretion ......................................................................................24

      Final Agency Action ..........................................................................................................24

      No Statutory Jurisdiction ...................................................................................................25

IV.    Plaintiffs Cannot Succeed on the Merits of Any of Their Claims ...............................26

       A.    Plaintiffs Are Not Likely to Succeed on the Merits of their Claims that the Notice is Contrary to Law ....................................................................................26

      Authority for Parole in Place .............................................................................................26

      Significant public benefit...................................................................................................28

      Case by case.......................................................................................................................32

Paroled into the United States ............................................................................34

Temporariness ....................................................................................................37

**B.      Parole in Place under KFT Does Not Circumvent Other INA Provisions .....38**

**C.      Plaintiffs Are Unlikely to Succeed on Any Arbitrary and Capricious Claims ..............................................................................................39**

**D.      Plaintiffs Are not Likely to Succeed on the Notice and Comment Claim.......44**

General Statement of Policy ..............................................................................44

Rule of Agency Procedure. ...............................................................................46

Foreign Affairs Function....................................................................................47

**E.      Plaintiffs Are Unlikely to Succeed on the Paperwork Reduction Act Claims ..............................................................................................49**

**F.      Plaintiffs Are Unlikely to Succeed on the Take Care Clause Claim. ..............51**

**V.    Plaintiffs Have Not Demonstrated Irreparable Injury and the Balance of Harms Weighs Against Entry of Injunctive Relief. ......................................................53**

**VI.   If the Court Grants Relief, It Must be Sharply Limited. ...............................................54**

**A.      Postponement Under Section 705 Is No Longer Available. ............................54**

**B.      Neither Nationwide Relief Nor Reporting Requirements are Authorized. ....55**

**CONCLUSION** ...............................................................................................................55

**CERTIFICATE OF SERVICE** ..................................................................................56

**CERTIFICATE OF CONFERENCE** ...........................................................................56

**INTRODUCTION**

On August 20, 2024, the Department of Homeland Security (DHS) published a federal register notice entitled *Implementation of Keeping Families Together*, 89 Fed. Reg. 67459 (August 20, 2024) (Notice). The Notice outlines a process through which certain noncitizen spouses and stepchildren of U.S. citizens can apply for a discretionary grant of parole in place that DHS officers will consider on a case-by-case basis.  The Notice also memorializes the Secretary's determination that granting parole to eligible noncitizen spouses and stepchildren of U.S. citizens living in the United States will generally result in a significant public benefit. Although the Notice establishes a process for submitting and adjudicating parole requests from covered noncitizens, it does not itself confer any new eligibility for parole or change the substantive standards for granting parole, which remains a case-by-case discretionary determination of whether parole furthers urgent humanitarian reasons or a significant public benefit.

On August 26, 2024, the Court entered a 14-day "administrative stay" of the Notice without "express[ing] any ultimate conclusions about the success or likely success of those claims," ECF 27 at 4. The order indicated that "the administrative stay may be extended for a like period . . . for good cause or if all adverse parties consent to a longer extension." *Id*. at 5-6. For the reasons set forth below, the stay should be vacated as inconsistent with Federal Rule of Civil Procedure 65, and equitable principles, and in excess of this Court's authority under the All Writs Act (AWA). *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 202 (5th Cir. 1979) ("[AWA] does not free a district court from the restraints of Rule 65."). Any further extension of the order must be supported by more than "good cause." ECF 27 at 5. To obtain relief, Plaintiffs must demonstrate that they are entitled to a preliminary relief consistent with Rule 65 and *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008). Plaintiffs have not carried their burden here and therefore the Court must dissolve the administrative stay and deny further temporary relief.

Plaintiffs lack standing because they challenge a parole process that is available only to noncitizens already living in the United States and already eligible to adjust status, and because they allege only indirect, downstream costs from the Keeping Families Together (KFT) process

that are not cognizable as a legal matter. Even if those types of harms were cognizable, Plaintiffs have not made the required showing that the KFT process will increase a Plaintiff State's net expenditures on public services. Moreover, Plaintiffs lack any basis to challenge the Notice under the Administrative Procedure Act (APA) because KFT is not final agency action; Plaintiffs are not within the zone of interests of relevant statutes; and KFT is not subject to judicial review.

Plaintiffs are also not likely to succeed on the merits of their claims. The KFT process is consistent with the parole statute because any parole granted under KFT must be on a case-by-case basis and supported by a significant public benefit or urgent humanitarian reasons. *See* 8 U.S.C. § 1182(d)(5)(A). The Secretary's authority to grant parole in place has been upheld by multiple courts of appeals, is consistent with other parole in place programs, including that for spouses of military personnel, and has been affirmed by Congress. The Secretary considered all relevant factors, including alternative approaches and effects on States and other stakeholders, and found that benefits of KFT outweighed any potential drawbacks. KFT is exempt from the APA's notice and comment requirement because it is both a general statement of policy and procedural rule and involves a foreign affairs function. Nor can Plaintiffs succeed on their Take Care Clause claim because that clause does not provide an independent cause of action, and even if it did, Plaintiffs' policy disagreement over parole does not rise to the level of an Executive abdication of duty.

Finally, Plaintiffs fail to show that the equities weigh in favor of preliminary relief, or that they would suffer irreparable harm absent one. The Notice by its design generally applies to individuals who have already been settled in the United States for over a decade and are otherwise eligible to seek lawful permanent resident (LPR) status through an alternative process, and the anticipated economic impact for the country is overwhelmingly positive. An injunction, on the other hand, would cause significant costs to the public, to the United States, and to Plaintiffs.

Accordingly, the Court should lift the administrative stay and decline to issue further temporary injunctive relief.

## BACKGROUND

Parole. The Executive Branch has broad constitutional and statutory power over the

administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(4); 8 U.S.C. § 1103(a)(1), (3). Congress delegated to the Executive Branch the authority and discretion to inspect and process "applicants for admission"— noncitizens present without being admitted or arriving in the United States. 8 U.S.C. § 1225(a)(1). The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security to "parole" applicants for admission "under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The statute confers broad discretion on the Secretary over the entirety of the parole process, from determining "in his discretion" whether to grant parole, setting the parole conditions "he may prescribe," and determining when "in [his] opinion" the purpose for the parole has been satisfied. *Id*. This statutory authority accords with the Executive Branch's authority over management of the admission of noncitizens and foreign affairs, including its historical discretion to grant parole. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229 (1925); *Ahrens v. Rojas*, 292 F.2d 406 (5th Cir. 1961).

In 1952, Congress generally "codif[ied]" the Executive's longstanding "administrative [parole] practice" in the INA's original version of section 1182(d)(5). *Leng May Ma v. Barber*, 357 U.S. 185, 188-190 (1958). Numerous authorities have long recognized the Executive's authority to parole noncitizens who are physically present in the United States without being inspected and admitted. INS General Counsel, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998)[1]; *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007) (stating "[w]e see nothing [in the INA] that would preclude the government from paroling . . . into the United States under § 1182(d)(5)(A)" noncitizens "who are currently present in the United States but who were not inspected upon arrival at a port of entry"). For example, DHS accepts parole in place applications without any formal process specific to any particular group of noncitizens. Who Can Apply for

---

[1] https://www.uscis.gov/sites/default/files/document/legal-docs/Coldebella_Memo.pdf

Parole, https://www.uscis.gov/humanitarian/humanitarian_parole. DHS has also used parole in place under section 1182(d)(5)(A) for over 15 years to permit certain noncitizen relatives of active-duty members of the military an opportunity to adjust status without the concerns associated with leaving the country. 89 Fed. Reg. 67461; USCIS Policy Memorandum, PM-602-0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces,* (Nov. 15, 2013).[2] In 2020, Congress "reaffirmed" "the importance of the parole in place authority of the Secretary of Homeland Security." National Defense Authorization Act for Fiscal Year 2020 (NDAA), Pub. L. 116-92, § 1758 (2019) (8 U.S.C. § 1182 note).

<u>Adjustment of Status</u>. To be eligible for adjustment of status to a LPR, an applicant generally must have been "inspected and admitted or paroled into the United States or … [have] approved petition for classification as a [Violence Against Women Act] self-petitioner." 8 U.S.C. § 1255(a). Parole under 8 U.S.C. § 1182(d)(5)(A), including parole in place, satisfies the "admitted or paroled" requirement. *E.g.*, *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1114 (9th Cir. 2007). An applicant for adjustment must be eligible for an immigrant visa and have one immediately available. Spouses and stepchildren of U.S. citizens are eligible for immediate relative immigrant visas. 8 U.S.C. § 1151(b)(2)(A)(i).; *see also id.* at § 1101(b)(1)(B) And because there is no numerical limit on immigrant visas for such individuals, *see id.*, immigrant visas are immediately available to them upon approval of a Form I-130, Petition for Alien Relative. *See* 8 C.F.R. § 245.2(a)(2)(i)(B); 22 C.F.R. § 42.21(a).

Absent parole, covered spouses and stepchildren who were not inspected and admitted or paroled into the country who seek LPR status on the basis of their relationships to U.S. citizens generally must leave the United States and follow a lengthy and uncertain process. 89 Fed. Reg. 67460. Those inadmissible under the unlawful presence ground in 8 U.S.C. § 1182(a)(9)(B)  must apply for an inadmissibility waiver of prior unlawful presence of one year or more before they can be admitted as LPRs. This process requires spouses and stepchildren of U.S. citizens to remain

---

[2]https://www.uscis.gov/sites/default/files/document/memos/2013-1115_Parole_in_Place_Memo.pdf

abroad during processing, potentially separated from their families for months or years. *Id*.

The Notice. On August 20, 2024, DHS published the Notice announcing the KFT process. 89 Fed. Reg. 67459. The Notice primarily encompasses two aspects.

First, the Notice announces that DHS has established a process by which eligible noncitizen spouses and stepchildren of U.S. citizens may submit a request for parole in place. In general, to take advantage of this process, spouses must have been continuously physically present in the United States since June 17, 2014, and have a legally valid marriage to a U.S. citizen as of June 17, 2024. Stepchildren must qualify as a stepchild of a U.S. citizen under 8 U.S.C. § 1101(b)(1) and have been under the age of 21 and unmarried on June 17, 2024, and continuously physically present in the United States from that date through the date of filing. Applicants must have no disqualifying criminal history; must not pose a threat to national security or public safety; and must demonstrate they merit parole in place as a matter of discretion. 89 Fed. Reg. 67460-61. Although those eligibility criteria suffice to permit a noncitizen to use the Notice's process for submitting a parole request, the ultimate adjudication of those requests is governed by the statutory standard; thus, a noncitizen may not be granted parole unless DHS determines that the noncitizen has demonstrated they merit a favorable exercise of discretion and that the grant of parole is for urgent humanitarian reasons or would have a significant public benefit. Although noncitizens who do not meet the eligibility criteria outlined in the Notice may not use the KFT process, they remain free— as are all noncitizens present without being lawfully admitted—to submit requests for parole.

Second, the Notice memorializes the Secretary's determination that paroling noncitizen family members of U.S. citizens who meet certain criteria and who "merit a favorable exercise of discretion will generally provide a significant public benefit to the United States." 89 Fed. Reg. at 67495. As the Notice explains, DHS has estimated that over two-thirds of the approximately 765,000 noncitizens married to U.S. citizens currently present in the United States have not been "inspected and admitted and paroled" and therefore are ineligible to apply for LPR status without first leaving the United States. *Id*. at 67460. As a result, such noncitizen family members are discouraged from pursuing LPR status, and those who do pursue that status "may be separated

8

from their U.S. citizen family members for months or years." *Id.* at 67460. Against this backdrop, the Secretary determined that granting parole in place to certain noncitizen family members who demonstrate they merit a favorable exercise of discretion—enabling them to pursue LPR status without the hardship of separating from their family—will "generally" have a significant public benefit, including by "promoting family unity and stability"; "strengthening the U.S. economy and the economic position of families and U.S. communities"; "advancing diplomatic relationships and key foreign policy objectives of the United States"; "reducing strain on limited government resources"; and "furthering national security, public safety, and border security objects." *Id.*

Noncitizens who are granted parole in place under KFT still must satisfy all other statutory and regulatory requirements for adjustment of status, including that are the beneficiary of an approved immigrant petition based on a bona fide relationship to a U.S. citizen, are admissible to the United States, and merit a grant of adjustment of status as a matter of discretion. Eligibility for a family-based immigrant petition and for adjustment of status are determined in a distinct and separate process from the parole-in-place adjudication. *Id.* at 67460; *see* 8 U.S.C. § 1255(a).

## ARGUMENT

Preliminary injunctive relief, including a temporary restraining order, "is an extraordinary remedy which should only be granted if" Plaintiffs have "clearly carried the burden of persuasion on all four requirements": (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest. *Winter*, 555 U.S. at 22; *Karaha Bodas Co. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara*, 335 F.3d 357, 363 (5th Cir. 2003). An administrative stay is not appropriate here as the Court has not made any of the requisite findings or legal determinations to support relief. Applying the proper four-factor test, Plaintiffs are not entitled to a temporary stay pending a decision on merits.

## I.    The Court Lacks Authority to Issue Equitable Relief Under the AWA and Cannot Further Extend the Administrative Stay Without Complying with Rule 65.

The Court lacked authority to issue an administrative stay, which effectively affords

temporary injunctive relief, without first determining under well-established principles that Plaintiffs were entitled to preliminary equitable relief. In issuing an administrative stay, the Court relied on the AWA, which the Court believed authorized it to order "temporary, injunctive relief to preserve the status quo pending prompt review of an agency's action through existing channels." Order at 2-3. That was error. Plaintiffs did not seek an administrative stay under the AWA, and there was no basis for entry of such an order.

It is settled law in this Circuit that the AWA "does not free a district court from the restraints of Rule 65." *Fla. Med. Ass'n*, 601 F.2d at 202. The AWA "is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the [AWA], that is controlling." *Pennsylvania Bureau of Corr. v. United States Marshals Serv.*, 474 U.S. 34, 43 (1985); *Clinton v. Goldsmith*, 526 U.S. 529, 537 (1999) (holding that injunction under the AWA is an extraordinary remedy that "invests a court with a power that is essentially equitable and, as such, not generally available to provide alternatives to other, adequate remedies at law"). Accordingly, while the AWA "empowers a district court to fashion extraordinary remedies when the need arises, it does not authorize a district court to promulgate an Ad *hoc* procedural code whenever compliance with the Rules [of Civil Procedure] proves inconvenient." *Fla. Med. Ass'n*, 601 F.2d at 202.

Multiple other Circuits have held Rule 65 governs the issuance of temporary restraining orders and preliminary injunction orders, "and thus [is] controlling" even under the AWA. *In re Est. of Ferdinand Marcos Hum. Rts. Litig.*, 94 F.3d 539, 546 (9th Cir. 1996); *accord In re Jimmy John's Overtime Litig.*, 877 F.3d 756, 770 n.11 (7th Cir. 2017) (rejecting argument that "Rule 65 and the traditional injunction factors do not apply to injunctions issued under the [AWA]"); *Scardelletti v. Debarr*, 265 F.3d 195, 212 (4th Cir. 2001), *rev'd on other grounds, Devlin v. Scardelletti*, 536 U.S. 1 (2002) (finding "no reason to distinguish between [AWA] injunctions and other injunctions that must comply with Rule 65"); *Ben David v. Travisono*, 495 F.2d 562, 563 (1st Cir. 1974) ("[w]hether proceeding under the [AWA] or not, a district court has no license to ignore [Rule 65]"); *see also Schiavo ex rel. Schindler v. Schiavo*, 403 F.3d 1223, 1229 (11th Cir.

2005) ("where the relief sought is in essence a preliminary injunction, the [AWA] is not available because other, adequate remedies at law exist, namely [Rule] 65, which provides for temporary restraining orders and preliminary injunctions"). The court therefore lacked authority to issue equitable, injunctive relief without first concluding that plaintiffs had satisfied the traditional requirements for injunctive relief. *See Winter*, 555 U.S. at 24 (injunction); *Nken v. Holder*, 556 U.S. 418, 427, 434 (2009) (stay).

The court's order did not address these authorities. Instead, it relied on a two-Justice concurring opinion in *United States v. Texas*, 144 S. Ct. 797, 798 (2024) (Barrett, J., concurring in denial of applications to vacate stay). Order at 1-4. Justice Barrett's concurrence is inapposite because it addresses the distinct issue of administrative stays of *lower court orders* during the pendency of an emergency motion to stay pending appeal. *See id.* As she explained, in the ordinary course, an administrative stay "freeze[s] legal proceedings until the court can rule on a party's request for expedited relief." *Texas*, 144 S. Ct. at 798. "Their point is to minimize harm *while an appellate court deliberates*, so the choice to issue an administrative stay reflects a first-blush judgment about the relative consequences of staying the lower court judgment versus allowing it go to into effect." *Id.* (emphasis added). The district court, however, is not reviewing a lower court's decision, and so its administrative stay does not "freeze legal proceedings." Here, the Court has not maintained the status quo but has enjoined the KFT process and granted the very relief sought by the complaint. *Fla. Med. Ass'n*, 601 F.2d at 202 (order under AWA "confers the same legal rights upon plaintiffs and imposes the same legal duties upon defendants as would a preliminary injunction"). And even if rules governing stays *pending appeal* were relevant in district court, it would "be an abuse of discretion for a [court] to decline to decide a pending motion because an administrative stay is in place." *Hassoun v. Searls*, 976 F.3d 121, 130 n.5 (2d Cir. 2020); *accord Texas*, 144 S. Ct. at 799-800 (Barrett, J., concurring) (directing Fifth Circuit to promptly "apply the *Nken* factors and decide the motion" for stay pending appeal). Therefore, now that the government has submitted a full response to the TRO motion, the Court cannot rely on an AWA administrative stay to avoid the "procedural[] inconvenience" of ruling on the Rule 65

11

request for injunctive relief. *Fla. Med. Ass'n*, 601 F.2d at 202.

The cases on which the Court relied, *F.T.C. v. Dean Foods Co*., 384 U.S. 597, 603 (1966), and *Scripps-Howard Radio, Inc. v. F.C.C.*, 316 U.S. 4 (1942), do not support its conclusions. *Dean Foods* stands for the proposition that the AWA "empowers the federal courts to issue all writs necessary or appropriate in aid of their respective jurisdictions." 384 U.S. at 603. Issuance of the writ was necessary there because the consummation of the merger halted by the writ would have deprived the court of appeals of the ability to review an administrative order regarding the merger. *See id.* at 603-05. And *Scripps-Howard* merely notes that appellate courts may stay "enforcement of an [agency] order"—there, the Federal Communications Commission—pending appellate judicial review, and that no specific rule under the Federal Communications Act provides a more specific rule that would preclude such a stay. 316 U.S. at 16. Neither case holds, or even suggests, that federal district courts may ignore Rule 65 and *Winter* and issue administrative stays outside the confines of the federal rules of civil procedure. Were there any doubt on this score, as explained, more recent Supreme Court cases make clear that the AWA does not provide district courts any basis to issue an administrative stay where "a statute specifically addresses the particular issue at hand" and "does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate." *Pennsylvania Bureau of Corr*., 474 U.S. at 43; *accord Clinton*, 526 U.S. at 537 ("a writ may not be used ... when another method of review will suffice").

Likewise, in *National Treasury Employees Union v. King*, 961 F.2d 240, 241 (D.C. Cir. 1992), the court of appeals did not stay any agency decision or action. It merely directed the district court not to outright dismiss the case, as it had, but rather to "maintain[]" the case "on its docket in a suspended state" while the plaintiff exhausted its administrative remedies. And in *Astrazeneca Pharm. LP v. Burwell*, 197 F. Supp. 3d 53, 59 (D.D.C. 2016), the court also did not temporarily enjoin or stay the agency action, but rather simply ordered the agency to provide the court with 24 hours' notice before issuing its decision on Astrazeneca's petition, enabling Astrazeneca to contest the decision at that time if it chose and enabling the court to rule on any TRO filed at that time.

12

Because the Court lacked authority to issue injunctive relief outside the confines of Rule 65, the Court must lift the administrative stay and cannot further extend it. Instead, the only means of issuing injunctive relief is for the Court to conclude that Plaintiffs are entitled to relief under Rule 65 based on "reasoned application of the four factors held to be necessary prerequisites before a preliminary injunction may be obtained." *Fla. Med. Ass'n*, 601 F.2d at 202. As explained below, Plaintiffs cannot make the "extraordinary" showing necessary to enjoin an agency program during the pendency of judicial proceedings. *E.g., Winter*, 555 U.S. at 22 (injunctive relief is "extraordinary remedy never awarded as of right").

## II.    This Court Lacks Jurisdiction Because Plaintiffs Lack Article III Standing.

Plaintiffs fail to demonstrate they have standing because they cannot show they have suffered, or will imminently suffer, a concrete, non-speculative injury in fact that is fairly traceable to the actions they challenge and likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992). Plaintiffs cannot satisfy this standard, both because their allegations of harm are not cognizable, and because they fail to make a "clear showing that they have standing," as is their burden on a motion for a temporary restraining order. *See Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017); *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987) (same standard governs temporary restraining order and preliminary injunction).[3]

### A.  Plaintiffs Have Not Asserted a Cognizable Injury.

The harms asserted by the Plaintiff States—alleged future, indirect, downstream impacts on their public expenditures and economies based on the federal government's exercise of discretionary authority to issue parole in place to certain noncitizen spouses or stepchildren of U.S. citizens—are not cognizable injuries for purposes of Article III standing.

Because the KFT process is available only to noncitizens who are already in the United States, the Plaintiffs' claimed harms allegedly arise from the presence in their States of noncitizens

---

[3] Plaintiffs have stipulated that they "will only seek to establish Article III injury based on alleged injuries to Texas and that they will not submit any evidence as to injury for any other State Plaintiff." ECF 36 at 1.

who, Plaintiffs speculate, would otherwise be removed were it not for their ability to request parole in place under the KFT process. *E.g.*, ECF 3 (Mot.) at 46 (asserting costs to cover illegal aliens that would not be present if KFT process parole recipients "were removed"), 48 (asserting that "aliens currently subject to the PIP Program would be removable if the PIP program were vacated"); *see also* Compl. ¶¶ 78 (alleging that it is "essential to detain and remove aliens"), 191. The premise that such noncitizens would otherwise be removed is unfounded because noncitizens who are enforcement priorities are ineligible for parole in place under the KFT process, and a grant of parole in place does not in and of itself prevent a noncitizen's removal. *See infra* at 21. Regardless, Plaintiffs cannot possibly demonstrate standing to challenge the Executive's failure to arrest and remove those noncitizens. This is precisely the type of nonprosecution injury that the Supreme Court recently held was not cognizable. *See United States v. Texas*, 599 U.S. 670 (2023) (*Priorities*). In *Priorities*, the Supreme Court rejected Texas and Louisiana's challenges to immigration prosecutorial discretion guidelines—which prioritized the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country in recent years—holding that the States' claims of indirect, downstream financial harm from immigration enforcement policies are not cognizable injuries for the purposes of Article III standing. *Priorities*, 599 U.S. at 674, 677–81 & n.3. Third parties like the Plaintiff States, who are not the subject of the challenged regulation or policy, have "no judicially cognizable interest in procuring enforcement of the immigration laws." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 897 (1984) (citing *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)), *quoted in Priorities*, 599 U.S. at 677. Accordingly, the Supreme Court held that the plaintiff States lacked a cognizable injury from the executive's "enforcement discretion over arrests and prosecutions" in the immigration context. *Priorities*, 599 U.S. at 677–81 & n.3. Plaintiffs' claimed injury arising from discretionary decisions not to initiate removal proceedings or execute removal orders are indistinguishable from the injury asserted, and rejected, in *Priorities*.

But even if Plaintiffs were not challenging the exercise of discretion to decline to remove noncitizens, the principles set forth in *Priorities* apply to other discretionary areas of immigration

enforcement, like the granting of parole. *See Texas v. Mayorkas*, No. 2:23-CV-00024-AM, 2024 WL 3679380, at *7 (W.D. Tex. Aug. 5, 2024) (applying *Priorities* to hold that Texas lacked standing to challenge asylum and parole policies); *cf. E. Bay Sanctuary Covenant v. Biden,* 102 F.4th 996, 1002 (9th Cir. 2024) (holding, based on *Priorities*, that States did not have "significant protectible interest" in enforcement of the immigration laws or policies in a particular manner or in "minimizing expenditures" related to the effect those policies might have on third parties). Congress has vested DHS with discretion and responsibility to manage immigration enforcement, including through administering parole determinations. *See* 6 U.S.C. § 202(4), (5) (charging DHS with responsibility for "establishing national immigration enforcement policies and priorities" and "administering rules . . . governing . . . parole"). Thus, just as the plaintiff States in *Priorities* had no standing to challenge the Executive Branch's "enforcement discretion over arrests and prosecutions" based on allegations of indirect effects on revenue and spending, 599 U.S. at 677–81 & n.3, here, the Plaintiffs lack a cognizable interest in the circumstances in which the Executive exercises its inherently discretionary authority to parole applicants for admission, *see Garcia-Mir v. Smith*, 766 F.2d 1478, 1484–85 (11th Cir. 1985) (recognizing "broad discretion given the [Executive Branch] in making parole decisions").

Each of the reasons the Supreme Court articulated in *Priorities* that the States lacked standing to challenge immigration enforcement guidelines applies equally to DHS's exercise of its discretionary authority to implement the KFT process. First, the discretionary parole process involves no exercise of coercive power over the Plaintiffs. *See Priorities*, 599 U.S. at 678-81. Second, the decision to implement the process implicates Article II and foreign-policy concerns. *See* 89 Fed. Reg. at 67467 (explaining that the process "responds to the requests and interests of key foreign partners and aligns with the U.S. government's broader foreign policy objectives to collaboratively manage migration and promote economic stability in countries throughout the Western Hemisphere"). Third, courts lack "meaningful standards" to assess this decision, which reflects the Executive's "complicated balancing" of "resource constraints" and factors like "public-safety and public-welfare needs," *see Priorities*, 599 U.S. at 679–80; *see also Heckler v. Chaney*,

470 U.S. 821, 830–32 (1985); 89 Fed. Reg. at 67468 (explaining that the process will allow DHS and the Department of State to more efficiently use their resources to fulfill immigration duties), 67466 (explaining how parole in place will strengthen the U.S. economy), 67469 (explaining how parole in place furthers national security, public safety, and border security).

Plaintiffs argue their case is distinguishable from *Priorities* because a grant of parole also involves a conferral of a benefit in the form of employment authorization and "protection from removal." *See* Mot. at 48. But, as explained, the standing analysis here does not meaningfully differ from the analysis in *Priorities*, because the decision to grant parole implicates the same core discretionary matters as policies governing the prosecution of immigration violations, and because Plaintiffs' claimed injury still arises from decisions concerning whether to arrest and remove those noncitizens who are eligible to seek parole through the KFT process. Moreover, Plaintiffs are incorrect, as a grant of parole does not confer immigration status or prevent removal: "DHS may initiate and pursue enforcement action pursuant to its enforcement priorities under its existing authorities notwithstanding a noncitizen's . . . grant of parole in place under this process." 89 Fed. Reg. at 67465. Nor does the KFT process itself confer parole. Instead, it establishes a process by which certain noncitizens may be considered, on a case-by-case basis, for parole, under the pre-existing statutory authority at 8 U.S.C. § 1182(d)(5)(A). Likewise, employment authorization is not automatic upon a grant of parole in place under the KFT process; instead, parolees may apply for employment authorization through a separate application process governed by long-standing regulations that Plaintiffs do not challenge here. *See* 8 C.F.R.§ 274a.12(c)(11). Accordingly, the KFT process does not create a new benefit or render parolees eligible for a benefit they would not otherwise have been eligible to receive. Nor does it involve any "abdication" of DHS's statutory responsibilities that could take it outside the holding of *Priorities*. *See* Compl. ¶ 210. Just like the guidelines at issue in *Priorities* amounted to a use of enforcement discretion rather than a complete abdication of the executive's immigration enforcement duties, *see* 599 U.S. at 682, the KFT process allows for immigration enforcement consistent with those same guidelines and is well within its traditional and statutory discretion governing grants of parole. *See infra* § III.A.

But even if the Plaintiff States' injury did not fall squarely under the reasoning in *Priorities*, their claimed downstream injuries from the effects of federal policy on the actions of third parties that may then in turn impact State expenditures, revenues, and other activities still would not be cognizable. In *Priorities*, the Supreme Court cautioned against recognizing such "attenuated" claims by States even outside the immigration context. *See Texas*, 599 U.S. at 680 n.3 (recognizing "bedrock Article III constraints in cases brought by States against an executive agency or officer"). This case does not involve the sort of direct injury that might allow a State to sue in limited instances. *See, e.g.*, *Florida v. Mellon*, 273 U.S. 12, 18 (1927) (holding that Florida lacked standing to challenge a federal inheritance tax because its claimed injury of "withdrawal of property" and resulting diminishment of tax base was "at most, only remote and indirect"); *see also El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) ("[I]ncidental and attenuated harm is insufficient to grant a state or county standing."). "[W]here the government action is so far removed from its distant (even if predictable) ripple effects . . . the plaintiffs cannot establish Article III standing." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 383 (2024) ("*Alliance*"); *see also id.* at 390–93 (rejecting allegations of indirect, downstream "monetary" harm from the government's loosened regulation of certain mediation).[4] Just as "[t]eachers in border states" may not "sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms," *Alliance*, 602 U.S. at 392, neither may Texas sue the government whenever it alleges that a federal policy increases the number of noncitizens in the State who may ultimately use State law enforcement, health care, and education resources. Because Plaintiffs' claimed injury is too far removed from the challenged policy, particularly given that States are subject to "bedrock Article III constraints"

---

[4] Although discussing the causation requirement of standing, "[i]n cases of alleged future injuries to unregulated parties from government regulation, the causation requirement and the imminence element of the injury in fact requirement can overlap. Both target the same issue: Is it likely that the government's regulation or lack of regulation of someone else will cause a concrete and particularized injury in fact to the unregulated plaintiff?" *Alliance*, 144 S. Ct at 1558 n.2.

on their ability to use the courts to challenge federal policy, *Priorities*, 599 U.S. at 680 n.3, they have not stated a cognizable injury for standing purposes.[5]

**B.   Plaintiffs' Claimed Injury is Too Speculative and Attenuated to be Cognizable.**

Even if the Plaintiff States' claimed downstream injuries were cognizable, their claimed injuries would be too speculative and remote to support standing. "Injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not 'conjectural' or 'hypothetical.'" *Duarte ex rel. Duarte v. City of Lewisville, Tex.*, 759 F.3d 514, 517 (5th Cir. 2014) (quoting *Lujan*, 504 U.S. at 560). Further, particularly when States are the plaintiffs, the alleged harms must be sufficiently direct: "distant (even if predictable) ripple effects . . . cannot establish Article III standing." *Alliance*, 602 U.S. at 383; *supra* at 17. To demonstrate an injury based on their theory of increased state expenditures, Plaintiffs must show, at minimum, an actual or imminent increase in expenditures as measured against the relevant status quo—that is, as measured against the existing levels of expenditures if the challenged process did not exist. *See Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068, at *15–17 (S.D. Tex. Mar. 8, 2024) (*CHNV*) (analyzing pre-*Priorities* Fifth Circuit cases, including *Gen. Land Off. v. Biden*, 71 F.4th 264 (5th Cir. 2023), and *Texas v. Biden*, 20 F.4th 928, 966 (5th Cir. 2021) (*MPP*), *rev'd and remanded*, 597 U.S. 785 (2022), to support the holding that harm "has long been understood in the immigration context" as meaning harm "relative to the status quo, and relative to Plaintiff's position absent the challenged policy"), *appeal filed*, No. 24-40160 (5th Cir. Mar. 12, 2024). In other words, "the baseline for these analyses is not zero immigration." *Arizona v. Garland*, No. 6:22-cv-01130, 2024 WL 1645417, at *11 (W.D. La. Apr. 16, 2024) (characterizing *CHNV*). And the increase in expenditures must also be traceable to the particular immigration policy at issue, not to immigration policies generally. *Crane v. Johnson*, 783 F.3d

---

[5] Thus, although pre-*Priorities* cases in this Circuit have at times held States to a lesser standard for imminent injury or causation, *see, e.g.*, *Texas v. United States*, 50 F.4th 498, 514 (5th Cir. 2022), the Supreme Court has since indicated that States are generally not subject to such relaxed standards of challenging federal policies, *see Priorities*, 599 U.S. at 680 n.3, 685 n.6.; *infra* at 24.

244, 252 (5th Cir. 2015) (finding no injury where state submitted evidence that "illegal immigration" increased costs but did not connect any increases to the particular challenged policy).

The Plaintiff States' principal theory of injury hinges on the assumption that the KFT process will actually result in a net increase in noncitizens within their borders who will use state public services or other benefits or cause law enforcement expenditures. Yet their speculative and generalized claims of increases in "illegal immigration" are unsupported by facts specific to the context and ignore the contours of the particular policy they challenge. And in any event their principal alleged harms—eventual net increase in expenditures because the KFT process will allegedly lead to some noncitizens remaining in the United States who otherwise would not be present, *see* Compl. ¶ 184, Mot. at 48–49—are far too attenuated to support standing.

Here, the Plaintiff States have not made the threshold showing that the KFT process will lead to more noncitizens in their States. First, there is no reason to believe (and Plaintiffs provide no evidence) that the process—which does not apply to any noncitizen who entered the United States after June 17, 2024, primarily encompasses noncitizens who have already been continuously present in the United States for at least 10 years, and generally does not cover those who have entered unlawfully since 2020[6]—will "encourage" or "incentivize" *new* migration to the United States. *See, e.g.*, Mot. at 1; Compl. ¶¶ 3, 76, 80, 84, 86–87; 89 Fed. Reg. at 67461, 67469–72. As the KFT process is available only to a group of noncitizens who are already in the United States and have familial relationships with U.S. Citizens, Plaintiffs' claim that the KFT process will cause people still outside the United States to migrate here is based on unfounded speculation.

Plaintiffs also present no concrete evidence to support their theory that the population of noncitizens who are eligible to request parole in place under the KFT process would otherwise voluntarily leave the Plaintiff States if the process did not exist. *See, e.g.*, Mot. at 48–49; Compl.

---

[6] Specifically, spouses of U.S. Citizens who constitute a threat to border security are ineligible for parole under the KFT process. 89 Fed. Reg. at 67471. "As noted in the September 2021 [Enforcement Priorities] Guidelines, noncitizens present border security concerns if they were apprehended while attempting to enter the U.S. unlawfully or if they entered unlawfully after November 1, 2020." 89 Fed. Reg. at 67472 n.146.

¶¶ 184, 189, 191. Indeed, even if the process did not exist, these same noncitizens would likely remain in the United States.  Some of these noncitizens may remain in the United States while they pursue a provisional unlawful presence waiver which, if granted, would allow them to shorten the time they would need to be abroad to obtain an immigrant visa.[7] Other noncitizens would instead likely opt to remain in the United States without regularizing their status—no change from their status prior to the KFT process. *See, e.g.*, 89 Fed. Reg. 67466 ("Without this process, hundreds of thousands of noncitizen spouses are likely to instead remain in the United States without lawful status . . . ."). Indeed, many of the noncitizens eligible for the KFT process have already been unlawfully present in the United States for decades. *See* 89 Fed. Reg. at 67465 (explaining that the median time potentially eligible noncitizen spouses have been in the United States is 23 years). Accordingly, the availability of the KFT process would in fact serve to counteract the harms Plaintiffs claim. And Plaintiffs' own declarant acknowledges that those who are potentially eligible for parole under the KFT process are already less likely to voluntarily leave the United States because of their long residence in the country and their close family relationships with U.S. citizens. *E.g.*, Mot. Ex. A ¶¶ 11 (citing studies that found that indicators of "social ties in the United States" deters emigration from the United States and that having a spouse in the country of origin favors return migration), 12 ("[U]nlawful immigrants who have been in the United States for a shorter period are more likely to voluntarily return to their country of origin."). Plaintiffs' proffered evidence also highlights that the likelihood of noncitizens leaving the United States depends on a variety of factors that are not tied solely to the availability of work authorization, including their

---

[7] It is true that those ultimately granted a discretionary provisional unlawful presence waiver may leave the United States for consular processing to obtain an immigrant visa. *See generally* 8 C.F.R. § 212.7(e). But Plaintiffs do not actually assert that they are harmed by the continued unlawful presence of those who may otherwise *temporarily* depart the United States to pursue consular processing. Their failure to assert this theory of injury makes sense, as such a temporary absence likely does not impact their expenditures because the noncitizen who leaves to pursue consular processing will likely return to the United States to be admitted as an LPR. Although this temporary absence is certainly prolonged from the perspective of the U.S. citizen family members and thus disruptive to family unity, the Plaintiff States have introduced no evidence that the temporary absence would have any concrete impact on their claimed public expenditures.

20

level of education, strength of ties to their country of origin, length of time in the United States, ability to meet savings goals, age, and economic conditions. *See id.* ¶¶ 5, 9, 11–12. Plaintiffs' theory of injury is too attenuated and distant to support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 & n.5 (2013); *Alliance*, 602 U.S. at 383.

Nor will the parole-in-place process cause any net decrease in removals, because noncitizens who would otherwise be removed under this Administration's enforcement priorities will generally not be able to meet the eligibility criteria for parole in place. *See* TRO Opp. Ex. A ¶ 14; Compl. ¶ 191. Noncitizens who pose a threat to national security, public safety, or border security are ineligible to receive parole in place pursuant to the process. 89 Fed. Reg. at 67465 ("DHS may initiate and pursue enforcement action pursuant to its enforcement priorities under its existing authorities notwithstanding a noncitizen's intent to request parole in place, eligibility to request parole in place, filing of a request for parole in place, or grant of parole in place under this process.").  Thus, even if a noncitizen is granted parole in place under the KFT process, that grant of parole does not prevent the noncitizen's removal if removal becomes appropriate. And noncitizens with unexecuted final removal orders—regardless of whether or not they constitute an enforcement priority—are also presumptively ineligible for this process. *See id.* Thus, there is no showing that the process will contribute to a net decrease in removals that could even possibly contribute to increased use of public services and increased expenditures for the Plaintiff States.

Plaintiffs' claims of alleged future expenditures generally fail to take into account that noncitizens eligible for consideration under the KFT process are already here in the United States and thus, any alleged costs associated with the presence of such noncitizens would already exist and are not traceable to the KFT process. For example, Plaintiffs assert that the state of Texas's unreimbursed costs for the incarceration of "illegal criminal aliens" will likely increase if more noncitizens are paroled under the KFT process. Mot. at 47. But even if such costs could possibly constitute cognizable harms, the declaration on which Plaintiffs rely asserts only the declarant's "belief" that if the number of noncitizens in Texas custody increases, Texas's expenses will increase. *See* Mot. Ex. D ¶ 10. It does not suggest that grants of parole to noncitizens who are

*already here* would lead to more noncitizens incarcerated in Texas.

Even assuming, however, that Plaintiffs could show some number of KFT process-eligible noncitizens would eventually, temporarily leave the United States in the future absent the KFT process, Plaintiffs make no showing that this particular population of noncitizens will otherwise contribute to law enforcement or public service expenditures that would otherwise not be spent if they were to depart. Any claimed costs are too speculative and attenuated. For example, even if a court were to "assume" that a policy change "increase[s] unlawful immigration," it "cannot further infer that [it] increase[s] crime." *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015); *Arizona v. Biden*, 40 F.4th 375, 387 (6th Cir. 2022) (rejecting theory of injury grounded in rising crime rates because the injury would "hinge on third parties committing more crimes"). Such an inference is especially inappropriate here because those with a criminal history are generally either ineligible or presumptively ineligible for parole under the KFT process. *See* 89 Fed. Reg. at 67471. And any claimed future increase in education costs for KFT-eligible stepchildren is likewise speculative and attenuated, as Plaintiff Texas does not appear to assert an immediate, per-student pocketbook cost for state funding of public education, *see* Mot. Ex. B, and presumably, such noncitizen stepchildren of U.S. citizens would not leave the country while still of school age, *cf.* Mot. Ex. A ¶ 9 (citing research that young immigrants are less likely to return to their country of origin).

Plaintiffs' next theory of injury is that noncitizens granted parole will become eligible for certain educational or other benefits that they could not otherwise access. *See* Compl. ¶¶ 75, 186. There are several additional problems with this theory. First, as Plaintiffs themselves acknowledge, noncitizens who are granted parole are generally ineligible for at least five years after being granted parole for the means-tested public benefits Plaintiffs cite as costs. *See* 89 Fed. Reg. at 67478 (explaining that SNAP, Medicaid, TANF, and CHIP programs generally require five years in "qualified alien" status); *see* Compl. ¶ 75 & n.11. And some of these benefits are not available at all in Texas. 89 Fed. Reg. at 67478 (explaining that the Plaintiff States of Ohio, South Carolina, and Texas deny access to TANF to some "qualified aliens" even after expiration of the five-year period). Thus, any injury from noncitizens qualifying for benefits in five years and potentially

seeking those means-tested public benefits is not "imminent" and may be superseded by other events. *See Lujan*, 504 U.S. at 560. Second, to the extent there are any costs for public higher education or other benefits provided to paroled noncitizens, those costs are attributable to the States' own choices concerning eligibility for in-state resident tuition or participation in certain benefit programs. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"); Mot. at 46 (citing Idaho providing in-state tuition for "residents able to verify [their] lawful presence"). Third, the States have not presented specific evidence that tends to show an overall increase in benefit applications is a likely effect as to the particular population eligible to obtain parole through the KFT process, or that an increase in applications would cause the States a direct fiscal injury. *See* 89 Fed. Reg. 67478-79 (explaining that costs to states from federal benefit programs depend on particular states' implementation).

Finally, any benefit expenditures as to some noncitizens are outweighed by the likely decrease in reliance on those public services from those who benefit from employment authorization. *See* 89 Fed. Reg. at 67478 ("Upon receipt of employment authorizations and gainful employment, spouses and stepchildren of U.S. citizens may no longer need or qualify for public benefits."). In determining pocketbook injury, courts must consider, "offsetting benefits … arise from the same transaction as the costs." [8] *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015); *see  Henderson v. Stalder*, 287 F.3d 374, 379–80 (5th Cir. 2002) (plaintiffs lacked standing based on the cost of producing specialized license plates, where that cost was offset by payments made by members of the public to cover those costs). Accordingly, any future offsetting reduction in use of a particular public benefit must be considered, but Plaintiffs' evidence merely recounts past

---

[8] Although courts in this circuit have previously declined to engage in a balancing of the various offsetting costs and benefits that might result from a federal policy to assess a state's alleged pocketbook injury, the true cost of any policy to a state cannot be calculated by looking at any one cost in isolation without recognizing offsetting benefits. And "[p]roviding access to employment authorization for this population would increase tax revenues by decreasing barriers to compliance with the tax code and increasing the earning potential of these noncitizens" and may contribute to "other economic benefits." 89 Fed. Reg. 67467, 67478.

expenditures and includes no projections that account for such offsets. For these reasons, the States' theory of injury based on benefits afforded to those who are granted parole likewise fails.

The Plaintiffs thus have not shown, and likely cannot show, that there will be an increase in State healthcare, education, or law enforcement expenditures even as an indirect, downstream effect of the challenged KFT process. At a minimum, their theory of injury is too attenuated to support standing. And contrary to their assertion, Plaintiffs cannot use the concept of "special solicitude" to circumvent the requirements to show an actual, non-speculative likelihood of injury as a result of the challenged process. *See* Compl. ¶¶ 192–207. The Supreme Court in *Priorities* rejected States' reliance on special solicitude where they challenged an immigration policy under the general provision of APA—just as the Plaintiff States do here—rather than the denial of a statutorily authorized petition for rulemaking as in *Massachusetts v. EPA*, 549 U.S. 497 (2007). *See Priorities*, 599 U.S. at 685 n.6. Thus, the Supreme Court has rejected the Fifth Circuit's view that a relaxed inquiry into causation and the immediacy of injury is warranted whenever States assert that they are aggrieved by final agency action within the meaning of the APA, as in *Texas v. United States (DACA)*, 50 F.4th 498, 514 (5th Cir. 2022). To the contrary, States are subject to additional "constraints" on standing. *See Priorities*, 599 U.S. at 680 n.3, 685 n.6; *see also id.* at 689 (Gorsuch, J., concurring) (noting lower courts should leave the concept of "special solicitude" "on the shelf"). Further, Plaintiffs do not have a procedural right because they cannot state a procedural or substantive APA claim. *See infra* §§ I.C, II. But even if they had a cognizable injury, the alleged impacts of the KFT process are speculative and remote. *See DACA*, 50 F.4th at 514.[9]

As Plaintiffs thus cannot establish injury in fact, there is no subject-matter jurisdiction over their claims, and any relief would be improper. At a minimum, Plaintiffs have failed to make a "clear showing" of standing, thereby failing to meet their burden to show entitlement to preliminary-injunctive relief. *See Barber*, 860 F.3d at 352.

---

[9] Plaintiff States cannot assert standing based on a speculative future economic or other injury to their citizens, Mot. at 48, because "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023).

### C.  Plaintiffs' Injuries Are Not Redressable.

Even if Plaintiffs clearly show non-speculative, cognizable injury traceable to the KTF process, their claims are not redressable. First, Plaintiffs contend they incur costs to provide services to noncitizens eligible for KFT currently present in the United States, and they concede that reducing these costs requires that covered noncitizens be detained or removed rather than be paroled. *See, e.g.,* Mot. at 48 ("Relief against the PIP Program will redress Plaintiffs' injuries. Aliens currently subject to the PIP Program would be removable if the PIP Program were vacated[.]"). But DHS is not likely to detain or remove noncitizens who are not priorities for removal. And the INA does not authorize the Court to order DHS to detain or remove anyone. Section 1252(f)(1) provides that, except in a case brought by an "an individual [noncitizen]" in removal proceedings, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of the provisions of part IV of this subchapter [of the INA]." 8 U.S.C. § 1252(f)(1). Any injunctive relief that "enjoins or restrains" DHS's use of covered provisions—including any court order that directs DHS as to how it should implement the covered provisions or which or how many noncitizens it should or should not admit, detain, or remove, 8 U.S.C. 1225, 1226, 1229a, 1231—is barred by 8 U.S.C. § 1252(f)(1). *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022); *Biden v. Texas*, 597 U.S. 785, 797-98 (2022).

Second,  any court order enjoining the KFT process cannot redress Plaintiffs' injuries because, DHS officers possess the same authority to consider parole requests (including parole in place) under the parole statute regardless of the KFT process. *See Priorities*, 143 S. Ct. at 1978-79 (Gorsuch, J., concurring) (redressability cannot be established where a "judicial decree rendering" guidance "a nullity does nothing to change the fact that federal officials possess the same underlying" discretion without the guidance); *see* https://www.uscis.gov/humanitarian/humanitarian_parole, Who Can Apply for Parole? (explaining that any applicant for admission may apply for parole, including parole in place). An order enjoining KFT, regardless of the order's reasoning, does not prevent USCIS from exercising its parole authorities under section 1182(d)(5)(A) or the harm Plaintiffs allege is caused by the

exercise of such statutory authority. Therefore redressability is lacking. *Haaland v. Brackeen*, 599 U. S. 255, 294 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability.")

### III.   Plaintiffs Cannot Obtain APA Review of Their Claims.

Plaintiffs' APA claims are unreviewable. Plaintiffs impermissibly challenge action committed to agency discretion by law, fail to properly challenge a final agency action, are not within the zone of interests of section 1182(d)(5)(A) or the Paperwork Reduction Act, and assert claims that are subject to jurisdiction-stripping provisions of the INA.

<u>Zone of Interests</u>. A plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). The majority of Plaintiffs' APA claims challenge the agency's KFT process. But nothing in the text, structure, or purpose of either the relevant parole statute, section 1182(d)(5)(A), nor the INA generally, evinces a congressional concern with States' attenuated downstream financial costs from the enforcement or implementation of immigration policies. *See Fed'n for Am. Immigration Reform, Inc.  v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996). To the contrary, the INA throughout reflects the principle that immigration enforcement is exclusively the province of the federal government and the Executive. *Supra* pp. 5-6 & §§ II.A, II.B; *infra* p. 25 & § IV.A. And that conclusion is reinforced by the general rule that third parties have no cognizable legal interest in compelling the enforcement of laws against others, *see Linda R.S.*, 410 U.S. at 619. In light of those principles, it is unsurprising that under the INA only the noncitizens against whom the immigration laws are being enforced may challenge application of those laws—and only in certain circumstances and often only through their removal proceedings. *See, e.g.,* 8 U.S.C. §§ 1226(e); 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g). A detailed review scheme that allows some parties, but not others, to challenge specific executive action is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484

U.S. 439, 448 (1988).

      <u>Committed to Agency Discretion</u>. The APA precludes review of agency action that is committed to agency discretion. *Lincoln v. Vigil,* 508 U.S. 182, 191 (1993); 5 U.S.C. § 701(a)(2). Section 1182(d)(5) provides that the Secretary "may" grant parole and thus commits the decision to grant or deny to his discretion, 8 U.S.C. § 1182(d)(5)(A); *see Jama v. ICE*, 543 U.S. 335, 346 (2005) ("may" "connotes discretion"). Indeed, the Statute confers broad discretion on the Secretary over the entirety of the parole process, from determining "in his discretion" whether to grant parole, setting "such conditions as he may prescribe," and determining when "in [his] opinion" the purpose for the parole has been satisfied. *Id.* Beyond the statute, the Notice's implementation of the Secretary's long-established parole authority involves the "complicated balancing of a number of factors which are peculiarly within its expertise," like the Executive's comprehensive diplomatic efforts to address and manage migration in the Western Hemisphere, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). Further, the Notice identifies a framework of common factors and priorities, such as preserving family unity and preventing extreme hardship from international separation, increasing immigrant accountability and tax contributions, and managing migration that *may* support findings of significant public benefit for parole-in-place requests upon individual review, but requires no particular result in any case. *See* 89 Fed. Reg. at  67,465 ("Through a case-by-case assessment, USCIS will consider whether parole for each requestor individually will provide a significant public benefit[.]"). The Court thus lacks any "meaningful standard against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191.

      <u>Final Agency Action</u>. Plaintiffs also fail to challenge "final" agency action, 5 U.S.C. § 704, that is, action that "consummate[es] the agency's decision making process" and determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The Notice does not determine anyone's rights or obligations or produce "legal consequences." *Id.*; *see* 89 Fed. Reg. 67,474. The Notice informs the public of the agencies' current approach to implementing discretionary parole authority with respect to certain unlawfully present spouses and stepchildren of U.S. citizens who meet the pre-existing statutory standards. *See id.* But it is the

27

statute—section 1182(d)(5)(A)—not the Notice, that would create rights or obligations, if any, or produce any legal consequences. The Notice itself neither creates any rights to parole for noncitizen spouses and stepchildren of U.S. citizens, obligates DHS to grant parole, nor otherwise alters the legal consequences attendant to any noncitizen's consideration for parole under section 1182(d)(5)(A). *See Bennett*, 520 U.S. at 178. Any grant of parole to a spouse of stepchild of a U.S. citizen under this process is an individualized decision made by a USCIS officer on a case-by-case basis if the noncitizen has demonstrated that they are statutorily eligible, merits parole based on urgent humanitarian reasons or significant public benefit, and merits a favorable exercise of discretion. *See* 89 Fed. Reg. 67465. And the Notice leaves USCIS officers with discretion to deny parole to applicants when they deem it appropriate. *Id.* The notice is thus unlike the policies at issue in *Texas*, 20 F.4th at 948; *Texas v. United States*, 809 F.3d 134, 163 n.82 (5th Cir. 2015), as the Fifth Circuit understood USCIS officers not to have discretion to grant or deny deferred action. Here, however, USCIS retains discretion to grant or deny parole requests on an individual basis under the Notice, based entirely on the terms of the statute. The Notice itself leaves the agency "the discretion and the authority to change its position in any specific case and does not seek to impose or elaborate or interpret a legal norm," that is, the specific terms of the parole statute, and thus is not "final agency action." *Texas v. EEOC,* 933 F.3d 433, 442 (5th Cir. 2019).

No Statutory Jurisdiction. Finally, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review of Plaintiffs' claims. *See* 5 U.S.C. § 701(a)(1). Congress provided that "no court shall have jurisdiction to review . . . any other decision or action … the authority for which is specified … to be in the discretion of the . . . Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii). Parole under section 1182(d)(5)(A) is a "decision or action" specified to be in the "discretion" of the Secretary and thus is subject to the jurisdiction-stripping effect of section 1252(a)(2)(B)(ii). *See* 8 U.S.C. § 1182(d)(5)(A). This bar includes programmatic-level challenges to any parole process, including parole in place. In *Patel v. Garland*, 596 U.S. 328, 338 (2022), the Supreme Court held that section 1252(a)(2)(B)(i), which bars jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions, bars review of "judgments of whatever kind" covered by the statute,

and "not just discretionary judgments or the last-in-time judgment," and "encompasses not just the granting of relief but also any judgment relating to the granting of relief." Since sections 1252(a)(2)(B)(i) and (ii) cover decisions "of a like kind," *Kucana v. Holder,* 558 U.S. 233, 247 (2010), the Notice's decision to use parole in place in this context—a "judgment relating to" the Secretary's discretionary decision to grant parole under section 1182(d)(5)(A)—is shielded from review by section 1252(a)(2)(B)(ii).

### IV.   Plaintiffs Cannot Succeed on the Merits of Any of Their Claims.

#### A.   Plaintiffs Are Not Likely to Succeed on the Merits of their Claims that the Notice is Contrary to Law.

Section 1182(d)(5)(A) provides that the Secretary of Homeland Security may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The Notice comports with all requirements of this statute.

Authority for Parole in Place. Granting parole in place is consistent with the INA and longstanding DHS practice. The Notice provides that parole in place may only be granted to noncitizen spouses and stepchildren who "remain applicants for admission." 89 Fed. Reg. 67461. Any noncitizen "present in the United States who has not been admitted" is an "applicant for admission." 8 U.S.C. § 1225(a)(1). Even unadmitted noncitizens, such as the unlawfully present family members at issue here, "already physically present in the United States … may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) by virtue of their status as applicants for admission." *Cruz-Miguel*, 650 F.3d at 198; *accord Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007) (stating "[w]e see nothing [in the INA] that would preclude the government from paroling . . . into the United States under § 1182(d)(5)(A)" noncitizens "who are currently present in the United States but who were not inspected upon arrival at a port of entry"); *Akhtar v. Dir. United States Citizenship & Immigr. Servs. Mt. Laurel Field Off.*, No. 23-1577, 2024 WL 1427634, at *3 (3d Cir. Apr. 3, 2024) (recognizing DHS's authority to parole

29

under section 1182(d)(5)(A) unadmitted noncitizens encountered already inside the United States); INS General Counsel, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998). Because the KFT parole process is limited to noncitizen spouses and stepchildren of U.S. citizens "who are present in the United States without admission or parole," 89 Fed. Reg. 67464, it by definition covers only "applicants for admission" who are eligible for parole under the terms of the parole statute. *See* 8 U.S.C. § 1182(d)(5)(A) (parole eligible to any noncitizen "applying for admission" whose case will be dealt with "in the same manner as that of any other applicant for admission to the United States").

Moreover, the KFT process is consistent with DHS's longstanding interpretation of the parole statute to provide for parole in place in similar circumstances. *See supra* pp. 6-7; INS General Counsel, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998);[10] *Ortega-Cervantes*, 501 F.3d at 1118. Congress has recognized and affirmed the use of parole in place under section 1182(d)(5)(A). NDAA, Pub. L. 116-92, § 1758. In 2013, USCIS issued policy guidance on the parole in place process for family members of certain current or former members of the U.S. Armed Forces in order permit them to meet the "inspected and admitted or paroled" requirement for adjustment of status. USCIS Policy Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces* (Nov. 15, 2013). In November 2014, the Secretary directed USCIS to expand on these policies to include family members of U.S. citizens and LPRs who seek to enlist in the U.S. Armed Forces. Memorandum from Jeh Johnson, Secretary, U.S. Dep't of Homeland Security, *Families of U.S. Armed Forces Members and Enlistees* (Nov. 20, 2014). In 2019, the NDAA explicitly "reaffirmed" "the importance of the Secretary's parole in place authority." NDAA § 1758(b)(3). This legislation emphasized that the use of "parole in place

---

[10] Given that this has been the Government's consistent interpretation of the parole statute since its most recent amendment in 1996, this position is entitled to greater deference. *See Loper Bright Ent.*, 144 S. Ct. at 2258 (noting "the longstanding practice of the government—like any other interpretive aid—can inform [a court's] determination of 'what the law is'").

reinforces the objective of military family unity," and directed DHS to "consider, on a case-by-case basis, whether granting the [parole in place] request would enable military family unity that would constitute a significant public benefit." *Id.* § 1758(a), (b). In 2019, Congress also provided a new long-term immigration status specifically for certain noncitizens in the Commonwealth of the Northern Mariana Islands who had been paroled in place by USCIS for various reasons, including family unity, and authorized continued parole in place for those noncitizens pending adjudication of their applications for the new status. Northern Mariana Islands Long-Term Legal Residents Relief Act, Pub. L. 116-24, § 2 (2019) (codified at 48 U.S.C. 1806(e)(6)). These enactments demonstrate Congress's understanding that parole in place represents a proper use of the section 1182(d)(5)(A) authority and serves significant public benefits including family unity. *See Bob Jones Univ. v. United States,* 461 U.S. 574, 599 (1983) (Congress's awareness of widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence"); *Barnhart v. Walton,* 535 U.S. 212, 220 (2002) ("These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible.").

    <u>Significant public benefit.</u> Parole grants are limited to situations where parole serve a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The Secretary determined that, as appropriate to individual cases, a grant of parole in place to an eligible spouse or stepchild of a U.S. citizen who does not represent a national security or public safety threat and otherwise warrants a favorable exercise of discretion, as a basis for applying for adjustment of status, could advance one or more significant public benefits. 89 Fed. Reg 67465-69. Through a case-by-case assessment of the individualized information identified above, DHS will determine whether parole for each requestor individually supports one or more of the five significant public benefits. *Id*.

- Promote family unity and stability by allowing noncitizen family members to obtain lawful status without separating them from their U.S. citizen spouses and, in many cases, their U.S. citizen children, which existing legal options for obtaining lawful status otherwise would often require. 89 Fed. Reg. at 67466.

- Support the U.S. economy by allowing the noncitizen to apply for and, if eligible, obtain employment authorization. This would enable them to obtain lawful employment, reduce labor exploitation, increase economic productivity, and generate greater income tax revenue, among other benefits. *Id*.

- Advancing diplomatic relationships and foreign policy objectives by obtaining assistance from foreign partners on key initiatives such as disrupting human smuggling, trafficking, and criminal networks, in return for offering regularization opportunities for those countries' nationals residing in the United States. *Id*. at 67467.

- Preserving administrative resources by reducing the backlog of pending adjudications of I-601A, Application for Provisional Unlawful Presence Waiver under 8 U.S.C. § 1182(a)(9)(B)(v), a lengthier, more complex and more resource-intensive process than the parallel use of parole in place. *Id*. at 67468.

- Promoting national security, public safety, and border security by helping DHS identify noncitizens currently living unlawfully and unknown in the United States and potentially identify national security or public safety threats through biometrics, and background and security checks. *Id*. at 67469.

Plaintiffs contend that the public benefits outlined in the Notice are not "significant." Mot. at 9-13. However, as Plaintiffs concede, *id.*, Congress chose not to define "significant public benefit" in section 1182(d)(5)(A); instead Congress expressly conferred discretion on DHS to interpret and implement that term. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-425 (1999) (relying on 8 U.S.C. § 1103(a)(1) and noting the Secretary is with charged "administration and enforcement" of all "laws relating to the immigration and naturalization of aliens"). The Supreme Court's rejection of the *Chevron* doctrine, which concerned an implicit delegation of interpretive authority to the agency through an ambiguous statute, in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2265 (2024), does not alter the principle that Congress can expressly delegate such authority through explicit conferral of discretion, *id.* at 2265, 2268 ("That is not to say that Congress cannot or does not confer discretionary authority on agencies," in which case the court's

role is simply to "police the outer statutory bounds of those delegations[.]"). Congress has done so in section 1182(d)(5)(A). *Jean v. Nelson*, 727 F.2d 957, 977 (11th Cir. 1984) ("Congress has delegated remarkably broad discretion to executive officials under the INA, and these grants of statutory authority are particularly sweeping in the context of parole" and "it is not the court's proper role … to substitute its own policy preferences for those of the official vested by law with discretionary authority to act on requests for parole."), *aff'd*, 472 U.S. 846 (1985).

Nevertheless, Plaintiffs challenge the Secretary's determination of "significant public benefit" here, contending that "significant" means, among other synonyms, "[h]aving or likely to have a major effect; important," and also "[f]airly large in amount or quantity." Mot. at 10 (quoting "Significant," American Heritage Dictionary (5th ed. 2018)). However, Plaintiffs fail to—and cannot reasonably—argue the Notice's cited significant public benefits outlined above are not public benefits likely to "have a major effect" or "important" impact that is "large in amount or quantity." *See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D.N.M. 2020) ("vague standard" of "significant public benefit" in section 1182(d)(5)(A) "conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers or allowing an individual to carry on their employment in the United States").

Plaintiffs suggest that these significant public benefits do not qualify under section 1182(d)(5)(A) because they are not the medical or legal-proceeding reasons cited as significant public benefits in other cases. Mot. at 10-13. However, none of the authorities Plaintiffs cite indicate that these two reasons for parole are exclusive of any others, *see id.*, and Plaintiffs fail to acknowledge cases recognizing other "significant public benefit" justifications for parole, *see, e.g.*, *New Mexico*, 450 F. Supp. 3d at 1174 n.5; *cf. Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (recognizing in a Commerce Clause case the "significant public interests" of promoting "public health and the allocation of related costs").

The history of the current version of section 1182(d)(5)(A) confirms that Congress considered and rejected limiting the meaning of "significant public benefit" to a few circumstances including the medical and legal-proceeding examples. In fact, in 1996, when Congress drafted the

parole statute and created these terms, it explicitly removed language from the original bill that would have limited parole to a defined set of situations, notably including a "medical emergency" or if the noncitizen "has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity." *Compare* H.R. 2202, Immigration in the National Interest Act of 1995, § 524 (Aug. 4, 1995) *with* 8 U.S.C. § 1182(d)(5)(A). Congress eliminated these restrictions from the bill after concerns were raised about the importance of giving the Secretary "flexibility to deal with compelling immigration situations." H.R. Rep. No. 104-469, pt. 1, https://www.govinfo.gov/content/pkg/CRPT-104hrpt469/pdf/CRPT-104hrpt469-pt1.pdf. That Congress explicitly rejected the House's proposal of limiting parole to the narrow set of circumstances advanced by Plaintiffs here in favor of the unlimited version the Senate eventually adopted weighs heavily against adopting Plaintiffs' overly restrictive interpretation of section 1182(d)(5). *See, e.g.*, *Hamdan v. Rumsfeld,* 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation.").

Finally, Plaintiffs fail to explain how parole in place for the significant public benefit of preserving family unity can violate section 1182(d)(5)(A) when Congress has expressly ratified DHS's use of the parole authority for this purpose in the context of noncitizen family members of U.S. veterans. *See* NDAA, Pub. L. 116-92, § 1758(a), (b) (emphasizing that the use of "parole in place reinforces the objective of military family unity," and directing DHS to "consider, on a case-by-case basis, whether granting the [parole in place] request would enable military family unity that would constitute a significant public benefit"). It also ignores Congress's approval of the use of parole as a basis for adjustment of status for CNMI residents for the preservation of family unity. *See* Northern Mariana Islands Long-Term Legal Residents Relief Act, Public Law 116-24, § 2 (2019), *codified at* 48 U.S.C. § 1806(e)(6). Congress's recognition that family unity constitutes a "significant public benefit," NDAA § 1758(b), necessarily extends to the other "significant public benefits" recognized by the Secretary here. *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning for each category would be to invent a statute

34

rather than interpret one."). Contrary to Court's assertion, ECF 27 at 4, the benefits outlined in the Notice—promoting family unity, economic productivity, efficient governmental resource allocation, and public safety and security—benefit the public in addition to the parolee.

Case by case. Parole in place will be considered only "on a case-by-case basis in the exercise of discretion" and will be granted only "based on significant public benefit or urgent humanitarian reasons." *Compare* 89 Fed. Reg. 67461 *with* 8 U.S.C. § 1182(d)(5)(A). DHS will consider on a case-by-case basis: criminal history; any previous removal proceedings and removal orders; the results of background checks, which include national security and public safety vetting; positive and adverse factors presented by the requestor; and any other relevant information available to or requested by DHS. 89 Fed. Reg. 67,465. "Even if a requestor establishes that they have met all of the criteria for eligibility, USCIS will examine the totality of the circumstances in the individual case to determine whether the requestor merits a grant of parole in place as a matter of discretion for significant public benefit or urgent humanitarian reasons." *Id.* Thus, in addition to satisfying all other discretionary factors, applicants must demonstrate a significant public benefit applies in the individual case. *Id.* This is consistent with the Secretary's approach to the case-by-case requirement for decades. *See* Mem. from Bo Cooper, General Counsel, INS to Jeffrey L. Weiss, Director, Office of lnt'l Affairs, INS, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001), *cited by Lin v. U.S. DOJ*, 459 F.3d 255, 263 (2d Cir. 2006).

Plaintiffs argue that the Notice violates the "case by case" consideration requirement based on Plaintiffs' speculation that 1.3 million noncitizens will receive parole through the procedures outlines by the Notice. The agency itself estimates approximately 550,000, noncitizens satisfy the time-in-residence and family relationship criteria, which is larger than the number that will apply and who will merit a favorable exercise of discretion. 89 Fed. Reg. 67466. Regardless, the number of individuals who may benefit has no bearing on whether the agency is conducting an individualized inquiry and making parole determinations on a case-by-case basis. Unlike other provisions in the INA, *e.g.*, 8 U.S.C. §§ 1157(a), 1184(p)(2), 1151(c)(1), 1152, 1153(a)(1)-(4), the

current parole statute places no numerical limitation on parole grants. The statute does not preclude the Secretary from establishing presumptions regarding statutory terms. *Cf. Reno v. Flores*, 507 U.S. 292, 313-14 (1993) (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules"). That a significant number of noncitizens may qualify for parole does not mean it is not being granted only on a case-by-case basis in accordance with the statute. Indeed, as of June 30, 2024, 61,000 noncitizens have received parole under the military parole-in-place process that Congress legislatively affirmed and directed DHS to continue to implement. 89 Fed. Reg. 67464 & n.63. Tens of thousands of others have received parole (also as a basis for adjustment of status) through other family-unity and reunification parole initiatives Congress has recognized and aided. *See id.* at 67464 & nn. 60, 65-67 (discussing CNMI parole in place and Cuban, Haitian, and Filipino World War II veterans parole); 48 U.S.C. § 1806(e)(6); *see, e.g.*, Pub. L. 117-128 (2022) (providing resettlement assistance and other benefits to Ukrainian parolees); Pub. L. 117-43 (2021) (providing public benefits and expeditious asylum consideration for Afghan parolees); Pub. L. 104-208, § 646 (1996) (providing for adjustment of status for certain Polish and Hungarian parolees). Thus, the continued use of parole in this way does not "circumvent[]," but rather reflects, "congressionally established immigration policy." *See* Mot. at 13.

Plaintiffs next argue that the "Case-by-Case Consideration for Parole" in the Notice contains only 63 words and therefore sends an "obvious" "message to DHS officers" that "they are expected to rubber-stamp all qualifying applications." Mot. at 14. This analysis of the Notice is inaccurate, because in other sections, it discusses the individualized inquiry and factors in greater detail. 89 Fed. Reg. 67465 (explaining the several factors "USCIS will consider on a case-by-case basis"); *id.* at 67467 (explaining that requestors will have to "[s]ubmit biometrics, undergo required background checks and national security, public safety, and border security vetting, and be found not to pose a threat to national security or public safety"); *id.* at 67472 (providing a lengthy but still "non-exhaustive" list of the various positive and negative individualized factors DHS will consider in "examin[ing] the totality of the circumstances in the individual case").

Finally, Plaintiffs' reliance on the alleged "lack of information that Defendants collect about each alien" is unsupported and meritless. Mot. at 14-15. USCIS officers are directed to collect and consider significant evidence from each applicant, including "biometrics," "background checks and national security, public safety, and border security vetting," which will help DHS determine if any present a criminal threat. 89 Fed. Reg. 67467. This information is also helpful to determining whether there are individual economic benefits, the nature of the familial benefits, and whether processing the noncitizen through this process will allow the agency to use its limited resources more efficiently.

Congress expressly required the agency to make particularized findings for a different type of parole in section 1182(d)(5)(B). Section 1182(d)(5)(B) governs "parole into the United States [of] an alien who is a refugee" and includes additional requirements that Congress did not include in the adjacent provision at section 1182(d)(5)(A), such as the requirement for a "determin[ation] that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled." (emphasis added). Congress therefore left open the possibility that urgent humanitarian reasons and significant public benefits under section 1182(d)(5)(A) might be presented by many similarly situated noncitizens, and that the Executive could consider the aggregate benefits of paroling noncitizens because they fall within certain groups. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020) ("[W]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely.").

<u>Paroled into the United States</u>. The Notice  is consistent with sections 1182(d)(5)(A) and 1255(a), which refer to noncitizens paroled "into the United States." At least three courts of appeals have recognized that unadmitted noncitizens already present in the United States may nevertheless be paroled in place under the terms of section 1182(d)(5)(A), thus rendering them eligible for adjustment of status under section 1255(a). *Cruz-Miguel*, 650 F.3d at 198 (stating "even aliens already physically present in the United States … may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) by virtue of their status as applicants for admission");

*Ortega-Cervantes*, 501 F.3d at 1116 ("We see nothing that would preclude the government from paroling such an alien" who was physically present in the country without inspection and admission "into the United States under § 1182(d)(5)(A)" and explaining that had the petitioner there, who was apprehended after illegally entering the country, been paroled under section 1182(d)(5)(A), as opposed to 8 U.S.C. § 1226(a), he would have been "eligible for adjustment of status under § 1255(a)"); *Akhtar*, 2024 WL 1427634, at *3  (recognizing DHS's authority to parole in place under section 1182(d)(5)(A) unadmitted noncitizens encountered already inside the United States, providing a basis for adjustment of status). In fact, the Fifth Circuit has recognized that a "[q]uintessential modern use[]" of parole is "paroling aliens who qualify for a visa but are waiting for it to become available." Mot. at 11 (quoting *MPP*, 20 F.4th at 947).

Plaintiffs concede that Congress "specifically authorized parole of aliens already present in the United States," but claim it was "*only* in the limited circumstance of military families." Mot. at 17 (citing NDAA 2020 § 1758). However, Plaintiffs have no basis for this assertion, as nothing in the NDAA limits Congress's reaffirmation of "the importance of the Secretary's parole in place authority" to the military context. *Id.* § 1758(b)(3). Further, the size of these groups does not matter as the use of parole in place for them reflects an interpretation of section 1182(d)(5)(A) that must be consistently applied here. *See Clark*, 543 U.S. at 378.

The only authority Plaintiffs offer for their novel reading of the parole and adjustment statutes is isolated language from the Senate report accompanying the 1960 amendment to section 1255 stating that "the wording of the amendment is such as not to grant eligibility for adjustment of status … to aliens who entered the United States surreptitiously." Mot. at 27. This language is now obsolete in light of the structural revision of the INA in 1996. With the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). Pub. L. No. 104–208, div. C, § 304, 110 Stat. 3009-587, Congress abandoned the deportation-exclusion regime, which was based on a noncitizen's physical presence, to remove the incentive for noncitizens to unlawfully enter the country and thereby obtain more favorable procedural rights. *See, e.g., Cruz-Miquel*, 650 F.3d at 197-98; *Akhtar v. Gonzales*, 450 F.3d 587, 590 (5th Cir. 2006); *Landon v. Plasencia*, 459 U.S. 21,

38

25-26 (1982) (discussing pre-IIRIRA procedure). To achieve this, IIRIRA relied on "admission," not physical presence, and defined "admission" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); *see Cruz-Miguel*, 650 F.3d at 197. Unless and until the noncitizen has been inspected and authorized to enter by an immigration officer, the noncitizen is deemed an "applicant for admission," and treated the same as if standing at the border, regardless of whether they are in the process of actively seeking admission. 8 U.S.C. § 1225(a)(1). IIRIRA thus eliminated the perverse incentive to gain greater rights through surreptitious entry that the 1960 Senate report referenced.

At the same time, section 1182(d)(5)(A) continued to allow for parole of "any" applicant for admission and "[t]he IIRIRA did not change section 1255(a) or otherwise change the adjustment of status process," continuing to allow paroled applicants for admission to apply for adjustment. *Akhtar*, 450 F.3d at 590. Thus, the confluence of the "admission" structure and section 1255(a)'s limitation on adjustment to noncitizens who have been "inspected and admitted or paroled" and who are otherwise "admissible to the United States for permanent residence" categorically prevents any unadmitted noncitizen unlawfully present without inspection from being able to adjust status under that provision.  Congress's express ratification of the use of parole in place to resolve unlawfully present noncitizens' prior lack of inspection and provide them a basis for adjustment of status in the military and CNMI contexts signals its understanding that parole in place is consistent with both the IIRIRA categorical reform and the pre-existing, underlying desire not to provide permanent lawful status to those who persist in flouting immigration laws. *Supra* pp. 7, 30-31; *Cruz-Miguel*, 650 F.3d at 198 (stating that even noncitizens "who might otherwise be inadmissible" and those "already physically present in the United States who, upon inspection, are placed in removal proceedings, may be eligible for … parole under § 1182(d)(5)(A)" which in turn provides a basis for adjustment under section 1255(a)).

Plaintiffs thus misunderstand the current structure of the INA when they argue that parole "into the United States" in sections 1182(d)(5)(A) and 1255(a) "literally means that the alien must have been granted parole while physically entering the United States" and that KFT parolees thus

must leave the country so they may be paroled back "into" it. Mot. at 16-17. By providing that parole is available to "applicant[s] for admission," 8 U.S.C. § 1182(d)(5)(A), the parole statute (and adjustment statute by virtue of its reference to parole) makes clear that it is referencing the *legal status* of noncitizens arriving at or present in the country with inspection or admission, 8 U.S.C. § 1225(a)(1), not the *temporal fact* of whether the noncitizen is at that time just entering the country or has already done so. *See, e.g.*, *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022); *Cruz-Miguel*, 650 F.3d at 198 (providing that even noncitizens "already physically present in the United States … may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) *by virtue of their status as applicants for admission*") (emphasis added); *United States v. Gambino-Ruiz*, 91 F.4th 981, 989 (9th Cir. 2024) (explaining that the noncitizen "by entering illegally 'from outside the country'" was placed …. "into 'a fictive legal status' … as the equivalent of an arriving alien applying for admission at a port of entry").

Temporariness. Paroles granted consistent with the Notice are "temporary." 8 U.S.C. § 1182(d)(5)(A). The Notice provides that parole in place will be granted only for a limited period, "generally … of up to three years," and does not contemplate the opportunity for additional grants of parole, or "re-parole," under this process. 89 Fed. Reg. 67473. Furthermore, as explained, the Fifth Circuit has states that a "[q]uintessential modern use[]" of parole is "paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947. Noncitizens covered by the notice qualify as immediate relatives and therefore, once paroled, are immediately eligible to adjust status. Accordingly, many will not require the full three-year parole period.

Plaintiffs object that the Notice procedures will be used to "help [noncitizens] remain permanently in the United States" due to the potential for parole. Mot. at 17-19. But this does not mean that the *parole* is not temporary. Rather it demonstrates that the parole is not indefinite will come to an end with or without a set parole term.

### B.  Parole in Place under KFT Does Not Circumvent Other INA Provisions.

The parole authority has long existed alongside other avenues for noncitizens to adjust

status, as the plain language of the adjustment statue itself declares. *See* 8 U.S.C. 1255(a) (offering eligibility for adjustment of status to noncitizens "inspected and admitted" or "paroled"). Congress and multiple federal appellate courts have held that parole in place is a valid mechanism to address certain basis of ineligibility that would preclude adjustment of status. *See supra* pp. 6, 29-31.

Plaintiffs argue that the Notice circumvents statutory requirements for a noncitizen to qualify for a waiver of inadmissibility or visa ineligibility, including departing and applying for an immigrant visa at a U.S. embassy or consulate overseas. Mot. at 19-24. Plaintiffs refer to 8 U.S.C. § 1182(a)(9)(B)(i)(II), which renders inadmissible a noncitizen who was unlawfully present in the United States for one year or more and seeks admission within 10 years of their departure or removal from the United States, and then provides for a waiver of this inadmissibility "if refusal of admission … would result in extreme hardship to the citizen or lawfully resident spouse or parent of such" noncitizen. This waiver can be applied for by a noncitizen before they depart the United States for their immigrant visa interview by filing a Form I-601A or by a noncitizen who has departed the United States for consular processing by filing a Form I-601. 8 U.S.C. § 1182(a)(9)(B)(i)(II), (v); 8 C.F.R. 212.7(2). However, as Congress and multiple federal appellate courts have implicitly recognized, *supra* pp. 6-7, 29-31, nothing in section 1182(a)(9)(B) suggests that departing the United States and pursuing an immigrant visa abroad a is the sole path to obtaining lawful permanent resident status. Indeed, adjustment of status is expressly available to noncitizens who are inspected and paroled into the United States, *see* 8 U.S.C. § 1255(a).

Congress also provided certain unlawfully present noncitizens in removal proceedings a means to seek cancellation of removal to avoid removal, and path to LPR status. *See* 8 U.S.C. § 1229b(b)(1). Plaintiffs' attempt to add atextual requirements "Congress has omitted" "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest," shows Congress did not intend exclusivity. *Jama*, 543 U.S. at 341. *E.g.*, 8 U.S.C. § 1229a(a)(3) (providing "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be … removed from the United States"); *id.* § 1252(a)(5) (providing "a petition for review filed with an appropriate court of appeals in accordance with this

section shall be the sole and exclusive means for judicial review of an order of removal"). The fact that Congress provided other statutory routes for unlawfully present noncitizens to obtain LPR status, and did not expressly require them to overcome their inadmissibility through an approved Form 601 or Form 601A and then consular processing, defeats Plaintiffs' argument.

Thus, contrary to Plaintiffs' argument, the Major Questions Doctrine does not come into play here, because Congress "sp[oke] clearly" and explicitly "when authorizing" other statutory paths for unlawfully present noncitizens to become a LPR without leaving the country to seek an immigrant visa and triggering the unlawful presence ground of inadmissibility. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021). That there are different procedural and evidentiary requirements and costs associated with obtaining an immigrant visa as opposed to parole in place or cancellation of removal, *see* Mot. at 21-24, also has no bearing on the clear statutory provision of these alternate pathways, especially given Congress's recent affirmations of parole in place. *See* NDAA, §1758. Indeed, there are different requirements for admission and parole, *compare* 8 U.S.C. §§ 1182(a), 1201-1202 *with id.* § 1182(d)(5)(A), yet Congress treated these statuses the same when providing that both may serve as a basis for adjustment. *See* 8 U.S.C. § 1255(a). Plaintiffs' counter-statutory argument would mean that all other Congressionally and court-approved uses of parole in place are also *ultra vires*, and Plaintiffs do not, and cannot, point to a single authority supporting so sweeping a result.

### C.  Plaintiffs Are Unlikely to Succeed on Any Arbitrary and Capricious Claims.

DHS's decision to use its longstanding parole in place authority in this context easily satisfies the APA's "highly deferential" standard of review as it is reasonable and reasonably explained and the agency considered all relevant factors. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). The decision is also fully supported by the record. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158, 1160 (2021).

When announcing KFT, the Secretary noted the success and explicit Congressional approval of parole in place in the parallel context of military families. The Secretary thoroughly

explained how extending parole in place to qualifying spouses of U.S. citizens who have lived in the country for 10 years or more and to specified stepchildren of U.S. citizens comports with section 1182(d)(5)(A) and serves at least five significant public interests. The Secretary carefully considered but ultimately rejected as less effective alternative approaches. 89 Fed. Reg. 67,474-78. And the Secretary considered the impact of this process on administrative resources and adjudicatory capacity, as well as fiscal impacts on federal and local governments and States, and determined that these factors either weighed strongly in favor of the KFT process or at the least did not represent significant drawbacks outweighing the greater value of the process. *Id.* at 67478-79. The analysis in the record amply supports these determinations as well. AR 4648-4674. That analysis amply satisfies the "narrow" "scope of review under the 'arbitrary and capricious' standard" under which a court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In assessing agency action, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Instead, to satisfy judicial scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

Plaintiffs' contrary arguments fail. First, Plaintiffs argue the Secretary "failed to consider the States' interest in reliance on the prior regime." Mot. at 30-31. But Plaintiffs do not identify any actions they have taken or changes to their budgets they have made in reliance on the prior approach. Moreover, reliance interests are implicated when a regulatory change directly affects a regulated entity, but States are not regulated by the KFT process. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222-23 (2016) (addressing regulatory change that upset "decades of industry reliance," resulting in "substantial" and potentially "retroactive" legal "liability" for the regulated entities); *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 31-33 (2020) (noting reliance interests of the regulated entities on longstanding policies).

Rather than identify actual reliance interests, Plaintiffs argue the Secretary should have considered costs to States from parole of a large number of noncitizens who will be eligible for public benefits, Mot. at 31-32, but they identify no evidence that such costs will be incurred, the amount of such costs, nor a timeline for their outlay. *Supra* §§ II.A, II.B. The Secretary expressly considered the economic impact on State and local governments and determined that, although definite figures were impossible to predict given variation in state policies with regard to services to noncitizens, there would potentially be increased tax revenue as an offset to any increased service expenditures, and overall "the significant public benefits of the case-by-case parole of noncitizens under this process to the United States outweigh the anticipated costs to Federal and State governments alike." 89 Fed. Reg. 67467, 67477-79; *see* AR 4550-4613. At the outset, because noncitizen spouses must have been continuously present in the United States since at least June 17, 2014, in order to qualify for parole in place, the KFT process is not expected to draw any new migration to the United States. *Id.* at 67479. Thus, KFT affects only the already-resident noncitizen population in States.

States already must provide free emergency medical services under Medicaid and K-12 public education to noncitizens regardless of immigration status under pre-existing law. *See* 42 U.S.C. § 1396b (v)(2)(A); *Plyler v. Doe*, 457 U.S. 202 (1982). Hence, obtaining parolee status will not significantly alter or increase these State expenditures. 89 Fed. Reg. 67478-79. Parolees also generally need to be in "qualified" parole status for at least five years before they become eligible for state-administered federal benefits such as Medicaid, Temporary Assistance for Needy Families (TANF), and the Children's Health Insurance Program (CHIP). *Id.* at 67,478. Because KFT authorizes parole in place only for a period of three years, the KFT process will not cause beneficiaries to be in "qualified" parole status long enough to qualify for these benefits. Regarding driver's licenses, for those States (such as Texas) that do not provide them regardless of immigration status, nothing in federal law requires States to provide these licenses to parolees and, because such States also charge fees for driver's-license applications, they have yet to demonstrate that they actually lose any money by providing this service. *See id.* at 67479; *CHNV*, 2024 WL

1021068, at *10 (holding "Texas profits on limited-term licenses," and so failed to show parole would increase state driver's license expenditures). While no increased expenses were predicted, to the extent there are any marginal increases in state expenditures due to the KFT process, the Secretary reasoned, such costs would be more than outweighed by the fact that parole recipients will be eligible for work authorization and would provide increased income tax revenue, along with other benefits to the State fisc from increased economic productivity. 89 Fed. Reg. 67,478.

Plaintiffs next argue "Defendants show no evidence of having considered the incentive structures built into our immigration laws," and assert that the KFT process "will increase illegal immigration." Mot. at 33. This argument is meritless. The Secretary specifically considered incentives and opted to limit eligibility for the KFT process for most noncitizens, specifically to only noncitizen spouses and stepchildren of U.S. citizens who have been physically present in the United States since June 17, 2014.  *See* 89 Fed. Reg. 67,479, 67,475-76; AR 1176-86, 1261-88. The Secretary explained that this limitation was intended to avoid meaningfully affecting or creating incentives for noncitizens to enter the United States. *See id*.

Plaintiffs' argument that Defendants "fail to address the shift from their prior position," Mot. at 33, is equally meritless. The Secretary explained why he was expanding parole in place beyond military families to other groups, set out the significant public benefits the KFT process would provide, considered alternatives and explained why possible alternatives would be less effective at providing these benefits, and evaluated possible impacts on administrative resources, adjudicatory capacity, States, and federal and local governments. *See* 89 Fed. Reg. 67,465-69; 67,474-79. This plainly satisfies the APA's deferential standard.

Plaintiffs argue the KFT process "is arbitrary and capricious because its rationales are pretextual," but they provide no basis to question the veracity of the Secretary's lengthy and well-reasoned explanations. Mot. at 34. The "Secretary's decision is entitled to a presumption of regularity," and Plaintiffs must make a "strong showing of bad faith or improper behavior," before questioning or looking behind the Secretary's stated explanation. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 420 (1971). Plaintiffs do not come close to meeting that standard.

They argue the Secretary's actual goal was to "increase migration opportunities," Mot. at 34, but they provide no evidence that this, rather than the KFT process's stated goals, was the reason for adopting the policy. Without strong evidence of bad faith, the Court is "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record," a "principle" that "reflects that further judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government" that "should normally be avoided." *Dep't of Com. v. New York*, 588 U.S. 752, 780-81 (2019) (quotation marks omitted). Even if Plaintiffs could show evidence of other motivations, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons" or "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id*. at 781.

Plaintiffs argue the KFT process "treats illegal aliens… in the U.S. workforce as a positive," and is arbitrary and capricious because it "relied on factors which Congress has not intended it to consider … the employment of illegal aliens." Mot. at 34, 36. This is a misrepresentation of the KFT process, which in fact is expected to decrease the number of noncitizens working without employment authorization and will not provide employment authorization to anyone present in the United States without admission or parole.  89 Fed. Reg. at 67466-67. KFT affects the manner and location in which noncitizens seek that statutorily authorized status—providing a range of significant public benefits in the process—but it does not change the statutory requirements for lawful permanent residence. As its provision of multiple routes to cure inadmissibility indicates, *supra* § IV.B, Congress intended the noncitizens eligible for KFT be able to seek permanent residence status and obtain employment authorization. It cannot be arbitrary and capricious for the agency to put a process in place for more efficiently carrying out that congressional intent for particular population groups, and nothing bars the Secretary from considering potential benefits that might develop, including that it might "facilitate greater access to job mobility and improve overall economic productivity; provide stable, consistent support to their U.S. citizen family members; reduce their risk of facing labor exploitation; and allow for

46

these noncitizens to contribute their full talents to the U.S. workforce." 89 Fed. Reg. 67466.; *see* AR 518-68, 783-800, 1389-2030, 2172-79, 2249-54, 4422. Finally, Plaintiffs argue "there is no sign that Defendants considered lawful alternatives" to the KFT process, including not changing prior practices. Mot. at 36. Yet, an entire section of the Federal Register notice discusses various alternatives considered, including additional resources for processing pending Forms I-601A and various alternative approaches in designing a parole process that would offer expeditious benefits to both U.S. families and the U.S. economy, without jeopardizing national security, public safety, or border security. 89 Fed. Reg. 67,474-78. Even if the Secretary had not considered various alternatives, under the APA, agencies are not required "to consider all policy alternatives in reaching [a] decision." *State Farm*, 463 U.S. at 51.

In sum, the Secretary considered relevant factors, including foreign policy objectives, alternative design approaches and potential costs to both the Federal Government and States. Ultimately, and reasonably, the Secretary determined that the benefits of parole in place outweighed any anticipated drawbacks and costs.

### D.  Plaintiffs Are not Likely to Succeed on the Notice and Comment Claim.

The States cannot succeed on the merits of their claims that the Notice had to be promulgated by notice-and-comment rulemaking. The Notice is both a general statement of policy and rule of agency procedure, and it implicates a foreign-affairs function, and therefore the APA does not require notice and comment.

General Statement of Policy. The Notice is a general statement of agency policy that "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power,"  *Lincoln*, 508 U.S. at 197, and thus exempt from notice and comment rulemaking. 5 U.S.C. 553(b)(A). "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach," and the "agency retains the discretion and the authority to change its position—even abruptly." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Whether agency action is a general statement of policy turns on "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its

decision-makers free to exercise discretion." *DACA*, 50 F.4th at 522. The primary focus of this inquiry is "whether the rule has binding effect on agency discretion or severely restricts it." *Id*.

The Notice does not "grant rights, impose obligations, or produce other significant effects on private interests." *DACA*, 50 F.4th at 522. Rather, the Notice explains how USCIS will exercise its discretionary parole authority with respect to certain spouses and stepchildren of U.S. citizens. *See, e.g.*, 89 Fed. Reg. 67,488. But it is the statute, not the Notice, that creates the discretionary authority and requirements for parole, and the KFT process does not alter those requirements, let alone bind the agency to exercise that discretionary authority in any way. *See EEOC*, 933 F.3d 433, 442 (5th Cir. 2019). Indeed, any noncitizen applicant for admission physically present in the United States can apply for parole in place, with or without the KFT process, *see* https://www.uscis.gov/humanitarian/humanitarian_parole, Who Can Apply for Parole, and so KFT cannot be understood to "withdraw[] … discretion" or "impose or elaborate or interpret a legal norm." *DACA*, 40 F.4th at 220.

Plaintiffs nevertheless argue the Notice is not a general policy statement because it requires DHS officials to exercise their discretion in particular ways, sets "new criteria for granting parole," obligates the federal government "to provide benefits to certain aliens," and "binds the agency." Mot. at 25-26. None of this is true. The Secretary was clear that the KFT process "is being implemented as a matter of the Secretary's discretion" and "is not intended to … and does not create any rights, privileges, benefits, substantive or procedural." *Id*. at 67474. It does not bind DHS to any particular course with respect to any noncitizen—those decisions continue to be made on a case-by-case basis by individual officials—and it provides no assurance that parole in place will be granted in any specific case. *Id.* at 67465. The Notice thus "leaves the agency and its decision-makers free to exercise discretion" to grant or deny parole based on the discretionary factors and equities of individual cases. *DACA*, 50 F. 4th at 522. The Notice's guidelines for consideration of parole in place requests neither "appear[] on [their] face to be binding," nor are "applied by the agency in a way that indicates [they are] binding," *id*. at 524. *See* 89 Fed. Reg. 67472 ("DHS's decision whether to grant parole in place to a requestor is a discretionary, case-by-

case determination," "[e]ven if a requester establishes that they have met all the criteria"); 67488 ("this process leaves USCIS adjudicators the discretion to approve or deny requests … as they perform their case-by-case review"). Because the Notice does not bind agency decision-makers to any particular outcome, but leaves them discretion to grant or deny parole in individual cases based on section 1182(d)(5)(A), it is a general statement of policy that does not modify substantive rights, does not guarantee anyone parole, and thus does not have the type of impact that would require notice and comment. *Texas*, 809 F.3d at 176; *see Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, in context of FDA guidance concerning enforcement actions).

Rule of Agency Procedure. The Notice is also exempt from notice-and-comment requirements because it establishes a process for officers to follow when specific noncitizens apply for parole, and rules establishing such internal processes are exempt from notice-and-comment requirements as rules "of agency organization, practice, or procedure," even if agency employees must follow those processes. *See* 5 U.S.C. § 553(b)(A). A rule of procedure or practice regulates the agency's own behavior without changing the substantive rights of parties outside the agency. *Texas*, 809 F.3d at 176-77 ("rules are generally considered procedural so long as they do not 'change the *substantive standards* by which the [agency] evaluates' applications" (quoting *Nat'l Sec. Couns. v. C.I.A.*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)). Here, as explained, noncitizens eligible for parole under KFT are already eligible to apply for parole in place under the statute and longstanding agency practice. However, it is the parole statute, and not the Notice, that governs the substantive requirements for parole. The Notice merely provides processing guidance on discretionary considerations and an application process, including directions on the appropriate form type, what information is required in the application, and where to file the application. Because the Notice does not modify substantive rights or guarantee anyone parole or any other status in the United States, but merely provides structure to the manner in which USCIS receives parole applications from a specific population, the Notice does not have the type of substantive impact that would require notice and comment rulemaking. *Texas*, 809 F.3d at 176.

_Foreign Affairs Function_. The Notice is also exempt from notice-and-comment requirements as it "involve[s] . . . [a] foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). This exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." _Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States_, 751 F. 2d 1239, 1249 (Fed. Cir. 1985).

The Secretary's decision to provide parole in place through the KFT process involves a foreign affairs function because it is a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." _Yassini v. Crosland_, 618 F. 2d 1356, 1361 (9th Cir. 1980). Specifically, the KFT process "is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration." 89 Fed. Reg. 67489. "Regularizing certain noncitizens who have lived in and established deep ties to the United States is a key request of our partner countries, and establishment of this proposed process will help ensure our partners' continued collaboration to address irregular migration in the Western Hemisphere and improve economic stability and security in countries that are common sources of irregular migration to the United States." _Id._ The international collaboration the United States seeks through these diplomatic engagements include a range of initiatives: "disrupting human smuggling, trafficking, and transnational criminal networks; increasing migration controls on bus and train routes; imposing additional visa requirements to prevent individuals from exploiting legitimate travel regimes to facilitate their irregular journey to the United States; and expanding access to lawful pathways." _Id_. A "delay" in "implementing this process" to allow for "notice-and-comment rulemaking would adversely affect the United States' ability to negotiate with" other countries "for additional enforcement measures and increased cooperation with removals" as representatives of these governments have "specifically requested that the U.S. government regularize" the status of their nationals "who have been longterm residents of the United States" as part of those negotiations. _Id_.; _see, e.g., Int'l Bhd. of Teamsters v. Pena_, 17 F. 3d 1478, 1486 (D.C. Cir. 1994) (exception applied to implementation of diplomatic agreements).

Because the KFT process is one piece of and inextricably bound up in the United States' relations and international agreements with other countries to manage migration, it involves a foreign affairs function and is exempt from the notice-and-comment requirement. *See Am. Ass'n of Exporters*, 751 F. 2d at 1249; *see, e.g.*, DHS Administrative Record ("AR") 921-24, 1342-45, 1369-71, 1376-77, 2967-2982, 2988-89, 4431-4448, 4450-4468.

Plaintiffs attempt to impose a heightened standard for the foreign affairs exception, limiting it to circumstances where notice-and-comment rulemaking would cause "definitely undesirable international consequences," though they concede that the Firth Circuit has not adopted this reading. Mot. at 27-28. Contrary to Plaintiffs' contention, the foreign-affairs exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm; the exception does not require a showing of definitely undesirable international consequences. 5 U.S.C. § 553(a)(1). "[T]he phrase 'provoke definitely undesirable international consequences'" is merely "an illustration given in the APA's legislative history;" it is not "the definition for 'foreign affairs function.'" *New York v. Permanent Mission of India to United Nations*, 618 F. 3d 172, 202 (2d Cir. 2010) (quoting H. R. Rep. No. 79–1980, at 23 (1946)). There is no textual basis for interpreting the phrase "involve[s] a … foreign affairs function" as requiring a showing of definitely undesirable international consequences. *See id.*; *Capital Area Immigrants' Rights. Coal. v. Trump ("CAIR")*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020) (noting that such an interpretation would be "unmoored from the legislative text"). Such a requirement would make the foreign affairs exception superfluous because the separate good-cause exception in 5 U.S.C. § 553(b)(B) would apply where taking public comment would lead to negative international consequences. *CAIR*, 471 F. Supp. 3d at 53. Such a requirement would also require courts to evaluate how serious a particular international consequence would be, which is "generally beyond the authority or competency of a court's adjudicative powers." *Lane v. Halliburton*, 529 F. 3d 548, 559 (5th Cir. 2008).

Regardless, the Notice satisfies any such requirement. Delaying implementation of the KFT process through notice-and-comment rulemaking would cause "definitely undesirable international consequences." *Permanent Mission of India*, 618 F. 3d at 202. Representatives of

Mexico have specifically requested that the U.S. government regularize Mexican nationals who have been long-term residents of the United States, and the Government of Colombia has made repeated similar diplomatic requests for certain Colombian nationals residing in the United States in the context of ongoing diplomatic negotiations. 89 Fed. Reg. 67489; *see* AR 921-24, 1342-45, 2967-71, 2975-82, 4434-4448, 4450-4468. The provision of parole in place through the KFT process responds to these requests, and delaying or otherwise hampering its implementation "would adversely affect the United States' ability to negotiate with … Mexico and Colombia[] for additional enforcement measures and increased cooperation with removals." *Id.*

### E.  Plaintiffs Are Unlikely to Succeed on the Paperwork Reduction Act Claims.

The States likewise cannot succeed on their APA claim challenging the Office of Management and Budget's (OMB) approval of the collection of information through Form I-131F under the emergency processing provisions of the Paperwork Reduction Act (PRA), 44 U.S.C. § 3507(j), and OMB's implementing regulations, 5 C.F.R. § 1320.13. *See* Compl. ¶¶ 278–288; Mot. at 36–37. In the PRA, "Congress designated OMB the overseer of other agencies with respect to paperwork and set forth a comprehensive scheme designed to reduce the paperwork burden." *Dole v. United Steelworkers of Am.,* 494 U.S. 26, 32 (1990); *see also* 44 U.S.C. § 3501.

Initially, Plaintiffs lack standing to enforce the requirements of the PRA, as they have not asserted any cognizable injury arising from the form's collection of information, nor have they established causation or redressability. Form I-131F does not seek information from Plaintiffs, but rather collects information from individuals seeking parole in place. And Plaintiffs do not argue they are injured by the separate decision to authorize the use of Form I-131F. *See* 89 Fed. Reg. 67489. That is, Plaintiffs allege an injury arising from the KFT process, not from the collection of information from noncitizens. *See also* ECF No. 27 at 4. Also, any downstream injury to Plaintiffs that purportedly flows from the collection of information would be even more speculative and attenuated than injuries that purportedly flow from the KFT process. *Supra* § II.B. Plaintiffs thus have not made a clear showing of standing to pursue this claim. *Town of Chester, N. Y. v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) (plaintiffs must establish standing for each claim raised).

Even if Plaintiffs had standing, their interests do not fall within the zone of interests protected by the PRA. The interests protected by the PRA are, primarily, reducing paperwork burdens "resulting from the collection of information by or for the Federal Government"; improving efficiency and productivity of government programs through information resources management; and protecting privacy in information collection. *See* 44 U.S.C. § 3501; *Ass'n of Am. Physicians & Surgeons, Inc. v. HHS*, 224 F. Supp. 2d 1115, 1128 (S. D. Tex. 2002). The PRA's sole statutory enforcement mechanism is a "public protection provision" ensuring that no individual can be penalized for failing to comply with an unauthorized collection. 44 U.S.C. § 3512. The Plaintiff States are not claiming that Form I-131F is too burdensome, inefficient, or insufficiently protective of privacy for the noncitizens who use the form to request parole—to the contrary, their claim is that parole in place should be eliminated outright. States are not the target of the information collection at issue, and Plaintiffs do not even purport to claim an interest in protecting noncitizens from the burdens of information collection.

In any event, OMB's decision is unreviewable. The PRA expressly provides that OMB's decision "to approve . . . a collection of information contained in an agency rule shall not be subject to judicial review." 44 U.S.C. § 3507(d)(6). The Federal Register Notice here requires individuals seeking parole in place through the KFT process to use the Form I-131F, *see* 89 Fed. Reg. at 67472, and thus under § 3507(d)(6), OMB's approval of that collection is not reviewable. *See Hyatt v. Office of Management & Budget*, 908 F. 3d 1165, 1171 n.6 (9th Cir. 2018) (explaining that § 3507(d)(6) applies to all rule-based collections and is not limited to those contained in "proposed agency rules" undergoing notice and comment). APA review is thus not available because "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).

Even if the information-collection decision were reviewable, Plaintiffs would not be likely to succeed on their claim that the emergency authorization violates the APA's arbitrary and capricious standard. The PRA allows agencies to request emergency authorization if they make a written determination that "public harm is reasonably likely to result if normal clearance procedures are followed" or "the use of normal clearance procedures is reasonably likely to prevent

or disrupt the collection of information."  5 U.S.C. § 3507(j)(1)(B); *see* 5 C.F.R. § 1320.13(a). Contrary to Plaintiffs' bare assertion, both USCIS and OMB followed the PRA-required procedures. *See* Compl. ¶ 281. As evidenced in the administrative record and decision, OMB considered USCIS's written request for emergency authorization, which was based on necessity to USCIS's mission, and the public harm and impediment to the collection of information that would likely result if required to wait for normal clearance procedures, including because families would continue to experience significant hardships and would be susceptible to fraudsters "mak[ing] false promises to secure parole for a fee." *See* OMB Administrative Record; *see also* 5 C.F.R. § 1320.13(a). OMB's reliance on USCIS's justifications in approving its request is eminently reasonable and reflects consideration of the relevant regulatory factors, and thus easily withstands APA review. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F. 2d 897, 904 (5th Cir. 1983). Further, contrary to Plaintiffs' implication, Compl. ¶ 286, there is no requirement that the reasons for the emergency authorization be included in the Federal Register Notice; in fact, emergency clearances are routinely granted for reasons set forth in an agency's written statement requesting emergency clearance, as occurred here. *See* OMB AR; 5 C.F.R. § 1320.13 (a), (d). For each of these independent reasons, Plaintiffs are not likely to succeed on their PRA claim.

### F.  Plaintiffs Are Unlikely to Succeed on the Take Care Clause Claim.

The States' final argument is that the Notice violates the Take Care Clause because it dispenses with certain immigration statutes. Compl. ¶¶ 290-91, 300. This is not a basis for a viable constitutional claim. The Supreme Court has explained that claims alleging an "executive official" is acting "in excess of his statutory authority" are *statutory* claims, "not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). The Take Care Clause thus is not a basis for affirmative relief in court. The Supreme Court long ago made clear that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). The Take Care Clause falls under "the general principles which forbid judicial interference," and a claim to restrain executive action through this clause is not only "without a precedent," but there

is "much weight against it." *Id.* at 499-500; *see also Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019) (noting that "*Johnson* can be fairly read to suggest that a Take Care Clause claim is outright non-justiciable" and finding no cases holding otherwise). For the Judicial Branch to superintend how the Executive Branch performs discretionary executive functions, such as granting parole, would express a "lack of the respect due" to the Nation's highest elected official. *Baker v. Carr*, 369 U.S. 186, 217 (1962). The Take Care Clause thus places no justiciable restraints on executive action and cannot be a basis for a claim by states or private parties. *United States v. Jeong*, 624 F.3d 706, 713 (5th Cir. 2010) (noting the Executive's "broad discretion" to "discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed'"). That is especially so with respect to immigration, given how bound up such decisions are with foreign affairs and that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty," *Texas*, 106 F.3d at 661.

Finally, no court has ever found that the Take Care Clause provides a private right of action. *Florida v. United States*, 660 F. Supp. 3d 1239, 1283 (N.D. Fl. 2023) ("[I]t is unclear whether there is even a private cause of action under the Take Care Clause."); *Las Americas Immigrant Advocacy Center v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases); *Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1178 (D. Ariz. Sept. 23, 2022). The Court should therefore avoid creating new constitutional causes of action or even extend the application of previously implied causes of action, and decline to find a cause of action under the Take Care Clause. *See, e.g., Egbert v. Boule,* 142 S. Ct. 1793, 1800 (2022).

## V.    Plaintiffs Have Not Demonstrated Irreparable Injury and the Balance of Harms Weighs Against Entry of Injunctive Relief.

Even assuming Plaintiffs could demonstrate some nominal, future financial injury, they would fall well short of demonstrating a "likelihood" of immediate, irreparable harm. *See Winter*, 555 U.S. at 22. The KFT process is generally available only to noncitizens who are already residing

in the country and eligible to seek lawful permanent residence, and it offers no incentive for new noncitizens to enter the United States or move to Plaintiff States. 89 Fed. Reg. 67,475, 67,479. Plaintiffs do not deny that they are already providing services to these same noncitizens whether they are lawfully present or not and cannot explain why these noncitizens, who have not left the country in over 10 years, would suddenly decide to do so now. Further, Plaintiffs have not demonstrated that granting these already-present individuals parole for the temporary period of three years is likely to have any significant effect on state expenditures on services for them; any such effects would likely not accrue for at least five years; and any such State costs may well be offset by the increased income tax revenues and economic productivity created by such noncitizens' ability to obtain lawful employment.[11] *Supra* § II.B; 89 Fed. Reg. 67467, 67477-79. Such speculative and insubstantial costs cannot establish irreparable injury. *See Sampson v. Murray*, 415 U.S. 61, 91 (1974); *Moore v. Tangipahoa* Par. Sch. Bd., 507 F. App'x 389, 397-98 (5th Cir. 2013) ("general financial information and speculation" that "cash-strapped school board would find itself with fewer resources" insufficient to establish irreparable harm).  An alleged error from not engaging in notice-and-comment rulemaking is likewise insufficient. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Thus, Plaintiffs fail to demonstrate any injury at all, let alone one necessitating preliminary relief while this lawsuit proceeds. *See Winter*, 555 U.S. at 22. As explained, Plaintiffs fail to meet this likelihood standard.

Second, the Government's interest in public safety, obtaining international cooperation with migration and law enforcement efforts, managing its backlog and limited resources, and preserving family unity more than outweigh Plaintiffs' speculative alleged injuries. The opposing party's interest and public-interest factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Even if Plaintiffs' alleged harms were certain, they would not outweigh the harm imposed by "injunctive relief [that] deeply intrudes into the core concerns

---

[11] Likewise, their claim that, because KFT parole is available to noncitizens in removal proceedings in compelling circumstances, some noncitizens would otherwise be removed, is merely speculation. These individuals have not been removed in over 10 years and have cancellation of removal available to them absent the KFT process.

of the executive branch." *Adams v. Vance*, 570 F. 2d 950, 954 (D.C. Cir. 1978).

**VI.     If the Court Grants Relief, It Must be Sharply Limited.**

**A.  Postponement Under Section 705 Is No Longer Available.**

Section 705 provides that an agency "may postpone the effective date of action taken by it, pending judicial review" and the reviewing court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. Here, the Notice took effect on August 19, 2024. 89 Fed. Reg. 67459. Plaintiffs did not file suit, nor did the Court enter the administrative stay, until August 23, 2024, and August 26, 2024, respectively. ECF 1, 27. The Court cannot stay under section 705 an action that has already occurred. *Florida v. Mayorkas*, No. 3:23CV9962-TKW-ZCB, 2023 WL 3567851, at *4 (N.D. Fla. May 16, 2023) ("an APA stay is unavailable because the [] policy was already in effect when Florida filed its complaint"); *Safety-Kleen Corp. v. EPA*, Nos. 92-1629, 92-1639, 1996 U.S. App. LEXIS 2324, at *2-3 (D.C. Cir. Jan. 19, 1996); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2022 WL 971067, at *21 (D.D.C. Mar. 30, 2022) (collecting cases); *see also* Black's Law Dictionary Online (2d. Ed.) (defining "postpone" as "to put off; defer; delay; continue"); *but see Texas v. Biden*, 646 F. Supp. 3d 753, 769 (N.D. Tex. 2022). Therefore a stay is not available. And even if it was, entering such a stay would still require compliance with Rule 65 and applying the four-factor test for interim injunctive relief. *See, e.g.*, *Texas v. U.S. EPA*, 829 F.3d 405, 434 (5th Cir. 2016).

**B.  Neither Nationwide Relief Nor Reporting Requirements are Authorized**

Even if the Court could issue injunctive relief, it should be limited to the Plaintiff States. *See Louisiana v. Becerra*, 20 F. 4th 260, 264 (5th Cir. 2021). Article III requires that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018); *see Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) (same, rule in equity). Similarly, the APA does not affirmatively authorize universal vacatur or nationwide injunctive relief. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J. concurring) ("No

statute expressly grants district courts the power to issue universal injunctions."). The APA provides that a court may "hold unlawful and set aside agency action." 5 U.S.C. § 706(2). But section 706(2) does not authorize universal vacatur; indeed, it does not pertain to remedies at all. Remedies are governed by Section 703—a form of relief that is limited to redressing a particular plaintiff's specific injury. Interpreting Section 706 to require universal vacatur would bring about the kind of remedial innovation that Congress disclaimed. Remedies "ordinarily 'operate with respect to specific parties,'" rather than "'on legal rules in the abstract,'" *California*, 141 S. Ct. at 2115, but vacatur does the opposite. Universal relief "upset[s] the bedrock practice of case-by-case judgments with respect to the parties in each case," *Arizona*, 31 F. 4th at 484 (Sutton, C. J., concurring). And reading Section 706(2) to authorize hundreds of district judges around the Nation to grant universal relief in every APA case would perpetuate the now-familiar problems with nationwide injunctions. *See*, *e.g.*, *DHS v. New York*, 140 S. Ct. 599, 599-601 (2020) (Gorsuch, J., concurring in grant of stay); *Trump*, 138 S. Ct. at 2425-2433 (2019) (Thomas, J., concurring).

The same goes for Plaintiffs' onerous reporting requirements. Mot. at 51. These are not justified by equitable principles because they exceed the scope of the alleged injury. *See Gill*, 138 S. Ct. at 1929. To the extent the Court continues the stay or enters other injunctive relief, Defendants are entitled to a presumption of regularity that they will comply, *U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001), alleviating any need for irrelevant reporting requirements and resource-intensive monitoring on the Court's behalf.

## CONCLUSION

The Court should vacate the administrative stay and deny further injunctive relief.

Dated: September 3, 2024       Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

EREZ REUVENI
*Senior Counsel*

KATIE J. SHINNERS
BRIAN C. WARD
*Senior Litigation Counsel*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
*Trial Attorney*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on September 3, 2024, I electronically filed this memorandum in support of Defendants' motion with the Clerk of the Court for the United States District Court for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice

**CERTIFICATE OF CONFERENCE**

I hereby certify that counsel for Defendants complied with the meet and confer requirements of Local Rule CV-7(h). On August 30, 2024, counsel for Defendants conferred with counsel for Plaintiffs, by videoconference about the relief requested in this motion. Plaintiffs oppose this motion.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice