**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, <br><br>       *Plaintiffs*, <br><br>   v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, <br><br>       *Defendants*. | No.: 6:24-cv-00306 |

**<u>AMICUS BRIEF IN SUPPORT OF DEFENDANTS' MOTION TO VACATE
ADMINISTRATIVE STAY</u>**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................ 5

ARGUMENT ........................................................................................................................ 6

    I.    An Administrative Stay Is Not an Appropriate Vehicle for Halting KFT Parole Pending Summary Judgement Briefing. ................................................................................................ 6

    II.    Texas and the Plaintiff States Have Failed to Show Irreparable Harm, a Balance of Hardship in Their Favor, or That a Stay or Injunction Will Not Harm the Public Interest. ....... 7

        A.    Texas Demonstrates No Threat of Injury from Keeping Families Together Parole, Let Alone Irreparable Injury. ................................................................................................ 8

        B.    Harms to Amici Outweigh Texas's Attenuated and Speculative Claims to Harm. ....... 13

        C.    Halting Keeping Families Together, Without a Showing of Standing by Texas and in Contravention of a Congressional Scheme Intended to Facilitate Family Unity, Undermines the Public Interest. ........................................................................................................... 16

CONCLUSION ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**Cases**

*Astrazeneca Pharms. LP v. Burwell*, 197 F. Supp. 3d 53 (D.D.C. 2016)........................................ 7

*Barber v. Bryant*, 860 F.3d 345 (5th Cir. 2017) ............................................................................ 16

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567 (5th Cir. 1974) ........................................ 8

*Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469 (5th Cir. 2013) ..................................... 9

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) ..................................................................... 12

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015) ............................................................................ 9

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579 (5th Cir. 2013)...... 18

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1 (2020) ...................... 17

*Dep't of State v. Munoz*, 144 S. Ct. 1812 (2024)......................................................................... 18

*Fiallo v. Bell*, 430 U.S. 787 (1977)............................................................................................... 19

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)....................... 12, 16, 17

*Gen. Land Off. v. Biden*, 71 F.4th 264 (5th Cir. 2023) ................................................................. 9

*Gen. Land Off. v. Biden*, No. 7:21-CV-00272, 2024 WL 1023047 (S.D. Tex. Mar. 8, 2024) ....... 9

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)........................................................................................ 8

*Libertarian Party of Texas v. Fainter*, 741 F.2d 728 (5th Cir. 1984)............................................ 7

*Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872 (5th Cir. 2023)....................................................................... 9

*Morton v. Ruiz*, 415 U.S. 199 (1974)............................................................................................ 16

*Obergefell v. Hodges*, 576 U.S. 644 (2015)................................................................................. 15

*Peters v. Davis*, No. 6:17-cv-595, 2018 WL 11463601 (E.D. Tex. Oct. 10, 2018) ............. 7, 8, 12

*Scialabba v. Cuellar de Osorio*, 573 U.S. 41 (2014)................................................................... 18

*Shanks v. City of Dallas, Texas*, 752 F.2d 1092 (5th Cir. 1985) ................................................... 7

*Texas v. United States*, 805 F.3d 653 (5th Cir. 2015)................................................................... 17

*Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442 (2016) ............................................................... 8

*United States v. Jefferson County*, 720 F.2d 1511 (5th Cir. 1983)................................................ 8

*United States v. Texas*, 144 S. Ct. 797 (2024) .............................................................................. 6

*United States v. Texas*, 599 U.S. 670 (2023) ..................................................................... 9, 17, 20

*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) ................................................................ 16

*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)....................................................... 7, 16

**Statutes**

8 U.S.C. § 1182(d)(5) ........................................................................................... 15

8 U.S.C. 1151(b)(2)(A).......................................................................................... 14

**Other Authorities**

Alex Nowrasteh, *New Research on Illegal Immigration and Crime*, CATO Inst. (Oct. 13, 2020,
4:16 PM) ............................................................................................................... 7

*Fact Sheet: DHS Announces New Process to Promote the Unity and Stability of Families*, DHS
(June 17, 2024) .................................................................................................... 5

*Keeping Families Together*, USCIS, https://www.uscis.gov/keepingfamiliestogether................. 5

R. Bayefsky, Administrative Stays: Power and Procedure, 97 Notre Dame L. Rev. 1941 (2022)  2

**Regulations**

Implementation of Keeping Families Together ("KFT FRN"), 89 Fed. Reg. 67459 (Aug. 20,
2024) .................................................................................................................. 14

## PRELIMINARY STATEMENT

Oscar Silva Perez, Natalie Taylor, Salvador Doe, Justin Doe,[1] Carmen M. Miranda Zayas, Ricardo Ocampo Hernandez, Jessika Ocampo Hernandez, Foday Turay, Jaxhiel Turay, Genaro Vicencio Palomino, and Cindy Siqueiros Maduena are individuals whose lives and family unity are directly impacted by Plaintiffs' challenge to the Keeping Families Together ("KFT") parole process and this Court's administrative stay of the process. These individuals and the Coalition for Humane Immigrant Rights ("CHIRLA") (together, "Amici"), a membership organization with members who are similarly impacted by Plaintiffs' lawsuit and the Court's stay, write to support Federal Defendants' Motion to Vacate Administrative Stay and Opposition to a Stay Pending a Consolidated Hearing on the Merits, ECF No. 47.[2] Details of each Amici's specific interests in this litigation are laid out in the declarations attached to their Motion to Intervene. *See* ECF Nos. 15-1 – 15-12. In particular, Amici write to highlight the weakness of Texas's arguments when analyzed through the factors the Court must consider in issuing equitable relief. Amici draw on their own experiences to show why: (1) Texas has not shown irreparable injury; (2) equitable relief causes them and hundreds of thousands of other potential KFT beneficiaries far greater hardship than it does Plaintiffs; and (3) such relief, issued without consideration of Texas's standing or the statutory scheme authorizing KFT parole, disserves the public interest.

---

[1] Salvador Doe and Justin Doe respectfully renew their Motion to Proceed Under Pseudonym, ECF No. 19.

[2] Amici previously sought to intervene in this litigation, *see* Amici's Motion to Intervene, ECF No. 15; Corrected Reply in Support of Motion to Intervene, ECF No. 44. For the reasons Amici articulated in their prior briefing, relegation to the status of *amicus curiae* does not adequately protect Amici's interests in this litigation. Amici have filed a Notice of Appeal of the Court's denial of intervention. ECF No. 50.

**ARGUMENT**

**I.     An Administrative Stay Is Not an Appropriate Vehicle for Halting KFT Parole Pending Summary Judgment Briefing.**

In response to Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Stay of Agency Action, ECF No. 3, this Court granted a form of relief not sought by Plaintiffs—a "temporary administrative stay" of Keeping Families Together parole. Order, ECF No. 27. The Court based its ruling predominantly on Justice Barrett's concurring opinion in *United States v. Texas*, 144 S. Ct. 797 (2024), Order at 1-3, ECF No. 27, which discussed appellate courts' use of administrative stays for brief periods. The Court's order, however, effectively functions as an *ex parte* TRO that the Court appears to contemplate keeping in place until summary judgment briefing. Such equitable relief is not appropriate for several reasons.

First, both Justice Barrett's concurrence and its cited case law deal strictly with administrative stays issued by appellate courts as a stop gap before a stay pending appeal can be considered. *Texas*, 144 S. Ct. at 798 (Barrett, J., concurring) ("Their point is to minimize harm while an appellate court deliberates"); *see generally id.* at 798–800. None of this authority concerns administrative stays issued by district courts when no appeal is pending. Justice Barrett makes clear that "when entered, an administrative stay is supposed to be a short-lived prelude to the main event: a ruling on the motion for a stay pending appeal." *Id.* at 799; *accord id.* at 802 (Sotomayor, J., dissenting) (same).[3] This Court's cited case law likewise deals almost strictly with Supreme Court and appellate court proceedings. Although this Court cites a lone district court case from the District of Columbia, *Astrazeneca Pharms. LP v. Burwell*, 197 F. Supp. 3d 53, 59 (D.D.C.

---

[3] The article cited by Justice Barrett and this Court similarly makes no mention of the notion that district courts have authority or reason to employ administrative stays at all, let alone when no appeal is pending. *See generally* R. Bayefsky, Administrative Stays: Power and Procedure, 97 Notre Dame L. Rev. 1941 (2022).

6

2016), the term "administrative stay" appears nowhere in the opinion. In any case, the extremely brief *twenty-four hour* pause the D.D.C. ordered before the FDA could proceed with its intended action, *id.*, is poles apart from the relief ordered in this case, which is in function a TRO, issued without consideration of the relevant factors or the Court's (lack of) jurisdiction, and which could remain in place for nearly two months or longer.

Moreover, the Supreme Court has made clear that to grant drastic equitable relief like the Court has awarded here, a district court must consider each of the elements required for equitable relief, which the Court neglected to apply. *See, e.g.*, *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (setting out four-factor test for awarding injunctive relief); *Libertarian Party of Texas v. Fainter*, 741 F.2d 728, 729 (5th Cir. 1984) (same). Applying those elements, Texas fails to justify its request for equitable relief.

## II. Texas and the Plaintiff States Have Failed to Show Irreparable Harm, a Balance of Hardship in Their Favor, or That a Stay or Injunction Will Not Harm the Public Interest.

A TRO is typically granted, pending trial on the merits, to prevent irreparable injury that is *significantly likely* to result before a dispositive trial. *E.g.*, *Shanks v. City of Dallas*, 752 F.2d 1092, 1096, 1098 (5th Cir. 1985). The prerequisites for a TRO are: (1) substantial likelihood that the moving party will prevail on the merits of the underlying suit, (2) a substantial threat that the moving party will suffer irreparable injury if the TRO is not granted, (3) that the threatened injury to the movant outweighs the threatened harm the TRO may do to the nonmovant, and (4) that granting the TRO will not disserve the public interest. *Libertarian Party*, 741 F.2d at 729. "Since a temporary restraining order is such an extraordinary, and perhaps drastic remedy, one is not granted unless the movant clearly carries the onerous burden of persuasion as to all the elements." *Peters v. Davis*, No. 6:17-cv-595, 2018 WL 11463601, at *1 (E.D. Tex. Oct. 10, 2018) (citing

7

*United States v. Jefferson County*, 720 F.2d 1511, 1519 (5th Cir. 1983)). Because Texas seeks a nationwide end to Keeping Families Together—an action that affects hundreds of thousands of eligible applicants, and their families, across the country—the showing Texas must make is heightened further still. *See, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 466 (2016) ("Article III does not give federal courts the power to order relief to any uninjured plaintiff;" "[t]he Judiciary's role is limited to providing relief to claimants . . . who have suffered, or will imminently suffer, actual harm.") (internal quotation marks and citation omitted); *Gill v. Whitford*, 585 U.S. 48, 73 (2018) ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury.").

### A. Texas Demonstrates No Threat of Injury from Keeping Families Together Parole, Let Alone Irreparable Injury.

Texas has not, and indeed cannot, meet its "onerous burden," *Peters*, 2018 WL 11463601, at *1, to establish irreparable harm. The reason is simple: none of its claimed harms result from Keeping Families Together. Instead, Texas relies on a series of highly attenuated assertions of harm focusing on populations entirely distinct from those implicated in this litigation. Because Texas and the plaintiff states have not shown *any* threat of irreparable harm through Keeping Families Together, much less harm from its operation during the pendency of this litigation, there is no reason to halt the process at this early stage. *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) ("The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits."). The Court should thus vacate its stay or allow it to expire at the end of its fourteen-day term.

To attempt to show injury, Texas alleges three sources of financial harm: increased expenditures on education, healthcare, and crime resulting from KFT parole. The purported costs that Texas points to are all indirect costs which the Supreme Court has signaled are too "attenuated"

to support standing. *United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). But even if such costs are cognizable, Texas does not speculate that Keeping Families Together will *increase* these costs, as required to show injury,[4] but rather, that its *preexisting* costs will *decrease* if individuals eligible for the process become so discouraged in its absence that they decide to uproot their lives and extricate themselves from the country they have called home for an average of a quarter-century.[5] Such a theory is not only wholly speculative, it bends basic standing doctrine beyond its bounds.

First, Texas points out that law permits the state's undocumented residents to pay "resident tuition at all institutions of higher learning." Plaintiffs' Motion for Temporary Restraining Order, Preliminary Injunction, and Stay of Agency Action ("Plaintiffs' TRO Motion") 57, ECF No. 3. But the costs associated with offering resident tuition are unaffected by Keeping Families Together; Texas cites no tuition-related benefit that would suddenly become available to individuals granted parole that is not already available to them. Individuals eligible for KFT Parole already live in the United States.[6] As Texas readily admits, Keeping Families Together only "changes the status of immigrants *already* unlawfully present." *Id.* at 56 n.29 (emphasis added).

---

[4] *E.g.*, *Gen. Land Off. v. Biden*, No. 7:21-CV-00272, 2024 WL 1023047, at *4 (S.D. Tex. Mar. 8, 2024) ("Plaintiffs must show that if the funds in question are not spent on additional border walls, Texas would incur unrecoverable costs based on 'illegal aliens *who would not otherwise be in the State*.'" (quoting *Gen. Land Off. v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023))) (emphasis added); *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) ("Mississippi's alleged fiscal injury was purely speculative because there was no concrete evidence that Mississippi's costs had increased or will increase as a result of DACA."); *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023) (finding that standing through a strain on state resources "is necessarily contingent on a finding that the Final Rule will increase [the state's] enforcement costs."); *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 473 (5th Cir. 2013).
[5] *Fact Sheet: DHS Announces New Process to Promote the Unity and Stability of Families*, DHS (June 17, 2024), https://www.dhs.gov/news/2024/06/17/fact-sheet-dhs-announces-new-process-promote-unity-and-stability-families.
[6] *Id.*

Texas also complains of "the annual cost of educating unaccompanied [noncitizen][7] children." *Id.* at 57. This category of costs likewise has no rational connection to the process Texas challenges, since unaccompanied noncitizen children are not eligible for KFT parole.[8] Any assumptions that education costs associated with unaccompanied children could somehow be translated to children of individuals *eligible* for Keeping Families Together would be exactly that—assumptions unsupported by facts. The U.S. Constitution requires Texas to educate *all* children within its boundaries, whether or not they have the fortune of living with their parents or possessing immigration status. This is the case regardless of Keeping Families Together.

Next, Texas mentions "two healthcare programs that require significant expenditures to cover [undocumented noncitizens]": "the Emergency Medicaid Program and the Texas Children's Health Insurance Program (CHIP)." Plaintiffs' TRO Motion at 57. But once again, Texas concedes that federal law already requires it to include noncitizens in these programs. *Id.* at 57-58. Because Keeping Families Together will not increase the number of individuals (a) in the United States pursuant to the process, or (b) eligible for Medicaid or CHIP, Texas is not forced to expend any additional healthcare resources because of Keeping Families Together. On the contrary, Keeping Families Together parole will likely *lessen* Texas's expenditures, as it will enable eligible individuals to receive work authorization and thus become eligible for employer-sponsored healthcare options, reducing the number of individuals reliant on public benefits.

---

[7] Amici decline to use the terms "alien" or "illegal alien" because of their dehumanizing and pejorative connotations. Like the federal government, Amici use the term "noncitizen" in their place. Jean King, *Policy Memorandum to EOIR*, DOJ (July 23, 2021), https://www.justice.gov/eoir/book/file/1415216/dl.

[8] *See Keeping Families Together*, USCIS, https://www.uscis.gov/keepingfamiliestogether (last updated Aug. 28, 2024).

Finally, Texas alleges "serious injuries from the crime and associated costs caused by [KFT Parole]," *id.* at 58, without offering any plausible theory for how KFT Parole could increase crime or costs related to crime. Texas's contention that its unreimbursed law enforcement costs "will likely increase if more [individuals] are paroled under [KFT parole]," *id.*, does not follow from its declarant's general statement that if the Texas Department of Criminal Justice ("TDCJ") must detain more individuals, then Texas's unreimbursed costs associated with that detention will also increase. Declaration of Rebecca Waltz, Exh. D to Plaintiffs' TRO Motion, at ¶ 10. Texas points to no evidence showing that Keeping Families Together has increased or will increase the number of individuals in TDCJ custody. Indeed, KFT parole results in *no additional net entries* into the interior of the country; it is strictly for qualifying spouses and stepchildren of U.S. citizens who already have prolonged presence in the United States *and no pending criminal charges or disqualifying criminal history*. Grants of parole under Keeping Families Together have no effect on criminality, and Texas does not claim otherwise.[9] Thus, Texas cannot demonstrate any financial harm from "criminal activity" pursuant to Keeping Families Together.

Because of this, Texas frames its theory of injury as "increased incentive for [undocumented noncitizens] to remain in the United States," arguing that individuals "currently subject to [KFT] would be removable if [KFT] were vacated, providing incentives for some if not many to leave the United States, including Texas," so that their departure would reduce Texas's costs. Plaintiffs' TRO Motion at 59 (internal quotation marks and citation omitted). This is wholly speculative and unsupported by the facts including Texas's own declarations, and insufficient for

---

[9] Immigrants generally are *less* likely to commit crimes than their native-born counterparts. In a 2018 study performed in Texas, the Cato Institute found that the crime rate was a mere 535 and 782 per 100,000, respectively, for legal and undocumented immigrants, compared with a crime rate of 1,422 per 100,000 for native-born Americans. Alex Nowrasteh, *New Research on Illegal Immigration and Crime*, CATO Inst. (Oct. 13, 2020, 4:16 PM), https://bit.ly/3OV3KTa.

an "extraordinary" and "drastic remedy," *Peters*, 2018 WL 11463601, at *1, of a TRO. *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013) ("[A] theory of standing, which relies on a highly attenuated chain of possibilities, does not satisfy the requirement" of actual or impending injury); *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 369 (2024) ("[T]he causal link between . . . regulatory actions . . . and those alleged injuries is too speculative . . . and is otherwise too attenuated to establish standing."). Individuals eligible for Keeping Families Together are required to have been in the United States for at least ten years, and on average have been present here for *twenty-three years*.[10] For many of the Amici, the United States is the only country they have ever truly known,[11] and are American in every way but "on paper." Decl. of Foday Turay ("F. Turay Decl.") ¶ 25, ECF No. 15-8. Amici have built lives, families, and livelihoods in the United States, *see infra* Section II.B, discrediting Texas's pipe dream of some mass exodus were Keeping Families Together to be permanently terminated. Amici did not leave the United States before the possibility of qualifying for KFT, and there is no evidence that they or others would depart if the program were terminated.

What is more, the number of "self-deportations" is the wrong metric to measure irreparable harm. To show irreparable harm, Texas's preexisting irreparable costs must *increase* due to Keeping Families Together, not *decrease* if it were terminated. *Supra*, at 9 n.3; *Texas v. U.S. Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068, at *16 (S.D. Tex. Mar. 8, 2024) ("[W]hen deciding whether a state has been injured . . . the Fifth Circuit reviews whether the numbers of [noncitizens], and the associated amount expended because of them, increased relative

---

[10] *Fact Sheet: DHS Announces New Process to Promote the Unity and Stability of Families*, U.S. Dep. of Homeland Sec. (June 17, 2024), https://www.dhs.gov/news/2024/06/17/fact-sheet-dhs-announces-new-process-promote-unity-and-stability-families.

[11] *E.g.*, Declaration of Oscar Silva Perez ("Silva Decl."), ECF 15-1 at ¶ 3; Declaration of Ricardo Ocampo Hernandez ("R. Ocampo Decl."), ECF No. 15-6 ¶ 1.

to those same numbers prior to the implementation of the challenged program."). That is simply not the case here. KFT does not *increase* Texas's obligations, and if anything, it lessens them.

For these reasons, Texas cannot show any harm, let alone irreparable harm, stemming from KFT parole.

### B.  Harms to Amici Outweigh Texas's Attenuated and Speculative Claims to Harm.

In contrast to the wholly speculative costs Texas claims it will face, the harms to Amici and others like them are concrete, irreparable, and devastating. The financial harm to Amici alone outstrips any conjectural future losses to Texas. Lack of employment authorization and permanent status, for oneself or one's spouse, is extremely expensive: it thwarts career advancement, depresses incomes, and leads to greater exploitation by unscrupulous employers. Declaration of Angelica Salas ("CHIRLA Decl.") ¶ 8, ECF No. 15-12. Without employment authorization, Salvador Doe is unable to earn enough money to save for retirement. Declaration of Salvador Doe ("Salvador Doe Decl.") ¶ 19, ECF No. 15-3. Because her husband does not have employment authorization and she is the couple's sole breadwinner, Natalie works three jobs and cannot afford to go back to school to pursue a career in genetics. Declaration of Natalie Taylor ("Taylor Decl.") ¶ 8, ECF No. 15-2. Genaro's lack of immigration status has prevented him from obtaining loans to expand his company, despite its success as the highest-paying employer among painting companies in his county. Declaration of Genaro Vicencio ("Vicencio Decl.") ¶¶ 7, 11, ECF No. 15-10. Neither Oscar nor Francisco can access health insurance, which puts their families and their U.S.-citizen spouses on the brink of disaster at any time. Declaration of Carmen M. Miranda Zayas ("Miranda Decl.") ¶ 15, ECF No. 15-5; Silva Decl. ¶ 12; *see also* R. Ocampo Decl. ¶ 11 (describing his family's loss of their home due to medical debt stemming from his undocumented brother's lack of health insurance). Alternatives to KFT, meanwhile, are not just complex and dangerous but

costly. R. Ocampo Decl. ¶¶ 14-15 (estimating he and his wife have spent $15,000 pursuing consular processing). These direct costs, which mount each day, are not reparable should Amici ultimately prevail.

But those harms are only a fraction of Amici's hardship from a stay of KFT parole, which also encompasses fear and trauma; loss of opportunity; and inability to plan for the future. Every Amicus describes a daily painful toll from their family's fear and lack of stability. *See*, *e.g*., F. Turay Decl. ¶ 15 ("[M]y family and I still live each day in this country we call home with a fear that we could be separated."); R. Ocampo Decl. ¶¶ 9-10; Salvador Doe Decl. ¶ 20; Declaration of Jessika Ocampo Hernandez ("J. Ocampo Decl.") ¶ 10, ECF No. 15-7 ("I want to know the love of my life can't be ripped away at any time. . . . To not have those worries if he doesn't come home from work or if he comes home an hour later that ICE took him away . . .").

That fear and uncertainty eats away not only at applicants for KFT parole, but also their U.S.-citizen families. Ricardo explains that his lack of status is "a traumatic experience" for his children: "The unpredictability has caused [his fifteen-year-old son] mental health breakdowns and even suicidal thoughts. He lives with a lot of fear." R. Ocampo Decl. ¶ 12. His nine-year-old son is just "getting to the point where he knows his dad is different from other dads" due to his lack of status. *Id.* ¶ 13. For Ricardo, "[t]here are moments where I have to sit down, just him and I, and I have to let him know that I am doing everything possible to stay with him." *Id.*

The availability of KFT parole redresses that immense and ongoing harm. Carmen Miranda Zayas, a U.S. citizen with multiple sclerosis who relies on her husband Francisco to navigate everyday life, writes that when she first learned about KFT parole, "I started tearing up from how excited I was that there was finally a path forward for us that wouldn't require us to be apart. I had been waiting so long for this day." Miranda Decl. ¶ 12; *accord* Taylor Decl. ¶ 12. For Amici, the

availability of KFT parole means "knowing I will be able to put my kids to bed the next day." R. Ocampo Decl. ¶ 18; *see also* F. Turay Decl. ¶ 24. Halting the KFT process, even temporarily, dashes that relief and prolongs hardships to Amici and their families.

It also subjects Amici and others eligible for KFT parole to uncertainty and instability. *Cf. Obergefell v. Hodges*, 576 U.S. 644, 680 (2015) (citing the need to alleviate "instability and uncertainty" for married couples as a reason to require recognition of out-of-state unions). Faced with a temporary injunction or stay long before a merits decision, families cannot determine whether to pursue an I-601A waiver, a costly application process that takes nearly four years to complete. Silva Decl. ¶¶ 14-17 (describing how he and his wife were considering whether to pursue an I-601A waiver when KFT parole was announced). And because consular processing is a protracted, complex, and expensive process, short-term injunctions halting KFT parole may force individuals who have already begun that process into the very separation and hardship they sought to avoid through KFT parole. Carmen Miranda Zayas has already spent nearly a decade pursuing consular processing for her husband Francisco. Miranda Decl. ¶ 10. Carmen's MS causes her debilitating pain and difficulty maintaining balance, which exacerbates her challenges as a little person. *Id.* ¶ 8. Because Francisco "provides physical care for [her] that is necessary given [her] medical conditions," and is the family's breadwinner, "[h]is leaving [their] family for any amount of time would cause significant hardship." *Id.* ¶¶ 11, 14. Yet a temporary stay to the KFT parole process may force the couple into precisely that separation when their pending consular interview is finally rescheduled. *Id.* ¶ 10*; see also* Vicencio Decl. ¶ 10; Declaration of Cindy Siqueiros ("Siqueiros Decl.") ¶ 7, ECF No. 15-11 (the couple has had a 601A application pending for three years, but consular processing would be "extremely difficult for [Cindy] and [their] son").

The uncertainty and unpredictability created by a temporary injunction extends to every facet of life, from education, to buying a home, to changing jobs, and even having children. Silva Decl. ¶ 11; F. Turay Decl. ¶ 23; R. Ocampo Decl. ¶ 19. The Court cannot redress this hardship through an eventual ruling in Amici's favor, making Amici's harms irreparable—and far exceeding the speculative, indirect harms Texas claims it may face.

### C. Halting Keeping Families Together, Without a Showing of Standing by Texas and in Contravention of a Congressional Scheme Intended to Facilitate Family Unity, Undermines the Public Interest.

As Amici demonstrate, a stay or injunction at this stage also undermines the public interest. *Cf. Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction.") (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

**First**, there is a public interest in courts rigorously applying the threshold requirement that movants establish standing to sue before issuing stays that alter the lives of hundreds of thousands of people and threaten to transfer the task of governance from the executive to the courts, however briefly. *Barber v. Bryant*, 860 F.3d 345, 352 (5th Cir. 2017) ("[P]laintiffs must make a clear showing that they have standing to maintain the preliminary injunction.") (internal quotations omitted); *All. for Hippocratic Med.*, 602 U.S. at 397. The importance of that principle is heightened when the process at issue—like KFT Parole—is agency action affecting "the rights of individuals," *Morton v. Ruiz*, 415 U.S. 199, 235 (1974), and has been publicized, planned for, and relied upon for months. *See, e.g.*, CHIRLA Decl. ¶ 10; Salvador Doe Decl. ¶ 13; Taylor Decl. ¶¶ 12-13. It is further heightened where, as here, such individuals have been denied the opportunity to appear as parties in a proceeding to fully join in the defense of agency action, despite the Court's acknowledgment of their "direct, substantial, legally protectable interest in the proceedings" that

is "sufficiently implicated by [the] case." Order Denying Motion to Intervene, ECF No. 49, at 2-3 (citing *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015)).

Texas has recycled the same standing claims in numerous challenges to federal policies and has met growing skepticism from the courts. *See United States v. Texas*, 599 U.S. 670, 685 (2023); *see also Texas v. U.S. Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068, at *17 (S.D. Tex. Mar. 8, 2024) (concluding that Texas and other states lacked standing because they "claim that they have been injured by a program that has actually lowered their out-of-pocket costs"). Plaintiffs' standing arguments strain credulity even more here, since Texas complains of costs associated with undocumented individuals residing within its borders—costs it asserts will decrease if some of those individuals leave the U.S.—but by design and in fact, beneficiaries of KFT parole are longtime U.S. spouses or stepchildren of U.S. citizens with neither incentive nor intent to depart the country. The Court has authorized discovery into the question of standing.

Taken together, these factors demonstrate a strong likelihood that Texas cannot establish standing to bring suit, and instead can be considered at best "concerned bystanders," *All. for Hippocratic Medicine*, 602 U.S. at 382, or even indirect *beneficiaries* of KFT parole, through increased tax revenue, improved public health, and other positive outcomes, *cf. Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 31 (2020) (potential loss in tax revenue from rescinding employment authorization to DACA holders would be over $60 billion). Yet absent a rigorous application of the requirement that a movant show standing to halt a nationwide process, Plaintiffs will already have succeeded in upending months of preparations and plans by Amici and thousands of other families. Silva Decl. ¶¶ 16-17; Taylor Decl. ¶¶ 12-13; Salvador Doe Decl. ¶ 13, 17-20; Vicencio Decl. ¶¶ 9-10; Miranda Decl. ¶¶ 12-15; R. Ocampo Decl. ¶¶ 16-21; Siqueiros Decl. ¶¶ 6-7. That misuse of the legal system is contrary to the public interest.

17

**Second**, staying KFT parole frustrates Congress's intent in making immigrant visas for the spouses of U.S. citizens immediately available and providing DHS with broad parole authority. "[T]he public is served when the law is followed." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013). "Family unity is a bedrock objective of the U.S. immigration system," Implementation of Keeping Families Together ("KFT FRN"), 89 Fed. Reg. 67459 (Aug. 20, 2024), protected and facilitated throughout the immigration system. *See Dep't of State v. Munoz*, 144 S. Ct. 1812, 1825 (2024) (Congress has frequently "use[d] its authority over immigration to prioritize the unity of the immigrant family"). Immediate relatives, defined as "the children, spouses, and parents of a citizen of the United States," are not subject to any numerical limitation on immigrant visas, meaning they are the rare category of visa for which there should be no wait beyond adjudicatory processing time. 8 U.S.C. 1151(b)(2)(A)(i); *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 47–48 (2014).

Yet the experience of Amici demonstrates that, as the government acknowledged in commencing Keeping Families Together, U.S. citizens and their spouses face immense extra-statutory barriers to availing themselves of the benefits that Congress extended to immediate relatives. Consular processing and waiver applications are backlogged and inefficient, mired in bureaucratic hurdles and the lingering effects of the pandemic. Adjudication of I-601A waivers now takes three and a half years. KFT FRN, 89 Fed. Reg. at 67468; Vicencio Decl. ¶ 10 (application filed in November 2021 remains pending). Even with an approved waiver in hand, delays at U.S. consulates abroad can stretch to a year or more. *See* KFT FRN, 89 Fed. Reg. at 67460; F. Turay Decl. ¶ 18; Taylor Decl. ¶ 10.

The waiver and aftermath to an interview are not the only sources of delay. Carmen and her husband Francisco have had an approved I-130 since 2015 and an approved I-601A application

18

since 2017, but have not completed the process because they received notice only days before a consular appointment in 2021 and have now waited *three years* for that appointment to be rescheduled. Miranda Decl. ¶ 10; KFT FRN, 89 Fed. Reg. at 67469 ("some U.S. consular sections are still working to reduce backlogs caused by the COVID-19 pandemic"). Consular processing is also complex and fraught with logistical obstacles; for instance, a petition at the National Visa Center can expire, which requires it to be refiled (along with a new fee) and re-adjudicated—an experience that has hampered two Amicus families. Miranda Decl. ¶ 10; R. Ocampo Decl. ¶ 15.

Amici describe their own hesitancy or unwillingness to undertake consular processing as rooted in those barriers, which appear nowhere in Congress's statutory scheme. *E.g.* F. Turay Decl. ¶ 18; Miranda Decl. ¶ 11; Taylor Decl. ¶ 10. Jessika Ocampo calls the process "terrifying" and recalls her mother-in-law missing the birth of her grandson while stranded for nearly a year in Mexico consular processing. J. Ocampo Decl. ¶ 8. By contrast, DHS's broad authority to issue parole *is* rooted in statute. 8 U.S.C. § 1182(d)(5).

Congress did not intend to strand half a million families without a path to immediate-relative visas due to backlogs and the unforeseen effects of a global pandemic, nor to tie the agency's hands in fixing the mess. *Cf. Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977) (legislative history of the immediate-relative provisions of the INA "establishes that congressional concern was directed at 'the problem of keeping families of United States citizens and immigrants united'") (citing H.R. Rep. No. 1199, 85th Cong., 1st Sess., 7 (1957)). In seeking to reduce those barriers, KFT Parole *better* effectuates the law. Enjoining the process does the opposite.

**Third**, the public interest is disserved by a nationwide injunction, enforceable not only in the fifteen Plaintiff States that have stated explicitly that they will make no effort to prove they have standing but also in thirty-four states that have not brought suit. *Cf. Gill*, 585 U.S. at 73 (a

remedy must be "tailored to redress" a plaintiff's injury). Nationwide injunctions are increasingly

disfavored as they "intrude on powers reserved for the elected branches[,] . . . deprive other lower

courts of the chance to weigh in on important questions before this Court has to decide them [,] . . .

[and] encourage parties to engage in forum shopping and circumvent rules governing class-wide

relief." *United States v. Texas*, 599 U.S. at 694 (Gorsuch, J., concurring).

## CONCLUSION

For the foregoing reasons, the Court should vacate the administrative stay.

Dated: September 4, 2024                Respectfully submitted,

**Paige Austin**                        */s/ Esther H. Sung*
New York Bar No. 5246954                **Esther H. Sung (Lead Attorney)**
paige.austin@maketheroadny.org          California Bar No. 255962
                                        esther.sung@justiceactioncenter.org
**Harold A. Solis**
New York Bar No. 5122726                **Karen C. Tumlin**
Harold.Solis@maketheroadny.org          California Bar No. 234961
                                        karen.tumlin@justiceactioncenter.org
Make the Road New York
301 Grove Street                        **Hillary Li**
Brooklyn, NY 11237                      Georgia Bar No. 898375
Telephone: (718) 418-7690               hillary.li@justiceactioncenter.org
Facsimile: (866) 420-9169
                                        **Laura Flores-Perilla**
                                        California Bar No. 355645
                                        laura.flores-perilla@justiceactioncenter.org

                                        **Brandon Galli-Graves**
                                        Texas Bar No. 24132050
                                        brandon.galli-graves@justiceactioncenter.org

                                        **Vanessa Rivas-Bernardy**
                                        California Bar No. 341464
                                        vanessa.rivas-
                                        bernardy@justiceactioncenter.org

                                        Justice Action Center
                                        P.O. Box 27280

20

Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

*Counsel for Amici*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2024, I electronically filed this Amicus Brief with the Clerk of the Court for the United States District Court for the Eastern District of Texas using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Esther H. Sung*
Esther H. Sung