# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS

State of Texas, et al.,

     *Plaintiffs,*

v.

United States Department of
Homeland Security, et al.,

     *Defendants.*

No. 6:24-cv-00306

---

# BRIEF OF *AMICI CURIAE* STATES OF WEST VIRGINIA, MONTANA, AND 5 OTHER STATES IN SUPPORT OF PLAINTIFFS

## TABLE OF CONTENTS

INTRODUCTION AND INTERESTS OF AMICI STATES..........................................1

ARGUMENT .......................................................................................................2

   I.   The States Have Article III Standing ..................................................2

     A.   As Co-Sovereigns, States Receive Special Solicitude.....................................3

     B.   The States Meet All The Standing Requirements—Special Solicitude Or Not .............................................................8

   II.   The PIP Program Hurts The States And Is Unlawful ..................................16

   III.  The Court Should Vacate The Rule, Not Selectively Enjoin It .......................19

CONCLUSION.....................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alden v. Maine,*
  527 U.S. 706 (1999)................................................................................................3

*Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez,*
  458 U.S. 592 (1982)................................................................................................6

*Amanullah v. Nelson,*
  811 F.2d 1 (1st Cir. 1987) .....................................................................................17

*Arizona v. United States,*
  567 U.S. 387 (2012)............................................................................................1, 21

*Associated Gen. Contrs. of Am. v. U.S. Dep't of Lab.,*
  No. 5:23-CV-0272-C, 2024 WL 3635540 (N.D. Tex. Jun. 24, 2024)....................20

*Bennett v. Spear,*
  520 U.S. 154 (1997)..............................................................................................13

*Braidwood Mgmt. v. Becerra,*
  104 F.4th 930 (5th Cir. 2024)...........................................................................19, 20

*California v. Azar,*
  911 F.3d 558 (9th Cir. 2018).................................................................................14

*Cruz-Miguel v. Holder,*
  650 F.3d 189 (2d Cir. 2011) ...................................................................................9

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020)..................................................................................................10

*E. Bay Sanctuary Covenant v. Barr,*
  964 F.3d 832 (9th Cir. 2020).................................................................................22

*FDA v. Alliance for Hippocratic Medicine,*
  602 U.S. 367 (2024)..............................................................................................11

*Florida v. Mellon,*
  273 U.S. 12 (1927)................................................................................................11

*Florida v. United States,*
  660 F. Supp. 3d 1239 (N.D. Fla. 2023) ..............................................................5, 20

*Florida v. United States,*
  No. 3:21cv1066, 2022 WL 2431414 (N.D. Fla. May 4, 2022).............................17

*In re Gee,*
  941 F.3d 153 (5th Cir. 2019)..................................................................................3

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Geier v. Am. Honda Motor Co.,*
  529 U.S. 861 (2000) .................................................................................................18

*Gen. Land Off. v. Biden,*
  71 F.4th 264 (5th Cir. 2023) ...............................................................................1, 2

*Haaland v. Brackeen,*
  946 F.3d 649 (5th Cir. 2019) ..................................................................................14

*Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic &*
  *Atmospheric Admin.,*
  70 F.4th 872 (5th Cir. 2023) .....................................................................................4

*Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania,*
  591 U.S. 657 (2020) ....................................................................................................7

*Loper Bright Enters. v. Raimondo,*
  144 S. Ct. 2244 (2024) .............................................................................................10

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ..................................................................................................11

*Mason v. Brooks,*
  862 F.2d 190 (9th Cir. 1988) .....................................................................................9

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ...............................................................................2, 3, 4, 11, 14

*Murthy v. Missouri,*
  144 S. Ct. 1972 (2024) ...............................................................................................7

*Nat'l Fed'n of Indep. Bus. v. Sebelius,*
  567 U.S. 519 (2012) ..................................................................................................14

*Plyler v. Doe,*
  457 U.S. 202 (1982) ....................................................................................................5

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021) ......................................................................................5

*Texas v. Biden,*
  40 F.4th 205 (5th Cir. 2022) .........................................................................1, 20, 21

*Texas v. Brooks-LaSure,*
  No. 6:21-CV-00191, 2021 WL 5154219 (E.D. Tex. Aug. 20, 2021) ......................6

*Texas v. Dep't of Homeland Sec.,*
  No. 6:23-CV-00007, 2024 WL 1021068 (S.D. Tex. Mar. 8, 2024) .......................12

iv

## TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) .................................................................5, 6, 13, 15, 17

*Texas v. United States,*
    515 F. Supp. 3d 627 (S.D. Tex. 2021) .................................................................20

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ...................................... 4, 5, 11, 12, 14, 15, 20, 22

*Tootkaboni v. Trump,*
    No. 17-CV-10154, 2017 WL 386550 (D. Mass. Jan. 29, 2017) ...........................22

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ...............................................................................................8

*Trump v. Hawaii,*
    585 U.S. 667 (2018) .............................................................................................22

*United States v. Texas,*
    599 U.S. 670 (2023) ...........................................................................6, 7, 8, 9, 10, 12

**Constitutional Provision**

U.S. CONST. art. I, § 8, cl. 4 ...................................................................................21

**Statutes**

5 U.S.C. § 706 ........................................................................................................19

8 U.S.C. § 1182 ..............................................................................................8, 10, 16

IDAHO CODE § 33-3717 .............................................................................................8

IDAHO CODE § 67-7903 ...........................................................................................12

**Other Authorities**

42 C.F.R. § 435.406 ...............................................................................................20

Aaron Flint,
    *New Details: 18 Arrested in Bozeman Human Trafficking Operation,*
    MONTANA TALKS (July 27, 2023) ...........................................................................21

Amanda Frost,
    *In Defense of Nationwide Injunctions,*
    93 N.Y.U. L. REV. 1065 (2018) ...........................................................................22

# TABLE OF AUTHORITIES
*(continued)*

**Page(s)**

*"Every State Is Now A Border State": House Homeland Security
Committee Hears Testimony from Colleagues on Impacts of the Border
Crisis*, U.S. COMM. ON HOMELAND SEC. (Dec. 7, 2023) .................................................16

Calvin R. Massey,
*The Tao of Federalism*,
20 HARV. J.L. & PUB. POL'Y 887 (1997) ................................................................17

Charles Davant IV,
*Sorcerer or Sorcerer's Apprentice?: Federal Agencies and the Creation
of Individual Rights*,
2003 WIS. L. REV. 613 (2003) ...............................................................................18

D. Bruce La Pierre,
*Political Accountability in the National Political Process—the
Alternative to Judicial Review of Federalism Issues*,
80 NW. U. L. REV. 577, 633 (1985) .......................................................................17

Jonathan H. Adler,
*The Ducks Stop Here? The Environmental Challenge to Federalism*,
9 SUP. CT. ECON. REV. 205 (2001) ........................................................................17

Kristin Merkel,
*Montana continues to see record-breaking numbers of fentanyl
seizures*,
7 KBZK BOZEMAN (Mar. 7, 2024, 7:27 P.M.)........................................................21

Laurence H. Tribe,
*Intergovernmental Immunities in Litigation, Taxation, and
Regulation: Separation of Powers Issues in Controversies About
Federalism*,
89 HARV. L. REV. 682 (1976) ................................................................................18

Memorandum on Illegal Immigration,
31 WEEKLY COMP. PRES. DOC. 200 (Feb. 7, 1995) ..............................................1

Michael Sant'Ambrogio and Glen Staszewski,
*Democratizing Rule Development*,
98 WASH. U.L. REV. 793 (2021) ...........................................................................18

Michele E. Gilman,
*Presidents, Preemption, and the States*,
26 CONST. COMMENT. 339 (2010)..........................................................................18

National Center for Health Statistics,
*Drug Overdose Mortality by State*, CDC (Mar. 1, 2022)....................................21

## TABLE OF AUTHORITIES
(*continued*)

**Page(s)**

*Nationwide Encounters*,
 U.S. CUSTOMS & BORDER PROT. (Aug. 28, 2024) ................................................................16

Note,
 *Unenforced Boundaries: Illegal Immigration and the Limits of
 Judicial Federalism*,
 108 HARV. L. REV. 1643 (1995) ............................................................................................18

S. REP. NO. 104-249 (1996) ........................................................................................................17

U.S. DEPARTMENT OF STATE,
 INTERNATIONAL NARCOTICS CONTROL STRATEGY REPORT (Mar. 2024) ........................21

W. VA. DEP'T OF HUM. AND HEALTH RES.,
 WEST VIRGINIA INCOME MAINTENANCE MANUAL: ALIENS, REFUGEES
 AND CITIZENSHIP (2014) ......................................................................................................8

### INTRODUCTION AND INTERESTS OF AMICI STATES

States "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012). And in the past few years, illegal immigration has surged along the southern border. *See Gen. Land Off. v. Biden*, 71 F.4th 264, 275 (5th Cir. 2023) ("[T]he tide of illegal immigration has been dramatically increasing."). More illegal aliens mean more burdens for States like Amici States of West Virginia, Montana, Indiana, Mississippi, Nebraska, Oklahoma, and Utah. *Id.* So the federal government should be trying to lessen the costs that illegal immigration produces for States, not increase them. Ultimately, "[d]eterring illegal immigration is the best long-term solution to protect States from growing costs for illegal immigration." Memorandum on Illegal Immigration, 31 WEEKLY COMP. PRES. DOC. 200, 203 (Feb. 7, 1995).

Yet Defendants refuse to acknowledge those realities, both in their policies and their Article III standing arguments. Defendants' latest move is to rewrite immigration law to allow over a million illegal aliens to remain in the United States and live as temporary legal residents until they can apply for permanent residency. Defendants do all that amid an ongoing immigration crisis that imposes significant costs on the States, including hundreds of millions of dollars in new expenses relating to law enforcement, education, and healthcare programs. And Defendants decided not to even hear the States out on this issue—foregoing notice-and-comment rulemaking under the APA.

As dual sovereigns within our federal system, Amici States have a vested interest in ensuring the federal government's adherence to the rule of law. Indeed, States have "quasi-sovereign 'interest[s] in the enforcement of immigration law.'" *Texas v. Biden*, 40 F.4th

1

205, 216 n.4 (5th Cir. 2022) (per curiam).  Defendants' challenged policies here, however, reflect a disregard for both federalism and the harms they are imposing on States.  Because States have fewer means to protect themselves in the immigration context, it is vital that States at least be able to insist that Defendants comply with federal law.  The Fifth Circuit has consistently recognized that the States' status as separate sovereigns means that the States have Article III standing.

The States' special status as co-sovereigns also confirms that the parole-in-place (PIP) Program is particularly pernicious.  By cutting Congress and the States out of the process, Defendants have changed immigration law without any sort of recourse.  Allowing the PIP Program to continue would allow the Executive to harm the States with impunity and degrade the States' status as separate sovereigns.  That's also why limiting the injunction to the State Plaintiffs is not enough—*all* States will continue to suffer harm if some part of the Program is allowed to continue.

This Court should stop the unlawful PIP Program by issuing an injunction.

## ARGUMENT

### I.      The States Have Article III Standing.

Texas and the other State Plaintiffs here have Article III standing.  To establish Article III standing, the States must show "an injury in fact that is concrete, particularized, and actual or imminent," that the defendant "likely caused" the injury, and "that the injury would likely be redressed by judicial relief."  *Gen. Land Off.*, 71 F.4th at 272 (cleaned up).  But States receive "special solicitude in [the] standing analysis."  *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007).  In our federal system, States "are not relegated to the role of mere

provinces or political corporations, but retain the dignity, though not full authority, of sovereignty." *Alden v. Maine*, 527 U.S. 706, 715 (1999). Thus, a State can show standing "without meeting all the normal standards for redressability and immediacy." *Massachusetts*, 549 U.S. at 517-18 (cleaned up). Though the Supreme Court has more recently resisted stretching *Massachusetts* too far, States still enjoy broader standing than other plaintiffs. And in any event, the States have shown that they satisfy the standing requirements whether this Court applies *Massachusetts*'s special solicitude or not.

The States easily meet the three core elements of standing. The State Plaintiffs' submissions show that illegal immigration and the PIP Program impose hundreds of millions of dollars of costs on the States. These harms are traceable to the PIP Program, as it affords lawful presence and other benefits to aliens who would not otherwise have them. And enjoining the Program redresses the States' injuries because many of those aliens would return to their countries of origin or would not take advantage of available benefits.

### A. As Co-Sovereigns, States Receive Special Solicitude.

**1.** In general, States are afforded slightly more leeway in the standing analysis. *See In re Gee*, 941 F.3d 153, 167 (5th Cir. 2019) ("[T]he Supreme Court has long recognized States' special rights to seek relief in federal court."). "States are not normal litigants for purposes of invoking federal jurisdiction" because they "surrender[ed] certain sovereign prerogatives" when forming the United States, depriving them of the chance to vindicate their interests through war, treaties, or some exercises of the police power. *Massachusetts*, 549 U.S. at 518-19. As a result, States are "entitled to special solicitude in [the] standing

3

analysis." *Id.* at 520.  Special solicitude is not a "shortcut when standing is otherwise lacking," as States must still show a "cognizable injury" that is both "concrete and particularized." *Louisiana ex rel. La. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023).  But *Massachusetts* does say that States "can assert [their] right[s] without meeting all the normal standards for redressability and immediacy." *Massachusetts*, 549 U.S. at 517-18 (cleaned up).

In *Massachusetts v. EPA,* the Supreme Court held that to receive this special solicitude, a State must possess a "procedural right" to challenge the action, and the challenged action must affect one of the State's "quasi-sovereign interests."  549 U.S. at 520.  There, Massachusetts's "procedural right" was the statutory right to seek judicial review for "agency action unlawfully withheld." *Id.* at 517 (quoting 42 U.S.C. § 7607(b)(1)). The "quasi-sovereign interests" at stake were Massachusetts's "desire to preserve its sovereign territory" from harmful effects assertedly imposed on that State by greenhouse gases. *Id.* at 519.  The latter interests were reinforced by Massachusetts's ownership of "a great deal of the territory alleged to be affected" by greenhouse gases. *Id.* (internal quotation marks omitted).  At bottom, *Massachusetts* relaxes Article III standing requirements for certain suits brought by states, particularly where the federal government has "abdicated its responsibility" to protect the States. *Id.* at 505.

The Fifth Circuit has consistently applied *Massachusetts*'s state-solicitude framework to cases in the immigration context.  In *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) (*DAPA*), for example, the Fifth Circuit found that the state plaintiffs were entitled to special solicitude to their challenge of DHS's decision to set guidelines for

granting lawful presence to a broad class of illegal aliens because the states were "challeng[ing] DHS's decision to act, rather than its decision to remain inactive, a procedural right similar to" *Massachusetts*. *Id.* at 152. The *DAPA* Court further found that the States satisfied the second prong of *Massachusetts* because the States' challenge involved quasi-sovereign interests by "imposing substantial pressure on them to change their laws, which provide for issuing driver's licenses to some aliens and subsidizing those licenses." *Id.*; *see also Texas v. Biden*, 20 F.4th 928, 969-70 (5th Cir. 2021), *rev'd on other grounds*, 597 U.S. 785 (2022).

Likewise, in Texas's challenge to the Deferred Action for Childhood Arrival program, the Fifth Circuit found that the states had a quasi-sovereign interest in immigration policy. *Texas v. United States*, 50 F.4th 498, 516 (5th Cir. 2022) (*DACA*). That's because "[w]hen the states joined the union, they surrendered some of their sovereign prerogatives over immigration, including their power to establish their own classifications of aliens." *Id.* at 515 (quoting *DAPA*, 809 F.3d at 153) (quotation marks omitted). This relinquishment meant that the states relied on the federal government to protect their interests, implicating a quasi-sovereign interest. *Id.*; *accord Plyler v. Doe*, 457 U.S. 202, 242 n.1 (1982) (Burger, C.J., dissenting) ("If the Federal Government, properly chargeable with deporting illegal aliens, fails to do so, it should bear the burdens of their presence here."); *Florida v. United States*, 660 F. Supp. 3d 1239, 1265 (N.D. Fla. 2023) ("If special solicitude is to have any meaning, it must apply in the immigration context.").

This case is no different. Like *DAPA* and *DACA*, the States are alleging a "procedural injury from the absence of notice and an opportunity to comment regarding

the rescission." *Texas v. Brooks-LaSure*, No. 6:21-CV-00191, 2021 WL 5154219, at *4 (E.D. Tex. Aug. 20, 2021).  This APA injury satisfies the first prong.  And like in *DACA*, the States have a quasi-sovereign interest in immigration policy that they are unable to address absent a challenge to the policy.  The States also have a quasi-sovereign interest in protecting the "economic" "well-being" of their residents.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel. Barez*, 458 U.S. 592, 607 (1982).  Here, the States have alleged that if the action is allowed to proceed that they will be forced to expend millions of dollars.  The States thus meet *Massachusetts*'s two prongs for special solicitude.

**2.** *Massachusetts* remains good law, too.  To be sure, the Supreme Court in recent years has declined to extend *Massachusetts*'s standing analysis at times.  But it has pointedly *not* chosen to overrule the case.

Most obviously, the Supreme Court in *United States v. Texas*, 599 U.S. 670 (2023) (*Immigration Priorities*), found that certain States lacked standing over immigration-enforcement guidelines that prioritized the arrest and removal of certain illegal immigrants on grounds specific to the non-enforcement context.  *Id.* at 686.  The Court reasoned that while "[m]onetary costs are of course an injury," an injury would not count for standing unless it was "traditionally redressable in federal court."  *Id.* at 676.  Invoking precedent stating that "a citizen lacks standing to contest" non-prosecution decisions and worrying about judicial incursions on executive discretion, the Court concluded that the suit was "not the kind" a federal court could adjudicate.  *Id.* at 674, 678.  The Court contrasted that case with *Massachusetts*, which "involved a challenge to the denial of a statutorily authorized petition for rulemaking" and "not a challenge to an exercise of the Executive's enforcement

6

discretion." *Id.* at 685 n.6. *Immigration Priorities* looked to be driven by an unwillingness to step in and control traditional executive discretion—a marked contrast, for instance, from this case, where Congress has provided definite standards and procedures that the executive has ignored. So while the Supreme Court cabined the state-solicitude analysis in some respects, it certainly did not abandon the doctrine.

The same term as *Immigration Priorities*, the Supreme Court reinforced *Massachusetts*'s vitality in *Haaland v. Brackeen*, where Texas joined a lawsuit challenging the constitutionality of the Indian Child Welfare Act. 599 U.S. 255 (2023). While the Supreme Court rejected Texas's claim that it had standing as *parens patriae* to bring an action against the federal government, *id.* at 294-95, the Court found that Texas had standing in its claim that ICWA unconstitutionally commandeered state-government processes related to the foster-care, adoption, and judicial systems. *Id.* at 280 n.5. That is, Texas had standing because it said that ICWA forced it to implement federal law rather than the states' own legal code. *Id.* By approving without explaining Texas's standing to raise such claims (and by doing so in a footnote), the Court suggested that recognizing sovereign standing in this context was not even a close call. *Cf. Little Sisters of the Poor Saints Peter & Paul Home v. Pennsylvania*, 591 U.S. 657 (2020) (omitting any discussion of state standing to bring to challenge to federal rule exempting certain religious organizations from contraceptive insurance coverage mandate); *Murthy v. Missouri*, 144 S. Ct. 1972, 1996 n.11 (2024) (reiterating that *Massachusetts* applies to only state plaintiffs but not otherwise questioning its validity).

Because *Massachusetts* remains good law, the standing requirements are relaxed here.

**B. The States Meet All The Standing Requirements—Special Solicitude Or Not.**

**1.** The States have suffered an injury in fact. Even putting aside special solicitude for the States, financial injuries of any amount are usually enough to confer Article III standing. *See*, *e.g.*, *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021) ("[C]ertain harms readily qualify as concrete injuries under Article III. The most obvious are traditional tangible harms, such as physical harms and monetary harms. If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III.").

And the States here have alleged that illegal immigration imposes substantial costs on them. Texas, for example, details how illegal immigration costs the State "hundreds of millions of dollars annually." Pls.' Mot. TRO 46, ECF No. 3. Idaho also highlights the specific harms the PIP Program imposes as the State limits public benefits to residents who can "verify [their] lawful presence." *Id.* at 57; IDAHO CODE § 33-3717B(3)(b). Or consider Amici States: West Virginia makes illegal aliens paroled under 8 U.S.C. § 1182(d)(5) eligible for Medicaid. *See* W. VA. DEP'T OF HUM. AND HEALTH RES., WEST VIRGINIA INCOME MAINTENANCE MANUAL: ALIENS, REFUGEES AND CITIZENSHIP 18.4 (2014), https://tinyurl.com/mry589fu. These losses are the quintessential injuries for purposes of standing.

The Defendants' cases don't say otherwise. Take *Immigration Priorities*. There, the Supreme Court found that the States lacked standing because they had not suffered a

cognizable injury from the Biden Administration's enforcement discretion to prioritize the arrest and removal of certain noncitizens.  599 U.S. at 686.  But in reaching that decision, the Court noted "that a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 674 (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).  Applying that holding to the States, the Court found that the States could not show an injury given that "an agency's refusal to initiate enforcement proceedings is not ordinarily subject to judicial review." *Id.* at 685 n.6.

But the State Plaintiffs here aren't just challenging Defendants' enforcement discretion but also are challenging their decision to rewrite immigration laws to provide a path for citizenship.  And in that same decision, the Supreme Court expressly noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." *Immigration Priorities*, 599 U.S. at 683.  That's "because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." *Id.*  So Defendants are wrong when they say that the Supreme Court answered the injury inquiry, especially when the Executive is not employing traditional enforcement authority but is instead evading congressionally imposed limits. *See, e.g., Cruz-Miguel v. Holder*, 650 F.3d 189, 194 (2d Cir. 2011) (describing how Congress "conferr[ed] discretion on the Attorney General to grant such parole under *limited circumstances*" (emphasis added)); *Mason v. Brooks*, 862 F.2d 190, 194 (9th Cir.

1988) ("The legislative history of the parole provision indicates that Congress intended that temporary admission be granted infrequently.").

This distinction also sinks Defendants' argument that "courts lack meaningful standards to assess" the Programs.  Defs.' Mot. Mem. 15, ECF No. 47.  *Immigration Priorities* involved the Government's decision not to enforce immigration laws against more noncitizens due to "resource constraints" and factors like "public-safety and public-welfare needs."  599 U.S. at 679-80.  This case involves Defendants changing federal law to provide legal status for a broad class of illegal aliens in contravention of express statutory limits requiring "case-by-case" determinations finding "urgent humanitarian reasons" or "significant public benefit."  8 U.S.C. § 1182(d)(5)(A).  Examining that set of facts simply requires legal interpretation, which is "emphatically … the province and duty of the" Court. *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) (cleaned up).

Recognizing that the Supreme Court has not foreclosed this avenue of standing, Defendants argue that the PIP Program does not actually "confer immigration status" or "confer parole."  Defs.' Mot. Mem. 16, ECF No. 47.  But the Supreme Court rejected that line of argument in *Department of Homeland Secretary v. Regents of the University of California*, 591 U.S. 1 (2020), where it held that DACA was subject to review because DACA recipients "may request work authorization and are eligible for Social Security and Medicare"—classic interests "courts often are called upon to protect."  *Id.* at 18-19 (cleaned up).  So too here.  And indeed, Defendants' description of their own program as nothing new makes very little common sense; if it were correct, then the program would be a total redundancy.

10

The Defendants also try to characterize the States' injuries as "downstream" ones that are too attenuated.  Defs.' Mot. Mem. 17, ECF No. 47.  It relies on *Florida v. Mellon*, a case where the Supreme Court held that Florida lacked standing to challenge a federal inheritance tax because the resulting withdrawal of property was only remote and indirect.  *See* 273 U.S. 12, 18 (1927).  But unlike *Mellon*, the harms here are not indirect—the States will suffer real, direct harm because of the PIP Program.  What's more, *Mellon* did not arise under the APA, which specifically allows States to assert "procedural right[s] to protect [their] concrete interests."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 572 n.7 (1992); *see also DAPA*, 809 F.3d at 152 (noting that the APA "authorizes challenges to 'final agency actions for which there is no other adequate remedy in a court'" (quoting 5 U.S.C. § 704)).

Defendants' reliance on *FDA v. Alliance for Hippocratic Medicine* fares no better.  *See* Defs.' Mot. Mem. 17, ECF No. 47.  There, the Supreme Court found that several pro-life doctors and associations lacked standing to challenge FDA's decision that made it easier for doctors to prescribe mifepristone, an abortion drug.  602 U.S. 367, 396 (2024).  The Court reasoned that while the doctors had "sincere legal, moral, ideological, and policy objections to elective abortion, … those kinds of objections alone do not establish a justiciable case or controversy in federal court."  *Id.* at 396.  In rejecting this conception of standing, the Court also rejected standing for "[t]eachers in border states … su[ing] to challenge allegedly lax immigration policies that lead to overcrowded classrooms."  *Id.* at 392.  But the Court's example in dicta does not foreclose the States' argument here.  Most obviously, "States are not normal litigants for purposes of invoking federal jurisdiction."  *Massachusetts*, 549 U.S. at 518, 520.  They feel the harm in more acute ways than an individual teacher might, and

they raise more than "ideological[] and policy objections" to a wave of new persons seeking state benefits.    And again, return to the Supreme Court's decision in *Immigration Priorities*, where it expressly distinguished a pure "non-prosecution" challenge from a "non-prosecution challenge with benefits."  599 U.S. at 681-83.

Finally, *Texas v. Department of Homeland Security* does not change things. No. 6:23-CV-00007, 2024 WL 1021068, at *17 (S.D. Tex. Mar. 8, 2024).  The States there challenged an immigration regulatory program which allows up to 30,000 foreign nationals every month to live and work in the United States. *Id.* at *1.  Ultimately, the district court found that the States lacked standing because it found that the program's putative immigration-reducing benefits for the States outweigh any inevitable costs. *Id.* at *14-16. That is, the program would decrease the costs to Texas because *fewer* foreign nationals were entering Texas under the program than before. *Id.* at *16.

To be clear, the district court in *DHS* erred by doing its accounting exercise to find that DHS's unlawful action benefits the States.  *See* Pet'rs' Br., *State of Texas v. DHS*, No. 24-40160 (5th Cir. June 26, 2024), 2024 WL 1021068; *see also DAPA*, 809 F.3d at 156 (explaining that standing "is not an accounting exercise").  But even spotting the district court's reasoning, the injury here is not the sort that will be washed out by benefits.  Idaho, for example, limits public benefits to residents able to "verify [their] lawful presence." IDAHO CODE § 67-7903(1).  And as explained above, the PIP Program allows this class of aliens to access these types of benefits.  What's more, a dose of common-sense goes a long way here, too: it's hard to see how the PIP Program would result in anyone *declining* to

12

come to the United States, and it only incentivizes those who are otherwise here unlawfully to stay longer (in ways that mirror the DACA/DAPA programs).

The States have suffered an injury in fact.

**2.** The harms to the States are readily traceable from the PIP Program.  The States must identify a "causal connection" between Defendants' actions and the States' harms. *Bennett v. Spear*, 520 U.S. 154, 167 (1997).

The increased expenditures for incarceration, education, and social services arising from the increased presence of illegal aliens directly flows from the PIP Program. Defendants dismiss this causal connection, claiming that "any alleged costs associated with the presence of such noncitizens would already exist and are not traceable to the" PIP Program.  Defs.' Mot. Mem. 21, ECF No. 47.  But this ignores the States' contention that the recission of the PIP Program would cause some recipients to leave, reducing the financial burdens on the States.  *See* Pls.' Mot. TRO 48-49, ECF No. 47.  Though Defendants dismiss the number of aliens that would leave, *see* Defs.' Mot. Mem. 20, ECF No. 47, all that matter is that *some* aliens would.  *DACA*, 50 F.4th at 519.  While the PIP Program "is not the sole cause of the State's injury … [it] has exacerbated it.  That is sufficient." *Id.*

The States also argue that granting illegal aliens parole unlocks certain educational or other benefits that they could not otherwise access.  Defendants dismiss those costs, arguing "costs are attributable to the States' own choices concerning eligibility for in-state resident tuition or participation in certain benefit programs."  Defs.' Mot. Mem. 23, ECF No. 47.  In essence, Defendants argue that any injury is the States' fault, so standing is unavailable.  Under that logic, Defendants could categorically parole every illegal alien and

13

that would not be a traceable injury because the States had laws on the books offering benefits to paroled noncitizens. That can't be right. The States "cannot both change their laws to avoid injury from amendments to another sovereign's laws *and* achieve their policy goals." *DAPA*, 809 F.3d at 158 n.65 (5th Cir. 2015); *accord California v. Azar*, 911 F.3d 558, 574 (9th Cir. 2018) ("Courts regularly entertain actions brought by states and municipalities that face economic injury, even though those governmental entities theoretically could avoid the injury by enacting new legislation."). And it's hardly a voluntary "choice" when States must either (a) adopt the Federal Government's definitions of eligible participants for purposes of several critical programs (which in turn increases their own financial burdens because of matching obligations); or (b) opt out of the programs entirely, a practically infeasible option. *Cf. Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 581 (2012) (opinion of Roberts, C.J.) (describing similar logic as to insurance mandate and Medicaid coverage).

But that's all beside the point, though. Illegal immigration harms the States; the PIP Program worsens that harm. The States' costs are thus "fairly traceable" to the PIP Program.

**3.** A favorable ruling would also redress the States' injuries. "To satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019) (cleaned up). But remember: *Massachusetts* says that special solicitude means that a State does not have to meet "all the normal standards for redressability." 549 U.S. at 517-18 (cleaned up). Instead, the States can

establish redressability "if there is some possibility that the requested relief" will reduce the harm. *DACA*, 50 F.4th at 520.

The States satisfy redressability here whether the Court applies the ordinary Article III standards for standing or not. To start, enjoining the PIP Program "based on the procedural APA claim could prompt DHS to reconsider the program, which is all a plaintiff must show when asserting a procedural right." *DAPA*, 809 F.3d at 161. Rescinding the PIP Program would also redress its harm. Those eligible for the PIP Program would be removable if the Program were put on hold, providing incentives from some to leave the United States. *See DACA*, 50 F.4th at 520 (finding that rescinding DACA was redressable because it "would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them").

Defendants dismiss these remedies, claiming that "DHS officers possess the same authority to consider parole requests … under the parole statute regardless" of the PIP Program. Defs.' Mot. Mem. 25, ECF No. 47. But that misses the mark. A problem with the PIP Program is that it ignores explicit statutory language to consider applications on a case-by-case basis in favor of a sweeping program. Congress handed DHS a chisel to consider parole requests, and DHS opted to use a wrecking ball. And again, if the PIP Program really did nothing but parrot statutory power that was already there, then it's hard to see why the program was implemented at all. No, better to recognize that the PIP Program upends the ordinary practices. Stopping the PIP Program would set things back into place.

The States have demonstrated standing based on their direct injury.

15

## II.     The PIP Program Hurts The States And Is Unlawful.

Turning to the merits, the States are likely to succeed.  The national immigration crisis has rendered "every state" "a border state."  *"Every State Is Now A Border State": House Homeland Security Committee Hears Testimony from Colleagues on Impacts of the Border Crisis*, U.S. COMM. ON HOMELAND SEC. (Dec. 7, 2023), https://tinyurl.com/2p8d68nd.  Indeed, the past three years have seen an unprecedented influx of illegal aliens—over nine million—overwhelming the national infrastructure. *Nationwide Encounters*, U.S. CUSTOMS & BORDER PROT. (Aug. 28, 2024), https://tinyurl.com/y96z6r9u.  And the crisis has only intensified.  For example, last December saw a historic high for illegal alien encounters at the U.S. southern border (over 302,000 that month).  *Id.*  Amici States bear the brunt of the significant economic, health, and public safety issues generated by this mass migration crisis.

The PIP Program only worsens the crisis.  But while it's arguable most of the crisis has been fueled by the Biden Administration's *inaction*, the PIP Program is an *active* decision by the Biden Administration to worsen the illegal immigration disaster.  And it does so unlawfully.

The PIP Program exceeds the parole statute by providing sweeping parole eligibility to over a million illegal aliens at a stroke of the pen.  But the Immigration and Nationality Act authorized the Secretary of Homeland Security to parole inadmissible aliens only on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). As other courts have recognized, "Congress consistently visualized parole as an indulgence to be granted only occasionally, in the case of rare and exigent

circumstances, and only when it would plainly serve the public interest." *Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir. 1987).  Indeed, "[t]he historical record admits of no doubt on this score," such that "it cannot reasonably be argued but that the Congress has sown the seeds of the parole authority in such a scanty way as to plant a decidedly austere garden." *Id.*  As the States explain, granting relief to entire groups of aliens from different countries lets the "garden" run wild.  So the PIP Program "is foreclosed by Congress's careful plan," which "reserve[d] for itself the authority to determine the framework of the [N]ation's immigration system." *DACA*, 50 F.4th at 511, 528; *accord Florida v. United States*, No. 3:21cv1066, 2022 WL 2431414, at *9 (N.D. Fla. May 4, 2022) (finding that a similar abuse of parole authority was likely unlawful).  "No matter how successful Congress might be in crafting a set of immigration laws that would—in theory—lead to the most long-term benefits to the American people, such benefits will not actually occur if those laws cannot be enforced." S. REP. NO. 104-249, at 3 (1996).

Removing Congress from the parole equation is especially problematic for political accountability.  Congress can be better "relied upon to respect the States." Calvin R. Massey, *The Tao of Federalism*, 20 HARV. J.L. & PUB. POL'Y 887, 891 (1997).  Part of the reason is that "[m]embers of Congress are more responsive to the concerns of [their] local" constituencies than "centralized regulatory agencies." Jonathan H. Adler, *The Ducks Stop Here? The Environmental Challenge to Federalism*, 9 SUP. CT. ECON. REV. 205, 221 (2001). State-focused "political checks and Congress' political accountability"—like state political party pressure and lobbying efforts—help, too.   D. Bruce La Pierre, *Political Accountability in the National Political Process—the Alternative to Judicial Review of*

*Federalism Issues*, 80 Nw. U. L. Rev. 577, 633 (1985).  Congress also has "peculiar institutional competence" in "adjusting … power relationships," including those between the States and the federal government.  Laurence H. Tribe, *Intergovernmental Immunities in Litigation, Taxation, and Regulation: Separation of Powers Issues in Controversies About Federalism*, 89 Harv. L. Rev. 682, 696 (1976).

Even more practically, the legislative process has "more opportunities and more access points to provide input to Congress" than rulemaking does to the President and executive agencies.  Michele E. Gilman, *Presidents, Preemption, and the States*, 26 Const. Comment. 339, 365 (2010).  The "'political safeguards' that give states a voice" in lawmaking simply do not extend to a "voice in the executive branch's activities."  Charles Davant IV, *Sorcerer or Sorcerer's Apprentice?: Federal Agencies and the Creation of Individual Rights*, 2003 Wis. L. Rev. 613, 640 (2003).  "[U]nlike Congress, administrative agencies are clearly not designed to represent the interests of States."  *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 908 (2000) (Stevens, J., dissenting).  So courts should take special care in the immigration-context to ensure that the executive branch is not undermining judgments that Congress has already made.  *See*, *e.g.*, Note, *Unenforced Boundaries: Illegal Immigration and the Limits of Judicial Federalism*, 108 Harv. L. Rev. 1643 (1995) (describing how "blurred lines of political accountability" have allowed "[t]he federal government [to] effectively coerce[] state legislatures into enacting programs to assist illegal immigrants" "[b]y failing to enforce federal statutes designed to prevent illegal immigration").

But even though the legislative process allows for more accountable government, notice-and-comment rulemaking provides at least *some* accountability.  Michael

Sant'Ambrogio and Glen Staszewski, *Democratizing Rule Development*, 98 WASH. U.L. REV. 793, 796 (2021) ("Public engagement also enhances the democratic legitimacy and accountability of federal agencies and the regulations they promulgate … Requiring agencies to consider and respond to public comments in a reasoned fashion improves the democratic legitimacy and accountability of agency action from a variety of theoretical views."). Yet Defendants dispensed with that modest accountability by skipping the notice-and-comment process under the APA altogether—effectively placing the program outside the political process.  The administration should not be permitted to impose serious immigration-related burden on the States by press release alone.

Enjoining the PIP Program is a modest step to ensure accountability in the immigration system.  The Court should step in.

### III.     The Court Should Vacate The Rule, Not Selectively Enjoin It.

After recognizing the PIP Program is unlawful, this Court should grant nationwide relief for at least three reasons.  First, the APA expressly allows courts to vacate unlawful actions.  Second, the unlawful PIP Program harms every state in the country—nationwide harm requires nationwide relief.  And third, the immigration context warrants nationwide relief.

Under the APA, a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  This language allows courts to vacate unlawful agency action.  *Braidwood Mgmt. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024).  A vacatur has a "nationwide effect" because it "affects persons in all judicial districts

equally." *Id.* (quoting *In re Clark*, 94 F.4th 502, 512 (5th Cir. 2024)).  And this Circuit has previously imposed nationwide injunctions for APA violations in the immigration context. *See DAPA*, 809 F.3d at 187-88; *Texas*, 40 F.4th at 229 n.18.  District courts in this Circuit have routinely followed suit.  Those courts have recognized that they are "bound to faithfully apply the precedents of [their] Circuit" and issue a nationwide injunction when program-wide problems arise in the immigration context.  *Texas v. United States*, 515 F. Supp. 3d 627, 637-40 (S.D. Tex. 2021).

The Court should also vacate the PIP Program because its effects will be felt nationwide.  The hundreds of thousands of illegal aliens that would be paroled under the Program will balloon the already high costs the States bear in providing social services, education, and emergency health care to these aliens.  For example, federal law requires states to offer expensive services to paroled immigrants, including Medicaid.  *See* 42 C.F.R. § 435.406(a)(2)(ii).  And these costs will only climb as the administration tries to unlawfully parole more illegal aliens in the future.  Where "the scope of the irreparable injury is national … the injunction should be nationwide in scope."  *Associated Gen. Contrs. of Am. v. U.S. Dep't of Lab.*, No. 5:23-CV-0272-C, 2024 WL 3635540, at *18 (N.D. Tex. Jun. 24, 2024).

Additionally, the Program incentivizes more illegal immigration.  Policies like the PIP Program send a strong signal that the United States is unwilling to enforce immigration laws.  In fact, U.S. Border Patrol Chief Raul Ortiz agreed that, "since President Biden was elected[,]" "aliens illegally entering the United States perceive that they will be able to enter and remain in the United States."  Ortiz Dep. at 59:22-60:5, *Florida*

*v. United States*, 660 F. Supp.3d 1239 (N.D. Fla. 2022) (No. 21-CV-1066), ECF No. 78-3. And with this increase in illegal immigration, crime and drug rates will continue to rise. For example, in Montana, the state saw a 111% increase in seized fentanyl in 2022, with evidence that the drug was being trafficked by illegal immigrants. *See*, *e.g.*, Kristin Merkel, *Montana continues to see record-breaking numbers of fentanyl seizures*, 7 KBZK BOZEMAN (Mar. 7, 2024, 7:27 P.M.), https://bit.ly/4d2863C; *see also*, *e.g.*, Aaron Flint, *New Details: 18 Arrested in Bozeman Human Trafficking Operation*, MONTANA TALKS (July 27, 2023), https://bit.ly/3Xk8ODD.  Likewise, West Virginia has the highest drug overdose mortality rate in America, driven chiefly by fentanyl.  National Center for Health Statistics, *Drug Overdose Mortality by State*, CDC (Mar. 1, 2022), https://bit.ly/47TzYVc.  That poison is coming from the Southern border.  *See* U.S. DEPARTMENT OF STATE, INTERNATIONAL NARCOTICS CONTROL STRATEGY REPORT 203 (Mar. 2024) ("[T]he consensus among U.S. authorities is that Mexico was the only significant source of illicit fentanyl or fentanyl analogues trafficked into the United States in 2023.").  Every State is now a border state, and the PIP Program will only make things worse.

Finally, the immigration context requires a nationwide injunction.  The Constitution requires a "uniform Rule of Naturalization."  U.S. CONST. art. I, § 8, cl. 4.  And the Supreme Court has described our nation's immigration laws as "a comprehensive and unified system."  *Arizona v. United States*, 567 U.S. 387, 401, (2012).  Again, the Fifth Circuit agrees: "[I]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement."  *Texas*, 40 F.4th at 229 n.18.  Other courts of

appeal do, too: Nationwide injunctions or vacatur are "uniquely appropriate in immigration cases." *E. Bay Sanctuary Covenant v. Barr*, 964 F.3d 832, 857 (9th Cir. 2020).

And it's easy to see why vacatur is especially important in the immigration context. Consider the legal challenges to President Trump's Executive Orders temporarily restricting the entry of foreign nationals from six countries. *Trump v. Hawaii*, 585 U.S. 667, 676 (2018).  Initially, a district court in Massachusetts issued a geographically limited injunction, commanding Customs and Border Protection Officials to "notify airlines that ha[d] flights arriving at Logan Airport ... that individuals on these flights [would] not be detained or returned based solely on the basis of the Executive Order." *Tootkaboni v. Trump*, No. 17-CV-10154, 2017 WL 386550, at *1 (D. Mass. Jan. 29, 2017).  But this order confused federal immigration officials, airline personnel, and foreign nationals.  Amanda Frost, *In Defense of Nationwide Injunctions*, 93 N.Y.U. L. REV. 1065, 1099 (2018).  And some immigrants switched their flights to Massachusetts and then traveled to their original destination—"rendering the geographic limit on the injunction pointless." *Id.*

The same chaos and evasion would happen with a limited injunction here.  Enjoining the PIP Program to only the State Plaintiffs would lead to inconsistent outcomes and evasion of enforcement.  Aliens in a state like California or Arizona could be paroled and then move to Texas or another state covered by the injunction.  Thus, the harms from the PIP Program would still hurt the States even with the injunction in place.  So nationwide vacatur is necessary because a "geographically limited injunction would be ineffective." *DAPA*, 809 F.3d at 187-88.

## CONCLUSION

The Court should grant the States' Motion for Preliminary Injunction.

Dated: October 15, 2024

Respectfully submitted,

AUSTIN KNUDSEN
  ATTORNEY GENERAL

PATRICK MORRISEY
  ATTORNEY GENERAL

/s/ Anna Schneider
Anna Schneider
  *Special Assistant Attorney General*

/s/ Michael R. Williams
Michael R. Williams*
  *Solicitor General*

OFFICE OF THE MONTANA
ATTORNEY GENERAL
215 North Sanders
P.O. Box 201401
Helena, MT 59620
(406) 444-2026

OFFICE OF THE WEST VIRGINIA
ATTORNEY GENERAL
1900 Kanawha Blvd. E
State Capitol Building 1, Rm. 26-E
Charleston, WV 25305
(304) 558-2021

*Counsel for* Amicus Curiae
*State of Montana*

*Counsel for* Amicus Curiae
*State of West Virginia*

*admitted pro hac vice

## ADDITIONAL COUNSEL

THEODORE E. ROKITA
Attorney General
State of Indiana

LYNN FITCH
Attorney General
State of Mississippi

MICHAEL T. HILGERS
Attorney General
State of Nebraska

GENTNER DRUMMOND
Attorney General
State of Oklahoma

SEAN REYES
Attorney General
State of Utah

24