**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*, ) | |
| ) | |
| *Plaintiffs,* ) | |
| ) | |
| v. ) | Civil Action No. 6:24-cv-00306 |
| ) | |
| UNITED STATES DEPARTMENT OF ) | |
| HOMELAND SECURITY, *et al.*, ) | |
| ) | |
| *Defendants.* ) | |

## DEFENDANTS' TRIAL BRIEF AND MOTION FOR SUMMARY JUDGMENT

1

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 3

BACKGROUND ....................................................................................................... 5

ARGUMENT ........................................................................................................... 15

   **I.**    **This Court Lacks Jurisdiction Because Plaintiffs Lack Article III Standing.**..........15

      A. Plaintiffs Have Not Asserted a Cognizable Injury. ...................................... 15

      B. Plaintiffs' Claimed Injury is Too Speculative and Attenuated.................... 20

      C. Plaintiffs' Injuries Are Not Redressable..................................................... 27

  **II.**   **Plaintiffs Cannot Obtain APA Review of Their Claims.** .............................**29**

  **III.** **Plaintiffs Cannot Succeed on the Merits of Any of Their Claims.**...........................**32**

      A. The Notice is Not Contrary to Law. ........................................................... 32

      B. Parole in Place under KFT Does Not Circumvent Other INA Provisions. ............... 46

      C. The Notice is Not Arbitrary and Capricious............................................... 48

      D. Plaintiffs Cannot Succeed on the Notice and Comment Claim.................... 53

      E. Plaintiffs' Paperwork Reduction Act Claims Lack Merit. ......................... 58

      F. The Notice Does Not Violate the Take Care Clause. .................................. 60

      D. Plaintiffs' Cannot Succeed on their Ultra Vires Claim. ............................ 61

  **IV.** **If the Court Grants Relief it Must be Sharply Limited.** .............................**63**

      A. Plaintiffs Have Not Proven Irreparable Injury and the Balance of Harms Weigh Against Injunctive Relief. ...................................................................... 64

      B. Remand Without Vacatur Is the Only Appropriate Remedy...................... 66

CONCLUSION .......................................................................................... **72**

**INTRODUCTION**

On August 20, 2024, the U.S. Department of Homeland Security (DHS) published a federal register notice entitled *Implementation of Keeping Families Together*, 89 Fed. Reg. 67,459 (Aug. 20, 2024) (Notice). The Notice outlines the Keeping Families Together (KFT) process, through which certain noncitizen spouses and stepchildren of U.S. citizens may apply for a discretionary grant of parole in place that DHS officers will consider on a case-by-case basis. The Notice also memorializes the Secretary's determination that granting parole to noncitizen spouses and stepchildren of U.S. citizens living in the United States who are eligible to use the process will generally result in a significant public benefit. Although the Notice establishes a process for submitting and adjudicating parole requests filed by certain noncitizen spouses and stepchildren of U.S. citizens, it does not itself confer any new eligibility for parole or change the substantive standards for granting parole, which remains a case-by-case determination of whether the request is for urgent humanitarian reasons or a significant public benefit and whether the requestor merits a favorable exercise of discretion.

Plaintiffs, 16 states who are not regulated by the Notice, challenge it, contending the KFT process violates the Administrative Procedure Act (APA) because it exceeds the Secretary's authority under the Immigration and Nationality Act (INA), was improperly promulgated without notice and comment, is arbitrary and capricious, violates the Take Care Clause, and is *ultra vires*. ECF 1. Plaintiffs—none of which, other than Texas, have made any effort to present evidence of harm—ask this Court to enjoin the KFT process not only in their jurisdictions, but nationwide. The Court should reject that meritless request and grant summary judgment in favor of Defendants.

To start, Plaintiffs cannot demonstrate, as is their burden, that they have Article III standing. They challenge a parole process that is available only to noncitizens already present in the United States with familial relationships to U.S. citizens that would enable them to become a lawful permanent resident (LPR) if they meet certain eligibility requirements. Plaintiffs allege, at best, only indirect, downstream costs from the KFT process that are not cognizable as a legal matter. Even if those types of harms were cognizable, Plaintiffs have not made the required

showing that the KFT process will increase a Plaintiff State's net expenditures on public services. Moreover, Plaintiffs lack any basis to challenge the Notice under the APA because the KFT process is not final agency action; Plaintiffs are not within the zone of interests of relevant statutes; and the KFT process is not subject to judicial review.

Plaintiffs also cannot succeed on the merits of their claims. The KFT process is consistent with the parole statute because parole in place under the KFT process may be granted only on a discretionary, case-by-case basis for a temporary period and must be supported by urgent humanitarian reasons or significant public benefit and, therefore, does not exceed DHS's statutory authority. *See* 8 U.S.C. § 1182(d)(5)(A). The Secretary's authority to grant parole in place has been upheld by multiple courts of appeals and has been affirmed by Congress. The KFT process, moreover, is consistent with other parole in place processes, including the parole in place process for certain spouses, children, and parents of current and former members of the U.S. Armed Forces. The Secretary considered all relevant factors, including alternative approaches and effects on States and other stakeholders, and found that the benefits of the KFT process outweighed any potential drawbacks. The Notice is exempt from the APA's notice and comment requirement both because it is a general statement of policy and procedural rule and because it involves a foreign affairs function. Nor can Plaintiffs succeed on their Take Care Clause or *ultra vires* claims because neither of those asserted claims provides an independent cause of action; and, even if they did, Plaintiffs' policy disagreement over the proper use of parole does not rise to the level of an Executive abdication of duty.

Finally, even if any relief were warranted, Plaintiffs fail to demonstrate entitlement to any injunctive or other coercive relief. Instead, at most, the Court should remand without vacatur to permit the agency to correct any errors the Court has identified. Equitable considerations weigh strongly in the Defendants' favor. The Notice, by its design, generally applies to individuals who have already been continuously physically present in the United States for over a decade (for spouses of U.S. citizens) and are otherwise eligible to seek LPR status through an alternative process, and the anticipated economic impact for the country is overwhelmingly positive. An

4

injunction or vacatur, on the other hand, would cause significant costs to the public, to the United States, and to Plaintiffs. In all events, should the Court issue any injunctive relief, it must be limited to the harms actually shown by Texas, the only plaintiff to submit any evidence whatsoever concerning injury and harm. Broader relief would be inappropriate but, if permitted, should be limited to Plaintiff States.

## BACKGROUND

I.     **Legal Background**

Parole. The Executive Branch has broad constitutional and statutory power over the administration and enforcement of the nation's immigration laws. *Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950); *see, e.g.*, 6 U.S.C. § 202(4); 8 U.S.C. § 1103(a)(1), (3). Congress delegated to the Executive Branch the authority and discretion to inspect and process "applicants for admission"—noncitizens present without being admitted or arriving in the United States. 8 U.S.C. § 1225(a)(1). The Immigration and Nationality Act (INA) authorizes the Secretary of Homeland Security to parole "any" applicant for admission temporarily "under such conditions as [the Secretary] may prescribe" "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). A noncitizen who is granted parole is permitted to physically enter or remain in the United States temporarily, but parole is not an admission to the United States. Congress has provided that a noncitizen who was paroled may apply to adjust his status to that of an LPR. *See id.* § 1255(a).

The INA has long been understood to permit the granting of parole not only to noncitizens who are physically outside the United States, but also to those who are physically present in the United States but who have not been admitted. *See, e.g.*, INS General Counsel, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998)[1]; *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007) (stating "[w]e see nothing [in the INA] that would preclude the government from paroling . . . into

---

the United States under § 1182(d)(5)(A)" noncitizens "who are currently present in the United States but who were not inspected upon arrival at a port of entry"). This conclusion follows the INA's text: the INA allows the parole of "any alien applying for admission," 8 U.S.C. § 1182(d)(5)(A), and the statute deems all noncitizens "present in the United States who ha[ve] not been admitted" to be "applicant[s] for admission," *id.* § 1225(a)(1). The grant of parole to such physically present noncitizens is generally referred to as "parole in place." And in 2020, Congress "reaffirmed" "the importance of the parole in place authority of the Secretary of Homeland Security." National Defense Authorization Act for Fiscal Year 2020 (NDAA), Pub. L. No. 116-92, § 1758 (2019) (8 U.S.C. § 1182 note). Congress also approved use of parole in place to enable CNMI residents to apply for adjustment of status for the purpose of preserving family unity. Northern Mariana Islands Long-Term Legal Residents Relief Act, Pub. L. No. 116-24, § 2 (2019) (48 U.S.C. § 1806(e)(6)).

Sometimes, DHS has set up processes that specified noncitizens may use to apply for parole, including parole in place. For example, for more than 5 years, DHS has operated a process that allows certain noncitizen relatives of active-duty members of the military to apply for parole in place. 89 Fed. Reg. 67461; USCIS Policy Memorandum, PM-602-0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces,* (Nov. 15, 2013).[2]

At the same time, such a dedicated process is not required for a noncitizen to request parole. Instead, DHS accepts parole applications, including applications for parole in place, from any statutorily eligible noncitizen. Who Can Apply for Parole, https://www.uscis.gov/humanitarian/humanitarian_parole. And whether or not a noncitizen submits his application through a dedicated process, every application is adjudicated individually and parole may not be granted unless DHS determines that the specific grant would be meet the statutory requirements.

Finally, the INA confers broad discretion on the Secretary over the entirety of the parole

---

[2]https://www.uscis.gov/sites/default/files/document/memos/2013-1115_Parole_in_Place_Memo.pdf

process, from determining "in his discretion" whether to grant parole, setting the parole conditions "he may prescribe," and determining when "in [his] opinion" the purpose for the parole has been satisfied. 8 U.S.C. § 1182(d)(5)(A).; *cf. Trump v. Hawaii*, 585 U.S. 667, 684 (2018) (observing that similar language in 8 U.S.C. § 1182(f) "exudes deference" to the Executive). And because the decision whether to grant parole is committed to the Secretary's discretion, it is generally not subject to judicial review. *See* 8 U.S.C. § 1252(a)(2)(B)(ii). This broad discretionary authority accords with the Executive Branch's authority over management of the admission of noncitizens and foreign affairs, including its historical discretion to grant parole. *See, e.g.*, *Kaplan v. Tod*, 267 U.S. 228, 229 (1925); *Ahrens v. Rojas*, 292 F.2d 406, 410-11 (5th Cir. 1961).

Adjustment of Status. To be eligible for adjustment of status to that of a LPR, an applicant generally must have been "inspected and admitted or paroled into the United States or … [have] approved petition for classification as a [Violence Against Women Act] self-petitioner." 8 U.S.C. § 1255(a). Parole under 8 U.S.C. § 1182(d)(5)(A), including parole in place, satisfies the "inspected and admitted or paroled" requirement. *E.g.*, *Ortega-Cervantes*, 501 F.3d at 1114. An applicant for adjustment of status must also be eligible for an immigrant visa and have one immediately available. Spouses and stepchildren of U.S. citizens are immediate relatives and therefore are not subject to the numerical limitations for immigrant visas. 8 U.S.C. § 1151(b)(2)(A)(i); *see also id.* at § 1101(b)(1)(B). Because there is no numerical limit on immigrant visas for immediate relatives, *see id.*, immigrant visas are immediately available to them upon approval of a Form I-130, Petition for Alien Relative, filed by their U.S. citizen spouse or parent, *see* 8 C.F.R. § 245.2(a)(2)(i)(B); 22 C.F.R. § 42.21(a).  Finally, applicants for adjustment of status must demonstrate that they are otherwise admissible to the United States and that they merit a favorable exercise of discretion. 8 U.S.C. §§ 1255(a)(2), 1182(a).

Absent parole in place, noncitizen spouses and stepchildren of U.S. citizens who are present in the United States but were not inspected and admitted or paroled and who seek LPR status on the basis of their relationships to U.S. citizens generally must leave the United States and pursue a lengthy immigrant visa process abroad. 89 Fed. Reg. at 67,460. Further, departing the

United States to pursue their immigrant visas may result in inadmissibility under the unlawful presence ground at 8 U.S.C. § 1182(a)(9)(B)(i), which would require obtaining a waiver of inadmissibility before they can be admitted as LPRs. The immigrant visa process requires these noncitizen spouses and stepchildren of U.S. citizens to remain abroad during processing of their immigrant visa applications, potentially separated from their families for months or years. *Id.*

## II.    Factual Background[3]

The Notice. On August 20, 2024, DHS published the Notice announcing the KFT process. 89 Fed. Reg. 67459-02, 2024 WL 3859266. The Notice primarily encompasses two aspects. *Id.*

First, the Notice announces that DHS established a process by which certain noncitizen spouses and stepchildren of U.S. citizens may submit a request for parole in place. In general, to take advantage of the KFT process, spouses must have been continuously physically present in the United States since June 17, 2014, through the date of filing, and have a legally valid marriage to a U.S. citizen as of June 17, 2024. *Id.* at 67469-70. Stepchildren must qualify as a stepchild of a U.S. citizen under 8 U.S.C. § 1101(b)(1) and have been under the age of 21 and unmarried on June 17, 2024, and continuously physically present in the United States from that date through the date of filing. *Id.* at 67470-71. Requestors must have no disqualifying criminal history; must not pose a threat to national security or public safety; must demonstrate urgent humanitarian reasons or significant public benefit; and demonstrate they merit parole in place as a matter of discretion. *Id.*

---

[3] As an APA case challenging agency action based on an administrative record, this case is exempt from the normal summary judgment standard and factual-statement requirements of Fed. R. Civ. P. 56 and Local Rule CV-56, because the material facts have already been determined by the agency in the record. "When assessing a summary judgment motion in an APA case, the district judge sits as an appellate tribunal" and the "entire case on review is a question of law, and only a question of law." *Permian Basin Petroleum Ass'n v. Dep't of the Interior*, 127 F. Supp. 3d 700, 706 (W.D. Tex. 2015) (internal citations and quotation marks omitted). The material factual issues are already "'resolve[d by the agency] to arrive at a decision that is supported by the administrative record,' and the district court applies the APA standards of review to determine whether, as a matter of law, 'the evidence in the administrative record permitted the agency to make the decision it did.'" *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2024 WL 3517504, at *14 (N.D. Tex. July 23, 2024) (quoting *Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 797–98 (S.D. Tex. 2021), *aff'd*, 38 F.4th 455 (5th Cir. 2022)).

at 67460-61. Although those eligibility criteria suffice to permit a noncitizen to use the Notice's process for submitting a parole in place request, the ultimate adjudication of those requests is governed by the statutory standard; thus, a noncitizen may not be granted parole in place under the KFT process unless DHS determines, on a case-by-case basis, that the noncitizen has demonstrated the grant of parole is for urgent humanitarian reasons or significant public benefit and that they merit a favorable exercise of discretion. *Id.* at 67472. Although noncitizens who do not meet the eligibility criteria outlined in the Notice may not request parole in place under the KFT process, they remain free—as are all noncitizens present without being admitted—to submit requests for parole. *See* 8 U.S.C. § 1182(d)(5)(A).

Second, the Notice memorializes the Secretary's determination that paroling noncitizen family members of U.S. citizens who meet certain criteria and who "merit a favorable exercise of discretion will generally provide a significant public benefit to the United States." 89 Fed. Reg. at 67495; *cf.* 8 C.F.R. § 212.5(b) (reflecting similar determinations for certain groups of noncitizens in immigration detention, such as pregnant women and minors). Over two-thirds of the approximately 765,000 noncitizens married to U.S. citizens who are currently present in the United States without lawful status have not been "inspected and admitted and paroled." Office of Management and Budget Administrative Record (OMB AR) at 3-12; DHS Administrative Record (AR) at 4687-89. These noncitizens therefore are ineligible to apply for LPR status without taking additional measures, which include leaving the United States in many cases. 89 Fed. Reg. at 67460. As a result, such noncitizen family members face barriers to pursuing LPR status, and those who do pursue that status "may be separated from their U.S. citizen family members for months or years." *Id.* at 67460.

Against this backdrop, the Secretary determined that granting parole in place to certain noncitizen family members of U.S. citizens who demonstrate they merit a favorable exercise of discretion—enabling them to pursue LPR status within the United States without the hardship of departing the country for consular processing—will "generally" result in one or more significant public benefits, including by "promoting family unity and stability"; "strengthening the U.S.

9

economy and the economic position of families and U.S. communities"; "advancing diplomatic relationships and key foreign policy objectives of the United States"; "reducing strain on limited government resources"; and "furthering national security, public safety, and border security objects." *Id.*; AR 4656-4663. Specifically:

- Parole in place under the KFT process promotes family unity and stability by allowing noncitizen family members to obtain lawful status without separating them from their U.S. citizen spouses and, in many cases, their U.S. citizen children, which existing legal options for obtaining lawful status otherwise would often require. 89 Fed. Reg. at 67466. Studies have found that children experience serious detrimental health consequences that persist into adulthood due to the absence of a parent, regardless of the reason or length of time, AR 4492-4505, and can experience poorer health outcomes as a result of the stress and uncertainty caused by a parent's lack of lawful immigration status, AR 1346-68.

- Parole in place under the KFT process supports the U.S. economy by allowing noncitizens who are granted parole in place under the process to apply for and, if eligible, obtain employment authorization. This would enable them to obtain lawful employment, and reduces labor exploitation, increases economic productivity, and generates greater income tax revenue, among other benefits. 89 Fed. Reg. at 67466. Giving noncitizens the ability to obtain lawful employment increases their labor participation and income, AR 2172-79, reduces the amount of labor exploitation—including workplace-safety and minimum-wage violations—they experience, AR 4-74, 3095-97,  and increases their tax contributions, AR 2180-2243. The tax compliance rate by the undocumented noncitizen migration is estimated to be only 50 to 75 percent, while it is close to 100 percent for ordinary wage earners. AR 261-84.

- Parole in place under the KFT process advances diplomatic relationships and foreign policy objectives by obtaining assistance from foreign partners on key initiatives such as disrupting human smuggling, trafficking, and criminal networks, in return for offering regularization opportunities for those countries' nationals residing in the United States. *Id.*

10

at 67467. Representatives of Mexico have specifically requested that the U.S. government regularize Mexican nationals who have been long-term residents of the United States, and the Government of Colombia has made repeated similar diplomatic requests for certain Colombian nationals residing in the United States in the context of ongoing diplomatic negotiations. 89 Fed. Reg. at 67489; AR 921-24, 1342-45, 2967-71, 2975-82, 4434-4448, 4450-4468. In return, Mexico and Colombia are partnering with the United States to address irregular migration in the Western Hemisphere, and the United States seeks their ongoing participation in international criminal enforcement efforts and cooperation with noncitizen removals. 89 Fed. Reg. at 67489; AR 4661. Further, by providing noncitizens paroled into the United States under the KFT process the ability to apply for employment authorization and potentially to regularize their status, individuals are enabled to send remittances to family members in their countries of origin, promoting stability and reducing incentives for those family members to irregularly migrate to the United States. AR 1261-88, 4661.

- Parole in place under the KFT process would preserve administrative resources by enabling the agency to reduce the backlog of pending adjudications of Form I-601A, Application for Provisional Unlawful Presence Waiver, a lengthier, more complex, and more resource-intensive adjudication, which is part of the process of pursuing an immigrant visa abroad in order for the noncitizen to return to the United States to be admitted as an LPR. *Id*. at 67468. USCIS has nearly 124,000 Form I-601A waivers awaiting adjudication, and the median processing time to adjudicate a Form I-601A is 41.7 months. AR 4244-59. Similarly, the KFT process is expected to preserve other administrative resources.  Due to backlogs created during the COVID-19 pandemic, as of May 2024, U.S. consulates had 438,443 noncitizens awaiting an interview for an immigrant visa, but were able to schedule only 43,607 interviews in June 2024. AR 4449. Noncitizens availing themselves of the KFT process, which might enable them to seek adjustment of status in the United States, rather than the immigrant visa process abroad, would help reduce the adjudicative strain

on Department of State resources and therefore reduce wait times for visa interviews abroad. AR 4662.

- Parole in place under the KFT process would promote national security, public safety, and border security by helping DHS identify noncitizens currently living unlawfully and unknown in the United States and potentially identify national security or public safety threats through biometrics, and background and security checks. *Id*. at 67469.  Requestors are required to pass Federal Bureau of Investigation (FBI) fingerprint checks, as well as Treasury Enforcement Communication System (TECS) and National Crime Information Center (NCIC) checks. AR 4663.

Noncitizens who are granted parole in place under the KFT process and who apply for adjustment of status to that of a LPR will be able to demonstrate that they were inspected and admitted or paroled, a requirement for adjustment of status. 8 U.S.C. § 1255(a). However, they still must satisfy all other statutory and regulatory requirements for adjustment of status, including that they are the beneficiary of an approved immigrant petition based on a bona fide relationship to a U.S. citizen, are admissible to the United States, and merit a grant of adjustment of status as a matter of discretion. 89 Fed. Reg. at 67463, 67474.  Eligibility to be a beneficiary of a family-based immigrant petition and for adjustment of status are determined in a distinct and separate process from the parole in place adjudication and the KFT process does not change the eligibility requirements for these processes. *Id.* at 67460; *see* 8 U.S.C. § 1255(a).

Plaintiffs. Sixteen states, led by Texas, seek declaratory and injunctive relief and vacatur of the Notice. ECF No. 1 at 52. Rather than demonstrate injury as to each Plaintiff, including by responding to the Defendants' discovery requests and submitting declarations in support of their claims, every Plaintiff but Texas agreed to waive any argument that they are injured by the KFT process for purposes of the pending motions and bench trial. ECF No. 36. Instead, Plaintiffs stipulated that only Texas would endeavor to prove injury, and thus Plaintiffs could only rely on injury to Texas for purposes of demonstrating Article III standing and any entitlement to equitable relief. *Id.*

Texas's theory of harm is based on the proposition that the KFT process will increase migration to the United States and/or lead to some noncitizens remaining in the United States, who otherwise might depart, thus eventually leading to costs to the Plaintiff States for providing services to those particular noncitizens, ECF No. 1 ¶ 184; Exhibit A (Plaintiffs' Responses to Defendants' Discovery Requests) at 4, 6. However, because it limits eligibility to noncitizens already present in the United States prior to the Notice's promulgation, KFT is not anticipated to incentivize new migration to the United States. 89 Fed. Reg. at 67461, 67469–72. Further, the relevant group of noncitizens is likely to simply remain living unlawfully in the United States, as they have already been for at least 10 years or more, absent the KFT process. 89 Fed. Reg. at 67466; ECF No. 3-1 ¶ 11-12. Additionally, any noncitizens who would be subject to removal under the current DHS enforcement priorities guidance will generally not meet the eligibility criteria for parole in place under the KFT process. 89 Fed. Reg. at 67465.

Regarding increased costs, Texas asserts future increased costs due to providing healthcare, education, and criminal enforcement services to the noncitizen population. ECF Nos. 3-2, 3-3, 3-4; *e.g.*, Ex. A at 5-6. Yet Texas does not even know if it has any resident noncitizens who would qualify for parole under the KFT process, and concedes that it has no information regarding healthcare, education or criminal enforcement costs incurred by any noncitizens within the KFT-eligible population within the past five years. Ex. A at 3. Further, noncitizens who are granted parole are generally ineligible for at least five years after being granted parole for means-tested public healthcare benefits. 89 Fed. Reg. at 67478 (explaining that SNAP, Medicaid, TANF, and CHIP programs generally require five years in "qualified alien" status); ECF No. 1 ¶ 75 & n.11, not all of which are available Texas, 89 Fed. Reg. at 67478.

This Lawsuit. Plaintiffs filed a motion for preliminary relief, which the Court consolidated with a trial on the merits under Rule 65(b)(2), after granting Plaintiffs a de facto injunction against full implementation of the Notice, without finding the requirements for a preliminary injunction to have been satisfied. ECF Nos. 27, 54, 69.

In preparation for trial on the merits, Defendants submit the following statement of their positions on the factual and legal issues presented in this case. Based on those positions, Defendants also seek summary judgment in their favor. As explained in detail below, Plaintiffs lack Article III standing, cannot obtain APA review, and cannot show that the Notice (1) violates the APA because it exceeds DHS's statutory authority, was promulgated without notice and comment, and is arbitrary and capricious, (2) violates the Take Care Clause, or (3) is *ultra vires*. *See* ECF No. 1.

## STANDARD OF REVIEW

The Court has consolidated Plaintiffs' motion for preliminary injunction with a ruling on the merits under Rule 65(a)(2), and separately given notice that it will decide the legal claims on cross motions for summary judgment. ECF No. 27 at 8-9. Accordingly, the "consolidation of the motion for injunctive relief with a hearing on the merits pursuant to Fed. R. Civ. P. 65(a)(2), thereby convert[s] plaintiffs' motion to one for summary judgment." *New Lift Hosps. of Chester Cnty. LLC v. Azar*, 417 F. Supp. 3d 31, 41 (D.D.C. 2019). As the Court acknowledged, "summary judgment" is "the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." ECF No. 27 at 8; *see, e.g.*, *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1225-26 (D.C. Cir. 1993); *Texas v. EPA*, 389 F. Supp. 3d 497, 503 (S.D. Tex. 2019). Under that standard, "[t]he entire case . . . is a question of law," and the district court "sits as an appellate tribunal," *Am. Biosci.*, *Inc. v. Thompson*, 269 F.3d 1081, 1083 (D.C. Cir. 2001), "not as a court authorized to determine in a trial-type proceeding whether the [agency's action] was factually flawed," *Marshall Cnty.*, 988 F.2d at 1225-26. On the merits, therefore, the court is "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record," *Dep't of Com. v. New York*, 588 U.S. 752, 780-81 (2019), and may not rely on evidence outside of the administrative

record for purposes of litigation. *See* 5 U.S.C. § 706; *Camp v. Pitts*, 411 U.S. 138, 142 (1973). For purposes of this case, the only exception to that rule is with respect to Plaintiffs' burden to demonstrate Article III standing. Because the Court has permitted discovery and consolidated the pending motions with a trial on the merits, Plaintiffs must demonstrate all their standing to pursue their claims by a "preponderance of the evidence." *Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020).

## ARGUMENT

The Court should grant Defendants summary judgment on all claims. Plaintiffs lack Article III standing; their claims are not reviewable under the APA; and Defendants are entitled to summary judgment on the merits of each claim raised.

### I.      This Court Lacks Jurisdiction Because Plaintiffs Lack Article III Standing.

To demonstrate standing, at this stage of the proceedings, Plaintiffs need to establish by a preponderance of the evidence that they have suffered, or will imminently suffer, a concrete, non-speculative injury in fact that is fairly traceable to the actions they challenge and likely to be redressed by a favorable decision. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992); *Env't Tex. Citizen Lobby*, 968 F.3d at 367. This showing must be made "separately for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)."

In an attempt to make that showing, Texas—the only plaintiff that, by Plaintiffs' stipulation, will attempt to demonstrate standing and irreparable harm at this point, *see* ECF No. 36, at 1—asserts that it will suffer indirect economic costs from the notice, such as increased healthcare, education, and law enforcement expenditures. But that assertion fails to establish Article III standing: such indirect costs do not reflect a cognizable "injury in fact"; Texas has not established any "actual or imminent" such costs; and Texas has failed to show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S. at 560-61 (quotations omitted).

### A.  Plaintiffs Have Not Asserted a Cognizable Injury.

**1.** As the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023) (*Priorities*), makes clear, Texas's asserted downstream expenditures do not represent a cognizable injury in fact. There, as here, Texas attempted to challenge a federal policy that it asserted would cause an increase in the number of noncitizens residing in Texas, to which Texas would respond by making additional expenditures for education, healthcare, and law enforcement. *See id.* at 674. The Supreme Court rejected that theory of standing, explaining that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* at 680 n.3. When a State asserts "that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* Thus, the Court held that the plaintiffs' assertions regarding increased expenditures failed to "overcome[] the fundamental Article III problem with th[eir] lawsuit." *Id.*

Texas's theory of standing fails here for the same reason. Texas does not assert that the Notice will cause it direct injury. Instead, Texas asserts that the Notice will have downstream effects on the State. Relying on the predicate that the Notice will result in some noncitizen residents of Texas who otherwise would have departed the United States remaining in Texas, the State asserts that it will spend additional money on those noncitizens through education, healthcare, and law enforcement costs. *See* ECF No. 1 ¶¶ 184, 189, 191; ECF No. 3 at 46-47. But such indirect, incidental effects are not judicially cognizable injuries.[4]

Any contrary rule would be at odds with bedrock principles of our federal system, in which the United States and the States share sovereignty over the same territory and people. When a State

---

[4] Plaintiffs also assert injury based on alleged labor-market impacts on their citizens. *See* ECF No. 1 ¶ 203. But even if they could factually support this claim of harm, it cannot establish standing because "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," *Haaland v. Brackeen*, 599 U.S. 255, 295 (2023). Moreover, the record is replete with evidence considered by the Secretary showing that (1) a majority of noncitizens eligible under the Notice are already in the workforce, 89 Fed. Reg. at 67480 n.187; AR 2983-87, 4407-21; (2) lawful immigrant employment generally does not harm, and can even augment, citizen employment rates, AR 831-75, 876-920, 1187-1260, 2324-2966; and (3) providing lawful work authorization leads to reductions in workplace labor violations, AR 4-74, 783-800, 3004-37, 3080-81, 3095-97.

suffers a "direct injury" at the hands of the federal government, it may be able to sue the United States. *Florida v. Mellon*, 273 U.S. 12, 18 (1927). But a State cannot sue the federal government based on the indirect effect of federal policies regulating the people within the State, including when the State responds by making additional expenditures. Such policies inevitably have derivative consequences for States, but deeming cognizable a State interest in avoiding such incidental effects on the exercise of its own authority is inconsistent with the autonomy of the national and state sovereigns to act directly upon individuals "'within their respective spheres.'" *Printz v. United States*, 521 U.S. 898, 920 (1997). That is particularly true where, as here, those effects derive from the independent actions of individuals.

Texas's theory of standing has startling implications. On its view, any federal action that increases, even indirectly, the number of immigrants in a State creates standing because the State may increase its expenditures in response. Other States could use equivalent logic to claim injury from any federal action reducing their noncitizen populations, on the theory that noncitizens pay state taxes or otherwise contribute economically to the State. If such incidental financial effects satisfied Article III, every immigration-policy dispute between the federal government and the States would end up in federal court. Nor is the problem limited to immigration. Indeed, because almost every federal policy will affect the people within the States, almost every policy will indirectly affect the States themselves. But if such effects satisfy Article III, "what limits on state standing remain?" *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022). The Supreme Court has recently made clear that the kind of population-driven indirect harm argument Texas invokes cannot support standing. *See FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 392 (2024) ("*Alliance*") (rejecting the notion that "[t]eachers in border states could sue to challenge allegedly lax immigration policies that lead to overcrowded classrooms.").

In addition, Texas's theory of harm additionally runs afoul of the principles articulated in *Priorities* because it relies on challenging the Executive Branch's non-enforcement decisions: Texas's asserted indirect costs flow from the Executive's decision not to remove noncitizens who are granted parole in place. But in *Priorities*, the Supreme Court made clear that "a citizen lacks

standing to contest the policies of the prosecuting authority 'when he himself is neither prosecuted nor threatened with prosecution.'" 599 U.S. at 677–81 & n.3. The Court cited the lack of historical precedent for such suits and noted the importance of "'history and tradition'" in determining the types of cases an Article III court can entertain. *Id*. at 676. It noted that lawsuits alleging that the Executive Branch has brought an insufficient number of prosecutions "run up against the Executive's Article II authority to enforce federal law," *id*. at 678, and "courts generally lack meaningful standards for assessing the propriety of enforcement choices," *id*. at 679. The Court confirmed that the "principle of enforcement discretion over arrests and prosecutions extends to the immigration context, where the Court has stressed that the Executive's enforcement discretion implicates not only 'normal domestic law enforcement priorities' but also 'foreign-policy objectives.'" *Id*.

Texas's claim of harm here likewise implicates Article II's assignment to the Executive Branch, not the judiciary, of the "authority to decide 'how to prioritize and how aggressively to pursue legal actions against defendants who violate the law.'" *Priorities*, 599 U.S. at 678. Plaintiffs' alleged injuries are related to the presence of these noncitizens in the United States, and are not specific to whether the noncitizen is granted parole. Accordingly, regardless of how they frame their legal challenge, their claimed injury arises from discretionary decisions concerning immigration prosecution (or non-prosecution) and are squarely precluded by *Priorities*.

**2.** In response, Texas has argued that this case is distinguishable from *Priorities* because a grant of parole is not merely a non-enforcement decision but also involves a conferral of a benefit in the form of employment authorization and "protection from removal." *See* ECF No. 3 at 48. But that argument fails on all levels.

For one, Texas is incorrect on the legal effects of parole and the notice. The grant of parole does not confer immigration status or prevent removal: "DHS may initiate and pursue enforcement action pursuant to its enforcement priorities under its existing authorities notwithstanding a noncitizen's . . . grant of parole in place under this process." 89 Fed. Reg. at 67465. Nor does the notice, or KFT process, itself create new eligibility for parole. Instead, it establishes a process by

which certain noncitizens may be considered, on a case-by-case basis, for parole, under the pre-existing, discretionary statutory authority at 8 U.S.C. § 1182(d)(5)(A). Likewise, employment authorization is not automatic upon a grant of parole in place under the KFT process; instead, parolees may apply for employment authorization through a separate application process governed by long-standing regulations that Plaintiffs do not challenge here. *See* 8 C.F.R. § 274a.12(c)(11).

Regardless, Texas is also wrong about the law of standing. Just as parties lack a cognizable interest in the prosecution of somebody else, they also ordinarily lack a judicially cognizable interest in preventing the provision of government benefits to someone else. *See DaimlerChrysler Corp.*, 547 U.S. at 342-46. Moreover, the principles set forth in *Priorities* apply not only to non-enforcement decisions but also generally to other discretionary immigration enforcement decisions, like those pertaining to parole. *See Texas v. Mayorkas*, No. 2:23-CV-00024-AM, 2024 WL 3679380, at *7 (W.D. Tex. Aug. 5, 2024) (applying *Priorities* to hold that Texas lacked standing to challenge asylum and parole policies), *appeal filed*, No. 24-50717; *see also East Bay Sanctuary Covenant v. Biden*, 102 F.4th 996, 1002 (9th Cir. 2024) (finding no protectible interest sufficient to support intervention to support regulation limiting asylum). Just as plaintiff States lack standing to challenge the Executive Branch's "enforcement discretion over arrests and prosecutions" based on allegations of indirect effects on revenue and spending, 599 U.S. at 677–81 & n.3, Plaintiffs also lack a cognizable interest in the circumstances in which the Executive exercises its inherently discretionary authority to parole applicants for admission, *see Garcia-Mir v. Smith*, 766 F.2d 1478, 1484–85 (11th Cir. 1985) (recognizing "broad discretion given the [Executive Branch] in making parole decisions"); 6 U.S.C. § 202(4), (5) (charging DHS with responsibility for "establishing national immigration enforcement policies and priorities" and "administering rules . . . governing . . . parole").

Indeed, each of the reasons the Supreme Court articulated in *Priorities* that the States lacked standing to challenge immigration enforcement guidelines applies equally to DHS's exercise of its discretionary authority to implement the KFT process. First, the discretionary parole process involves no exercise of coercive power over the Plaintiffs. *See Priorities*, 599 U.S. at 678-

81. Second, the decision to implement the process implicates Article II and foreign-policy concerns. *See* 89 Fed. Reg. at 67467 (explaining that the process "responds to the requests and interests of key foreign partners and aligns with the U.S. government's broader foreign policy objectives to collaboratively manage migration and promote economic stability in countries throughout the Western Hemisphere"). Third, courts lack "meaningful standards" to assess this decision, which reflects the Executive's "complicated balancing" of "resource constraints" and factors like "public-safety and public-welfare needs," *Priorities*, 599 U.S. at 679–80; *see also Heckler v. Chaney*, 470 U.S. 821, 830–32 (1985); 89 Fed. Reg. at 67468 (explaining that the process will allow DHS and the Department of State to more efficiently use their resources to fulfill immigration duties), *id.* at 67466 (explaining how parole in place will strengthen the U.S. economy), *id.* at 67469 (explaining how parole in place furthers national security, public safety, and border security).

### B.  Plaintiffs' Claimed Injury is Too Speculative and Attenuated.

Even if such indirect effects on a State's decisions concerning the expenditure of funds could serve as a cognizable interest, Texas has failed to demonstrate the "certainly impending" increase in expenditures that would be required to establish standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (quotation omitted); *see also Alliance*, 602 U.S. at 383 (2024) ("distant (even if predictable) ripple effects . . . cannot establish Article III standing"); *El Paso Cnty. v. Trump*, 982 F.3d 332, 341 (5th Cir. 2020) ("[I]ncidental and attenuated harm is insufficient to grant a state or county standing."). And in this context, Texas must demonstrate, at minimum, an actual or imminent increase in expenditures as measured against the relevant status quo—that is, as measured against the existing levels of expenditures if the challenged process did not exist. *See Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068, at *15–17 (S.D. Tex. Mar. 8, 2024) (*CHNV*). That increase must also be traceable to the particular immigration policy at issue, not to immigration policies generally. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding no injury where state submitted evidence that "illegal immigration" increased costs but did not connect any increases to the particular challenged policy).

20

In an attempt to make that showing, Texas contends that the KFT process will actually result in a net increase in noncitizens within its borders over the course of several years, and that those noncitizens will use state public services or other benefits or cause law enforcement expenditures that result in pocketbook injuries to the State fisc. Texas's speculative and generalized claims of increases in "illegal immigration"—and its generalized theories of increased expenditures—are unsupported by facts specific to the context and ignore the contours of the particular policy they challenge.

As an initial matter, Texas cannot demonstrate that the KFT process will lead to any certainly impending increase in noncitizens in Texas. First, there is no reason to believe (and Plaintiffs provide no evidence) that the process will "encourage" or "incentivize" *new* migration to the United States. The process does not apply to any noncitizen who entered the United States after June 17, 2024, primarily encompasses noncitizens who have already been continuously physically present in the United States for at least 10 years, and generally does not cover those who have entered unlawfully since 2020.[5] *See, e.g.*, ECF No. 3 at 1; ECF No. 1 ¶¶ 3, 76, 80, 84, 86–87; 89 Fed. Reg. at 67461, 67469–72. Nor will the KFT process cause any net decrease in removals, *see* ECF No. 1 ¶ 191, because noncitizens who would otherwise be removed under this Administration's enforcement priorities will generally not be able to meet the eligibility criteria for parole in place. *See* 89 Fed. Reg. at 67465. And "DHS may initiate and pursue enforcement action pursuant to its enforcement priorities under its existing authorities notwithstanding a noncitizen's intent to request parole in place, eligibility to request parole in place, filing of a request for parole in place, or grant of parole in place under this process." *Id.*

Nor do plaintiffs present concrete evidence to support their theory that any meaningful number of noncitizens covered by the KFT process would, absent the process, voluntarily and

---

[5] Specifically, spouses of U.S. citizens who constitute a threat to border security are ineligible for parole under the KFT process. 89 Fed. Reg. at 67471. "As noted in the September 2021 [Enforcement Priorities] Guidelines, noncitizens present border security concerns if they were apprehended while attempting to enter the U.S. unlawfully or if they entered unlawfully after November 1, 2020." 89 Fed. Reg. at 67472 n.146.

imminently leave the United States. *See, e.g.*, ECF No. 1 ¶¶ 184, 189, 191. As explained, any noncitizen eligible to use the KFT process would also be eligible to request parole in place through preexisting processes even if the KFT process were vacated. In addition, even without parole in place at all, many of the covered noncitizens would likely choose to remain in the United States to pursue other forms of immigration relief or without attempting to regularize their status. *See, e.g.*, 89 Fed. Reg. at 67466 ("Without this process, hundreds of thousands of noncitizen spouses are likely to instead remain in the United States without lawful status . . . ."). Indeed, many of the noncitizens eligible for the KFT process have already been unlawfully present in the United States for decades. *See* 89 Fed. Reg. at 67465 (explaining that the median time potentially eligible noncitizen spouses have been in the United States is 23 years).[6]

Plaintiffs' own evidence underscores the gaps in their theory. As Plaintiffs' declarant acknowledges, those who are potentially eligible for parole under the KFT process are already less likely to voluntarily leave the United States because of their long-term residence in the country and their close family relationships with U.S. citizens.[7] *E.g.*, ECF No. 3-1 ¶¶ 11 (citing studies that found that indicators of "social ties in the United States" deters emigration from the United States and that having a spouse in the country of origin favors return migration), 12 ("[U]nlawful immigrants who have been in the United States for a shorter period are more likely to voluntarily

---

[6] It is true that those who are ultimately granted a discretionary provisional unlawful presence waiver may leave the United States for consular processing to obtain an immigrant visa. *See generally* 8 C.F.R. § 212.7(e). But Plaintiffs did not allege in their Complaint that they are harmed by the continued unlawful presence of those who may otherwise *temporarily* depart the United States to pursue consular processing. A noncitizen who leaves to pursue consular processing will likely return to the United States to be admitted as an LPR. Although this temporary absence is certainly prolonged from the perspective of the U.S. citizen family members and thus disruptive to family unity, Plaintiffs have introduced no evidence tending to show that a temporary absence of even a percentage of KFT-process-eligible noncitizens would have any concrete impact on their claimed public expenditures.

[7] Although the declarant's citations to studies and surveys conducted by others help illustrate the attenuated and speculative nature of Plaintiffs' claimed injury, they are inadmissible hearsay. *United States v. Noria*, 945 F.3d 847, 852 (5th Cir. 2019) (explaining rule against hearsay). Nor can his citations be considered part of an expert opinion, *see* Fed. R. Evid. 803(18), where Plaintiffs did not make timely required disclosures under Rule 26(a)(2)(B).

return to their country of origin."). And Plaintiffs' proffered evidence highlights that the likelihood of noncitizens leaving the United States depends on a variety of factors that are not tied solely to the availability of employment authorization, including their level of education, strength of ties to their country of origin, length of time in the United States, ability to meet savings goals, age, and economic conditions. *See id.* ¶¶ 5, 9, 11–12.

In short, although some of the covered noncitizens may have eventually chosen to depart the country and sacrifice family unity for the sake of pursuing LPR status, Texas has not shown that, absent the Notice, any meaningful number of noncitizens would do so imminently—and any such suggestion is necessarily speculative given the extended continuous presence required to qualify for the process in the notice. Plaintiffs' theory of injury is thus too attenuated and distant to support standing. *See Amnesty Int'l USA*, 568 U.S. at 414 & n.5; *Alliance*, 602 U.S. at 383.

Moreover, any attempt by Texas to make the required showing would run headlong into the Supreme Court's repeated admonitions that standing is more difficult to establish where, as here, "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else." *Lujan*, 504 U.S. at 562. Texas's asserted chain of causation "hinge[s] on the response" of multiple other actors, *id.*: the decisions of individual immigration officers who must determine, on a case-by-case basis, whether to grant parole to any individual covered by the notice; the decisions of individual noncitizens to remain in or depart the country; the decisions of those noncitizens to engage in activities that may result in Texas's expending funds; and the decision of Texas itself to make those expenditures. That chain of causation is far too attenuated to support standing. *See Alliance*, 602 U.S. at 383 (holding standing "cannot rely on speculation about the unfettered choices made by independent actors not before the courts.") (internal quotation omitted).

Even assuming, however, that Plaintiffs could show that *some* meaningful number of KFT process-eligible noncitizens would imminently leave the United States absent the KFT process, Plaintiffs' theory that the process will lead to increased expenditures suffers from multiple additional gaps in evidence.

For one, Texas has no evidence linking this particular population of noncitizens to the particular law enforcement or public service expenditures Texas claims. To the contrary, the declarations alleging harm produced by Texas do not address increased costs related to noncitizens eligible for parole through the KFT process. Indeed, many are from cases challenging wholly different immigration processes. *See, e.g.,* Exhibit B (Declaration of Susan Bricker concerning health and human services costs in case challenging CHNV parole process); Exhibit C (Declaration of James Terry concerning education costs in a case challenging DACA); Exhibit D (Declaration of Lisa Kalakanis concerning healthcare and other costs in case challenging reduction in funding for border wall). And Texas has no evidence that noncitizens who are eligible to be considered for parole in place have contributed to particular claimed expenditures in the past. *See* Ex. A at 3 (responding that Texas does not track whether KFT-process-eligible noncitizens have committed crimes or have received healthcare and medical services for which the costs were paid by the State and not reimbursed).

And the specific costs that Texas claims it will incur suffer from even additional hurdles. For example, Texas suggests that the process will lead to increased law enforcement expenditures. But those with a criminal history are generally either ineligible or presumptively ineligible for parole under the KFT process. *See* 89 Fed. Reg. at 67471; *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015) (even if a court were to "assume" that a policy change "increase[s] unlawful immigration," it "cannot further infer that [it] increase[s] crime"); *Arizona v. Biden*, 40 F.4th 375, 387 (6th Cir. 2022) (rejecting theory of injury grounded in rising crime rates because the injury "hinge[s] on third parties committing more crimes"). Indeed, the record demonstrates that when granted parole, noncitizens are more likely to report crimes to police, permitting more effective law enforcement responses to crime, and thereby contribute to and increase public safety. 89 Fed. Reg. at 67,469 n.130; DHS Administrative Record ("AR") at 449-80. Further, granting noncitizens lawful status based on familial relationships lowers the incidence of domestic violence crimes targeting women. AR 1331-1341.

And any claimed increase in future education costs for KFT-process-eligible stepchildren

of U.S. citizens is likewise speculative and attenuated. Presumably, even *if* such stepchildren were to leave the United States if the KFT process did not exist, they would not leave the country while still of school age. *Cf.* ECF No. 3-1, ¶ 9 (citing research that young immigrants are less likely to return to their country of origin). In other words, the availability of the KFT process should have no impact on State public education expenditures, or any impact is highly speculative. Further, Texas's evidence concerning education funding is not specific to the noncitizen population at issue here, *see* ECF No. 3-2, and Texas has not shown that a temporary or even permanent absence of a particular number of children from its thousand-plus school districts will reduce the State's portion of public education costs.

Similarly, although Texas complains that, in Texas, unlawfully present noncitizens pay resident tuition—rather than higher nonresident tuition—at State universities, ECF No. 3 at 46, that cannot support standing. That is a choice Texas itself has made. *See id.* (citing 19 Tex. Admin. Code § 21.24(a), (d)(4)). Moreover, Texas does not explain how the Notice will result in more students paying resident tuition, rather than out-of-state tuition. Even assuming the (speculative) premise that, absent the Notice, some resident noncitizens who are enrolled in Texas universities would depart the country, the presumptive outcome of such departures is that the noncitizens would cease to be enrolled in Texas universities. It is not that the noncitizens would continue to be enrolled in—and thus pay higher, nonresident tuition at—a university in a country that, by hypothesis, they have departed.

Plaintiffs' next theory of injury is that noncitizens granted parole via the KFT process will become eligible for certain public benefits that they could not otherwise access. *See* ECF No. 1 ¶¶ 75, 186. But, as Plaintiffs themselves acknowledge, noncitizens who are granted parole are generally ineligible for at least five years after being granted parole for the means-tested public benefits Plaintiffs cite as costs. *See* 89 Fed. Reg. at 67478 (explaining that SNAP, Medicaid, TANF, and CHIP programs generally require five years in "qualified alien" status); *see* ECF No. 1 ¶ 75 & n.11. And some of these benefits are not available at all in Texas. 89 Fed. Reg. at 67478 (explaining that Texas denies access to TANF to some "qualified aliens" even after expiration of

25

the five-year period). Thus, any injury from noncitizens granted parole and qualifying for benefits in five years and potentially seeking those means-tested public benefits is not "imminent" and may be superseded by other events. *See Lujan*, 504 U.S. at 560. Second, to the extent there are any costs for benefits provided to paroled noncitizens, those costs are often attributable to the States' own choices concerning eligibility for participation in certain benefit programs. *See Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam) (rejecting standing where "injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures"). Third, Texas has not presented specific evidence that tends to show an overall increase in benefit applications is a likely effect as to the particular population eligible to obtain parole through the KFT process. Fourth, Texas has not shown that, even assuming those who are ultimately granted parole under the process will avail themselves of particular benefits they could not have accessed before, this would cause a direct pocketbook injury to Texas that would not be reimbursed and covered by general program administration costs.

Finally, any benefit expenditures as to some noncitizens are outweighed by the likely decrease in reliance on those same benefits from those who obtain employment authorization. *See* 89 Fed. Reg. at 67478 ("Upon receipt of employment authorizations and gainful employment, spouses and stepchildren of U.S. citizens may no longer need or qualify for public benefits."); 67467 n. 108 (parolees uptake of public benefits will be curtailed by access to lawful employment); AR 285-92, 2172-79 (same). In determining pocketbook injury, courts must at a minimum consider, "offsetting benefits that are of the same type and arise from the same transaction as the costs." *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015); *see  Henderson v. Stalder*, 287 F.3d 374, 379–80 (5th Cir. 2002) (plaintiffs lacked standing based on the cost of producing specialized license plates, where that cost was offset by payments made by members of the public to cover those costs). Accordingly, any future offsetting reduction in use of a particular public benefit must be considered, but Plaintiffs' evidence merely recounts past expenditures and includes no projections that account for such offsets. For these reasons, the States' theory of injury based on benefits afforded to those who are granted parole likewise fails.

The Plaintiffs thus have not shown, and likely cannot show, that there will be an increase in State healthcare, education, or law enforcement expenditures even as an indirect, downstream effect of the challenged KFT process. At a minimum, their theory of injury is too attenuated to support standing. And contrary to their assertion, Plaintiffs cannot use the concept of "special solicitude" to circumvent the requirements to show an actual, non-speculative likelihood of injury as a result of the challenged process. *See* ECF No. 1 ¶¶ 192–207. The Supreme Court in *Priorities* rejected States' reliance on special solicitude where they challenged an immigration policy under the general provision of APA—just as the Plaintiff States do here—rather than the denial of a statutorily authorized petition for rulemaking as in *Massachusetts v. EPA*, 549 U.S. 497 (2007). *See Priorities*, 599 U.S. at 685 n.6. Thus, the Supreme Court has rejected the Fifth Circuit's view that a relaxed inquiry into causation and the immediacy of injury is warranted whenever States assert that they are aggrieved by final agency action within the meaning of the APA, as in *Texas v. United States (DACA)*, 50 F.4th 498, 514 (5th Cir. 2022). To the contrary, States are subject to additional "constraints" on standing. *See Priorities*, 599 U.S. at 680 n.3, 685 n.6; *see also id.* at 689 (Gorsuch, J., concurring) (noting lower courts should leave the concept of "special solicitude" "on the shelf"). Further, Plaintiffs do not even have a plausible procedural right because they cannot state a procedural or substantive APA claim. *See infra* §§ I.C, II. But regardless of the applicability of the doctrine of special solicitude, the alleged impacts of the KFT process are too speculative and remote to support standing. *See DACA*, 50 F.4th at 514.

As Plaintiffs thus cannot establish injury in fact, there is no subject-matter jurisdiction over their claims, and any relief would be improper.

### C.  Plaintiffs' Injuries Are Not Redressable.

Even if Plaintiffs could clearly show non-speculative, cognizable injury traceable to the KFT process, their claims are not redressable. First, Plaintiffs contend they incur costs to provide services to noncitizens eligible for consideration under the KFT process currently present in the United States, and they concede that reducing these costs requires that such noncitizens be detained or removed rather than be paroled. *See, e.g.*, ECF 3 at 48 ("Relief against the PIP Program will

27

redress Plaintiffs' injuries. Aliens currently subject to the PIP Program would be removable if the PIP Program were vacated[.]"). But DHS has limited enforcement resources and is not likely to detain or remove noncitizens who are not priorities for removal. And the INA does not authorize the Court to order DHS to detain or remove any noncitizen. Section 1252(f)(1) provides that, except in a case brought by an "an individual [noncitizen]" in removal proceedings, "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of the provisions of part IV of this subchapter [of the INA]." 8 U.S.C. § 1252(f)(1). Any injunctive relief that "enjoins or restrains" DHS's use of covered provisions—including any court order that directs DHS as to how it should implement the covered provisions or which or how many noncitizens it should or should not admit, detain, or remove, 8 U.S.C. §§ 1225, 1226, 1229a, 1231—is barred by 8 U.S.C. § 1252(f)(1). *See Garland v. Aleman Gonzalez*, 596 U.S. 543, 549-50 (2022); *Biden v. Texas*, 597 U.S. 785, 797-98 (2022).

Second, any court order enjoining the KFT process cannot redress Plaintiffs' injuries because DHS officers possess the same authority to consider parole requests (including parole in place) under the parole statute regardless of the KFT process. *See Priorities*, 143 S. Ct. at 1978-79 (Gorsuch, J., concurring) (redressability cannot be established where a "judicial decree rendering" guidance "a nullity does nothing to change the fact that federal officials possess the same underlying" discretion without the guidance); *see* https://www.uscis.gov/humanitarian/humanitarian_parole, Who Can Apply for Parole? (explaining that any applicant for admission may apply for parole, including parole in place). An order enjoining KFT, regardless of the order's reasoning, does not prevent USCIS from exercising its parole authorities under section 1182(d)(5)(A) or the harm Plaintiffs allege is caused by the exercise of such statutory authority. Therefore, redressability is lacking. *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) ("It is a federal court's judgment, not its opinion, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability.").

## II.    Plaintiffs Cannot Obtain APA Review of Their Claims.

Plaintiffs' APA claims are unreviewable. Plaintiffs are not within the zone of interests of section 1182(d)(5)(A) or the Paperwork Reduction Act, impermissibly challenge action committed to agency discretion by law, fail to properly challenge a final agency action, and assert claims that are subject to jurisdiction-stripping provisions of the INA.

Zone of Interests. A plaintiff has no right of review if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987). Most of Plaintiffs' APA claims challenge the agency's KFT process. But nothing in the text, structure, or purpose of either section 1182(d)(5)(A) or the INA generally evinces a congressional concern with States' attenuated downstream financial costs from the enforcement or implementation of immigration policies. *See Fed'n for Am. Immigration Reform, Inc.  v. Reno*, 93 F.3d 897, 902 (D.C. Cir. 1996). To the contrary, the INA throughout reflects the principle that immigration enforcement is exclusively the province of the federal government and the Executive. *Supra* Background & §§ II.A, II.B; *infra* § IV.A. And that conclusion is reinforced by the general rule that third parties have no cognizable legal interest in compelling the enforcement of laws against others, *see Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). In light of those principles, it is unsurprising that under the INA only the noncitizens against whom the immigration laws are being enforced may challenge application of those laws—and only in certain circumstances and often only through their removal proceedings. *See, e.g.*, 8 U.S.C. §§ 1226(e), 1252(a)(2)(B)(ii), 1252(a)(5), (b)(9), (g); *see also id.* §§ 1226a(b)(1), 1229c(f), 1231(h), 1252(a)(2)(A), (a)(2)(C), (b)(4)(D), (b)(9), (d), (f), (g). A detailed review scheme that allows some parties, but not others, to challenge specific executive action is "strong evidence that Congress intended to preclude [other parties] from obtaining judicial review." *United States v. Fausto*, 484 U.S. 439, 448 (1988).

Committed to Agency Discretion. The APA precludes review of agency action that is committed to agency discretion. *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993); 5 U.S.C. § 701(a)(2). Section 1182(d)(5)(A) provides that the Secretary "may" grant parole and thus commits the

decision to grant or deny to his discretion, 8 U.S.C. § 1182(d)(5)(A); *see Jama v. ICE*, 543 U.S. 335, 346 (2005) ("may" "connotes discretion"). Indeed, the statute confers broad discretion on the Secretary over the entirety of the parole process, from determining "in his discretion" whether to grant parole, setting "such conditions as he may prescribe," and determining when "in [his] opinion" the purpose for the parole has been satisfied. *Id.* Beyond the statute, the Notice's implementation of the Secretary's long-established parole authority as part of the Executive's comprehensive diplomatic efforts to address and manage migration in the Western Hemisphere involves the "complicated balancing of a number of factors which are peculiarly within its expertise." *Heckler*, 470 U.S. at 831. Further, the Notice identifies a framework of common factors and priorities, such as preserving family unity and preventing extreme hardship from extended separation, increasing immigrant accountability and tax contributions, and managing migration that *may* support findings of significant public benefit for parole in place requests upon individual review, but the Notice requires no particular result in any case. *See* 89 Fed. Reg. at 67465 ("Through a case-by-case assessment, USCIS will consider whether parole for each requestor individually will provide a significant public benefit[.]"). The Court thus lacks any "meaningful standard against which to judge the agency's exercise of discretion." *Lincoln*, 508 U.S. at 191.

Final Agency Action. Plaintiffs also fail to challenge "final" agency action, 5 U.S.C. § 704, that is, action that "consummate[es] the agency's decision making process" and determines "rights or obligations" or produces "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 178 (1997). The Notice does not determine anyone's rights or obligations or produce "legal consequences." *Id.*; *see* 89 Fed. Reg. 67474. The Notice informs the public of the agency's current approach to implementing its discretionary parole authority with respect to certain unlawfully present spouses and stepchildren of U.S. citizens who meet the pre-existing statutory standards for parole. *See* 89 Fed. Reg. 67474. But it is the statute—section 1182(d)(5)(A)—not the Notice, that would create rights or obligations, if any, or produce any legal consequences. The Notice itself does not create any rights to parole for noncitizen spouses and stepchildren of U.S. citizens, obligate DHS to grant parole, or otherwise alter the legal consequences attendant to any noncitizen's consideration for

parole under section 1182(d)(5)(A). *See Bennett*, 520 U.S. at 178. Any grant of parole in place to a spouse or stepchild of a U.S. citizen under this process is an individualized decision made by USCIS on a case-by-case basis if the noncitizen has demonstrated, as required in the statute, that they are an applicant for admission, that there are urgent humanitarian reasons or significant public benefit, and that they merit a favorable exercise of discretion. *See* 89 Fed. Reg. 67465. And the Notice leaves USCIS with discretion to deny parole in place requests when the agency deems it appropriate. *Id.* The Notice is thus unlike the policies at issue in *Texas v. Biden*, 20 F.4th 928, 948 (2021) ("*MPP*"), and *Texas*, 809 F.3d at 163 n.82 ("*DAPA*"), as the Fifth Circuit understood MPP's termination to have a blanket effect and USCIS officers not to have discretion to grant or deny deferred action. Here, however, USCIS retains discretion to grant or deny parole in place requests under the KFT process on an individual basis under the Notice, based entirely on the terms of the statute. The Notice itself leaves the agency "the discretion and the authority to change its position in any specific case and does not seek to impose or elaborate or interpret a legal norm*,*" that is, the specific terms of the parole statute, and thus is not "final agency action." *Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019).

No Statutory Jurisdiction. Finally, 8 U.S.C. § 1252(a)(2)(B)(ii) precludes review of Plaintiffs' claims. *See* 5 U.S.C. § 701(a)(1). Congress provided that "no court shall have jurisdiction to review . . . any other decision or action … the authority for which is specified … to be in the discretion of the . . . Secretary." 8 U.S.C. § 1252(a)(2)(B)(ii). Parole under section 1182(d)(5)(A) is a "decision or action" specified to be in the "discretion" of the Secretary and thus is subject to the jurisdiction-stripping effect of section 1252(a)(2)(B)(ii). *See id.* § 1182(d)(5)(A). This bar applies to programmatic-level challenges to any parole process, including parole in place. In *Patel v. Garland*, 596 U.S. 328, 338 (2022), the Supreme Court held that section 1252(a)(2)(B)(i), which bars jurisdiction to review "any judgment regarding the granting of relief" under certain INA provisions, precludes review of "judgments of whatever kind" covered by the statute, and "not just discretionary judgments or the last-in-time judgment," and "encompasses not just the granting of relief but also any judgment relating to the granting of relief." Since

sections 1252(a)(2)(B)(i) and (ii) cover decisions "of a like kind," *Kucana v. Holder,* 558 U.S. 233, 247 (2010), the Notice's decision to use parole in place in this context—a "judgment relating to" the Secretary's discretionary decision to grant parole under section 1182(d)(5)(A)—is shielded from review by section 1252(a)(2)(B)(ii).

### III.    Plaintiffs Cannot Succeed on the Merits of Any of Their Claims.

#### A.  The Notice is Not Contrary to Law.

Section 1182(d)(5)(A) provides that the Secretary of Homeland Security may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). Further, the INA expressly grants the Secretary authority to "establish[] and administer[] rules" governing "parole" of noncitizens. 6 U.S.C. § 202(4). The Notice comports with all requirements of section 1182(d)(5)(A).

Authority for Parole in Place. Granting parole in place is consistent with the INA and longstanding DHS practice. The Notice provides that parole in place may be granted only to noncitizen spouses and stepchildren who "remain applicants for admission." 89 Fed. Reg. at 67461. Any noncitizen "present in the United States who has not been admitted" is an "applicant for admission." 8 U.S.C. § 1225(a)(1). Unadmitted noncitizens, such as the unlawfully present family members at issue here, "already physically present in the United States … may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) by virtue of their status as applicants for admission." *Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011); *accord Ortega-Cervantes*, 501 F.3d at 1118 (stating "[w]e see nothing [in the INA] that would preclude the government from paroling . . . into the United States under § 1182(d)(5)(A)" noncitizens "who are currently present in the United States but who were not inspected upon arrival at a port of entry"); *Akhtar v. Dir. USCIS Mt. Laurel Field Off.*, No. 23-1577, 2024 WL 1427634, at *3 (3d Cir. Apr. 3, 2024) (recognizing DHS's authority to parole under section 1182(d)(5)(A) unadmitted

noncitizens encountered already inside the United States); INS General Counsel Op., 1998 WL 1806685. Because the KFT parole process is limited to noncitizen spouses and stepchildren of U.S. citizens "who are present in the United States without admission or parole," 89 Fed. Reg. 67464, it by definition covers only "applicants for admission" who are eligible for parole under the terms of the parole statute. *See* 8 U.S.C. § 1182(d)(5)(A) (parole eligible to any noncitizen "applying for admission" whose case will be dealt with "in the same manner as that of any other applicant for admission to the United States").

Moreover, the KFT process is consistent with DHS's longstanding interpretation of the parole statute to permit parole in place in similar circumstances. *See supra* Background; 1998 INS General Counsel Op.;[8] *Ortega-Cervantes*, 501 F.3d at 1118; *see also* 22 U.S.C. § 7105(c)(3) (authorizing DHS to facilitate "continued presence" in U.S. of trafficking victims pending

---

[8] That this has been the Government's consistent interpretation of the parole statute since its most recent amendment in 1996 lends considerable force. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2258, 2262 (2024) (instructing that "the longstanding practice of the government— like any other interpretive aid—can inform [a court's] determination of 'what the law is'" and that "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning"); *see also* 6 U.S.C. § 522 (providing that nothing in the transfer of certain immigration authorities from the Attorney General to the Secretary of Homeland Security, including parole authority under 8 U.S.C. § 1182(d)(5), "shall be construed to limit judicial deference to regulations, adjudications, interpretations, orders, decisions, judgments, or any other actions of the Secretary of Homeland Security or the Attorney General"). Moreover, because the Notice is an inextricable piece of the United States' foreign policy concerning managing migration in the Western Hemisphere, the agency's judgment is independently entitled to deference outside the context of *Chevron. See INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (recognizing, separately from *Chevron*, that "judicial deference to the Executive Branch is especially appropriate in the immigration context where officials exercise especially sensitive political functions that implicate questions of foreign relations") (internal quotation omitted); *Rana v. Jenkins*, 113 F.4th 1058, 1066 (9th Cir. 2024) ("[B]ecause the logic underpinning *Chevron* deference is entirely distinct from the logic underpinning a deference to the Executive in matters of foreign affairs, *Loper Bright* has no effect on our decision here."). Further, DHS's interpretation of the statute to permit parole in place for these reasons is entitled to *Skidmore* deference because the Notice carefully tracks the terms of the statute, the agency provides thorough rationale and supporting evidence and a reasonable basis for its conclusion, and the Notice is consistent with both prior agency interpretations of the parole authority and Congressional and judicial pronouncements on parole in place, as explained. *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

investigations, civil actions, etc.); 28 C.F.R. § 1100.35(b) (regulation recognizing parole as a form of "continued presence"). Congress has recognized and reaffirmed the use of parole in place under section 1182(d)(5)(A). NDAA, Pub. L. No. 116-92, § 1758 (8 U.S.C. § 1182 note). In 2013, USCIS issued policy guidance on the parole in place process for family members of certain current or former members of the U.S. Armed Forces in order permit them to meet the "inspected and admitted or paroled" requirement for adjustment of status and thereby promote family unity. USCIS Policy Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces* (Nov. 15, 2013), AR 4328-36. In November 2014, the Secretary directed USCIS to expand on these policies to include family members of U.S. citizens and LPRs who seek to enlist in the U.S. Armed Forces. Memorandum from Jeh Johnson, Secretary, U.S. Dep't of Homeland Security, *Families of U.S. Armed Forces Members and Enlistees* (Nov. 20, 2014); *see also* AR 3100-08, 3347-3532, 4290-92, 4337-47, 4686. In 2019, Congress, through the NDAA, explicitly "reaffirmed" "the importance of the Secretary's parole in place authority." NDAA § 1758(b)(3). This legislation emphasized that the use of "parole in place reinforces the objective of military family unity," and directed DHS to "consider, on a case-by-case basis, whether granting the [parole in place] request would enable military family unity that would constitute a significant public benefit." *Id.* § 1758(a), (b); *see also* 89 Fed. Reg. at 67461 n.25. In 2019, Congress also provided a new long-term immigration status specifically for certain noncitizens in the Commonwealth of the Northern Mariana Islands who had been paroled in place by USCIS for various reasons, including family unity, and authorized continued parole in place for those noncitizens pending adjudication of their applications for the new status. Northern Mariana Islands Long-Term Legal Residents Relief Act, Pub. L. 116-24, § 2 (2019) (codified at 48 U.S.C. § 1806(e)(6)). These enactments demonstrate Congress's understanding that parole in place represents a proper use of the section 1182(d)(5)(A) authority and serves significant public benefits including family unity. *See Bob Jones Univ. v. United States,* 461 U.S. 574, 599 (1983) (Congress's awareness of widely known agency action "when enacting other and related legislation make out an unusually strong case of legislative acquiescence"); *Barnhart v. Walton,*

535 U.S. 212, 220 (2002) ("These circumstances provide further evidence—if more is needed—that Congress intended the Agency's interpretation, or at least understood the interpretation as statutorily permissible.").

Significant public benefit. Parole grants are limited to situations where parole serves an "urgent humanitarian reason" or a "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The Secretary determined that, as appropriate to individual cases, a grant of parole in place to an eligible spouse or stepchild of a U.S. citizen who meets the criteria outlined in the Notice, does not represent a national security or public safety threat, and otherwise warrants a favorable exercise of discretion, will advance a significant public benefit for the reasons listed below. 89 Fed. Reg. at 67465-69. Through a case-by-case assessment of the individualized information identified above, DHS will determine whether parole in place for each requestor is supported by a demonstration of urgent humanitarian reasons or significant public benefit, as well as a showing that a favorable exercise of discretion is warranted. *Id.* Through the Notice, the Secretary has determined that a grant of parole to eligible noncitizen spouses and stepchildren of U.S. citizens under the KFT process can:

- Promote family unity and stability by allowing noncitizen family members to obtain lawful status without separating them from their U.S. citizen spouses and, in many cases, their U.S. citizen children, which existing legal options for obtaining lawful status otherwise would often require. 89 Fed. Reg. at 67466.

- Support the U.S. economy by allowing the noncitizen to apply for and, if eligible, obtain employment authorization. This would enable them to obtain lawful employment, reduce labor exploitation, increase economic productivity, and generate greater income tax revenue, among other benefits. *Id.*

- Advance diplomatic relationships and foreign policy objectives by obtaining assistance from foreign partners on key initiatives such as disrupting human smuggling, trafficking, and criminal networks, in return for offering regularization opportunities for those countries' nationals residing in the United States. *Id.* at 67467.

- Preserve administrative resources by reducing the backlog of pending adjudications of I-601A, Application for Provisional Unlawful Presence Waiver under 8 U.S.C. § 1182(a)(9)(B)(v), a lengthier, more complex and more resource-intensive process than the parallel use of parole in place. *Id.* at 67468.

- Promote national security, public safety, and border security by helping DHS identify noncitizens currently living unlawfully and unknown in the United States and potentially identify national security or public safety threats through biometrics, and background and security checks. *Id.* at 67469.

Plaintiffs contend that the public benefits outlined in the Notice are not "significant." ECF 3 at 9-13. However, as Plaintiffs concede, *id.*, Congress chose not to define "significant public benefit" in section 1182(d)(5)(A). Instead, Congress expressly conferred discretion on DHS to interpret and implement that term. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-425 (1999) (relying on 8 U.S.C. § 1103(a)(1) and noting the Secretary is with charged "administration and enforcement" of all "laws relating to the immigration and naturalization of aliens"). The Supreme Court's rejection of the *Chevron* doctrine, which concerned an implicit delegation of interpretive authority to the agency through an ambiguous statute, in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2265 (2024), does not alter the independent principle that Congress can expressly delegate such authority through explicit conferral of discretion, *id.* at 2265, 2268 ("That is not to say that Congress cannot or does not confer discretionary authority on agencies," in which case the court's role is simply to "police the outer statutory bounds of those delegations[.]"); *Mayfield v. U.S. Dep't of Labor*, --- F.4th ---, 2024 WL 4142760, at *4 (5th Cir. Sept. 11, 2024) ("[B]ecause there is an uncontroverted, explicit delegation of authority, the question [under *Loper Bright*] is whether the Rule is within the outer boundaries of that delegation."). Congress has done so in section 1182(d)(5)(A). *Jean v. Nelson*, 727 F.2d 957, 977 (11th Cir. 1984) ("Congress has delegated remarkably broad discretion to executive officials under the INA, and these grants of statutory authority are particularly sweeping in the context of parole" and "it is not the court's

36

proper role … to substitute its own policy preferences for those of the official vested by law with discretionary authority to act on requests for parole."), *aff'd*, 472 U.S. 846 (1985).

Nevertheless, Plaintiffs challenge the Secretary's determination of "significant public benefit" here, contending that "significant" means, among other synonyms, "[h]aving or likely to have a major effect; important," and also "[f]airly large in amount or quantity." ECF 3 at 10 (quoting "Significant," American Heritage Dictionary (5th ed. 2018)). However, Plaintiffs fail to—and cannot reasonably—argue the Notice's cited reasons for finding a significant public benefit are not likely to "have a major effect" or "important" impact that is "large in amount or quantity." *See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D.N.M. 2020) ("vague standard" of "significant public benefit" in § 1182(d)(5)(A) "conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers or allowing an individual to carry on their employment in the United States").

Plaintiffs suggest that the benefits of paroling eligible noncitizen spouses and stepchildren of U.S. citizens outlined in the Notice do not qualify under section 1182(d)(5)(A) as a "significant public benefit" because they are not the medical or legal-proceeding reasons cited as significant public benefits in other cases. ECF 3 at 10-13. However, none of the authorities Plaintiffs cite indicates that these two reasons for parole are exclusive of any others, *see id.*, and Plaintiffs fail to acknowledge cases recognizing other "significant public benefit" justifications for parole, *see, e.g.*, *New Mexico*, 450 F. Supp. 3d at 1174 n.5; *cf. Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (recognizing in a Commerce Clause case the "significant public interests" of promoting "public health and the allocation of related costs").

The history of the current version of section 1182(d)(5)(A) confirms that Congress considered and rejected limiting the meaning of "significant public benefit" to a few circumstances including the medical and legal-proceeding examples given. In fact, in 1996, when Congress drafted the parole statute and created these terms, it explicitly removed language from the original bill that would have limited parole to a defined set of situations, notably including a "medical emergency" or if the noncitizen "has assisted the United States Government in a matter, such as a

criminal investigation, espionage, or other similar law enforcement activity." *Compare* H.R. 2202, Immigration in the National Interest Act of 1995, § 524 (Aug. 4, 1995) *with* 8 U.S.C. § 1182(d)(5)(A). Congress eliminated these restrictions from the bill after concerns were raised about the importance of giving the Secretary "flexibility to deal with compelling immigration situations." H.R. Rep. No. 104-469, pt. 1, https://www.govinfo.gov/content/pkg/CRPT-104hrpt469/pdf/CRPT-104hrpt469-pt1.pdf. That Congress explicitly rejected the House's proposal of limiting parole to the narrow set of circumstances advanced by Plaintiffs here in favor of the broad and flexible version the Senate eventually adopted weighs heavily against adopting Plaintiffs' overly restrictive interpretation of section 1182(d)(5). *See, e.g.*, *Hamdan v. Rumsfeld,* 548 U.S. 557, 579-80 (2006) ("Congress' rejection of the very language that would have achieved the result the Government urges here weighs heavily against the Government's interpretation.").

Finally, Plaintiffs fail to explain how granting parole in place for the purpose of preserving family unity in conjunction with other factors can violate section 1182(d)(5)(A) when Congress has expressly reaffirmed the importance of the Secretary's parole in place authority and ratified DHS's use of it in the context of noncitizen family members of U.S. veterans. *See* NDAA, Pub. L. 116-92, § 1758(a), (b) (emphasizing that the use of "parole in place reinforces the objective of military family unity," and directing DHS to "consider, on a case-by-case basis, whether granting the [parole in place] request would enable military family unity that would constitute a significant public benefit"). It also ignores Congress's approval of the use of parole as a basis for eligibility for adjustment of status for CNMI residents for the preservation of family unity. *See* Northern Mariana Islands Long-Term Legal Residents Relief Act, Pub. L. No. 116-24, § 2 (2019) (48 U.S.C. § 1806(e)(6)). Congress's recognition that the objective of family unity constitutes a "significant public benefit," NDAA § 1758(b), necessarily extends to the other "significant public benefits" recognized by the Secretary here. *See Clark v. Martinez*, 543 U.S. 371, 378 (2005) ("To give these same words a different meaning for each category would be to invent a statute rather than interpret one."). Contrary to the Court's assertion, ECF 27 at 4, the benefits outlined in the Notice—promoting family unity, economic productivity, efficient governmental resource allocation, and

38

public safety and security—benefit the public in addition to the parolee.  *See* 89 Fed. Reg. at 67465-69.

Case by case. Parole in place will be considered only "on a case-by-case basis in the exercise of discretion" and will be granted only upon a requestor's showing of urgent humanitarian reasons or significant public benefit. *Compare* 89 Fed. Reg. at 67461 *with* 8 U.S.C. § 1182(d)(5)(A). DHS will consider on a case-by-case basis: criminal history; any previous removal proceedings and removal orders; the results of background checks, which include national security and public safety vetting; positive and adverse factors presented by the requestor; and any other relevant information available to or requested by DHS. 89 Fed. Reg. at 67465. "Even if a requestor establishes that they have met all of the criteria for eligibility, USCIS will examine the totality of the circumstances in the individual case to determine whether the requestor merits a grant of parole in place as a matter of discretion for significant public benefit or urgent humanitarian reasons." *Id.* Thus, in addition to satisfying all other discretionary factors, applicants must demonstrate an urgent humanitarian reason or significant public benefit applies in their individual case. *Id.* This is consistent with the Secretary's approach to the case-by-case requirement for decades. *See* Mem. from Bo Cooper, General Counsel, INS to Jeffrey L.  Weiss, Director, Office of lnt'l Affairs, INS, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee Status* (June 15, 2001), AR 4675-79; *see also Loper Bright*, 144 S. Ct. at 2262 (underscoring that "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning").

Plaintiffs argue that the Notice violates the "case by case" consideration requirement based on Plaintiffs' speculation that 1.3 million noncitizens will receive parole through the procedures outlined by the Notice. The agency itself estimates approximately 550,000 noncitizens may satisfy the time-in-residence and family relationship criteria, which is larger than the number that will apply and who will merit a favorable exercise of discretion. 89 Fed. Reg. at 67466. Regardless, the number of individuals who may benefit has no bearing on whether the agency is conducting

an individualized inquiry and making parole determinations on a case-by-case basis. Unlike other provisions in the INA, *e.g.*, 8 U.S.C. §§ 1157(a), 1184(p)(2), 1151(c)(1), 1152, 1153(a)(1)-(4), the current parole statute places no numerical limitation on parole grants. *See* 89 Fed. Reg. at 67488 n. 246 (describing how legacy INS granted parole to tens of millions of foreign visitors in a six-month span in 2000). The statute does not preclude the Secretary from establishing presumptions regarding statutory terms, which DHS has done in long-standing regulations. *See* 8 C.F.R. § 212.5(b) (establishing presumptions that parole of arriving noncitizens will generally serve an urgent humanitarian reason or significant public benefit where those noncitizens have serious medical conditions, are pregnant, are minors, are witnesses in proceedings, or simply when their "continued detention is not in the public interest"); *cf. Reno v. Flores*, 507 U.S. 292, 313-14 (1993) (holding that a statute requiring "individualized determination[s]" does not prevent immigration authorities from using "reasonable presumptions and generic rules"). That a significant number of noncitizens may qualify for parole does not mean it is not being granted only on a case-by-case basis in accordance with the statute. Indeed, as of June 30, 2024, 61,000 noncitizens have received parole under the military parole-in-place process that Congress legislatively affirmed and directed DHS to continue to implement. 89 Fed. Reg. at 67464 & n.63. Tens of thousands of others have received parole (also as a basis for adjustment of status) through other family-unity and reunification parole initiatives Congress has recognized and aided. *See id.* at 67464 & nn. 60, 65-67 (discussing CNMI parole in place and Cuban, Haitian, and Filipino World War II veterans parole); 48 U.S.C. § 1806(e)(6); *see also, e.g.*, Pub. L. No. 117-128 (2022) (providing resettlement assistance and other benefits to Ukrainian parolees); Pub. L. No. 117-43 (2021) (providing public benefits and expeditious asylum consideration for Afghan parolees); Pub. L. 104-208, § 646 (1996) (providing for adjustment of status for certain Polish and Hungarian parolees). Thus, the continued use of parole in this way does not "circumvent[]," but rather reflects, "congressionally established immigration policy." *See* ECF No. 3 at 13.

   Plaintiffs next argue that the "Case-by-Case Consideration for Parole" in the Notice contains only 63 words and therefore sends an "obvious" "message to DHS officers" that "they

are expected to rubber-stamp all qualifying applications." ECF No. 3 at 14. Even if this were a reasonable inference, which it is not, it is based on an inaccurate reading of the Notice, because in other sections, the Notice discusses the individualized inquiry and factors in greater detail. 89 Fed. Reg. at 67465 (explaining the several factors "USCIS will consider on a case-by-case basis"); *id.* at 67467 (explaining that requestors will have to "[s]ubmit biometrics, undergo required background checks and national security, public safety, and border security vetting, and be found not to pose a threat to national security or public safety"); *id.* at 67472 (providing a lengthy but still "non-exhaustive" list of the various positive and negative individualized factors DHS will consider in "examin[ing] the totality of the circumstances in the individual case").

Finally, Plaintiffs' reliance on the alleged "lack of information that Defendants collect about each alien" is unsupported and meritless. ECF No. 3 at 14-15. USCIS officers are directed to collect and consider significant evidence from each applicant, including "biometrics," "background checks and national security, public safety, and border security vetting," which will help DHS determine if any present a criminal threat. 89 Fed. Reg. at 67467. This is in addition to evidence included by noncitizens in their filings or requested by USCIS, such as personal statements, evidence of the requestor's continuous physical presence and relationships in the United States, and any other information they provide to demonstrate that they meet criteria set forth in the Notice and merit a favorable exercise of discretion. *Id.*

Congress expressly required the agency to make particularized findings for a different type of parole in section 1182(d)(5)(B). Section 1182(d)(5)(B) governs "parole into the United States [of] an alien who is a refugee" and includes additional requirements that Congress did not include in the adjacent provision at section 1182(d)(5)(A), such as the requirement for a "determin[ation] that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled." (emphasis added). Congress therefore left open the possibility that urgent humanitarian reasons and significant public benefits under section 1182(d)(5)(A) might be presented by many similarly situated noncitizens, and that the Executive could consider the aggregate benefits of paroling noncitizens because they fall within certain groups. *See Gulf*

*Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020) ("[W]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely.").

<u>Paroled into the United States</u>. The Notice is consistent with sections 1182(d)(5)(A) and 1255(a), which refer to noncitizens paroled "into the United States." As explained below, this phrase speaks to the noncitizen's legal status as a foreign national who has not yet been inspected and admitted into the United States when they seek parole, not whether or not they are physically located inside or outside the country when they do so.

Plaintiffs concede that Congress "specifically authorized parole of aliens already present in the United States," but claim it was "*only* in the limited circumstance of military families." ECF 3 at 17 (citing NDAA 2020 § 1758). However, Plaintiffs have no basis for this assertion, as nothing in the NDAA limits Congress's reaffirmation of "the importance of the Secretary's parole in place authority" to the military context. *Id.* § 1758(b)(3). Further, plaintiffs provide no explanation for why the interpretation of section 1182(d)(5)(A) would differ between populations, and the size of these groups does not matter as the use of parole in place for them reflects an interpretation of section 1182(d)(5)(A) that must be consistently applied here. *See Clark*, 543 U.S. at 378.

The only authority Plaintiffs offer for their novel reading of the parole and adjustment statutes is isolated language from the Senate report accompanying the 1960 amendment to section 1255 stating that "the wording of the amendment is such as not to grant eligibility for adjustment of status … to aliens who entered the United States surreptitiously." ECF 3 at 27. This language is now obsolete in light of the structural revision of the INA in 1996. With the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104–208, div. C, § 304, 110 Stat. 3009-587, Congress abandoned the deportation-exclusion regime, which was based on a noncitizen's physical presence, to remove the incentive for noncitizens to unlawfully enter the country and thereby obtain more favorable procedural rights. *See, e.g.*, *Cruz-Miguel*, 650 F.3d at 197-98; *Akhtar v. Gonzales*, 450 F.3d 587, 590 (5th Cir. 2006); *Landon v. Plasencia*, 459 U.S. 21, 25-26 (1982) (discussing pre-IIRIRA procedure). To achieve this, IIRIRA relied on "admission,"

not physical presence, and defined "admission" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); *see Cruz-Miguel*, 650 F.3d at 197. Unless and until the noncitizen has been inspected and authorized to enter by an immigration officer, the noncitizen is deemed an "applicant for admission" and treated the same as if standing at the border, regardless of whether they are in the process of actively seeking admission. 8 U.S.C. § 1225(a)(1). IIRIRA thus eliminated the perverse incentive to gain greater rights through surreptitious entry that the 1960 Senate report referenced.

At the same time, IIRIRA amendments to section 1182(d)(5)(A), 110 Stat. 689, continued to allow for parole of "any" applicant for admission and "[t]he IIRIRA did not change section 1255(a) or otherwise change the adjustment of status process," continuing to allow paroled applicants for admission to apply for adjustment. *Akhtar*, 450 F.3d at 590. Thus, the confluence of the "admission" structure and section 1255(a)'s limitation on adjustment to noncitizens who have been "inspected and admitted or paroled" and who are otherwise "admissible to the United States for permanent residence" categorically prevents any unadmitted noncitizen unlawfully present without inspection from being able to adjust status under that provision.  Congress's express ratification of the use of parole in place to resolve unlawfully present noncitizens' prior lack of inspection and provide them a basis for adjustment of status in the military and CNMI contexts signals its understanding that parole in place is consistent with both the IIRIRA categorical reform and the pre-existing desire not to provide permanent lawful status to those who persist in flouting immigration laws. *Supra* Background; *Cruz-Miguel*, 650 F.3d at 198 (stating that even noncitizens "who might otherwise be inadmissible" and those "already physically present in the United States who, upon inspection, are placed in removal proceedings, may be eligible for … parole under § 1182(d)(5)(A)," which in turn provides a basis for adjustment of status under section 1255(a)).

Plaintiffs thus misunderstand the current structure of the INA when they argue that parole "into the United States" in sections 1182(d)(5)(A) and 1255(a) "literally means that the alien must have been granted parole while physically entering the United States" and that KFT parolees thus must leave the country so they may be paroled back "into" it. ECF No. 3 at 16-17. By providing

that parole is available to "applicant[s] for admission," 8 U.S.C. § 1182(d)(5)(A), the parole statute (and adjustment statute by virtue of its reference to parole) makes clear that it is referencing the *legal status* of noncitizens arriving at or present in the country without inspection or admission, 8 U.S.C. § 1225(a)(1), not the *temporal fact* of whether the noncitizen is at that time just entering the country or has already done so. *See, e.g.*, *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022); *Cruz-Miguel*, 650 F.3d at 198 (providing that even noncitizens "already physically present in the United States … may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) *by virtue of their status as applicants for admission*") (emphasis added); *United States v. Gambino-Ruiz*, 91 F.4th 981, 989 (9th Cir. 2024) (explaining that the noncitizen "by entering illegally 'from outside the country'" was placed …. "into 'a fictive legal status' … as the equivalent of an arriving alien applying for admission at a port of entry").

Indeed, at least three courts of appeals have recognized that unadmitted noncitizens already present in the United States may nevertheless be paroled in place under the terms of section 1182(d)(5)(A), thus rendering them eligible for adjustment of status under section 1255(a). *Cruz-Miguel*, 650 F.3d at 198; *Ortega-Cervantes*, 501 F.3d at 1116 ("We see nothing that would preclude the government from paroling such an alien" who was physically present in the country without inspection and admission "into the United States under § 1182(d)(5)(A)" and explaining that had the petitioner there, who was apprehended after illegally entering the country, been paroled under section 1182(d)(5)(A), as opposed to 8 U.S.C. § 1226(a), he would have been "eligible for adjustment of status under § 1255(a)"); *Akhtar*, 2024 WL 1427634, at *3 (recognizing DHS's authority to parole in place under section 1182(d)(5)(A) unadmitted noncitizens encountered already inside the United States, providing a basis for adjustment of status). In fact, the Fifth Circuit has recognized that a "[q]uintessential modern use[]" of parole is "paroling aliens who qualify for a visa but are waiting for it to become available." ECF No. 3 at 11 (quoting *MPP*, 20 F.4th at 947).

On this point, 6 U.S.C. § 202(4) provides the Secretary authority to establish rules governing visa and "other forms of permission, including parole" for noncitizens "to enter the

United States." *Id.* This general language cannot be read as an implicit limitation on the use of parole only for noncitizens entering the United States from without. First, this provision on its face addresses specifically visa-issuance for admitting noncitizens entering the United States from abroad, and the use of parole and other parallel procedures providing permission to enter to *this particular population* of noncitizens who otherwise would need visas. This is clear from section 202's provision that the Secretary's establishment and administration of the rules at issue must be "in accordance with section 236 of this title," that is, 6 U.S.C. § 236. 6 U.S.C. § 202(4). Section 236 addresses the authority only for "[v]isa issuance." 6 U.S.C. § 236. It does not address the whole scope of the Secretary's authority to grant noncitizens permission to remain in or lawful status in the United States, such as through the procedure for adjustment of status to LPR of noncitizens already within the United States, which expressly covers parolees.[9] *See* 8 U.S.C. § 1255(a); *see also* 8 U.S.C. § 1103(a)(1) (providing the Secretary authority over "the administration and enforcement of … all other laws relating to the immigration and naturalization of aliens"). And were there any remaining doubt, Congress's and multiple circuit courts' express recognition of the Secretary's authority to promulgate rules for administering parole to noncitizens already within the United States, such as in the military-family and CNMI parole in place contexts, explained *supra*, unequivocally reiterates the availability of parole for noncitizens already within the jurisdiction of the United States.

Temporariness. Parole in place granted under the Notice is "temporary." 8 U.S.C. § 1182(d)(5)(A). The Notice provides that parole in place will be granted only for a limited

---

[9] If Congress, which is presumed to have been aware of the INS's then established and well publicized interpretation of section 1182(d)(5)(A), had intended to limit the Secretary's parole authority in the Homeland Security Act (HSA), "Congress certainly would have done so in a less oblique fashion." *Choeum v. INS*, 129 F.3d 29, 43 (1st Cir. 1997); *cf., e.g.*, *Trump v. Hawaii*, 585 U.S. 667, 695 (2018) ("Had Congress . . . intended in [subsequent legislation] to constrain the President's power [under the INA], it could easily have chosen language directed to that end."). And, indeed, there is no evidence in the legislative history of the HSA suggesting that Congress intended to constrain the Secretary's parole authority or abrogate the agency's interpretation of the parole statute.

period,[10] "generally … of up to three years," and does not contemplate the opportunity for additional grants of parole, or "re-parole," under this process. 89 Fed. Reg. at 67473. Furthermore, as explained, the Fifth Circuit has stated that a "[q]uintessential modern use[]" of parole is "paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947. Noncitizens covered by the Notice are eligible to be classified as immediate relatives and therefore, once paroled, may apply for adjustment of status. Accordingly, many will not require the full three-year parole period.

Plaintiffs object that the Notice procedures will be used to "help [noncitizens] remain permanently in the United States" due to the potential for adjustment of status. ECF 3 at 17-19. But this does not mean that the *parole* is not temporary. Rather it demonstrates that the parole is not indefinite and will come to an end after a limited period.

### B. Parole in Place under KFT Does Not Circumvent Other INA Provisions.

The parole authority has long existed alongside other avenues for noncitizens who are otherwise eligible to adjust their status to that of a lawful permanent resident, as the plain language of the adjustment statute itself declares. *See* 8 U.S.C. § 1255(a) (offering eligibility for adjustment of status to noncitizens "inspected and admitted" or "paroled"). Congress and multiple federal appellate courts have held that parole in place is a valid mechanism to address certain bases of ineligibility that would preclude adjustment of status. *Supra* Background, § IV.A.

Plaintiffs argue that the Notice circumvents statutory requirements for a noncitizen to qualify for a waiver of inadmissibility or visa ineligibility, including departing and applying for an immigrant visa at a U.S. embassy or consulate overseas. ECF No. 3 at 19-24. Plaintiffs refer to 8 U.S.C. § 1182(a)(9)(B)(i)(II), which renders inadmissible a noncitizen who was unlawfully present in the United States for one year or more, departs the United States and then seeks admission within 10 years, and then provides for a waiver of this inadmissibility "if refusal of

---

[10] Dictionaries commonly define "temporary" and "temporarily" as meaning for a limited time, not permanently. *See* Webster's New Int'l Dict. 2598 (2d ed. unabridged 1958) (defining temporary as "(l)asting for a time only; existing or continuing for a limited time; not permanent; ephemeral; transitory").

admission … would result in extreme hardship to the citizen or lawfully resident spouse or parent of such" noncitizen. This waiver can be sought on a provisional basis by certain noncitizens before they depart the United States for their immigrant visa interview by filing a Form I-601A or by a noncitizen who has departed the United States for consular processing by filing a Form I-601. 8 U.S.C. § 1182(a)(9)(B)(i)(II), (v); 8 C.F.R. 212.7(a)(1), (e). However, as Congress and multiple federal appellate courts have implicitly recognized, *supra* Background, § IV.A. nothing in section 1182(a)(9)(B) suggests that departing the United States (and thus triggering the inadmissibility ground) and pursuing an immigrant visa abroad is the sole path to obtaining LPR status even for those who have accrued significant unlawful presence. Indeed, adjustment of status to LPR is expressly available to noncitizens who were paroled. *See* 8 U.S.C. § 1255(a).

Congress also provided certain unlawfully present noncitizens in removal proceedings a means to seek cancellation of removal and adjustment of status. *See* 8 U.S.C. § 1229b(b)(1). Plaintiffs' attempt to add atextual requirements that "Congress has omitted" "when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest," shows Congress did not intend exclusivity. *Jama*, 543 U.S. at 341; *see*, *e.g.*, 8 U.S.C. § 1229a(a)(3) (providing "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be … removed from the United States"); *id.* § 1252(a)(5) (providing "a petition for review filed with an appropriate court of appeals in accordance with this section shall be the sole and exclusive means for judicial review of an order of removal"). The fact that Congress provided other statutory routes for unlawfully present noncitizens to obtain LPR status, and did not require them to undergo consular processing, defeats Plaintiffs' argument.

Contrary to Plaintiffs' argument, the Major Questions Doctrine does not come into play here. There is no "major question" to trigger the doctrine because Congress "sp[oke] clearly" and explicitly "when authorizing" other statutory paths for unlawfully present noncitizens to become a LPR without being granted a waiver for the unlawful presence ground of inadmissibility. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021). That there are different procedural and evidentiary requirements and costs associated with obtaining an immigrant visa as opposed to

parole in place and adjustment of status or cancellation of removal, *see* ECF 3 at 21-24, also has no bearing on the clear statutory provision of these alternate pathways, especially given Congress's recent affirmations of parole in place. *See* NDAA, § 1758. Indeed, there are different requirements for admission and parole, *compare* 8 U.S.C. §§ 1182(a), 1201-1202 *with id.* § 1182(d)(5)(A), yet Congress treated them the same when providing that both may serve as a basis for adjustment. *See* 8 U.S.C. § 1255(a). Plaintiffs' counter-statutory argument would mean that all other congressionally- and court-approved uses of parole in place are also *ultra vires*, and Plaintiffs do not, and cannot, point to a single authority supporting so sweeping a result.

### C.  The Notice is Not Arbitrary and Capricious.

DHS's decision to use its longstanding parole in place authority in this context easily satisfies the APA's "highly deferential" standard of review as it is reasonable and reasonably explained and the agency considered all relevant factors. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 904 (5th Cir. 1983). The decision is also fully supported by the record. *See FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158, 1160 (2021).

When announcing the KFT process, the Secretary noted the success and explicit Congressional approval of parole in place in the parallel context of military families. The Secretary thoroughly explained how extending parole in place to certain spouses of U.S. citizens who have continuously been present in the country for 10 years or more and to specified stepchildren of U.S. citizens who have been present in the United States since the date of announcement of the process comports with section 1182(d)(5)(A) and serves a significant public benefit. The Secretary carefully considered but ultimately rejected as less effective alternative approaches. 89 Fed. Reg. at 67,474-78. And the Secretary considered the impact of this process on administrative resources and adjudicatory capacity, as well as fiscal impacts on federal and local governments and States, and determined that these factors either weighed strongly in favor of the KFT process or at the least did not represent significant drawbacks outweighing the greater value of the process. *Id.* at 67478-79. The analysis in the record amply supports these determinations as well. AR 4648-4674.

The agency's analysis is more than sufficient to satisfy the "narrow" "scope of review under the 'arbitrary and capricious' standard" under which a court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In assessing agency action, "[a] court is not to ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 292 (2016). Instead, to satisfy judicial scrutiny, an agency need only "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm*, 463 U.S. at 43.

Plaintiffs' contrary arguments lack merit. First, Plaintiffs argue the Secretary "failed to consider the States' interest in reliance on the prior regime." ECF No. 3 at 30-31. But Plaintiffs do not identify any actions they have taken or changes to their budgets they have made in reliance on the prior approach. Moreover, reliance interests are implicated when a regulatory change directly affects a regulated entity, but States are not regulated by the KFT process. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 222-23 (2016) (addressing regulatory change that upset "decades of industry reliance," resulting in "substantial" and potentially "retroactive" legal "liability" for the regulated entities); *DHS v. Regents of the Univ. of California*, 591 U.S. 1, 31-33 (2020) (noting reliance interests of the regulated entities on longstanding policies).

Rather than identify actual reliance interests, Plaintiffs argue the Secretary should have considered costs to States from parole of a large number of noncitizens who will be eligible for public benefits, ECF 3 at 31-32, but they identify no evidence that such costs will be incurred, the amount of such costs, nor a timeline for their outlay. *Supra* §§ II.A, II.B. Moreover, the Secretary expressly considered the economic impact on State and local governments and determined that, although definite figures were impossible to predict given variation in state policies with regard to services to noncitizens, there would potentially be increased tax revenue as an offset to any increased service expenditures, and overall "the significant public benefits of the case-by-case parole of noncitizens under this process to the United States outweigh the anticipated costs to Federal and State governments alike." 89 Fed. Reg. at 67467, 67477-79; *see* AR 261-84, 518-68,

2990-3003, 4550-4613. At the outset, because noncitizen spouses of U.S. citizens must have been continuously present in the United States since at least June 17, 2014, and stepchildren since prior to the date the policy was announced in order to qualify for parole in place, the KFT process is not expected to draw any new migration to the United States. *Id*. at 67479. Thus, the KFT process affects only the noncitizen population currently in the States.

States already must provide free emergency medical services under Medicaid and K-12 public education to noncitizens regardless of immigration status under pre-existing law. *See* 42 U.S.C. § 1396b(v)(2)(A); *Plyler v. Doe*, 457 U.S. 202 (1982). Hence, noncitizens obtaining parole under the KFT process will not significantly alter or increase these State expenditures. 89 Fed. Reg. at 67478-79. Parolees also generally need to be in "qualified" status for at least five years before they become eligible for state-administered federal benefits such as Medicaid, Temporary Assistance for Needy Families (TANF), and the Children's Health Insurance Program (CHIP). *Id.* at 67478. Because the Notice authorizes parole in place only for a period of up to three years, the Notice will not cause beneficiaries to be in an authorized period of parole long enough to qualify for these benefits. Regarding driver's licenses, for those States (such as Texas) that do not provide them regardless of immigration status, nothing in federal law requires States to provide these licenses to parolees and, because such States also charge fees for driver's-license applications, they have yet to demonstrate that they actually lose any money by providing this service. *See id.* at 67479; *CHNV*, 2024 WL 1021068, at *10 (holding "Texas profits on limited-term licenses," and so failed to show parole would increase state driver's license expenditures). While no increased expenses were predicted, the Secretary reasoned that any marginal increases in state expenditures due to the KFT process would be more than outweighed by the fact that parole recipients would be eligible for work authorization and would benefit the State fisc by increased economic productivity, including their increased incomes and access to employment benefits that may actually decrease demand for public benefits. 89 Fed. Reg. at 67478.

Plaintiffs next argue that "Defendants show no evidence of having considered the incentive structures built into our immigration laws," and assert that the KFT process "will increase illegal

50

immigration." ECF No. 3 at 33. This argument is meritless. The Secretary specifically considered incentives and opted to limit eligibility for the KFT process to only noncitizen spouses of U.S. citizens who have been physically present in the United States since June 17, 2014 and stepchildren of U.S. citizens who have been physically present since before the policy was announced. *See* 89 Fed. Reg. at 67,479, 67,475-76; AR 1176-86, 1261-88. The Secretary explained that this limitation was intended to avoid meaningfully affecting or creating incentives for noncitizens to enter the United States unlawfully. *See id*.

Plaintiffs' argument that Defendants "fail to address the shift from their prior position," ECF 3 at 33, is equally meritless. The Secretary explained why he was expanding the groups for whom a specific parole in place process would be available, carefully explained the reasons why granting parole in place to eligible noncitizens under the KFT process would generally provide a significant public benefit to the United States, considered alternatives and explained why possible alternatives would be less effective at providing these benefits, and evaluated possible impacts on administrative resources, adjudicatory capacity, States, and federal and local governments. *See* 89 Fed. Reg. at 67465-69; 67474-79. This plainly satisfies the APA's deferential standard.

Plaintiffs argue the KFT process "is arbitrary and capricious because its rationales are pretextual," but they provide no basis to question the veracity of the Secretary's lengthy and well-reasoned explanations. ECF No. 3 at 34. The "Secretary's decision is entitled to a presumption of regularity," and Plaintiffs must make a "strong showing of bad faith or improper behavior" before questioning or looking behind the Secretary's stated explanation. *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415, 420 (1971). Plaintiffs do not come close to meeting that standard. They argue the Secretary's actual goal was to "increase migration opportunities," ECF No. 3 at 34, but they provide no evidence that this, rather than the KFT process's stated goals, was the reason for adopting the policy. Without strong evidence of bad faith, the Court is "limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record," a "principle" that "reflects that further judicial inquiry into executive motivation represents a substantial intrusion into the workings of another branch of Government" that "should

51

normally be avoided." *Dep't of Com. v. New York*, 588 U.S. 752, 780-81 (2019) (quotation marks omitted). Even if Plaintiffs could show evidence of other motivations, "a court may not reject an agency's stated reasons for acting simply because the agency might also have had other unstated reasons" or "set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities." *Id.* at 781.

Plaintiffs argue the KFT process "treats illegal aliens… in the U.S. workforce as a positive" and is arbitrary and capricious because it "relied on factors which Congress has not intended it to consider … the employment of illegal aliens." ECF No. 3 at 34, 36. This is a misrepresentation of the KFT process, which in fact is expected to decrease the number of noncitizens working without employment authorization and will not provide employment authorization to anyone present in the United States without admission or parole.   89 Fed. Reg. at 67466-67; *see* AR 261-284 (recognizing public costs arising from unlawful immigration). KFT affects the manner and location in which noncitizens seek a grant of parole under section 1182(d)(5)(A)—as well as the Secretary's determination that parole of eligible individuals, if granted, would provide a significant public benefit to the United States—but it does not change the statutory requirements for obtaining parole or LPR status. As its provision of multiple routes to cure inadmissibility indicates, *supra* § IV.B, Congress intended the noncitizens eligible for the KFT process, i.e., noncitizens present in the United States without admission, to be able to seek LPR status and obtain employment authorization. It cannot be arbitrary and capricious for the agency to put a process in place to more efficiently carry out that congressional intent for particular population groups, and nothing bars the Secretary from considering potential benefits that might develop, including that it might "facilitate greater access to job mobility and improve overall economic productivity; provide stable, consistent support to their U.S. citizen family members; reduce their risk of facing labor exploitation; and allow for these noncitizens to contribute their full talents to the U.S. workforce." 89 Fed. Reg. at 67466.; *see* AR 4-74, 518-68, 783-800, 1389-2030, 2172-79, 2249-54, 4422. Finally, Plaintiffs argue "there is no sign that Defendants considered lawful alternatives" to the KFT process, including not changing prior practices. Mot. at 36. Yet, an entire section of the

Federal Register notice discusses various alternatives considered, including additional resources for processing pending Form I-601A and various alternative approaches in designing a parole process that would offer expeditious benefits to both U.S. families and the U.S. economy, without jeopardizing national security, public safety, or border security. 89 Fed. Reg. at 67,474-78. Even if the Secretary had not considered various alternatives, under the APA, agencies are not required "to consider all policy alternatives in reaching [a] decision." *State Farm*, 463 U.S. at 51.

In sum, the Secretary considered relevant factors, including foreign policy objectives, alternative design approaches, and potential costs to both the Federal Government and States. Ultimately, and reasonably, the Secretary determined that the benefits of parole in place outweighed any anticipated drawbacks and costs.

### D.  Plaintiffs Cannot Succeed on the Notice and Comment Claim.

The States cannot succeed on their claims that the Notice had to be promulgated by notice-and-comment rulemaking. The Notice is both a general statement of policy and rule of agency procedure, and it implicates a foreign-affairs function. As a result, the APA does not require notice and comment.

General Statement of Policy. The Notice is a general statement of agency policy that "advise[s] the public prospectively of the manner in which the agency proposes to exercise a discretionary power," *Lincoln*, 508 U.S. at 197, and thus is exempt from notice and comment rulemaking. 5 U.S.C. 553(b)(A). "By issuing a policy statement, an agency simply lets the public know its current enforcement or adjudicatory approach," and the "agency retains the discretion and the authority to change its position—even abruptly." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Whether agency action is a general statement of policy turns on "whether the rule (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *DACA*, 50 F.4th at 522. The primary focus of this inquiry is "whether the rule has binding effect on agency discretion or severely restricts it." *Id*.

The Notice does not "grant rights, impose obligations, or produce other significant effects on private interests." *DACA*, 50 F.4th at 522. Rather, the Notice explains how USCIS will exercise

its discretionary parole authority with respect to certain spouses and stepchildren of U.S. citizens. *See, e.g.*, 89 Fed. Reg. at 67,488. But it is the statute, not the Notice, that creates the discretionary authority and requirements for parole, and the KFT process does not alter those requirements, let alone bind the agency to exercise that discretionary authority in any way. *See EEOC*, 933 F.3d 433, 442 (5th Cir. 2019). Indeed, any noncitizen applicant for admission physically present in the United States can apply for parole in place, with or without the KFT process, *see* https://www.uscis.gov/humanitarian/humanitarian_parole, Who Can Apply for Parole; https://www.uscis.gov/i-131, and so KFT cannot be understood to "withdraw[] … discretion" or "impose or elaborate or interpret a legal norm." *DACA*, 40 F.4th at 220.

Plaintiffs nevertheless argue the Notice is not a general policy statement because it requires DHS officials to exercise their discretion in particular ways, sets "new criteria for granting parole," obligates the federal government "to provide benefits to certain aliens," and "binds the agency." Mot. at 25-26. None of this is true. The Secretary was clear that the KFT process "is being implemented as a matter of the Secretary's discretion" and "is not intended to … and does not create any rights, privileges, benefits, substantive or procedural." *Id.* at 67474. It does not bind DHS to any particular course with respect to any noncitizen—those decisions continue to be made on a case-by-case basis by individual officials—and it provides no assurance that parole in place will be granted in any specific case. *Id.* at 67465. The Notice thus "leaves the agency and its decision-makers free to exercise discretion" to grant or deny parole based on the discretionary factors and equities of individual cases. *DACA*, 50 F.4th at 522. The Notice's guidelines for consideration of parole in place requests neither "appear[] on [their] face to be binding," nor are "applied by the agency in a way that indicates [they are] binding," *id.* at 524. *See* 89 Fed. Reg. at 67472 ("DHS's decision whether to grant parole in place to a requestor is a discretionary, case-by-case determination," "[e]ven if a requester establishes that they have met all the criteria"); 67488 ("this process leaves USCIS adjudicators the discretion to approve or deny requests … as they perform their case-by-case review"). Because the Notice does not bind agency decision-makers to any particular outcome, but leaves them discretion to grant or deny parole in individual cases based

54

on section 1182(d)(5)(A), it is a general statement of policy that does not modify substantive rights, does not guarantee anyone parole, and thus does not have the type of impact that would require notice and comment. *Texas*, 809 F.3d at 176; *see Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 597 (5th Cir. 1995) (similar, FDA guidance concerning enforcement actions).

Rule of Agency Procedure. The Notice is also exempt from notice-and-comment requirements because it establishes a process for officers to follow when specific noncitizens apply for parole, and rules establishing such internal processes are exempt from notice-and-comment requirements as rules "of agency organization, practice, or procedure," even if agency employees must follow those processes. *See* 5 U.S.C. § 553(b)(A). A rule of procedure or practice regulates the agency's own behavior without changing the substantive rights of parties outside the agency. *Texas*, 809 F.3d at 176-77 ("rules are generally considered procedural so long as they do not 'change the *substantive standards* by which the [agency] evaluates' applications" (quoting *Nat'l Sec. Couns. v. C.I.A.*, 931 F. Supp. 2d 77, 107 (D.D.C. 2013)). Here, as explained, noncitizens eligible for parole under the KFT process are already eligible to apply for parole in place under the statute and longstanding agency practice. However, it is the parole statute, and not the Notice, that governs the substantive requirements for parole. The Notice merely provides processing guidance on discretionary considerations and an application process, including directions on the appropriate form type, what information is required in the application, and where to file the application. Because the Notice does not modify substantive rights or guarantee anyone parole or any immigration status in the United States, but merely provides guidance regarding the manner in which USCIS considers parole applications from a specific population, the Notice does not have the type of substantive impact that would require notice and comment rulemaking. *Texas*, 809 F.3d at 176.

Foreign Affairs Function. The Notice is also exempt from notice-and-comment requirements as it "involve[s] . . . [a] foreign affairs function of the United States." 5 U.S.C. § 553(a)(1). This exception covers agency actions "linked intimately with the Government's overall

political agenda concerning relations with another country." *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F. 2d 1239, 1249 (Fed. Cir. 1985).

The Secretary's decision to provide parole in place through the KFT process involves a foreign affairs function because it is a "[d]ecision[ ] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Yassini v. Crosland*, 618 F. 2d 1356, 1361 (9th Cir. 1980). Specifically, the KFT process "is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration." 89 Fed. Reg. at 67489. "Regularizing certain noncitizens who have lived in and established deep ties to the United States is a key request of our partner countries, and establishment of this proposed process will help ensure our partners' continued collaboration to address irregular migration in the Western Hemisphere and improve economic stability and security in countries that are common sources of irregular migration to the United States." *Id.* The international collaboration the United States seeks through these diplomatic engagements include a range of initiatives: "disrupting human smuggling, trafficking, and transnational criminal networks; increasing migration controls on bus and train routes; imposing additional visa requirements to prevent individuals from exploiting legitimate travel regimes to facilitate their irregular journey to the United States; and expanding access to lawful pathways." *Id*. A "delay" in "implementing this process" to allow for "notice-and-comment rulemaking would adversely affect the United States' ability to negotiate with" other countries "for additional enforcement measures and increased cooperation with removals" as representatives of these governments have "specifically requested that the U.S. government regularize" the status of their nationals "who have been long-term residents of the United States" as part of those negotiations. *Id*.; *see, e.g.*, *Int'l Bhd. of Teamsters v. Pena*, 17 F. 3d 1478, 1486 (D.C. Cir. 1994) (exception applied to implementation of diplomatic agreements). Because the KFT process is one piece of, and inextricably bound up in, the United States' relations and international agreements with other countries to manage migration, it involves a foreign affairs function and is exempt from the notice-and-comment requirement. *See Am. Ass'n of Exporters*,

56

751 F.2d at 1249; *see, e.g.*, AR 921-24, 1342-45, 1369-71, 1376-77, 2967-2982, 2988-89, 4431-4448, 4450-4468.

Plaintiffs attempt to impose a heightened standard for the foreign affairs exception, limiting it to circumstances where notice-and-comment rulemaking would cause "definitely undesirable international consequences," though they concede that the Fifth Circuit has not adopted this reading. ECF 3 at 27-28. Contrary to Plaintiffs' contention, the foreign-affairs exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm; the exception does not require a showing of definitely undesirable international consequences. 5 U.S.C. § 553(a)(1). "[T]he phrase 'provoke definitely undesirable international consequences'" is merely "an illustration given in the APA's legislative history;" it is not "the definition for 'foreign affairs function.'" *New York v. Permanent Mission of India to United Nations*, 618 F. 3d 172, 202 (2d Cir. 2010) (quoting H. R. Rep. No. 79–1980, at 23 (1946)). There is no textual basis for interpreting the phrase "involve[s] a … foreign affairs function" as requiring a showing of definitely undesirable international consequences. *See id.*; *Capital Area Immigrants' Rights. Coal. v. Trump ("CAIR")*, 471 F. Supp. 3d 25, 53 (D.D.C. 2020) (noting that such an interpretation would be "unmoored from the legislative text"). Such a requirement would make the foreign affairs exception superfluous because the separate good-cause exception in 5 U.S.C. § 553(b)(B) would apply where taking public comment would lead to negative international consequences. *CAIR*, 471 F. Supp. 3d at 53. Such a requirement would also require courts to evaluate how serious a particular international consequence would be, which is "generally beyond the authority or competency of a court's adjudicative powers." *Lane v. Halliburton*, 529 F. 3d 548, 559 (5th Cir. 2008).

Regardless, the Notice satisfies any such requirement. Delaying implementation of the KFT process through notice-and-comment rulemaking would cause "definitely undesirable international consequences." *Permanent Mission of India*, 618 F.3d at 202. Representatives of Mexico have specifically requested that the U.S. government regularize Mexican nationals who have been long-term residents of the United States, and the Government of Colombia has made repeated similar diplomatic requests for certain Colombian nationals residing in the United States

in the context of ongoing diplomatic negotiations. 89 Fed. Reg. at 67489; *see* AR 921-24, 1342-45, 2967-71, 2975-82, 4434-4448, 4450-4468. The provision of parole in place through the KFT process responds to these requests, and delaying or otherwise hampering its implementation "would adversely affect the United States' ability to negotiate with … Mexico and Colombia[] for additional enforcement measures and increased cooperation with removals." *Id*.

### E.  Plaintiffs' Paperwork Reduction Act Claims Lack Merit.

The States likewise cannot succeed on their APA claim challenging the Office of Management and Budget's (OMB) approval of the collection of information through Form I-131F, *Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens*, under the emergency processing provisions of the Paperwork Reduction Act (PRA), 44 U.S.C. § 3507(j), and OMB's implementing regulations, 5 C.F.R. § 1320.13. *See* ECF No. 1 ¶¶ 278–288; ECF No. 3 at 36–37. In the PRA, "Congress designated OMB the overseer of other agencies with respect to paperwork and set forth a comprehensive scheme designed to reduce the paperwork burden." *Dole v. United Steelworkers of Am.,* 494 U.S. 26, 32 (1990); *see also* 44 U.S.C. § 3501.

Initially, Plaintiffs lack standing to enforce the requirements of the PRA, as they have not asserted any cognizable injury arising from the form's collection of information, nor have they established causation or redressability. Form I-131F does not seek information from Plaintiffs, but rather collects information from individuals seeking parole in place. And Plaintiffs do not argue they are injured by the separate decision to authorize the use of Form I-131F. *See* 89 Fed. Reg. 67489. That is, Plaintiffs allege an injury arising from the KFT process, not from the collection of information from noncitizens. *See also* ECF No. 27 at 4; Ex. A at 5-6 (response to Interrogatory No. 11). Also, any downstream injury to Plaintiffs that purportedly flows from the collection of information would be even more speculative and attenuated than injuries that purportedly flow from the KFT process. *Supra* § II.B. Plaintiffs thus have not made a clear showing of standing to pursue this claim. *Town of Chester, N. Y. v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) (plaintiffs must establish standing for each claim raised).

Even if Plaintiffs had standing, their interests do not fall within the zone of interests protected by the PRA. The interests protected by the PRA are, primarily, reducing paperwork burdens "resulting from the collection of information by or for the Federal Government"; improving efficiency and productivity of government programs through information resources management; and protecting privacy in information collection. *See* 44 U.S.C. § 3501; *Ass'n of Am. Physicians & Surgeons, Inc. v. HHS*, 224 F. Supp. 2d 1115, 1128 (S. D. Tex. 2002). The PRA's sole statutory enforcement mechanism is a "public protection provision" ensuring that no individual can be penalized for failing to comply with an unauthorized collection. 44 U.S.C. § 3512. The Plaintiff States are not claiming that Form I-131F is too burdensome, inefficient, or insufficiently protective of privacy for the noncitizens who use the form to request parole—to the contrary, their claim is that parole in place should be eliminated outright. States are not the target of the information collection at issue, and Plaintiffs do not even purport to claim an interest in protecting noncitizens from the burdens of information collection.

In any event, OMB's decision is unreviewable. The PRA expressly provides that OMB's decision "to approve . . . a collection of information contained in an agency rule shall not be subject to judicial review." 44 U.S.C. § 3507(d)(6). The Federal Register Notice here requires individuals seeking parole in place through the KFT process to use the Form I-131F, *see* 89 Fed. Reg. at 67472, and thus under § 3507(d)(6), OMB's approval of that collection is not reviewable. *See Hyatt v. Office of Management & Budget*, 908 F. 3d 1165, 1171 n.6 (9th Cir. 2018) (explaining that § 3507(d)(6) applies to all rule-based collections and is not limited to those contained in "proposed agency rules" undergoing notice and comment). APA review is thus not available because "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).

Even if the information-collection decision were reviewable, Plaintiffs' claim that the emergency authorization violates the APA's arbitrary and capricious standard is meritless. The PRA allows agencies to request emergency authorization if they make a written determination that "public harm is reasonably likely to result if normal clearance procedures are followed" or "the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of

information." 5 U.S.C. § 3507(j)(1)(B); *see* 5 C.F.R. § 1320.13(a). Contrary to Plaintiffs' bare assertion, both USCIS and OMB followed the PRA-required procedures. *See* ECF 1 ¶ 281. As evidenced in the administrative record and decision, OMB considered USCIS's written request for emergency authorization, which was based on necessity to USCIS's mission, and the public harm and impediment to the collection of information that would likely result if required to wait for normal clearance procedures, including because families would continue to experience significant hardships and would be susceptible to fraudsters "mak[ing] false promises to secure parole for a fee." *See* OMB Administrative Record; *see also* 5 C.F.R. § 1320.13(a). OMB's reliance on USCIS's justifications in approving its request is eminently reasonable and reflects consideration of the relevant regulatory factors, and thus easily withstands APA review. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F. 2d 897, 904 (5th Cir. 1983). Further, contrary to Plaintiffs' implication, ECF 1 ¶ 286, there is no requirement that the reasons for the emergency authorization be included in the Federal Register Notice; in fact, emergency clearances are routinely granted for reasons set forth in an agency's written statement requesting emergency clearance, as occurred here. *See* OMB AR; 5 C.F.R. § 1320.13 (a), (d). For each of these independent reasons, the PRA claim lacks merit.

### F.  The Notice Does Not Violate the Take Care Clause.

Plaintiffs argue that the Notice violates the Take Care Clause because it allegedly dispenses with certain immigration statutes. ECF 1 ¶¶ 290-91, 300. This is both incorrect, as explained, and not a basis for a viable constitutional claim. The Supreme Court has explained that claims alleging an "executive official" is acting "in excess of his statutory authority" are *statutory* claims, "not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 472 (1994). The Take Care Clause thus is not a basis for affirmative relief in court. The Supreme Court long ago made clear that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866). The Take Care Clause falls under "the general principles which forbid judicial interference," and not only is a claim to restrain executive action through this clause "without a

precedent," but there is "much weight against it." *Id.* at 499-500; *see also Citizens for Responsibility & Ethics in Washington v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018), *aff'd*, 924 F.3d 602 (D.C. Cir. 2019) (noting that "*Johnson* can be fairly read to suggest that a Take Care Clause claim is outright non-justiciable" and finding no cases holding otherwise). For the Judicial Branch to superintend how the Executive Branch performs discretionary executive functions, such as granting parole, would express a "lack of the respect due" to the Nation's highest elected official. *Baker v. Carr*, 369 U.S. 186, 217 (1962). The Take Care Clause thus places no justiciable restraints on executive action and cannot be a basis for a claim by states or private parties. *United States v. Jeong*, 624 F.3d 706, 713 (5th Cir. 2010) (noting the Executive's "broad discretion" to "discharge his constitutional responsibility to 'take Care that the Laws be faithfully executed'"). That is especially so with respect to immigration, given how bound up such decisions are with foreign affairs and that a "principal feature of the removal system is the broad discretion exercised by immigration officials." *Arizona*, 567 U.S. at 396. "Real or perceived inadequate enforcement of immigration laws does not constitute a reviewable abdication of duty." *Texas*, 106 F.3d at 661.

Finally, no court has ever found that the Take Care Clause provides a private right of action. *Florida v. United States*, 660 F. Supp. 3d 1239, 1283 (N.D. Fla. 2023) ("[I]t is unclear whether there is even a private cause of action under the Take Care Clause."); *Las Americas Immigrant Adv. Ctr. v. Biden*, 571 F. Supp. 3d 1173, 1180 (D. Or. 2021) (collecting cases); *Brnovich v. Biden*, 630 F. Supp. 3d 1157, 1178 (D. Ariz. 2022). The Court should avoid creating new constitutional causes of action or extending the application of previously implied causes of action, and decline to find a cause of action under the Take Care Clause. *See, e.g.*, *Egbert v. Boule*, 596 U.S. 482, 486 (2022).

### D.  Plaintiffs' Cannot Succeed on their Ultra Vires Claim.

Plaintiffs assert an ultra vires statutory claim alleging that the Executive (acting through the Secretary of Homeland Security) has exceeded its statutory authority. ECF No. 1 ¶¶ 301-03. But following the 1976 amendment to the APA, Plaintiffs' ultra vires claim is no longer viable. *Apter v. Dep't of Health & Hum. Servs.*, 80 F.4th 579, 592 (5th Cir. 2023) ("[U]nder our precedent,

Congress apparently did away with the *ultra vires* doctrine and other fictions surrounding sovereign immunity when it amended the APA in 1976.") (cleaned up); *Geyen v. Marsh*, 775 F.2d 1303, 1307 (5th Cir. 1985) ("[T]he principal purpose of [the 1976 amendment to the APA] was to do away with the ultra vires doctrine."); *accord E. V. v. Robinson*, 906 F.3d 1082, 1092 (9th Cir. 2018) ("[S]ince 1976 federal courts have looked to [5 U.S.C.] § 702 ... to serve the purposes of the [ultra vires doctrine] in suits against federal officers.") (internal quotation omitted). Moreover, even if such a standalone claim could exist, it cannot co-exist with an identical claim under the APA.

Before 1976, "to avoid the bar of sovereign immunity, courts indulged in the fiction that a federal official acting . . . beyond his statutory powers was acting for himself only and not as an agent of government." *Geyen*, 775 F.2d at 1307. From this fiction, the "ultra vires" action was born. *See Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949) (If "the officer is not doing the business which the sovereign has empowered him to do or he is doing it in a way which the sovereign has forbidden[,] [h]is actions are ultra vires his authority and therefore may be made the object of specific relief."). Even under the *Larson* doctrine, however, if a suit which is nominally directed against an individual officer is in substance a suit against the government, sovereign immunity applies, and the claim cannot proceed regardless of whether it is styled as a suit at law or at equity. *Id*. at 688. The test for making this determination requires looking to the remedy. *Larson*, 337 U.S. at 388. If the suit "will not require action by the sovereign," there is "no jurisdictional difficulty." *Id.* On the other hand, a suit nominally directed at an officer, but seeking judicial "compulsion against the sovereign" is barred. *Id.* at 688. In *Dugan v. Rank*, the Supreme Court expanded upon the test, by adding that a suit is also against the sovereign, and thus barred, if the remedy sought "would expend itself on the public treasury or domain, or interfere with the public administration." 372 U.S. 609, 620 (1963).

Here, even assuming the *Larson* doctrine were still viable, it would not apply because Plaintiffs' suit is in substance one against the federal government, not against any individual who is nominally named in the Complaint. Given that Plaintiffs' ultra vires claim is identical to their

APA claim that KFT exceeds Defendants' statutory authority, the latter of which clearly must be against the government, Plaintiffs cannot plausibly contend that the mirroring ultra vires claim is somehow *not* directed against the government.

In any event, the *Larson* doctrine is no longer viable. In 1976, Congress recognized that "actions challenging official conduct are intrinsically against the United States" and should be "treated as such for all practical purposes." H.R. Rep. No. 1656, 94th Cong., 2d Sess. 11 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad. News 6121, 6131. At the same time, to permit certain types of ultra vires lawsuits to continue, Congress waived sovereign immunity from lawsuits seeking nonmonetary relief through nonstatutory judicial review of agency action. Act. of Oct. 21, 1976, Pub. L. No. 94–574, § 1, 90 Stat. 2721, 2721. Congress codified that waiver in what is now section 702 of the APA. 5 U.S.C. § 702. Further, the APA, by its express terms, offers a vehicle to challenge unconstitutional and otherwise ultra vires executive action. 5 U.S.C. § 706(2)(C) (permitting court to review and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). It is "well-established" that "a precisely drawn, detailed statute preempts more general remedies." *Hinck v. United States*, 550 U.S. 501, 506 (2007) (internal citations omitted). "And that makes sense: when the legislature has attacked a specific problem—and crafted a detailed and precise remedy to address that problem— we should generally assume that the law represents Congress's considered and exclusive judgment on that issue." *Savage Servs. Corp. v. United States*, 25 F.4th 925, 939 (11th Cir. 2022).

Thus, to the extent Plaintiffs have a claim for equitable relief arising from alleged ultra vires action by Defendants, this claim must be brought under the APA and its procedures. *Apter*, 80 F.4th at 592; *Geyen*, 775 F.2d at 1307. Accordingly, the Court should reject and dismiss Plaintiffs' ultra vires claim.

### IV.    If the Court Grants Relief it Must be Sharply Limited.

Even assuming Plaintiffs in fact can demonstrate actual injury by a preponderance of the evidence and that they are entitled to summary judgment on any of their claims, there is no basis

for the court to issue injunctive relief, when other equitable relief can cure Plaintiffs' alleged injuries. The standard for permanent injunctive relief requires Plaintiffs to "demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). Moreover, because "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course," [i]f a less drastic remedy (such as "partial or complete vacatur" of the challenged action is "sufficient to redress [Plainitffs'] injury, no recourse to the additional and extraordinary relief of an injunction was warranted." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165–66 (2010); *Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004) (plaintiff must not only prevail on the claims on the merits, but must also, "establish that equitable relief is appropriate in all other respects," including that there is no other remedy that would be adequate to address the alleged injury).

### A. Plaintiffs Have Not Proven Irreparable Injury and the Balance of Harms Weigh Against Injunctive Relief.

An injunction is unwarranted for at least two reasons. First, Plaintiffs cannot demonstrate that they will suffer immediate, irreparable harm absent entry of injunctive relief, or that the balance of equities favors them. The KFT process is generally available only to noncitizens who are already residing in the country and eligible to apply for LPR status, and it offers no incentive for new noncitizens to enter the United States or move to Plaintiff States. 89 Fed. Reg. at 67475, 67479. Plaintiffs do not deny that they are already providing services to these same noncitizens whether they are lawfully present or not and cannot explain why these noncitizens, who have not left the country in over 10 years, would suddenly decide to do so now. Further, Plaintiffs have not demonstrated that granting these already-present noncitizens parole for the temporary period of up to three years is likely to have any significant effect on state expenditures on services for them; any such effects would likely not accrue for at least five years; and any such State costs may well

be offset by the increased income tax revenues and economic productivity created by such noncitizens' ability to obtain employment authorization.[11] *Supra* § II.B; 89 Fed. Reg. 67467, 67477-79. Such speculative and insubstantial costs cannot establish irreparable injury. *See Sampson v. Murray*, 415 U.S. 61, 91 (1974); *Moore v. Tangipahoa Par. Sch. Bd.*, 507 F. App'x 389, 397-98 (5th Cir. 2013) ("general financial information and speculation" that "cash-strapped school board would find itself with fewer resources" insufficient to establish irreparable harm). An alleged error from not engaging in notice-and-comment rulemaking is likewise insufficient. *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 545 (1987). Plaintiffs fail to show any injury at all, let alone one necessitating permanent relief.

Moreover, the Government's interest in public safety, obtaining international cooperation with migration and law enforcement efforts, managing its backlog and limited resources, and preserving family unity more than outweigh Plaintiffs' speculative alleged injuries. The opposing party's interest and public-interest factors merge when the Government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Even if Plaintiffs' alleged harms were certain, they would not outweigh the harm imposed by "injunctive relief [that] deeply intrudes into the core concerns of the executive branch." *Adams v. Vance*, 570 F. 2d 950, 954 (D.C. Cir. 1978). As explained, *supra* § IV.D, awarding Plaintiffs relief in this case would interfere with the nation's diplomatic efforts with other Western Hemisphere countries to obtain their cooperation in immigration and international-crime enforcement in return for providing a route for regularization of their nationals long residing in the United States. Even if proven (*but see supra* §§ II.A, II.B), minor increases in incidental costs associated with services that States have chosen to provide to noncitizens would not outweigh the disruption to the United States' foreign relations caused by vacating or enjoining KFT.

---

[11] Likewise, Plaintiffs' claim that, because parole under the KFT process is available to noncitizens in removal proceedings in compelling circumstances, some noncitizens would otherwise be removed, is merely speculation. These individuals have not been removed in over 10 years and may have other forms of relief, such as cancellation of removal, available to them absent the KFT process.

**B.  Remand Without Vacatur Is the Only Appropriate Remedy.**

Where a challenge to agency action alleges that the agency failed to engage in reasoned decision-making or adequately explain its decision, as Plaintiffs do here, ECF 1 ¶¶ 247-268, the agency should be given the opportunity to correct any procedural defects on remand. "Remand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021). "Only in 'rare circumstances' is remand for agency reconsideration not the appropriate solution." *O'Reilly v. U.S. Army Corps of Engineers*, 477 F.3d 225, 239 (5th Cir. 2007) (overturning district court's "decision to issue a permanent injunction" that was based on finding that agency action was arbitrary and capricious under the APA); *Cent. & S. W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (holding "failure to explain … does not require vacatur" where it is possible the agency can "substantiate its decision" on remand); *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993). Remanding without vacating or issuing injunctive relief is particularly appropriate where doing otherwise would cause disruption. *See, e.g.*, *Cent. & S. W. Servs*, 220 F.3d at 692 (remand without vacatur appropriate "when vacating would be disruptive"); *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (remand without vacatur appropriate where vacating decision would have "disruptive consequences" and be "an invitation to chaos"); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995); *Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003) (staying vacatur when it would cause "serious disruptions"), *appeal dismissed*, 2004 WL 1052989 (D.C. Cir. 2004).

Here, vacating the Notice or issuing injunctive relief would disrupt foreign relations. As explained, the Notice constitutes a piece in the United States' diplomatic strategy to manage migration and international law enforcement in the Western hemisphere. *Supra* § IV.D. Specifically, the KFT process responds to requests from other countries to offer regularization avenues for their nationals living in the United States. Representatives of Mexico and Colombia have requested that the U.S. government regularize Mexican and Colombian nationals residing in

the United States and the Government of Colombia has made repeated similar diplomatic requests for certain Colombian nationals residing in the United States in the context of ongoing diplomatic negotiations. The KFT process responds to these requests, and delaying or otherwise hampering its implementation "would adversely affect the United States' ability to negotiate with … Mexico and Colombia[] for additional enforcement measures and increased cooperation with removals." 89 Fed. Reg. at 67,489; *see* AR 921-24, 1342-45, 2967-71, 2975-82, 4434-4448, 4450-4468.

Given these clear consequences stemming from any vacatur, Fifth Circuit precedent requires the Court to avoid disruption and, at most, remand without vacatur or other injunctive relief because the agency can remedy any APA defect by providing further explanation. *See, e.g.*, *Cent. & S. W. Servs.*, 220 F.3d at 692 ("remand, without vacatur" is appropriate where "it would be disruptive to vacate a rule that applies to other" groups beyond the plaintiffs and where the agency "may well be able to justify its decision" with further explanation); *Texas v. EPA*, 389 F. Supp. 3d 497, 506 (S.D. Tex. 2019) (finding "remand, not vacatur of the Final Rule … is the appropriate remedy" where vacatur "would be disruptive" and agency could fix defects that violated the APA on remand); *Texas Ass'n of Mfrs.*, 989 F.3d at 389 (similar). This rule has even greater force in the context of immigration and foreign affairs, where Plaintiffs' requested relief would interfere with diplomatic efforts with "foreign nations not before the court," *Lin v. United States*, 690 F. App'x 7, 9 (D.C. Cir. 2017), and implicate issues "intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations," *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952); *see also Texas*, 597 U.S. at 805-06. Thus, remand without vacatur would redress Plaintiffs' alleged injury by having the agency address any deficiencies in its reasoning, while avoiding the significantly disruptive consequences of vacatur on foreign policy in the interim.

### C.  Relief Must Be Limited to the Parties Demonstrating Injury.

Should the Court nevertheless determine that vacatur or an injunction was warranted, any such relief must be narrowly tailored to address only the particular defect in the agency action identified and only to the extent necessary to address the injuries of the parties before the Court.

Article III requires that an equitable remedy be no broader than is necessary to remedy the particular Plaintiff's injury. *Gill,* 138 S. Ct. at 1929.  Granting Plaintiffs relief that would extend to circumstances "apart from any concrete application that threatens imminent harm to [their] interests" would "fly in the face of Article III's injury-in-fact requirement." *Summers v. Earth Island Institute*, 555 U.S. 488, 494 (2009). Thus, the Fifth Circuit has held that any injunctive relief must be limited to the Plaintiff States who have actually demonstrated injury by a preponderance of the evidence. *See Louisiana v. Becerra*, 20 F. 4th 260, 264 (5th Cir. 2021) (limiting lower court's nationwide injunction to Plaintiff states who were injured by the challenged action); *see also Labrador v. Poe*, 144 S. Ct. 921 (2024).

Moreover, even apart from Article III's jurisdictional constraints, relief that goes beyond a plaintiff's own injuries exceeds the power of a court sitting in equity. Equitable relief must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *see, e.g.*, *Scott v. Schedler*, 826 F.3d 207, 214 (5th Cir. 2016) ("injunction may not encompass more conduct than was requested or exceed the legal basis of the lawsuit"); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) ("[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification.") (alteration in original; quotation marks omitted)); *Virginia Society for Human Life, Inc. v. Federal Election Commission*, 263 F.3d 379, 393 (4th Cir. 2001) ("[p]reventing the [agency] from enforcing [the regulation] against other parties in other circuits does not provide any additional relief to [the plaintiff]").

Longstanding practice confirms that equitable relief is limited to what is necessary to remedy a plaintiff's injury. The scope of a court's authority to enter such relief is circumscribed by the type of relief that was "traditionally accorded by courts of equity." *Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318-19 (1999). But the tradition of equity inherited from English law was premised on "providing equitable relief only to parties" because the fundamental role of a court was to "adjudicate the rights of 'individual[s].'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2427-28 (2018) (Thomas, J., concurring) (quoting The Federalist No. 78,

at 466 (Alexander Hamilton) (Clinton Rossiter ed., 1961)); *DHS v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) (same). As a result, "a plaintiff could not sue to vindicate the private rights of someone else." *Hawaii*, 138 S. Ct. at 2428.

 Those principles require restricting any relief—whether an injunction or vacatur—in two primary ways.

*First*, relief should be, at most, limited to the portions of the Notice found insufficient as applied to Plaintiffs who have demonstrated injury, provide for remand for further consideration or explanation, and not include injunctive relief for Plaintiffs or nationwide. The common remedy in an APA case where a rule or policy is found arbitrary or capricious, is to vacate the part of the rule or policy that is unlawful. *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1022 (5th Cir. 2019). Injunctive relief is inappropriate in such circumstances. *See Monsanto*, 561 U.S. at 165  (reversing injunction in APA case where vacatur provided sufficient relief). Here, vacatur as to Plaintiffs based on the specific claims found to have merit, and remand to the agency to reconsider those issues, would more than redress any injury Plaintiffs assert. *See, e.g.*, *N. Air Cargo v. U.S. Postal Serv.*, 674 F.3d 852, 861 (D.C. Cir. 2012) ("It was quite anomalous [for the district court] to issue an injunction. When a district court reverses agency action and determines that the agency acted unlawfully, ordinarily the appropriate course is to identify a legal error and then remand to the agency, because the role of the district court in such situations is to act as an appellate tribunal.").

*Second*, any relief must be limited to Texas, the only party that has even attempted to demonstrate injury. *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023) (plaintiffs have the burden "to *prove* that whatever injunction they request" is "no broader" than necessary "to protect against their proven injuries"); *see Arizona*, 31 F.4th at 483 (Sutton, C.J., concurring) ("A valid Article III remedy operates with respect to specific parties, not with respect to law in the abstract," which "is why courts generally grant relief in a party-specific and injury-focused manner." (cleaned up)). In other words, the Notice would be enjoined or vacated only with respect to parole requests from individuals residing in Texas, as that is the only Plaintiff who endeavored to demonstrate injury at all. Unlike with standing, where as long as one plaintiff has standing for

each claim, a court "may address the merits of each claim" and "need not inquire into the standing of the other Plaintiffs," "when it comes to granting relief, each Plaintiff must show it has standing to obtain the relief sought." *Braidwood Mgmt. Inc. v. Becerra*, 627 F. Supp. 3d 624, 638-39 (N.D. Tex. 2022). Plaintiffs' decision to limit the evidence at trial to Texas's injury precludes entry of any relief beyond Texas. *See Texas v. Becerra*, 623 F. Supp. 3d 696, 738 (N.D. Tex. 2022) (limiting scope of injunction to Texas only, as "majority of the briefing and evidence presented focuses on the Guidance's injury to Texas").

The Fifth Circuit has taken the position that universal vacatur is permitted under the APA. *See, e.g., Texas Medical Ass'n v. HHS*, 110 F.4th 762, 779 (5th Cir. Aug. 2, 2024). But Plaintiffs go farther and argue that universal vacatur is required. ECF No. 3 at 49-50. That is incorrect. Congress enacted the APA against a background rule that statutory remedies must be construed in accordance with "traditions of equity practice." *Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944). The Supreme Court has recently reinforced this principle of interpretation, instructing that "[w]hen Congress empowers courts to grant equitable relief, there is a strong presumption that courts will exercise that authority in a manner consistent with traditional principles of equity." *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024). And the Court explained that even seemingly mandatory statutory language—such as a directive "that an injunction 'shall be granted' if" certain conditions are met—will not "supplant the traditional equitable principles governing" relief; "such an abrupt departure from traditional equity practice" as requiring relief no matter the equities requires "plain[er]" language than that. *Id.* at 1577 (quotations omitted); *see also Hecht Co.*, 321 U.S. at 329 (Congress's authorization for courts to issue a remedy "hardly suggests an absolute duty" to grant such relief "under any and all circumstances.").

So too with the APA. As an initial matter, the APA itself provides for traditional forms of equitable actions and relief, such as "declaratory judgments or writs of prohibit[ion] or mandatory injunction," 5 U.S.C. § 703, and explicitly preserves "the power or duty of the court to … deny relief on any … equitable ground," *id.* § 702(1). In light of the traditional equitable principles against which the statute was enacted—and which are explicitly incorporated into the statute—

70

there is no sound reason to conclude that Congress's adoption of the unremarkable "set aside" language in § 706 reflected a decision to compel courts to abandon "the bedrock practice of case-by-case judgments with respect to the parties in each case." *Texas*, 599 U.S. at 695 (Gorsuch, J., joined by Thomas and Barrett, JJ., concurring in the judgment) (quotations omitted).

That construction of the APA—as permitting, but not requiring, universal vacatur—coheres with Fifth Circuit precedent. That court has treated universal vacatur of agency action as a discretionary equitable remedy—not a remedy that is automatic or compelled. *See, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur of the final rule and instructing the district court to "determine what remedy—injunctive, declarative, or otherwise—is appropriate to effectuate" the judgment); *see also id.* (recognizing that a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury" (quotation omitted). That makes sense: to the extent the APA permits vacatur at all, it makes explicit that its provisions do not affect "the power or duty of the court" to "deny relief on" any "equitable ground." 5 U.S.C. § 702(1).

In addition, even if this Court were to erroneously conclude that any vacatur must be universal, the proper course then would be to refuse to enter any vacatur at all under § 702(1). Instead, because Texas's asserted injuries may be fully redressed by a party-specific injunction—and because such a limited injunction is significantly less burdensome to defendants than would be a universal vacatur—the equitable principles described above as incorporated into § 702(1) would compel this Court to enter that limited injunction in lieu of the broader vacatur.

And even were it appropriate to extend relief beyond Texas to all Plaintiffs—notwithstanding the fact that they avoided discovery and failed to submit any evidence that would allow the court to find that they were injured by a preponderance of the evidence actually injured by the KFT process—relief must be limited to Plaintiff States only. Plaintiffs' only asserted injuries are alleged expenses for eligible noncitizens who would be in their States, so a remedy limited to individuals in their States would provide full relief. Any relief more extensive than

71

tailored to Plaintiff States would impermissibly exceed the Court's equitable powers, be much more burdensome on Defendants than necessary to fully remedy Plaintiffs injuries, and implicate the rights of other parties (i.e., the States who have chosen not to challenge the Notice) not before the Court. *See, e.g.*, *Louisiana*, 20 F. 4th at 264 (limiting injunction to Plaintiff states); *Texas Bankers Ass'n v. Consumer Fin. Prot. Bureau*, 685 F. Supp. 3d 445, 458 (S.D. Tex. 2023) (declining to issue nationwide injunction even though Plaintiffs had "members across the country," and limiting injunction to Plaintiffs); *Texas v. United States Env't Prot. Agency*, 662 F. Supp. 3d 739, 758 (S.D. Tex. 2023)  (limiting injunction to Plaintiffs, in part because "the states that have not challenged the Rule may actually welcome it"); *accord Arizona*, 31 F.4th at 483 (Sutton, C.J., concurring) (questioning the judicial authority for granting "nationwide" or "universal remedies" that "give States victories they did not earn and sometimes give States victories they do not want").

## CONCLUSION

The Court should grant summary judgment in Defendants' favor and dismiss Plaintiffs' claims with prejudice.

Dated: October 18, 2024

Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

EREZ REUVENI
*Senior Counsel*

KATIE J. SHINNERS
BRIAN C. WARD
*Senior Litigation Counsel*
Office of Immigration Litigation-GLA

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ERIN T. RYAN
ELISSA P. FUDIM
CAROLINE MCGUIRE
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation-GLA
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2024, I electronically filed this memorandum in support of Defendants' motion with the Clerk of the Court for the United States District Court for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice