# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF TEXAS
# TYLER DIVISION

| | | |
|---|---|---|
| STATE OF TEXAS, et al. | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| v. | § § | |
| | § | |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY; | § | No. 6:24-cv-00306 |
| ALEJANDRO MAYORKAS, in his official | § | |
| capacity as Secretary for DHS; UR | § | |
| JADDOU, in her official capacity as Director | § | |
| of USCIS; TROY MILLER, in his official | § | |
| capacity as the Acting Commissioner of | § | |
| CBP; PATRICK J. LECHLEITNER, in his | § | |
| official capacity as the Acting Director of | § | |
| ICE; the OFFICE OF MANAGEMENT AND | § | |
| BUDGET; SHALANDA YOUNG in her | § | |
| official capacity as the Director of the Office | § | |
| of Management and Budget, | § | |
| *Defendants.* | § | |

---

## Plaintiffs' Combined Updated Motion for Preliminary Injunction and Stay of Agency Action, Motion for Summary Judgment, and Trial Brief

---

# TABLE OF CONTENTS

## INTRODUCTION

This agency action is nothing less than mass amnesty cloaked in purported executive discretion—a sweeping, last-minute ploy by an administration bent on rewriting immigration laws without Congress. Not only does this recent move strip away the legal requirement for illegal aliens to leave the country before obtaining green cards, it also shamelessly hands out work permits and other taxpayer-funded benefits to millions who have sidestepped the lawful immigration process. In effect, Defendants are trying to make illegal immigration legal through administrative fiat.

Indeed, this is just the latest example of a calculated effort to encourage illegal immigration by rewarding those who break our Nation's laws. *See Texas v. United States (DAPA),* 809 F.3d 134 (5th Cir. 2015) (program giving legal status to illegal aliens who were parents of citizens or lawful permanent residents), *aff'd,* 579 U.S. 547 (2016); *Texas v. Biden (MPP)*, 20 F.4th 928 (5th Cir. 2021) (DHS terminating program which returned certain illegal aliens to Mexico during their removal proceedings); *Texas v. United States (DACA),* 50 F.4th 498, 508 (5th Cir. 2022) (program directing that removal of certain aliens who entered the U.S. illegally as children should be deferred); *GLO v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023) (DHS diverting funds away from the construction of a border wall, resulting in a "fivefold" increase in southwest border encounters).

Longstanding federal law prohibits aliens who entered the United States unlawfully from obtaining most immigration benefits. This includes obtaining lawful permanent resident status—without first leaving the United States and waiting outside the United States for the requisite time—based on an approved family-based or employment-based visa petition. These provisions of law established by Congress serve as powerful disincentives for individuals to cross the border unlawfully. Indeed, were they not present, there would be no practical reason for any alien to abide by the law, wait his turn, and only come to the United States when the law provides. But the Biden-Harris Administration—dissatisfied with the system Congress created, and for blatant political purposes—has yet again attempted to create its own immigration system.

The Department of Homeland Security (DHS) has announced the creation of a new Parole in Place (PIP) Program that would allow aliens who have been unlawfully present in the United States for ten or more years to receive a grant of "parole"—without leaving the United States and attempting to come back and apply for admission at a port of entry—if the alien is the spouse or stepchild of a U.S. citizen. Absent court intervention, this program will effectively provide a new pathway to a green card and eventual citizenship, allowing more than 1.3 million aliens who are unlawfully present in the United States—more than 200,000 of whom live in Texas—to circumvent the processes established by Congress to apply for permanent residency.

DHS aims to accomplish this end-run around the law by exceeding the limited authority set forth in 8 U.S.C. § 1182(d)(5), which states that the DHS Secretary may "parole *into the United States temporarily* under such conditions as he may prescribe only on a *case-by-case basis* for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5) (emphasis added). But the Supreme Court has emphasized that the parole "authority is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' " *Biden v. Texas*, 597 U.S. 785, 806 (2022). DHS "cannot use that power to parole aliens *en masse*," *MPP*, 20 F.4th at 997—which the PIP Program does.

These actions encourage illegal immigration and will irreparably harm the Plaintiff States. Until it has issued final relief, the Court should enter a preliminary injunction against implementation of the PIP Program and stay the program under Section 705 of the Administrative Procedure Act (APA). That final relief should be issued by granting summary judgment to Plaintiffs on all claims, along with a declaratory judgment, vacatur of the agency action, and a permanent injunction against its implementation and future abuse of the parole authority.

## STATEMENT OF ISSUES

The issue is whether this Court should grant Plaintiffs summary judgment and (1) declare the PIP Rule unlawful; (2) order that, under 5 U.S.C. § 706(2) of the APA, the PIP Rule be set

aside, i.e., vacated; and (3) tailor permanent injunctive relief that prohibits Defendants from enforcing the PIP Rule nationwide.

Summary judgment is warranted where, as here, there is no genuine dispute as to any material fact and plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996) ("We have consistently upheld, without comment, the use of summary judgment as a mechanism for review of agency decisions.").

In the present case, Texas sets forth five separate legal grounds in favor of summary judgment:

    I.    The PIP Program is contrary to law because it violates the parole statute, the INA, and IIRIRA and contravenes the text and intent of existing immigration law.

    II.    The PIP Program was promulgated without lawful authority.

    III.    The PIP Program was promulgated without the requisite notice and opportunity to comment.

    IV.    The PIP Program is the product of arbitrary and capricious rulemaking.

    V.    The PIP Program violates the Take Care Clause.

Texas need only meet its burden on one of its claims to warrant relief.

### STATEMENT OF UNDISPUTED MATERIAL FACTS

1.    The Secretary of Homeland Security may parole into the United States an otherwise inadmissible alien, but may do so only on a "case-by-case basis" for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Congress added each of those restrictions to the parole power in 1996 as part of the Illegal Immigration Reform and Immigrant Responsibility Act, commonly called IIRIRA, because the executive branch had abused that parole power "to admit entire categories of aliens who do not qualify for admission under any other category in immigration law." H.R. Rep. No. 104-469, at 140 (1996).

2.      Certain categories of aliens who are present in the United States may adjust their status to that of a lawful permanent resident (LPR).[1] Only aliens present in the United States who were "inspected and admitted or paroled *into* the United States" or aliens who have self-petitioned under the Violence Against Women Act (VAWA) may adjust their status to LPR. 8 U.S.C. § 1255(a) (emphasis added). Otherwise, all aliens who entered the United States unlawfully after April 30, 2001 (except for the few aliens self-petitioning under VAWA) who want to adjust their status to LPR are required to leave the United States and apply for an immigrant visa at a U.S. consulate or embassy overseas. *See* 8 U.S.C. § 1255(i).

3.      Aliens who have been unlawfully present in the United States for more than one year are inadmissible to the United States and are also ineligible for visas for ten years after the "alien's departure or removal from the United States." 8 U.S.C. § 1182(a)(9)(B)(i)(II). The ten-year inadmissibility period may be waived "in the case of an immigrant who is the spouse or son or daughter of a United States citizen or of an alien lawfully admitted for permanent residence, if it is established to the satisfaction of the [DHS Secretary] that the refusal of admission to such immigrant alien would result in *extreme hardship* to the citizen or lawfully resident spouse or parent of such alien." 8 U.S.C. § 1182(a)(9)(B)(v) (emphasis added).

4.      If an unlawfully present alien does not qualify for an extreme hardship waiver, he or she must remain outside of the United States for ten years before applying for an immigrant visa to the United States and obtaining LPR status.

5.      On July 17, 2024, the White House website published a document entitled "FACT SHEET: Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Family Has a Fair Shot at the American Dream" (the "July 17 Fact Sheet"). Ex. A, Declaration of James K. Rogers ("Attorney Decl."), Ex. 1. The document describes actions the Biden-Harris Administration is taking "to ensure that all Latino families and

---

[1] Also commonly referred to as becoming a green card holder.

communities can achieve greater opportunity." *Id.*

The July 17 Fact Sheet announced the PIP Program, describing it as "a new process to help U.S. citizens with noncitizen spouses and children who have been here for 10 years … apply for lawful permanent residence without leaving the country" that would "apply to approximately half a million spouses of U.S. citizens, and 50,000 noncitizen children." *Id.*

6.    The Biden-Harris Administration's expectation of only 550,000 beneficiaries of the PIP Program is likely a significant underestimate. For context, the Migration Policy Institute estimates 1,314,000 unlawfully present aliens are married to U.S. citizens. Attorney Decl. Ex. 2.

7.    On August 16, DHS's United States Citizenship and Immigration Services (USCIS) announced the official start of the PIP Program and that it had published "a new electronic form, Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens" that would become available on August 19. Attorney Decl. Ex. 3. USCIS also announced that it had published a "Filing Guide for Form I-131F." *Id.* The Filing Guide announced the following criteria for PIP Program eligibility, explaining that aliens qualify if they:

- Are present in the United States without admission or parole;
- Have been continuously physically present in the United States:
  - Since June 17, 2014, if seeking parole in place as the spouse of a U.S. citizen; or
  - Since June 17, 2024, if seeking parole in place as the stepchild of a U.S. citizen;
- Have:
  - A legally valid marriage to a U.S. citizen as of June 17, 2024, if seeking parole in place as the spouse of a U.S. citizen; or
  - A noncitizen parent who had a legally valid marriage to a U.S. citizen on or before June 17, 2024, and before the stepchild's 18th birthday, if seeking parole in place as the stepchild of a U.S. citizen;
- Do not have any disqualifying criminal history; and
- Do not pose a threat to national security and public safety.

Attorney Decl. Ex. 4.

8.    The Filing Guide does not list "urgent humanitarian reasons" or "significant public benefit" as one of the requirements to qualify for the program. *Id.* The Filing Guide imposes only five requirements of proof that the applicant must supply:

- "Evidence of Your Identity" (the guide states that providing a school-issued ID satisfies this requirement)
- "Evidence of Your Spouse/Stepparent's Citizenship"
- "Evidence of Your Relationship" with the U.S.-citizen spouse or stepparent
- "Evidence of Physical Presence"
- "Evidence Regarding Criminal Charges"

*Id*. at 13–15.

9.    The Filing Guide also gives aliens the option to provide "[o]ther Evidence … demonstrating the significant public benefit or urgent humanitarian reasons that warrant granting you parole." *Id*. at 19.

10.    On August 20, 2024, DHS issued a Federal Register notice entitled "Notice of implementation of the Keeping Families Together Process," 89 Fed. Reg. 67459 (Aug. 20, 2024) ("Notice"). Claiming that it has "unfettered discretion" to administer the parole process, 89 Fed. Reg. 67465, DHS says the quiet part out loud.  Indeed, illustrating the insincerity of DHS's claim that it will review each application and exercise discretion on a "case-by-case" basis, DHS began approving applications and granting parole the same day. Attorney Decl. Ex. 5. The Notice was not a notice-and-comment rulemaking, claiming to be exempt from that requirement because, in DHS's view, it was merely "a general statement of policy"—and even if it were a legislative rule subject to notice-and-comment, the foreign affairs exemption would apply. *Id*. at 67488–89.

11.    The Notice did not make any specific claims that the PIP Program fulfills the "urgent humanitarian reasons" prong of Section 1182(d)(5). Rather, the Notice justified the Program entirely based on generalized claims, without evidence, that it would afford the following five claimed "significant public benefits": (1) "promot[ing] family unity;" (2) "advanc[ing] U.S. economic and labor interests by enabling paroled noncitizens to work lawfully in the United States;" (3) "further[ing] critical U.S. diplomatic interests and U.S. foreign policy objectives of managing migration, increasing economic stability, and fostering security in the United States and in partner countries in the region;" (4) "preserv[ing] limited resources across U.S. government agencies that may otherwise be expended on consular processing and proceedings;" (5) "further[ing] national security, public safety, and border security objectives by encouraging

noncitizens to provide information for background and security checks." *Id.* at 67461–62.

12.    All five of the claimed benefits were programmatic benefits—none related to a significant public benefit resulting from an individual grant of parole in a specific case.

STANDARD OF REVIEW

### Injunctive Relief

Plaintiffs seeking a preliminary injunction must establish that (1)  they are likely to succeed on the merits of their claims; (2) "[they] [are] likely to suffer irreparable harm in the absence of preliminary relief;" (3)  "the balance of equities tips in [their] favor," and (4) "an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

Permanent injunctive relief is proper where the plaintiffs show (1) irreparable harm; (2) no adequate remedy at law; (3) the balance of hardships between the plaintiffs and defendants favors injunctive relief; and (4) the public interest would not be disserved by a permanent injunction. *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 291 (2006).

### Stay of Agency Action and Vacatur

Section 705 of the APA, meanwhile, "authorizes reviewing courts to stay agency action pending judicial review." *Affinity Healthcare Servs., Inc. v. Sebelius*, 720 F. Supp. 2d 12, 15 n.4 (D.D.C. 2010) (citing 5 U.S.C. § 705). "Motions to stay agency action pursuant to these provisions are reviewed under the same standards used to evaluate requests for interim injunctive relief." *Id.* (citing *Cuomo v. U.S. Nuclear Regulatory Comm'n,* 772 F.2d 972, 974 (D.C. Cir. 1985)); *see also Texas v. EPA*, 829 F.3d 405, 435 (5th Cir. 2016) (granting stay of agency action under 5 U.S.C. § 705 and applying preliminary injunction factors).

Furthermore, Section 706(2) requires that a "reviewing court shall … hold unlawful and *set aside* agency action … found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." (emphasis added). This requires vacatur of unlawful agency action.

**Declaratory Relief**

The Declaratory Judgment Act allows courts to "declare the rights and other legal relations of any interested party." 28 U.S.C. § 2201. "The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate." Fed. R. Civ. P. 57. The APA expressly contemplates declaratory relief: "The form of proceeding for judicial review … includ[es] actions for declaratory judgments or writs of prohibitory or mandatory injunction[.]" 5 U.S.C. § 703.

**Summary Judgment**

Summary judgment is proper where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In the context of a challenge to agency action under the APA, "[s]ummary judgment is the proper mechanism for deciding, as a matter of law, whether an agency action is supported by the administrative record and consistent with the APA standard of review." *Blue Ocean Inst. v. Gutierrez*, 585 F. Supp. 2d 36, 41 (D.D.C. 2008). In evaluating an APA case on summary judgment, courts apply the APA standard of review, *see Shell Offshore Inc. v. Babbitt*, 238 F.3d 622, 627 (5th Cir. 2001), which requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be," among other things, promulgated in excess of statutory authority. 5 U.S.C. § 706(2)(A)–(D).

ARGUMENT

For the reasons outlined below, the PIP Program is unlawful and there are no disputed issues of material fact. The Plaintiffs, therefore, are entitled to summary judgment.

**The PIP Program is unlawful.**

Because administrative agencies are creatures of statute, they possess only the authority that Congress has provided. *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) (per curiam); *La. Pub. Serv. Comm'n. v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act … unless and until Congress confers power upon it."). And it is a core principle that an agency may not rewrite statutory terms to suit its own sense of how the law should operate. *Util.*

*Air Regul. Grp. v. EPA*, 573 U.S. 302, 328 (2014).

The PIP Program exceeds Defendants' authority, was promulgated without the required notice and comment, is arbitrary and capricious, and is unconstitutional. The States are, therefore, likely to succeed on the merits and entitled to summary judgment as a matter of law.

### A. The PIP Program is contrary to law because it violates the parole statute, the INA, and IIRIRA and contravenes existing immigration law.

The PIP Program is contrary to preexisting, controlling immigration law and undermines the policies Congress established by statute. Worse, the PIP Program, by its own terms, 89 Fed. Reg. 67465, is an effort by the Secretary to claim "unfettered discretion" to rewrite the INA at whim via mass parole. But Congress put limits on the parole power and has repeatedly reaffirmed that the Secretary's discretion is limited. The PIP Program eviscerates these constraints and undermines the INA, all to get around Congress's limits.

**The controlling statute limits the parole power.**

The Secretary of Homeland Security may parole into the United States an otherwise inadmissible alien. *See* 8 U.S.C. § 1182(d)(5). But he may do so only on a "case-by-case basis" for "urgent humanitarian reasons" or "significant public benefit." 8 U.S.C. § 1182(d)(5)(A).

Parole was always intended to be a narrow authority granted to the executive to deal with situations that are not otherwise addressed in the country's immigration laws. *See Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011) ("'[P]arole into the United States' under §1182(d)(5)(A) is narrowly circumscribed."). The statute authorizing parole was once more broadly worded, permitting parole "for emergent reasons or for reasons deemed strictly in the public interest." But faced with executive abuse, Congress substantially narrowed the parole authority in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), adding a "case-by-case" requirement, changing "emergent reasons" to "urgent humanitarian reasons," and changing "strictly in the public interest" to require a "*significant* public benefit." *See* Omnibus Consolidated Appropriations Act of 1997, 110 Stat. 3009–689 (emphasis added).

The "case-by-case" requirement was more a clarification than a new limitation on the parole authority. As the House Report explained: "The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy." H.R. Rep. No. 104-469, at 140 (1996). But officials had often used parole "to admit entire categories of aliens who do not qualify for admission. ... This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary." *Id.* The "case-by-case" language was clarification, but the "urgent humanitarian reasons" and "significant public benefit" terms were intended to raise the standards and decrease the Secretary's discretion. *Id.*

Since IIRIRA, courts have recognized that Congress "specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" precisely because of Congress's "concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel*, 650 F.3d at 199 & n.15. In an act lacking any subtlety, Congress titled the IIRIRA section heading amending the parole statute: "LIMITATION ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat 3009, § 602 (1996); *see also Ram v. INS*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles in a law "may be used to interpret its meaning").

To clarify the amendments, Congress explained in the House Report that parole was to be granted only "on a *case-by-case basis* for specified *urgent humanitarian reasons*, such as life-threatening humanitarian medical emergencies, or for specified *public interest reasons*, such as assisting the government in a law-enforcement-related activity. It should not be used to circumvent Congressionally-established immigration policy or to admit aliens who do not qualify for admission." H.R. Rep. No. 104-469, at 141.

The INA further limits parole power in circumstances where another provision of law is more appropriate, specifically emphasizing that DHS "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public

interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee[.]" 8 U.S.C. § 1182(d)(5)(B); *see also MPP*, 20 F.4th at 994.

The Supreme Court recently reaffirmed the limited nature of the parole power, noting that it "is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' … And under the [Administrative Procedure Act], DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 597 U.S. at 806–07.

### Defendants' exercise of "unfettered discretion" is unlawful.

Notwithstanding the congressional intent to limit the Secretary's power apparent on the face of the prior version of the parole statute, or the *explicitly stated* intent to reinforce those limitations and further curtail the Secretary's discretion in IIRIRA, the Defendants continue to rely on the fallacious notion that the parole statute grants the Secretary limitless discretion to rewrite the nation's immigration laws at whim using the parole power. *See* 89 Fed. Reg. 67465; ECF No. 47 at 27 ("Indeed, the Statute confers broad discretion on the Secretary over the entirety of the parole process."); *id*. at 34 (claiming Congress rejected limitations on parole power "in favor of the unlimited version the Senate eventually adopted"). Such arguments are meritless.

Throughout their defense of the Program, the Defendants have relied almost entirely on inapposite, outdated authorities that address the version of § 1182(d)(5)(A) that Congress amended *specifically to reign in executive authority*. *See, e.g.*, ECF No. 47 at 6 (citing *Kaplan v. Todd*, 267 U.S. 228, 229 (1925) **and** *Ahrens v. Rojas*, 292 F.2d 406 (5th Cir. 1961) to claim "historical discretion to grant parole"); *id*. at 15 (citing *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484**–85 (11th Cir.** 1985) to claim "broad discretion … in making parole decisions"); *id*. at 33 (citing *Jean v. Nelson*, 727 F.2d 957, 977 (11th Cir. 1984) to claim "remarkably broad discretion"). Of course, these claims of broad discretion are the precise reason Congress curtailed executive discretion in IIRIRA.

The Defendants' reliance on *Jean v. Nelson* is ironic, given that the Eleventh Circuit rejected arguments about APA reviewability based on discretion, final agency action, and statutory

jurisdiction remarkably similar to those the Defendants have advanced in this action. The *Jean* Court also explained that, even under the "broad grants of authority" in the obsolete, broader parole statute, "executive officials 'function as agents of Congress in enforcing the law . … If such officers depart from the zone of authority charted in the statute they act illegally and their actions can be corrected in the courts.'" *Jean*, 727 F.2d at 966 (quoting 1 C. Gordon & H. Rosenfield, *Immigration Law and Procedure* § 2.2b (rev. 1982)) (alteration in original).

The Defendants' acontextual and myopic focus on "discretion," *see* ECF No. 47 at 14–16, 26, as a bar to review ignores the strict (and reviewable) limits Congress placed on the Secretary's discretion. If Congress had wanted to grant "sole discretion … not subject to further administrative or judicial review," 8 U.S.C. § 1182(a)(5)(c), or "sole and unreviewable discretion," 8 U.S.C. § 1182(a)(10)(c)(ii), it could have. Congress chose not to, instead delimiting the boundaries of the Secretary's discretion to a narrow range of cases. *See* 8 U.S.C. § 1182(d)(5)(A).

### The PIP Program violates Section 1182(d)(5)'s "urgent humanitarian reasons or significant public benefit" requirement.

The PIP Program fails to satisfy the "urgent humanitarian reasons or significant public benefit" requirement of 8 U.S.C. § 1182(d)(5)(A).[2] Congress chose not to define in IIRIRA the terms "significant public benefit" and "urgent humanitarian reasons." But Congress provided a strong direction as to their intended meaning by coupling the word "significant" with the phrase "public benefit," and offering examples elsewhere of what it means for something to serve a "public," as opposed to private, benefit. Thus, to be a significant public benefit requires that the beneficial purpose behind a grant of parole be (1) significant and (2) public. "Urgent humanitarian reasons" has always been understood as a straightforward reference to preventing immediate physical harm to persons who wouldn't otherwise qualify as refugees.

---

[2] Congress also did not explain its decision to remove the term "public interest" and instead use the term "public benefit," but the change has little legal consequence, as "[a]bstract, often interchangeably used terms such as 'public benefit,' [and] 'public interest,' … are often used in public policy." Mary D. Fan, *The Right to Benefit from Big Data as a Public Resource*, 96 N.Y.U. L. Rev. 1438, 1473 (2022).

The substantial change in IIRIRA was the addition of "significant," so understanding the change to the parole statute begins with defining significance. "[I]n the absence of a statutory definition [courts] 'start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used.'" *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 47 (1989) (quoting *Richards v. United States*, 369 U.S. 1, 9 (1962)). Black's Law Dictionary defines "significant" as "[o]f special importance; momentous, as distinguished from insignificant." *Significant*, Black's Law Dictionary (12th ed. 2024). Similarly, the American Heritage Dictionary defines "significant" to mean "[h]aving or likely to have a major effect; important," and also "[f]airly large in amount or quantity." *Significant*, American Heritage Dictionary (5th ed. 2018).

Since the prior version of the statute already limited the grant of parole to situations "in the public interest," Congress's decision to add "significant" means that post-IIRIRA the benefit to the public must be greater than it used to be. Before IIRIRA was enacted, Congress and the executive branch had both provided specific examples of situations in which an alien would qualify for parole under the old, more forgiving "public interest" standard. An INS rulemaking from 1982 summarizes those examples. Attorney Decl. Ex. 6. Thus, under the prior, less stringent standard, Congress gave as classic examples of valid exercises of the parole power "cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution" and "isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law." *Id.*

The PIP Program falls far outside what would have been allowed even pre-IIRIRA, let alone the stricter standard imposed by IIRIRA. Post-IIRIRA court decisions illustrate that the PIP Program falls miles outside the carefully circumscribed boundary of allowable situations where the parole statute is properly applied. When describing "Congress' provision of parole," Justice Breyer provided two examples of what Congress had in mind: "release for the purpose of medical care or to testify in a court proceeding." *Jennings v. Rodriguez*, 583 U.S. 281, 348 (2018) (Breyer, J., dissenting). The Fifth Circuit likewise has explained, "[q]uintessential modern uses of the parole

power include, for example, paroling aliens who do not qualify for an admission category but have an urgent need for medical care in the United States and paroling aliens who qualify for a visa but are waiting for it to become available." *MPP*, 20 F.4th at 947.

These examples, particularly the recurring emphasis on medical care, highlight the *physical* nature of the "urgent humanitarian reasons" justification for parole. The specific alien being paroled must be in some sort of physical jeopardy that does not otherwise qualify him or her as a refugee, such as a need for imminent medical care. Nothing in the Notice relates to any potential beneficiaries of the PIP Program facing physical danger; passing references to "urgent humanitarian reasons" cannot provide a statutorily sufficient justification for granting parole. Further, other provisions of 8 U.S.C. § 1182(d) distinguish "humanitarian purposes" from "family unity." *See* 8 U.S.C. § 1182(d)(11)–(12). If family unity were a sufficient "humanitarian purpose" (to say nothing of an "urgent humanitarian reason"), then each of the several references to "humanitarian purposes or family unity" in Section 1182(d) would be redundant.

Neither does the Notice offer a statutorily sufficient justification based on significant public benefit according to the long-running understanding of that term. At the outset, the underlying premise of the PIP Program—that parole can be authorized for purposes of family unity—is disproven by references to family unity elsewhere in Section 1182. Congress knows how to empower the Secretary to promote family unity; when an otherwise admissible alien encouraged a spouse, son, or daughter to enter the United States illegally, Congress decided that family unity was reason enough to grant the Secretary discretion to waive that alien's inadmissibility. *See* 8 U.S.C. 1182(d)(11). Congress did not give the Secretary discretion to promote family unity through parole. *Contrast* 8 U.S.C. 1182(d)(11)–(12) *with* 8 U.S.C. 1182(d)(5).

But even if Congress had not spoken to this (through the venerable *expressio unius* canon), the purposes supposedly served by the PIP Program are neither significant nor public. "[T]here are various types of parole, including port of entry parole, which applies to a wide variety of situations and is used at the discretion of the supervisory immigration inspector, usually to allow short periods

16

of entry. Other types of parole include humanitarian parole, granted in instances of medical emergency; and public interest parole, granted for aliens participating in legal proceedings." *Hornof v. United States*, No. 2:19-cv-198, 2023 WL 5627631, at *25 n.49 (D. Me. Aug. 31, 2023) (cleaned up) (quoting *Succar v. Ashcroft*, 394 F.3d 8, 15 n.7 (1st Cir. 2005)).

"The Government often utilizes significant public benefit parole to secure testimony from noncitizens—who otherwise would not have legal status to be in the United States—in criminal proceedings."[3] *Id.* at *25 (granting summary judgment to the federal government in action by aliens who were paroled into the United States against their will and then detained to compel their testimony). The government sometimes paroles into the United States the family members of cooperating witnesses. *Jonaitiene v. Holder*, 660 F.3d 267, 270 (7th Cir. 2011) (explaining that "the United States government brought the children [of a cooperating witness] and [the witness's] mother to the United States temporarily under Significant Public Benefit Parole").

Aliens have been granted "'significant public benefit parole' to remain in the country because of … work as a confidential source" for the FBI. *United States v. Williams*, 571 F. App'x 887, 890 (11th Cir. 2014); *see also United States v. Clements*, 686 F. App'x 849, 851 (11th Cir. 2017) (referring to "Significant Public Benefit Parole program, which allows illegal aliens who are informants for law enforcement to gain lawful status in the United States"); *Torres-Balderas v. Lynch*, 806 F.3d 1157, 1158 (8th Cir. 2015) (alien who had assisted "the St. Louis Police Department as well as the FBI in matters concerning false documents" received "[i]n exchange … a one-year Significant Public Benefit Parole"); *United States v. Mills*, 334 F. App'x 946, 947 (11th Cir. 2009)

---

[3] *See also United States v. Jumaev*, 20 F.4th 518, 547 n.17 (10th Cir. 2021) ("Significant Public Benefit Parole so that [a witness] could remain in the U.S." (cleaned up)); *United States v. Calderon-Lopez*, 268 F. App'x 279, 289 (5th Cir. 2008) (ICE special agent had "requested Significant Public Benefit Paroles in order to facilitate … reentry into the United States" for witnesses); *Garcia v. Peery*, No. CV 15-6273, 2016 WL 6304647, at *5 (C.D. Cal. Aug. 26, 2016) (efforts by DHS special agent to obtain testimony of crime victim by "secur[ing] a 'Significant Public Benefit Parole'"); *Amador v. Meeker*, No. 8:11-CV-1977, 2011 WL 4502092, at *1 (M.D. Fla. Sept. 28, 2011) (alien who had "agreed to cooperate with [a] federal investigation and testify against" defendants "was granted 'significant public benefit' parole"); *United States v. Kahre*, No. CR-S-05-0121, 2007 WL 9757487, at *1 (D. Nev. Apr. 20, 2007) ("the I.R.S. is attempting to obtain a significant public benefit parole into the U.S. for" a "Special Circumstances Witness" in criminal trial).

(referring to "application for a Significant Public Benefit Parole" filed by DEA for informant); *United States v. Blanco*, 392 F.3d 382, 392 (9th Cir. 2004) (referring to "public benefit parole" received by paid confidential informant).

Perhaps the most telling examples of public benefit parole come from DHS's own explanations. One is from *Milardo v. Kerilikowske*, in which two "deportees seeking to comply with the legislative subpoenas" from the Connecticut legislature sued to contest ICE's denial of their parole applications. No. 3:16-MC-00099, 2016 WL 1305120, at *1 (D. Conn. Apr. 1, 2016). ICE provided to the aliens a letter that explained: "Significant public benefit parole 'is a temporary measure generally used to provide a legal mechanism for informants, witnesses, criminals, and defendants' to 'assist with ongoing investigations, prosecutions or testify as witnesses in proceedings.'" *Id.* at *2 (quoting text of ICE letter).

The PIP Program does not fit within any of these established exercises of the parole power, where the specific alien being paroled provides a significant public benefit unique to himself; a witness in a legal case, for example, could easily mean the difference between convicting a dangerous criminal or not. But the justifications for the PIP Program are all programmatic benefits. *See* 89 Fed. Reg. at 67465–69. More to the point, most of the purported justifications are not even arguably "significant" other than in the aggregate. For example, even if it was economically beneficial to parole illegal aliens (it isn't), the impact of a single alien's participation in the workforce on the overall economy could hardly be called significant; it is only even arguably significant when hundreds of thousands are paroled. Likewise, the administrative convenience justification. But the statute requires consideration on a "case-by-case" basis; to justify parole, each individual parole applicant must serve a significant public benefit. Here, they don't.

The closest any of the purported benefits comes to satisfying the "significant" element, that of promoting family unity, illustrates how the Program fails to serve *public*, vice private benefits. Family unity might be significant to the families involved, but as a public benefit, promoting an individual alien's interest in family unity is not, as a matter of law, significant. The congressional

authorization for military family unity parole[4] illustrates the nature of the "public" element.

In the National Defense Act for Fiscal Year 2020 (2020 NDAA), Congress directed the Secretary to consider whether paroling a covered individual "would enable military family unity that would constitute a significant public benefit." Pub. L. 116-92 § 1758 (2019) (8 U.S.C. § 1182 note). If family unity met the significance element, there would be no need to consider whether a particular grant of parole could constitute an incidence of family unity that would be significant. The law could simply direct the Secretary to consider "whether granting the request would enable military family unity," but more is needed, so more is written. *See United States v. Palomares*, 52 F.4th 640, 646–47 (5th Cir. 2022) (surplusage should only be read into a law when there is "no other option" that is sensible). But Congress goes on to explain the *public* element as well: "It is the sense of Congress that … except as required in furtherance of the missions of the Armed Forces, disruption to military family unity should be minimized in order *to enhance military readiness and allow members of the Armed Forces to focus on the faithful execution of their military missions and objectives*, with peace of mind regarding the well-being of their family members." Pub. L. 116-92 § 1758. In other words, family unity is a private benefit, but it becomes a public concern when it impacts military readiness and the ability of our servicemembers to carry out their missions.

Other examples above, such as where parole significantly benefits the public by permitting prosecution of a criminal case or the accomplishment of a legislative subpoena, serve a public interest beyond whatever benefit the parolee might enjoy. Likewise, military family unity parole serves a public interest in military readiness and accomplishment. The benefit to the parolee or his family is not "public," and so does not rise to the importance required by the parole statute.

Because none of the justifications identified by the Defendants serve an urgent humanitarian reason or a benefit that is both (1) significant and (2) public, they are inadequate under

---

[4] The Court should note that a law authorizing parole in place for purposes of military family unity would be superfluous if parole in place or "family unity" parole was already authorized in § 1182(d)(5)(A), further confirming that the Defendants' interpretation of the law is fatally flawed.

the parole statute. The Notice is not supported by law and should be held unlawful and set aside.

**The PIP Program violates the "case-by-case" requirement.**

The government cannot confer automatic parole eligibility on 1.3 million aliens with the stroke of a pen (nor, for that matter, on the low-end 550,000 estimate Defendants offer). As the Fifth Circuit explained: "DHS cannot use [its] power to parole aliens *en masse*; that was the whole point of the 'case-by-case' requirement that Congress added in IIRIRA." *MPP*, 20 F.4th at 997. Executive abuses of the parole authority like the PIP Program are exactly what Congress was trying to *prevent* when it adopted IIRIRA. "[T]his change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel*, 650 F.3d at 199 n.15.

As the Northern District of Texas has previously observed, although "the parole statute does not set any limit on the number of individuals DHS can decide to release on parole," "the number of aliens paroled each month … gives rise to a strong inference that the Government is not really making these parole decisions on a case-by-case basis." *Texas v. Biden*, 646 F. Supp. 3d 753, 775 (N.D. Tex. 2022) (Kacsmaryk, J.) (cleaned up) (quoting *Biden*, 597 U.S. at 825–26 (Alito, J., dissenting)), *appeal dismissed*, No. 23-10143, 2023 WL 5198783 (5th Cir. May 25, 2023). A program that confers parole eligibility on 1.3 million aliens at once gives rise to the same inference that the case-by-case requirement has not been followed. Further, where the approval rate for those who meet the program eligibility criteria is 100%, Ex. B. at 267 (Defendants' discovery response showing of eight PIP applications adjudicated, all eight were approved), it strains credulity to believe those carrying out the policy conduct substantial individualized assessments.

The Notice provides detailed instructions about the specific characteristics that make an alien eligible for the PIP Program and about application processing instructions for DHS officers. 89 Fed. Reg. 67472–74. Those instructions take up 5,283 words. Among all those words, there is one short subsection titled "Case-by-Case Consideration for Parole." That section contains only

the following perfunctory 63-word statement to DHS officers to instruct them about the case-by-case requirement:

> Noncitizens who meet the criteria listed in this notice may be considered for a discretionary grant of parole on a case-by-case basis. USCIS may grant parole in place to the requestor if USCIS determines that there is a significant public benefit or urgent humanitarian reason for parole and that the requestor merits a favorable exercise of discretion in the totality of the circumstances.

89 Fed. Reg. 67473. The message to DHS officers is obvious: they are expected to rubber-stamp all qualifying applications. In practice, within hours of PIP being noticed in the Federal Register, it was already clear that such rubber-stamping without meaningful case-by-case analysis was precisely how DHS is implementing the PIP Program. The very day DHS published its notice it also began sending out parole approvals to applicants who had spent as little as 20 minutes filling out the cursory PIP applications.[5] No applicant has been denied parole—not one. Ex. B. at 267.

This is nothing new. The Biden-Harris Administration has become notorious for creating such programs. For example, DHS's CHNV Program for granting parole to aliens from Cuba, Haiti, Nicaragua, and Venezuela, which has similar eligibility criteria and processing requirements, has "an approval rate of 97.5 percent." *Texas v. DHS*, --- F. Supp. 3d ----, 2024 WL 1021068, at *2 (S.D. Tex. Mar. 8, 2024), *appeal filed*, No. 24-40160 (5th Cir. Mar. 11, 2024).

Further, the lack of information that Defendants collect about each alien applying for parole shoes that a case-by-case determination is impossible. The Northern District of Florida made this point about another similar parole program, and it is just as true here:

> However, like the Parole+ATD policy, the new policy does not explain how a meaningful evaluation of the criteria that determine whether the policy may be utilized (e.g., the alien's "national security risk" and "public safety threat") could possibly occur in light of the evidence in [the Florida Parole+ATD case], which established that DHS "has no idea whether [the arriving aliens] have criminal histories or not" because it "has no way to determine if an alien has a criminal

---

[5] Armando Garcia, *Immigrants begin receiving relief from deportation under new Biden executive order*, ABC News (Aug. 21, 2024).

history in his home country unless that country reports the information to the U.S. government or the alien self-reports." Moreover, whenever the policy discusses individual, case-by-case consideration of each alien, it does so with reference to overcrowding and the CBP's resource constraints, not with regard to any characteristics of that specific alien that might constitute a legally sufficient reason for parole, which strongly suggests that the repeated "case-by-case," "individualized" language is (as it was in the Parole+ATD policy) pretextual.

*Florida v. Mayorkas*, 672 F. Supp. 3d 1206, 1213 (N.D. Fla. 2023) (quoting *Florida. v. United States*, 660 F. Supp. 3d 1239, 1259, 1280–81 (N.D. Fla. 2023)).

It is axiomatic that "this court should strive to interpret a statute in a way that best gives effect to Congress's intentions and purpose to as much of the statute's language as possible." *United States v. Marek*, 198 F.3d 532, 536 (5th Cir. 1999). Congress made its intentions in passing IIRIRA clear in the House Report: "Parole should only be given on a case-by-case basis for *specified* urgent humanitarian reasons … or for *specified* public interest reasons." H.R. Rep. No. 104-469, at 141 (emphasis added). A program that creates broad eligibility criteria that are then applied by rote in 100% of cases does not require *specified* reasons why any particular case was decided as it was. Thus, even if the Defendants' justifications for the Program included urgent humanitarian reasons or a significant public benefit—which they don't—the Program would still be unlawful because it is based on programmatic reasoning, rather than *specified*, case-by-case adjudication.

### The PIP Program violates the requirements of 8 U.S.C. §§ 1182(d)(5) and 1255 that aliens be paroled "into" the United States.

Section 1182(d)(5)(A) only allows for an alien to be "parole[d] *into* the United States." (emphasis added). Because PIP Program beneficiaries are already inside the United States, they cannot be paroled "into" it. "[A]ny question of statutory interpretation … begins with the plain language of the statute. It is well established that, when the statutory language is plain, [courts] must enforce it according to its terms." *Jimenez v. Quarterman*, 555 U.S. 113, 118 (2009) (citations omitted). Applying "the ordinary meaning of the words used," *Mississippi Miss. Band of Choctaw Indians*, 490 U.S. at 47 (cleaned up), the meaning of "into" is clear.

An alien who is already physically present in the United States cannot be paroled "into" the country. Dictionary definitions confirm this. For example, the Oxford English Dictionary (OED) defines "into" as meaning "[t]o a position within a space or thing having material extension; to a point within the limits of; to the interior of; so as to enter." *Into*, Oxford English Dictionary (Mar. 2024). Similarly, the American Heritage Dictionary defines "into" as meaning "[t]o the inside or interior of: went into the house." *Into*, American Heritage Dictionary (5th ed.). It is only possible to move "inside" or to the "interior" of something by first starting outside of it. So "into the United States" in Section 1182(d)(5) only permits the parole power to be exercised for aliens who are *outside* the United States when parole is granted.

Similarly, 8 U.S.C. § 1255 only allows an alien to adjust to LPR status without leaving the United States if the alien "was inspected and admitted or paroled into the United States." The legislative history makes clear that Congress added this language in 1960 specifically to prevent the adjustment of status of aliens who had entered the United States unlawfully. The Senate report explaining the reasons for adopting the 1960 amendment to Section 1255 stated that one of its purposes was "to broaden the existing procedure for the adjustment of the status ... to include all aliens (other than crewman) who have been inspected at the time of their entry into the United States or *who have been paroled into the United States*." S. Rep. No. 86–1651 (1960), as reprinted in 1960 U.S.C.C.A.N. 3124, 25 (capitalization standardized) (emphasis added). The Senate Report also explained that "the wording of the amendment is such as not to grant eligibility for adjustment of status to alien crewmen and *to aliens who entered the United States surreptitiously*." *Id.* at 3137 (capitalization standardized) (emphasis added).

The plain language and legislative history of Section 1255 make clear that aliens who unlawfully entered the United States are not eligible to adjust status from within the United States. Therefore, the phrase "paroled into the United States" in Section 1255 literally means that the alien must have been granted parole while physically entering the United States.

Section 1182(d)(5) uses nearly the same language as Section 1255: "parole into the United

States." It is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Lexon Ins. Co., Inc. v. Fed. Deposit Ins.*, 7 F.4th 315, 324 (5th Cir. 2021) (quoting *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992)). If Congress made clear that it meant for "paroled into the United States" in Section 1255 to mean a grant of parole at the time of physical entry, then the nearly identical phrase "parole into the United States" in Section 1182(d)(5) in the INA should be interpreted to mean the same thing.

Further, Section 1255's prohibition on adjustment of status within the United States for aliens who entered unlawfully contradicts the stated purpose of the PIP Program. Even if Defendants could lawfully parole aliens already present in the United States, those aliens could not lawfully adjust status to that of LPR without leaving the United States since they would not have been physically paroled "into" the United States, as required by 8 U.S.C. § 1255.

When it enacted the Homeland Security Act of 2002, Pub. L. No. 107-296 (2002) ("HSA"), Congress further confirmed that "parole into the United States," 8 U.S.C. § 1182(d)(5)(A), means physical entry. The HSA created DHS and delineated the DHS Secretary's responsibilities, including "[e]stablishing and administering rules … governing the granting of visas *or other forms of permission, including parole, to enter the United States* to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States. 6 U.S.C. § 202(4); HSA § 402 (emphasis added). The HSA specifically characterizes parole as a "form of permission … to enter the United States," *id*. Congress chose *not* to characterize it in any other way. *See Jennings*, 583 U.S. at 300 ("[t]he expression of one thing implies the exclusion of others"). The language is plain, and it is binding: parole can only be granted when an alien is physically entering the United States.

The Defendants mistakenly rely on the requirement that an alien must be an "applicant for admission" to be eligible for parole, ECF No. 47 at 29, but parole is a "form[ ] of permission … to enter the United States." 6 U.S.C. § 202(4). "Admission" and "entry" are different, which is why Congress uses different words—the former is a legal action and the latter a physical one. *See, e.g.*,

*Chi Thon Ngo v. INS*, 192 F.3d 390, 392 n.1 (explaining that 8 U.S.C. § 1182(d)(5)(A) regards parole "[i]n the context of an alien's initial entry" into the country, as opposed to usages of parole in a criminal context, and that an alien's status following revocation or expiration of parole reverts to that of an applicant for admission).

Congress has specifically authorized parole of aliens already present in the United States in only one context: military families.[6] The National Defense Authorization Act for Fiscal Year 2020 (NDAA 2020) authorizes parole in place, but only for a "covered individual," as that term is defined in the Act, which requires that the person "(1) is a member of the Armed Forces; (2) is the spouse, son, or daughter of a member of the Armed Forces; (3) is the parent of a member of the Armed Forces who supports the request of such parent for parole in place; or (4) is the widow, widower, parent, son, or daughter of a deceased member of the Armed Forces." NDAA 2020. Pub. L. 116-92, § 1758 (2019) (8 U.S.C. 1182 note). Under the venerable *expressio unius* canon, "[t]he expression of one thing implies the exclusion of others." *Jennings* 583 U.S. at 300. Thus, Congress's authorization of parole in place *only* in the limited circumstance of military families means that it has *not* authorized it in any other circumstance.

The precedent the Defendants have cited in defense of the PIP Program largely confirms this understanding. Defendants rely heavily on dicta in *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1117 (9th Cir. 2007). But that opinion readily acknowledges that the legislative history of 8 U.S.C. § 1255 unambiguously demonstrates that "Congress did not intend . . . to benefit aliens already within the United States." *Id*. "Parole *into* the United States meant just that." *Id*. (emphasis

---

[6] There is some ambiguity about aliens eligible for CNMI resident status; the statute the Defendants cite authorizes "deferred action or parole, as appropriate" during the pendency of an application for CNMI Resident status, but only a limited class of aliens, including certain aliens with pre-existing grants of parole, are eligible at all. *See* 48 U.S.C. § 1806(e)(6). In other words, parole "as appropriate" may mean no more than authority to *extend* a prior grant of parole. If, by contrast, the statute is best understood as conferring authority to grant parole in place, then *expressio unius* applies with all the greater force because the language in § 1806(e)(6) is more permissive and deferential to the Secretary's discretion than that in the 2020 NDAA and would be entirely superfluous if the Secretary already had broad parole-in-place power under Section 1182.

original). The *Ortega-Cervantes* Court's passing dicta comment that it could "see nothing that would preclude the government from paroling such an alien into the United States under § 1182(d)(5)(A)" was no more than a recognition that the question was not before the court. *See id*. (clarifying that the court's ruling was limited to distinguishing § 1226(a) from § 1182(d)(5)(A) and did not reach whether parole in place was lawful). A passing comment from an out-of-circuit court limiting the precedential scope of the court's ruling to exclude issues it had no cause to reach is hardly binding support for the Defendants' position.

The Defendants' reliance on *Akhtar v. Director United States Citizenship & Immigration Services Mount Laurel Field Office*, No. 23-1577, 2024 WL 1427634 (3d Cir. Apr. 3, 2024) (unpublished and nonprecedential), is even further misplaced. *See* ECF No. 47 (citing *Akhtar*). The issue in that case was a grant of *advance* parole, "an administrative procedure whereby the government decides in advance of a noncitizen's arrival that the individual will be paroled into the United States *upon arrival at a port of entry*." *Id*. at *3 (emphasis added). Akhtar had applied for advance parole so that he could visit his seriously ill mother and was paroled *into* the country upon his return from overseas. *Id*. at *2. But advance parole is merely sets expectations; "the actual decision to parole is discretionary, and is made *at the port of entry*." *Id*. at *3 (emphasis added). Indeed, the *Akhtar* Court acknowledged, "Inspection *at a port of entry* is a mandatory component of parole, except in the rare circumstance that an applicant has requested and been granted parole in place. Parole in place is granted sparingly and is generally reserved for active and former U.S. military members and their families." *Id*. (emphasis added). This appears to be the passage upon which the Defendants rely, but, as discussed above, the unique statutory authority for parole in place for military families implies that it is unavailable to others.

### The PIP Program violates Section 1182(d)(5)'s temporariness requirement.

Parole may be used only to allow aliens "temporarily" "into" the United States. 8 U.S.C. § 1182(d)(5). Yet even though parole status may be granted only to allow aliens into the United States temporarily, the explicitly stated intent of the PIP Program is to allow beneficiaries to remain

permanently in the United States. *See* Attorney Decl. Ex. 1 ("This new action … will help certain noncitizen spouses and children apply for lawful permanent residence without leaving the country …"); 89 Fed. Reg. 67460 (describing the purpose of the program as facilitating applications for lawful permanent resident status). Indeed, Defendants have a long track record of instituting "temporary" programs for allowing aliens into the country that never end.

The INA does not define "temporarily." Black's Law Dictionary defines "temporary" to mean "[l]asting for a time only; existing or continuing for a limited (usu. short) time; transitory." *Temporary*, Black's Law Dictionary (12th ed. 2024). The OED defines it as meaning "[l]asting for a limited time; existing or valid for a time (only); not permanent; transient; made to supply a passing need." *Temporary*, Oxford English Dictionary (Sept. 2023). There is nothing limited about the duration of the PIP Program beneficiaries' presence in the United States, and parole cannot be used for the *purpose* of aliens remaining permanently in the United States.

The Notice grants a three-year parole period for PIP Program beneficiaries. 89 Fed. Reg. 67473. But DHS has a mechanism in place for any recipient of parole to apply for a renewal of their parole, which DHS calls "re-parole." As DHS explains on its public-facing website for parolees and parole applicants, "Although parole is temporary in nature, in some instances, an individual may need to remain in the United States beyond the period of authorized parole. In such instances, an individual may request re-parole from within the United States." Attorney Decl. Ex. 7. Indeed, the procedure for applying for re-parole is trivially simple: an alien simply files "a new Form I-131, Application for Travel Document," checks the proper box, and then finishes by "[w]riting 're-parole' across the top of the application." *Id.* The Notice does not exempt aliens in the PIP Program from DHS's normal re-parole application process.

DHS virtually always renews such "temporary" parole programs. Parole under the PIP Program will be permanent. The federal government's Afghan parole program is instructive. With the federal government's military withdrawal from Afghanistan in the summer of 2021, Secretary Mayorkas issued a memo instituting a parole program for Afghans that "instructed the CBP Acting

Commissioner to parole eligible Afghan nationals into the United States for 2 years." Attorney Decl. Ex. 8. When those two-year grants of parole were set to expire, DHS went into action to ensure the program participants could remain in the United States. DHS didn't just authorize "re-parole" on an individualized basis but set up a re-parole program. Secretary Mayorkas announced a "new streamlined and fee-exempt process" so that "eligible Afghan nationals will be able to continue living and working here as they pursue a permanent status." Attorney Decl. Ex. 9. DHS has an entire webpage dedicated to helping Afghan parolees navigate the re-parole process. Attorney Decl. Ex. 10. Secretary Mayorkas appears to consider their permanent presence in the United States a foregone conclusion.

Given the sheer volume of aliens that DHS will parole under the PIP Program, the availability of re-parole generally, and the very recent history of a programmatic "re-parole" scheme for tens of thousands of aliens from one country, there is every reason to conclude that Defendants will do the same here.

The Defendants have sought to defend the PIP Program through the odd interpretation that "temporarily," as used in 8 U.S.C. § 1182(d)(5)(A), means only that the grant of parole itself must be temporary, not that the alien's anticipated presence must be temporary. *See* ECF No. 47 at 40. The semantic game is clever, but unsupportable in context. The statute explains, "when the purposes of such parole shall ... have been served the alien shall forthwith return or be returned to the custody from which he was paroled." 8 U.S.C. § 1182(d)(5)(A). If temporariness applied solely to legal status, the statute would not focus on a physical return to custody from which paroled. If temporariness was merely a reference to parolee status, the statute would say that, when the purpose is served, "parolee status will end." Indeed, all of Section 1182(d), entitled "Temporary admission of nonimmigrants," deals with temporary *physical presence*, not temporary legal status. *See, e.g.*, 8 U.S.C. § 1182(d)(1) (providing for waiver of inadmissibility to temporarily admit witness for criminal investigation); § 1182(d)(3)(A) (temporary physical admission of otherwise inadmissible consular officers); § 1182(d)(8) (temporary admission for "immediate and continuous

transit through the United States").

To be sure, Congress did not intend that *all* parolees must eventually physically depart the United States. After all, case-by-case grants of parole should be fact-intensive, and the facts of an individual case may be that a specific alien's physical departure is unreasonable or unsafe. But a program that authorizes parole for the explicit purpose of keeping the parolee physically present in the United States *permanently* (as a Lawful Permanent Resident) is a prima facia violation of Section 1182(d)(5)'s authorization to parole aliens "temporarily" into the United States.

### B.  The PIP Program was promulgated without lawful authority.

The Constitution explicitly allocates the power "[t]o establish an uniform Rule of Naturalization" to Congress, U.S. CONST. art. 1, § 8, but the Biden-Harris Administration seems determined to create its own immigration system. *See, e.g.*, *Lloyd Sabaudo Societya Anonima Per Azioni v. Elting*, 287 U.S. 329, 334 (1932) ("Under the Constitution and laws of the United States, control of the admission of aliens is committed exclusively to Congress ... ."); *Jean*, 727 F.2d at 965 ("In practice, however, the comprehensive character of the INA vastly restricts the area of potential executive freedom of action, and the courts have repeatedly emphasized that the responsibility for regulating the admission of aliens resides in the first instance with Congress."). Defendants had no authority to promulgate the PIP Program, so the program would be unlawful even if they did not directly contradict established statutory law.

The PIP Program is not in accordance with law and exceeds Defendants' statutory parole authority under the INA and 8 U.S.C. §§ 1182 and 1255 because it is designed to circumvent the immigration system established by Congress, including the statutory requirements for an alien to qualify for a waiver of inadmissibility or visa ineligibility and to circumvent the statutory requirements for adjustment of status. *See Texas v. United States*, 549 F. Supp. 3d 572, 614 (S.D. Tex. 2021) (DACA unlawful because its "grant of advance parole eligibility ... allows DACA recipients to travel abroad and then return to the United States without complying with" the ten-year bar imposed by Congress).

By law, as relevant, unlawfully present aliens may not adjust their status within the United States but must instead depart and apply for an immigrant visa at a U.S. embassy or consulate overseas after a statutorily specified waiting period. The PIP Program is *explicitly* designed to allow aliens to evade these statutory requirements. *See* 89 Fed. Reg. 67460. Therefore, it "is foreclosed by Congress's careful plan; the program is manifestly contrary to the statute." *DACA*, 50 F.4th at 528. "Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system." *Id.* at 511 (quoting *Texas*, 549 F. Supp. 3d at 614). Congress specifically defined classes of aliens who are eligible for deferred action and discretionary relief from removal. *Id.* at 525–26 & nn.196–97. In addition, Congress enacted immigration classifications for lawful and unlawful presence. *Id.* at 525–26 & n.195. Congress also allowed for work authorization for specific categories of illegal aliens. *Id.* at 525–26 & n.198.

Congress must "speak clearly when authorizing an agency to exercise powers of 'vast economic and political significance.'" *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021). The Major Questions Doctrine is a principle of statutory interpretation under which courts will not assume that Congress has assigned to the Executive Branch questions of "deep 'economic and political significance'" unless Congress has done so expressly. *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014)). In *West Virginia v. EPA,* the Supreme Court explained that the Major Questions Doctrine required applying "common sense as to the manner in which Congress would have been likely to delegate such power to the agency at issue. … Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." 597 U.S. 697, 722–23 (2022) (cleaned up).

A central characteristic of our constitutional republic is that "[a]gencies have only those powers given to them by Congress, and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." *Id.* Thus, the Supreme Court explained that "Congress typically [does not] use oblique or elliptical language to empower an agency to make a

radical or fundamental change to a statutory scheme. … We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies." *Id.* (cleaned up); *see also King*, 576 U.S. at 486; *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000).

Here, the federal government is doing what the Supreme Court said agencies cannot do. It is using the PIP Program to ignore and circumvent the channels of immigration that Congress has established. Congress manifestly did *not* expressly or clearly authorize the PIP Program when it adopted Section 1182(d)(5). The very structure of the INA makes this abundantly clear. In Section 1255, Congress established a clear requirement that aliens who are unlawfully present in the United States may *not* adjust status from within the United States but must leave the country and apply for an immigrant visa at an overseas U.S. embassy or consulate, going through the entire visa process overseas. And yet, the explicitly stated intent of the PIP Program is do exactly what Congress made unlawful by allowing unlawfully present aliens to circumvent the requirements of the INA and instead adjust status without leaving the United States.

Congress would not have adopted dozens of statutory sections setting forth specific immigration requirements, just for one small subparagraph to confer on the executive the authority to replace all of that with its own alternate system. The statutory scheme that Congress created to establish our visa system is intricate and detailed. The PIP Program copies some of those elements, complete with application forms for aliens. But at every step of the process, the PIP Program omits significant elements and requirements that Congress has imposed and instead replaces them with far less stringent requirements, often replacing them with nothing at all to simply eliminate statutory requirements. If Congress had meant for something like the PIP Program to be established, it would have set it up. It didn't.

As explained above, the PIP Program only requires submission of very basic biographical information and evidence sufficient to establish that the alien's spouse or stepparent is a citizen and that the alien has been present in the United States long enough to qualify for the Program. The Program requirements are so lax that even a student ID card is enough to "confirm" the alien's

31

identity—no passports or government IDs required. In contrast, at every step, the visa process imposed by Congress is much more rigorous, extensive, and reliable. For example, Congress has imposed specific requirements for the documents aliens must have to enter the United States. *E.g.* 8 U.S.C. § 1181 (imposing documentary requirements for admission of immigrant aliens); *id.* §§ 1201, 1204 (imposing standards and requirements for issuance of visas); *id.* § 1202 (imposing requirements for visa applications); *id.* § 1203 (imposing requirements for reentry permits).

Congress has also empowered the Secretary of State, and *not* DHS or its components, to issue regulations for the issuance of entry documents into the United States. *See, e.g.,* § 1202 (making nine references to regulations "prescribed" or "issued" related to issuance of visas and specifically providing for "regulations issued by the Secretary of State" and empowering the Secretary of State with discretion to establish different "application forms for the various classes of nonimmigrant admissions"). Indeed, the Secretary of State has established an elaborate regulatory scheme for the issuance of visas, including detailed visa application forms, and procedures for the assessment of aliens for ineligibility for admission into the United States and for national security and public health and safety. 22 C.F.R. §§ 40.1–46.7.

The requirements that an alien must fulfill to get a visa are extensive. For example, to get an immigrant visa, aliens must pay a substantial fee of between $205 and $345 for each applicant applying for an immigrant visa, and an identical fee must be paid for every member of a family, including children. Attorney Decl. Ex. 11. Then, aliens must complete a detailed visa application. Attorney Decl. Ex. 12. And finally, aliens must appear in person for a visa interview with a Department of State consular officer at an embassy or consulate. 8 U.S.C. § 1202(e). Aliens applying for immigrant visas also must submit to many other requirements, such as comprehensive medical exams, 42 C.F.R. § 34.1 *et seq.*; strict vaccination requirements, 8 U.S.C. § 1182(a)(1)(ii); and must provide conclusive proof that they have the financial means to support themselves. 8 U.S.C. §§ 1182(a)(4) and 1183a. The PIP Program requires none of this—no interviews with consular officers, no medical exams, no visa security requirements, and no need to prove financial

support. PIP Program participants do not even need to provide their foreign passport to prove their identity and nationality. The PIP Program circumvents the process that Congress has created for immigration into the United States, completely evading the limits.

The PIP Program creates an entirely new and parallel immigration system that was never authorized by Congress. As if that were not bad enough, this new system lacks most of the procedures and protections that Congress has carefully created and imposed. DHS itself admits in the Notice that one of the purposes of the PIP Program is to replace "the overlapping, lengthier, and more complex Form I-601A, Application for Provisional Unlawful Presence Waiver." 89 Fed. Reg. 67468. Thus, DHS touts the PIP Program as "requir[ing] fewer resources" because the alternative "is a more complex adjudication involving the determination of various factors, including whether the noncitizen has met their [sic] burden to show they would be inadmissible only under [8 U.S.C. § 1182(a)(9)(B)(i)] at the time of their consular interview, and whether they [sic] have demonstrated extreme hardship to a qualifying relative as required under" 8 U.S.C. § 1182(a)(9)(B)(v). *Id.* Yet this reduction in required resources only comes at the expense of failing to apply the requirements of the INA, which only allow unlawful presence to be waived in very specific circumstances. The PIP Program essentially creates a new waiver with much more forgiving standards than what Congress imposed. DHS lacks the authority to replace requirements imposed by Congress with less onerous ones more to its liking.

DHS also boasts that the PIP Program will save Department of State resources because consular officers will no longer be required to conduct an "immigrant visa interview at a U.S. embassy or consulate" and thus will also no longer be required to "determine[]" whether the alien is "otherwise eligible for an immigrant visa in light of the approved provisional waiver." *Id.* But these are *requirements* imposed by Congress—DHS has no authority to waive them.

Amazingly, the Defendants seem to argue that the comprehensiveness of the INA *supports* their expansive interpretation of § 1182(d)(5)(A). *See* ECF No. 47 at 42 ("[T]he Major Questions Doctrine does not come into play here, because Congress 'sp[oke] clearly' and explicitly 'when

authorizing' other statutory paths for unlawfully present noncitizens to become a LPR without leaving the country to seek an immigrant visa and triggering the unlawful presence ground of inadmissibility.") (citing *Ala. Ass'n of Realtors*, 594 U.S. at 764). That argument gets the law exactly backwards—as explained by the *Alabama Association of Realtors* Court. "Even if the text were ambiguous," an interpretation of statutory text that confers vast authority on the Executive "counsel[s] against the Government's interpretation." 594 U.S. at 764.

The Defendants point to alternative, very specific grants of authority, *see, e.g.*, ECF No. 47 at 41 (citing 8 U.S.C. § 1229b(b)(1)'s authorization for cancellation of removal of carefully defined category of aliens who meet all of four requirements), to illustrate that Congress has authorized alternatives to consular processing. This is true, there are alternatives—and they are carefully defined, in detail, by statute, and provided to limited, carefully defined classes of aliens—all of which cuts against the interpretation that the Secretary has "unfettered discretion" to render Congress's statutory system irrelevant with the stroke of a pen. "Indeed, the Government's read of [§ 1182(d)(5)] would give [DHS] a breathtaking amount of authority." *Ala. Ass'n of Realtors*, 594 U.S. at 764. In fact, the most significant distinction between *Alabama Association of Realtors* and the PIP Program is that in the former the Government "identified no limit" to the power it claimed, but in the present case the Defendants go a step further and affirmatively claim "unfettered discretion" to set policies insulated from any form of judicial oversight or other review. *See, e.g.*, ECF No. 47 at 27 (claiming such vast discretion over the parole power that the APA precludes review of the PIP Program). The Defendants would have this Court believe that an effectively limitless parole power, by which DHS can rewrite immigration policy at whim and render the more-specific provisions of the INA nugatory, was most recently updated in Congress's "LIMITATION ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat 3009, § 602 (1996). Congress *has* spoken clearly on the issue—just not the way the Defendants think.

Defendants have "gone beyond what Congress has permitted [them] to do." *City of Arlington v. FCC*, 569 U.S. 290, 298 (2013). They have no "power to act unless and until Congress"

gives it to them. *NRDC v. Nat'l Highway Traffic Safety Admin.*, 894 F.3d 95, 112 (2d Cir. 2018). They are especially powerless to disregard express statutory commands. *League of Women Voters of the U.S. v. Newby*, 838 F.3d 1, 9–12 (D.C. Cir. 2016). "Agencies may play the sorcerer's apprentice but not the sorcerer himself." *Alexander v. Sandoval*, 532 U.S. 275, 291 (2001). The executive branch has no authority to conjure up a new, extra-statutory immigration system.

### There was not the requisite notice and opportunity to comment.

Under the Administrative Procedure Act (APA), rules promulgated by federal agencies are subject to the notice-and-comment rulemaking process unless they fall within one of the APA's limited exceptions, 5 U.S.C. § 553(b)(A), which "must be narrowly construed." *DAPA*, 809 F.3d at 171 (quoting *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)) (affirming order granting preliminary injunction against illegal DHS immigration policy). The Notice was promulgated without advance publication in the Federal Register nor with any opportunity for interested parties to comment, both of which are required under the APA. The Court, therefore, has a duty to "hold unlawful and set aside agency action, findings and conclusions" that, like the challenged regulations, were promulgated "without observance of procedures required by law." 5 U.S.C. § 706(2)(D).

### 1.  The Notice is legislative in nature, not a mere policy statement.

"Legislative rules are ones with the 'force and effect of law.'" *Mock v. Garland*, 75 F.4th 563, 578 (5th Cir. 2023) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)). Generally, the difference between a rule and a policy statement depends on two criteria: "whether the [agency action] (1) imposes any rights and obligations and (2) genuinely leaves the agency and its decision-makers free to exercise discretion." *DAPA*, 809 F.3d at 171 (cleaned up). A court making that determination should be "mindful but suspicious of the agency's own characterization," and its primary consideration is whether the action "has binding effect on agency discretion or severely restricts it." *Id.* (quoting *Prof'ls & Patients*, 56 F.3d at 595).

The Notice imposes rights and obligations by instructing DHS officials on how to exercise their discretionary parole authority, setting new criteria for granting parole, affecting the States' obligations to provide benefits to certain aliens, affecting the federal government's obligations to provide benefits to certain aliens, and establishing a framework for the showing required to parole hundreds of thousands or millions of aliens into the country (or into a new status—in direct contravention of the unambiguous language of the parole statute—since they are already in the country). *See, e.g.*, *Texas v. United States*, 328 F. Supp. 3d 662, 731 (S.D. Tex. 2018) (DACA was not a policy statement for many of the same reasons the PIP Program is a legislative rule).

The federal government's own statements highlight the new rights created for illegal aliens who take advantage of this program: they will have a new process to apply for parole and a new set of criteria by which to be evaluated for parole, and "[i]f parole is granted, noncitizens who are eligible to apply for lawful permanent residence based on their marriage to a U.S. citizen will be able to do so without having to leave the United States," regardless of what explicit statutory law might say to the contrary. Attorney Decl. Ex. 13. Whether a rule "will produce significant effects on private interests'" has been treated in the Fifth Circuit as "the primary means to look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Mock*, 75 F.4th at 581 (cleaned up). The Notice's "significant effects on private interests" are the explicit purpose of the PIP program, spelled out in no uncertain terms in the Notice and the federal government's public statements.

Courts do not look at "the agency's self-serving label" of its action, but instead "look[] to the contents of the agency's *action*." *DACA*, 50 F.4th at 522 (cleaned up) (emphasis added). Courts are thus "mindful but suspicious of the agency's own characterization of what it has done." *Id.* (cleaned up). The "primary focus is whether the rule has binding effect on agency discretion or severely restricts it." *Id.* (cleaned up). The Notice sets forth criteria that binds the agency, 89 Fed. Reg. 67469–74, and DHS employees thus far have treated the criteria as binding, granting 100% of applications adjudicated under the PIP Program. Ex. B. at 267.

36

Even if the Defendants were correct that § 1182(d)(5)(A), and not the Notice, creates rights and obligations under the parole authority (they're not, both because § 1182(d)(5)(A) does not authorize parole under the circumstances described in the Notice and because the Notice is treated by DHS staff as binding), the Notice would still be legislative in that it (1) creates a right to access a unique, expedited process for certain aliens and (2) substantively modifies the presumptions embodied in other legislative regulations, *see, e.g.*, 8 C.F.R. § 212.5(b), by creating a presumption that parole serving "family unity" objectives meets the "significant public benefit" criterion.

In short, the PIP Program is a legislative rule that became effective without the notice and comment required by the APA, nor any opportunity for interested parties to participate in the policymaking process, so it is unlawful. *See* 5 U.S.C. § 553(b) and (c); *Mock*, 75 F.4th at 583.

**The foreign affairs exemption does not apply.**

"As with other exceptions to the notice-and-comment requirements, the foreign affairs exception 'must be narrowly construed.'" *Louisiana v. CDC*, 603 F. Supp. 3d 406, 437 (W.D. La. 2022) (quoting *DAPA*, 809 F.3d at 171). And even "in the immigration context," the government must make a strong showing that allowing even a short notice-and-comment period "will provoke definitely undesirable international consequences." *E. Bay Sanctuary Covenant v. Trump*, 932 F.3d 742, 775–76 (9th Cir. 2018). The government has not and cannot make such a showing.

In the Notice, Defendants attempt to invoke the foreign affairs exception merely by making the obvious and unexceptional disclosure that the PIP Program is part of "ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration." 89 Fed. Reg. 67489. This weak attempt to invoke the foreign affairs exception is insufficient. That the United States is engaged in "ongoing conversations with key foreign partners about migration management," *id.*, does not entitle Defendants to except the Notice from the APA's procedures. There is no evidence that complying with the APA's rulemaking procedures would cause a diplomatic incident.

Multiple circuits have adopted the "definitely undesirable international consequences" standard. *See Rajah v. Mukasey*, 544 F.3d 427, 437 (2d Cir. 2008); *Jean v. Nelson*, 711 F.2d 1455, 1477 (11th Cir. 1983) (cleaned up), *vacated and rev'd on other grounds*, 727 F.2d 957 (11th Cir. 1984) (en banc); *Am. Ass'n of Exps. & Imps.-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). The Fifth Circuit does not appear to have addressed the "foreign affairs" exception yet. But there is no reason to believe that it would split from, and adopt a less-stringent standard than, the four circuits that have adopted the "definitely undesirable consequences" standard.

The government's invocation of the foreign affairs exception does not identify *any* potential "undesirable international consequences"—let alone ones that will "definitely" occur. That rationale is thus insufficient on its face. Indeed, it is *exactly* what courts have made clear does not suffice: "the foreign affairs exception requires the Government to do more than merely recite that the Rule 'implicates' foreign affairs." *E. Bay*, 932 F.3d at 775. But that is all Defendants have done here, with the slight modification of swapping the word "implicates" with the vague, unsupported claim that notice-and-comment would "complicate ongoing conversations with key foreign partners." 89 Fed. Reg. 67489. Just as the "reference in the Rule that refers to our 'southern border with Mexico' [was] not sufficient" in *East Bay*, 932 F.3d at 775, the mere allusion to discussions with Mexico and Colombia, and unspecified other counties does not suffice here.

And even if the Fifth Circuit were to adopt a less stringent standard, Defendants' attempt to invoke the exception still fails. At a minimum, courts distinguish between whether a policy primarily concerns policy towards a specific country or group of countries or merely touches on other countries' interests generally. For example, in *Yassini v. Crosland*, 618 F.2d 1356, 1360–61 (9th Cir. 1980), the INS was able to rely on the foreign affairs exception to implement policy that "was an integral part of the President's response to the [Iran hostage] crisis," but the court emphasized that "[r]eview of decisions involving aliens nevertheless remains available." By contrast, in a case much more like the present one, the district court had no difficulty finding that "the foreign affairs function exception does not excuse the Departments from failing to engage in notice-and-comment

rulemaking before promulgating the Rule." *See Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 55 (D.D.C. 2020). In that case, the exception did not apply to an asylum policy rule because the rule "overhaul[ed] the procedures through which the United States decides whether aliens who arrive at our southern border are eligible for asylum here, no matter the country from which they originally fled." *Id.* "Not every request for international cooperation seriously may be called 'foreign policy,'" and a Program that doesn't even involve *recent* arrivals at any border—indeed, overwhelmingly involves those who have been *within U.S. borders* for over 10 years—comes nowhere near justifying the exception. *See Jean*, 711 F.2d at 1477–78 (holding that the foreign policy exception does not apply to general policies regarding detention and parole).

Courts have repeatedly and frequently rejected Executive efforts to invoke the "foreign affairs" exception in the immigration context. The APA provides an exception to notice-and-comment requirements for "foreign affairs function[s]." 5 U.S.C. § 553(a)(1). It has no such exception for immigration functions. *Id.* "The dangers of an expansive reading of the foreign affairs exception in [the immigration] context are manifest." *City of N.Y. v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010). Immigration matters, by their very nature, affect "foreign affairs." But if those implications alone sufficed, federal courts would effectively recognize a *de facto* immigration exception to notice-and-comment requirements.

Accepting the government's rationale here would have particularly pernicious effects. It would effectively permit any agency to avoid notice-and-comment rulemaking through the expedient of *talking* perfunctorily with foreign nations about the same subject—which is all that the government says here. The executive branch could avoid any obligation to give notice to, and take comments from, the *American* public by talking to a foreign government instead. Why would an agency *ever* trouble itself with intentionally burdensome notice-and-comment requirements when it could instead engage in a cursory and *un*burdensome conversation with a foreign government? After all, our "key foreign partners" might reasonably have strong opinions about almost everything our government does that could "complicate ongoing conversations." Courts

have never permitted such naked circumvention under the foreign-affairs exception.

**The Program is arbitrary and capricious.**

Plaintiffs are also likely to prevail on the merits because the regulation that created the PIP program is arbitrary and capricious, which is independently sufficient for the Program to be set aside. Under the APA, a reviewing court must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706 (2)(A). "[A]gency action is lawful only if it rests on a consideration of the relevant factors" and "important aspects of the problem." *Michigan v. EPA*, 576 U.S. 743, 750–52 (2015) (requiring "reasoned decisionmaking"). This means agencies must "examine all relevant factors and record evidence." *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 923 (D.C. Cir. 2017). Further, agencies must actually analyze the relevant factors and the agency must instead provide more than "conclusory statements" to prove it considered them. *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016).

The PIP Program is arbitrary and capricious for several independently sufficient reasons. Defendants failed to "consider[ ] important aspect[s] of the problem," *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins.,* 463 U.S. 29, 43 (1983).

*First*, Defendants arbitrarily failed to consider the States' interest in reliance on the prior regime and the disruption caused by paroling, by the most conservative estimate, at least 550,000 aliens *en masse*. As federal courts have recognized, "a sudden shift in immigration policy could cause immediate, unexpected, and acute harm to the State's budget. The potential for suffering such harm is direct and substantial." *100-Day Pause*, 524 F. Supp. 3d at 630. When an agency changes course, as here, it must "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 30 (2020) (citation omitted). In fact, "[i]t would be arbitrary and capricious to ignore such matters." *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

The PIP Program creates major liabilities for the States by transforming—without lawful

40

authority—at least 550,000 illegal aliens into "parolees," thereby making them eligible for a vast swath of expensive government benefits. These programs also incentivize illegal migration by subverting statutorily mandatory disincentives, *e.g.* 8 U.S.C. 1182(a)(9)(B), thereby increasing illegal migration and the myriad financial and social costs that accompany it.

The Notice claims "DHS considered the potential impact of the proposed process on State budgets," however a few sentences later, it admits DHS actually did no such thing: "[a] comprehensive quantified accounting of local and State fiscal impacts specifically due to this parole in place process is not possible." 89 Fed. Reg. 67478. It offers a "dismissive analysis, which dots 'i's' and crosses 't's' without actually saying anything." *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) (per curiam) (failure to "quantify or at least reasonably describe the costs of this policy to the States" did not satisfy requirement to consider them).

Agencies must actually analyze the relevant factors. "'Stating that a factor was considered … is not a substitute for considering it.'" *Texas v. Biden*, 10 F.4th 538, 556 (5th Cir. 2021) (cleaned up). The agency must instead provide more than "conclusory statements" to prove it considered the relevant statutory factors. *Encino Motorcars, LLC*, 579 U.S. at 224. The Notice, therefore, does not evidence any consideration whatsoever of the States' reliance on the ongoing enforcement of our immigration laws, nor of the costs imposed by undermining that reliance.

*Second*, related to the complete neglect of the States' reliance interests, the Notice does not meaningfully consider the financial costs the PIP Program will impose on the States. "The Supreme Court has recognized that border states 'bear[ ] many of the consequences of unlawful immigration.' It therefore follows that a 'potential reliance interest' that DHS must consider includes Texas." *Texas v. Biden*, 10 F.4th 538, 553 (5th Cir. 2021) (per curiam). And the "consideration [of any reliance interests] must be undertaken by the agency in the first instance," "even weak interests." *MPP*, 20 F.4th at 990 (quotation omitted); *see Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1907 (2020) ("judicial review of agency action is limited to 'the grounds that the agency invoked when it took the action.'").

Federal law requires that aliens with parole status become eligible for a variety of State-paid benefits after five years. These benefits include Medicaid, SNAP (commonly referred to as "food stamps"), and TANF (commonly referred to as welfare payments).[7] Furthermore, children and pregnant women who are aliens present in Texas who are paroled can become eligible immediately upon receiving parole for Medicaid and CHIP under the Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. No. 111-3 § 214, 123 Stat 8 (Feb. 4, 2009). Texas offers this benefit to children up to age 19. Attorney Decl. Ex. 14. Therefore, any minors who receive parole status under the PIP Program will become immediately eligible for Medicaid in Texas. These legal requirements impose specific costs on Texas that the Defendants could have calculated and should have considered. They did not. The PIP Program is, therefore, arbitrary and capricious.

*Third*, Defendants did not consider the incentive structures built into our immigration laws. As detailed above, the INA, augmented by IIRIRA, actively discourages illegal immigration by making it harder for those who have broken American immigration law to obtain the status of a legal resident without first leaving the country and by imposing waiting periods between departing the country and being eligible to be considered admissible for purposes of lawful reentry. The flip side of what the Defendants present as an urgent crisis of family unity and security is that the "harm" Defendants purport to solve with the PIP Program is also a strong disincentive to entering this country illegally. Reducing disincentives against bad behavior (like unlawful migration) tends to increase that bad behavior. Despite the obvious impact that undermining the statutory scheme, removing disincentives, and creating incentives for illegal migration is likely to have on illegal immigration (specifically: it will increase it), Defendants failed to seriously consider incentives or the risk of increased illegal immigration in any way before promulgating the Notice. Instead,

_____

[7] *See* 8 U.S.C.A. § 1641(b)(4) (defining "qualified alien" as "alien who is paroled into the United States under [§ 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (qualified aliens eligible for food stamps after 5 years); 8 U.S.C. § 1613(a) (qualified aliens eligible for "any Federal means-tested public benefit … 5 years" after "the date of the alien's entry").

Defendants weakly claim that "DHS does not believe this process will meaningfully affect or create incentives for noncitizens to enter the United States" merely because it imposes a ten-year residency requirement. 89 Fed. Reg. 67479.

*Fourth*, Defendants fail to address the shift from their prior position. We don't know why Defendants have deviated from their prior position, policy, and practice, because no reasoned explanation was provided—a per se violation of APA requirements. *Encino Motorcars, LLC* ("existing policies" can be changed only after "a reasoned explanation for the change.").

*Fifth*, the PIP Program is arbitrary and capricious because its rationales are pretextual. Although courts are loath to investigate "the mental processes of administrative decisionmakers," there is an exception for "bad faith or improper behavior" that can justify such an inquiry, along with extra-record discovery. *Dep't of Com. v. New York*, 588 U.S. 752, 781, 785 (2019) (affirming finding of pretext where "explanation for agency action … is incongruent with what the record reveals about the agency's priorities and decisionmaking process").

The PIP Program essentially grants amnesty and a path to "lawful permanent residence," Attorney Decl. Ex. 1, and, eventually, citizenship for *at least* 550,000 people and vastly expands the parole power, without any statutory authorization. Mass amnesty for illegal aliens and increased migration have long been policy priorities of the Biden-Harris Administration. *See, e.g.*, U.S. Citizenship Act of 2021, H.R. 1177, 117th Cong. (2021) (rejected proposal for amnesty for estimated 11 million illegal aliens). The Biden-Harris Administration has also sought to expand the parole power via legislation to permit mass amnesty for vast numbers of illegal aliens. For example, in 2021, the Administration tried (unsuccessfully) to incorporate a massive expansion of the parole power into the economic stimulus package nicknamed "Build Back Better." Attorney Decl. Ex. 15.

*Sixth*, the Notice repeatedly treats illegal aliens participating in the U.S. workforce as a positive. *See, e.g.*, 89 Fed. Reg. 67466, 67483, 67487. This contradicts Congress's "comprehensive framework for combating the employment of illegal aliens," which has "forcefully made combating the employment of illegal aliens central to the policy of immigration law." *Arizona v. United States*,

43

567 U.S. 387, 404 (2012) (cleaned up). And "as Congress [has] explained, '[a]liens who enter or remain in the United States in violation of our law are effectively taking immigration opportunities that might otherwise be extended to others.'" *Demore v. Kim*, 538 U.S. 510, 518 (2003) (quoting S. Rep. No. 104–249, p. 7 (1996)). Indeed, "a primary purpose in restricting immigration is to preserve jobs for American workers." *INS v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 194 (1991). The PIP Program disregards Congress's determinations that employment of illegal aliens harms American workers. Instead, the PIP Program adopts a cost-benefit analysis that relies on potential downstream effects that could help some American workers despite harms to those directly competing with PIP recipients in the labor market. 89 Fed. Reg. 67466–67.

An agency rule is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider." *State Farm*, 463 U.S. at 43. Congress did not intend Defendants to consider the positive effects of what it has forbidden by statute—the employment of illegal aliens. Instead, Congress allowed employment authorization for certain categories of illegal aliens while they were not removable, not to encourage the continued (or increased) presence of removable illegal aliens.

*Seventh*, there is no sign that Defendants considered lawful alternatives to the PIP Program. Defendants did not consider whether de-prioritizing enforcement against illegal aliens married to U.S. citizens might have been a less disruptive (and more lawful) method of promoting family unity. Defendants did not consider whether any statutory authorities might legitimately facilitate opportunities for families to maintain physical proximity without the U.S. citizen spouse being put in a difficult position. And Defendants did not consider whether the best policy might be to allow those who break our laws (or marry lawbreakers) to keep their families united outside the United States until they have completed the requirements to be lawfully re-admitted.

Any of these reasons are independently sufficient for the court to find that PIP is arbitrary and capricious and, thus, unlawful.

44

**The approval and use of Form I-131F violates the Paperwork Reduction Act and is arbitrary and capricious.**

Under the Paperwork Reduction Act (PRA), "[a]n agency shall not conduct or sponsor the collection of information unless in advance of the adoption or revision of the collection of information," the agency complies with a number of requirements, including a review of the information to be collected, publication in the Federal Register of the intent to collect information, a 60-day notice-and-comment period, approval by OMB, and then publication in the Federal Register by OMB with another 30-day notice-and-comment period. 44 U.S.C. §§ 3506, 3507. Defendants have followed none of these PRA-required procedures. Therefore, the earliest that Form I-131F could be approved is 90 days from first publication in the Federal Register. There is one exception to the PRA's normal requirements: the PRA and OMB's implementing regulations allow "OMB to authorize emergency processing of submissions of collections of information." 5 C.F.R. § 1320.13; *see also* 44 U.S.C. § 3507(j). But emergency processing is only permitted in narrow circumstances not present here. 44 U.S.C. § 3507(j)(1) and 5 C.F.R. § 1320.13(a).

"The power to utilize [the emergency processing] authority under these provisions is not unlimited. Such emergency requests are only appropriate upon an agency head's determination that public harm is reasonably likely to result if normal clearance procedures are followed." *Texas Blockchain Council v. Dep't of Energy*, No. W-24-cv-99, 2024 WL 990067, at *2 (W.D. Tex. Feb. 23, 2024) (Albright, J.). When "the facts alleged by Defendants to support an emergency request fall far short of justifying such an action," the emergency processing "determination likely violates the APA as 'arbitrary, capricious, [or] an abuse of discretion.'" *Id.* (quoting 5 U.S.C. § 706(2)(A)).

The Notice fails to allege any of the circumstances required for emergency processing of Form I-131F, and none of the circumstances required for emergency processing are present here. Defendants do not qualify for emergency processing under the PRA, so they violated the Act, and the approval and use of Form I-131F is unlawful and arbitrary and capricious under the APA.

**The PIP Program violates the Take Care Clause.**

Since our Founding, "both courts and the executive branch itself have recognized the

president's inability to suspend or dispense with the law." *MPP,* 20 F.4th at 981. "The Framers agreed that the executive should have neither suspending nor dispensing powers." *Id.* at 980. The Supreme Court has held likewise. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Id.* at 613. Any other conclusion would "vest[] in the President a dispensing power." *Id.* Through its adoption of the policies of the PIP Program, the Executive dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful, thereby violating the Take Care Clause. U.S. CONST. art. II, § 3 ("[The president] shall take Care that the Laws be faithfully executed …").

The PIP Program further violates the Take Care Clause because it dispenses with certain immigration statutes by granting a pathway to citizenship to aliens who, but for the PIP Program, are clearly unlawfully present. As Justice Scalia properly noted, the similar DACA program involved "biennial requests for *dispensation*" from immigration statutes. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia, J., concurring in part and dissenting in part) (emphasis added).

Plaintiffs do not base their Take Care Clause claim on an implied cause of action arising from that constitutional provision itself. Instead, Plaintiffs have an explicit APA cause of action: "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret *constitutional* and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 (emphasis added), and a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "contrary to constitutional right, power, privilege, or immunity," *id.* at (2)(B).

**Plaintiffs are within the zone of interests and have a cause of action.**

Plaintiffs have a cause of action under the APA because their claims are within the zone of interests protected by the INA. The zone-of-interests test is satisfied if the claims are "*arguably* within the zone of interests to be protected or regulated by the statute." *DACA*, 50 F.4th at 521

(citing *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012)). The only time that review is foreclosed under this test is "when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.* (cleaned up).

The interests or purposes of the INA and related immigration statutes are to set forth "a comprehensive federal statutory scheme for regulation of immigration and naturalization" and to "set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *DACA*, 50 F.4th at 521 (internal quotations omitted) (quoting *Chamber of Commerce v. Whiting*, 563 U.S. 582, 587 (2011)). Plaintiffs have an interest in seeing the INA and other statutes enforced and upheld. *See id.* at 521 (citing *Arizona*, 567 U.S. at 397, and *DAPA*, 809 F.3d at 163). Plaintiffs also have an interest in reducing the financial burdens of illegal immigration, as shown by the injuries that demonstrate their standing and irreparable injury. *Id.* Plaintiffs fall within the zone of interests of the INA as a whole, which is the proper reference for actions under the APA, rather than any particular section. *MPP*, 20 F.4th at 975–76.

### The PIP Program is reviewable.

- **The PIP Program is final agency action.**

As the Fifth Circuit's most relevant precedent instructs, the issue of final agency action should be addressed first because "that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Finality finds its origins in the Administrative Procedure Act ("APA"), which only allows judicial review of "final" agency action. 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: (1) the agency action "mark[s] the consummation of the agency's decisionmaking process" and is not "merely tentative or interlocutory [in] nature," and (2) the action determines "rights or obligations" and imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as 'flexible.'" *EEOC*, 933 F.3d at 441 (cleaned up). Both finality prongs are satisfied here.

### 1.  The Notice marks the consummation of DHS's decisionmaking.

The Fifth Circuit recognizes that even "guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011). "[T]he key question [for the first finality prong] is whether [the agency action] is 'subject to further agency review.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 638 (5th Cir. 2023); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022).

Indeed, where "the challenged action is a definitive statement of the agency's position," the "agency action is final." *Jobs, Training & Servs., Inc. v. E. Tex. Council of Gov'ts*, 50 F.3d 1318, 1324 (5th Cir. 1995); *Barrick Goldstrike Mines Inc. v. Browner*, 215 F.3d 45, 48 (D.C. Cir. 2000) ("a guidance document reflecting a settled agency position and having legal consequences for those subject to regulation may constitute 'final agency action'") (citation omitted).

In *MPP*, the Fifth Circuit held that a DHS decision to terminate the Migrant Protection Protocols constituted final agency action. 20 F.4th at 948; *see also Biden*, 597 U.S. at 807 ("As the Court of Appeals correctly held, [the termination decision] constituted final agency action."). The Federal Government argued that the termination decision did not consummate DHS' decisionmaking process. *Id.* The Federal Government also asserted that the decision was merely a policy statement and that "a policy statement isn't final until the agency applies it in a particular situation to an affected person or entity." *Id.* (internal quotation marks omitted). The court rejected this argument and affirmed the district court's finding that the termination decision "altered [the] status quo and caused DHS to return fewer aliens to Mexico (and to instead release and/or parole them into the United States)."

Here, a decision to implement new rules and protocols constitutes final agency action just as a decision to terminate rules and protocols constitutes final agency action. As in *MPP* where the court affirmed that the termination decision altered the status quo by resulting in fewer aliens being returned to Mexico and more being paroled in the United States, here, implantation of the PIP Program will have the same result—fewer aliens returned to Mexico and more being paroled in the United States. This result is not speculative. The Notice declares that without the PIP Program,

"hundreds of thousands of noncitizen spouses of U.S. citizens are likely to instead remain in the United States without lawful status." 89 Fed. Reg. 67466. Implementation of the PIP Program clearly alters the status quo by changing the outcome for hundreds of thousands of aliens and consummates DHS' decisionmaking process. Thus, the first finality prong is satisfied.

### The Notice binds DHS and imposes legal consequences.

In addition to the first prong of finality, the Notice also satisfies the second prong of finality when it binds Defendants and their employees to a particular legal position and causes significant legal consequences for Texas and the other Plaintiff States. Generally, when an agency "loses discretion" because of an agency action, "[t]hat's textbook final agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 854. Even if the agency action only removes "*some* of the [agency's] discretion," it still satisfies the second prong of finality. *Clarke*, 74 F.4th at 638 (emphasis added). Stated differently, "the existence of some amount of discretion is not determinative." *Texas*, 549 F. Supp. 3d at 602. The Notice does not genuinely leave the agency and its personnel free to exercise discretion, as demonstrated by the parole approval rates of 100% under the Program. *See* Ex. B. at 267. This sort of approval rate demonstrates that the agency is not applying the Parole Program's criteria on a case-by-case basis. *See Texas v. United States*, 86 F. Supp. 3d 591, 670 n. 101 (S.D. Tex. 2015), *aff'd, DAPA*, 809 F.3d 134 ("Evidence of DACA's approval rate [somewhere between 94–99%], however, persuades the Court that this [discretionary] 'factor' is merely pretext").

And one way that courts have held that agency "guidance" documents like the Notice constitute final and reviewable agency actions under the APA is if they "bind" the agency and its employees "to a particular legal position." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997) ("The primary distinction between a substantive rule—really any rule—and a general statement of policy … turns on whether an agency intends to bind itself to a particular legal position."); *accord DAPA*, 809 F.3d at 171 ("We focus primarily on whether the rule has binding effect on agency discretion or severely restricts it.") (cleaned up). Action "bind[ing]" an

"agenc[y]" to a legal view "gives rise to 'direct and appreciable legal consequences.'" *U.S. Army Corps of Eng'rs v. Hawkes*, 578 U.S. 590, 598 (2016) (citation omitted).

Here, the Notice makes clear that the PIP Program binds DHS. For instance, the Notice provides that "DHS *will* begin using the [new] Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens," 89 Fed. Reg. 67,459 (emphasis added), "USCIS *will* assume a new workload by accepting [new] parole in place requests," *id.* at 67,468 (emphasis added), and "USCIS *will* notify the noncitizen in writing of the time and location for a biometric services appointment," *id.* at 67,473 (emphasis added). These new processes and rules trigger legal consequences including the paroling of, by DHS' estimates, 500,000 noncitizen spouses and 50,000 noncitizen stepchildren—causing Plaintiffs to take on financial burdens of unknown proportions. *Id.* at 67,466.

The Notice also creates obligation for DHS and new rights for aliens by fashioning an expedited and less "burdensome" path to being paroled in the United States and granted legal residency status. 89 Fed. Reg. 67483; *id.* at 67466 ("this process will provide these noncitizens the ability to work lawfully" because they "generally lack access to employment authorization" without the Program); *id.* at 67483 (Program would grant recipients "expanded employment opportunities not previously available to them"). The PIP Program is no different than the Deferred Action for Childhood Arrivals program in *DACA*, 50 F.4th 498, where the Government argued the program "confers no rights because the [underlying] memorandum says it does not." *Id.* at 523. Looking at the memorandum's language, the court rejected this argument, and instead concluded that the memorandum conferred rights on aliens and obligations on USCIS. *Id.* Specifically, the court noted that the memorandum stated that "USCIS shall accept applications to determine whether these individuals qualify for work authorization during this period of deferred action." *Id.* Thus, the *DACA* court held that the subject program satisfied the second finality prong. *Id.*

Here, the action reflected in the Notice binds the agencies and imposes legal consequences because it explicitly cabins discretion. At a minimum, it imposes a presumption no less impactful

than the presumptions in 8 C.F.R. § 212.5(b), that certain aliens are eligible for parole and that "family unity" suffices to meet the "significant public benefit" requirement. But the reality is that the PIP Program goes much farther than that. The PIP Program also alters the rights of aliens by creating a program where the agency adjudicates applications for parole, conferring a right to participate in the program, and results in grants of parole that make aliens eligible for federal and state benefits. *See DACA*, 50 F.4th at 521–24 (DACA is a substantive rule because it provides "affirmative immigration relief … following extensive proceedings that are effectively adjudications" and "eligibility for benefits"); *DAPA*, 809 F.3d at 173 n.137 ("[P]lac[ing] a cost on the states" is also a sign that a rule is binding).

Indeed, by its own terms the Notice creates benefits and an opportunity to access LPR status for noncitizen spouses and noncitizen stepchildren who "currently cannot access LPR status without first departing the United States." 89 Fed. Reg. 67460. Even the Notice touts the contrast between "past sparing uses of parole in place," 89 Fed. Reg. 67461 n.26, and the unique parole application process that it makes available to hundreds of thousands—maybe millions—of illegal aliens who otherwise would have no process available to apply for parole. By its own term, it goes quite a bit farther than merely "inform[ing] the public of the agencies' current approach to implementing discretionary parole authority with respect to certain unlawfully present spouses and stepchildren." ECF No. 47 at 27.

The Notice did not merely "remind parties of existing statutory or regulatory duties" but rather imposed new duties, "chang[ed] the text" of the statute it "profess[ed] to interpret," and effects[ed] a substantive change in existing law or policy," and is therefore a substantive (or "legislative") rule. *POET Biorefining, LLC v. EPA*, 970 F.3d 392, 407 (D.C. Cir. 2020). And because those agency documents do not "genuinely leave[] the agency and its decisionmakers free to exercise discretion," it is also a substantive rule. *Texas*, 549 F. Supp. 3d at 600 (citation omitted). DHS employees, at least, have interpreted the Notice as binding guidance, deciding the rights of applicants for parole—if they meet the guidance outlined in the Notice, they are entitled to parole,

as indicated by the 100% approval rate. Ex. B. at 267. As all substantive rules are, "by definition, final agency action," *EEOC*, 933 F.3d at 441, the Notice here constitutes final agency action.

Further, the Notice constitutes a substantive rule because no statutory authority "compels or logically justifies" its provisions. *Nat'l Council for Adoption v. Blinken*, 4 F.4th 106, 113 (D.C. Cir. 2021). That's because "the [action] does not simply repeat the relevant provisions of [the parole statute]. Instead, the [action] purports to interpret authoritatively [those statutory requirements]. This court has always considered such a distinction important when deciding whether agency action is 'final' under the APA." *Texas v. EEOC*, 827 F.3d 372, 385–86 (5th Cir. 2016), *opinion withdrawn on reh'g,* 838 F.3d 511 (5th Cir. 2016).

Even policy statements may sometimes be final agency actions due to their effects. *See MPP*, 20 F.4th at 949; *Ctr. for Auto Safety v. NHTSA*, 452 F.3d 798, 807 (D.C. Cir. 2006). What matters is the actual effect of the challenged actions, not how Defendants label them. *See Prof'ls & Patients*, 56 F.3d at 596. The Notice establishes eligibility for a unique program, disqualifies specific categories of alien who are ineligible, and has been treated by DHS employees as binding. By any reasonable measure, it is final agency action.

### The PIP Program is reviewable under the APA.

The APA establishes a "basic presumption of judicial review for one suffering legal wrong because of agency action." *Regents of the Univ. of Cal.*, 591 U.S. at 16–17. "That presumption can be rebutted by a showing that the relevant statute precludes review, or that the agency action is committed to agency discretion by law [as explained by *Heckler v. Chaney*, 470 U.S. 821 (1985)]." *Id.* (cleaned up). Neither exception applies in the current action. Establishing unreviewability is a heavy burden, and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *DAPA*, 809 F.3d at 164 (cleaned up). Only a narrow group of matters are regarded as "committed to agency discretion," such that they are exempt from review under the APA under 5 U.S.C. § 701(a)—an agency's decision not to institute enforcement proceedings, for example, or statutes drawn in such

broad terms that "there is no law to apply." *DAPA*, 809 F.3d at 163. That is not the case here, where Congress set forth both specific legal criteria for eligibility for parole and a specific process for determining whether those criteria are met. *See* 8 U.S.C. § 1182(d)(5).

### 1. No statute bars review.

No "statutes preclude judicial review." 5 U.S.C. § 701(a)(1). The INA provides that "no court shall have jurisdiction to review ... any other decision" of DHS "the authority for which is specified under this subchapter to be in the discretion of" DHS. 8 U.S.C. §1252(a)(2)(B)(ii). As relevant here, DHS "may ... in [its] discretion parole into the United States temporarily under such conditions as [it] may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States." *Id.* §1182(d)(5)(A). Courts have consistently rejected the claim that § 1252(a)(2)(B)(ii) bars review of the type of programmatic challenge the States assert here. "To the contrary, the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *MPP*, 20 F.4th at 977 (rejecting argument that "an *entire program*—operating across an international border and affecting thousands or millions of people and dollars—is rendered unreviewable by § 1252(a)(2)(B)(ii)) (emphasis in original); *see also Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *8–9 (D. Mass. May 12, 2023) ("the Court agrees with Plaintiffs that § 1252(a)(2)(B)(ii) does not bar all judicial review of agency action taken under § 1182(d)(5)(A)" and collecting cases holding the same); *id.* at *9 (DHS parole policies at issue in the case were reviewable under the APA, because "the guidelines in § 1182(d)(5)(A) provide sufficient guidance such that the [Federal] Defendants' actions are not unreviewable under the narrow exception articulated in § 701(a)(2).").

Nor is the analysis in *Patel v. Garland*, 596 U.S. 328 (2022), to the contrary. Not only does *Patel* not "unequivocally overrule" *MPP*, *Martinelli v. Hearst Newspapers, L.L.C.*, 65 F.4th 231, 234 (5th Cir. 2023), but it supports the Fifth Circuit's analysis. The question in *Patel* was whether Congress precluded courts from reviewing *factual findings* under §1252(a)(2)(B)(i); the answer to

which turned on the meaning of the word "judgment." *Patel*, 596 U.S. at 336–37. The Supreme Court looked to §1252(a)(2)(B)(i), which precludes review of discretionary judgements, and §1252(a)(2)(D), which permits review of legal and constitutional challenges. *Id.* at 338–39. To give both provisions meaning, the Court concluded that facts would fall in the discretionary component of a judgment that courts cannot reach. *Id.* Nothing in that analysis suggests that DHS can disregard 8 U.S.C. §1182(d)(5)'s "case-by-case" requirement." *Patel* was about individual decisions "made discretionary by legislation"—not challenges to programmatic immigration policy. 596 U.S. at 333–34 (quoting *Kucana v. Holder*, 558 U.S. 233, 246–47 (2010)). Furthermore, the fact that the Court was focused on a single discrete regulatory action rather than a program-wide decision demonstrates the proper scope of §1252(a)(2)(B)(ii).

The Supreme Court has also explained that DHS's parole authority "is not unbounded: DHS may exercise its discretion to parole applicants 'only on a case-by-case basis for urgent humanitarian reasons or significant public benefit.' And under the APA, DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." *Biden*, 597 U.S. at 806–07 (quoting 8 U.S.C. §1182(d)(5)(A)). The Supreme Court would not have said that DHS's parole must comport with the APA if there were no review under the APA.

**The PIP Program is not committed to agency discretion by law.**

The Parole Program is a "rule" under the APA. A rule is "an agency statement of general … applicability and future effect" that either "prescribe[s] law or policy" or "describe[s] [agency] organization, procedure, or practice requirements. 5 U.S.C. § 551(4). "*Heckler* does not apply to agency rules" at all. *MPP*, 20 F.4th at 978. Courts "apply *Heckler*, if at all, to one-off agency enforcement decisions rather than to agency rulemakings." *Id.* at 984. Such one-off enforcement decisions would include, for example, a particular decision to grant (or not grant) parole to a specific alien. Plaintiffs here do not challenge such decisions. Thus, this Court need proceed no further—the PIP Program is reviewable under the APA.

Even if *Heckler* could apply to the PIP Program as a rule, it wouldn't apply because of what the Notice does. The operation of the Program "would trigger eligibility for federal benefits and state benefits that would not otherwise be available to illegal aliens." *DAPA*, 809 F.3d at 166. "[T]o be reviewable agency action, [the challenged action] need not directly confer public benefits— removing a categorical bar on receipt of those benefits and thereby making a class of persons newly eligible for them'provides a focus for judicial review.'" *Id.* at 167 (quoting *Heckler*, 470 U.S. at 832). The removal of that bar "provides a focus for judicial review." *Heckler*, 470 U.S. at 832; *accord DAPA*, 809 F.3d at 167.

Even if *Heckler*'s presumption against reviewability applied, "the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *MPP*, 20 F.4th at 982. That rebuttal holds here. The Supreme Court in *Biden*, 597 U.S. at 806–07, recently stated that parole authority "is not unbounded" because of its case-by-case limitation and limit to urgent humanitarian reasons or significant public benefit and "DHS's exercise of discretion within that statutory framework must be reasonable and reasonably explained." (quoting landmark APA case *State Farm*, 463 U.S. 29).

### Texas has standing.

Texas has demonstrated each of the three elements required to have standing to bring its claims: (a) an injury in fact, (b) fairly traceable to the challenged action, (c) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Under the standing analysis, only one plaintiff needs to establish standing for an Article III case or controversy to exist. *See DACA*, 50 F.4th at 514 (citing *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). And once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g.*, *Massachusetts*, 549 U.S. at 525–26.

"Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status." *DACA*, 50 F.4th at 517. On top of these federally required costs, other expenditures are required by preexisting state law. Texas

55

law requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq.* Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining nonprofit status. *See id.* § 311.043.

- **Texas has an injury in fact.**

"For standing purposes, even 'a dollar or two' of injury suffices." *Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023) (Tipton, J.) (quoting *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008)). Standing is not defeated by the fact that some of the beneficiaries could have been paroled under a different circumstance. And Texas need not show that any actual PIP Program beneficiaries partake of any of these benefits to show standing. *MPP*, 20 F.4th at 971 *see also DACA*, 50 F.4th at 517–18 (finding sufficient for standing that "[t]he record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients, but no one disputes that some are.").

The annual cost of educating unaccompanied alien children—a subset of illegal aliens—costs Texas hundreds of millions of dollars annually, and approximately $232.77 million in FY 2023 and $201.90 million in FY 2024. Ex. C. ¶ 5.

Additionally, Texas funds two healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program and the Texas Children's Health Insurance Program (CHIP). Ex. D. ¶ 5. Texas is required by federal law to cover illegal aliens in Emergency Medicaid. *See* 42 C.F.R. § 440.255(c). "The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; $95.0 million in CY 2022; and $97.5 million in 2023." *Id.* ¶ 8. Texas also spends millions of dollars per year on CHIP for perinatal coverall for illegal aliens, including over $31 million in 2023. *Id.* at 309.

Texas also faces serious injuries from the crime and associated costs caused by the PIP Program. From July 1, 2022, to June 30, 2023, the Texas Department of Criminal Justice (TDCJ) housed 7,768 illegal criminal aliens for a total of 2,208,639 days. Ex. E. ¶ 6. That cost Texas around

$171,147,436, but the federal government has yet to reimburse Texas. *Id.* ¶¶ 6–7. And from July 1, 2022, through June 30, 2022, TDCJ housed 6,914 illegal criminal aliens for a total of 2,019,635 days. *Id.* ¶ 8. That cost Texas around $156,501,516. *Id.* Of this amount, TDCJ was only reimbursed $14,555,173. *Id.* ¶ 9. And from July 1, 2020, through June 30, 2021, TDCJ housed 7,058 criminal illegal aliens for a total of 1,984,597 days. *Id.* ¶ 10. That cost Texas an estimated $ 153,786, 422. *Id.* Of this amount, TDCJ was only reimbursed $ 14,883,040 by the federal government. *Id.* ¶ 11. The amounts of unreimbursed expenses will likely increase if more illegal aliens are paroled under the PIP Program. *Id.* ¶ 12. Criminal activity by aliens would not occur had they not been present in the State imposes a significant cost on Texas's criminal justice system.

### Texas's injury in fact is legally cognizable.

The Supreme Court's decision in *United States v. Texas* ("*Enforcement Priorities*"), 143 S. Ct. 1964 (2023), does not apply to cases like this one. That case addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized its narrow holding: "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to

*require* the Executive Branch to make arrests or bring prosecutions are rare. …This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action," but that "case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* "[T]his case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court … holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

This extremely narrow and "highly unusual" case does not apply here. That is because Texas's injuries are not based on a mere failure to arrest particular aliens—they are based on the grant of affirmative relief to aliens via parole through an adjudicatory process making them eligible for benefits. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any particular aliens.

The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id.* (cleaned up). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id.* at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But *those* indirect injuries were not *redressable* because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id.* at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 588 U.S. 752 (2019), which upheld indirect injury supporting States' standing to challenge federal agency action, *see id.* at 753 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting this).

The Supreme Court even took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or

bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, its exceptions would apply even if it did.

### a. The PIP Program is affirmative immigration relief, not mere non-enforcement.

The *Enforcement Priorities* majority noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *DAPA*, 809 F.3d at 154 (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

This applies to this case. The PIP Program makes its recipients eligible for various federal and state benefits. Under federal law, aliens paroled into the United States become eligible for various benefits after five years. These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). *See* 8 U.S.C. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for

food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States"). Beneficiaries of the PIP Program are also eligible for employment authorization to work in the United States.

Here, Texas's injuries are not based on a mere failure to arrest particular parole-eligible aliens—instead, a grant of parole (like a grant of deferred action) is not mere non-enforcement but constitutes "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action"—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission— is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated). This exception applies to this case due to the effects that parole has on aliens and States. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP causing injuries to States via paroling aliens, *Biden v. Texas*, 142 S. Ct. 2528 (2022), as raising different standing issues—the Court reached the merits in that case). Increasing grants of parole even *indirectly* through termination of MPP satisfied this test:

> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (emphases in original), *rev'd on other grounds*, *Biden*, 597 U.S. 785. In this case, the challenged agency action—directly increasing parolees—even more directly causes this injury. When a policy "has increased the number of aliens released on parole into the United States, including Texas," *MPP*, 20 F.4th at 966, that meant that more aliens were being granted parole into the States to use healthcare services and public education. *Id*. at 968. This was sufficient for Article III standing and remains the case here.

Texas's injuries on this basis are not *indirect*—courts in the DACA litigation described these same injuries from "affirmative immigration relief" that makes aliens eligible for benefits and lawful presence as *direct* costs to the States. *See DACA*, 50 F.4th at 517 ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id*. at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas*, 549 F. Supp. 3d at 589 ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services."). *Enforcement Priorities* concerned a claim of indirect injury because the challenged agency action was a refusal to take criminal aliens into custody. But a direct chain of events is cognizable for standing even if the harm is several links down the chain—While a man may not be said to *directly* harm another when he callously stands by as he falls (*Enforcement Priorities*), the man does *directly* harm another if he pushes an object that then causes the other to fall (*DACA*, termination of remain-in-Mexico in *MPP*—and the PIP Program).

As with the termination of MPP, the DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up). Paroling aliens makes them eligible for benefits, imposing *direct* costs on the Plaintiff States.

### b. Texas has standing because the agency action challenged here constitutes an abdication of Defendants' statutory responsibilities.

The *Enforcement Priorities* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id*. at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id*. at 1974. "But the States have not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id*.

The Parole Program is just such an extreme example that constitutes abdication of the Federal Defendants' statutory responsibilities to grant parole only on a case-by-case basis for significant public benefit or urgent humanitarian reasons. "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse*." *Id*. at 997. Yet the Program relies on precisely the type of programmatic parole that the INA expressly prohibits.

Judge Hanen had previously found that States had standing to challenge DAPA based on this abdication theory. *See Texas v. United States*, 86 F. Supp. 3d 591, 636–41 (S.D. Tex. 2015) (Hanen, J.); *id*. at 641 ("The States claim that, unlike the FDA's action at issue in *Heckler,* the DAPA program is a total abdication and surrender of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees."). Indeed, Judge Hanen relied on APA reviewability under *Heckler v. Chaney, id*. at 641, to also find standing—the same analysis adopted by the *Enforcement Priorities* majority.

The *Enforcement Priorities* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in that case or argued that the Executive has entirely ceased enforcing the relevant statutes." 143 S. Ct. at 1974. And Justice Gorsuch's concurrence notes that a claim

under the Take Care Clause could be an abdication argument. *Id*. at 1977-78. Here, the Parole Program "prevents immigration officials from enforcing these [limiting] provisions of the" parole statute. *Texas*, 549 F. Supp. 3d at 608. As explained above, this violates the Take Care Clause, and the States therefore have standing based on an abdication argument. Recently, Judge Hanen found States had standing on this basis to challenge DACA. *See Texas v. United States*, 691 F. Supp. 3d 763, 780 (S.D. Tex. 2023), *appeal filed*, No. 23-40653 (5th Cir. Nov. 9, 2023).

Now that the Supreme Court has explicitly approved abdication of statutory responsibilities as a basis for standing, this Court should find standing for the States here on this additional ground—this case involves allegations of total disregard of Congress's limits on the parole authority and thus constitutes an abdication of Defendants' statutory responsibilities.

### Texas's harms are traceable to the PIP Program and redressable by this Court.

Injury must be "fairly" traceable to the defendant and be "likely" redressable by the relief sought. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When it comes to the "inherently imprecise" task of discerning traceability, "common sense" and "basic economics" are "useful tool[s]." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.).

Here, Texas has shown that the PIP Program will result in a variety of direct economic harms. Some aliens will return to their home countries when they are not incentivized to stay via work authorizations and protection from removal. "Texas has satisfied the second requirement for standing by showing that its costs are 'fairly traceable' to [the PIP Program]" because the rescission of the Program would "cause some recipients to leave, thereby reducing the financial burdens on the State." *Id*. at 519. For example, a national survey found 22.3% of DACA recipients stated that they were likely or very likely to leave the U.S. if they lacked deferred action. Ex. F. ¶ 12. Even illegal aliens who have been in the U.S. for ten years or longer "return to their countries of origin at a rate of 1% each year." *Id*. ¶ 14. Beyond these voluntary departures a number of these aliens would be removable, "providing incentives for some if not many to leave the United States, including Texas … and their departure would reduce the State's Medicaid, social services and

education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520. For instance, during the second term of the Obama Administration, "365 persons who formerly had DACA status were removed from the United States." *Id.* ¶ 16. Return migration patterns have also been observed in the context of "family migrants" who "primarily move to a new county" so they can live with "their spouse or intended spouse." *Id.* ¶ 17. Like many marriages, a "substantial number of these unions end in divorce." *Id.* When this happens, "one or both partners may choose to relocate, often leading to a return to their country of origin." *Id.*

The Notice itself understands that without the Program, at least some PIP-eligible aliens "must therefore depart the United States and seek an immigrant visa at a U.S. embassy or consulate abroad," where "they [would] face uncertainty about whether they will be granted an immigrant visa and be able to return to the United States." *See* 89 Fed. Reg. 67460; *see also id.* at 67474. Defendants concede that only "the vast majority of this population would remain in the country." *Id.* at 67486. The direct effect of the Program leading to reduced flows of illegal aliens back to their home countries is a feature of the Program: "USCIS also anticipates that this process will lead to … some noncitizens who would otherwise seek lawful permanent residence via consular processing, … will now seek adjustment of status." *Id.* at 67478. "Absent this process, for these noncitizens to apply for permanent residence, their U.S. citizen spouses and children might have to endure prolonged separation from them" and "for an indefinite period." *Id.* at 67466. USCIS predicts this Program will reduce the number of aliens leaving the United States to apply at an embassy or consulate from abroad, *id.* at 67468, and predicts that ICE and DOJ will save resources because fewer aliens will be placed in or remain in removal proceedings, leaving them free in the country, *id.* at 67469. Indeed, even aliens with unexecuted final removal orders may apply, *id.* at 67471–72, 67477, as well as aliens in removal proceedings, *id.* at 67476. So the Notice acknowledges that some aliens granted PIP status would otherwise have voluntarily left the United States to apply for adjustment of status at a consulate in their home countries, with the possibility of never being permitted to return, and that others would have been removed from the United States or detained

65

in removal proceedings.  In any of these scenarios, those aliens would not be using Texas's public education, healthcare, or incarceration programs.

In other words, there is at least a "substantial risk," *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2747 (2010), that the PIP Program keeps some aliens here who would otherwise leave the country, sometimes for years. *See* ECF No. 15-3 ¶ 23 (Decl. of Salvador Doe) ("[I]f [the PIP Program] is blocked from continuing, my only remaining option to obtain lawful permanent residency would be to do consular processing" in Mexico); ECF No. 15-8 ¶ 18 (Decl. of Foday Turay) (relaying that some "spouses have been stuck abroad for up to seven years" during consular processing); ECF No. 15-9 ¶¶ 9–10 (Decl. of Jaxhiel Turay) (acknowledging that without the PIP Program her spouse would have to "leave the United States" for consular processing and that the process could take "months or even years"). The PIP Program admits as much, allowing aliens who are "currently in *removal* proceedings" to request PIP. 89 Fed. Reg. at 67465 (emphasis added). Ultimately, this gives aliens eligibility for government benefits they otherwise would not have. This increased incentive for illegal aliens to remain in the United States imposes massive costs on Texas, and the State will need to spend more money on law enforcement, education, and Emergency Medicaid because of it. *See Natl. Infusion Ctr. Assn. v. Becerra*, 116 F.4th 488, 499 (5th Cir. 2024) (finding traceability based on changing "incentives" that are likely to make third parties act in 'predictable ways.'") (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)).

And since Texas challenges government action, "[c]ausation and redressability typically overlap as two sides of a causation coin." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). In the same way Texas's injuries are "fairly traceable" to the PIP Program, Texas has shown its injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S. 330. "After all, if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council*, 854 F.3d at 6 n.1. In other words, all the economic harm to Texas will be prevented—and thus remedied, by vacatur, of the PIP Program. 5 U.S.C. § 706.

Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *DACA*, 50 F.4th at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is some possibility that the requested relief will reduce the harm." *Id.* at 520 (cleaned up).

Redressability holds even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Com. v. New York*, 588 U.S. 752, 139 S. Ct. 2551, 767–68 (2019) ("[T]hird parties will likely react in predictable ways."); *Bennett*, 520 U.S. at 169 (defendants' actions need not be "the very last step in the chain of causation"); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015).

Judicial relief would reduce harm because "[t]hose presently subject to DACA would be removable if the DACA program were ended, providing incentives for some if not many to leave the United States, including Texas … and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520.

### Texas is entitled to special solicitude in the standing inquiry.

The *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis. *See Texas v. Cardona*, ---F.Supp.3d---, No. 4:23-CV-604, 2024 WL 3658767, at *20 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.) (explaining continued viability of special solicitude doctrine post-*Enforcement Priorities*), *appeal filed*, No. 24-10910 (5th Cir. Oct. 7, 2024); *see also Missouri v. Biden*, 680 F. Supp. 3d 630, 718–19 (W.D. La. 2023) (recognizing the continued viability of special solicitude doctrine), *rev'd in part on other grounds*, 83 F.4th 350 (5th Cir. 2023).

Defendants may argue that *Enforcement Priorities* overturns the special solicitude doctrine. But, again, lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it. *Cochran*, 20 F.4th at 206 n.11.

When special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is *some possibility* that the requested relief will reduce the harm." *Id.* at 520 (emphasis added; cleaned up). Texas has satisfied the test for special solicitude standing because it has shown that (1) there is "a procedural right to challenge the action in question" and (2) the challenged action "affect[ed] one of the State's quasi-sovereign interests." *DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151-52).

### 1. Texas has a procedural right to challenge the agency action in question.

Plaintiffs in this case established a procedural right to challenge the Parole Program under the APA because they have suffered a legal wrong and are being adversely affected or aggrieved by it. *See* 5 U.S.C. § 702; *see also MPP*, 20 F.4th at 970 n.10 (noting that such a procedural right is not limited to notice-and-comment claims but includes substantive claims under the APA).

As in *DACA*, Texas here uses its procedural right to "challenge[] DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *DACA*, 50 F.4th at 514. "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the [S]tates fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). Texas thus satisfies the first element of special solicitude.

### The challenged action affects Texas's quasi-sovereign interests.

Texas also satisfies the second element because the PIP Program affects its quasi-sovereign interests. "'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quotation omitted). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain 'sovereign prerogatives [that] are now lodged in the Federal Government.'" *Id.* (quoting *Massachusetts*, 549 U.S. at 519). The Parole Program's

pressure on Texas to change its laws relating to its prison system, public education system, and participation in the Medicaid program gives "rise to a quasi-sovereign interest." *DACA*, 50 F.4th at 515.

In *DACA*, the Fifth Circuit concluded that the State's interest in classifying aliens was a quasi-sovereign interest. *Id.* The PIP Program implicates those quasi-sovereign interests just as the DACA Memorandum did. If Plaintiffs sought to change the classifications of parole recipients to alleviate their injuries, they would be threatened with federal preemption. The Fifth Circuit acknowledged these federal preemption concerns in *DACA*, concluding that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *Id.* at 516. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id.* (citing *Arizona*, 567 U.S. at 409). The same is true under the PIP Program.

### Vacatur or a stay is proper.

"[V]acatur of an agency action is the default rule in this Circuit." *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc). Indeed, "[v]acatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan Alliance, Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022). The Fifth Circuit does not "require consideration of the various equities at stake before determining whether a party is entitled to vacatur" because "Section 706, after all, provides that a reviewing court *shall* set aside unlawful agency action." *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 952 (5th Cir. 2024). A stay under Section 705 is justified as vacatur.

### Injunctive relief is proper.

Plaintiffs have satisfied each of the elements for a permanent injunction. "The court may issue a preliminary injunction ... only if the movant gives security in an amount that the court considers proper ...." Fed. R. Civ. P. 65(c). The amount of security required pursuant to Rule 65(c) "is a matter for the discretion of the trial court." *Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996) (citing *Corrigan DispatchCo. v. Casa Guzman, S.A.,* 569 F.2d 300, 303 (5th Cir. 1978)).

Further, a district court has discretion "to require no security at all." *Id.* The underlying purpose of Rule 65(c) is to provide a mechanism for reimbursing an enjoined party for harm it suffers as a result of an improvidently issued injunction. *See Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 421 n.3 (4th Cir. 1999). Such harm includes incidental and consequential costs, as well as losses the unjustly enjoined party will suffer during the period he is prohibited from engaging in certain activities. *See* 11A Wright & Miller, *Federal Practice & Procedure* § 2954 (2d ed. 1995). Where a court determines that the risk of harm is remote, the court has discretion to require only a nominal bond or no bond at all. *See International Controls Corp. v. Vesco,* 490 F.2d 1334, 1356 (2d Cir. 1974) (approving district court's fixing of bond amount at zero in absence of evidence regarding likelihood of harm).

Here, the Court should not require any security under Fed. R. Civ. P. 65(c) as this is a public interest case where Defendants will not suffer a financial loss from any preliminary injunction. And there is no basis to require security to issue a permanent injunction, much less the preliminary relief of a stay under Section 705 of the APA or vacatur under Section 706 of that statute.

- **Plaintiffs succeeds on the merits.**

As explained above, the PIP Program is unlawful on several grounds.

### Texas will suffer irreparable injury.

"To show irreparable injury if threatened action is not enjoined, it is not necessary to demonstrate that harm is inevitable and irreparable." *Humana, Inc. v. Jacobson*, 804 F.2d 1390, 1394 (5th Cir. 1986). Texas faces an imminent, irreparable, sovereign injury from the PIP Program. In addition, while financial injuries are generally reparable, here, sovereign immunity is a bar to Plaintiffs' recovery. *Texas v. EPA*, 829 F.3d at 434; *Wages & White Lion Invs., L.L.C. v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021). Accordingly, that injury "cannot be undone through monetary remedies." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012).

### The public interest and the balance of equities favor relief.

When governmental action is implicated, the third and fourth factors merge. *Nken v.*

*Holder*, 556 U.S. 418, 435 (2009). To preserve the status quo, federal courts regularly enjoin federal agencies from implementing and enforcing new regulations pending litigation challenging them. *Texas v. United States*, 787 F.3d 733 (5th Cir. 2015). And there is "no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022).

Finally, even if the program could meaningfully be said to benefit the illegal aliens at issue, immediate injunctive relief cannot be reasonably said to cause them any harm. The Notice itself illustrates the hollowness of any claims about the urgency of the regulations. The primary population they target is people who have been unlawfully present in this country for at least 10 years (on average 23 years)—there's no rush. Attorney Decl. Ex. 1. At worst, even if there is some way that these regulations could be lawful (there is not), immediate injunctive relief would mean a short delay in program implementation while this litigation runs its course for people who have already spent at least a decade in this country without parole.

### No relief sought here is precluded by 8 U.S.C. § 1252(f)(1).

Section 1252(f)(1)'s "[l]imit on injunctive relief" provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of" sections 1221–1232 of Title 8. 8 U.S.C. § 1252(f)(1). "By its plain terms, and even by its title," section 1252(f)(1) "is nothing more or less than a limit on injunctive relief." *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 481 (1999).

- **Neither vacatur nor a stay of agency action is barred by Section 1252(f)(1).**

The Fifth Circuit has repeatedly held that vacatur is not precluded by Section 1252(f)(1) *See DACA*, 50 F.4th at 528 ("As an initial matter, § 1252(f)(1) does not apply to vacatur."); *Texas*, 40 F.4th at 219 (rejecting DHS argument that "vacatur 'prohibits' DHS from implementing the [challenged agency action] and *de facto* 'enjoin[s] or restrain[s]' the agency's enforcement decisions," and was therefore barred by Section 1252(f)(1)). As the temporary form of vacatur, stays under Section 705 of the APA are also not barred. *See Texas v. Biden*, 646 F. Supp. 3d 753, 766–69 (N.D. Tex. 2022) (Kacsmaryk, J.), *appeal dismissed,* No. 23-10143 (5th Cir. May 25, 2023).

**Injunctive relief sought in this case is not barred by Section 1252(f)(1).**

The Final Rule conflicts with many parts of the INA—but they are not within §§ 1221–1232 and thus fall outside the scope of Section 1252(f)(1). *See, e.g.*, 8 U.S.C. §§ 1182(a)(9)(B)(i) (unlawful presence); 1182(d)(5)(A) (parole); 1324a (employment). Section 1252(f)(1) thus does not preclude any of the relief against the PIP Program sought in this action.

Texas's requested relief is not an attempt to compel the federal government to enforce the immigration laws against aliens in contravention of *Garland v. Aleman Gonzalez*, 596 U.S. 543, 552–54 (2022). The relief against the PIP Program would have, at most, only a "collateral effect" on Defendants' responsibilities in the covered sections. *Id.* at 553 n.4. *Aleman Gonzalez* is clear that ancillary repercussions are not sufficient to trigger § 1252(f)(1). Indeed, it approvingly cites a case where an injunction only was "one step removed" from the operation of covered provisions. 596 U.S. at 553 n.4 (citing *Gonzalez v. DHS*, 508 F.3d 1227, 1233 (9th Cir. 2007)). The order there enjoined the application of an INA provision governing alien status adjustments. *Gonzalez*, 508 F.3d at 1233. Although that provision was not itself covered by the INA's remedial bar, the order's practical effects would include the initiation of removal proceedings under a provision that *was* covered. *Id.* The Ninth Circuit nevertheless held § 1252(f)(1) inapplicable because removal proceedings were just a "collateral consequence" of the injunction. *Id.* Here, any impact Plaintiffs' requested relief might have on Defendants' authority under §§ 1221–1232 is just as attenuated.

**Declaratory relief is not barred by Section 1252(f)(1).**

Section 1252(f)(1) is also no bar to declaratory relief. *See Alli v. Decker*, 650 F.3d 1007, 1013 (3d Cir. 2011). This is consistent with the Supreme Court's most recent pronouncement on the question. *See Biden*, 1597 U.S. at 786–87 (describing how, in *Nielsen v. Preap*, 139 S. Ct. 954 (2019), the Court "proceeded to reach the merits of the suit, notwithstanding the District Court's apparent violation of section 1252(f)(1), by reasoning that '[w]hether the [District] [C]ourt had jurisdiction to enter such an injunction is irrelevant because the District Court had jurisdiction to entertain the plaintiffs' request for declaratory relief'") (quoting *Preap*, 139 S. Ct. at 962).

### Relief should be universal and nationwide.

Should the Court issue injunctive relief, it should be nationwide. "[T]he Fifth Circuit's precedent in this area is applicable and controlling." *100-Day Pause*, 524 F. Supp. 3d at 667. As in other immigration cases, "a geographically-limited injunction would be ineffective" since aliens in the United States are "free to move among [S]tates." *DAPA*, 809 F.3d at 188. Further, "immigration policy" is supposed to be "a comprehensive and *unified* system." *Id.* (quotation omitted). The Fifth Circuit has "reject[ed] DHS's contention that the nationwide vacatur is overbroad" because "[i]n the context of immigration law, broad relief is appropriate to ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18.

Plaintiffs also seek a stay under 5 U.S.C. § 705, which provides that a "reviewing court" may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." "[T]he scope of preliminary relief under Section 705 aligns with the scope of ultimate relief under Section 706, which is not party-restricted and allows a court to 'set aside' an unlawful agency action." *Career Colleges & Schools of Texas v. U.S. Dep't of Education*, 98 F.4th 220, 255 (5th Cir. 2024).

That this incidentally benefits other States as well is not unusual. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,]' [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction *could* benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (citations omitted).

### CONCLUSION

For the reasons above, Plaintiffs respectfully request preliminary and permanent relief and grant summary judgment to halt Defendants' implementation of the illegal PIP Program, including the Notice, the Filing Guide, and the Form I-131F. A proposed order sets out the relief sought.

Dated: October 18, 2024.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085
Ryan.Walters@oag.texas.gov

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415
Kathleen.Hunker@oag.texas.gov

**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

Respectfully submitted.

**GENE P. HAMILTON**
Virginia Bar No. 80434

**JAMES ROGERS**
Arizona Bar no. 027287

**RYAN GIANNETTI**
DC Bar no. 1613384

America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org
James.Rogers@aflegal.org
Ryan.Giannetti@aflegal.org

**COUNSEL FOR PLAINTIFF STATE OF TEXAS**

**RAUL R. LABRADOR**
Idaho Attorney General

*/s/ Alan Hurst*
Alan Hurst
Solicitor General
Michael A. Zarian
Deputy Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov
Michael.Zarian@ag.idaho.gov

**COUNSEL FOR STATE OF IDAHO**

**STEVE MARSHALL**
Attorney General of Alabama

*/s/ Robert M. Overing*
**ROBERT M. OVERING**
Deputy Solicitor General
Robert.Overing@AlabamaAG.gov
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400

**COUNSEL FOR STATE OF ALABAMA**

**TIM GRIFFIN**
Attorney General of Arkansas

Nicholas J. Bronni
Solicitor General

*/s/ Dylan L. Jacobs*
**DYLAN L. JACOBS***
Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR 72201
Telephone: (501) 682-2007
Dylan.jacobs@arkansasag.gov
Counsel for State of Arkansas
*admission application forthcoming*

**ASHLEY MOODY**
Attorney General of Florida

*s/ James Percival*
**JAMES H. PERCIVAL**
Chief of Staff
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
James.percival@myfloridalegal.com

**COUNSEL FOR STATE OF FLORIDA**

**ELIZABETH B. MURRILL**

**CHRISTOPHER M. CARR**
Attorney General of Georgia

*/s/Stephen J. Petrany*
**STEPHEN J. PETRANY**
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
**COUNSEL FOR STATE OF GEORGIA**

**BRENNA BIRD**
Attorney General of Iowa

*/s/ Eric H. Wessan*
**ERIC H. WESSAN**
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
**COUNSEL FOR STATE OF IOWA**

**KRIS W. KOBACH**
Attorney General of Kansas

*s/ Abhishek S. Kambli*
**ABHISHEK S. KAMBLI**
Deputy Attorney General – Special Litigation &
Constitutional Issues Division
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Phone: (785) 296-6109 | Fax: (785) 221-3938
abhishek.kambli@ag.ks.gov
**COUNSEL FOR STATE OF KANSAS**

**DAVE YOST**

Attorney General of Louisiana

*s/ J. Benjamin Aguiñaga*

**J. BENJAMIN AGUIÑAGA**
Solicitor General
Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov
**COUNSEL FOR STATE OF LOUISIANA**


**ANDREW BAILEY**
Attorney General of Missouri

*/s/ Samuel C. Freedlund*

**SAMUEL C. FREEDLUND**, 73707MO
*Deputy Solicitor General*
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, MO 63188
Phone: (314) 340-4869
Fax (573) 751-1774
Samuel.Freedlund@ago.mo.gov
**COUNSEL FOR THE STATE OF MISSOURI**


**DREW H. WRIGLEY**
Attorney General of North Dakota

*/s/ Philip Axt*

Attorney General of Ohio

*/s/ T. Elliot Gaiser*

**T. ELLIOT GAISER**
Ohio Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
614.466.5087 fax
thomas.gaiser@ohioago.gov
**COUNSEL FOR STATE OF OHIO**


**MARTY JACKLEY**
Attorney General of South Dakota

*/s/ Clifton E. Katz*

**CLIFTON E. KATZ**
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-Mail: clifton.katz@state.sd.us

**COUNSEL FOR STATE OF SOUTH DAKOTA**

**ALAN WILSON**
Attorney General of South Carolina

*s/ J. Emory Smith, Jr.*

**JAMES EMORY SMITH, JR**.
Deputy Solicitor General
Email:  esmith@scag.gov
Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3642
Fax: (803) 734-3677

**COUNSEL FOR STATE OF SOUTH CAROLINA**


**BRIDGET HILL**
Attorney General of Wyoming

**PHILIP AXT**
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
pjaxt@nd.gov

**COUNSEL FOR STATE OF NORTH DAKOTA**

**JONATHAN SKRMETTI**
Attorney General of Tennessee

*/s/ Whitney D. Hermandorfer*
**WHITNEY D. HERMANDORFER**
*Director of Strategic Litigation*
Tennessee Bar. No. 041054
Whitney.Hermandorfer@ag.tn.gov
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726

**COUNSEL FOR STATE OF TENNESSEE**

*/s/ Ryan Schelhaas*
**RYAN SCHELHAAS**
Chief Deputy Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov

**COUNSEL FOR STATE OF WYOMING**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 18, 2024, which serves all counsel of record.

*/s/Ryan D. Walters*
RYAN D. WALTERS