# EXHIBIT A

# United States District Court
# Eastern District of Texas
# Tyler Division

STATE OF TEXAS, *et al.*,

     *Plaintiffs*,

     v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

     *Defendants*

No. 6:24-cv-00306

## DECLARATION OF ATTORNEY JAMES K. ROGERS

I, James K. Rogers, declare as follows:

1. I am over 18 years of age and am fully competent to make this declaration. I am Senior Counsel with the America First Legal Foundation, and I am admitted to practice law in the State of Arizona. I was approved to appear pro hac vice in this matter on August 22, 2024. I submit this Declaration in support of Plaintiffs' Omnibus Motion for Preliminary Injunction and Summary Judgment in the above-captioned matter. I have personal knowledge of the facts stated herein.

2. Attached hereto are true and correct copies of the following exhibits, which are cited in Plaintiff's Omnibus Motion for Preliminary Injunction and Summary Judgment:

| Exhibit No. | Document Citation |
|---|---|
| 1 | *Fact Sheet: Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Family Has a Fair Shot at the American Dream*, THE WHITE HOUSE (July 17, 2024), https://perma.cc/93ZX-3M7M |
| 2 | *Profile of the Unauthorized Population: United States*, MIGRATION POLICY INSTITUTE, https://perma.cc/JT43-RUCB (last accessed on Aug. 8, 2024) |
| 3 | *USCIS Publishes Filing Guide for Keeping Families Together*, USCIS, (Aug. 16, 2024), https://perma.cc/EL6Z-2AUE. |
| 4 | *Filing Guide for Form I-131F*, USCIS, (Aug. 16, 2024), https://perma.cc/664U-C2T2 |
| 5 | Armando Garcia, *Immigrants begin receiving relief from deportation under new Biden executive order*, ABC NEWS (Aug. 21, 2024), https://perma.cc/TAC8-JWUZ |
| 6 | Detention and Parole of Inadmissible Aliens; Interim Rule with Request for Comments, 47 Fed. Reg. 30,044, (July 9, 1982), https://perma.cc/F7BH-F4UJ<br><br>(Exhibit 6 includes only the relevant pages.) |
| 7 | *Humanitarian or Significant Public Benefit Parole for Individuals Outside the United States*, U.S. Citizenship and Customs Servs. (May 2, 2023), https://perma.cc/L64A-H28L |
| 8 | Dep't of Homeland Sec. Off. of Inspector Gen., *The Unified Coordination Group Struggled to Track Afghan Evacuees Independently Departing U.S. Military Bases*, DEP'T OF HOMELAND SEC. (Sept. 29, 2022), https://perma.cc/37BP-THB6 |
| 9 | Press Release, *DHS Announces Re-parole Process for Afghan Nationals in the United States*, DEP'T OF HOMELAND SEC. (June 8, 2023), https://perma.cc/QTA2-2NG2 |
| 10 | *Re-Parole Process for Certain Afghans*, IMMIGR. AND CUSTOMS SERVS. (Sept. 27, 2023), https://perma.cc/NT7B-DKFU |
| 11 | *Fees for Visa Services*, DEP'T OF STATE, (accessed Sept. 25, 2023), https://perma.cc/92JU-BARM |

| 12 | *Form DS-260*, DEP'T OF STATE, (Oct. 2019), https://perma.cc/B99K-2VND |
| 13 | *Reminders on the Process to Promote the Unity and Stability of Families*, U.S. CITIZENSHIP AND IMMIGR. SERVS. (July 17, 2024), https://perma.cc/W587-DBJZ |
| 14 | Medicaid.gov, *Medicaid and CHIP Coverage of Lawfully Residing Children & Pregnant Individuals*, CENTERS FOR MEDICARE & MEDICAID SERVICES, (May 4, 2023), https://www.medicaid.gov/medicaid/enrollment-strategies/medicaid-and-chip-coverage-lawfully-residing-children-pregnant-individuals |
| 15 | Rebecca Beitsch, *House Outlines Immigration Provisions in Latest Build Back Better Package*, THE HILL (Nov. 3, 2021), https://perma.cc/J2LR-FRYE |
| 16 | *Cost of Attendance*, UNIVERSITY OF TEXAS AT AUSTIN, https://perma.cc/7NG3-TUYU (last accessed Aug. 15, 2024) |
| 17 | *Cost of Attendance*, UNIVERSITY OF IDAHO, https://perma.cc/E9F2-DKJ2 (last accessed Aug. 15, 2024) |
| 18 | *Cost of Attendance*, BOISE STATE UNIVERSITY, https://perma.cc/U5RU-N8UX (last accessed Aug. 15, 2024) |

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, and that this declaration was issued on October 17, 2024, in Washington, D.C.

/s/ James Rogers

James K. Rogers
Senior Counsel
America First Legal Foundation

Plaintiffs' Combined MSJ Exhibits - Page 5

# EXHIBIT 1

Case 6:24-cv-00306-JCB   Document 78-1   Filed 10/19/24   Page 6 of 343 PageID #: 1213

Plaintiffs' Combined MSJ Exhibits - Page 6

JULY 17, 2024

# FACT SHEET: Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Family Has a Fair Shot at the American Dream

President Biden and Vice President Harris are working to ensure that all Latino families and communities can achieve greater opportunity. Over the past three years, the Administration has taken historic action to expand opportunity for Latino families and communities, including creating more than 15 million jobs – with 5 million created for Latinos, helping Latino entrepreneurs start new businesses at the fastest rate in over 10 years, working to ensure equitable educational opportunity for students, addressing our broken immigration system through new executive actions, and more.

Today, the Biden-Harris Administration is announcing new actions to advance educational opportunities for Latino communities and give more families a fair shot at achieving the American dream.

### **Advancing Educational Equity, Excellence, and Economic Opportunity through Hispanic-Serving Institutions**

Hispanic-Serving Institutions (HSIs) play a critical role in shaping the future of our Nation. With more than 500 HSIs across 27 states, the District of Columbia, and Puerto Rico, HSIs make an extraordinary contribution to our Nation's higher education system, including educating more than 4.7 million students. More than 55 percent of Hispanic and Latino college students in the U.S. attend an HSI, and nearly 40 percent of those students attend a two-year HSI.

To strengthen the Federal Government's commitment to advancing opportunity, today, President Biden will sign an Executive Order establishing

10/15/24, 1:01 PM   FACT SHEET: Biden-Harris Administration Announces New Actions to Expand Opportunities for Latino Communities and Ensure Every Famil…

Plaintiffs' Combined MSJ Exhibits - Page 7

2/6

Case 6:24-cv-00306-JCB   Document 78-1   Filed 10/10/24   Page 6 of 343 PageID #: 1214

the White House Initiative on Advancing Educational Equity, Excellence, and Economic Opportunity through Hispanic-Serving Institutions. This Executive Order creates a new Initiative and President's Board of Advisors for HSIs that will work to:

- Increase awareness of opportunities for HSIs to equally participate in Federal programs and enhance the capacity of HSIs to meet the educational needs of their students.

- Identify best practices for HSIs to scale effective strategies, programs, and initiatives to support the educational success and economic mobility of their students.

- Improve the ability of HSIs to align program offerings with the economic needs of the Nation and their local economies, especially in Science, Technology, Engineering, Math, and teaching.

- Coordinate efforts to help HSIs become or remain fiscally secure institutions.

- Foster cross-sector collaboration among HSIs and philanthropic, public, and private sector organizations.

- Strengthen Federal recruitment activities at HSIs to build accessible and equal pathways into Federal career opportunities for HSI students, faculty, staff, and alumni.

- Provide tools, data, and analytics to support HSIs in improving educational equity, excellence, and economic opportunity for students.

**Making America's Immigration System More Fair and More Just**

Since Day One, President Biden has called on Congress to fix our broken immigration system. While Congress has failed to act on these critically needed reforms, the Biden-Harris Administration has taken action to make our immigration system more fair and more just.

Today, the Administration is highlighting steps taken to fulfill the President's promise to keep families together and allow more Dreamers to contribute to our economy, and announcing new actions to expand access to legal representation and immigration services so that more people have the tools

Plaintiffs' Combined MSJ Exhibits - Page 8

and support they need to navigate our complex immigration system. These actions build on steps the Administration has taken to strengthen and improve our immigration system, including eliminating the backlog of naturalization applications, vigorously defending the DACA (Deferred Action for Childhood Arrivals) policy in court, extending Affordable Care Act coverage to DACA recipients, and streamlining, expanding, and instituting new programs so that families can stay together while they complete the immigration process.

*Today's new announcements include:*

**Announcing key progress on actions to keep families together**

On June 18th, the President announced a new process to help U.S. citizens with noncitizen spouses and children who have been here for 10 years or more keep their families together. This new action – which will help certain noncitizen spouses and children apply for lawful permanent residence without leaving the country – is expected to apply to approximately half a million spouses of U.S. citizens, and 50,000 noncitizen children whose parent is married to a U.S. citizen. And today, **the President is announcing that beginning on August 19, 2024, eligible spouses and children will be able to apply for this process to obtain legal status while remaining with their families.**

In June, President Biden also announced new actions to help young people who have been educated in the U.S., including DACA recipients and other Dreamers, receive work visas more quickly. These actions will help more young people use their talents to enrich our communities and strengthen our economy. The Department of State has updated its public guidance – making it clear that it is in the public interest that individuals who graduated from a U.S. institution of higher education and are seeking a work visa are able to put their degree to use in the United States, and that these factors should be considered favorably when recommending waivers in the visa application process.

**Helping thousands of Dreamers transition successfully to college**

Today, the Administration is also announcing that the Department of Education is issuing a proposed rule to expand the federal TRIO program to

Plaintiffs' Combined MSJ Exhibits - Page 9

ensure Dreamers and others can enroll. By providing high school students with services and supports such as college campus visits, tutoring, and help completing college and financial aid applications, the TRIO program helps students from low-income backgrounds and students who would be the first in their family go to college successfully transition from high school to college. The proposed expansion would mean that an estimated 50,000 more students each year would be able to access TRIO programs and services, and thousands more would go to college.

**Expanding access to legal representation**

Today, the Department of Justice Executive Office of Immigration Review (EOIR) is doubling the number of locations for their "Attorney of the Day" program, which makes volunteer lawyers available in immigration courtrooms to provide assistance to those who do not have representation at their initial immigration court hearings. The Department will expand this program to include immigration courts in Hyattsville, Maryland; New York City; and Atlanta in addition to the three current locations: San Francisco, New Orleans, and Chicago. The Department is also increasing free and low-cost legal representation by increasing participation of law students in clinical programs and expanding training opportunities such as its mock trial program.

Earlier this year, the Department of Justice announced the launch of the Respondent Access Portal, a secure online platform that allows unrepresented noncitizens with proceedings before EOIR to view case information and scheduled hearings, download their electronic case record, and file documents directly with the immigration court.

Additionally, the Justice Department is creating a new leadership position focused on improving access to the immigration system and finding innovative ways to increase representation rates for noncitizens in immigration court.

Finally, the Administration is announcing a call to action for members of the legal community, including law firms, nonprofits, advocacy organizations, and other stakeholders to make commitments of pro bono support for those who are unrepresented in immigration proceedings. In response, the American Bar Association will leverage its existing resources to help and

Plaintiffs' Combined MSJ Exhibits - Page 10

encourage more lawyers to provide pro bono support to unrepresented noncitizens in immigration proceedings. The Administration welcomes additional commitments from interested stakeholders to build upon these efforts.

**Ensuring access to immigration services**

The Department of Homeland Security's U.S. Citizenship and Immigration Services (USCIS) is announcing the launch of a new initiative – "USCIS to You" – to bring immigration-related assistance into local communities, including rural and underserved areas. Services that may be provided include naturalization interviews and oath ceremonies, customer service appointments, and education on immigration benefits and processes. "USCIS to You" events will be coordinated in partnership with communities, including libraries, community colleges, and other local entities.

USCIS is also providing up to $2.6 million to help small public and non-profit organizations establish new citizenship programs and train staff to assist lawful permanent residents in understanding and navigating the naturalization process. USCIS has released this new Notice of Funding Opportunity and plans to announce grant recipients by September 2024.

**Today's announcements build on additional historic action President Biden has taken to advance opportunity for Latino communities, including:**

- Bringing the Latino unemployment rate to a near record low of 4.9%.

- Taking action to support Latino-owned businesses, which are now starting up at the fastest rate in fifteen years.

- Doubling Latino enrollment in health coverage through the Affordable Care Act, and fighting to protect the Affordable Care Act.

- Expanding access to Affordable Care Act benefits to DACA recipients.

- Expanding the Child Tax Credit which lifted 1.2 million Hispanic children out of poverty in 2021.

- Investing over $15 billion in Hispanic-serving colleges and universities—the largest ever investment. This investment strengthened the capacity of HSIs to better serve their students, including meeting their basic needs and completing their programs.

- Securing a $900 increase to the maximum Pell Grant award – the largest in the last decade – to benefit students from low- and middle-income backgrounds in their pursuit of a college degree.

- Canceling $167 billion in student loan debt for 4.75 million borrowers. Student loan debt disproportionately burdens Latino borrowers who are more likely to default on their student loans compared to white borrowers, with 15% of those in repayment in default and 29% in serious delinquency.

###

Plaintiffs' Combined MSJ Exhibits - Page 12

# EXHIBIT 2

Profile of the Unauthorized Population: US migrationpolicy.org

Plaintiffs' Combined MSJ Exhibits - Page 13

NEWSROOM | MPI EN ESPAÑOL | MULTIMEDIA | DONATE | CONTACT |



All MPI

RESEARCH & INITIATIVES     PUBLICATIONS     EVENTS     ABOUT US     MPI EU

Home » Data Hub » Unauthorized Immigrant Population

# Profile of the Unauthorized Population: United States

DEMOGRAPHICS

FAMILY

EDUCATION AND LANGUAGE

WORKFORCE

ECONOMICS

| Demographics | Estimate | % of Total |
|---|---|---|
| Unauthorized Population | 11,047,000 | 100% |
| **Top Countries of Birth** | | |
| Mexico | 5,313,000 | 48% |
| El Salvador | 741,000 | 7% |
| Guatemala | 724,000 | 7% |
| India | 553,000 | 5% |
| Honduras | 490,000 | 4% |
| **Regions of Birth** | | |
| Mexico and Central America | 7,381,000 | 67% |
| Caribbean | 327,000 | 3% |
| South America | 907,000 | 8% |
| Europe/Canada/Oceania | 440,000 | 4% |
| Asia | 1,697,000 | 15% |
| Africa | 295,000 | 3% |
| **Years of U.S. Residence** | | |
| Less than 5 | 2,370,000 | 21% |
| 5 to 9 | 1,744,000 | 16% |
| 10 to 14 | 2,132,000 | 19% |
| 15 to 19 | 2,368,000 | 21% |
| 20 or more | 2,433,000 | 22% |
| **Age** | | |
| Under 16 | 606,000 | 5% |
| 16 to 24 | 1,577,000 | 14% |
| 25 to 34 | 2,986,000 | 27% |
| 35 to 44 | 3,084,000 | 28% |
| 45 to 54 | 1,772,000 | 16% |
| 55 and over | 1,023,000 | 9% |
| **Gender** | | |
| Female | 5,062,000 | 46% |
| **Family** | Estimate | % of Total |

| Parental Status | | |
|---|---|---|
| Population ages 15 and older | 10,513,000 | 100% |
| Reside with at least one U.S.-citizen child under 18 | 3,521,000 | 33% |
| Reside with noncitizen children only under 18 | 806,000 | 8% |
| Reside with no children | 6,185,000 | 59% |
| **Marital Status** | | |
| Population ages 15 and older | 10,513,000 | 100% |
| Never married | 4,057,000 | 39% |
| Married to a U.S. citizen | 1,314,000 | 12% |
| Married to a legal permanent resident (LPR) | 654,000 | 6% |
| Married to non-U.S. citizen/non-LPR | 2,822,000 | 27% |
| Divorced, separated, widowed | 1,665,000 | 16% |

| Education and Language | Estimate | % of Total |
|---|---|---|
| **School Enrollment of Children and Youth** | | |
| Population ages 3 to 17 | 733,000 | 100% |
| Enrolled | 651,000 | 89% |
| Not enrolled | 83,000 | 11% |
| Population ages 3 to 12 | 381,000 | 100% |
| Enrolled | 324,000 | 85% |
| Not enrolled | 57,000 | 15% |
| Population ages 13 to 17 | 352,000 | 100% |
| Enrolled | 327,000 | 93% |
| Not enrolled | 25,000 | 7% |
| Population ages 18 to 24 | 1,411,000 | 100% |
| Enrolled | 569,000 | 40% |
| Not enrolled | 842,000 | 60% |
| **Educational Attainment of Adults** | | |
| Population ages 25 and older | 8,864,000 | 100% |
| 0-5 grade | 1,330,000 | 15% |
| 6-8 grade | 1,444,000 | 16% |
| 9-12 grade | 1,334,000 | 15% |
| High school diploma or equivalent | 2,136,000 | 24% |
| Some college or associate's degree | 1,062,000 | 12% |
| Bachelor's, graduate, or professional degree | 1,558,000 | 18% |
| **English Proficiency** | | |
| Population ages 5 and older | 10,951,000 | 100% |
| Speak only English | 773,000 | 7% |
| Speak English "very well" | 2,734,000 | 25% |
| Speak English "well" | 2,450,000 | 22% |
| Speak English "not well"/"not at all" | 4,994,000 | 46% |
| **Top 5 Languages Spoken at Home** | | |
| Population ages 5 and older | 10,951,000 | 100% |
| Spanish | 7,919,000 | 72% |

10/15/24, 1:08 PM
Case 6:24-cv-00306-JCB    Document 78-1    Filed 10/19/24    Page 15 of 343 PageID #:
Profile of the unauthorized population: United States | migrationpolicy.org
1222
Plaintiffs' Combined MSJ Exhibits - Page 15

| | | |
|---|---:|---:|
| English | 780,000 | 7% |
| Chinese | 377,000 | 3% |
| Tagalog | 290,000 | 3% |
| Portuguese | 166,000 | 2% |

| Workforce | Estimate | % of Total |
|---|---:|---:|
| **Labor Force Participation** | | |
| Civilian population ages 16 and older | 10,434,000 | 100% |
| Employed | 6,829,000 | 65% |
| Unemployed | 448,000 | 4% |
| Not in the labor force | 3,157,000 | 30% |
| **Top Industries of Employment** | | |
| Civilian employed population ages 16 and older | 6,829,000 | 100% |
| Construction | 1,403,000 | 21% |
| Accommodation and food services, arts, entertainment, and recreation | 1,092,000 | 16% |
| Professional, scientific, management, administrative, and waste management services | 946,000 | 14% |
| Manufacturing | 694,000 | 10% |
| Retail trade | 547,000 | 8% |

| Economics | Estimate | % of Total |
|---|---:|---:|
| **Family Income** | | |
| Below 50% of the poverty level | 1,344,000 | 12% |
| 50-99% of the poverty level | 1,542,000 | 14% |
| 100-149% of the poverty level | 1,824,000 | 17% |
| 150-199% of the poverty level | 1,575,000 | 14% |
| At or above 200% of the poverty level | 4,762,000 | 43% |
| **Access to Health Insurance** | | |
| Uninsured | 5,823,000 | 53% |
| **Home Ownership\*** | | |
| Homeowner | 3,069,000 | 28% |

*Source*: These 2019 data result from Migration Policy Institute (MPI) analysis of U.S. Census Bureau data from the pooled 2015-19 American Community Survey (ACS) and the 2008 Survey of Income and Program Participation (SIPP), weighted to 2019 unauthorized immigrant population estimates provided by Jennifer Van Hook of The Pennsylvania State University.

*Note*: For U.S. and state estimates of the unauthorized population potentially eligible for the Deferred Action for Childhood Arrivals (DACA) program, click here.

Data-related notes
* "Homeowners" are unauthorized immigrants residing in homes that are owned, not rented.

+ Includes the following Colorado counties: Adams, Broomfield, Clear Creek, Douglas, Elbert, Gilpin, and Jefferson, as well as portions of Arapahoe, Boulder, and Weld counties.

++ NECTAs refer to New England City and Town Areas, geographic entities defined by the U.S. Census Bureau for use as alternatives to counties in the six-state New England region.

Estimate for China includes Hong Kong but excludes Taiwan; estimate for Korea includes South Korea and North Korea.

"School Enrollment of Children and Youth" refers to unauthorized immigrants who reported attending school or college at any time in the three months prior to the survey.

For languages, "Chinese" includes Mandarin, Cantonese, and other Chinese languages; "English" includes English, Jamaican Creole, Krio, Pidgin Krio, and other English-based Creole languages; "French" includes French, Patois, and Cajun; "Pacific Island languages" includes Ilocano, Samoan, Hawaiian, Sebuano, Chamorro, Guamanian, Marshallese, Trukese, Tongan, and other Austronesian languages, but excludes Tagalog and Filipino, which are reported separately; "Portuguese" includes Portuguese and Cape Verdean Creole; "Sub-Saharan African" includes Swahili or other Bantu languages, Mande, Fulani, Kru, and other unspecified African languages; "Tagalog" includes Tagalog and Filipino.

For industries, "Other services" are miscellaneous services, not including the following services listed separately: (1) professional, scientific, management, administrative, and waste management services; (2) educational services; (3) health and social services; and (4) accommodation and food services, arts, entertainment, and recreation.

"-" estimates are zero, not applicable, or not displayed due to small sample size.

Percentages may not add up to 100 due to rounding.

*Methodology in Brief:*

MPI's method uses information from the SIPP to assign legal status to noncitizens in the ACS. In the SIPP, noncitizens report whether they currently have lawful permanent resident (LPR) status—i.e., a green card. Those without LPR status may be recent refugees, temporary visitors (e.g., international students or high-skilled H-1B workers), or unauthorized immigrants. Our method maps characteristics such as country of birth, year of U.S. entry, age, gender, and educational attainment between the two surveys, and those noncitizens in the ACS who have characteristics similar to those reporting LPR status in the SIPP are coded as LPRs in the ACS. The remaining noncitizens—who are similar in characteristics to those not reporting LPR status in the SIPP—are classified as either unauthorized or legal temporary migrants, depending on whether they meet the qualifications for H-1B and the other temporary visa classifications. Estimates of unauthorized immigrants are weighted to match control totals (benchmarks) for immigrants from a set of origin countries and world regions. These control totals are calculated by subtracting the number of legal immigrants from the total of all immigrants for each country and region that are captured in the ACS data. The number of legal immigrants is estimated by adding up all legal admissions from each country and region in every year—using Department of Homeland Security administrative data—and then reducing this number to account for deaths and emigration of legal immigrants. Finally, the unauthorized immigrant population estimates are adjusted upward slightly to account for the undercount of this population in the ACS.

MPI's overall method was developed in consultation with James Bachmeier of Temple University and Jennifer Van Hook of The Pennsylvania State University, Population Research Institute. For more detail on the methods, see MPI, "MPI Methodology for Assigning Legal Status to Noncitizen Respondents in U.S. Census Bureau Survey Data." The control totals were developed by Van Hook. These estimates have the same sampling and coverage errors as any other survey-based estimates that rely on ACS and other Census Bureau data.



1275 K St. NW, Suite 800, Washington, DC 20005 | ph. 202-266-1940 | fax. 202-266-1900



Copyright © 2001-2024 Migration Policy Institute. All rights reserved.

Plaintiffs' Combined MSJ Exhibits - Page 17

# EXHIBIT 3

10/15/24, 1:08 PM  Case 6:24-cv-00306-JCB  Document 78-1  Filed 10/19/24  Page 18 of 343 PageID #: 1225
USCIS Publishes Filing Guide for Keeping Families Together | USCIS

Plaintiffs' Combined MSJ Exhibits - Page 18



**U.S. Citizenship and Immigration Services**

MENU

Home > Newsroom > All News > Alerts >
USCIS Publishes Filing Guide for Keeping Families Together

# USCIS Publishes Filing Guide for Keeping Families Together

Release Date : 08/16/2024

On Aug. 19, USCIS will begin accepting requests for, using a new electronic form, Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens. Form I-131F will not be available on uscis.gov until Aug. 19. USCIS is not accepting any other form for Keeping Families Together. **Do not file a request for parole in place under this process before Aug. 19, 2024.**

**We are publishing a Filing Guide for Form I-131F (PDF, 9.25 MB) on the Keeping Families Together webpage.** This guide will help individuals as they prepare to file a request for parole in place through the online process. We have also updated the Key Questions and Answers about the process on the Keeping Families Together webpage. More information about Keeping Families Together will be made available in a Federal Register notice in the coming days.

**Form I-131F will only be available to file online.** Each requestor, including minors, must file a separate Form I-131F, and each requestor must have their own USCIS online account, including minors. Information on creating a USCIS online account is available on the How to Create a USCIS Online Account webpage. There is no paper form for this process.

## Protect Yourself from Immigration Scams

We do not want you to become the victim of an immigration scam. If you need legal advice on immigration matters, make sure the person helping you is authorized to give legal advice. Only an attorney admitted to practice law in the United States or accredited representative working for a Department of Justice-recognized organization can give you legal advice on immigration matters. Be aware of individuals who guarantee outcomes; applications are reviewed on a case-by-case basis by USCIS. Visit the Avoid Scams webpage for information and resources.

Some common scams to be aware of include:

- **Government impersonators:** Look out for individuals who pretend to be USCIS officials. USCIS will only contact you through official government channels and will not contact you through your personal social media accounts (such as Facebook, X, LinkedIn, etc.).
- **Scam Websites:** Some websites claim to be affiliated with USCIS and offer step-by-step guidance on completing a USCIS application or petition. Make sure your information is from uscis.gov or dhs.gov or is affiliated with uscis.gov. Make sure the website address ends with .gov.

Need Help?
Chat with Emma™

- **Payments by Phone or Email:** We will never ask you to transfer money to an individual. We do not accept Western Union, MoneyGram, PayPal, or gift cards as payment for immigration fees. In addition, we will never ask you to pay fees to a person on the phone or by email.

- **Notarios Públicos and unauthorized practitioners of immigration law:** In the United States, a notario público is not authorized to provide you with any legal services related to immigration benefits. Only an attorney admitted to practice law in the United States or an accredited representative working for a Department of Justice-recognized organization can give you legal advice on immigration matters. For more information about finding legal services, visit our website.

Last Reviewed/Updated: 08/16/2024

Plaintiffs' Combined MSJ Exhibits - Page 20

# EXHIBIT 4

Plaintiffs' Combined MSJ Exhibits - Page 21

# Filing Guide for
# **Form I-131F,**

Application for Parole in Place
for Certain Noncitizen Spouses
and Stepchildren of U.S. Citizens



**U.S. Citizenship
and Immigration
Services**

You can file Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, to request a temporary period of parole if you are the spouse or stepchild of a U.S. citizen and otherwise meet the eligibility criteria below. You can only file Form I-131F online, and you must file a separate Form I-131F for each person seeking parole in place. The Form I-131F is to be completed by the noncitizen spouse or stepchild, and not the U.S. citizen.

See the USCIS website at **uscis.gov/keepingfamiliestogether** for more detailed information.



## Who May File Form I–131F

A noncitizen spouse or stepchild of a U.S. citizen may request parole in place under this process if they:

- Are present in the United States without admission or parole;

- Have been continuously physically present in the United States:

  - Since June 17, 2014, if seeking parole in place as the spouse of a U.S. citizen; or

  - Since June 17, 2024, if seeking parole in place as the stepchild of a U.S. citizen;

- Have:

  - A legally valid marriage to a U.S. citizen as of June 17, 2024, if seeking parole in place as the spouse of a U.S. citizen; or

  - A noncitizen parent who had a legally valid marriage to a U.S. citizen on or before June 17, 2024, and before the stepchild's 18th birthday, if seeking parole in place as the stepchild of a U.S. citizen;

- Do not have any disqualifying criminal history; and

- Do not pose a threat to national security and public safety.



### I-131F: Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens

Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, is used by certain noncitizens who are present in the United States without admission or parole to request a temporary period of parole.

DHS, in its discretion, may grant parole on a case-by-case basis for significant public benefit or urgent humanitarian reasons to any noncitizen who is an applicant for admission. This authority extends to noncitizens present in the United States who have not been lawfully admitted, a practice known as "parole in place." If we approve Form I-131F filed for a noncitizen spouse or stepchild of a U.S. citizen seeking parole in place, the noncitizen spouse or stepchild of a U.S. citizen will receive a Form I-94, Arrival/Departure Record, which is evidence of their parole.

**Note:** Form I-94 does not authorize entry into the United States after departure. Individuals granted parole in place as a noncitizen spouse or stepchild of a U.S. citizen who depart the United States without first obtaining an Advance Parole Document may be precluded from returning as someone who is inadmissible to the United States, and may also be ineligible for future immigration benefits.

Visit the Keeping Families Together page for more information.

✅ Before You Start Your Application

📋 Eligibility

A separate Form I-131F must be filed for each noncitizen spouse or stepchild of a U.S. citizen seeking parole in place.

A noncitizen spouse or stepchild of a U.C. citizen may request parole in place under this process if they:

- Are present in the United States without admission or parole;
- Have been continuously physically present in the United States:
  - Since at least June 17, 2014, if seeking parole in place as the spouse of a U.S. citizen OR
  - Since June 17, 2024, if seeking parole in place as the stepchild of a U.S. citizen;
- Have:
  - A legally valid marriage to a U.S. citizen as of June 17, 2024 (see note), if seeking parole in place as the spouse of a U.S. citizen OR
  - A noncitizen parent who had a legally valid marriage to a U.S. citizen on or before June 17, 2024, and before the stepchild's 18th birthday, if seeking parole in place as the stepchild of a U.S. citizen;
- Do not have any disqualifying criminal history; and
- Do not pose a threat to national security and public safety.

If you were admitted to the United States (such as with a nonimmigrant visa), you are not eligible for parole in place as a noncitizen spouse or stepchild because you are not an applicant for admission, even if you overstayed your nonimmigrant status or are otherwise in the United States past your authorized period of stay.

If your U.S. citizen spouse or stepparent has died prior to submitting your parole request, you may still qualify for parole in place as a noncitizen spouse or stepchild of a U.S. citizen as long as a legally valid marriage was entered into on or before June 17, 2024.

Even if you meet the criteria to seek a discretionary grant of parole under this process, USCIS may deny your request if we determine, as a matter of discretion, that a grant of parole is not warranted in your case.

If you are in removal proceedings or have an order of removal, you may still qualify for parole. However, if parole is granted, you will likely have to take additional steps with the immigration court prior to seeking additional immigration benefits from USCIS.

2

Even if you meet the criteria to seek a discretionary grant of parole, USCIS may deny your request if we determine that a grant of parole is not warranted in your case.

If you are in removal proceedings or have an order of removal, you may still qualify for parole.

**Revocation or termination of parole**

USCIS may revoke your grant of parole in place if you make a materially false representation or concealment in this application. DHS may also terminate your parole at any time if we determine that your continued presence in the United States is no longer warranted. Issuance of a Notice to Appear (NTA) placing you in removal proceedings after you are granted parole will constitute written notice of parole termination. If you depart the United States after you are granted parole, your parole automatically terminates.

**Penalties**

If you knowingly and willfully falsify or conceal a material fact or submit a false document with your Form I-131F, we will deny your application and may deny any other immigration benefit. In addition, you will face severe penalties provided by law and may be subject to criminal prosecution.

**Fee**

We will automatically calculate the cost for you before you submit your application. For specific information about fees applicable to this form, see Form G-1055.

**Refund policy:** USCIS does not refund fees, regardless of any action we take on your application, petition or request, or how long USCIS takes to reach a decision. By continuing this transaction, you acknowledge that you must submit fees in the exact amount and that you are paying the fees for a government service.

**Documents you may need**

We will automatically determine which documents you should provide us as you fill out your application. At the time of filing, you must submit all evidence and supporting documentation listed.

**Biometric services appointment**

All applicants must submit biometrics at a USCIS Application Support Center (ASC). After you have filed this application, USCIS will notify you in writing of the time and location for your biometric services appointment. Failure to appear for biometrics submission may result in us denying your application.

Biometrics will be used to conduct background and security checks, including a check of criminal history records maintained by the Federal Bureau of Investigation (FBI), before making a decision on your application.

At your biometrics appointment, you must sign an oath reaffirming that:

- You provided or authorized all information in the application;
- You reviewed and understood all of the information contained in, and submitted with, the application; and
- All of this information was complete, true, and correct at the time of filing.

If you do not attend your biometric services appointment, we may deny your application.

**USCIS Contact Center**

For additional information on the application and other questions, visit the USCIS Contact Center page or call at 800-375-5283 (TTY 800-767-1833). The USCIS Contact Center provides information in English and Spanish.

**After You Submit Your Application**

**Track your case online**

After you submit your form, you can track its status through your USCIS account. Sign into your account often to check your case status and read any important messages from USCIS.

**Respond to requests for information**

If we need more information from you, we will send you a Request for Evidence (RFE) or Request for Information (RFI). You can respond to our request and upload your documents through your USCIS account.

**Request for interview**

We may request that you appear at a USCIS office for an interview based on your application. During your interview, USCIS may require you to provide your biometrics to verify your identity and/or update background and security checks.

**Provide your biometrics**

We will contact you to schedule an appointment at an Application Support Center near you. At the appointment, we will get your fingerprints, photograph, and signature.

Next

Plaintiffs' Combined MSJ Exhibits - Page 24

## Completing Your Form Online

**Complete the Getting Started section first**

You should answer all questions in the Getting Started section first so we can best customize the rest of your online form experience.

**Provide as many responses as you can**

You should provide as many responses as you can. Incomplete fields or sections and missing information can slow down the process after you submit your form.

**We will automatically save your responses**

We will automatically save your information when you select next to go to a new page or navigate to another section of the form. We will save your information for 30 days from today, or from the last time you worked on the form.

**How to continue filling out your form**

After you start your form, you can sign in to continue where you left off.

**Decision**

The decision on Form I-131F involves a case by case determination of whether you have established eligibility for parole in place. Approval of Form I-131F does not guarantee eligibility for any future immigration benefits. USCIS will notify you of our decision in writing.

## DHS Privacy Notice

**AUTHORITIES:** USCIS is collecting the information requested on this application, and the associated evidence, under INA sections 103, 208(c)(1)(C), 211, 212(d)(5)(A), 215 and 8 CFR sections 211.1(a)(3-4), 212.5, and 223.1-223.3.

**PURPOSE:** The primary purpose for providing the requested information on this application is to apply for parole (Form I-94, Arrival/Departure Record) based on urgent humanitarian reasons or a significant public benefit. DHS uses the information you provide to grant or deny the immigration benefit you are seeking.

**DISCLOSURE:** The information you provide is voluntary. However, failure to provide the requested information, including your Social Security number (if applicable), and any requested evidence, may delay a final decision or result in USCIS denying your application.

**ROUTINE USES:** DHS may, where allowable under relevant confidentiality provisions, share the information you provide on this application and any additional required evidence with other Federal, state, local, and foreign government agencies and authorized organizations. DHS follows approved routine uses described in the associated published system of records notices [DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System, DHS/USCIS-007 Benefits Information System, and DHS/USCIS-018 Immigration Biometric and Background Check] and the published privacy impact assessments [DHS/USCIS/PIA-016(a) Computer Linked Application Information Management System and Associated Systems and DHS/USCIS/PIA-051 Case and Activity Management for International Operations] which you can find at www.dhs.gov/privacy. DHS may also share this information, as appropriate, for law enforcement purposes or in the interest of national security.

## Paperwork Reduction Act

USCIS may not conduct or sponsor an information collection, and you are not required to respond to a collection of information, unless it displays a currently valid Office of Management and Budget (OMB) control number. The public reporting burden for this collection of information is estimated at 1.667 hours per response, including the time for reviewing instructions, gathering the required documentation and information, completing the application, preparing statements, attaching necessary documentation, and submitting the application. The collection of biometrics is estimated to require 1.17 hours. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to:

U.S. Citizenship and Immigration Services
Office of Policy and Strategy, Regulatory Coordination Division
5900 Capital Gateway Drive, Mail Stop #2140
Camp Springs, MD 20588-0009

**Do not mail your completed Form I-131F to this address.**

OMB No.1615-0161
Expires: 02/28/2025

🔒 **Security reminder**
If you do not work on your form for more than 30 days, we will delete your data in order to prevent storing personal information indefinitely.

Back    Start

Plaintiffs' Combined MSJ Exhibits - Page 25

**Important filing information**

The Form I-131F **must** be filed by the noncitizen spouse or noncitizen stepchild as the requestor. Enter the noncitizen spouse or noncitizen stepchild's information in the "About You" section. If you enter the U.S. citizen spouse or stepparent's information in this section, your request may be rejected or denied without refund.

Each requestor, including noncitizen stepchildren, must file a separate Form I-131F requesting parole in place, and each requestor must have their own USCIS online account. A parent or legal guardian may create an online account for their minor child if the purpose is to submit a form on behalf of the minor. If a parent or legal guardian is not available, a primary caregiver or legal assistance provider may also help a child create their own USCIS online account.

You must complete all fields with an asterisk (*) to submit this form.

I am requesting parole in place under INA section 212(d)(5)(A) as the: *

◉ Spouse of a United States Citizen
○ Stepchild of a United States Citizen

---

You must complete all fields with an asterisk (*) to submit this form.

I am requesting parole in place under INA section 212(d)(5)(A) as the: *

○ Spouse of a United States Citizen
◉ Stepchild of a United States Citizen

**What is your parent's Form I-131F receipt number? (if applicable)**

☐ I do not have or know the I-131F receipt number.

Provide a 13-character receipt number, beginning with 3 capitalized letters followed by 10 digits.

> I do not know the I-131F receipt number or my noncitizen parent has not filed Form I-131F.

---

# Information You Must Provide

When you prepare to file online, you should be ready to provide basic information, including:

- Your full name, and any other names you have used;
- Current mailing address and your physical address (if different);
- Your phone number and any email address you use;
- Birth date;
- Your Alien Registration Number (A-Number), if any;
- Your country of birth and your country of citizenship;
- Gender;
- Marital status (including the date of your marriage, if any);
- U.S. Social Security number (if any);
- USCIS online account number (if any); and
- Biographical information including your height, weight, hair and eye color, and your race and ethnicity.

---

**What is your current legal name?**

Your current legal name is the name on your birth certificate, unless it changed after birth by a legal action such as marriage or court order. Do not provide any nicknames here.

Given name (first name)     Middle name (if applicable)

Family name (last name) *

**Have you used any other names since birth?**

Provide all other names you have ever used, including aliases, maiden name, and nicknames.

◉ Yes
○ No

Provide all other names you have ever used, including aliases, maiden name, and nicknames.

Given name (first name)     Middle name (if applicable)

Family name (last name)

---

You must complete all fields with an asterisk (*) to submit this form.

**How can we contact you?**

Daytime telephone number

Provide a 10-digit phone number.

Mobile telephone number (if any)
☐ This is the same as my daytime telephone number.

Provide a 10-digit phone number.

Email address*

Example: user@domain.com

**What is your current U.S. mailing address or safe address (if applicable)?**

In care of name (if any)

[                    ]

Address line 1 *

[                    ]

Street number and name

Address line 2

[                    ]

Apartment, suite, unit, or floor

City or town *        State *        Zip code *

[          ]        [        ]        [          ]

Provide a 5 or 9-digit ZIP code.

---

**Is your current mailing address the same as your current U.S. physical address?***

○ Yes

● No

---

**What is your current U.S. physical address?**

Provide your current U.S. physical address.

In care of name (if any)

[                    ]

Address line 1 *

[                    ]

Street number and name

Address line 2

[                    ]

Apartment, suite, unit, or floor

City or town *        State *        Zip code *

[          ]        [        ]        [          ]

Provide a 5 or 9-digit ZIP code.

---

[ Back ]        [ Next ]

Plaintiffs' Combined MSJ Exhibits - Page 27

**What is your date of birth?** *

```
MM/DD/YYYY
```

**What is your country of birth?** *

Use the current name of the country. Do not use historical, ethnic, provincial, or other local names.

```
                                                        ▾
```

**What is your country of citizenship or nationality?***

Provide the name of the country where you are a citizen and/or national. If you do not have citizenship in any country, select Stateless.

```
                                                        ▾
```

**What is your gender?**

Based on your selection, a gender of "M" (male), "F" (female), or "X" (another gender identity) will be reflected on your secure documents if your application is approved.

○ Male
○ Female
○ Another gender identity

**What is your ethnicity?**

Hispanic or Latino refers to a person of Cuban, Mexican, Puerto Rican, South or Central American, or other Spanish culture or origin, regardless of race.

○ Hispanic or Latino
○ Not Hispanic or Latino

**What is your race?**

Select all that apply. Your race is different from your ethnicity and should reflect your geographical origins.

☐ American Indian or Alaska Native ⑦
☐ Asian ⑦
☐ Black or African American ⑦
☐ Native Hawaiian or Other Pacific Islander ⑦
☐ White ⑦

**What is your height?**

Feet                     Inches

```
              ▾          ▾
```

**What is your weight?**

Pounds

```

```

Provide a weight between 30 and 699 pounds.

Plaintiffs' Combined MSJ Exhibits - Page 28



What is the color of your eyes?

What is the color of your hair?

Back    Next

## What is your A-Number?

The A-Number refers to your immigration file number provided by U.S. immigration officials. We use your A-Number to identify your immigration records. It is a seven to nine-digit number that begins with an "A" and can be found on correspondence you have received from DHS or USCIS or on immigration court records.

☑ I do not have or know my A-Number.

Provide a 7, 8, or 9-digit number. If your A-Number is fewer than 9 digits, the system will automatically add zero(s) after the "A" and before the first digit so there is a total of 9 digits, for example: A-001234567.

## What is your U.S. Social Security number (SSN)?

☑ I do not have or know my U.S. Social Security number.

Provide a 9-digit Social Security number.

## What is your USCIS Online Account Number?

You will only have an Online Account Number, or OAN, if you previously filed a form that has a receipt number that begins with IOE. If you filed the form online, you can find your OAN in your account profile. If you mailed us the form, you can find your OAN at the top of the Account Access Notice we sent you.

If you do not have a receipt number that begins with IOE, you do not have an OAN.

(The OAN is not the same as an A-Number.)

☑ I do not have or know USCIS Online Account Number.

Provide a 12-digit Online Account Number.

## What is your most recent Form I-94 Arrival/ Departure Number? (if any)

If CBP or USCIS issued you a Form I-94, Arrival/Departure Record, provide your Form I-94 number and date that your authorized period of stay expires or expired (as shown on your Form I-94). The Form I-94 number also is known as the Departure Number on some versions of Form I-94.

**Note:** If you were admitted to the United States when you last entered the country, you will not be eligible for parole in place as a noncitizen spouse or stepchild of a U.S. citizen.

☑ I do not have or know my Form I-94 record number.

Provide an 11-character I-94 number.

What is your marital status? *

- ○ Single, Never married
- ● Married
- ○ Divorced
- ○ Widowed
- ○ Marriage annulled
- ○ Separated

---

When did you marry your current spouse?

MM/DD/YYYY

---

What is your United States Citizen spouse's or stepparent's current legal name? *

Their current legal name is the name on their birth certificate, unless it changed after birth by a legal action such as marriage or court order. Do not provide any nicknames here.

Given name (first name)

Middle name (if applicable)

Family name (last name)*

---

What is your United States Citizen spouse's or stepparent's date of birth? *

MM/DD/YYYY

---

What is your United States Citizen spouse's or stepparent's U.S Social Security number (SSN)? *

☑ I do not have or know their U.S. Social Security number.

Provide a 9-digit Social Security number.

---

Back        Next

9

Plaintiffs' Combined MSJ Exhibits - Page 30

When did you begin your continuous physical presence in the United States? *

MM/DD/YYYY

Have you **EVER** been in any exclusion, deportation, removal, or rescission proceedings?*

This includes if you were issued a Form I-862, Notice to Appear, but did not receive a hearing date in immigration court. If you do not know if you have a removal order or are currently in immigration proceedings, you can use your A-Number to look up your immigration court case status. You can also call the EOIR hotline: 1-800-898-7180 / 304-625-2050 / TDD: 800-828-1120.

**Note:** If you have a removal order but did not depart the United States (an unexecuted removal order) or failed to depart the United States pursuant to a grant of voluntary departure, you will be presumed ineligible for parole in place under this process unless you establish that there are significant favorable factors that outweigh the removal order and any other adverse factors. If you have an executed removal order, you are ineligible for parole in place under this process.

◉ Yes

○ No

Have you **EVER** been arrested for, charged with, or convicted of a felony or misdemeanor, including incidents handled in juvenile court, in the United States? *

Do not include minor traffic violations unless they were alcohol or drug-related.

◉ Yes

○ No

Have you **EVER** been arrested for, charged with, or convicted of a crime in any country other than the United States? *

Additional information about disqualifying criminal history, as well as information on criminal convictions that will result in a presumption of ineligibility that may be overcome if you can establish that there are mitigating factors, may be found by visiting our About Keeping Families Together page.

◉ Yes

○ No

Have you **EVER** or are you **NOW** engaged in activities that could be reasonable grounds for concluding that you are a danger to public safety or to the security of the United States? *

You will not be eligible for parole in place as a noncitizen spouse or stepchild of a U.S. citizen if you are found to be a danger to the national security or public safety of the United States.

◉ Yes

○ No

Plaintiffs' Combined MSJ Exhibits - Page 31

Have you ever filed a Form I-601A, Application for a Provisional Unlawful Presence Waiver, with USCIS?

● Yes

○ No

## What is the receipt number of the Form I-601A?

If you have ever filed Form I-601A, Application for Provisional Unlawful Presence Waiver, with USCIS, provide the receipt number. You should include the receipt number for your Form I-601A regardless of whether USCIS has issued a final decision on your Form I-601A or if it is still pending.

[            ]

[ Back ]    [ Next ]

---

You must complete all fields with an asterisk (*) to submit this form.

## Explain how you qualify for parole in place, including information regarding the significant public benefit or urgent humanitarian reasons warranting a grant of parole, and why you believe you merit a favorable exercise of discretion.

You must explain how you qualify for parole in place as a noncitizen spouse or stepchild of a U.S. citizen in the space provided, including any specific factors that support your request or may be considered in overcoming a rebuttable presumption of ineligibility. You will be able to upload copies of any supporting documents or evidence you want USCIS to consider. USCIS will use the information provided in your parole request and supporting evidence, along with the results of background and security checks and any other relevant information available to or requested by USCIS, to determine whether parole is warranted based on a significant public benefit or urgent humanitarian reasons and whether you merit a favorable exercise of discretion.

Provide an explanation. Your answer must be at least 750 characters. *

[                    ]

0 / 2000

[ Back ]    [ Next ]

Plaintiffs' Combined MSJ Exhibits - Page 32

If a preparer or interpreter helps you complete your request, you will need to provide basic information about that person.



Is someone assisting you with completing this application?

○ Yes
○ No

Is a preparer assisting you with completing this application?

A preparer is anyone who completes or helps you complete all or part of your application using information and answers that you provide.

● Yes
○ No

Is an interpreter assisting you with completing this application?

An interpreter is anyone who translates or helps you translate all or part of your application using information and answers that you provide.

● Yes
○ No

Back    Next

What is your preparer's full name?

Given name (first name)     Family name (last name)

What is your preparer's business or organization name?

☐ My preparer is not part of a business or organization.

What is your preparer's contact information?

Daytime telephone number

Provide a 10-digit phone number.

Mobile telephone number
☐ My preparer does not have a mobile telephone number.

Provide a 10-digit phone number.

Email address
☐ My preparer does not have an email address.

Example: user@domain.com

What is your interpreter's full name?

**Given name (first name)**

**Family name (last name)**

What is your interpreter's business or organization name?

☐ My interpreter is not part of a business or organization.

What is your interpreter's contact information?

**Daytime telephone number**

Provide a 10-digit phone number.

**Mobile telephone number**

☐ My interpreter does not have a mobile telephone number.

Provide a 10-digit phone number.

**Email address**

☐ My interpreter does not have an email address.

Example: user@domain.com

What language is your interpreter using to interpret this application for you?

# Evidence of Your Identity

You must provide a copy of an official photo identity document showing your photo, name, and date of birth. This could be:

- A valid government-issued driver's license;

- A passport identity page;

- Any national identity document from your country of origin bearing your photo;

- Any school-issued form of identification with photo; or

- Any other official identity document with a photo.

The copy you provide must clearly show the photo and identity information. Expired documents are acceptable.

### Photo Identity Document

Upload a copy of an official photo identity document showing your photo, name, and date of birth. For example:

- A valid government-issued driver's license;
- Passport identity page;
- Any national identity document from your country of origin bearing your photo;
- Any school-issued form of identification with photo; or
- Any other official identity document with a photo.

**Note:** The copy must clearly show the photo and identity information. Expired documents are acceptable.

### File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|-----------|----------|--------|
| this-is-my-evidence | Support Evidence | 🗑 Delete |

13

# Evidence of Your Spouse/ Stepparent's Citizenship

You must provide evidence that your spouse or stepparent is a U.S. citizen. This could be a copy of their:

- U.S. birth certificate;
- Naturalization Certificate;
- Certificate of Citizenship;
- Consular Report of Birth Abroad; or
- U.S. passport.

**Evidence Of Your Relative's Status As A U.S. Citizen**

Upload a copy of evidence that your relative referenced in Getting Started is a U.S. citizen. For example:

- U.S. birth certificate;
- Naturalization Certificate;
- Certificate of Citizenship;
- Consular Report of Birth Abroad; or
- U.S. passport.

**File requirements**

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|---|---|---|
| this-is-my-evidence | Support Evidence | 🗑 Delete |

# Evidence of Your Relationship

You must provide evidence you are the spouse or stepchild of the U.S. citizen. To do this, you could provide:

- A marriage certificate;
- Documentation of termination of your and your spouse's/stepparent's previous marriages, if any;
- Birth certificate with your noncitizen parent's name, if you are filing as the stepchild of a U.S. citizen; or
- Death certificate of your U.S. citizen spouse/ stepparent or your noncitizen parent, if applicable.

**Evidence Of Qualifying Relationship**

Upload a copy of evidence of your qualifying spouse or stepchild relationship to the U.S. citizen referenced in Getting Started. For example:

- Marriage certificate;
- Documentation of termination of any previous marriages, if applicable;
- Birth certificate with your noncitizen parent's name, if you are filing as the stepchild of a U.S. citizen; or
- Death certificate of your U.S. citizen spouse, U.S. citizen stepparent, or noncitizen parent, if applicable.

**File requirements**

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|---|---|---|

# Evidence of Physical Presence

You must provide evidence of your continual physical presence in the United States. To show this, you could submit:

- Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (for example, Form I-862, Notice to Appear);

**Evidence Of Continuous Physical Presence**

Upload copies of any of the following documents:

- Any Immigration and Naturalization Service (INS) or DHS document stating your date of entry (e.g., Form I-862, Notice to Appear);
- Rent receipts, utility bills (e.g., gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence that connects you to your presence at that address;
- Tax returns or tax receipts;
- School records (e.g., transcripts, report cards) from the schools that you have attended in the United States, showing the names of the schools and the periods of school attendance;
- Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities of physicians and the dates of the treatment or hospitalization;
- Official records from a religious entity in the United States confirming your participation in a religious ceremony, rite, or passage (e.g., baptism, first communion, wedding);

- Rent receipts, utility bills (such as gas, electric, phone), or receipts or letters from companies showing the dates during which you received service. You may submit this documentation even if it only has the name of your parents or legal guardians, as long as you also submit other evidence that shows your presence at that address;

- Tax returns, tax transcripts, or tax receipts;

- School records (such as transcripts or report cards) from the schools that you have attended in the United States, showing the names of the schools and the periods you attended;

- Hospital or medical records concerning treatment or hospitalization, showing the names of the medical facilities of physicians and the dates of the treatment or hospitalization;

- Official records from a religious entity in the United States confirming that you participated in a religious ceremony, rite, or passage (for example, baptism, first communion, wedding);

- Attestations by religious entities, unions, or other organizations to your physical presence; or

- Other documents such as money order receipts for money sent in or out of the country; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements; contracts to which you have been a party; insurance policies; receipts; postmarked letters or any other document you believe is relevant.

You must submit evidence that establishes your continuous physical presence for the entire period required, but you do not need to submit documentation for every day, week, or month within that period. USCIS will evaluate the totality of the evidence to determine whether you have established continuous physical presence for the required period (since June 17, 2014, for spouses or June 17, 2024, for stepchildren).

---

- Money order receipts for money sent in or out of the country; birth certificates of children born in the United States; dated records of bank transactions; correspondence between you and another person or organization; automobile license receipts, title, vehicle registration, etc.; deeds, mortgages, rental agreements, contracts to which you have been a party; insurance policies; receipts; postmarked letters;
- Attestations by religious entities, unions, or other organizations to your physical presence; or
- Any other document you believe is relevant.

**Note:** You must submit sufficient documentation to establish your continuous physical presence for the entire period of time required, but you do not need to submit documentation for every day, week, or month within that period. USCIS will evaluate the totality of the evidence to determine whether you have established continuous physical presence for the required period of time (since at least June 17, 2014 for spouses or as of June 17, 2024 for stepchildren).

File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|---|---|---|
| this-is-my-evidence | Arrest record and disposition | 🗑 Delete |

Back    Next

# Evidence Regarding Criminal Charges

If you have been arrested for or charged with any felony or misdemeanor in the United States, or a crime in any country other than the United States, you must submit evidence demonstrating the results of the arrest or charges brought against you. You do not need to submit documentation about minor traffic violations such as driving without a license unless they were alcohol- or drug-related.

If you have been arrested for or charged with any felony (i.e., a Federal, state, or local criminal offense punishable by imprisonment for a term exceeding one year) or misdemeanor (i.e., a Federal, state, or local criminal offense for which the maximum term of imprisonment authorized is one year or less but greater than five days) in the United States, or a crime in any country other than the United States, you must upload evidence demonstrating the results of the arrest or charges brought against you.

**Note:** If the charges against you were handled in juvenile court, and the records are from a state with laws prohibiting their disclosure, this evidence is not required.

- If you have ever been arrested for any felony or misdemeanor in the United States, or a crime in any country other than the United States, and no charges were filed, submit an original official statement by the arresting agency or applicable order confirming that no charges were filed for each arrest. If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.
- If you have ever been charged with or convicted of a felony or misdemeanor in the United States, or a crime in any country other than the United States, submit an original or court-certified copy of the complete arrest record and disposition for each incident (e.g., dismissal order, conviction and sentencing record, acquittal order). If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.
- If you have ever had any arrest or conviction vacated, set aside, sealed, expunged, or otherwise removed from your record, submit:

   - An original or court-certified copy of the court order vacating, setting aside, sealing, expunging, or otherwise removing the arrest or conviction; or
   - An original statement from the court that no record exists of your arrest or conviction.
- If you are unable to provide such documentation or if it is not available, you must provide an explanation, including a description of your efforts to obtain such evidence.

**Note:** You do not need to submit documentation concerning minor traffic violations such as driving without a license unless they were alcohol- or drug-related.

File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|---|---|---|
| this-is-my-evidence | Arrest record and disposition | 🗑 Delete |

# Other Evidence

You can submit any additional evidence demonstrating the significant public benefit or urgent humanitarian reasons that warrant granting you parole and evidence of any additional favorable discretionary factors that you would like us to consider, including any information that may be considered in overcoming a rebuttable presumption of ineligibility.

Additional Evidence You Want To Provide

You can provide any additional evidence demonstrating the significant public benefit or urgent humanitarian reasons warranting a grant of parole and evidence of any additional favorable discretionary factors that you would like us to consider, including any information that may be considered in overcoming a rebuttable presumption of ineligibility.

File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

| File Name | Document | Action |
|---|---|---|
| this-is-my-evidence | Other Supporting Documents | 🗑 Delete |

Plaintiffs' Combined MSJ Exhibits - Page 37



## Check your application before you submit

Please review your I-131F and check it for accuracy and completeness before you submit it.

We encourage you to provide as many responses as you can throughout the I-131F Missing or incomplete information may slow down the review process after you submit your I-131F.

You can return to this page to review your I-131F as many times as you want before you submit it.

### Your fee

ℹ Your form filing fee is: $580

**Refund policy:** USCIS does not refund fees, regardless of any action we take on your application, petition or request, or how long USCIS takes to reach a decision. By continuing this transaction, you acknowledge that you must submit fees in the exact amount and that you are paying the fees for a government service.

### Alerts and warnings

✓ We found no alerts or warnings in your application.

| Back | Next |
|------|------|



## Review the I-131F form information

Here is a summary of all the information you provided in your application.

Make sure you have provided responses for everything that applies to you before you submit your application. You can edit your responses by going to each application section using the site navigation.

We also prepared a draft case snapshot with your responses, which you can download below.

📄 View draft snapshot   🖨 Print

| Getting Started | |
|---|---|
| Application type | |
| I am applying for parole in place under INA section 212(d)(5)(A) under the Keeping Families Together Process as the: | Stepchild of a United States Citizen; Parent's I-131F Receipt Number |
| Receipt number of parent's I-131F | IOE3248908324 |
| Preparer information | |
| Is someone assisting you with completing this application? | Yes |
| Is a preparer assisting you with completing this application? | Yes |
| What is your preparer's full name? | |
| Given name (first name) | Test |
| Family name (last name) | Preparer |
| What is your preparer's business or organization name? | Organization Name |

Plaintiffs' Combined MSJ Exhibits - Page 38

What is your preparer's mailing address?

| | |
|---|---|
| Country | United States |
| Address line 1 | 800 N GLEBE RD |
| Address line 2 | SUITE 700 |
| City or town | ARLINGTON |
| State | Virginia |
| ZIP code | 22203 |

### About You

Your name

What is your current legal name?

| | |
|---|---|
| Given name (first name) | Ronny |
| Middle name | Tom |
| Family name (last name) | Jast |

Your contact information

What is your daytime phone number? 643-238-9982

What is your physical address?

| | |
|---|---|
| In care of name (if any) | |
| Country | United States |
| Address line 1 | 800 N GLEBE RD |
| Address line 2 | SUITE 700 |
| City or town | ARLINGTON |
| State | New York |
| ZIP code | 22203 |

When and where you were born

What is your date of birth? 06/07/1972

What is your country of birth? Chile

Country of citizenship or nationality? Chilean

### Eligibility

Eligibility

Date of established continuous presence in the United States

Have you been in any exclusion, deportation, removal, or rescission proceedings?

Have you EVER been arrested for, charged with, or convicted of a felony or misdemeanor, including incidents handled in juvenile court, in the United States? Do not include minor traffic violations unless they were alcohol or drug-related.

Have you EVER been arrested for, charged with, or convicted of a crime in any country other than the United States?

Plaintiffs' Combined MSJ Exhibits - Page 39

Have you EVER or are you NOW engaged in activities that could be reasonable grounds for concluding that you are a danger to the security of the United States?

Provide the receipt number if you have filed a Form I-601A, Application for a Provisional Unlawful Presence

Qualification for Parole

Explain how you qualify for parole in place including information regarding the significant public benefit or urgent humanitarian need warranting a grant of parole, and regarding why you may warrant a favorable exercise of discretion.

Evidence

Supporting evidence

Evidence of disposition of any criminal record

[ Back ]    [ Next ]



### Preparer's certification and signature

Your preparer must read and agree to the certification below.

I certify, under penalty of perjury, that I prepared this application for the applicant at their request and with express consent and that all the responses and information contained in and submitted with the application are complete, true, and correct and reflects only information provided by the applicant. The applicant reviewed the responses and information and informed me that they understand the responses and information in or submitted with the application.

As the applicant's preparer, you must sign on paper and provide your signature page to the applicant. Follow these steps:

1. Download the Preparer Signature page

2. Print the Preparer Signature page

3. Read and sign the Preparer Signature page

4. Give the signed Preparer Signature page to the applicant

The applicant will need to scan and upload your completed signature page on the next screen.

[ Back ]    [ Next ]

Plaintiffs' Combined MSJ Exhibits - Page 40



Preparer signature upload

Scan and upload your preparer's completed signature page below.

File requirements

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

Back    Next



Interpreter's certification and signature

Your interpreter must read and agree to the certification below.

I certify, under penalty of perjury, that I am fluent in English and [Fillable language field], and I have interpreted every question on the application and instructions and interpreted the applicant's answers to the questions in that language, and the applicant informed me that they understood every instruction, question, and answer on the application.

As the applicant's interpreter, you must sign on paper and provide your signature page to the applicant. Follow these steps:

1. Download the Interpreter Signature page

2. Print the Interpreter Signature page

3. Read and sign the Interpreter Signature page

4. Give the signed Interpreter Signature page to the applicant

The applicant will need to scan and upload your completed signature page on the next screen.

Back    Next



**Interpreter signature upload**

Scan and upload your interpreter's completed signature page below.

**File requirements**

- Clear and readable
- Accepted file formats: JPG, JPEG, PDF, TIF or TIFF
- No encrypted or password-protected files
- If your documents are in a foreign language, upload a full English translation and the translator's certification with each original document.
- Upload no more than five documents at a time
- Accepted file name characters: English letters, numbers, spaces, periods, hyphens, underscores, and parentheses
- Maximum size: 12MB per file

**Choose** or drop files here to upload

Back        Next

**Applicant certification and signature**

You must read and agree to the certification below. If you knowingly and willfully falsify or conceal a material fact or submit a false document with your application, we can deny your application and may deny any other immigration benefit. You may also face criminal prosecution and penalties provided by the law.

I certify, under penalty of perjury, that I provided or authorized all of the responses and information contained in and submitted with my application, I read and understand or, if interpreted to me in a language in which I am fluent by the interpreter listed in the Getting Started section of this application, understood, all of the responses and information contained in, and submitted with, my application (as explained to me by the interpreter), and that all of the responses and the information are complete, true and correct. Furthermore, I authorize the release of any information from any and all of my records that USCIS may need to determine my eligibility for an immigration request and to other entities and persons where necessary for the administration and enforcement of U.S. immigration law.

☑ I have read and agree to the applicant's statement

**Applicant Signature**

You must provide your digital signature below by typing your full legal name. We may deny your application if you do not completely fill out this application or fail to submit required documents. We will record the date of your signature with your application.

Back        Next

## Pay for and submit your application

The final step to submit your Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, is to pay the required fee.

Your application fee is: $580.00

**Refund policy:** By continuing this transaction, you agree that you are paying for a government service and that the filing fee, biometric services fee and all related financial transactions are final and not refundable, regardless of any action USCIS takes on an application, petition or request, or how long USCIS takes to reach a decision. You must submit all fees in the exact amounts.



We will send you to Pay.gov — our safe, secure payment website — to pay your fees and submit your form online.

Here are the steps in the payment and submission process:

1. Provide your billing information on Pay.gov

2. Provide your credit card or U.S. bank account information

3. Submit your payment

When you have paid your fee, your application will be submitted.

Pay.gov will redirect you to a uscis.gov confirmation screen, which will include your receipt number. Please keep a copy of your receipt number for your records. You can track the status of your application through your USCIS online account.

---

### You successfully submitted your I-131F

We will contact you if we have any questions or need additional information. You can track the status of your form through your USCIS online account.

[ Go to my cases ]

---

### You did not submit your I-131F

Your payment failed because your credit or debit card was declined.

You can try again now to sign and submit your form or save and exit. We will save your form for 30 days from when you started it.

[ Sign and submit ]

---



I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens

Submitted on January 13, 2023  |  Receipt # IOE9169555103

View PDF ▼

ⓘ  **I-131F notices will not be sent by mail**
We will send all Form I-131F notices and correspondence to your USCIS online account. **You must print your biometric services appointment notice and bring it with you to your biometrics appointment.** To ensure you have the latest information about your case, sign into your USCIS online account often to receive important messages and check your case status.

Case status    Case history    **Documents**

**USCIS Notices**

**Reminder:** You must print your biometric services appointment notice and bring it with you to your biometrics appointment.

| File | Date Sent | Action |
|------|-----------|--------|
| Appointment-Scheduled.pdf | January 13, 2023 | N/A |
| Receipt-Notice.pdf | January 13, 2023 | N/A |

**Unsolicited evidence**

Unsolicited evidence is any additional information or evidence that we did not request from you. If you upload evidence that we did not request from you, USCIS will consider the timeliness and relevance of this information when making a decision about your case.

[ Upload evidence ]

Plaintiffs' Combined MSJ Exhibits - Page 43



Plaintiffs' Combined MSJ Exhibits - Page 44

# EXHIBIT 5

10/15/24, 4:36 PM    Immigrants begin receiving relief from deportation under new Biden executive order | abc13houston.com
Live StormTracker 6 and Sky 6

WATCH LIVE       58°    Log In

menu

# Immigrants begin receiving relief from deportation under new Biden executive order

By Armando Garcia 

Wednesday, August 21, 2024

Cecilia sat in front of her computer repeatedly refreshing the U.S. Citizenship and Immigration Services webpage on Monday, waiting for the application for the Biden administration's "Keeping Families Together" program to show up on her screen.

Minutes later, she clicked it open and submitted the form in less than 20 minutes.

A little more than 24 hours later, she got an e-mail sharing the news that she had been waiting 20 years to hear.

"I see that I got approved, and I'm like, oh that was quick," she told ABC News in an interview. "I was lost for words...a whole bunch of emotions were going on."

Cecilia, who asked ABC News not to disclose her full name so she can freely disclose her immigration status, is one of the first immigrants to receive parole in place, a temporary relief from deportation under a new program that allows undocumented spouses and stepchildren of United States citizens to apply for permanent legal residence without having to leave the country.



Read More

00:00                                                                                    02:24

Noncitizen spouses are already eligible for legal status under current laws but often have to apply from their home countries and face up to a 10-year ban from returning to the U.S.

On June 18, President Joe Biden announced an executive action launching the program, calling it a "commonsense fix" to keep families together.

"This action is a better way. It doesn't tear families apart, while requiring every undocumented spouse to fulfill their obligations under the law," Biden said.

It's estimated that half a million noncitizen spouses and 50,000 children could benefit from the program, according to the Department of Homeland Security.

In order to qualify for the program, applicants must be in the country unlawfully and pass background checks. They also have to prove they've lived in the country for at least a decade and must be married to a U.S. citizen on or before June 17, 2024.

Some noncitizen stepchildren under the age of 21 are also eligible.

Cecilia's family brought her to the U.S. from Mexico when she was a 4-year-old, she told ABC News.

After unsuccessfully applying for the Deferred Action for Childhood Arrivals (DACA) program, which continues to be paused pending a yearlong battle that could permanently end the program, she thought her

dreams of finally being able to pursue a career as a chemist were over. For years, she said her parents worked to help her with paying out of state tuition because of her status.

In 2018, she met her future husband when he was studying biology at the same school.

"At the time I didn't really tell him about my status, because I was like, what if he doesn't like me because I'm not here legally," she told ABC News.



Read More

00:00                                                                                          02:24

However, she said her husband was overwhelmingly supportive of her despite her being undocumented. He has helped her get through school while raising their 3-year-old. He was working when she shared the news that her application was approved.

"He was like, 'Are you not playing with me?'" she recalled. They went to celebrate as soon as he got home.

"We always try to celebrate little moments in our lives, even if they're small, because we never know when one us might not be there and we try to be united as a family, she said.

Cecilia learned about the new policy from American Families United, a nonprofit organization that advocates for legal pathways to citizenship for foreign nationals married to U.S. citizens.

"Countless American families like Cecilia's have endured years of uncertainty, holding onto the hope that one day they could live without fear," said Ashley DeAzevedo, president of American Families United, in a statement. "We are encouraged to see the quick approval of Cecilia's application-she is American in every way that counts. Now, she will have the opportunity to contribute even more to her family and this nation that she calls home."



Read More

00:00                                                  02:24

Cecilia believes that because she had already submitted biometrics and other information to USCIS as part of her DACA application, her case was expedited.

A USCIS official told ABC News that the agency may prioritize applicants who already have other pending applications and have submitted accurate biographic information.

Cecilia has already applied for her work permit and plans to apply for lawful permanent residence status as soon as she's able to, finally putting the frustration of living in limbo as an undocumented immigrant in the past for good. Her dreams of owning a home, launching her career and raising her child with her husband seem within reach.

She's urging other undocumented immigrants to remain hopeful.

"I feel like people should be more hopeful and that there are people advocating for them," she said. "Everyone deserves an extra opportunity."

Report A Correction Or Typo

Copyright © 2024 ABC News Internet Ventures.

## Related Topics

ABC NEWS    NATIONAL

FROM THE WEB                                          Promoted Links by Taboola

**These Barefoot Shoes are Leaving Neuropathy Experts Baffled**
Barefoot Vitality

**Washington: Protect Your Pet Starting At $10 a month**
Lemonade

**Here's The Estimated Price For a Metal Roof in 2024**
HomeBuddy.com

**Delaware school bus aide charged with allegedly assaulting 4-year-old student**

**Woman shot by her husband as she read her Bible in Bethel Twp., police say**

**Uber driver charged with raping Villanova University student in her dorm room**

**Who Has the Cheapest Car Insurance in District Of Columbia (Check Zip Code)**
Forbes

**Look For Any High School Yearbook, It's Free**
Classmates

**Here's an Estimated Price for a 1-Day Walk-in Shower**
HomeBuddy

Home

AccuWeather

Traffic

Local News

Categories

Station Info

Shows

Apps



Follow Us:

Privacy Policy    Do Not Sell or Share My Personal Information    Children's Privacy Policy

Your US State Privacy Rights    Terms of Use    Interest-Based Ads    Public Inspection File

FCC Applications

Copyright © 2024 ABC, Inc., WPVI-TV Philadelphia. All Rights Reserved.

Plaintiffs' Combined MSJ Exhibits - Page 50

# EXHIBIT 6

Plaintiffs' Combined MSJ Exhibits - Page 51

7-9-82
Vol. 47    No. 132
Pages 29817-30046

Friday
July 9, 1982




# federal register

## Selected Subjects

**Animal Drugs**
Food and Drug Administration

**Coal Mining**
Surface Mining Reclamation and Enforcement Office

**Flood Insurance**
Federal Emergency Management Agency

**Food Additives**
Food and Drug Administration

**Foreign Trade**
Census Bureau

**Loan Programs—Housing and Community Development**
Farmers Home Administration

**Marketing Orders**
Agricultural Marketing Service

**Meat and Poultry Inspection**
Food Safety and Inspection Service

**Mine Safety and Health**
Mine Safety and Health Administration

**Mineral Royalties**
Minerals Management Service

**National Banks**
Comptroller of Currency

**Over-the-Counter Drugs**
Food and Drug Administration

**Passports and Visas**
Immigration and Naturalization Service

CONTINUED INSIDE

Plaintiffs' Combined MSJ Exhibits - Page 52

II        Federal Register / Vol. 47, No. 132 / Friday, July 9, 1982



# Selected Subjects

**FEDERAL REGISTER** Published daily, Monday through Friday, (not published on Saturdays, Sundays, or on official holidays), by the Office of the Federal Register, National Archives and Records Service, General Services Administration, Washington, D.C. 20408, under the Federal Register Act (49 Stat. 500, as amended; 44 U.S.C. Ch. 15) and the regulations of the Administrative Committee of the Federal Register (1 CFR Ch. I). Distribution is made only by the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402.

The **Federal Register** provides a uniform system for making available to the public regulations and legal notices issued by Federal agencies. These include Presidential proclamations and Executive Orders and Federal agency documents having general applicability and legal effect, documents required to be published by Act of Congress and other Federal agency documents of public interest. Documents are on file for public inspection in the Office of the Federal Register the day before they are published, unless earlier filing is requested by the issuing agency.

The **Federal Register** will be furnished by mail to subscribers, free of postage, for $300.00 per year, or $150.00 for six months, payable in advance. The charge for individual copies is $1.50 for each issue, or $1.50 for each group of pages as actually bound. Remit check or money order, made payable to the Superintendent of Documents, U.S. Government Printing Office, Washington, D.C. 20402.

There are no restrictions on the republication of material appearing in the **Federal Register**.

Questions and requests for specific information may be directed to the telephone numbers listed under INFORMATION AND ASSISTANCE in the READER AIDS section of this issue.

**Probation and Parole**
   Immigration and Naturalization Service
**Radio**
   Federal Communications Commission
**Securities**
   Securities and Exchange Commission
**Television**
   Federal Communications Commission
**Trade Practices**
   Federal Trade Commission



**Friday**
**July 9, 1982**

**Part IX**

# Department of Justice

Immigration and Naturalization Service

Detention and Parole of Inadmissible Aliens; Interim Rule With Request for Comments

## DEPARTMENT OF JUSTICE

### Immigration and Naturalization Service

### 8 CFR Parts 212 and 235

### Detention and Parole of Inadmissible Aliens; Interim Rule With Request for Comments

**AGENCY:** Immigration and Naturalization Service, Justice.

**ACTION:** Interim rule with request for comments.

**SUMMARY:** This interim rule, published pursuant to an order of the District Court for the Southern District of Florida, sets forth the Service's policy regarding the detention and parole of aliens who seek to enter the United States illegally. The Administration has determined that a large number of Haitian nationals and others are likely to attempt to enter the United States illegally unless there is in place a detention and parole regulation meeting the approval of the District Court. Such a large scale influx would clearly be contrary to the public interest. This rule insures that the parole of illegal aliens will be carefully and narrowly exercised to conform to statutory purposes and legislative intent.

**EFFECTIVE DATE:** July 9, 1982. Comments must be received on or before August 9, 1982.

**ADDRESSES:** Please submit written comments in duplicate to the Commissioner of Immigration and Naturalization, Room 7100, 425 I Street, N.W., Washington, DC 20536.

**FOR FURTHER INFORMATION CONTACT:**
For General Information: Stanley J. Kieszkiel, Acting Instructions Officer, Immigration and Naturalization Service, 425 I Street NW., Washington, DC 20536, Telephone: (202) 633–3048.

For Specific Information: Maurice C. Inman, Jr., General Counsel, Immigration and Naturalization Service, 425 I Street NW., Washington, DC 20536, Telephone: (202) 633–2895.

**SUPPLEMENTARY INFORMATION:** On June 18, 1982, the District Court for the Southern District of Florida held that the Service's present detention policy in regard to aliens who attempt to enter the United States illegally was "null and void." In its decision, *Louis v. Nelson*, No. 81–1260–CIV–EPS, the court found that the Service had not complied with the rule making provisions of the Administrative Procedure Act (APA) with respect to its detention policy. The court enjoined the enforcement of this policy with respect to those Haitians who were then detained in the United States.

In its subsequent order of July 2, 1982, the court stayed for 30 days, that portion of its order which enjoined enforcement of the detention policy with respect to future illegal entrants into the United States. The court expressly conditioned the stay of its order with respect to future illegal entrants upon the Service's publication, within a 30 day period, of rules embodying the Service's detention policy.

This rule is therefore being published in compliance with and consistently with the court's order, although the Service strongly disagrees with the analysis and conclusions of the court, strongly disagrees that the Service's detention policy is subject to and falls within the APA rule making requirements, and strongly disagrees that its detention policy is null and void because the Service did not engage in formal APA rule making. Accordingly, this rule is being published "under protest." The Service has sought judicial review of this order.

This rule is being published as an *interim rule* with comment, effective immediately upon publication, because the delays involved in customary publication would seriously impair the Service's ability to protect the country's borders and would be detrimental to the public interest. Accordingly, suspension of the normal 30 day publication requirement is essential under the "good cause" provision of 5 U.S.C. 553(d)(3).

The district court's order has created a vacuum in the Service's detention policy and in the enforcement of the immigration laws of the United States. This vacuum will be prolonged unless the 30 day publication requirement is suspended. If this requirement is not suspended, a significant number of persons who were previously deterred from attempting to enter the United States illegally by the Service's detention policy may now enter the United States without fear of being detained until publication is completed.

This potential emergency was expressly recognized by the district court in its July 2, 1982 order, where the court referred to the affidavit of Bob Graham, the Governor of Florida as follows:

The affidavit * * * states that there are between 20,000 and 40,000 Haitians in the Bahamas as well as "additional numbers of Haitians, Nicaraguans, El Salvadorans and other nationals currently residing in other areas within the Caribbean basin * * *. Consistent with the information obtained from the aforesaid reports your affiant fears a renewed influx of Haitian and other aliens into south Florida if the court's judgment dated June 29, 1982 is not stayed * * *".

The court recognizes the validity of this assessment in its July 2, 1982 order at page 3:

The appearance of an inability on behalf of the United States Government to control unlawful immigration into this country is "the greatest inducement to the ultimate swollen tide of undocumented aliens." *Haitian Refugee Center v. Smith*, No. 80–5683, slip op. 15182 n. 11 (11th Cir. May 4, 1982). This Court does not want its Final Judgment to render INS helpless and thereby induce further migration to these shores.

Publication of this rule as an interim rule is therefore the only possible course of action for the Service to follow in discharging its obligation to enforce the immigration laws of the United States.

Section 235(b) of the Immigration and Nationality Act directs that every alien, (other than crewmen, stowaways, and security risks who are covered by separate provisions) "* * * who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land *shall* be detained for further inquiry to be conducted by a special inquiry officer." (Italics supplied.) Detention is therefore mandated by the statute.

In the event that an arriving alien covered by section 235(b) does not wish to withdraw his application and depart, the only exception to detention is through the exercise of parole authority under section 212(d)(5) of the Act. That section provides that parole may be exercised in the discretion of the Attorney General, and "* * * under such conditions as he may prescribe for emergent reasons or reasons deemed strictly in the public interest * * *".

The legislative history of the parole provision shows a Congressional intent that parole be used in a restrictive manner. The drafters of the Immigration and Nationality Act of 1952 gave as examples situations where parole was warranted in cases involving the need for immediate medical attention, witnesses, and aliens being brought into the United States for prosecution. H. Rep. No. 1365, 82nd Cong., 2d Sess., at 52 (1952). In 1965, a Congressional committee stated that the parole provisions "were designed to authorize the Attorney General to act only in emergent, individual, and isolated situations, such as the case of an alien who requires immediate medical attention, and not for the immigration of classes or groups outside the limit of the law." S. Rep. No. 748, 89th Cong., 1st Sess., at 17 (1965). Finally, in the Refugee Act of 1980, Congress removed the Attorney General's authority to parole groups of aliens as refugees. Pub.

Plaintiffs' Combined MSJ Exhibits - Page 55

L. 96–212, 96th Cong., 2d Sess., 94 Stat. 108 (1980).

By regulation, the authority to parole aliens is delegated to district directors of the Service. However, in exercising this discretion, district directors should be guided by the fact that the statutory rule is one of detention, and that the use of parole authority is an exception to that rule and should be carefully and narrowly exercised to be in conformity with the statutory purpose and legislative intent.

Where an alien who appears to be inadmissible has arrived aboard a regular carrier which has entered into a contract with the Attorney General under section 238 of the Act, the placing of aliens in the custody of the carrier, as authorized by section 233 of the Act, will ordinarily satisfy the detention requirements of the statute. In cases where carrier custody appears to be inadequate to protect the safety of the public, or where the security precautions which the carrier will take appear to be inadequate or inappropriate to detain the alien, custody may be assumed by the Service.

Aliens who appear to be inadmissible and who have false or no documentation, and/or who arrive at places other than designated ports of entry, will be detained by the Service under section 235(b) of the Act. This policy is set forth in this rule. In addition, the rule defines a number of situations where exercise of the parole authority is justified for "emergent reasons" or would be "strictly in the public interest": (1) Serious medical conditions; (2) pregnant women; (3) certain juveniles; (4) aliens with close family relatives in the United States; (5) other unusual situations warranting parole.

Compliance with 5 U.S.C. 553 as to notice of proposed rulemaking and delayed effective date is contrary to the public interest and is waived for good cause.

In accordance with 5 U.S.C. 605(d), the Commissioner of Immigration and Naturalization certifies that this rule will not have significant economic impact on a substantial number of small entities.

This rule is not a major rule within the meaning of section 1(b) of E.O. 12291, and it is exempt under section 8(a)(1) of E.O. 12291 from the normal procedures prescribed by virtue of the emergency situation which exists by virtue of a mass influx of illegal aliens.

## List of Subjects

### 8 CFR Part 212

Administrative practice and procedure, Aliens, Bonds, Detention, Probation and parole.

### 8 CFR Part 235

Aliens, Bonds, Detention, Inspections, Port of Entry, Probation and parole.

Accordingly, Title 8 of the Code of Federal Regulations is amended as follows:

## PART 212—DOCUMENTARY REQUIREMENTS: NONIMMIGRANTS; WAIVERS; ADMISSION OF CERTAIN INADMISSIBLE ALIENS; PAROLE

1. In Part 212, § 212.5 is revised to read as follows:

### § 212.5  Parole of aliens into the United States.

(a) In determining whether or not aliens detained in accordance with § 235.3(b) or (c) will be paroled, the district director should consider the following:

(1) The parole of aliens who have serious medical conditions in which continued detention would not be appropriate would generally be justified by "emergent reasons";

(2) The parole of aliens within the following groups would generally come within the category of aliens for whom the granting of the parole exception would be "strictly in the public interest", provided that the aliens present neither a security risk nor a risk of absconding:

(i) Women who have been medically certified as pregnant;

(ii) Aliens who are defined as juveniles should only be placed in a juvenile facility or with an appropriate responsible agency or institution, recognized or licensed to accommodate juveniles by the laws of that state. A juvenile is generally defined as a person subject to the jurisdiction of a juvenile court. To determine what constitutes legal age or exceptions to the above definition in a particular state, the laws of the state where the alien is physically present will apply. Children of tender years who are too young to be placed in a juvenile facility or youth hall, and older juveniles who it is anticipated will remain in detention for a period longer than thirty days, should be placed with relatives or friends. In those extreme cases where it is impossible to accommodate a child of tender years accompanied by an adult or juvenile who will or has remained in detention for periods of over 30 days, consideration should be given to paroling the juvenile with the accompanying adult to a responsible

agency, relative, or friend. When it is determined that such juvenile should be paroled from detention, the following guidelines should be followed:

(A) Juveniles may be released to a relative (brother, sister, aunt, uncle) not in Service detention who is willing to sponsor a minor and the minor may be released to that relative notwithstanding that he has a relative who is in detention.

(B) If a relative who is not in detention cannot be located to sponsor the minor, the minor may be released with an accompanying relative who is in detention.

(C) If the Service cannot locate a relative in or out of detention to sponsor the minor, but the minor has identified a nonrelative in detention who accompanied him on arrival, the question of releasing the minor and the accompanying nonrelative adult shall be addressed on a case-by-case basis.

(iii) Aliens who have close family relatives in the United States (parent, spouse, children, or siblings who are United States citizens or lawful permanent resident aliens) who are eligible to file, and have filed, a visa petition on behalf of the detainee;

(iv) Aliens who will be witnesses in proceedings being, or to be, conducted by judicial, administrative, or legislative bodies in the United States;

(v) Aliens whose continued detention is not in the public interest as determined by the district director.

(3) Aliens subject to prosecution in the United States who are needed for the purposes of such prosecution may be paroled to the custody of the appropriate responsible agency or prosecuting authority.

(b) In the cases of all other arriving aliens except those detained under § 235.3(b) or (c), and paragraph (a) of this section, the district director in charge of a port of entry may, prior to examination by an immigration officer, or subsequent to such examination and pending a final determination of inadmissibility in accordance with sections 235 and 236 of the Act and this chapter, or after a finding of inadmissibility has been made, parole into the United States temporarily in accordance with section 212(d)(5) of the Act any such alien applicant for admission at such port of entry under such terms and conditions, including those set forth in paragraph (c) of this section, as he may deem appropriate.

(c) Conditions. In any case where an alien is paroled under paragraph (a) or (b) of this section, the district director may require reasonable assurances that the alien will appear at all hearings

and/or depart the United States when required to do so. Not all factors listed need be present for parole to be exercised. The district director should apply reasonable discretion. The consideration of all relevant factors includes:

(1) The giving of an undertaking by the applicant, counsel, or a sponsor to ensure appearances, and a bond may be exacted on Form I–352 in such amount as the district director may deem appropriate;

(2) Community ties such as close relatives with known addresses; and

(3) Agreement to reasonable conditions (such as periodic reporting of whereabouts).

(d) *Termination of parole.—(1) Automatic.* Parole shall be automatically terminated without written notice (i) upon the departure from the United States of the alien, or, (ii) if not departed, at the expiration of the time for which parole was authorized, and in the latter case the alien shall be processed in accordance with paragraph (d)(2) of this section except that no written notice shall be required.

(2) *On notice.* In cases not covered by paragraph (d)(1) of this section, upon accomplishment of the purpose for which parole was authorized or when in the opinion of the district director in charge of the area in which the alien is located neither emergency nor public interest warrants the continued presence of the alien in the United States, parole shall be terminated upon written notice to the alien and he or she shall be restored to the status which he or she had at the time of parole. Any further inspection or hearing shall be conducted under section 235 or 236 of the Act and this chapter, or any order of exclusion and deportation previously entered shall be executed. If the exclusion order cannot be executed by deportation within a reasonable time, the alien shall again be released on parole unless in the opinion of the district director the public interest requires that the alien be continued in custody.

(e) *Advance authorization.* When parole is authorized for an alien who will travel to the United States without a visa, the alien shall be issued Form I–512.

(Sec. 103, 212 of the Immigration and Nationality Act, as amended; 8 U.S.C. 1103, 1182)

## PART 235—INSPECTION OF PERSONS APPLYING FOR ADMISSION

2. In Part 235, § 235.3 is revised to read as follows:

### § 235.3  Detention and deferred inspection.

(a) *Prior to inspection.* All persons arriving at a port in the United States by vessel or aircraft shall be detained aboard the vessel or at the airport of arrival by the master, commanding officer, purser, person in charge, agent, owner, or consignee of such vessel or aircraft until admitted or otherwise permitted to land by an officer of the Service. Notice or order to detain shall not be required.

(b) *Aliens with no documentation or false documentation.* Any alien who appears to the inspecting officer to be inadmissible, and who arrives without documents (except an alien for whom documentary requirements are waived under § 211.1(b)(3) or § 212.1 of this chapter) or who arrives with documentation which appears to be false, altered, or otherwise invalid, or who arrives at a place other than a designated port of entry, shall be detained in accordance with section 235(b) of the Act. Parole of such aliens shall only be considered in accordance with § 212.5(a) of this chapter.

(c) *Aliens with documents.* Any alien who appears to the inspecting officer to be inadmissible, but who does not fall within paragraph (b), may be detained, paroled, or paroled for deferred inspection by the inspecting officer. In determining whether or not a parole or a parole for deferred inspection is warranted the inspecting officer shall consider the likelihood that the alien will abscond or pose a security risk.

(d) *Carrier custody.* Any alien subject to detention under paragraph (b) or (c) of this section may be placed in the custody of the carrier if the carrier has entered into a contract with the Attorney General under section 238 of the Act. If in the opinion of the examining immigration officer it is not practical to resolve a question of admissibility at the time of arrival of a passenger on a vessel or aircraft, the officer shall execute Form I–259 to notify the agent for the vessel or aircraft and the master or commanding officer, if available, that the passenger is to be presented for further inspection. The Form I–259 shall list the name of each such passenger and shall contain instructions as to the date and place the passenger is to be presented for continued inspection or further proceedings under the Act. If the place specified is a designated port of entry to which the transportation company has carried or has contracted to carry the passenger, the transportation company shall remain under the obligation, described in the preceding paragraph, to prevent an unauthorized landing, unless the transportation company has been relieved of this obligation by removal under section 233(a) of the Act at the direction of the Service or unless the Service has paroled the alien under section 212(d)(5) of the Act without directing the carrier in writing to present the alien for further inspection. The term port of entry as used in this paragraph includes a Service district office or suboffice within the city or town or in local commuting distance of the seaport or airport at which the passenger arrived or of the onward seaport or airport specified by the examining immigration officer as the place for completion of inspection. In cases where carrier custody appears to be inadequate to protect the safety of the public, or where the security precautions which the carrier will take appear to be inadequate or inappropriate to detain the alien, custody may be assumed by the Service.

(Secs. 103, 233, 235 of the Immigration and Nationality Act, as amended; 8 U.S.C. 1103, 1223, 1225)

Dated: July 7, 1982.

**Alan C. Nelson,**

*Commissioner of Immigration and Naturalization.*

[FR Doc. 82–18771 Filed 7–8–82; 9:07 am]

**BILLING CODE 4410-10-M**

Plaintiffs' Combined MSJ Exhibits - Page 57

# EXHIBIT 7



**U.S. Citizenship and Immigration Services**

MENU

[Home](#) > [Humanitarian](#) > Humanitarian or Significant Public Benefit Parole for Noncitizens Outside the United States

# Humanitarian or Significant Public Benefit Parole for Noncitizens Outside the United States

> ⓘ **ALERT – Parole Processing Times**
>
> See more ⌄

> ⓘ **ALERT: Filing Form I-131 Online to Request Parole**
>
> See more ⌄

Individuals who are outside of the United States may be able to request parole into the United States based on urgent humanitarian reasons or a significant public benefit.

**For information on the types of documents and evidence you should submit** to support a request for parole, please see [Guidance on Evidence for Certain Types of Humanitarian or Significant Public Benefit Parole Requests](#).

This webpage does **not** cover the following types of parole requests:

- *Requests for individuals who are already inside the United States and wish to depart temporarily, and who seek advance parole or travel authorization to return.* For information on how an individual inside the United States may be considered for advance parole or travel authorization to return to the United States a er temporary travel, please see [Form I-131 instructions (PDF, 646.57 KB)](#).

- *Requests by individuals who are inside the United States and seek parole in place.* For general information, please contact the [USCIS Contact Center](#)

- *Requests for parole under the Immigrant Military Members and Veterans Initiative for individuals living outside the United States.* For more information, please visit our [Military webpage](#) and the [ImmVETS Resource Center](#).

- *Requests for individuals seeking initial parole under a special parole program or process, such as:*

  - [Processes](#)

  - [The Central American Minor Refugee/Parole Program](#)



Need Help?
Chat with Emma™

10/15/24, 4:4... Case 6:24-cv-00306-JCB Humanitarian or Significant Public Benefit Parole for Individuals Outside Document 78-1 Filed 10/19/24 Page 59 of 343 PageID #: 1266

Plaintiffs' Combined MSJ Exhibits - Page 59

- The Filipino World War II Veterans Parole Program

↗ Close All    ↗ Open All

| Terminology | ⌄ |
|---|---|

| What Is Parole? | ⌄ |
|---|---|

| Who Can Apply for Parole? | ⌄ |
|---|---|

| The Need for a Financial Supporter | ⌄ |
|---|---|

| Eligibility for Parole | ⌄ |
|---|---|

| Parole Process | ⌄ |
|---|---|

| How to Apply | ⌄ |
|---|---|

| Travel for Parolees | ⌄ |
|---|---|

| Re-Parole | ⌄ |
|---|---|

| Related Links | ⌄ |
|---|---|

↗ Close All    ↗ Open All

Last Reviewed/Updated: 10/11/2024

Plaintiffs' Combined MSJ Exhibits - Page 60

# EXHIBIT 8

**OFFICE OF INSPECTOR GENERAL**

# The Unified Coordination Group Struggled to Track Afghan Evacuees Independently Departing U.S. Military Bases



Homeland Security

**September 29, 2022**

**OIG-22-79**

Plaintiffs' Combined MSJ Exhibits - Page 62



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Washington, DC 20528 / www.oig.dhs.gov

September 29, 2022

MEMORANDUM FOR:    The Honorable Alejandro N. Mayorkas
Secretary
Department of Homeland Security

FROM:    Joseph V. Cuffari, Ph.D.
Inspector General

JOSEPH V CUFFARI

Digitally signed by JOSEPH V CUFFARI
Date: 2022.09.29 18:01:59 -04'00'

SUBJECT:    *The Unified Coordination Group Struggled to Track Afghan Evacuees Independently Departing U.S. Military Bases*

Attached for your action is our final report, *The Unified Coordination Group Struggled to Track Afghan Evacuees Independently Departing U.S. Military Bases.* We incorporated the formal comments from the Department of Homeland Security in the final report.

The report contains one recommendation to ensure DHS contacts and counsels Afghan evacuees who independently departed and have not yet completed parole requirements. Your office concurred with this recommendation. Based on information provided in your response to the draft report, we consider this recommendation open and resolved. Once your office has fully implemented the recommendation, please submit a formal closeout letter to us within 30 days so that we may close the recommendation. The memorandum should be accompanied by evidence of completion of agreed-upon corrective actions. Please send your response or closure request to OIGISPFollowup@oig.dhs.gov.

Consistent with our responsibility under the *Inspector General Act*, we will provide copies of our report to congressional committees with oversight and appropriation responsibility over the Department of Homeland Security.

Please call me with any questions, or your staff may contact Thomas Kait, Deputy Inspector General for Inspections and Evaluations, at (202) 981-6000.

Attachment

# DHS OIG HIGHLIGHTS

## *The Unified Coordination Group Struggled to Track Afghan Evacuees Independently Departing U.S. Military Bases*

**September 29, 2022**

## Why We Did This Evaluation

We conducted this evaluation to assess DHS' efforts to track Afghan evacuees independently departing U.S. military bases and how independent departures affect immigration status.

## What We Recommend

We made one recommendation to ensure DHS contacts and counsels Afghan evacuees who independently departed and have not yet completed parole requirements.

**For Further Information:**
Contact our Office of Public Affairs at (202) 981-6000, or email us at DHS-OIG.OfficePublicAffairs@oig.dhs.gov

## What We Found

The Unified Coordination Group (UCG) struggled to track Afghan evacuees who independently departed U.S. military bases designated as "safe havens." Specifically, UCG officials had difficulties documenting when independent departures occurred. Hummingbird, the case tracking system used by UCG officials, was not designed to track independent departures, and data quality issues included missing departure dates and contact information for evacuees. In some instances, officials noticed that Afghan evacuees recorded as present at safe havens had already left.

Some Afghan evacuees independently departed safe havens without completing medical requirements. In addition, the UCG's Independent Departure Task Force did not attempt to locate all Afghan evacuees who independently departed safe havens to verify their compliance with parole conditions. These evacuees could face challenges obtaining long-term immigration status due to their failure to comply with parole conditions or to submit immigration applications.

## DHS Response

DHS concurred with our recommendation. We consider this recommendation resolved and open. Appendix B contains DHS' full response.

Plaintiffs' Combined MSJ Exhibits - Page 64



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Table of Contents

Introduction ................................................................. 2

Background .................................................................. 3

Results of Evaluation ...................................................... 6

    Safe Havens Had Difficulties Tracking Independent Departures ............ 7

    Some Afghan Evacuees Independently Departed Safe Havens without Completing Medical Requirements .......................................... 9

    The Task Force Did Not Consistently Verify Parole Compliance for Evacuees Who Independently Departed Safe Havens .......................... 10

    Afghan Evacuees Who Independently Departed Could Face Challenges Obtaining Long-Term Immigration Status .................................. 11

Conclusion ................................................................ 12

Recommendation ........................................................... 13

Management Comments and OIG Analysis ..................................... 13

## Appendixes

    Appendix A:  Objective, Scope, and Methodology  ................................. 15
    Appendix B:  DHS Comments to the Draft Report ................................. 16
    Appendix C:  Office of Inspections and Evaluations Major Contributors to This Report ............................................. 24
    Appendix D:  Report Distribution ......................................... 25

## Abbreviations

| | |
|---|---|
| CBP | U.S. Customs and Border Protection |
| ICE | U.S. Immigration and Customs Enforcement |
| UCG | Unified Coordination Group |
| USCIS | U.S. Citizenship and Immigration Services |

Plaintiffs' Combined MSJ Exhibits - Page 65



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Introduction

Between August 20, 2021, and February 19, 2022, the U.S. Government flew approximately 85,000 Afghan evacuees to the United States.[1]  These Afghan evacuees arrived at U.S. ports of entry located at Washington Dulles and Philadelphia International Airports.  The Department of Homeland Security determined an estimated 12,000 Afghan evacuees had U.S. citizenship or long-term immigration status,[2] including lawful permanent residence or special immigrant visas for assisting the United States in Afghanistan.[3]  U.S. Customs and Border Protection (CBP) granted the remaining estimated 73,000 evacuees humanitarian parole into the United States,[4] most for 2 years.[5]

DHS established a process to temporarily house Afghan evacuees on military bases in the continental United States, designated as "safe havens," until nongovernmental organizations helped resettle them into U.S. communities.  However, DHS determined that approximately 11,700 of the evacuees departed the safe havens without resettlement assistance; these departures were called independent departures.  Our objective was to review DHS' efforts to track Afghan evacuees who independently departed safe havens and how independent departures affect evacuees' immigration status.

---

[1] *Operation Allies Welcome Daily Report*, Feb. 19, 2021.  This was the largest U.S. evacuation of a wartime ally since the evacuation of 130,000 Vietnamese from South Vietnam in 1975.  *Afghanistan, Iraq, Vietnam: How the U.S. Has Resettled Its Wartime Allies*, Council on Foreign Relations, Sep. 28, 2022.

[2] DHS led the interagency effort to resettle Afghan evacuees.  DHS and its interagency partners released reports with data related to the evacuees.

[3] In this report, "long-term immigration status" refers to evacuees who are granted, for example, special immigrant visas, refugee status, or asylum, and/or evacuees who applied for lawful permanent residence and received a favorable decision.

[4] Humanitarian parole is a discretionary immigration mechanism provided "on a case-by-case basis" that grants foreign nationals who are otherwise inadmissible to the United States permission to remain for a designated period and temporary employment authorization" (see *Immigration and Nationality Act* § 212(d)(5)(A), 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5; see also 8 C.F.R. § 274a.12(c)(11)).  Parolees are expected to depart the United States when the parole period expires, obtain authorization to re-parole, or apply for another immigration status that will permit them to remain in the United States, such as asylum (see *Immigration and Nationality Act* § 212(d)(5); 8 C.F.R. § 212.5(e)).

[5] On August 23, 2021, the DHS Secretary instructed the CBP Acting Commissioner to parole eligible Afghan nationals into the United States for 2 years, after appropriate vetting.  See memorandum from Alejandro N. Mayorkas, DHS Secretary, to Troy Miller, CBP Acting Commissioner, *Guidance for the Immigration Processing of Afghan Citizens During Operations Allies Refuge,* Aug. 23, 2021.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

## Background

DHS led the interagency effort to support and resettle Afghan evacuees.  The DHS Secretary established a Unified Coordination Group (UCG)[6] to coordinate efforts to provide Afghan evacuees with temporary housing, vaccinations,[7] a tuberculosis screening, and immigration processing.[8]  The UCG Senior Response Official[9] oversaw these operations at eight safe havens, managed by DHS officials, with representatives from the Department of Defense, Department of State, and Department of Health and Human Services.  The UCG partnered with nongovernmental organizations known as resettlement agencies, which helped the evacuees at safe havens locate housing and jobs to resettle in the United States.  See Figure 1 for a map showing the locations of the eight safe havens and two ports of entry.

### Figure 1. Map of Safe Havens and Ports of Entry



*Source:* DHS Office of Inspector General analysis of UCG and DHS documents

---

[6] According to the *DHS National Response Framework, Fourth Ed.*, Oct. 28, 2019, a UCG is made up of senior leaders representing state, tribal, territorial, insular area, and Federal interests, and in some instances includes local jurisdictions, the private sector, and nongovernmental organizations.  A UCG is responsible for determining staffing levels and coordinating staff based on incident requirements.  Further, a UCG should include operations, planning, public information, and logistics to integrate personnel for unity of government effort.

[7] The UCG provided vaccinations for mumps, measles, rubella, polio, COVID-19, and other age-appropriate vaccinations.

[8] Immigration processing could include, for example, completing an application for employment authorization.

[9] The Senior Response Official led the UCG and provided direction and guidance to UCG officials.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

All Afghan evacuees had U.S. citizenship, long-term immigration status, or received parole, and they could depart ports of entry[10] or safe havens and could choose to relocate without assistance from a resettlement agency.[11] The UCG referred to departures without assistance from a resettlement agency as "independent departures." DHS implemented and refined certain conditions for evacuees with parole to lawfully remain in the United States, such as completing vaccinations and a tuberculosis screening.[12]

An estimated 20,300 total evacuees independently departed either a port of entry or a safe haven without assistance from a resettlement agency. Of this total, approximately 8,600 Afghan evacuees independently departed ports of entry rather than proceeding to a safe haven. The remaining 11,700 evacuees independently departed after arriving at a safe haven but before receiving assistance from a resettlement agency. These evacuees at the safe havens left at various stages of the resettlement process,[13] as depicted in Figure 2.[14]

---

[10] As an exception, on September 7, 2021, DHS began requiring evacuees with parole to proceed to safe havens to receive vaccinations and a tuberculosis screening, as described later.
[11] The UCG referred to evacuees as "guests," underscoring the voluntary nature of their participation in the resettlement process.
[12] DHS may set conditions on parole, including compliance with public health measures (see 8 C.F.R. § 212.5(c)). As discussed later in the report, DHS implemented and refined its medical requirements for evacuees with parole between August 20 and September 7, 2021. Evacuees with U.S. citizenship and long-term immigration status were not subject to these medical requirements.
[13] We identified data quality issues related to certain stages of the resettlement process, such as evacuees completing medical requirements, as discussed below. As a result, we cannot determine the total number of Afghan evacuees who completed each stage of the process.
[14] For example, some Afghan evacuees independently departed safe havens after receiving a resettlement offer. With high housing costs and resettlement agencies' limited resources in areas with an established Afghan community, such as Sacramento, CA, and northern Virginia, some Afghan evacuees were offered resettlement in communities outside of these areas where they had no established ties. In these instances, some Afghan evacuees rejected the resettlement offers and independently departed safe havens.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

### Figure 2. Stages of Independent Departures



*Source:* DHS OIG analysis of UCG documents

The UCG officials located at each safe haven established their own processes for meeting with Afghan evacuees electing to independently depart and for recording data on their departures, and on September 9, 2021, officials received instruction to record the information in Hummingbird, a Department of State case tracking system. During these independent departure meetings, UCG officials offered to counsel the evacuees about the benefits they would forego if they left the UCG's resettlement process, including immigration processing, facilitated travel to U.S. communities, and help locating housing and jobs. The UCG officials also offered to counsel the evacuees with parole about the need to comply with parole conditions after their departure, which could include completing medical requirements.[15] UCG data indicates that more than 95 percent of the evacuees received this counseling before independently departing safe havens.[16]

---

[15] DHS medical requirements for Afghan evacuees with parole evolved over time, as discussed later in the report.
[16] UCG data reflects that 2.4 percent of evacuees did not receive counseling, and UCG data on counseling is missing for 2 percent of evacuees. See Figure 3.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

In early September 2021, UCG officials discussed creating a task force to ensure all evacuees with parole met their parole conditions.  On September 8, 2021, the UCG Senior Response Official sent an email to the U.S. Immigration and Customs and Enforcement (ICE) Acting Director stating the task force should focus on evacuees with parole "departing [U.S.] facilities that did not comply with conditions … to ensure that [the UCG is] able to verify a 100% [sic] received vaccinations."

Following these discussions, the UCG established the Independent Departure Task Force (Task Force), located in DHS headquarters, to assist with verifying that evacuees who had already independently departed complied with parole conditions.  The UCG management plan, which provided work assignments to offices within the UCG, instructed the Task Force to "[l]ocate and verify completion of parole requirements for all [i]ndependent [d]epartures."  In addition, the UCG developed guidance on how to deliver parole compliance information to Afghan evacuees who independently departed ports of entry and safe havens.

The Task Force, made up of four ICE officers serving as Director, Deputy Director, and two additional members,[17] sought to identify the current locations of Afghan evacuees with parole who independently departed.  The Task Force then either asked ICE officers in field offices to deliver information to them on how to meet their parole requirements or delivered the information electronically via email.

## Results of Evaluation

The UCG struggled to track Afghan evacuees who independently departed safe havens.  UCG officials had difficulties documenting when independent departures occurred.  Additionally, the Hummingbird system was not designed to track independent departures, and data quality issues included missing departure dates and contact information for evacuees.  In some instances, officials noticed that Afghan evacuees recorded as present at safe havens had already left.

Some Afghan evacuees independently departed safe havens without completing medical requirements.  In addition, the Task Force did not attempt to locate all Afghan evacuees who independently departed safe havens to verify their compliance with parole conditions.  These evacuees could face challenges

---

[17] The Director and Deputy Director were the only two members assigned day-to-day management and planning responsibilities.  The other two members provided temporary assistance.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

obtaining long-term immigration status due to their failure to comply with parole conditions or to submit immigration applications.

## Safe Havens Had Difficulties Tracking Independent Departures

As the Afghan evacuees arrived, UCG officials at each safe haven established their own processes to meet with evacuees electing to independently depart and record data on their departures, including their U.S. points of contact, destination addresses, and departure dates.[18]  UCG officials initially recorded this information in various ways at each safe haven, such as on paper or in Excel spreadsheets, but received instruction from the DHS Chief Information Officer on September 9, 2021, to record the information in Hummingbird.

Our analysis of Hummingbird data identified missing or erroneous information for Afghan evacuees who independently departed each of the safe havens.  For example, the data in Hummingbird did not contain departure dates for more than 100 independent departures, while Hummingbird listed January 1, 1900, as the departure date for 11 others.  Additionally, we observed independent departure data fields missing the following:

- first, middle, and last names;
- alien registration numbers;
- contact information;
- whether the evacuees received independent departure counseling; or
- whether the evacuees completed medical requirements.

When UCG officials received Hummingbird access, the system initially lacked important data fields, such as a field for the destination of Afghan evacuees independently departing and a field for compliance with medical requirements.  Although the UCG later added these fields, one UCG official said she was not confident that safe havens updated the fields with data from individuals who previously independently departed.[19]  Another official said system updates, which added medical fields, created a technical issue that erased prior data entries, which they needed to reenter.

The process of tracking independent departures for one safe haven in particular demonstrates the difficulties that UCG officials encountered.  In

---

[18] Resettlement agency staff provided assistance holding these meetings and recording independent departure data.
[19] This official explained that she was impressed with how quickly the UCG began using a system that was not originally designed for recording this information.  She said she does not think the UCG could have performed better unless it had more time to plan for the resettlement effort.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

January and February 2022, resettlement agency staff informed UCG officials at the Joint Base McGuire-Dix-Lakehurst safe haven that they could not locate some Afghan evacuees to provide resettlement assistance. UCG officials attempted to locate them by posting the evacuees' names in a common area at the safe haven, messaging a mobile application used by the evacuees, and calling the evacuees or their U.S. points of contact. After these efforts, the Joint Base McGuire-Dix-Lakehurst safe haven determined that some of the evacuees had already departed:

- On January 19, 2022, a UCG official determined that three evacuees had departed in September, but he could not confirm the specific date of each departure.
- On January 28, 2022, the official attempted to contact an evacuee and determined, "[t]here is no way [the evacuee] is still on base.... He had a phone number listed but it goes unanswered." The official said he felt "comfortable marking [the evacuee] as departed."
- On February 10, 2022, the official determined that two evacuees "were confirmed not to be on base," but it was "[u]ndetermined when they left or how."

The UCG official who attempted to contact these evacuees informed us that the safe haven initially failed to establish good record-keeping procedures, and evacuees "were likely allowed to [independently depart] without counseling or were counseled but their departure was not documented." He explained that the safe haven recorded information on paper before it had access to Hummingbird, and when the safe haven received access to Hummingbird and transferred data to the system, the data quality was poor. When another UCG official at this safe haven attempted to contact evacuees to determine whether they had already left, he noted that many had missing contact information. As a result, UCG officials at the Joint Base McGuire-Dix-Lakehurst safe haven were unable to contact all Afghan evacuees who independently departed to determine when and how they left.

A UCG official at the Holloman Air Force Base safe haven told us that officials at the safe haven realized certain Afghan evacuees had independently departed after they missed appointments related to their resettlement process. He said the UCG tried to identify how many evacuees had already left the Holloman Air Force Base safe haven and determined that approximately 20 evacuees listed in Hummingbird were no longer at the safe haven.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Some Afghan Evacuees Independently Departed Safe Havens without Completing Medical Requirements

Some Afghan evacuees were able to independently depart safe havens without completing the necessary medical requirements. DHS has the authority to require public health measures as a condition of parole.[20] During the first weeks of the resettlement effort, DHS implemented and refined its medical requirements, including vaccinations and a tuberculosis screening, for Afghan evacuees paroled into the United States, as described below:

- From August 20 to 24, 2021, DHS did not make medical requirements a condition of parole for Afghan evacuees.[21]
- From August 25 to September 6, 2021, DHS made vaccinations and a tuberculosis screening within 7 days of arrival a condition of parole but gave evacuees the option of independently departing ports of entry or safe havens and completing medical requirements on their own.[22]
- On September 7, 2021, following an outbreak of measles among evacuees awaiting travel to the United States and at several safe havens, DHS required evacuees to receive vaccinations and a tuberculosis screening at the safe havens before independently departing, as a condition of their parole.

The UCG estimated that "fewer than 600" of the 45,000 Afghan evacuees who arrived between August 25 and September 6, 2021, independently departed without completing medical requirements.[23] Because the safe havens had difficulties recording when independent departures occurred, as discussed above, we cannot confirm whether this estimate is correct.

The DHS Chief Medical Officer told us there were "very little to no concerns of risk" to public health because the "overwhelming majority" of Afghan evacuees received vaccinations following DHS' changes to medical requirements. Nonetheless, the UCG established the Task Force and instructed the Task Force to verify evacuees' parole compliance.

---

[20] 8 C.F.R. § 212.5(c).
[21] The UCG estimated that 500 evacuees with parole arrived during this timeframe. DHS required the remaining evacuees with parole to meet medical requirements.
[22] U.S. Citizenship and Immigration Services developed a website where evacuees could report that they completed their medical requirements.
[23] These Afghan evacuees lawfully left the resettlement process. However, if they did not complete their medical requirements within 7 days, they would have violated their parole. After September 6, 2021, Afghan evacuees could not lawfully independently depart without completing medical requirements.

Plaintiffs' Combined MSJ Exhibits - Page 73



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## The Task Force Did Not Consistently Verify Parole Compliance for Evacuees Who Independently Departed Safe Havens

As described earlier, the UCG instructed the Task Force to locate and verify completion of parole requirements for all evacuees who independently departed. On September 21, 2021, a senior UCG official sent an email to Task Force members with a spreadsheet of Afghan evacuees with parole who independently departed Washington Dulles International Airport. The spreadsheet was missing addresses and contact information for many evacuees, and Task Force members were responsible for finding the missing data and delivering information to the evacuees about parole compliance. In the email, the senior UCG official wrote that in addition to the data for evacuees who independently departed from the Washington Dulles International Airport, "[l]et's … work with [the Philadelphia International Airport] and the [safe havens] to get the info they have" regarding independent departures.

Instead, the Task Force focused mainly on locating and verifying parole compliance for only the Afghan evacuees who independently departed from Washington Dulles International Airport. For example, in October 2021, when the Task Force asked ICE officers in field offices to locate 67 Afghan evacuees who independently departed to verify their parole compliance, 65 had departed from Washington Dulles International Airport. Similarly, in December 2021, when the Task Force asked ICE officers to locate 21 Afghan evacuees who independently departed, all had departed from Dulles. On December 13, 2021, a UCG official informed the Task Force Deputy Director about an additional 93 Afghan evacuees who departed the Fort Bliss safe haven without completing medical requirements. In response, the Task Force Deputy Director requested and received the data on these evacuees and added them to a list of evacuees whom the Task Force planned to contact.[24]

We are not aware of the other seven safe havens providing independent departure data to the Task Force,[25] and the Task Force's list of evacuees to contact never included data from safe havens other than Fort Bliss. The Task Force Director said he did not recall receiving instructions to contact all Afghan

---

[24] At the time of our review, the Task Force confirmed that some evacuees who independently departed Fort Bliss completed their parole requirements, and the Task Force was trying to locate the other evacuees.

[25] Additionally, although the UCG issued daily reports about the total number of independent departures, these reports did not include data on how many Afghan evacuees independently departed without completing medical requirements.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

evacuees independently departing from safe havens.[26]  Additionally, the Task Force Deputy Director[27] said he understood the UCG had already counseled these individuals about complying with parole conditions when they left the safe havens.[28]

Despite the Task Force Deputy Director's belief that all individuals had been counseled prior to leaving a safe haven, we found evidence that this was not always the case.  As shown in Figure 3, Hummingbird data reflected that 277 Afghan evacuees independently departed safe havens without counseling (2.4 percent of independent departures).[29]  Hummingbird was missing counseling data for another 239 Afghan evacuees (2.0 percent of independent departures), and we could not determine whether they also did not receive counseling.

**Figure 3. Counseling Data for Safe Haven Independent Departures**



*Source:* DHS OIG analysis of UCG documents

## Afghan Evacuees Who Independently Departed Could Face Challenges Obtaining Long-Term Immigration Status

Recipients of humanitarian parole are expected to depart the United States when the parole period expires, obtain authorization to re-parole, or apply for long-term immigration status.  Afghan evacuees who independently departed

---

[26] It is unclear why the Task Force Director did not recall these instructions, as he had received the September 21, 2021 email instructing the Task Force to request lists of independent departures from safe havens.
[27] This Deputy Director replaced the original Task Force Deputy Director in January 2022.
[28] As discussed previously, counseling included informing evacuees with parole about the need to comply with parole conditions after their departure, such as completing medical requirements.
[29] We identified data quality issues in Hummingbird, as stated previously, and cannot confirm the accuracy of Hummingbird's counseling data.  As a result of issues identified by a UCG official with the quality of medical requirements data, we did not assess how many Afghan evacuees who independently departed without counseling also did not complete their medical requirements.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

and did not receive parole compliance information could face challenges obtaining long-term immigration status.[30]

Resettlement agencies at the safe havens could help evacuees find legal aid for assistance applying for long-term immigration status. After leaving, Afghan evacuees who independently departed could still contact resettlement agencies and request assistance obtaining legal aid. However, the UCG noted in counseling materials for independent departures that "it could take several weeks or months to get an appointment or you may not be able to be served at all."

Although U.S. Citizenship and Immigration Services (USCIS) periodically reports to Congress on the immigration status of Afghan evacuees,[31] DHS does not track independent departures separately from other types of evacuees. DHS, therefore, does not have an estimate of the number of Afghan evacuees who independently departed and have not yet applied for long-term immigration status. DHS has discretion to re-parole evacuees as needed, which would provide evacuees with more time to apply. However, authorizing re-parole is not guaranteed.

DHS could revoke parole for Afghan evacuees who did not complete medical requirements. Although the UCG guidance on how to deliver parole compliance information includes procedures for DHS to revoke parole for noncompliance, we found no indication DHS had taken such measures. Nonetheless, the UCG's requirement to locate and counsel these evacuees will help ensure they are knowledgeable about their parole conditions.

## Conclusion

The UCG developed processes to record when independent departures occurred, locate Afghan evacuees after their independent departures, and verify their parole compliance. However, the UCG officials at safe havens had difficulties tracking when Afghan evacuees independently departed safe havens, and the Task Force did not attempt to locate all Afghan evacuees who independently departed safe havens to verify their parole compliance. Evacuees could face challenges obtaining long-term immigration status due to their failure to comply with parole conditions or to submit immigration applications.

---

[30] In a separate review, OIG is evaluating USCIS' preparation to adjudicate requests for long-term legal status.
[31] *Afghanistan Supplemental Appropriations Act*, 2022 (P.L.117-43), Sept. 30, 2021, Title V, Section 2503, Reporting Requirement.



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

## Recommendation

**Recommendation 1:** We recommend the DHS Secretary ensure U.S. Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services:

- identify Afghan evacuees who independently departed safe havens, were not on the Task Force's list of evacuees to contact, and have not yet completed medical requirements; and
- provide Afghan evacuees with counseling on their parole requirements.

## Management Comments and OIG Analysis

In response to our draft report, DHS concurred with our recommendation and described corrective actions to address the issues we identified. We consider the recommendation resolved and open. Appendix B contains DHS' management comments in their entirety. We also received technical comments on the draft report and revised the report as appropriate.

DHS expressed concerns with our portrayal of the Task Force's scope of work; specifically, that we found the Task Force did not attempt to locate all Afghan evacuees who independently departed safe havens to verify their compliance with parole conditions. DHS explained that the Task Force "focused its efforts" on Afghan evacuees who independently departed from the airport, rather than safe havens, based on its understanding of the instructions. However, documentation provided by the UCG, including the work assignments in the UCG management plan, UCG guidance on delivering parole compliance information, and additional instructions to the Task Force, directed the Task Force specifically to locate evacuees who independently departed safe havens.

DHS also disagreed that Afghan evacuees who independently departed safe havens "will not know how to comply with parole conditions." DHS stated that CBP provided information to Afghan evacuees about their parole conditions at ports of entry, and USCIS and DHS websites provided parole information for Afghan evacuees. However, the UCG also took steps to counsel evacuees who independently departed safe havens and established the Task Force to verify their parole compliance. This indicates that steps taken at ports of entry and on websites were not sufficient for providing information to evacuees about parole conditions. Based on the UCG's requirement to locate and counsel Afghan evacuees who independently departed, we concluded that Afghan evacuees who did not receive this counseling could face challenges obtaining long-term immigration status.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

A summary of DHS' response to our recommendation and our analysis follows.

**Recommendation 1:** We recommend the DHS Secretary ensure U.S. Immigration and Customs Enforcement and U.S. Citizenship and Immigration Services:

- identify Afghan evacuees who independently departed safe havens, were not on the Task Force's list of evacuees to contact, and have not yet completed medical requirements; and
- provide Afghan evacuees with counseling on their parole requirements.

**DHS Response to Recommendation 1:** Concur.  DHS has already taken, or will take, steps to provide counseling on parole requirements to Afghan evacuees with parole.  For example, USCIS External Affairs Directorate will further amplify its public information campaign regarding the importance of compliance.  USCIS Field Operations Directorate will continue to issue Requests for Evidence to Afghan evacuees with parole who have applied for Adjustment of Status in the United States and are determined to have not yet fulfilled the medical conditions of their parole.  USCIS Asylum Division will instruct its asylum officers to remind Afghan evacuees with parole who have applied for asylum in the United States about their parole conditions and provide them an information sheet.  USCIS will also notify Afghan evacuees applying for re-parole of the requirement to complete the medical conditions of their parole if they have not yet done so.

In addition, ICE Enforcement and Removal Operations will establish procedures to provide counseling on parole requirements upon encountering Afghan evacuees with parole who independently departed safe havens between August 25, 2021, and September 6, 2021, who have not yet completed their medical requirements, and were not on the Task Force's list of parolees to contact.

DHS estimates completion by December 30, 2022.

**OIG Analysis:** We consider these actions responsive to the recommendation, which is resolved and open.  ICE's proposed actions include identifying Afghan evacuees who independently departed safe havens, were not on the Task Force's list of evacuees to contact, and have not yet completed medical requirements, but only counseling them if an ICE encounter occurs.  We will close this recommendation when we receive documentation showing that DHS has implemented its proposed steps to provide counseling to Afghan evacuees, including steps to identify Afghan evacuees who meet the criteria and proactively deliver parole compliance information.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

**Appendix A**
**Objective, Scope, and Methodology**

The Department of Homeland Security Office of Inspector General was established by the *Homeland Security Act of 2002* (Pub. L. No. 107−296) by amendment to the *Inspector General Act of 1978*.

Our objective was to review DHS efforts to track Afghan evacuees departing safe havens without assistance from resettlement agencies and how these departures affect Afghan evacuees' immigration status.

We reviewed more than 300 documents related to independent departures. These included:

- policies, procedures, and guidance in draft and final form related to independent departures;
- information provided to evacuees who independently departed, including information on parole requirements provided by CBP and counseling documents provided by USCIS, the Department of State, and the Task Force;
- correspondence within the UCG regarding tracking and counseling evacuees who independently departed; and
- information provided to members of Congress and the media about independent departures.

We collected and analyzed data on Afghan evacuees who independently departed ports of entry and safe havens, including spreadsheets developed by the Department of State and the Task Force, and data obtained from the Hummingbird data system.

We conducted more than 30 interviews with relevant DHS employees, other Federal employees, and nongovernmental organization representatives.

We coordinated with other OIG teams within DHS and seven other departments conducting reviews related to Afghan evacuees.

We conducted our fieldwork between January and April 2022 under the authority of the *Inspector General Act of 1978*, as amended, and according to the *Quality Standards for Inspection and Evaluation* issued by the Council of the Inspectors General on Integrity and Efficiency.



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

U.S. Department of Homeland Security
Washington, DC 20528



September 9, 2022

MEMORANDUM FOR:    Joseph V. Cuffari
                             Inspector General

FROM:                    Jim H. Crumpacker, CIA, CFE
                             Director
                             Departmental GAO-OIG Liaison Office

*JIM H CRUMPACKER* — Digitally signed by JIM H CRUMPACKER Date: 2022.09.09 13:01:02 -04'00'

SUBJECT:             Management Response to Draft Report: "The Unified
                             Coordination Group Struggled to Track Afghan Evacuees
                             Independently Departing U.S. Military Bases"
                             (Project No. 22-018-ISP-SEC)

Thank you for the opportunity to comment on this draft report. The U.S. Department of Homeland Security (DHS or the Department) appreciates the work of the Office of Inspector General (OIG) in planning and conducting its review and issuing this report.

DHS leadership is pleased to note OIG's recognition that the Unified Coordination Group (UCG) developed processes to record and counsel Afghan nationals about the benefits they would forgo if they independently departed the UCG's resettlement process. Operation Allies Welcome (OAW) was, and continues to be, a historic undertaking for DHS. Specifically, on August 29, 2021, President Joseph R. Biden, Jr. directed the Secretary of Homeland Security to lead coordination of ongoing efforts across the federal government to resettle vulnerable Afghans, including those who worked on behalf of the United States (U.S.).[1] The Secretary was also directed to establish a UCG and name a Senior Response Official (SRO) to lead these efforts, which was done that same day.

Since its establishment, OAW has been a whole-of-government effort, the largest such effort since 1975, to resettle more than 86,000 vulnerable Afghans to the U.S. over the past year. Before Afghan evacuees were approved to travel and enter the U.S., they underwent a rigorous and multi-layered screening and vetting process that began overseas before individuals were permitted to a board a plane to the U.S. As with other arrivals at

---

[1] https://www.whitehouse.gov/briefing-room/statements-releases/2021/08/29/memorandum-on-the-designation-of-the-department-of-homeland-security-as-lead-federal-department-for-facilitating-the-entry-of-vulnerable-afghans-into-the-united-states/



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

U.S. ports of entry, Afghan nationals completed a primary inspection upon arriving at a U.S. airport. This inspection was conducted by U.S. Customs and Border Protection (CBP) officers and included additional biographic and biometric checks. All parolees are subject to recurrent vetting, as are other foreign nationals visiting the U.S., to further enable the federal government to identify and appropriately act upon any information of concern. This included more than 77,000 Afghans who were paroled into the U.S. by CBP under Operation Allies Refuge (OAR) and later under OAW.[2] Within two weeks of being named the lead federal agency for OAW, DHS coordinated the support, care, and security for nearly 54,000 Afghans who were temporarily housed at eight military bases (or "safe havens") around the country. These designated safe havens provided a range of services, including medical care and testing, vaccinations, mental health services, and immigration processing, while the Afghan nationals waited to be connected to resettlement services.

The timeline of events discussed in this response are outlined in detail below.

- August 25, 2021: The UCG placed medical conditions on arriving Afghan nationals paroled into the U.S. via to OAR/OAW, including requiring Afghan nationals to obtain age-appropriate vaccinations and a tuberculosis screening within 7 days of arrival;
- September 2, 2021: The Centers for Disease Control and Prevention (CDC) issued a memorandum[3] to the SRO recommending that medical screening, including all age-appropriate vaccines and tuberculosis testing for Afghans arriving to the U.S. under OAW be conducted at a federal facility;
- September 5, 2021: The SRO issued a memorandum[4] requiring Afghan nationals paroled pursuant to OAW to undergo the medical screening (as suggested by CDC) as a condition of their parole at a safe haven;
- September 7, 2021: The new parole conditions were implemented by UCG officials, and CBP updated the information sheet issued to Afghan nationals at ports of entry to include these parole conditions; and
- September 8, 2021: The SRO directed U.S. Immigration and Customs Enforcement (ICE) to form the Independent Departure Task Force (IDTF).

As the UCG placed medical conditions on all arriving Afghan nationals who were paroled into the U.S. starting on August 25, 2021, each Afghan national was informed of these conditions in writing, in English, Dari, and Pashto, through an informational sheet provided by CBP personnel at the port of entry. In addition, U.S. Citizenship and

---

[2] Parolees mentioned throughout this document refer solely to those individuals paroled into the U.S. by CBP pursuant to OAR and OAW.
[3] "Public Health Recommendation for Medical Screening," Centers for Disease Control and Prevention, dated September 2, 2021.
[4] "Medical Requirements for Operation Allies Welcome," SRO, UCG, dated September 5, 2021.

2



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

Immigration Services (USCIS) developed a website[5] for Afghan nationals paroled into the U.S. to register their compliance with the medical requirements. On September 2, 2021, four days after DHS was named the lead of the UCG, the CDC Director's memorandum to the OAW SRO recommended that the UCG institute a process that required all arriving Afghan nationals (other than U.S. citizens and returning lawful permanent residents) to complete a medical screening process at a federal center, rather than allowing them to leave the federal facility in order to seek the required processing in the local community.

In response to the CDC's memorandum, the SRO also issued a memorandum that required all arriving Afghan nationals paroled into the U.S. to be transported to the safe havens to receive all age-appropriate vaccinations, including the measles-mumps-rubella and COVID-19 vaccines, and a tuberculosis screening at the safe havens as a condition of their parole. The UCG immediately implemented these new requirements and communicated the revised conditions of parole, in writing, through information sheets provided to Afghans at the time of processing by CBP at the port of entry, beginning September 7, 2021. USCIS[6] and DHS[7] websites were also updated to reflect these revised requirements, and the information sheets and related websites included translations in Dari and Pashto.

It is important to note, however, that although each safe haven initially established its own processes to meet with independently departing Afghan nationals and to record data on those departures, the SRO issued a memorandum on October 18, 2021,[8] recommending that data on independent departures be captured solely in the Hummingbird database. This was intended to create consistent data collection procedures across all eight safe havens, as well as encourage orderly processing of independent departures. Procedures and materials developed for independent departure counseling were then formalized across all safe havens by October 29, 2021.

DHS also believes it is important to emphasize that Afghan nationals paroled into the U.S. who did choose to independently depart had been provided information about parole conditions in several ways at the time of their parole. This includes information sheets provided in their native language at time of entry, as well as providing advice and encouragement at safe havens to complete medical requirements from individuals such as cultural competency advisors, who assisted in communicating with Afghan nationals at the safe havens. DHS also developed materials such as an Information Sheet for Afghan Parolees Departing Safe Havens[9] issued at the safe havens to Afghan nationals paroled

---

[5] https://www.uscis.gov/vaccination-status
[6] https://www.uscis.gov/humanitarian/information-for-afghan-nationals
[7] https://www.dhs.gov/allieswelcome
[8] "Safe Haven Data Collection on 'Independent Departures,'" UCG, SRO, dated October 18, 2021.
[9] https://www.uscis.gov/sites/default/files/document/fact-sheets/Information_Sheet_for_Afghans_Departing_Safe_Havens-English.pdf

3



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

into the U.S. who were considering independent departure, which explained once again the requirements for Afghan nationals paroled into the U.S. as part of OAW to complete the medical conditions of their parole. USCIS also created and regularly maintains a landing page on its website for Afghans to find the latest information on conditions of parole, work authorization, seeking asylum or adjustment of status as a special immigrant, and the full range of other immigration issues that could be of assistance to Afghans who independently departed.[10]

As previously noted, the SRO also directed ICE to form the IDTF on September 8, 2021, to verify and encourage compliance with the parole conditions for those Afghan nationals paroled into the U.S. who departed U.S. facilities. Although DHS has attempted to clarify to the OIG that the IDTF's assigned scope of work is not accurately reflected in this draft report, the Department is concerned that OIG's report confuses the intent and purpose of the IDTF. For example, the report indicates that the OIG believes the IDTF was instructed to locate and verify completion of parole requirements for all independent departures, including any Afghan national paroled into the U.S. as part of OAW who is found to have independently departed from the arrival airports, transit locations or the safe havens, whether that departure occurred prior to or after the SRO announced the new parole requirements on September 5, 2021.

However, the UCG and IDTF leadership understood the instruction to have been limited to only those Afghan nationals paroled into the U.S. who independently departed prior to the implementation of the new requirements on September 7, 2021, when the conditions of parole did not require these Afghans to go to a safe haven. The UCG management plan specifically qualifies the instruction is to locate and verify completion of parole requirements for all independent departures "**that have reached or exceeded the 7 days from time of departure from APOE [Airport Port of Entry], Safe Haven or other entry point into the U.S.**" (Emphasis added). In addition, a revised UCG management plan was signed by the SRO on March 8, 2022, to further clarify the instruction, directing the IDTF to "[l]ocate Independent Departures that have reached or exceeded the 7 days from time of departure from APOE, Safe Haven or other entry points into the U.S. between the dates of August 20th, 2021, and September 7th, 2021."[11]

Accordingly, the IDTF focused its efforts on the arrivals with the least opportunities to benefit from engagements with UCG personnel that took place at the safe havens, and thus could be at greatest risk of non-compliance—namely, OAW Afghan nationals paroled into the U.S. between August 25, 2021, and September 6, 2021 who independently departed from the airport prior to completing all of their vaccinations. Given the more limited opportunities to engage with this group of Afghans, the IDTF largely focused outreach efforts on this population, and either verified compliance or was

---

[10] https://www.uscis.gov/humanitarian/information-for-afghan-nationals
[11] "Incident Action Plan," UCG, dated March 8, 2022.

4



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

able to make direct contact to encourage compliance by providing parole information, to 100 percent of the individuals (or for minors, their parents/adult relatives) referred for outreach by the UCG.

Again, as noted above, Afghans paroled into the U.S. have been provided information about parole conditions in several ways from the time of their parole at the port of entry, through counseling and an information sheet at safe havens, to a regularly maintained landing page and ongoing public awareness outreach. The IDTF efforts and scope were one piece of this layered approach.

Further, the Department believes that the OIG's finding that Afghan nationals paroled into the U.S. who independently departed and did not receive parole compliance information could face challenges obtaining long-term immigration status appears to assume that: (1) these Afghans would not know how to comply with the conditions of their parole; and (2) failure to comply with these conditions will negatively impact their ability to obtain long-term status in the U.S. To the contrary, DHS disagrees that the Afghan nationals paroled into the U.S. who departed without completing medical processing at safe havens or related counseling will not know how to comply with parole conditions. Not only did DHS inform arriving Afghan nationals of parole conditions in a variety of ways previously mentioned in this letter, but many of the Afghan nationals who independently departed from the airport have registered their compliance with medical requirements on the USCIS-developed website. DHS also continues to provide information to Afghan nationals paroled into the U.S. about their status, the medical processing that must be completed to comply with the conditions set on their parole, and detailed explanations on how Afghans nationals can obtain long-term status in the U.S. on both USCIS and DHS public-facing websites, with links to the information provided in Dari and Pashto.

To date, with respect to Afghans paroled through OAW, DHS has not revoked parole, nor precluded access to an immigration benefit due solely to noncompliance with medical parole conditions. DHS's efforts have focused, and continue to focus, on informing Afghan nationals paroled into the U.S. about the need to fulfill medical requirements in order to promote the underlying public health goals of the parole conditions. This intention is reflected in the IDTF's communication with Afghan nationals paroled into the U.S. urging compliance and provide information to assist them to do so, and in DHS and USCIS website content and accessibility of tools to help Afghan nationals paroled into the U.S. to update their vaccination status online. Moreover, this approach is consistent with the institutionalized counseling provided at safe havens and the greater whole-of-government approach for encouraging compliance with medical requirements during other USG touchpoints and interactions with Afghan nationals paroled into the U.S.

5

Plaintiffs' Combined MSJ Exhibits - Page 84



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

The draft report contained one recommendation, with which DHS concurs. Enclosed find our detailed response to the recommendation. DHS previously submitted technical comments addressing several accuracy, contextual and other issues under a separate cover for OIG's consideration.

Again, thank you for the opportunity to review and comment on this draft report. Please feel free to contact me if you have any questions.

Enclosure

6



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

Enclosure:  Management Response to Recommendation
Contained in OIG-22-018-ISP-SEC

<u>OIG recommended that the Secretary for Homeland Security ensure that ICE and USCIS:</u>

**Recommendation 1:**

- identify Afghan evacuees who independently departed safe havens, were not on the Task Force's list of evacuees to contact, and have not yet completed medical requirements; and
- provide Afghan evacuees with counseling on their parole requirements.

**Response:**  Concur.  DHS has already taken, or will take, the following steps to provide counseling on the parole requirements to Afghan nationals paroled into the U.S. as part of OAW, including individualized counseling whenever an Afghan national who has yet to complete the medical requirements is identified:

1. USCIS External Affairs Directorate will further amplify its already existing public information campaign regarding the importance of compliance, which will include updates to existing webpages and providing existing information sheets to Afghan nationals whenever public forums involving the Afghan community are held, such as Welcome Centers.

2. USCIS Field Operations Directorate will continue to issue Requests for Evidence to Afghan nationals paroled into the U.S. as part of OAW who have applied for Adjustment of Status in the U.S. and are determined to have not yet fulfilled the medical conditions of their parole.  In completing the medical exam required for adjustment of status, the Afghan national will have complied with the medical conditions placed on their parole.

3. USCIS Asylum Division will instruct its Asylum Officers to ask Afghan nationals paroled into the U.S. as part of OAW who have applied for asylum in the U.S. whether they have completed the conditions of their parole into the U.S. and, in any circumstance where it is determined that it is unclear if they have complied, the Asylum Officer will remind the Afghan national of the conditions placed on their parole and provide them an Information Sheet reminding Afghan nationals paroled into the U.S. of the obligation to complete the required vaccinations and medical screening.

4. Should an Afghan paroled pursuant to OAW apply for re-parole, they will be notified of the requirement to complete the medical conditions of their parole if they have not yet done so, referring them to the USCIS.gov site to attest to the

7

Plaintiffs' Combined MSJ Exhibits - Page 86



# OFFICE OF INSPECTOR GENERAL
## Department of Homeland Security

satisfaction of those conditions once they have obtained the required vaccinations and tuberculosis screening.

5. ICE Enforcement and Removal Operations will establish procedures to provide counseling on parole requirements upon encounter to Afghan nationals paroled into the United States as part of OAW, who independently departed safe havens between August 25, 2021, and September 6, 2021, have not yet completed their medical requirements, and were not on the IDTF's list of parolees to contact.

Estimated Completion Date: December 30, 2022.

8

Plaintiffs' Combined MSJ Exhibits - Page 87



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix C**
**Office of Inspections and Evaluations Major Contributors to This Report**

Tatyana Martell, Chief Inspector
Seth Winnick, Chief Inspector
Lorraine Eide, Lead Inspector
Gregory Flatow, Lead Inspector
Stephanie Murguia, Inspector
Lisa Knight, Communications Analyst
Anthony Crawford, Independent Referencer

Plaintiffs' Combined MSJ Exhibits - Page 88



**OFFICE OF INSPECTOR GENERAL**
Department of Homeland Security

**Appendix D**
**Report Distribution**

**Department of Homeland Security**

Secretary
Deputy Secretary
Chief of Staff
Deputy Chiefs of Staff
General Counsel
Executive Secretary
Director, GAO/OIG Liaison Office
Under Secretary for Office of Strategy, Policy and Plans
Assistant Secretary for Office of Public Affairs
Assistant Secretary for Office of Legislative Affairs

**Office of Management and Budget**

Chief, Homeland Security Branch
DHS OIG Budget Examiner

**Congress**

Congressional Oversight and Appropriations Committees

## Additional Information and Copies

To view this and any of our other reports, please visit our website at: www.oig.dhs.gov.

For further information or questions, please contact Office of Inspector General Public Affairs at: DHS-OIG.OfficePublicAffairs@oig.dhs.gov.
Follow us on Twitter at: @dhsoig.



## OIG Hotline

To report fraud, waste, or abuse, visit our website at www.oig.dhs.gov and click on the red "Hotline" tab. If you cannot access our website, call our hotline at (800) 323-8603, fax our hotline at (202) 254-4297, or write to us at:

Department of Homeland Security
Office of Inspector General, Mail Stop 0305
Attention: Hotline
245 Murray Drive, SW
Washington, DC 20528-0305

Plaintiffs' Combined MSJ Exhibits - Page 90

# EXHIBIT 9

10/15/24, 1:5... Case 6:24-cv-00306-JCB DHS Announces Re-parole Process for Afghan Nationals in the United States | Homeland Security

Plaintiffs' Combined MSJ Exhibits - Page 91

Document 78-1 Filed 10/19/24 Page 91 of 343 PageID #: 1298

**U.S. Department of Homeland Security**

# DHS Announces Re-parole Process for Afghan Nationals in the United States

**Release Date:** June 8, 2023

WASHINGTON – Today, the Department of Homeland Security (DHS) announced a new process (https://www.uscis.gov/humanitarian/information-for-afghan-nationals/re-parole-process-for-certain-afghans) that will enable Afghan nationals to renew their parole and continue to live and work in the United States. The new process is streamlined and will be at no cost, and will provide for a two-year renewal of parole for qualifying individuals. This action is part of the Biden-Harris Administration's ongoing commitment to the safety, security, and well-being of the thousands of Afghan nationals who arrived in the United States through Operation Allies Welcome and Enduring Welcome.

"DHS is proud to have led Operation Allies Welcome and we are committed to supporting our Afghan allies as they continue to settle into their communities across the country," **said Secretary of Homeland Security Alejandro N. Mayorkas**. "Through this new streamlined and fee-exempt process, eligible Afghan nationals will be able to continue living and working here as they pursue a permanent status."

Afghan national who are currently parolees may now apply for a renewal of their parole and employment authorization through a new streamlined and fee-exempt application process that is available online and on paper and that uses Form I-131, Application for Travel Document. The renewal requests will be considered on a case-by-case basis for urgent humanitarian reasons and for a significant public benefit.

DHS will also consider a two-year extension of parole for those Afghan parolees who applied and continue to apply for asylum (Form I-589) or for adjustment of status to that of lawful permanent resident (Form I-485) (for example, adjustment of status as a special immigrant). The extensions will be considered on a case-by-case basis for urgent humanitarian reasons and for a significant public benefit. If an extension is approved, the applicant's original employment authorization will be extended and sent to the applicant's last address of record with USCIS.

The Administration has repeatedly put forward an adjustment act and publicly called on Congress to support a bipartisan adjustment act that would provide a durable, more streamlined immigration pathway for those currently in parole.

Afghan nationals are encouraged to pursue a permanent status in the United States for which they may be eligible, including through the Special Immigrant and asylum processes. On May 17, 2023, DHS began hosting Afghan Support Centers across the country – the first two were held in Phoenix and Tucson, Arizona, and the next Afghan Support Center will be held June 21-24 at the SAFE Credit Union Convention Center in Sacramento, California. U.S. government personnel and nongovernmental organizations at the Afghan Support Centers will provide information regarding immigration and social services available for those who arrived through Operation Allies Welcome and Enduring Welcome. Additional dates and locations for Afghan Support Centers will be announced in the coming weeks.

## Topics

CITIZENSHIP AND IMMIGRATION SERVICES (/TOPICS/CITIZENSHIP-AND-IMMIGRATION-SERVICES)

SECRETARY OF HOMELAND SECURITY (/TOPICS/SECRETARY-HOMELAND-SECURITY)

## Keywords

OPERATION ALLIES WELCOME (/KEYWORDS/OPERATION-ALLIES-WELCOME)

U.S. CITIZENSHIP AND IMMIGRATION SERVICES (USCIS) (/KEYWORDS/US-CITIZENSHIP-AND-IMMIGRATION-SERVICES-USCIS)

Last Updated: 06/08/2023

Plaintiffs' Combined MSJ Exhibits - Page 92

# EXHIBIT 10



**U.S. Citizenship and Immigration Services**

MENU

Home > Humanitarian > Information for Afghan Nationals > Re-Parole Process for Certain Afghans Nationals

# Re-Parole Process for Certain Afghans Nationals

> ⓘ **ALERT:** We will automatically consider you for re-parole (an additional period of parole) on a case-by-case basis if you are an Afghan national and you:
>
> - Were under age 14 years on Sept. 26, 2023;
> - Were paroled into the United States between July 30, 2021, and Sept. 30, 2022; and
> - Were paroled with an OAR or PAR class of admission.
>
> We also will automatically consider you for re-parole on a case-by-case basis if you are an Afghan national and you:
>
> - Are age 14 years or older on Sept. 26, 2023;
> - Were paroled into the United States with an OAR or PAR class of admission;
> - Have a pending Form I-589, Application for Asylum and for Withholding of Removal, or Form I-485, Application to Register Permanent Residence or Adjust Status; and
> - Filed Form I-589 or Form I-485 before your initial parole expired.
>
> If you are an Afghan national and you want re-parole, but you do not meet these conditions, we will not consider you for re-parole automatically. You must file Form I-131, Application for Travel Documents, Parole Documents, and Arrival/Departure Records, to apply for re-parole before your parole period expires. We encourage you to file Form I-131 using an online account. Please see the Re-Parole Process for Certain Afghans webpage for more information about filing online.

> ⓘ **ALERT:** The Office of Refugee Resettlement (ORR) has issued updated guidance clarifying that ORR benefits and services will be available to eligible Afghan parolees who have a pending re-parole application, a pending asylum application, or a pending adjustment of status application with USCIS. This guidance applies to eligible Afghan parolees whose initial period of parole expires while their applications are pending with USCIS.

We will accept and consider, on a case-by-case basis, re-parole requests under section 212(d)(5) of the Immigration and Nationality Act (INA) from certain noncitizen Afghan nationals. Eligible individuals either:

**Need Help? Chat with Emma™**

- Were initially paroled into the United States with an "OAR" or "PAR" class of admission on their Form I-94, Arrival/Departure Record (even if they subsequently traveled with advance parole and received a different class of admission when they were paroled back into the United States); or

- Their Form I-94 class of admission has been updated to "OAR" or "PAR." *

For information regarding fees and fee exemptions, please see [Form G-1055](#).

Through Jan. 31, 2025, these re-parole requests (**from self-petitioners only**) are exempt from:

- The Form I-131 filing fee to apply for re-parole;

- The filing fee for the associated Form I-765, Application for Employment Authorization; and

- The requirement to file Form I-134, Declaration of Financial Support, with Form I-131.

For information regarding fees and fee exemptions, please see [Form G-1055](#).

*Individuals who received their Form I-94 from U.S. Customs and Border Protection (CBP) when they were paroled into the United States should visit the [CBP Form I-94](#) website to view and print a copy of their current Form I-94, which will be updated if their request for re-parole is approved. CBP has instructions in [English (PDF)](#), [Dari (PDF)](#), and [Pashto (PDF)](#) on how to look up your Form I-94.

Before you file a request for re-parole, you may need to contact CBP to update your class of admission, if you did not receive an "OAR" or "PAR" class of admission on your Form I-94 and you:

- Are an Afghan national who was paroled into the United States between July 31, 2021, and Sept. 30, 2023;

- Were paroled into the United States after Sept. 30, 2023, and are the spouse or child of an individual paroled into the United States between July 31, 2021, and Sept. 30, 2023; **or**

- Are the parent or legal guardian of an individual who was paroled into the United States between July 31, 2021, and Sept. 30, 2023, as an unaccompanied child.

To contact CBP, go to CBP's [I-94 OAW Questions](#) webpage. At the top of the question form there is a "Topic" drop-down menu; select "I-94/Traveler Compliance." Next, for the "Applicable Issue" drop-down menu, select "Operation Allies Refuge (OAR/OAW)."

↗ Close All    ↗ Open All

---

If You Apply for Asylum or a Green Card    ⌄

---

Mental Health and Emotional Support    ⌄

---

Re-parole Videos    ⌄

---

Applying Online: How to Self-Petition for Fee-Exempt Re-Parole and an Employment Authorization Document (EAD) at the Same Time    ⌄

---

Applying by Paper: How to Apply for Fee-Exempt Re-Parole and Request a Fee-Exempt Employment Authorization Document (EAD)    ⌄

---

Submitting Identity Documents    ⌄

---

Filing Fee    ⌄

---

Social Security Number and Card    ⌄

---

Actions to take if you are filing for fee-exempt re-parole and EAD on or a er June 8, 2023    ⌄

---

Actions to take if you filed for re-parole before June 8, 2023    ⌄

---

Additional Information and FAQs    ⌄

---

↖ Close All    ↗ Open All

Last Reviewed/Updated: 10/11/2024

Plaintiffs' Combined MSJ Exhibits - Page 96

# EXHIBIT 11

# Fees for Visa Services

Coming to the United States Temporarily - Nonimmigrant Visa Services
Coming to the United States Permanently - Immigrant Services
Special Visa Services

This webpage lists visa application fees and other visa related fees collected by Department of State. Note that many immigration-related forms are submitted to the Department of Homeland Security's United States Citizenship and Immigration Services (USCIS), and not to the Department of State. If the type of information or form you are seeking is not shown here, select USCIS Forms and Fees⧉ to go to the USCIS Website to review more.

## Coming to the United States Temporarily - Nonimmigrant Visa Services

Nonimmigrant visa application processing fees are tiered, as shown below, based on the visa category for which you are applying.

**Notice:** Every visa applicant must pay the visa application processing fee for the visa category being applied for, unless the application fee is not required, as listed below.

## Description of Service and Fee Amount (All fees = $ in US currency)

**Nonimmigrant visa application processing fee (non-refundable) for all categories below**

- Non-petition-based nonimmigrant visa (except E): **$185.00**

Includes (but not limited to), the following visa categories:

| B | Visitor Visa: Business, Tourism, Medical treatment |
|------|---------------------------------------------------|
| C-1 | Transiting the United States |
| D | Crewmembers - Airline, Ship |
| F | Student, Academic |
| I | Media and Journalists |

| J | Exchange Visitors |
|---|---|
| | *Applicants for J visas participating in official U.S. Government-sponsored educational and cultural exchanges: **No Fee** (See Exchange Visitor Visas for further detailed fee information.) |
| M | Students, Vocational |
| TN/TD | NAFTA Professionals |
| S | Witness or Informant* |
| T | Victim of Trafficking in Persons* |
| U | Victim of Criminal Activity* |

*Though petition-based nonimmigrant visas, the processing fee for these visas is $185.00

- Petition based visa categories: **$205.00**

Includes these visa categories:

| H | Temporary Workers/Employment or Trainees |
|---|---|
| L | Intracompany Transferees |
| O | Persons with Extraordinary Ability |
| P | Athletes. Artists & Entertainers |
| Q | International Cultural Exchange |
| R | Religious Worker |

- E - Treaty Trader/Investor, Australian Professional Specialty category visa: **$315.00**
- K – Fiancé(e) or Spouse of U.S. citizen category visa: **$265.00**

## Border crossing card fees

- Border crossing card - age 15 and over (Valid 10 years): **$185.00**
- Border crossing card - under age 15; for Mexican citizens if parent or guardian has or is applying for a border crossing card (valid 10 years or until the applicant reaches age 15, whichever is sooner): **$15.00**

## Other Fees

- L visa fraud prevention and detection fee - for visa applicant included in L blanket petition  (principal applicant only): **$500.00**

Plaintiffs' Combined MSJ Exhibits - Page 99

applicant only): **$500.00**

- The Consolidated Appropriations Act of 2016 (Public Law 114-113) increases fees for certain H-1B and L-1 petitioners.  Consular sections collect this fee for blanket L-1 visa applications (principal applicant only) filed by petitioners who employ 50 or more individuals in the United States if more than 50 percent of those individuals are in H-1B or L-1 nonimmigrant status: **$4,500.00**

## When the nonimmigrant visa application processing fee is not required:

- Applicants for A, G, C-2, C-3, NATO, and diplomatic visas (defined in 22 CFR 41.26): **No Fee**
- Applicants for J visas participating in official U.S. Government-sponsored educational and cultural exchanges: **No Fee** (See Exchange Visitor Visas for further detailed fee information.)
- Replacement of machine-readable visa when the original visa was not properly affixed or needs to be reissued through no fault of the applicant: **No Fee**
- Applicants exempted by international agreement as determined by Visa Services, including members and staff of an observer mission to United Nations Headquarters recognized by the UN General Assembly, and their immediate families: **No Fee**
- Applicants travelling to provide charitable services as determined by Visa Services: **No Fee**
- U.S. government employees travelling on official business: **No Fee**
- A parent, sibling, spouse or child of a U.S. government employee killed in the line of duty who is traveling to attend the employee's funeral and/or burial; or a parent, sibling, spouse, son or daughter of a U.S. government employee critically injured in the line of duty for visitation during emergency treatment and convalescence: **No Fee**

## Nonimmigrant visa issuance fee, including border-crossing cards.

- See the Visa Reciprocity Tables to find out the visa issuance fee amount, if applicable:  Fee varies (Reciprocal)

10/15/24, 1:16 AM  Case 6:24-cv-00306-JCB   Document 78-1   Filed 10/19/24   Page 100 of 343 PageID #:
Fees for Visa Services
1307

Plaintiffs' Combined MSJ Exhibits - Page 100

(Reciprocal)

**When the nonimmigrant visa issuance fee is not required:**

- An official representative of a foreign government or an international or regional organization of which the United States is a member; members and staff of an observer mission to United Nations Headquarters recognized by the UN General Assembly; and applicants for diplomatic visas as defined under item 22(a); and their immediate families: **No Fee**
- An applicant transiting to and from the United Nations Headquarters: **No Fee**
- An applicant participating in a U.S. government sponsored program which may include applicant's dependent spouse and children: **No Fee**
- An applicant travelling to provide charitable services as determined by Visa Services: **No Fee**

**Other - When a Visa is Not Required - Visa Waiver Program**

- Citizens of Visa Waiver Program participating countries, and meeting requirements pay a small fee. Select USCIS fees⊠ to learn more.

**Coming to the United States Permanently - Immigrant Services**

Immigrant visa application processing fees are tiered, as shown below, based on the visa category you apply for.

Notice: Every visa applicant must pay the visa application processing fee for the visa category being applied for.

**Description of Service and Fee Amount (All fees = $ in US currency)**

**Filing an Immigrant Visa Petition** (When collected by U.S. Embassies and Consulates for USCIS. Fees subject to change.)

| | |
|---|---|
| Immigrant petition for relative (I-130) | $675.00 |
| Orphan (intercountry adoption) immediate relative petition  (I-600, I-800) | $775.00 |

**Immigrant Visa Application Processing Fees (non-refundable, per person)**

| | |
|---|---|
| [Immediate relative and family preference applications](#) (processed on the basis of an approved I-130, I-600 or I-800 petition) | $325.00 |
| [Employment-based applications](#) (processed on the basis of an approved I-140 or I-526 petition) | $345.00 |
| [Other immigrant visa applications](#) (including approved I-360 self-petitioners, special immigrant visa applicants, returning resident (SB-1) applicants, and all others, except DV program selectees) | $205.00 |
| Certain Iraqi and Afghan special immigrant visa applications | No Fee |

**Other Fees**

| | |
|---|---|
| Diversity Visa Lottery fee (per person applying as a DV program selectee for a [DV category immigrant visa](#)) | **$330.00** |
| Affidavit of Support Review (only when reviewed domestically) | **$120.00** |

**Note:** Forms and fee amounts are listed for immigration petitions which are submitted to Department of State, either accepted at a U.S. Embassy or Consulate abroad, or within the United States to the National Visa Center or Kentucky Consular Center. Other immigration related forms can only be approved by the Department of Homeland Security's United States Citizenship and Immigration Services (USCIS). For other fees (relating to forms starting with an "I" select [USCIS Forms and Fees](#)⧉ for additional information.

## Special Visa Services

## Description of Service and Fee Amount (All fees = $ in US currency)

| | |
|---|---|
| Application for Determining Returning Resident Status, [Form DS-117](#) | **$180.00** |
| Transportation letter for Legal Permanent Residents of the United States | **$575.00** |
| [Application for Waiver](#) of two-year residency | |

| | |
|---|---|
| ~~Application for Waiver~~ of two year residency requirement, J Waiver, <u>Form DS-3035</u> | **$120.00** |
| Application for Waiver of visa ineligibility, <u>Form I-601</u>⧉ (Collected for USCIS and subject to change) | **$930.00** |
| Refugee or significant public benefit parole case processing | **No Fee** |

**Note:** These fee charts are based on the Code of Federal Regulations - Title 22, Part 22, Sections 22.1 through 22.7.)

Plaintiffs' Combined MSJ Exhibits - Page 103

# EXHIBIT 12

Plaintiffs' Combined MSJ Exhibits - Page 104

# DS-260
# IV Application

# **SAMPLE**



October 2019

Bureau of Consular Affairs
Consular Systems and Technology

Plaintiffs' Combined MSJ Exhibits - Page 105

# Sign In Page



**Contact Us**

## Immigrant Visa

## Sign In

Welcome to the Consular Electronic Application Center – Immigrant/Diversity Visa portal. To access your case, please enter your case number below.

Case Number

[ Continue ]

**Important:** Before You Begin

Browser Requirements

**Please be patient. Download times may vary depending on your internet connection speed.**

This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

Copyright Information 🔗  Disclaimers 🔗

2

Plaintiffs' Combined MSJ Exhibits - Page 106

# Sign In Page



## U.S. DEPARTMENT of STATE
### CONSULAR ELECTRONIC APPLICATION CENTER

Contact Us

Immigrant Visa

## Sign In

Welcome to the Consular Electronic Application Center – Immigrant/Diversity Visa portal. To access your case, please enter your case number below.

**Please do not use the browser's back or refresh buttons while using the CEAC site. Instead, use the navigation links on the page. You will lose information if you use the browser's back or refresh button, and will need to log back into the application.**

Case Number

Enter the Invoice ID Number that the National Visa Center sent you

I am the
-- SELECT ONE --                                                ▼

Enter the characters as shown:

Continue

**Important: Before You Begin**

Browser Requirements

**Please be patient. Download times may vary depending on your internet connection speed.**



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information 🔗   Disclaimers 🔗                                    [114]

3

# Sign In Page



**Immigrant Visa**

## Sign In

Welcome to the Consular Electronic Application Center – Immigrant/Diversity Visa portal. To access your case, please enter your case number below.

**Please do not use the browser's back or refresh buttons while using the CEAC site. Instead, use the navigation links on the page. You will lose information if you use the browser's back or refresh button, and will need to log back into the application.**



Case Number

▮▮▮▮▮▮▮

Enter the Invoice ID Number that the National Visa Center sent you

000027548293

I am the

-- SELECT ONE --

| |
|---|
| – SELECT ONE – |
| APPLICANT |
| ATTORNEY |
| PETITIONER |
| THIRD-PARTY AGENT |

Enter the characters as shown:

**Important: Before You Begin**

Browser Requirements

**Please be patient. Download times may vary depending on your internet connection speed.**

[ Continue ]



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information 🔗   Disclaimers 🔗

(134)

4

Plaintiffs' Combined MSJ Exhibits - Page 108

# Summary Information Page

Example of a piVot case Summary page.



# Getting Started Page – Immigration Visa and Alien Registration Application



# Personal Information 1 Page

Displayed for all applicants. Answered 'No' to the question "Have you ever used other names (i.e., maiden, religious, professional, alias, etc.)?".



Plaintiffs' Combined MSJ Exhibits - Page 111

# Personal Information 1 Page

Displayed for all applicants. Answered 'Yes' to the question 'Have you ever used other names (i.e., maiden, religious, professional, aliases, etc.)?'.





Plaintiffs' Combined MSJ Exhibits - Page 113

# Personal Information 2 Page

Displayed for all applicants. Answered "Passport" for "Document Type".  Answered 'No' to the question 'Do you hold or have you held any nationality other than the one you have indicated above?'.



# Personal Information 2 Page

Displayed for all applicants. Answered "Other Travel Document" for "Document Type"'. Answered 'Yes' to the questions 'Do you hold or have you held any nationality other than the one indicated in question above on nationality?' and 'answer "No" to the question " Do you hold a passport for the other nationality above?'.





This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

Copyright Information ⧉    Disclaimers ⧉    Paperwork Reduction Act and Confidentiality Statement ⧉

Plaintiffs' Combined MSJ Exhibits - Page 115

# Personal Information 2 Page

Displayed for all applicants. Answered "Other Travel Document" for "Document Type".  Answered 'Yes' to the questions 'Do you hold or have you held any nationality other than the one indicated in question above on nationality?' and 'Do you hold a passport for the other nationality above?'.

# Personal Information 2 Page





# Present and Previous Address Information Page

Displayed for all applicants. All questions answered 'No'. Please note sections added for Additional Telephone and Email Address. Additional field for Social Media and Other Social Media.



Plaintiffs' Combined MSJ Exhibits - Page 118

# Present and Previous Address Information Page

Displayed for all applicants. All questions answered 'Yes'. Please note sections added for Additional Telephone and Email Address. Additional field for Social Media and Other Social Media.





**Page Continued**

## Social Media

Select from the list below each social media platform you have used within the last five years. In the space next to the platform's name, enter the username or handle you have used on that platform. Please do not provide your passwords. If you have used more than one platform or more than one username or handle on a single platform, click the 'Add Another' button to list each one separately. If you have not used any of the listed social media platforms in the last five years, select 'None.'

**Social Media Provider/Platform**

ASK.FM                                              ▼

**Social Media Identifier**

TESTID1

⊙ Add Another        ⊟ Remove

## Help: Social Media

Enter information associated with your online presence, including the types of online providers/platforms, applications, and websites that you use to collaborate, share information, and interact with others. List the username, handle, screenname, or other identifiers associated with your social media profile. You do not need to list accounts designed for use by multiple users within a business or other organization.

## Other Social Media

Do you wish to provide information about your presence on any other websites or applications you have used within the last five years to create or share content (photos, videos, status updates, etc.)?

**A:** ⊙ Yes  ○ No

Please provide the name of the platform and the associated unique social media identifier (username or handle) for each social media platform you would like to list. This does not include private messaging on person-to-person messaging services, such as WhatsApp.

**Other Social Media Provider/Platform**

SOCIAL2

**Other Social Media Identifier**

SOCIALID2

⊙ Add Another        ⊟ Remove

Please provide the name of the platform and the associated unique social media identifier (username or handle) for each social media platform you would like to list. This does not include private messaging on person-to-person messaging services, such as WhatsApp.

**Other Social Media Provider/Platform**

SOCIAL3

**Other Social Media Identifier**

SOCIALID3A

⊙ Add Another        ⊟ Remove

◀ Back: Personal        🖫 Save        Next: Mailing/Permanent ▶



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information ⧉   Disclaimers ⧉   Paperwork Reduction Act and Confidentiality Statement ⧉          (148)

17

Plaintiffs' Combined MSJ Exhibits - Page 121

# Mailing and Permanent Address Page

Displayed for all applicants who do not list "United States of America" as their Present Address Country/Region. All questions answered 'Yes'.



# Mailing and Permanent Address Page

Displayed for all applicants who do not list "United States of America" as their Present Address Country/Region.. All questions answered 'No'.



Plaintiffs' Combined MSJ Exhibits - Page 123

# Mailing and Permanent Address

Displayed for all applicants who list "United States of America" as their Present Address Country/Region. . All questions answered 'Yes'.



Plaintiffs' Combined MSJ Exhibits - Page 125

# Mailing and Permanent Address Page

Displayed for all applicants who list "United States of America" as their Present Address Country/Region. Answered 'No' to the question 'Is this address where you want your Permanent Residence Card (Green Card) mailed?'.



# Family Information: Parents Page

Displayed for all applicants.



# Family Information: Parents Page

Displayed for all applicants.   Answers to all questions are "Yes".



# Family Information: Parents Page

Displayed for all applicants.  Answers to all questions are "No".



# Family Information: Parents Page



Displayed for all applicants. Answered 'Yes' to "Is your father/mother still living?" and answered 'No' to the question "If your mother's address the same as your father's?"

# Family Information: Parents Page

Displayed for all applicants. Answered 'Do Not Know' to the questions 'Surname' and 'Given Name'.



# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Answered 'No' to the question 'Is your spouse immigrating to the U.S. with you?'.



29

# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Answered 'Yes' to the question 'Is your spouse immigrating to the U.S. with you?'.



# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Selected 'Same as Present Address' and 'Not Employed' for 'Occupation'.



# Family Information: Spouse Page

Displayed for applicants who indicate they are currently married or separated. Selected 'Other (Specify Address)' for 'Spouse's Address' and 'Other' for 'Occupation'.



Plaintiffs' Combined MSJ Exhibits - Page 136

# Family Information: Previous Spouse Page



# Family Information: Previous Spouse Page

Displayed for all applicants. Answered 'No' to the question 'Do you have any previous spouses?'.

Displayed for all applicants. Answered 'Yes' to the question 'Do you have any previous spouses?'.
Answered 'Other' to the question 'How was your marriage terminated?'.



Displayed for all applicants. Answered 'No' to the question 'Do you have any children?'.



Displayed for all applicants. Answered 'Yes' to all questions.



| Home | Contact Us | Help | Sign Out |

# U.S. DEPARTMENT *of* STATE
CONSULAR ELECTRONIC APPLICATION CENTER

| COMPLETE | REVIEW | SIGN |

Online Immigrant Visa and Alien Registration Application (DS-260)

## Family Information: Children

✔ Getting Started
✔ Personal
✔ Address and Phone
Family ▶
  Parents
  Spouse
  Previous Spouse
▪ Children
  Previous U.S. Travel
  Work / Education / Training
  Petitioner
  Security and Background
  Social Security Number

NOTE: The Immigration and Nationality Act (INA) does not allow derivative status to family members of immediate relatives. For example, IR1, CR1, IR2, CR2 and IR5 classifications are immediate relative visa categories. The petitioner must file separate immediate relative petitions for the spouse, each child and each parent.

**Q:** Do you have any children?

**A:** ⦿ Yes ◯ No

Number of Children: [____]

Provide the following information on each of your children (this includes all natural children, adopted children, and step children).

### Child 1
Surnames
[_____]

Given Names
[_____]

Date of Birth
[__▾] [____▾] [_____]
(Format: DD-MMM-YYYY)

Place of Birth

City
[_____]
                      ☐ Do Not Know

State/Province
[_____]  ☐ Does Not Apply

Country/Region
[- SELECT ONE -          ▾]

**Q:** Does this child live with you?

**A:** ⦿ Yes ◯ No

**Q:** Is this child immigrating to the U.S. with you?

**A:** ⦿ Yes ◯ No

✚ Add Another    ━ Remove

**Help: Children Information**

The Immigration and Nationality Act (INA) does not allow derivative status for family members of immediate relatives. IR1, CR1, IR2, CR2 and IR5 classifications are immediate relative visa categories. If you have questions about whether or not your child is allowed to immigrate to the U.S. with you or is allowed to follow to join in the U.S., please see travel.state.gov for more information.

◀ Back: Previous Spouse    💾 Save    Next: Previous U.S. Travel ▶



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information ⧉  Disclaimers ⧉  Paperwork Reduction Act and Confidentiality Statement ⧉

36

Displayed for all applicants. Answered 'Yes' to the question 'Do you have any children?'. Answered 'No' to the question 'Is this child immigrating to the U.S. with you?'.



# Previous U.S. Travel Information Page

Displayed for all applicants. All questions are answered 'No'.





# Previous U.S. Travel Information Page

### Displayed for all applicants that answer 'Yes.'



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Agriculture', 'Business', 'Communications', 'Computer Science', 'Culinary/Food Services', 'Education', 'Engineering', 'Government', 'Homemaker', 'Legal Profession', 'Medical/Health', 'Military', 'Natural Science', 'Physical Sciences', 'Religious Vocation', 'Research', 'Social Science', or 'Student'. Answer to 'Do you have other occupations?' is 'No'.



Displayed for all applicants over the age of 14. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Agriculture', 'Business', 'Communications', 'Computer Science', 'Culinary/Food Services', 'Education',

# Present Work/Education/Training Information Page

'Engineering', 'Government', 'Homemaker', 'Legal Profession', 'Medical/Health', 'Military', 'Natural Science', 'Physical Sciences', 'Religious Vocation', 'Research', 'Social Science', or 'Student'. Answer to 'Do you have other occupations?' is 'Yes' and 'Other Occupation' is not 'Other' or 'Homemaker'.



Displayed for all applicants. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is

# Present Work/Education/Training Information Page

'Agriculture', 'Business', 'Communications', 'Computer Science', 'Culinary/Food Services', 'Education', 'Engineering', 'Government', 'Homemaker', 'Legal Profession', 'Medical/Health', 'Military', 'Natural Science', 'Physical Sciences', 'Religious Vocation', 'Research', 'Social Science', or 'Student'.  Answer to 'Do you have other occupations?' is 'Yes' and 'Other Occupation' is 'Homemaker'.



# Present Work/Education/Training Information Page

Displayed for all applicants over the age of 14. . Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Other'.



# Present Work/Education/Training Information Page

Displayed for all applicants. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Not Employed'.



Displayed for all applicants over the age of 14. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Homemaker' or 'Retired'.

# Present Work/Education/Training Information Page



Displayed for all applicants over the age of 14. Primary Occupation and 'In which occupation do you intend to work in the U.S.?' is 'Homemaker' or 'Retired'.

# Present Work/Education/Training Information Page





# Present Work/Education/Training Information Page

Displayed only for Diversity Visa (DV) principal applicants when Primary Occupation is not "HOMEMAKER", "NOT EMPLOYED" or "STUDENT".



# Present Work/Education/Training Information Page



Displayed only for Diversity Visa (DV) principal applicants when Primary Occupation is not "HOMEMAKER", "NOT EMPLOYED" or "STUDENT".  Answer to "Do you have other occupations?" is "Yes".

# Present Work/Education/Training Information Page



Displayed only for  Diversity Visa (DV) principal applicants when Primary Occupation is not "HOMEMAKER", "NOT EMPLOYED" or "STUDENT".
Answer to "Do you have        other occupations?"      is
"Yes".  Other  Occupation is "OTHER".

# Previous Work/Education/Training Information Page

Displayed for all applicants who meet one of the following criteria:

•The applicant is male and age is between 14 and 60
•The applicant is over the age of 14 and is from Burma, China, Cuba, India, Iran, North Korea, Pakistan, Saudi Arabia,
Sudan, Syria, or Stateless
•The applicant is retired, not employed, or is a homemaker
•The applicant is a principal applicant and is applying for any of the following visa classes: E11, E12, E13, E21, E31, E32, EW3, SD1, SR1, SE1, C51, T51, SI1, SQ1, SF1, SG1, SH1, SJ1, SK1, SN1, R51, and I51, DV-1.

The answer to both questions is 'No'.



Displayed for all applicants who meet one of the following criteria:

51

# Previous Work/Education/Training Information Page

•The applicant is male and age is between 14 and 60
•The applicant is over the age of 14 and is from Burma, China, Cuba, India, Iran, North Korea, Pakistan, Saudi Arabia, Sudan, Syria, or Stateless
•The applicant is retired, not employed, or is a homemaker
•The applicant is a principal applicant and is applying for any of the following visa classes: E11, E12, E13, E21, E31, E32, EW3, SD1, SR1, SE1, C51, T51, SI1, SQ1, SF1, SG1, SH1, SJ1, SK1, SN1, R51, and I51, DV-1.

Answer to both questions is 'Yes'.



52

# Previous Work/Education/Training Information Page

Displayed for all applicants who selected 'Afghanistan' for 'Nationality' and is over the age of 14. The answer to



both questions is 'Yes'.

Plaintiffs' Combined MSJ Exhibits - Page 157

# Previous Work/Education/Training Information Page

Displayed for all applicants who selected 'Iraq' for 'Nationality' and is over the age of 14. . The answer to both

# Previous Work/Education/Training Information Page



questions is 'Yes'.

Plaintiffs' Combined MSJ Exhibits - Page 159

# Previous Work/Education/Training Information Page

Displayed for all DV principal applicants who answer "Yes" to the first question and "No" to the other questions on the page.

# Previous Work/Education/Training Information Page



# Previous Work/Education/Training Information Page

answer "Yes" to all questions on the page.



# Additional Work/Education/Training Information Page

Displayed for all applicants who are 14 years or older. The answer to the question is unanswered.  No additional questions are triggered if answered 'No'.



Displayed for all applicants who are 14 years or older. The answer to the question is 'Yes'.

# Additional Work/Education/Training Information Page



# Additional Work/Education/Training Information Page

Displayed for all applicants who selected 'Iraq' for 'Nationality' or 'Other Nationality, is 14 years or older, and is Male. Answers to questions are 'No'.



Displayed for all applicants who meet one of the following two criteria:

•The applicant is Male and age is between 14 and 60 and Nationality (or Other Nationality) is NOT AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAQ, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA,  SUDAN, SYRIA, OR STATELESS

•The applicant is 14 years or older and Nationality (or Other Nationality) is AFGHANISTAN, BURMA, CHINA, CUBA, INDIA, IRAN, NORTH KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS.

•The applicant is 14 years or older, Nationality is IRAQ, and is Female.

Answers to questions are 'No'.

# Additional Work/Education/Training Information Page



Displayed for all applicants who meet one of the following two criteria:    •The applicant is Male and age is between 14 and 60 and Nationality (or Other Nationality) is NOT
AFGHANISTAN, BURMA, CHINA,
CUBA, INDIA, IRAQ, IRAN, NORTH
KOREA, PAKISTAN, SAUDI ARABIA,  SUDAN, SYRIA, OR STATELESS
•The applicant is 14 years or older and
Nationality (or Other Nationality) is
AFGHANISTAN, BURMA, CHINA,
CUBA, INDIA, IRAQ, IRAN, NORTH  KOREA, PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR
STATELESS.

Answers to questions are 'Yes'.  Part 1

# Additional Work/Education/Training Information Page



Part 2

# Additional Work/Education/Training Information Page





This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information ⧉   Disclaimers ⧉   Paperwork Reduction Act and Confidentiality Statement ⧉

(122)

# Additional Work/Education/Training Information Page

Displayed for all applicants who meet one of the following two criteria:    •The applicant is Male and age is between 14 and 60 and Nationality (or Other Nationality) is
NOT AFGHANISTAN,
BURMA, CHINA, CUBA,
INDIA, IRAQ, IRAN,
NORTH KOREA,
PAKISTAN, SAUDI
ARABIA, SUDAN,
SYRIA, OR STATELESS
•The applicant is 14 years or older and Nationality (or Other Nationality) is
AFGHANISTAN,
BURMA, CHINA, CUBA,
INDIA, IRAQ, IRAN,
NORTH KOREA,
PAKISTAN, SAUDI ARABIA, SUDAN, SYRIA, OR STATELESS.

'Iraq' is selected for
'Name of Country/Region'.  Answers to questions are 'No' except for 'Have you ever served in the military?'.
'Name of
Country/Region' is 'Iraq'.

# Additional Work/Education/Training Information Page





# Petitioner Information Page

Displayed for all applicants.



Displayed for all applicants. Answered 'Father' to 'Petitioner is my'.  The same questions display if 'Mother',  'Brother', 'Sister', 'Spouse', 'Child', 'Stepfather', 'Stepmother', 'Uncle', 'Aunt', 'Grandparent', or 'In-law' is selected.

# Petitioner Information Page



Displayed for all applicants. Answered 'Employer' to the question 'Petitioner is my'.  The same questions display if
'Prospective Employer' is selected.  If 'Other' is selected, an additional 'Specify Other' box is displayed.

# Petitioner Information Page



Displayed for all applicants. Answered 'Self' to the question 'Petitioner is my'.

# Petitioner Information Page





Plaintiffs' Combined MSJ Exhibits - Page 174

# Security and Background: Medical and Health Information Page

Displayed for all applicants. Answers to questions are 'No'.

Home | Contact Us | Help | Sign Out

# U.S. DEPARTMENT *of* STATE
CONSULAR ELECTRONIC APPLICATION CENTER

| COMPLETE | REVIEW | SIGN |

Online Immigrant Visa and Alien Registration Application (DS-260)

tting Started

rsonal

ldress and Phone

mily

evious U.S. Travel

ork / Education /
aining

titioner

curity and
ckground  ▶

edical and
ealth

iminal

ecurity 1

ecurity 2

migration Law
olations 1

scellaneous 1

scellaneous 2

cial Security
mber

## Security and Background: Medical and Health Information

NOTE: Provide the following security and background information. Provide complete and accurate information to all questions that require an explanation. A visa may not be issued to persons who are within specific categories defined by law as inadmissible to the United States (except when a waiver is obtained in advance). Are any of the following applicable to you? A YES answer does not automatically signify ineligibility for a visa. **Please note that should you answer Yes to any of the following questions, you may be requested to provide documentation to support your explanation.**

**Q:** Do you have a communicable disease of public health significance such as tuberculosis (TB)?

**A:**  ○ Yes  ● No

**Q:** Do you have documentation to establish that you have received vaccinations in accordance with U.S. law?

**A:**  ○ Yes  ● No

Explain

**Q:** Do you have a mental or physical disorder that poses or is likely to pose a threat to the safety or welfare of yourself or others?

**A:**  ○ Yes  ● No

**Q:** Are you or have you ever been a drug abuser or addict?

**A:**  ○ Yes  ● No

◀ Back: Petitioner | 🖫 Save | Next: Criminal ▶



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information 🖙  Disclaimers 🖙  Paperwork Reduction Act and Confidentiality Statement 🖙

72

# Security and Background: Medical and Health Information Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Security and Background: Criminal Information Page

Displayed for all applicants. Answers to questions are 'No'.



Plaintiffs' Combined MSJ Exhibits - Page 178

# Security and Background: Criminal Information Page

Displayed for all applicants. Answers to questions are 'Yes'.

Plaintiffs' Combined MSJ Exhibits - Page 179

# Security and Background: Security Information 1 Page

Displayed for all applicants. Answers to questions are 'No'.



# Security and Background: Security Information 1

NOTE: Provide the following security and background information. Provide complete and accurate information to all questions that require an explanation. A visa may not be issued to persons who are within specific categories defined by law as inadmissible to the United States (except when a waiver is obtained in advance). Are any of the following applicable to you? A YES answer does not automatically signify ineligibility for a visa. **Please note that should you answer Yes to any of the following questions, you may be requested to provide documentation to support your explanation.**

Q: Do you seek to engage in espionage, sabotage, export control violations, or any other illegal activity while in the United States?

A: ○ Yes  ● No

Q: Do you seek to engage in terrorist activities while in the United States or have you ever engaged in terrorist activities?

A: ○ Yes  ● No

Q: Have you ever or do you intend to provide financial assistance or other support to terrorists or terrorist organizations?

A: ○ Yes  ● No

Q: Are you the spouse, son, or daughter of an individual who has engaged in terrorist activity, including providing financial assistance or other support to terrorists or terrorist organizations, in the last five years?

A: ○ Yes  ● No

Q: Are you a member or representative of a terrorist organization?

A: ○ Yes  ● No

Q: Have you ever ordered, incited, committed, assisted, or otherwise participated in genocide?

A: ○ Yes  ● No

Q: Have you ever committed, ordered, incited, assisted, or otherwise participated in torture?

A: ○ Yes  ● No

Q: Have you committed, ordered, incited, assisted, or otherwise participated in extrajudicial killings, political killings, or other acts of violence?

A: ○ Yes  ● No

Q: Have you ever engaged in the recruitment of or the use of child soldiers?

A: ○ Yes  ● No

Q: Have you, while serving as a government official, been responsible for or directly carried out, at any time, particularly severe violations of religious freedom?

A: ○ Yes  ● No



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information 🗗   Disclaimers 🗗   Paperwork Reduction Act and Confidentiality Statement 🗗

# Security and Background: Security Information 1 Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Security and Background: Security Information 2 Page

Displayed for all applicants. Answers to questions are 'No'.





79

# Security and Background: Security Information 2 Page

Displayed for all applicants. Answers to questions are 'Yes'.

# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered "No" to "Have you ever been to the U.S.?" on the Previous U.S. Travel page.



.

# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered "No" to "Have you ever been to the U.S.?" on the Previous U.S. Travel page. Displayed when you answer 'Yes'.



# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel Page. Answers to questions are 'No'.



# Security and Background: Immigration Law Violation Information 1 Page

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel page. Answers to questions are 'Yes'.

Part 1:



# Security and Background: Immigration Law Violation Information 1 Page



# Security and Background: Immigration Law Violation Information 2 Page

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel page.  Answers to questions are 'No'.



# Security and Background: Immigration Law Violation

Displayed for all applicants who answered 'Yes' to 'Have you ever been to the U.S.?' on the Previous U.S. Travel page.  Answers to questions are 'Yes'.



# Security and Background: Miscellaneous Information 1 Page

Displayed for all applicants. Answers to questions are 'No'.



# Security and Background: Miscellaneous Information 1 Page

Displayed for all applicants. Answers to questions are 'Yes'.

Plaintiffs' Combined MSJ Exhibits - Page 193

# Security and Background: Miscellaneous Information 2 Page

Displayed for all applicants. Answers to questions are 'No'.

| Home | Contact Us | Help | Sign Out |

## U.S. DEPARTMENT *of* STATE
### CONSULAR ELECTRONIC APPLICATION CENTER

| COMPLETE | REVIEW | SIGN |

Online Immigrant Visa and Alien Registration Application (DS-260)

# Security and Background: Miscellaneous Information 2

NOTE: Provide the following security and background information. Provide complete and accurate information to all questions that require an explanation. A visa may not be issued to persons who are within specific categories defined by law as inadmissible to the United States (except when a waiver is obtained in advance). Are any of the following applicable to you? A YES answer does not automatically signify ineligibility for a visa. **Please note that should you answer Yes to any of the following questions, you may be requested to provide documentation to support your explanation.**

- ✔ Getting Started
- ✔ Personal
- ✔ Address and Phone
- ✔ Family
- ✔ Previous U.S. Travel
- ✔ Work / Education / Training
- ✔ Petitioner
- **Security and Background** ▶
- Medical and Health
- Criminal
- Security 1
- Security 2
- Immigration Law Violations 1
- Miscellaneous 1
- ▪ Miscellaneous 2
- Social Security Number

**Q:** Are you a health care worker seeking to perform such work in the United States but have not yet received certification from the Commission on Graduates of Foreign Nursing Schools or from an equivalent approved independent credentialing organization?

**A:** ○ Yes ◉ No

**Q:** Are you permanently ineligible for U.S. citizenship?

**A:** ○ Yes ◉ No

**Q:** Have you ever departed the United States in order to evade military service during a time of war?

**A:** ○ Yes ◉ No

**Q:** Are you coming to the U.S. to practice polygamy?

**A:** ○ Yes ◉ No

**Q:** Are you a former exchange visitor (J) who has not yet fulfilled the two-year foreign residence requirement?

**A:** ○ Yes ◉ No

**Q:** Has the Secretary of Homeland Security of the United States ever determined that you knowingly made a frivolous application for asylum?

**A:** ○ Yes ◉ No

**Q:** Are you likely to become a public charge after you are admitted to the United States?

**A:** ○ Yes ◉ No

| ◀ Back: Miscellaneous 1 |  Save | Next: Social Security Number ▶ |



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information ⌕    Disclaimers ⌕    Paperwork Reduction Act and Confidentiality Statement ⌕

Plaintiffs' Combined MSJ Exhibits - Page 195

# Security and Background: Miscellaneous Information 2 Page

Displayed for all applicants. Answers to questions are 'Yes'.



# Social Security Number Information Page

Displayed for all applicants. Answers to questions are 'No'.





# Social Security Number Information Page

Displayed for all applicants. Answers to questions are 'Yes'.





# Social Security Number Information Page

Displayed for all applicants. Answers to the first three questions are 'Yes' with the last question answered 'No'.



# Sign and Submit Page

Displayed for all applicants. Answered 'No' to the question 'Did anyone assist you in filling out this application?'.



Plaintiffs' Combined MSJ Exhibits - Page 201

# Sign and Submit Page

Displayed for all applicants. Answered 'Yes' to the question 'Did anyone assist you in filling out this application?'.



99

Plaintiffs' Combined MSJ Exhibits - Page 203

# Sign and Submit Page

Displayed for all applicants. Answered 'No' to the question 'Did anyone assist you in filling out this application?'. If you are from Benin, Burkina Faso, Cameroon, Central African Republic, Chad, Cote d'Ivoire, Democratic Republic of the Congo, Djibouti, Egypt, Eritrea, Ethiopia, Gambia, Ghana, Guinea, Guinea-Bissau, Iraq, Kenya, Liberia, Mali, Mauritania, Niger, Nigeria, Senegal, Sierra Leone, Somalia, Sudan, Tanzania, Togo, Uganda, Yemen then you will have an extra box on your Sign and Submit page. Applicants must certify they reviewed the FGM/C government fact sheet, given they are from a FGM/C prevalent country/region.

| Home | Contact Us | Help | Sign Out |

**U.S. DEPARTMENT of STATE**
CONSULAR ELECTRONIC APPLICATION CENTER

| COMPLETE | REVIEW | SIGN |

Online Immigrant Visa and Alien Registration Application (DS-260)

## Sign and Submit

E-Sign and
Certification

**Read the following information carefully before dating, electronically signing and submitting the application.**

Your application is now ready to be submitted. Please note that this does not necessarily mean that your application for a immigrant visa is complete, as additional information may be needed after Department of State personnel have reviewed the application.

By clicking "Sign and Submit Application" you are electronically signing the application. You are required to electronically sign your application yourself, unless otherwise exempt by regulation, even if the application has been prepared by someone other than yourself. Your electronic signature certifies that you have read and understood the questions in this application and that your answers are true and correct to the best of your knowledge and belief. The submission of an application containing any false or misleading statements may result in the permanent refusal of a visa or the denial of entry into the United States. All declarations made in this application are unsworn declarations made under penalty of perjury (28 U.S.C. 1746). If fingerprints are collected as part of your application process, they may be used for the purpose of comparing them to other fingerprints in the FBI's Next Generation Identification (NGI) fingerprint system or its successor systems (including civil, criminal, and latent fingerprint repositories). If you wish to correct a record as it appears in the FBI's CJIS Division Records System, you should follow procedures to change, correct or update a record that are set forth in Title 28, CFR, Section 16.34. The photograph that you provide with your application may be used for employment verification or other U.S. law purposes.

The information that you have provided in your application and other information submitted with your application may be accessible to other government agencies having statutory or other lawful authority to use such information, including for law enforcement and immigration law enforcement purposes.

Wednesday, October 16, 2019 - 11:32:15 AM EDT

### Preparer of Application

**Q:** Did anyone assist you in filling out this application?

**A:**  ○ Yes  ● No

### E-Signature

Immigrant visa applicants are required to undergo a medical examination with an authorized physician to assess visa eligibility consistent with INA Sections 212(a) and 221 (d). I understand that failure to provide required information may cause delay or denial of my visa application. If required to undergo a medical examination, I understand that my medical examination information may be collected and temporarily stored in the eMedical system hosted, operated, and maintained by the Australian Department of Home Affairs. If my medical examination is collected in eMedical, I understand and consent to its collection and temporarily being stored in such system, and being transferred to the U.S. Government for the purposes of enabling the U.S. Department of State to determine my medical eligibility and for the U.S. Centers for Disease Control and Prevention to undertake public health functions under the Public Health Service Act Section 325 and INA Section 212(a). I understand that if I am issued a visa, I am required to display my visa to the United States Immigration Officer at the port of entry where I apply to enter the United States and that possession of a visa does not entitle me to enter the United States if, at that time, I am found to be inadmissible under the immigration law.

I understand that any willfully false or misleading statement or willful concealment of a material fact made by me herein may result in refusal of the visa, denial of admission to the United States and, may subject me to criminal prosecution and/or removal from the United States.

I, the undersigned applicant for a United States immigrant visa, do solemnly swear (or affirm) that all statements which appear in this application have been made by me are true and complete to the best of my knowledge and belief. I do further swear (or affirm) that, if admitted to the United States, I will not engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States; in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder, or in other activities subversive to the national security; in any activity the purpose of which is the opposition to or the control or overthrow of, the Government of the United States; by force, violence, or other unconstitutional means.

Enter your NVC Case Number:

Enter your Passport Number:



Enter the code below as shown:

Female Genital Mutilation/Cutting (FGM/C) Prevention

Pursuant to Section 644 the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Public Law 104-208 (8 U.S.C. 1374), the Department of State is required to provide you with access to copy the information sheet on the severe harm to physical and psychological health caused by female genital mutilation/cutting (FGM/C).

**Click on the following link to view the Female Genital Mutilation or Cutting Government Fact Sheet**

Female Genital Mutilation or Cutting Government Fact Sheet

☐ I certify that I have received the U.S. Government Fact Sheet on Female
Genital Mutilation or Cutting (FGM/C).

**Click the button below to electronically sign your application:**

Sign and Submit Application

| ◀ Back: REVIEW | 🖫 Save | Next: Confirmation ▶ |

 This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.
Copyright Information ⏿ | Disclaimers ⏿ | Paperwork Reduction Act and Confidentiality Statement ⏿

Plaintiffs' Combined MSJ Exhibits - Page 205

# Sign and Submit Page

Displayed for all applicants. Answered 'Yes' to the question 'Did anyone assist you in filling out this application?'. If you are from Benin, Burkina Faso, Cameroon, Central African Republic, Chad, Cote d'Ivoire, Democratic Republic of the Congo, Djibouti, Egypt, Eritrea, Ethiopia, Gambia, Ghana, Guinea, Guinea-Bissau, Iraq, Kenya, Liberia, Mali, Mauritania, Niger, Nigeria, Senegal, Sierra Leone, Somalia, Sudan, Tanzania, Togo, Uganda, Yemen then you will have an extra box on your Sign and Submit page. Applicants must certify they reviewed the FGM/C government fact sheet, given they are from a FGM/C prevalent country/region.

| Home | Contact Us | Help | Sign Out |

**U.S. DEPARTMENT of STATE**
CONSULAR ELECTRONIC APPLICATION CENTER

| COMPLETE | REVIEW | ▼ | SIGN |

Online Immigrant Visa and Alien Registration Application (DS-260)

# Sign and Submit

E-Sign and Certification ▶

**Read the following information carefully before dating, electronically signing and submitting the application.**

Your application is now ready to be submitted. Please note that this does not necessarily mean that your application for a immigrant visa is complete, as additional information may be needed after Department of State personnel have reviewed the application.

By clicking "Sign and Submit Application" you are electronically signing the application. You are required to electronically sign your application yourself, unless otherwise exempt by regulation, even if the application has been prepared by someone other than yourself. Your electronic signature certifies that you have read and understood the questions in this application and that your answers are true and correct to the best of your knowledge and belief. The submission of an application containing any false or misleading statements may result in the permanent refusal of a visa or the denial of entry into the United States. All declarations made in this application are unsworn declarations made under penalty of perjury (28 U.S.C. 1746). If fingerprints are collected as part of your application process, they may be used for the purpose of comparing them to other fingerprints in the FBI's Next Generation Identification (NGI) fingerprint system or its successor systems (including civil, criminal, and latent fingerprint repositories). If you wish to correct a record as it appears in the FBI's CJIS Division Records System, you should follow procedures to change, correct or update a record that are set forth in Title 28, CFR, Section 16.34. The photograph that you provide with your application may be used for employment verification or other U.S. law purposes.

The information that you have provided in your application and other information submitted with your application may be accessible to other government agencies having statutory or other lawful authority to use such information, including for law enforcement and immigration law enforcement purposes.

Wednesday, November 06, 2019 - 8:19:05 AM EST

### Preparer of Application

**Q:** Did anyone assist you in filling out this application?

**A:** ○ Yes  ◉ No

understand that failure to provide required information may cause delay or denial of my visa application. If required to undergo a medical examination, I understand that my medical examination information may be collected and temporarily stored in the eMedical system hosted, operated, and maintained by the Australian Department of Home Affairs. If my medical examination is collected in eMedical, I understand and consent to its collection and temporarily being stored in such system, and being transferred to the U.S. Government for the purposes of enabling the U.S. Department of State to determine my medical eligibility and for the U.S. Centers for Disease Control and Prevention to undertake public health functions under the Public Health Service Act Section 325 and INA Section 212(a). I understand that if I am issued a visa, I am required to display my visa to the United States Immigration Officer at the port of entry where I apply to enter the United States and that possession of a visa does not entitle me to enter the United States if, at that time, I am found to be inadmissible under the immigration law.

I understand that any willfully false or misleading statement or willful concealment of a material fact made by me herein may result in refusal of the visa, denial of admission to the United States, and, may subject me to criminal prosecution and/or removal from the United States.

I, the undersigned applicant for a United States immigrant visa, do solemnly swear (or affirm) that all statements which appear in this application have been made by me are true and complete to the best of my knowledge and belief. I do further swear (or affirm) that, if admitted to the United States, I will not engage in activities which would be prejudicial to the public interest, or endanger the welfare, safety, or security of the United States; in activities which would be prohibited by the laws of the United States relating to espionage, sabotage, public disorder, or in other activities subversive to the national security; in any activity the purpose of which is the opposition to or the control or overthrow of, the Government of the United States, by force, violence, or other unconstitutional means.

I understand that if I am issued an immigrant visa and I am a male between the ages of 18 and 25, I am required by law to register with the Selective Service System in accordance with the Military Service Act.

> NOTE: You must read the Selective Service System DS-1810 (pdf) form before signing. Adobe Acrobat Reader is required to open the form. If you don't have Adobe Acrobat Reader go here to download a free copy.  **Click on the following link to view the form:**
>
> Selective Service System DS-1810 (pdf)

Enter your NVC Case Number:

[                    ]

Enter your Passport Number:

[                    ]



Enter the code below as shown:

[                    ]

Plaintiffs' Combined MSJ Exhibits - Page 207

# Confirmation Page

Displayed for applicants when the case is at NVC.



Plaintiffs' Combined MSJ Exhibits - Page 209

# Confirmation Page

Displayed for applicants when the case is at Post  Displayed for DV applicants when



the case is at KCC

# Confirmation Page



# Confirmation Page

Displayed for DV applicants when the case is at Post





Plaintiffs' Combined MSJ Exhibits - Page 212

# Copyright Page – Immigrant Visa and Alien Registration Application



# Disclaimer Page – Immigrant Visa and Alien Registration Application



Home | Contact Us | Sign Out

## U.S. DEPARTMENT of STATE
### CONSULAR ELECTRONIC APPLICATION CENTER

Online Immigrant Visa and Alien Registration Application (DS-260)

## Disclaimer

For site management, see Privacy and Computer Fraud and Abuse Act Notices

The information content and design/organization of the web site launched in 1995.

The Federal Depository Library at the University of Illinois at Chicago provides technical and reference support for the web site at http://travel.state.gov. Please direct technical questions about http://travel.state.gov to our contact us page.

Some bureaus/offices maintain servers separately from the site maintained by CA/EX/CSD/DO. However, CA/EX/CSD/DO coordinates release of information on those servers to ensure that it is linked appropriately with the site at contact us page; your message will be forwarded to the appropriate office or bureau.

ca-travel-webmaster@state.gov.

Links to External Web Sites
Links to web sites outside the U.S. Federal Government or the use of trade, firm, or corporation names within the State Department web sites are for the convenience of the user. Such use does not constitute an official endorsement or approval by the U.S. State Department of any private sector web site, product, or service.

Computer Fraud and Abuse Act Unauthorized attempts to upload information and/or change information on these web sites are strictly prohibited and are subject to prosecution under the Computer Fraud and Abuse Act of 1986 and Title 18 U.S.C. Sec.1001 and 1030.

Disclaimer of Liability Every effort is made to provide accurate and complete information. However, with the thousands of documents available, often uploaded within short deadlines, we cannot guarantee that there will be no errors. With respect to documents and information on the current and archive State Department web sites, neither the U.S. Government, the U.S. Department of State, the University of Illinois at Chicago (UIC), Digex (web host), ClearBlue Technologies (formerly Applied Theory, an independent software development contractor), nor their employees and contractors make any warranty, expressed or implied, including the warranties of merchantability and fitness for a particular purpose with respect to documents available from State Department web sites. Additionally, the U.S. Government, U.S. State Department, Digex, ClearBlue Technologies, and UIC assume no legal liability for the accuracy, completeness, or usefulness of any information, product, or process disclosed herein and do not represent that use of such information, product, or process would not infringe on privately owned rights.

Please read the State Department's guidelines pursuant to the Data Quality Information Act before submitting inquiries under this Act.

If you would like verification or a hard copy of information released on State Department web sites or if you have any questions or comments about the information presented here, please contact the public information staff in the Bureau of Public Affairs.

Public Communication Division
PA/PL, Room 2206
U.S. Department of State
Washington, D.C. 20520
202-647-6575
Also see http://contact-us.state.gov/

Non Compliance with LEP

Translations are not available for most of the material on this site as it is updated frequently. Travel.State.Gov will be offering some translations in the future when we are able to keep tranlations up-to-date and therefore accurate.

OK



This site is managed by the Bureau of Consular Affairs, U.S. Department of State. External links to other Internet sites should not be construed as an endorsement of the views contained therein.

110

# Paperwork Reduction Act Page – Immigrant Visa and Alien Registration Application



**U.S. DEPARTMENT of STATE**
CONSULAR ELECTRONIC APPLICATION CENTER

Online Immigrant Visa and Alien Registration Application (DS-260)

## Paperwork Reduction Act and Confidentiality Statement

**PAPERWORK REDUCTION ACT:** Public reporting burden for this collection of information is estimated to average 155 minutes per response, including time required for searching existing data sources, gathering the necessary documentation, providing the information and/or documents required, and reviewing the final collection. You do not have to supply this information unless this collection displays a currently valid OMB control number. If you have comments on the accuracy of this burden estimate and/or recommendations for reducing it, please send them to: **PRA_BurdenComments@state.gov**

**CONFIDENTIALITY STATEMENT:** The information asked for on this form is requested pursuant to Section 222 of the Immigration and Nationality Act. Section 222(f) provides that the records of the Department of State and of diplomatic and consular offices of the United States pertaining to the issuance and refusal of visas or permits to enter the United States shall be considered confidential and shall be used only for the formulation, amendment, administration, or enforcement of the immigration, nationality, and other laws of the United States. Certified copies of such records may be made available to a court provided the court certifies that the information contained in such records is needed in a case pending before the court. The U.S. Department of State uses the facts you provide on this form primarily to determine your classification and eligibility for a U.S. immigrant visa. Individuals who fail to submit this form or who do not provide all the requested information may be denied a U.S. immigrant visa. Although furnishing this information is voluntary, failure to provide this information may delay or prevent the processing of your case. If you are issued an immigrant visa and are subsequently admitted to the United States as an immigrant, the Department of Homeland Security will use the information on this form to issue you a Permanent Resident Card, and, if you so indicate, the Social Security Administration will use the information to issue a social security number. The information provided may also be released to federal agencies for law enforcement, counterterrorism and homeland security purposes; to Congress and courts within their sphere of jurisdiction; and to other federal agencies who may need the information to administer or enforce U.S. laws.

111

Plaintiffs' Combined MSJ Exhibits - Page 215

# EXHIBIT 13

10/15/24, 4:02 PM
Case 6:24-cv-00306-JCB     Document 78-1     Filed 10/19/24     Page 216 of 343 PageID #:
Reminders on the Process to Promote the Unity and Stability of Families | USCIS
1423
Plaintiffs' Combined MSJ Exhibits - Page 216



**U.S. Citizenship
and Immigration
Services**

MENU

<u>Home</u> > <u>Newsroom</u> > <u>All News</u> > <u>Alerts</u> > Reminders on the Process to Promote the Unity and Stability
of Families

# Reminders on the Process to Promote the Unity and Stability of Families

Release Date : 07/17/2024

On June 18, the Department of Homeland Security (DHS) <u>announced</u> actions to promote family unity in the immigration process. This announcement is consistent with the Biden-Harris administration's commitment to keep families together. DHS is establishing a process to consider, on a case-by-case basis, requests for parole in place from certain noncitizen spouses of U.S. citizens who have been in the U.S. for at least a decade. If parole is granted, noncitizens who are eligible to apply for lawful permanent residence based on their marriage to a U.S. citizen will be able to do so without having to leave the United States.

USCIS is not currently accepting applications under this process. We will begin accepting applications on Aug. 19. If you apply before Aug. 19, we will reject your application. More information about eligibility and the application process will be published in a forthcoming Federal Register notice.

## Eligibility

To be considered for a discretionary grant of parole, on a case-by-case basis, under this process, you must:

- Be present in the United States without admission or parole;

- Have been continuously present in the United States for at least 10 years as of June 17, 2024;

- Have a legally valid marriage to a U.S. citizen as of June 17, 2024;

- Not have any disqualifying criminal history or otherwise constitute a threat to national security or public safety; and

- Otherwise merit a favorable exercise of discretion.

More information about these eligibility criteria will be available in the forthcoming Federal Register notice.

We may also consider certain noncitizen children of requestors under this process if, as of June 17, 2024, they were physically present in the United States without admission or parole, and have a qualifying stepchild relationship to a U.S. citizen.

## Timeline

Need Help?
Chat with Emma™

Case 6:24-cv-00306-JCB    Document 78-1    Filed 10/18/24    Page 217 of 343 PageID #: 1424
Plaintiffs' Combined MSJ Exhibits    Page 217

**You cannot apply for this process yet.** We will publish a Federal Register notice that will further explain eligibility and the application process, including the form to use, and the associated filing fees. If you apply before the implementation date in the Federal Register notice, we will reject your application.

We will provide additional information on the Process to Promote the Unity and Stability of Families webpage as it becomes available.

## What You Can Do Now

Although we are not currently accepting applications, you can begin to prepare to file a parole application by gathering evidence of your eligibility, such as:

- Evidence of a legally valid marriage to a U.S. citizen as of June 17, 2024, such as a marriage certificate;

- Documentation of proof of identity, including expired documents may include:

  - Valid state or country driver's license or identification;

  - Birth certificate with photo identification;

  - Valid passport; or

  - Any government issued document bearing the requestor's name, date of birth, and photo.

- Evidence of your spouse's U.S. citizenship, such as a passport, birth certificate or Certificate of Naturalization;

- Documentation to establish your continued presence in the United States for at least 10 years, as of June 17, 2024. While more information will be made available in the forthcoming Federal Register Notice and subsequent FAQs, examples of documentation could include copies of:

  - Rent receipts or utility bills;

  - School records (letters, report cards, etc.);

  - Hospital or medical records;

  - Attestations to your residence by religious entities, unions, or other organizations, identifying you by name;

  - O icial records from a religious entity confirming participation in a religious ceremony;

  - Money order receipts for money sent into or out of the United States;

  - Birth certificates of children born in the United States

  - Dated bank transactions;

  - Automobile license receipts, title, or registration;

  - Deeds, mortgages, or rental agreement contracts;

  - Insurance policies; or

Plaintiffs' Combined MSJ Exhibits - Page 218

○ Tax returns or tax receipts.

For noncitizen children of requestors, evidence of eligibility could include:

- Evidence of the child's relationship to the noncitizen parent, such as a birth certificate or adoption decree;

- Evidence of the noncitizen parent's legally valid marriage to a U.S. citizen as of June 17, 2024, such as a marriage certificate; and

- Evidence of the child's presence in the United States as of June 17, 2024.

If you are interested in this process, you should consider creating or updating your myUSCIS account at my.uscis.gov.

**Beware of Scams**

We want to remind you that immigration scams are pervasive.

Remember, **you cannot apply for this process yet.** If you see someone selling their services to file an application before we publish the Federal Register notice or open the process, please see our Report Immigration Scams webpage.

Remember that in the United States, a notario público is not authorized to provide you with any legal services related to immigration. Only an attorney licensed to practice law in the United States or an accredited representative working for a Department of Justice-recognized organization can give you legal advice.

If you seek legal counsel, beware of individuals who pose as immigration attorneys (such as unlicensed individuals or disbarred attorneys). The signs of an unethical practitioner may include:

- Promising guaranteed outcomes or money-back guarantees;
- Using predatory or threatening pricing structures;

- Asking you to sign a blank paper or not allowing you to review a paper you have signed; and

- Asking to keep your signature on file.

To protect yourself from potential scams, remember:

- Do not pay for government application forms – forms are free, and you can download them at uscis.gov/forms;

- Ask for a written agreement that describes the services to be provided and is signed by the provider. Read the agreement before signing it, and keep the signed copy for your records;

- Get copies of documents prepared for you; and

- Ask for a written receipt that includes the name and address of the provider.

**USCIS o  icials will never reach out to you directly through social media platforms.** We will only contact you through o  icial government channels. This may include a secure private message to your

Case 6:24-cv-00306-JCB     Document 78-1    Filed 10/19/24    Page 219 of 343 PageID #: 1426

Plaintiffs' Combined MSJ Exhibits - Page 219

myUSCIS account. Report questionable users on social media platforms and see our Report Immigration Scams webpage.

USCIS is committed to protecting the integrity of the immigration system. Individuals committing immigration fraud, including the development and submission of fictitious or altered documents in support of any immigration benefit request, may be found ineligible for this and future benefits and punishable by law. The public may report immigration fraud and abuse through our online tip form.

Visit our Avoid Scams page for more information on how to help safeguard your information and avoid becoming a victim.

Last Reviewed/Updated: 07/17/2024

Plaintiffs' Combined MSJ Exhibits - Page 220

# EXHIBIT 14

10/16/24, 3:38 PM    Medicaid and CHIP Coverage of Lawfully Residing Children & Pregnant Individuals | Medicaid

Case 6:24-cv-00306-JCB    Document 78-1    Filed 10/19/24    Page 221 of 343 PageID #:
1428
Plaintiffs' Combined MSJ Exhibits - Page 221



An official website of the United States government    Here's how you know

# Medicaid.gov
### Keeping America Healthy

Home › Medicaid › Enrollment Strategies › Lawfully Residing Immigrant Children & Pregnant Individuals

# Medicaid and CHIP Coverage of Lawfully Residing Children & Pregnant Individuals

**Additional Resources**

- Overview of Eligibility for Non-Citizens in Medicaid and CHIP

- Lawfully Residing Children and Pregnant Women Eligible for Medicaid and CHIP, National Immigration Law Center

- Facts About Federal Funding for States to Provide Health Coverage to Immigrant Children and Pregnant Women, National Immigration Law Center

- New Option for States to Provide Federally Funded Medicaid and CHIP Coverage to Additional Immigrant Children and Pregnant Women, Kaiser Commission on Medicaid and the Uninsured

The Children's Health Insurance Program Reauthorization Act of 2009 (CHIPRA) included a new option for states to provide Medicaid and CHIP coverage to children and pregnant individuals who are lawfully residing in the United States, including those within their first five years of having certain legal status. Previously, federal law required a 5-year waiting period before many legal immigrants were permitted to enroll in Medicaid and CHIP, although many states offered health coverage to these populations with state-only funds. This coverage may be applied to pregnant individuals in Medicaid and CHIP and/or children up to age 19 for CHIP or up to age 21 for Medicaid who would otherwise be eligible for cove through these programs.

Learn more about providing health coverage to lawfully residing children and pregnant women.

States providing Medicaid or CHIP coverage to lawfully residing children and/or pregnant individuals include:

**State**

Feedback

American Samoa***

## CHIP

## Medicaid
Children and pregnant individuals

## State
Arkansas

## CHIP
Children

## Medicaid
Children and pregnant individuals*

## State
California

## CHIP
Children

## Medicaid
Children and pregnant individuals

## State
Colorado

## CHIP
Children and pregnant individuals

## Medicaid
Children and pregnant individuals*

## State
Connecticut

## CHIP
Children

## Medicaid
Children and pregnant individuals

## State
Commonwealth of the Northern Mariana Islands (CNMI)***

## CHIP

10/16/24, 3:38 Case 6:24-cv-00306-JCB Medicaid and CHIP Coverage of Lawfully Residing Children & Pregnant Individual | Medicaid Page 223 of 343 PageID #: 1430

Plaintiffs' Combined MSJ Exhibits - Page 223

**Medicaid**

Children and pregnant individuals*

**State**

Washington, D.C.***

**CHIP**

**Medicaid**

Children and pregnant individuals

**State**

Delaware

**CHIP**

Children

**Medicaid**

Children and pregnant individuals

**State**

Florida

**CHIP**

Children

**Medicaid**

Children*

**State**

Hawaii***

**CHIP**

**Medicaid**

Children and pregnant individuals*

**State**

Illinois

**CHIP**

Children

**Medicaid**

Children*

**State**

10/16/24, 3:43 PM    Case 6:24-cv-00306-JCB    Document 78-1    Filed 10/10/24    Page 224 of 343 PageID #:
Medicaid and CHIP Coverage of Lawfully Residing Children & Pregnant Individuals | Medicaid
1431
Plaintiffs' Combined MSJ Exhibits - Page 224

Iowa

**CHIP**
Children

**Medicaid**
Children

**State**
Kentucky

**CHIP**
Children and pregnant individuals

**Medicaid**
Children and pregnant individuals*

**State**
Louisiana

**CHIP**
Children

**Medicaid**
Children*

**State**
Maine

**CHIP**
Children

**Medicaid**
Children and pregnant individuals

**State**
Maryland***

**CHIP**

**Medicaid**
Children and pregnant individuals

**State**
Massachusetts

**CHIP**
Children

Feedback

**Medicaid**
Children and pregnant individuals

**State**
Minnesota

**CHIP**
Children

**Medicaid**
Children and pregnant individuals

**State**
Montana

**CHIP**
Children

**Medicaid**
Children*

**State**
Nebraska

**CHIP**
Children

**Medicaid**
Children and pregnant individuals*

**State**
New Jersey

**CHIP**
Children and pregnant individuals

**Medicaid**
Children and pregnant individuals

**State**
New Mexico***

**CHIP**

**Medicaid**
Children and pregnant individuals

Feedback

**State**

New York

**CHIP**

Children

**Medicaid**

Children and pregnant individuals

**State**

Nevada

**CHIP**

Children

**Medicaid**

Children and pregnant individuals*

**State**

North Carolina

**CHIP**

Children

**Medicaid**

Children and pregnant individuals*

**State**

Ohio***

**CHIP**

**Medicaid**

Children and pregnant individuals

**State**

Oregon

**CHIP**

Children

**Medicaid**

Children*

**State**

Pennsylvania

Feedback

10/16/24, 3:35 PM · Case 6:24-cv-00306-JCB · Document 78-1 · Medicaid and CHIP Coverage of Lawfully Residing Children & Pregnant Individuals | Medicaid · Filed 10/10/24 · Page 227 of 343 PageID #: 1434

Plaintiffs' Combined MSJ Exhibits - Page 227

**CHIP**
Children

**Medicaid**
Children and pregnant individuals

**State**
Rhode Island

**CHIP**
Children and pregnant individuals

**Medicaid**
Children*

**State**
South Carolina***

**CHIP**

**Medicaid**
Children and pregnant individuals

**State**
Texas

**CHIP**
Children

**Medicaid**
Children*

**State**
U.S. Virgin Islands***

**CHIP**

**Medicaid**
Children and pregnant individuals

**State**
Utah

**CHIP**
Children

**Medicaid**

10/16/24, 3:45 PM    Case 6:24-cv-00306-JCB    Document 78-1    Filed 10/10/24    Page 228 of 343    PageID #: 1435
Medicaid and CHIP Coverage of Lawfully Residing Children & Pregnant Individuals | Medicaid
Plaintiffs' Combined MSJ Exhibits - Page 228

Children*

**State**

Vermont***

**CHIP**

**Medicaid**

Children and pregnant individuals

**State**

Virginia**

**CHIP**

Children and pregnant individuals

**Medicaid**

Children and pregnant individuals*

**State**

Washington

**CHIP**

Children

**Medicaid**

Children and pregnant individuals

**State**

West Virginia

**CHIP**

Children and pregnant individuals

**Medicaid**

Children and pregnant individuals*

**State**

Wisconsin

**CHIP**

Children

**Medicaid**

Children and pregnant individuals*

**State**

Wyoming

Case 6:24-cv-00306-JCB    Document 78-1    Filed 10/10/24    Page 229 of 343 PageID #: 1436

Plaintiffs' Combined MSJ Exhibits - Page 229

**CHIP**

**Medicaid**

Pregnant individuals

Updated as of May 4, 2023.

\* These states cover children in Medicaid up to age 19.

\*\* Virginia is using an 1115 demonstration to cover pregnant individuals.

\*\*\* These states are CHIP Medicaid expansion programs.

Feedback

Plaintiffs' Combined MSJ Exhibits - Page 230

# EXHIBIT 15

TRENDING:   DONALD TRUMP   DNC DAY 2   JOE BIDEN   MICHELLE OBAMA        SPONSORED:   CONTENT FROM GUARDANT HEALTH

HOUSE

# House outlines immigration provisions in latest Build Back Better package

BY REBECCA BEITSCH - 11/03/21 6:47 PM ET

Share          Post        • • •    More



The latest version of the House's $1.75 trillion social spending package includes immigration provisions that would give up to 10 years of work authorization for undocumented people living in the U.S. — an effort to comply with Senate rules that have killed two previous plans.

The Build Back Better package released by the House on Wednesday does not provide a pathway to citizenship for the estimated 11 million undocumented people already living in the U.S.

It instead relies on a process known as parole to waive immigration requirements for five years for those who have been living in the U.S. prior to 2011. Once approved, beneficiaries could apply for a five-year extension, allowing them to stay in the country until the end of 2031.

It's a bid to appeal to the Senate parliamentarian, who twice has batted down more expansive immigration proposals, arguing they did not meet the budgetary rules that allow the measure to get around a GOP filibuster.

But it leaves open the question of whether House Democrats will be able to wrangle the backing of those who have lobbied for both stronger and weaker immigration provisions.

According to a source familiar with the conversation, Speaker Nancy Pelosi (D-Calif.) quelled any notion that the immigration language would go beyond what the Rules Committee released Wednesday.

That would quash any attempt to insert a change of registry date provision — providing a sort of statute of limitations for those who entered the U.S.

It would also block any more ambitious immigration proposals, an unnerving concept to those who argue the House is negotiating against itself by trying to anticipate what might get blocked in the Senate.

"The responsibility for what happens next is to rest with the Senate. We should not be doing all the lifting, throwing things out, eliminating things on a perceived problem in the Senate or on a perceived risk adverse situation here," said Rep. Raúl Grijalva (D-Ariz.), a member of the Congressional Hispanic Caucus (CHC).

Also at issue is the bill's silence on whether those who receive parole should also be able to access other social services — nixing a provision that would have expressly blocked parolees from receiving such services.

"There are a lot of moderate Democrats that have a problem. They're OK to give people work permits. They're OK to have people move around, but they have a problem with benefits. I personally, I think that if you ask my constituents … do you want to give the illegals benefits, they're going to say no," Rep. Henry Cuellar (D-Texas), another CHC member, told The Hill.

Grijalva said the Republican's victory in the Virginia governor's race may also have put people on alert.

"I understand that some people are concerned about it and feel that their concerns now get magnified after Virginia. They think that this is the bellwether of all times," he said.

"We have to look at it two ways, do you want to not do anything about [immigration]? I don't think we can get away with that either."

Rep. Chuy García (D-Ill.), one of three lawmakers to meet with Pelosi about the bill Wednesday shortly before the text was released, said the broader provisions in the bill should be enough to secure backing for it regardless of any immigration concerns.

"We know that there's a concern among members who, you know, represent Trump districts or a swing district. So that's understandable," he said. "In the grand scheme of things, this is a huge bill that affects people in so many ways. When you consider all of that, immigration reform is such a tiny piece of it. That, I think, that will be a perspective that hopefully will prevail."

But over in the Senate, some leaders seemingly encouraged the House to be more aggressive.

"Last week we were encouraged when the House included provisions to provide a pathway to citizenship for millions of undocumented immigrants. And today, we strongly urge Senate and House leadership to act boldly and continue fighting for the broadest legal protections possible to fully unleash the economic might of the undocumented community," Sens. Bob Menendez (D-N.J.), Catherine Cortez Masto (D-Nev.), Ben Ray Luján (D-N.M.) and Alex Padilla (D-Calif.) said in a statement.

"That's the only way we can fully Build Back Better and transform the lives of millions of hardworking people and their families."

The bill does include visa recapture, preserving some 222,000 unused family-based visas and roughly 157,000 employment-based visas that would otherwise lapse.

The parole provisions, even without a pathway to citizenship, would still provide temporary status, much like that given to "Dreamers" under President Obama. Some would likely be able

Some advocacy groups cheered the legislation's immigration provisions even though they are less ambitious than earlier Senate proposals.

"Immigration relief that provides work permits and deportation protections would transform the lives of millions of families who have lived, worked and contributed to this country for at least a decade. It would allow people who have been living in this country for an average of 20 years basic freedoms, like the ability to work, the security to remain together with their families, and the opportunity to visit loved ones abroad," Todd Schulte, president of Fwd.Us, said in a statement.

"While short of the explicit pathway to citizenship for all 11 million undocumented immigrants which we know is needed and we will continue to fight to achieve, this would be the most significant immigration measure passed by Congress in decades."

*Rafael Bernal contributed.*

TAGS    ALEX PADILLA    BARACK OBAMA    BEN RAY LUJAN    BOB MENENDEZ    BUILD BACK BETTER    CATHERINE CORTEZ MASTO    IMMIGRATION    JERROLD NADLER    NANCY PELOSI

Copyright 2024 Nexstar Media Inc. All rights reserved. This material may not be published, broadcast, rewritten, or redistributed.

SHARE          POST          •••    MORE

SPONSORED CONTENT

Privacy Policy

**Seniors on SS Are Now Entitled To These 12 "Kickbacks" In August (Tap For Full List)**
The-PenniSaver.com | Sponsored          Learn More

**District Of Columbia Drivers: Uncover the Secret to Lower Car Insurance in These Zip Codes**
Forbes | Sponsored          Get Offer

**Amazon's Worst Nightmare: Thousands Canceling Prime for This Clever Hack**
Coupon Code Finder | Sponsored

**Worst Toxic Foods For Dogs: The One Meat You Should Never Feed Your Dog**
Dog Food Exposed | Sponsored

**Flight Attendant Reveals Secret To Fly Business Class For The Price of Economy**
Coupon Code Finder | Sponsored

**People Born Between 1941-1971 Entitled To A Big Surprise**
NationalPenny | Sponsored          Click Here

**This Is The Highest Rated Hearing Aid In The US**
hear.com | Sponsored

**Who normally has the cheapest car insurance?**
Forbes | Sponsored          Get Offer

**Never Do This With An Aging Cat**
Dr. Marty | Sponsored          Watch More

**Cesar Millan Shares The #1 Meat You Should Never Give Your Dog**
Dog Food Exposed | Sponsored

Plaintiffs' Combined MSJ Exhibits - Page 234

# EXHIBIT 16



We are experiencing higher than normal call volumes. During these peak times, you may be offered a callback so you can speak with a coordinator directly. Email response times may take at least 5-7 business days. Thank you for patience!

The University of Texas at Austin
**Texas One Stop**

**MENU**

Texas OneSto

**KEEP LEARNING**

Managing Costs  ›  **Cost & Tuition Rates**

# Cost of Attendance

The cost of attendance (COA) is an estimate of what it costs the typical student to attend UT. Your COA covers both your tuition and basic living expenses, including housing and food, books and supplies, transportation and travel costs and personal expenses. Your COA is also used to create your financial aid package. Small changes to this estimate may or may not result in adjustments to aid depending on Federal/State policies and regulations. UT and other resources may provide financial aid up to your total COA but will not provide financial aid exceeding that amount.



**Find your estimated COA on the Costs and Tuition calculator.  ›**

## 2024-2025 Estimated Costs

The figures below outline the estimated cost of attendance for undergraduate and graduate students to attend UT during the 2024-25 academic year. The tuition amounts listed are based on Fall 2023-Spring 2024, as Fall 2024-Spring 2025 tuition rates are not final at this time. Should the Board of Regents approve tuition increases for the 2024-25 academic year, the rates on this page will be updated. Small changes to the estimate may or may not result in adjustments to aid depending on Federal/State policies and regulations.

Fall & Spring Semesters for Full-Time Undergraduate                                              ›

Fall & Spring Semesters for Full-Time Graduate                                                    ›

## 2023-2024 Estimated Costs

The figures below outline the estimated cost of attendance for undergraduate and graduate students based on a nine-month academic year. Small changes to the estimate may or may not result in adjustments to aid depending on Federal/State policies and regulations.

| Fall & Spring Semesters for Full-Time Undergraduate | ❯ |
| --- | --- |

| Fall & Spring Semesters for Full-Time Graduate | ❯ |
| --- | --- |

| Summer Undergraduate | ❯ |
| --- | --- |

| Summer Graduate | ❯ |
| --- | --- |

## Longhorn Fixed Tuition

Longhorn Fixed Tuition is an optional tuition program **available only to undergraduate students enrolling at UT for the first time**. Longhorn Fixed Tuition rates remain the same for four consecutive academic years. The rates are guaranteed each semester the student is enrolled during this period. Fixed tuition rates are higher than traditional rates because they are based on the projected average flat rate tuition over the next four years.

Undergraduate students may be eligible for a tuition rebate of up to $1,000, and students enrolled in the Longhorn Fixed Tuition program are eligible for an additional $2,500 rebate. Eligible students are required to apply for a tuition rebate prior to graduation.

### How to Enroll in Longhorn Fixed Tuition

To enroll in the Longhorn Fixed Tuition program, go to the Enrollment page and sign the electronic agreement. If you are younger than 18 years old or do not have an upgraded UT EID, you may download the agreement, print, manually sign and return it to Student Accounts Receivable.

**You must enroll by the 12th class day (fourth class day of a summer session) of your first semester in attendance to participate in Longhorn Fixed Tuition. Changes to the selection must be made by the 12th class day.**

Students who do not enroll in the Longhorn Fixed Tuition program will default to the traditional flat rate tuition.

### Rebate Eligibility Requirements

- Resident and nonresident undergraduate students may be eligible for the rebate if they are enrolled in the Longhorn Fixed Tuition program.

- Student must have attempted no more than three semester credit hours in excess of the minimum number of semester credit hours required to complete the degree under the catalog which they graduate.

- Students who want to receive the rebate must graduate within four calendar years for a four-year degree program or within five calendar years if the degree requires more than four years to complete.

- Student must complete at least 60 semester credit hours of coursework counted toward the degree in residence.

- Student must not have already received a bachelor's degree.

- A student is required to apply for a tuition rebate prior to graduation.

## Net Price Calculator

Use the Net Price Calculator below to get an estimate on the amount of financial aid you may receive.

| Net Price Calculator |
| --- |

*Disclaimer: This information is provided for informational purposes only. Inclusion does not constitute endorsement. Neither the Office of Scholarships and Financial Aid nor The University of Texas at Austin can guarantee the accuracy or the timeliness of information found at the link above. It is critical that students verify information, particularly where deadlines are concerned.*

**BACK TO TOP ⌃**

Case 6:24-cv-00306-JCB    Document 78-1    Filed 10/19/24    Page 237 of 343 PageID #: 1444

Plaintiffs' Combined MSJ Exhibits - Page 237

# Still Need Help?

**We're here for you.**

**VISIT**

Hours of Operation
Monday–Tuesday, Thursday-Friday: 8:30 a.m.– 4:30 p.m.
Wednesday: 9:00 a.m.– 4:30 p.m.

  **Visit Texas One Stop ›**

MAI 1 (Ground Floor of UT Tower)
110 Inner Campus Dr.
Austin, TX 78712

**CALL**

(512) 232-6988 (myUT)

Hours of operation for phone calls are Monday-Tuesday, Thursday-Friday 8:30 a.m.- 5:00 p.m., Wednesday 9:00 a.m.-5:00 p.m. Call volumes may be higher during peak times.

  📞 **Call Us**

**EMAIL**

onestop@utexas.edu
Email response times may take 5-7 business days.

✉ **email**

**FEEDBACK**

  ⬈ **feedback survey**



| CONTACT | SMS Terms and Conditions |
| MY UT | Web Privacy Policy |
| MY FINANCIAL AID | Web Accessibility |
| CODE OF CONDUCT | Consumer Information Disclosures |
| POLICIES | Further Information and Disclosures |
| EMERGENCY INFORMATION | utexas.edu |
| FAFSA #003658 | |

  

Plaintiffs' Combined MSJ Exhibits - Page 239

# EXHIBIT 17

Plaintiffs' Combined MSJ Exhibits - Page 240

# Cost of Attendance

The estimated total cost of attendance for attending University of Idaho for one academic year (two semesters) is outlined below. It is important to understand these figures are an estimate based on a student's financial aid eligibility and information known. Costs may vary based on individual circumstances.

## University of Idaho Costs and Tuition for 2024-25

| | |
|---|---|
| Undergraduate 2024-25 | + |
| Graduate 2024-25 | + |
| Law 2024-25 | + |

1. **Living expenses** are estimated costs students may anticipate for housing and meals. Actual costs may vary; the figure above is based on an estimated median of housing and meal plan options offered on campus. Students who live with their parents or in Boise may have different housing and meal costs.

2. **Books, Course Materials, Supplies and Equipment** refer to textbooks and other school supplies needed for coursework. These are estimated costs for a full-time student for one academic year.

3. **Transportation**: Actual costs for a student vary greatly depending on factors such as the need for transportation to a job or internship and how far a student must travel to get home on school breaks.

4. **Miscellaneous and personal expenses** include items such as clothing, health insurance, special course fees, federal loan fees, personal care products, laundry, etc. These items are considered indirect costs and will vary for each student.

If you have questions and/or comments about financial aid and the cost of attendance, please contact Student Financial Aid Services.

If you have questions and/or comments about tuition and fees charges on your account, please contact the Student Accounts and Cashier's Office.

Plaintiffs' Combined MSJ Exhibits - Page 241

## Net Price Calculator

Want your estimated financial aid award offer? Use our Net Price Calculator with your personal information to see your U of I cost of attendance, including potential grants, scholarships and more.

**GET STARTED**

Plaintiffs' Combined MSJ Exhibits - Page 242

# EXHIBIT 18

Plaintiffs' Combined MSJ Exhibits - Page 243

# Cost of Attendance

Many factors contribute to your education budget, and we're here to help. On this page you will find:

- Cost of attendance estimator
- Types of expenses
- Resident tuition, scholarships and other costs
- Nonresident tuition, scholarships and other costs

Figures on this page offer average costs for full-time undergraduate students with adjustments for automatic scholarships. Additional scholarships, grants and other types of aid are available through our Financial Aid office.

## Cost of Attendance Estimator

The Cost of Attendance Estimator is a tool students can use to estimate tuition and fees for the school year. Boise State offers a calculator to help students and families prepare financially to make a college decision. Get an estimate today!

## Types of Expenses

Your education budget will likely depend on a lot of factors. Some fees are paid directly to Boise State, but you are able to choose the extent of your indirect costs. Will you pedal around our bike-friendly campus, or would you rather

bring a car? Which off-campus housing amenities would you like? Tables on this page contain direct costs, average indirect costs, and adjustments for automatic scholarships in their estimates.

## Direct Costs

- Tuition and Fees

- Food and Housing (on-campus)

## Indirect Costs

- Books and Supplies

- Food and Housing (off-campus)

- Meals Away From Home

- Transportation

- Personal and Miscellaneous

## Automatic Scholarships

- Resident Scholarships

- Nonresident Scholarships

Plaintiffs' Combined MSJ Exhibits - Page 245

# Resident Tuition and Automatic Scholarships

This table details estimated full-time (12-16 credits) tuition and fees for the 2024-2025 year with and without the Boise State automatic resident scholarships included. Estimated amounts are based on direct costs that are subject to change.

| Expense Type | No Scholarship | True Blue Promise Scholarship | Dean's Scholarship | Presidential Scholarship |
|---|---|---|---|---|
| Tuition and Fees | $9,048 | $9,048 | $9,048 | $9,048 |
| Scholarship Award | $0 | $2,000/year for 4 years | $2,500/year for 4 years | $3,000/year for 4 years |
| Total | $9,048 | $7,048 | $6,548 | $6,048 |

# Other Resident Costs

This table details average estimated full-time (12-16 credits) expenses for the 2024-2025 year for students with Idaho residency living on-campus, off-campus, and with their parent(s). Estimated amounts are based on direct and indirect costs that are subject to change.

| Expense Type | On-Campus | Off-Campus | Living with Parent(s) |
|---|---|---|---|
| Books and Supplies | $800 | $800 | $800 |

| Expense Type | On-Campus | Off-Campus | Living with Parent(s) |
|---|---|---|---|
| **Average Food and Housing** | $14,884 | $13,634 | $6,482 |
| **Transportation** | $2,808 | $2,900 | $2,256 |
| **Personal and Misc.** | $3,652 | $3,652 | $3,652 |
| **Total** | **$22,144** | **$20,986** | **$13,190** |

# Nonresident Tuition and Automatic Scholarships

This table details estimated full-time (12-16 credits) tuition and fees for the 2024-2025 year with and without the Boise State automatic nonresident scholarships included. Estimated amounts are based on direct costs that are subject to change.

| Expense Type | No Scholarship | Ridgeline Scholarship | Summit Scholarship | Western Undergraduate Exchange (WUE) |
|---|---|---|---|---|
| **Tuition and Fees** | $27,788 | $27,788 | $27,788 | $27,788 |
| **Scholarship Award** | $0 | $5,000/year for 4 years | $10,000/year for 4 years | $15,680/year for 4 years |
| **Total** | **$27,788** | **$22,788** | **$17,788** | **$12,108** |

Plaintiffs' Combined MSJ Exhibits - Page 247

# Other Nonresident Costs

**This table details average estimated full-time (12-16 credits) expenses for the 2024-2025 year for students without Idaho residency living on-campus, off-campus, and with their parent(s). Estimated amounts are based on direct and indirect costs that are subject to change.**

| Expense Type | On-Campus | Off-Campus | Living with Parent(s) |
|---|---|---|---|
| **Books and Supplies** | $800 | $800 | $800 |
| **Average Food and Housing** | $14,884 | $13,634 | $6,482 |
| **Transportation** | $3,154 | $2,724 | $2,256 |
| **Personal and Misc.** | $3,652 | $3,652 | $3,652 |
| **Total** | **$22,490** | **$20,810** | **$13,190** |

**Need-based, merit-based and federal student aid**

# FINANCIAL AID

Plaintiffs' Combined MSJ Exhibits - Page 248

## Additional Scholarships

## Types of Aid

## Contact the Financial Aid Office

**BOISE STATE ADMISSIONS**

admissions@boisestate.edu

+1 (208) 426-1156

1910 University Dr. Boise, 83725-1320

**FOLLOW US**



Plaintiffs' Combined MSJ Exhibits - Page 249

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |
|---|---|
| STATE OF TEXAS, et al., | ) |
| | ) |
| *Plaintiffs,* | ) |
| | ) |
| v. | ) |
| | ) Civil Action No. 6:24-cv-0306 |
| U.S. DEPARTMENT OF HOMELAND SECURITY, et al., | ) |
| | ) |
| *Defendants.* | ) |

**DEFENDANTS' SUPPLEMENTAL REPONSES AND OBJECTIONS
TO PLAINTIFFS' FIRST SET OF JURISDICTIONAL
REQUESTS FOR PRODUCTION, INTERROGATORIES, AND
REQUESTS FOR ADMISSION**

1

Pursuant to Federal Rules of Civil Procedure 33, 34, 36 Defendants hereby submit supplemented objections and responses to Plaintiffs' First Set of Discovery Requests.

Defendants' responses and objections are based on the information known to Defendants at this time and are made without prejudice to supplement these responses should additional responsive information be discovered. By answering any request, Defendants do not concede the materiality of the subject matter to which it refers. Defendants' responses are made expressly subject to, and without waiving or intending to waive, any questions, or objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence or for any other purpose, of any of the documents or information provided, or of the subject matter thereof, in any proceeding including any trial of this action or any subsequent proceeding. Inadvertent production of any document or information which is privileged, was prepared in anticipation of litigation, or is otherwise immune from discovery, shall not constitute a waiver of any privilege or other ground for objecting to discovery with respect to that document or any other document, or its subject matter, or the information contained therein, or of Defendants' right to object to the use of any such document or the information contained therein during any proceeding in this litigation or otherwise.

## OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Defendants object to the "relevant dates for each Discovery Requests" in Definition and Instruction No. 5 as overbroad and thus unduly burdensome and not proportionate to the needs of the case, because the date range includes time periods before August 19, 2024, when the Keeping Families Together ("KFT") parole process was implemented. Defendants also object to Instruction No. 4 as it includes text messages and emails in the definition of the term "document" as over broad, not proportionate to the needs of this case and the limited, expedited discovery the Court

set. *See* ECF No. 27. Further, Defendants object to the inclusion of text messages and emails to the extent Plaintiffs seek internal documents that contain confidential attorney-client communications, documents not subject to discovery under the attorney-client or attorney-work product privileges.

## RESPONSES TO REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1

Produce all checklists, lesson plans, manuals, guidance, slide presentations, memos, emails, or training materials used to implement or administer the PIP Program.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 1

Defendants object to Request for Production No. 1 on the grounds that it is overbroad, unduly burdensome and disproportionate to the needs of the case, and is outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7 ("It also appears to the court that, just as initial disclosures are dispensed with, no other discovery is necessarily occasioned by plaintiffs' causes of action … any discovery on factual matters related to standing can reasonably be conducted within a short time…"). As this Request for Production does not seek information that is relevant to Plaintiff Texas's standing, Defendants object.

Defendants also object on the grounds that Plaintiffs' challenge to the Keeping Families Together ("KFT") parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any documents would be deliberative in nature and therefore privileged and not subject to discovery. *See Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001). To the extent Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney-work product privileges. *Mead Data Central,*

*Inc. v. Department of the Air Force*, 566 F.2d 242, 254 (D.C. Cir. 1977) (explaining attorney-client and attorney work-product privileges).

Based on these objections, Defendants will not be searching for and/or producing responsive documents, if any, in response to this Request.

## REQUEST FOR PRODUCTION NO. 2

Produce all documents related to the following statement in the Notice about the Paperwork Reduction Act: "USCIS has submitted, and OMB has approved, the request for emergency authorization of the new Form I–131F (under 5 CFR 1320.13) for a period of 6 months." 89 Fed. Reg. 67,489.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 2

Defendants object to Request for Production No. 2 on the grounds that it is vague as to what Plaintiffs mean by "related to," overbroad, and outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7. As this Request for Production does not seek information that is relevant to Plaintiff Texas's standing, Defendants object.

Defendants also object on the grounds that Plaintiffs' challenges to the OMB authorization and to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain

5

confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges. Additionally, Defendants object to the extent the documents sought are publicly available. Documents equally accessible to all parties are not discoverable.

Based on these objections, Defendants will not be searching for and/or producing responsive documents specifically in response to this Request. However, subject to, and without waiving or in any way limiting these objections, Defendants refer Plaintiffs to the certified administrative record ("CAR") at pages Bates stamped 03915-3932 and 04271-4280, and the OMB certified administrative record ("OMB CAR") at OMB00001-119, and to documents made publicly available at https://www.reginfo.gov/public/do/PRAViewDocument?ref_nbr=202407-1615-002.

## REQUEST FOR PRODUCTION NO. 3

Produce all documents issued by any directorate or official at USCIS related to the implementation or administration of the PIP Program.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 3

Defendants object to Request for Production No. 3 on the grounds that it is overbroad as it seeks "all documents" issued by "any directorate or official at USCIS" without limitation, vague as to who Plaintiffs define as a "directorate or official" at USCIS, and outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7. As this Request for Production does not seek information that is relevant to Plaintiff Texas's standing, Defendants object.

Defendants also object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district

6

court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges.

Based on these objections, Defendants will not be searching for and/or producing responsive documents specifically in response to this Request.

## REQUEST FOR PRODUCTION NO. 4

Produce all documents issued by USCIS relating to how determinations are to be made regarding the use of the parole authority and standards for determining "urgent humanitarian reasons" or "significant public benefit" under 8 U.S.C. § 1182(d)(5)(A) in the PIP Program.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 4

Defendants object to Request for Production No. 4 on the grounds that it is vague by what is meant by "how determinations are to be made," overbroad, and outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7. As this Request for Production does not seek information that is relevant to Plaintiff Texas's standing, Defendants object.

Defendants also object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing

court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges.

Based on these objections, Defendants will not be searching for and/or producing responsive documents specifically in response to this Request. However, subject to, and without waiving or in any way limiting these objections, Defendants refer Plaintiffs to the CAR at 00001-2, 00375-394, 00481, 00801-804, 01037-1155, 03082-3087, 03100-3108, 04306-4347, 04614-4674.

**REQUEST FOR PRODUCTION NO. 5**

Produce all documents related to crime rates of, or criminal activity by, PIP Program beneficiaries or potential beneficiaries, including in which State any criminal activity occurred.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 5**

Defendants object to Request for Production No. 5 on the grounds that it is vague as to what is meant by "crime rates" and "criminal activity" as well as "beneficiaries" or "potential beneficiaries," overbroad, and beyond the scope of the parties' discovery stipulation which limited standing to Texas only. *See* ECF No. 36.

Defendants also object on the grounds that this Request is unduly burdensome in the context of expedited discovery, even if limited to KFT parole process applicants who reside in Texas, as obtaining this information would require Defendants to run each individual through the

requisite databases in order to provide a response to this Request. Additionally, to the extent Plaintiffs say they are not seeking "personal information of any particular alien," Instruction No. 8, Defendants object to this Request to the extent is seeks information about individual noncitizens, or would require personal information of individual noncitizens to provide a response. Defendants further object on the grounds that this request seeks information related to criminal activity and crime rates in the Plaintiff states, and thus is information more available to Plaintiffs.

Defendants also object to this Request as outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court, *see* Docket No. 27 at 7, as well as to the merits, to the extent it seeks "crime rates" and "criminal activity" relating to those who may have applied for, but have not been granted and/or are ineligible for parole under the KFT parole process.

Based on these objections, Defendants will not be searching for and/or producing responsive documents, if any, in response to this Request.

## REQUEST FOR PRODUCTION NO. 6

Produce all documents related to reduction of wages or displacement of American workers caused by PIP Program beneficiaries or potential beneficiaries, or any estimates of these effects.

## RESPONSE TO REQUEST FOR PRODUCTION NO. 6

Defendants object to Request for Production No. 6 on the grounds that it is vague as to what is meant by "caused by PIP Program beneficiaries or potential beneficiaries," overbroad, and beyond the scope of the parties' discovery stipulation which limited standing to Texas only. *See* ECF No. 36. And, to the extent Plaintiffs are seeking information considered by Defendants in creating the KFT parole process, Defendants object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the

9

APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges. Defendants further object on the grounds that this request seeks information related to purported injury to Plaintiffs, and thus is information more available to Plaintiffs. Defendants further object on the grounds that this request seeks information related to purported impacts on wages and workers in the Plaintiff States, and thus is information equally available to Plaintiffs.

Subject to, and without waiving or in any way limiting these objections, Defendants refer Plaintiffs to the CAR 00108-170, 00293-324, 00734-762, 00831-920, 00928-997, 01187-1260, 02031-2047, 02112-2117, 02172-2243, 02324-2966, 04368-4421, and 04614-4645.

## REQUEST FOR PRODUCTION NO. 7

Produce all documents related to forecasted or actual use of public education by PIP Program beneficiaries or potential beneficiaries.

## RESPONSE TO REQUEST FOR PRODUCTION NO.7

Defendants object to Request for Production No. 7 on the grounds that it is vague as to what is meant by "use of public education by PIP Program beneficiaries or potential beneficiaries," overbroad, and beyond the scope of the parties' discovery stipulation which limited standing to

Texas only. *See* ECF No. 36. And, to the extent Plaintiffs are seeking information considered by Defendants in creating the KFT parole process, Defendants object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges. Defendants further object on the grounds that this request seeks information related to purported public education provided in and by the Plaintiff States, and thus is information more available to Plaintiffs.

Subject to, and without waiving or in any way limiting these objections, Defendants refer Plaintiffs to the CAR at 00261-284, 02031-2047, 02161-2179, 04550-4613, and 04634 4642.

**REQUEST FOR PRODUCTION NO. 8**

Produce all documents related to or conveying estimates of how many (whether numerical estimates, percentage estimates, or otherwise) PIP Program eligible aliens the Defendants anticipated would be separated from their families (whether because they voluntarily left the United States or because they were removed); would leave the United States accompanied by their families; or would otherwise leave the country in the absence of the PIP Program.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 8**

Defendants object to Request for Production No. 8 on the grounds that it is vague, calls for information not in the possession or control of Defendants, and to the extent it seeks documents outside the scope of the limited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27. Defendants also object because this Request goes beyond the scope of the parties' discovery stipulation which limited standing to Texas only. *See* ECF No. 36. And, to the extent Plaintiffs are seeking information considered by Defendants in creating the KFT parole process, Defendants object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges.

Subject to, and without waiving or in any way limiting these objections, Defendants have no documents specifically responsive to this request.

## REQUEST FOR PRODUCTION NO. 9

Produce all documents consulted in making determinations of eligibility for the PIP Program and documents sufficient to demonstrate what factors were considered when making those determinations.

12

**RESPONSE TO REQUEST FOR PRODUCTION NO. 9**

Defendants object to Request for Production No. 9 on the grounds that it is vague, overbroad, and outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7. As this Request for Production does not seek information that is relevant to Plaintiff Texas's standing, Defendants object.

Defendants also object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges.

Based on these objections, Defendants will not be searching for and/or producing responsive documents specifically in response to this Request. However, subject to, and without waiving or in any way limiting these objections, Defendants refer Plaintiffs to the CAR at 03915-3918, 04281-4288, and 04614-4645.

**REQUEST FOR PRODUCTION NO. 10**

Produce all documents analyzing the burden on States imposed by the creation, implementation, and operation of the PIP Program.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 10**

Defendants object to Request for Production No. 10 on the grounds that it is vague as to what Plaintiffs mean by "analyzing the burden," overbroad, and beyond the scope of the parties' discovery stipulation which limited standing to Texas only. *See* ECF No. 36. And, to the extent Plaintiffs are seeking information considered by Defendants in creating the KFT parole process, Defendants also object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges. Defendants further object on the grounds that this request seeks information related to purported burdens on the Plaintiff States, and thus is information more available to Plaintiffs.

Subject to, and without waiving or in any way limiting these objections, Defendants refer Plaintiffs to the CAR 00261-284, 04614-4645, and 04648-4674.

**REQUEST FOR PRODUCTION NO. 11**

Produce all documents related to the processing time for individual aliens approved or denied under the PIP Program.

**RESPONSE TO REQUEST FOR PRODUCTION NO. 11**

Defendants object to Request for Production No. 11 on the grounds that it is vague as to what is meant by "processing time," overbroad, and outside the scope of the limited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27, at 7. As this Request for Production does not seek information that is relevant to Plaintiff Texas's standing, Defendants object.

Defendants also object on the grounds that Plaintiffs' challenge to the KFT parole process must be governed by review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that any such documents would be deliberative in nature and therefore privileged and not subject to discovery. To the extent that Plaintiffs seek internal documents that contain confidential attorney-client communications, Defendants further object that any such documents are not subject to discovery under the attorney-client or attorney work-product privileges.

Subject to and notwithstanding these objections, and limiting this request to documents which show processing times for applications adjudicated to date, Defendants state that there are no existing documents responsive to this request.

**REQUEST FOR PRODUCTION NO. 12**

Produce all documents consulted or relied upon in responding to Interrogatories No. 1–12 and Requests for Admission No. 1–18.

15

## RESPONSE TO REQUEST FOR PRODUCTION NO. 12

Defendants object to Request for Production No. 12 on the grounds that it is overly broad and unduly burdensome to the extent it seeks productions of entire databases that are used to obtain data to answer any Interrogatory, as such data would go beyond any information that is relevant to Plaintiff Texas's standing and would be overly burdensome to produce, and thus and disproportionate to the needs of the case. Defendants will not produce any screenshots or documents generated by databases in response to this document request. Defendants also object to this Request to the extent it seeks internal pre-decisional documents protected by the deliberative process privilege, internal documents that contain confidential attorney-client communications protected by the attorney-client or attorney work-product privileges, and any internal documents created for the purposes of responding to the Interrogatories that are protected from disclosure under the work product doctrine.

<div align="center">**RESPONSES TO INTERROGATORIES**</div>

**INTERROGATORY NO. 1**

Identify for each day starting on August 19, 2024, through September 16, 2024, the number of PIP Program applications received, adjudicated, approved, denied, pending, granted employment authorization, and denied employment authorization, providing numbers for each day on a national basis, as well as for Texas.

**RESPONSE TO INTERROGATORY NO. 1**

Defendants object to Interrogatory No. 1 on the grounds that it is overly broad and exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. The Interrogatory is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures. Defendants further object to this Interrogatory as overly broad and unduly burdensome in that it requests information through September 16, 2024, when a response to these requests is required by September 3, 2024, and when Defendants must obtain data from before that date in order to prepare a response to be served by September 3, 2024. Accordingly, Defendants will limit their response to aggregate data obtained from their systems as of August 30, 2024, at 6:30 p.m. EDT.

Defendants further object to the Interrogatory as vague because it is not clear what information is sought about employment authorizations, and is overly broad and thus disproportionate to the needs of the case to the extent it seeks information applications for employment authorization that are not based on a grant of parole under the KFT parole process. Defendants will limit their response to employment authorization applications that are based on a grant of parole under the KFT parole process.

Subject to and without waiving these objections, Defendants respond as follows:

Defendants refer Plaintiffs to the following chart showing data as to Texas from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect overall totals for applicants who listed a physical address in Texas, regardless of benefit request type (Spouse of a USC/Stepchild of a USC):

| Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|
| 7,672 | 0 | 0 | 0 | 7,672 | 0 | 0 |

Defendants also refer Plaintiffs to the following chart showing nationwide data from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect overall totals for applicants, regardless of benefit request type (Spouse of a USC/Stepchild of a USC):

| Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|
| 45,085 | 8 | 8 | 0 | 45,077 | 0 | 0 |

**INTERROGATORY NO. 2**

Identify the daily number of minors for each of your answers to Interrogatory No. 1, providing numbers for each day on a national basis, as well as for Texas.

**RESPONSE TO INTERROGATORY NO. 2**

Defendants object to Interrogatory No. 2 on the grounds that it is overly broad and exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. The Interrogatory is also overly broad and unduly burdensome and

18

disproportionate to the needs of this case to the extent it requests daily figures. Defendants further object to this Interrogatory as overly broad and unduly burdensome in that it requests information through September 16, 2024, when a response to these requests is required by September 3, 2024, and when Defendants must obtain data from before that date in order to prepare a response to be served by September 3, 2024. Accordingly, Defendants will limit their response to aggregate data obtained from their systems as of August 30, 2024, at 6:30 p.m. EDT.

Subject to and without waiving these objections, Defendants respond as follows:

Defendants refer Plaintiffs to the following chart showing data as to Texas from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect applicants under 18 years old as of August 30, 2024, who listed a physical address in Texas by benefit request type:

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 1 | 0 | 0 | 0 | 1 | 0 | 0 |
| Stepchild of a USC | 37 | 0 | 0 | 0 | 37 | 0 | 0 |
| **TOTAL** | **38** | **0** | **0** | **0** | **38** | **0** | **0** |

Defendants also refer Plaintiffs to the following chart showing nationwide data from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect applicants under 18 years old as of August 30, 2024 by benefit request type:

19

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 11 | 0 | 0 | 0 | 11 | 0 | 0 |
| Stepchild of a USC | 151 | 0 | 0 | 0 | 151 | 0 | 0 |
| **TOTAL** | **162** | **0** | **0** | **0** | **162** | **0** | **0** |

### INTERROGATORY NO. 3

Identify the daily number of spouses of U.S. citizens for each of your answers to Interrogatory No. 1, providing numbers for each day on a national basis, as well as for Texas.

### RESPONSE TO INTERROGATORY NO. 3

Defendants object to Interrogatory No. 3 on the grounds that it is overly broad and exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. The Interrogatory is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures. Defendants further object to this Interrogatory as overly broad and unduly burdensome in that it requests information through September 16, 2024, when a response to these requests is required by September 3, 2024, and when Defendants must obtain data from before that date in order to prepare a response to be served by September 3, 2024. Accordingly, Defendants will limit their response to aggregate data obtained from their systems as of August 30, 2024, at 6:30 p.m. EDT.

Subject to and without waiving these objections, Defendants respond as follows:

Defendants refer Plaintiffs to the following chart showing data as to Texas from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect total applicants who listed a physical address in Texas by benefit request type:

20

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 7,575 | 0 | 0 | 0 | 7,575 | 0 | 0 |
| Stepchild of a USC | 97 | 0 | 0 | 0 | 97 | 0 | 0 |
| **TOTAL** | **7,672** | **0** | **0** | **0** | **7,672** | **0** | **0** |

Defendants also refer Plaintiffs to the following chart showing nationwide data from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect total applicants by benefit request type:

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 44,676 | 8 | 8 | 0 | 44,668 | 0 | 0 |
| Stepchild of a USC | 409 | 0 | 0 | 0 | 409 | 0 | 0 |
| **TOTAL** | **45,085** | **8** | **8** | **0** | **45,077** | **0** | **0** |

## INTERROGATORY NO. 4

For each of your answers to Interrogatory No. 1, identify the number of such aliens in removal proceedings, providing numbers for each day on a national basis, as well as for Texas.

## RESPONSE TO INTERROGATORY NO. 4

Defendants object to Interrogatory No. 4 on the grounds that it is overly broad and exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. Accordingly, Defendants initial data collection pertained to applications received from those who listed a physical address in Texas on the Form I-131F, and the response to this Interrogatory is thus so limited given the expedited discovery schedule. The Interrogatory is also overly broad and unduly burdensome and disproportionate to the needs of this case to the

extent it requests daily figures. Defendants further object to this Interrogatory as overly broad and unduly burdensome in that it requests information through September 16, 2024, when a response to these requests is required by September 3, 2024, and when Defendants must obtain data from before that date in order to prepare a response to be served by September 3, 2024. Accordingly, Defendants will limit their response to aggregate data obtained from their systems as of August 30, 2024 at 6:30 p.m. EDT.

The request is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures. Defendants further object on the grounds that "in removal proceedings" is vague and ambiguous. Defendants further object to this interrogatory as unduly burdensome because, depending on the definition of removal proceedings, this information is not kept in electronically searchable form and would require a manual review of files based on Alien registration number ("A-number"). Defendants thus object to this interrogatory as unduly burdensome and not proportionate to the needs of the case given the expedited discovery schedule, to the extent it seeks information about applicants who did not provide an A-number on their Form I-131F.

Defendants further object to this Interrogatory as overly broad and outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7, to the extent it seeks information about noncitizens who are in removal proceedings and have not been granted or denied parole under the KFT parole process.

Subject to and without waiving these objections and limiting the request to noncitizens who listed a physical address in Texas, Defendants respond as follows: As of August 30, 2024, 7,672 applicants listed Texas as their physical address. Of these, 7,223 provided an A-number with their

22

application. As of September 8, 2024, of the 7,223 applicants who provided an A-number, 456 were in removal proceedings.[1]

## INTERROGATORY NO. 5

For each of your answers to Interrogatory No. 1, identify the number of such aliens for whom orders of removal had been issued, providing numbers for each day on a national basis, as well as for Texas.

## RESPONSE TO INTERROGATORY NO. 5

Defendants object to Interrogatory No. 5 on the grounds that it is overly broad and exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. Accordingly, Defendants will limit their response to this Interrogatory to information concerning applications received from those who list a physical address in Texas on the Form I-131F. The Interrogatory is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures. Defendants further object to this Interrogatory as overly broad and unduly burdensome in that it requests information through  September 16, 2024, when a response to these requests is required by September 3, 2024, and when Defendants must obtain data from before that date in order to prepare a response to be served by September 3, 2024. Accordingly, Defendants will limit their response to aggregate data obtained from their systems as of August 30, 2024 at 6:30 p.m. EDT.

The request is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures. Defendants further object to this Interrogatory as unduly burdensome because this information is not kept in electronically searchable form and would require a manual review of files based on A-number and therefore would be unduly

---

[1] "In Removal proceedings" for the purpose of this data is defined as having an active case in EOIR's system and an open/active case in ICE ERO's system.

burdensome to conduct such a review in order to response given the expedited discovery schedule set by the Court. *See* ECF No. 27. Defendants further object to this Interrogatory on the grounds that "for whom orders of removal had been issued" is vague and ambiguous, as well as overbroad. For example, this term could include those who have removal orders that are not yet administratively final, or that were previously issued by immigration judges but were overturned on appeal or on petitions for review or otherwise vacated.

Defendants further object to this Interrogatory as overly broad and outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7, to the extent it seeks information about noncitizens who have outstanding removal orders and have not been granted or denied parole under the KFT parole process. Accordingly, Defendants will limit their response to this Interrogatory to those whose requests have been adjudicated.

Subject to and without waiving these objections, and limiting the request to noncitizens in Texas, granted parole under the KFT parole process, the answer is zero.

## INTERROGATORY NO. 6

For all of the aliens included in the numbers reported for your answers to Interrogatory 1, identify for each Plaintiff State the number of such aliens who listed an address of residence in each State.

## RESPONSE TO INTERROGATORY NO. 6

See objections and response to Interrogatory No. 1.

## INTERROGATORY NO. 7

For each of your answers to Interrogatory No. 1, identify the number of such aliens who have ever submitted a Form I-601A, Application for Provisional Unlawful Presence Waiver, providing numbers for each day on a national basis, as well as for Texas.

## RESPONSE TO INTERROGATORY NO. 7

Defendants object to Interrogatory No. 7 on the grounds that it is overly broad and exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. The Interrogatory is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures. Defendants further object to this Interrogatory as overly broad and unduly burdensome in that it requests information through September 16, 2024, when a response to these requests is required by September 3, 2024, and when Defendants must obtain data from before that date in order to prepare a response to be served by September 3, 2024. Accordingly, Defendants will limit their response to aggregate data obtained from their systems as of August 30, 2024, at 6:30 p.m. EDT. The request is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures.

Subject to and without waiving these objections, Defendants respond as follows:

Defendants refer Plaintiffs to the following chart showing data as to Texas from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect applicants who have ever submitted an I-601A who listed a physical address in Texas by benefit request type:

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 2,452 | 0 | 0 | 0 | 2,452 | 0 | 0 |
| Stepchild of a USC | 9 | 0 | 0 | 0 | 9 | 0 | 0 |
| **TOTAL** | **2,461** | **0** | **0** | **0** | **2,461** | **0** | **0** |

Defendants also refer Plaintiffs to the following chart showing nationwide data from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect applicants who have ever submitted an I-601A by benefit request type:

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 15,155 | 3 | 3 | 0 | 15,152 | 0 | 0 |
| Stepchild of a USC | 46 | 0 | 0 | 0 | 46 | 0 | 0 |
| **TOTAL** | **15,201** | **3** | **3** | **0** | **15,198** | **0** | **0** |

## INTERROGATORY NO. 8

For each of the daily totals reported in Interrogatory No. 1, identify the number of such aliens whose Application for Provisional Unlawful Presence Waiver have ever been denied, providing numbers for each day on a national basis, as well as for Texas.

## RESPONSE TO INTERROGATORY NO. 8

Defendants object to Interrogatory No. 8 on the grounds that it is overly broad and exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. The request is also overly broad and unduly burdensome and disproportionate to the needs of this case to the extent it requests daily figures.

Defendants further object to this Interrogatory as outside the scope of the limited, expedited discovery into Plaintiffs' standing ordered by the Court. *See* Docket No. 27 at 7, to the extent it seeks information about noncitizens who have had applications for Provisional Unlawful Presence Waivers denied but who have not been granted parole under the KFT parole process. Accordingly,

Defendants will limit their response to this Interrogatory to those applicants with a physical address in Texas who have been granted parole.

Subject to and without waiving these objections, Defendants respond as follows:

Defendants refer Plaintiffs to the following chart showing data as to Texas from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect applicants who have had an I-601A denied who listed a physical address in Texas by benefit request type:

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 132 | 0 | 0 | 0 | 132 | 0 | 0 |
| Stepchild of a USC | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| TOTAL | 132 | 0 | 0 | 0 | 132 | 0 | 0 |

Defendants also refer Plaintiffs to the following chart showing nationwide data from August 19, 2024, through and including August 30, 2024, at 6:30 p.m. EDT. This chart reflects the most up to date data available at the time the database was queried. Counts may differ from those reported in previous periods due to system updates and post-adjudicative outcomes. These counts reflect applicants who have had an I-601A denied by benefit request type:

| Benefit Request Type | Receipts | Adjudicated | Approved | Denied | Pending | Approved EAD | Denied EAD |
|---|---|---|---|---|---|---|---|
| Spouse of a USC | 868 | 0 | 0 | 0 | 868 | 0 | 0 |
| Stepchild of a USC | 2 | 0 | 0 | 0 | 2 | 0 | 0 |
| TOTAL | 870 | 0 | 0 | 0 | 870 | 0 | 0 |

**INTERROGATORY NO. 9**

Identify the average processing time for the daily totals of such aliens approved or denied under the PIP Program in Interrogatory No. 1.

**RESPONSE TO INTERROGATORY NO. 9**

Defendants object to Interrogatory No. 9 on the grounds that it seeks information that is not related to Plaintiff Texas's standing and is therefore beyond the scope of the Court's discovery order. *See* ECF No. 27. The merits of Plaintiffs' claims are governed by a review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973).

In accordance with their objections, Defendants are not providing a response to this Interrogatory.

**INTERROGATORY NO. 10**

Identify the approximate number of aliens Defendants anticipate would leave the United States without the PIP Program, including aliens who would otherwise be removed, aliens who would otherwise voluntarily leave to pursue lawful admission (e.g., to pursue LPR eligibility) from abroad; and aliens who would otherwise voluntarily leave for other or unknown reasons; and if Defendants produced more than one such estimate while considering the PIP Program, please identify all such estimates.

**RESPONSE TO INTERROGATORY NO. 10**

Defendants object to Interrogatory No. 10 as speculative, in that the number of noncitizens who would be removed or voluntarily leave the United States at some point in the future depends

upon the independent future action of third parties or even future governmental policies, as well as other independent, unknown factors.

Defendants further object to this interrogatory because to the extent it seeks Defendants' current estimations for purposes of future policymaking, it calls for information that is protected from disclosure under the deliberative process privilege; to the extent it calls for the disclosure of estimations made by Defendants for purposes of creating the KFT parole process, such information would be confined to the certified administrative record and the Federal Register Notice announcing the KFT parole process. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). Defendants thus limit their response to information considered in creating the KFT parole process.

Subject to and without waiving these objections, Defendants refer Plaintiffs to the CAR at 00325-368, 00569-717, 02118-2160, and 04620-4621.

## INTERROGATORY NO. 11

Identify the number (both total and residing in each Plaintiff State) of grants of parole of aliens under 8 U.S.C. § 1182(d)(5)(A) since January 20, 2021, and how many of such grantees of parole remain in the United States (and within each Plaintiff State). Note that this inquiry is not limited to grants of parole under the PIP Program. Also, break down these numbers by month.

## RESPONSE TO INTERROGATORY NO. 11

Defendants object to Interrogatory No. 11 on the grounds that it is overly broad, unduly burdensome and disproportionate to the needs of this case, in that it seeks figures pertain to all grants of parole, and is not limited to the KFT parole process and thus is outside the scope of the

29

limited, expedited discovery ordered by this Court, *see* Docket No. 27 at 7. Defendants further object to this interrogatory on the grounds that it exceeds the scope of the Parties' stipulation that Plaintiffs will limit their claim to standing as to the State of Texas. *See* ECF No. 36. Defendants will thus limit their response to applicants with a physical address in Texas who have been granted parole under the KFT parole process.

Subject to and without waiving these objections, and limiting the response to Texas and grants of parole under the KFT parole process, the answer is zero.

**INTERROGATORY NO. 12**

For any Request for Admission that you deny, please explain the basis for your denial and identify any evidence supporting your denial.

**RESPONSE TO INTERROGATORY NO. 12**

Defendants refer Plaintiffs to Defendants' responses and objections to Plaintiffs' Requests for Admission Nos. 1 through 18.

30

## RESPONSES TO REQUESTS FOR ADMISSION

### REQUEST FOR ADMISSION NO. 1

Admit that Texas has not been and will not be fully reimbursed by the federal government for expenses incurred to provide public education to individuals who are paroled pursuant to the PIP Program.

### RESPONSE TO REQUEST FOR ADMISSION NO. 1

Defendants object that Request for Admission No. 1 is overly broad and burdensome because it relates to information outside of Defendants' possession and is thus disproportionate to the needs of this case. Defendants further object to this Request as vague because "expenses incurred to provide public education" is not defined. Defendants further object to the extent the information sought is not relevant to Plaintiffs' standing and thus the limited discovery ordered by the Court, as any individuals applying for the KFT parole process who would use public education are already present in the United States and their use of public education would not be affected by a grant of parole, so there would no "expenses incurred" as a result of a grant of parole under the KFT parole process.

Subject to and without waiving these objections, after reasonable inquiry and based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information to admit or deny Request for Admission No. 1, and on that basis, deny it.

### REQUEST FOR ADMISSION NO. 2

Admit that Texas has not been and will not be fully reimbursed by the federal government for expenses incurred to provide Emergency Medicaid services to individuals who are paroled pursuant to the PIP Program.

**RESPONSE TO REQUEST FOR ADMISSION NO. 2**

Defendants object that Request for Admission No. 2 is overly broad and burdensome because it relates to information outside of Defendants' possession and is disproportionate to the needs of the case. Defendants further object to this Request as vague because "expenses incurred" is not defined. Defendants further object to the extent the information sought is not relevant to Plaintiffs' standing and thus the limited discovery ordered by the Court, as any individuals applying for the KFT parole process are already present in the United States and would already be eligible for emergency Medicaid, so there would be no "expenses incurred" as a result of a grant of parole under the KFT parole process.

Subject to and without waiving this objection, after reasonable inquiry and based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information to admit or deny Request for Admission No. 2, and on that basis, deny it.

**REQUEST FOR ADMISSION NO. 3**

Admit that aliens present in Texas who are paroled under the PIP Program will become "qualified aliens," as that term is defined in 8 U.S.C.A. § 1641(b)(4), one year after receiving parole status.

**RESPONSE TO REQUEST FOR ADMISSION NO. 3**

Defendants object to Request for Admission No. 3 to the extent it assumes that noncitizens present in Texas will be paroled under the KFT parole process. Subject to and withing waiving this objection, to the extent that any qualifying noncitizens in Texas will be paroled under the KFT parole process, Defendants deny because this is an incorrect statement of law. 8 USC 1641(b)(4) defines a qualified alien as "an alien who is paroled into the United States under section

212(d)(5)(A) of such Act for a period of at least one year." The "period of at least one year" refers to the length of parole granted to the noncitizen, not how long the noncitizen spends as a parolee.

## REQUEST FOR ADMISSION NO. 4

Admit that aliens present in Texas who are paroled under the PIP Program will, five years after receiving parole status, become eligible for food stamps under 8 U.S.C. § 1612(a)(2)(L).

## RESPONSE TO REQUEST FOR ADMISSION NO. 4

Defendants object to Request for Admission No. 4 as vague, ambiguous, and speculative, in that the answer depends upon the independent future action of third parties, including but not limited to whether such noncitizens paroled under the KFT parole process obtain lawful status that extends their tenure as a qualified alien during the three-year parole period authorized under the process and whether they otherwise meet the income qualifications to be eligible for food stamps. Defendants also object to the Request for Admission to the extent it assumes that noncitizens present in Texas will be paroled under the KFT parole process. Subject to and without waiving this objection and based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information to admit or deny Request for Admission No. 4, and on that basis, deny it.

## REQUEST FOR ADMISSION NO. 5

Admit that aliens present in Texas who are paroled under the PIP Program will, five years after receiving parole status, become eligible for "any Federal means-tested public benefit" under 8 U.S.C. § 1613(a), including Medicaid and TANF.

## RESPONSE TO REQUEST FOR ADMISSION NO. 5

Defendants object to Request for Admission No. 5 as vague, ambiguous, and speculative, in that the answer depends upon the independent future action of third parties, including but not

limited to whether such noncitizens paroled under the KFT parole process obtain lawful status that extends their tenure as a qualified alien during the three-year parole period authorized under the process, and whether they otherwise meet the means-testing requirements. Defendants also object to the Request for Admission to the extent it assumes that noncitizens present in Texas will be paroled under the KFT parole process. Subject to and without waiving this objection and based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information to admit or deny Request for Admission No. 5, and on that basis, deny it.

## REQUEST FOR ADMISSION NO. 6

Admit that children or pregnant women who are aliens present in Texas who are paroled under the PIP Program become eligible immediately upon receiving parole for Medicaid and CHIP under the Children's Health Insurance Program Reauthorization Act of 2009, Pub. L. No. 111-3 § 214, 123 Stat 8 (Feb. 4, 2009).

## RESPONSE TO REQUEST FOR ADMISSION NO. 6

Defendants object to Request for Admission No. 6 to the extent it assumes that noncitizens present in Texas will be paroled under the KFT parole process. Defendants also object to this request because it depends upon the future independent actions of third parties and is speculative, in that it assumes that children or pregnant women in Texas who are paroled under the KFT parole process will otherwise meet all requirements, including income requirements, to qualify for Medicaid and CHIP. To the extent that any qualifying noncitizens in Texas will be paroled under the KFT parole process, and otherwise meets all criteria Defendants admit this allegation as to

children and deny this allegation as to pregnant women because upon information and belief, Texas has included children and but not pregnant women in expanded CHIP and Medicaid coverage.[2]

## REQUEST FOR ADMISSION NO. 7

Admit that the federal government does not fully reimburse Texas for its expenditures, including program administration costs, for the benefits and entitlement programs described in Request for Admission Nos. 4–6.

## RESPONSE TO REQUEST FOR ADMISSION NO. 7

Defendants object to Request for Admission No. 7 as vague because "expenditures" and "program administration costs" are not defined, and as overbroad to the extent "program administration costs" are not a basis for Plaintiff Texas's assertion of injury. Defendants further object to the term "entitlement programs." Defendants also object to this Request as compound because it groups benefits together that flow from separate programs (some of which are voluntary by Texas and other States) with different rules governing administration and funding. Subject to and without waiving this objection and after reasonable inquiry, based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information as to Texas's expenditures to admit or deny Request for Admission No. 7, and on that basis, deny it.

## REQUEST FOR ADMISSION NO. 8

Admit that the federal government does not fully reimburse Texas under the State Criminal Alien Assistance Program (SCAAP), or through any other means, for expenses incurred to incarcerate individuals who are paroled.

---

[2] *See* Medicaid and CHIP Coverage of Lawfully Residing Children and Pregnant Individuals, https://www.medicaid.gov/medicaid/enrollment-strategies/medicaid-and-chip-coverage-lawfully-residing-children-pregnant-individuals; *See* Immigrant's Access to Health Care in Texas, Center for Public Policy Priorities (Oct. 2016), https://everytexan.org/images/HW_2016_ImmigrantsAccess_FullReport.pdf, at 7; S*ee November 12, 2002 State Health Official Letter (SHO #02-004)* for additional information on the FCEP coverage option.

**RESPONSE TO REQUEST FOR ADMISSION NO. 8**

Defendants object to Request for Admission No. 8 as vague and ambiguous as to what is meant by "expenses incurred to incarcerate." Defendants further object that this Request is overly broad in that it refers to all individuals who are paroled and is not limited to individuals who may qualify for the KFT parole process, and that indeed individuals with disqualifying criminal histories are not eligible for parole under the KFT parole process.

Subject to and without waiving this objection and after reasonable inquiry, based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information as to Texas's expenditures to admit or deny Request for Admission No. 8, and on that basis, deny it.

**REQUEST FOR ADMISSION NO. 9**

Admit that the PIP Program requests aliens to provide less information on Form I-131F than is required on the DS-260 application for immigrant visas (DS-260) or the Form I-601A Application for Provisional Unlawful Presence Waiver.

**RESPONSE TO REQUEST FOR ADMISSION NO. 9**

Defendants object to Request for Admission No. 9 on the grounds that it seeks information that is not related to jurisdiction and is therefore beyond the scope of the Court's discovery order. Further, the merits of Plaintiffs' claims are governed by a review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent an answer is required, Defendants deny.

36

## REQUEST FOR ADMISSION NO. 10

Admit that, under the PIP Program, you make no determination that paroling any particular applicant satisfies the standards of "urgent humanitarian reasons" or "significant public benefit" under 8 U.S.C. § 1182(d)(5)(A).

## RESPONSE TO REQUEST FOR ADMISSION NO. 10

Defendants object to Request for Admission No. 10 on the grounds that it seeks information that is not related to jurisdiction and is therefore beyond the scope of the Court's discovery order. The merits of Plaintiffs' claims are governed by a review of the certified administrative record. Under the APA, the district court's review of merits issues must be "based on the record the agency presents to the reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142 (1973). To the extent an answer is required, Defendants deny.

## REQUEST FOR ADMISSION NO. 11

Admit that "Absent [the PIP Program's] process, applying for [Lawful Permanent Resident] status requires aliens who are present without admission or parole (PWAP) to depart the United States and remain abroad for an indefinite period." 89 Fed. Reg. 67,466.

## RESPONSE TO REQUEST FOR ADMISSION NO. 11

Defendants object to Request for Admission No. 11 because it seeks admission of a general statement that is subject to exceptions noted elsewhere in the cited Federal Register Notice. *See e.g.* CAR at 4615. In accordance with this objection, Defendants admit that Request for Admission No. 11 accurately quotes from the Federal Register Notice, 89 Fed. Reg. 67,466, but denies that all noncitizens who are present without admission or parole are required to depart the United States to obtain Lawful Permanent Resident status absent the KFT parole process, because certain statutes

and programs permit and have permitted noncitizens to adjust their status notwithstanding lacking

inspection and admission or parole. *See e.g.* 8 USC § 1255(i); Liberian Refugee Immigration

Fairness (LRIF) (https://www.uscis.gov/policy-manual/volume-7-part-p-chapter-5).

## REQUEST FOR ADMISSION NO. 12

Admit that you anticipated, before implementing the PIP Program, that at least some aliens

present without admission or parole would depart the United States and remain abroad for some

period, whether because they wished to apply for Lawful Permanent Resident status or for any

other reason.

## RESPONSE TO REQUEST FOR ADMISSION NO. 12

Defendants object to Request for Admission No. 12 to the extent it seeks information

known to or considered by Defendants in creating the KFT parole process. Under the APA, the

district court's review of merits issues must be "based on the record the agency presents to the

reviewing court." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743-44 (1985); *see Citizens to

Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971); *Camp v. Pitts*, 411 U.S. 138, 142

(1973). To the extent Plaintiffs seek internal pre-decisional documents, Defendants also object that

any such documents would be deliberative in nature and therefore privileged and not subject to

discovery.

Subject to and without waiving these objections, Defendants admit Request for Admission

No. 12 and refer Plaintiffs to CAR at 000340, 02118-2160, 04620-4621, 04649-4650, and 04656.

## REQUEST FOR ADMISSION NO. 13

Admit that, without a process to obtain parole under the PIP Program, at least some aliens

eligible for that program would leave the United States, either because they would face removal

from the United States or because they would voluntarily leave the country to pursue lawful admission to the United States from abroad.

## RESPONSE TO REQUEST FOR ADMISSION NO. 13

Defendants object to Request for Admission No. 13 as calling for speculation. Defendants also object to the Request because it appears to assume that a grant of parole would prevent removal from the United States. *See* 89 Fed. Reg. at 67,472. Subject to and without waiving these objections and based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information to admit or deny Request for Admission No. 13, and on that basis, deny it.

## REQUEST FOR ADMISSION NO. 14

Admit that, without a process to obtain parole under the PIP Program, at least some aliens eligible for that program, whether alone or accompanied by their families, would leave the United States to pursue lawful admission to the United States from abroad.

## RESPONSE TO REQUEST FOR ADMISSION NO. 14

Defendants object to Request for Admission No. 14 as calling for speculation. Subject to and without waiving this objection and based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information to admit or deny Request for Admission No. 14, and on that basis, deny it.

## REQUEST FOR ADMISSION NO. 15

Admit that at least some aliens who would have been eligible for the PIP Program have, in fact, left the United States since January 1, 2021, whether alone or accompanied by their families to pursue lawful admission to the United States from abroad.

**RESPONSE TO REQUEST FOR ADMISSION NO. 15**

Defendants object to Request for Admission No. 15 as calling for speculation because Defendants cannot ascertain whether a noncitizen departed the United States with the intent "to pursue lawful admission to the United States from abroad." Defendants object to this Request for Admission as outside the scope of discovery, outside the knowledge of Defendants, and unduly burdensome and disproportionate to the needs of the case to the extent it purports to requires an inquiry into noncitizens who previously entered without inspection and whether they have departed the United States, or as to which individuals who have sought immigrant visas would have been potentially eligible for parole under the KFT parole process. Subject to and without waiving this objection and based on the information currently known or readily obtainable to Defendants, Defendants are without sufficient information to admit or deny Request for Admission No. 15, and on that basis, deny it.

**REQUEST FOR ADMISSION NO. 16**

Admit that at least some aliens placed in removal proceedings are eventually removed from the United States.

**RESPONSE TO REQUEST FOR ADMISSION NO. 16**

Defendants object to Request for Admission No. 16 on the grounds that it is overly broad in that it requests information about all "aliens placed in removal proceedings" and is not limited to noncitizens who qualify for parole under the KFT parole process, particularly because noncitizens who are an enforcement priority are generally not eligible for parole under the process, and because a grant of parole under the process does not prevent execution of a removal order. Subject to and without waiving these objections, Defendants admit.

**REQUEST FOR ADMISSION NO. 17**

Admit that at least some aliens subject to final orders of removal are eventually removed from the United States.

**RESPONSE TO REQUEST FOR ADMISSION NO. 17**

Defendants object to Request for Admission No. 17 on the grounds that it is overly broad in that it requests information about all "aliens placed in removal proceedings" and is not limited to noncitizens who qualify for the KFT parole process, particularly because noncitizens who are an enforcement priority are generally not eligible for parole under the process, and because a grant of parole under the process does not prevent execution of a final removal order. Subject to and without waiving these objections, Defendants admit.

**REQUEST FOR ADMISSION NO. 18**

Admit that PIP Program beneficiaries who are granted parole are free to relocate to another State other than their State of residence at the time of initial application or enrollment.

**RESPONSE TO REQUEST FOR ADMISSION NO. 18**

Defendants object to Request for Admission No. 18 on the grounds that it is irrelevant to jurisdiction in this case as noncitizens who qualify for the KFT parole process are already free to relocate to another State other than their State of residence. Subject to and without waiving these objections, Defendants admit.

Date:  September 17, 2024        Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

WILLIAM C. PEACHEY
*Director*
Office of Immigration Litigation
District Court Section

41

EREZ REUVENI
*Senior Counsel*

BRIAN C. WARD
KATHERINE J. SHINNERS
*Senior Litigation Counsels*

/s/   *Erin T. Ryan*
ERIN T. RYAN
ELISSA FUDIM
JOE DARROW
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
District Court Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 532-5802
Email: erin.t.ryan@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 17, 2024, I served a copy of these responses on Plaintiffs' counsel by email.

<div style="margin-left: 45%;">

/s/  *Erin T. Ryan*
ERIN T. RYAN
U.S. Department of Justice

</div>

43

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

STATE OF TEXAS, *et al.*,

       *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND SECURITY, *et al.*,

       *Defendants*.

No: 6:24-cv-00306

The Honorable J. Campbell Barker

**CERTIFICATION OF DEFENDANTS' RESPONSES TO PLAINTIFFS' FIRST SET OF INTERROGATORIES**

    I, Katherine Lotspeich, hereby declare that I am the Chief of the Office of Performance and Quality (OPQ). I have reviewed Defendants' responses to Plaintiffs' Interrogatories, and I certify that the information contained in Defendants' responses to Plaintiffs' Interrogatory Nos. 1-8, 11, and 12 are true and correct to the best of my knowledge, information, and belief.

KATHERINE J LOTSPEICH

Digitally signed by KATHERINE J LOTSPEICH
Date: 2024.09.16 18:10:30 -04'00'

Dated: September 16, 2024

_____
Katherine Lotspeich
Chief, Office of Performance and Quality
U.S. Citizenship and Immigration Services

Certification of Defs' Responses to
Pls.' First Set of Interrogatories
Katherine Lotspeich
Case No. 6:24-cv-00306

Office of Immigration Litigation
P.O. Box 868, Ben Franklin Station
Washington, D.C. 20044
(202) 353-8536

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

STATE OF TEXAS, *et al.,*

        *Plaintiffs*,

v.

U.S. DEPARTMENT OF HOMELAND
SECURITY, *et al.,*

        *Defendants*.

No: 6:24-cv-00306

The Honorable J. Campbell Barker

**CERTIFICATION OF
DEFENDANTS' RESPONSES TO
PLAINTIFFS' FIRST SET OF
INTERROGATORIES**

I, Minnettia G. Durant, Unit Chief of the Statistical Tracking Unit, have reviewed

Defendants' responses to Interrogatories, and I certify that the information contained in ICE's

responses to Interrogatory No. 4 is true and correct to the best of my knowledge, information,

and belief.

Dated: September 16, 2024

MINNETTIA G
DURANT

Digitally signed by
MINNETTIA G DURANT
Date: 2024.09.16 21:36:09
-04'00'

Minnettia G. Durant
Unit Chief
Statistical Tracking Unit

Certification of Defs' Responses to
Pls.' First Set of Interrogatories
Minnettia G. Durant
Case No. 6:24-cv-00306

U.S. Immigration and Customs Enforcement
500 12th Street, SW
Washington, D.C. 20536
(571)235-6328

Plaintiffs' Combined MSJ Exhibits - Page 295

# EXHIBIT C

## <u>DECLARATION OF AMY COPELAND</u>

My name is Amy Copeland, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.    I am the Associate Commissioner of School Finance at the Texas Education Agency ("TEA"). I have worked for TEA in this capacity since March 2024. Prior to March 2024, I worked for TEA in the following roles since November 2012: FSP Operations Manager (November 2012 – May 2016), Assistant Director of State Funding (May 2016 – October 2019), and Director of State Funding (October 2019 – February 2024). As a part of my current role, I oversee TEA's school finance operations, including the administration of the Foundation School Program and analysis and processing of TEA's financial data. I have access to TEA's historical financial data as well as its current financial data. My responsibilities also include representing TEA in legislative hearings and school finance-related litigation.

2.    TEA estimates that the average funding entitlement from state and local sources for fiscal year 2024 will be $10,107 per student in attendance for an entire school year. If a student qualified for additional Bilingual and Compensatory Education weighted funding, it would cost the State $12,316 to educate each student in attendance for the entire school year. Most, if not all non-citizen (*i.e.*, "alien") children would likely qualify for both Bilingual and Compensatory Education weighted funding.

3.    TEA has not received any information directly from the federal government regarding the precise number of non-citizen children in Texas. However, I am aware that the U.S. Health and Human Services ("HHS") Office of Refugee Resettlement provides data for a particular subset of the population of non-citizen children present in Texas: unaccompanied

children ("UAC") (available at https://www.acf.hhs.gov/orr/grant-funding/unaccompanied-children-released-sponsors-state, accessed on October 6, 2024 at 1:33 p.m. CST). It indicates that in Texas, 3,272 UAC were released to sponsors during the 12-month period of fiscal year 2015 covering October 2014 through September 2015; 6,550 UAC were released to sponsors during the 12-month period of fiscal year 2016 covering October 2015 through September 2016; 5,391 UAC were released to sponsors during the 12-month period of fiscal year 2017 covering October 2016 through September 2017; 4,136 UAC were released to sponsors during the 12-month period of fiscal year 2018 covering October 2017 through September 2018; 9,900 UAC were released to sponsors during the 12-month period of fiscal year 2019 covering October 2018 through September 2019; 2,336 UAC were released to sponsors during the 12-month period of fiscal year 2020 covering October 2019 through September 2020; 15,338 UAC were released during the 12-month period of fiscal year 2021 covering October 2020 through September 2021; 19,071 UAC were released during the 12-month period of fiscal year 2022 covering October 2021 through September 2022; and 16,394 UAC were released during the 12-month period of fiscal year 2023 covering October 2022 through September 2023.

5.    To demonstrate the scope of expenditures to the State of Texas for educating non-citizen children by looking at the known particular subset of non-citizen children for which we have concrete data (UAC): if each of the children described above for fiscal years 2022 and 2023 enrolls in and achieves full attendance at a Texas public school during the school year following the period during which they are released to a sponsor, and qualifies for Bilingual and Compensatory Education weighted funding (such that the annual cost to educate each student from state and local sources for fiscal years 2023 and 2024 would be approximately $12,206 and $12,316, respectively),

the annual costs to educate these groups of children for fiscal years 2023 and 2024 would be approximately $232.77 million and $201.90 million, respectively. These estimates do not include any potential costs associated with UAC continuing in Texas public schools beyond one year.

6.  Texas public school formula funding is comprised of state and local funds. Funding entitlements are initially based on projections of student counts, attendance patterns, and other factors, and adjusted as actual data become available. Districts often experience changes in their student enrollment from year to year resulting from births and deaths, movement in and out of the district, and other factors. Enrollment is forecast to peak in 2025 due to smaller birth cohorts working their way through the system. Based on available data, the State plans for a net decrease of approximately 15,000 students in average daily attendance across Texas each year in 2026 and 2027, and then remains relatively flat with small increases back to 2026 levels by 2031.  Any increase in enrollment of alien children in Texas schools necessarily increases TEA's expenditures on public K-12 education.

7.  The Foundation School Program serves as the primary funding mechanism for providing state aid to public schools in Texas. Any additional UAC or other non-citizen children enrolled in and attending Texas public schools would increase the State's cost of the Foundation School Program over what it otherwise would have been.

8.  All of the facts and information contained within this declaration are within my personal knowledge and are true and correct to the best of my knowledge.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 7th day of October 2024.

_____

AMY COPELAND

Plaintiffs' Combined MSJ Exhibits - Page 300

# EXHIBIT D

Plaintiffs' Combined MSJ Exhibits - Page 301

## DECLARATION OF SUSAN BRICKER

1.      My name is Susan Bricker. I am an adult and competent to testify. The information and opinions contained in this declaration are based upon my personal knowledge, my review of the relevant documents, and my knowledge, skills, training, and experience.

2.      I am currently the manager (Manager V) of the Health Program Outcomes and Epidemiology Team ("HPOE") within the Office of Data, Analytics and Performance ("DAP") (the office formerly known as the Center for Analytics and Decision Support--CADS) at the Texas Health and Human Services Commission ("HHSC").

3.      Except for a brief eight-month period in 2014 when I worked in the private sector, I've been employed at HHSC since 2007. In that time, I have worked as an Epidemiologist II (2007-2012), Research Specialist V (2012-Jan. 2014), a Research Specialist V (Sept. 2014-Apr. 2018), a Program Specialist VII (May 2018-May 2021), and Manager V (June 2021-current). The HPOE Team conducts and/or coordinates legislative and HHS-directed research on health care utilization, demographic trends, and enrollment patterns for the state's health care and human service programs.

4.      In 2007, as part of the 2008-2009 General Appropriations Act, the Texas Legislature required HHSC to report the cost of services and benefits provided by HHSC to undocumented immigrants in the State of Texas. This report, also known as the Rider 59 Report, was first completed by HHSC in 2008. Due to numerous requests for more recent information following the issuance of the 2008 report, the Rider 59 Report was updated in 2010, 2013, 2014, 2017, and 2021. The Rider 59 Report completed in 2021 covered state fiscal year (SFY) 2019.

5.      HHSC provided three principal categories of services and benefits to undocumented immigrants in Texas: (i) Texas Emergency Medicaid; (ii) the Texas Family Violence Program (FVP); and (iii) Texas Children's Health Insurance Program (CHIP) Perinatal Coverage (a/k/a "CHIP Perinate") for Rider 59 and subsequent versions. Undocumented immigrants also receive uncompensated medical care from public hospitals in the State. In the 2008 and 2010 versions of the Rider 59 Report, HHSC provided estimates of the amount of uncompensated medical care provided by state public hospital district facilities to undocumented immigrants. HHSC has not provided any estimates of uncompensated care for undocumented immigrants in more recent versions of the Rider 59 Report.

6.      In September 2022, HHSC updated the methodology for calculating the fraction of the Texas' Medicaid Type Program 30 (Emergency Medicaid) clients and CHIP Perinate clients that are likely to be undocumented immigrants. The newer methodology is described in paragraphs 8 and 10. These estimates are calculated for calendar years (CY) 2019 through 2023. Due to the change in methodology and the shift from state fiscal year to calendar year, the current estimates do not match the estimates provided in previous testimony.

7.      Emergency Medicaid is a federally required program jointly funded by the federal government and the states. The program provides Medicaid coverage, limited to emergency medical conditions including childbirth and labor, to undocumented immigrants living in the United States. To produce Rider 59 cost estimates for the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive-age females in Texas who have not attained some form of legal permanent resident

status.  The method based on Census data was used because HHSC Medicaid claims data do not conclusively identify an individual's residency status. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

8.      In September of 2022, HHSC analysts identified a secondary data source that could be used in combination with claims data to better estimate the fraction of Emergency Medicaid services provided to undocumented immigrants. The updated method relies on enrollment data collected by the Texas Integrated Eligibility Redesign System (TIERS), which contains a variable related to documentation status. Using the percentage of Emergency Medicaid clients with 'UN' (for "undocumented") alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS, HHSC estimated the portion of Emergency Medicaid payments attributable to undocumented immigrants in Texas. The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; $95.0 million in CY 2022; and $97.5 million in 2023. Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

9.      Texas CHIP Perinatal Coverage provides prenatal care to certain low-income women who do not otherwise qualify for Medicaid. To produce Rider 59 cost estimates for the portion of CHIP Perinate expenditures attributable to undocumented immigrants in Texas, HHSC relied on population estimates from the U.S. Census Bureau to estimate the percentage of non-U.S. citizen reproductive age females in Texas who have not attained some form of legal permanent resident status. The method based on Census data was used because there is no way to definitively report the number of undocumented immigrants served by CHIP Perinate as the

program does not require citizenship documentation. Attached as Exhibit 1 is a document that explains the original methodology HHSC utilized to obtain estimates derived from the Census.

10.    Estimates for the cost of CHIP Perinate benefits provided to undocumented immigrants use TIERS data in combination with capitation payments to better estimate the fraction of CHIP Perinate expenditures attributable to undocumented immigrants. The updated method uses the percentage of CHIP Perinate clients with 'UN' alien status among individuals that did not have a null/blank value for their Alien Type Code in TIERS to estimate the portion of CHIP Perinate capitation payments attributable to undocumented immigrants in Texas. The total estimated cost to the State for CHIP Perinatal Coverage to undocumented immigrants residing in Texas was $11.1 million in CY 2019; $16.9 million in CY2020; $25.8 million in CY 2021; $30.9 million in CY2022; and $31.4 million in CY2023. Attached as Exhibit 2 is a report providing detailed information and data sources for these calculations.

11.    For Emergency Medicaid and CHIP Perinate, the total estimated cost to the State each year is affected by both the volume and cost of services provided and annual changes in the percentage of expenditures matched by the federal government (i.e., Federal Medical Assistance Percentage (FMAP) and Enhanced Federal Medical Assistance Percentage (E-FMAP)), which determines the state share of overall Medicaid and CHIP expenditures. It is important to note that documentation status is missing or unknown for some individuals enrolled in these programs. Additionally, an Alien Type Code of 'UN' (undocumented) may result from a failure to provide proper documentation at the time an application is submitted. Although all of these cost estimates include some margin of uncertainty, it is clear that both of these programs have some

positive cost to the State of Texas due to utilization by non-citizens, including undocumented immigrants.

12.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct. Executed on this 14th day of October 2024.

Susan Bricker    Digitally signed by Susan Bricker
Date: 2024.10.14 09:34:05 -05'00'

SUSAN BRICKER

Plaintiffs' Combined MSJ Exhibits - Page 306

# Population-based Method for Estimating the Percentage of Undocumented Clients in Texas

## Original Rider 59 Estimates

Previously, HHSC relied on different methods to estimate the percentage of non-U.S. citizens in Texas who are undocumented. The first method consisted of assuming that one-half of the estimated non-U.S. citizen population in the state was undocumented. Under this method, HHSC would obtain the estimate for total number of non-U.S. citizens in the state, as reported from the U.S. Census Bureau's American Community Survey (ACS)[1], and would divide that number by two in order to obtain an estimate of the undocumented population in the state.

HHSC relied on a method that used two different sources of official federal government data to develop its own in-house estimates of the percent of Texas residents that are undocumented immigrants:

- The Texas-specific sample of the U.S. Census Bureau's American Community Survey (ACS), and
- The Office of Immigration Statistics of the U.S. Department of Homeland Security (DHS).

The ACS was the source for estimates of the total non-U.S. citizen population in the state while DHS was the source for the estimated number of persons in the state who are undocumented.

Using these two sources, HHSC estimated the percent of non-U.S. citizens who are undocumented by taking DHS' estimate of the number of undocumented immigrants in Texas (the numerator) and dividing it by the ACS estimate for the number of non-U.S. citizens in the state (the denominator). This calculation resulted in HHSC's estimate of the proportion/percent of non-U.S. citizens in the state who are undocumented.

---

[1] The ACS is a large-scale demographic survey that provides annual estimates of the total population in Texas according to U.S. citizen status (citizen versus non-citizen). However, the estimate for the non-U.S. citizen population is not broken down any further according to documented/undocumented status because that type of information is not collected by the survey.

According to this method, during 2008-2014, an estimated two-thirds (62 to 66%) of non-citizens were considered undocumented on any given year within that period.

DHS temporarily suspended the publication of its estimates for the unauthorized/undocumented population after March 2013, when it published estimates for this population as of January 2012. It resumed publication of the estimates on April 19, 2021, when it released previously unpublished estimates for the years 2013-2018.  The new updates may be used to develop future versions of this report.

With the temporary suspension of DHS's estimates after March 2013, HHSC lost the official information source relied upon for data on the number of non-citizens who are undocumented, as none of the other Federal and Texas state agencies collected and published information about the legal status of non-U.S. citizens' residing in the state of Texas.

This situation resulted in the need to develop and alternative method for estimating the number and percent of non-U.S. citizens using HHSC services who are undocumented. The goal was to develop a method that does not rely on the simple assumptions previously used (that one-half of non-citizens are undocumented). The alternative method is explained below.

## Subsequent Estimates (2014 – 2022)

### Benchmark Program: Texas' Medicaid Type Program 30

Texas' Medicaid Type Program 30 (TP 30) plays an important role in paying for emergency medical services provided to non-U.S. citizens who do not meet the eligibility criteria for Medicaid. Given the high-profile role the program plays in compensating health care providers for services provided to non-eligible non-citizens, it was chosen as the benchmark program for developing an estimate of the percent of non-citizens provided HHSC services who are undocumented.

To a very significant degree, uninsured non-citizen reproductive-age (ages 15-44) females are the main caseload driver within TP 30. In SFY 2017, reproductive- age females accounted for 81% of the clients served. Given the highly disproportionate impact this group has on the program, it is by far the most important one to analyze to obtain the best and most accurate estimate possible of the percent of clients served under this program that are likely to be undocumented non-citizens.

## Data Analysis and Estimate

According to the U.S. Census Bureau's American Community Survey (ACS), in 2016 there were approximately 446,000 uninsured non-U.S. citizen reproductive-age females in Texas. Of those, 39 percent (176,000) had resided in the U.S. for 10 years or less and 61 percent (270,000) for more than 10 years.

It is reasonable to expect that the longer a non-citizen has resided in the U.S., the more likely he/she would have been able to attain some form of U.S. legal permanent resident status.

Assuming that the fraction of non-citizen reproductive-age females (ages 15-44) who have not attained some form of legal permanent resident status is 7 of every 10 (70%) among those who have lived in the U.S 10 years or less, and 4 of every 10 (40%) among those in the U.S. for more than 10 years, the estimated potential percentage for undocumented females of reproductive age in Texas is 52%.

**Calculation for Estimated Percent Undocumented**

**((0.7*176,000 + 0.4*270,000) / (446,000)) * 100 = 51.8% ~ 52%**

Extending these assumptions derived from the ACS data to non-citizen reproductive-age females that received assistance under TP 30 – for whom year of entry into the U.S. information is not known -- it is then estimated that 52% of them are likely to be undocumented.

Taking into consideration that uninsured, non-citizen reproductive-age females represent a highly disproportionate share of the program's caseload, the estimated potential percentage for undocumented clients applicable to them, slightly adjusted downwards to 50%, is also applied to the entire TP 30 program. Due to the lack of sufficient demographic data on populations at-risk for other programs of interest, the same percentage was also applied to the Family Violence and CHIP-P programs in reports prior to 2023.

Plaintiffs' Combined MSJ Exhibits - Page 309

**Health and Human Services Commission Services and Benefits Provided to Undocumented Immigrants, Medicaid and CHIP-Perinate Programs, CY2019 - 2023**

| | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| Texas Emergency Medicaid | $116,000,000 | $88,300,000 | $95,600,000 | $95,000,000 | $97,500,000 |
| Texas Children's Health Insurance Program (CHIP) Perinatal Coverage | $11,100,000 | $16,900,000 | $25,800,000 | $30,900,000 | $31,400,000 |
| **TOTAL TEXAS HEALTH AND HUMAN SERVICES COMMISSION** | $127,100,000 | $105,200,000 | $121,400,000 | $125,900,000 | $128,900,000 |

Plaintiffs' Combined MSJ Exhibits - Page 310

**Texas Emergency Medicaid Expenditures, Type Program 30, Calendar Years 2019 - 2023**

| Client Service[1] | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| Inpatient hospital | $330,920,650 | $317,411,166 | $340,355,399 | $300,366,730 | $284,494,943 |
| Outpatient hospital | $24,240,002 | $20,021,218 | $21,920,429 | $21,554,905 | $21,278,740 |
| Professional and other services | $23,975,315 | $20,204,430 | $17,634,540 | $17,348,280 | $17,561,000 |
| Vendor drug | $272,418 | $115,664 | $54,879 | $66,861 | $188,407 |
| **Total** | **$379,408,384** | **$357,752,477** | **$379,965,247** | **$339,336,776** | **$323,523,090** |

| Texas' Share of TP 30 Expenditures | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| Texas' Share of Federal Medical Assistance Percentage (FMAP)[2] | 41.14% | 32.68% | 32.24% | 34.78% | 36.26% |
| Texas' Share of TP 30 Expenditures *(row 7 x row 10)* | $156,088,609 | $116,913,510 | $122,500,796 | $118,021,331 | $117,309,473 |

| Estimated Percentage of TP30 Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| TIERS estimate[3] | 74.3% | 75.5% | 78.0% | 80.5% | 83.1% |

| Estimated Cost of Services Provided to Undocumented Immigrants | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| *Total (row 11 x row 14)* | **$115,973,837** | **$88,269,700** | **$95,550,621** | **$95,007,171** | **$97,484,172** |

Data Sources:
[1] TMHP, AHQP Medicaid Claims

[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.
FFY 2023 rates are final as stated in Federal Register Vol. 86, No. 225, November 26, 2021.

[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:

Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants is estimated based on TIERS eligibility data. The TIERS estimate is the percentage of Emergency Medicaid clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

**Texas Children's Health Insurance Program (CHIP) Perinatal Coverage Expenditures, Calendar Years 2019 - 2023**

|  | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| Texas CHIP Perinatal Coverage expenditures [1] | $175,103,677 | $154,717,301 | $150,341,871 | $161,628,934 | $155,033,182 |

| **Texas' Share of CHIP Expenditures** | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| Texas' Share of Enhanced Federal Medical Assistance Percentage (EFMAP) [2] | 8.67% | 14.25% | 22.57% | 24.35% | 25.38% |
| Texas' Share of CHIP-Perinate Expenditures (row 3 x row 6) | $15,181,489 | $22,047,215 | $33,932,160 | $39,356,645 | $39,347,422 |

| **Estimated Percentage of CHIP-Pernate Services Provided to Undocumented Immigrants** | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| TIERS estimate [3] | 73.3% | 76.6% | 76.1% | 78.4% | 79.7% |

| **Estimated Cost of Services Provided to Undocumented Immigrants** | CY 2019 | CY 2020 | CY 2021 | CY 2022 | CY 2023 |
|---|---|---|---|---|---|
| *Total (row 7 x row 10)* | **$11,128,031** | **$16,888,167** | **$25,822,374** | **$30,855,610** | **$31,359,895** |

Data Sources:
[1] HHSC, DAP SQL Server, CHIP_hx file
[2] FFY 2019 rates are final as stated in Federal Register Vol. 82, No. 223, November 21, 2017.
 FFY 2020 rates are final as stated in Federal Register Vol. 83, No. 229, November 28, 2018.
 FFY 2021 rates are final as stated in Federal Register Vol. 84, No. 232, December 3, 2019.
 FFY 2022 rates are final as stated in Federal Register Vol. 85, No. 230, November 30, 2020.
 FFY 2023 rates are final as stated in Federal Register Vol. 86, No. 225, November 26, 2021.
[3] Texas Integrated Eligibility Redesign System (TIERS)

Notes:
Because HHSC Medicaid claims data do not conclusively identify the legal residency status of immigrants, the portion of Emergency Medicaid payments attributable to undocumented immigrants must be estimated using TIERS eligibility data. The TIERS method is based on the percentage of CHIP-Perinate clients with 'UN' alien status, among individuals that did not have a null/blank value for their Alien Type Code in TIERS.

Plaintiffs' Combined MSJ Exhibits - Page 312

# EXHIBIT E

Plaintiffs' Combined MSJ Exhibits - Page 313

## DECLARATION OF REBECCA WALTZ

My name is Rebecca Waltz, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise of the matters herein stated.

1.        I am the Budget Director for the Texas Department of Criminal Justice. The Texas Department of Criminal Justice (TDCJ) is the state agency responsible for the care, custody, and rehabilitation of persons convicted of a criminal offense in the state of Texas.

2.        I have been employed with TDCJ since June 2004, and I have served in my current position since January 2020. Prior to that, I served as TDCJ's Deputy Budget Director from December 2017 to December 2019, a Senior Budget Analyst from October 2007 to November 2017, and a Junior Budget Analyst from September 2004 to September 2007.

3.        The Bureau of Justice Assistance (BJA) administers the State Criminal Alien Assistance Program (SCAAP) in conjunction with the U.S. Immigration and Customs Enforcement (ICE), Department of Homeland Security (OHS). SCAAP provides federal payments to states and localities that incurred correctional officer salary costs for incarcerating undocumented criminal aliens with at least one felony or two misdemeanor convictions for violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period.

4.        As a part of my employment with TDCJ, I am responsible for compiling the data to be included in TDCJ's application for federal reimbursement to the State Criminal Alien Assistance Program. These data sets include the number of correctional officers and their salary expenditures (correctional officer is defined as a person whose primary employment responsibility is to maintain custody of individuals held in custody in a correctional facility) for the reporting period, information regarding maximum bed counts and inmate days, and information about the

eligible inmates – (1) whom the agency incarcerated for at least four consecutive days during the reporting period; and (2) who the agency knows were undocumented criminal aliens, or reasonably and in good faith believes were undocumented criminal aliens.

5.     TDCJ has sought reimbursement from the federal government through SCAAP since 1998.

6.     For the most recently completed SCAAP application (reporting period of July 1, 2022, through June 30, 2023), TDCJ reported data for 7,768 eligible inmates and a total of 2,208,639 days. An estimate of the cost of incarceration for these inmates can be calculated by multiplying the systemwide cost per day per inmate for Fiscal Year 2022 ($77.49) as reported by the Texas Legislative Budget Board by the number of days.  For example ($77.49 x 2,208,639 days = $171,147,436).

7.     A SCAAP award for this application period has not been received.

8.     TDCJ also submitted a SCAAP application for the reporting period of July 1, 2021 through June 30, 2022.  TDCJ reported data for 6,914 eligible inmates and a total of 2,019,635 days.  An estimate of the cost of incarceration for these inmates can be calculated by multiplying the systemwide cost per day per inmate for Fiscal Year 2022 ($77.49) as reported by the Texas Legislative Budget Board by the number of days.  For example ($77.49 x 2,019,635 days = $156,501,516).

9.     Of this estimated amount, TDCJ was reimbursed by the federal government $14,555,173 after it approved the application.

10.     TDCJ also submitted a SCAAP application for the reporting period of July 1, 2020 through June 30, 2021.  TDCJ reported data for 7,058 eligible inmates and a total of 1,984,597 days.  An estimate of the cost of incarceration for these inmates can be calculated by multiplying

the systemwide cost per day per inmate for Fiscal Year 2022 ($77.49) as reported by the Texas Legislative Budget Board by the number of days. For example ($77.49 x 1,984,597 days = $153,786,422).

11.     Of this estimated amount, TDCJ was reimbursed by the federal government $14,883,040 after it approved the application.

12.     It is my belief that to the extent the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well.

13.     Whether incarcerating criminal aliens or having them on parole or mandatory supervision, TDCJ incurs costs. Keeping detainees in TDCJ custody, or adding them to parole or mandatory supervision, imposes costs on TDCJ for housing, supervising, and providing health care. An estimate of the cost of parole or mandatory supervision for these inmates can be calculated by multiplying the average cost per inmate for active parole supervision for Fiscal Year 2022 ($4.69) as reported by the Texas Legislative Budget Board by the number of days. For example ($4.69 x 2,208,639 = $10,358,517).

14.     All of the facts and information contained within this declaration are within my personal knowledge and are true and correct.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 4th day of October 2024.

Rebecca Waltz
TDCJ Budget Director

3

Plaintiffs' Combined MSJ Exhibits - Page 316

# EXHIBIT F

## EXPERT DECLARATION OF
## LLOYD B. POTTER, PH.D.

1.  My name is Lloyd B. Potter, and I am over the age of 18 and fully competent in all respects to make this declaration. I have personal knowledge and expertise in the matters stated herein.

2.  I was appointed State Demographer of Texas in June of 2010. I hold degrees of Ph.D. in sociology from The University of Texas at Austin, a Master of Public Health in epidemiology from Emory University, a Master of Science in Education from the University of Houston at Clear Lake, and a Bachelor of Science in sociology from Texas A&M University. I have worked as an Assistant Professor at Fordham University, a post-doctoral fellow at Emory University and Centers for Disease Control and Prevention, a Behavior Scientist at the Centers for Disease Control and Prevention, and as a Research Scientist at the non-profit company Education Development Center, Inc. I am currently a professor in the Department of Sociology and Demography at The University of Texas at San Antonio. I also serve as the director of the Institute for Demographic and Socioeconomic Research (IDSER). I have extensive experience working as an applied demographer, and my current work focuses on public policy-related research and training applied demographers. I have not testified at either deposition or trial in the last four years. Attached as Exhibit 1 is my curriculum vitae setting forth my experience and education. Attached as Exhibit 2 is a list of my publications for the last ten years.

3.  My area of specialization is applied demography. Applied demographers study population size, distribution, and composition and of the processes of fertility, mortality, and migration with emphases on gaining knowledge of the consequences and concomitants of demographic change to guide decision making related to the planning, development, and/or distribution of public-or private-sector goods or services for current

1

and future use in the study area or areas (Murdock, 2019).

4.      I was asked by Plaintiffs to provide my assessment of the magnitude of undocumented immigrants in Texas who were married to U.S. Citizens in Texas, and to provide my assessment of the likelihood that undocumented immigrants would return to their country of origin or leave the United States if they were to lose permission to work in the United States.

5.      Based on my education, qualifications, experience, and knowledge of the relevant literature, I believe the following statements are true and accurate.

6.      Using data from the American Community Survey, FWD.US estimated that there are about 155,000 undocumented immigrants married to U.S. Citizens in the State of Texas in 2021 (FWD.US, 2024). Another study by the Migration Policy Institute, employed different methodology from the FWD.US study, used the U.S. Census Bureau's Survey of Income and Program Participation (SIPP) and the American Community Survey, estimated that there were about 204,000 unauthorized immigrants married to U.S. citizens in the State of Texas in 2019. (Migration Policy Institute, 2019). The methodologies used in both estimates seem reasonable, given data limitations, and the estimates are consistent with other estimates.

7.      Economic factors are strongly associated with many migrant flows. For example, differences in economic growth, wages, and the employment situation between the United States and Mexico are critical determinants of immigration, and migration of labor out of Mexico (Aguila, 2012). Most unlawful migrants coming to the U.S. are doing so to work. Massey, et. al., found that that undocumented migration from Mexico appears to reflect U.S. labor demand and access to migrant networks (Massey, Durand, & Pren, 2014).

8.      Kennan and Walker found that interstate migration decisions are influenced to a

substantial extent by income prospects. Their research suggests that the link between income and migration decisions is driven both by geographic differences in mean wages and by a tendency to move in search of a better locational match when the income realization in the current location is unfavorable (Kennan & Walker, 2011).

9.  In part, the Immigration Reform and Control Act (IRCA) is intended to restrict unauthorized immigration into to the United States by making it illegal for employers to hire unauthorized immigrants and imposing sanctions on employers who employ unauthorized immigrants (Wishnie, 2007). Several States have adopted laws to require E-Verify to make hiring of unlawful immigrants more difficult. Orrenius and Zadvodny found that possible unauthorized immigrants in States that had implemented such efforts may have more difficulty working and more difficulty changing jobs (Orrenius & Zavodny, 2016). They also found some evidence suggesting "... that most of the drop in the number of already-present unauthorized immigrants in [S]tates that adopt universal E-Verify laws is due to them leaving the USA entirely." (Orrenius & Zavodny, 2016).

10. While unlawful immigrants are motivated to stay in the United States, it is reasonable to conclude that some will return to their country of origin if they lose or are not given permission to work in the United States. The causes of return migration are difficult to assess because there is limited research and understanding of return migration.

11. In a study of young immigrants to the United States, Regan and Olsen found they were less likely than older immigrants to return to their country of origin (Reagan & Olsen, 2000). Child and young immigrants who migrated later in their childhood (having spent more time in their country of origin) were more likely to return to their country of origin than those who immigrated when they were

younger. They also found that immigrants with college degrees were more likely to return to their country of origin than those without.

12.   In a national survey, Wong, et al., found that 22.3% of recipients of deferred action and work authorization under the Deferred Action for Childhood Arrivals (DACA) program stated that they were likely or very likely to leave the United States without DACA status. (Wong, et al., 2017).

13.   In a study of characteristics associated with emigration of foreign-born persons in the United States (return migration), Van Hook and Zhang found that "indicators of economic integration (home ownership, school enrollment, poverty) and social ties in the United States (citizenship, having young children, longer duration in the United States) deter emigration." (Van Hook & Zhang, 2011). They found that indicators favoring return migration to country of origin included having connections with the sending society, such having a spouse or close family there.

14.   Although undocumented immigrants who have been in the United States for a shorter period are more likely to voluntarily return to their country of origin, some who have been in the United States for 10 years or longer also voluntarily return. Fazel-Zarandi, Feinstein, & Kaplan note that the consensus estimate is that undocumented immigrants who have been in the United States for more than 10 years return to their countries of origin at a rate of 1% each year. (Fazel-Zarandi, Feinstein, & Kaplan, 2018).

15.   Without permission to work in the United States, some unlawful immigrants could be expected to migrate out of the  United States back to their country of origin or  to another country where they would be able to work. Those unlawful immigrants who migrated to the United States when they were older, who  have strong family relationships in their country of origin,  those who had met savings goals, and those who had achieved higher levels of education would be more likely to emigrate under conditions of not being able to work in the United States.

16.    In addition to some number of unlawful immigrants voluntarily departing the United States if they lack work authorization or lawful presence, a number of such unlawful immigrants would be removed from the United States if they lacked such protections. This can be seen with former DACA recipients who were subsequently removed—during the second term of the Obama Administration, 365 persons who formerly had DACA status were removed from the United States. (Jarvie, 2017).

17.    In a study of the impact of divorce on return migration conducted in the Netherlands, Govert E. Bijwaard and Stijn van Doeselaar (2012) found that family migrants primarily move to a new country, to live with their spouse or intended spouse. However, as with many marriages in the Western world, the study found that a substantial number of these unions end in divorce.  The study also found that when a family migrant's marriage dissolves, the original purpose of their migration—living with their spouse—no longer exists. As a result, one or both partners may choose to relocate, often leading to a return to their country of origin.

18.    References:

19.    Aguila, E. (2012). United States and Mexico: Ties That Bind, Issues That Divide (2 ed.). Santa Monica, CA: RAND.

20.    Bijwaard, G. E. & van Doeselaar, S. (2012). *The Impact of Divorce on Return-Migration of Family Migrants*. Institute for the Study of Labor (IZA) Discussion Paper No. 6852, available at https://ftp.iza.org/dp6852.pdf.

21.    Ihrke, D. (2014). Reason for Moving: 2012 to 2013. Current population reports. Washington, DC: US Census Bureau, 20, 574.

22.    Fazel-Zarandi, M, Feinstein, J., & Kaplan, E. (2018). The number of undocumented immigrants in the United States: Estimates based on demographic modeling with data from 1990 to 2016. PLOS ONE 13(9): e0201193. https://doi.org/10.1371/journal.pone.0201193.

23.    FWD.US, (2024). Millions of long-term undocumented residents could be protected by

the Biden Administration, available at https://www.fwd.us/news/undocumented-immigrants/.

24. Jarvie, Jenny, 2017. "Deportations of 'Dreamers' who've lost protection have surged under Trump." "Deportations of 'Dreamers' who've lost protection have surged under Trump." Los Angeles Times, April 19.

25. Kennan, J., & Walker, J. R. (2011). The Effect of Expected Income on Individual Migration Decisions. Econometrica, 79(1), 211-251. doi:doi:10.3982/ECTA4657.

26. Massey, D. S., Durand, J., & Pren, K. A. (2014). Explaining Undocumented Migration to the U.S. International Migration Review, 48(4), 1028-1061. doi:doi:10.1111/imre.12151

27. Migration Policy Institute (2019), *Profile of the Unauthorized Population: Texas*, available at https://www.migrationpolicy.org/data/unauthorized-immigrant-population/state/TX .

28. Murdock, S. H., & Ellis, D. R. (2019). Applied Demography: An Introduction To Basic Concepts, Methods, And Data. (First edition.). Routledge

29. Orrenius, P. M., & Zavodny, M. (2016). Do state work eligibility verification laws reduce unauthorized immigration? IZA Journal of Migration, 5(1), 5. doi:10.1186/s40176-016-0053-3

30. Reagan, P. B., & Olsen, R. J. (2000). You can go home again: Evidence from longitudinal data. Demography, 37(3), 339-350. doi:10.2307/2648046

31. Van Hook, J., & Zhang, W. (2011). Who Stays? Who Goes? Selective Emigration Among the Foreign-Born. Population Research and Policy Review, 30(1), 1-24. doi:10.1007/s11113-010-9183-0

32. Wishnie, M. J. (2007). Prohibiting the employment of unauthorized immigrants: The experiment fails. U. Chi. Legal F., 193.

Wong, T., et al. (2017). 2017 National DACA Study, available at

https://www.americanprogress.org/wp-content/uploads/sites/2/2017/11/2017
_DACA_study_economic_report_updated.pdf.

Materials Reviewed: Cited reference documents.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 11th day of September 2024.

LLOYD POTTER, PH.D.

**Lloyd B. Potter**

**Department of Sociology and Demography and
Institute for Demographic and Socioeconomic Research**
The University of Texas at San Antonio
One UTSA Circle
Main Building
San Antonio, Texas 78249
Lloyd.Potter@utsa.edu

**Educational Background:**

| | |
|---|---|
| M.P.H. | Epidemiology, Emory University, Rollins School of Public Health, spring 1993. |
| Ph.D. | Sociology/Demography, the University of Texas at Austin, fall 1989. Dissertation: Proximate and Non-Proximate Causes of Racial Life Expectancy Differentials in the U.S., 1970 and 1980. |
| M.S. | Education, University of Houston Clear Lake, spring 1981. |
| B.S. | Sociology, Texas A&M University, fall 1979. |

**Professional Employment History**

| | |
|---|---|
| 2010-present | State Demographer of Texas and Director of the Texas Demographic Center. |
| 2008-present | Director, Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, San Antonio, TX. |
| 2008-present | Professor, Department of Sociology and Demography, the University of Texas at San Antonio, San Antonio, TX. |
| 2019-2020 | Interim-Dean, College of Public Policy/College for Health, Community and Policy, the University of Texas at San Antonio, San Antonio, TX. |
| 2014-2016 | Associate Dean for Research, College of Public Policy, the University of Texas at San Antonio, San Antonio, TX. |
| 2008-2020 | Adjunct Faculty, The University of Texas School of Public Health at Houston through the San Antonio Regional Campus. |
| 2009- 2011 | Interim-Chair, Department of Demography, the University of Texas at San Antonio, San Antonio, TX. |
| 2001-2004 | Adjunct faculty member, University of Michigan School of Public Health, Summer Epidemiology Seminar. |
| 2000-2008 | Director, Center for the Study and Prevention of Injury, Violence, and Suicide. Education Development Center Inc., Newton, MA. |
| 1998-99 | Detail from C.D.C. to Massachusetts Department of Public Health (9 months) – Injury Surveillance Program, Boston, Massachusetts. Developed surveillance reports on suicide in the state. |
| 1997 | Detail from C.D.C. to Hanoi School of Public Health, Field Epidemiology Training Program, Hanoi, Vietnam (1.5 months). Developed a course on demographic methods in public health. |

Plaintiffs' Combined MSJ Exhibits - Page 325
L.B. Potter – September 2024

| | |
|---|---|
| 1995-2000 | Team Leader (Branch Chief), Youth Violence and Suicide Prevention, Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia. Managed C.D.C.'s scientific and grant program portfolio on youth violence and suicide prevention. |
| 1993-1995 | Team Leader, Suicide Prevention, Division of Violence Prevention, National Center for Injury Prevention and Control, Centers for Disease Control and Prevention, Atlanta, Georgia. Manage C.D.C. scientific program on suicide prevention. |
| 1992 | Consultant, Field Epidemiology Training Program, Taiwan Department of Health, Taipei, Taiwan, R.O.C. Provided research and survey methodology training. |
| 1991-93 | National Institute of Mental Health HIV/AIDS Post-Doctoral Fellow, Emory University School of Public Health/Centers for Disease Control and Prevention, Atlanta, Georgia. Received Master of Public Health and conducted HIV/AIDS prevention research at C.D.C. |
| 1989-91 | Assistant Professor of Sociology, Fordham University, Bronx, New York. |
| 1990 & 91 | Lecturer, summers, the University of Texas at Austin, Department of Sociology. Managed and taught the NSF-funded Research Experience for Undergraduates (R.E.U.) program. |
| 1989 | Research Associate, the University of Texas at Austin, Departments of Social Work and Home Economics. Conducted research on adoption. |
| 1988 | Research Associate, the University of Texas at Austin, Population Research Center. |
| 1987-88 | Research Associate, Texas A&M University, Department of Rural Sociology, College Station, Texas. Assisted with a book on farm financial crisis, Texas population estimates and projections, and socioeconomic impact assessments |
| 1986 | Social Science Analyst, Summer, Center for International Research, U.S. Bureau of the Census, Washington D.C. Developed population estimates, projections, and profiles for various countries |
| 1985 | United Nations Intern, summer, Population Policy Section, New York, New York. Developed population estimates, projections, and profiles for multiple countries |
| 1984-87 | Research Assistant, the University of Texas at Austin, Population Research Center. Conducted research on consumer bankruptcy |
| 1983-84 | Research Assistant, Texas A&M University, Department of Rural Sociology, College Station, Texas. Assisted with population estimates and projections for Texas. |
| 1981-83 | Teacher, LaPorte Independent School District, LaPorte, Texas. |

**Awards and Honors**

| | |
|---|---|
| 2024 | National Academy of Sciences, Division of Behavioral and Social Sciences and Education, Committee on National Statistics (CNSTAT), Member (to begin October 2024). |
| 2022-present | Texas State Demographer Distinguished Professorship |
| 2022 | Texas Department of Transportation Road Hand Award. |
| 2021-2023 | National Academies of Sciences, Engineering, and Medicine Panel to Evaluate the Quality of the 2020 Census |
| 2019-2020 | Mark G. Yudof Endowed Professor, the University of Texas at San Antonio |

Plaintiffs' Combined MSJ Exhibits - Page 326

| 2017-2019 | Peter Flawn Professor, the University of Texas at San Antonio |
| 2012 | Outstanding Clear Creek Independent School District (CCISD) Alumni Award, Clear Creek Education Foundation. |
| 2005 | Allies for Action Award, Suicide Prevention Action Network |
| 2000 | Special Act of Service Award, C.D.C. For leadership in conceptualizing and producing "Best Practices of Youth Violence Prevention." |
| 2002 | Surgeon General's Exemplary Service Award. For leadership in developing a National Strategy for Suicide Prevention. |
| 1998 | Builder Award for the National Strategy for Suicide Prevention, Suicide Prevention Advocacy Network |
| 1996 | Special Act of Service Award, C.D.C. For leadership toward establishing C.D.C.'s Behavioral and Social Science Working Group. |
| 1996 | Special Act of Service Award, C.D.C. For efforts to assess the achievement of Healthy People 2000 objectives in injury and violence. |
| 1993-96 | Equal Opportunity Award, C.D.C. For leadership toward creating a diverse work environment. |
| 1986 | Professional Development Award, Graduate School, the University of Texas at Austin |
| 1984-85 & 1988-89 | National Institute of Child Health and Development Trainee. the University of Texas at Austin. |

## Research Activities

*Peer-Reviewed*

1. National Academies of Sciences, Engineering, and Medicine. 2023. Assessing the 2020 Census: Final Report. Washington, DC: The National Academies Press. https://doi.org/10.17226/27150. (panel member and chair of data analysis sub-panel)

2. National Academies of Sciences, Engineering, and Medicine. 2022. Understanding the Quality of the 2020 Census: Interim Report. Washington, DC: The National Academies Press. https://doi.org/10.17226/26529. (panel member and member of data analysis sub-panel)

3. Potter, L.B.; Tremaine, D.M.; Banner, J.L. Predictors of Variations in Residential Water Consumption in Central Texas. Water 2022, 14, 1804. https://doi.org/10.3390/w14111804 (Impact factor 3.53).

4. Roghani, A., Nyarko, S.H. & Potter, L. Smoking Cigarettes, Marijuana, and the Transition to Marriage among Cohabiters in the U.S.A. Glob Soc Welf (2021). https://doi.org/10.1007/s40609-021-00211-w (Impact factor: 0.31).

5. Nyarko SH, Potter L (2021) Levels and socioeconomic correlates of nonmarital fertility in Ghana. PLoS O.N.E. 16(2): e0247189. https://doi.org/10.1371/journal.pone.0247189 (Impact factor: 2.74)

6. Bitew, F.H., Nyarko, S.H., Potter, L. Sparks, C., Machine learning approach for predicting under-five mortality determinants in Ethiopia: evidence from the 2016 Ethiopian Demographic and Health Survey. Genus 76, 37 (2020). https://doi.org/10.1186/s41118-020-00106-2. (Impact factor:1.40)

7. Nyarko SH, Potter L., Effect of socioeconomic inequalities and contextual factors on induced abortion in Ghana: A Bayesian multilevel analysis. PLoS One. 2020;15(7):e0235917. Published 2020 July 9. DOI: https://doi.org/10.1371/journal.pone.0235917 (Impact factor: 2.74)

8. Kim, J., Potter, L.B., U.S. Fertility Decline and Recuperation Following the Great Recession by County-Level Industrial Composition of the Labor Force. Spatial Demography, 8, 193–210 (2020). https://doi.org/10.1007/s40980-020-00063-6 (impact factor 1.2).

9. Valenzuela, C., Valencia, A., White, S., Jordan, J. J., Cano, S. L., Keating, J. P., Nagorski, J. J., Potter, L.B., An analysis of monthly household energy consumption among single-family residences in Texas, 2010, Energy Policy, 2014(69):263-272, ISSN 0301-4215, http://dx.doi.org/10.1016/j.enpol.2013.12.009. (corresponding author with a student as first, Impact factor:4.039).

10. Howard, J.T., Potter, L.B., An assessment of the relationships between overweight, obesity, related chronic health conditions, and worker absenteeism. Obesity Research & Clinical Practice 2014(8):1-15. (student first author - Impact factor: 2.062)

11. Goldston D, Walrath C, McKeon R, Puddy R, Lubell K, Potter L, Rodi M.. The Garrett Lee Smith Memorial Suicide Prevention Program. Suicide & Life-Threatening Behavior 2010;40 (3):245-256. (Impact factor:3.032)

12. Durant T, Mercy J, Kresnow M, Simon T, Potter L, Hammond R. Racial Differences in Hopelessness as a Risk Factor for a Nearly Lethal Suicide. Journal of Black Psychology.2006; 32: 285-302 (Impact factor 1.55)

13. Stone D, Barber C, Potter L. Public health training online: the National Center for Suicide Prevention Training. American Journal of Preventive Medicine, 2005;29: 247–51.

14. Potter L, Stone D. Suicide prevention in schools: what can and should be done. American Journal of Health Education, 2003, 34(5 Suppl): s35-s41

15. Powell K, Kresnow M, Mercy J, Potter L, Swann A, Frankowski R, Lee R, Bayer T. Alcohol Consumption and Nearly Lethal Suicide Attempts. Suicide and Life-Threatening Behavior, 2001;31(5): S.S. 30-41.

16. Potter L, Kresnow M, Powell K, Simon T, Mercy J, Lee R, Frankowski R, Swann A, Bayer T, O'Carroll P. The Influence of Geographic Mobility on Nearly Lethal Suicide Attempts. Suicide and Life-Threatening Behavior, 2001;31(5): S.S. 42-48.

17. Kresnow M, Ikeda R, Mercy J, Powell K, Potter L, Simon T, Lee R, Frankowski R. An Unmatched Case-Control Study of Nearly Lethal Suicide Attempts in Houston, Texas: Research Methods and Measurements. Suicide and Life-Threatening Behavior, 2001;31(5): S.S. 7-20.

18. Swahn M, Potter L. Factors Associated with the Medical Severity of Suicide Attempts in Youths and Young Adults. Suicide and Life-Threatening Behavior, 2001;31(5): S.S. 21-29.

19. Simon T, Swann A, Powell K, Potter L, Kresnow M, O'Carroll P. Characteristics of Impulsive Suicide Attempts and Attempters. Suicide and Life-Threatening Behavior, 2001;31(5): S.S. 49-59.

20. Ikeda R, Kresnow M, Mercy J, Powell K, Simon T, Potter L, Durant T, Swahn M. Medical Conditions and Nearly Lethal Suicide Attempts. Suicide and Life-Threatening Behavior, 2001;31(5): S.S. 60-68.

21. Anderson M,  Kaufman J,  Simon T, Barrios L. Paulozzi L, Ryan G, Hammond R, Modzeleski W, Feucht T, Potter L, School-Associated Violent Deaths Study Group. "School-Associated Violent Deaths in the United States, 1994-1999," JAMA. 2001;286:2695-2702.

22. Dahlberg LL., Potter LB. Youth violence: developmental pathways and prevention challenges. American Journal of Preventive Medicine 2001;20(1 Suppl 1):3-14.

23. Kresnow M, Powell KE, Webb KB, Mercy JA, Potter LB, Simon TR, Ikeda RM, Frankowski R. Assigning time-linked exposure status to controls in unmatched case-control studies: alcohol use and nearly lethal suicide attempts. Statistics in Medicine 2001;20(9/10):1479-85

24. Mercy J, Kresnow M, O'Carroll P, Lee R, Powell K, Potter L, Swann A, Frankowski R, Bayer T. Is Suicide Contagious? A Study of the Relation between Exposure to the Suicidal Behavior of Others and Nearly Lethal Suicide Attempts. Am. J. Epidemiol. 2001 154: 120-127

25. Johnson G, Krug E, Potter L. Suicide Among Adolescents And Young Adults: A Cross-National Comparison Of 34 Countries. Suicide and Life-Threatening Behavior, 2000 Spring; 30(1):74-82.

26. Potter L, Sacks J, Kresnow M, Mercy J. Nonfatal Physical Violence, United States, 1994. Public Health Reports. 1999 Jul-Aug;114(4):343-52.

27. Potter L, Kresnow M, Powell K, O'Carroll P, Lee R, Frankowski R, Swann A, Bayer T, Bautista M, Briscoe M. Identification of nearly fatal suicide attempts: Self-Inflicted Injury Severity Form. Suicide and Life-Threatening Behavior. 28(2):174-186, 1998.

28. Grabbie L, Demi A, Camann M, Potter L. Suicide and health status among the elderly: The National Mortality Followback Survey. American Journal of Public Health, 1997 Mar;87(3):434-7.

29. Mercy J, Potter L.  Combining analysis and action to solve the problem of youth violence. American Journal of Preventive Medicine 1996; Supplement to Volume 12(5):1-2.

30. Kachur S., Potter L, Powell K, Rosenberg M. Suicide: Epidemiology, Prevention, Treatment. Adolescent Medicine: State of the Art Reviews, 25(2):171-182, 1995.

31. Potter L, Powell K, Kachur S. Suicide Prevention from a Public Health Perspective. Suicide and Life-Threatening Behavior, 25(1):83-92, 1995.

32. Potter L, Rogler L, Moscicki E. Depression Among Puerto Ricans in New York City: The Hispanic Health and Nutrition Examination Survey. Social Psychiatry and Psychiatric Epidemiology, 30:185-193, 1995.

33. Potter L, Anderson J.  Patterns of Condom Use, Sexual Behavior and STDs/H.I.V. Among Never-Married Women. Sexually Transmitted Diseases, 20(4), 1993.

34. Burr J, Potter LB, Galle O, Fossett M.  Migration and Metropolitan Opportunity Structures: A Demographic Response to Racial Inequality. Social Science Research, 22, 1992.

35. Galle O, Burr J, Potter L.  Rethinking Measures of Migration: On the Decomposition of Net Migration. Social Indicators Research, 28, 1992.

36. Potter L.  Socioeconomic Determinants of Black-White Male Life Expectancy Differentials, 1980. Demography, 28(2):303-322, 1991.

37. Potter L, Galle O.  Residential and Racial Mortality Differentials in the South by Cause-of-Death. Rural Sociology, Summer 1990.

*Peer-reviewed – under review*
1. Uddin MS, Potter  L. Applicability of the Nighttime Light Data as an Ancillary Tool to Estimate the Population at the County and Place Level of Texas. Journal of Spatial Demography. Revised and resubmitted (8-22-24); currently under review.

*Edited Book*
1. Hoque, N., Potter, LB. (eds), Emerging Techniques in Applied Demography, Dordrecht Heidelberg New York London: Springer, (2014). ISBN 978-94-017-8989-9.

*Book Chapters*
1. Potter, L. Chapter 13 Youth Suicide. In Liller K.D. (ed), Injury Prevention for Children and Adolescents: Research, Practice, and Advocacy 2nd Edition. Washington, DC: American Public Health Association, 2012, eISBN: 978-0-87553-250-9
2. Potter L. Violence Prevention. In Gorin SS, Arnold J (eds), Health Promotion in Practice, Chapter 12 (pp. 392-426). San Francisco, CA: Jossey-Bass, 2006.
3. Potter L. Youth Suicide. In Liller K.D. (ed), Injury Prevention for Children and Adolescents: Research, Practice, and Advocacy, Chapter 13 (pp. 321-340). Washington, DC: American Public Health Association, 2006.
4. Potter L. Public Health and Suicide Prevention. In Lester D (ed), Suicide Prevention: Resources for the New Millennium, Chapter 5 (pp. 67-82). Ann Arbor, MI: Sheridan Books, 2000.
5. Potter L. Understanding the Incidence and Origins of Community Violence: Toward a Comprehensive Perspective of Violence Prevention. In Gullotta T (ed), Violence In Homes And Communities, Chapter 4 (pp. 101-132). Sage Publications, 1999.
6. Cohen L, Potter L.  Injuries and Violence: Risk Factors and Opportunities for Prevention During Violence. In: Fisher M, Juszczak L, Klerman L, eds. Adolescent Medicine: Prevention Issues in Adolescent Health Care. Philadelphia, PA: Hanley & Belfus, Inc., 1999:125-135.
7. Potter L, Mercy J.  Public health perspective on interpersonal violence among youths in the United States. In Stoff DM, Breiling J, Maser JD, editors.  Handbook of antisocial behavior. New York: John Wiley & Sons, Inc; 1997
8. Potter L, Powell K. The Public Health Approach to Suicide Prevention in the United States. Pp.329-345, in Ramsey RF, Tanney BL (`eds), Global Trends in Suicide Prevention: Toward the Development of National Strategies for Suicide Prevention. Mumbai, India: Tata Institute of Social Sciences, 1996.
9. Murdock S, Leistritz F, Hamm R, Albrecht D, Potter L, Backman K.  Impacts of the Farm Financial Crisis of the 1980s on Resources and Poverty in Agriculturally Dependent Counties in the United States. Pp. 67-94 in Rodgers H, Weiher G, (eds.). Rural Poverty: Special Causes and Policy Reforms. NY: Greenwood Press 1989.
10. Murdock S, Leistritz F, Hamm R, Albrecht D, Potter L, Backman K.  Impacts of the Farm Financial Crisis of the 1980s on Resources and Poverty in Agriculturally Dependent Counties in the United States. Policy Studies Review, 1988;7(4):810-827.
11. Murdock S, Potter L, Hamm R, Backman K, Albrecht D, Leistritz L.  The Implications of the Current Farm Crisis for Rural America. Pp. 169-184 in Steve Murdock and Larry

Plaintiffs' Combined MSJ Exhibits - Page 330
L.B. Potter – September 2024

Leistritz (eds.)  The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas. Boulder, Colorado: Westview Press, 1988.

12. Murdock S, Potter L, Hamm R, Albrecht D. Demographic Characteristics of Rural Residents in Financial Distress and Social and Community Impacts of the Farm Crisis. Pp. 113- 140 in Steve Murdock and Larry Leistritz (eds.) The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas. Boulder, Colorado: Westview Press, 1988.

13. Murdock S, Albrecht D, Potter L, Backman K, Hamm R.  Demographic, Socioeconomic and Service Characteristics of Rural Areas in the United States: The Human Resource Base for the Response to the Crisis. Pp. 45-73 in Murdock S, Leistritz L, (eds.)  The Farm Financial Crisis: Socioeconomic Dimensions and Implications for Producers and Rural Areas. Boulder, Colorado: Westview Press, 1988.

*Commentary*

1. Potter L, Salvo J.  "STANDARD DEVIATIONS: Data Utility vs. Confidentiality: How Can We Square the Circle for the 2030 Census Data Products?" Posted on May 22, 2024, by The Census Project, Posted in Census 2020. https://thecensusproject.org/2024/05/22/standard-deviations-data-utility-vs-confidentiality-how-can-we-square-the-circle-for-the-2030-census-data-products/.

2. Rosenberg M, Mercy J, Potter L. Firearms and suicide. New England Journal of Medicine. 1999 Nov 18;341(21):1609-11

3. Potter L, Rosenberg M, Hammond W. Suicide in youth: a public health framework [comment]. Journal of the American Academy of Child & Adolescent Psychiatry. 37(5);484-7, 1998 May.

*Other*

1. You, H., Geppert, J., Potter, L. Evaluating the Impact of Differential Privacy Using the Census Bureau's 2010 Demonstration Data Products. Texas Demographic Center, May 2021.

2. You, H., Huang, P., Geppert, J., Potter, L., Jordan, J., Texas Household Trends and Projections, 2010-2050. Texas Demographic Center, April 2021.

3. Huang, P., Jordan, J., You, H., Potter, L., Evaluation of the Proposed 2020 Metropolitan Statistical Areas Criteria. Texas Demographic Center, March 2021.

4. Valencia, A., You, H., Huang, P., Geppert, J., Potter, L.B. Texas's Most Vulnerable Populations. Texas Demographic Center, September 2020.

5. Huang, P., You, H., Valencia, A., Potter, L.B., 2018 Estimated Population of Texas, Its Counties, and Places. Texas Demographic Center, December 2019.

6. You, H., Potter, L.B., Valencia, A., Geppert, J., Huang, P. Texas Population Projections 2010 to 2050. Texas Demographic Center, September 2019.

7. Potter, L. Community Assessment AVANCE-San Antonio Head Start and Early Head Start Program 2019. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2019

8. Robinson, S., Valencia, L. You, H., Potter, L.B., White, S., Jordan, J.,  Diabetes in Texas. Texas Demographic Center, December 2018.

9. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B., Urban Texas - Part Four. Texas Demographic Center, November 2017

10. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J., Robinson, S., Urban Texas - Part Three. Texas Demographic Center, October 2017

11. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B., Urban Texas - Part Two. Texas Demographic Center, September 2017

12. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B., Robinson, S., Urban Texas - Part One. Texas Demographic Center, August 2017

13. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B., Texas Migration, Texas Demographic Center, January 2017

14. White, S., Potter, L. B., You, H., Valencia, A., Jordan, J., Pecotte, B. Texas Mobility. Texas Demographic Center, November 2016.

15. Valencia, A., Potter, L. B., White, S., You, H., Jordan, J., Pecotte, B. Aging in Texas: Introduction. Texas Demographic Center,  June 2016

16. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B., Introduction to Texas Domestic Migration. Texas Demographic Center, April 2016.

17. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B.,  The Foreign-Born Population in Texas: Sources of Growth Texas Demographic Center, October 2015.

18. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B., Origins of Immigrants to Texas Texas Demographic Center, May 2015.

19. White, S., Potter, L.B., You, H., Valencia, A., Jordan, J. Pecotte, B., Introduction to Migration in Texas Brief. Texas Demographic Center, March 2015.

20. Potter, L.B., Hoque, N., Texas Population Projections, 2010 to 2050.  Texas Demographic Center, November 2015.

21. Potter, L. Community Assessment: Wintergarden Head Start and Early Head Start Program 2015. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2015.

22. Potter, L. Community Assessment AVANCE-San Antonio Head Start and Early Head Start Program 2015. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2015

23. You, H., Potter, L.B. Educational Attainment Projections of the Texas Civilian Workforce, 2011-2030. Texas Demographic Center, 2014

24. Potter, L. Community Assessment: Wintergarden Head Start and Early Head Start Program 2014. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2014.

25. Potter, L. Community Assessment AVANCE-San Antonio Head Start and Early Head Start Program 2014. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2014.

26. Potter, L., Valenzuela, C., Flores, M., Jordan, J., Valencia, l., White, S., Keating, J., Canos,S., Nagorski, J., Karuppusamy, S. Robinson. S. Modeling Household Energy Consumption in Bexar County, 2010, Confidential Research Report. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2014.

27. Potter, L. Community Assessment Update, City of San Antonio Head Start Program. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2013

28. Potter, L (Chair), Horowitz, R., Robin, D., Tillyer, R. Recommendations for Fostering Research Productivity and Creating a Research Culture at the University of Texas at San Antonio. UTSA Research Advisory Board - Sub-Committee on Macro Research Issues, 2013

29. You, H., White, S., Potter, L. An Examination of Static and Dynamic Aspects of Uninsurance In Texas. Institute for Demographic and Socioeconomic Research. Report for Methodist Healthcare Ministries. The University of Texas at San Antonio, 2012.

30. Potter, L., Ozuna, C., Campbell, J. Community Assessment San Antonio & Bexar County Head Start Program 2012. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2012

31. Garza, J., Flores, M., Jordan, J., Potter, L.  Community Assessment Report for San Antonio Head Start. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2010

32. Garza, J., Potter, L., Jordon, J. Community Assessment Report for San Antonio Head Start. Institute for Demographic and Socioeconomic Research, the University of Texas at San Antonio, 2009.

33. Malley E, Posner M, Potter L. Suicide risk and prevention for lesbian, gay, bisexual, and transgender youth. Suicide Prevention Resource Center. Newton, MA: Education Development Center, Inc. 2008.

34. Potter L, Silverman M, Connorton E, Posner M. Promoting Mental Health and Preventing Suicide in College and University Settings. Suicide Prevention Resource Center, Newton, MA: Education Development Center, Inc., 2004.

35. Potter L. Suicide Prevention: Prevention Effectiveness and Evaluation. Atlanta, GA: SPAN, U.S.A., 2001.

36. Silverman M, Davidson L, Potter L, (eds.) National Suicide Prevention Conference Background Papers, October 1998, Reno, Nevada. Suicide and Life-Threatening Behavior, 31(S), 2001.

37. Potter L, Hasbrouk L. Influence of Homicide on Racial Disparity in Life Expectancy --- United States, 1998. MMWR, September 14, 2001 / 50(36);780-3.

38. Davidson L, Potter L, Ross V. The Surgeon General's Call To Action To Prevent Suicide. Washington, DC: U.S. Public Health Service,1999.

39. Moscicki E, Muehrer P, Potter L.  Introduction to Supplemental Issue: Research Issues in Suicide and Sexual Orientation. Suicide and Life-Threatening Behavior 1995; Supplement:25:1-3.

40. Kachur S, Potter L, James S, Powell K.  Suicide in the United States, 1980-1992. Atlanta: Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 1995. Violence Surveillance Summary Series, No. 1.

41. O'Carroll P, Potter L., Mercy J. Suicide Contagion and the Reporting of Suicide: Recommendations from a National Workshop. MMWR 43(No. RR-6):8-18, 1994

42. O'Carroll P, Potter L. Programs for the Prevention of Suicide Among Adolescents and Young Adults. MMWR 43(No.RR-6):1-7, 1994

43. Murdock S, Potter L, Backman K, Hamm R, Hwang S.  Patterns of Post-1980 Population Change in Towns and Cities in Texas: An Analysis of the U.S. Bureau of the Census Population Estimates for 1982, 1984 and 1986. Department of Rural Sociology

Technical Report No. 88-2. College Station, Texas: The Texas Agricultural Experiment Station, March 1988.

44. Murdock S, Schriner E, Hamm R, Jones L, Potter L. An Analysis of Selected Human Resource and Environmental Impact Dimensions of the Amarillo and Dallas-Fort Worth Super-Conducting Super Collider Siting Areas. Report submitted to The National Research Laboratory Commission, Office of the Governor, State of Texas, July 1987.

**Granting Activities (Proposals Academic Year 23-24)**

1. "Unveiling Air Quality and Environmental Justice: Integrating Concentration and Source-Specific Emission with Exposure Inequalities in the U.S." Muhammad Salaha Uddin Lead PD/PI, Lloyd Potter, Co-PI, 10%, Sponsored by National Aeronautics & Space Administration, $921,640 (August 2, 2024).

2. "24-hour movement guideline adherence among children and youth in Texas from 2015 to 2023: Time trends, geographic determinants and associations with overweight/obesity." Timothy Grigsby, Lead PD/PI, Lloyd Potter, Co-PI, 5%, Sponsored by National Institutes of Health, $240,742 (October 20, 2023).

3.

**Granting Activities (Awards)**

1. "Head Start 2024 Comprehensive Community Needs Assessment Update" Lloyd Potter, Lead PD/PI, 100.00%, $5,835.(March-24-2024).

2. "Demographic Data and Assistance One-Stop Demographic Data Analysis Tool, Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Dept of Transportation, $1,526,538. (September 1, 2023 - August 31, 2026).

3. "Demographic Factors" Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by Texas Workforce Commission, $21,235 (December 15, 2021-March 31, 2022).

4. "Sustainable Transportation Electrification for an Equitable and Resilient Society, P.I.'s/Co-PI's;, Cynthia PI - 30.00% Gatsis, Nikolaos Co-PI - 30.00% Potter, Lloyd Co-PI - 20.00% Kumar, Amit Co-PI - 20.00% Sponsor: National Science Foundation, Texas A&M University, $24,995 (September 1, 2021-August 31,2022.

5. "Demographic Data Research and Analysis for Modelling Transportation Demand and Demographic Research Technical Assistance," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Dept of Transportation 601, $911,243. (October 1, 2021 - August 31, 2023).

6. "Upbring Early Head Start Community Assessments," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by Center for New Communities, $30,468.00. (June 1, 2021 – October 31, 2021).

7. "2021 Comprehensive Community Needs Assessment Update." Sponsored by South San Antonio I.S.D., $5,188 (June 21, 2021-September 27, 2021.

8. "AVANCE San Antonio Service Area Head Start/Early Head Start Community Assessment Update 2017," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $8,264. (March 22, 2021 - June 30, 2021).

Plaintiffs' Combined MSJ Exhibits - Page 334

L.B. Potter – September 2024

9. "AVANCE Wintergarden Service Area Head Start/Early Head Start Community Assessment Update 2017," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $7,941. . (March 22, 2021 - June 30, 2021).

10. "Texas Workforce Commission - Allocation Factors," Lloyd Potter, PD/PI, 100.00%, Sponsored by TX Workforce Comm 320, ~ $16,207.00. (December 1, 2013 - 2021).

11. "The New 100th Meridian: Urban Water Resiliency in a Climatic and Demographic Hot Spot," Lloyd Potter, CoPI, 100.00%, Sponsored by National Science Foundation through Univ of TX at Austin 721, $24,219.00. (June 1, 2016 - August 31, 2020).

12. "Demographic Data Research and Analysis for Modelling Transportation Demand and Demographic Research Technical Assistance," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Dept of Transportation 601, $573,601.60. (September 1, 2017 - August 31, 2019).

13. "Texas Workforce Commission Allocation Factors," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Workforce Comm 320, $17,323.00. (October 1, 2018 - May 31, 2019).

14. "Center for New Communities Early Head Start Community Assessment Update," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by Center for New Communities, $4,443.00. (May 1, 2018 - August 31, 2018).

15. "Texas Workforce Commission," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Workforce Comm 320, $17,323.00. (October 1, 2017 - August 31, 2018).

16. "AVANCE Wintergarden Head Start Community Assessment Update 2018," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $12,365.00. (April 15, 2018 - August 15, 2018).

17. "COSA Head Start Community Assessment Update 2018 and 2019," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by City of San Antonio, $13,000.00. (May 1, 2018 - July 31, 2018).

18. "San Antonio Service Area Community Assessment Update 2018," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $12,365.00. (April 15, 2018 - July 15, 2018).

19. "UTSA Graduate Student Services for CIVHTR:  Deleveaux Jamiko," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by U.S. Dept of Vet Affairs, $38,250.00. (May 1, 2016 - September 30, 2017).

20. "Comprehensive Community Needs Assessment Update," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by Center for New Communities, $4,308.00. (July 10, 2017 - September 29, 2017).

21. "COSA Head Start and Early Head Start Community Assessment Update 2017," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by City of San Antonio, $13,000.00. (April 1, 2017 - August 31, 2017).

22. "Demographic Data and Assistance," Lloyd Potter, Lead PD/PI, 100.00%; Jeffrey Jordan, Co-PD/P.I., 0.00%, Sponsored by TX Dept of Transportation 601, $506,870.00. (September 1, 2015 - August 31, 2017).

23. "Estimation allocation factors for local workforce development areas," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Workforce Comm 320, $17,323.00. (February 1, 2017 - August 30, 2017).

24. "AVANCE San Antonio Service Area Head Start/Early Head Start Community Assessment Update 2017," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by

AVANCE-San Antonio Inc, $10,692.00. (January 30, 2017 - March 31, 2017).

25. "AVANCE Wintergarden Service Area Head Start/Early Head Start Community Assessment Update 2017," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $13,954.00. (January 30, 2017 - March 31, 2017).

26. "Evaluation of the COSA Financial Empowerment Counselling program," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by City of San Antonio, $24,562.00. (July 1, 2016 - November 30, 2016).

27. "Intergovernmental Personnel Assignment Agreement," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by U.S. Dept of Vet Affairs, $34,875.00. (June 15, 2015 - September 30, 2016).

28. "Task order for the base year Support Services," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by U.S. Dept of Vet Affairs, $13,407.00. (May 16, 2016 - September 28, 2016).

29. "Task order for the base year Support Services," Lloyd Potter, Lead PD/PI, 50.00%; Adel Alaeddini, Co-PD/P.I., 50.00%, Sponsored by U.S. Dept of Vet Affairs, $33,116.52. (September 29, 2015 - September 28, 2016).

30. "Estimation allocation factors for local workforce development areas," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Workforce Comm 320, $16,903.00. (November 1, 2015 - August 31, 2016).

31. "COSA Head Start Community Assessment Update 2016," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by City of San Antonio, $13,000.00. (April 1, 2016 - June 30, 2016).

32. "2016 Comprehensive Community Assessment Wintergarden Head Start/Early Head Start Service Area," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $12,451.00. (February 2, 2016 - April 30, 2016).

33. "Community Service Block Grant (CSBG) and Head Start Community Assessment Report," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by City of San Antonio, $27,067.00. (April 1, 2015 - January 31, 2016).

34. "Research collaboration on health care and veterans," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by U.S. Dept of Vet Affairs, $270,000.00. (September 15, 2014 - September 14, 2015).

35. "Texas Workforce Commission Allocation Factors," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by TX Workforce Comm 320, $16,207.00. (November 1, 2014 - August 31, 2015).

36. "San Antonio Health Care Data Analysis Cluster (SAHCDAC)," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by UTSA VPR Office, $149,406.00. (September 1, 2014 - August 31, 2015).

37. "Community Needs Assessment - Community Action Corporation of South Texas (CACOST)," Lloyd Potter, Lead PD/PI, 90.00%; Misty Sailors, Co-PD/P.I., 10.00%, Sponsored by Community Action Corp of So TX (CACOST), $53,689.00. (March 18, 2015 - July 18, 2015).

38. "Head Start Community Assessment Update Wintergarden Head Start/Early Head Start Service Area," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $9,808.00. (January 27, 2015 - March 27, 2015).

39. "Head Start/Early Head Start Community Assessment Update - San Antonio Service Area," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio

Inc, $9,808.00. (January 27, 2015 - March 27, 2015).

40. "Survey of Bexar County residents regarding emergency preparedness," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by Bexar County, $15,000.00. (December 1, 2014 - January 31, 2015).

41. "San Antonio Head Start Community Assessment Update," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by City of San Antonio, $25,000.00. (October 11, 2014 - January 31, 2015).

42. "SA2020 Integrated Database System," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by SA2020, $96,033.00. (November 1, 2013 - August 31, 2014).

43. "AVANCE Wintergarden HS EHS CA Update Bid," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $8,101.00. (March 1, 2014 - April 30, 2014).

44. "Head Start Community Assessment for Harlandale," Lloyd Potter, Lead PD/PI, 100.00%, Sponsored by AVANCE-San Antonio Inc, $23,292.00. (November 1, 2013 - February 28, 2014).

45. "San Antonio Head Start Community Assessment," Lloyd Potter, PD/PI, 100.00%, Sponsored by City of San Antonio, $24,170.00. (October 1, 2013 - January 31, 2014).

## Teaching

*Dissertations chaired:*

1. Elahkim Ibrahim, December 2023,  Commonness, Correlates and Consequences of High-Risk Fertility Dissertations chaired:y Behavior Ii Sub-Saharan Africa: Insights from Demographic and Health Surveys

2. Jeffrey Wright, August 2020. The Purpling of the Peach: Demographic Change and Partisanship in the State of Georgia

3. Samuel Nyarko, April 2020, Socioeconomic and contextual determinants of fertility in Ghana: A Bayesian multilevel approach

4. Andrés Gallardo De Las Peñas, May 2019, Measuring the Impact of Aging and Migration on the Economic Activity of the United States

5. Jessica Omoregie, December 2018, Determinants of Women's Health in Nigeria: The Role of Media Exposure and Autonomy

6. Daniela Krotzer, May 2018, Employment Changes Corresponding to the Duration of Disability

7. Jewel Barnett, December 2017, Barriers to Health: Place and Food Insecurity as Determinants of Childhood Obesity

8. Pamela Willrodt, July 2016, Vietnam-Era Veteran Health:  A Life-Course Perspective at the End of Middle-Adulthood

9. Mikiko Oliver, August 2015, Population Aging and Economic Growth in the United States and Japan

10. Alexis Santos Lozano, April 2015, Inequalities in Human Papillomavirus Vaccination for Female Adolescents in the United States

11. John Garza, April 2014, Spatially Oriented Demographic Determinants of Foreclosures in Bexar County

12. Sadasivan Karuppusamy, September 2013, The Determinants and Trends in the Household Energy Consumption for Different End Users in the United States During 2001-2009

13

Plaintiffs' Combined MSJ Exhibits - Page 337
L.B. Potter – September 2024

13. Carlos Valenzuela, April 2013, An Analysis of Household Energy Consumption by Race/Ethnic Composition:  Incorporating Racial Stratification in the Lifestyle Perspective,
14. Frank Martinez III, December 2012, Las Colonias de la Frontera: A Study of Substandard Housing Settlements along the Texas-Mexico Border

Plaintiffs' Combined MSJ Exhibits - Page 338

*Dissertation committee member:*

Joseph Jaiyeola – in progress
Coda Rayo-Garza – in progress
Jyoti Nepal– in progress
Julie Gonzalez, November 2023
Sarah Sharmin, November 2023
Joshua Reyna, August 2023
Ricardo Ramirez, April 2022
William H. Kazanis, November 2021
Kahlí Hedrick-Romano, June 2020
Ali Roghani, June 2020
Paulina Cano McCutcheon, April 2020
Serge Atherwood, April 2020
Fikrewold Bitew, April 2020
Jeongsoo Kim, March 2020
Stephanie Hernandez, March 2020
Stephen Sano, November 2019
Jamiko Deleveaux, December 2018
Federico Ghirimoldi, April 2018
Brico Vasquez, April 2018
Jose Louro, April 2018
Sara Robinson, May 2018
Lorenzo Sanchez. May 2018
Dorian Galindo, May 2018
Sharon Goodwin, May 2017
Rebecca Adeigbe, May 2017
Clarissa Ozuna, December 2017
Andrea Bautista, November, 2017
Xiaoling Liang, August, 2017
Paul Chance Kinnison, June 2016
Danielle Gordon, May 2016

Dan Shinaberry, April 2016
Daesung Choi, December 2015
Heidy Colon Lugo, December 2015
Romona Serban, August 2015
Mikiko Oliver, August 2015
Jeffrey Howard, April 2014
Susanne Schmidt, December 2013
Jinny Case, June 2013
Brian Munkombwe, April 2013
Rabindra K.C., December 2013
Mathew Martinez, December 2013
Ke Meng, December 2012
Samantha John, December 2012
Victoria Locke, May 2012
Alma Martinez-Jimenez, December 2011
Lila Valencia, May 2011
David Armstrong, May 2011
Emma Mancha, May 2011
Joseph Campbell, May 2011
Mary Hogan, May 2011
Gilbert Suarez, May 2011
Mike Cline, August 2010
Miguel Flores, August 2010
Deborah Perez, August 2010
Eliza Hernandez, August 2010
Jennifer Roth, August 2010
Marguerite Sagna, August 2010
Mary Bollinger, May 2010

*Dissertations chaired - in progress:*
1. Noelia Flores
2. Bryan Solomon
3. Tobias Kuhn
4. Sarah Serpas

15

L.B. Potter – September 2024

Plaintiffs' Combined MSJ Exhibits - Page 339

*Courses taught at UTSA (all graduate):*
- Disparities in Health and Health Care
- Applied Demography and Urban and Regional Planning
- Applied Demography in Policy Settings
- Demographic Methods of Analysis
- Social Demography and Community Trends
- Social and Economic Impact Assessment
- Survey Methods for Demographers
- Special Topic Reading Courses (multiple)
- Dissertation hours (multiple)

**Service**

*Professional*

*President,* Southern Demographic Association, 2015

*Co-Editor:* Population Research and Policy Review (peer-reviewed journal) 2015

*Peer reviewer:*

Suicide and Life-Threatening Behavior

American Journal of Preventive Medicine

American Journal of Public Health

Archives of General Psychiatry

Demography

Injury Prevention

New England Journal of Medicine

*Miscellaneous:*
- State Demographer of Texas, 2010 to Present
- Testimony on demographic topics for Texas House and Senate standing and special committees
- Consultation with Texas House and Senate members and staff members on various demographic topics
- Demographic analysis for San Antonio Mayor's Office for Pre-K for S.A.
- Public speaking on demographic topics (~35 per year)
- News items using Google search
- Video clips using Google search
- San Antonio P-16 Data Support Council Member 2012-2016
- San Antonio CI Now Board Member and former Chair
- Applied Demography Conference, organizer, and program chair for 2010, 2012, 2014, and 2017.

L.B. Potter – September 2024
Plaintiffs' Combined MSJ Exhibits - Page 340

*University (partial listing)*

    2020-24
    HCAP Research Committee
    Faculty Grievance Committee 2017-present
    HCAP College Executive Committee 2019-2020
    Committee on Conflict of Interest (CCOI) in Research and Intellectual Property

    2018-19
    COPP College Executive Council
    Faculty Grievance Committee
    Committee on Conflict of Interest (CCOI) in Research and Intellectual Property

    2017-18
    COPP College Executive Council
    College Faculty Development and Research Committee (CFDRC)
    University Assembly
    Faculty Grievance Committee

    2016-17
    COPP College Executive Council
    COPP College Faculty Council, Chair
    UTSA Faculty Senate Representative- Demography
        Academic Freedom, Evaluation, and Merit Committee
    UTSA Graduate Council - Graduate Program Evaluation Committee
    University Assembly

    2015-16
    COPP College Executive Council
    COPP College Faculty Council, Chair
    College Faculty Development and Research Committee (CFDRC)
    UTSA Faculty Senate Representative- Demography
    Academic Freedom, Evaluation, and Merit Committee
    UTSA Graduate Council Committee
    Graduate Program Evaluation
    University Assembly

    2014-15
    COPP College Executive Council
    UTSA Faculty Senate
    College Faculty Review Advisory Committee (CFRAC)
    College Faculty Development and Research Committee (CFDRC)
    Research Advisory Board

L.B. Potter − September 2024
Plaintiffs' Combined MSJ Exhibits - Page 341

**Summary of student course evaluation surveys**

**Faculty Name:**    Lloyd B. Potter

**Faculty Rank:**    Professor

**Department:**    Sociology and Demography, College for Health, Community and Policy

**Terms Included:** August 1, 2013 – May 31, 2024

| Term | Course/Section | Course Type (L.D., U.D., GR) | New Course Prep? | Course Enrollment | No of Responses | Overall Course Rating* | Overall Instructor Rating* |
|---|---|---|---|---|---|---|---|
| Spring 2024 | DEM 7073-003 | GR | | 15 | 13 | 4.92 | 5.00 |
| Spring 2023 | DEM 7073-001 | GR | | 9 | 5 | 5.00 | 5.00 |
| Fall 2022 | DEM 7013-901 | GR | | 9 | 9 | 4.7 | 4.8 |
| Fall 2021 | DEM 7013 – 901 | GR | | 10 | 1 | 5.00 | 5.00 |
| Spring 2021 | DEM 7073- 901 | GR | X | 6 | 5 | 5.00 | 4.60 |
| Fall 2020 | DEM 7013 – 901 | GR | | 15 | 6 | 4.67 | 4.67 |
| Fall 2019 | DEM 5013 – 901 | GR | | 7 | 4 | 5.00 | 5.00 |
| Spring 2019 | DEM 7153 – 901 | GR | X | 7 | 7 | 5.00 | 5.00 |
| Fall 2018 | DEM 7013 – 901 | GR | | 6 | 4 | 4.50 | 4.50 |
| Fall 2017 | DEM 7013 – 901 | GR | | 6 | 5 | 4.80 | 4.60 |
| Fall 2016 | DEM 7013 – 901 | GR | | 7 | 6 | 4.50 | 4.50 |
| Spring 2016 | DEM 7063 – 901 | GR | | 10 | 10 | 4.40 | 4.60 |
| Fall 2015 | DEM 7013 – 901 | GR | | 10 | 10 | 4.60 | 4.30 |
| Fall 2014 | DEM 7013 – 901 | GR | | 10 | 9 | 4.88 | 4.88 |
| Spring 2014 | DEM 7023 – 901 | GR | | 6 | 4 | 4.25 | 4.50 |
| Fall 2013 | DEM 7013 – 901 | GR | | 9 | 7 | 4.28 | 4.57 |

* 5 highest, 0 lowest

Courses taught:

DEM 5013. Demographic Methods of Analysis (combined master's and Ph.D. students).

DEM 7013. Demographic Methods of Analysis

DEM 7023. Advanced Methods of Demographic Analysis

DEM 7153. Applied Demography in Public Health.

L.B. Potter – September 2024

Plaintiffs' Combined MSJ Exhibits - Page 342

DEM 7063. Applied Demography in Policy Settings

DEM 7073. Disparities in Health and Health Care

DEM 7173. Applied Demography in Urban and Regional Planning (small class-no evaluation).

**Publications Authored or Co-Authored by Lloyd Potter in the Past 10 Years**

1. National Academies of Sciences, Engineering, and Medicine. 2023. Assessing the 2020 Census: Final Report. Washington, DC: The National Academies Press. https://doi.org/10.17226/27150. (panel member and chair of data analysis sub-panel)

2. National Academies of Sciences, Engineering, and Medicine. 2022. Understanding the Quality of the 2020 Census: Interim Report. Washington, DC: The National Academies Press. https://doi.org/10.17226/26529. (panel member and member of data analysis sub-panel)

3. Potter, L.B.; Tremaine, D.M.; Banner, J.L. Predictors of Variations in Residential Water Consumption in Central Texas. Water 2022, 14, 1804. https://doi.org/10.3390/w14111804 (Impact factor 3.53).

4. Roghani, A., Nyarko, S.H. & Potter, L. Smoking Cigarettes, Marijuana, and the Transition to Marriage among Cohabiters in the U.S.A. Glob Soc Welf (2021). https://doi.org/10.1007/s40609-021-00211-w (Impact factor: 0.31).

5. Nyarko SH, Potter L (2021) Levels and socioeconomic correlates of nonmarital fertility in Ghana. PLoS O.N.E. 16(2): e0247189. https://doi.org/10.1371/journal.pone.0247189 (Impact factor: 2.74)

6. Bitew, F.H., Nyarko, S.H., Potter, L. Sparks, C., Machine learning approach for predicting under-five mortality determinants in Ethiopia: evidence from the 2016 Ethiopian Demographic and Health Survey. Genus 76, 37 (2020). https://doi.org/10.1186/s41118-020-00106-2. (Impact factor:1.40)

7. Nyarko SH, Potter L., Effect of socioeconomic inequalities and contextual factors on induced abortion in Ghana: A Bayesian multilevel analysis. PLoS One. 2020;15(7):e0235917. Published 2020 July 9. DOI: https://doi.org/10.1371/journal.pone.0235917 (Impact factor: 2.74)

8. Kim, J., Potter, L.B., U.S. Fertility Decline and Recuperation Following the Great Recession by County-Level Industrial Composition of the Labor Force. Spatial Demography, 8, 193–210 (2020). https://doi.org/10.1007/s40980-020-00063-6 (impact factor 1.2).

9. Valenzuela, C., Valencia, A., White, S., Jordan, J. J., Cano, S. L., Keating, J. P., Nagorski, J. J., Potter, L.B., An analysis of monthly household energy consumption among single-family residences in Texas, 2010, Energy Policy, 2014(69):263-272, ISSN 0301-4215, http://dx.doi.org/10.1016/j.enpol.2013.12.009. (corresponding author with a student as first, Impact factor:4.039).

10. Howard, J.T., Potter, L.B., An assessment of the relationships between overweight, obesity, related chronic health conditions, and worker absenteeism. Obesity Research & Clinical Practice 2014(8):1-15. (student first author - Impact factor: 2.062)

*Peer-reviewed – under review*

1. Uddin MS, Potter L. Applicability of the Nighttime Light Data as an Ancillary Tool to Estimate the Population at the County and Place Level of Texas. Journal of Spatial Demography. Revised and resubmitted (8-22-24); currently under review.

*Edited Book*

1. Hoque, N., Potter, LB. (eds), Emerging Techniques in Applied Demography, Dordrecht Heidelberg New York London: Springer, (2014). ISBN 978-94-017-8989-9.