**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | No. 6:24-cv-00306 |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| Defendants. | § | |
| | § | |

**AMICUS CURIAE BRIEF OF THE AMERICAN IMMIGRATION LAWYERS**
**ASSOCIATION IN SUPPORT OF DEFENDANTS**

1

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................3

STATEMENT OF INTEREST OF AMICUS CURIAE ..................................................6

INTRODUCTION ..............................................................................................................7

ARGUMENT ......................................................................................................................7

   I.    AN OVERVIEW OF DIFFERENT PATHS TO LAWFUL STATUS .............................8

     a.   THE STATUTORY SCHEME .........................................................................8

     b.   GROUNDS OF INADMISSIBILITY & WAIVERS ....................................11

   II.    CONSULAR PROCESSING—REALITIES AND DANGERS ................................13

     a.   FAMILY SEPARATION DUE TO SCHEDULING ISSUES .....................13

     b.   FAMILY SEPARATION DUE TO PROCESSING DELAYS ...................14

     c.   FAMILY SEPARATION DUE TO CONSULAR ERRORS ......................16

     d.   RISKS OF HARM TO U.S. CITIZEN FAMILY MEMBERS ...................18

     e.   RISKS OF VIOLENCE AND DEATH ABROAD ......................................21

   III.   KFT PAROLE IS IN LINE WITH SIMILAR PAST PROGRAMS ...........................26

   IV.   CONCLUSION ...................................................................................................28

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Dep't of State v. Munoz*, 144 S. Ct. 1812 (2024) ........................................................................ 12

**Statutes**

8 U.S.C. § 1154(a)(1)(A)(i). ........................................................................................................ 9

8 U.S.C. § 1154(b) ...................................................................................................................... 11

8 U.S.C. § 1182 ........................................................................................................................... 10

8 U.S.C. § 1182(a)(6)(B) ............................................................................................................ 12

8 U.S.C. § 1182(a)(6)(e) ............................................................................................................. 15

8 U.S.C. § 1182(a)(9)(A)(ii). ...................................................................................................... 12

8 U.S.C. § 1182(a)(9)(A)(iii) ...................................................................................................... 12

8 U.S.C. § 1182(a)(9)(B)(v) ....................................................................................................... 12

8 U.S.C. § 1202(a)-(b) ................................................................................................................ 11

8 U.S.C. § 1255(a) ................................................................................................................... 9, 10

8 U.S.C. § 1255(a)(1) .................................................................................................................. 10

8 U.S.C. § 1255(c) ........................................................................................................................ 9

8 U.S.C. § 1255(i) ......................................................................................................................... 9

8 U.S.C. §§ 1182(a)(9)(B)(i)(I)-(II) ........................................................................................... 12

8 U.S.C. § 1201(a)(1) .................................................................................................................. 11

8 U.S.C. §§ 1201(a)-(e) .............................................................................................................. 11

**Regulations**

22 C.F.R. § 42.62 ........................................................................................................................ 11

8 C.F.R. § 212.7(a) ...................................................................................................................... 13

8 C.F.R. § 212.7(e)(14) ............................................................................................................... 13

8 C.F.R. § 212.7(e) ...................................................................................................................... 12

8 C.F.R. § 245.1 .......................................................................................................................... 10

8 C.F.R. § 245.2 .......................................................................................................................... 10

8 C.F.R. § 103.2(b)(9) ................................................................................................................. 10

8 C.F.R. § 142.3-.18 (1949) ........................................................................................................ 28

8 C.F.R. § 212.2(j) ...................................................................................................................... 12

8 CFR § 103.2(b)(8) .................................................................................................................... 26

## Other Authorities

78 Fed. Reg. 536 ........................................................................................................ 28

89 Fed. Reg. at 67466. ............................................................................................... 23

89 Fed. Reg. at 67475, 67468-9 (Aug. 20, 2024). ..................................................... 27

Almudena Barragán, *More than 3,000 women are murdered in Mexico each year: How violence affects the youngest victims*, El Pais, Nov. 25, 2023, *available at* https://english.elpais.com/international/2023-11-25/more-than-3000-women-are-murdered-in-mexico-each-year-how-violence-affects-the-youngest-victims.html ...................................... 16

Bastian Herre, *Violence between Mexican drug cartels has surged in recent years*, Our World In Data, July 16, 2024, *available at* https://ourworldindata.org/data-insights/violence-between-mexican-drug-cartels-has-surged-in-recent-years.................................................................. 16

H.R. Rep. No. 82-2096, at 128 (1952)......................................................................... 28

PBS News, *Record 3 million cases clog U.S. immigration courts*, Jan. 15, 2024, *available at* https://www.pbs.org/newshour/nation/record-3-million-cases-clog-u-s-immigration-courts .. 23

"Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives," 78 Fed. Reg. 536 (January 3, 2013). ....................................................................... 11

USCIS Policy Manual, Ch. 6, Evidence, available at https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-6 (last accessed Oct. 24, 2024). .......................................... 26

USCIS Policy Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces* (Nov. 15, 2013) ................................................. 28

USCIS, Adjustment of Status, *available at* https://www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-of-status ...................................................... 10

USCIS, Apr. 3, 2007, "*New Pilot I-601 Waiver Adjudication Program, Ciudad Juarez, Mexico, American Consulate.*", Available at https://www.aila.org/aila-files/11326214-E1E9-46BD-A0E3-C5D00BB3F2D7/07042666.pdf. ...................................................... 28

USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/https://egov.uscis.gov/processing-times/......................................................... 16

USCIS, Consular Processing, *available at* https://www.uscis.gov/green-card/green-card-processes-and-procedures/consular-processing ...................................................... 11

USCIS, Filing Guide for Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, available at https://www.uscis.gov/sites/default/files/document/guides/USCIS-Filing-Guide-Form-I-131F.pdf.............................................................................................................. 26

USCIS, I-485, Application to Register Permanent Residence or Adjust Status, *available at* https://www.uscis.gov/i-485 .......................................................................... 10

4

USCIS, I-601, Application for Waiver of Grounds of Inadmissibility, *available at*
    https://www.uscis.gov/i-601 ................................................................................... 10

USCIS, I-601, Application for Waiver of Grounds of Inadmissibility, *available at*
    https://www.uscis.gov/i-601 (last accessed Oct. 24, 2024). .................................... 13

USCIS, I-601A, Application for Provisional Unlawful Presence Waiver, *available at*
    https://www.uscis.gov/i-601a (last accessed Oct. 24, 2024). ................................... 12

## STATEMENT OF INTEREST OF AMICUS CURIAE[1]

Amicus curiae, American Immigration Lawyers Association (AILA), is a national association with nearly 17,000 members throughout the U.S., including lawyers and law professors who practice and teach in the field of immigration and nationality law. AILA members collectively represent legions of noncitizens who qualify for and would benefit from the Keeping Families Together ("KFT") parole program. Therefore, AILA has a strong interest in ensuring that eligible noncitizens have full access to the relief provided by the program. This case is exceptionally important and impacts many individuals beyond the parties here.

---

[1] This brief was solely authored by counsel indicated on the signature page. No party, party's counsel, or any other person other than amicus curiae, its members or its counsel, contributed money that was intended to fund preparing or submitting the brief. All parties consented to the filing of this brief prior to its submission.

## INTRODUCTION

The Court should grant summary judgment in favor of the Department of Homeland Security, deny summary judgment to Texas, et al., and deny the motion for preliminary injunction in this matter. Keeping Families Together ("KFT") parole is both within Defendants' authority and necessary to address significant issues associated with consular processing—both delays and dangers—which impact noncitizens and their United States citizen family members in ways neither intended nor foreseen by Congress. Noncitizens seeking lawful permanent resident status through consular processing are routinely subject to extensive delays, family separation, dangerous country conditions, and other unintended consequences, which have had the perverse effect of discouraging many from pursuing residency and instead remaining in the country for many years without lawful immigration status.

KFT parole is intended to mitigate the unnecessary harms being visited on noncitizens and their families in the same manner as other initiatives enacted in previous administrations such as provisional waivers and parole-in-place for military families. Amicus supports the authority of Defendants to enact such a program and writes here to share the experiences of our clients and how they are affected by our country's immigration policies and programs.

## ARGUMENT

While there are many paths to lawful status in the United States, family-based immigration is most likely to be accomplished through one of two options: consular processing or adjustment of status. Consular processing is a lengthy, multi-stage effort to secure lawful permanent resident status that begins in the United States but, in contrast to adjustment of status, the ultimate application and interview take place outside the United States. Over time, the myriad difficulties and hardships presented by the statutory scheme have compelled various administrations to take steps to provide relief for applicants subject to consular processing, whether it be providing

something akin to provisional approval of a waiver request or a parole program such as the one at issue here. An understanding of the law as well as the reality for applicants navigating the existing process demonstrates exactly why KFT parole is necessary and appropriate in the same manner as previous efforts to alleviate the difficulties of the process for deserving applicants.

## I.    AN OVERVIEW OF DIFFERENT PATHS TO LAWFUL STATUS

### a.  THE STATUTORY SCHEME

A U.S. citizen seeking lawful immigrant status on behalf of their spouse or qualifying stepchild starts by filing a petition. 8 U.S.C. § 1154(a)(1)(A)(i). Under the current statutory scheme, whether the U.S. citizen's family member will be eligible to apply within the United States for adjustment of status or have to depart to complete their residency process at a U.S. consulate depends, with some exceptions, on whether the family member beneficiary has been inspected and admitted or paroled into the country.

Immediate relatives of U.S. citizens (which generally include their spouse and minor children or stepchildren) are eligible to apply for adjustment of status if they have been inspected and admitted or paroled. 8 U.S.C. § 1255(a). This is true even if they overstay their initial period of admission, are no longer in valid immigration status, and/or have worked unlawfully. 8 U.S.C. § 1255(c). In other words, a noncitizen who entered lawfully and overstayed their visa might remain in the United States unlawfully for 20 years and still be eligible for adjustment of status if petitioned by a U.S. citizen spouse.

By contrast, persons who have not been admitted or paroled are not eligible to adjust their status inside the United States.[2] A person who initially entered without inspection and remained

---

[2] Beneficiaries of certain petitions filed before April 30, 2001, may also adjust their status inside the United States if they pay a fine of $1000. 8 U.S.C. § 1255(i).

in the United States for 20 years without lawful status, then, would not be eligible to adjust status inside the country. Being inspected and admitted or paroled, in and of itself, does not automatically qualify an applicant for adjustment of status or bestow lawful permanent resident status but rather is merely a threshold requirement to seeking that benefit without leaving the United States. 8 U.S.C. § 1255(a); 8 C.F.R. § 245.1; 89 Fed. Reg. at 67475, 67460 (Aug. 20, 2024).

When seeking adjustment of status as an immediate relative, applicants must file an application with U.S. Citizenship and Immigration Services ("USCIS") either subsequent to or simultaneously with the filing of their visa petition. 8 U.S.C. § 1255(a)(1); 8 C.F.R. § 245.2. Each application must be submitted with the required fees and supporting documentation, including a medical examination. 8 C.F.R. §§ 245.2(a)(3), 245.5. Thereafter, applicants must submit their biometric information and, unless the interview is waived, attend an interview with USCIS before their application can be approved. 8 C.F.R. §§ 103.2(b)(9), 245.6. Applicants for adjustment of status subject to any ground of inadmissibility must also seek waivers of their inadmissibility as appropriate and if available before they can be approved for adjustment of status. *See generally* 8 U.S.C. § 1182. Such waivers are submitted using Form I-601, which are also adjudicated while the individual waits in the United States.[3] Ultimately, USCIS decides whether to grant an application for adjustment of status in its discretion. 8 U.S.C. § 1255(a).[4]

Immediate relatives who do not have a lawful admission or parole, and do not qualify for any exceptions, must complete their residency through consular processing outside the United

---

[3] *See* USCIS, I-601, Application for Waiver of Grounds of Inadmissibility, *available at* https://www.uscis.gov/i-601 (last accessed Oct. 24, 2024).

[4] For a detailed overview of the adjustment of status process and required forms, documentation, and fees, *see* USCIS, Adjustment of Status, *available at* https://www.uscis.gov/green-card/green-card-processes-and-procedures/adjustment-of-status (last accessed Oct. 24, 2024); USCIS, I-485, Application to Register Permanent Residence or Adjust Status, *available at* https://www.uscis.gov/i-485 (last accessed Oct. 24, 2024).

States. Consular processing also begins with a visa petition filed within the United States but unlike adjustment applicants, there is no simultaneous filing of the visa petition and other necessary applications. Rather, beneficiaries must wait for their visa petition to be approved by USCIS and then forwarded to the U.S. Department of State. 8 U.S.C. § 1154(b). Eventually, the beneficiary will be scheduled for an appointment at a U.S. consulate—typically in their country of birth although not always—and will have to depart the United States and submit to an interview. 8 U.S.C. §§ 1201(a)(1), 1202(a)-(b); 22 C.F.R. § 42.62. Their application for an immigrant visa at the consulate is similar to the process followed by applicants for adjustment of status within the United States—they also submit an application with the required fees and supporting documentation, including a medical examination. 8 U.S.C. §1201(a)-(e). Immigrant visa applicants must also seek waivers as needed, either provisionally or post-interview, as described below, prior to an immigrant visa being granted.[5]

One notable aspect of consular processing is that no one is forced to depart the United States; rather, persons seeking consular processing do so voluntarily and in their own time. Many people eligible for consular processing choose not to do so, or delay doing so, on account of risks to their safety, potential hardship to their families, and the inherent uncertainty baked into the process. As the Department of Homeland Security has previously recognized, "many immediate relatives who may qualify for an immigrant visa are reluctant to proceed abroad" as a result of lengthy processing times and uncertainty about their eligibility. "Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives," 78 Fed. Reg. 536 (January 3, 2013).

---

[5] For a detailed overview of the consular processing procedures, see USCIS, Consular Processing, *available at* https://www.uscis.gov/green-card/green-card-processes-and-procedures/consular-processing (last accessed Oct. 24, 2024).

### b.  GROUNDS OF INADMISSIBILITY & WAIVERS

While all applicants for admission (whether through adjustment of status or through consular processing) are subject to the grounds of inadmissibility, many grounds apply only to persons who have departed the country. For example, 8 U.S.C. § 1182(a)(6)(B) levies a 5-year ban against return to the U.S. for anyone who failed to attend a removal proceeding without good cause. The bar begins to run not as of the date of the missed proceeding but as of the date of departure. 8 U.S.C. § 1182(a)(6)(B). There is no waiver available for this ground of inadmissibility.

Other grounds of inadmissibility tied to departure from the U.S. include a 3-year bar against return to the United States for anyone who departs after being unlawfully present more than 180 days but less than one year, a 10-year bar against return for those unlawfully present for more than a year who then depart, and a 10-year bar against returning after a removal or deportation. 8 U.S.C. §§ 1182(a)(9)(B)(i)(I)-(II), 1182(a)(9)(A)(ii). There are waivers available for each of these bars if the applicants can demonstrate extreme hardship to qualifying family members. 8 U.S.C. §§ 1182(a)(9)(B)(v), 1182(a)(9)(A)(iii).

In cases where an applicant is inadmissible only under 8 U.S.C. § 1182(a)(9)(A) and/or (a)(9)(B), and subject to the 3-year and/or 10-year bars, they may qualify to file their waivers provisionally. *See generally* 8 C.F.R. §§ 212.2(j); 212.7(e). A provisional waiver is submitted (using Form I-601A) prior to the applicant's departure from the United States and, if approved, takes effect following their departure. *Id*.[6] Assuming that there are no surprises at the consular interview—whether substantive or more logistical, as with frequent appointment cancellations or

---

[6] *See* USCIS, I-601A, Application for Provisional Unlawful Presence Waiver, *available at* https://www.uscis.gov/i-601a (last accessed Oct. 24, 2024).

scheduling delays—an applicant who has been granted a provisional waiver or waivers should expect to be out of the United States only a few weeks before returning with their immigrant visa and entering the country as a lawful permanent resident. "Provisional Unlawful Presence Waivers of Inadmissibility for Certain Immediate Relatives," *supra*.

If a consular officer finds that an applicant is inadmissible on another ground other than what was provisionally waived, the provisional waiver will be automatically revoked. 8 C.F.R. § 212.7(e)(14). A consular official's determinations are generally not reviewable. *See Dep't of State v. Munoz*, 144 S. Ct. 1812 (2024). For those whose provisional waivers are revoked or for those subject to grounds of inadmissibility that cannot be provisionally waived, they must submit their waiver applications (using Form I-601, the same form used for Adjustment of Status) after they attend their consular interview and await adjudication outside the United States. 8 C.F.R. § 212.7(a).[7] The length of time an applicant may spend outside the United States during consular processing thus depends on the unreviewable findings of a consular official and also the average processing times for waiver applications submitted to USCIS.

This provides the necessary background for understanding the meaning of KFT parole in place. This program does not make anyone eligible to legalize their status who would not otherwise be able to do so. Rather, what it does is make it possible for people eligible for consular processing to legalize their status without leaving the United States—that is, without facing the risks, dangers, and grave delays that consular processing routinely imposes.

---

[7] *See* USCIS, I-601, Application for Waiver of Grounds of Inadmissibility, *available at* https://www.uscis.gov/i-601 (last accessed Oct. 24, 2024).

## II.       CONSULAR PROCESSING—REALITIES AND DANGERS

AILA members' experiences representing individuals eligible to apply for KFT parole in place confirm that granting parole would confer a significant public benefit and be warranted for urgent humanitarian reasons. Even where an applicant is otherwise eligible to regularize their immigration status through consular processing, significant hurdles exist in that system that are not contemplated by the statutory scheme, making the process too risky or dangerous for many families to pursue. AILA thus writes as amicus to share our members' experiences with the practical realities of consular processing.

### a.   FAMILY SEPARATION DUE TO SCHEDULING ISSUES

Bureaucratic issues like scheduling delays and communication failures between various agencies cause many clients to experience processing times that extend beyond the expected brief travel outside of the United States. For example, AILA member Victoria Wilkinson reports that she represented a client who left the United States in February 2024 to attend a consular interview in Tegucigalpa, Honduras. Although the client expected the process to take a few days, in light of the fact that he had an approved provisional waiver and no other inadmissibility factors, he ended up spending four and a half months in Honduras before he was able to complete consular processing. Unfortunately, he had not been scheduled for a "pre-interview," which is a unique requirement to the consulate in Honduras,[8] so when he appeared for his consular interview he was not seen. The first available appointment to reschedule was months later. Although his application

---

[8] Each consulate follows individualized procedures with respect to the scheduling of consular interviews and requirements. These requirements are available at
https://travel.state.gov/content/travel/en/us-visas/visa-information-resources/list-of-posts.html.

was ultimately approved, he and his family suffered significant uncertainty and hardship during their unexpected months long separation.[9]

The same issue is currently impacting a client of AILA member Rachel Yamamoto. Her client departed the United States to consular process in Tegucigalpa, Honduras, with an approved provisional waiver in September 2024. He was not subject to any other grounds of inadmissibility and should have been able to consular process and return quickly to his family. But he, too, failed to receive a "pre-check" appointment as required and was then turned away from his scheduled appointment. He is still in Honduras waiting for a new appointment, despite many attempts to contact the consulate to schedule one. Ms. Yamamoto's client was not prepared to be in Honduras for more than a week, and his wife and U.S. Citizen children, including a five-year-old daughter who is disabled, are greatly suffering in his absence.[10]

### b.  FAMILY SEPARATION DUE TO PROCESSING DELAYS

Although some individuals experience a delay in consular processing that can be resolved after a period of months, others may face multi-year separation from their families. For example, AILA attorney Valicia Trowbridge represents a client who has been married to a U.S. Citizen for nearly ten years. They live together with their three U.S. Citizen daughters, ages 8, 10, and 19, as well as an older daughter who came to the United States with her mother at a very young age. Ms. Trowbridge's client is the primary caregiver for her younger daughters and a lengthy separation would shatter the family. However, because she initially entered the United States with her eldest child, she is ineligible to file a provisional waiver. *See* 8 U.S.C. § 1182(a)(6)(e) (inadmissibility ground for any noncitizen "who at any time knowingly has encouraged, induced, assisted, abetted,

---

[9] Supporting documentation on file with the author and AILA member Victoria Wilkinson.
[10] Supporting documentation on file with the author and AILA member Rachel Yamamoto.

or aided any other alien to enter or to try to enter the United States in violation of law"). Instead, she would have to travel to the consulate at Ciudad Juarez, Mexico, attend a consular interview, pay for a medical examination, all to ultimately be denied and required to file a post-interview waiver. *See supra* at 11–12 (explaining difference between provisional waivers available for unlawful presence, and waivers for other inadmissibility grounds). The current processing time for such a waiver is 29 months. *See* USCIS, Check Case Processing Times, https://egov.uscis.gov/processing-times/https://egov.uscis.gov/processing-times/ (last accessed October 22, 2024).[11]

In order to consular process, then, Ms. Trowbridge's client would be separated from her family, including her minor children, for over two years. She cannot risk this extended separation. Nor could she bring her family with her during this time due to fears of cartel violence in Mexico, including gender-based harms that she fears would befall her daughters.[12] She also does not want to interrupt her children's education, particularly because her daughters primarily speak English and would not be able to adapt well to the Mexican education system. She thus has chosen to stay with her family without regularizing her status—despite a lawful path available to her to do so— rather than risk consular processing. If she were granted parole in place through the KFT program, however, she would be able to apply to adjust her status to that of a lawful permanent resident without subjecting her young U.S. Citizen daughters to prolonged separation from their mother.[13]

---

[11] Supporting documentation on file with the author and AILA member Valicia Trowbridge.

[12] *See, e.g.*, Almudena Barragán, *More than 3,000 women are murdered in Mexico each year: How violence affects the youngest victims*, El Pais, Nov. 25, 2023, *available at* https://english.elpais.com/international/2023-11-25/more-than-3000-women-are-murdered-in-mexico-each-year-how-violence-affects-the-youngest-victims.html; Bastian Herre, *Violence between Mexican drug cartels has surged in recent years*, Our World In Data, July 16, 2024, *available at* https://ourworldindata.org/data-insights/violence-between-mexican-drug-cartels-has-surged-in-recent-years.

[13] Supporting documentation on file with the author and AILA member Valicia Trowbridge.

### c.   FAMILY SEPARATION DUE TO CONSULAR ERRORS

While some consular officials may correctly identify additional inadmissibility grounds that require a post-interview waiver, thereby extending the time an applicant is outside the United States, other consular officials may incorrectly find an individual is inadmissible or make other errors that prolong the process and, in turn, the separation from U.S. Citizen family members.

For example, AILA member Shannon Shepherd represented a client who attempted to consular process in the Philippines in 2019. She had previously lived in the United States for nearly 20 years. Ms. Shepherd's client had an approved provisional waiver and no other inadmissibility factors, and therefore expected to be apart from her husband and their two U.S. Citizen teenage sons for a brief period of time. Instead, she ended up being separated from them for eight months due to an error with her medical exam. Despite the fact that she was a licensed nurse in the United States who was regularly tested for tuberculosis, the consulate required her to go through additional tuberculosis testing. Her family in the United States suffered in her absence, as her husband was now the sole breadwinner for their family after having relied on their dual incomes. He also had to send her money to support herself in the Philippines, where she had no family; all of her parents and siblings are either lawful permanent residents or U.S. Citizens living in the United States. The extended separation and hardship to herself and her U.S. Citizen family members was unnecessary: she ultimately was able to provide testing to confirm to the satisfaction of the consulate that she did not have tuberculosis, and reentered the United States to reunite with her family as a lawful permanent resident. She has since become a naturalized U.S. Citizen.[14]

AILA attorney Mariela Caravetta has also represented clients who have been affected by consular errors. Earlier this year, a client of hers who had lived in the United States for over four

---

[14] Supporting documentation on file with the author and AILA member Shannon Shepherd.

decades and has been with his U.S. Citizen wife for twenty years, went to El Salvador to consular process and finally become a lawful permanent resident. He had an approved provisional waiver and no other inadmissibility factors. His wife initially accompanied him, expecting the trip to be short. But after his interview and during the medical exam, the physician ordered an additional psychological evaluation with a referred psychologist, without providing a reason. Ms. Caravetta's client complied with the exam and added expense it entailed, but the additional time this required forced his wife to return to the United States. She was employed there as an apartment manager and the extended time away put her at risk of losing not only her job but their home. When Ms. Caravetta's client returned to a second interview, the consular officer took photographs of tattoos on his arms. The tattoos were innocuous and not gang-related, and had been disclosed to the agency with the filing of the provisional waiver. The consulate then provided no information about the status of the case for many months. It was not until the client's U.S. Citizen wife contacted her congressional representative that the U.S. consulate finally approved her husband's visa. During their extended separation, the applicant's U.S. Citizen wife suffered greatly. She relied on her husband's income in construction, and with his absence she incurred significant debt to support her living expenses. She was also unable to make the payments on her husband's car in his absence and it was repossessed. Throughout this time, she suffered from severe depression and anxiety and felt hopeless given the uncertainties.[15]

Ms. Caravetta represents another individual currently facing the same uncertainty. This client has lived in the United States for over 20 years, since first entering at the age of 17. He has been married to his U.S. Citizen wife for the last eight years, after living together for 16, and they have a 7-year-old U.S. Citizen child. Although Ms. Caravetta's client left the United States to

---

[15] Supporting documentation on file with the author and AILA member Mariela Caravetta.

consular process in Ciudad Juarez, Mexico, with an approved provisional waiver, shortly after his interview in June 2024 he was told that his case is "under administrative processing." The U.S. consulate has provided no information as to what administrative processing means or why it is needed, and does not permit any case inquiries until six months have passed. Ms. Caravetta's client was the breadwinner for his family, and his wife and young child are suffering greatly in his absence and are facing serious financial hardship.[16]

### d.  RISKS OF HARM TO U.S. CITIZEN FAMILY MEMBERS

Given the experiences like those relayed above that involve prolonged and unexpected family separations, many AILA members report that clients fear consular processing due to the harms that would befall their U.S. Citizen family members.

For example, AILA member Camila Pacheco-Fores represents a client who has lived in the United States for over 36 years, since the age of 13, and currently lives with his U.S. Citizen spouse. He and his wife have a large extended family, including five U.S. Citizen children and five U.S. Citizen grandchildren. His family relies on him for financial support. But if he had to be absent from his job for more than a week to pursue consular processing, he would likely lose his job, throwing his U.S. Citizen family members into economic uncertainty. In addition, his U.S. Citizen wife suffers from many medical issues, including epilepsy, chronic migraines, anxiety, and depression. Many of these conditions stem from a prior relationship in which she was the victim of domestic violence. Her husband has helped her to heal from this prior abusive relationship and provides daily emotional support. Any period of separation, particularly given the uncertainties inherent in consular processing, would be devastating to his wife's well-being. He and his wife

---

[16] Supporting documentation on file with the author and AILA member Mariela Caravetta.

have therefore chosen to submit an application for parole in place through the KFT program, as they will not risk damaging their family by attempting to consular process.[17]

AILA member Jaime Mendenhall also represents a client who cannot consular process without serious hardship to his U.S. Citizen family. Ms. Mendenhall's client tragically became a single father to his two young, U.S. Citizen sons aged 12 and 15, when their mother and his U.S. Citizen wife passed away two years ago. Although prior to her death, his wife had filed a visa petition for her husband and a provisional waiver, and both were approved, now that she is deceased and his sons depend upon him as their sole caregiver, he cannot risk any period of separation that would occur during consular processing. The risks of separation are particularly acute because both sons have serious mental health needs, including one who expressed suicidal ideation after his mother's death and had to be hospitalized for mental health treatment. Ms. Mendenhall's client could not risk bringing his sons with him to consular process either, as he would have to attend a consular interview in Ciudad Juarez, Mexico, and he does not want to risk exposing his sons to violence. In addition, his sons do not speak Spanish and thus any period of time they had to spend in Mexico would significantly disrupt their education. If he had to consular process, his sons would stay temporarily with his mother-in-law, but he fears they would have to turn to additional public benefits in the event of any extended period of separation because he is their main financial support. Given all of these concerns, he has chosen not to pursue consular processing and instead has applied to parole in place through the KFT program, which would bring his sons much needed security and stability after their mother's death.[18]

---

[17] Supporting documentation on file with the author and AILA member Camila Pacheco-Fores.
[18] Supporting documentation on file with the author and AILA member Jaime Mendenhall.

Similarly, AILA member Aparna Patrie represents a client whose U.S. Citizen family members would be harmed by any length of separation. Her client has lived in the United States for over 32 years, since the age of 12. He and his U.S. Citizen wife reside together and have two young U.S. Citizen children, ages 13 and 18. The client's U.S. Citizen wife was recently diagnosed with a rare form of leukemia, which requires significant medical care and help from her spouse, particularly as she has been unable to continue working due to her health. What's more, the family was tragically affected by the Maui wildfires last year and are working to rebuild their community. Although consular processing is an option available to this client, he and his family will not risk it as any length of separation would be devastating.[19]

Finally, AILA member Heidi L. Oligmueller represents a client who cannot risk leaving her family. She has been living in the United States for over 25 years and has been married to a U.S. Citizen for the last 15 years. The couple's 12-year-old U.S. Citizen child is severely autistic, requiring around the clock care, including assistance with eating, diapering, and non-stop supervision. Ms. Oligmueller's client is the child's sole caregiver, as her U.S. Citizen spouse works full time as a truck driver to support the family. She has already submitted a provisional waiver, which has been approved, and no other grounds of inadmissibility would bar her from completing consular processing. But she cannot risk even a brief absence as it would be detrimental to the well-being of her child with serious medical needs as well as their other minor U.S. Citizen child. This couple has no other family who can care for their children in her absence, nor would the children be able to accompany their mother on an international trip to consular process given the child's serious medical needs.[20]

---

[19] Supporting documentation on file with the author and AILA member Aparna Patrie.

[20] Supporting documentation on file with the author and AILA member Heidi L. Oligmueller.

e.   **RISKS OF VIOLENCE AND DEATH ABROAD**

In addition to fears about how separation would affect their families, many AILA members' clients fear leaving their families, even if temporarily, to travel to a consulate interview due to risks of violence or even death. These fears are not unfounded. AILA member Kristin Knudson reports that her client's brother previously went to Ciudad Juarez in Mexico to attend a consular interview and while there was kidnapped for ransom. Although his family paid the ransom money, the brother was ultimately killed anyway. Although Ms. Knudson's client is eligible to consular process, as he has no criminal history or other inadmissibility factors and is an integral member of his community and volunteer for many years at his church, he and his U.S. Citizen wife will not take that risk given their fear that he could face the same fate as his brother. They hope instead to regularize his status by first obtaining parole in place through the KFT program, which would enable him to file an application for adjustment of status without risking his own life.[21]

In addition to general fears of violence at consulates, many AILA members represent clients who have specific fears of persecution or torture. Some even have pending asylum applications. Although those individuals are eligible to consular process, they cannot risk traveling to a consulate for even a temporary period of time without putting themselves in harm's way. For example, AILA member Mariela Caravetta reports that she represents a client who fled El Salvador in 2006 and entered the United States. He had been a police officer in El Salvador for many years until he was threatened by gangs who wanted to kill him for his participation in arresting suspected gang members. He requested permission to leave the police force and went into hiding, but ultimately felt he could not live anywhere safely in El Salvador. He has been married to a U.S. Citizen wife for five years. Although he would like to regularize his immigration status and has an

---

[21] Supporting documentation on file with the author and AILA member Kristin Knudson.

approved I-601A provisional waiver, he has not consular processed due to his fears of returning to El Salvador given the prior threats against his life. He has applied for parole in place through the KFT program, hoping that instead he will be able to adjust his status within the United States.[22]

Similarly, AILA attorney Rachel Yamamoto represents a client who was threatened by gang members in El Salvador and came to the United States seeking asylum over ten years ago. He later met and married a U.S. Citizen, and together they have a four-year old U.S. Citizen daughter. His wife filed a family visa petition, which has already been approved, but he cannot continue with the process and attend a consular interview in El Salvador without grave risk to his life. Thus, he continues to pursue his asylum claim within the United States, which has already been pending for many years. If he were able instead to obtain parole in place and then later file an adjustment of status application, it would have the benefit of both reducing the burden on the backlogged immigration court and asylum offices,[23] as well as enabling him to stay with his wife and young child without risking his life to travel to El Salvador to complete consular processing.[24]

* * *

As these examples demonstrate, although many individuals are eligible under our laws to become lawful permanent residents—including by leaving the country and pursuing consular processing—serious risks and harms associated with consular processing that are not part of Congress' design lead many to forgo that opportunity and to instead remain undocumented in the United States. 89 Fed. Reg. at 67466.  Indeed, these examples also demonstrate that the argument made by Plaintiffs to support their standing to challenge KFT parole—that KFT parole will cause

---

[22] Supporting documentation on file with the author and AILA member Mariela Caravetta.

[23] *See* PBS News, *Record 3 million cases clog U.S. immigration courts*, Jan. 15, 2024, *available at* https://www.pbs.org/newshour/nation/record-3-million-cases-clog-u-s-immigration-courts.

[24] Supporting documentation on file with the author and AILA member Rachel Yamamoto.

noncitizens to remain in Texas who would otherwise consular process, thereby preventing the state from reducing some of its expenditures—is belied by the facts. Many families have long chosen not to consular process even before KFT parole was ever announced. For those that have attempted to consular process, their absence from the United States generally lasts only weeks or months— a length of time devastating for families but entirely insignificant for a state budget. And indeed, for those cases that may face longer separation during consular processing, the difficulties that causes to families presents a greater risk of straining state resources: separation itself brings serious financial hardship and destabilization, with U.S. Citizen family members left behind in the United States at greater need of public assistance than if the family had not separated in the first place. If such individuals were granted parole, however, they would not have to place their families at risk of financial hardship as well as the emotional and other damages that would accompany an extended separation, to complete the process to adjust status within the United States. Both processes require an individual applicant to file required forms, pay associated fees, submit extensive supporting documentation, and make themselves available for a medical examination and interview. But KFT parole allows the government to advance the goal of family unity which is itself a significant public benefit. *See* Defendants' Trial Br. and Motion for Summary Judgment, ECF Doc. 77, at 38.

As the U.S. Department of Homeland Security explains, the power to grant parole— including parole in place—exists independent of any specific process such as the KFT parole program. *See Id.* at 5–6. Indeed, AILA member Heidi Oligmueller represented a client who was granted parole due to hardships associated with family separation many years before KFT parole. She had left the United States with an approved provisional waiver to consular process in Ciudad Juarez, Mexico, expecting to be apart from her U.S. Citizen husband and other minor U.S. Citizen

children for a brief period of time. She brought her daughter, who has severe disabilities and requires a feeding tube and constant care, with her, because her daughter also needed to consular process in order to obtain lawful permanent resident status. While she and her child waited in Mexico for the processing of a waiver application, they experienced severe hardship. The child's health deteriorated due to the disruption of their medical care and separation from family in the United States, including showing signs of infection near the feeding tube site. Ultimately, due to these hardships, DHS granted parole in 2018 to allow her and her daughter to stay with their family in the United States rather than wait during the lengthy waiver processing in Mexico. She later became a lawful permanent resident and is now a naturalized U.S. Citizen.[25]

Even though the authority to grant parole—including parole in place—has long existed, the KFT parole process is an enormous improvement over the status quo because it provides clear guidance about where applications should be sent, what materials applicants should submit, and how adjudicators should review such requests. This will provide important benefits to both applicant families and the government. Had such a process been in place for Heidi Oligmueller's client, who is the spouse of a U.S. Citizen and whose daughter is the stepchild of a U.S. Citizen, neither would have been forced to suffer such hardship while attempting to consular process in Mexico.

Furthermore, far from being a rubber-stamped process as Plaintiffs allege, AILA members' experiences show that the government is considering each family's application on an individualized basis. During the various stays imposed on the KFT process throughout most of this litigation, USCIS has been prevented from approving parole in place applications under KFT, but it has been allowed to continue processing them. AILA members report receiving "Requests for

---

[25] Supporting documentation on file with the author and AILA member Heidi L. Oligmueller.

Evidence" in response to pending applications, which is consistent with case-by-case adjudication. *See* 8 C.F.R. § 103.2(b)(8); USCIS Policy Manual, Ch. 6, Evidence.[26] USCIS can request any supplementary evidence needed to adjudicate an application for KFT parole, including evidence that supports why there would be a "significant public benefit or urgent humanitarian reason" to grant the applicant parole—which is a question already specifically requested in the application form. *See* USCIS, Filing Guide for Form I-131F, Application for Parole in Place for Certain Noncitizen Spouses and Stepchildren of U.S. Citizens, at 11.[27] Although some applications were already granted prior to the injunction, as the examples above demonstrate many individuals who are eligible for KFT parole have already submitted extensive relevant documentation to the government in connection with prior applications and already have approved provisional waivers, thereby enabling expedited review. *See id.* (KFT parole application requests receipt number for any prior filed Form I-601A).

If such applicants are eventually granted parole, that will be but the first step on their longer journey to apply for adjustment of status, which will require additional documentation, fees, supplementary evidence, interviews, and when applicable, waiver applications. Just as with consular processing, ultimately those applications may or may not be granted depending on the particular facts of each case. But the grant of temporary parole will enable applicants to stay with their families, promoting the significant public benefit of family unity.

---

[26] *Available at* https://www.uscis.gov/policy-manual/volume-1-part-e-chapter-6 (last accessed Oct. 24, 2024).
[27] A*vailable at* https://www.uscis.gov/sites/default/files/document/guides/USCIS-Filing-Guide-Form-I-131F.pdf (last accessed Oct. 24, 2024).

### III.    KFT PAROLE IS IN LINE WITH SIMILAR PAST PROGRAMS

Contrary to Plaintiffs' assertions that KFT keeps noncitizens here who would otherwise depart, or that KFT-eligible noncitizens would otherwise be forced to depart the United States in order complete consular processing, the reality is that many noncitizens elect to simply remain in unlawful status as a direct result of the difficulties and dangers of consular processing. Plaintiffs offer no evidence in the declarations filed by intervenors that any noncitizens *would* depart if the KFT parole process was blocked. ECF No. 78 at 66. As reflected by several of the examples above, and well known to most AILA practitioners, it is extremely common for noncitizens who are eligible to obtain lawful permanent residence to remain here without lawful immigration status rather than take the risks associated with departing the United States to consular process.

The flaw in Plaintiffs' logic is readily apparent when we consider that KFT parole is only available to noncitizens who are already unlawfully present in the U.S. and have been so for at least ten years (and, on average, for 23 years). 89 Fed. Reg. at 67475, 67468-9 (Aug. 20, 2024). Moreover, the data suggests, consistent with the AILA member experiences detailed above, that most potential KFT beneficiaries have been here for quite a while longer than that and married to their US citizen spouses for lengthy periods of time and yet, in spite of their apparent eligibility, never chose to pursue residency through consular processing. *Id*. at 67460.

Recognizing the reluctance of potential noncitizen applicants to depart the United States, and the hardship to both them and their families as a result of consular processing, the Government has repeatedly taken steps intended to address the problem. One of the earliest examples of this was "preexamination" which allowed noncitizens who were already in the United States to apply for an immigrant visa from within the country and, if approved, attend a consular appointment in Canada (regardless of country of origin) to retrieve the visa they were certain to be issued. 8 C.F.R.

§§ 142.3-.18 (1949) (1952 Supplement). Adjustment of status itself was introduced to allow immigrants to avoid leaving the U.S. to obtain residency. H.R. Rep. No. 82-2096, at 128 (1952).

More recently, and under multiple administrations, there have been efforts targeted at alleviating the burdens of consular processing. In 2007, USCIS created a pilot program to allow applicants at the U.S. Consulate in Ciudad Juarez, Mexico to receive a same-day adjudication of their waiver of inadmissibility and return to the United State almost immediately rather than waiting for lengthy waiver processing while separated from their families. *See* USCIS, Apr. 3, 2007, "*New Pilot I-601 Waiver Adjudication Program, Ciudad Juarez, Mexico, American Consulate.*"[28] In 2012, USCIS created the provisional waiver process described above. 78 Fed. Reg. at 536. In 2013, USCIS issued a policy memorandum creating a parole-in-place process for family members of the military personnel. USCIS Policy Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces* (Nov. 15, 2013).[29] Similar to the KFT parole process at issue here, certain military families already had been receiving parole in place prior to the promulgation of the 2013 policy, but that policy improved the process for both prospective applicants and adjudicators by providing transparency and creating guidelines for the submission and adjudication of requests.

Each of these programs or initiatives are not unlike KFT—most especially parole for military family members which is particularly similar. Indeed, KFT is only the most recent iteration of Defendant's clear authority to take action in this sphere.

---

[28]    *Available    at*    https://www.aila.org/aila-files/11326214-E1E9-46BD-A0E3-C5D00BB3F2D7/07042666.pdf.
[29] Which was later affirmed by Congress, as Defendants have noted. ECF No. 77 at 38.

## IV.    CONCLUSION

AILA urges this Court to consider the very real and vulnerable noncitizens who may benefit from KFT parole and well as both the statutory basis for the Government's authority to provide parole in place and the valid policy reasons cited by the Department of Homeland Security for doing so now.

Dated: October 25, 2024                    Respectfully Submitted,

/s/ *Amanda Waterhouse*
Amanda Waterhouse
WATERHOUSE DOMINGUEZ &
STROM, PLLC
P.O. Box 671067
Houston, Texas 77267
Tel: (713) 930-1430
Fax: 346) 576-8080
Texas Bar No. 24047676
awaterhouse@wdslawyers.com

Alexandra Lampert*
Brooklyn Defender Services
177 Livingston St, 7th Floor
Brooklyn, NY 11201
Tel: (646) 856-8378
New York Bar No. 5085915
alampert@bds.org

*On behalf of* American Immigration
Lawyers Association (AILA)

*As member of the AILA Amicus Committee.

**CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2024, I electronically filed this Amicus Brief with the Clerk of the Court for the United States District Court for the Eastern District of Texas using the CM/ECF system. All counsel in this matter are registered CM/ECF users and service will be electronically accomplished via the CM/ECF system.


/s/ *Amanda Waterhouse*
Amanda Waterhouse