**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.,* | |
| *Plaintiffs,* | |
| v. | No. 6:24-cv-00306 |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.,* | |
| *Defendants.* | |

**BRIEF OF AMICUS CURIAE AMERICAN FAMILIES UNITED**

## TABLE OF CONTENTS

I.    INTEREST OF AMICUS CURIAE ...................................................................... 4

II.   SUMMARY OF ARGUMENT ............................................................................. 4

III.  BY PROMOTING FAMILY STABILITY AND PREVENTING THE IRREPARABLE
      HARM OF SEPARATION TO FAMILIES, KFT PAROLE PROVIDES A SIGNIFICANT
      PUBLIC BENEFIT TO THE UNITED STATES ..................................................... 5

      a.    KFT Parole Promotes Family Unity and Prevents Irreparable Harms................6

      b.    KFT Parole Promotes Family Stability....................................................... 9

IV.   KFT PAROLE WILL SIGNIFICANTLY INCREASE RECIPIENTS' CONTRIBUTIONS
      TO FEDERAL, STATE, AND LOCAL ECONOMIES ........................................ 10

      a.    KFT Parole Will Expand Job Opportunities, Earning Potential, and Tax Revenues ........10

      b.    KFT Parole Will Bolster Immigrant Entrepreneurship ...............................13

      c.    KFT Parole Will Enhance Recipients' Service to Their Communities ........................... 14

V.    CONCLUSION ................................................................................................. 15

## TABLE OF AUTHORITIES

**Statutes**

8 U.S.C. § 1182(d)(5)(A) ............................................................................................ 5

**Regulations**

Implementation of Keeping Families Together, 89 Fed. Reg. 67459 (Aug. 20, 2024).................. 6

**Other Authorities**

Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (2021) ....... 7

Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of
      Parental Deportation on the Health and Well-being of U.S. Citizen Children*, 9 J. Migration
      and Health 1 (2024). ..................................................................................... 7

Andrew Moriarty, *Keeping American Families Together: Parole in Place for Undocumented
      Spouses of American Citizens*, FWD (Aug. 23, 2024)............................................ 10

Annette Bernhardt et al., *Broken Laws, Unprotected Workers: Violations of Employment and
      Labor Laws in America's Cities* (2009) ....................................................................11

Chair Cecilia Rouse et al., *The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021) ............................................................................ 12

Diana Guelespe et al., *Mixed-Status Immigrant Families Disproportionately Experienced Material Hardship in 2021* (2023) ............................................................................ 9

Joanna Dreby, *How Today's Immigration Enforcement Policies Impact Children, Families, and Communities – A View from the Ground* (2012) ............................................................................ 9

Kathleen M. Roche et al., *Association of Family Member Detention or Deportation With Latino or Latina Adolescents' Later Risks of Suicidal Ideation, Alcohol Use, and Externalizing Problems*, 174 (5) JAMA Pediatrics 478-486 (2020) ................................................................... 7

Kevin Appleby, *The Importance of Immigrant Labor to the U.S. Economy*, Ctr. for Migration Stud. (Sept. 2, 2024) ............................................................................ 12

Mariah Barnetche, *Does Legalizing Unauthorized Immigrants Negatively Impact the U.S. Economy?* Mich. J. Econ. (2024) ............................................................................11

Samantha Artiga & Petry Ubri, *Living in an Immigration Family in America: How Fear and Toxic Stress are Affecting Daily Life, Well-Being, & Health*, KFF (Dec. 13, 2017) ................... 6

Sari Pekkala Kerr & William R. Kerr, *Immigration Policy Levers for U.S. Innovation and Startups* (Nat'l Bureau of Econ. Rsch., Working Paper No. 27040 (2020) ............................ 13

Sherrie A. Kossoudji & Deborah Cobb-Clark, *Coming out of the Shadows: Learning about Legal Status and Wages from the Legalized Population*, 20 (3) J. of Lab. and Econ. 598 (2002) ......11

Tom K. Wong et al., *Results from Tom K. Wong et al.*, *2023 National DACA Study* (2023) .........11

Zoya Gubernskaya & Joana Dreby, *US Immigration Policy and the Case for Family Unity*, 5 J. on Migration and Human Sec. 417 (2017) ............................................................................ 6

## I.   INTEREST OF AMICUS CURIAE

*Amicus curiae*, American Families United (AFU), is a national nonprofit organization dedicated to advocating for the interests of U.S. citizens and their noncitizen family members. AFU works to improve immigration pathways that allow American families to remain together in the U.S. without fear of separation. As an organization representing families directly impacted by national immigration policies, AFU has a unique perspective on the legal and practical effects of the Keeping Families Together parole in place program (KFT parole). This case is of critical importance to AFU; its outcome will directly affect the lives of AFU's members and countless other U.S. citizens, their families, and their communities.

As *amicus curiae*, AFU underscores the importance of preserving the lawful discretion of DHS to implement policies that support families and communities and provides the Court with insight into the real-world consequences of immigration policies that disrupt and destroy families. This brief focuses on the human impacts of this case, offering the Court a perspective grounded in the lived experiences of U.S. citizens, their loved ones, and their communities.

## II.   SUMMARY OF ARGUMENT

AFU submits this brief in support of Defendants and proposed Defendant intervenors, to emphasize the significant public and humanitarian benefits provided by KFT parole and offer insight into the damage that enjoining the policy will cause. Maintaining family cohesion promotes social stability, mental health, and well-being, and allowing noncitizen family members of U.S. citizens to remain in the country while their immigration applications are processed contributes to state and local economies through employment, entrepreneurship, and increased consumer spending. Families who remain together are more likely to be economically productive, reducing reliance on public assistance and increasing their contributions to the

federal, state, and local tax base. The program's preservation supports not only the immediate

needs of families but also broader public interests, offering a pragmatic solution that aligns with

both economic and humanitarian goals.

In contrast, terminating KFT parole would impose severe hardships on thousands of

families across the country. Families forced to separate suffer long-lasting and often irreparable

damage, and the ripple effects extend far beyond the individuals directly involved, impacting

their communities and local economies. For these reasons, AFU urges the Court to affirm DHS's

lawful authority to administer KFT parole, which both aligns with its statutory authorization and

serves a profound public interest.

## III.    BY PROMOTING FAMILY STABILITY AND PREVENTING THE IRREPARABLE HARM OF SEPARATION TO FAMILIES, KFT PAROLE PROVIDES A SIGNIFICANT PUBLIC BENEFIT TO THE UNITED STATES

The 1996 Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA)

amended previous immigration law to allow the Attorney General discretionary authority to

parole, on a case-by-case basis, any immigrants applying for admission into the U.S. where such

parole would provide a substantial advantage to the public interest. *See* 8 U.S.C. §

1182(d)(5)(A).[1] While IIRIRA does not define "significant public benefit" under its statutory or

regulatory framework, the term has been shaped by historical precedents over time in the use of

parole authority. In line with these historical precedents,[2] KFT parole could help up to 550,000

---

[1] "[T]he Attorney General may [] in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons or significant public benefit any alien applying for admission to the United States[.]" 8 U.S.C. § 1182(d)(5)(A)).

[2] Numerous parole programs have been enacted to promote the public interest and confer significant public benefits by allowing individuals to remain in the U.S. while their immigration applications are pending.  These programs include, but are not limited to, the: (1) Military Parole in Place; (2) Cuban Family Reunification Parole Program; (3) Haitian Family Reunification

individuals in mixed-status families stay together in the U.S.[3] instead of spending time apart while their applications are being processed. This process is not only within Defendant's statutory authority, but it also promotes a "significant public benefit" similar to parole programs created in the past to promote family unity and economic stability in communities nationwide.

### a.   KFT Parole Promotes Family Unity and Prevents Irreparable Harms

KFT parole will promote family unity by allowing eligible noncitizens—who, on average, have been in the U.S for 23 years—to remain with their families while pursuing adjustment of their status.[4] These individuals have families that depend on them for emotional, physical, and financial support. Family unity is not only an important goal of immigration law, but it provides a significant public benefit to the U.S. by promoting the economic and social stability of families and preventing the negative health outcomes of family fragmentation.[5]

Family separation—and even the threat of separation—have been shown to have devastating emotional and psychological impacts on U.S. citizen children[6] and family members in mixed-status families.[7] The U.S. citizen children of parents eligible for KFT parole are at greater risk of developing anxiety, depression, and behavioral and academic problems due to fears of family separation. Studies that explore the impacts of parental deportation on U.S. citizen children have illustrated the long-lasting adverse effects, such as emotional instability,

---

Parole Program; (4) Central American Minors (CAM) Program; (5) International Entrepreneur Rule; (6) Operation Allies Welcome program; and (7) United for Ukraine program.
[3] *See* Implementation of Keeping Families Together, 89 Fed. Reg. 67459 (Aug. 20, 2024)).
[4] *Id*. at 67466.
[5] *See generally* Zoya Gubernskaya & Joana Dreby, *US Immigration Policy and the Case for Family Unity*, 5 J. on Migration and Human Sec. 417, 417-26 (2017).
[6] *See* Am. Immigr. Council, *U.S. Citizen Children Impacted by Immigration Enforcement* (2021).
[7] *See* Samantha Artiga & Petry Ubri, *Living in an Immigration Family in America: How Fear and Toxic Stress are Affecting Daily Life, Well-Being, & Health*, KFF (Dec. 13, 2017), https://www.kff.org/racial-equity-and-health-policy/issue-brief/living-in-an-immigrant-family-in-america-how-fear-and-toxic-stress-are-affecting-daily-life-well-being-health/.

physical illnesses, lower academic performance, and material hardships.[8] By easing fears of family separation, KFT parole safeguards U.S. citizen children against these damaging effects.

The potential for negative emotional and psychological health impacts is even greater in families who risk the loss of a primary caregiver. Children who are separated from their parents experience well-documented and often irreparable harm,[9] and individuals who need assistance with disabilities and other medical conditions will also suffer. The impact in households where the noncitizen is the primary caregiver would be immediate, leaving U.S. citizen children, spouses, and other family members without the care and stability they need.

Mixed-status families such as **J.S.** and **Y.S.** live in fear of separation.[10] J.S. is the sole provider for Y.S., his U.S. citizen wife, and five U.S. citizen children. J.S. has worked at the same place of employment for the past 26 years, a job that has allowed him to financially support his entire family. Y.S. suffers from clinical depression, which is exacerbated by her constant fear of her husband's deportation and the fact that, as a former foster child, she has no other family. J.S.'s ineligibility for a driver's license adds an extra layer of fear for the family, since J.S. is unable to drive them to the hospital or pick them up from school in an emergency. KFT parole would relieve the family of the constant anxiety that one day J.S. might not come home.

---

[8] *See* Ana Martinez-Donate et al., *Between the Lines: A Mixed-Methods Study on the Impacts of Parental Deportation on the Health and Well-being of U.S. Citizen Children*, 9 J. Migration and Health 1, 2 (2024).
[9] *See* Kathleen M. Roche et al., *Association of Family Member Detention or Deportation With Latino or Latina Adolescents' Later Risks of Suicidal Ideation, Alcohol Use, and Externalizing Problems*, 174 (5) JAMA Pediatrics 478-486 (2020) (studying the associations between a family member's detention or deportation and Latino adolescents' later risk for suicidal ideation, alcohol use, and clinically significant externalizing symptoms such as aggression and rule breaking).
[10] To protect the privacy of the individuals referenced in this brief, initials are used in place of full names. This ensures confidentiality of those who will be affected by this case's outcome.

The uncertainty of **V.L.'s** immigration status and the threat of family separation is a constant struggle for him and for **A.L.**, his U.S. citizen wife of 15 years. A.L. is a stay-at-home mom and V.L. is the sole breadwinner for the family, which includes their three U.S. citizen children, ages 12, 8, and 3. A.L. fears that any separation from her husband would exacerbate her anxiety, depression, and panic attacks, undermine her ability to complete her bachelor's degree in social work, and leave her children at risk of not having their needs met. Their 19-year-old son, who suffers from anxiety, depression, ADHD, and PTSD, worries about the emotional impact separation from V.L. would have on his family. In addition, their 12-year-old has lordosis and kyphosis, hormone growth deficiency, depression, and anxiety; their 8-year-old son has ADHD and an iron deficiency which causes sleepwalking. KFT parole would help alleviate the agonizing anxieties that the family experiences due to V.L.'s unsettled immigration status.

Familial separation is an ongoing worry for **M.H.**, a U.S. citizen, and her husband **N.H.** With her family's deep U.S. roots and her children's health conditions, it is difficult for M.H. to think about N.H.'s leaving his family behind for any period of time to pursue consular processing. M.H. and N.H. have five U.S. citizen children, ages 20, 17, 15, 11, and 7, several of whom suffer from chronic conditions: their first child has epilepsy and needs four medications to manage her condition; their 15-year-old has hemiparesis and had a stroke at birth; and their 11-year-old has anxiety and attempted suicide in the past. She does not do well with change and her parents are very concerned that her mental health issues would be exacerbated if she were forced to separate from her father. It would be impossible for M.H. to support her five children financially and to meet their individual needs on her own. N.H. is a devoted father, breadwinner, and caretaker who does not want his children to endure greater challenges than they already do.

**K.H.**, a DACA recipient and **A.H.**, a U.S. citizen, have been married for nine years and have a U.S. citizen son, age 4. Their son has suffered from severe eczema and food allergies since he was a baby and, for the past three years, has had topical steroid withdrawal. There was a point when his rashes were so serious that K.H. describes his skin appearing to fall off and him looking like a mummy. It has taken K.H. and A.H. years to find treatment that works for their son. Due to his dietary restrictions and need for treatment, K.H. is unable to separate from her child, whom she also homeschools. Being able to adjust her status without leaving the U.S. would allow K.H. to stay by her son's side to continue to supervise his treatment and education.

### b.  KFT Parole Promotes Family Stability

Family separation has devastating costs for the economic stability of families and their communities.[11] Undocumented noncitizens are often the sole or primary financial providers for their families, and separation can lead families to experience economic hardships. These economic hardships will often lead to housing insecurity and limited resources for children, including reduced access to healthcare and education.[12] KFT parole has the potential to strengthen the economic stability and security of families.

Families like **A.H.** and her noncitizen spouse, **E.H.**, worry about family separation and the resulting economic consequences. E.H. is the breadwinner in the family. Although A.H. works part-time, her income is insufficient to pay for their mortgage, bills, and care for their three U.S. citizen children. Because E.H. provides for the household, A.H. can give her undivided attention to the care of her children, especially their daughter who struggles with

---

[11] *See* Joanna Dreby, *How Today's Immigration Enforcement Policies Impact Children, Families, and Communities – A View from the Ground*, 17 (2012).
[12] *See* Diana Guelespe et al., *Mixed-Status Immigrant Families Disproportionately Experienced Material Hardship in 2021*, 1-7 (2023); *see also* Dreby, *supra* note 11, at 18.

phonological dyslexia. A.H. believes that she could be forced to rely on public benefits for herself and her children if E.H. had to leave the U.S. temporarily to adjust his status abroad. KFT parole would take away the distress and uncertainty about the future that A.H. and E.H. experience daily. By allowing E.H. to adjust status in the U.S. through KFT parole, he can continue to provide physical and financial support for his family.

Without KFT parole, parents such as **Y.X.**, a noncitizen mother of two U.S. citizen daughters, ages 6 and 10, fear what could happen to her family. Separating from her daughters would cause them severe hardships as Y.X. is currently the family's only income earner because her spouse suffered a work accident and is recovering from surgery. Y.X. is diligent about being there for her daughters, helping them with schoolwork, and showing up to school events. Her daughters and U.S. citizen husband are her priorities, and she wants to always be there for them.

## IV. KFT PAROLE WILL SIGNIFICANTLY INCREASE RECIPIENTS' CONTRIBUTIONS TO FEDERAL, STATE, AND LOCAL ECONOMIES

### a. KFT Parole Will Expand Job Opportunities, Earning Potential, and Tax Revenues

KFT parole and accompanying employment authorization will expand recipients' job opportunities, increase their earning potential, and enable them to access employment that better leverages their education and job skills. These gains will not only benefit individual recipients, their families, and their communities, but will increase job productivity and tax revenues and generate substantial economic value for the U.S.

KFT parole will expand employment opportunities for recipients. Although eighty-one percent of KFT parole-eligible individuals are already working,[13] even highly skilled individuals

---

[13] *See* Andrew Moriarty, *Keeping American Families Together: Parole in Place for Undocumented Spouses of American Citizens*, FWD (Aug. 23, 2024), https://www.fwd.us/news/parole-in-place-citizen-spouses/#contributions.

are frequently stuck in low-paying jobs with few opportunities for advancement and in which they are vulnerable to workplace exploitation.[14] Employment authorization through KFT parole would offer the opportunity to move into jobs that provide better wages and that better match their skills and training, thus increasing their productivity and their effective labor supply.

Expanded employment opportunities will facilitate the movement of recipients into jobs with higher pay and better benefits. Workers who lack employment authorization are estimated to earn 14 to 24% percent less than work-authorized workers.[15] Workers who have gained employment authorization through other discretionary federal immigration processes, such as Deferred Action for Childhood Arrivals, report that nearly 60% got a job with better pay, 57% got a job with health insurance or other benefits, and 47% got a job with better work conditions.[16] Other studies reinforce the finding that "[l]egalized immigrants are more likely to transition to higher-paying formal jobs which reduces the likelihood of wage suppression."[17]

KFT parole would enable recipients to find employment that better matches their education, skills, and training. Studies involving "[c]omparisons between the earnings of authorized and unauthorized immigrants suggest that limited job opportunities cause talent to be misallocated," which means that unauthorized immigrant workers' skills and education are not

---

[14] *See* Annette Bernhardt et al., *Broken Laws, Unprotected Workers: Violations of Employment and Labor Laws in America's Cities*, 41-48 (2009) (finding that 37% of undocumented workers suffered minimum wage violations).

[15] Sherrie A. Kossoudji & Deborah Cobb-Clark, *Coming out of the Shadows: Learning about Legal Status and Wages from the Legalized Population*, 20 (3) J. of Lab. and Econ. 598, 598 (2002)

[16] Tom K. Wong et al., *Results from Tom K. Wong et al.*, *2023 National DACA Study*, 2 (2023).

[17] Mariah Barnetche, *Does Legalizing Unauthorized Immigrants Negatively Impact the U.S. Economy?* Mich. J. Econ. (2024).

being maximized, "reduc[ing] productivity."[18] Better job and skills matching leads to greater job productivity, which "is foundational for improving U.S. economic growth."[19]

As the productivity and the earnings of KFT parole recipients grow, so too would the U.S. tax base. According to the American Community Survey, undocumented immigrants paid $59.4 billion in federal and $13.6 billion in state and local taxes in 2022.[20] Work authorization will raise KFT recipients' earnings and, in turn, their federal, state, and local tax contributions, generating even greater economic value to the country. If the parole in place policy is enjoined, all these economic gains—for recipients and their families, for their employers, and for states' and the federal fisc—will be lost.

**R.Z.**, the sole provider for his U.S. citizen wife and 18-month-old baby, currently has an employment authorization document (EAD) that will soon expire. R.Z. worked his way through community college and then graduated with a bachelor's degree in computer science from SUNY New Paltz. He worked his way up from freelance work to an entry level software development job to his current position as a software engineer at NBC Universal. He fears that if KFT parole remains blocked, he will lose his job when his current EAD expires. In that case, he will lose the job that he loves and will be forced to seek work in a lower-paid industry, which would not leverage the software engineering skills he has spent years developing. By contrast, with stable work authorization, R.Z. would invest further in his professional career and pursue his dream of returning to graduate school for a master's degree in computer science.

---

[18] Chair Cecilia Rouse et al., *The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants* (Sept. 17, 2021) https://www.whitehouse.gov/cea/written-materials/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants.
[19] *Id*.
[20] Kevin Appleby, *The Importance of Immigrant Labor to the U.S. Economy*, Ctr. for Migration Stud. (Sept. 2, 2024), https://cmsny.org/importance-of-immigrant-labor-to-us-economy/.

 **K.D.** is married to a noncitizen spouse, **C.B.C.**, with whom she has an 18-month-old son and a second child on the way. C.B.C. completed high school in the U.S. and worked his way through Northern Virginia Community College and George Mason University, where he is currently only four classes away from a bachelor's degree in accounting. Because of C.B.C.'s lack of work authorization, K.D., who works for the government, is unable to apply for a security clearance, while C.B.C. is limited in the jobs he can find. C.B.C. currently works in a restaurant, but if he obtains work authorization through KFT parole, he would be able to move to other jobs in the restaurant industry with better hours, working conditions, and pay. Longer-term, he would be able to put his college degree to use, once he graduates, and fulfill his long-time goal of becoming an accountant.

 **K.S.** is married to a noncitizen spouse, **D.C.**, who has precarious and short-term work authorization through DACA. D.C. is currently four years into a Ph.D. program in Applied Mathematics at Cornell University. The Ph.D. will be the culmination of D.C.'s exemplary educational record, which started at Passaic County Technical Institute and led to a bachelor's degree in physics and mathematics from Rutgers University and a term as a Caltech Wave Fellow at the California Institute of Technology. KFT parole would allow D.C. to complete her Ph.D. and to pursue the career she has long worked toward: being a university professor, while continuing to develop technological applications to enhance national security.

  **b. KFT Parole Will Bolster Immigrant Entrepreneurship**

 Immigrants operate new businesses at higher rates than native-born business owners, accounting for about 25% of U.S. entrepreneurship and innovation.[21] These businesses create

---

[21] Sari Pekkala Kerr & William R. Kerr, *Immigration Policy Levers for U.S. Innovation and Startups*, 1-20 (Nat'l Bureau of Econ. Rsch., Working Paper No. 27040 (2020)).

jobs, generate business tax revenues, foster innovation, and promote economic development. KFT parole recipients would be no different: many have already launched businesses, though their abilities to grow their businesses would be greatly enhanced by KFT parole.

**H.P.** is the primary provider for his U.S. citizen wife, three-year-old child, and his wife's parents, who live with them and are unable to work because of chronic illnesses. An initial loan enabled H.P. to buy and operate two businesses in their small town in Illinois: two convenience stores, with one attached to the sole gas station in town. Both stores had been vacant for several years. H.P. now employs five employees between the two stores, which has contributed to the town's recent economic growth, as residents can now spend their money on services in the community. As one neighbor observed, H.P. has helped bring life back to their town.

**S.W.** is the U.S. citizen spouse of a noncitizen, **P.V.**, who would be able to build out his growing contracting business more robustly if he were to obtain work authorization through KFT parole. Despite launching his own business, P.V. continues full-time work in the construction industry as well, in order to better support his wife, who suffers from major depressive disorder and anxiety, and his household. With work authorization, P.V. could achieve his aspiration of going to a trade school to hone his skills in plumbing and electrical specialty work, which would benefit his business and enable him to take better care of himself and his family.

### c.  KFT Parole Will Enhance Recipients' Service to Their Communities

Many KFT-eligible individuals are actively engaged in giving back to their communities through volunteering and civic and community engagement. The considerable contributions that KFT parole recipients are providing to their communities underscore the significant public benefits that the policy seeks to enhance.

**J.S.**, a U.S. citizen and second-year law student, and his partner, **E.Q.**, a noncitizen and third-year medical student, fear for their future without KFT parole. As a medical student at Darthmouth Geisel School of Medicine, E.Q. has made significant contributions to both his academic community and to underserved populations. He has held leadership roles in the Latino Medical Student Association and as a COVID-19 contract tracing team manager for a public health department. He works with Project Salud to provide medical care to Spanish-speaking farmworkers in New Hampshire and served on the Darthmouth Medical Education Committee. E.Q. has been involved in medical research fellowships at institutions such as the Brigham and Women's Hospital and Georgetown School of Medicine. E.Q. aspires to remain in the U.S., where he can continue his education and provide medical care to disadvantaged communities.

**B.C.** has been married to **H.M.**, a noncitizen, for over ten years and they have three U.S. citizen children together, ages eight, six, and four. H.M. is deeply involved in using the skills he has developed through construction work to make their community a better place. As part of the fathers' group of their Parent-Teacher Association, H.M. helped build a new play area for the school; he also volunteered with Living Arts, an after-school non-profit to help repair the school building. H.M. volunteers for church events and is the team manager for their children's traveling soccer team.

## V.   CONCLUSION

For the reasons provided by Defendants and proposed intervenors and the reasons given above, American Families United (AFU) respectfully urges that this Court dismiss Plaintiffs' complaint in its entirety and uphold KFT parole. AFU urges the Court to recognize the profound human and societal impact of KFT parole and to affirm DHS's authority to administer this

15

program in alignment with the nation's long-standing commitment to family unity and

compassion. The lives of thousands of U.S. citizens and their loved ones depend on it.


Dated: October 25, 2024                              Respectfully submitted,

                                                     NATIONAL IMMIGRATION LAW CENTER
                                                     */s/ Lisa S. Graybill*
                                                     **Lisa S. Graybill (Lead Attorney)**
                                                     (Texas Bar No. 24054454)
                                                     P.O. Box 40476
                                                     Austin, Texas 78704
                                                     Phone: (213) 493-6503
                                                     Facsimile: (213) 639-3911
                                                     graybill@nilc.org

## CERTIFICATE OF SERVICE

I certify that on October 25, 2024 I electronically filed the foregoing with the Clerk of the Court for the U.S. District Court for the Eastern District of Texas by using the TXED CM/ECF system.  I further certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the TXED CM/ECF system.


*/s/ Lisa S. Graybill*
Lisa S. Graybill

**Cassandra Charles\***
(New York Bar No. 5540133)

**Hilda Bonilla\***
(D.C. Bar No. 90023968)

P.O. Box 34573
Washington, D.C. 20043
Phone: (213) 639-3900
Facsimile: (213) 639-3911
charles@nilc.org
bonilla@nilc.org

*\*pro hac vice forthcoming*

NATIONAL IMMIGRATION LAW CENTER
**Joshua Stehlik\***
(California Bar No. 220241)

3435 Wilshire Blvd. No. 108-62
Los Angeles, California 90010
Phone: (213) 639-3900
Facsimile: (213) 639-3911
stehlik@nilc.org


*Counsel for Amicus Curiae*
*American Families United*