**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | |
|---|---|
| STATE OF TEXAS, *et al.*,<br><br>        *Plaintiffs,*<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF<br>HOMELAND SECURITY, *et al.*,<br><br>        *Defendants.* | No.: 6:24-cv-00306 |

**AMICUS BRIEF OF OSCAR SILVA PEREZ, NATALIE TAYLOR,
SALVADOR DOE, JUSTIN DOE, CARMEN MIRANDA ZAYAS,
RICARDO OCAMPO HERNANDEZ, JESSIKA OCAMPO HERNANDEZ,
FODAY TURAY, JAXHIEL TURAY, GENARO VICENCIO PALOMINO,
CINDY SIQUEIROS MADUENA, AND THE COALITION FOR HUMANE
IMMIGRANT RIGHTS IN SUPPORT OF FEDERAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................1

ARGUMENT .......................................................................................................2

I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE NO PLAINTIFF HAS STANDING.................................................................2

    A. Texas Has Not Alleged or Proven a Cognizable Injury In Fact......................3

    B. Texas's "Evidence" of Injury is Neither Relevant to Nor Probative of Injury in Fact.......................................................................................................7

    C. Texas Has Not Proven That KFT Causes Any Impact of Consequence to Texas, Much Less That It Causes a Cognizable Injury ..................................11

    D. Texas Has Not Shown This Court Can Redress Any Cognizable Injury .......20

II.   KFT PAROLE LENDS TRANSPARENCY AND CONSISTENCY TO DHS'S LONG-ESTABLISHED USE OF ITS PAROLE AUTHORITY—WHICH CONGRESS HAS CONSISTENTLY SANCTIONED AND ENCOURAGED. ..........23

    A. DHS Has Exercised Parole-In-Place Authority For Decades But Requires Clear, Public-Facing Guidance to Facilitate Consistent Adjudication, Access, and Transparency. ...............................................................................24

    B. Congress Preserved and Reaffirmed DHS's Parole in Place Authority in 2019, Leading Even Conservative Legal Commentators to Recognize the Authority Was Beyond Challenge.................................................................29

III.   KFT-ELIGIBLE FAMILIES LIKE AMICI FACE TRAUMATIC DAILY HARDSHIP FROM A LOSS OF ACCESS TO KFT PAROLE, WHILE TEXAS CANNOT ARTICULATE ANY LEGITIMATE HARDSHIP. ....................................32

CONCLUSION.....................................................................................................34

# TABLE OF AUTHORITIES

## Cases

*Arizona v. Garland*, __ F. Supp. 3d __, 2024 WL 1645417 (W.D. La. Apr. 16, 2024)................................................................................................11, 13

*Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013)......................19, 20

*Crane v. Johnson*, 783 F.3d 244 (5th Cir. 2015)..........................................................13

*Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 36 (2024).............passim

*Fulani v. Brady*, 935 F.2d 1324 (D.C. Cir. 1991) .......................................................21

*Henderson v. Stalder*, 287 F.3d 374 (5th Cir. 2002).....................................................10

*Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872  (5th Cir. 2023) ..............................13

*Lujan v. Defs. of Wildlife*, 504 U.S. 555  (1992)....................................................11, 12

*Missouri v. Food & Drug Admin.*, No. 2:22-cv-00223-Z (N.D. Tex. filed Oct. 11, 2024)................................................................................................................6

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010) ....................................34

*Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319 (S.D. Tex. Sept. 26, 2023)...34

*Texas v. Garland*, __ F. Supp. 3d __, 2024 WL 967838 (N.D. Tex. Feb. 27, 2024) ....11

*Texas v. Mayorkas*, __F. Supp. 3d __,  2024 WL 3679380 (W.D. Tex. Aug. 5, 2024)...5

*Texas v. Mayorkas*, No. 6:23-CV-00001, 2024 WL 4355197 (S.D. Tex. Sept. 30, 2024)..............................................................................................................19

*Texas v. U.S. Dep't of Homeland Security*, __ F. Supp. 2d __, 2024 WL 1021068 (S.D. Tex. Mar. 8, 2024) ...........................................................................20

*Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068 (S.D. Tex. Mar. 8, 2024) ..............................................................13

*Texas v. United States,* 809 F.3d 134 (5th Cir. 2015)..................................................19

*United States v. Texas*, 599 U.S. 670, 676 (2023)...............................................4, 5, 22

## Statutes

6 U.S.C. § 279(g)(2) ........................................................................................................7

8 C.F.R. § 213a.2 ...........................................................................................................19

8 U.S.C. § 1101(a)(15)(K)..............................................................................................17

8 U.S.C. § 1183a............................................................................................................19

8 U.S.C. § 1225(a)(1).....................................................................................................23

National Defense Authorization Act for Fiscal Year 2020, Pub. L. No.116-92, § 1758(b)(3) (2019) ....................................................................................................... 31

## Regulations

89 Fed. Reg. at 67466-67 ................................................................... 11, 18, 22, 33

89 Fed. Reg. at 67471 .......................................................................................... 9

89 Fed. Reg. at 67480 ........................................................................................ 13

Fed. Reg. at 67474 ............................................................................................. 19

## Government Documents

165 Cong. Rec. 116, H5631 (daily ed. July 11, 2019), https://www.congress.gov/congressional-record/volume-165/issue-116/house-section/article/H5594-7 ..................................................................................... 30

Citizenship and Immigration Services Ombudsman, Annual Report 2011 (June 29, 2011), https://www.dhs.gov/sites/default/files/publications/cisomb-annual-report-2011.pdf ........................................................................................................... 28

Citizenship and Immigration Services Ombudsman, Annual Report 2012 (June 25, 2012) at 23, https://www.dhs.gov/sites/default/files/publications/cisomb-2012-annualreport.pdf.......................................................................................................... 28

DHS General Counsel, *Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007), www.uscis.gov/sites/default/files/document/legal-docs/Coldebella_Memo.pdf ...................................................................................... 23

*Immigration Needs of America's Fighting Men and Women: Hearing Before the Subcomm. on Immigr., Citizenship, Refugees, Border Sec., & Int'l L. of the H. Comm. on the Judiciary*, 110th Cong. 15 (2008), https://www.govinfo.gov/content/pkg/CHRG-110hhrg42509/html/CHRG-110hhrg42509.htm ............................................................................................. 26

INS Commissioner, *Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a Designated Port-of-Entry* (Apr. 19, 1999) ........................................................................................ 23

INS General Counsel, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998) ..... 23

Letter from Debra Rogers, Acting U.S. Citizenship and Immigration Serv. Ombudsman, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Serv. (May 22, 2013) .................................................................................................. 28

Letter from Hon. Zoe Lofgren, et al., to Janet Napolitano, Sec'y, Dep't of Homeland Sec. (July 9, 2010) ...................................................................................26

Letter from Michael Chertoff, Sec'y, Dep't of Homeland Sec., to Senator John F. Kerry (June 21, 2007), https://bit.ly/3AkEHnW .......................................................26

Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to León Rodríguez, Dir., U.S. Citizenship and Immigration Serv. (Nov. 20, 2024) ...........29

USCIS Office of Field Operations, *Processing of Initial Parole or Renewal Parole Requests Presented by Natives or Citizens of Cuba to USCIS Field Offices* (Mar. 4, 2008), https://www.hsdl.org/c/abstract?docid=21360 ...........................................23

USCIS Policy Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)*, PM-602-0091 (Nov. 15, 2013) ....................29

USCIS Policy Memorandum, *Parole of Spouses, Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees*, PM-602-0114 (Nov. 23, 2016).........................29

## Other Authorities

Andrew R. Arthur, *Why is 'Parole in Place' in the NDAA*, Center for Immigration Studies, Dec. 26, 2019, https://cis.org/Arthur/Why-Parole-Place-NDAA ...............31

Andrew R. Arthur, *With Choice of Kamala Harris, Biden's Immigration Plans Become Clearer*, Center for Immigration Studies, Aug. 12, 2020, cis.org/Arthur/Choice-Kamala-Harris-Bidens-Immigration-Plans-Become-Clearer .......................................................................................................................31

Camilo Montoya-Galvez, *Soldier's Immigrant Mother Could Be Among the Last to Benefit from Program*, CBS News, Aug. 22, 2019, https://www.cbsnews.com/news/parole-in-place-soldiers-immigrant-mother-could-be-among-the-last-to-benefit-from-program/ ..................................................30

Franco Ordoñez, *Trump Wants to Withdraw Deportation Protections for Families of* Active *Troops*, NPR, June 27, 2019, .https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-deportation-protections-for-families-of-active-troops..............................................30

George Fishman, *Biden/Harris 'Keeping Families Together' Scheme Seems Headed for Annulment*, Center for Immigration Studies, Aug. 30, 2024, https://cis.org/Fishman/BidenHarris-Keeping-Families-Together-Scheme-Seems-Headed-Annulment.......................................................................................................32

Gov. Greg Abbott, *2024 Report to the People* 57 (2024),
    https://gov.texas.gov/uploads/files/press/2024_Report_to_the_People_of_Texas.pd
    f.................................................................................................................................6

## PRELIMINARY STATEMENT

Amici Oscar Silva Perez, Natalie Taylor, Salvador Doe, Justin Doe, Carmen M. Miranda Zayas, Ricardo Ocampo Hernandez, Jessika Ocampo Hernandez, Foday Turay, Jaxhiel Turay, Genaro Vicencio Palomino, and Cindy Siqueiros Maduena and the Coalition for Humane Immigrant Rights write in support of Defendants' Trial Brief and Motion for Summary Judgment ("Defs.' Brief"), ECF 77. Individual amici are all applicants or the spouses of applicants for Keeping Families Together ("KFT") and CHIRLA is a nonprofit with both its own deep organizational interest in the KFT process and an interest on behalf of its members eligible for KFT parole, dozens of whom have already applied. Amici have filed a brief once before, and move to incorporate by reference the arguments therein. Amicus Brief in Support of Defendants' Motion to Vacate Administrative Stay ("Amicus to Defs.' Mtn. to Vacate"), ECF 52.

Amici write now to address three issues crucial to the Court's ruling on summary judgement. First, amici address Texas's failure to show standing, drawing on Texas's own filing as well as amici's individual declarations and five additional fact and expert declarations previously filed by amici in support of their Renewed Motion to Intervene ("Renewed Mot. to Int."), ECF 84, and resubmitted herein. These declarations lay bare fatal holes in Texas's standing argument, set forth in Plaintiffs' Corrected Combined Updated Motion for Preliminary Injunction and Stay of Agency Action, Motion for Summary Judgment, and Trial Brief ("Tx's Br."), ECF 79, including false equivalencies between the population eligible for Keeping Families

Together ("KFT") parole and unrelated groups, and reliance on inapposite and irrelevant social science research to make baseless predictions about departure from the U.S. Second, amici review the history of the Department of Homeland Security exercising its parole in place authority to assist military families over the last two decades with the full knowledge and encouragement of Congress, and the reaffirmation of that authority in statute in 2019. This history shows not only the lawfulness of the statutory authority underlying KFT parole but also the importance of clear, public guidance and application procedures to ensure that parole authority is used by adjudicators in a consistent, accessible, and transparent way and in accordance with statutory requirements. Finally, amici again share the immense harm that they and other families like theirs will suffer through loss of access to the stability and unity that KFT parole offers them. Balanced against this, Texas's speculative and far-distant claim of continued costs that might otherwise have decreased cannot justify permanent injunctive relief.

## ARGUMENT

### I.  This Court Lacks Jurisdiction Because No Plaintiff Has Standing.

Article III confines the jurisdiction of federal courts to actual cases and controversies as a structural protection of the separation of powers. *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 378 (2024) *("Hippo. Med.")*. As the unanimous Supreme Court reminded earlier this year, federal courts are not "open forum[s]" for litigants to "to press general complaints about the way in which government goes about its business," *id.* at 379 (citation omitted), and the proper

application of the standing requirements will inevitably mean that some disputes are beyond the purview of the courts. *Id.* at 380. This result is by design. *Id.* ("[T]he standing requirement means that the federal courts may never need to decide some contested legal questions: 'Our system of government leaves many crucial decisions to the political processes'") (citation omitted). For this Court to have jurisdiction, Texas must establish that its dispute with the Biden Administration about the KFT parole guidance is amenable to judicial resolution by proving three elements of standing—and Texas cannot carry its burden to prove even one.

The solitary basis of Texas's injury is that—like any other government at virtually any level—it provides basic governmental services to the people who live within its borders, like public education and health care. None of the costs that Texas identifies as its injury are related to immigration or citizenship status, much less to anything related to KFT or the KFT-eligible population. Instead, Texas claims injury based on the ordinary costs of governing people, regardless of their immigration status or citizenship or any other variable, on the theory that but for KFT, there would be fewer human beings in the State of Texas and so its expenses would necessarily be lower absent KFT.

There are several independently fatal flaws in Texas's argument.

**A. Texas Has Not Alleged or Proven a Cognizable Injury In Fact.**

To begin, Texas has not even alleged a cognizable injury in fact (much less proven that it exists, is caused by the KFT parole guidance, and could be redressed by this Court, which are addressed below). Texas's claimed injuries—the routine costs

of governance—are simply not a cognizable injury in fact for Article III purposes, which can be seen in a few different ways.

For one, the governance costs that Texas claims as injuries are abstract and generalized; they are not particularized in either direction—they are wholly generic, as nothing about them is particular to Texas providing the services, the services being provided, or the human beings receiving the services. They therefore cannot count as injuries in fact; Article III does not authorize this Court to opine on generalized grievances. *Hippo. Med.*, 602 U.S.at 381 ("An injury in fact must be 'concrete,' meaning that it must be real and not abstract," and it "also must be particularized; the injury must affect 'the plaintiff in a personal and individual way' and not be a generalized grievance.") (citation omitted). Indeed, it is difficult to imagine Texas presenting a *more* generalized grievance than it does here, where it must argue that it is injured every time that it provides services—of any nature whatsoever, so long as it costs "a dollar or two," Tx Br. at 57 (citation omitted)—to a single additional human being. Texas's theory of standing is limitless, *see* Defs.' Br. at 16-17, and illogical.

Texas also cannot point to any "history or tradition" of the federal courts entertaining cases in which the simple provision of basic government services is considered an injury. *Contra United States v. Texas*, 599 U.S. 670, 676 (2023) (*Priorities*). And for good reason: they are not injuries—they are government services, and Texas cannot cite a single case after *Priorities* standing for the proposition that a state or a government is injured when it provides healthcare, administers a justice

system, or educates a child, particularly when it does so within a constitutional democracy; and the pre-*Priorities* cases it relies upon never considered whether these "pocketbook injuries" were legally cognizable in first place. *See Texas v. Mayorkas*, __F. Supp. 3d __,  2024 WL 3679380, at *6 (W.D. Tex. Aug. 5, 2024) (Moses, C.J.) (acknowledging the prior Fifth Circuit precedent and then explaining how "the Supreme Court has more recently narrowed plaintiffs' standing to challenge federal programs based on indirect, downstream monetary costs such as those Texas claims here," in ultimately dismissing Texas's suit regarding an asylum regulation for lack of standing). Nor, for that matter, did any of those opinions consider whether routine costs of governance are sufficiently particularized to meet the injury-in-fact requirement.  To the extent that Texas claims that providing general services to one of its residents inflicts on it an "injury," what it really complains about is constitutional federalism, *see* Defs.' Br. at 16-17, and what it really argues for is akin to taxpayer standing (but for states and even when they come out ahead).  That is not enough to meet the injury in fact requirement, which was designed to prevent the federal courts from entertaining precisely this type of case. *Hippo. Med.*, 602 U.S.at 380-81; *Priorities*, 599 U.S. at 680, n.3.

Yet another way to tell that Texas and the other Plaintiff States are not injured by providing services to people who live within their borders is that they actively try to attract people to move into their jurisdictions—they *want* population growth. Texas's Governor, for example, routinely brags about the state's population growth, *see, e.g.*, Gov. Greg Abbott, *2024 Report to the People* 57 (2024),

https://gov.texas.gov/uploads/files/press/2024_Report_to_the_People_of_Texas.pdf (touting that Texas has been the "[t]op state for population growth for 18 years in a row"), yet Texas asks this Court to conclude that it is injured when that happens.

Even more starkly, three of the Plaintiff States arguing to this Court that they are injured by providing services to more people earlier this month told Judge Kacsmaryk in the Northern District of Texas the exact opposite, also in a case against the federal government. After being allowed to intervene as plaintiffs in a pre-existing case challenging the availability of mifepristone,[1] an abortion medication, the States of Idaho, Kansas, and Missouri have claimed injury based on the idea that each abortion "lead[s] to a reduction in the actual or potential population of each state." Am. Compl., *Missouri v. Food & Drug Admin*, No. 2:22-cv-00223-Z (N.D. Tex. filed Oct. 11, 2024), ECF 195-1 at 188-89. In addition to claiming a standalone "Sovereign Injury to [their] Population Interests," *id.* at 189 ("Defendants' actions are causing a loss in potential population or potential population increase"), the Plaintiff States also allege that "[a] loss in potential population causes further injuries as well," including "diminishment of political representation" in Congress by losing a seat and the "loss of federal funds . . . if their populations are reduced or their increase diminished." *Id.* at 190. The Plaintiff States' diametrically *opposite* claims about how they as litigants are entitled to invoke the jurisdiction of the federal courts—made to two different federal courts at the same time, and without regard to consequence to

---

[1] Had these States not moved to intervene in this existing lawsuit filed in the one-judge Amarillo Division of the Northern District of Texas, they could not have laid venue there or anywhere else in the Fifth Circuit.

them or their (identical) counsel articulating the parallel but irreconcilable claims—could scarcely highlight more that Plaintiff States lack the requisite stake here. *See Hippo. Med.*, 602 U.S. at 379 ("The requirement that the plaintiff possess a personal stake helps ensure . . . . that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action.") (citation omitted).

## B. Texas's 'Evidence' of Injury Is Neither Relevant to Nor Probative of Injury in Fact.

The "evidence" that Texas provides to prove injury in fact further illustrates just how far short it falls from carrying its burden to justify this Courts' exercise of jurisdiction. Indeed, even were this Court to take every bit of evidence that Texas provides as conclusively establishing the facts they purport to establish, that evidence would fail to meet the burden of showing injury.

Beginning with education, Texas's entire presentation is limited to a declaration estimating the costs of providing a public-school education to unaccompanied noncitizen children. Declaration of Amy Copeland ("Copeland Decl.") at 2, ECF 79-3. By definition, these children do not have a parent or caregiver in the United States. 6 U.S.C. § 279(g)(2). There is literally zero overlap between that population and KFT: the only children eligible for KFT parole are stepchildren of a U.S. citizen who have *two* parents caring for them. Texas does not even proffer an argument to bridge that chasm.

7

Were that not enough—and it plainly is, given that Texas bears the burden of proof—children without a parent are "not representative of the population of children implicated by the program at issue in this case." Expert Declaration of Drs. Patricia Gándara and Gary Oldfield ("Gandara and Orfield Decl."), Exhibit 3 ¶ 16. Worse, Texas provides only the "gross cost estimate for educational services provided to unaccompanied children"—which (presumably intentionally) leaves no way to estimate a per-child cost or "to extrapolate a comparison cost for KFT-eligible stepchildren of U.S. citizens, or children of KFT-eligible noncitizen spouses, who are already residing in Texas (a number that is also not provided in the declaration.)" *Id*. ¶ 17. It also fails to consider or note the incremental nature of costs and benefits as well as the various federal government funds provided to the state to offset the costs of educating low-income students and English learners, further undermining the validity of its cost estimates. *Id*. ¶¶ 18-19.

Texas next says that the federal government fails to reimburse the full cost to Texas to "house[] . . . illegal aliens" in Texas Department of Criminal Justice (TDCJ) custody and then asserts "[t]he amounts of unreimbursed expenses will likely increase if more illegal aliens are paroled under the PIP Program." Tx's Br. at 57 (citing Walz Decl. ¶ 12). But its declarant as to criminal-justice costs says no such thing: she states that "*to the extent* the number of aliens in TDCJ custody increases, TDCJ's unreimbursed expenses will increase as well." Walz Decl. ¶ 12 (emphasis added). Even with the benefit of that tautology, Texas has not shown that it incarcerates a single KFT-eligible individual, much less that KFT parole would cause

8

"the number of aliens in TDCJ custody" to increase. *Cf.* Walz Decl. ¶ 12. Instead, the figures that Texas cites are for costs reported to the federal government's State Criminal Alien Assistance Program (SCAAP), Tx's Br. at 57-58 (*citing* Walz Decl.), which covers states' and localities' salary costs "for incarcerating undocumented criminal aliens *with at least one felony or two misdemeanor convictions* for violations of state or local law, and incarcerated for at least 4 consecutive days during the reporting period." Walz Decl. ¶ 3 (emphasis added). But felony convictions are a per se bar to KFT parole, as are several types of misdemeanor convictions and *any* pending criminal charge. 89 Fed. Reg. at 67471. Any other type of conviction "will result in a presumption of ineligibility for parole." *Id.* at 67476. In short, KFT-eligible Texans do not fall under SCAAP and Texas has not shown it spends any money incarcerating them.

Texas also does not offer any reason to think prospective expenditures on incarceration will be any different. Dr. Charis Kubrin, a renowned expert on criminal justice, explains why: extensive research across "metropolitan areas, counties, cities, census tracts, block groups, and neighborhood clusters" has concluded "higher or increased immigration does not lead to more crime and, if anything, can decrease crime." Expert Declaration of Charis Kubrin ("Kubrin Decl."), Exhibit 2 ¶ 17. Research specifically into undocumented immigration has shown a strongly *negative* correlation between increased immigration and both violent crime, *id.* ¶ 23, and drug arrests, drug overdose deaths, and DUI arrests. *Id.* at 24. Since "[l]ower crime rates also lead to lower rates of incarceration," *id.* ¶ 25, the most reasonable prediction

9

assuming any impact from KFT at all (which is unlikely, *see infra* at I(C) is that Texas will save money.

The same is true for claimed healthcare costs. Texas's data collection on healthcare costs for undocumented immigrants only commenced in August 2024, casting doubt on the reliability of the state's historical estimates. *See* Expert Declaration of Leighton Ku ("Ku Decl."), Exhibit 1 ¶¶ 14. What is more, the state relies on broad, generalized estimates associated with undocumented immigrants earning below a certain threshold income and unable to access other health insurance. Its declarant, Susan Bricker of the Texas Health and Hospitals Commission, offers no evidence that these financial costs would be lessened if KFT Parole ceased to exist—nor could she, since Texas has no idea who in its state is eligible for KFT parole, does not track that data, and in any event has no legitimate basis to speculate that they may "self-deport." *See infra* at I(C). To the contrary, Texas offers reason to believe they will *not* emigrate. Emergency Medicaid and Children's Health Insurance Program ("CHIP") are means-tested benefits: Texans who qualify do so by virtue of indigence, which even Texas's own expert concedes means they are *less* likely to leave the U.S. *Cf.* Potter Decl. ¶ 13 ("poverty" is among the factors that deters emigration), ¶ 11 (research shows "immigrants with college degrees were more likely to return to their country of origin than those without").

Finally, Texas conveniently ignores that parole through KFT will lead tens of thousands more people to have employer-sponsored health insurance. *See* Ku Decl. ¶¶ 15-17; *cf. Henderson v. Stalder*, 287 F.3d 374, 379–80 (5th Cir. 2002). More

generally, as the FRN notes, the economic benefits to the country as a whole, including Texas, are overwhelmingly positive. 89 Fed. Reg. at 67466-67; Declaration of Angelica Salas ("CHIRLA Decl.") ¶¶ 7-8, ECF 15-12; Defs.' Br. at 4-5.

Texas obviously cannot come into federal court and demand the extraordinary remedy of an injunction without providing any evidence at all, but what it provides here is not substantively any better; the evidence it offers here is pure makeweight, and cannot establish injury, as other courts have held in similar circumstances. *See, e.g.*, *Arizona v. Garland*, __ F. Supp. 3d __, 2024 WL 1645417, at *12-14 (W.D. La. Apr. 16, 2024) (Joseph, J.) (dismissing suit over an asylum regulation for lack of standing, where the plaintiff states' evidence—even after extensive discovery—was largely irrelevant and did not establish injury); *Texas v. Garland*, __ F. Supp. 3d __, 2024 WL 967838, at *20-26 (N.D. Tex. Feb. 27, 2024) (Hendrix, J.) (dismissing claims regarding an immigration-detention related appropriation for lack of standing, where Texas provided only evidence about costs "illegal immigration imposes on Texas generally").

### C. Texas Has Not Proven That KFT Causes Any Impact of Consequence to Texas, Much Less That It Causes a Cognizable Injury.

In addition to proving that it has or certainly will suffer an injury in fact, Texas must also show that its claimed injury—its provision of government services—is caused by the KFT parole guidance. *See Hippo. Med.*, 602 U.S. at 382-83; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). Here, Texas cannot prove that the KFT guidance will have any effect on Texas *at all*, much less that it causes Texas a cognizable injury.

Where, as here, a plaintiff challenges a defendant's treatment of a third party, standing is not categorically precluded, but it is "'substantially more difficult to establish.'" *Hippo. Med.*, 602 U.S. at 382 (quoting *Lujan*, 504 U.S. at 562). And understandably so—Texas has the burden of proving that third parties with "unfettered choices" will act in a specific way that, in turn "will likely injure" Texas. *Id.* at 383. For several reasons, Texas cannot "thread the causation needle" here. *Id.*

For one, Texas cannot point to a particularized injury in fact, and so instead relies solely on the ordinary costs of governance as injury. As discussed above, accepting these ordinary costs of governance as inflicting an "injury" on states is to read the injury-in-fact requirement out of Article III, and it likewise makes the causation requirement meaningless; if existing as a sub-federal governmental entity in 2024 is an injury, as Texas posits, then Texas is always a victim. Our Constitution demands more. *Hippo. Med.*, at 602 U.S. at 382-83.

Even assuming Plaintiff States *would* be injured in fact by federal immigration policy resulting in more humans residing in their borders (yet somehow also injured by federal policy resulting in *fewer* humans in their borders when challenging other federal policy they oppose, as discussed above), they still cannot prove that the KFT Parole policy causes there to be any such impact. Texas's sole theory for causation is predicated on the unadorned speculation that "[s]ome [noncitizens] will return to their home countries when they are not incentivized to stay via work authorizations and protection from removal" and others "would be removable," further incentivizing departure. Tx's Br. at 64. As amici argued in their prior brief, that premise is legally

flawed, since the alleged harms stem from needing to maintain, rather than increase, existing costs.[2] Amicus to Defs.' Mot. to Vacate at 8-9. Worse, Texas's self-deportation theory is not only speculative, it has no basis in reality or plain logic. *Cf. Hippocratic Med.*, 602 U.S. at 383.

Texas acknowledges that "social ties . . . deter emigration" and the likelihood of an undocumented immigrant returning to their country of origin decreases the longer they have lived in the United States. Declaration of Llyod Potter ("Potter Decl.") ¶¶ 13-14, ECF 79-6. Those two attributes—long-term, continuous residence in the United States and deep, strong, personal ties—are at the heart of the KFT Parole policy. KFT-eligible individuals like amici are firmly rooted in the U.S.: their U.S. citizen spouses and children are here, they came at a young age, they have lived here continuously for many years, and the vast majority are working. 89 Fed. Reg. at 67480; Expert Declaration of Robert Smith ("Smith Decl."), Exhibit 4 ¶ 36, ECF 84-4; *see also* Declaration of Oscar Silva Perez ("Silva Decl.") ¶ 2, ECF 15-1 (came to the

---

[2] *See*, *e.g.*, *Louisiana State by & through Louisiana Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 881 (5th Cir. 2023) (finding that standing through a strain on state resources "is necessarily contingent on a finding that the Final Rule will increase [the state's] enforcement costs."); *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) ("Mississippi's alleged fiscal injury was purely speculative because there was no concrete evidence that Mississippi's costs had increased or will increase as a result of DACA."); *Arizona v. Garland*, No. 6:22-CV-01130, 2024 WL 1645417, at *11 (W.D. La. Apr. 16, 2024) ("when deciding whether a state has been injured for Article III standing purposes, courts review whether the number of aliens, and the associated costs attributable to them, *increased* relative to those same numbers prior to the implementation of the challenged program") (emphasis added); *Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068, at *16 (S.D. Tex. Mar. 8, 2024), *reconsideration denied*, 2024 WL 2888758 (S.D. Tex. May 28, 2024) (same).

U.S. as an infant); Declaration of Ricardo Ocampo ("R. Ocampo Decl.") ¶ 1, ECF 15-6 (came at age two); Declaration of Foday Turay ("F. Turay Decl.") ¶ 6, ECF 15-8 (came on his seventh birthday); Declaration of Genaro Vicencio ("Vicencio Decl.") ¶ 2, ECF 15-10 (came at age 11). These factors are all strongly correlated with *not* emigrating. Smith Decl. ¶¶ 36-37.

Critically, KFT-eligible individuals also have also never had the benefit of KFT parole—and yet have remained here for over a decade and on average over two decades without status. To the extent any consequence is "predictable" from the elimination of a process that has heretofore never existed, *cf. Hippocratic Med.*, 602 U.S. at 383, it is that this population will stay right where they are, at home with their families. Smith Decl. ¶ 45 (plaintiffs' suggestion that "blocking parole in place, which the KFT population does not now enjoy, has never enjoyed, and may have little knowledge of, will change future behavior, and cause them to abandon the lives with their spouses and children they have developed over decades . . . inconsistent with the research and does not make logical sense.")

Texas's sole basis for its conjecture that a subset of undocumented immigrants will leave the U.S. if deprived access to KFT parole is a declaration by Dr. Lloyd Potter, the State Demographer of Texas. *See* Potter Decl. But the sources relied upon by Dr. Potter provide no support for this conclusion. Most glaringly, the 2018 study that Dr. Potter cites for the proposition that "the consensus estimate is that undocumented immigrants who have been in the United States for more than 10 years return to their country of origin at a rate of 1% each year," *id.* ¶ 14, itself relied

14

upon a study that was not about undocumented immigrants at all. Instead, it was a study of individuals of Mexican origin that explicitly noted it was unable to determine whether the returners were U.S. citizens, Lawful Permanent Residents, visa holders, or undocumented individuals. Smith Decl. ¶ 12. Similarly, Dr. Potter references another study that found "a 1% return rate of *all* immigrants (without reference to legal status)." *Id*. Critically, beyond saying nothing about the propensity of undocumented immigrants in general to return to their country of origin, to say nothing of well-settled undocumented immigrants like the KFT population, *id*. at ¶ 14, neither study distinguished between temporary and permanent departures from the United States. Id. ¶ 15.[3]

Additionally, drawing conclusions from these studies about the return rate of KFT-eligible individuals who, by definition, lack lawful immigration status, is at best speculative and at worst misleading. Research consistently demonstrates that immigrants who have citizenship or a durable lawful immigration status are *more likely* to return to their country of origin than those without lawful immigration status. *Id*. at ¶¶ 13, 16. While the former can be confident in their ability to return to their adopted country after a departure, undocumented immigrants—particularly those who are well-settled and have built complete lives here—risk everything when

---

[3] Other studies cited in the 2018 paper considered by Texas's declarant found return rates of close to zero, particularly after heightened security at the U.S. border lessened the phenomenon of circular migration. Potter Decl. ¶¶ 18, 39.

they leave, which makes them less likely to do so.[4] Smith at ¶ 38 (any departure by a KFT-eligible individual "involve[s] the risk of permanently losing the American lives they have built, including the ability to raise or be with their U.S.-born children."). Texans with status may winter in Cancun; Texans without status stay home. This gives lie to Texas's claim that being removable renders KFT-eligible individuals *more* likely to leave the U.S., TX's Br. at 65-66; in fact, they are more likely to leave if given lawful status.

Consistent with their shotgun approach to establishing standing, Texas also references a single online survey of Deferred Action for Childhood Arrivals ("DACA") holders who were asked a series of questions likely to prime feelings of fear and concern and were then asked how likely they were to leave the United States if DACA ended. But the hypothetical plans expressed there are, like all intentions, "notoriously unreliable as guides to eventual behavior," particularly for difficult decisions with many steps and no precedent in one's own life. Smith Decl. ¶¶ 28-31. As a result, that survey is not a reliable basis to predict even the actions of DACA holders in response to an action that strips them of something they already possess, much less the KFT-eligible population which differs from DACA holders in crucial

---

[4] Another study relied upon by Texas's declarant regarding economic opportunity drivers of domestic, interstate relocation is even less apposite to the question of whether KFT-eligible individuals will emigrate from the U.S. *See* Potter Decl. ¶ 8 (citing Kennan and Walker, 2011). *Cf.* Smith ¶¶ 21-26 (explaining the Kennan and Walker study "is unsuited to draw inferences about the likely response of the KFT population," in part because it draws from 1979 data on "white, non-Hispanic, high school graduate males who have not gone to college").

respects, not least that they have never had the thing that they would now be denied following issuance of a permanent injunction. *Id.* at ¶¶ 30-34.

Finally, in Dr. Potter's declaration in support of the Plaintiff States' current motion, he raises for the first time a study of individuals who migrated to the Netherlands to join their future spouse, some of whom later returned to their country of origin after getting divorced. Neither Dr. Potter nor Texas attempts to connect this study to the present case, nor could they. Unlike those in the study, the KFT-eligible population did not migrate to the United States lawfully for the purpose of joining their U.S. citizen partner: these individuals came at an average age of 17, Smith Decl. ¶ 42, and lack status precisely because they did *not* immigrate to the U.S. through their U.S.-citizen spouse.[5] *See, e.g.*, 8 U.S.C. § 1101(a)(15)(K) (making available a nonimmigrant visa for the fiancé(e) of a U.S. citizen). Moreover, the study underscores that KFT is at best irrelevant to whether people may eventually decide to depart; the immigrants in the Netherlands who chose to leave *had lawful status*, which means their emigration conforms with other research showing that immigrants with lawful status are more likely to depart than those without. Regardless, the speculative nature of these inferences, projected years in the future and through a series of contingent events, does not support standing and does not

---

[5] Indeed, with the exception of Salvador Doe, who came to the United States at the age of 22 in search of opportunity, and who believes it is essential to his safety that he not return to Mexico because of anti-LGBTQ+ sentiment and discrimination, Declaration of Salvador Doe ("S. Doe Decl.") ¶ 3, ECF 15-3, each amici who is a KFT-eligible noncitizen came to the United States as a young child.

belong in this forum. *Hippocratic Med.*, 602 U.S. at 382 ("An Article III court is not a legislative assembly, a town square, or a faculty lounge").

Absent any evidence that the state's population will change at all because of the KFT parole guidance, Texas attempts to equate permanent departures from the U.S. with temporary departures to consular process. TX's Br. at 65-66.[6] But Texas has offered no reason to conclude that temporary departures for consular processing, the duration of which not even the federal government can guess, 89 Fed. Reg. at 67466, will decrease state expenditures. Substantial evidence points to precisely the opposite conclusion: these departures may *increase* state expenditures when U.S.-citizen family members remain behind in Texas without a breadwinner or caregiver. *Id.*; R. Ocampo Decl. ¶¶ 10-11 (describing fear that his family would lose their health insurance if he could not work); F. Turay Decl. ¶ 19 ("I am the primary breadwinner, so without my income, Jaxhiel would also struggle to pay for childcare, food, and other basic needs for our son and for herself"); Declaration of Carmen M. Miranda Zayas ("Miranda Decl.") ¶ 4, ECF 15-5 ("I depend on Francisco's income to provide for many

---

[6] Of course, families denied access to KFT parole may not resort to consular processing at all. 89 Fed. Reg. at 67466 ("Without this process, hundreds of thousands of noncitizen spouses of U.S. citizens are likely to instead remain in the United States without lawful status, causing these families to live in fear and with uncertainty about their futures."). And the very fact that KFT-eligible spouses (who have lived in the United States without status for an average of 23 years) remain undocumented today suggests an unwillingness or inability to consular process. Amici's experience reflects this hesitancy. *See*, *e.g.* S. Doe Decl. ¶ 18 (consular processing "would be more dangerous for me in Mexico as someone that's part of the LGBTQ+ community and who could also be targeted for returning from the United States"); F. Turay Decl. ¶ 17 (consular processing would mean "leav[ing] my family behind for an indefinite amount of time, which would cause my wife and son a great burden.").

of our costs," including utility bills and food). *See Texas v. United States,* 809 F.3d 134, 156 (5th Cir. 2015) (costs "sufficiently connected" to the alleged benefit can be considered in analyzing harm).

What is more, Texas's argument again hinges on a mismatch with the KFT-eligible population (or in this case, the small subset of that population which Texas speculates may choose to consular process). Consular processing is expensive. Fed. Reg. at 67474 (noting the "great financial cost" to pursuing a provisional waiver and consular processing); R. Ocampo Decl. ¶¶ 14-15 (estimating he and his wife have spent $15,000 pursuing consular processing). It costs thousands of dollars in fees and requires demonstrating sufficient income to support the intending immigrant. 8 U.S.C. § 1183a; 8 C.F.R. § 213a.2. Texas has not shown that KFT-eligible Texans who can overcome these barriers receive *any* state benefits, and indeed there are good reasons to doubt that they do. *Clapper v. Amnesty International USA*, 568 U.S. 398, 410 (2013) (rejecting as too "speculative" a theory of standing contingent on "a highly attenuated chain of possibilities").

In sum, even assuming that an increase in its population would constitute an injury to Texas, the state has not shown that what it challenges here will cause any change to its population at all. It therefore cannot carry its burden of proving traceability, as required by Article III, and this case must be dismissed for reasons similar to those articulated by Judge Tipton in recently dismissing two other Texas cases challenging immigration policies with which Texas disagreed. *Texas v. Mayorkas*, No. 6:23-CV-00001, 2024 WL 4355197, at *5-6 (S.D. Tex. Sept. 30, 2024)

19

(dismissing suit over "public charge" regulation for lack of standing); *Texas v. U.S. Dep't of Homeland Security*, __ F. Supp. 2d __, 2024 WL 1021068, at *14-17 (S.D. Tex. Mar. 8, 2024) (dismissing suit over parole processes for certain nationals of Cuba, Haiti, Nicaragua, and Venezuela for lack of standing), *reconsideration denied* 2024 WL 2888758 (S.D. Tex. May 28, 2024).

### D. Texas Has Not Shown This Court Can Redress Any Cognizable Injury.

Finally, Texas cannot identify a single form of relief that this Court can order that would redress any cognizable injury it has identified. Even assuming Texas could prove that it bears any cost whatsoever related to the KFT-eligible population, and even assuming it could prove a causal relationship—neither of which it comes remotely close to doing—Texas would need to provide some basis to conclude that an order of this Court would provide it relief from its injures. Texas cannot do that, and for several reasons.

First, as amici's own experiences demonstrate, Texas cannot show a halt to KFT parole will redress any economic injury because KFT-eligible families, like all families, are balancing a host of individualized factors in determining where to live and what status, if any, to pursue for the undocumented spouse. *E.g.* Silva Decl. ¶¶ 14-16 (describing weighing the costs and risks of pursuing an I-601A provisional waiver). *Cf. Clapper*, 568 U.S. at 413 ("we have been reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment"). Texas's own expert concedes that relocation is contingent on a range of factors, from work opportunities to home ownership, education level, and age of children. Potter Decl. ¶¶ 11-13. In their summary judgment briefing, Texas also

posits that divorce may be a factor (at least as to divorcees with lawful status). Tx's Br. at 66 (citing Potter Decl. ¶ 17). But to meet its high burden, Texas cannot simply allege that a butterfly might flap its wings in the Amazon and a KFT-eligible individual may someday decide to leave the country. Texas has adduced no evidence it is the halt of KFT parole that will cause such a decision, rather than a host of intervening factors. *Fulani v. Brady*, 935 F.2d 1324, 1329 (D.C. Cir. 1991) ("given the number of causal factors significant to [plaintiff's] alleged injury, we find that the claim lacks sufficient redressability to warrant standing").

Second, rather than helping to redress Texas's claimed injuries, a court order preventing KFT Parole from being implemented could cause or exacerbate serious harms "to the U.S.-citizen Texan children (and other family members) whose parents could benefit from the parole in place process." Smith Decl. ¶ 46. "Research has demonstrated that children, most of whom are U.S. citizens, are harmed by the risks and stresses of living with undocumented parents (experiencing worse mental health, getting less medical care, struggling in school, and other harms)." *Id.*

Third, as amici explain *infra* in section II, the statutory authority to grant parole in place will endure even if the Court enjoins the KFT Parole process. That is because just as the parole in place authority was used for military family members—albeit in an ad hoc and inconsistent manner—for years before the promulgation of a policy in 2013 and explicit congressional approval in 2019, the authority to parole in place KFT-eligible individuals will continue to exist even if policy guidance and a standardized application process do not. In both cases, written policies are critical to

improving the agency's use of its statutory parole in place authority, because they promote greater consistency in adjudications and provide the public with clear and transparent guidance—but they do not change the scope of the Department of Homeland Security's ("DHS's") authority to grant parole in place. As parole will remain available to KFT-eligible individuals, the Court can offer no redress to Texas through this action. *Priorities*, 599 U.S. at 691 (Gorsuch, J., concurring) (explaining how vacating the enforcement guidelines Texas challenged would "do[es] nothing to redress the States' injuries" because the underlying discretionary authority would remain unchanged, and nothing the court's order would "require federal officials to change how they exercise that discretion in the Guidelines' absence," and thus Texas failed to prove redressability).

Even assuming Texas is correct that some KFT-eligible individuals may ultimately leave the United States, that would also exacerbate rather than redress financial harm to the state—because they leave behind U.S.-citizen spouses and young children (an estimated 317,000 in Texas alone, Smith Decl. ¶ 37), who qualify for and may become *more* reliant on state benefits. *Supra* at 18-19; 89 Fed. Reg. at 67466 (prolonged separation results in "avoidable economic and emotional hardship" to families).

In summary, Texas has failed to meet its burden to show standing and this Court lacks jurisdiction.

## II.     KFT Parole Lends Transparency and Consistency to DHS's Long-Established Use of Its Parole Authority—Which Congress Has Consistently Sanctioned and Encouraged.

The KFT Parole guidance is not only lawful but rooted in decades of consistent legal interpretation by Congress, the executive,[7] and the courts. In their brief, the Federal Defendants lay out the statutory basis for that authority, which extends to any noncitizen "applying for admission," 8 U.S.C. § 1182(d)(5)(A), and where the term "applicant for admission" is defined to include noncitizens "present in the United States who ha[ve] not been admitted," 8 U.S.C. § 1225(a)(1). Defs.' Br. at 32-35. Amici neither repeat those arguments here nor address all of Texas' arguments. Instead, amici underscore two points evidenced through the history of the military families parole in place policy.

First, DHS has utilized its discretionary parole-in-place authority to promote military family unity for decades.[8] But prior to the creation of DHS's first public guidance on the use of parole in place for this population in 2013, the agency's

---

[7] INS General Counsel, *Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens*, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998); DHS General Counsel, *Clarification of the Relation Between Release under Section 236 and Parole under Section 212(d)(5) of the Immigration and Nationality Act* (Sept. 28, 2007), www.uscis.gov/sites/default/files/document/legal-docs/Coldebella_Memo.pdf.

[8] Beyond military families, policy guidance regarding the use of parole in place for certain Cuban nationals—and the impact of such paroles on their ability to adjust status under the Cuban Adjustment Act—has been in place since 1999. *See* INS Commissioner, *Eligibility for Permanent Residence Under the Cuban Adjustment Act Despite Having Arrived at a Place Other than a Designated Port-of-Entry* (Apr. 19, 1999), *reprinted in* 76 Interpreter Releases 676, 684, App. 1 (May 3, 1999); *see also* USCIS Office of Field Operations, *Processing of Initial Parole or Renewal Parole Requests Presented by Natives or Citizens of Cuba to USCIS Field Offices* (Mar. 4, 2008), https://www.hsdl.org/c/abstract?docid=21360.

decision-making was ad hoc and inconsistent, which created obvious challenges for access and transparency. The solution came in the form of the eventual military parole in place policy, which like KFT parole, promoted the good-government values of consistency and transparency. Second, for more than a decade, Members of Congress were not only aware of DHS's use of its parole in place authority, they repeatedly urged DHS to make *greater* use of that authority to benefit members of the U.S. military. In 2019, Congress enacted legislation in the National Defense Authorization Act for Fiscal Year 2020 to direct DHS to continue considering military families for parole in place and, relevant to this case, to reaffirm the importance of the Secretary of Homeland Security's parole in place authority itself—without limitation to military families.

### A. DHS Has Exercised Parole-In-Place Authority For Decades But Requires Clear, Public-Facing Guidance to Facilitate Consistent Adjudication, Access, and Transparency.

Long before DHS published a policy memorandum in 2013 specifically addressing the use of parole in place for certain family members of current and former members of the Armed Forces, adjudicators around the country (first for the Immigration and Naturalization Service ("INS") and later U.S. Citizenship and Immigration Services ("USCIS") were fielding requests for assistance from military service members concerned about the possibility of immigration enforcement against their undocumented family members. Debra Rogers Declaration ("Rogers Decl."), Exhibit 5 ¶ 3. Although thousands of adjudicators, spread across 100 district offices and field offices nationwide, had "general guidance and training regarding how to

consider requests for humanitarian or significant public benefit parole under the statute," they lacked "specific guidance regarding whether or how they could exercise the statutory parole authority to help military personnel or their family members avoid periods of family separation, including where that could promote military readiness." *Id.* ¶¶ 4-5.

In the absence of such guidance, the agency took an "ad hoc, office-by-office approach" for a period of years, with "different offices around the country handling seemingly like cases in materially different ways." *Id.* ¶ 4. For instance, while the San Diego office typically handled cases by working with State Department counterparts in Mexico to expedite visa processing to minimize periods of separation outside the country, the San Antonio Field Office granted parole in place to certain military family members. *Id.* These inconsistent adjudications posed a management challenge. *Id.* ¶ 6.

The lack of uniform and transparent agency guidance, in turn, led to other problems. It meant, for example, that requests for assistance, including parole in place, were typically raised only by "attorneys with particular expertise in handling immigration matters pertaining to military personnel and their family members." *Id.* ¶ 7. Military personnel and their family members who lacked counsel not only were "less likely to request discretionary relief such as parole in place," *id.*, but might not even know "where and how to make such a request," *id.* ¶ 6.

The first instance of military parole in place that gained national attention occurred in 2007, when then-Secretary of Homeland Security Michael Chertoff

25

responded to a letter of concern by Senator John Kerry to inform him that he had directed Immigration and Customs Enforcement to grant parole to the spouse of an active-duty soldier so that she could apply for adjustment of status.[9] The following year, the Immigration Subcommittee of the House Judiciary Committee held a hearing on the "Immigration Needs of America's Fighting Men and Women,"[10] which included testimony from Lt. Col. Margaret Stock that due to a lack of policy guidance, "[h]undreds of other US military families face similar dilemmas, with family members who cannot adjust status facing possible deportation at the hands of the same government that employs their military member relatives. "[11] Lt. Col. Stock observed that "no system can operate successfully and fairly if it depends on the personal intervention of the Secretary of Homeland Security." *Id.*

As media attention continued, so did congressional interest, and on July 8, 2010, a bipartisan group of eighteen Members of Congress wrote to then-Secretary Janet Napolitano to urge DHS to "use all the power at your disposal to assist. . . soldiers, veterans, and their close family members to attain durable solutions."[12] The letter specifically urged DHS to "favorably exercise its parole authority for close

---

[9] Letter from Michael Chertoff, Sec'y, Dep't of Homeland Sec., to Senator John F. Kerry (June 21, 2007), https://bit.ly/3AkEHnW.

[10] *Immigration Needs of America's Fighting Men and Women: Hearing Before the Subcomm. on Immigr., Citizenship, Refugees, Border Sec., & Int'l L. of the H. Comm. on the Judiciary*, 110th Cong. 15 (2008), https://www.govinfo.gov/content/pkg/CHRG-110hhrg42509/html/CHRG-110hhrg42509.htm.

[11] *Id.* (testimony of Margaret Stock, Attorney and Lieutenant Colonel, Military Police Corps, United States Army Reserve).

[12] Letter from Hon. Zoe Lofgren, et al., to Janet Napolitano, Sec'y, Dep't of Homeland Sec. (July 9, 2010), *reprinted in* 160 Cong. Rec. H2328-29 (daily ed. Mar. 12, 2014).

family members that entered without inspection." [13] In response, Secretary Napolitano on August 30, 2010, confirmed that "On a case-by-case basis, DHS utilizes parole and deferred action to minimize periods of family separation, and to facilitate adjustment of status within the United States by immigrants who are spouses, parents and children of military members."[14]

Following the issuance of Secretary Napolitano's letter to Members of Congress, the USCIS workforce was reminded through leadership channels that parole in place was an available option for them to consider when fielding requests from noncitizen family members of military service members. Rogers Decl. ¶ 10. But it was still more than three years before USCIS issued a policy memorandum to create a process through which parole in place requests could be submitted on behalf of current and former service members and their families and updated its Adjudicator's Field Manual to provide consistent and publicly available workforce guidance regarding the handling of such requests. In the interim, problems continued to stem from inconsistent adjudications.

In its statutorily mandated 2011 Annual Report, the Office of the Citizenship and Immigration Services ("CIS") Ombudsman reported to Congress that "Stakeholders report a great deal of confusion regarding the exact nature of the relief

---

[13] *Id.*

[14] Letter from Janet Napolitano, Sec'y, Dep't of Homeland Sec., to Hon. Zoe Lofgren (Aug. 30, 2010) (attached as Exh. A to Rogers Decl.).

available to military family members and how to request it."[15] The following year,
Acting CIS Ombudsman Debra Rogers wrote to then-USCIS Director Alejandro
Mayorkas to once again inquire about the status of the policy that the agency had
committed to issue and to raise concerns about the continuing lack of such policy
guidance, which had led to "troubling inconsistency across the country."[16] The letter
stated forcefully that "[p]ermitting widespread inconsistency across USCIS field
offices is untenable." *Id*. In addition to attaching this letter as an appendix to its 2012
Annual Report to Congress, the CIS Ombudsman informed Congress that "[t]he
Ombudsman's Office has repeatedly raised these issues with USCIS, emphasizing
the impact on military families."[17]

   In 2013, the USCIS Office of the Director finally issued Policy Memorandum
PM-602-0091, "to ensure consistent adjudication of parole requests made on behalf of
[noncitizens] who are present without admission or parole and who are spouses,
children and parents of those serving on active duty in the U.S. Armed Forces, in the
Selected Reserve of the Ready Reserve or who previously served in the U.S. Armed

---

[15] Citizenship and Immigration Services Ombudsman, Annual Report 2011 (June 29,
2011) at 20, https://www.dhs.gov/sites/default/files/publications/cisomb-annual-
report-2011.pdf

[16] Letter from Debra Rogers, Acting U.S. Citizenship and Immigration Serv.
Ombudsman, to Alejandro Mayorkas, Dir., U.S. Citizenship and Immigration Serv.
(May 22, 2013) (attached as Exh. B to Rogers Decl.)

[17] Citizenship and Immigration Services Ombudsman, Annual Report 2012 (June 25,
2012) at 23, https://www.dhs.gov/sites/default/files/publications/cisomb-2012-
annualreport.pdf

Forces or Selected Reserve of the Ready Reserve."[18] The following year, Jeh Johnson, Secretary of Homeland Security, directed USCIS to work on a revised policy "with the Department of Defense to address the availability of parole-in-place and deferred action for the spouse, parent, and child of a U.S. citizen or lawful permanent resident who seeks to enlist in the U.S. Armed Forces."[19] Two years later, that policy was issued.[20]

This history makes clear that DHS has exercised its parole-in-place authority for at least two decades, with the full awareness of Congress.

### B. Congress Preserved and Reaffirmed DHS's Parole in Place Authority in 2019, Leading Even Conservative Legal Commentators to Recognize the Authority Was Beyond Challenge.

Congress reaffirmed DHS's parole-in-place authority in 2019 and it did so without limitation to only military families—a point that some of the most vocal proponents of restricting immigration concede.

---

[18] USCIS Policy Memorandum, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces, the Selected Reserve of the Ready Reserve, and Former Members of the U.S. Armed Forces or Selected Reserve of the Ready Reserve and the Effect of Parole on Inadmissibility under Immigration and Nationality Act § 212(a)(6)(A)(i)*, PM-602-0091 (Nov. 15, 2013)

[19] Memorandum from Jeh Johnson, Sec'y, Dep't of Homeland Sec., to León Rodríguez, Dir., U.S. Citizenship and Immigration Serv. (Nov. 20, 2024)

[20] USCIS Policy Memorandum, *Parole of Spouses, Discretionary Options for Designated Spouses, Parents, and Sons and Daughters of Certain Military Personnel, Veterans, and Enlistees*, PM-602-0114 (Nov. 23, 2016)

In June 2019, reports surfaced that DHS under the Trump administration was thinking about ending the military parole in place policy.[21] By August, a USCIS official confirmed that the policy was "under review."[22] In the middle of this period— and in response to the reported efforts to end this parole in place policy—the U.S. House of Representatives adopted by voice vote an amendment to the National Defense Authorization Act ("NDAA") for Fiscal Year 2020 designed to "preserve the parole in place program and reaffirm the DHS Secretary's authority to keep families together and to minimize disruption to our servicemembers through this vital program."[23] The final version of the bill enacted by Congress and signed into law by President Trump effectively codified the Department's military families parole in place policy and "reaffirmed" parole in place more generally.

Nowhere in the NDAA did Congress purport to be creating the authority to parole people in place, nor to be narrowing that authority solely to military families.

---

[21] Franco Ordoñez, *Trump Wants to Withdraw Deportation Protections for Families of Active Troops*, NPR, June 27, 2019, https://www.npr.org/2019/06/27/736362986/trump-wants-to-withdraw-deportation-protections-for-families-of-active-troops.

[22] Camilo Montoya-Galvez, *Soldier's Immigrant Mother Could Be Among the Last to Benefit from Program*, CBS News, Aug. 22, 2019, https://www.cbsnews.com/news/parole-in-place-soldiers-immigrant-mother-could-be-among-the-last-to-benefit-from-program/.

[23] 165 Cong. Rec. 116, H5631 (daily ed. July 11, 2019), https://www.congress.gov/congressional-record/volume-165/issue-116/house-section/article/H5594-7

Rather, Congress explicitly and broadly stated that "the importance of the parole in place authority of the Secretary of Homeland Security is reaffirmed."[24]

Plaintiffs' arguments questioning the parole in place authority or, in the alternative, begrudgingly conceding its existence but seeking to cabin it only to military families differs markedly even from the view adopted by some of the most prominent immigration restrictionist voices. Writing for the Center for Immigration Studies, Andrew R. Arthur analyzed the parole in place provisions in the NDAA for Fiscal Year 2020 less than a week after the law's enactment and observed that a future policy-based exercise of the parole in place authority beyond military families "will set firmly on the rock of Congress's recognition of the 'authority of' DHS to grant 'parole in place' — implicit in Congress's reaffirmation of the 'importance' of that authority is Congress's conclusion that DHS has the authority to begin with."[25] Arthur published a follow-up piece in which he said the NDAA language "gave congressional imprimatur to [parole in place]" and made "litigating against" a parole in place policy "next to impossible."[26] During his career, Arthur has served as an immigration judge, staff director for the National Security Subcommittee at the U.S. House of Representatives' Committee on Oversight and Government Reform, and

---

[24] National Defense Authorization Act for Fiscal Year 2020, Pub. L. No.116-92, § 1758(b)(3) (2019).

[25] Andrew R. Arthur, *Why is 'Parole in Place' in the NDAA*, Center for Immigration Studies, Dec. 26, 2019, https://cis.org/Arthur/Why-Parole-Place-NDAA.

[26] Andrew R. Arthur, *With Choice of Kamala Harris, Biden's Immigration Plans Become Clearer*, Center for Immigration Studies, Aug. 12, 2020, cis.org/Arthur/Choice-Kamala-Harris-Bidens-Immigration-Plans-Become-Clearer.

Acting Chief of the National Security Law Division of the Office of the General Counsel of the Immigration and Naturalization Service.

George Fishman, Senior Legal Fellow at the Center for Immigration Studies and former Chief Counsel of the Immigration Subcommittee of the House Judiciary Committee and Deputy General Counsel of DHS and Acting Chief Counsel of USCIS, agrees that the NDAA "specially recognized the validity of parole in place," and observes "If I were the states [in the litigation], I wouldn't bet the farm on parole in place being outside the bounds of the parole statute."[27]

### III. KFT-Eligible Families Like Amici Face Traumatic Daily Hardship from a Loss of Access to KFT Parole, While Texas Cannot Articulate Any Legitimate Hardship.

For Amici, the availability of KFT parole would be vital and life changing. When the program was first announced in June 2024, many recall crying at the news. Carmen Miranda Zayas, a U.S. citizen with multiple sclerosis who relies on her undocumented husband Francisco to navigate everyday life, recalled, "I started tearing up from how excited I was that there was finally a path forward for us that wouldn't require us to be apart." Miranda Decl. ¶ 12; *accord* Declaration of Natalie Taylor ("Taylor Decl.") ¶ 12, ECF 15-2 ("I felt like they were speaking directly to us").

---

[27] George Fishman, *Biden/Harris 'Keeping Families Together' Scheme Seems Headed for Annulment*, Center for Immigration Studies, Aug. 30, 2024, https://cis.org/Fishman/BidenHarris-Keeping-Families-Together-Scheme-Seems-Headed-Annulment.

For years, the absence of a consistent, transparent parole in place process has led these families not to leave the U.S., but to live in fear and uncertainty in their adopted home country. *See* 89 Fed. Reg. at 67466. The psychic toll and trauma, for them and their children, is immense. Silva Decl. ¶ 11; F. Turay Decl. ¶ 15; R. Ocampo Decl. ¶¶ 9-10; S. Doe Decl. ¶ 20; Declaration of Jessika Ocampo Hernandez ¶ 10, ECF 15-7. The resumption of KFT parole will alleviate that trauma. As Ricardo Ocampo describes, it will mean "knowing I will be able to put my kids to bed the next day." R. Ocampo Decl. ¶ 18; *see also* Taylor Decl. ¶ 16 ("So many fears that we carry with us on the daily would be gone"); F. Turay Decl. ¶ 24 ("my wife and son . . . would no longer have to worry that their husband and father could be taken away"). It will open a pathway to careers and plans that amici and thousands of other families like theirs have only dreamed of, from returning to school to buying a home and even having children. Silva Decl. ¶ 8; F. Turay Decl. ¶ 23; R. Ocampo Decl. ¶ 19; . For many members of CHIRLA, "this process is the best—if not the only—pathway to work authorization, and sometimes to lawful permanent residence, and the resulting stability and family unity. The alternative for these families is uncertainty and pain." CHIRLA Decl. ¶ 18.

In contrast, Texas has offered nothing but speculation and conjecture about downstream costs it may face years in the future, through a chain of causation so attenuated it strains credulity. Texas labors to dress up its "policy objections" in the guise of a justiciable controversy. *Cf. Hippocratic Med.*, 602 U.S. at 396. But the "dollar or two of injury" it claims, Tx's Br. at 57 (*quoting Texas v. Biden*, No. 6:22-CV-

00004, 2023 WL 6281319, at *4 (S.D. Tex. Sept. 26, 2023)), cannot approach the level of harm and hardship that it seeks to inflict on amici and other families like theirs. *Cf. Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (requiring "the balance of hardships between the plaintiff and defendant" be considered in issuing permanent injunctive relief). For Texas, the victory at stake is a press release. For amici, it is their lives, their futures, and their families.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this suit for lack of standing or, should it reach the merits, grant summary judgment to Defendants.

Dated: October 25, 2024

Respectfully submitted,

*/s/ Esther H. Sung*

**Paige Austin**
New York Bar No. 5246954
paige.austin@maketheroadny.org

**Esther H. Sung (Lead Attorney)**
California Bar No. 255962
esther.sung@justiceactioncenter.org

**Harold A. Solis**
New York Bar No. 5122726
Harold.Solis@maketheroadny.org

**Karen C. Tumlin**
California Bar No. 234961
karen.tumlin@justiceactioncenter.org

MAKE THE ROAD NEW YORK
301 Grove Street
Brooklyn, NY 11237
Telephone: (718) 418-7690
Facsimile: (866) 420-9169

**Hillary Li**
Georgia Bar No. 898375
hillary.li@justiceactioncenter.org

**Laura Flores-Perilla**
California Bar No. 355645
laura.flores-perilla@justiceactioncenter.org

**Brandon Galli-Graves**
Texas Bar No. 24132050
brandon.galli-graves@justiceactioncenter.org

34

JUSTICE ACTION CENTER
P.O. Box 27280
Los Angeles, CA 90027
Telephone: (323) 450-7272
Facsimile: (323) 450-7276

*Counsel for Amici*

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, I electronically filed this Amicus Brief with the Clerk of the Court for the United States District Court for the Eastern District of Texas using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

*/s/ Paige Austin*
Paige Austin
