# Exhibit 4

Declaration of Robert Courtney Smith

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | | |
|---|---|---|
| STATE OF TEXAS, *et al.*, | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| | § | Civil Action No. 6:24-CV-00306 |
| v. | § | |
| | § | Judge J. Campbell Barker |
| UNITED STATES DEPARTMENT OF | § | |
| HOMELAND SECURITY, *et al.*, | § | |
| | § | |
| | § | |
| *Defendants* | § | |

**EXPERT DECLARATION OF PROFESSOR ROBERT COURTNEY SMITH**

I, ROBERT COURTNEY SMITH, hereby declare pursuant to 28 U.S.C. § 1746:

**Summary of Professional Qualifications**

1. My name is Robert Courtney Smith. I am a Professor of Public and International Affairs at the Austin W. Marxe School, Baruch College and a Professor in the Department of Sociology, the Department of Political Science, and the Program in Social Welfare at the Graduate Center, City University of New York (CUNY). I received my doctorate in Political Science from Columbia University in 1995. My 2006 book, *Mexican New York* (University of California Press), won the American Sociological Association's (ASA) top book prize in 2008 – the Distinguished Book Award – and three other ASA book prizes, including the 2006 Thomas and Znaniecki Award from the International Migration Section, the 2007 Robert Park Prize from the Urban and Community Sociology Section, and the 2008 best book award from the Latino/a Sociology Section, and the CUNY Presidential Prize.

2.  I have been awarded peer-reviewed research or postdoctoral grants from major foundations, including the National Science Foundation (NSF), the National Academy of Education-Spencer Foundation, the Social Science Research Council, the Oral History Research Project at Columbia, the W.T. Grant Foundation, and others. I have previously been named a Visiting Scholar at the Russell Sage Foundation, a Fellow at the Advanced Research Cooperative, and a Guggenheim Fellow. All this work was for research on immigration and related issues, especially with migrants from Mexico and with Mexicans and their children in the U.S.

3.  My research has been published in respected journals, including the *American Sociological Review*, the flagship journal of the American Sociological Association, and in others such as *International Migration Review*, *Ethnic and Racial Studies*, and the *Annals of the American Academy of Political and Social Science*. I have served as a reviewer for major foundations, including the NSF, and was a member of the NSF's Worker Group to Enhance the Scientific Bases of Qualitative Research. I was a consultant to the Census Bureau on undercounting. I served as an expert witness to the U.S. Department of Justice in a Voting Rights Act case.

4.  My 2024 book, *Dreams Achieved and Denied: Mexican Intergenerational Mobility*, analyzes the mobility of children of Mexican immigrants in New York in an over 20-year study. It is published by the Russell Sage Foundation, through the Rose Series, the only book series published under the auspices of the American Sociological Association.

5.  My recent research has analyzed factors promoting mobility and wellbeing, including the long-term impacts on immigrants' mobility and life changes of having, lacking, getting, or losing lawful immigration status or Deferred Action for Childhood Arrivals (DACA); and

the impacts of the pandemic on immigrants and their families in New York State. I have attached my vita, which lists a fuller description of my research, awards, and other intellectual work, as **Exhibit A** to this Declaration.

6.  I have been engaged by counsel for the Proposed Intervenors in this case in connection with a motion to intervene in *Texas v. Department of Homeland Security*, 24-cv-00306, E.D. Tex., to evaluate certain claims made by Texas and the other Plaintiff States regarding the likelihood that intended beneficiaries of a new parole in place process, Keeping Families Together, would permanently leave the United States if the process was prevented from taking effect by court order. The Plaintiff States' claims appear to rely solely on two declarations from Dr. Lloyd B. Potter. In preparing this declaration, I have reviewed the relevant court papers filed by the Plaintiff States, as well as the two declarations of Dr. Potter and the studies cited therein, and I have applied my own expertise in research in sociology and on migration. I additionally reviewed the significant body of existing research on immigrant return migration (also described as immigrant emigration). As the two declarations of Dr. Potter are identical in nearly every respect, in this declaration I refer generally throughout to the Potter Declaration except where otherwise noted. I have been compensated $1,500 for my time and expertise in preparing this declaration.

## Summary of Opinion

7.  The Plaintiff States claim, based upon the declaration of Dr. Potter, that an order from the court preventing the Keeping Families Together (KFT) parole process from being implemented, will incentivize the KFT population, which otherwise may have been eligible for parole under the process, to leave the United States, thereby relieving Texas of various

costs. But the sources referenced in Dr. Potter's Declaration do not support the arguments advanced in reliance on those opinions.

8. Dr. Potter's Declaration fails to make his case in four ways. First, in important and material respects, many sources cited by Dr. Potter do not say what his declaration seems to assert. Second, the Potter Declaration places undue weight on a single online survey question posed to DACA recipients – a piece of evidence that, as it is ill-suited to support inferences about future actions that the DACA population might take, is also ill-suited to infer about future actions of the KFT-eligible population. Third, the Potter Declaration draws on studies that analyze actions or outcomes of populations so different from the population at issue here that they cannot support inferences about the KFT population. And fourth, the Potter Declaration seems not to fully engage substantial research on return migration that further undercuts the opinions advanced therein.

9. Contrary to the opinion offered in the Potter Declaration and the Plaintiff States' filings, apposite research suggests very strongly that the KFT-eligible population would *not* leave the U.S. if they are prevented from receiving parole in place under KFT.

**Research Relied Upon by Dr. Potter Does Not Support a 1% Annual Return Rate for Undocumented Immigrants like the KFT Population**

10. Citing a 2018 paper by Fazel-Zarandi, Feinstein, and Kaplan ("the 2018 paper"), Dr. Potter states that "the consensus estimate is that unlawful immigrants who have been in the United States for more than 10 years return to their countries of origin at a rate of 1% each year." The Plaintiff States cite Dr. Potter's Declaration, which cites this 2018 paper, in support of their argument that if the KFT process is blocked, "[s]ome aliens will return to their home countries when they are not incentivized to stay via work authorizations and protection from removal."

11. There are compounding problems with taking the 2018 paper's asserted "consensus estimate" at face value and with Dr. Potter's use of it.

12. First, the 2018 paper cites Van Hook and Zhang (2011) as a source for this 1% annual undocumented return migration rate, but Van Hook and Zhang do not report a return migration rate for undocumented immigrants such as the KFT population. Van Hook and Zhang (2011) found a 1% rate of return among Mexican *origin* immigrants, and explicitly state that they *could not determine* if those returners were U.S. citizens, lawful permanent residents, visa holders in the U.S., or undocumented. Similarly, Reagan and Olsen (2000), found a 1% rate of return rate of *all* immigrants (without reference to legal status) to their various birth countries.

13. Other research not cited by Dr. Potter reports a 1% return rate for *legally resident* immigrants. A large study of *permanently legal resident* immigrants in Germany found that the odds of returning to the birth country dropped to .012 or 1.2% after 15 years in Germany (Constant and Massey 2002). As I explain in greater detail below, this difference in legal status is material because having citizenship or lawful immigration status in an adopted country makes returns or visits to one's birth country more likely, because there will be little difficulty in returning once more to the adopted country. But for an undocumented immigrant in the United States – particularly someone who has lived here for many years, has built a life here, and may have U.S. citizen children here – even a short return visit to a home country would entail a significant risk of permanently losing the American life they have built, including the ability to raise or be with their U.S.-born children.

14. These studies cited above do not report a rate at which undocumented immigrants generally would leave the United States, and hence cannot be used to predict an emigration rate for

more embedded undocumented immigrants, who have lived here for a substantial number of years and have forged deep ties in their adopted home, including through marriage to a U.S. citizen spouse.

15. Second, because Texas is arguing that a court order blocking parole under KFT will help the state save money that it would otherwise have to spend, their claim that perhaps 1% of noncitizens "will return to their home countries" each year strongly suggests Texas understands such "return" to be permanent return (meaning they would permanently leave Texas), rather than return for a temporary visit (meaning they would return to Texas). But the research that Dr. Potter relies upon, which Texas cites to support this argument, cannot support that inference. Van Hook and Zhang (2011) explicitly state that they cannot determine if the returns were permanent returns or temporary visits. Similarly, the data for Reagan and Olsen's 2000 article finding a 1% return rate for *all* immigrants (without regard to legal status) cannot show if these were visits or permanent return, or if the person later returned to the U.S.

16. Research by Carling, et al. (2015) offers some insight on this question of permanent return versus return temporary visits. Carling et al. (2015) found in a survey that 22% of children of immigrants expressed a desire to return to their parents' or their own birth country, but in interviews these respondents reported wanting to *see* that country, with nearly none expressing desire to *live* there. Moreover, nearly all of Carling et al.'s respondents had legal status, and could thus legally return to the country where they grew up, after their visits to their parents' or their own birth country.

17. Moreover, Reagan and Olsen's (2000) 1% return rate among all immigrants analyzed data from the 1979 National Longitudinal Survey of Youth (NLSY), which is very unlikely to

have captured anyone in the KFT population. Respondents in the 1979 NLSY were 18-24 years old in in 1979 (born 1957-1964), while the KFT population are on average age 40 in 2024, with an average year of birth of 1984, making them 5 years old when the 1979 NLSY was done, and thus ineligible for the survey. Finally, the 1979 NLSY was less likely to get data on undocumented persons, because it was drawn from lists of housing units. According to the U.S. Census Bureau's Manuel de la Puente, undocumented persons' housing is less likely to be included in the sample (de la Puente, n.d.).

18. Finally, other studies cited in the 2018 paper – Warren 2013; Bhaskar et al. 2013 – report return rates close to 0% or calculate rates using data from 1980-1990, during the period of circular migration, when return migration from the United States to Mexico was a regular part of migrant social life. Especially after 1999, border enforcement made crossing the border much more expensive and dangerous, and converted mostly male circular migrants into a population of settled families of migrants (Massey et al., whom Dr. Potter also cites).

19. Contrary to Dr. Potter's statement in Paragraph 10 of his second declaration, dated September 11, 2024, that "The causes of return migration are difficult to assess because there is limited research and understanding of return migration," there is a strong body of research on return migration – some of which Dr. Potter cites – that identifies key factors that point against the likelihood of return migration. This research is discussed in greater depth below, but it is worth noting here that conditions such as being in the adopted country longer, being married or having children (or grandchildren), and otherwise having one's adult life rooted in the adopted country all point to an increased likelihood that one will stay in their adopted country rather than return to their birth country (Constant and Massey 2002; Carling et al. 2015; Reagan and Olsen 2001, Van Hook and Zhang 2011).

20. Dr. Potter cites studies that discuss the drivers of migration *from* Mexico *to* the U.S. to argue that not granting parole to the KFT population could cause them to return to their birth countries. But the causes of migration to the U.S. do not osmotically affect decisions regarding remaining or returning among long-settled U.S. populations like the KFT population. Rather, research shows that decisions regarding remaining or returning are related to migrants' degree of settlement and other factors, discussed below. That research cannot support the assertion that the KFT population would decide to separate themselves from their American lives, their U.S. citizen spouses, and their mostly U.S.-citizen children based on an injunction of the KFT process, which prevents them from requesting and possibly receiving parole in place – something they do not now have, have not previously enjoyed, and may not even have known about.

21. For further support, Dr. Potter cites in Paragraph 8 of his second declaration a study by Kennan and Walker (2011) about how interstate migration decisions are influenced by income prospects, as assessed by potential movers or attributed to them by the researchers. But Kennan and Walker only analyzed the mobility decisions of white, non-Hispanic, high school graduate males who have not gone to college, using data from the 1979 National Longitudinal Survey of Youth. As Kennan and Walker explain it:

> *To obtain a relatively homogeneous sample, we consider only white non-Hispanic high-school graduates with no post-secondary education, using only the years after schooling is completed. (Kennan and Walker, 2011: 220-221).*

22. Kennan and Walker's study is thus unsuited to draw inferences about the likely response of the KFT population, which is comprised of long-term undocumented immigrants, mostly

Hispanic, and who are married to U.S. citizens, to not getting parole in place – something they have never previously enjoyed, and something they may not even know was proposed.

23. The differences between the KFT population and the population studied by Kennan and Walker merit close examination.

24. First, there are no Latinos (immigrant or U.S.-born) in the Kennan and Walker study. Kennan and Walker analyze how white males (presumably all U.S. citizens; citizenship is not discussed) who graduated high school but did not attend college responded (by moving or not) in response to income prospects in other U.S. states or locations (not in other countries). Second, Kennan and Walker analyzed how young white males in their 20s to early 30s – who would be less likely to be married or have children – responded to economic prospects.

25. The KFT population is dramatically different than these young white males in 1979, and the incentives to action and costs of various actions differ dramatically, weakening any inferences Dr. Potter might imply one could draw based on the Kennan and Walker study. Indeed, these differences in life conditions, as documented in the research literature on migration, point strongly away from return, and point toward the KFT-eligible population remaining in the U.S.

26. Moreover, the decision Kennan and Walker analyze is that of a U.S. citizen to move to another *state or locality in the U.S.* to get a better job – where there is no legal status barrier to movement in either direction, and no other social costs that cannot be remedied. That decision is not commensurate with the decision of an undocumented, married, (on average) middle-aged undocumented spouse of a U.S. citizen, who would stand to lose central and vital dimensions of their life by such a movement back to their birth country, where they

have not lived, on average, for 23 years. The U.S. citizens that Kennan and Walker analyze have little to lose by moving back to their hometowns, and can move again whenever they wish. The KFT undocumented spouse of a U.S. citizen has a great deal to lose, and little incentive to move back to their birth country in the first place (Constant and Massey 2002; Carling et al. 2015; Reagan and Olsen 2001, Van Hook and Zhang 2011).

27. Taken together, the research cited by the 2018 paper does not offer a basis for drawing inferences about the future actions of the KFT population.

**A Single Online Survey Question Posed to Deferred Action for Childhood Arrivals (DACA) Recipients Provides Little to No Support for Inferences about Future Actions the KFT Population May Take**

28. Aside from the inapposite 1% annual return rate discussed above, Dr. Potter also cites in paragraph 12 of his second declaration Prof. Tom Wong's single 2017 online survey question by writing that the survey found that 22.3% of DACA recipients "stated that they were likely or very likely to leave the U.S. *without DACA status*." (Italics added). This phrasing is slightly, but critically, different from the actual question in the Wong survey, which asked DACA recipients how likely they would be to "leave the country *if DACA ended*." This rephrasing seems designed to suggest a stronger semantic parallel between the situation of the DACA population then and the KFT population now. But DACA recipients in this scenario would be responding to losing a current, life-improving benefit in a bad, imagined future, while the KFT population who would not get parole in place would not lose something they have now, but rather would not get something which they have never had, and might not even have known was possible.

29. Additionally, this single online survey question – to which 22.3% of DACA recipients surveyed responded they would be "likely" or "very likely" to "leave the country" if DACA

ended – is not a strong basis to infer or predict DACA recipients' future actions for several reasons (Smith 2024). These include question order and priming effects, the intention-behavior gap, and the difference between reporting an emotional state when answering a question, and a considered intent, a plan of action, and executing a plan (Smith 2024). Two key migration scholars argue that "intentions are notoriously unreliable as guides to eventual behavior" (Constant and Massey, 2002, 23).

30. Research shows that question order and content of prior questions affect responses to later questions (Deaton and Stone, 2016; Schaeffer and Presser, 2003; Schwarz and Strack, 1999; Schwartz 2000). For example, reports of overall happiness or well-being are higher in political surveys when asked before a question about whether the country is going in the right direction, because that question primes those who believe the country is wrong-headed to report lower happiness scores (Deaton and Stone, 2016). In the online survey of DACA recipients, the question on the likelihood of leaving the country comes after five questions that begin by asking: "Thinking about immigration enforcement under the Trump administration, how concerned are you about: Your family's safety? Your finances? Your property? Your future?" Given the Trump administration's overall harsh rhetoric, media image, and actions on DACA and immigration in 2017, the year the survey was conducted, this line of questioning – and this question in particular – would prime respondents' fear and concern. Some 90.8% of respondents reported being concerned or very concerned about their future. Moreover, research shows the former President's anti-immigration statements increased anxiety among DACA recipients and their children (Patler and Pirtle 2018; Patler et al 2019). This perceived threat would make respondents more likely to answer "likely" to the later question on leaving the country. The survey also asked in an

earlier question if the respondent knew "that the Texas Attorney General, along with the attorney generals [sic] of 9 other states . . . recently sent a letter to the Trump administration demanding an end to DACA," which would concretize the perceived threat, further priming more "likely" answers to the question about leaving the country.

31. Research on the intention-behavior gap does not support treating the 22.3% as a reliable predictor of respondents' future action. Indeed, in a 2016 research review, Sheeran and Webb subtitle one section, "The Intention-Behavior Gap: The Proverbial 'Road to Hell' is Well Paved." Intention-behavior gap research usually studies the relationship between intent to do something or change some behavior, and actually doing so, often regarding consumer or health habits (e.g., attend a seminar, take vitamins). Because such actions are mostly under the respondent's control, research often analyzes their self-regulation or planning towards that outcome. The research shows that performing even a one-off intended action (attending a seminar), but especially for larger goals (getting fit), depend not just on intent, but also on accurate perceptions of how to achieve a goal, having resources to do so, and anticipated regret about taking/not taking an action (Sheeran 2002; Morwitz and Munz 2020). The intention-behavior gap can increase when there are more steps, or more difficult ones, between intent and the goal, because many fail to execute some steps (Sheeran and Webb 2016; Hulland and Houston 2021; Morwitz and Munz 2020). The intention-behavior gap is smaller where one has engaged in the behavior before, and bigger where one has not (ibid.). Even in studies of health intervention designed specifically with conditions to promote follow through, intentions only explain about 28% of behavioral variance. Studies analyzing the relationship between stand-alone intentions and later behaviors usually explain between 4%-16% of variance, even for easier behaviors

with smaller consequences (Sheeran 2002; Morwitz and Munz 2020; Schwarz 2022). Leaving the country, for DACA recipients or potential KFT recipients, would be a very big decision with many steps and impacts.

32. The research on intent-behavior gap therefore strongly supports the conclusion pointing away from DACA recipients leaving the U.S. if DACA were terminated.

33. In light of the above, that 22.3% of survey respondents indicated in response to a single online question that they would "likely or very likely" leave the U.S. if DACA were ended provides little reliable evidence that any survey respondent had a serious intent to actually leave the country. Instead, it suggests an emotional state primed by prior questions and the former president's rhetoric and actions. The DACA population also differs from the KFT-eligible population in important respects.

34. In short, a single online survey question of DACA recipients cannot adequately support inferences about the likely actions of the Keeping Families Together population, who present with many factors (discussed more fully below) that would predict they would stay in the U.S. – namely, they are married to U.S. citizens; have been in the U.S. continuously at least 10 years, and have on average been in the U.S. for 23 years; and if they have children, those children are likely to overwhelmingly be U.S. citizens, whose futures are in the U.S.

**<u>Research on Migration Strongly Points Against the KFT Population Leaving their Lives in the U.S. were KFT Blocked from Taking Effect</u>**

35. Research on the return (even for temporary visits) of immigrants with permanent legal status or citizenship to their destination countries finds the likelihood of return decreases with the presence of certain conditions. These conditions include being in the adopted country longer, being married or having children or grandchildren in the host country, being

in school or having more education, having a job in the host country, and being embedded in one's local community (Constant and Massey 2002; Carling et al. 2015; Reagan and Olsen 2001, Van Hook and Zhang 2011). Dr. Potter cites some of this research in his declaration and recognizes these factors are correlated with remaining in the adopted homeland. The overarching indication from this research is that the longer and more firmly rooted one's life is in the U.S. (or other destination country), the less likely one is to seek to return to their birth country, especially permanently.

36. The Keeping Families Together populations in the U.S. and in Texas present with key traits predicting against returning to one's birth country, and towards staying in the U.S., as we see in Table 1 below. The KFT population is, by definition, an undocumented immigrant married to a U.S. citizen, who has lived in the U.S. without returning to their birth country for at least 10 years. The KFT population has lived in the U.S. on average for 23 years. All these factors weigh strongly towards their staying in the U.S. with or without the parole in place process. Moreover, the KFT population's average age is 40, indicating they came on average to the U.S. in their teens, which makes it very likely they have fully established their lives in the U.S. According to an estimate by FWD.us, 81% nationally – and 76% in Texas – of the KFT population are in the labor force, further strengthening the chances that they would stay in the U.S. Being in shorthanded industries – as 67% are in the U.S. and 76% in Texas – could increase the demand for their labor. This very high labor force participation undermines the assertion that not getting parole in place could cause the KFT population to return to their birth country – they do not have parole in place now, and most are working.

37. The KFT population's average age and, for many, family situation, also point strongly towards staying in the U.S. Being on average 40 years old puts the KFT population in the prime child-rearing age range. Immigrants with children in a host country are more likely to stay there because their children are in school, and they have become integrated into the fabric of their U.S. citizen children's lives – dropping their kids at school, bringing them to the doctor or to religious services, coaching their sports teams. For KFT parents above the average age, their young adult children may have started families of their own, with grandchildren rooting the family further in the U.S. Research shows that a very large majority – over 79% nationally and over 80% in Texas – of children of undocumented immigrants are U.S. citizen children.[1] Moreover some 1.4 million U.S. citizen relatives live with a KFT eligible person in the U.S., and 317,000 live with such U.S. citizen relatives in Texas. These U.S. citizens are very likely to be children or family of the KFT eligible person.

**Table 1. Socio-Demographic Traits of Keeping Families Together Population in US and in Texas.**

|  | Eligible spouse population | Average age | Average years in the US | Additional value added annually to US economy, if USC (US citizens) | Additional taxes paid annually if USC | Percent in labor force | Percent in shorthanded industry/sector | Total number of USCs living in family with eligible spouse |
|---|---|---|---|---|---|---|---|---|
| U.S. | 500,000 | 40 | 23 | $6.6 billion | $2.6 billion | 81% | 67% | 1.4 million |
| Texas | 111,000 | 39 | 22 | $1.5 billion | $512 million | 76% | 67% | 317,000 |

(Sources: USCIS and FWD.us[2])

---

[1] Capps et al 2016. This figure refers to all undocumented people, not just the KFT population, but the percentage of U.S. citizen children should be similar, and could be higher, given the KFT population came to the U.S. on average in their teens, 23 years earlier, and have lived in the U.S. continuously at least 10 years.
[2] https://www.uscis.gov/keepingfamiliestogether; https://www.fwd.us/news/parole-in-place-citizen-spouses.

38. Key factors affecting decisions regarding immigrant return include whether or not return decisions are reversible, how difficult return will be, and country conditions in the country of origin (Carling et al 2015). As discussed above, having citizenship or permanent legal status in one's adopted country makes returns or visits to one's birth country more likely, because return to the adopted country is easier. But this calculus would be different for the KFT population. For them, even short return visits would involve the risk of permanently losing the American lives they have built, including the ability to raise or be with their U.S.-born children. Moreover, undocumented spouses of U.S. citizens would face extremely difficult conditions in Mexico and Central America. Research has shown that deported migrants face difficulties in finding employment that keeps them out of poverty and face a deteriorating safety and security situation in Mexico (Smith 2024). Indeed, the U.S. Department of State (2022, 2023, 2024) reports many human rights violations and high levels of crime in Mexico, lists 5 states on its *Do Not Travel To* list, and lists 7 states on its *Reconsider Travel To* list; many of these are states with high rates of outmigration. The State Department recommends *Increased Caution* when travelling to 17 other states (including Mexico City). The State Department only says *Exercise Normal Caution When Traveling To* 2 of 32 Mexican states, which are states with extremely low rates of outmigration.  Similarly, the State Department has issued a Reconsider Travel due to crime advisory for El Salvador and Guatemala (as countries, not specific states within the country) and offers extensive reports of human rights abuses in these countries.

39. Research shows that rates of return for undocumented immigrants have decreased in the last decades, driven by increased enforcement at the U.S.-Mexico border, increased settlement in the U.S., having more education or being in school, or having U.S. citizen

children or family members. Massey and his colleagues find that increased border enforcement after 1986 changed the heavily circular Mexico-U.S. migration pattern increasingly towards permanent settlement in the U.S. Even during the circular migration period (1970s-late 1980s), settled immigrants living in the U.S. for five or more years returned to Mexico at rates close to zero (Massey et al 1987). Increased border enforcement did not prevent new entrants, but led such entrants to settle permanently in the U.S. with their families, driving the undocumented population from 1.9 million in 1988 to over 12 million in 2007 (Wasem 2012). Massey and his colleagues have also found that likelihood of return to Mexico or Central American has fallen to near or at zero for settled undocumented immigrants, and that having U.S. citizen-children, more education, and more time in the U.S. correlates with lower likelihood to return (Massey and Riosmena 2010; Massey et al. 2014; Massey, Durand and Pren 2015; Massey, Durand, and Pren 2017; Parrado and Ocampo 2019; Warren 2021). The Keeping Families Together population presents traits that reflect their long-term settlement in the U.S. – having come to the U.S. on average 23 years ago, not having left the U.S. in at least 10 years, being married to U.S. citizens, being on average 40 years old, and living with U.S. citizen relatives, including overwhelmingly U.S. citizen children.

**Research on Divorced Family Migrants in the Netherlands is Irrelevant**

40. In Dr. Potter's second declaration, he cites for the first time a 2012 study by Bijwaard and Doeselaar, which found that that some "legal" migrants who migrated to join their future partners in the Netherlands ended up later divorcing. Getting divorced was correlated for some such future spouse-joining legal migrants with later return to their country of origin.

The authors posit these returns could be because the original purpose of migration – to join their partner – no longer obtains.

41. The study offers no support for Dr. Potter's and Plaintiffs' argument that blocking the parole in place process would cause the Keeping Families Together population to leave the U.S., for several reasons. First and most obviously, neither the study nor any other evidence presented by Dr. Potter and the Plaintiffs draws any connection between a court order blocking paroles under the KFT process and the likelihood of the KFT population divorcing. As a result, even if a member of the KFT population were to one day leave the country after getting divorced from their U.S. citizen spouse, the departure would not be the result of a prior court injunction.

42. Another reason the Bijwaard and Doeselaar paper does not offer support for Dr. Potter's and Plaintiffs' argument is that this paper analyzes a population that is dissimilar to the Keeping Families Together population in relevant respects. First, the paper analyzes data on "all *legal* immigration" (p7, italics added) to the Netherlands, and does not report having any data on undocumented immigrants, and specifically not on undocumented spouses of Dutch citizens. Hence, there is no Keeping Families Together-type population in the Bijwaard and Doeselaar paper. As discussed in earlier sections of this declaration, decisions to leave one's adopted country are very different for those with permanent lawful status and those who are undocumented. Second, Bijwaard and Doeselaar analyze cases of spouses who *migrated legally to join* their future spouses in the Netherlands, so they were presumably already engaged to be married before migrating. This seems very unlikely to describe the KFT population, whose average age now is 40 years old, and who have been in the U.S. for 23 years on average, which would yield an average age of arrival in the U.S.

of 17 years. Given these demographic facts, the Keeping Families Together population is much more likely to be composed of people who fell in love with their spouses and married in the U.S., and who (unlike the Bijwaard and Doeselaar paper) did not come to the U.S. with a visa gained through their engagement to a U.S. citizen spouse. Rather, the parole in place process would enable these families to seek lawful permanent residence for the undocumented spouse while still living together in the U.S., without having to risk indefinite and potentially prolonged separation. Finally, the Bijwaard and Doeselaar paper says the effects of divorce on migration are strongest among younger migrants who have been in the Netherlands a short time (less than three years) – migrants very dissimilar to the KFT population.

## Conclusion

43. The KFT population presents with many factors that research finds predict against return migration, and especially against permanent return migration. The KFT population necessarily has longtime residence in the U.S. and is married to a U.S. citizen spouse. They are in prime child rearing age, and many live with U.S.-citizen children or family members. They have high rates of employment. All these factors predict against permanent return migration to their country of origin and predict they will remain in the U.S. in the lives they have built with their families here, with or without parole in place.

44. Despite this research, the Plaintiff States argue that the KFT population will (presumably) permanently depart the United States and, in doing so, help Texas avoid certain costs, if they are prevented from requesting and receiving parole under the KFT process. But the studies cited in the Potter Declaration, which underpin the Plaintiff States' argument, cannot support such an inference.

45. Moreover, the Plaintiff States and Dr. Potter posit that blocking parole in place, which the KFT population does not now enjoy, has never enjoyed, and may have little knowledge of, will change their future behavior, and cause them to abandon the lives with their spouses and children they have developed over decades. This argument is inconsistent with the research and does not make logical sense.

46. Finally, not only does the argument of Dr. Potter and the Plaintiffs lack evidentiary support and not make sense as a path to relieve Texas' claimed injuries, but it also ignores research showing serious harms that its current course of action will cause or cause to continue to the U.S.-citizen Texan children (and other family members) whose parents could benefit from the parole in place process. Research has demonstrated that children, most of whom are U.S. citizens, are harmed by the risks and stresses of living with undocumented parents (experiencing worse mental health, getting less medical care, struggling in school, and other harms; Hainmueller et al 2017; Oropesa et al. 2017; Patler et al. 2019; Amici Curiae Brief 2019). Texas' avowed commitment to its duty as a quasi-sovereign entity to protect Texans should also lead it to seek to protect these thousands of U.S. citizen Texan children whose lives would be improved by their parents getting parole in place.

I declare under penalty of perjury and under the laws of the United States that the foregoing is true and correct.

Executed at Montclair, NJ on _____10-21-24_____

_____
Robert Courtney Smith, PhD

# __EXHIBIT A__

to Declaration of Robert Courtney Smith

Fall 2024

CURRICULUM VITAE
Robert Courtney Smith
email: robert.smith@baruch.cuny.edu; robsmithcuny@gmail.com.

**EDUCATION**
1995. Ph.D. Columbia University, Political Science Department.
1987. B.A. Univ of Delaware, Honors Degree, Econ/Political Science. Phi Beta Kappa, magna cum laude.

**ACADEMIC APPOINTMENTS**
Professor of Sociology, Immigration Studies and Public Affairs, Marxe School of Public and International Affairs, Baruch College 2009-present; Assoc Prof 2005-2009.
Sociology Department, the Graduate Center, CUNY. September 2006-present;  Ph.D. Program in Social Welfare, Graduate Center, CUNY. 2019-present; Political Science Department 2024-.
Assistant Professor, Sociology Department, Barnard College.  July 1995 to June 2005.

**Faculty Affiliate**
CUNY Institute for Demographic Research (CIDR), Marxe School, Baruch College.
Center for Nonprofit Strategy and Management (CNSM). Baruch College, Marxe School.

**ACADEMIC HONORS, FELLOWSHIPS AND GRANTS**

| | |
|---|---|
| 2022-2025 | How and How Much Has New York State's Excluded Workers Fund Affected the Food and Housing Security and Health of Immigrants? Social, Behavioral, and Economic COVID Coordinating Center, University of Michigan.  $60,000. with Co-Investigators Frank Heiland (Baruch College) and Krista Perreira (UNC). |
| 2021-2022 | CUNY Research IRG Grant. How Has the Pandemic Affected Immigrants?  With co-PIs Don Waisanen (Baruch) and Ilze Earner (Hunter). $40,000. |
| 2018-2024 | William T. Grant Foundation.  *Effects of Legal Status Change (DACA) on Individuals, within Families, and Across Local Ecosystems. $599,000* |
| 2020-2022 | Samuels Center, Marxe School, Baruch College. CUNY.  *Legal Status, Locality, & Other Determinants of the Pandemic's Impact on Immigrants in New York State.* $8500. |
| 2016-2018 | Russell Sage Foundation.  *Long Term Effects of Legal Status and Deferred Action Across Legal Status Categories and Institutional Ecosystems.*  $149,000 |
| 2015-2016 | *Mexican Initiative on Deferred Action MIDA.* Principal Investigator, Lead and Coordinator. Service, capacity building, research project promoting DACA applications and studying the effects of having, lacking, gaining, or losing legal status? US$1.25 million (Institute for Mexicans Abroad, Mexican Consulate,). |
| 2015 | Sociological Research Association (inducted) |
| 2015 | Universidad de Deusto, Bilbao, Spain. Erasmus Mundus Fellow.  May/June 2015. |
| 2013 | Max Planck Institute (Study of Religion and Ethnicity) Germany. Fellow, December. |
| 2011-2013 | CIDE (Centro de Investigacion y Docenia Economica), Mexico City.  "How to Talk to Mexican Migrants About Seguro Popular." $80,000. |
| 2011-2013 | CIDE, Mexico City.  "How Much Do Mexican Migrants in New York Know about Seguro Popular?" $200,000. |
| 2011-2012 | CUNY Collaborative Incentive Research Grant, "Contested Immigrant Incorporation and American Institutions and Voting Rights"(with Andy Beveridge)" *$25,000.* |
| 2010-2012 | National Science Foundation, Sociology Program.  "Strengthening Qualitative Research: Assimilation and the Transition to Early Adulthood for Mexican Americans."  $93,000. |
| 2009-2010 | John Simon Guggenheim Foundation Fellow. |
| 2007-2008 | Russell Sage Foundation, Visiting Scholar. "Early Adulthood and Assimilation of |

Fall 2024

Children of Immigrants."
2005-2010    William T. Grant Foundation. "Early Adulthood and Assimilation of Children of Immigrants." Principal Investigator. supplement, 2008-2010. $225,000.
1998-2000.    "Gender, race and ethnicity and social organization: determinants of second generation Mexican American educational and work mobility in New York City." National Science Foundation, Social, Behavioral and Economic Research Directorate. Principal Investigator. 2000-2002. Supplement. $133,000.
1999-2000.    "Gendered ethnicity at three strategic sites:  Explaining variation in second generation Mexican American men and women's work and school mobility." Social Science Research Council, Post-doctoral Fellowship. $20,000.
1999-2000.    Writing Grant for, *Mexican New York: Transnational Worlds of New Immigrants,* from Oral History Research Program, Post-Doctoral Fellowship, Rockefeller Foundation.
1999-2001.    "Gendered ethnicity at three strategic sites:  Explaining variation in second generation Mexican American men and women's work and school mobility." National Academy of Education/Spencer Postdoctoral Fellowship. $45,000.

**OTHER PROFESSIONAL OR CAREER AWARDS**
2008 Youth Advocate of the Year, Associacion Tepeyac.  New York.
2014 Citation by NYC Public Advocate Leticia James for Masa (as Board Chair) w Masa ExDir.
2019 Migrant and Seasonal Head Start, Plate of Bounty Award.
2019 Baruch College Alumni Association Professor Service Award
2020 Public Sociology Award, Section on International Migration, American Sociological Association.
2023 William Foote Whyte Career Award, Section on Public and Applied Sociology Award, American Sociological Association.
2024 Public Sociology Award – Post Tenure, Eastern Sociological Association.
2024 American Sociological Association – Distinguished Career Award for the Practice of Sociology.

**SCHOLARLY WORK IN DEVELOPMENT, UNDER REVIEW, OR FORTHCOMING**
**Books**
*This Is Still America!  Immigration, Voting Rights, and Contested Immigrant Political Incorporation.* (research done)

**Articles**
2023    Smith, Robert Courtney. (*R and R*) Hawthorne Effects in Ethnography: Epistemology, Ethics and Scientific Validity.
2023    Smith, Robert Courtney and Andres Besserer Rayas. (*drafted*) Driving as a Strategic Site to Construct Citizenship and Illegality: Analyzing Immigrant-Police Relations.
2023    Smith, Robert Courtney and Andres Besserer Rayas. (*data collected; in development)* How the Excluded Workers Fund Affected the Wellbeing of Hispanic Immigrants Excluded From the Social Safety Net in the Pandemic.
2023    Smith, Robert Courtney, Ilze Earner, and Andres Besserer Rayas. (*drafted*). The Actionable/Service Ethnography Model and Community Health Worker Model: Potential Multipliers for Social Workers and Social Work Agencies and the Immigrants and Child Welfare Project Approach**.**  *Child Welfare League* Special Issue on Latinx Child Well-being.
2022    Smith, Robert Courtney, Guillermo Yrizar Barbosa, MIDA Team. (*drafted*). Policy Cracks and Organizational Bridges in Promoting DACA: The Collaborative Univ-Immigrant Organization-Consular Approach in the Mexican Initiative on Deferred Action (MIDA) in NY State.
2022    Besserer Rayas, Andres and Robert Courtney Smith. (*drafted; to revise to submit*). Ethnography

Fall 2024

and Political Science.

## PUBLICATIONS AND PRIZES (previously published)

### Books

2024    Smith, Robert Courtney. *Dreams Achieved and Denied: Mexican Intergenerational Mobility.* Russell Sage Foundation. An American Sociological Association Rose Series Book.

2006.    Smith, Robert Courtney.  *Mexican New York: Transnational Lives of New Immigrants.* University of California Press.
*WINNER of the 2008 Distinguished Book Award from the American Sociological Association; 2006 W.I. Thomas and Florian Zaniecki Award of the International Migration Section of the American Sociological Association for best book on migration; 2007 Robert Park Award of the Community and Urban Sociology Section of the American Sociological Association for the best book on community and urban sociology; 2007 Baruch College Presidential Excellence Award for Distinguished Scholarship; Co-WINNER 2008 Best Book Award of the Latino/a Section of the American Sociological Association.  Section reprinted in The Urban Ethnography Reader. 2014. Editors M. Duneier, P. Kasinitz, and A. Murphy. Oxford.*

*2019.*  Smith, Robert Courtney, Don Waisanen, Guillermo Yrizar Barbosa. *Immigration and Strategic Public Health Communication: Lessons from Seguro Popular Healthcare Project.* Routledge.

## Journal Special Issue -- Editor

2023    Smith, Robert Courtney. Editor, *Sociological Forum* Special Issue (10 papers) on *Publicly Engaged Sociology*, Summer.

### Journal Articles

2024    Smith, Robert Courtney. Doing Community and Institutionally Engaged Work and Promoting Immigrant Wellbeing While Building a Research Career. *American Behavioral Scientist.*

2023    Will DACA Recipients Return to Their Birth Countries If DACA Is Ended? *Journal on Migration and Human Security.*

2023    Smith, Robert Courtney. Introduction: Special Issue of *Sociological Forum* on Advancing Publicly Engaged Sociology. Summer.

2022    Smith, Robert Courtney. Advancing Publicly Engaged Sociology.  *Sociological Forum.* 37 (4): 926-950. December. (2022 Eastern Sociological Society Presidential Address).

2021    Robert Smith, Andres Besserer Rayas, Angelo Cabrera, Daisy Flores, Guillermo Yrizar, Maria Xique, Karina Weinstein, Averi Guidicessi, Eduardo Torres. The Traffic Stop to Deportation Pipeline. *Journal on Migration and Human Security*

2021    Smith, Robert Courtney. In the Emergency Room with Erving Goffman and Oliver Sacks: Analytic Autoethnography of Familial and Institutional Social Identity Construction of an Alzheimer's Patient. *Social Science and Medicine* (April).

2017    Smith, Robert Courtney. "Don't Let the Illegals Vote!" The Myths of Voter Fraud and Illegal Latino Voters. *Russell Sage Foundation Journal* Special Issue on *Undocumented Immigration.*

2016    Smith, Robert Courtney. What's A Life Worth? Ethnographic Counterfactual Analysis, Undocumented Status and Sociological Autopsy in a Wrongful Death Lawsuit.  *Ethnography.* Spring.

2014.    Smith, Robert Courtney. Black Mexicans, Conjunctural Ethnicity and Operating Identities: Long Term Ethnographic Analysis.   April. *American Sociological Review.*
*WINNER – 2015 Louis Wirth Best Article Award*, International Migration Section of the American Sociological Association; *Honorable Mention*, Latino/a Sociology Section, ASA.

Fall 2024

2008.  Smith, Robert Courtney. Horatio Alger Lives in Brooklyn: Extra-family Support,  Intra-Family Dynamics, and Socially Neutral Operating Identities in Exceptional Mobility Among Children of Mexican Immigrants. *Annals of the American Academy of Political and Social Science*.

2008.  Smith, Robert C. "Contradictions of Diasporic Institutionalization: The 2006 Mexican Migrant Vote and Other Forms of Inclusion and Control." May.  *Racial and Ethnic Studies*.
        *Reprinted in*: 2009. Jean-Michel LeFleur, editors.  *The Transnational Political Participation of Immigrants: A Transatlantic Perspective.*  London: Routledge.

2003.  Smith, Robert C. "Migrant Membership as an Instituted Process: Migration, the State and the Extra-Territorial Conduct of Mexican Politics." *International Migration Review*.  Summer. 37 (2): 297-343.
        *Reprinted in*: 2005. *International Migration and the Globalization of Domestic Politics*, edited by Reynold Koslowski. New York and London: Routledge.

2003.  Smith, Robert C. 2003.  "Diasporic Memberships in Historical Perspective: Comparative Insights from the Mexican and Italian Cases". *International Migration Review*. Fall. 37 (3): 722-757.

2000.  Smith, Robert C. 2000.  "How Durable and New is Transnational Life? Historical Retrieval through Local Comparison." *Diaspora.*  9 (2): 203 235.
        *Reprinted, in shortened form*: 2001. "Local Level Transnational Life in Rattvik, Sweden and Ticuani, Mexico: An Essay in Historical Retrieval" in *New Transnational Social Spaces*, edited by L. Pries, 37-59.  New York: Routledge.

1998.  Smith, Robert C. 1998.  "Transnational Localities: Technology, Community the Politics of Membership within the Context of Mexico-US Migration" *Journal of Urban and Comparative Research.* 6: 196-241.  Edited by Michael Peter Smith and Luis Guarnizo. Transaction Publishers.
        *Translation/Reprint*: 2001. "Los Ausentes Siempre Presentes: Tecnologia, Comunidad, y la Politica de Miembresia en el contexto de la migracion Mexicana hacia Estados Unidos." In *Las Disputas por el Mexico Rural,* eds S. Zendejas y P.Vandergeest. El Colegio de Michoacan.
        *Reprint*: 1998 in *Encuentros Antropológicos* ed by V. Napolitano and X. Leyva Solano. London: Inst Latin American Studies.

**SUPREME COURT AMICUS BRIEF for November 2019 case June 2020 decision.**
*2019 Amici Curiae Brief of Empirical Scholars in Support of Respondents. Supreme Court of the United States. Three Consolidated DACA Cases (18-587, 18-588, 18-589) 1-12-19.*

**OTHER AMICUS BRIEFS.**
2024.  Besserer Andrés Rayas, and Robert Courtney Smith. *The Right to Family Unity*. Amicus brief presented in case T-9.666.794 and T-9.885.871 corresponding to actions of Obioma Kingsley Olikeze against the Ministry of Foreign Affairs and the Special Administrative Unit of Migration, Colombia.

**DACA CASES EXPERT WITNESS.**
2019  Expert witness, Mexican American Legal Defense and Educational Fund, San Antonio. Case defending DACA in *Texas v. United States*, 18-CV-68 (S.D.Tex.).

2019.  *Perez v. Wells Fargo Bank, N.A.*, No. 17-cv-00454-MMC, U.S. District Court for the Northern District of California, testifying expert on DACA population and related issues.

**OTHER EXPERT WITNESS Consulting (selected).**

2006-07 United States Department of Justice, Expert Witness and Consultant, U.S. v. Port Chester. testified in federal court in Voting Rights Act trial.

2011    Separate and Unequal:  A History of Segregation and Discrimination on Long Island and in Nassau County, and African American and Latino "Communities of Interest".   Affidavit for Boone v. Nassau County Legislature et al;  Voting Rights Act lawsuit.

 1990s- present. Deportation (Cancellation of Removal), Asylum, CAT, and related cases

### *Public Sociology Pieces (selected)*

2024 Besserer Rayas, Andrés & Robert Courtney Smith. 2024. "El PEP-Tutor: regularizar es potenciar la vida." *El Espectador*: June 27, 2024. https://www.elespectador.com/responsabilidad-social/lado-a-lado/el-pep-tutor-regularizar-es-potenciar-la-vida/

2023 Besserer Rayas, Andres, Robert Courtney Smith, Nicolas Baron, Laura Sofia Galvis, Maria Fernanda Orozco, Juan Camilo Ovalles Paez, Sebastian Portilla Parra, Marıa Jose Peña, Lublanc Prieto, and Gabriela del Pilar Thiriat Pedroza. 2023. *Ciudadanıa Cancelada, Derechos Arrebatados: Daño Multidimensional y Prevenible Ocasionado por la Privación Arbitraria de la Nacionalidad Mediante la Anulación de Registros Civiles y Cancelación de Cédulas de Ciudadanıa en Colombia.* Bogota: JRS-Colombia. https://col.jrs.net/wp-content/uploads/sites/14/2023/03/Informe-privacio%CC%81n-ciudadania-Comprimido.pdf

2021. Moreno, Diana, Robert Courtney Smith, Andres Besserer Rayas.  Essential and Excluded: New York's Forgotten Class. New York Daily News. Op-Ed 3-5-22 https://www.nydailynews.com/opinion/ny-oped-essential-excluded-workers-20220305-umef77d2rjefpghsejaorxclhy-story.html

2020. Castro, Manuel and Robert C. Smith. City Budget Crisis Threatens Lifeline for Day Laborers and Immigrant Workers. *Gotham Gazette.* 6-24-20. https://www.gothamgazette.com/opinion/9521-new-york-city-budget-crisis-threatens-lifeline-day-laborers-immigrant-workers

2020. Prof. Robert Courtney Smith, Manuel Castro, Andrés Besserer Rayas, and the NICE team. *Immigrant Serving Organizations: Key Partners with Government to Help Those Worst-Hit and Least-Served Through the Lifecycle of the Pandemic*. Marxe School Center for Nonprofit Management and Strategy. Baruch College, CUNY. https://marxe.baruch.cuny.edu/wp-content/uploads/sites/7/2020/06/SmithCastroRayas_2020_ImmigrantServingOrganizationsfinal.pdf

2019    Smith, Robert Courtney. Want to Help Children? Let Undocumented Parents Drive.  *New York Daily News*. 6-10-19. https://www.nydailynews.com/opinion/ny-oped-let-undocumented-immigrants-drive-20190610-24nlzaqrize27hetozgihylkxq-story.html

2019.   Smith, Robert Courtney. DATABRIEF – Why and How a Greenlight Law Will Reduce Preventable Harm to US Citizen Children in New York State. https://greenlightny.files.wordpress.com/2019/04/revised-databrief-greenlight-campaign-nys-3-9-19-with-county-specific-states-4-15-19.pdf

2019    Smith, Robert Courtney. Thought Project, CUNY Graduate Center.  How and Why the NY State Greenlight Law Will Help US Citizen Children in New York State.  https://www.gc.cuny.edu/Page-Elements/News/2019/May/The-Thought-Project-Episode-55-Interview-with-Robert-Smith

2013    Smith, Robert Courtney.  We Need to End Our Natural Experiment with Undocumented Children.  Op-Ed *National Journal.* first posted 2-4-13.

2004. Smith, Robert Courtney.  Complementary Articulation: Matching Qualitative Data and Quantitative Methods. IN Charles Ragin, Joane Nagel, and Patricia White, editors. *Scientific Foundation of Qualitative Research*. Sociology Program. National Science Foundation.

1996    Smith, Robert C. "Counting Migrant Farmworkers: Causes of the Undercount of Farmworkers in the Northeastern United States in the 1990 Census, and Strategies to Increase Coverage for Census 2000." *Final Report* to Bureau of the Census,  Washington DC.

**UNIVERSITY, COLLEGE, AND DEPARTMENTAL AND  SERVICE.  (selected, recent)**
Advisory Board Member (elected) CUNY Mexican Institute 2012-present.
Promotion and Budget Committee, School of Public Affairs. 2008-2012; 2014-2023.
Ackerman Chair, Marxe School 2017-2022.
MacCauley Honors College, Admissions Committee for Baruch College. 2021.
Diversity Committee, Baruch College, 2016-2019.
Executive Committee, Baruch College, 2016-present.
Admissions Committee, Graduate Center, Sociology Department, 2009-2011; 2017-2018; 2021-2022; 2023-2024.
CUNY Chancellors Commission on Mexicans and Mexican Americans in Higher Education. 2004-2012.
*Lead Faculty, Mexican Consulate Leadership Program, School of Public Affairs.* 2007-2017. Programs promote individual & organizational nonprofit capacity building, direct service, educational promotion.

*Doctoral Students (only CUNY reported).*
Principal Sponsor, CUNY.
Andres Besserer Rayas, CUNY Graduate Center, Political Science.
Stephen Ruszczyk, CUNY Graduate Center, Sociology (defended, 2015)
Allison Goodman, CUNY Graduate Center, Sociology (defended, 2013).
Pamela Izvanariu, CUNY, Graduate Center, Sociology
Suzanne Strickland, CUNY, Graduate Center, Sociology
Guillermo Yrizar, CUNY Graduate Center, Sociology (defended, 2020).
Hiroyuki Shibata, CUNY Graduate Center, Sociology (defended 2021).
Isabel Gil E. CUNY Graduate Center, Sociology (defended, 2020).

**NONPROFIT WORK AND LEADERSHIP (Selected)**
2012-2020 -- Board Chair, Masa – educational and organizational nonprofit working with Mexican community in the South Bronx.
1998-2012. Co-Founder and Board Member, Masa.

**SERVICE TO THE PROFESSION (Sociology, selected)**
2020-2023 – President, *Eastern Sociological Association* (2022 term; Pres-Elect 2020-21/Past Pres 2023)
2022 and 2023 – Chair of Public Sociology Awards for Younger and Post-Tenure Scholars, Eastern Sociological Society.
2021 – Public Sociology Committee Chair, ASA International Migration Section.
2019 and 2020. ASA. Workshop On How to Do Expert Witness Testimony in Asylum and Deportation Cases (organized with Cecilia Menjivar)
2016.  Chair of Louis Wirth Award Committee, International Migration Section, ASA.
2011-2013 Member, Award for Public Understanding of Sociology. ASA.
2013 Chair, Public Sociology Award, International Migration Section, ASA.
2012-15 ADVANCE Mentor (Prof. Nadia Flores).
2011 Chair, Robert Park Book Award Committee, ASA.
2009     Chair, Latino/a Section Best Book Award Committee.
2008-2011 Member, International Migration Council, ASA; proposer of public sociology award.
2007     Chair, Thomas and Zaniecki Award Committee, International Migration Section,  ASA.
2004.    Social Science Research Council.  Summer Institute on Migration.  Institute Faculty Member.
2003-2005. National Science Foundation. Panelist, Review Panel, Sociology, Grants to Improve Doctoral

Dissertation Research.

2003.    "Workshop on Scientific Foundations of Qualitative Research" National Science Foundation. Conference to orient its initiative on qualitative research. July.

1998-present. Associate Editor. *Global Networks: A Journal of Transnational Research*.

# __EXHIBIT B__

to Declaration of Robert Courtney Smith

# REFERENCES

AMICI CURIAE BRIEF OF EMPIRICAL SCHOLARS IN SUPPORT OF RESPONDENTS. 2019. (Smith, Robert Courtney, Caitlin Patler, Cecilia Menjívar, Douglas S. Massey, James D. Bachmeier, Elizabeth Aranda, Mary C. Waters, Frank D. Bean, Susan K. Brown, Catalina Amuedo-Dorantes, Leisy J. Abrego, Joanna Dreby, Francesc Ortega, Amy Hsin) *Supreme Court of the United States.* Nos. 18-587, 18-588, and 18-589.

Bhaskar R, Arenas-Germosén B, Dick C. 2013. "Demographic analysis 2010: Sensitivity analysis of the foreign-born migration component." US Census Bureau Population Division *Working Paper 98*.

Bijwaard, G. E. & van Doeselaar, S. 2012. "The Impact of Divorce on Return-Migration of Family Migrants." Institute for the Study of Labor (IZA) *Discussion Paper No. 6852*. https://ftp.iza.org/dp6852.pdf.

Capps, Randy, Michael Fix, and Jie Zong. 2016. *A Profile of U.S. Children with Unauthorized Immigrant Parents*. Washington, D.C.: Migration Policy Institute.

Carling, Jørgen, Marta Bolognani, Marta Bivand Erdal, Rojan Tordhol Ezzati, Ceri Oeppen, Erlend Paasche, Silje Vatne Pettersen, and Tove Heggli Sagmo. 2015. *Possibilities and Realities of Return Migration* Research Council of Norway/ Peace Research Institute Oslo (PRIO).

Chaudry, Ajay, Randolph Capps, Juan M. Pedroza, Rosa Maria Castañeda, Robert Santos, and Molly M. Scott. 2010. *Facing Our Future: Children in the Aftermath of Immigration Enforcement*. Washington, D.C.: Urban Institute.

Constant, Amelie, and Douglas Massey. 2002. "Return Migration by German Guestworkers." *International Migration* 40(4): 5-38.

Deaton, Angus, and Arthur Stone. 2016. "Understanding context effects for a measure of life evaluation: how responses matter." *Oxford Economics Papers* 68(4): 861-870.

De la Puente, Manuel. N.d. (1995). *Using Ethnography to Explain Why People are Missed or Erroneously Included by the Census: Evidence from Small Area Ethnographic Studies.* U.S. Census Bureau. Center for Survey Methods Research. https://www.census.gov/content/dam/Census/library/working-papers/1995/adrm/mdp9501.pdf

Fazel-Zarandi, Mohammad M., Jonathan S. Feinstein, and Edward H. Kaplan. 2018 (September 21). The number of undocumented immigrants in the United States: Estimates based on demographic modeling with data from 1990 to 2016. *Plos*.

Hainmueller, Jens, Duncan Lawrence, Linna Martén, Bernard Black, Lucila Figueroa, Michael Hotard, Tomás R. Jiménez, Fernando Mendoza, Maria I. Rodriguez, Jonas J. Swartz, and David

D. Laitin. 2017. "Protecting Unauthorized Immigrant Mothers Improves Their Children's Mental Health." *Science* 357(6355):1041–44.

Hulland, John, and Mark Houston. 2021. "The Importance of Behavioral Outcomes." *Journal of the Academy of Marketing Science* 49: 437–440.

Ihrke, David. 2014. "Reason for Moving: 2012 to 2013: Population Characteristics." U.S. Census Bureau. https://www.census.gov/prod/2014pubs/p20-574.pdf

Jarvie, Jenny. 2017. "Deportations of 'Dreamers' who've lost protection have surged under Trump." *Los Angeles Times*, April 19.

Kennan, John, and James Walker. 2011. "The Effect of Expected Income on Individual Migration Decisions." *Econometrica* 79(1): 211-251.

Massey, Douglas S. 1986. "Settlement Process Among Mexican Migrants to the United States." *American Sociological Review* 51:670-685.

Massey, Douglas S., Rafael Alarcón, Jorge Durand, and Humberto González. 1987. *Return to Aztlan: The Social Process of International Migration from Western Mexico.* Berkeley, CA: University of California Press.

Massey, Douglas S., Joaquín Arango, Graeme Hugo, Ali Kouaouci, Adela Pellegrino, and J. Edward Taylor. 1998. *Worlds in Motion.* Oxford, U.K.: Oxford University Press.

Massey, Douglas S., Jorge Durand, and Nolan J. Malone. 2002. *Beyond Smoke and Mirrors: Mexican Immigration in an Age of Economic Integration.* New York, NY: Russell Sage Foundation.

Massey, Douglas S., and Chiara Capoferro. 2008. "The Geographic Diversification of U.S. Immigration." In *New Faces in New Places: The Changing Geography of American Immigration.* New York, NY: Russell Sage Foundation. pp. 25-50.

Massey, Douglas S., and Fernando Riosmena. 2010. "Undocumented Migration from Latin America in an Era of Rising U.S. Enforcement." *Annals of American Academy of Political and Social Science* 630: 137-61.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2014. "Explaining Undocumented Migration to the U.S." *International Migration Review* 48(4): 1028-1061.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2015. "Border Enforcement and Return Migration by Documented and Undocumented Mexicans." *Journal of Ethnic and Migration Studies* 41:1015–40.

Massey, Douglas S., Jorge Durand, and Karen A. Pren. 2017. "Why Border Enforcement Backfired." *American Journal of Sociology* 121(5): 1557-1600.

Massey, Douglas S. 2019. Declaration of. In *Texas et al v. United States et al*, 49, 1:18-CV-00068, Southern District, Texas (TXSD), 2018; *Texas et al v United States et al,* 12, No. 21-40680, Court of Appeals, Fifth Circuit, 2022

Mathema, Silva. 2017. *Keeping Families Together: Why All Americans Should Care What Happens to Unauthorized Immigrants.* Washington, D.C.: Center for American Progress.

Moriarty, Andrew. 2024. August.  Keeping American Families Together: *Parole in Place for Undocumented Spouses of U.S. Citizens. Forward.us.* https://www.fwd.us/news/parole-in-place-citizen-spouses.

Morwitz, Vicki, and Kurt P. Munz. 2020. "Intentions." *Consumer Psychology Review* 00: 1-16.

Oropesa, R.S., Nancy S. Landale, and Marianne M. Hillemeier. 2017. "How does legal status matter for oral health care among Mexican-origin children in California?" *SSM - Population Health* 3: 730-739.

Parrado, Emilio A., and Angie N. Ocampo. 2019. "Continuities and Changes in the Processes of Mexican Migration and Return." *Annals of American Academy of Political and Social Science* 684(1): 212-226.

Parrado, Emilio A., and Edith Y. Gutierrez. 2016. "The Changing Nature of Return Migration to Mexico, 1990–2010." *Sociology of Development* 2(2): 93-118.

Patler, Caitlin, Jorge A. Cabrera, and Dream Team Los Angeles. 2015. "From Undocumented to DACAmented: Impacts of the Deferred Action for Childhood Arrivals (DACA) Program." *UCLA: Institute for Research on Labor and Economics Report.*

Patler, Caitlin, and Whitney Laster Pirtle. 2018. "From undocumented to lawfully present: Do changes in legal status impact psychological wellbeing among Latino immigrant young adults?" *Social Science and Medicine* 199: 39-48.

Patler, Caitlin, Erin Hamilton, Kelsey Meagher, and Robin Savinar. 2019. "Uncertainty About DACA May Undermine Its Positive Impact On Health For Recipients And Their Children." *Health Affairs* 38(5): 738-745.

Reagan, Patricia, and Randall Olsen. 2000. "You can go home again: Evidence from longitudinal data." *Demography* 37(3): 339-350.

Rojas-Flores, Lisseth, Mari L. Clements, J. Hwang Koo, and Judy London. 2016. "Trauma and Psychological Distress in Latino Citizen Children Following Parental Detention and Deportation."  *Psychological Trauma: Theory, Research, Practice, and Policy* 9(3): 352-361.

Schaeffer, Nora Cate, and Stanley Presser. 2003. "The Science of Asking Questions."  *Annual Review of Sociology* 29: 65-88.

Schwarz, Norbert, and Fritz Stack. 1999. "Reports of Subjective Well-Being: Judgmental Processes and Their Methodological Implications." In Daniel Khaneman, Edward Deiner, and Norbert Schwarz, editors. *Well-Being: The Foundations of Hedonic Psychology*. New York, NY: Russell Sage Foundation.

Schwarz, Norbert. 2000. "Emotion, cognition, and decision making." *Cognition & Emotion* 14(4): 433-440.

Sheeran, Pascal. 2002 "Intention—Behavior Relations: A Conceptual and Empirical Review." *European Review of Social Psychology* 12(1): 1-36.

Sheeran, Pascal and Thomas L. Webb. 2016. "The Intention–Behavior Gap." *Social and Personality Psychology Compass* 10(9): 503-518.

Smith, Robert Courtney. 2024. *Dreams Achieved and Denied: Mexican Intergenerational Mobility in New York*. Russell Sage Foundation via ASA Rose Series.

Smith, Robert Courtney. 2006. *Mexican New York: Transnational Worlds of New Immigrants*. Berkeley, CA: University of California Press.

U.S. Department of State Country Reports 2022, 2023, 2024 on Human Rights Practices and Travel Advisories for Mexico, El Salvador, Guatemala.

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/mexico-travel-advisory.html

https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/mexico/

https://www.state.gov/reports/2023-country-reports-on-human-rights-practices/el-salvador/

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/el-salvador-travel-advisory.html

https://www.state.gov/reports/2022-country-reports-on-human-rights-practices/guatemala

https://travel.state.gov/content/travel/en/traveladvisories/traveladvisories/guatemala-travel-advisory.html

Van Hook, Jennifer, and Weiwei Zhang. 2011. "Who Stays? Who Goes? Selective Emigration Among the Foreign-Born." *Population Research and Policy Review* 30(1): 1-24.

Warren, Robert. 2013. "Unauthorized immigration to the United States: Annual estimates and components of change, by state, 1990 to 2010." *International Migration Review*. 47(2): 296–329

Wasem, Ruth Ellen. 2012. "Unauthorized Aliens Residing in the United States: Estimates Since 1986." *Congressional Research Service*. Report # 7-5700

Waters, Mary C., and Marisa Gerstein Pineau, Editors. 2015. *The Integration of Immigrants into American Society*. Panel on Integration of Immigrants into American Society; Division of Behavioral and Social Sciences and Education; National Academies of Sciences, Engineering, and Medicine. National Academies Press.