UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

---

STATE OF TEXAS, et al.,

                *Plaintiffs,*

        *v.*

U.S. DEPARTMENT OF HOMELAND SECURITY, et al.,

                *Defendants.*

Case No. 6:24-cv-00306

---

**BRIEF FOR AMICI CURIAE STATES OF NEW YORK, COLORADO,
CONNECTICUT, DELAWARE, HAWAIʻI, ILLINOIS, MAINE,
MARYLAND, MASSACHUSETTS, MICHIGAN, MINNESOTA, NEVADA,
NEW JERSEY, OREGON, PENNSYLVANIA, RHODE ISLAND,
VERMONT, WASHINGTON, AND WISCONSIN,
AND THE DISTRICT OF COLUMBIA IN SUPPORT OF
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

1

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................3

INTRODUCTION AND INTERESTS OF AMICI CURIAE ...................................... 10

BACKGROUND...................................................................................... 13

    A.    The Federal Government Has Long Exercised Its Authority to Implement Parole Programs to Promote Family Unity........................... 13

    B.    The Federal Government Implements the Keeping Families Together Process....................................................................................... 18

ARGUMENT .......................................................................................... 23

    I.    THE KEEPING FAMILIES TOGETHER PROCESS SIGNIFICANTLY BENEFITS THE PUBLIC ............................................................................... 23

    A.    Family Unity Is a Core Value of the American Immigration System............................................................................................ 24

    B.    Allowing Eligible Noncitizens to Apply for Parole in Place Can Have Numerous Economic Benefits. ........................................ 27

    II.    IF THE COURT GRANTS INJUNCTIVE RELIEF, IT SHOULD BE LIMITED TO THE PLAINTIFF STATES........................................................... 34

CONCLUSION....................................................................................... 37

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) ................................................................................ 35

*Fiallo v. Bell,*
    430 U.S. 787 (1977) ................................................................................ 24

*Gill v. Whitford,*
    585 U.S. 48 (2018) .................................................................................. 35

*Holder v. Martinez Gutierrez,*
    566 U.S. 583 (2012) ......................................................................... 11, 24

*Louisiana v. Becerra,*
    20 F.4th 260 (5th Cir. 2021) .................................................................. 35

*Moore v. City of East Cleveland,*
    431 U.S. 494 (1977) ................................................................................ 25

*Nwozuzu v. Holder,*
    726 F.3d 323 (2d Cir. 2013) ................................................................... 24

**Statutes**

8 U.S.C.
    § 1151 ...................................................................................................... 24
    § 1182 ................................................................................... 13, 19, 23
    § 1255 ...................................................................................................... 19

Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (1900) ..................... 24

Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911 (1965) .............. 24

National Defense Authorization Act for Fiscal Year 2020 (NDAA),
    Pub. L. No. 116-92, § 1758, 133 Stat. 1198 (2019) (8 U.S.C. § 1182 note) ........... 14

**Regulations**

8 C.F.R. § 245.1 ............................................................................................. 19

**Regulations**                                                                 **Page(s)**

Cuban Family Reunification Parole Program,
  72 Fed. Reg. 65588 (Nov. 21, 2007) ........................................................ 16

Implementation of a Haitian Family Reunification Parole Program,
  79 Fed. Reg. 75581 (Dec. 18, 2014) ........................................................ 16

Filipino World War II Veterans Parole Policy,
  81 Fed. Reg. 28097 (May 9, 2016) ......................................................... 16

Deferred Action for Childhood Arrivals,
  87 Fed. Reg. 53152 (Aug. 30, 2022) ...................................................... 30

Implementation of a Parole Process for Venezuelans,
  87 Fed. Reg. 63507, 63508 (Oct. 19, 2022) ........................................... 17

Implementation of a Family Reunification Parole Process for Colombians,
  88 Fed. Reg. 43591 (July 10, 2023) ........................................................ 16

Implementation of a Family Reunification Parole Process for Guatemalans,
  88 Fed. Reg. 43581 (July 10, 2023) ........................................................ 16

Implementation of a Family Reunification Parole Process for Hondurans,
  88 Fed. Reg. 43601 (July 10, 2023) ........................................................ 16

Implementation of a Family Reunification Parole Process for Salvadorans,
  88 Fed. Reg. 43611 (July 10, 2023) ........................................................ 16

Implementation of a Family Reunification Parole Process for Ecuadorians,
  88 Fed. Reg. 78762 (Nov. 16, 2023) ....................................................... 16

Implementation of Keeping Families Together,
  89 Fed. Reg. 67459 (Aug. 20, 2024) ..........................13-15, 18-23, 26-28, 31-32, 34

**Miscellaneous Authorities**

136 Cong. Rec. 36838 (1990).................................................................. 11, 24

Allison Abrams, *Damage of Separating Families*, Psychology Today (June 22,
  2018), https://www.psychologytoday.com/us/blog/nurturing-self-
  compassion/201806/damage-separating-families................................................ 26

**Miscellaneous Authorities**                                                    **Page(s)**

Am. Immigr. Council, *The Biden Administration's Parole-In-Place
    Announcement: Helping Mixed-Status Families Stay Together and Avoid
    Bureaucratic Traps* (June 18, 2024),
    https://www.americanimmigrationcouncil.org/research/biden-parole-place-
    announcement-helping-mixed-status-families-stay-together ............................ 19

Am. Immigr. Council, *Immigrants in California*,
    https://map.americanimmigrationcouncil.org/locations/california/ .................... 33

Am. Immigr. Council, *Immigrants in District of Columbia*,
    https://map.americanimmigrationcouncil.org/locations/district-of-
    columbia/ ................................................................................................ 33

Am. Immigr. Council, *Immigrants in New York*,
    https://map.americanimmigrationcouncil.org/locations/new-york/ ................... 32

Am. Immigr. Council, *Immigrants in Washington*,
    https://map.americanimmigrationcouncil.org/locations/washington/ ................ 33

Am. Immigr. Laws Ass'n, *Practice Alert: Denials and Refusals to Adjudicate
    Military Parole in Place Applications* (Sept. 4, 2019),
    https://www.aila.org/library/practice-alert-denials-and-refusals-to-
    adjudicate .............................................................................................. 22

Andrew Moriarty, *Keeping American Families Together: Parole in Place for
    Undocumented Spouses of U.S. Citizens* (Aug. 23, 2024),
    https://www.fwd.us/news/parole-in-place-citizen-spouses/ ................. 25, 29, 32-33

Anita Ortiz Maddali, *Left Behind: The Dying Principle of Family
    Reunification Under Immigration Law,* 50 U. Mich. J. L. Reform 107
    (2016),
    https://repository.law.umich.edu/cgi/viewcontent.cgi?article=1168&context
    =mjlr .................................................................................................... 25

Authority to Parole Applicants for Admission Who Are Not Also Arriving
    Aliens, Legal Op. 98-10 (INS) (Aug. 21, 1998), 1998 WL 1806685 ............... 14, 20

Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status for 530,000
    Migrants Who Arrived Under Biden Program*, CBS News (Oct. 4, 2024),
    https://www.cbsnews.com/news/venezuelans-legal-status-chnv-program/ .......... 17

5

**Miscellaneous Authorities**                                                            **Page(s)**

Carl Davis et al., Inst. on Taxation and Econ. Pol'y, *Tax Payments by Undocumented Immigrants* (July 30, 2024), https://sfo2.digitaloceanspaces.com/itep/ITEP-Tax-Payments-by-Undocumented-Immigrants-2024.pdf ................................................................. 28-29

Cecilia Rouse et al., White House Council of Econ. Advisers, *The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants,* The White House (Sept. 17, 2021), https://www.whitehouse.gov/cea/written-materials/2021/09/17/the-economic-benefits-of-extending-permanent-legal-status-to-unauthorized-immigrants/ ............................................................................................ 27

Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief (July 2019), https://www.ncfr.org/sites/default/files/2019-07/Immigrant_Families_Policy_Brief_July_23_2019.pdf ................................... 26

Dan Kosten, *Immigrants as Economic Contributors: They Are the New American Workforce*, Nat'l Immigr. F. (June 5, 2018), https://immigrationforum.org/article/immigrants-as-economic-contributors-they-are-the-new-american-workforce/ ........................................... 32

David J. Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Inst. (July 17, 2023), https://www.cato.org/blog/126-parole-orders-over-7-decades-historical-review-immigration-parole-orders ...................................................... 13-14, 16-17

DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023), https://www.dhs.gov/news/2023/01/05/dhs-continues-prepare-end-title-42-announces-new-border-enforcement-measures-and ............................... 17

DHS, *Operations Allies Welcome* (Aug. 29, 2021), https://www.dhs.gov/sites/default/files/publications/21_1110_opa-dhs-resettlement-of-at-risk-afghans.pdf ...................................................... 16

Edward D. Vargas & Vickie D. Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children*, J. Immigr. Minor Health (Aug. 2017), https://pmc.ncbi.nlm.nih.gov/articles/PMC5236009/ ........................................... 27

**Miscellaneous Authorities**                                    **Page(s)**

*FACT SHEET: President Biden Announces New Actions to Keep Families
Together,* The White House (June 18, 2024),
https://www.whitehouse.gov/briefing-room/statements-
releases/2024/06/18/fact-sheet-president-biden-announces-new-actions-to-
keep-families-together/ ............................................................................. 18

Francesc Ortega & Amy Hsin, *Occupational Barriers and the Productivity
Penalty from Lack of Legal Status*, 76 Labour Econ. art. 102181
(June 2022),
https://www.sciencedirect.com/science/article/abs/pii/S0927537122000720 ........ 28

Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents
and Their Young Children* (2011) ........................................................... 26

Jin. K. Park et al., *DACA, Public Health, and Immigrant Restrictions on
Healthcare in the United States*, 21 Lancet Reg'l Health Am. (May 2023),
https://pmc.ncbi.nlm.nih.gov/articles/PMC10131123/ ......................................... 30

Kelsey Y. Santamaria, Cong. Rsch. Serv., LSB11102, *Humanitarian Parole
Authority: A Legal Overview and Recent Developments* (Jan. 11, 2024),
https://crsreports.congress.gov/product/pdf/LSB/LSB11102# ............................. 13

KFF, *Key Facts on Health Coverage of Immigrants* (Sept. 17, 2023),
https://www.kff.org/racial-equity-and-health-policy/fact-sheet/key-facts-on-
health-coverage-of-immigrants/ ............................................................. 29

Leighton Ku, *Why Immigrants Lack Adequate Access to Health Care and
Health Insurance*, Migration Pol'y Inst. (Sept. 1, 2006),
https://www.migrationpolicy.org/article/why-immigrants-lack-adequate-
access-health-care-and-health-insurance .............................................. 30

Mem. from Alejandro N. Mayorkas, Sec'y, DHS, to Tae D. Johnson, Acting
Dir., ICE, Guidelines for the Enforcement of Civil Immigration Law (Sept.
30, 2021), https://www.ice.gov/doclib/news/guidelines-
civilimmigrationlaw.pdf ....................................................................... 28

Mem. from Jeh Charles Johnson, Sec'y, DHS, to León Rodríguez, Dir.,
USCIS, Families of U.S. Armed Forces Members and Enlistees (Nov. 20,
2014),
https://www.dhs.gov/sites/default/files/publications/14_1120_memo_parole
_in_place_0.pdf ..................................................................................... 21

**Miscellaneous Authorities**                                              **Page(s)**

Nat'l Immigr. F*., Fact Sheet: Military Parole in Place* (Oct. 7, 2021),
    https://immigrationforum.org/article/fact-sheet-military-parole-in-place-
    mil-pip/ .................................................................................................. 15

Nik Theodore, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi., *Insecure
    Communities: Latino Perceptions of Police Involvement in Immigration
    Enforcement* (May 2013),
    https://www.policylink.org/sites/default/files/INSECURE_COMMUNITIE
    S_REPORT_FINAL.PDF ..................................................................... 31

Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of
    the US Temporary Protected Status Populations from El Salvador,
    Honduras, and Haiti*, 5 J. Migration & Hum. Sec. 577 (2017),
    https://journals.sagepub.com/doi/pdf/10.1177/233150241700500302.................. 28

Tom K. Wong et al., Ctr. for Am. Progress, *2021 Survey of DACA Recipients
    Underscores the Importance of a Pathway to Citizenship* (Feb. 3, 2022),
    https://www.americanprogress.org/article/2021-survey-of-daca-recipients-
    underscores-the-importance-of-a-pathway-to-citizenship/ .................................. 28

U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the
    Budgets of State and Local Governments* 8 (Dec. 2007),
    https://www.cbo.gov/sites/default/files/110th-congress-2007-
    2008/reports/12-6-immigration.pdf........................................................ 30

U.S. Dep't of Homeland Sec., *DHS Announces Family Reunification Parole
    Processes for Colombia, El Salvador, Guatemala, and Honduras* (July 7,
    2023), https://www.dhs.gov/news/2023/07/07/dhs-announces-family-
    reunification-parole-processes-colombia-el-salvador-guatemala ........................ 15

USCIS, Policy Memorandum, PM-602-0091, *Parole of Spouses, Children and
    Parents of Active Duty Members of the U.S. Armed Forces* (Nov. 15, 2013),
    https://www.uscis.gov/sites/default/files/document/memos/2013-
    1115_Parole_in_Place_Memo_.pdf........................................................ 15

Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear:
    Immigration Policy's Effects on Young Children* (Mar. 2018),
    https://www.clasp.org/sites/default/files/publications/2018/03/2018_ourchil
    drensfears.pdf ................................................................................. 26

**Miscellaneous Authorities**                                        **Page(s)**

Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to
    Travel Ban: Data*, Reuters (Feb. 26, 2019),
    https://www.reuters.com/article/us-usa-immigration-ban/us-denied-tens-
    of-thousands-more-visas-in-2018-due-to-travel-ban-data-
    idUSKCN1QF2KF/.............................................................................................. 27

Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case
    for Family Unity*, 5 J. Migration & Hum. Sec. 417 (2017),
    https://cmsny.org/publications/jmhs-case-for-family-unity/ ...........................24-26

## INTRODUCTION AND INTERESTS OF AMICI CURIAE

In August 2024, the U.S. Department of Homeland Security (DHS) began implementing Keeping Families Together (KFT), a process through which certain noncitizens living in the United States who are the spouses or stepchildren of U.S. citizens can apply for a form of immigration parole known as "parole in place." A noncitizen who is granted parole in place through KFT would be able to apply for and be granted permanent residence in the United States, if otherwise eligible, without first needing to depart the country.

KFT does not create a new form of parole, nor does it alter the substantive standards for granting parole. Rather, it is a process to facilitate consideration of certain noncitizens for a preexisting form of parole under preexisting eligibility criteria, so that they can apply for permanent legal status without needing to first leave the United States and separate from their families (including U.S.-citizen spouses and children) for a decade or more. KFT thus keeps these families intact, and it does so under the federal government's existing statutory authority to grant parole in place. That authority has long been recognized by DHS and reaffirmed by Congress.

Amici States of New York, Colorado, Connecticut, Delaware, Hawai'i, Illinois, Maine, Maryland, Massachusetts, Michigan, Minnesota, Nevada, New Jersey, Oregon, Pennsylvania, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia, file this brief in support of the KFT process and defendants' motion for

summary judgment.[1] Thousands of potentially eligible parolees—and their U.S.-citizen families—live in amici States, are essential to the fabric of our communities, and are vital to our economies.

Amici write to underscore two main points about the value of the KFT process. *First*, by promoting family unity, the KFT process advances a bedrock value under-pinning the American immigration system. *See* 136 Cong. Rec. 36838 (1990); *Holder v. Martinez Gutierrez*, 566 U.S. 583, 594 (2012). The benefits of stable, intact families are well documented and reverberate throughout the amici States and the Nation as a whole. Intact families are critical to the health and well-being of children and other dependents, while also strengthening our neighborhoods, communities, and civic society at large. Conversely, splitting up families in the United States contradicts the values of our immigration system and will irreparably harm our families, neighbor-hoods, and communities. That harm is particularly acute in the context of KFT because prospective parolees under the program necessarily have close ties to this country, making prolonged or permanent separation from their families even more wrenching.

*Second*, the KFT process will also benefit amici States because noncitizens granted parole in place can fully participate in the labor force while applying for lawful permanent resident status. Eligible noncitizens are more likely to apply for

---

[1] Defendants are DHS, the Office of Management and Budget, Alejandro Mayorkas, Ur Jaddou, Troy Miller, Patrick J. Lechleitner, and Shalanda Young. Compl. ¶¶ 25-31 (Aug. 23, 2024), ECF No. 1.

permanent residency, with its concomitant benefits and contributions, if they can do so without separating from their homes and families for a lengthy and indefinite period. And the attendant increase in our States' formal labor forces will increase tax revenues at the federal and state levels, lower costs, address labor shortages, reduce labor exploitation, and build greater spending power.

Because the KFT program is broadly beneficial, well reasoned, and lawful, defendants' motion for summary judgment should be granted and plaintiffs' motion for summary judgment and injunctive relief should be denied. Contrary to plaintiffs' account, KFT does not incentivize new unauthorized immigration, does not create any new benefit that a prospective parolee would not otherwise have been eligible to receive, and does not set new criteria for granting parole. Other assertions made by plaintiffs amount to pure speculation, contradicted by the records of other recent parole programs. At an absolute minimum, any injunctive relief should be limited to the plaintiff States. A nationwide injunction against implementation of the KFT process would be far greater than necessary to address the attenuated injuries that plaintiffs claim and would grievously harm amici States and other nonparties.

## BACKGROUND

### A.   The Federal Government Has Long Exercised Its Authority to Implement Parole Programs to Promote Family Unity.

The Immigration and Nationality Act gives the Secretary of Homeland Security discretion to grant immigration parole to noncitizens applying for admission to the United States "on a case-by-case basis for urgent humanitarian reasons or significant public benefit" until the purposes of such parole have been served. 8 U.S.C. § 1182(d)(5)(A). "Parole allows an alien, who may be considered inadmissible and ineligible to be 'admitted' to the United States under immigration laws, to either enter, reenter, or remain in the United States for a temporary period pending review of his or her immigration status."[2] Noncitizens who are physically present in the United States without having been lawfully "admitted"—those who entered the country without authorization, for example—remain "applicants for admission" and, therefore, eligible for parole.[3] Granting parole in such cases is known as "parole in place."[4]

The federal government's exercise of its parole authority has "deep historical precedent."[5] At least 126 "programmatic or categorical parole orders" have been

---

[2] Kelsey Y. Santamaria, Cong. Rsch. Serv., LSB11102, *Humanitarian Parole Authority: A Legal Overview and Recent Developments* 1-2 (Jan. 11, 2024). (For authorities available online, full URLs appear in the table of authorities. All URLs were last visited on October 25, 2024.)

[3] Implementation of Keeping Families Together, 89 Fed. Reg. 67459, 67462 (Aug. 20, 2024).

[4] *Id.*

[5] David J. Bier, *126 Parole Orders over 7 Decades: A Historical Review of Immigration Parole Orders*, Cato Inst. (July 17, 2023).

implemented by administrations of both major parties since 1954.[6] Over a third of those parole programs (46) were implemented after Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) in 1996, which required grants of parole to rest on case-by-case determinations.[7] Indeed, immigration officials have recognized their authority to grant "parole in place" since shortly after IIRIRA's enactment, based on a careful, reasoned reading of the statute.[8] And this understanding has since been affirmed multiple times, including by Congress, which in 2019 "reaffirmed" "the importance of the parole in place authority of the Secretary of Homeland Security."[9]

Above all, parole in place has aimed "to promote family unity and remove barriers to" applying for lawful permanent resident (LPR) status.[10] In 2010, for example, DHS identified parole as one discretionary tool "to minimize periods of family separation, and to facilitate adjustment of status within the United States by

---

[6] *See id.*

[7] IIRIRA substantially amended the immigration statute. Prior to IIRIRA's enactment, there would not have been reason to consider grants of parole in place. *See* Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens, Legal Op. 98-10 (INS) (Aug. 21, 1998), 1998 WL 1806685. See *infra* at 10 (highlighting changes in statutory language effected by IIRIRA).

[8] *Id. See* Defs.' Trial Br. & Mot. for Summ. J. at 42-44, ECF No. 77 (analyzing IIRIRA's text and discussing Courts of Appeals decisions which "have recognized that unadmitted noncitizens already present in the United States may nevertheless be paroled in place under the terms of" IIRIRA).

[9] National Defense Authorization Act for Fiscal Year 2020 (NDAA), Pub. L. No. 116-92, § 1758, 133 Stat. 1198, 1860 (2019) (8 U.S.C. § 1182 note).

[10] Implementation of Keeping Families Together, 89 Fed. Reg. at 67463.

14

immigrants who are the spouses, parents and children of military members."[11] Since then, USCIS has issued policy guidance to ensure consistent adjudication of parole requests by noncitizen family members of certain current or former members of the U.S. armed forces.[12] In doing so, the agency sought to alleviate the "stress and anxiety" servicemembers and veterans faced over concerns about their family members' immigration status in the United States.[13] This exercise of parole in place authority relied on the same statutory provision—Immigration and Nationality Act (INA) § 212(d)(5)(A)—that KFT does.[14]

In the same vein, parole authority has been used to reunify separated families and to aid particularly vulnerable groups of people. For example, DHS has exercised parole authority to promote family unity for noncitizens outside the United States who are waiting for a family-based immigrant visa to become available.[15] These "Family Reunification Parole" processes have been implemented for family members

---

[11] USCIS, Policy Memorandum, PM-602-0091, *Parole of Spouses, Children and Parents of Active Duty Members of the U.S. Armed Forces* (Nov. 15, 2013). In 2007, "DHS Secretary Michael Chertoff ordered the first known parole in place of a military spouse who was facing deportation while her US military husband, Staff Sergeant Alex Jimenez, was missing in action in Iraq." Nat'l Immigr. F., *Fact Sheet: Military Parole in Place* (Oct. 7, 2021).

[12] USCIS, Policy Memorandum at 1.

[13] *Id.* at 2.

[14] *Compare id., with* 89 Fed. Reg. at 67462.

[15] Implementation of Keeping Families Together, 89 Fed. Reg. at 67464; *see* U.S. Dep't of Homeland Sec., *DHS Announces Family Reunification Parole Processes for Colombia, El Salvador, Guatemala, and Honduras* (July 7, 2023) (announcing that "[t]hese new processes promote family unity and provide lawful pathways consistent with our laws and our values").

of U.S. citizens and LPRs who are nationals of Cuba,[16] Haiti,[17] Colombia,[18] Ecuador,[19] El Salvador,[20] Guatemala,[21] and Honduras,[22] as well as for Filipino World War II veterans.[23] Past parole programs have also benefitted refugees from Southeast Asia, Cuban nationals, and minor children ineligible for refugee status.[24] More recently, the United States has created parole pathways for certain Central American minor children of parents residing in the United States,[25] vulnerable Afghan nationals,[26] and Ukrainian citizens along with their immediate family members. A similar parole

---

[16] Cuban Family Reunification Parole Program, 72 Fed. Reg. 65588 (Nov. 21, 2007).

[17] Implementation of Haitian Family Reunification Parole Program, 79 Fed. Reg. 75581 (Dec. 18, 2014).

[18] Implementation of a Family Reunification Parole Process for Colombians, 88 Fed. Reg. 43591 (July 10, 2023).

[19] Implementation of a Family Reunification Parole Process for Ecuadorians, 88 Fed. Reg. 78762 (Nov. 16, 2023).

[20] Implementation of a Family Reunification Parole Process for Salvadorans, 88 Fed. Reg. 43611 (July 10, 2023).

[21] Implementation of a Family Reunification Parole Process for Guatemalans, 88 Fed. Reg. 43581 (July 10, 2023).

[22] Implementation of a Family Reunification Parole Process for Hondurans, 88 Fed. Reg. 43601 (July 10, 2023).

[23] Filipino World War II Veterans Parole Policy, 81 Fed. Reg. 28097 (May 9, 2016).

[24] *See* Bier, *supra*.

[25] *Id.*

[26] DHS, *Operations Allies Welcome* 1-2 (Aug. 29, 2021).

pathway was implemented for Venezuelans,[27] and then for Cubans, Haitians, and Nicaraguans, based on the successful processes for Venezuelans and Ukrainians.[28]

While these programs prioritize specific groups of people in need of assistance, parole ultimately is granted on a "case-by-case" basis as mandated by the statute. Many "large-scale programmatic uses of parole" have been implemented against the backdrop of that statutory mandate.[29] That is because "even if someone's categorization create[s] a presumption that they met the 'emergent/humanitarian' or 'public interest/significant public benefit' requirement," a case-by-case determination "always mean[s] an individual determination."[30] And, even if someone is granted parole, that designation is temporary and subject to revocation. Recently, for example, the Biden administration announced that parole would not be renewed for certain migrants from Nicaragua, Cuba, Venezuela, and Haiti who had previously been granted parole.[31]

---

[27] Implementation of a Parole Process for Venezuelans, 87 Fed. Reg. 63507, 63508 (Oct. 19, 2022).

[28] DHS, *DHS Continues to Prepare for End of Title 42; Announces New Border Enforcement Measures and Additional Safe and Orderly Processes* (Jan. 5, 2023).

[29] Bier, *supra*.

[30] *Id.*

[31] Camilo Montoya-Galvez, *U.S. Won't Extend Legal Status for 530,000 Migrants Who Arrived Under Biden Program*, CBS News (Oct. 4, 2024).

17

### B.   The Federal Government Implements the Keeping Families Together Process.

On August 20, 2024, DHS announced its implementation of Keeping Families Together, a "process for certain noncitizen spouses and stepchildren of U.S. citizens who are present in the United States without admission or parole to request parole in place under existing statutory authority."[32] KFT helps these noncitizen spouses and stepchildren apply for lawful permanent residence—a status they are already eligible to seek—without leaving the country.[33] Consistent with the overarching objective of the American immigration system, and prior successful parole processes, KFT aims to "achieve the significant public benefit of promoting the unity and stability of families."[34]

To appreciate how KFT will achieve that goal, consider the challenges it intends to address. As DHS explained, the KFT process responds to the difficulties faced by many noncitizen members of mixed-status families in the United States who wish to adjust to permanent legal residence status. "DHS estimates that there are approximately 765,000 noncitizens in the United States who are married to U.S. citizens and lack lawful immigration status."[35] Collectively, these noncitizens "live with more than 2.5 million U.S. citizen family members, raising and caring for more

---

[32] Implementation of Keeping Families Together, 89 Fed. Reg. at 67459.

[33] *FACT SHEET: President Biden Announces New Actions to Keep Families Together*, The White House (June 18, 2024).

[34] Implementation of Keeping Families Together, 89 Fed. Reg. at 67459.

[35] *Id.* at 67460.

than 1.6 million U.S. citizen children."[36] Many of them have been in the United States for decades. More than two-thirds of these noncitizens are present in the United States without admission or parole. As a result, they generally are ineligible to apply for LPR status while in the United States (a process known as "adjustment of status").[37] Instead, to apply for LPR status, they must first leave the country and then seek an immigrant visa at a U.S. embassy or consulate abroad.[38]

For nearly all of these noncitizens, however, leaving the United States to pursue that avenue will trigger a ten-year bar on legally reentering the country—and reuniting with their families.[39] Faced with the prospect of separating from their loved ones in the United States for a decade or more, many noncitizens in this situation opt to stay put and, consequently, remain ineligible to apply for LPR status.[40] The ten-year bar on reentry was introduced by IIRIRA, which made a number of substantial

---

[36] *Id.*

[37] With limited exceptions, a person who "was not admitted or paroled following inspection by an immigration officer" is ineligible to adjust status. 8 C.F.R. § 245.1(b)(3); *see* 8 U.S.C. § 1255(a).

[38] Implementation of Keeping Families Together, 89 Fed. Reg. at 67460.

[39] For noncitizens who have been unlawfully present in the United States for one year or more, their departure triggers a ten-year bar to admission. 8 U.S.C. § 1182(a)(9)(B)(i)(II). A three-year bar to admission applies when a person voluntarily leaves the United States after having been unlawfully present for more than 180 days but less than a year. 8 U.S.C. § 1182(a)(9)(B)(i)(I). Because eligibility for KFT requires that the spouse of the U.S. citizen have been continuously present in the country for at least ten years prior to June 17, 2024, amici here focus on the ten-year bar.

[40] Am. Immigr. Council, *The Biden Administration's Parole-In-Place Announcement: Helping Mixed-Status Families Stay Together and Avoid Bureaucratic Traps 1* (June 18, 2024).

changes to the INA, not limited to the parole authority provision. Those statutory changes support the agency's authority to offer parole in place. Under IIRIRA, "aliens who were once deportable for having entered without inspection" became "applicants for admission, who are inadmissible."[41] And "[a]s aliens applying for admission, they are within the scope of the statutory parole authority."[42]

KFT serves the public interest by addressing the challenges faced by noncitizens seeking to adjust status, and it does so under the statutory parole authority that IIRIRA made applicable to persons who entered without inspection. KFT directs DHS to consider, on a case-by-case basis, parole in place applications filed by certain noncitizen spouses and stepchildren of U.S. citizens. "If granted parole in place, these noncitizens, if otherwise eligible, could apply for adjustment of status to that of an LPR, rather than having to depart the United States to pursue an immigrant visa."[43] To qualify for the process, the applicant must (1) be present in this country without admission or parole; (2) have been continuously physically present in this country either since June 17, 2014, in the case of a spouse of a U.S. citizen, or since June 17, 2024, and have been unmarried and under the age of 21 as of that date, in the case of a stepchild of a U.S. citizen; (3) have a valid marriage to a U.S. citizen dating to on or before June 17, 2024, or have a parent who entered into such a marriage before

---

[41] Authority to Parole Applicants for Admission, INS, *supra*, at *2 (citation omitted).

[42] *Id.*

[43] Implementation of Keeping Families Together, 89 Fed. Reg. at 67460.

the applicant's 18th birthday; (4) have no disqualifying criminal history; and (5) submit biometrics and pass national security and public safety vetting.[44]

Notably, KFT does not itself confer parole on any categorical basis. Meeting the stringent eligibility requirements outlined above simply qualifies a noncitizen to use the KFT process. From there, as with all parole determinations, "DHS's decision whether to grant parole in place to a requestor is a discretionary, case-by-case determination."[45] That adjudication considers factors such as community ties, length of presence in the United States, and status as a parent or caregiver of a U.S. citizen.[46] Adjudicating parole applications is not, as plaintiffs argue (Mot. for TRO, Prelim. Inj., & Stay at 14, ECF No. 3), a "rubber-stamp" process. The existing parole in place program for family members of the military illustrates the selection criteria in action.[47] Out of approximately 82,000 noncitizens who have applied for parole in place under the program since 2013, 61,000 noncitizens have received parole in place as of June 30, 2024.[48] Thus, more than one quarter of the applicants were denied or have

---

[44] *Id.* at 67469-70; *see* Order at 1 (Sept. 4, 2024), ECF No. 54.

[45] Implementation of Keeping Families Together, 89 Fed. Reg. at 67472.

[46] *Id.*

[47] *See, e.g.*, Mem. from Jeh Charles Johnson, Sec'y, DHS, to León Rodríguez, Dir., USCIS, Families of U.S. Armed Forces Members and Enlistees (Nov. 20, 2014) (noting that "[a]lthough parole determinations must be made on an individualized basis, the authority has long been interpreted to allow for designation of specific classes of aliens for whom parole should be favorably considered, so long as the parole of each alien within the class is considered on a discretionary, case-by-case basis").

[48] Implementation of Keeping Families Together, 89 Fed. Reg. at 67464.

yet to receive parole in place under the extant program.[49] Plaintiffs offer no reason to think that the agency would implement KFT any differently.

Likewise, KFT does not itself grant work authorization or access to public benefits. A noncitizen *granted* parole under KFT—like all other immigrant parolees—may apply for employment authorization "to work lawfully in the United States during their period of parole."[50] However, parolees would not be eligible for "most means-tested benefits for five years after being granted parole in place."[51] And "a discretionary grant of parole does not in itself establish eligibility for adjustment of status to that of an LPR," which still requires an applicant to satisfy numerous other statutory requirements.[52]

In addition, KFT does not otherwise curb the federal government's wide range of immigration enforcement powers. For example, the federal government may impose conditions on a grant of parole under KFT, verify compliance with those conditions at any time, and terminate parole if any of those conditions are violated.[53] Moreover, KFT does not limit DHS's ability to take enforcement actions, including against

---

[49] Indeed, during the first Trump Administration, a higher denial rate was reported than under prior administrations, further evincing the discretion available to, and exercised by, USCIS. *See, e.g.*, Am. Immigr. Laws. Ass'n, *Practice Alert: Denials and Refusals to Adjudicate Military Parole in Place Applications* (Sept. 4, 2019).

[50] Implementation of Keeping Families Together, 89 Fed. Reg. at 67462 (citing 8 C.F.R. 274a.12(c)(11)).

[51] *Id.* at 67467.

[52] *Id.* at 67464.

[53] *Id.* at 67473.

noncitizens who apply for or are granted parole in place under this process.[54] Indeed, noncitizens with unexecuted final removal orders are "presumptively ineligible for this process."[55]

## ARGUMENT

### I.   THE KEEPING FAMILIES TOGETHER PROCESS SIGNIFICANTLY BENEFITS THE PUBLIC

For the reasons set forth in the policy announcement and defendants' motion for summary judgment, ECF No. 77, DHS acted well within its long-recognized and broad discretion—affirmed by Congress—in implementing the KFT process. Amici States write to highlight several ways in which the KFT process serves DHS's statutory mandate to grant parole "on a case-by-case basis for urgent humanitarian reasons or significant public benefit." *See* 8 U.S.C. § 1182(d)(5)(A). In the experience of amici States, preserving the unity of immigrant families in the United States delivers significant public benefit to amici States and our residents.

---

[54] *Id.* at 67474.

[55] *Id.* at 67465. Even if an applicant overcomes that presumption, "[a] decision by USCIS to grant parole in place to a requestor with an unexecuted removal order does not rescind, cancel, vacate, or otherwise remove the existence of the unexecuted removal order." *Id.* at 67472 n.153.

### A.     Family Unity Is a Core Value of the American Immigration System.

The "principle of family unity" has been "a hallmark of US immigration policy over the past 50 years and the most important mechanism for immigration to the United States."[56] As Congress understood, "American immigration law should be based upon a desire for pursuing the time-honored American tradition of encouraging family unity." 136 Cong. Rec. 36838. To that end, the INA "was directed at 'the problem of keeping families of United States citizens and immigrants united.'" *Fiallo v. Bell*, 430 U.S. 787, 795 n.6 (1977) (quoting H.R. Rep. No. 85-1199, at 7 (1957)); *see Nwozuzu v. Holder*, 726 F.3d 323, 332 (2d Cir. 2013) (explaining that the INA "'implements the underlying intention of our immigration laws regarding the preservation of the family unit'") (quoting H.R. Rep. No. 82-1365 (1952)); *Holder*, 566 U.S. at 594 (recognizing that the "objectives of providing relief to [noncitizens] with strong ties to the United States and promoting family unity . . . underlie or inform many provisions of immigration law") (quotation marks omitted).[57]

The KFT process advances this "bedrock objective" of family unity for families who, by the terms of the policy, have put down roots in the United States. "On

---

[56] Zoya Gubernskaya & Joanna Dreby, *U.S. Immigration Policy and the Case for Family Unity*, 5 J. Migration & Hum. Sec. 417, 423 (2017).

[57] The importance Congress placed upon family unity is underscored by the numeric limits and visa allotments set by the INA amendments of 1965, and refined by further amendments to the INA in 1990. *See* Immigration and Nationality Act, Pub. L. No. 89-236, 79 Stat. 911 (1965); Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978. Unlike other visa categories, there is no limit on the number of immediate relatives of U.S. citizens—such as spouses, unmarried children under the age of 21, and parents—who can immigrate here. 8 U.S.C. § 1151(b). Gubernskaya & Dreby, *supra*, at 418-19.

average, the 500,000 undocumented spouses who qualify for the new parole in place process have lived in the U.S. for 23 years, are 40 years old, and have been married to their U.S. citizen spouses for many years."[58]

Family unity benefits amici States in numerous ways. "Allowing families to remain together throughout the migration process reflects a belief that the family has a stabilizing effect."[59] That is especially true for mixed-status families because "it means that they can build a life in the United States without living in constant fear of separation."[60] Intact families provide crucial social support, which strengthens not only the family unit but also the neighborhood, community, and civic society at large. *See, e.g.*, *Moore v. City of East Cleveland*, 431 U.S. 494, 503-04 (1977) ("It is through the family that we inculcate and pass down many of our most cherished values, moral and cultural."). Multiple studies illustrate that family reunification benefits the economic, social, and psychological well-being of the affected individuals.[61] For immigrant communities, families provide "networks for employment, housing, transportation, informal financial services, schooling, childcare, and old age care."[62] As a result,

---

[58] Andrew Moriarty, *Keeping American Families Together: Parole in Place for Undocumented Spouses of U.S. Citizens*, FWD.us (Aug. 23, 2024).

[59] Anita Ortiz Maddali, *Left Behind: The Dying Principle of Family Reunification Under Immigration Law*, 50 U. Mich. J. L. Reform 107, 163 (2016) (quotation marks omitted).

[60] *Id.*

[61] Gubernskaya & Dreby, *supra*, at 423.

[62] *Id.* at 417.

"family unity is critical for promoting immigrant integration, social and economic well-being, and intergenerational mobility."[63]

Requiring noncitizen spouses and stepchildren to depart the United States in order to apply for LPR status—even when they have lived in this country for a decade or more—disrupts lives, creates instability, and results in economic and emotional hardship.[64] Separating family members from each other can result in negative health outcomes, including mental- and behavioral-health issues, such as severe stress and symptoms of post-traumatic stress disorder.[65] Separation can be particularly traumatizing to children, resulting in a greater risk of cognitive impairment and developing mental-health disorders such as depression, anxiety, and attention-deficit/hyperactivity disorder.[66] Trauma can also have negative physical effects on children, such as loss of appetite, stomachaches, and headaches, which can become chronic if left untreated.[67] A child's concern about their parents' immigration status can also impair socioemotional and cognitive development.[68] Indeed, the fear and stress engendered

---

[63] *Id.*

[64] Implementation of Keeping Families Together, 89 Fed. Reg. at 67466.

[65] *See* Colleen K. Vesely et al., *Immigrant Families Across the Life Course: Policy Impacts on Physical and Mental Health*, 4 Nat'l Council on Fam. Rels. Pol'y Brief 2-3 (July 2019).

[66] Allison Abrams, *Damage of Separating Families*, Psychology Today (June 22, 2018).

[67] *Id.*; *see also* Wendy Cervantes et al., Ctr. for L. & Soc. Pol'y, *Our Children's Fear: Immigration Policy's Effects on Young Children* 2-4 (Mar. 2018).

[68] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120-36 (2011).

by anti-immigrant policymaking has been termed a "multi-generational punishment" because it hurts undocumented parents and their U.S. citizen children alike.[69] Similarly, spousal separation can cause fear, anxiety, and depression.[70] By offering access to parole in place, KFT "will reduce the stress and anxiety of U.S. citizen spouses and children by providing stability for these families in the short and long term."[71]

### B.   Allowing Eligible Noncitizens to Apply for Parole in Place Can Have Numerous Economic Benefits.

The KFT process stands to benefit the Nation's economy in at least four respects. *First*, it would pave the way for greater tax revenue collected by the States. A person granted parole in place under KFT would become eligible to apply for work authorization. The ability to work lawfully in the United States would, in turn, likely increase overall tax contributions among parolees "by decreasing barriers to compliance with the tax code and increasing the earning potential of these noncitizens."[72]

---

[69] *See* Edward D. Vargas & Vickie D. Ybarra, *U.S. Citizen Children of Undocumented Parents: The Link Between State Immigration Policy and the Health of Latino Children*, 2 J. Immigr. Minor Health (Aug. 2017).

[70] *See, e.g.,* Yeganeh Torbati, *U.S. Denied Tens of Thousands More Visas in 2018 Due to Travel Ban: Data*, Reuters (Feb. 26, 2019) (stating that the separation of a U.S. citizen from his non-citizen wife caused them both to "break down psychologically").

[71] Implementation of Keeping Families Together, 89 Fed. Reg. at 67466.

[72] Implementation of Keeping Families Together, 89 Fed. Reg. at 67467. For comparison, estimates of the tax compliance rate among undocumented immigrants range between 50 and 75 percent, while the tax compliance rate among the rest of the population nears 100 percent. Cecilia Rouse et al., White House Council of Econ.

(*continued on the next page*)

Individuals who reside in the United States under programs similar to parole already make positive contributions to the economy. For example, in a 2021 survey of recipients under the Deferred Action for Childhood Arrivals (DACA) program, nine out of ten individuals reported that they were employed or in school.[73] Similarly, more than eight in ten Temporary Protected Status recipients from El Salvador, Honduras, and Haiti participate in the labor force.[74] More broadly, undocumented noncitizens "lead our congregations of faith, teach our children, do back-breaking farm work to help deliver food to our table, and contribute in many other meaningful ways."[75] Research shows that the wages of undocumented immigrants increase when they gain legal status.[76] Already, "undocumented noncitizens contribute billions in Federal, State, and local taxes each year."[77] In 2022, for example, undocumented immigrants paid $37.3 billion in state and local taxes and $96.7 billion total.[78]

---

Advisers, *The Economic Benefits of Extending Permanent Legal Status to Unauthorized Immigrants*, The White House (Sept. 17, 2021).

[73] Tom K. Wong et al., Ctr. for Am. Progress, *2021 Survey of DACA Recipients Underscores the Importance of a Pathway to Citizenship* (Feb. 3, 2022).

[74] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Sec. 577, 577 (2017).

[75] Mem. from Alejandro N. Mayorkas, Sec'y, DHS, to Tae D. Johnson, Acting Dir., ICE, Guidelines for the Enforcement of Civil Immigration Law 2 (Sept. 30, 2021).

[76] Francesc Ortega & Amy Hsin, *Occupational Barriers and the Productivity Penalty from Lack of Legal Status*, 76 Labour Econ. art. 102181 (June 2022).

[77] Implementation of Keeping Families Together, 89 Fed. Reg. at 67467.

[78] Carl Davis et al., Inst. on Taxation and Econ. Pol'y, *Tax Payments by Undocumented Immigrants* 3 (July 30, 2024). And these contributions benefit

(*continued on the next page*)

According to one study, if work authorization were provided to all current undocumented immigrants, their tax contributions would rise by $40.2 billion per year.[79] Another report estimates that noncitizens who are potentially eligible for KFT "would be on track to pay an additional $2.6 billion in combined taxes each year" if granted U.S. citizenship, which can follow adjustment of status.[80] In New York alone, that would translate to $252 million in additional tax revenue annually.[81] Texas would be expected to see an even greater fiscal benefit—$512 million in additional tax revenue per year.[82] The increased revenues from work authorization could help fund services benefiting all citizens living in the States.

*Second*, contrary to plaintiffs' assertions (Compl. ¶¶ 80-83 (Aug. 23, 2024), ECF No. 1), the opportunity for work authorization could also benefit State economies by lowering healthcare costs for individuals as well as public providers. As of 2023, fifty percent of likely undocumented immigrant adults in the United States reported being uninsured, compared to only six percent of naturalized citizen adults and eight percent of U.S.-born citizen adults.[83] Because undocumented immigrants are less

---

everyone. "More than a third of the tax dollars paid by undocumented immigrants go toward payroll taxes dedicated to funding programs that these workers are barred from accessing. Undocumented immigrants paid $25.7 billion in Social Security taxes, $6.4 billion in Medicare taxes, and $1.8 billion in unemployment insurance taxes in 2022." *Id.*

[79] *Id.*

[80] Moriarty, *supra*.

[81] *Id.* (Choose "New York" from "Select state for local estimates").

[82] *Id.* (Choose "Texas" from "Select state for local estimates").

[83] KFF, *Key Facts on Health Coverage of Immigrants* (Sept. 17, 2023).

likely to have health insurance, they are more likely to rely on costly emergency services, rather than preventative services, to meet their healthcare needs.[84] By contrast, individuals with work authorization are more likely to receive employer-sponsored healthcare or be able to afford insurance directly from carriers.[85] That translates to lower costs for States in providing care for uninsured residents, including emergency health services and funding for public health programs that serve underinsured patients.[86] Further, once parolees secure stable access to healthcare, improved health outcomes follow. After the implementation of DACA, for example, recipients received improved access to healthcare because of the health insurance that deferred action allowed them to obtain.[87] A "significant body of scholarship" has recognized the "immense benefits" that subsequently flowed to "individual beneficiaries, their families, and the broader U.S. economy."[88] KFT promises to deliver similar, far-reaching benefits.

---

[84] U.S. Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007).

[85] Deferred Action for Childhood Arrivals, 87 Fed. Reg. 53152, 53172 (Aug. 30, 2022).

[86] *Cf.* U.S. Cong. Budget Off., *supra*. *See* Leighton Ku, *Why Immigrants Lack Adequate Access to Health Care and Health Insurance*, Migration Pol'y Inst. (Sept. 1, 2006) (noting that legalizing status "could improve immigrant workers' employment prospects and thereby raise their opportunities to secure private, employer-sponsored insurance").

[87] Deferred Action for Childhood Arrivals, 87 Fed. Reg. at 53154.

[88] Jin. K. Park et al., *DACA, Public Health, and Immigrant Restrictions on Healthcare in the United States*, 21 Lancet Reg'l Health Am. 1 (May 2023).

That is why plaintiffs' assertions about healthcare expenditures and other costs miss the mark. For example, plaintiffs insist (Compl. ¶¶ 81-83) that undocumented immigrants increase Texas's expenditures on its Emergency Medicaid and its Children's Health Insurance Program coverage. *See* ECF No. 79 at 57. But, tellingly, plaintiffs do not connect that alleged increase in costs to any specific feature of the KFT program. Instead, plaintiffs allege that increased costs stem from "increased illegal immigration" supposedly incentivized by KFT. *See* Compl. ¶¶ 80, 86. That conclusory reasoning ignores the fact that KFT does not authorize any new immigration: It applies only to those already in the United States, many of whom have lived here for decades. As explained, moreover, KFT could potentially lower healthcare costs to States through access to work authorization. Plaintiffs' allegations about the costs of increased law enforcement (*id.* ¶ 84) are equally misplaced. *See* Pls.' Corrected Combined Mot. at 57-58 (Oct. 19, 2024), ECF No. 79. Potential parolees under KFT must pass national-security and public-safety vetting, and they cannot have any disqualifying criminal history.[89] Public safety improves, moreover, when noncitizens feel safe reporting crimes to law enforcement without fear of adverse immigration consequences.[90] In sum, plaintiffs' allegations about increasing healthcare and law-

---

[89] *See* Implementation of Keeping Families Together, 89 Fed. Reg. at 67461; *see also id.* at 67463 (noting that noncitizens applying for adjustment of status must establish "that they merit a favorable exercise of discretion including not being a threat to public safety or national security").

[90] *See* Nik Theodore, Dep't of Urb. Plan. & Pol'y, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 1 (May 2013).

enforcement costs ring hollow. They express generalized grievances about the cost of "illegal immigration" without explaining how KFT would cause such costs to rise. And they ignore how the KFT process could serve to reduce such costs over time.

The *third* economic benefit of KFT relates to the States' labor markets: providing more noncitizens with access to work authorization could help address labor shortages in industries "where there are more jobs than workers."[91] Nationally, 67 percent of potentially eligible noncitizens already work in "labor-short industries," such as construction, professional and business services, and food and accommodation services.[92] More than 325,000 undocumented spouses of U.S. citizens already work in such industries.[93] But working without formal authorization can be dangerous. Noncitizens who lack employment authorization are more likely to experience violations of labor laws and less likely to report them to authorities.[94] Historically, immigrants often fill important jobs that may otherwise be difficult to fill, especially in burgeoning sectors such as at-home healthcare.[95] For example, in New York, immigrants made up 27.4 percent of the labor force in 2022 and held 68.9 percent of home health aide jobs and 69.8 percent of housekeeping jobs.[96] In California,

---

[91] Implementation of Keeping Families Together, 89 Fed. Reg. at 67466.

[92] Moriarty, *supra*.

[93] *Id.*

[94] Implementation of Keeping Families Together, 89 Fed. Reg. at 67466.

[95] Dan Kosten, *Immigrants as Economic Contributors: They Are the New American Workforce*, Nat'l Immigr. F. (June 5, 2018).

[96] Am. Immigr. Council, *Immigrants in New York* (n.d.).

immigrants made up 32 percent of the labor force in 2022, and held 46.8 percent of healthcare aide jobs, 84.1 percent of sewing machine operator jobs, and 61.2 percent of agricultural jobs.[97] Immigrants account for similarly substantial portions of the labor forces of other States and localities.[98] Access to work authorization has the potential to encourage more individuals from this population to enter the work force, and to do so without fear of exploitation.

*Fourth*, and finally, these increased economic opportunities will likely lead to greater spending power among noncitizens eligible for the KFT process. One study estimates that "[i]ndividuals who are likely eligible for relief through parole in place already contribute an estimated $13.5 billion annually to the U.S. economy in spending power."[99] These "potentially eligible individuals would contribute an additional $6.6 billion annually in spending power to the U.S. economy if they secured citizen-ship."[100]

Plaintiffs fail to acknowledge the benefits discussed above, and instead offer arguments about the supposed costs of KFT that mischaracterize the features, limitations, and effects of the program. As noted, contrary to plaintiffs' assertions, KFT does not "incentivize increased illegal immigration" into the United States

---

[97] Am. Immigr. Council, *Immigrants in California* (n.d.).

[98] *See, e.g.*, Am. Immigr. Council, *Immigrants in Washington* (n.d.); Am. Immigr. Council, *Immigrants in District of Columbia* (n.d.).

[99] Moriarty, *supra*.

[100] *Id.*

(Compl. ¶ 86) because new immigrants are, by definition, ineligible for KFT. The program covers only a specified subset of noncitizens who have already formed close ties to this country—a minimum of ten years of continuous physical presence in the United States is required for the spouses of U.S. citizens to be eligible.[101] Many prospective KFT applicants have lived here for decades, and all of them are family members of U.S. citizens. For these applicants, "the KFT process does not create a new benefit or render parolees eligible for a benefit they would not otherwise have been eligible to receive." Defs.' Mot. to Vacate Admin. Stay & Opp. to Stay at 16 (Sept. 3, 2024), ECF No. 47. It does not "set[ ] new criteria for granting parole" to individuals eligible for this process (Mot. for TRO, Prelim. Inj., & Stay at 25), or "hand[ ] out work permits," as plaintiffs wrongly contend (*id.* at 1). These are among the many reasons why defendants' motion for summary judgment should be granted, and plaintiffs' cross-motion denied.

## II.    IF THE COURT GRANTS INJUNCTIVE RELIEF, IT SHOULD BE LIMITED TO THE PLAINTIFF STATES.

If this Court finds that plaintiffs are entitled to injunctive relief (and it should not), any injunction should, at a minimum, be tailored to the specific plaintiffs in this case. A federal court's equitable powers are founded on the bedrock principle that "injunctive relief should be no more burdensome to the defendant than necessary to

---

[101] Implementation of Keeping Families Together, 89 Fed. Reg. at 67469.

provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). And, "[a]s is true for all injunctive relief, the scope of the injunction must be justified based on the 'circumstances'" of the case. *Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (declining to enjoin federal COVID-19 vaccination mandates outside of fourteen plaintiff States).

Aside from a few conclusory statements in the Complaint (Compl. ¶¶ 216, 218) and the motion for summary judgment (Pls.' Corrected Combined Mot. at 74) plaintiffs fail to articulate why they require a nationwide injunction to obtain complete relief. The supposed injuries on which plaintiffs base their standing to sue, and ask this Court to remedy, are wholly local. Plaintiffs point to expenditures allegedly incurred by plaintiff States due to noncitizens living in those States (Compl. ¶¶ 181-186); plaintiffs nowhere allege that someone using the KFT process in, say, New York causes an injury to Texas. It follows that any redress for plaintiffs' purported injuries should be similarly circumscribed. *See Gill v. Whitford*, 585 U.S. 48, 73 (2018) (instructing that "[a] plaintiff's remedy must be tailored to redress the plaintiff's particular injury").

Moreover, a nationwide injunction would significantly undermine the interests of amici States by depriving amici and their residents of significant public benefits, such as the social, psychological, and economic support fostered by family unity. As explained (see *supra* at 16-17), the prospect of prolonged or permanent family separa-tion in the absence of KFT disrupts lives, creates instability, and sows economic and

emotional upheaval. So too does the alternative of U.S. citizens living in perpetual stress about the status and vulnerability of their spouses and parents. Thus, while a KFT applicant in New York presents no injury to Texas (or to any other plaintiff), the injunction that plaintiffs seek here would injure New Yorkers (and residents of every other amici State).

## CONCLUSION

Defendants' motion for summary judgment should be granted. Alternatively, if the Court grants injunctive relief to plaintiffs, such relief should be limited in scope to the plaintiff States.

Dated:   New York, New York
           October 25, 2024

Respectfully submitted,

LETITIA JAMES
  *Attorney General*
  *State of New York*

By:   */s/ Kartik Naram*
       KARTIK NARAM
       Assistant Solicitor General
       *Admitted pro hac vice*
       N.Y. State Bar No. 5515853
       28 Liberty Street
       New York, NY 10005
       Telephone: (212) 416-6347
       Facsimile:  (212) 416-8962

BARBARA D. UNDERWOOD
  *Solicitor General*
ESTER MURDUKHAYEVA
  *Deputy Solicitor General*
KARTIK NARAM
  *Assistant Solicitor General*
      *of Counsel*

*(Counsel listing continues on next page.)*

PHILIP J. WEISER
 *Attorney General*
 *State of Colorado*
1300 Broadway
Denver, CO 80203

WILLIAM TONG
 *Attorney General*
 *State of Connecticut*
165 Capitol Ave.
Hartford, CT 06106

KATHLEEN JENNINGS
 *Attorney General*
 *State of Delaware*
820 N. French St.
Wilmington, DE 19801

ANNE E. LOPEZ
 *Attorney General*
 *State of Hawai'i*
425 Queen St.
Honolulu, HI 96813

KWAME RAOUL
 *Attorney General*
 *State of Illinois*
115 South LaSalle St.
Chicago, IL 60601

AARON M. FREY
 *Attorney General*
 *State of Maine*
6 State House Station
Augusta, ME 04333

ANTHONY G. BROWN
 *Attorney General*
 *State of Maryland*
200 Saint Paul Pl., 20th Fl.
Baltimore, MD 21202

ANDREA JOY CAMPBELL
 *Attorney General*
 *Commonwealth of*
 *Massachusetts*
One Ashburton Pl.
Boston, MA 02108

DANA NESSEL
 *Attorney General*
 *State of Michigan*
P.O. Box 30212
Lansing, MI 48909

KEITH ELLISON
 *Attorney General*
 *State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther
 King Jr. Blvd.
St. Paul, MN 55155

AARON D. FORD
 *Attorney General*
 *State of Nevada*
100 North Carson St.
Carson City, NV 89701

MATTHEW J. PLATKIN
 *Attorney General*
 *State of New Jersey*
25 Market St.
Trenton, NJ 08625

ELLEN F. ROSENBLUM
 *Attorney General*
 *State of Oregon*
1162 Court St. N.E.
Salem, OR 97301

MICHELLE A. HENRY
 *Attorney General*
 *Commonwealth of*
  *Pennsylvania*
Strawberry Sq., 16th Fl.
Harrisburg, PA 17120

PETER F. NERONHA
 *Attorney General*
 *State of Rhode Island*
150 South Main Street
Providence, RI 02903

CHARITY R. CLARK
 *Attorney General*
 *State of Vermont*
109 State St.
Montpelier, VT 05609

ROBERT W. FERGUSON
 *Attorney General*
 *State of Washington*
P.O. Box 40100
Olympia, WA 98504

JOSHUA L. KAUL
 *Attorney General*
 *State of Wisconsin*
17 W. Main St.
Madison, WI 53703

BRIAN L. SCHWALB
 *Attorney General*
 *District of Columbia*
400 6th St., N.W., Ste. 8100
Washington, D.C. 20001

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically with the Court's CM/ECF system on October 25, 2024. Service will be effectuated by the Court's electronic notification system upon all parties and counsel of record.

Dated:      New York, New York
            October 25, 2024

                                    */s/ Kartik Naram*