# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| STATE OF TEXAS, *et al.*, | ) | |
| | ) | |
| *Plaintiffs,* | ) | |
| | ) | |
| v. | ) | Civil Action No. 6:24-cv-00306 |
| | ) | |
| UNITED STATES DEPARTMENT OF HOMELAND SECURITY, *et al.*, | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

1

## INTRODUCTION

Plaintiffs' motion for summary judgment offers arguments based primarily on rhetoric without any valid supporting authority. *See* ECF No. 79. Plaintiffs' contentions boil down to their repeated assertion that the Federal Register Notice at issue in this case, *Implementation of Keeping Families Together*, 89 Fed. Reg. 67459 (Aug. 20, 2024) (Notice or KFT), represents Defendants' "rewriting" of the Immigration and Nationality Act. Plaintiffs rely in large part, misleadingly, on legislative history accompanying an unenacted version of the parole statute, 8 U.S.C. § 1182(d)(5)(A), that was *rejected* when Congress adopted the current version, and Plaintiffs' own, unprecedented interpretations of the meaning of the terms of that statute. In doing so, they misinterpret or wholly ignore Congressional, judicial, and administrative authority affirming the use of section 1182(d)(5)(A) to consider individual requests for parole in similar contexts, including parole in place for many of the same reasons that motivate the Notice. The Court should grant summary judgment in Defendants' favor and dismiss Plaintiffs' claims, for the reasons Defendants explained in their motion. ECF No. 77. Plaintiffs' arguments for summary judgment in their favor, ECF No. 79, fail to demonstrate they have Article III standing, can obtain APA review, can succeed on the merits of their claims, or are entitled to the universal relief they request.

## RESPONSE TO PLAINTIFFS' STATEMENT OF FACTS

As Defendants explained in their Motion for Summary Judgment, this case is exempt from the normal summary judgment standard and factual-statement requirements of Fed. R. Civ. P. 56 and Local Rule CV-56, because Plaintiffs challenge agency action based on an administrative record under the APA. ECF No. 77 at 8. "When assessing a summary judgment motion in an APA case, the district judge sits as an appellate tribunal" and the "entire case on review is a question of law, and only a question of law." *Permian Basin Petroleum Ass'n v. Dep't of the Interior*, 127 F.

Supp. 3d 700, 706 (W.D. Tex. 2015) (internal citations and quotation marks omitted). The material factual issues are already "resolve[d]" by the agency "'to arrive at a decision that is supported by the administrative record,' and the district court applies the APA standards of review to determine whether, as a matter of law, 'the evidence in the administrative record permitted the agency to make the decision it did.'" *Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2024 WL 3517504, at *14 (N.D. Tex. July 23, 2024) (quoting *Yogi Metals Grp. Inc. v. Garland*, 567 F. Supp. 3d 793, 797–98 (S.D. Tex. 2021), *aff'd*, 38 F.4th 455 (5th Cir. 2022)).

However, Plaintiffs included a "Statement of Undisputed Material Facts" in their motion, consisting of 12 numbered paragraphs. ECF No. 79 at 6-10. To be clear, Defendants dispute these statements. The majority of these "facts" consists of Plaintiffs' characterization of provisions of the INA, the legislative history, and the terms of the Federal Register Notice at issue in this case. *See id.* at 6-10, ¶¶ 1, 2, 3, 4, 10, 11, 12. These are not "facts" at all. Instead, they are arguments and conclusions of law improperly labeled as "facts," and have no value for demonstrating why summary judgment is appropriate here. Importantly, this Court "may not consider bare conclusions of law in deciding summary judgment motions." *Equal Emp. Opportunity Comm'n v. Mod. Grp., Ltd.*, No. 1:21-CV-451, 2024 WL 1288634, at *11 (E.D. Tex. Mar. 25, 2024); *see Clark v. Am.'s Favorite Chicken Co.*, 110 F.3d 295, 297 (5th Cir. 1997) (explaining "conclusions of law are insufficient to defeat a motion for summary judgment"). Likewise, argument in a statement of facts does not create a dispute of fact. *Tesoro Ref. & Mktg. Co. LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. SA 13-CV-931-DAE, 2015 WL 1206936, at *2 (W.D. Tex. Mar. 16, 2015)

To the extent Plaintiffs' Statement includes any factual statements at all, they address the merits of Plaintiffs' claims that the Notice is unlawful. ECF No. 79 at 7-9, ¶¶ 5, 6, 7, 8, 9, 10. In doing so, Plaintiffs rely on evidence outside the record–-specifically, the declaration of James K.

Rogers. *Id.* Plaintiffs' reliance on extra-record evidence to argue the merits violates the APA record rule: "Courts must generally limit their review to the administrative record before the agency at the time the decision was made." *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552547, at *1 (N.D. Tex. July 19, 2021) ("This principle is often referred to as the record rule.") (citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971)). While the record rule undisputedly applies to merits issues, it generally "does not apply to non-merit issues such as standing." *Id.* at *2. But even construed liberally, none of Plaintiffs' factual assertions address standing: they all address the process of promulgating, content, and operational effect of the Notice. ECF No. 79 at 7-9, ¶¶ 5, 6, 7, 8, 9, 10.[1] None of their assertions speak to the alleged financial harms Plaintiff States allege they will suffer. *Id.* Accordingly, these "facts" are inadmissible for the purposes of summary judgment as extra-record evidence. Defendants dispute both the content and propriety of all of Plaintiffs' "factual" statements.

## ARGUMENT

## I.   PLAINTIFFS LACK ARTICLE III STANDING.

Plaintiffs' motion for summary judgment fails to demonstrate that Texas has standing to pursue the Plaintiff States' challenge to the KFT process. *See Env't Tex. Citizen Lobby, Inc. v. ExxonMobil Corp.*, 968 F.3d 357, 367 (5th Cir. 2020) (requiring a showing by a preponderance of the evidence), *vacated for reh'g en banc*, 61 F.4th 1012 (5th Cir. 2023). Relying on the supposition that the KFT process will result in some noncitizens remaining in Texas who would otherwise

---

[1] To the extent Plaintiffs argue Statement No. 6 speaks to standing, that Statement is inaccurate. DHS estimates that only approximately 550,000 noncitizens would be eligible to apply for parole through the KFT process. 89 Fed. Reg. at 67466. Moreover, Plaintiffs' proffered data was gathered between 2015 through 2019 and, therefore, does not reflect an accurate representation of qualifying individuals today. Further, the cited figures pertained to estimates of noncitizens married to U.S. citizens, not noncitizens who also have the requisite ten years of physical presence to be considered eligible to request parole under the KFT process.

have departed the United States at some point in the future, Texas claims that it will eventually spend money on those noncitizens through education, health care, and law enforcement costs that it otherwise would not have spent. Contrary to Plaintiffs' assertions, these asserted harms are indistinguishable from the indirect harms asserted by States in the Supreme Court's *Priorities* decision. And the reasoning of *Priorities* applies equally here as to lawsuits directly challenging non-prosecution policies. But even if Texas's alleged harms were cognizable, their claimed harms are not supported by competent evidence and are far too attenuated and speculative to satisfy Article III's requirement of an imminent injury fairly traceable to the KFT process and redressable by a favorable decision. *See Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).

### A.  Plaintiffs Have Not Asserted a Cognizable Injury.

As explained, the Supreme Court's decision in *United States v. Texas*, 599 U.S. 670 (2023) (*Priorities*), precludes Texas from demonstrating a legally cognizable injury based on the types of harms—downstream impacts on public expenditures—it asserts. *See* ECF No. 77 at 16–20. In *Priorities*, Texas made the same claims of injury as does Texas here—that the challenged policy results in a net increase in the number of unlawful immigrants residing in the United States and thus increases Texas's education and healthcare costs. *See* Br. for Respondents at 13, *Priorities*, 599 U.S. 670 (No. 22-58); ECF No. 79 at 65–67. The Supreme Court held that this argument failed to "overcome[] the fundamental Article III problem" with the suit. *Priorities*, 599 U.S. at 680 n.3.

In attempting to escape the application of the principles articulated in *Priorities* to this case, Texas does not contend that its asserted injuries here are in any way different from the injuries it unsuccessfully asserted in *Priorities*. Instead, Texas claims that those same injuries are now sufficient to confer standing because its legal theory on the merits is different: in Texas's view, *Priorities* is limited to challenges to arrest and prosecution policies and does not apply here, ECF

No. 79 at 58-60. That argument is wrong on all levels. First, Texas misreads *Priorities*. Although that case arose in the context of Texas's challenge to the Executive's arrest and removal policies and some of the Court's analysis described the particular problems with such a suit, the Court's reasoning reflects a broader principle that parties generally lack any judicially cognizable interest in avoiding attenuated effects that flow from discretionary government decisions about whether or how to enforce immigration laws against others. That rule applies across the range of discretionary immigration enforcement decisions that the Executive makes—including the exercise of the Secretary's discretionary authority to grant parole. Thus, as the government explained, *see* ECF No. 77 at 19–20, the Court's reasoning in *Priorities* applies with equal force here, and Plaintiffs offer no persuasive reason that their claims do not implicate the same concerns animating the Court's reasoning in that case. Regardless, at bottom, Plaintiffs do challenge the Executive's arrest and removal policies. Texas's alleged injuries do not stem from the grant of parole directly but are instead related generally to the presence of noncitizens in Texas. However Plaintiffs may frame their legal challenge, their claimed injury arises from discretionary non-enforcement decisions that are not meaningfully different from the decisions at issue in *Priorities*.

Plaintiffs incorrectly contend that their claimed prospective harms are distinguishable from those addressed in *Priorities* because they supposedly stem from a grant of "affirmative relief to aliens via parole" that they say imposes "*direct* costs on the Plaintiff states." ECF No. 79 at 59, 62, 63. Parole does not impose any direct costs on the States and Plaintiffs' argument does not in any event distinguish the Supreme Court's standing analysis in *Priorities*. *See* ECF No. 77 at 18–20. Parole does not automatically confer any benefits on recipients or protect them from removal, the KFT process does not authorize any parole that could not be sought under the statute itself even without the KFT process, and parties ordinarily lack a cognizable interest in the grant of benefits

to others. *See id.* Even assuming the grant of parole leads to potential eligibility for certain benefits and employment authorization as Plaintiffs argue, *see* ECF No. 79 at 61, 63, Texas's asserted harms do not arise from those benefits but merely from the continued presence of noncitizens in Texas. Although Plaintiffs assert that "paroling aliens makes them [eventually] eligible for benefits" such as Medicaid, SNAP, and TANF, *see* ECF No. 79 at 61, 63, Plaintiffs do not in their MSJ claim such benefits result in additional costs to the State or submit any evidence of such costs. *See* ECF No. 79 at 57–58.[2] Plaintiffs also point to the fact that those granted parole are eligible to seek employment authorization, ECF No. 79 at 62, but Plaintiffs do not even argue, let alone submit any evidence, that a grant of employment authorization to a noncitizen imposes any direct costs on them. *See also* ECF No. 77 at 16 n.4. Instead, Plaintiffs rely solely on evidence of costs that are incurred for all individuals present in Texas, including all "undocumented immigrants." *See id.*; ECF No. 79-3 (public K-12 education);[3] ECF No. 79-4 (health care benefits that are

---

[2] Even if Texas did claim any costs related to non-emergency Medicaid, SNAP, or TANF as an injury, those costs are still at most downstream injuries from a discretionary decision to grant parole. Paroled noncitizens are often not immediately eligible for such benefits; instead, they must typically wait several years before applying for them. *See* 89 Fed. Reg. at 67478 (explaining that SNAP, Medicaid, and TANF programs generally require five years in "qualified alien" status). Texas has not disputed that it denies access to TANF to some "qualified aliens" even after expiration of the five-year period. *See* 89 Fed. Reg. at 67478. Further, paroled noncitizens may not ultimately seek or qualify for these means-tested benefits, particularly if they obtain legitimate employment and health insurance benefits.

[3] Plaintiffs' proffered declaration of Amy Copeland in support of their summary judgment motion contradicts her sworn testimony submitted in support of Plaintiffs' preliminary injunction. *Compare* ECF No. 79, Ex. 3 at ¶¶ 2, 5, 6 *with* ECF No. 3, Ex. B at ¶¶ 2, 4, 5. Ms. Copeland is the Commissioner of School Finance at the Texas Education Agency. ECF No. 79, Ex. 3 at ¶ 1. First, Ms. Copeland provides updated costs for the "average funding entitlement from state and local sources for fiscal year 2024," at $10,107 per student, and $12,316 per student qualifying for Bilingual and Compensatory Education. *See* ECF No. 79, Ex. 3 at ¶ 2. Although allegedly derived from the same source, these figures are a departure (and demonstrate a decrease) from those

available to undocumented immigrants); ECF No. 79-5 (incarceration costs). Yet the noncitizens

eligible for parole under the KFT process are already residing in the United States. Accordingly,

there could be no net increase in general education, health care, or law enforcement costs resulting

from their parole. In sum, even if benefits may arise from a grant of parole, those benefits are not

the source of Texas's claimed injury in this case and thus cannot carry any weight in the standing

analysis. And, contrary to Plaintiffs' argument, *see* ECF No. 79 at 63, an affirmative benefit does

not transform otherwise indirect, downstream costs from a discretionary immigration decision into

direct injury. The prior authority on which Texas relies does not survive or supersede the Supreme

Court's more recent and on-point holding in *Priorities* that the very type of injury Texas raises

here is an indirect one.[4] In any event, the KFT process does not itself guarantee or provide parole

---

provided in support of Plaintiffs' preliminary injunction: $10,836 and $13,044, respectively. *See*
ECF No. 3, Ex. B at ¶ 2. Notably, the first calculations provided by Plaintiffs were supported by
what Texas produced in discovery, bearing Bates Number 00765. Defendants find no like support
in the record for Plaintiffs' updated calculations. Similarly, and also without explanation, Ms.
Copeland adjusts her cost per capita to educate a subset of non-citizen children from $13,044 to
$12,316, thus decreasing their alleged total costs from $213.85 million to $201.90 million.
*Compare* ECF No. 79, Ex. 3 at ¶ 5 *with* ECF No. 3, Ex. B at ¶ 4. It is unclear which of these figures
are correct, and why. Secondly, Ms. Copeland originally represented that Texas planned for a net
increase of 15,000–25,000 in average daily student attendance. ECF No. 3, Ex. B at ¶ 5. Now,
Plaintiffs change their tune, and forecast a "net decrease of approximately 15,000 students in
average daily attendance." ECF No. 79, Ex. 3 at ¶¶ 6. Importantly, Ms. Copeland's declaration is
irrelevant because the data she relies on (unaccompanied minors) is a self-disqualifying
demographic; minors qualify for this program only if they are the stepchild of a citizen and a non-
citizen. But more to the point, the Court should disregard Plaintiffs' Exhibit B when deciding
summary judgment because it creates a dispute of material fact between the witness's prior
testimony. *Powell v. Dallas Morning News L.P.*, 776 F. Supp. 2d 240, 246 (N.D. Tex. 2011) ("A
court cannot consider an affidavit or declaration that contradicts prior testimony or admissions for
the purposes of creating a fact issue because it is not competent summary judgment evidence.").

[4] Plaintiffs also suggest (at ECF No. 79 at 60), that their case is more like *Dep't of Commerce v.
New York*, 588 U.S. 752, 756-57 (2019). In *Dep't of Commerce*, the Supreme Court held that
plaintiff States had shown that changes to the census would cause an undercount in their population
such that they would "lose out on federal funds that are distributed on the basis of state population."
*Id*. at 767. Here, the injury is clearly indirect because it involves a more attenuated theory of harm
and is precisely the same theory of indirect harm that was insufficient in *Priorities*.

to anyone, let alone any benefits that may be sought after obtaining parole.

Finally, Plaintiffs cannot distinguish *Priorities* by asserting that the KFT process is a "an abdication of [DHS's] statutory responsibilities." ECF No. 79 at 64–65. This argument implicitly concedes that Plaintiffs are at base challenging immigration enforcement decisions. Plaintiffs have not even attempted to show, however, that the "Executive has entirely ceased enforcing the relevant statutes" or "wholly abandoned its statutory responsibilities to make arrests or bring prosecutions." *Priorities*, 599 U.S. at 682–83.  To the contrary, the KFT process relies on DHS's existing ability to grant parole in place on a case-by-case basis and thus does not depart from its statutory duties and authority. Further, the process allows the government to more efficiently use its immigration resources—not to avoid using those resources at all. *See* 89 Fed. Reg. at 67468–69.  And regardless, the Supreme Court did not hold that abdication of statutory responsibilities alone can establish standing, as Plaintiffs appear to suggest. *See* ECF No. 79 at 65. Litigants must still meet the requirements of injury, causation, and redressability. *Lujan,* 504 U.S. at 560–61.

Even assuming *Priorities* "does not preclude standing based on indirect costs to States in all cases," ECF No. 79 at 60, *Priorities* does preclude standing based on Texas's asserted indirect costs here. Plaintiffs offer no reason the standing analysis should differ from that in *Priorities*.

**B.  Plaintiffs' Claimed Injury is Too Speculative and Attenuated.**

Even assuming Texas could assert an injury based on a federal policy's indirect effects on state spending, those claimed prospective injuries are too speculative and remote to support standing. ECF No. 77 at § I.B. Plaintiffs have not met their burden to show by a preponderance of the evidence that Texas is likely to imminently suffer an increase in expenditures on social services that is fairly traceable to the KFT process or redressable by its vacatur (to the extent such relief is even available). In any event, even assuming Plaintiffs could show a substantial likelihood of

increased costs from social services, those increases are far too distant and remote to establish injury in fact. *See FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 383 (2024) ("[D]istant (even if predictable) ripple effects . . . cannot establish Article III standing.").

1. Plaintiffs have not proven that the KFT process will lead to any "certainly impending" increase in noncitizens in Texas. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). They point to no evidence that the process will encourage new migration to the United States. They instead contend that some noncitizens already present and residing in Texas would return to their home countries if the KFT process did not exist. ECF No. 79 at 65–67. But Plaintiffs' predictions on this score continue to ignore key facts and are unsupported by relevant, competent evidence. As a threshold matter, these individuals by definition had already been living in the country for at least ten years prior to the announcement of the KFT process and did not decide to voluntarily depart during that period. Plaintiffs' own witness acknowledges that the noncitizens who are eligible to seek parole under the KFT process are much *less* likely to voluntarily depart the United States due to the length of their residence and close social connections to the United States. ECF No. 77 at 22–23; 89 Fed. Reg. at 67466; ECF No. 3-1 at ¶¶ 11–12; ECF No. 79-6 at ¶ 13. Many of the covered noncitizens would likely choose to remain in the United States to pursue other forms of immigration relief or without attempting to regularize their status. *Id.* Further, Plaintiffs' own proffered evidence highlights that the likelihood of any noncitizens leaving the United States is "difficult to assess" and depends on a variety of factors that are unrelated to their ability to obtain employment authorization. ECF No. 77 at 23; ECF No. 3-1 at ¶¶ 5, 9, 11–12; ECF No. 79-6 at ¶¶ 10–11, 13, 15. Plaintiffs also make no showing that noncitizens would otherwise ultimately be removed from the United States absent the KFT process. *See* ECF No. 79 at 66. As explained, neither a request for, nor a grant of, parole under the KFT process prevent DHS from pursuing

removal of the noncitizen, if removal becomes appropriate. *See* ECF No. 77 at 21; 89 Fed. Reg. at 67465; *see also* Ex. A (Texas's Corrected Discovery Reponses), at 4 (admitting that Texas "is unable to predict" whether individuals would be removed absent the KFT process). Finally, noncitizens eligible to use the KFT process would still be able to request parole in place through preexisting processes even if the KFT process were vacated. ECF No. 77 at 22; *infra* at 25.

Plaintiffs speculate that some noncitizens eligible for parole under the KFT process might instead leave to pursue consular processing before seeking to return on an immigrant visa, citing the Notice's statement that "the vast majority of this [KFT-eligible] population would remain in the country." ECF No. 79 at 66 (quoting 89 Fed. Reg. at 67486). But there is no evidence that occurred prior to the KFT process and, as Plaintiffs tacitly acknowledge, such noncitizens who are eligible to pursue consular processing abroad to obtain lawful permanent residence have substantial reason not to do so, even temporarily, to avoid separation from their families. *See* ECF No. 79 at 67 (citing ECF Nos. 15-3, 15-8, 15-9); *see also* ECF No. 91 at 22–23. And Plaintiffs still do not explain how a temporary absence of potential KFT beneficiaries eligible to pursue consular processing has any meaningful impact on their expenditures on social services.

The remaining points on which Plaintiffs rely likewise do not suffice to establish a likely, imminent net increase in noncitizens in Texas traceable to the KFT process. Plaintiffs point to declarant Lloyd Potter's citation to a "national survey" from 2017 that purportedly found that 22.3% of DACA recipients stated that they were likely or very likely to leave the U.S. if they lacked deferred action. ECF No. 79 at 65 (citing ECF No. 79-6 at ¶ 12). But a seven-year-old survey of self-selected recipients of DACA—a different policy with different contours and a different eligible population—speaking about their hypothetical response to a *different type of agency action*, cannot support Plaintiffs' prediction that some stepchildren or long-resident

spouses of U.S. citizens are likely to leave if the KFT process did not exist. Moreover, the survey available at the link provided by Dr. Potter does not contain the information recounted in the declaration.[5] Finally, both the survey—which was not conducted by Dr. Potter—and the underlying statements from survey recipients are hearsay and are not admissible evidence in this case. *Alzuraqi v. Grp. 1 Auto., Inc.*, 921 F. Supp. 2d 648, 671 (N.D. Tex. 2013).  Plaintiffs next point to Dr. Potter's citation to a hearsay article in support of the claim that noncitizens who have been in the U.S. for ten years or longer "return to their countries of origin at a rate of 1% each year." ECF No. 79 at 65 (citing ECF No. 79-6 at ¶ 14). But the underlying article concedes that this is an estimate and that voluntary emigration rates are the "most uncertain based on limited data availability." *See* Fazel-Zarandi, et al., *The Number of Undocumented Immigrants in the United States: Estimates Based on Demographic Modeling with Data from 1990 to 2016* (2018), *available at* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0201193. Even so, this low estimate actually reinforces how *unlikely* it is that KFT-eligible individuals would leave Texas if the KFT process did not exist.

Plaintiffs also point to Dr. Potter's discussion of a hearsay study conducted in the Netherlands concerning the impact of divorce on return migration. ECF No. 79 at 66. Yet the cited portions of the article have little relevance here, as they focus on migration in the Netherlands rather than the United States, and only on marriages in which the spouse moved to a new country to live with their spouse or intended spouse—not marriages in which the spouses met within that new country—and do not address the effect, if any, of immigration status on these rates. Finally, Dr. Potter's citation to a newspaper article pointing out that some DACA recipients were ultimately

---

[5] *See* ECF No. 79-6 at ¶ 32 (citing survey and location); https://www.americanprogress.org/wp-content/uploads/sites/2/2017/11/2017_DACA_study_economic_report_updated.pdf (last visited October 22, 2024).

removed does nothing to support Plaintiffs' predictions. That merely demonstrates that DACA recipients who committed crimes or were no longer eligible for deferred action were removed— just as those who receive parole would likely be removed if later deemed an enforcement priority.

Moreover, all of these points are hearsay from the declaration of their purported expert witness. Further, Plaintiffs improperly designated Dr. Potter as an "expert" for the very first time at summary judgment, contrary to the requirements of Federal Rule of Civil Procedure 26. ECF No. 79, Ex. F ("*Expert* Declaration of Lloyd B. Potter, PH.D.") (emphasis added). Dr. Potter's statements should therefore be disregarded.[6]

---

[6] Plaintiffs first proffered Dr. Potter as a witness in support of their motion for a preliminary injunction, but did not designate him as an expert or include information required for expert disclosures. ECF No. 3, Ex. A ("Declaration of Lloyd B. Potter, PH.D."). On August 26, 2024, this Court issued a scheduling order, excusing the parties from "initial disclosures." ECF No. 27 at 7 (citing FED. R. CIV. P. 26(a)(1)(B)(i))). The Court, however, ordered that the parties should commence discovery pursuant to Rule 26(d)(1), acknowledging that Defendants "seek discovery into factual matters that may bear on plaintiffs' standing." *Id.* To deem a witness an expert, a party is *required* to disclose the individual as such. FED. R. CIV. P. 26(a)(2)(B) ("In addition to the disclosures required by Rule 26(a)(1), a party *must* disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705.") (emphasis added). "That duty to disclose a witness *as an expert* is *not* excused when a witness who will testify as a fact witness *and* as an expert witness is disclosed as a fact witness." *Karum Holdings LLC v. Lowe's Cos.*, 895 F.3d 944, 951 (7th Cir. 2018) (emphasis in original) (citation omitted). Rule 26(e)(2) also requires that a party supplement their expert disclosures, if necessary. FED. R. CIV. P. 26(e)(2). In addition to first identifying the expert, the Federal Rules require that an expert to disclose a written report, listing specific criteria. FED. R. CIV. P. 26(a)(2)(B)(i)–(vi). Expert disclosures ensure that each side has an opportunity to defend itself against choice litigation strategies, especially when nuanced, and complex subject matters are involved. *See* FED. R. CIV. P. 37(c)(1) advisory committee's note to 1993 amendment. ("Revised Rule 37(c)(1) provides an incentive for full disclosure; namely, that a party will not ordinarily be permitted to use on direct examination any expert testimony not so disclosed."). Here, Plaintiffs did not submit *any* of these disclosures required by FED. R. CIV. P. 26(a)(2)(B) before filing their summary-judgment motion, much less identify this witness as an "expert." This Court did not exempt the parties from *expert* disclosures. ECF No. 27 at 7. And Plaintiffs' error was neither "substantially justified" nor "harmless." *See* FED. R. CIV. P. 37(c)(1). Defendants are prejudiced by Plaintiffs' improper and

In sum, Plaintiffs have failed to support their predictions about the effect of government action on noncitizens future departure from the United States with relevant, competent evidence. *Cf. Dep't of Commerce*, 588 U.S. at 767-68 (noting the plaintiffs had supported their predictions through "evidence at trial establish[ing]" certain historical past behavior). But regardless, Plaintiffs' theories of injury rely on predicted effects that are so far in the future—and so likely to be influenced by a number of independent factors that have nothing to do with the KFT process— that they are simply too distant and remote to support standing.

2. Even assuming "some" KFT-eligible noncitizens stay in the United States who would otherwise have left, Plaintiffs have not attempted to show or project how this would increase Texas's expenditures as compared to Texas's position absent the KFT process. *See Texas v. United States Dep't of Homeland Sec.*, No. 6:23-CV-00007, 2024 WL 1021068, at *15–17 (S.D. Tex. Mar. 8, 2024) (*CHNV*) (analyzing pre-*Priorities* Fifth Circuit cases, including *Gen. Land Off. v. Biden*, 71 F.4th 264 (5th Cir. 2023), and *Texas v. Biden*, 20 F.4th 928, 966 (5th Cir. 2021) (*MPP*), *rev'd and remanded*, 597 U.S. 785 (2022), to support the holding that harm "has long been understood in the immigration context" as meaning harm "relative to the status quo, and relative to Plaintiff's position absent the challenged policy"). Plaintiffs do not track, and cannot show, that any of the noncitizens currently eligible for KFT are imposing such costs or would impose costs in the future. *See* Ex. A at 3 (admitting that Texas does not track information related to costs incurred for KFT-eligible noncitizens). Accordingly, Plaintiffs cannot possibly show, as they must, that these particular noncitizens are likely to cost the State more money in the future were it not

---

belated expert proffer because they have been deprived of the ability to engage in expert discovery. *See RooR Int'l BV v. Stinky's Smoke Shop, LLC*, No. 4:18-CV-00735-KPJ, 2020 WL 7646742, at *2 (E.D. Tex. Dec. 23, 2020) ("The Court finds there would be significant prejudice to Defendants if the Court permitted Plaintiffs to disclose their expert on the eve of trial.") (citing *Shelak v. White Motor Co.*, 581 F.2d 1155, 1159 (5th Cir. 1978)).

for the KFT process. *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir. 2015) (finding no injury where state submitted evidence that "illegal immigration" increased costs but did not connect any increases to the challenged policy).

Nor does Plaintiffs' evidence demonstrate how they would be injured, even assuming they could trace their costs to KFT-eligible noncitizens. Each declaration submitted instead claims that an *increase* in noncitizens present in the State will result in an increase in costs. But Texas has not sought to introduce any statistics or projections attempting to show how the continued presence of noncitizens already in the state will result in an increase in costs. Nor have they explained how many noncitizens must leave, and for how long, to have any meaningful impact on future education, law enforcement, or health care costs. Most importantly, Texas's simplistic equation that more noncitizens always means more costs completely fails to account for the non-speculative probability that providing lawful presence and employment authorization to noncitizens will actually result in fewer of those noncitizens relying on social services in the future. *See* 89 Fed. Reg. at 67478, 67467 n. 108; AR 285–92, 2172–79.

Finally, contrary to Plaintiffs' assertion, ECF No. 79 at 68–70, Texas is not entitled to "special solicitude." *See* ECF No. 77 at 27. The Fifth Circuit's prior holdings that plaintiff States may warrant "special solicitude" in the standing analysis under *Massachusetts v. EPA*, 549 U.S. 497 (2007), are inconsistent with the Supreme Court's later decision in *Priorities.* In *Priorities*, the plaintiff States specifically argued, like here, that they were entitled to special solicitude because they had a procedural right to sue "under the APA" and were challenging an agency's alleged failure to protect "sovereign prerogatives that are now lodged in the Federal Government." Br. For Respondents at 16–17, *Priorities*, 599 U.S. 670 (No. 22-58); ECF No. 79 at 69–70. The *Priorities* majority explicitly rejected the states' argument that they were entitled to such

solitude, explaining that their reliance on *Massachusetts* was misplaced because that case "involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion." *Priorities*, 599 U.S. at 685 n.6; *see also id.* at 689 (Gorsuch, J., concurring) (noting lower courts should leave the concept of "special solicitude" "on the shelf").

The Supreme Court's refusal to extend Massachusetts to permit States to challenge asserted underenforcement of immigration laws makes sense. In affording a State "special solicitude" in *Massachusetts*, the Supreme Court explicitly relied on two features absent here. 549 U.S. at 520. First, *Massachusetts* involved the threatened loss of the State's sovereign territory—a harm long been treated as distinctive and legally cognizable. *See id.* at 518-519. This case, in contrast, involves "indirect effects on state revenues or state spending"—a commonplace consequence of federal policies. *Priorities*, 599 U.S. at 680 n.3. Second, *Massachusetts* attached "critical importance" to the State's "procedural right" under the Clean Air Act to challenge the denial of a petition for rulemaking on emissions standards. 549 U.S. at 516, 518, 520. "[A] person … accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy." *Lujan*, 504 U.S. at 572 n.7. The INA, however, creates no procedural right for third parties to challenge a deferred-action policy, nor did the Supreme Court accept the States' invitation in *Immigration Priorities* to locate such a specific right in the APA.

Moreover, the "quasi-sovereign interest" that Texas claims in its brief—an "interest in classifying aliens," ECF No. 79 at 70—is not implicated here. As discussed, Texas's claimed costs do not hinge on grants of parole or the classification of any particular noncitizen as a parole recipient, but from the general presence of noncitizens in their states. And to the extent Texas is

arguing that it has an interest in arresting or removing such noncitizens, parole does not prevent removal if removal becomes appropriate under existing enforcement guidelines. Further, this claimed interest would implicate the same type of enforcement discretion that the Supreme Court confirmed was unreviewable in *Priorities*. As Plaintiffs thus cannot establish injury in fact, there is no subject-matter jurisdiction over their claims, and any relief would be improper.

### C.  Plaintiffs' Injuries Are Not Redressable.

Plaintiffs' claims are not redressable. According to Plaintiffs, the KFT process "incentivizes" unlawful immigration, thus amalgamating costs to the States. ECF No. 1 at ¶¶ 8, 73–75. Plaintiffs speculate that without this process, qualifying individuals would either be incentivized to voluntarily leave the country, or the Government would initiate removal proceedings against them, thus prompting their departure. *Id.* at ¶¶ 189, 191; ECF No. 77 at 68. Plaintiffs contend that "all the economic harm to Texas will be prevented—and thus remedied, by vacatur, of the PIP Program." ECF No. 77 at 67 (citing 5 U.S.C. § 706). Plaintiffs claim that an alleged injury is redressable, even if relief is contingent on the uncertain actions of third parties, if the provided relief would, "(1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way." *Id.* at 68.

But that argument is wrong. First, Plaintiffs' theory of redressability hinges on the notion that, without the KFT Process, the noncitizens eligible to apply through that process will not receive parole in place. But even if the KFT Process were vacated, federal officials still possess authority and discretion to grant parole in place. *Priorities*, 599 U.S. at 691 (Gorsuch, J., concurring) ("Nor does such a decree require federal officials to change how they exercise that discretion in the Guidelines' absence."); *see also* 8 U.S.C. §§ 1252(a)(2)(b)(ii) and 1182(d)(5)(A).

Regardless, "[i]t is a federal court's *judgment*, not its *opinion*, that remedies an injury; thus it is the judgment, not the opinion, that demonstrates redressability." *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023) (emphasis added). In other words, redressability is not measured "by asking whether a court's legal reasoning may inspire or shame others into acting differently." *Priorities*, 599 U.S. at 691 (Gorsuch, J., concurring). Instead, it is measured by "…whether a court's judgment will remedy the plaintiff 's harms." *Id.* And here, any order eliminating the KFT process would not require any noncitizen to leave or be removed, nor does this Court have the authority to fashion a judgment effectuating any such requirement. Even crediting Plaintiffs' speculation that some noncitizens will react to a judgment in their favor by choosing to leave the country, that voluntary third-party action in response to the judgment does not constitute legal redressability.

Plaintiffs' corrected discovery responses illuminate this flaw. *See* Ex. A. After lodging a "speculation" objection, Texas admitted it could not predict whether the government would remove qualifying individuals in lieu of the KFT parole process, because it lacks knowledge of agency resources and capabilities. *Id.* at 3–4. This admission, coupled with the fact that this Court cannot order the government to remove individuals, demonstrates Texas's untenable position. *Garland v. Aleman Gonzalez*, 596 U.S. 543, 544 (2022) ("§1252(f)(1) generally prohibits lower courts from entering injunctions that order federal officials to take or to refrain from taking actions to enforce, implement, or otherwise carry out the specified [INA] provisions."). Texas similarly admitted that "it cannot provide a numerical estimate as to how many aliens in this category would [voluntarily leave the United States] absent the KFT parole process…" Ex. A at 4. As Plaintiffs admit, whether qualifying individuals ultimately depart the United States, for one reason or another, is "contingent on "independent future actions of third parties or even future governmental policies, as well as other independent, unknown factors." *Id.* at 4; *see* ECF No. 91 at 22–23.

Here, there is no *judgment* this Court could craft that would effectuate removals, or a qualifying individual's voluntary departure. Section 1252(f)(1) bars the Court from ordering the removal of these individuals. *See Aleman Gonzalez*, 596 U.S. at 549-50. Additionally, even without the KFT guidance, DHS officers possess the same authority to consider parole in place requests under the parole statute. *See Priorities*, 599 U.S. at 690 (Gorsuch, J., concurring) (finding Texas did not establish their injury could be redressed, reasoning, "[a] judicial decree rendering the Guidelines a nullity does nothing to change the fact that federal officials possess the same underlying prosecutorial discretion. Nor does such a decree require federal officials to change how they exercise that discretion in the Guidelines' absence."); *Who Can Apply for Parole?*, USCIS https://www.uscis.gov/humanitarian/humanitarian_parole (last updated Oct. 11, 2024) (explaining that any applicant for admission may apply for parole, including parole in place); *Arrival/Departure Records for Parole in Place*, USCIS, https://www.uscis.gov/i-131. Importantly, this Court cannot review the discretionary decision of whether to grant parole. ECF 77 at 31–32 (citing 8 U.S.C. §§ 1252(a)(2)(b)(ii) and 1182(d)(5)(A)). As there is no judgment that would remedy Plaintiffs' alleged harms, their claims lack redressability.

## II.    PLAINTIFFS CANNOT OBTAIN APA REVIEW OF THEIR CLAIMS

### A.  Plaintiffs Do Not Fall Within the Statutory Zone of Interests.

Plaintiffs are unable to state a cause of action for several reasons. First, the States' claims do not fall within a zone of interests recognized by the INA. A plaintiff has no right to review under the APA if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987); *see Fed'n for Am. Immigration Reform, Inc. v. Reno*, 93 F.3d 897, 900 (D.C. Cir. 1996) (recognizing parties' protected interest "if either they were intended by Congress as beneficiaries of the statute or a court could infer that

19

Congress intended them as a suitable challenger") (cleaned up).

Here, the statute in question is section 1182(d)(5)(A)—a federal immigration statute—while Plaintiffs are a number of States that have postulated certain financial costs as a downstream effect of the Federal Government's implementation of its own immigration policies. *See generally* ECF No. 1. It is well settled that the Federal Government holds "broad, undoubted" "power to determine immigration policy"—not to mention "inherent power as sovereign to control and conduct relations with foreign nations." *Arizona v. United States*, 567 U.S. 387, 394–95 (2012). It is in service of those larger objectives that the INA was enacted, as opposed to any financial impact that might potentially accrue to the States. Indeed, nothing in section 1182(d)(5)(A)—or the INA as a whole—indicates a congressional intent to benefit the States or to otherwise advance any particular interest of the States through the parole authority. Absent any showing of such intent, no State has a cognizable legal interest to intrude upon the federal government's exclusive province of immigration enforcement or to compel federal agencies to enforce the laws in its preferred way. *See Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973) (third parties may not compel the enforcement of laws against others).

Plaintiffs have not pointed to any language in section 1182(d)(5)(A) suggesting Congress intended to allow any State to challenge how the Federal Government exercises its exclusive powers over immigration, particularly where there is a clear grant of discretion. Instead, they argue that "the INA as a whole . . . is the proper reference for actions under the APA, rather than any particular section." ECF No. 79 at 48. That argument, however, fails to contend with the "clear" principle that "the breadth of the zone of interests varies according to the provisions of law at issue." *Bennett v. Spear*, 520 U.S. 154, 163 (1997). And given how sweeping the federal power is over immigration, it would hardly be consistent with the unitary scheme of enforcement to take *all*

of the INA as the zone of interests, and not the specific statute that squarely addresses parole. *See Clarke*, 479 U.S. at 756 (noting "the potential for disruption inherent in allowing every party adversely affected by agency action to seek judicial review"). Further, even if the INA provided the relevant scope of inquiry, Plaintiffs readily acknowledge that the purpose of the INA was to establish "a comprehensive federal statutory scheme for regulation of immigration and naturalization." ECF No. 79 at 48. And while they allege that the KFT process implicates their "interest in reducing the financial burdens of illegal immigration," they offer only cursory statements as to how any financial costs they might incur as a knock-on effect of the Federal Government's enforcement of immigration law and policy fall within the zone of interests contemplated by section 1182(d)(5)(A) or even the INA as a whole. *Id.*; *see Lujan v. Nat'l Wildlife Found.*, 497 U.S. 871, 885–99 (1990). In any case, regardless of what putative evidence the States might want to offer, Congress has provided in the INA that only a noncitizen against whom the immigration laws are being enforced may challenge the application of those laws. *See* 8 U.S.C. § 1252(b)(9). That statutory limitation on review reflects Congress's understanding that the downstream effects of immigration policy on third parties are no more than marginally relevant to the INA's purposes, and allowing States or other third parties to challenge the Executive's immigration-enforcement decisions through the APA would circumvent Congress's design.

As for the cases Plaintiffs rely on to advance a looser understanding of "zone of interests" based on some potential of financial burdens to the States, ECF No. 79 at 48 (citing *Texas v. United States* (*DACA*), 50 F.4th 498, 521 (5th Cir. 2022)), that theory of harm runs up against the principles articulated in *Priorities* to the extent it challenges non-enforcement decisions, such as the decisions of immigration officials not to remove noncitizens who are granted parole in place. In *Priorities*, the Supreme Court emphasized that a party "lacks standing to contest the policies of

the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." 599 U.S. at 677–81 & n.3. It further confirmed that the foundational "principle of enforcement discretion over arrests and prosecutions" "extends to the immigration context," in light of the degree to which immigration matters implicate both "normal domestic law enforcement priorities" and "foreign-policy objectives." *Id.* at 679.

**B.  Plaintiffs Challenge Action That Is Committed to Agency Discretion.**

Plaintiffs' claims are unreviewable because the APA precludes review of agency action that is committed to agency discretion and section 1182(d)(5)(A) grants the Secretary broad discretion over parole. 5 U.S.C. § 701(a)(2); 8 U.S.C. § 1182(d)(5)(A). The KFT process involves the "complicated balancing of a number of factors which are peculiarly within [agency] expertise," including the Executive's comprehensive diplomatic efforts to address and manage migration in the Western Hemisphere, *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), and the Court lacks any "meaningful standard against which to judge the agency's exercise of discretion" in serving these foreign affairs goals. *Lincoln*, 508 U.S. at 191.

Skirting the clear statutory text that grants the Secretary discretion over parole, Plaintiffs dispute the relevance of *Heckler*, which they argue "does not apply to agency rules at all." ECF No. 79 at 55 (internal quotation marks omitted). But as discussed below, *infra* § III.D, the Notice does not "grant rights, impose obligations, or produce other significant effects on private interests." *DACA*, 50 F.4th at 522. Thus, the Notice would not "trigger" or otherwise give rise to eligibility for any government benefits otherwise not available to noncitizens who are unlawfully present in the United States. ECF No. 79 at 56 (internal quotation marks omitted). Nor is it true that the Notice somehow "make[s] a class of person newly eligible" for "public benefits." *Id.* (internal quotation marks omitted). It is the statute, and not the Notice, that provides for the Secretary's

discretion to grant and prescribe the conditions for parole, and the KFT process in no way interferes with that direct statutory conferral of authority or dictates how that authority, once granted, should be exercised. *See Texas v. EEOC*, 933 F.3d 433, 442 (5th Cir. 2019).

As for Plaintiffs' argument that the KFT process is nevertheless reviewable because the parole statute itself contains some language that might be construed as "guidelines for the agency to follow," ECF No. 79 at 56, that is a misreading of *Heckler*. While *Heckler* left open the possibility that an agency decision might be reviewable where there were statutory guidelines for the agency to follow, it went on to explain that those standards had to be "sufficient" to draw the conclusion that Congress meant to "limit [the] agency's exercise of enforcement power . . . , either by setting substantive priorities, or by otherwise circumscribing [the] agency's power to discriminate among issues or cases it will pursue." *Heckler*, 470 U.S. at 832–33. Neither element is present in section 1182(d)(5)(A); instead, the statute empowers the Secretary not only to make parole decisions "in his discretion" but also to set "such conditions as he may prescribe" and determine when "in [his] opinion" the purposes of a parole have been satisfied. 8 U.S.C. § 1182(d)(5)(A). Thus, the parole statute, far from seeking to impose constraints on the agency's "exercise of enforcement power," affords the Executive ample discretionary authority to govern the entirety of the parole process.

### C.  Plaintiffs Do Not Challenge Final Agency Action.

As explained, Plaintiffs fail to challenge "final" agency action because the Notice does not "consummate" any decision-making process or determine anyone's rights or obligations or produce "legal consequences." *Bennett*, 520 U.S. at 178; *see* 89 Fed. Reg. 67474. The Notice informs the public of the agency's current approach to implementing discretionary parole authority on a case-by-case basis with respect to certain unlawfully present spouses and stepchildren of U.S.

citizens who are already eligible to seek parole. *See id.* But the Notice does not bind the agency to any particular result and leaves USCIS officers with discretion to deny parole to applicants when they deem it appropriate and "does not seek to impose or elaborate or interpret a legal norm." *See EEOC,* 933 F.3d at 442.

Plaintiffs' attempt to draw a parallel to the MPP case, where certain agency "memoranda" were held to constitute "operative agency actions" that, of their own force, put law or policy into effect. *MPP*, 20 F.4th at 947; *Texas*, 597 U.S. at 807–10. Here, however, the agency "merely adopt[ed] a general statement of policy," which the Notice points out "typically uses permissive, rather than binding, language that leaves the agency free to exercise discretion." 89 Fed. Reg. at 67488, n.245. In the same vein, the Notice also explains that the KFT process "does not change or eliminate the eligibility criteria for adjustment of status," and that "the authority to parole applicants for admission 'in place' . . . is consistent with DHS's longstanding interpretation of its authorities." *Id.* at 67460, 67461. In short, unlike the DACA case, where USCIS officers were found not to have discretion to grant or deny deferred action, here, the agency has full discretion to adjudicate parole in place requests on a case-by-case basis, and "retains the sole discretion to terminate parole in place under [the KFT] process at any point." *Id.* at 67474; *see EEOC*, 933 F.3d at 442 (distinguishing a final agency action from "a policy statement—which leaves the agency the discretion and the authority to change its position in any specific case" (cleaned up)).

Plaintiffs' contention that the Notice "makes clear" that it "binds" the agency and imposes "legal consequences," ECF No. 79 at 51, is not accurate.  Plaintiffs refer to such statements as "DHS will begin using the Form I-131F" and "USCIS will assume a new workload by accepting these parole in place requests," but those simply describe operational procedures (e.g., "charging a filing fee of $580" to help "recover the costs associated with this new workload") that are covered

by section 1252(b)(4) and serve to "support [the KFT] process"—which, again, "does not create any rights, privileges, [or] benefits." 89 Fed. Reg. at 67459, 67468, 67674. In no way do these relatively mundane, if not unimportant, details give rise to "legal consequences" that would render the Notice a final agency action. More broadly, Plaintiffs misunderstand the relevant legal principles, which focus not on whether the action provides guidance to agency employees, but rather on whether the action has an "actual legal effect" on "*regulated* entities." *National Mining Ass'n v. McCarthy*, 758 F.3d 243, 252 (D.C. Cir. 2014) (emphasis added). The Notice does not bind agency officials in the decisions they make pursuant to their discretionary authority under section 1252(b)(4), and it certainly does not address itself to the States in any way.

Plaintiffs also make a comparison to the DACA case, where the agencies had argued that "DACA confers no rights because the memorandum says it does not." *DACA*, 50 F.4th at 523. But there is a critical difference between the two cases. Here, the Notice simply outlines a process wholly subject to the Secretary's preexisting discretionary authority under section 1182(d)(5)(A). 89 Fed. Reg. at 67488; *DACA*, 50 F.4th at 523 (noting that the "ultimate concern" in assessing finality "is the *contents* of the agency's action" (internal quotation marks omitted)). In that sense, the Notice is not a binding rule, as it never "dictates what [the agency's] discretion should be used to do," but rather "genuinely leaves the agency and its decision-makers free to exercise discretion." *DACA*, 50 F.4th at 523–24. That point is reinforced by the fact that parole authority under section 1182 would exist even in the absence of the KFT process—further demonstrating that the statute is the only source of law governing how the agency administers parole in place.

Plaintiffs go on to assert that "by its own terms" the Notice creates new benefits for noncitizen spouses and stepchildren in allowing them to apply for parole in place. ECF No. 79 at 52. For this, they rely on a statement in the Notice that purportedly "touts the contrast between

25

'past sparing uses of parole in place' and the unique parole application process" described in the Notice. *Id.* (citing 89 Fed. Reg. at 67461 n.26). But that statement does nothing of the sort. Instead, it points out that making the KFT process "available only to certain spouses and stepchildren of U.S. citizens is *consistent* with past sparing uses of parole in place," and "DHS *continues* to view use of parole in place as consistent with the best reading of the statute." 89 Fed. Reg. at 67461 n.26 (emphases added). In short, rather than imposing new duties or ushering in "a substantive change in existing law or policy," ECF No. 79 at 52, the Notice maintains the agency's longstanding application of its powers under section 1182(d)(5)(A), without altering the legal consequences that flow from the statute itself. *See Bennett*, 520 U.S. at 178.

### D.  Section 1252(a)(2)(B)(ii) Precludes Jurisdiction.

Under 8 U.S.C. § 1252(a)(2)(B)(ii), no court has jurisdiction to review any decision or action the authority for which is specified to be in the Secretary's discretion. Parole under section 1182(d)(5)(A) is just such a decision or action. Moreover, section 1182(d)(5)(A) is written in a way that covers the entirety of the parole process, such that the jurisdictional bar in section 1252(a)(2)(B)(ii) extends to programmatic challenges to the parole process, including parole in place. *See Patel v. Garland*, 596 U.S. 328, 338 (2022).

Plaintiffs' contrary claim that the jurisdictional bar reaches only challenges to individual determinations of parole lacks merit. They rely mostly on *MPP*, where the Fifth Circuit held it was not statutorily barred from reviewing "DHS's decision to terminate an *entire program*"—i.e., the MPP program. ECF No. 79 at 54. But Plaintiffs overlook that the Supreme Court reversed the Fifth Circuit's decision by applying a provision in section 1252—specifically section 1252(f)(1)—to the States that had brought suit. *Texas*, 597 U.S. at 801 (holding that the statute no doubt deprives the lower courts of 'jurisdiction' to grant classwide injunctive relief."). In doing so, the Supreme Court

necessarily rejected any blanket argument that jurisdictional bars under section 1252 do not extend to State plaintiffs (who generally will bring policy-level claims, as opposed to one-off suits involving individual grants or denials of relief), as well as the strained distinction the States attempt to draw here between parole decisions and the policies with which those decisions are entwined.

Plaintiffs' attempt to distinguish *Patel* is also unpersuasive. *See* ECF No. 79 at 54–55. The Supreme Court in *Patel* held that section 1252(a)(2)(B)(i) precludes review of "judgments of whatever kind" covered by the INA, and "not just discretionary judgments or the last-in-time judgment." 596 U.S. at 338. *Patel*, in short, affirmed a broad reading of section 1252(a)(2)(B)(i)— which covers decisions "of a like kind" as section 1252(a)(2)(B)(ii), *Kucana v. Holder*, 558 U.S. 233, 247 (2010)—as a provision barring review of "not just 'the granting of relief' but also any judgment *relating to the granting of relief*." *Patel*, 596 U.S. at 329 (emphasis added). From this, Plaintiffs come away with the notion that § 1252(a)(2)(B)(ii) is strictly confined to barring "*individual* decisions 'made discretionary by legislation,'" and "not challenges to programmatic immigration policy." ECF No. 79 at 55. But *Patel* does not in fact make any such distinction between individual decisions and the policies underlying and informing those decisions. If anything, *Patel*'s expansive understanding of the term "judgment" as used in § 1252(a)(2)(B)— noting, for example, that judgments can emerge at various points along the way to an "ultimate decision"—indicates that the review bar in § 1252(a)(2)(B)(ii) does encompass programmatic challenges to discretionary agency actions, such as the States' suit here. *Patel*, 596 U.S. at 344– 45; *see Thigulla v. Jaddou*, 94 F.4th 770, 775 (8th Cir. 2024).

## III.   PLAINTIFFS CANNOT SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.   The Notice is Not Contrary to Law.

The DHS Secretary may "in his discretion parole into the United States temporarily under such conditions as he may prescribe only on a case-by-case basis for urgent humanitarian reasons

or significant public benefit any alien applying for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). The Notice comports with all requirements of this statute, as Defendants explained. ECF No. 77 at 32-63. None of Plaintiffs' six arguments to the contrary have merit.

    1.  <u>The Notice Fully Complies with the Statutory Parole Authority.</u>

The Notice makes clear that all grants of parole in place through the KFT process must be done on a case-by-case basis and parole is authorized only if it served an "urgent humanitarian reason or significant public benefit." ECF No. 77 at 35-42. Further, parole under the Notice is available only for noncitizens who remain "applicants for admission," the category of unadmitted noncitizens to which section 1182(d)(5)(A) by its terms applies, and only for a "temporary period" of up to three years. *Id*. at 42-46. The Notice is consistent with DHS's longstanding interpretation of section 1182(d)(5)(A) to authorize parole in place of unadmitted noncitizens already within the United States for similar purposes, and Congress's affirmation of DHS's prior use of, and provision for future use of, parole in place. NDAA, Pub. L. 116-92, § 1758 (8 U.S.C. § 1182 note); Northern Mariana Islands Long-Term Legal Residents Relief Act, Pub. L. No. 116-24, § 2 (2019) (48 U.S.C. 1806(e)(6)). No fewer than three courts of appeals have noted DHS's authority to provide parole in place. *Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1118 (9th Cir. 2007); *Akhtar v. Dir. USCIS Mt. Laurel Field Off.*, No. 23-1577, 2024 WL 1427634, at *3 (3d Cir. Apr. 3, 2024).  ECF No. 79 at 11-29.

Plaintiffs argue the Notice does not comply with the statute based on their mistaken reliance on *unauthoritative* language in a 1996 House Report accompanying IIRIRA pertaining to section 1182(d)(5)(A). ECF No. 79 at 12 (citing H.R. Rep. No. 104-469, at 140-41 (1996)). As Defendants have explained, the House version of the statute would have limited parole to specified scenarios, but Congress rejected that language in the final version and chose instead the Senate's

language (*i.e.*, the current version of section 1182(d)(5)(A) affording the Secretary flexibility to grant parole in myriad circumstances that could present urgent humanitarian reasons or significant public benefit. *Compare* H.R. 2202, Immigration in the National Interest Act of 1995, § 524 (Aug. 4, 1995) *with* 8 U.S.C. § 1182(d)(5)(A); H.R. Rep. No. 104-828, at 245 (1996) (noting the House receded to the Senate's language on section 1182(d)(5)(A)). Hence, the House Report on which Plaintiffs rely offers little insight into the meaning of the actual and current terms in the parole statute, because it was discussing much narrower proposed terms that were ultimately rejected.

To the extent the Court deems that Report relevant at all, moreover, the Notice does not promote the abuse of parole that the Report criticized. As Plaintiffs themselves concede, the House's concern was that parole was being employed "'to admit entire categories of aliens who do not qualify for admission.'" ECF No. 79 at 12 (quoting H.R. Rep. No. 104-469, at 140). The Notice has no such design or effect. In contrast to the practice criticized, where parole itself was employed as a tool to provide noncitizens an indefinite permission to live in the United States, the Notice's use of parole does not "admit" any noncitizens or offer indefinite residence in the country. Noncitizens will achieve lawful permanent residence only if they meet separate requirements for a family-based immigrant visa and are deemed qualified to adjust status through that separate Congressionally established process. *See* 8 U.S.C. § 1255(a). And the history of the adjustment statute, section 1255, indicates that Congress intended to provide "adjust[ment of] status to aliens whose admission was 'for urgent humanitarian reasons or significant public benefit' as set forth in § 212(d)(5)(A)." *Delgado-Sobalvarro v. Att'y Gen. of U.S.*, 625 F.3d 782, 786 (3d Cir. 2010). The Notice does exactly that by granting parole in place on a case-by-case basis only to those eligible noncitizens who merit a favorable exercise of discretion where parole serves "urgent humanitarian reasons or significant public benefit." 89 Fed. Reg. at 67461, 67462, 67465, 67470, 67472, 67473.

2. <u>Parole is Expressly Discretionary Within the Parameters of Section 1182(d)(5)(A).</u>

Section 1182(d)(5)(A) undisputedly expressly confers "discretion" upon DHS to grant parole as the Secretary deems appropriate "in his opinion" so long as parole is granted only "temporarily" "on a case-by-case basis" "for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). Courts "must presume that Congress says in a statute what it means and means in a statute what it says there." *Rotkiske v. Klemm*, 589 U.S. 8, 13–14 (2019) (internal quotation omitted). Accordingly, section 1182(d)(5)(A)'s express provision of "discretion" must be presumed meaningful.[7] And this provision of discretion makes sense given that the statute does not define how long "temporarily" must be, what degree and extent of processing constitutes "case-by-case," or what constitute "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). As explained, the absence of definition of these terms is purposeful, intended to give DHS the discretion to determine where circumstances support its use. H.R. Rep. No. 104-469, pt. 1, https://www.govinfo.gov/content/pkg/CRPT-104hrpt469/pdf/CRPT-104hrpt469-pt1.pdf (explaining that House's proposed restrictions were eliminated from IIRIRA after concerns were raised about the importance of giving the Secretary "flexibility to deal with compelling immigration situations"); H.R. Rep. No. 104-828, at 245. The express grant of discretion therefore provides DHS authority to apply the parole authority within the parameters set by section 1182(d)(5)(A) based upon its understanding of those flexible terms.

---

[7] Although Congress chose not to further modify the grant of "discretion" in section 1182(d)(5)(A) with additional qualifiers such as "sole discretion … not subject to further administrative or judicial review" or "sole and unreviewable discretion," that does not (as Texas suggests, *see* ECF No. 79 at 14) alter the fact that the statute expressly confers "discretion" upon the Secretary. 8 U.S.C. 1182(d)(5)(A). To hold that the absence of such modifiers means the statute did not confer such discretion would violate the canon against rendering statutory text a nullity or surplusage. *See Ysleta Del Sur Pueblo v. Texas,* 596 U.S. 685, 699 (2022) (noting "Texas's competing interpretation of the law renders … whole provisions without work to perform").

*See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D.N.M. 2020) (undefined "significant public benefit" standard in section 1182(d)(5)(A) "conceivably encompasses a wide range of public benefits, such as conserving resources otherwise spent on housing asylum seekers or allowing an individual to carry on their employment in the" country).

Plaintiffs cite pre-IIRIRA law to argue that the parole standard used to be broader so IIRIRA must have narrowed it. ECF No. 79 at 11-12. But Congress rejected attempts to more narrowly define "urgent humanitarian reason" or "significant public benefit." *Supra*; H.R. Rep. No. 104-469, pt. 1, https://www.govinfo.gov/content/pkg/CRPT-104hrpt469/pdf/CRPT-104hrpt469-pt1.pdf. Plaintiffs attack Defendants' references to cases predating IIRIRA's update of the parole provision to demonstrate what they concede is the historically broad discretion enjoyed by the Executive when it comes to parole of noncitizens. ECF No. 79 at 13 (citing *Kaplan v. Todd*, 267 U.S. 228, 229 (1925); *Ahrens v. Rojas*, 292 F.2d 406 (5th Cir. 1961); *Garcia-Mir v. Smith*, 766 F.2d 1478, 1484–85 (11th Cir. 1985); *Jean v. Nelson*, 727 F.2d 957, 977 (11th Cir. 1984)). But the fact that IIRIRA added new parameters to parole to prevent its abuse to evade the INA's requirements that noncitizens be admitted based on visas or adjust status to obtain permanent lawful residence (requirements the KFT process observes and is fully consistent with) does not mean IIRIRA eliminated DHS's discretion to interpret those terns and administer parole within their bounds. *See* 8 U.S.C. § 1182(d)(5)(A); *Texas,* 597 U.S. at 806 (explaining that DHS may "exercise its discretion to parole applicants" so long as it is "on a case-by-case basis for urgent humanitarian reasons or significant public benefit"); *Palacios v. Dep't of Homeland Sec.,* 434 F. Supp. 3d 500, 508 (S.D. Tex. 2020) (holding "this court lacks jurisdiction to review denials of parole under [section 1182(d)(5)(A)] because these actions are 'committed to agency discretion by law'"); *Maldonado v. Macias*, 150 F. Supp. 3d 788, 794–95 (W.D. Tex. 2015) (collecting cases

demonstrating lack of review of discretionary parole decision under section 1182(d)(5)(A)). In short, Plaintiffs offer nothing demonstrating that DHS lacks statutory authority to grant parole as it deems appropriate within the intentionally "flexible" parameters of section 1182(d)(5)(A), which the Notice does.

3.   The Notice Requires that KFT Parole Applicants Demonstrate "Urgent Humanitarian Reasons or Significant Public Benefit."

The Notice complies with the statute's requirement that parole serve "urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A). The Notice repeatedly requires that DHS officers determine a grant of parole in place is warranted based on significant public benefit or urgent humanitarian reasons in each individual case. *See, e.g.*, 89 Fed. Reg. at 67461, 67462, 67465, 67470, 67472, 67473. Plaintiffs point to nothing to refute the presumption of regularity that these DHS officers are acting in accordance with the law and only granting parole after determining the existence of an urgent humanitarian reason or significant public benefit, as required by both the statute and Notice. *U.S. v. Chem. Found. Inc.*, 272 U.S. 1, 14-15 (1926).

Plaintiffs fail to show that DHS is not observing the substantive requirements of section 1182(d)(5)(A) in adjudicating requests under the Notice, and indeed do not even to attempt to argue this. Rather, their argument is merely that they disagree with how DHS may be interpreting the terms "urgent humanitarian reason or significant public benefit" in adjudicating KFT parole requests. At the threshold, Plaintiffs fail to even demonstrate that this disagreement over the meaning of these terms presents a cognizable claim that DHS is violating its statutory duty to apply them, especially given Plaintiffs' concession that Notice in fact offers detailed "significant public benefit" justifications for potential KFT grants of parole. ECF No. 79 at 18 (citing 89 Fed. Reg. at 67465–69). Plaintiffs point to no authority overturning grants of parole because the proffered humanitarian reason was not "urgent" enough or the public benefit not "significant enough."

Rather, the Secretary's discretionary determination whether to grant parole on these bases is not subject to review. *See Palacios,* 434 F. Supp. 3d at 508; *Maldonado*, 150 F. Supp. 3d at 794–95. And, as the Fifth Circuit held in the similar context of conditional parole under 8 U.S.C. § 1226, courts lack review over the manner in which discretionary parole judgments are made—including presumably the adjudicator's interpretation of the parole justifications—in addition to the ultimate judgment itself. *Loa-Herrera v. Trominski*, 231 F.3d 984, 991 & n.12 (5th Cir. 2000).

As Plaintiffs concede, Congress chose not to define the substantive terms in section 1182(d)(5)(A), leaving their interpretation to the agency. *Supra* at 28-29; *Infra* 36. T.his all strongly suggests that a *disagreement* over DHS's interpretation of "urgent humanitarian reason" or "significant public benefit" as a basis for parole falls within the unreviewable discretion afforded to the Secretary to administer parole under section 1182(d)(5)(A), and does not make out a claim that the Secretary is violating that section such as by *failing to justify* a grant of parole on the basis of an urgent humanitarian reason or significant public benefit at all.

But even if Plaintiffs had a cognizable claim, they still fail to demonstrate that the Notice violates these terms. Plaintiffs attempt to extract significance from the fact that, before IIRIRA added "significant" to modify "public benefit," an INS document from 1982 provided examples of public benefits. ECF No. 79 at 14. Then they offer a list of cases similarly describing the use of parole for urgent humanitarian reason or significant public benefit to assist noncitizens with serious medical issues or who are participating in legal proceedings or investigations. *Id.* at 14-18. But none of the authorities Plaintiffs cite indicate that these two reasons for parole, medical issues or law-enforcement needs, are exclusive of any others, *see id.*, and courts have recognized many other justifications for parole under the *current* terms of section 1182(d)(5)(A). *See New Mexico*, 450 F. Supp. 3d at 1174 n.5 (section 1182(d)(5)(A) "encompasses a wide range of public benefits, such

as conserving resources otherwise spent on housing asylum seekers or allowing an individual to carry on their employment in the United States"). Indeed, in rejecting the House version of section 1182(d)(5)(A) in IIRIRA, Congress explicitly removed language that would have limited parole to a defined set of situations, notably including a "medical emergency" or if the noncitizen "has assisted the United States Government in a matter, such as a criminal investigation, espionage, or other similar law enforcement activity." *Compare* H.R. 2202, Immigration in the National Interest Act of 1995, § 524 (Aug. 4, 1995) *with* 8 U.S.C. § 1182(d)(5)(A). The narrow reading of the statute Plaintiffs urge would thus improperly read into the statutory authority limits that Congress expressly rejected when enacting section 1182(d)(5)(A) in its current form.[8]

Further, Plaintiffs concede that the Fifth Circuit has recognized a "quintessential modern use[] of parole" that falls into neither of their two buckets, but rather is analogous to the circumstances here: "paroling aliens who qualify for a visa but are waiting for it to become available." ECF No. 79 at 15-16 (quoting *MPP*, 20 F.4th at 947). This justification in essence describes the function of the Notice, as parole in place under the Notice is only available to noncitizens who may qualify for an immediate relative-based immigrant visa and provides them a temporary period to apply for adjustment status on that basis.

Plaintiffs argue that parole in place under the Notice cannot be for an urgent humanitarian reason because "[n]othing in the Notice relates to any potential beneficiaries of the PIP Program facing physical danger." ECF No. 79 at 16. However, nothing in the statute indicates that physical

---

[8] Plaintiffs cite the discussion of parole as for witnesses to appear in legal proceedings in *Milardo v. Kerilikowske*, No. CV316MC00099VLB, 2016 WL 1305120, at *2 (D. Conn. Apr. 1, 2016). But *Milardo* explained the authority for this was 8 C.F.R. 212.5(b), which both applies to arriving noncitizens (not at issue in this case) and lists many other categorical justifications for parole under section 1182(d)(5)(A), including when "continued detention is not in the public interest." *Id.* at *1; 8 C.F.R. 212.5(b)(5).

danger is a requirement for a finding of urgent humanitarian reasons. Moreover, although the Notice does not offer general scenarios that would contribute to a finding of urgent humanitarian reasons, as it does with significant public benefit, that does not mean that it does not charge DHS officers with examining individual factors in particular cases to determine if they would justify parole on the basis of an urgent humanitarian reason. To the contrary, the Notice repeatedly states that parole in place under the KFT process may be justified on the basis of an urgent humanitarian reason depending on the facts of each case, and directs USCIS officers to "examine the totality of the circumstances in the individual case to determine whether the requestor merits a grant of parole in place as a matter of discretion for … urgent humanitarian reasons." 89 Fed. Reg. at 67472. It further directs those officers to consider individualized evidence that could indicate such an urgent humanitarian reason, including the presence of a "physical or mental condition requiring care or treatment in the United States" or status as a victim of a crime or caregiver for an individual with a disability. *Id.*

As for "significant public benefit" justifications, Plaintiffs assert that "the purposes supposedly served by the PIP Program are neither significant nor public." ECF No. 79 at 16-20. Plaintiffs first argue that the fact that the INA elsewhere authorizes other types of relief on the express basis of promoting family unity somehow means that family unity cannot contribute to a "significant public benefit" under section 1182(d)(5)(A). *Id.* at 16 (citing 8 U.S.C. 1182(d)(11)). But their conclusion does not logically follow from their premise, which actually undermines their argument. Their concession that "Congress decided that family unity was reason enough to grant the Secretary discretion to waive that alien's inadmissibility," *id.*, only supports an inference that the Secretary may consider family unity in exercising statutory discretion in the parole context.. But the Court need not resort to merely inferring Congress's approval, because Congress explicitly

stated that parole in place may be justified on the basis of a significant public benefit from promoting family unity. 8 U.S.C. § 1182 note, Pub. L. No. 116-92, § 1758 (providing that "military family unity" may, on a case-by-case basis, constitute a significant public benefit justifying parole in place under section 1182(d)(5)(A)).

Plaintiffs contend that family unity and other justifications cited in the Notice afford only private benefits to the particular noncitizen and their family, and rise to the level of public benefits only when aggregated among many noncitizens, which they claim is insufficient since the statute requires "case-by-case" analysis. ECF No. 79 at 18-20. This argument is both incorrect and contrary to the authorities on point. The example Plaintiffs provide, the military parole in place program, *id.*, demonstrates this. If Plaintiffs were correct, "military family unity" would not constitute a significant public benefit, contrary to Congress's expression recognition of such, 8 U.S.C. § 1182 note, because providing parole to the spouse of a single, individual service member has negligible effect on the overall "military readiness" of the United States Armed Forces. ECF No. 79 at 18 (citing Pub. L. No. 116-92, § 1758). Rather, as the military example demonstrates, "significant public benefit" encompasses the effects of both individual grants of parole and the aggregate effect of parole under the same process for the same justifications.

Section 1182(d)(5)(A)'s companion provision confirms this. Congress expressly required the agency to make particularized findings for parole under section 1182(d)(5)(B). Section 1182(d)(5)(B) governs "parole into the United States [of] an alien who is a refugee" and includes additional requirements that Congress did not include in the general provision at section 1182(d)(5)(A), such as the requirement for a "determin[ation] that compelling reasons in the public interest *with respect to that particular alien* require that the alien be paroled." (emphasis added). Congress therefore left open the possibility that urgent humanitarian reasons and significant public

benefits under section 1182(d)(5)(A) might be presented by many similarly situated noncitizens, and that the Executive could consider the aggregate benefits of paroling noncitizens because they fall within certain groups. *See Gulf Fishermens Ass'n v. Nat'l Marine Fisheries Serv.*, 968 F.3d 454, 466 (5th Cir. 2020) ("[W]here Congress includes particular language in one section of a statute but omits it in another, it is presumed that Congress acts intentionally and purposely.").

Further, Plaintiffs argue that family unity on its own serves only a private interest, and "more is needed" to make it public, such as its contribution (when aggregated) to national military readiness in the NDAA context. ECF No. 79 at 18-19. The Notice, however, articulates multiple additional and far-reaching public benefits of KFT. The Notice explains that the potential significant public benefit justification for parole under the KFT process not only includes family unity—and the effect of family unity on the long-term health, development and social contribution of the family members—but also (a) conserving government resources and counteracting processing backlogs slowing visa adjudication generally; (b) increasing economic productivity and obtaining greater income tax revenue from parolees when they can obtain lawful employment; (c) advancing U.S. foreign policy objectives by obtaining assistance from foreign partners on key initiatives such as disrupting human smuggling, trafficking, and criminal networks; and (d) helping the Government identify public safety threats among noncitizens currently living unlawfully in the United States. 89 Fed. Reg. at 67465-69; ECF No. 77 at 10-12. Plaintiffs' suggestion that these additional public benefits are not "significant," ECF No. 79 at 18, offers no support for that bald assertion. *See New Mexico*, 450 F. Supp. 3d at 1174 n.5 (recognizing that "significant public benefit" in section 1182(d)(5)(A) "encompasses a wide range of public benefits" including, as provided by parole under the Notice, allowing an individual to pursue employment in the U.S.).

As Plaintiffs concede, Congress chose not to define "significant public benefit" in section 1182(d)(5)(A); instead Congress expressly conferred discretion on DHS to interpret and implement that term. *See INS v. Aguirre-Aguirre,* 526 U.S. 415, 424-425 (1999) (relying on 8 U.S.C. § 1103(a)(1) and noting the Secretary is with charged "administration and enforcement" of all "laws relating to the immigration and naturalization of aliens"). Congress can expressly delegate authority to interpret and apply undefined statutory terms through explicit conferral of discretion as it has done here. *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2265, 2268 (2024) ("That is not to say that Congress cannot or does not confer discretionary authority on agencies," in which case the court's role is simply to "police the outer statutory bounds of those delegations[.]"). Congress has done so through its grant of discretion to the Secretary to implement the parole authority in section 1182(d)(5)(A). *See* 8 U.S.C. §§ 1103(a)(1), 1182(d)(5)(A), 1252(a)(2)(B)(ii); *Aguirre-Aguirre,* 526 U.S. at 424-425. Plaintiffs wholly fail to acknowledge or address the impact of the explicit conferral of discretion to DHS to interpret and apply the undefined terms of section 1182(d)(5)(A). *See generally* ECF No. 79.

4.  <u>Parole In Place Decisions  Under The Notice Satisfy The Case-By-Case Requirement.</u>

As Defendants explained, the Notice makes clear that parole in place requests will be considered only "on a case-by-case basis." 89 Fed. Reg. at 67461; ECF No. 77 at 39-42. Plaintiffs argue that the Notice violates the "case by case" consideration requirement based on their assertion that the Notice will "confer automatic parole eligibility on 1.3 million aliens." ECF No. 79 at 20-22. This argument is incorrect in multiple ways.

First, Plaintiffs merely speculate that 1.3 million noncitizens could obtain parole in place under the Notice. They offer no support for this figure in the record, and the extrinsic evidence they cite is inadmissible for this merits argument. *Supra* § I.A. p. 6.  The figure is their estimate of

the number of noncitizens unlawfully present in the United States married to citizens, regardless of whether they remain applicants for admission or have been present since 2014, and therefore would even be facially eligible for parole via the KFT process. *See* ECF No. 79 at 4. The agency itself estimates approximately 550,000 noncitizens satisfy the time-in-residence and family relationship criteria, which is likely larger than the number of noncitizens who, if they apply, will merit a favorable exercise of discretion. 89 Fed. Reg. at 67466.

Regardless, the number of individuals who may benefit has no bearing on whether the agency is conducting an individualized inquiry and making parole determinations on a case-by-case basis. Unlike other provisions in the INA, *e.g.*, 8 U.S.C. §§ 1157(a), 1184(p)(2), 1151(c)(1), 1152, 1153(a)(1)-(4), the parole statute places no numerical limitation on parole grants. Consistent with that authority, DHS has long had parole initiatives dating back to the IIRIRA amendments, including those acknowledged and affirmed by Congress, that applied to large groups, such as the 61,000 noncitizens who have received parole under the military parole-in-place process that Congress directed DHS to continue to implement. 89 Fed. Reg. at 67464 & n.63. Tens of thousands of others have received parole (also as a basis for adjustment of status) through other family-unity and reunification parole initiatives Congress has recognized and aided. *See id.* at 67464 & n. 60, 65-67 (discussing CNMI parole in place and Cuban, Haitian, and Filipino World War II veterans parole); 48 U.S.C. § 1806(e)(6); *see, e.g.*, Pub. L. 117-128 (2022) (providing resettlement assistance and other benefits to Ukrainian parolees); Pub. L. 117-43 (2021) (providing public benefits and expeditious asylum consideration for Afghan parolees); Pub. L. 104-208, § 646 (1996) (providing for adjustment of status for certain Polish and Hungarian parolees). Thus, the continued use of parole in this way does not "circumvent[]," but rather reflects, "congressionally established immigration policy." *See* ECF No. 3 at 13. Indeed, under one parole initiative in 2000,

the legacy Immigration and Naturalization Service (INS) granted parole to *tens of millions* of foreign nationals in a six-month span. 89 Fed. Reg. at 67488 n.246.

Second, Plaintiffs offer no record evidence supporting their assertion that the Notice "confers automatic parole eligibility" on anyone. The Notice repeatedly indicates that the mere fact of meeting the relationship and time-in-residency requirements does not guarantee a grant of parole in place; rather, the individual still must establish that they warrant a favorable exercise of discretion, have no disqualifying criminal convictions or other negative factors, and that their parole would serve an urgent humanitarian reason or significant public benefit. 89 Fed. Reg. at 67465 ("Even if a requestor establishes that they have met all of the criteria for eligibility, USCIS will examine the totality of the circumstances in the individual case to determine whether the requestor merits a grant of parole in place as a matter of discretion for significant public benefit or urgent humanitarian reasons."). DHS will consider on a case-by-case basis: criminal history; any previous removal proceedings and removal orders; the results of background checks, which include national security and public safety vetting; positive and adverse factors presented by the requestor; and any other relevant information available to or requested by DHS. 89 Fed. Reg. at 67465. USCIS is entitled to a presumption of regularity that is making KFT parole determinations in compliance with the case-by-case requirements of section 1182(d)(5)(A) and the Notice, and Plaintiffs point to nothing in the record to defeat this presumption. *Chem. Found.*, 272 U.S. at 15.

Thus, in addition to satisfying all other discretionary factors, applicants must demonstrate a significant public benefit applies in each individual case, or they will not receive parole. *Id.* This is consistent with the Secretary's approach to the case-by-case requirement for decades. *See* Mem. from Bo Cooper, General Counsel, INS to Jeffrey L.  Weiss, Director, Office of lnt'l Affairs, INS, *Legal Opinion: Parole of Individuals from the Former Soviet Union Who Are Denied Refugee*

*Status* (June 15, 2001), AR 4675-79. Nothing about this individualized and discretionary process is "automatic," and contrary to Plaintiffs' unsupported assertion, the rationale for granting parole in any particular case must be specific to that individual under the Notice. *See* ECF No. 79 at 22.

Plaintiffs' only support for their argument is their reference to extra-record evidence, Defendants' discovery responses pertaining to Plaintiffs' standing, ECF No. 79 at 20 & Ex. B at 267, which is inadmissible to argue the merits in this APA challenge to agency action on the basis of an administrative record. *CHNV*, 2023 WL 2842760 at *3; *Texas v. Biden*, No. 2:21-CV-0067-Z, 2021 WL 4552547, at *2 (N.D. Tex. July 19, 2021). And even were this extrinsic evidence adduced regarding standing admissible for the merits argument Plaintiffs use it for here (which it is not), Plaintiffs concede the evidence shows only eight KFT parole in place grants nationwide over an entire week before the Notice was administratively stayed, ECF No. 79 at 20, which hardly indicates an "en masse" use of parole, especially by comparison to other parole initiatives, *supra*.

Plaintiffs next argue that the "Case-by-Case Consideration for Parole" in the Notice contains only 63 words and therefore sends an "obvious" "message to DHS officers" that "they are expected to rubber-stamp all qualifying applications." ECF No. 79 at 20-21. This argument contravenes the presumption of regularity, *see Chem. Found.*, 272 U.S. at 14-15, and is inaccurate. In other sections, the Notice discusses the individualized inquiry and factors in greater detail. 89 Fed. Reg. at 67465 (explaining the several factors "USCIS will consider on a case-by-case basis"); *id.* at 67467 (explaining that requestors will have to "[s]ubmit biometrics, undergo required background checks and national security, public safety, and border security vetting, and be found not to pose a threat to national security or public safety"); *id.* at 67472 (providing a lengthy but still "non-exhaustive" list of the various positive and negative individualized factors DHS will consider in "examin[ing] the totality of the circumstances in the individual case"). In arguing that

review under the Notice is cursory, Plaintiffs again impermissibly rely on extrinsic evidence for their merits argument: a newspaper article offering no way to verify the claims reported therein, even if it were admissible. ECF No. 79 at 21 n.5. Regardless, neither this article nor anything in the record indicates that USCIS officers would not conduct the thorough case-by-case analysis required by the Notice.

Finally, Plaintiffs' assertion regarding the "lack of information that Defendants collect about each alien" is unsupported and meritless. ECF No. 3 at 14-15. USCIS officers are directed to collect and consider significant evidence from each applicant, including "biometrics," "background checks and national security, public safety, and border security vetting," which will help DHS determine if any applicant presents a national security or public safety threat. 89 Fed. Reg. at 67467. This information is also helpful to determining whether there are individual economic benefits, the nature of the familial benefits, and whether processing the noncitizen through this process will allow the agency to use its limited resources more efficiently. The only basis for Plaintiffs' assertion, language in a decision from a district court in Florida, has no bearing here. ECF No. 79 at 21-22 (quoting *Florida v. Mayorkas,* 672 F. Supp. 3d 1206, 1213 (N.D. Fla. 2023)). *Florida* involved a different use of parole, for noncitizens arriving at the border, and the court's criticism there (which Defendants dispute and have appealed) is that the government knew nothing about those noncitizens' criminal histories since they were only arriving in the United States and were expected to self-report past crimes. 672 F. Supp. 3d at 1213. In contrast, here, spouses are eligible for parole under the Notice only if they have been living in the United States for ten years or more. Given their need to submit biometrics and undergo background screening, the Notice creates a process whereby DHS will have a reliable, objective way to determine if

applicants have a relevant disqualifying criminal history from the previous decade if not longer, absent reliance on self-reporting.

5.  The Notice Does Not Violate the Paroled "Into" Language in Section 1182(d)(5)(A), Which Speaks to the Noncitizen's Legal Status as Unadmitted, Not Their Location.

The Notice is consistent with sections 1182(d)(5)(A) and 1255(a), which refer to noncitizens paroled "into the United States." Both Congress, in the military family and CNMI residents contexts, *supra* at 37, and at least three courts of appeals have recognized that unadmitted noncitizens already present inside United States territory may nevertheless be paroled "into the United States" under the terms of section 1182(d)(5)(A), thus rendering them eligible for adjustment of status under section 1255(a). *Cruz-Miguel*, 650 F.3d at 198 (stating "even aliens already physically present in the United States … may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) by virtue of their status as applicants for admission"); *Ortega-Cervantes*, 501 F.3d at 1116 ("We see nothing that would preclude the government from paroling such an alien" who was physically present in the country without inspection and admission "into the United States under § 1182(d)(5)(A)" and explaining that had the petitioner there, who was apprehended after illegally entering the country, been paroled under section 1182(d)(5)(A), as opposed to 8 U.S.C. § 1226(a), he would have been "eligible for adjustment of status under § 1255(a)"); *Akhtar*, 2024 WL 1427634, at *3 (recognizing DHS's authority to parole in place under section 1182(d)(5)(A) unadmitted noncitizens encountered already inside the United States, providing a basis for adjustment of status).[9] The Notice utilizes parole in accordance with

_____

[9] Plaintiffs argue that *Ortega-Cervantes* and *Akhtar* turned on other issues, not the availability of parole under section 1182(d)(5)(A) to noncitizens already physically present in the United States. ECF No. 79 at 25-26. Regardless, this does not undermine the persuasive value of the former's

these authorities' understanding of the meaning of being "paroled into the United States."

Plaintiffs' argument to the contrary illustrates their misunderstanding of this term as it is employed by the INA post-IIRIRA, and specifically their failure to grasp the difference between legal status and physical location, and the changes IIRIRA wrought to make the former and not the latter dispositive of noncitizens' status and rights. *See* ECF No. 79 at 22-26. In determining noncitizens' status, IIRIRA focused on "admission," not physical presence, and defined "admission" as "the lawful entry of the alien into the United States after inspection and authorization by an immigration officer." 8 U.S.C. § 1101(a)(13)(A); *see Cruz-Miguel*, 650 F.3d at 197. Unless and until admitted, the noncitizen is deemed an "applicant for admission." 8 U.S.C. § 1225(a)(1); *see* ECF No. 77 at 42-44.

At the same time, section 1182(d)(5)(A) continued to allow for parole of "any" applicant for admission, and "[t]he IIRIRA did not change section 1255(a) or otherwise change the adjustment of status process," continuing to allow paroled applicants for admission to apply for adjustment. *Akhtar v. Gonzalez*, 450 F.3d 587, 590 (5th Cir. 2006). Thus, following IIRIRA, section 1255(a)'s limitation on adjustment to noncitizens who have been "inspected and admitted

---

analysis of the parole authority and conclusion that *"*nothing*"* "preclude[s] the government from paroling" a noncitizen physically present in the country without inspection and admission "into the United States under § 1182(d)(5)(A)," *Ortega-Cervantes*, 501 F.3d at 1116, nor the latter's recognition that section 1182(d)(5)(A) permits parole in place of noncitizens who are not applying at a port of entry—i.e., who are already inside the United States, *Akhtar*, 2024 WL 1427634, at *3, *especially* given the lack of *any* cases even indirectly supporting Plaintiff's interpretation. Plaintiffs cite *Chi Thon Ngo v. INS*, 192 F.3d 390, 392 n.1 (3d Cir. 1999), but misleadingly portray what that case says. It does not support them. The court merely noted that "[i]n the context of an alien's initial entry" specifically, parole "amounts to permission … for ingress into the country," but then went on to explain that parole is used in multiple other contexts, such as the release from immigration detention of aggravated felons, who are *already inside the country*. *Id.*

or paroled"[10] and who are otherwise "admissible to the United States for permanent residence" categorically prevents any *unadmitted* noncitizen unlawfully present without inspection from being able to adjust status under that provision. The only authority Plaintiffs offer for their novel reading of the parole and adjustment statutes is isolated language from the Senate report accompanying the 1960 amendment to section 1255 stating that "the wording of the amendment is such as not to grant eligibility for adjustment of status … to aliens who entered the United States surreptitiously." ECF No. 79 at 23. This language was rendered obsolete by the changes in IIRIRA, which changed the "entry" paradigm to one of "admission," and now hinges the ability to adjust status on being inspected and admitted or paroled, not physical entry into the United States. *See, e.g.*, *Cruz-Miguel*, 650 F.3d at 197-98. Congress's express ratification of the use of parole in place to resolve unlawfully present noncitizens' prior lack of inspection and provide them a basis for adjustment of status in the military and CNMI contexts signals its understanding that, consistent with IIRIRA, the paroled "into the United States" language in sections 1182(d)(5)(A) and 1255(a) speaks to whether a noncitizen has been admitted, regardless of whether they already physically entered the country. *Supra* at 37.

Plaintiffs thus misunderstand the current structure of the INA when they argue that parole "into the United States" in sections 1182(d)(5)(A) and 1255(a) "literally means that the alien must have been granted parole while physically entering the United States." ECF No. 79 at 23. By providing that parole is available to "applicant[s] for admission," 8 U.S.C. § 1182(d)(5)(A), the parole statute (as well as the adjustment statute by virtue of its reference to parole) makes clear

---

[10] Plaintiffs incorrectly maintain, based on outdated legislative history pre-IIRIRA, that section 1255 "prohibit[s] … adjustment of status within the United States for aliens who entered unlawfully." ECF No. 79 at 24. The plain text of section 1255(a) does not discuss the lawful or unlawful manner of noncitizens' entry at all, but provides for adjustment for noncitizens based only on whether they have been "inspected and admitted or paroled." 8 U.S.C. § 1255(a).

that it is referencing the *legal status* of noncitizens arriving at or present in the country without inspection or admission, 8 U.S.C. § 1225(a)(1), not the *physical location* of the noncitizen inside or outside of the country. *See, e.g.*, *Duarte v. Mayorkas*, 27 F.4th 1044, 1058 (5th Cir. 2022); *Cruz-Miguel*, 650 F.3d at 198 (providing that even noncitizens "already physically present in the United States … may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) *by virtue of their status as applicants for admission*") (emphasis added); *United States v. Gambino-Ruiz*, 91 F.4th 981, 989 (9th Cir. 2024) (explaining that the noncitizen "by entering illegally 'from outside the country'" was placed …. "into 'a fictive legal status' … as the equivalent of an arriving alien applying for admission at a port of entry"). Congress authorized parole for any "applicant for admission," 8 U.S.C. § 1182(d)(5)(A), and the INA defines an "applicant for admission" as anyone "present in the United States who has not been admitted," 8 U.S.C. § 1225(a)(1). Plaintiffs' argument would render this statutory language in section 1225(a)(1) meaningless.

Plaintiffs' reliance on the reference to parole in 6 U.S.C. § 202(4) is misplaced, as Defendants explained. ECF No. 77 at 44-45. This provision on its face specifically addresses visa issuance for admission of noncitizens seeking permission to enter the United States from abroad, and the use of parole and other parallel procedures providing "permission . . . to enter" for *that particular population* of noncitizens who otherwise would need visas. 6 U.S.C. § 202(4). This is clear from section 202(4)'s provision that the Secretary's establishment and administration of rules relating to visas and other forms of permission to travel to a U.S. port of entry must be "in accordance with [6 U.S.C. § 236]." 6 U.S.C. § 202(4). Section 236 addresses the respective DHS and Department of State authorities only with respect to "[v]isa issuance." 6 U.S.C. § 236. It does not address parole. Nor does it address the whole scope of the Secretary's authority to grant noncitizens permission to remain in or lawful status in the United States, such as through the

procedure for adjustment of status to that of an LPR, which is only available for noncitizens already within the United States, and which expressly covers parolees. *See* 8 U.S.C. § 1255(a); *see also* 8 U.S.C. § 1103(a)(1) (providing the Secretary authority over "the administration and enforcement of … all other laws relating to the immigration and naturalization of aliens"). That 6 U.S.C. § 202(4) recognizes the well-understood premise that parole under 8 U.S.C. § 1182(d)(5) also may constitute a form of "permission . . . to enter" the country for noncitizens abroad does not limit the Secretary's parole authority under 8 U.S.C. § 1182(d)(5) with respect to noncitizens already present in the United States (concerning, e.g., parole from immigration custody, parole in place).[11]

Indeed, Plaintiffs concede that Congress "specifically authorized parole of aliens already present in the United States," but claim it was "*only* in the limited circumstance of military families." ECF No. 79 at 25 (citing NDAA 2020, § 1758). However, Plaintiffs have no basis for this assertion, as nothing in the NDAA limits Congress's reaffirmation of "the importance of the Secretary's parole in place authority" to the military context. *Id.* § 1758(b)(3).

Finally, Plaintiffs claim there is "some ambiguity" about the Congressional authorization of parole in place for certain CNMI residents because the statute provides for "'deferred action or parole, as appropriate.'" ECF No. 79 at 25 n.6 (quoting 48 U.S.C.§ 1806(e)(6)). There is no ambiguity. In this statute, Congress expressly provided the Secretary discretion to "authorize … parole" for the noncitizens addressed in that provision, noncitizens already continuously present in the Commonwealth of the Mariana Islands since 2009. 48 U.S.C. § 1806(e)(6)(A)(ii)(II) & (B). Whether or not the Secretary was making an initial grant of parole or re-granting parole to noncitizens already lawfully present in the CNMI under parole (both of

---

[11] Indeed, "[i]t would be passing strange for Congress to restrict" the Secretary's authority under 8 U.S.C. § 1182(d)(5) "in a manner so oblique." *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 320 (2019).

which section 1806(e)(6) by its plain terms provides for) has no bearing on the fact that this provision confirms Congressional understanding that "into the United States" in section 1182(d)(5)(A) did not prohibit the parole of noncitizens who had been living inside United States territory for years.  Indeed, the distinction Plaintiffs highlight defeats their argument that the ability to re-authorize an additional period of parole under section 1182(d)(5)(A) constitutes a violation of the "temporary" requirement of that statute, *infra*, as Congress in section 1806(e)(6) clearly authorized the Secretary to parole individuals who may already have been present under a grant of parole. 48 U.S.C. § 1806(e)(6)(A)(ii)(II) & (B).

6.  The Limited Period of Parole Under The Notice Satisfies the Temporary Requirement.

Paroles granted under the Notice are "temporary," 8 U.S.C. § 1182(d)(5)(A), as Defendants explained. ECF No. 77 at 45-46. The Notice provides that parole in place will be granted only for a limited period, "generally … of up to three years," and does not contemplate the opportunity for additional grants of parole, or "re-parole," under this process. 89 Fed. Reg. at 67473.

Plaintiffs argue that the Notice violates the temporary requirement because parole via the KFT process will "help [noncitizens] remain permanently in the United States" due to their opportunity to apply for immigrant visas and adjustment of status while on parole. ECF No. 79 at 26-29. But this does not mean that the *parole* is not temporary. Rather it demonstrates that the parole is not indefinite and will come to an end when the noncitizens enter the adjustment process. Plaintiffs contend that section 1182(d)(5)(A) require that both the noncitizen's grant of parole and the entire length of their presence in the United States be temporary, pointing to a later clause in section 1182(d)(5)(A) that says, "when the purposes of such parole shall ... have been served the alien shall forthwith return or be returned to the custody from which he was paroled." ECF No. 79 at 28-29 (quoting 8 U.S.C. § 1182(d)(5)(A)).

There are several flaws in this reasoning. First, that clause applies to noncitizens paroled from "custody" and not all grants of parole under section 1182(d)(5)(A) are to noncitizens who would otherwise be in custody, *see, e.g.*, *MPP*, 20 F.4th at 947 (citing parole of noncitizens while they wait for their visas to become available); *Akhtar*, 2024 WL 1427634 at *3 (discussing advance parole of noncitizens outside the country), indicating this clause does not pertain to all parolees or those who may be paroled under the KFT process, but only to those who are paroled out of detention. Second, the language of section 1255(a), where Congress expressly authorized adjustment for parolees, renders Plaintiffs' reading of the "temporary" requirement in section 1182(d)(5)(A) incorrect, or else all paroles that served as a basis for adjustment of status and thus long-term status in the United States would violate section 1182(d)(5)(A), and this provision of section 1255(a) would be superfluous. But courts must interpret statutes to form a "coherent regulatory scheme," which interpreting the express use of section 1255(a) to violate section 1182(d)(5)(A) would not. *See FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). Third, Plaintiffs' argument ignores precedent. The Fifth Circuit has recognized that "paroling aliens" during the finite period while they are "waiting for [their visa] to become available" represents a valid use of the temporary parole authority, *MPP*, 20 F.4th at 947, even though obtaining that visa means in many cases that they will become permanent residents. Finally, Plaintiffs' interpretation is inconsistent with Congress's provision for parole for military family members or longtime CNMI residents for the purpose that they be able to apply for adjustment of status to LPR, *supra*.

Plaintiffs also argue that the possibility of re-parole means the Notice violates the temporariness requirement. ECF No. 79 at 27-28. However, Plaintiffs discuss re-parole only in the context of other, unrelated parole use, misleadingly ignoring the Notice's explicit statement that,

as far as the KFT process is concerned, "DHS does not contemplate a re-parole process at this time." 89 Fed. Reg. at 67473. But even were re-parole available under the Notice, Congress's ratification of the use of re-parole in, just to name one instance, the CNMI parole in place initiative Plaintiffs cite, indicates that the possibility of re-parole does not conflict with the temporariness requirement of section 1182(d)(5)(A). *Supra*; 48 U.S.C.§ 1806(e)(6)(A)(ii)(II) & (B).

### B.  Parole in Place under KFT Does Not Circumvent Other INA Provisions.

As Defendants explained, the Notice operates within Defendants' lawful authority to use their parole power and does not circumvent other INA provisions aimed at providing noncitizens lawful status within the United States. ECF No. 77 at 46-48. The parole authority has long existed alongside other avenues for noncitizens to adjust status, as the plain language of the adjustment statue itself declares in providing both admission and parole as platforms. *See* 8 U.S.C. § 1255(a). Congress and multiple federal appellate courts have held that parole in place is a valid mechanism to address certain bases of ineligibility that would preclude adjustment of status. *Supra* § III.A.

Plaintiffs argue that the Notice circumvents statutory requirements for a noncitizen to qualify for a waiver of inadmissibility or visa ineligibility, including departing and applying for an immigrant visa at a U.S. embassy or consulate overseas. ECF No. 79 at 19-24. Plaintiffs refer to 8 U.S.C. § 1182(a)(9)(B)(i)(II), which renders inadmissible a noncitizen who was unlawfully present in the United States for one year or more and seeks admission within 10 years of their departure or removal from the United States, and then provides for a waiver of this inadmissibility "if refusal of admission … would result in extreme hardship to the citizen or lawfully resident spouse or parent of such" noncitizen.

However, nothing in section 1182(a)(9)(B) suggests that the sole path to obtaining lawful permanent resident status involves departing the United States and pursuing an immigrant visa

abroad. Indeed, Plaintiffs themselves repeatedly concede that the INA offers other avenues for unlawfully present noncitizens to adjust status without leaving the country or obtaining a waiver under section 1182(a)(9)(B). *See* ECF No. 79 at 16 (citing 8 U.S.C. § 1182(d)(11) and explaining "when an otherwise admissible alien encouraged a spouse, son, or daughter to enter the United States illegally, Congress decided that family unity was reason enough to grant the Secretary discretion to waive that alien's inadmissibility"); *id.* at 34 (describing "8 U.S.C. § 1229b(b)(1)'s authorization for cancellation of removal," which provides adjustment of status to qualifying noncitizens facing removal). And as noted, adjustment of status is expressly available to noncitizens who are paroled into the United States, *see* 8 U.S.C. § 1255(a), and Congress's ratification of other parole in place uses indicates that it views parole in place as a valid manner to cure inadmissibility imposed by unlawful presence and provide a basis to adjust status. *Supra* at 37. That not all noncitizens would qualify for all routes to lawful permanent residence is beside the point; the fact that Congress provided different statutory alternatives to achieve LPR status and at least some noncitizens would be eligible to avail themselves of multiple avenues to obtain LPR status indicates that Congress did not intend consular processing to be the sole avenue.

And had Congress intended consular processing to be the only path for unlawfully present noncitizens to obtain LPR status, it would have said so explicitly, without the need to resort to the tortured route of implication Plaintiffs suggest. The INA has several provisions where Congress indicates its intent to make a procedure the "sole and exclusive" path to obtain a particular immigration relief through using exactly that language. *See*, *e.g.*, 8 U.S.C. § 1229a(a)(3) (providing "a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be … removed from the United States"); *id.* § 1252(a)(5) (providing "a petition for review filed with an appropriate court of appeals in accordance with this

section shall be the sole and exclusive means for judicial review of an order of removal").  This a case where "Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest," and its failure to include the "sole and exclusive" language in section 1182(a)(9)(B) shows Congress did not intend exclusivity. *See Jama v. Immigration and Customs Enforcement*, 543 U.S. 335, 341 (2005).

Plaintiffs also complain that the procedural requirements and costs of applying for parole in place are different and (in their view) less onerous than applying for a visa or an I-601A waiver. ECF No. 79 at 31-33. But the fact that there are different procedural and evidentiary requirements and costs associated with obtaining an immigrant visa as opposed to parole in place has no bearing on the clear statutory provision of these alternate pathways, especially given Congress's recent affirmations of parole in place. *See* 8 U.S.C. § 1182 note (NDAA); 48 U.S.C.§ 1806(e)(6). There are different requirements for admission and parole, *compare* 8 U.S.C. §§ 1182(a), 1201-1202 *with id.* § 1182(d)(5)(A), yet Congress said both may serve as a basis for adjustment. *See* 8 U.S.C. § 1255(a). Plaintiffs' argument would mean that all other congressionally and court-approved uses of parole in place, to the extent that they do not have the same requirements and costs as immigrant visa processing (which they do not) are also unlawful. Plaintiffs do not, and cannot, point to a single authority supporting so sweeping a result, and their anomalous reading, which would require the Court to interpret some of Congress's immigration provisions as indicating that others were unlawful, fails to interpret the INA to form a "coherent regulatory scheme." *See Brown & Williamson Tobacco Corp.*, 529 U.S. at 133.

Thus, as Defendants explained, the Major Questions Doctrine does not come into play here, because Congress "sp[oke] clearly" and explicitly "when authorizing" other statutory paths for unlawfully present noncitizens to become a LPR without leaving the country to seek an immigrant

visa and triggering the unlawful presence ground of inadmissibility. *See Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021). Plaintiffs' contention boils down to their subjective value judgment that permitting the Secretary authority to use parole in place as a basis for unlawfully present noncitizens to adjust status confers unprecedented "vast" and "breathtaking" authority on DHS. ECF No. 79 at 33-35. Regardless of the adjectives Plaintiffs wish to use, however, they fail to confront that Congress has unequivocally affirmed the use of parole in place for just this purpose in other contexts, *see* 8 U.S.C. § 1182 note (NDAA); 48 U.S.C. § 1806(e)(6), and that the Notice's potential effect is not qualitatively different or "vaster" or more "breathtaking" than other uses of parole Congress has accepted and approved. *See* 89 Fed. Reg. at 67464 & n.63 (61,000 grants of military parole in place); *id.* at 67464 & n.60, n.65-n.67 (CNMI parole in place and Cuban, Haitian, and Filipino World War II veterans parole); *id.* at 67488 n.246 (tens of millions of grants of parole in legacy INS initiative in six-month period). Plaintiffs fail to show the Notice is intended to or actually does violate Congressional intent and circumvent other provisions of the INA, given that Congress has already authorized multiple routes, including parole, to accomplish the same result.

### C.  The Notice is Not Arbitrary and Capricious.

DHS's decision to use its longstanding parole authority in this context easily satisfies the "narrow" "scope of review under the 'arbitrary and capricious' standard" under which a court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). The agency considered all relevant factors, it reasonably explained the decision, and the Secretary's conclusions are fully supported by the record. *See* ECF No. 77 at 48-53. The Secretary noted the success and explicit congressional approval of parole in place in the parallel context of military families, explained in detail how extending parole in place to certain qualifying spouses of U.S. citizens and to specified

stepchildren of U.S. citizens comports with section 1182(d)(5)(A) and serves at least five significant public interests, considered but ultimately rejected as less effective alternative approaches, and considered the impact on administrative resources, adjudicatory capacity, federal and local governments, and States. *Id.* at 48-49.

Plaintiffs' contrary arguments lack merit. *See* ECF No. 79 at 41-45. First, Plaintiffs argue that the Secretary "failed to consider the States' interest in reliance on the prior regime and the disruption caused by paroling, by the most conservative estimate, at least 550,000 aliens *en masse.*" ECF No. 79 at 41. Plaintiffs' argument attacks a straw man—the notice does not provide access to parole to anyone who could not seek it under section 1182(d)(5)(A) prior to the KFT process, *see supra* at 15, 38, nor does it provide for *en masse* parole, *see, e.g.*, 89 Fed. Reg. at 67465 ("All parole in place requests will be considered on a case-by-case basis as required under the statute," and "[t]hrough a case-by-case assessment, USCIS will consider whether parole for each requestor individually will provide a significant public benefit"). Plaintiffs argue the KFT process "creates major liabilities for the States" by making parolees "eligible for a vast swath of expensive government benefits" and will "incentivize illegal migration ... increasing illegal migration and the myriad financial and social costs that accompany it." ECF No. 79 at 42. Plaintiffs' assertion of increased liabilities and incentives for "illegal migration" is contrary to the evidence in the record, as well as the evidence Plaintiffs have put forth in this case. *Supra* at 9-10.

A significant portion of the Notice is devoted to discussing and addressing the available evidence about the likely impact of the KFT process. Among other things, "DHS considered the potential impact of the proposed process on State budgets, including noncitizens' access to means tested benefits, driver's licenses, and public education." 89 Fed. Reg. at 67478-79. In doing so, the Secretary determined based on the available evidence that the benefits of the KFT process would

"outweigh the anticipated costs to Federal and State governments alike," and that the process would not "meaningfully affect or create incentives for noncitizens to enter the United States." *Id.* at 67479. Plaintiffs do not point to any evidence in the record that contradicts the Secretary's analysis, and their argument that the Secretary did not "actually analyze the relevant factors," ECF No. 79 at 42, is directly contradicted by the Notice itself. Nor is there any merit to Plaintiffs' argument that the Notice is arbitrary and capricious because it acknowledges that a "comprehensive quantified accounting of local and state fiscal impacts due to this parole in place process is not possible." *Id.* (quoting 89 Fed. Reg. at 67478). Plaintiffs cannot point to any existing study of such costs that exists, nor have they put forth evidence of any such costs in this case, and "[t]he APA imposes no general obligation on agencies to conduct or commission their own empirical or statistical studies." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 427 (1978) ("[I]t is not unusual in day-to-day agency decisionmaking within the Executive Branch" for the agency to lack "perfect empirical or statistical data.").

Plaintiffs do not raise any actual reliance interests that the Secretary failed to consider. To raise reliance interests, Plaintiffs must show that they are regulated by the KFT process, took some action in reliance on a prior approach, and suffer some unexpected liability as a result of an unexpected change in approach, *see* ECF No. 77 at 49.  Plaintiffs do not, and cannot, satisfy any of those criteria here. Instead, Plaintiffs assert costs the agency should have considered, specifically Medicaid, SNAP, TANF, and Medicaid and CHIP under the Children's Health Insurance Program. ECF No. 79 at 42-43. But Plaintiffs cannot point to any evidence of actual costs in these areas. As they acknowledge, noncitizens with parole do not "become eligible for" Medicaid, SNAP, and TANF until they have been paroled for "five years." *Id.* at 43. Because parole under the KFT process is limited at most to three years, there is no basis to argue that the

KFT process will cause costs in these areas. ECF No. 77 at 50. Moreover, the Secretary specifically addressed these types of costs and discussed both the various reasons why it was unlikely that the KFT process would increase these costs and the ways in which any costs that might accrue would be outweighed by other benefits. *See* 89 Fed. Reg. at 67478-79. As to medical services to children, States already must provide free emergency medical services to children regardless of immigration status, *see* ECF No. 77 at 50, and as the Secretary noted, CHIP is also limited to individuals who have been in a qualified status for at least five years, 89 Fed. Reg. at 67478.

Plaintiffs next argue "Defendants did not consider the incentive structures built into our immigration laws." ECF No. 79 at 43. Once again, this argument is contradicted by the Notice. The Secretary specifically considered incentives, put certain limits on who can use the KFT process to eliminate the possible incentives Plaintiffs raise, and reasonably determined that, with those limitations, the KFT process would not meaningfully affect or create incentives for noncitizens to enter the United States unlawfully. *See* ECF No. 77 at 50-51.

Plaintiffs argue the Secretary "fail[ed] to address the shift from their prior position." ECF No. 79 at 44. But the Secretary addressed at length the reasons for and benefits of extending parole in place from the military context to certain additional groups. *See* ECF No. 77 at 51. Plaintiffs also argue "the PIP Program is arbitrary and capricious because its rationales are pretextual." ECF No. 79 at 44. Plaintiffs cite no evidence of pretext, and their argument falls far short of the standard they must meet to overcome the presumption of regularity and look behind the Secretary's stated explanations for the KFT process. *See* ECF No. 77 at 51-52. Plaintiffs argue "the Notice repeatedly treats illegal aliens participating in the U.S. workforce as a positive." ECF No. 79 at 44; *id.* at 45. The KFT process is, however, expected to *decrease* the number of noncitizens working in the United States without authorization. *See* ECF No. 77 at 52. The Notice also addresses the various

benefits that might result if noncitizens who obtain parole through the KFT process obtain work authorization through the separate process for applying for employment authorization. *Id.* Nothing in the statute bars the Secretary from considering these factors and Plaintiffs point to no evidence of negative impacts on the existing workforce.

Finally, Plaintiffs argue that the Secretary failed to consider alternatives to the KFT process. ECF No. 79 at 45. But an entire section of the Notice discusses various alternatives the Secretary considered, including leaving the existing process in place and providing additional resources for processing pending Forms I-601A. *See* ECF No. 77 at 52-53. Even if the Secretary had not considered these possible alternative approaches before determining they were inferior to the KFT process, agencies are not required "to consider all policy alternatives in reaching [a] decision." *State Farm*, 463 U.S. at 51.

### D.  Plaintiffs Cannot Succeed on the Notice and Comment Claim.

As previously explained, the States cannot succeed on their claim that the Notice was required to undergo notice-and-comment rulemaking. *See* ECF No. 77 at 53–58. The Notice is a general statement of policy, rather than a legislative rule, because it explains how USCIS will exercise its discretionary parole authority in certain cases. *Id.* at 53–55. Likewise, the Notice constitutes a rule of agency procedure because it establishes a process for USCIS adjudicators to follow when specific noncitizens apply for parole, without dictating the outcome of any given parole determination. *Id.* at 55. And the Notice is exempt under the foreign-affairs function exception because it "is one part of the United States' ongoing efforts to engage hemispheric partners to increase their efforts to collaboratively manage irregular migration." 89 Fed. Reg. at 67489. Under any of these standards, notice-and-comment rulemaking was not required.

The States raise several arguments to the contrary, but their contentions are incorrect. *See* ECF No. 79 at 36–41. *First*, the States argue the Notice is a legislative rule because it "imposes rights and obligations by instructing DHS officials on how to exercise their discretionary parole authority, setting new criteria for granting parole, affecting the States' obligations to provide benefits to certain aliens, affecting the federal government's obligations to provide benefits to certain aliens, and establishing a framework for the showing required to parole hundreds of thousands or millions of aliens into the country." *Id.* at 37. They also assert the Notice imposes rights and obligations insofar as it "creates a right to access a unique, expedited process for certain aliens." *Id.* at 38.  But they point to nothing in the Notice requiring DHS to reach a certain result as a function of the KFT process. As explained, the Notice does not change the statutory requirement that DHS officials make parole determinations on a case-by-case basis, nor does it provide any assurance that parole-in-place will be granted in any specific case. 89 Fed. Reg. at 67465. The Notice "leaves the agency and its decision-makers free to exercise discretion" to grant or deny parole based on the discretionary factors and equities of individual cases. *DACA*, 50 F.4th at 522. And the fact that the Notice establishes the KFT process does not make it a legislative rule; any noncitizen remains able to apply for parole at any time and the substantive standards for granting parole under the KFT process remain unchanged. *See* 89 Fed. Reg. at 67465; *see Texas v. United States*, 809 F.3d 134, 176–77 (5th Cir. 2015) (explaining that "rules are generally considered procedural so long as they do not change the *substantive standards* by which the agency evaluates applications") (cleaned up).

*Second*, the States argue the Notice is a legislative rule because it "'will produce significant effects on private interests,'" insofar as it will confer noncitizens granted parole-in-place with "eligib[ility] to apply for lawful permanent residence based on their marriage to a U.S. citizen ...

without having to leave the United States." ECF No. 79 at 37 (quoting *Mock v. Garland*, 75 F.4th 563, 581 (5th Cir. 2023)). But they ignore that any such benefit flows from *the INA*, not the Notice or KFT. If a noncitizen is granted parole in place under section 1182(d)(5)(A), then he meets the requirement under section 1255(a) to have been "paroled into the United States"—regardless of whether the noncitizen utilized the KFT process or not. Any "significant effect" on the noncitizen's "private interest[]," *Mock*, 75 F.4th 563, thus flows from the statute, not the Notice. Plaintiffs rejoin that the INA cannot be the source of the benefit because section 1182(d)(5)(A) "does not authorize parole under the circumstances described in the Notice." ECF No. 79 at 38. But that is incorrect, and regardless, the Notice itself does not purport to, and does not, provide the new benefits as Plaintiffs contend.

*Third*, the States contend the foreign-affairs function exception does not apply because the KFT pathway "doesn't ... involve *recent* arrivals at any border," and instead concerns noncitizens "who have been *within U.S. borders* for over 10 years." ECF No. 79 at 40. But they fail to understand that the KFT process would mitigate the effects of noncitizens departing the United States for their home countries and then facing uncertainty about their return. *See* 89 Fed. Reg. 67460 (explaining that noncitizens granted parole-in-place, "if otherwise eligible, could apply for adjustment of status to that of an LPR, rather than having to depart the United States to pursue an immigrant visa"). The fact that noncitizens covered by the Notice are not recent arrivals is immaterial, because the process mitigates against potential issues with the United States' foreign partners if these noncitizens did return to their home countries to pursue consular processing, responds to concerns those foreign partners have raised, and supports important shared efforts with those partners. *See* 89 Fed. Reg. 67849 (explaining how delayed implementation of the Notice "would complicate ongoing conversations with key foreign partners about migration management

on a range of priorities," including "initiatives aimed at disrupting human smuggling, trafficking, and transnational criminal networks; increasing migration controls on bus and train routes; imposing additional visa requirements to prevent individuals from exploiting legitimate travel regimes to facilitate their irregular journey to the United States; and expanding access to lawful pathways"); *id.* at 67489 ("Regularizing certain noncitizens who have lived in and established deep ties to the United States is a key request of our partner countries, and establishment of this proposed process will help ensure our partners' continued collaboration to address irregular migration in the Western Hemisphere and improve economic stability and security in countries that are common sources of irregular migration to the United States.").

*Finally*, the States argue the Notice does not satisfy the foreign-affairs-function exception because the Government has not shown that notice-and-comment rulemaking would lead to "definitely undesirable international consequences." ECF No. 79 at 39. But they concede, as they must, that this is not the law in the Fifth Circuit. The foreign-affairs exception applies when a rule "involve[s]" a "foreign affairs function of the United States"—without regard to harm. 5 U.S.C. § 553(a)(1). The APA does not require a showing of definitely undesirable international consequences. And even if it did, the Government has explained how delayed implementation of the Notice would harm relations with the Governments of Mexico and Colombia. *See* ECF No. 77 at 57–58; 89 Fed. Reg. 67489. Thus, the Notice was not required to undergo notice-and-comment rulemaking.

### E.  Plaintiffs' Paperwork Reduction Act Claims Lack Merit.

The States likewise cannot succeed on their APA claim challenging the Office of Management and Budget's (OMB) approval of the collection of information through Form I-131F under the emergency processing provisions of the Paperwork Reduction Act (PRA), 44 U.S.C.

§ 3507(j), and OMB's implementing regulations, 5 C.F.R. § 1320.13. *See* ECF No. 1 at ¶¶ 278–288; ECF No. 3 at 36–37. In the PRA, "Congress designated OMB the overseer of other agencies with respect to paperwork and set forth a comprehensive scheme designed to reduce the paperwork burden." *Dole v. United Steelworkers of Am.,* 494 U.S. 26, 32 (1990); *see also* 44 U.S.C. § 3501.

Initially, Plaintiffs lack standing to enforce the requirements of the PRA, as they have not asserted any cognizable injury arising from the form's collection of information, nor have they established causation or redressability. Form I-131F does not seek information from Plaintiffs, but rather collects information from individuals seeking parole in place. And Plaintiffs do not argue they are injured by the separate decision to authorize the use of Form I-131F. *See* 89 Fed. Reg. 67489. That is, Plaintiffs assert an injury arising from the KFT process, not from the collection of information from noncitizens. *See* ECF No. 79 at 56–57. Also, any downstream injury to Plaintiffs that purportedly flows from the collection of information would be even more speculative and attenuated than injuries that purportedly flow from the KFT process. *Supra* § I.B. Plaintiffs thus have not established standing to pursue this claim. *Town of Chester, N. Y. v. Laroe Ests., Inc.,* 581 U.S. 433, 439 (2017) (plaintiffs must establish standing for each claim raised).

Even if Plaintiffs had standing, their interests do not fall within the zone of interests protected by the PRA. The interests protected by the PRA are, primarily, reducing paperwork burdens "resulting from the collection of information by or for the Federal Government"; improving efficiency and productivity of government programs through information resources management; and protecting privacy in information collection. *See* 44 U.S.C. § 3501; *Ass'n of Am. Physicians & Surgeons, Inc. v. HHS,* 224 F. Supp. 2d 1115, 1128 (S. D. Tex. 2002). The PRA's sole statutory enforcement mechanism is a "public protection provision" ensuring that no individual can be penalized for failing to comply with an unauthorized collection. 44 U.S.C.

§ 3512. The Plaintiff States are not claiming that Form I-131F is too burdensome, inefficient, or insufficiently protective of privacy for the noncitizens who use the form to request parole—to the contrary, their claim is that parole in place should be eliminated outright. States are not the target of the information collection at issue, and Plaintiffs do not even purport to claim an interest in protecting noncitizens from the burdens of information collection.

In any event, OMB's decision is unreviewable. *See* ECF No. 77 at 59. The PRA expressly provides that OMB's decision "to approve . . . a collection of information contained in an agency rule shall not be subject to judicial review." 44 U.S.C. § 3507(d)(6). The Federal Register Notice here requires individuals seeking parole in place through the KFT process to use the Form I-131F, *see* 89 Fed. Reg. at 67472, and thus under § 3507(d)(6), OMB's approval of that collection is not reviewable. *See Hyatt v. Office of Management & Budget*, 908 F. 3d 1165, 1171 n.6 (9th Cir. 2018) (explaining that § 3507(d)(6) applies to all rule-based collections and is not limited to those contained in "proposed agency rules" undergoing notice and comment). APA review is thus not available because "statutes preclude judicial review." 5 U.S.C. § 701(a)(1).

Even if the information-collection decision were reviewable, Plaintiffs' claim that the emergency authorization violates the APA's arbitrary and capricious standard is meritless. The PRA allows agencies to request emergency authorization if they make a written determination that "public harm is reasonably likely to result if normal clearance procedures are followed" or "the use of normal clearance procedures is reasonably likely to prevent or disrupt the collection of information." 5 U.S.C. § 3507(j)(1)(B); *see* 5 C.F.R. § 1320.13(a). Contrary to Plaintiffs' bare assertion, both USCIS and OMB followed the PRA-required procedures. *See* ECF No. 1 at ¶ 281. As evidenced in the administrative record and decision, OMB considered USCIS's written request for emergency authorization, which was based on timing necessity and it being essential to

USCIS's mission, as well as the public harm and impediment to the agency's collection of information that would likely result if it were required to wait for normal clearance procedures; in particular, families would continue to experience significant hardships before the information collection was implemented and would be susceptible during that time period to fraudsters "mak[ing] false promises to secure parole for a fee," which would disrupt the agency's collection of information. *See* OMB Administrative Record; *see also* 5 C.F.R. § 1320.13(a). OMB's reliance on USCIS's justifications in approving its request is eminently reasonable and reflects consideration of the relevant regulatory factors, and thus easily withstands APA review. *See Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F. 2d 897, 904 (5th Cir. 1983). Plaintiffs do not acknowledge or cite to any aspect of the administrative record concerning the request for emergency authorization or make any specific arguments concerning the reasonableness of that authorization. *See* OMB AR. They merely argue that the reasons for the emergency authorization were not included in the Notice, ECF No. 79 at 46; ECF No. 1 at ¶ 286, but there is no requirement that the reasons for the emergency authorization be included in the Federal Register Notice. In fact, emergency clearances are routinely granted for reasons set forth in an agency's written statement requesting emergency clearance, as occurred here. *See* OMB AR; 5 C.F.R. § 1320.13 (a), (d). For each of these independent reasons, the PRA claim lacks merit.

### F.  The Notice Does Not Violate the Take Care Clause Claim.

Plaintiffs argued in their complaint that the Notice violates the Take Care Clause because it dispenses with certain immigration statutes. ECF No. 1 at ¶¶ 290-91, 300. This is not a viable constitutional claim, and the Take Care Clause does not create a private right of action. ECF No. 77 at 60-61. Plaintiffs now concede that they are not asserting an implied cause of action arising under the Take Care Clause, but rather just raising a claim under the APA that the KFT process

conflicts with other provisions. ECF No. 79 at 46. But, insofar as Plaintiffs base their Take Care Clause claim upon their allegation that "PIP Program contravenes the law and the Constitution," ECF No. 1 at ¶ 297, the Take Care Clause claim is duplicative of their APA claim that the challenged policy is contrary to law. It should, therefore, be dismissed as duplicative. *Texas v. Biden*, 589 F. Supp. 3d 595, 617 (N.D. Tex. 2022) (dismissing Take Care Clause claim as duplicative of APA claim).

### G. Plaintiffs Have Abandoned Their Ultra Vires Claim.

Plaintiffs' ultra vires claim, ECF No. 1 at ¶¶ 301-03, is not viable for the reasons set forth in Defendants' motion. ECF No. 77 at 61-63. Plaintiffs apparently agree, as they did not seek summary judgment on their ultra vires claim, or otherwise preserve it as part of their "trial brief explaining [their] position on the legal and factual issues in the case," ECF No. 69 (Court Order). *See generally* ECF No. 79. The Court should dismiss Plaintiffs' ultra vires claim for the reasons stated in Defendants' motion and because Plaintiffs have not moved for relief on this claim at trial.

### IV.  IF THE COURT GRANTS RELIEF IT MUST BE SHARPLY LIMITED

Even assuming Plaintiffs in fact can demonstrate actual injury by a preponderance of the evidence and that they are entitled to summary judgment on any of their claims, remand without vacatur is the only appropriate remedy. ECF No. 77 at 66-67.

### A. Plaintiffs Have Not Proven Irreparable Injury and the Balance of Harms Weigh Against Injunctive Relief.

Plaintiffs cannot demonstrate that they will suffer immediate, irreparable harm absent entry of injunctive relief. They do not even try. ECF No. 79, at 70. The section of their brief titled "Texas will suffer irreparable injury" is three sentences. *Id.* Plaintiffs simply state, in conclusory fashion, that "Texas faces an imminent, irreparable, sovereign injury from the PIP Program." *Id*. Not so. As set forth in Defendants' motion, and above, Plaintiffs have failed to demonstrate any injury at

all, let alone one that is imminent and irreparable. ECF No. 77 at 21-23; *supra* at 17–19. Indeed, the KFT process is generally available only to noncitizens who are already residing in the country and have been for at least ten years. *Id.* at 64. Plaintiffs do not explain how any remedy issued by this Court would cause their alleged costs to diminish. They cannot explain, for example, why individuals who have been here without lawful status for more than ten years would suddenly leave the country were this Court to vacate or enjoin the KFT Processes. For the reasons stated in Defendants' moving brief, *id.* at 64, and *supra* at 5–9, Plaintiffs fail to demonstrate any injury necessitating permanent relief.

With respect to the balancing of the equities, Plaintiffs again provide little argument. First, they assert that "there is 'no public interest in the perpetuation of unlawful agency action.'" ECF No. 79, at 71 (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022)). But that reasoning cannot be reconciled with *Winter v. NRDC*, 555 U.S. 7, 32 (2008), in which the Supreme Court made clear that permanent injunctive relief "does not follow from success on the merits as a matter of course," and that a court must still address "the balance of equities and consideration of the public interest." 555 U.S. at 32.

The only meaningful argument Plaintiffs make with respect to balancing the equities is their short statement that "even if the program could meaningfully be said to benefit the illegal aliens at issue, immediate injunctive relief cannot be reasonably said to cause them any harm." ECF No. 79 at 71. But the harm this Court should consider in balancing the equities is not limited to the harm that would be imposed upon noncitizens who would otherwise benefit from the KFT Process. The severe disruption to the United States' foreign relations caused by permanent relief weighs heavily against vacatur or injunction. The Government's interests in public safety, obtaining international cooperation with migration and law enforcement efforts, managing its

backlog of immigration cases and prioritizing the use of DHS's limited resources also weigh against Plaintiffs' speculative injuries. *See* ECF No. 77 at 65. While Plaintiffs argue that even if "these regulations could be lawful," injunctive relief or vacatur would result only in "a short delay in program implementation while this litigation runs its course." ECF No. 79 at 71. But this argument has no weight at the trial stage where this litigation has already run its course in the district court. Those concerns tip the scale against permanent injunctive relief. *Id*.

### B. Remand Without Vacatur Is the Only Appropriate Remedy.

The Fifth Circuit has held that "[r]emand, not vacatur, is generally appropriate when there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *Texas Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389–90 (5th Cir. 2021). This rule is particularly appropriate here where vacatur would interfere with and disrupt the country's diplomatic efforts with other Western Hemisphere countries to obtain their cooperation in immigration and international-crime enforcement in return for providing a route for regularization of their nationals long residing in the United States. ECF No. 77, at 65; *see, e.g.*, *Cent. & S.W. Servs v. U.S. EPA*, 220 F.3d683,  692 (remand without vacatur appropriate "when vacating would be disruptive"); *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 97-98 (D.C. Cir. 2002) (remand without vacatur appropriate where vacating decision would have "disruptive consequences"); *A.L. Pharma, Inc. v. Shalala*, 62 F.3d 1484, 1492 (D.C. Cir. 1995); *Hawaii Longline Ass'n v. Nat'l Marine Fisheries Serv.*, 288 F. Supp. 2d 7 (D.D.C. 2003) (staying vacatur when it would cause "serious disruptions"), appeal dismissed, 2004 WL 1052989 (D.C. Cir. 2004). Thus, remand without vacatur is the appropriate remedy. Plaintiffs do not address the viability and appropriateness of remand as a remedy. *See generally* ECF No. 79 at 69-73. For the reasons stated in Defendants' motion, and herein, remand is the only appropriate remedy in this case. ECF No. 77 at 66-67.

### C.  Relief Should be Limited to the Parties Who Have Proven Injury.

Plaintiffs argue that should this Court issue a nationwide injunction. ECF No. 79 at 73. Plaintiffs cite to a decision from the Southern District of Texas (the *100-Day Pause* case), and two cases from the Fifth Circuit (the *DAPA* case and the *Priorities* case), both predating the Supreme Court's *Priorities* decision. ECF No. 79 at 73. The *Priorities* decision highlights the separation-of-powers concerns and other issues with universal remedies. *Priorities*, 599 U.S. at 686-704 (Gorsuch, J., concurring). Among those concerns is that while this Court might find the KFT process unlawful, another court elsewhere in the country might disagree. *Arizona v. Biden*, 31 F.4th 469, 484 (6th Cir. 2022) (nationwide injunctions "short-circuit the decision making benefits of having different courts weigh in on vexing questions of law and allowing the best ideas to percolate to the top."). Indeed, for precisely that reason, a district court in the Southern District of Texas recently declined to grant nationwide relief in another case concerning a national policy. *Texas v. Biden*, No. 6:22-CV-00004, 2023 WL 6281319, at *16 (S.D. Tex. Sept. 26, 2023). And universal remedies are problematic in other ways. They conflict with Article III's requirement that "[a] plaintiff's remedy must be tailored to redress the *plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 73 (2018) (emphasis added), and the rule in equity that relief "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994). Such remedies also circumvent Rule 23's class-action requirements, incentivize forum shopping, and overburden courts' emergency dockets. *See*, *e.g.*, *Arizona v. Biden*, 40 F.4th 375, 395-98 (6th Cir. 2022). They also "intrude on powers reserved for the elected branches" and "encourage parties to engage in forum shopping and circumvent rules governing class-wide relief." *Priorities*, 599 U.S. at 694 (Gorsuch, J., concurring).

These concerns apply equally to universal vacatur. *Id* at 701-704 (Gorsuch, J., concurring). Universal vacatur of a rule, if authorized at all, thus should be reserved for "truly extraordinary

circumstances," *id.*, which do not exist here. Plaintiffs argue that vacatur orders are, by definition, "not party-restricted." ECF No. 79 at 73. But like any other form of equitable relief, vacatur should be limited to redressing the specific injuries of the parties before the court. *See Priorities*, 599 U.S. at 702-703 (Gorsuch, J., concurring); *see id.* at 703 ("And courts [] must do their part, too, asking whether party-specific relief can adequately protect the plaintiff's interests. If so, an appellate court should not hesitate to hold that broader relief is an abuse of discretion."); *Trump v. Hawaii*, 585 U.S. 667, 714 (Thomas, J. concurring) ("No statute expressly grants district courts the power to issue universal injunctions." And if Plaintiffs were correct that this court could not fashion a party-restricted vacatur, then those longstanding equitable principles would require the court to forgo issuing any vacatur at all in favor of a party-specific injunction.

Plaintiffs argue that providing relief to Texas alone would be "ineffective," because "aliens in the United States are "free to move among states." ECF No. 79 at 73. But Plaintiffs do not cite any evidence suggesting that a meaningful number of noncitizens eligible to apply for relief through the KFT process would likely move to Texas in the future if they received such relief—much less that they would move to Texas and their presence would result in the State incurring the costs that constitute its alleged harm in this case. To the contrary, if anything, Texas-limited relief seems likely to incentivize noncitizens currently residing in Texas to move to other States.

Instead of supporting their assertion with evidence, Plaintiffs simply cite the Fifth Circuit's decision in *DAPA*. ECF No. 79 at 74 (citing *DAPA*, 809 F.3d at 188). But the *DAPA* case precedes recent Supreme Court precedent questioning universal relief and also ignores the reality here that KFT beneficiaries already have established ties to wherever they are living. Plaintiffs offer no explanation for why a noncitizen without lawful status, who has a spouse or children in one state, would choose to leave that state to travel instead to live in Texas. Plaintiffs have certainly presented

no evidence of that. And while Plaintiffs purport to address the "incidental" benefit to other states from nationwide vacatur, ECF No. 79 at 73, they disregard that many states have filed an amici brief in this case supporting Defendants. ECF No. 98.

Plaintiffs also seek a stay under 5 U.S.C. § 705, which they claim "aligns with the scope of ultimate relief under section 706." ECF No. 79 at 73. At the outset, §705 pertains to preliminary relief, and whereas the Court combined Plaintiff's motion for a preliminary motion with a trial on the merits, a stay under § 705 makes no sense. Regardless, section 705 itself makes clear that relief under that provision is constrained by the traditional equitable principles described above: under that section, a court may stay agency action only "to the extent necessary to prevent irreparable injury." 5 U.S.C. § 705. Indeed, the legislative history of that provision makes clear that Congress intended that § 705 relief would be "equitable" and used only "to prevent irreparable injury." H.R. Rep. No. 79-1980, at 43 (1946). Thus, consistent with equitable principles, Congress understood that "[s]uch relief would normally, if not always, be limited to the parties complainant." *Id.*

Plaintiffs have the burden "to *prove* that whatever injunction they request" is "no broader" than necessary "to protect against their proven injuries." *Feds for Med Freedom v. Biden*, 63 F.4th 366, 389 (5th Cir. 2023); *see also Madsen*, 512 U.S. at 765 (any relief the Court grants must "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *Gill*, 585 U.S. at 73 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."). They have not done so. And indeed, Defendants have provided the Court with a workable alternative—remanding without vacatur, or at most, enjoining the KFT process only as to those eligible noncitizens who live in Texas. The Court should reject Plaintiffs' request for a universal injunction or vacatur.

Finally, in response to the Court's request for discussion of provision of security under

Fed. R. Civ. P. 65(c), ECF No. 76, Defendants do not believe the posting of a bond as security is proper in these circumstances because the operational, administrative and diplomatic harms Defendants would suffer if enjoined are not financial harms compensable through a bond.

## CONCLUSION

The Court should grant summary judgment in Defendants' favor.

Dated: October 25, 2024          Respectfully submitted,

BRIAN M. BOYNTON
*Principal Deputy Assistant Attorney General*

DAVID MCCONNELL
*Director*
Office of Immigration Litigation
General Litigation and Appeals Section

EREZ REUVENI
*Acting Deputy Director*

BRIAN C. WARD
*Acting Assistant Director*

KATIE J. SHINNERS
ALEXANDER J. HALASKA
*Senior Litigation Counsel*

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
ELISSA P. FUDIM
DAVID KIM
CAROLINE MCGUIRE
ERIN T. RYAN
*Trial Attorneys*
U.S. Department of Justice
Civil Division
Office of Immigration Litigation
General Litigation and Appeals Section
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
Tel.: (202) 598-7537
Joseph.a.darrow@usdoj.gov

70

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 25, 2024, I electronically filed this memorandum in support of Defendants' motion with the Clerk of the Court for the United States District Court for the Eastern District of Texas by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ *Joseph A. Darrow*
JOSEPH A. DARROW
U.S. Department of Justice