**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TEXAS**
**TYLER DIVISION**

| | |
|---|---|
| State of Texas, et al. | |
| *Plaintiffs*, | |
| v. | |
| United States Department of Homeland Security; Alejandro Mayorkas, in his official capacity as Secretary for DHS; Ur Jaddou, in her official capacity as Director of USCIS; Troy Miller, in his official capacity as the Acting Commissioner of CBP; Patrick J. Lechleitner, in his official capacity as the Acting Director of ICE; the OFFICE OF MANAGEMENT AND BUDGET; SHALANDA YOUNG in her official capacity as the Director of the Office of Management and Budget, | No. 6:24-cv-00306 |
| *Defendants*. | |

---

**Plaintiffs' Response to Defendants' Trial Brief and Motion for Summary Judgment**

---

## INTRODUCTION

The Defendants continue to press for unconstitutional and unlawfully broad discretion, in direct contravention of the text and intent of the Immigration and Nationality Act (INA) as amended by the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA), in order to defend a brazenly unlawful mass amnesty pushed through by an administration with less than zero regard for Congress's role in crafting immigration policy. But the law is clear: The Defendants' discretion to grant parole is limited, the Program far exceeds the Defendants' lawful discretion, and the harm to the States resulting from this abuse is sufficient to confer Article III standing.

Along the way, Defendants have thrown up a lot of chaff to confuse the real issues. To hear the Defendants describe their Parole in Place Program (the "PIP Program" or "Program"), it simultaneously has no effect on anyone's rights or eligibility for parole, *see, e.g.*, ECF No. 77 at 18 ("Nor does the notice, or the KFT process, itself create new eligibility for parole. Instead, it establishes a process by which certain noncitizens may be considered, on a case-by-case basis, for parole, under the pre-existing, discretionary statutory authority at 8 U.S.C. § 1182(d)(5)(A)."), and it also is a vital to "promote[ ] family unity and stability by allowing noncitizen family members to obtain lawful status without separating them from their U.S. citizen spouses and, in many cases, their U.S. citizen children, which *existing legal options for obtaining lawful status* otherwise would often require," ECF No. 77 at 10 (emphasis added). The Defendants would have this Court believe the Program will not increase the future number of aliens present in this country, *see* ECF No. 77 at 21–22, but named their "Keeping Families Together" program after its purported *primary* effect of allowing illegal aliens to *avoid leaving the country* and applying for re-entry as the law requires.

The reality is that the Program does what it purports to do: It establishes parole eligibility for an illegal alien population that is, by statute, ineligible for parole, thereby increasing the number of illegal aliens who remain in the United States and eviscerating policies Congress instituted to deter further illegal migration into this country. *See* Implementation of Keeping Families Together, 89 Fed. Reg. 67,459, 67, 460 (Aug. 20, 2024) (the "Notice") (characterizing the PIP Program as

the Biden-Harris Administration "tak[ing] action to preserve the unity of U.S. citizens and their noncitizen spouses and noncitizen stepchildren who currently cannot access LPR [Lawful Permanent Resident] status without first departing the United States.").

The Program is nothing more than the latest example of an increasingly desperate effort by the Biden-Harris Administration to circumvent immigration law and encourage illegal immigration by rewarding those who break our Nation's laws. *See Texas v. United States* (*DAPA),* 809 F.3d 134 (5th Cir. 2015) (program giving legal status to illegal aliens who were parents of citizens or lawful permanent residents), *aff'd*, 579 U.S. 547 (2016); *Texas v. Biden* (*MPP*), 20 F.4th 928 (5th Cir. 2021) (DHS terminating program which returned certain illegal aliens to Mexico during their removal proceedings); *Texas v. United States* (*DACA),* 50 F.4th 498, 508 (5th Cir. 2022) (program directing that removal of certain aliens who entered the U.S. illegally as children should be deferred); *GLO v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023) (DHS diverting funds away from the construction of a border wall, resulting in a "fivefold" increase in southwest border encounters).

This Court should hold the Program unlawful and set it aside. Plaintiffs therefore reiterate their request that this Court grant preliminary relief until such time as it has rendered final judgment, grant summary judgment in favor of the Plaintiff States, and find the PIP Program unlawful and vacate it, and permanently enjoin the Program's operation, as well as any future abuses of the parole authority.

One note about evidence the Court may consider in this case. Although Defendants correctly cite the general rule that review of evidence in an APA case is largely limited to the administrative record, ECF No. 77 at 14–15, the record rule does not always apply, *see Gulf Coast Rod Reel & Gun Club, Inc. v. U.S. Army Corps of Engineers*, No. 3:13-cv-126, 2015 WL 1883522, at *1-2 (S.D. Tex. Apr. 20, 2015) (Costa, J.). It does not apply to non-merits issues like subject matter jurisdiction, including standing and whether the test for final agency action is satisfied, *see Qureshi v. Holder*, 663 F.3d 778, 781 (5th Cir. 2011) ("if there is no final agency action, a federal court lacks subject matter jurisdiction"). Evidence about such issues does not implicate the record rule because

courts consider it "not in order to supplement the administrative record on the merits, but rather to determine [their own] jurisdiction." *Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*, 117 F.3d 1520, 528 (9th Cir. 1997); *see also Sierra Club v. Yeutter*, 911 F.2d 1405, 1421 (10th Cir. 1990). In fact, courts routinely rely on extra-record evidence to support jurisdiction in APA cases, including for Article III standing. *See, e.g.*, *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010) (relying on declarations to find that plaintiffs had Article III standing in an APA case). The same is for remedial questions, *Mountains Trans-Pecos Heritage Ass'n v. FAA*, 116 F. App'x 3, 16 (5th Cir. 2004), and even to some merits determinations, such as failure to consider relevant factors, *Davis Mountains Trans-Pecos Heritage Ass'n v. FAA*, 116 F. App'x 3, 15–16  (5th Cir. 2004), or to ultra vires claims, *Texas v. Biden*, No. 2:21-cv-67-Z, 2021 WL 4552547, at *4-6 (N.D. Tex. July 19, 2021) (Kacsmaryk, J.), or to determining whether an agency action is a substantive rule for purposes of notice-and-comment claims. *Texas v. United States*, 606 F. Supp. 3d 437, 493 n.66.(S.D. Tex. 2022) (Tipton, J.).  Extra-record evidence is also allowed "where evidence arising after the agency action shows whether the decision was correct or not," *Nat' Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2024 WL 3517504, at *15 (N.D. Tex. July 23, 2024), such as whether the PIP Program is actually compliant with the statutory requirement for case-by-case parole determinations.

## ARGUMENT

### I.    Texas has Article III standing.

Texas has demonstrated each of the three elements required to have standing to bring its claims: (a) an injury in fact, (b) fairly traceable to the challenged action, (c) that will likely be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992). Under the standing analysis, only one plaintiff needs to establish standing for an Article III case or controversy to exist. *See DACA*, 50 F.4th at 514 (citing *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006)). And once a concrete injury is shown, the magnitude of that injury is irrelevant to the standing inquiry. *See, e.g.*, *Massachusetts v. EPAs*, 549 U.S. 497, 525–26 (2007).

"Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status." *DACA*, 50 F.4th at 517. On top of these federally required costs, other expenditures are required by preexisting state law. Texas law requires local governments to provide healthcare for the indigent. *See* Tex. Health & Safety Code §§ 61.001 *et seq.* Texas law also requires nonprofit hospitals to provide unreimbursed care for the indigent as a condition of maintaining nonprofit status. *See id.* § 311.043.

### A.  Texas has an injury in fact.

"For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'" *DACA*, 50 F.4th at 518. Contrary to Defendants' assertion, ECF No. 77 at 28 (making this point under redressability prong), standing is not defeated by the fact that some of the beneficiaries could have been paroled under a different process. And contrary to Defendants' argument, ECF No. 77 at 24–25, Texas need not show that any actual PIP Program beneficiaries partake of any of these benefits to show standing, and the fact that some beneficiaries could be paroled through some other process does not defeat standing.  The Fifth Circuit has rejected both of these points:

> The Government says that's not enough because Texas has not shown it has already issued any licenses to immigrants who became eligible because of MPP's termination. Tellingly, however, it offers no hint as to how Texas could make that showing—nor why we should require it to do so. Imagine Texas had produced copies of driver's license applications from paroled aliens. Would that have counted as evidence that Texas had, in the Government's words, "issued a single additional 'driver's license as a result" of MPP's termination? Of course not: There would always remain some possibility that *any given parolee* would have been paroled even under MPP. MPP is precisely the sort of large-scale policy that's amenable to challenge using large-scale statistics and figures, rather than highly specific individualized documents. And Texas's standing is robustly supported by just such big-picture evidence. There is nothing "conjectural" or "hypothetical" about that.

*MPP*, 20 F.4th at 971; *see also id.* at 972–73 (noting that despite no evidence of the MPP-eligible aliens specifically imposing costs, stranding satisfied because it was "easy to see" that "at least some MPP-termination-caused immigrants will certainly seek healthcare services from the State," because it was "a simple causal inference based on a simple change in incentives" and therefore

not speculative); *DACA*, 50 F.4th at 517–18 (finding sufficient for standing that "[t]he record does not indicate precisely what portion of all costs for illegal aliens is spent on DACA recipients, but no one disputes that some are."); *DAPA*, 809 F.3d at 155 (holding that Texas established injury in fact without precisely quantifying the costs of issuing driver's licenses to DAPA beneficiaries).

The annual cost of educating unaccompanied alien children—a subset of illegal aliens of which Texas has specific numbers due to public disclosure by the federal government—costs Texas hundreds of millions of dollars annually, and approximately $232.77 million in FY 2023 and $201.90 million in FY 2024. ECF No. 79-3, Ex. C. ¶ 5. Defendants argue that it is implausible that some of the stepchildren eligible for the PIP Program would depart the country for consular processing to adjust status. ECF No. 77 at 24–25. But if the illegal alien parent does so, it is likely the desire for family unity will lead the stepchildren to follow. And the evidence of DACA recipients (themselves children at the time) being likely in the future to leave the country without lawful presence belies Defendants' assumption. ECF No. 79-6, Ex. F ¶ 12.

Additionally, Texas funds two healthcare programs that require significant expenditures to cover illegal aliens: the Emergency Medicaid Program and the Texas Children's Health Insurance Program (CHIP). ECF No. 79-4, Ex. D. ¶ 5. Texas is required by federal law to cover illegal aliens in Emergency Medicaid. *See* 42 C.F.R. § 440.255(c). "The total estimated cost to the State for the provision of Emergency Medicaid services to undocumented immigrants residing in Texas was $116 million in CY 2019; $88.3 million in CY 2020; $95.6 million in CY 2021; $95.0 million in CY 2022; and $97.5 million in 2023." *Id.* ¶ 8. Texas also spends millions of dollars per year on CHIP for perinatal coverall for illegal aliens, including over $31 million in 2023. *Id.* ¶ 10.

Texas also faces serious injuries from the crime and associated costs caused by illegal aliens. From July 1, 2022, to June 30, 2023, the Texas Department of Criminal Justice (TDCJ) housed 7,768 illegal criminal aliens for a total of 2,208,639 days. ECF No. 79-5, Ex. E. ¶ 6. That cost Texas around $171,147,436, but the federal government has yet to reimburse Texas. *Id.* ¶¶ 6–7. And from July 1, 2022, through June 30, 2022, TDCJ housed 6,914 illegal criminal aliens for a total of

2,019,635 days. *Id.* ¶ 8. That cost Texas around $156,501,516. *Id.* Of this amount, TDCJ was only reimbursed $14,555,173. *Id.* ¶ 9. And from July 1, 2020, through June 30, 2021, TDCJ housed 7,058 criminal illegal aliens for a total of 1,984,597 days. *Id.* ¶ 10. That cost Texas an estimated $ 153,786, 422. *Id.*  Of this amount, TDCJ was only reimbursed $ 14,883,040 by the federal government. *Id.* ¶ 11. The amounts of unreimbursed expenses will likely increase if more illegal aliens are paroled under the PIP Program. *Id.* ¶ 12. Criminal activity by aliens would not occur had they not been present in the State imposes a significant cost on Texas's criminal justice system. Defendants argue that the PIP Program purporting to make ineligible applicants with a criminal record means Texas will face reduced incarceration costs in the future. ECF No. 77 at 24. Apparently, no illegal aliens ever commit that first crime, and are always caught and punished for the earlier ones that create such a record.

Defendants' reliance on *FDA v. Alliance for Hippocratic Medicine (Alliance)*, 602 U.S. 367, 374 (2024), is even more misplaced. ECF No. 77 at 17, 23. There, private plaintiffs lacked standing to challenge FDA's approval of mifepristone, which plaintiffs did not prescribe, based on their desire that *other* providers would not prescribe it either. *Id.* at 374. Relevant here, *Alliance* reaffirmed that standing is established if Texas shows "a predictable chain of events leading from the government action to the asserted injury." *Id.* at 385. Texas has done just that—the goals of the PIP Program itself rely on the Program reducing the flow of illegal aliens back to their home countries to adjust their status.  Defendants concede as much. *See* ECF No. 77 at 9, 10, 11. That reduced outbound flow means that Texas will fact more aliens to use its public education, healthcare, and incarceration programs.

Defendants also maintain that because Texas is not the object of the challenged agency action, it cannot have standing. ECF No. 77 at 23.  But the Fifth Circuit has repeatedly rejected this argument when States have challenged unlawful immigration policies. *See DACA*, 50 F.4th at 517 ("The Government asserts there is a presumption against standing by plaintiffs who are not the objects of the government action they challenge. Our decision in *DAPA* rejected the applicability

of this presumption.").

### 1. Any purported offsetting benefits to Texas do not defeat standing.

Defendants ask the Court to weigh supposed benefits to Texas from beneficiaries of the PIP Program when assessing whether the State has any injury. ECF No. 77 at 26. But Article III standing "is not an accounting exercise." *DAPA,* 809 F.3d at 156; *see also DACA*, 50 F.4th at 518. Instead, "[o]nce injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *Wendt v. 24 Hour Fitness USA, Inc.*, 821 F.3d 547, 550 n.10 (5th Cir. 2016) (quoting *DAPA*, 809 F.3d at 155-56). After all, "[s]tanding is recognized to complain that some *particular aspect* of the relationship is unlawful and has caused injury." 13A C. Wright & A. Miller, Fed. Practice & Procedure § 3531.4 (3d ed. 2014) (emphasis added).

In *DAPA*, the Court held that courts must not consider "offsetting benefits" because doing so amounts to an inappropriate "accounting exercise." 809 F.3d at 155-56. Further, the Court held that Texas is entitled to special solicitude in the standing analysis, recognizing the harm to the State's sovereignty created by DHS's failures to fully enforce federal law. *Id.* at 153. It mattered not, the Court said, that DHS could identify possible offsets in the form of ancillary benefits that may result from the program. *Id.* at 156–57. An evenly divided Supreme Court affirmed, *Texas*, 579 U.S. 547 (2016), leading the Obama Administration to withdraw the program.

In *DACA*, the court reached the same conclusion as to the DACA program. 50 F.4th at 518. Again, before holding the DACA program unlawful, the Fifth Circuit held that the States had standing to challenge the program because Texas established "expenditures in providing emergency medical services, social services and public education for illegal aliens." *Id.* at 518–19. The court reached this conclusion even in the face of DHS's assertions that without the DACA program, Texas's "healthcare costs would increase for aliens who remain in Texas," *id.* at 518—the same argument Defendants continue to make here. ECF No. 77 at

The Fifth Circuit has said—albeit in *dicta*—that Article III's 'no accounting' rule may not apply in cases with "offsetting benefits that are of the same type and arise from the same transaction." *DAPA*, 809 F.3d at 155. Assuming the exception exists, it is narrow and inapplicable here.

Although the Court of Appeals has maintained the possibility of considering offsetting benefits of "the same type" and arising out of the "same transaction" as the plaintiff's costs, it has refused to do so in immigration cases. For example, in *GLO v. Biden*, 71 F.4th 264 (5th Cir. 2023), the Fifth Circuit held that States had standing to challenge an agency's refusal to fund a border wall even if such refusal to do so would allow investment on "system-enhancing technology" that DHS claimed would more effectively reduce immigration. *Id.* at 273. "[E]ven if the installation of system-enhancing technology assists in border control," the court explained "that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *Id.* (quoting *DAPA*, 809 F.3d at 155). The States thus were not required to "demonstrat[e that] their 'preferred' border-barrier system would be more effective than the system DHS has elected to construct" because "once an 'injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant.'" *Id.* at 274 (quoting *DAPA*, 809 F.3d at 155-56). This negates Defendants' arguments that any reductions in state benefit utilization (of which they provide no evidence) could serve to offset injuries to Texas and deprive it of standing. ECF No. 77 at 26. Indeed, the Fifth Circuti has rejected the exact argument that Defendants make on this front—that without the program's employment authorization, aliens remaining in Texas would use more state benefits. *See DACA*, 50 F.4th at 518 ("The Government cites estimates that if the DACA program were to be terminated, the State's healthcare costs would increase for aliens who remain in Texas, because they would lose their jobs and employer-based health insurance and would rely more on emergency Medicaid. That may be, but these estimates do not account for the cost savings—healthcare *and educational*—from others' departure. Texas would no longer be required to educate

those who depart or the children who depart with them" and rejecting argument as "accounting exercise").

The Supreme Court has never altered the rule that once an injury is established, courts do not consider offsetting benefits. If anything, the Supreme Court seems to have implicitly agreed with the Fifth Circuit's position when it reversed the court's decision in *MPP* on the *merits*—but not standing. *See Biden v. Texas*, 597 U.S. 785, 801-07 (2022). In all events, because the Supreme Court reversed *MPP* on other grounds, this Court's standing analysis remains binding circuit precedent. *See Data Mktg. P'ship, LP v. Dep't of Lab.*, 45 F.4th 846, 856 n.2 (5th Cir. 2022) (*MPP's* standing analysis is binding); *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001).

### 2.   Defendants' "self-inflicted injury" argument has been rejected by the Fifth Circuit.

Defendants argue that standing is not satisfied because Texas's injuries are "attributable to [Texas's] own choices concerning eligibility for participation in certain benefit programs." ECF No. 77 at 26 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976)). The Fifth Circuit has repeatedly rejected the exact argument in the immigration context, where Defendants had relied on the same authority. *See MPP*, 20 F.4th at 972; *DAPA*, 809 F.3d at 157–60.

### 3.   Texas's injury in fact is legally cognizable.

The Supreme Court's decision in *United States v. Texas* ("*Enforcement Priorities*"), 143 S. Ct. 1964 (2023), does not apply to cases like this one. That case addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id.* The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more

10

arrests." *Id.* The Supreme Court held that Article III standing was lacking because "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized its narrow holding: "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare. ... This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action," but that "case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power—namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* "[T]his case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing *Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id.* at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id.* at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id.* at 1974 n.5 (emphases added); *see also id.* at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court ... holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies'").

This extremely narrow and "highly unusual" case does not apply here. That is because Texas's injuries are not based on a mere failure to arrest particular aliens—they are based on the grant of affirmative relief to aliens via parole through an adjudicatory process making them eligible for benefits. This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any particular aliens.

The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id.* (cleaned up). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id.* at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But *those* indirect injuries were not *judicially cognizable* because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id.* at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice, education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 588 U.S. 752 (2019), which upheld indirect injury supporting States' standing to challenge federal agency action, *see id.* at 753 ("diminishment of political representation, loss of federal funds, degradation

12

of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting this).

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have to follow it—it is the Supreme Court's "prerogative alone to overrule one of its precedents." *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

The Supreme Court even took pains to note that it was "not suggest[ing] that federal courts may never entertain cases involving the Executive Branch's alleged failure to make more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973. Although the *Enforcement Priorities* rule does not apply to this case, its exceptions would apply even if it did.

### a. The PIP Program is affirmative immigration relief—not mere non-enforcement.

The *Enforcement Priorities* majority noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as

exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and the key Fifth Circuit precedent of *DAPA*, 809 F.3d at 154 (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).

The DACA program counted as the provision of benefits even though that agency action did not itself supply those benefits. *See Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

This applies to this case. The PIP Program makes its recipients eligible for various federal and state benefits. Under federal law, aliens paroled into the United States become eligible for various benefits after five years. These benefits include Medicaid; SNAP (commonly referred to as "food stamps"); and TANF (commonly referred to as "welfare" payments). *See* 8 U.S.C. § 1641(b)(4) (defining a "qualified alien" as "an alien who is paroled into the United States under [8 U.S.C. § 1182(d)(5)] for a period of at least 1 year"); 8 U.S.C. § 1612 (2)(L) (making eligible for food stamps aliens who have been "'qualified aliens' for a period of 5 years or more"); 8 U.S.C. § 1613(a) (making qualified aliens eligible for "any Federal means-tested public benefit ... 5 years" after "the date of the alien's entry into the United States"). Beneficiaries of the PIP Program are also eligible for employment authorization to work in the United States.

Here, Texas's injuries are not based on a mere failure to arrest particular parole-eligible aliens—instead, a grant of parole (like a grant of deferred action) is not mere non-enforcement but constitutes "affirmative immigration relief":

> DACA is not simply a non-enforcement policy. For starters, the DACA Memorandum did not merely "refus[e] to institute proceedings" against a particular entity or even a particular class. [*Heckler v. Chaney*, 470 U.S. 821, 832 (1985)]. Instead, it directed USCIS to "establish a clear and efficient process" for identifying individuals who met the enumerated criteria. Based on this directive, USCIS solicited applications from eligible aliens, instituted a standardized review process, and sent formal notices indicating whether the alien would receive the two-year forbearance. These proceedings are effectively "adjudicat[ions]." *Id.*, at 117a. And the result of these adjudications—DHS's decision to "grant deferred action"—is an "affirmative act of approval," the very opposite of a "refus[al] to act," *Chaney*, 470 U.S. at 831–832. In short, the DACA Memorandum does not announce a passive non-enforcement policy; it created a program for conferring affirmative immigration relief. The creation of that program—and its rescission—is an "action [that] provides a focus for judicial review." *Id.*, at 832.

*DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1906 (2020) (citations truncated). This exception applies to this case due to the effects that parole has on aliens and States. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP causing injuries to States via granting parole to aliens, *Biden v. Texas*, 142 S. Ct. 2528 (2022), as raising different standing issues). Increasing grants of parole even *indirectly* through termination of MPP satisfied this test:

> [T]he decision to terminate MPP "is more than a non-enforcement policy." *Regents*, 140 S. Ct. at 1907. Although the termination of MPP *itself* does not confer affirmative benefits, the interaction between the termination of MPP and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization.

*Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (emphases in original), *rev'd on other grounds*, *Biden*, 597 U.S. 785. In this case, the challenged agency action—directly increasing the number of parolees—even more directly causes this injury. When a policy "has increased the number of aliens released on parole into the United States, including Texas," *MPP*, 20 F.4th at 966, that meant that more aliens were being protected by parole status to use healthcare services and public education. *Id.* at 968. This was sufficient for Article III standing and remains the case here.

15

Contrary to Defendants' repeated assertions, ECF No. 77 at 15, 16, 17, Texas's injuries on this basis are not *indirect*—courts in the DACA litigation described these same injuries from "affirmative immigration relief" that makes aliens eligible for benefits and lawful presence as *direct* costs to the States. *See DACA*, 50 F.4th at 517 ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id*. at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas*, 549 F. Supp. 3d at 589 ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services."). *Enforcement Priorities* concerned a claim of indirect injury because the challenged agency action was a refusal to take criminal aliens into custody, a failure to act. But a direct chain of affirmative actions is cognizable for standing even if the harm is several links down the chain—While a man may not be said to *directly* harm another when he callously stands by as he falls (*Enforcement Priorities*), the man does *directly* harm another if he pushes an object that then causes the other to fall (*DACA*, termination of Remain-in-Mexico in *MPP*—and the PIP Program).

As with the termination of MPP, the DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP*, 20 F.4th at 987 (cleaned up). Paroling aliens makes them eligible for benefits, imposing *direct* costs on the Plaintiff States.

### b. Texas has standing because the agency action challenged here constitutes an abdication of Defendants' statutory responsibilities.

The *Enforcement Priorities* majority noted that "a plaintiff arguably could obtain review of agency non-enforcement if an agency 'has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id*. at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)). "So too, an extreme case of non-enforcement

arguably could exceed the bounds of enforcement discretion and support Article III standing." *Id.* at 1974. "But the States have not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes," so the Court did not analyze this potential basis for standing. *Id.*

The Parole Program is just such an extreme example that constitutes abdication of the Federal Defendants' statutory responsibilities to grant parole only on a case-by-case basis for significant public benefit or urgent humanitarian reasons. "Deciding to parole aliens *en masse* is the opposite of … case-by-case decisionmaking." *MPP*, 20 F.4th at 942. Indeed, "the whole point of the 'case-by-case' requirement that Congress added in IIRIRA" was to prevent DHS from "parol[ing] aliens *en masse*." *Id.* at 997. Yet the Program relies on precisely the type of programmatic parole that the INA expressly prohibits.

Judge Hanen had previously found that States had standing to challenge DAPA based on this abdication theory. *See Texas v. United States*, 86 F. Supp. 3d 591, 636–41 (S.D. Tex. 2015) (Hanen, J.); *id.* at 641 ("The States claim that, unlike the FDA's action at issue in *Heckler,* the DAPA program is a total abdication and surrender of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees."). Indeed, Judge Hanen relied on APA reviewability under *Heckler v. Chaney, id.* at 641, to also find standing—the same analysis adopted by the *Enforcement Priorities* majority.

The *Enforcement Priorities* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in that case or argued that the Executive has entirely ceased enforcing the relevant statutes." 143 S. Ct. at 1974. And Justice Gorsuch's concurrence notes that a claim under the Take Care Clause could be an abdication argument. *Id.* at 1977-78. Here, the PIP Program "prevents immigration officials from enforcing these [limiting] provisions of the" parole statute. *Texas*, 549 F. Supp. 3d at 608. As explained above, this violates the Take Care Clause, and the States therefore have standing based on an abdication argument. Recently, Judge Hanen found States had

standing on this basis to challenge DACA. *See Texas v. United States*, 691 F. Supp. 3d 763, 780 (S.D. Tex. 2023), *appeal filed*, No. 23-40653 (5th Cir. Nov. 9, 2023).

Now that the Supreme Court has explicitly approved abdication of statutory responsibilities as a basis for standing, this Court should find standing for the States here on this additional ground—this case involves allegations of total disregard of Congress's limits on the parole authority and thus constitutes an abdication of Defendants' statutory responsibilities.

### B.   Texas's harms are traceable to the PIP Program and redressable by this Court.

Injury must be "fairly" traceable to the defendant and be "likely" redressable by the relief sought. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When it comes to the "inherently imprecise" task of discerning traceability, "common sense" and "basic economics" are "useful tool[s]." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 (D.C. Cir. 2017) (Kavanaugh, J.).

Here, Texas has shown that the PIP Program will result in a variety of direct economic harms. Some aliens will return to their home countries when they are not incentivized to stay via work authorizations and protection from removal. "Texas has satisfied the second requirement for standing by showing that its costs are 'fairly traceable' to [the PIP Program]" because the rescission of the Program would "cause some recipients to leave, thereby reducing the financial burdens on the State." *DACA*, 50 F.4th at 519. For example, a national survey found 22.3% of DACA recipients stated that they were likely or very likely to leave the U.S. if they lacked deferred action that protected them from removal and granted them work authorization. ECF No. 79-6, Ex. F. ¶ 12.[1] Even illegal aliens who have been in the U.S. for ten years or longer "return to their

---

[1] Defendants contend that Plaintiffs' expert testimony, and therefore, information on which Plaintiffs' expert relied to develop his declaration, should be stricken for failure to comply with Federal Rule of Civil Procedure 26(a)(2)(B). *See* ECF No. 77 at 22 n.7. Defendants' contention is misplaced, and the Court should not entertain their frivolous argument. Plaintiffs can show good cause in deviating from the expert disclosure deadline. In assessing good cause, the trial court primarily considers the diligence of the party seeking to alter the existing schedule. *See Deghand v. Wal–Mart Stores, Inc.*, 904 F. Supp. 1218, 1221 (D. Kan. 1995). The party's explanation for seeking relief from the schedule must demonstrate that it could not have

countries of origin at a rate of 1% each year." *Id.* ¶ 14. Beyond these voluntary departures a number of these aliens would be removable, "providing incentives for some if not many to leave the United States, including Texas … and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520. For instance, during the second term of the Obama Administration, "365 persons who formerly had DACA status were removed from the United States." *Id.* ¶ 16. Return migration patterns have also been observed in the context of "family migrants" who "primarily move to a new county" so they can live with "their spouse or intended spouse." *Id.* ¶ 17. Like many marriages, a "substantial number of these unions end in divorce." *Id.* When this happens, "one or both partners may choose to relocate, often leading to a return to their country of origin." *Id.*

Defendants claim that "the relevant group of noncitizens is likely to simply remain living unlawfully in the United States, as they have already been for at least 10 years or more, absent the KFT process," ECF No. 77 at 13, but ignore "the consensus estimate [ ] that unlawful immigrants who have been in the United States for more than 10 years return to their countries of origin at a rate of 1% each year." ECF No. 79-6, Ex. F ¶ 14. Defendants also forget the avowed purpose of the PIP Program: "the KFT process promotes family unity and stability by allowing noncitizen family

---

met the deadline despite her diligence. *Alexander v. Martin*, No. 2:08-CV-400, 2010 WL 11531247 (E.D. Tex. June 24, 2010). In general, "a party must disclose to the other parties the identity of any witness it may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705." Fed. R. Civ. P. 26(a)(2)(A). The party seeking to introduce expert testimony must make the required expert witness disclosures at least 90 days before trial. *Id.* 26(a)(2)(D)(i). The problem with Plaintiffs' theory is that barely sixty days have elapsed since the inception of the case, much less the required ninety. ECF No. 1 (filed August 23, 2024). Had Plaintiffs been required to file expert witness disclosures ninety days before trial, they would have had to file such disclosures well before they even filed this action. Such a position is, of course, counterintuitive to the purpose of the discovery process—Defendants are simply playing games to prevent Plaintiffs from entering important facts and data into evidence. And indeed, Plaintiffs are not engaging in gamesmanship by offering this expert testimony; instead, they are simply prosecuting their case on the Court's abbreviated timeline. Beyond that, Defendants have been on notice of the identity of Plaintiffs' expert from the inception of this lawsuit—since his declaration was attached to Plaintiffs' motion for preliminary injunction. *See* ECF No. 3-1. Good cause therefore exists for the Court to admit and subsequently consider Plaintiffs' expert witness declaration and the evidence upon which he relied to develop that opinion.

members to obtain lawful status without *separating* them from their U.S. citizen spouses and, in many cases, their U.S. citizen children, which existing legal options for obtaining lawful status otherwise would often require." ECF No. 77 at 10. That's why they call it "Keeping Families Together."

The Notice itself understands that without the Program, at least some PIP-eligible aliens "must therefore depart the United States and seek an immigrant visa at a U.S. embassy or consulate abroad," where "they [would] face uncertainty about whether they will be granted an immigrant visa and be able to return to the United States." *See* 89 Fed. Reg. 67460; *see also id.* at 67474. Defendants concede that only "the vast majority of this population would remain in the country"— so a minority would not. *Id.* at 67486. The direct effect of the Program leading to reduced flows of illegal aliens back to their home countries is a feature of the Program: "USCIS also anticipates that this process will lead to … some noncitizens who would otherwise seek lawful permanent residence via consular processing, … will now seek adjustment of status." *Id.* at 67478. "Absent this process, for these noncitizens to apply for permanent residence, their U.S. citizen spouses and children might have to endure prolonged separation from them" and "for an indefinite period." *Id.* at 67466. USCIS predicts this Program will reduce the number of aliens leaving the United States to apply at an embassy or consulate from abroad, *id.* at 67468, and predicts that ICE and DOJ will save resources because fewer aliens will be placed in or remain in removal proceedings, leaving them free in the country, *id.* at 67469. Indeed, even aliens with unexecuted final removal orders may apply, *id.* at 67471–72, 67477, as well as aliens in removal proceedings, *id.* at 67476. So the Notice acknowledges that some aliens granted PIP status would otherwise have voluntarily left the United States to apply for adjustment of status at a consulate in their home countries, with the possibility of never being permitted to return, and that others would have been removed from the United States or detained in removal proceedings. In any of these scenarios, those aliens would not be using Texas's public education, healthcare, or incarceration programs "for an indefinite period"—

months or years, or maybe never again, *id*. at 67460 ("uncertainty about whether they [would] be able to return to the United States" without the Program).

In other words, there is at least a "substantial risk," *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2747 (2010), that the PIP Program keeps some aliens here who would otherwise leave the country, sometimes for years. *See* ECF No. 15-3 ¶ 23 (Decl. of Salvador Doe) ("[I]f [the PIP Program] is blocked from continuing, my only remaining option to obtain lawful permanent residency would be to do consular processing" in Mexico); ECF No. 15-8 ¶ 18 (Decl. of Foday Turay) (relaying that some "spouses have been stuck abroad for up to seven years" during consular processing); ECF No. 15-9 ¶¶ 9–10 (Decl. of Jaxhiel Turay) (acknowledging that without the PIP Program her spouse would have to "leave the United States" for consular processing and that the process could take "months or even years"). Indeed, the Supreme Court has found that a State has standing where federal action will result in a predictable *future* loss of revenue. *See Dep't of Commerce*, 139 S.Ct. at 2565–66 (predictable loss of future funding is an injury in fact, even if amount is uncertain.)

The PIP Program even allows aliens who are "currently in *removal* proceedings" to request PIP. 89 Fed. Reg. at 67465 (emphasis added). Ultimately, this gives aliens eligibility for government benefits they otherwise would not have. This increased incentive for illegal aliens to remain in the United States imposes massive costs on Texas, and the State will need to spend more money on law enforcement, education, and Emergency Medicaid because of it. *See Natl. Infusion Ctr. Assn. v. Becerra*, 116 F.4th 488, 499 (5th Cir. 2024) (finding traceability based on changing "incentives" that are likely to make third parties act in 'predictable ways.'") (quoting *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 383 (2024)).

And since Texas challenges government action, "[c]ausation and redressability typically overlap as two sides of a causation coin." *Carpenters Indus. Council v. Zinke*, 854 F.3d 1, 6 n.1 (D.C. Cir. 2017). In the same way Texas's injuries are "fairly traceable" to the PIP Program, Texas has shown its injury is "likely to be redressed by a favorable judicial decision." *Spokeo, Inc.*, 578 U.S.

330. "After all, if a government action causes an injury, enjoining the action usually will redress that injury." *Carpenters Indus. Council*, 854 F.3d at 6 n.1. In other words, all the economic harm to Texas will be prevented—and thus remedied, by vacatur, of the PIP Program. 5 U.S.C. § 706.

Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *DACA*, 50 F.4th at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is some possibility that the requested relief will reduce the harm." *Id.* at 520 (cleaned up).

Redressability holds even if relief must filter downstream through third parties uncertain to comply with the result, provided the relief would either: (1) remove an obstacle for a nonparty to act in a way favorable to the plaintiff; or (2) influence a nonparty to act in such a way. *See, e.g., Dep't of Commerce*, 139 S.Ct. at 767–68 ("[T]hird parties will likely react in predictable ways."); *Bennett*, 520 U.S. at 169 (defendants' actions need not be "the very last step in the chain of causation"); *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 396–98 (5th Cir. 2015).

Judicial relief would reduce harm because "[t]hose presently subject to [the PIP Program] would be removable if the [P]rogram were ended, providing incentives for some if not many to leave the United States, including Texas … and their departure would reduce the State's Medicaid, social services and education costs for those individuals and their families who depart with them." *DACA*, 50 F.4th at 520.

Finally, Defendants argue that Plaintiffs' injuries caused by the PIP Program are not redressable by any relief from this Court because of the limitation on injunctive relief in 8 U.S.C. § 1252(f)(1). ECF No. 77 at 28. But Plaintiffs explained in detail that none of the relief sought in this action is barred by that provision. ECF No. 79 at 72–73.

### C.  Texas is entitled to special solicitude in the standing inquiry.

The *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis. *See Texas v. Cardona*, ---F.Supp.3d---, No. 4:23-CV-604, 2024 WL 3658767, at *20 (N.D. Tex. Aug. 5, 2024) (O'Connor, J.) (explaining continued viability of special solicitude

doctrine post-*Enforcement Priorities*), *appeal filed*, No. 24-10910 (5th Cir. Oct. 7, 2024); *see also Missouri v. Biden*, 680 F. Supp. 3d 630, 718–19 (W.D. La. 2023) (recognizing the continued viability of special solicitude doctrine), *rev'd in part on other grounds*, 83 F.4th 350 (5th Cir. 2023).

Defendants may argue that *Enforcement Priorities* overturns the special solicitude doctrine. But, again, lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it. *Cochran*, 20 F.4th at 206 n.11.

When special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy." *DACA*, 50 F.4th at 514. "Normally, to satisfy redressability, a plaintiff must show that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* at 519–20 (cleaned up). "With special solicitude, however, … [t]he standard is met if there is *some possibility* that the requested relief will reduce the harm." *Id.* at 520 (emphasis added; cleaned up). Texas has satisfied the test for special solicitude standing because it has shown that (1) there is "a procedural right to challenge the action in question" and (2) the challenged action "affect[ed] one of the State's quasi-sovereign interests." *DACA*, 50 F.4th at 514 (citing *DAPA*, 809 F.3d at 151-52).

### 1.  Texas has a procedural right to challenge the agency action here.

Plaintiffs in this case established a procedural right to challenge the Parole Program under the APA because they have suffered a legal wrong and are being adversely affected or aggrieved by it. *See* 5 U.S.C. § 702; *see also MPP*, 20 F.4th at 970 n.10 (noting that such a procedural right is not limited to notice-and-comment claims but includes substantive claims under the APA).

As in *DACA*, Texas here uses its procedural right to "challenge[] DHS's affirmative decision to set guidelines for granting lawful presence to a broad class of illegal aliens." *DACA*, 50 F.4th at 514. "Congress intended for those 'suffering legal wrong because of agency action' to have judicial recourse, and the [S]tates fall well within that definition." *Id.* (quoting *DAPA*, 809 F.3d at 152). Texas thus satisfies the first element of special solicitude.

### 2.   The PIP Program affects Texas's quasi-sovereign interests.

Texas also satisfies the second element because the PIP Program affects its quasi-sovereign interests. "'One helpful indication' of a quasi-sovereign interest is 'whether the injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers.'" *DACA*, 50 F.4th at 515 (quotation omitted). Indeed, "[a]n agency action may affect a quasi-sovereign interest if it is alleged to damage certain 'sovereign prerogatives [that] are now lodged in the Federal Government.'" *Id.* (quoting *Massachusetts*, 549 U.S. at 519). The PIP Program's pressure on Texas to change its laws relating to its prison system, public education system, and participation in the Medicaid program gives "rise to a quasi-sovereign interest." *DACA*, 50 F.4th at 515.

In *DACA*, the Fifth Circuit concluded that the State's interest in classifying aliens was a quasi-sovereign interest. *Id.* The PIP Program implicates those quasi-sovereign interests just as the DACA Memorandum did. If Plaintiffs sought to change the classifications of parole recipients to alleviate their injuries, they would be threatened with federal preemption. The Fifth Circuit acknowledged these federal preemption concerns in *DACA*, concluding that "DACA implicates preemption concerns" because it classifies aliens and their status, which is a power only the federal government can exercise. *Id.* at 516. "An attempt by Texas to establish an alternative classification system or work authorizations would be preempted, despite the State's likely interest in doing so." *Id.* (citing *Arizona*, 567 U.S. at 409). The same is true under the PIP Program.

## II.   Plaintiffs have a right to challenge and this court has jurisdiction to review the PIP Program under the APA.

### A.  Plaintiffs are within the zone of interests and have a cause of action.

The Plaintiff States are well within the zone of interests of the INA for APA purposes, and numerous courts across this country have had no difficulty finding as much. The Defendants vastly overstate the challenge of the zone of interests test, which the Supreme Court has characterized as "not especially demanding." *Lexmark Intern., Inc. v. Static Control Components, Inc.*, 572 U.S. 118,

130 (2014) (quotation omitted). A party's interests must only be "arguably within the zone of interests to be protected or regulated by the statute." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). "[T]he statute in question need not indicate that Congress intended to benefit the plaintiff's interests." *Wyoming ex rel. Clark v. United States*, 539 F.3d 1236, 1243 (10th Cir. 2008).

It should come as no surprise, therefore, that courts routinely hold that States "have an interest in seeing the INA enforced, and in participating in notice and comment to voice their concerns." *DACA*, 50 F.4th at 521; *see also DAPA*, 809 F.3d at 152 ("[T]he states are within the zone of interests of the Immigration and Nationality Act ("INA"); they are not asking us to 'entertain citizen suits to vindicate the public's nonconcrete interest in the proper administration of the laws.'" (quoting *Massachusetts*, 549 U.S. at 516–17). There are several reasons States are within the zone of interests of the INA, including because States "bear[ ] many of the consequences of unlawful immigration." *DAPA*, 809 F.3d at 163 (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)) ("Texas satisfies the zone-of-interests test not on account of a generalized grievance but instead as a result of the same injury that gives it Article III standing—Congress has explicitly allowed states to deny public benefits to illegal aliens."). Another reason the States have an interest in INA enforcement is the quasi-sovereign interest in protecting its territory, an interest inherently intertwined with federal control over immigration law. *See DAPA*, 809 F.3d at 151–52; *Arizona*, 567 U.S. at 417 ("As a sovereign, Arizona has the inherent power to exclude persons from its territory, subject only to those limitations expressed in the Constitution or constitutionally imposed by Congress. That power has long been recognized as inherent in sovereignty.") (Scalia, J., concurring in part and dissenting in part). The Defendants' claim that "immigration enforcement is exclusively the province of the federal government and the Executive," ECF No. 77 at 29, ignores the quasi-sovereign interests of the States in protecting both their people and territory, and the impact immigration policy has on State fiscs, which courts have recognized as interests intimately tied to our system of federalism.

Finally, precedent is not limited to the broad assertion of standing under the INA. Prior courts have held that the States have both Article III standing and prudential standing under the APA zone of interests test specifically to challenge parole policy under 8 U.S.C. § 1182(d)(5)(A) because of the impact such policies have on their duty to manage the public welfare, including both statutorily required spending and voluntary additional spending due to compelling humanitarian crisis. *See New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D.N.M. 2020) ("[P]arties such as state and local governments that can show that the United States' parole decisions were made contrary to 'significant public benefit' under 8 U.S.C. § 1182(d)(5)(A), are at least 'arguably' within the statute's zone of interests."); *id.* ("[W]here a party, such as a state or local government, faces harm from the United States' decision to parole asylees, that party is within § 1182(d)(5)(A)'s interests."); *id.* at 1184 (recognizing that even voluntary expenditures on parolees may confer Article III standing where parole polices "harm [the State's] quasi-sovereign interests in the health and safety of its citizens in general"); *id.* ("Increased use of state-funded services is an injury sufficient for Article III standing.").

### B.  The PIP Program is final agency action.

The PIP Program is final agency action, which the Fifth Circuit's most relevant precedent instructs, should be addressed first because "that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019). Finality finds its origins in the APA which only allows judicial review of "final" agency action. 5 U.S.C. § 704. Agency action is "final" for the purposes of judicial review if two conditions are met: (1) the agency action "mark[s] the consummation of the agency's decisionmaking process" and is not "merely tentative or interlocutory [in] nature," and (2) the action determines "rights or obligations" and imposes "legal consequences." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (cleaned up). The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality requirement as "flexible." *EEOC*, 933 F.3d at 441 (cleaned up). Both finality prongs are satisfied here.

The Notice marks the consummation of DHS's decision-making. The Fifth Circuit

recognizes that even "guidance letters can mark the 'consummation' of an agency's decision-making process." *Nat'l Pork Producers Council v. EPA*, 635 F.3d 738, 755 (5th Cir. 2011). "[T]he key question [for the first finality prong] is whether [the agency action] is 'subject to further agency review.'" *Clarke v. Commodity Futures Trading Comm'n*, 74 F.4th 627, 638 (5th Cir. 2023); *Data Mktg. P'ship, LP v. United States Dep't of Lab.*, 45 F.4th 846, 854 (5th Cir. 2022). Here, implementation of the PIP Program, like termination of the Migrant Protection Protocols (MPP) in *MPP*, 20 F.4th 928, 948 (5th Cir. 2021), alters the status quo and determines DHS's approach to parole in place for a specified population of illegally present aliens, satisfying the first prong.

The Notice also binds DHS and imposes legal consequences, meeting the second finality prong. Generally, when an agency "loses discretion" because of an action, "[t]hat's textbook final agency action." *Data Mktg. P'ship, LP*, 45 F.4th at 854. Even partial removal of discretion suffices. *Clarke*, 74 F.4th at 638. The Notice here mandates parole approvals, evidenced by the 100% approval rate. *See* ECF No. 79-2, Ex. B. at 267; *Texas v. United States*, 86 F. Supp. 3d 591, 670 n.101 (S.D. Tex. 2015), *aff'd*, *DAPA*, 809 F.3d 134. Even if approval were not mandatory, the presumption that satisfying the PIP Program eligibility requirements satisfies the statutory significant public benefit requirement *is* mandatory. *See* 89 Fed. Reg. at 67465. Agency documents that bind the agency to a particular legal position, such as the Notice, are substantive rules and thus final. *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997); *DAPA*, 809 F.3d at 171.

The Notice establishes eligibility for a unique program, altering the rights of aliens and imposing obligations on DHS and imposing costs on the States. Defendants argue that because the PIP Program must be implemented through individual grants of parole, it cannot be final. ECFF No. 77 at 31. But that would mean no "rules" under the APA could ever be final, as they must always be implemented through "orders." Guidance ending the Migrant Protection Protocols in *Biden v. Texas*, for example, had to be carried out by DHS staff, yet the guidance "resulted in 'rights and obligations [being] determined.'" 597 U.S. at 808 (citation omitted).

As the Fifth Circuit has noted, the existence of substantial legal consequences affirms that

an action is final. *EEOC*, 933 F.3d at 441. Thus, the PIP Program constitutes final agency action under the APA.

### C.  The PIP Program is reviewable under the APA.

The APA establishes a "basic presumption of judicial review for one suffering legal wrong because of agency action." *Regents of the Univ. of Cal.*, 591 U.S. at 16–17. This presumption can only be rebutted if the relevant statute explicitly precludes review or if the action is committed to agency discretion by law, as clarified in *Heckler v. Chaney*, 470 U.S. 821 (1985). Neither exception applies here. Establishing unreviewability is a high bar, and "where substantial doubt about the congressional intent exists, the general presumption favoring judicial review of administrative action is controlling." *DAPA*, 809 F.3d at 164 (cleaned up). Only a narrow set of matters are deemed "committed to agency discretion," such as enforcement decisions or instances where "there is no law to apply." *Id.* at 163. This is not the case here, as Congress provided clear legal criteria for parole eligibility and a specific process for determining whether those criteria are met. *See* 8 U.S.C. § 1182(d)(5). Indeed, providing such criteria and curtailing Executive discretion to grant parole was the express purpose of amending § 1182(d)(5)(A) in IIRIRA.

First, no statute bars judicial review. Under 5 U.S.C. § 701(a)(1), reviewability is the default unless statutes expressly preclude it. While the INA states that "no court shall have jurisdiction to review … any other decision" of DHS that is specified to be within the agency's discretion (8 U.S.C. § 1252(a)(2)(B)(ii)), courts have repeatedly rejected the idea that this provision bars review of programmatic challenges like the one here. For example, in *MPP*, the Fifth Circuit rejected the argument that § 1252(a)(2)(B)(ii) renders unreviewable "an entire program …affecting thousands or millions of people," as opposed to individual cases. *MPP*, 20 F.4th at 977. Similarly, the *Roe v. Mayorkas* court found that § 1252(a)(2)(B)(ii) does not preclude judicial review of DHS's parole policies under the APA, since 8 U.S.C. § 1182(d)(5)(A) provides sufficient guidance to make the action reviewable. *Roe v. Mayorkas*, No. 22-CV-10808-ADB, 2023 WL 3466327, at *8–9 (D. Mass. May 12, 2023).

Second, the PIP Program is not committed to agency discretion by law. It constitutes a "rule" under the APA, defined as an "agency statement of general … applicability and future effect" that either prescribes law or policy. 5 U.S.C. § 551(4). *Heckler*'s doctrine does not apply to agency rules like the PIP Program; it generally applies to one-off enforcement decisions, not programmatic actions. *MPP*, 20 F.4th at 978, 984. Even if *Heckler* were relevant exception to reviewability is rebutted because the statute in question provides specific guidelines for exercising parole authority. The Supreme Court stated that DHS's parole discretion is "not unbounded," being limited to urgent humanitarian reasons or significant public benefit, and must be "reasonable and reasonably explained" under the standards of the APA. *Biden*, 597 U.S. at 806–07.

In short, the PIP Program's implementation triggers eligibility for various benefits, making it subject to judicial review. This action removes barriers to benefit eligibility, providing a clear focus for review. *DAPA*, 809 F.3d at 167 (quoting *Heckler*, 470 U.S. at 832). Even if *Heckler*'s presumption applied, the statutory criteria guiding parole decisions would override it, ensuring that DHS's exercise of parole is bounded by law and open to APA review. *MPP*, 20 F.4th at 982; *Biden*, 597 U.S. at 806–07.

## III.   The PIP Program is unlawful.

### A.   The parole statute does not authorize parole in place under the Program.

#### 1.   Unless Congress has created an exception, Section 1182(d)(5)(A) only authorizes parole into the United States from outside of the Country.

As the Plaintiff States have explained, the parole statute, 8 U.S.C. § 1182(d)(5)(A), does not authorize parole in place, with the singular exception of military families, although other laws, such as 48 U.S.C. § 1806(e)(6),[2] may create additional, very limited authorizations for parole in place.

---

[2] As discussed in the Plaintiff States' Motion for Preliminary Injunction and State of Agency Action, Motion for Summary Judgment, and Trial Brief, ECF No. 79 at 26 n.6, there is some textual ambiguity in the CNMI statute as to whether the parole authorized by 48 U.S.C. § 1806(e)(6)(ii) permits parole for illegally present aliens or merely authorizes the Secretary to extend pre-existing

*See* ECF No. 79 at 23–27. Parole *into* the United States, as used in the statute, means precisely what it says, and aliens who are already unlawfully present in the United States cannot be paroled *into* the country unless a separate statute explicitly authorizes such parole.

The Defendants attempt to defend their interpretation with the misleading claim that Congress and the courts have approved parole in place under § 1182(d)(5)(A). *See, e.g.*, ECF No. 77 at 44, 48. Defendants claim that the Plaintiff States' "argument would mean that all other congressionally- and court-approved uses of parole in place are also *ultra vires*, and Plaintiffs do not, and cannot, point to a single authority supporting so sweeping a result." *Id.* at 48. The non sequitur is the false implication that anyone disputes Congress's *authority* to approve parole-in-place. No party here disputes that Congress has explicitly authorized parole in place for certain aliens, such as military family members, *see* NDAA 2020, Pub. L. 116-92 § 1758 (2019) (8 U.S.C. § 1182 note), nor that Congress had the constitutional authority to do so, *see, e.g.*, *Jean v. Nelson*, 727 F.2d 957, 965 (11th Cir. 1984) ("In practice, however, the comprehensive character of the INA vastly restricts the area of potential executive freedom of action, and the courts have repeatedly emphasized that the responsibility for regulating the admission of aliens resides in the first instance with *Congress*.") (emphasis added).

To the contrary, Plaintiffs recognize that Congress can and has explicitly authorized such parole and recognize that such authorization would be superfluous if existing statutory authority were *already* legally sufficient to support parole in place, particularly where existing regulations already directed the policy Congress authorized. *See United States v. Marek*, 198 F.3d 532, 536 (5th Cir. 1999) ("A statute should be interpreted so as to give each provision significance."); *United States v. Palomares*, 52 F.4th 640, 646–47 (5th Cir. 2022) (interpretation that creates surplusage

---

grants of parole while adjudicating applications for CNMI Resident status. Regardless, if the Defendants' interpretation is correct and § 1806(e)(6) authorizes parole-in-place, then the Defendants' interpretation of § 1182(d)(5)(A) *cannot* be correct because limitless authority to grant parole-in-place to *anyone* would render § 1806(e)(6) superfluous.

should be permitted only "if [the court] ha[s] no other option).

Plaintiffs also note with respect to the 2020 NDAA that the interpretive power of a "sense of Congress" statement only indirectly related to the operative language of the action and passed by a Congress that had no role in drafting the then-existing or current version of § 1182(d)(5)(A) is, at best limited. *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 217–20 (2012) ("The prologue, in other words, is in reality as well as in name *not* part of the congressionally legislated or privately created set of rights and duties. It is an aside."). As directly relevant here, the language authorizing parole in place for military families is operative language and would be superfluous if the Defendants' interpretation is correct. The language explaining the *public* purpose of such parole is helpful in interpreting the provisions authorizing parole in place for military families. The general language allegedly alluding to the importance of a general parole in place authority, even if the Defendants are correctly interpreting it, is of little to no importance. "It is hard to imagine, for example, that any legislator who disagreed with that aside would vote against a bill containing all the dispositions that the legislator favored," such as, in this case, creating *new* authority to grant parole in place to certain military family members. *Id.* at 217.

The falsehood in the Defendants' argument is the claim that multiple courts have affirmed the legality of parole in place. The precedent the Defendants cite is a combination of non-binding, out-of-circuit dicta from cases about other issues and cases that cut against their argument.

*Ortega-Cervantes* and *Cruz-Miguel* both dealt with the distinction between conditional parole under 8 U.S.C. § 1226(a) and parole into the United States under § 1182(d)(5)(A). The *Ortega-Cervantes* court discussed the history of the distinct concepts of parole, commenting in passing that it could see no reason the government *couldn't* grant parole "to aliens who are currently present in the United States," but made the comment in the context of clarifying that the nature of its holding. Specifically, the court was *not* holding that parole in place is illegal—because that issue was not before the court. Rather, the court was clarifying that, at a minimum, if parole in place even *was* legal, it could only apply "so long as the government makes its intention clear, for example, by

expressly referencing § 1182(d)(5)(A) and by issuing an I-94 card." 501 F.3d 1111, 1116 (9th Cir. 2007). The federal government's oft-cited language is nothing more than dicta clarifying the extent to which the legality of parole in place was *immaterial* to the outcome—either way, the alien in that case had not been issued parole *into* the United States, but, instead, conditional parole under § 1226(a) that left him ineligible for adjustment of status under 8 U.S.C § 1255(a).

Similarly, the *Cruz-Miguel* court dealt with aliens who had been conditionally paroled under § 1226(a) but (erroneously) claimed eligibility for adjustment of status based on alleged parole into the United States under § 1182(d)(5)(A). 650 F.3d 189, 191–92. Like Ortega-Cervantes, the alien was not eligible for adjustment of status. As in *Ortega-Cervantes*, the court assumed, in passing, that "aliens already physically present in the United States who, upon inspection, are placed in removal proceedings, may be eligible for humanitarian or public benefit parole under § 1182(d)(5)(A) by virtue of their status as applicants for admission." *Id.* at 198 (citing *Ortega-Cervantes*, 501 F.3d at 1116). This dicta has no bearing on the *Cruz-Miguel* court's conclusion, was not litigated, was not based on any reasoning beyond the prior dicta in *Ortega-Cervantes*, and so would not be binding even if it were in-Circuit (which it isn't). *See Abdi v. Duke*, 280 F. Supp. 3d 373, 387–88 (W.D.N.Y. 2017) (explaining that "in *Cruz-Miguel v. Holder*, … the court held only that, in interpreting the phrase 'paroled into the Untied States' in 8 U.S.C. § 1255(a) … there was no statutory ambiguity" about § 1255(a) not including "aliens released on 'conditional parole' under § 1226(a)(2)(B)") *vacated in part on unrelated grounds sub nom. Abdi v. McAleenan*, 405 F. Supp. 3d 467 (W.D.N.Y. 2019).

The closest the *Cruz-Miguel* court comes to a meaningful holding relevant to this case is in the very same paragraph when it clarifies that "the executive retains broader authority under § 1226(a)(2)(B) to order the release on bond or conditional parole of aliens who have been arrested and detained pending a final removability determination if they pose no risk of harm or flight." *Id.* This holding, clarifying the scope of the INA provision actually at issue in that case and which petitioners there were litigating, recognizes both that there are limitations on the scope of executive

discretion under § 1226(a)(2)(B) and that executive discretion is even narrower under § 1182(d)(5)(A), reinforcing that the Defendants' claims to "unreviewable" or "unfettered" discretion are meritless under settled precedent.

As Plaintiffs have already explained, *see* ECF No. 79 at 27, the Defendants' reliance on *Akhtar* is particularly misplaced. *See* ECF No. 77 at 32–33, 44 (citing *Akhtar v. Director United States Citizenship & Immigration Services Mount Laurel Field Office*, No. 23-1577, 2024 WL 1427634 (3d. Cir. Apr. 3, 2024) (unpublished and nonprecedential)). *Akhtar* was about *advance* parole, which, as the court there explained, "functions as permission to travel for a specified humanitarian purpose and thereafter return to the United States." 2024 WL 1427634 at *3. However, "the actual decision to parole is discretionary, 8 U.S.C. § 1182(d)(5)(A), and *is made at the port of entry*." *Id.* (emphasis added). In other words, advance parole is an assurance that, unless the government, in its discretion, changes its position, an alien departing the country will be granted parole *upon that alien's return* to a port of entry. *Id.* "Thus, inspection at a port of entry is a mandatory component of parole, except in the rare circumstance that an applicant has requested and been granted parole in place. Parole in place is granted sparingly and is generally reserved for active and former U.S. military members and their families." *Id.* Congress has specifically—and narrowly—authorized parole in place only to specified populations.

Defendants' discussion of the structural changes brought about by IIRIRA is also misguided. To be sure, IIRIRA altered the legal landscape to treat certain unlawfully present aliens with the "fictive legal status" of an "applicant for admission." *United States v. Gambino-Ruiz*, 91 F.4th 981, 989 (9th Cir. 2024).  An alien who enters surreptitiously may be considered to have made a "constructive application" for admission, and thus may be treated as "inadmissible under [8 U.S.C.] § 1182(a)(7)." *Id.* at 988 (holding that, because § 1182(a)(7) applies to "any immigrant at the time of application for admission," it applies to an alien who has constructive applied for admission by surreptitiously crossing the border).

However, it is not clear that the explicitly fictive "applicant for admission" status continues

in perpetuity, including for purposes where such status is beneficial to the alien. *See, e.g.*, *Gambino-Ruiz*, 91 F.4th at 989 ("*Torres* [*v. Barr*, 976 F.3d 918 (9th Cir. 2020) merely rejected the view that an alien remains in a perpetual state of applying for admission."); *Ortiz-Couchet v. United States Atty. Gen.*, 714 F.3d 1353, 1355–56 (11th Cir. 2013) (per curiam) ("We initially find that the IJ erred as a matter of law in finding Ortiz and Malpica inadmissible pursuant to 8 U.S.C. § 1182(a)(7)(A)(i)(I) because that section only applies to applicants for admission and not to immigrants like Ortiz and Malpica who sought post-entry adjustment of status while already in the United States."); *Marques v. Lynch*, 834 F.3d 549, 561 (5th Cir. 2016) (expressly adopting the *Ortiz-Couchet* distinction between "applicants for admission and … immigrants who sought post-entry adjustment of status while already in the United States").

As the Government explains, the purpose of merging the concepts of "deportation" and "exclusion" into the concept of "removal" and de-emphasizing physical presence in some areas was "to remove the incentive for noncitizens to unlawfully enter the country and thereby obtain more favorable procedural rights." ECF No. 77 at 42. It makes no sense, then, that IIRIRA would *expand* the availability of parole to those who entered surreptitiously and persisted in flouting U.S. law for years or decades by treating physically present unlawful aliens "as if standing at the border" for purposes of benefits as well as expedited removal. *See* ECF No. 77 at 43 ("IIRIRA thus eliminated the perverse incentive to gain greater rights through surreptitious entry that the 1960 Senate report referenced."). Rather, it makes more sense that Congress saw no need to further limit parole when it changed the definition of "applicant for admission" because parole had always been understood as a device for permitting *entry*.

Moving past the Defendants' myopic focus on the fictive legal status of "applicant for admission" to the plain meaning of "into the United States" further supports this reading. *See* Merriam-Webster, *Into*, MERRIAM-WEBSTER.COM DICTIONARY, https://www.merriam-webster.com/dictionary/into (last visited Oct. 24, 2024) ("used as a function word to indicate *entry*, introduction, insertion, superposition, or inclusion."). "Into" connotes entry, and "entry,"

in the immigration context, has been "long understood … to refer to 'coming from outside' the United States." *Torres v. Barr*, 976 F.3d 918, 925 (9th Cir. 2020) (quoting *United States ex rel Claussan v. Day*, 279 U.S. 398, 401 (1929))." The connection between "into" and "entry" is confirmed in the Homeland Security Act of 2002, Pub. L. No. 107-296 (2002) ("HSA"), where Congress refers to parole as a "form[ ] of permission … to enter the United States." 6 U.S.C. § 202(4); HSA § 402. Unless Congress has authorized parole in place for the specific population in question, it has not authorized parole in place; all other populations may only be paroled "*into* the United States" from outside of it under the authority of 8 U.S.C. § 1182(d)(5)(A).

The Defendants' lack authority to promulgate the PIP Program because its purpose is to parole people "into the United States" who are *already* in the United States and are therefore ineligible for parole. The Program is therefore unlawful and should be vacated.

### 2. The PIP Program does not serve an "urgent humanitarian reason" or "significant public benefit."

The PIP Program is also unlawful because grants of parole under the Program do not serve an "urgent humanitarian reason" or "significant public benefit," as required by 8 U.S.C. § 1182(d)(5)(A). Plaintiffs have exhaustively explained why "urgent humanitarian reason" refers to preventing or alleviating some form of physical harm. *See* ECF No. 79 at 15–17. Defendants make no serious effort to defend the program on "urgent humanitarian reasons" grounds nor to refute the Plaintiff States' position that physical danger is a touchstone of urgent humanitarian reasons, nor could they reasonably be expected to. *See* ECF No. 77 at 35–39 (characterizing asserted programmatic objectives as "advance[ing] a significant public benefit"). There are no urgent humanitarian reasons to implement the PIP Program.

That leaves Defendants to claim "significant public benefits." Although they put forward several arguments, all lack merit. The Defendants offer multiple recitations of the "case-by-case" standard and claims that many factors will be evaluated, but none of them accord with the reality revealed by the Notice and the Defendants' own briefing. The core of the PIP Program is: "The

Secretary determined that, as appropriate to individual cases, a grant of parole in place to an eligible spouse or stepchild of a U.S. citizen who meets the criteria outlined in the Notice, does not represent a national security or public safety threat, and otherwise warrants a favorable exercise of discretion, will advance a significant public benefit for the reasons listed below." ECF 77 at 35; *see also* 89 Fed. Reg. at 67465 ("Granting parole in place …will generally provide a significant public benefit to the United States by" serving the same five interests listed in the Defendants' brief). In other words, assuming there is no egregious disqualifying factor like evidence that a particular alien poses a serious national security threat (which should probably make an alien a removal priority regardless of the PIP Program), paroling the vast mass of aliens who meet the basic eligibility requirements of the Program is presumed to provide a significant public benefit "by: (1) promoting family unity and stability; (2) strengthening the U.S. economy and the economic position of families and U.S. communities; (3) advancing diplomatic relationships and key foreign policy objectives of the United States; (4) reducing strain on limited U.S. government resources; and (5) furthering national security, public safety, and border security objectives." 89 Fed. Reg. at 67465. Each of these justifications fails because they are not (1) specific to any given alien receiving parole, (2) significant, or (3) public in nature, and all three elements are required for a grant of parole to satisfy the significant public benefit requirement.

At the outset, Defendants have made no effort to dispute that programmatic reasoning is unacceptable and justifications specific to the alien being paroled are required. *See* ECF No. 3 at 6; ECF No. 79 at 23 ("[E]ven if the Defendants' justifications for the Program included urgent humanitarian reasons or a significant public benefit—which they don't—the Program would still be unlawful because it is based on programmatic reasoning, rather than *specified*, case-by-case adjudication."). But Congress was clear when it added the "case-by-case" requirement to § 1182(d)(5)(A) in IIRIRA that "Parole should only be given on a case-by-case basis for *specified* urgent humanitarian reasons … or for *specified* public interest reasons." H.R. Rep. No. 104-469, at 141 (emphasis added). The PIP Program, which creates broad eligibility criteria that are applied by

rote in 100% of cases does not require *specified* reasons why a particular case was adjudicated the way it was. To the contrary, *all* cases are adjudicated by the same standard which presumes one or more of the five enumerated reasons justifies granting parole. The "urgent humanitarian reason" or "significant public benefit" to be achieved by granting parole must be specific to the alien being granted parole; all justifications for the PIP Program are explicitly programmatic and generic, and, thus, inadequate under § 1182(d)(5)(A).

Even if cumulative programmatic justifications were permissible, the justifications for the PIP Program do not rise to the level of significance. The Defendants claim that the Secretary has discretion to define significance and that the term could "conceivably encompass[ ] a wide range of public benefits." ECF No. 77 at 37 (quoting *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D.N.M. 2020)). This interpretation flies in the face of the plain text of the statute and manifest intent of Congress. The Defendants accurately note that Congress declined to define "significant public benefits" (which only makes sense— parole is for individual, fact-intensive emergencies, and it makes no sense to try to catalogue every possible such emergency) but fail to grapple with the obvious fact that it was a change in the law. *See In re Crocker*, 941 F.3d 206, 213 (5th Cir. 2019) ("When Congress makes a significant change in language when it amends an existing statute, it 'presumptively connotes a change in meaning.'" (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 256 (2012)).

The prior iteration of the parole statute required that parole be granted "strictly in the public interest," but Congress sought to limit the use of parole in IIRIRA by requiring the higher "significant public interest" standard under the section heading "LIMITATION ON THE USE OF PAROLE." IIRIRA, Pub. L. No. 104-208, 110 Stat. 3009, § 609 (1996). IIRIRA cannot reasonably be read to confer broad discretion on the Executive Branch; to the contrary, it unambiguously curtails executive power, constraining the Secretary's discretion to exceptional cases. Declaring that granting parole to each of at least 550,000 people (likely well over a million) is manifestly *not* constraining discretion to exceptional cases, and so is contrary to the statute.

Defendants' reliance on *New Mexico v. McAleenan* is meritless. *See* ECF No. 77 at 39 (citing *New Mexico*, 450 F. Supp. 3d at 1174 n.5). The quoted passage is not even an interpretation of § 1182(d)(5)(A), but of the APA. The language is dicta discussing the APA "zone of interests" test and noting, in passing, that if the federal government's standing had been challenged, the government would "arguably" have interests protected by § 1182(d)(5)(A) because the "vague standard conceivably encompasses a wide range of public benefits." *New Mexico*, 450 F. Supp. 3d at 1174 n.5. But the federal government's standing was not at issue, nor was the scope of the "significant public benefits" requirement. *Id.* The court's passing comment about what "arguably" might "conceivably" be encompassed in the term, if, hypothetically, it were at issue and if the federal government's standing were challenged, is a far cry from any court actually holding that "allowing an individual to carry on their employment in the United States" constitutes a significant public benefit. *Id.* The Defendants' claim that "Plaintiffs fail to acknowledge cases recognizing other 'significant public benefit' justifications for parole" is false: The cases the Defendants cite *do not* "recognize other 'significant public benefit' justifications for parole." *See* ECF No. 77 at 37 (citing *New Mexico*, 450 F. Supp. 3d at 1174 n.5 and *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005) (addressing the Commerce Clause without reference to parole, the INA, immigration, or the definition of "significance").

As discussed further below, the actual holding in the relevant portion of *New Mexico*—the reason for the dicta—is that States and cities are within the "zone of interests" to challenge parole policy because "states and cities 'arguably' have an interest that 8 U.S.C. § 1182(d)(5)(A) protects." *New Mexico*, 450 F. Supp. 3d at 1174 n.5. To the extent that case is useful here, it is only because it illustrates how meritless are the Defendants' APA zone-of-interests arguments.

Rather, context makes clear that significance requires something more than a stark mismatch between the Biden-Harris Administration's policy preferences and the policies Congress has established by law. ECF No. 79 at 18–21. Indeed, Congress has made it clear that even the primary justification for the PIP Program—family unity—is not enough; no matter how important

it might be to the individual aliens, it does not constitute a significant public benefit. In the 2020 NDAA, Congress could have established a presumption that family unity constitutes a significant public benefit, but it did not. *Id.*at 20. Instead, Congress directed the Secretary to consider *whether* a grant of parole "would enable military family unity *that would constitute a significant public benefit*." Pub. Law. 116-92 § 1758 (2019) (8 U.S.C. § 1182 note) (emphasis added). Congress further explained how the Secretary should determine that: "[D]isruption to military family unity should be minimized in order to enhance military readiness and allow members of the Armed Forces to focus on the faithful execution of their military missions and objectives." *Id.* In other words, "family unity" is not a significant public benefit, but it may serve other significant public benefits where it impacts public interests like military readiness and mission accomplishment.

The other justifications fare no better. The marginal impact that granting legal work authorization to any given illegal alien (who, as the Notice acknowledges, is likely *already* working illegally in this country) will have on their communities is so insignificant as to be unquantifiable. Indeed, the Notice doesn't even attempt to quantify that impact on the public, focusing instead solely on the impact to aliens and their families. *See* 89 Fed. Reg. at 67480 ("DHS estimates that this process would result in increased earnings for the population that gains work authorization by removing the 'wage penalty' that affects undocumented individuals in the United States.").

The third and fourth justifications, foreign policy and administrative convenience, are both implausible (Is mass amnesty really the best way to get foreign partners to work with us? Does creating a process for over a million aliens to apply for benefits somehow *reduce* paperwork?) and reliant on the cumulative effect of mass parole, with no individual grant of parole providing a significant public benefit. The vague fifth alleged benefit—national security and border security—is entirely unsubstantiated, implausible (how many terrorists will decide that now is the time to submit biometric data?), and, quite frankly, would be better served by administration enforcement policies designed to uphold our country's immigration laws, rather than the Harris-Biden Administration's preferred "open borders" approach. Nothing here is significant.

The first and second justifications—the only even vaguely plausible ones—also don't serve *public* interests. As the Plaintiffs have explained, parole is not intended to be granted solely for the benefit of the alien or their immediate family, but for the benefit of the public at large. This is why the traditional justifications for parole tend to involve the alien helping law enforcement and criminal investigation; it's also why Congress directed the Secretary to look to the public aspects of military service (i.e., mission accomplishment and military readiness) when it authorized him to grant parole in place to certain servicemembers and military family members.

### 3. The PIP Program does not consider applicants on a case-by-case basis.

Defendants argue that § 1182(d)(5)(A) has no numerical limitation and that their recitation of "case-by-case" suffices for DHS to mass-parole at least 550,000, and likely over 1.3 million, illegal aliens into a legal status. But this Court is under no obligation to shield its eyes from reality, and the Defendants' own characterization of the program belies their rote recitation of legal requirements. The core policy of the program is to establish that anyone who meets the baseline requirements of the Notice is presumptively entitled to parole for the purpose of becoming an LPR. *See* ECF No. 77 at 35 ("The Secretary determined that, as appropriate to individual cases, a grant of parole in place to an eligible spouse or stepchild of a U.S. citizen who meets the criteria outlined in the Notice, does not represent a national security or public safety threat, and otherwise warrants a favorable exercise of discretion, will advance a significant public benefit for the reasons listed below."); 89 Fed. Reg. at 67465 ("Granting parole in place … will generally provide a significant public benefit to the United States … ."). We also know that the DHS employees implementing the program apply the Notice's eligibility requirements by rote. *See* ECF No. 79-2, Ex. B. at 267 (100% of all applications adjudicated have been granted).

The truth is that the availability of parole under the PIP Program is no more case-by-case than the availability of movie tickets are your local theater. To be sure, a patron without money to buy a ticket, or who is too young to see the movie according to MPAA guidance, or who is known to behave disruptively in movie theatres might be denied access to his preferred cinematic offering,

but no one would contend that the theatre was issuing tickets "only on a case-by-case basis," 8 U.S.C. §1182(d)(5)(A). Likewise, the aliens deemed inadmissible under § 1182(a) do not face exclusion from the United States on a case-by-case basis merely because there are exceptions to some of the grounds for inadmissibility or because they may only be treated as inadmissible after they apply for admission.

If the Defendants hyper-literal understanding of "case-by-case" were correct, *every* application for *anything* would be considered adjudicated on a case-by-case basis because adjudicators don't simultaneously adjudicate multiple applications. An application for a Netflix account requires the applicant to establish that he has the means to pay and hasn't been excluded from holding such an account (perhaps for sharing a prior account with friends, for example), but that doesn't make signing up for Netflix an individualized process any more than the possibility that an applicant for the PIP Program who is denied as ineligible because they have a criminal history or are a threat to national security makes the PIP Program a bona fide case-by-case evaluation.

The Defendants' bland recitation that "in addition to satisfying all other discretionary factors, applicants must demonstrate an urgent humanitarian reason or significant public benefit applies in their individual case," ECF No. 77 at 39, runs counter to their own acknowledgement just a few pages earlier that the PIP Program establishes a mass presumption of significant public benefit applicable to all applicants who meet the bare minimum requirements, based on the five purported programmatic benefits, ECF No. 77 at 35–36. The reality, borne out both by common sense and the Notice itself, is that this is a mass amnesty for hundreds of thousands or millions of people with "individualized" attention limited in most, if not all, cases to the basic eligibility requirements of the Program.

The Court need not blind itself to reality. The Defendants' rote recitations that applications will be adjudicated on a "case-by-case" basis are nowhere near enough to satisfy the requirements of 8 U.S.C. §1182(d)(5)(A) and are belied by the massive number of illegal aliens Defendants

predict will be paroled, the presumption of eligibility created by the Notice, and the federal government's operating assumption that all or substantially all of the eligible population will apply for and be granted parole. *See, e.g.*, 89 Fed. Reg. 67481–88 (estimating costs and benefits, including the estimated $1.15 billion in increased earnings for Program-eligible aliens, based on all or substantially all of the eligible aliens participating in the Program).

### 4. The PIP Program violates Section 1182(d)(5)(A)'s temporariness requirement.

Defendants have added nothing to their prior claim that the *parole* provided under the PIP Program is temporary and so the program is legal. *Compare* ECF No. 47 at 40 *with* ECF No. 77 at 47–48. The Plaintiff States addressed this extensively in their Combined Updated Motion. ECF No. 79 at 27–30. It suffices to note here that the statute is unambiguous. A statute authorizing the Secretary to "parole into the United States temporarily … any alien applying for admission to the United States," then commanding that "when the purposes of such parole shall … have been served the alien shall forthwith return or be returned to the custody from which he was paroled" contemplates, on its face, that the physical presence enabled by parole will be temporary, not that the legal status of "parolee" should be issued as a temporary stepping stone on the path to permanent lawful residency. *Compare Ireda v. Att'y Gen. of the United States*, 25 F.4th 193, 197 (3d Cir. 2022) (recognizing the "well-settled principle that Congress did not intend for parole of an alien to constitute an alien's legal entry or admission to the United States." (quoting *Ibragimov v. Gonzales*, 476 F.3d 125, 134 (2d. Cir. 2007)) *with* 89 Fed. Reg. at 67465–66 ("This use of the Secretary's statutory parole authority addresses a barrier that currently prevents many of these otherwise eligible noncitizens from obtaining LPR status … ."). Again, the "barrier" represented is the policy Congress established by statute combined with the fact that the "otherwise eligible noncitizens" are inadmissible, ineligible for adjustment of status, and illegally present in the United States.

### B.   The PIP Program is intended to and does contravene existing immigration law.

As Plaintiffs already pointed out, ECF No. 79 at 12–30, the PIP Program violates the clear language of the parole statute, the INA, and the amendments that Congress made to the INA through IIRIRA, the legislative history confirms this interpretation. The Defendants' only rejoinder is to argue that because Congress has provided *other* methods for aliens to adjust status without leaving the United States, that means the PIP Program is legal too. But the Defendants ignore a crucial distinction. The two examples that they cite—8 U.S.C. § 1255(a) and 8 U.S.C. § 1229b(b)(1) (*see* ECF No. 79 at 46-48)—establish detailed procedures and criteria for adjusting status that were carefully crafted by Congress. Then, Defendants go on to claim that Section 1182(d)(5)(A)—a statute that says *nothing* about adjustment of status and which imposes firm restrictions on its use, and which is only to be used to allow aliens "into the United States *temporarily*" (emphasis added)—gives DHS carte blanche to make up whatever new program it wants to allow unlawfully present aliens to adjust status and remain permanently in the United States. One of these things is not like the other.

Congress would not have adopted specific standards in 8 U.S.C. § 1255(a) and 8 U.S.C. § 1229b(b)(1) for allowing aliens to adjust status while in the United States just for one small subparagraph in another part of the INA to confer on the executive the authority to replace all of that with its own alternate system. It is brazen indeed for the Defendants to claim that a section that Congress in IIRIRA titled "*LIMITATION* ON USE OF PAROLE." IIRIRA, Pub. L. No. 104–208, 110 Stat 3009, § 602 (1996) (emphasis added), confers limitless authority to confer lawful status on hundreds of thousands of unlawfully present aliens, in direct contravention of the INA's requirements for adjustment of status, unlawful presence, and waivers of that unlawful presence.

Indeed, the very text of 8 U.S.C. § 1255(a) and 8 U.S.C. § 1229b(b)(1) make clear that Congress did *not* intend for PIP Program beneficiaries to be able to adjust status without leaving the country. 8 U.S.C. § 1255(a), states that "an alien who was inspected and admitted or paroled *into the United States*" may adjust to LPR status. *Id.* (emphasis added). If the Plaintiffs are correct that

"into the United States" means that parole may only be conferred upon aliens who are in the process of physically entering the United States and may not be conferred on aliens already present, then Congress made clear its intent that aliens who are already unlawfully present in the United States are *not* entitled to adjust status while within the United States. The PIP Program seeks to circumvent this clear language of the statute.

Nor does 8 U.S.C. § 1229b(b)(1) help the Defendants' argument. That section allows for the cancellation of removal and adjustment of status for aliens in removal proceedings, but only for aliens who meet four strict qualifying conditions: the alien must (1) have "been physically present in the United States for a continuous period of not less than 10 years"; (2) have "been a person of good moral character during such period"; (3) have not been convicted of certain crimes; and (4) "establish[] that removal would result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or an alien lawfully admitted for permanent residence." 8 U.S.C. § 1229b(b)(1). Yet, the PIP Program seeks to circumvent these carefully established criteria and replace them with standards more to the Defendants' liking. However, they do not have the power to do this—only Congress does.

When Congress wrote the statutory section that establishes the procedures for adjustment of status, 8 U.S.C. § 1255, it used 3,444 words. When Congress wrote the section that establishes the procedures for cancellation of removal and adjustment of status, 8 U.S.C. § 1229b, it used 2,534 words. In contrast, Congress only used 190 words to draft the statutory subsection that confers the parole authority. *Id*. § 1182(d)(5). The Defendants are unlawfully trying to shoehorn their gargantuan new system for the adjustment of status, one that grants effective amnesty of unlawfully present aliens, into the "modest words, vague terms, [and] subtle devices" of a small subsection buried in the middle of one section out of the many sections of the INA. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned up).

"Congress ... does not ... hide elephants in mouseholes." *Whitman v. American Trucking Associations*, 531 U.S. 457, 468 (2001). And Congress did not hide the elephant of an entirely new

44

system in the mousehole of Section 1182(d)(5). Defendants do not contest that the PIP Program involves deep issues of economic or political significance. Yet, they argue that the Major Questions Doctrine does not apply here, claiming that "[t]here is no 'major question' to trigger the doctrine because Congress 'sp[oke] clearly' and explicitly 'when authorizing' other statutory paths for unlawfully present noncitizens to become a LPR without being granted a waiver for the unlawful presence ground of inadmissibility." ECF No. 77 at 47 (quoting *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021)). But Congress *has* spoken clearly. It has clearly stated that the parole power is limited. And it has established specific conditions for adjustment of status while in the United States that do *not* apply to PIP Program beneficiaries. The Defendants cannot use the parole statute—which does *not* speak clearly about adjustment of status, unlawful presence, and waivers—to circumvent the requirements that Congress has established.

Finally, Defendants justify parole in place as justified by its "longstanding interpretation" of its parole authority. But historical practice "does not, by itself, create power," *DAPA*, 809 F.3d at 184 (quoting *Medellin v. Texas*, 552 U.S. 491, 532 (2008)).

### C.  The Notice is arbitrary and capricious.

Despite the detailed explanation of the many arbitrary and capricious aspects of the Notice—many of which may have been avoidable if the Notice had been subject to the legally required notice and comment process—the Defendants respond with bland dismissiveness. The Defendants downplay the scope of APA review, but "[t]his review 'is not toothless.'" *MPP,* 20 F.4th at 989. Quite the contrary: "after *Regents*, it has serious bite." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021). To withstand scrutiny, an agency must "articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants have failed to address important aspects of the issue, and so the Notice is arbitrary and capricious.

Defendants failed to grapple in any meaningful way with the States' reliance interests, contending instead that none are implicated because "States are not regulated by the KFT Process." ECF 77 at 49. The Fifth Circuit rebuffed such reasoning as "astonishing[ ]" in the *MPP* case, where States' were found to have harms from parole. *See MPP*, 20 F.4th at 990. As the court there observed, States have overwhelming reliance interests in how the federal government executes its immigration laws: "Given the Supreme Court's explanation that border states 'bear[ ] many of the consequences of unlawful immigration,' one would expect a 'reasonable and reasonably explained' memo to mention the issue at least once." *Texas*, 20 F.4th at 989 (quoting *Arizona v. United States*, 567 U.S. 387, 397 (2012)). That is precisely the case here—the Defendants fail to consider even once the States' interests in preventing unlawful immigration. As in *MPP*, the Defendants merely deny that States have any reliance interests, despite the Fifth Circuit's repeated, unambiguous rulings to the contrary: "that 'contention is squarely foreclosed by *Regents*.'" *MPP*, 20 F.4th at 990 (quotation omitted).

The truth is that the States rely heavily on existing immigration policies in a wide variety of ways, including when crafting budgets, allocating resources, making public health policy, and establishing their own policies towards migrants (such as which immigrants are issued drivers licenses, which are entitled to what public benefits, etc.). This reliance includes what should be the uncontroversial proposition that the Administration will uphold the INA, not issue an unlawful amnesty to hundreds of thousands or millions of illegal aliens. But, as in the *MPP* case, Defendants fail to account for such reliance interests.

Defendants also ignored the related question of costs to the States. Despite admitting that a "comprehensive quantified accounting of local and state fiscal impacts specifically due to this parole in place process is not possible," 89 Fed. Reg. at 67478, Defendants proceeded to use generalizations about state benefits laws and optimistic estimates about tax revenues to conclude that "no increased expenses were predicted" and "any marginal increases in state expenditures due to the KFT process would be more than outweighed by … increased economic activity," ECF

No. 77 at 50. This argument is flawed in several respects. First, Defendants admit that they have no basis for their assumption because they cannot quantify the costs to the States. Second, even if there were offsetting revenues, the Notice would still require the States to reallocate their budgets to account for the new expenses imposed by the Notice.

Most importantly, the bland assumption that costs round to zero is simply unsupportable. Texas has detailed some of the many costs the Notice imposes on the States. ECF No. 79 at 43. To recap simply, this program is expensive for the States, and the Defendants show no concern for or acknowledgment of that reality.

Elsewhere, Defendants simply ignore the context of their actions, such as when they claim that limiting parole to aliens physically present in the United States before the Notice was promulgated prevents it from having any impact on incentives for other potential migrants. But the context of the PIP Program is a Biden-Harris Administration that has worked tirelessly to throw open our borders, eviscerate enforcement of our immigration law, and create amnesty programs at every turn. The PIP Program provides amnesty for aliens who arrived in this country as recently as this summer, but it also includes an explicit claim of "unfettered discretion" over parole and establishes a precedent that such discretion will be exercised beyond any boundaries Congress could conceivably have intended. When an administration that has (unsuccessfully) tried to get Congress to grant amnesty to over 11 million illegal aliens in one proposal, *see* U.S. Citizenship Act of 2021, H.R. 1177, 117th Cong. (2021), and tried to sneak itself broader parole power in another, *see* ECF No. 79, Ex. A ("Attorney Decl."), Ex. 15, promulgates a Notice that grants amnesty to over 1 million aliens based on its newfound "unfettered discretion," and does so explicitly to evade the "barriers to adjustment of status" embodied in our laws, the message to other potential unlawful migrants is clear. The PIP Program conveys that the door is open—the Administration will help the next batch of illegal migrants get around "barriers to adjustment of status" too, and now is the time to illegally enter the United States.

Elsewhere, Defendants rely on word games to deny that the PIP Program treats illegal aliens in the workforce as a positive, despite congressionally established policy to the contrary. Such treatment, which directly contradicts statutory policy, is enough on its own to render the entire Program arbitrary and capricious. The Defendants claim it is not a part of the Program, because the PIP Program "is expected to decrease the number of noncitizens working without employment authorization and will not provide employment authorization to anyone present in the United States without admission or parole." ECF No. 77 at 52. This presentation is, at best, misleading. The PIP Program operates exclusively to the benefit of illegal aliens—every single person who stands to gain parole, followed by work authorization, from the program was an illegal alien on August 19, 2024. The program illegally grants mass parole, in violation of the requirements of § 1182(d)(5)(A), to hundreds of thousands or millions of unlawfully present aliens, making them eligible to apply for work authorization. The Defendants' comment may be literally correct, but only because the Program itself illegitimately confers parole on a vast number of illegal aliens and makes them eligible for work authorization. Congress created laws to prohibit illegally present aliens from working for a reason, and Congress's policy is not served by simply declaring illegal aliens, *en masse*, to be legally present.

### D.  The PIP Program was promulgated without the required notice and comment.

"The Administrative Procedure Act requires that before an agency issues a binding rule, it must (at the very least) public a notice of the proposed rule, allow public comments, and respond. 5 U.S.C. § 553. Those procedures aren't mere formalities." *Huscoal, Inc. v. Dir., Office of Workers' Compensation Programs*, 48 F.4th 480, 494 (6th Cir. 2022) (Thapar, J., concurring). But Defendants refused to submit the PIP Program to the notice-and-comment process. It was therefore promulgated in violation of the APA.

Defendants offer several defenses of their decision to publish the Notice without giving any interested parties an opportunity to be heard. First, they claim that it is merely a general statement of policy and therefore exempt from the requirement. This is belied by the Notice itself. An agency

action is not a general statement of policy where "an agency intends to bind itself to a particular legal position." *Syncor Intern. Corp. v. Shalala*, 127 F.3d 90, 94 (D.C. Cir. 1997). Defendants argue that because there is some discretion in approving applications, that makes it a policy statement not subject to notice-and-comment requirements. ECF No. 77 at 54–55. But the Notice creates a binding presumption—that is, establishes the legal position—that "a grant of parole in place to an eligible spouse or stepchild of a U.S. citizen … will advance a significant public benefit … ." ECF 77 at 33; 89 Fed. Reg. at 67465 ("Granting parole in place on a case-by-case basis to noncitizens who meet the criteria outlined in this notice and merit a favorable exercise of discretion will generally provide a significant public benefit to the United States ...."). Defendants' employees have also treated the Notice as a binding rule creating rights for the affected aliens, approving 100% of adjudicated applications submitted pursuant to the PIP Program. ECF No. 79-2, Ex. B at 267. Regardless, "[t]he mere existence of some discretion is not sufficient, although it is necessary for a rule to be classified as a general statement of policy." *DACA*, 50 F.4th at 524 ("assum[ing] that agents do have discretion to reject applicants who meet the criteria" of DACA, but rejecting this made it a policy statement). "DACA created a detailed, streamlined process for granting enormously significant, predefined benefits to over 800,000 people. This constitutes a substantive rule." *Id*. Finally, because the affected aliens could not have been understood to have any eligibility for parole before the Notice, since "family unity" is not and was not previously considered a significant public benefit, it created (albeit illegally) new rights for such aliens to access parole. Plaintiffs have thoroughly briefed this issue, ECF No. 79 at 50–53, and incorporate that explanation and argument by reference here.

Similarly, the Notice is no mere "rule of agency procedure." *See* ECF No. 77 at 55. It creates substantive rights for individuals outside the agency and imposes substantive obligations on the agencies. *See DAPA*, 809 F.3d at 176–77 (DAPA program not a procedural rule because it conferred eligibility for lawful presence on hundreds of thousands of illegal aliens and made them eligible for benefits). As mentioned above, for example, it creates a binding presumption that an alien who

meets the requirements of the program is eligible for parole and that such parole will serve a significant public benefit. This changes the substantive standard by which the agency evaluates applications for parole. *Id.* at 177. It also establishes a broad concept of significant public benefit that includes "family unity" as sufficient justification for parole, and that did not exist before the Notice was promulgated (because it is contrary to the statute). All parties, including Defendants at times, seem to agree on this. *See, e.g.*, 89 Fed. Reg. at 67466 ("Absent this process, applying for LPR status requires noncitizens who are present without admission or parole (PWAP) to depart the United States and remain abroad for an indefinite period … ."); ECF No. 15 Ex. 5 at 6 ("[B]efore the new process for parole-in-place ('Keeping Families Together Parole') was announced, the *only* way that Francisco could satisfy the requirement to apply for adjustment of status of being 'inspected and admitted' or 'inspected and paroled' was to leave the United States and seek an immigrant visa abroad through consular processing.") (emphasis added). It simply is not true that the subject population could just fill out a different form to get parole; all seem to agree that without the PIP Program, parole is not available to the subject population of aliens. Therefore, the Notice is a substantive rule subject to notice and comment.

Finally, Defendants claim that the Notice is exempt as a foreign affairs function. The argument runs directly contrary to applicable precedent. *See* ECF No. 79 at 38–41. Put simply, a rule that overhauls how we treat people who have been present in this country for over 10 years, "no matter the country from which they" arrived, cannot seriously be treated as a foreign affairs function merely because the Executive discussed it with foreign partners. *Capital Area Immigrants' Rights Coalition v. Trump*, 471 F. Supp. 3d 25, 55 (D.D.C. 2020). "Not every request for international cooperation seriously may be called 'foreign policy,'" and the PIP Program comes nowhere close to meeting the standard. *Jean v. Nelson*, 711 F.3d 1455, 1477-78 (11th Cir. 1983) (foreign policy exception does not apply to policies regarding detention and parole).

### E.  The approval and use of Form I-131F violates the Paperwork Reduction Act.

In implementing the PIP Program, the Defendants violated the requirements of the

Paperwork Reduction Act (PRA). 44 U.S.C. §§ 3506, 3507. The Defendants' arguments to the contrary fail for four reasons.

*First*, the States have standing under the PRE because OMB unlawfully authorized emergency processing of the Form I-131F used to process applications for the PIP Program. The PIP Program could not operate without Form I-131F. Therefore, but for the approval of the form, the States' harms would not have manifested. The States thus have standing for the same reasons they are harmed by the PIP Program itself: without the emergency authorization of the Form I-131F, the PIP Program would not have started and none of its harms to the States would have manifested.

*Second*, the States fall within the zone of interests of the PRA—one of the Act's specifically enumerated purposes is to "strengthen the partnership between the Federal Government and *State* ... governments by minimizing the burden and maximizing the utility of information created, collected, maintained, used, disseminated, and retained by or for the Federal Government." 44 U.S.C. § 3501(6). Therefore, violations of the PRA that *weaken* the partnership between the federal government and the States fall squarely within the zone of interests of the Act. Furthermore, invocation of the PRA to conduct an illegal government program does not maximize information utility, and maximizing information utility in relation to the States is a purpose specifically enumerated in the Act.

*Third*, the OMB's decision to allow emergency processing is reviewable. "[T]he PRA's bar on judicial review is demonstrably narrow in scope." *Hyatt v. Off. of Mgmt. & Budget*, 908 F.3d 1165, 1171 (9th Cir. 2018) (citing 44 U.S.C. § 3507(d)(6)). The PRA only forecloses judicial review of a "decision by the [OMB] Director to approve or not act upon a collection of information contained in an agency rule." 44 U.S.C. § 3507(d)(6). Notably absent from the statutory language is a bar on judicial review of the OMB Director's decision to grant emergency processing.

*Fourth*, OMB's approval of emergency processing was arbitrary and capricious. Emergency processing is only permitted in narrow circumstances: when the information "is needed prior to

the expiration of time periods established under" the PRA; the information "is essential to the mission of the agency"; and "the agency cannot reasonably comply with the provisions of this subchapter because" "public harm" will result, "an unanticipated event has occurred," or the information collection is needed sooner to comply with statutory or court deadlines. 44 U.S.C. § 3507(j)(1); *see also* 5 C.F.R. § 1320.13(a). USCIS's first claimed justification for emergency processing falls far short of these narrow standards. Specifically, USCIS claimed that "[e]mergency processing is justified because USCIS must quickly collect the requested information to fulfill its mission of implementing the President's announcement and meet public expectations that USCIS will begin accepting applications by August 19, 2024." OMB000002. The only reason public expectations existed is because President Biden announced the start of the PIP Program without enough time for the Form I-131F to be approved. If an arbitrary deadline announced by the President were all that were necessary to justify emergency processing, then this would create an exception that swallows the rule, allowing the President to waive the PRA's requirements with the stroke of a pen whenever he wished. Similarly, USCIS's second claimed justification for emergency processing also falls flat. Specifically, USCIS claimed that public harm would result because "the hardships these families have endured will continue" and because aliens eligible for the PIP Program would be susceptible to "fraud perpetrated by consultants and others seeking to game the system, who make false promises to secure parole for a fee." OMB000002. Once again, these claims ring hollow. What public harm is caused by requiring eligible aliens who have been present in the United States for *more than ten years* to wait a few months more until the PRA's requirements have been fulfilled? And what additional fraud would eligible aliens be confronting now that is different from what they have faced during their more-than-ten-year illegal stay in the country? USCIS never explains, instead making unsupported (and unsupportable) claims.

### F.  The PIP Program violates the Take Care Clause.

The Executive Branch is violating the Take Care Clause, U.S. Const., art. II, §3, by refusing to faithfully execute the Nation's immigration laws.  The problem is not simply that the Executive

is prioritizing some matters over others—it is that, through the Notice, it is dispensing entirely with important provisions of the INA. The Take Care Clause is supposed to prevent such decrees—it repudiates the power, sometimes claimed by English kings, to suspend or otherwise nullify the law.  Christopher N. May, *Presidential Defiance of "Unconstitutional" Laws: Reviving the Royal Prerogative*, 21 HASTINGS CONST. L.Q. 865, 873 (1994).

The Defendants contend that the Take Care Clause is nonjusticiable and thus fails as a matter of law.  ECF No. 77 at 60-61. That would be surprising, as the Supreme Court not long ago ordered the parties in the DAPA case to brief the question whether another immigration-nonenforcement policy "violate[d] the Take Care Clause of the Constitution."  *United States v. Texas*, 577 U.S. 1101 (2016).

Since our Founding, "both courts and the executive branch itself have recognized the president's inability to suspend or dispense with the law." *MPP*, 20 F.4th at 981. "The Framers agreed that the executive should have neither suspending nor dispensing powers." *Id.* at 980. The Supreme Court has held likewise. *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the [C]onstitution, and entirely inadmissible." *Id.* at 613. Any other conclusion would "vest[] in the President a dispensing power." *Id.*

Through its adoption of the policies of the PIP Program, the Executive Branch dispenses with certain immigration statutes by declaring as lawful conduct that Congress established as unlawful, thereby violating the Take Care Clause. U.S. Const. art. II, § 3 ("[The president] shall take Care that the Laws be faithfully executed …"). Moreover, the PIP Program further violates the Take Care Clause because it dispenses with certain immigration statutes by granting a pathway to citizenship to aliens who would otherwise be unlawfully present but for the PIP Program. As Justice Scalia properly noted, the similar DACA program involved "biennial requests for *dispensation*" from immigration statutes. *Arizona v. United States*, 567 U.S. 387, 435 (2012) (Scalia,

J., concurring in part and dissenting in part) (emphasis added).

Plaintiffs are not basing their Take Care Clause claim on an implied cause of action arising from that constitutional provision itself. Instead, they have an explicit cause of action under the APA, which provides that "[t]o the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret *constitutional* and statutory provisions, and determine the meaning or applicability of the terms of an agency action," 5 U.S.C. § 706 (emphasis added), and. a "reviewing court shall … hold unlawful and set aside agency action, findings, and conclusions found to be" "contrary to constitutional right, power, privilege, or immunity," *id*. at (2)(B).

*Dalton v. Specter*, 511 U.S. 462, 473 (1994) is not to the contrary. While "the *Dalton* Court made clear that not every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution, it by no means found that action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim." *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020) (cleaned up) (quoting *Sierra Club v. Trump*, 929 F.3d 670, 696 (9th Cir. 2019)).

Plaintiffs' claim here is not only "that the President simply did not fully comply with a congressionally prescribed process"—such as failure to undergo notice-and-comment rulemaking— but "that the President's actions affirmatively displaced a congressional mandate[.]" *Make the Rd.*, 475 F. Supp. 3d at 258; *see DACA*, 50 F.4th at 524–28 (DACA Memorandum is "foreclosed by Congress's careful plan" and is "manifestly contrary to the statute."); *id*. at 511 ("Congress's clear articulation of laws for removal, lawful presence, and work authorization illustrates a manifest intent to reserve for itself the authority to determine the framework of the [N]ation's immigration system.") (quoting *Texas*, 549 F. Supp. 3d at 614). The PIP Program therefore implicates "constitutional separation of powers concerns not present in *Dalton*" and should be "appropriately considered as [a] constitutional claim[] subject to judicial review." *Make the Rd.*, 475 F. Supp. 3d  at 258–59.

Defendants may also argue that the PIP Program cannot violate the Take Care Clause because it is an exercise of prosecutorial discretion. But the Notice is a "rule" under the APA, defined as "'the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency.'" *MPP*, 20 F.4th at 982–83 (quoting 5 U.S.C. § 551(4)). This is "in contrast with an 'order,'" which is defined as "'the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing.'" *Id.* at 983 (quoting 5 U.S.C. § 551(6)).

While individual enforcement actions—"orders"—are properly subject to prosecutorial discretion, attempts to use "rules" to exercise prosecutorial discretion to not enforce statutes are dispensations precluded by the Take Care Clause. *MPP*, 20 F.4th at 983–85. And while "the executive [is] free to leave the law unenforced in *particular* instances and at *particular moments* in time," that constitutional provision "explicitly forbade the executive from nullifying whole statutes by refusing to enforce them on a *generalized* and *prospective* basis." *Id.* at 983 (emphases in original). An agency is not permitted "to modify unambiguous requirements imposed by federal statute … [and] were [courts] to recognize [such] authority … [they] would deal a severe blow" to the Take Care Clause. *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 326–27 (2014) (citing U.S. Const. Art. II, § 3).

### G.  The PIP Program is *ultra vires*.

The Plaintiff States have outlined in great detail why the PIP Program violates Section 1182(d)(5). Because of this, the Defendants are acting in excess of their authority. It is well-settled that such actions may be challenged outside the APA through a non-statutory review claim. *See Leedom v. Kyne*, 358 U.S. 184, 188-90 (1958). Defendants make two arguments against Plaintiffs' *ultra vires* claim. Neither is valid.

*First*, Defendants argue that, because of the doctrine of sovereign immunity, a non-statutory

*ultra vires* claim must be asserted against a public officer acting in excess of his authority and not against the government itself. ECF No. 77 at 62–63. The Defendants go on to argue that the Plaintiffs' claim "is in substance one against the federal government, not against any individual who is nominally named in the complaint" and that, therefore, the doctrine of sovereign immunity forecloses any *ultra vires* claim. *Id*. at 62.

Boiled down, Defendants' argument is that, because the PIP Program was created by federal officials acting in their official capacity, they have sovereign immunity from suit. Or, in even simpler terms, their argument is that, because the federal officials were not acting in excess of their authority, they are entitled to sovereign immunity. This argument only works if the Defendants *were* acting within the scope of their delegated statutory authority. But the whole crux of the States' *ultra vires* claim is whether the PIP Program exceeds the authority delegated by Congress in Section 1182(d)(5). If it does, then the federal official Defendants are most decidedly *not* protected by sovereign immunity, and there is no *Larson* problem here. The D.C. Circuit explained this in *Reich*: "under [*Larson*], if the federal officer, against whom injunctive relief is sought, allegedly acted in excess of his legal authority, sovereign immunity does not bar a suit." *Chamber of Com. of U.S. v. Reich*, 74 F.3d 1322, 1329 (D.C. Cir. 1996). This is because, if the federal official's powers are limited by statute, "his actions beyond those limitations ... are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do. So, there is no sovereign immunity to waive—it never attached in the first place." *Id*.

The same holds true here. If the federal officials named as Defendants in this case—Alejandro Mayorkas, Ur Jaddou, Troy Miller, Patrick J. Lechleiter, and Shalanda Young—are acting in excess of the authority granted by Section 1182(d)(5) and the PRA, then they are "not doing the business which the sovereign has empowered [them] to do," and there is thus "no sovereign immunity to waive." *Id*.

*Second*, Defendants argue that the availability of a non-statutory review claim did not survive Congress's 1976 amendment of the APA to add 5 U.S.C. § 706(2)(C), which waived

sovereign immunity and created a right of judicial review under the APA for agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." ECF No. 77 at 63. The Fifth Circuit has already rejected this argument and has specifically held that Section 702, as amended, allows for non-statutory causes of action: "Section 702 also waives immunity for claims where a person is 'adversely affected or aggrieved by agency action within the meaning of a relevant statute.' This type of waiver applies when judicial review is sought pursuant to a statutory *or non-statutory cause of action* that arises completely apart from the general provisions of the APA." *Alabama-Coushatta Tribe of Texas v. United States*, 757 F.3d 484, 489 (5th Cir. 2014) (quoting 5 U.S.C. § 702).

The D.C. Circuit has also held that the 1976 amendments did not abolish non-statutory causes of action: "nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of ultra vires actions recognized long before, in *McAnnulty*. When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Reich*, 74 F.3d at 1328. Indeed, federal courts have "repeatedly[] rejected" the federal government's argument, "expressly holding that the APA's waiver of sovereign immunity applies to any suit whether under the APA or not." *Trudeau v. FTC*, 456 F.3d 178, 186 (D.C. Cir. 2006) (cleaned up). In *Trudeau*, the D.C. Circuit comprehensively analyzed the legislative history of the 1976 amendments and held that "the measure's clear purpose [was] elimination of the sovereign immunity defense in all equitable actions for specific relief against a Federal agency or officer acting in an official capacity" and "the Senate Report plainly indicated that Congress expected the waiver to apply to non-statutory actions, and thus not only to actions under the APA." *Id*. at 186–87; *see also Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 776 (7th Cir. 2011) (same).

Congress's 1976 amendments were not meant to foreclose non-statutory review claims, and sovereign immunity does not shield the PIP Program. The *Kyne* exception applies here, and the States are entitled to assert a non-statutory review claim for *ultra vires* action.

IV.    **This Court should declare the PIP Program unlawful, stay or vacate it, and preliminarily or permanently enjoin its operation and that of similar future agency actions.**

      A.   **Universal vacatur under 5 U.S.C. § 706 is required because the Notice violates the APA.**

On finding an administrative rule violates the APA, "universal vacatur" under § 706 is "*required* in this circuit." *Texas Med. Assn. v. U.S. Dept. of Health and Human Services*, 110 F.4th 762, 780 (5th Cir. 2024) (emphasis added); *contra* ECF No. 77 at 70 (claiming the Fifth Circuit has "taken the position that universal vacatur is *permitted* under the APA" but that "Plaintiffs go farther and argue that universal vacatur is r*equired*") (emphasis added).

Defendants argue that if vacatur is warranted, it should be limited to the parties here. ECF No. 77 at 67–72.  But as the Fifth Circuit has recently reaffirmed, "party-restricted vacatur" is an oxymoron. That is because by its nature, the "scope" of vacatur under § 706 is "'nationwide … not party-restricted,"' "and 'affects all persons in all judicial districts equally."' *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930 (5th Cir. 2024) (quoting *In re Clarke*, 94 F.4th 502, 512 (5th Cir. 2024) and *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024))). This reading accurately reflects the difference between the APA context—where vacatur of a rule "for everyone" is the normal remedy, *Kiakombua v. Wolf*, 498 F. Supp. 3d 1, 52 (D.D.C. 2020) (K.B. Jackson, J.) (citation omitted); *see also Career Colleges and Schools of Texas*, 98 F.4th at 255— and non-APA cases involving requests for equitable relief that flow to particular parties. *Cf. Griffin v. HM Florida-ORL, LLC*, 144 S. Ct. 1, 1, n.1 (2023) (Kavanaugh, J., concurring in denial of stay) (explaining difference); *see also* Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 950 (2018) ("[T]he [APA] establishes a unique form of judicial review that differs from judicial review of statutes.").[3]

---

[3] This interpretation also harmonizes this Court's "set aside," 5 U.S.C. § 706(2)(A), authority with the rest of the APA. After all, it would be illogical for the APA to allow a court to "postpone the effective date of an agency action" during litigation, 5 U.S.C. § 705, but be powerless to terminate that action if the court concludes the action is "unlawful," *id.* § 706(2).

For those same reasons, there is no Article III problem with this Court issuing vacatur under that APA that happens to benefit non-parties, particularly since it is *necessary* to provide full relief to the parties. *Contra* ECF No. 77 at 67–68. This Court's authority to resolve this case is clear. Under Article III, only one plaintiff needs standing to allow a court to decide a case. Once that requirement is met, this Court has both the power and the duty to enforce the statutory remedy prescribed by Congress. *See, e.g., New York v. U.S. Dept. of Com.*, 351 F. Supp. 3d 502, 674–75 (S.D.N.Y. 2019), *aff'd in part, rev'd in part and remanded sub nom. Dept. of Com. v. New York*, 588 U.S. 752 (2019). Here, that remedy is to set aside unlawful agency action under the APA, which applies regardless of whether it benefits non-parties. *See, e.g., Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 913 (1990) (Blackmun, J., dissenting) (when a plaintiff "prevails" on a challenge under the APA to "a rule of broad applicability," "the result is that the rule is invalidated, not simply that the court forbids its application to a particular individual"). Simply put, not only is vacatur "warranted" here, ECF No. 77 at 67, it is the "only statutorily prescribed remedy for a successful APA challenge to a regulation." *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022).

Despite all this, Defendants argue the Fifth Circuit has treated universal vacatur as a "discretionary equitable remedy—not a remedy that is automatic or compelled." ECF No. 77 at 71. In support, they cite *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023). To be sure, the Fifth Circuit's en banc opinion in *Cargill* did remand to the district court, ECF No. 77 at 71, but only because "the parties ha[d] not briefed the remedial-scope question*." Cargill*, 57 F.4th at 472. And "[w]hat [Defendants'] short parenthetical citation to *Cargill* fails to capture is that just before the plurality decided that remand was appropriate given the lack of briefing, it recited plainly the proposition that is at odds with [their] argument: 'vacatur of an agency action is the default rule in this Circuit.'" *Braidwood Management, Incorporated*, 104 F.4th 930 n. 102 (5th Cir. June 21, 2024) (quoting *Cargill*, 57 F. 4th at 472).

Next, Defendants spill considerable ink arguing that traditional equitable principles should inform imposing universal relief under the APA. ECF No. 77 at 68–72. But that is wrong. To begin,

Defendants' arguments on this continuously conflate the meaningful distinctions between vacatur and "universal" or "nationwide" injunctions. ECF No. 77 at 68–72. Importantly, APA vacatur under § 706 is *not* a nationwide injunction, or even an injunction at all. The Supreme Court has explained that "[a]n injunction is a drastic and extraordinary remedy, which should not be granted as a matter of course." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). But "partial or complete vacatur" is "a less drastic remedy" that may still be "sufficient to redress" plaintiffs' injury without "recourse to the additional and extraordinary relief of an injunction." *Id.* at 165-66. An injunction generally acts *in personam*, while vacatur does not. That is, an injunction "operates on the enjoined officials" to block them from enforcing a regulation on pain of contempt, but vacatur of a regulation "unwinds the challenged agency action" altogether. *Driftless Area Land Conservancy v. Valcq*, 16 F.4th 508, 522 (7th Cir. 2021). This distinction is critical. While a district court in this circuit is not required to issue a nationwide injunction, *see, e.g.*, *Mock v. Garland*, 75 F.4th 563, 587 (5th Cir. 2023), it *is* required to apply the "default rule" and vacate agency action shown by Plaintiffs to be unlawful.  *Data Mktg. P'ship*, 45 F.4th at 859; *Texas Med. Assn.*, 110 F.4th at 780. *Contra* ECF No. 77 at 70 (citing *Starbucks Corp. v. McKinney*, 144 S. Ct. 1570, 1576 (2024), which involved the Court declining a lower statutory standard to obtaining a traditional injunction but not involving—or even mentioning—vacatur or § 706)).

With that in mind, Defendants' arguments that courts consider the equities and public interests before vacating unlawful agency actions falls flat. Even setting aside clear Fifth Circuit precedent holding vacatur is required and not party-restricted, at this stage, equities give way to the text of the APA that commands courts "*shall*" set aside unlawful agency action. 5 U.S.C. § 706(2) (emphasis added); *Loper Bright* at, 2262 ("The text of the APA means what it says."); *see also Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. System,* 144 S. Ct. 2440, 2467 (2024) (Kavanaugh, J., concurring) ("The Government has contended that equitable relief is ordinarily limited to the parties in a specific case. Therefore, nationwide injunctions would be permissible only if Congress authorized them. But in the APA, Congress did in fact depart from that baseline

and authorize vacatur."); *Braidwood Management, Incorporated*, 104 F.4th at 952 ("[W]e do not read out precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur."). In other words, the meaning of "set aside" in § 706 cannot mean "vacatur," *Braidwood Mgt., Inc.*, 104 F.4th at 951, only some of the time, or whenever the balance of equities or public interest favor a universal remedy.

In the end, to avoid this circuit's default rule of vacatur, Defendants present some of the "thoughtful arguments" against it that exist on "both sides of th[is] debate." *United States v. Texas*, 599 U.S. 670, 702 (2023) (Gorsuch., J. concurring). But the Fifth Circuit has chosen the side of universal vacatur. And until the Supreme Court holds otherwise, that continues to be the required relief here.

### B.  Defendants cannot show they are entitled to the exceptional remedy of remand without vacatur.

The default rule in this circuit is "vacatur *with* remand." *Natl. Assn. of Manufacturers v. U.S. Sec. and Exch. Comm'n*, 105 F.4th 802, 815 (5th Cir. 2024) (emphasis added); *MPP*, 20 F.4th at 1000 ("[B]y default, remand *with vacatur* is the appropriate remedy.") (emphasis added). Remand without vacatur is an exceptional and rare remedy that is appropriate where "there is at least a serious possibility that the agency will be able to substantiate its decision given an opportunity to do so." *See Texas v. Biden*, 10 F.4th 538, 560 (5th Cir. 2021) (quoting *Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n*, 989 F.3d 368, 389 (5th Cir. 2021)). Defendants fail to show why this Court should depart from the default rule in this circuit.

First, Defendants argue that because Texas "alleges that the agency failed to engage in reasoned decision-making or adequately explain its decision" that DHS should be given the opportunity to address such procedural defects on remand. ECF No. 77 at 66. But as Plaintiffs have shown, the Notice also runs contrary to the text, structure, purpose, and history of 8 U.S.C. § 1182(d)(5)(A). No additional explanation, factfinding, or notice-and-comment period could fix this. *See DACAs*, 50 F.4th at 529 ("There is no possibility that DHS could obviate these conflicts

on remand."); *Texas Med. Assn. v. U.S. Dept. of Health and Human Services*, 587 F. Supp. 3d 528, 548 (E.D. Tex. 2022), *appeal dismissed*, No. 22-40264, 2022 WL 15174345 (5th Cir. Oct. 24, 2022). Indeed, Defendants do not cite a single case, ECF No. 77 at 66, where a court ordered remanded without vacatur when the challenged agency action conflicted with the governing statute. *Cf., e.g., Tex. Ass'n of Mfrs. v. U.S. Consumer Prod. Safety Comm'n,* 989 F.3d 368, 389-90 (5th Cir. 2021) (remanding without vacatur so agency could "allow industry to comment" and "consider" certain costs); *Cent. & S.W. Servs., Inc v. EPA,* 220 F.3d 683, 692 (5th Cir. 2000) (remanding without vacatur so agency could "justify" its decision).

Second, Defendants claim that vacatur of the Notice would "cause disruption." ECF No. 77 at 66–67. But there are no disruptive consequences that would support remand without vacatur. After all, the notice is "not functionally effective at this moment*," Texas v. U.S. Dept. of Transportation*, No. 5:23-CV-304-H, 2024 WL 1337375, at *20 (N.D. Tex. Mar. 27, 2024). It is hard to see how vacating a Rule that was only in effect for a few days could have such "disruptive consequences," *DACA,* 50 F.4th at 529, that it would result in this Court being forced to deviate from the well-settled default rule of vacatur with remand. *MPP*, 20 F.4th at 1000.

### C.  Declaratory judgment is proper.

The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. Fed. R. Civ. P. 57.  Texas has established that the Notice violates the APA, entitling it to a declaration that clarifies the rights and legal relationships among itself and Defendants. The Court should therefore declare that the Notice, Letter, and Fact Sheet are unlawful, and that 8 U.S.C. § 1182(d)(5)(A) only permits an alien to be "parole[d] *into* the United States," and only on a case-by-case basis, for bona fide urgent humanitarian reasons or significant public benefits. The statute's parole authority cannot lawfully be applied to aliens physically present in the country, whether lawfully or unlawfully. As a result, beneficiaries of the PIP Program, who are already within the United States, cannot be lawfully paroled "into" it.

### D. Any injunctions should issue nationwide.

Since Plaintiffs have carried their burden to each of the injunction factors, this Court should—in addition to vacating the Notice—issue permanent injunctive relief with nationwide applicability. In many APA cases, there is no need for further relief, injunctive or otherwise—once vacated, the agency action is simply "treated as though it had never happened." *Griffin*, 144 S. Ct. at 2 n.1 (Kavanaugh, J.). That said, courts routinely issue other forms of relief in APA challenges.[4] Additional injunctive relief is especially important in cases like this one, where an agency has a history of flouting the plain statutory language of the parole statutes via final agency action.[5] *cf. Texas v. Cardona*, No. 4:23-CV-00604-0, 2024 WL 3658767, at *50 (N.D. Tex. Aug. 5, 2024) (vacating agency action and also granting injunctive relief because "the Department has enacted similar guidance in the past and may attempt to do so again").[6] A permanent injunction coupled with vacatur of the Notice is particularly warranted here, where Defendants have asserted that even without the Notice, "any noncitizen applicant for admission physically present in the United States can apply for parole in place." ECF No. 77 at 54.

This relief should issue nationwide. Immigration lawsuits are in a category of cases that are "particularly appropriate for universal injunctive relief." *Braidwood Mgt., Inc.*, 104 F.4th at 954 n. 122 (collecting cases). And as in other immigration cases, here, "broad relief is appropriate to

---

[4] *E.g., Franciscan All., Inc. v. Becerra*, 553 F. Supp. 3d 361, 377 (N.D. Tex. 2021) (rejecting the government's argument that a permanent injunction was duplicative with vacatur), *aff'd in relevant part*, 47 F.4th 368, 377–80 (5th Cir. 2022); *DACA*, 50 F.4th at 530–31 (affirming the district court's grant of both vacatur and a nationwide injunction*); Natl. Assn. of Manufacturers v. U.S. Securities and Exch. Comm'n*, 631 F. Supp. 3d 423, 431 (W.D. Tex. 2022) (following "the ordinary practice" of granting both vacatur and an injunction).

[5] *See, e.g., Fla. v. United States*, 660 F. Supp. 3d 1239 (N.D. Fla. 2023), *appeal dismissed,* No. 23-11528, 2023 WL 5212561 (11th Cir. July 11, 2023) (vacating DHS Policy on the Use of Parole Plus Alternatives to Detention to Decompress Border Locations ("Parole + ADT")).

[6] Indeed, this would not be the first time that a government body repeals a challenged action and replaces it with something substantially similar, thereby causing comparable injuries. *See, e.g., Ne. Fla. Chapter of Assoc. Gen. Contractors of Am. v. Jacksonville*, 508 U.S. 656, 660(1993) (involving the repeal of an ordinance and its subsequent replacement with a comparable ordinance causing similar injuries to the plaintiff despite minor differences between the different ordinances).

ensure uniformity and consistency in enforcement." *Texas*, 40 F.4th at 229 n.18. To that end, "a geographically-limited injunction would be ineffective" since once migrants cross into the United States, they are "free to move among states." *DAPA*, 809 F.3d at 188.

That this incidentally benefits other States is no bar to relief. While "'as a general rule, American courts of equity did not provide relief beyond the parties to the case[,] [a]s with all general rules, of course, this one was subject to exceptions—the most important of which was that an injunction could benefit non-parties as long as 'that benefit was merely incidental.'" *Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc) (citations omitted).

Because "[t]he Constitution requires 'an *uniform* Rule of Naturalization,'" *DAPA*, 809 F.3d at 187 (quoting U.S. Const. art. I, § 8, cl. 4) (emphasis in original), "Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and uniformly,'" *id*. at 187–88 (quoting Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115(1), 100 Stat. 3359, 3384) (emphasis in original), "and the Supreme Court has described immigration policy as 'a comprehensive and unified system,'" *id*. at 188 (quoting *Arizona v. United States*, 567 U.S. 387, 401 (2012)). Thus, "[p]artial implementation of [the challenged immigration policy] would "detract[] from the 'integrated scheme of regulation' created by Congress." *Id*. (quoting *Arizona*, 567 U.S. at 401); *Cf. Career Colleges and Schools of Texas v. U.S. Dept. of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) ("The Department's protests against nationwide relief are incoherent in light of its use of the Rule to prescribe uniform federal standards.").

Thus, this court should issue a permanent injunction in accordance with Plaintiffs' requested relief in this case. *See* ECF No. 79-7. Because this challenge implicates the inherently universal and uniform immigration scheme, any injunction should apply nationwide.

## CONCLUSION

For the reasons explained above, Defendants' Motion for Summary Judgment should be denied. Plaintiffs respectfully reiterate their request for immediate injunctive relief to halt

Defendants' implementation of the illegal PIP Program, including the Notice, the Filing Guide, and the Form I-131F. Specifically, Plaintiffs respectfully request that this Court stay and ultimately vacate the Notice. Plaintiffs also ask this Court to enter a preliminary—and ultimately a permanent injunction prohibiting Defendants from implementing the illegal PIP program, accepting applications pursuant to the PIP Program, or granting parole to PIP applicants. Plaintiffs further request declaratory relief establishing that 8 U.S.C. 1182(d)(5) does not permit the executive to grant parole on a programmatic basis for large populations, but instead requires case-by-case analysis in all circumstances.

Dated: October 25, 2024.

Respectfully submitted,

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**RALPH MOLINA**
Deputy First Assistant Attorney General

**AUSTIN KINGHORN**
Deputy Attorney General for Legal Strategy

*/s/Ryan D. Walters*
**RYAN D. WALTERS**
Chief, Special Litigation Division
Texas Bar No. 24105085
Ryan.Walters@oag.texas.gov

**KATHLEEN T. HUNKER**
Special Counsel
Texas Bar No. 24118415
Kathleen.Hunker@oag.texas.gov

**GARRETT GREENE**
Special Counsel
Texas Bar No. 24096217
Garrett.Greene@oag.texas.gov

Office of the Attorney General of Texas
Special Litigation Division
P.O. Box 12548, Capitol Station
Austin, Texas 78711-2548
Telephone: 512-463-2100
Fax: 512-457-4410

**GENE P. HAMILTON**
Virginia Bar No. 80434

**JAMES ROGERS**
Arizona Bar no. 027287

**RYAN GIANNETTI**
DC Bar no. 1613384

America First Legal Foundation
611 Pennsylvania Ave. SE #231
Washington, DC 20003
(202) 964-3721
Gene.Hamilton@aflegal.org
James.Rogers@aflegal.org
Ryan.Giannetti@aflegal.org

**COUNSEL FOR PLAINTIFF**
**STATE OF TEXAS**

**RAUL R. LABRADOR**
Idaho Attorney General

*/s/ Alan Hurst*
Alan Hurst
Solicitor General
Michael A. Zarian
Deputy Solicitor General
Office of the Idaho Attorney General
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov
Michael.Zarian@ag.idaho.gov

**COUNSEL FOR STATE OF IDAHO**

66

**STEVE MARSHALL**
Attorney General of Alabama

*/s/ Robert M. Overing*
**ROBERT M. OVERING**
Deputy Solicitor General
Robert.Overing@AlabamaAG.gov
Office of the Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36130
Telephone: (334) 242-7300
Fax: (334) 353-8400
**COUNSEL FOR STATE OF ALABAMA**


**TIM GRIFFIN**
Attorney General of Arkansas

Nicholas J. Bronni
 Solicitor General

*/s/ Dylan L. Jacobs*
**DYLAN L. JACOBS\***
 Deputy Solicitor General
Office of the Arkansas Attorney General
323 Center Street, Suite 200
Little Rock, AR  72201
Telephone: (501) 682-2007
Dylan.jacobs@arkansasag.gov
Counsel for State of Arkansas
*\*admission application forthcoming*


**ASHLEY MOODY**
Attorney General of Florida

*s/ James Percival*
**JAMES H. PERCIVAL**
Chief of Staff
Office of the Attorney General
The Capitol, Pl-01
Tallahassee, Florida 32399-1050
(850) 414-3300
(850) 410-2672 (fax)
James.percival@myfloridalegal.com

**COUNSEL FOR STATE OF FLORIDA**


**CHRISTOPHER M. CARR**
Attorney General of Georgia

*/s/Stephen J. Petrany*
**STEPHEN J. PETRANY**
Solicitor General
Office of the Attorney General
40 Capitol Square, SW
Atlanta, Georgia 30334
(404) 458-3408
spetrany@law.ga.gov
**COUNSEL FOR STATE OF GEORGIA**


**BRENNA BIRD**
Attorney General of Iowa

*/s/ Eric H. Wessan*
**ERIC H. WESSAN**
Solicitor General
1305 E. Walnut Street
Des Moines, Iowa 50319
(515) 823-9117
(515) 281-4209 (fax)
eric.wessan@ag.iowa.gov
**COUNSEL FOR STATE OF IOWA**


**KRIS W. KOBACH**
Attorney General of Kansas

*s/ Abhishek S. Kambli*
**ABHISHEK S. KAMBLI**
Deputy Attorney General – Special Litigation &
Constitutional Issues Division
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Phone: (785) 296-6109 | Fax: (785) 221-3938
abhishek.kambli@ag.ks.gov
**COUNSEL FOR STATE OF KANSAS**

ELIZABETH B. MURRILL
Attorney General of Louisiana

*s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General
Office of the Attorney General
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov
COUNSEL FOR STATE OF LOUISIANA


ANDREW BAILEY
Attorney General of Missouri

*/s/ Samuel C. Freedlund*
SAMUEL C. FREEDLUND, 73707MO
 *Deputy Solicitor General*
Office of the Attorney General
815 Olive St., Suite 200
St. Louis, MO 63188
Phone: (314) 340-4869
Fax (573) 751-1774
Samuel.Freedlund@ago.mo.gov
COUNSEL FOR THE STATE OF MISSOURI


DREW H. WRIGLEY
Attorney General of North Dakota

*/s/ Philip Axt*
PHILIP AXT*
*Solicitor General*
Office of Attorney General
600 E. Boulevard Ave Dept. 125
Bismarck, ND 58505
Phone: (701) 328-2210
pjaxt@nd.gov

COUNSEL FOR STATE OF NORTH DAKOTA

DAVE YOST
Attorney General of Ohio

*/s/ T. Elliot Gaiser*
T. ELLIOT GAISER
Ohio Solicitor General
30 East Broad Street, 17th Floor
Columbus, Ohio 43215
614.466.8980
614.466.5087 fax
thomas.gaiser@ohioago.gov
COUNSEL FOR STATE OF OHIO


MARTY JACKLEY
Attorney General of South Dakota

*/s/ Clifton E. Katz*
CLIFTON E. KATZ
Assistant Attorney General
1302 E. Highway 14, Suite 1
Pierre, South Dakota 57501
Telephone: 605-773-3215
E-Mail: clifton.katz@state.sd.us

COUNSEL FOR STATE OF SOUTH DAKOTA


ALAN WILSON
Attorney General of South Carolina

*s/ J. Emory Smith, Jr.*
JAMES EMORY SMITH, JR.
Deputy Solicitor General
Email:  esmith@scag.gov
Office of the Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
Phone: (803) 734-3642
Fax: (803) 734-3677

COUNSEL FOR STATE OF SOUTH CAROLINA

**JONATHAN SKRMETTI**
Attorney General of Tennessee

*/s/ Whitney D. Hermandorfer*
**WHITNEY D. HERMANDORFER**
*Director of Strategic Litigation*
Tennessee Bar. No. 041054
Whitney.Hermandorfer@ag.tn.gov
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
(615) 741-8726

**COUNSEL FOR STATE OF TENNESSEE**

**BRIDGET HILL**
Attorney General of Wyoming

*/s/ Ryan Schelhaas*
**RYAN SCHELHAAS**
Chief Deputy Attorney General
109 State Capitol
Cheyenne, WY 82002
(307) 777-5786
ryan.schelhaas@wyo.gov
**COUNSEL FOR STATE OF WYOMING**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 25, 2024, which serves all counsel of record.

*/s/Ryan D. Walters*
RYAN D. WALTERS