## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

STATE OF TEXAS, et al.,

  *Plaintiffs*,

v.

UNITED STATES DEPARTMENT OF
HOMELAND SECURITY, et al.,

  *Defendants*.

Civil Action No. 6:24-cv-00306

---

**Plaintiffs' Reply in Support of Plaintiffs' Combined Updated Motion for Preliminary Injunction and Stay of Agency Action, Motion for Summary Judgment, and Trial Brief**

---

  Defendants' mass amnesty parole-in place program ("PIP Program" or "Program") violates the text and intent of the Immigration and Nationality Act (INA) as amended by the Illegal Immigration Reform and Immigration Responsibility Act (IIRIRA). Congress granted the Executive a "narrowly circumscribed" parole power in 8 U.S.C. § 1182(d)(5)(A). *See Cruz-Miguel v. Holder*, 650 F.3d 189, 198 (2d Cir. 2011). But in this Court, Defendants seek to apply that narrow power to claim unreviewable discretion to rewrite our immigration laws.

### I.  Texas has standing.

  From the outset of this litigation, Defendants have relied on a misreading of *United States v. Texas* (*Enforcement Priorities*), 599 U.S. 670 (2023). *See, e.g.*, ECF No. 99 at 4–9. The *Enforcement Priorities* Court recognized that Texas had adequately shown injury but found a lack of standing based on the traditional principle that the Judiciary does not oversee the Executive's exercise of prosecutorial discretion, so the injuries proven were not judicially cognizable. *Id*. at 680 ("Therefore, in both Article III cases and Administrative Procedure Act cases, this Court has consistently recognized that federal courts are generally not the proper forum for resolving claims

that the Executive Branch should make more arrests or bring more prosecutions.").

The PIP Program, however, is not a matter of enforcement discretion. Granting parole (a distinct legal status with a wide range of legal consequences) to pave the way for aliens to adjust to Lawful Permanent Resident (LPR) status is an affirmative legal benefit by any definition. Binding precedent in the Fifth Circuit confirms that programs conferring affirmative immigration relief to illegally present aliens create costs for the States sufficient to confer Article III standing. *See, e.g.*, *Texas v. United States* (*DAPA), *809 F.3d 134 (5th Cir. 2015), *aff'd*, 579 U.S. 547 (2016); *see also Texas v. United States* (*DACA),* 50 F.4th 498, 517–18 (5th Cir. 2022) (finding injury in fact based on social services spending on illegal aliens and emphasizing that, without the program, "Texas would no longer be required to educate those who depart or the children who depart with them").

Defendants' effort to disregard the vast body of contrary precedent before *Enforcement Priorities* is also meritless, *see* ECF No. 99 at 8 ("The prior authority on which Texas relies does not survive or supersede the Supreme Court's more recent and on-point holding in *Priorities* that the very type of injury Texas raises here is an indirect one."), because the Supreme Court's "narrow" redressability decision explicitly did nothing more than "simply maintain[] the longstanding jurisprudential status quo." *Enforcement Priorities*, 599 U.S. at 686. Indeed, the Supreme Court pointed to the key Fifth Circuit case in *DAPA* as not falling within the category of immigration challenges that were not judicially cognizable:

> a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. That is because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion. Cf. *Department of Homeland Security* v. *Regents of Univ. of Cal.*, 140 S.Ct. 1891, 1906–07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); *Texas v. United States*, 809 F.3d 134, 154 (CA5 2015) (*Linda R. S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits"), *aff'd by an equally divided Court*, 579 U.S. 547 (2016). Again, we need not resolve the Article III consequences of such a policy.

*Enforcement Priorities*, 599 U.S. at 683 (citations truncated). This decision cannot therefore serve to overrule the holdings of *DAPA* or the Fifth Circuit precedents following it.

The *Enforcement Priorities* Court also favorably cited in own decision reviewing the termination of the Migrant Protection Protocols as not falling within the rule against judicially cognizable injuries—the Supreme Court in that case had exercised Article III jurisdiction where Texas's injuries were based on grants of parole, leaving unchallenged the Fifth Circuit's analysis on standing in that case, *Texas v. Biden (MPP)*, 20 F.4th 928 (5th Cir. 2021). *See Enforcement Priorities*, 599 U.S. at 683 (citing *Biden* v. *Texas*, 597 U.S. 785 (2022)). Indeed, the Supreme Court in the MPP litigation remanded to the lower courts to determine whether DHS's termination of the program was arbitrary and capricious based on its abuse of its parole authority, *Biden*, 597 U.S. at 806–07, 814; *id*. at 815–16 (Kavanaugh, J., concurring)—a strange outcome for *Enforcement Priorities* to favorably cite if there were no Article III jurisdiction over such a challenge.

Defendants also argue that because the "noncitizens eligible for parole under the [PIP Program] are already residing in the United States," so "there could be no net increase in general education, health care, or law enforcement costs resulting from their parole." ECF No. 99 at 8. The Fifth Circuit has ruled otherwise—DACA recipients were already present in the United States, but deferred action provided them with affirmative immigration relief that protected them from removal and made them eligible for work authorization, reducing the incentives for some of them to voluntarily return to their home countries. This was sufficient to show Texas was injured by that program. *See DACA*, 50 F.4th at 519. The entire purpose of the PIP Program is to unburden illegal aliens from having to comply with Congress's requirements that they return to their home countries for ten years before being able to adjust their status. Implementation of Keeping Families Together, 89 Fed. Reg. 67,459 (Aug. 20, 2024) (the "Notice"); *see* ECF No. 100 at 20–21 (listing the Notice's own statements to this effect). For Defendants to argue there is no basis to believe that the Program accomplishes any part of its central purpose is self-defeating.

Some PIP-eligible aliens would—absent the Program—pursue consular processing (a

process that, by statute, involves a 10-year waiting period for most of the subject alien population) or otherwise. *See* 8 U.S.C. 1182(a)(9)(B)(i)(II). Defendants dispute Dr. Potter's 1%-per-year estimate based on the prevailing academic literature but offer no counter estimate or alternative evidence. The only competent evidence reveals that at least 1% of the older population, per year, would voluntarily leave absent the PIP Program. But even ignoring Dr. Potter's estimates, Defendants cannot pretend that the number is zero, as it must be to defeat standing. Instead, they rely on equivocal language like "*less* likely" and "*many* … would *likely* choose to remain," implicitly admitting the obvious: that Defendants also anticipate that some aliens would otherwise depart. *See* 89 Fed. Reg. 67,466 ("Absent this process, applying for LPR status requires noncitizens who are present without admission or parole (PWAP) to depart the United States and remain abroad for an indefinite period … ."); ECF No. 99 at 59 ("[T]he KFT process would mitigate the effects of noncitizens departing the United States for their home countries and then facing uncertainty about their return."). An indisputable "effect[ ]" of the PIP Program is that it "mitigate[s] the effects of noncitizens departing," including that the States would have saved money on those aliens who would not have used public benefits like public education or Emergency Medicaid had the PIP Program not mitigated their rates of departure.

Defendants make much of the admission that Texas does not track expenses incurred as a result the specific population of PIP-eligible aliens, so "Plaintiffs cannot possibly show, as they must, that these particular noncitizens are likely to cost the State more money in the future were it not for the KFT process." ECF No. 99 at 14. But the Fifth Circuit has rejected any requirement that Texas show that beneficiaries of the particular program have imposed costs, finding sufficient evidence from estimates of costs from illegal aliens in general where large-scale programs are challenged. *See* ECF No. 100 at 5-6 (citing *MPP*, 20 F.4th at 971-73; *DACA*, 50 F.4th at 517–18; *DAPA*, 809 F.3d at 155).

Defendants also continue to urge the Court to engage in an "accounting exercise" and weigh potential reductions in costs to the States as a result of the Program as offsets to their injuries,

ECF No. 99 at 15.  But this has been repeatedly rejected by the Fifth Circuit. ECF No. 100 at 8–10.

Defendants make the argument that the parole statute itself authorizes grants of parole in place, not the Notice, so the Notice is not causing the injury. ECF No. 99 at 6, 11. But this Court must "assume, for purposes of the standing analysis, that Texas is correct on the merits of its claim[s]." *Texas v. EEOC*, 933 F.3d 433, 447 (5th Cir. 2019). Texas's claims are based on the absence of any such authority provided under the parole statute, so the PIP Program causes any alleged injury, and relief against the Program will redress that injury.

Defendants' redressability argument is similar, as it assumes that the PIP Program has no meaningful effect on anything and that the Executive has parole discretion beyond the boundaries of the parole statute. *See, e.g.*, ECF No. 99 at 17 ("But even if the KFT Process were vacated, federal officials still possess authority and discretion to grant parole in place."). Even were the Court not required to assume—for standing purposes—that Texas is correct about the lack of such authority under the parole statute, Plaintiffs have explained why federal officials lack authority to grant parole in place outside the few, limited contexts authorized by Congress. *See* ECF No. 79 at 23–27; ECF No. 100 at 29–35. Defendants' argument relies on the notion that the PIP Program is not even *likely* to increase the net number of aliens granted parole. But every predicted purported benefit of the Program in the Notice is predicated on the notion that it leads to grants of parole that would not have happened in the absence of the Program.

The PIP Program's removal of the incentive for illegally present aliens to voluntarily depart is immediately redressed by a favorable judgment. The undisputed—indeed, eponymous—purpose of the "Keeping Families Together" program is to prevent the physical departure of aliens (which the INA requires) and "keep families together."

If even a single school-aged alien would be among those who departs, the State of the child's residence saves thousands annually in education costs—more than enough to constitute injury in fact, and immediately redressable by a favorable litigation outcome. Every other publicly funded benefit is the same—every noncitizen who would otherwise leave or be removed but stays in the

U.S. and uses any of the public services the States provide causes harm to the States that is immediately redressable by vacatur of and injunctive relief against the Program.

## II.    Plaintiffs' evidence is admissible.

In their Response, Defendants cite the typical rule that "in an APA case, a reviewing court should have before it neither more nor less information than did the agency when it made its decision." *United Student Aid Funds, Inc. v. Devos*, 237 F. Supp. 3d 1, 4 (D.D.C. 2017). But Defendants ignore the many exceptions to that rule that allow extra-record evidence to be used to show final agency action, violation of notice-and-comment requirements, whether an action failed to consider relevant factors, and whether a statutory requirement is being complied with. ECF No. 100 at 3–4; *see also Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552547, at *6 (N.D. Tex. July 19, 2021) (extra-record evidence allowed to show violations of statutory requirements and Take Care Clause violations).

The Fifth Circuit has also recognized that an administrative record may be supplemented "when: (1) the agency deliberately or negligently excluded documents that may have been adverse to its decision, (2) the district court needed to supplement the record with 'background information' in order to determine whether the agency considered all of the relevant factors, or (3) the agency failed to explain administrative action so as to frustrate judicial review." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010). Overwhelmingly, the documents cited in the Attorney Declaration, ECF No. 79-1, Ex. A, fit the second exception, as they merely provide background information about the PIP Program or context for how the program has been understood and implemented, *id*. Exs. 1–5, 7–13, 15. The remaining exhibits to that declaration should be uncontroversial—Defendants admit that exhibits relevant to standing are admissible, *see id*. at Exs. 14, 16–18, and Ex. 6 is a federal regulation, which is judicially noticeable authority, not evidence (provided in the declaration for convenience).

Further, "district courts may consult extra-record evidence when the procedural validity of the agency's action remains in serious question." *Am. Bar Assoc. v. U.S. Dept. of Educ.*, 370 F. Supp.

3d 1, 38 (D.D.C. 2019) (quoting *Hill Dermaceuticals, Inc. v. Food & Drug Admin.*, 709 F.3d 44, 47 (D.C. Cir. 2013)) (cleaned up). As Plaintiffs are challenging the Notice, in part, for procedural irregularity, *see* ECF No. 1 at ¶¶ 269–77 (Count VII – Lack of Notice and Comment); 278–288 (Count VIII – Violation of Paperwork Reduction Act), relevant extra-record evidence, including evidence tending to show that those irregularities prejudiced Plaintiffs' opportunity to be heard and defend their rights, must be considered.

In reference to Dr. Lloyd Potter's declaration, ECF No. 79-6, Ex. F, Defendants allege hearsay with respect to the published studies Dr. Potter relies on. But Defendants ignore Federal Rule of Evidence 703:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Defendants do not (and cannot) allege that the studies Dr. Potter relies on are not "those kinds of facts or data" that an expert in the field would reasonably rely upon. By the plain text of Rule 703, their effort to downplay Dr. Potter's expert opinion is meritless. Defendants' objection based on alleged disclosure deficiencies is similarly meritless, as explained in Plaintiffs' Response. ECF No. 100 at 18–19 n.1. It is sufficient here to note that any error is harmless; the Defendants' complaint that they were prejudiced by being "deprived of the ability to engage in expert discovery" rings hollow when the Defendants had access to Dr. Potter's material statements since this case was filed and had every opportunity to evaluate a jurisdictional witness during jurisdictional discovery.[1]

---

[1] Defendants' arguments on this point boil down to form over function. The expert witness discovery rules are designed to aid the court in its fact-finding mission by allowing both sides to prepare their cases adequately and efficiently and to prevent the tactic of surprise from affecting the outcome of the case. *Sherrod v. Lingle*, 223 F.3d 605, 613 (7th Cir. 2000); *see* Fed. R. Civ. P. 26(a)(2) advisory committee's note (stating that expert disclosure rule intended to give opposing

Defendants object to consideration of Amy Copeland's declarations related to educational funding. *See* ECF No. 3, Ex. B; ECF No. 79-3, Ex. C. The objection is meritless on several levels. First, the point of the declaration is that every additional student enrolled in Texas's public schools costs Texas taxpayers between approximately $10,000 and $13,000 per year. The entire premise of the "Keeping Families Together" program is that it eliminates the need for certain unlawfully present aliens to depart the country (causing families to be *not* together) in accordance with existing immigration law. Whether the correct number is $10,107 or $10,836 makes no material difference for standing, and thus cannot constitute a dispute over material fact sufficient to deny summary judgment; if a single illegal alien public school student would have departed the country but for the PIP Program (that is, if the program's fundamental premise, for which it is named, holds true for a single one of the estimated 50,000 minors to whom it applies), then Texas is harmed to the tune of over $10,000—more than enough for standing.

Second, Ms. Copeland explains that her estimates are based on the Texas public school funding formula, which, in turn, allows State planners to estimate funding entitlements "based on projections of student counts, attendance patterns, and other factors," and are "adjusted as actual data become available." ECF No. 3, Ex. B ¶ 5; ECF No. 79-3 Ex. C ¶ 6. The cause of immaterial, minor adjustments to estimated costs is self-evident when two months have passed between the declarations; new data can cause estimates about the future to change.

Finally, Defendants complain of shifting estimates of how future populations will change.

---

parties "reasonable opportunity to prepare for effective cross examination and perhaps arrange for expert testimony from other witnesses."). Here, Dr. Potter's expert declaration is so much like his declaration that has been on file since this case began that there is no basis for Defendants to claim surprise. *Cf. Crump v. Versa Products, Inc.*, 400 F.3d 1104, 1110 (8th Cir. 2005) (finding defendant's failure to disclose experts was not prejudicial because plaintiffs were provided with each expert's report, and each expert was available for plaintiff to depose). Even assuming Defendants could show harm "a court may nevertheless exercise its discretion to impose lesser sanctions than complete exclusion" of the expert. *Zertuche v. Cty. of Santa Clara*, 2013 WL 4111142, at *3 (N.D. Cal. Aug. 12, 2013).

This reflects a misreading—the first declaration refers to an increase in students "across Texas each year, based on available data" with the most recent reference being to the years 2023-2024. ECF No. 3, Ex. B at ¶¶ 4–5. The second declaration refers specifically to estimates that population will decrease in the years 2026–2027. ECF No. 79-3, Ex. C at ¶ 6. Defendants complain that estimates for *different time periods* don't match up. Regardless, none of the Defendants' argument is material. The only material points, which the Defendants do not and cannot dispute, are the unremarkable facts that: (1) public education systems cost the States a lot of money and (2) more students in the public-school systems means higher public education costs.

Plaintiffs hope to exclude or limit consideration of their own interrogatory answers. ECF No. 99 at 41. Defendants' interrogatory responses are subject to exceptions permitting extra-record evidence in an APA case because they illustrate that the rationales for the Program are pretextual and that the Program is implemented in bad faith because the 100% grant rate for applications shows that DHS is not engaged in bona fide case-by-case review. *See Dep't of Com. v. New York*, 588 U.S. 752, 781–82 (2019) (district court may "rul[e] on pretext in light of all the evidence in the record before the court, including the extra-record discovery" and bad faith "may justify extra-record discovery"); *DAPA*, 809 F.3d at 172 ("Like the DAPA Memo, the DACA Memo instructed agencies to review applications on a case-by-case basis and exercise discretion, but the district court found that those statements were 'merely pretext' because only about 5% of the 723,000 applications accepted for evaluation had been denied."); *see also Nat'l Ass'n for Gun Rts., Inc. v. Garland*, No. 4:23-CV-00830-O, 2024 WL 3517504, at *16 (N.D. Tex. July 23, 2024) (rejecting attempt to use record rule to shield determination of whether statute was complied with by agency action as "a thinly veiled backdoor attempt to import *Chevron*-style deference into this case").

## III.    Plaintiffs' claims are reviewable under the APA.

Defendants have offered no meritorious arguments that could defeat Plaintiffs' rights to APA review of the PIP Program. For example, although Defendants rehash their argument about the APA zone-of-interests test, ECF No. 99 at 19–22, they ignore the Fifth Circuit precedent that

holds Texas's interest in minimizing expenditures on illegal aliens is within the INA's zone of interests. *See* ECF No. 79 at 47–48; ECF No. 100 at 24–26.

Similarly, Defendants continue to argue that setting parole policy is committed to agency discretion, despite a clear and lengthy legislative history proving that the current version of 8 U.S.C. § 1182(d)(5)(A) was passed by Congress as an explicit *limitation* on Executive discretion. *See* ECF No. 79 at 12–14. In any event, this argument has been thoroughly addressed elsewhere. *See, e.g.*, ECF No. 100 at 28–29. The Supreme Court has explicitly held that use of the parole authority is subject to review under the APA. *Biden*, 597 at 806–07.

More fundamentally, the PIP Program is a "rule" under the APA as it is "an agency statement of general ... applicability and future effect." 5 U.S.C. § 551(4). *See MPP*, 20 F.4th at 985 (termination of MPP was a rule because "it applied to DHS operations nationwide and on a prospective basis" and directed DHS agents' actions so "it either 'prescribe[d] law or policy' or at the very least 'describe[d] the organization, procedure, or practice requirements' of the agency") (quoting 5 U.S.C. § 551(4)). Rules are per se not exercises of enforcement discretion made nonreviewable by *Heckler v. Chaney*. *See MPP*, 20 F.4th at 978, 984.

Defendants' argument that the Notice is not final agency action has likewise been addressed extensively in prior briefing. *See* ECF No. 79 at 36–38; ECF No. 100 at 48–50. They counter that the Notice is a policy statement, so it cannot be final agency action. ECF No. 99 at 24. But policy statements "can nonetheless constitute final agency action under the APA." *MPP*, 20 F.4th at 949 (citation omitted). Defendants do not address the obvious fact that before the PIP Program was created, no one would have reasonably understood a generalized public interest in "family unity" to constitute the sort of urgent humanitarian reason or significant public benefit for which parole is appropriate or that parole was not previously used this way. Defendants do not address the binding presumption the Notice creates that "family unity" itself serves a significant public benefit, and that those who meet the eligibility requirements in the Notice are therefore presumptively eligible for parole. *See EEOC*, 933 F.3d at 443 (guidance is final agency action because it "binds [agency]

staff to an analytical method"). Defendants do not address that they have granted 100% of adjudicated applications. ECF No. 79-2, Ex. B at 267; *EEOC*, 933 F.3d at 441–42 (final agency action where guidance "is applied by the agency in a way that indicates it is binding"). Defendants claim to have relied on preexisting statutory authority in promulgating the Notice, which is both wrong (the statute does not authorize parole in place or authorize parole for "family unity" purposes) and involves a novel interpretation that creates new rights for eligible noncitizens. In sum, Defendants' argument ignores the facts on the ground, ignores the legal background of situation, ignores the substantive rights created by, for example, binding presumptions of eligibility for parole, and relies on a mistaken reading of 8 U.S.C. § 1182(d)(5)(A). *See* ECF No. 79 at 48–53.

The PIP Program does not "merely refuse to institute proceedings against a particular entity or even a particular class," instead "solicited applications from eligible aliens, instituted a standardized review process" culminating in "formal notices indicating whether the alien" would be granted parole, that are "effectively adjudications' that are "affirmative acts of approval" and "confer[] affirmative immigration relief," making it reviewable under the APA. *DHS v. Regents of the Univ. of Calif.,* 140 S.Ct. 1891, 1906 (2020).

Defendants' statutory jurisdiction argument remains similarly unpersuasive. Defendants have claimed before, ignoring binding precedent to the contrary, that 8 U.S.C. § 1252(a)(2)(B)(ii) bars this court from reviewing its programmatic decisions. Plaintiffs have addressed this argument at length. *See* ECF No. 79 at 54–55; ECF No. 100 at 28–29.

Nor is it plausible to read *Patel v. Garland*, 596 U.S. 328 (2022), so broadly as to overrule the substantial body of Fifth Circuit caselaw contrary to Defendants' position. The Court there intentionally, and appropriately, limited its holding to the relevant circumstances: "And so, we explained, a noncitizen 'may not bring a factual challenge to orders denying discretionary relief, including … adjustment of status.' We adhere to that view today." *Id*. at 340 (citing *Nasrallah v. Barr*, 590 U.S. 573, 586 (2020)).

Regardless, even if there were merit to the argument that the Program itself could not be

challenged under § 1252(a)(2)(B)(ii), Plaintiffs' notice-and-comment and Paperwork Reduction Act claims could proceed. *See Kurapati v. U.S. Bureau of Citizenship and Immigr. Services*, 775 F.3d 1255, 1262 (11th Cir. 2014) (explaining that failure to follow appropriate procedure is "not within USCIS's discretion," so "Section 1252(a)(2)(B)(ii) thus does not prevent judicial review of the conduct of administrative proceedings").

## IV. Legislative history cannot save Defendants' interpretation of the parole statute.

The PIP Program is unlawful because it violates nearly every aspect of the parole statute, including the requirement that parolees be paroled *into* the United States, that parole be granted on a case-by-case-basis, that parole may be granted only for "urgent humanitarian reasons" or "significant public benefit," and that parole may not be granted as a substitute for admission for the purpose of permanent residence in the United States. *See* 8 U.S.C. § 1182(d)(5)(A); ECF No. 79 at 12–30. The Defendants argue that the legislative history Plaintiffs cite "offers little insight into the meaning of the actual and current terms in the parole statute" because much of the cited legislative history refers to a more verbose prior version of the statute, rather than the more concise Senate version, and that the Executive may therefore claim "unfettered discretion" under the Senate version. A review of the legislative history belies this claim.

At the outset, the House Report the Defendants work to discredit was explicitly adopted as the legislative history of the final version of the parole statute adopted in IIRIRA. *See* 142 Cong. Rec. S11839 (daily ed. Sept. 30, 1996) (Presiding officer's order without objection to print the record of the Omnibus Consolidated Appropriations Act of 1997) ("The legislative history of [IIRIRA] shall be considered to include the Joint Explanatory Statement of the Committee of Conference in Report 104-828, as well as the Reports of the Committees on the Judiciary, Agriculture, and Economic and Educational Opportunities of the House of Representatives on H.R. 2202 (*Rept. 104-469, Parts I*, II, and III), and the report of the Committee on the Judiciary of the Senate on S. 1664 (Rept. 104-249).") (emphasis added).

Defendants' argument is also a *non sequitur* because the House Report was not talking about

the proposed definitions for urgent humanitarian reasons or significant public benefit in its version of the bill. Rather, the report was making a much broader point that still stands, regardless of the definitions' adoption, which is that Congress believed the Executive was abusing the parole authority and violating the statute and that, therefore, more restrictions were necessary to curtail such abuse. The subsequent congressional record confirms this.

The Senate's explanation for its version directly contradicts the Defendants' position. *See* S. Rep. No. 104-249, at 3 (1996) ("The committee bill is needed to address … the abuse of humanitarian provisions such as asylum and parole."). *See also id.* at 2 ("Other control measures in title I include: (1) Tightening the Attorney General's parole authority ….."). Explaining its proposal for § 1182(d)(5)(A)—the version eventually adopted in IIRIRA—the Senate wrote that it "Tightens the Attorney General's parole authority by (a) changing the criterion from "emergent reasons" and "reasons deemed strictly in the public interest" to "urgent humanitarian reasons or significant public benefit," and (b) requiring case-by-case determination." The final section of the relevant part of IIRIRA—"LIMITATION ON THE USE OF PAROLE"—further confirms what both houses of Congress said about the bill. IIRIRA, 110 Stat. 3009, 3009-689 (§602) (Sept. 30, 1996); *see also Ram v. INS*, 243 F.3d 510, 514 n.3 (9th Cir. 2001) (section headings and titles "may be used to interpret [a bill's] meaning"). By contrast, the record offers no support for Defendants' position that a more succinct bill means Congress granted the Executive "unfettered discretion."

The Circuits that have examined the legislative history of the parole statute all agree with Plaintiffs' interpretation of IIRIRA: It was a direct response to the Executive's abuse of the parole statute and was drafted to strictly limit Executive discretion to grant parole. *See, e.g.*, *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 & n.15 (2d Cir. 2011) ("Congress, in IIRIRA, specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States'" because "parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy.") (citing H.R. Rep. No. 104-469, pt. 1, at 140–41 (1996), just as Plaintiffs have done)); *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1119 (9th Cir. 2007) ("Congress

responded in IIRIRA by narrowing the circumstances in which aliens could qualify for 'parole into the United States' under § 1182(d)(5)(A)").

Ironically, just after their argument about legislative history, Defendants repeat their claim that § 1182(d)(5)(A) confers "unfettered discretion" by misreading legislative history. For example, Defendants claim that the Senate's more concise version of §1182(d)(5)(A) in IIRIRA was related to "giving the Secretary 'flexibility to deal with compelling immigration situations." *See* ECF No. 99 at 30. Defendants cite the very House Report that just a few pages before they had sought to denigrate, and they do so extremely misleadingly. The cited passage does not refer to the Senate amendment, nor does it refer to the language that the Senate changed. Rather, it comes from the "Dissenting Views" section, and laments the *precise language IIRIRA adopted. See* H.R. Rep. No. 104-469, pt. 1, at 526, 538–39. In its entirety, the relevant dissenting view is:

> We oppose the bill's sweeping new restrictions on the Attorney General's parole authority. Section 524 of the bill states that the Attorney General may parole aliens on a case by case basis only for urgent humanitarian reasons or for a reason deemed strictly in the public interest. We believe that there is no rationale for this legislative change. The current law provides the Attorney General with appropriate flexibility to deal with compelling immigration situations. For example, the amendment would not permit the parole of an alien to attend the funeral of a close family member or of a parent to accompany a child paroled into the United States for an organ transplant. In light of the proposed refugee cap, this provision unwisely ties the Administration's hands in an area where flexibility is always needed to deal with unforeseen emergency migration circumstances.

*Id.* at 538–39. To be sure, there are limits to the utility of dissenting views in legislative history—for example, Plaintiffs are unaware of any challenges to post-IIRIRA grants of parole to attend funerals. But the House Report shows that both opponents and supporters of IIRIRA's amendment to the parole statute understood the "case-by-case basis only for urgent humanitarian reasons or for a reason deemed strictly in the public interest" language to vastly curtail the Executive's "flexibility to deal with compelling immigration situations."

In short, Defendants' claims to "unfettered discretion" over parole are unpersuasive. *See, e.g.*, ECF No. 79 at 12–15. Defendants are correct that the statute grants a degree of discretion, but

their arguments go too far, and in some places invoke the canon against surplusage to create surplusage. *See, e.g.*, ECF No. 99 at 30 n.7 (asking this Court to render the many indications of broader discretion in other areas in the INA null to avoid rendering the reference to discretion in § 1182(d)(5)(A) a nullity).

Defendants push for the notion that the Executive has "discretion to interpret those terns [sic] and administer parole within their bounds." ECF No. 99 at 31. But the PIP Program is not within the bounds of the parole statute—if it were, and the Executive had broad discretion to interpret what constitutes a significant public benefit, there is no clear limiting principle. What prevents the Executive from rewriting immigration law because, in its exercise of discretion, the Administration has determined that its preferred policy more closely reflects "significant public interests" than the policies Congress created by statute? Did Congress eliminate its own ability to control the flow of migrants into this country in a statutory provision titled "LIMITATION ON THE USE OF PAROLE," IIRIRA, 110 Stat. 3009, 3009-689 (§602) (Sept. 30, 1996)?

## V.    The PIP Program is an unlawful application of the parole statute.

As Plaintiffs have explained, the PIP Program violates every requirement of the parole statute. *See* ECF No. 79 at 12–30; ECF No. 100 at 29–42. Parole under the PIP Program is not administered on a case-by-case basis, does not require urgent humanitarian reasons or significant public benefits, is not temporary, and does not even involve parole *into* the United States.[2]

Defendants' arguments to the contrary are unavailing. For example, Defendants argue: "The Notice repeatedly requires that DHS officers determine a grant of parole in place is warranted based on significant public benefit or urgent humanitarian reasons in each individual case." ECF

---

[2] Defendants claim that "Plaintiffs fail to show that DHS is not observing the substantive requirements of section 1182(d)(5)(A) in adjudicating requests under the Notice, and indeed do not even attempt to argue this," is false, bordering on baffling. Plaintiffs have argued and shown that the PIP Program violates *every* substantive requirement of § 1182(d)(5)(A) and that DHS administration of the program, with its rapid, 100% approval rate, proves that DHS is not conducting meaningfully "case-by-case" analysis and treats the Notice as final and binding.

No. 99 at 32. This claim ignores the binding presumption the Notice establishes that *every* alien who meets the minimum requirements of the PIP Program has thereby *automatically* shown a "significant public benefit." 89 Fed. Reg. at 67,465; *see also* ECF No. 77 at 54–55 (conceding the binding presumption in the Notice that "a grant of parole in place to an eligible spouse or stepchild of a U.S. citizen … will advance a significant public benefit … .").

### a.  The PIP Program does not serve urgent humanitarian reasons or a significant public benefit.

Defendants cannot justify their claim of vast discretion over what constitutes an "urgent humanitarian reason" or "significant public benefit." Provisions of law that have none of the restrictions of § 1182(d)(5)(A) do not support vast discretion. *See* ECF No. 99 at 33–34 (relying on conditional parole by analogy); 8 U.S.C. § 1226(a) ("the Attorney General … may release the alien on … conditional parole"). Cases respecting the Secretary's *negative* discretion to *deny* parole in particular cases are similarly compatible with Plaintiffs' argument. *See Loa-Herrera v. Trominski*, 231 F.3d 984, 991 & n.12 (5th Cir. 2000) ("Congress, however, has denied the district court jurisdiction to adjudicate *deprivations* of the plaintiffs' statutory and constitutional rights to parole.") (emphasis added).

Defendants claim that Congress "explicitly" conferred discretion to define the crucial defining terms of § 1182(d)(5)(A) is unsupported and counter to the entire legislative history of the "LIMITATION ON THE USE OF PAROLE" provision in IIRIRA. 110 Stat. 3009, 3009-689 (§602) (Sept. 30, 1996). As the Notice illustrates, and as Plaintiffs have repeatedly explained, Defendants' claim to such discretion includes a claim that Congress empowered the Executive to substitute its own policy preferences for those established by Congress. Defendants' reliance on policy justifications like the claim that granting mass amnesty to illegally present aliens "increase[es] economic productivity" illustrates this exact flaw in the Defendants' reasoning. *See* ECF No. 99 at 37. Congress made it unlawful—that is, contrary to public interest—under most circumstances for illegal aliens to work in the United States. The Biden-Harris Administration

16

disagrees with this policy conclusion, favoring work eligibility for aliens. So, Defendants claim "unfettered authority" to replace statutory policy with the Administration's preferred policy and justify it based on the "significant public benefits" that Congress *rejected*. It is implausible that this is the scope of power Congress intended in IIRIRA's "LIMITATION ON THE USE OF PAROLE."

As Plaintiffs have explained, *see, e.g.*, ECF No. 79 at 15–21, the PIP Program's binding presumption that "family unity" (or "benefits" supposedly flowing directly from an interest in family unity) constitutes a significant public benefit is contradicted by the INA itself. Congress also balanced this good against other policy priorities. *See, e.g.*, *Dep't of State v. Muñoz*, 144 S.Ct. 1812, 1824 (2024) ("Congress has not exempted spouses from inadmissibility restrictions like the INA's unlawful-activity bar."); *id*. at 1811–12 (detailing Congress's long history of prioritizing other interests over concern for unity between noncitizens and their U.S. citizen spouses); *Kerry v. Din*, 576 U.S. 86, 97 (2015) ("Even where Congress has provided special privileges to promote family immigration, it has also written in careful checks and qualifications."). The PIP Program substitutes Congress's careful consideration and weighing of interests, set down in statute, with the Defendants' own.

Finally, to dispute Plaintiffs' argument that "public benefits" means "*public* benefits," Defendants argue that military family parole in place does not fit the pattern. They ignore Congress's own explanation in the 2020 NDAA for *why* military family parole in place serves the public interest (military readiness) and question Congress's determination of servicemembers' individual contributions to our armed forces. *See* ECF No. 99 at 36 ("[P]roviding parole to the spouse of a single, individual service member has negligible effect on the overall 'military readiness' of the United States Armed Forces."). Respectfully, Plaintiffs ask this Court to decline Defendants' invitation to ignore Congress's specific determination regarding service members' individual contributions to our military.

### b.  The PIP Program does not adjudicate parole on a case-by-case basis.

The PIP Program does not adjudicate parole on a case-by-case basis in any sense other than the most literal. Applications must, of course, be processed individually to check that an applicant meets the minimum requirements of the program, but the binding presumption the PIP Program precludes meaningful case-by-case review.

Returning to legislative analysis, Defendants claim that "case-by-case" doesn't really mean what it says, because the use of "that particular alien" in § 1182(d)(5)(B) is stronger. But § 1182(d)(5)(B) merely emphasizes the importance of case-by-case analysis, even when "many similarly situated noncitizens" might merit relief. ECF No. 99 at 37. Subparagraph B addresses refugees, a status that routinely applies to "many similarly situated noncitizens," and emphasizes that they should be treated according to the refugee statutes unless there is some "compelling reason[ ] … with respect to that particular alien" to grant parole instead. In other words, in the most common situation where "urgent humanitarian reasons" might justify bringing "many similarly situated noncitizens" into this country, they should not be paroled, but treated as refugees unless there is a compelling reason to treat some "particular alien" differently. This tracks with a strong reading of subparagraph A's "case-by-case" requirement.

Defendants argue that "Plaintiffs offer no record evidence supporting their assertion that the Notice 'confers automatic parole eligibility' on anyone," but Plaintiffs have repeatedly pointed to the Notice and to the Defendants' own briefing to illustrate how the Notice creates a binding presumption that, absent some abnormal disqualifying factor like prior criminal history, "a grant of parole in place to an eligible spouse or stepchild of a U.S. citizen … will advance a significant public benefit … ." ECF No. 77 at 33; *see also* 89 Fed. Reg. at 67,465 (substantially the same). In other words, by Defendants' estimate, the Notice makes 550,000 aliens eligible for parole and automatically presumed to meet the statutory requirements *en masse* with "case-by-case" consideration limited to verifying that the alien meets the eligibility requirements in the Notice and has no potential *disqualifying* factors (but if he does—even if he is subject to removal

proceedings—such factors can be overcome by an "adequate" showing). By that definition, literally any government program or benefit that one must apply for, from public education to social security benefits, is available on a "case-by-case" basis; Congress meant "case-by-case" to have a stronger meaning when it imposed "LIMITATION[S] ON THE USE OF PAROLE" in IIRIRA.

### c. The PIP Program violates the paroled "into" language in Section 1182(d)(5)(A).

Plaintiffs have thoroughly addressed the requirement that parole be granted only at a port of entry and relates to physical entry into the United States unless Congress has created an explicit exception. *See* ECF No. 79 at 23–27; ECF No. 100 at 29–35. As explained there, none of the cases Defendants cite hold that parole in place is lawful. To the contrary, the *Akhtar* case unambiguously held that "inspection at a port of entry is a mandatory component of parole, except in the rare circumstance that an applicant has requested and been granted parole in place." *Akhtar v. Dir. United States Citizenship & Immigr. Servs. Mount Laurel Field Office*, No. 23-1577, 2024 WL 1427634, at *3 (3d Cir. Apr. 3, 2024) (clarifying that parole in place is restricted to explicit exceptions in the law, such as "for active and former U.S. military members and their families"). Indeed, despite having been granted "advance parole," Akhtar was ineligible to adjust his status because he "did not leave the country at that time and was never inspected at a port of entry where a decision to parole could be made." *Id.* (court had no "authority to construe this discretionary grant of advance parole as parole in place" because "Akhtar has provided no evidence that he was eligible to receive this rare privilege through affiliation with the United States Armed Forces"). To the extent courts have considered and ruled on the physical location aspects of "paroled into," they have agreed with Plaintiffs' interpretation. The PIP Program therefore violates the parole statute by granting parole in place where Congress has not authorized an exception to the physical entry aspect of parole.

Defendants' claim that the 1960 Senate report is too "outdated" to be considered, and that the Illegal Immigration Reform and Immigration Responsibility Act's "LIMITATION ON THE USE OF PAROLE" was drafted so as to make it easier for illegal aliens to adjust status after

surreptitiously entering the United States is unsupported by the statute, its legislative history, the historical understanding of the parole power, Congress's perceived need to explicitly authorize parole in place in the military family and CNMI contexts, and judicial precedent.

### d. The PIP Program is structured to support permanent residence and therefore violates the "temporary" requirement of Section 1182(d)(5)(A).

Plaintiffs refer the Court to their prior explanation for why the PIP Program violates section 1182(d)(5)(A)'s temporariness requirement. ECF No. 79 at 27–30; ECF No. 100 at 42. It is unlikely that Congress restricted the executive to granting parole "temporarily," then dedicated more than half of §1182(d)(5)(A) to explaining what happens when "temporary" parole reaches its endpoint, because it was concerned with the possibility that an alien might retain one specific legal status, rather than another, indefinitely. The only plausible reading is that §1182(d)(5)(A)'s temporariness requirement is targeted at paroling aliens with the intent that their physical presence in the United States be temporary—which is why Congress made extensive provision for longer-term admissions, including for emergency circumstances, *see, e.g.*, 8 U.S.C. §§ 1157, 1158 (providing for the admission of refugees, emergency situation refugees, and asylees), elsewhere in the INA.

Defendants' resort to 8 U.S.C. § 1255(a) is unavailing. To be sure, in section 1255(a), Congress provided for the possibility that an alien paroled into this country may be eligible to adjust status to that of a lawful permanent resident. But this is no indication that Congress meant to implicitly repeal or render nugatory the requirement that parole be temporary. Rather, it reflects the nature of parole, which is to deal with abnormal or emergent circumstances on a case-by-case basis. Consider the classic examples of parole that Congress contemplated, such as paroling aliens into this country to participate in a criminal investigation. *See* ECF No. 79 at 16–19. The possibility that such witnesses, following their participation in a criminal investigation, might face long-term danger from those criminals they helped to prosecute, or their associates, is entirely predictable. In such a case, parole into the country was temporary (for the duration necessary to participate in the investigation), but an adjustment of status later would become necessary when return to the alien's

home country was rendered impractical or unsafe. Any number of scenarios are readily conceivable in which an alien temporarily paroled into the United States with the expectation that they would depart when their temporary parole had ended would find, before parole had expired, that it was unsafe or impractical to return; Congress wisely provided for this possibility in section 1255(a), and the statute holds together neatly.

By Defendants' interpretation, Congress limited legal status when it permitted only temporary parole, but then created no mandatory recourse for the termination of that status. Adjustment of status under § 1255(a) is explicitly discretionary. By Defendants' reasoning, physical action (remanding the alien to custody or removing them from the country) is similarly discretionary and the half of § 1182(d)(5)(A) related to physical action only "applies to noncitizens paroled from 'custody' and not all grants of parole under section 1182(d)(5)(A)." ECF No. 99 at 49. So, Congress requires that parole status be temporary, but makes no provision for what comes next—DHS is free to adjust status (under certain limited circumstances), pursue removal, or ignore the situation and leave the alien present in the United States with no legal status at all. Indeed, if "temporarily" refers only to parole status, the implication is that Congress has established, as a matter of statutory policy, that leaving aliens present in the United States with no legal status whatsoever is *preferable* to allowing them to retain parole status indefinitely. Only Plaintiffs "interpret the statute as a symmetrical and coherent regulatory scheme" that fits "all parts into a harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

None of which is to say Congress cannot provide separately for a non-temporary form of parole, as Congress did with CNMI parole. Nor does this mean that, in appropriate circumstances, an alien granted parole may not *end up* staying in the United States indefinitely. *See* 8 U.S.C. § 1255(a). Rather, it merely means that when Congress said the Secretary may "parole into the United States temporarily" certain aliens, Congress precluded the Secretary from granting parole for the sole and explicit purpose of permanent residency. *But see* 89 Fed. Reg. at 67,460–61 (explaining that the PIP Program was devised to provide "access to LPR status" for certain illegally

21

present aliens who otherwise "are generally not eligible for adjustment of status").

   **e.  The PIP Program circumvents other provisions of the INA.**

Plaintiffs have explained at length why the PIP Program circumvents the carefully constructed statutory scheme of the INA. *See* ECF No. 79 at 30–36; ECF No. 100 at 43–45. Defendants' argument boils down to the notion that Congress created detailed requirements for aliens to obtain legal status, and in some limited and carefully considered circumstances, provided alternative routes, so that implies the otherwise "narrowly circumscribed" parole power, *Cruz-Miguel*, 650 F.3d at 198, can completely overtakes all other narrow and detailed procedures Congress created. This argument is meritless.

First, it is belied by the Notice itself, which proclaims that the Biden-Harris Administration promulgated the PIP Program to address what it identified as "flaws in the U.S. immigration system" by removing statutory "barriers" to lawful permanent resident status for illegally present aliens. 89 Fed. Reg. 67,460. Second, Defendants' argument leaves no limiting principle to use of the parole power, and thereby overtake and render nugatory every "alternative" (and far more restrictive and detailed) path to lawful immigration in U.S. immigration law. Defendants argue that the Secretary has limitless authority to define "significant public benefits," including any public interest that could otherwise justify lawmaking under the Commerce Clause, ECF No. 77 at 37 (citing *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 169 (2d Cir. 2005), a Commerce Clause case, to explain the limits of "significant public benefits"). The Secretary supposedly may grant mass parole to tens of millions of aliens without limitation and for the express purpose of establishing permanent residency. ECF No. 99 at 40, 50–53. The logical implication of Defendants' argument is that Congress delegated broad authority to the Executive to render every other procedure, including consular processing, superfluous and the limitations on eligibility to adjust status in section 1255(a) nugatory, whenever the Executive disagrees with the policy decisions Congress has made with respect to immigration. This Court should recognize that the Secretary "is an unlikely recipient of such broad authority," *Gonzales v. Oregon*, 546 U.S. 243, 274 (2006),

particularly from a law most recently amended under the heading "LIMITATION ON THE USE OF PAROLE," 110 Stat. 3009, 3009-689 (§602) (Sept. 30, 1996).

Finally, Defendants' reading cannot survive the canon of statutory construction that "[w]hen statutes intersect, the specific statutes [ ] trump the general [ ]." *Loving v. IRS.*, 917 F. Supp. 2d 67, 77 (D.D.C. 2013). "That is particularly true where," as in the INA, "Congress has enacted a comprehensive scheme and has deliberately targeted specific problems with specific solutions." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012); *see also Palmer v. Trump Model Mgmt., LLC*, 175 F. Supp. 3d 103, 108 (S.D.N.Y. 2016) (describing the INA as a case where "a precisely drawn, detailed statute pre-empts more general remedies").

As Plaintiffs have explained, the INA *requires* that illegal aliens depart the country and apply for a visa to be admitted to the country legally. *See, e.g.*, *Muñoz*, 144 S.Ct. at 1829 ("In certain cases, however, the law *requires* even couples who meet and marry in the United States to send the noncitizen spouse back to his country of origin to [apply for a visa to enter the United States].") (Sotomayor, J., dissenting) (emphasis added).

## VI.    The PIP Program was promulgated without the requisite procedure.

Defendants do not offer any new arguments to defend the arbitrary and capricious decision-making memorialized in the Notice in their Response, so Plaintiffs refer to their prior briefing. ECF No. 79 at 41–45; ECF No. 100 at 45–48. The same applies to Defendants' effort to evade the APA's notice-and-comment requirement. *See* ECF No. 79 at 36–41; ECF No. 100 at 48–50. As Plaintiffs have explained, the PIP Program is a legislative rule because, among other things, it creates a binding presumption that confers a right to parole on an otherwise ineligible population—and DHS officials implementing the program have seen it this way as well. *See* ECF No. 79-2, Ex. B at 267 (100% approval rate for adjudicated applications). In light of the Notice's *express* creation of a binding presumption, and the application of that presumption as binding, it is simply false for the Defendants to claim "the substantive standards for granting parole under the KFT process remain unchanged." ECF No. 99 at 58. The continued effort to rely on the foreign affairs exception despite

23

clear authority precluding its application here is also meritless. *See Cap. Area Immigrants' Rights Coal. v. Trump*, 471 F. Supp. 3d 25, 55 (D.D.C. 2020) (rejecting application of foreign affairs exception to asylum rule because, like the PIP Program, there is no specific concern for "the country from which they originally fled"); *Jean v. Nelson*, 711 F.2d 1455, 1477–78 (11th Cir. 1983) (foreign affairs exception does not apply to general policies regarding detention and parole).

Defendants' Paperwork Reduction Act (PRA) arguments are similarly unpersuasive. They rely on the notion that "Plaintiffs assert an injury arising from the KFT process, not from the collection of information from noncitizens," but ignore that the collection of information is an integral and inseparable component of the PIP Program. Plaintiffs have already addressed all other arguments Defendants proffer. *See, e.g.*, ECF No. 100 at 50–52.

Similarly, Plaintiffs have addressed their Take Care Clause claim elsewhere. *See* ECF No. 100 at 52–55. Contrary to Defendants' assertions, Plaintiffs have not abandoned their *ultra vires* claim; the States pressed this claim implicitly by explaining how the PIP Program exceeds Defendants' statutory parole authority, ECF No. 79 at 30–36, and again, explicitly, in their Response brief, ECF No. 100 at 55–57. Even if more explicit labeling in the Trial Brief would have been preferable, this court is free to consider the argument, and should do so. *United States v. Hernandez-Rodrigues*, 352 F.3d 1325, 1329 (10th Cir. 2003).

## VII.    The relief requested is appropriate.

As Plaintiffs have explained previously, the relief they have requested is appropriate and necessary. *See* ECF No. 77 at 70–74; ECF No. 100 at 58–64. Nationwide relief is required to provide full relief even to Texas alone.

### CONCLUSION

For the reasons explained above and in Plaintiffs' Motion for Summary Judgment, this Court should issue the relief requested by Plaintiffs.

Dated: October 30, 2024.                              Respectfully submitted,

**KEN PAXTON**                                         **GENE P. HAMILTON**
Attorney General of Texas                              Virginia Bar No. 80434

                                                       **JAMES ROGERS**
**BRENT WEBSTER**                                      Arizona Bar no. 027287
First Assistant Attorney General
                                                       **RYAN GIANNETTI**
                                                       DC Bar no. 1613384
**RALPH MOLINA**                                       America First Legal Foundation
Deputy First Assistant Attorney General                611 Pennsylvania Ave. SE #231
                                                       Washington, DC 20003
**AUSTIN KINGHORN**                                    (202) 964-3721
Deputy Attorney General for Legal Strategy             Gene.Hamilton@aflegal.org
                                                       James.Rogers@aflegal.org
*/s/Ryan D. Walters*                                   Ryan.Giannetti@aflegal.org
**RYAN D. WALTERS**
Chief, Special Litigation Division                     **COUNSEL FOR PLAINTIFF**
Texas Bar No. 24105085                                 **STATE OF TEXAS**
Ryan.Walters@oag.texas.gov
**KATHLEEN T. HUNKER**
Special Counsel                                        **RAUL R. LABRADOR**
Texas Bar No. 24118415                                 Idaho Attorney General
Kathleen.Hunker@oag.texas.gov                          */s/ Alan Hurst*
**GARRETT GREENE**                                     Alan Hurst
Special Counsel                                        Solicitor General
Texas Bar No. 24096217                                 Michael A. Zarian
Garrett.Greene@oag.texas.gov                           Deputy Solicitor General
Office of the Attorney General of Texas                Office of the Idaho Attorney General
Special Litigation Division                            P.O. Box 83720
P.O. Box 12548, Capitol Station                        Boise, Idaho 83720
Austin, Texas 78711-2548                               (208) 334-2400
Telephone: 512-463-2100                                Alan.Hurst@ag.idaho.gov
Fax: 512-457-4410                                      Michael.Zarian@ag.idaho.gov

                                                       **COUNSEL FOR STATE OF IDAHO**

**CERTIFICATE OF SERVICE**

I certify that a true and accurate copy of the foregoing document was filed electronically (via CM/ECF) on October 30, 2024, which serves all counsel of record.

*/s/Ryan D. Walters*
RYAN D. WALTERS

25