UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS

———

No. 6:24-cv-00306

———

**State of Texas et al.,**

*Plaintiffs,*

v.

**United States Department of Homeland Security et al.,**

*Defendants.*

———

# MEMORANDUM OF DECISION

In this case, 16 States challenge a rule issued by the Department of Homeland Security that creates a process allowing foreign nationals to be paroled "in place" under 8 U.S.C. 1182(d)(5) if are present in the country illegally and are qualifying spouses or stepchildren of U.S. citizens. Implementation of Keeping Families Together, 89 Fed. Reg. 67,459 (Aug. 20, 2024). After a bench trial, the court now issues its findings of fact and conclusions of law.

**Table of contents**

I.   Background ........................................................................ 3

   A.  Statutory and regulatory background ............................. 3

      1.  Immigration and Nationality Act before 1996 ........... 3

      2.  Current law after Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ...................... 7

      3.  Specialized actions regarding parole ...................... 18

   B.  The challenged Rule ................................................... 22

   C.  Procedural history ...................................................... 26

   D.  Standards for fact-finding ........................................... 27

II.  Findings of fact and conclusions of law .............................. 28

   A.  Jurisdiction ................................................................ 28

      1.  Sovereign immunity ............................................. 28

         a.  Final agency action .......................................... 29

   b. Zone of interests ................................................. 32

   c. Commission to agency discretion by law ........... 34

  2. Article III jurisdiction ............................................ 35

   a. Stipulation limiting injury evidence to Texas..... 36

   b. General principles of standing law ................... 36

   c. Costs from change in residents' legal status ...... 49

   d. Costs from decreased voluntary emigration....... 54

   e. Costs from future immigration......................... 59

  3. Statutory jurisdiction .............................................. 59

 B. Merits of plaintiffs' claims ........................................... 60

  1. Parole "into the United States" ............................... 61

  2. "Case-by-case" for "significant public benefit" ..... 67

  3. "Temporary" parole ................................................ 69

  4. Circumvention / Take Care Clause / capricious ..... 69

  5. Procedural-rights claims.......................................... 70

 C. Remedies ...................................................................... 70

  1. Vacatur of the Rule................................................. 70

  2. Declaratory and injunctive relief............................ 72

III. Conclusion ........................................................................ 74

## I. Background

### A. Statutory and regulatory background

The Constitution assigns to Congress the power "[t]o establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8. Congress's exercise of that power is expressed in the Immigration and Nationality Act of 1952 (INA) as amended over the years. That Act collected and reorganized various provisions of immigration law in one place, now codified in title 8, subchapter 12, of the United States Code. Pub. L. No. 82-414, 66 Stat. 163 (1952).

The INA's section numbering has historical significance and may be more familiar, so the court cites both it and the U.S. Code. As defined in INA § 101, an "alien" is "any person not a citizen or national of the United States." 8 U.S.C. § 1101(a)(3).[1]

Since its enactment, the INA has allowed that some aliens who are detained upon arrival at a U.S. border or port of entry may be paroled "into the United States," but only for limited reasons. The law surrounding that parole authority is explained below.

### 1. Immigration and Nationality Act before 1996

As enacted in 1952, the INA defined two types of parole, one for each of the "two types of proceedings in which aliens can be denied the hospitality of the United States: deportation hearings and exclusion hearings." *Landon v. Plasencia*, 459 U.S. 21, 25 (1982). The proceedings were covered by separate chapters of the INA's second title: exclusion in chapter 4 and deportation in chapter 5. *Leng May Ma v. Barber*, 357 U.S. 185, 187 (1958). That reflected the historical "distinction between those aliens who have come to our shores seeking admission, [who were subject to exclusion hearings under chapter 4,] and those who are within the United States after an entry, irrespective of its legality," who

---

[1] The term "alien" is not synonymous with "noncitizen" because some noncitizens of the United States are still nationals of the United States and therefore are not "aliens." *Id.* § 1101(a)(2) ("national of the United States" includes a noncitizen who owes this country permanent allegiance). The substitution "noncitizen" may also be confusing because most INA "aliens" are citizens of some country, as opposed to stateless persons.

enjoyed the additional rights of deportation hearings under chapter 5. *Id.*

a. *Parole from detention pending exclusion hearing.*—Under chapter 4's process for entering aliens, immigration officers were to examine aliens "seeking admission or readmission to, or the privilege of passing through the United States" and to take evidence of their privilege "to enter, reenter, pass through, or reside" in this country. INA of 1952, § 235(a), 66 Stat. at 198–99. Congress directed that "[e]very alien" at a port of entry who did not appear "to be clearly and beyond a doubt entitled to land shall be detained" for further inquiry. *Id.* § 235(b), 66 Stat. at 199.

When that detention occurred, the alien was taken before a special officer to decide whether the alien "shall be allowed to enter or shall be excluded." *Id.* § 236(a), 66 Stat. at 200.[2] *See generally Landon*, 459 U.S. at 27 (describing that regime). The grounds on which an alien "shall be excluded from admission into the United States" were numerous, such as lacking a required visa or having specified convictions or traits. INA of 1952, § 212(a)(1)–(13), (20), 66 Stat. at 182–84.

The Attorney General, however, could "parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest" an alien "applying for admission to the United States." *Id.* § 212(d)(5), 66 Stat. at 188. Parole was not "an admission of the alien," and "when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled." *Id.* As noted, that custody under chapter 4 was

---

[2] The "word 'deportation' appears also in Chapter 4 to refer to the return of excluded aliens from the country," *e.g.*, *id.* (referring to arriving aliens being "excluded and deported"), "but its use there reflects none of the technical gloss accompanying its use as a word of art in Chapter 5." *Leng May Ma*, 357 U.S. at 187. *See generally Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) (noting "the traditional division between the two kinds of aliens and the two kinds of hearings").

detention pending an exclusion hearing to determine the alien's admissibility.

The Senate Judiciary Committee stated that it adopted this language "to permit the Attorney General to parole inadmissible aliens into the United States in emergency cases, such as the case of an alien who requires immediate medical attention before there has been an opportunity for an immigration officer to inspect him, and in cases where it is strictly in the public interest to have an inadmissible alien present in the United States, such as a witness or for purposes of prosecution." S. Rep. No. 82-1137, at 13 (1952); *see* H.R. Rep. No. 82-1365, at 52 (1952) (same).

b. *Parole from custody pending deportation hearing.*—A deportation hearing, rather than an exclusion hearing, was "the usual means of proceeding against an alien already physically in the United States." *Landon*, 459 U.S. at 25 (explaining that a deportation hearing came with more procedural rights). Those proceedings were governed by a separate INA chapter that concerned "aliens who have already entered the United States and are subject to 'expulsion,' . . . commonly referred to as 'deportation proceedings.'" *Leng May Ma*, 357 U.S. at 187.

An alien in the country could be arrested for deportation. INA of 1952, § 242(a), 66 Stat. at 208–09. If arrested, an alien could then be continued in custody, be released on a secured bond, or "be released on conditional parole." *Id.* An alien's conditional parole under INA § 242(a) was from his "custody . . . until final determination of his deportability." *Id.* Section 242(a) did not speak of parole "into" this country because an alien in deportation proceedings was already "in the United States," *id.* § 241(a), 66 Stat. at 204, even if unlawfully.

The distinction between the two types of parole—§ 212(d)(5) and § 242(a)—turned on whether aliens were in the process of "entry" into the country (arriving at a border or port of entry) or had completed an "entry." The INA defined the term "entry" as a transition: "any coming of an alien into the United States, from

a foreign port or place or from an outlying possession." *Id.*
§ 101(a)(13), 66 Stat. at 167.[3]

c. *Obtaining LPR status.*—As today, status as an alien law-
fully admitted for permanent residence (LPR or "green card" sta-
tus) enabled an alien's eventual naturalization as a U.S. citizen. *Id.*
§ 318, 66 Stat. at 244 ("no person shall be naturalized unless he
has been lawfully admitted to the United States for permanent res-
idence"), *codified as amended at* 8 U.S.C. § 1429. The INA of 1952
defined two processes for obtaining LPR status.

First, an alien could apply for an immigrant visa at a U.S. con-
sulate or embassy abroad, wait for one to become available and to
issue, and then travel to a U.S. port of entry and be admitted for
permanent residence under that visa. *Id.* §§ 101(a)(9) (consular
officer), 203 (numerical limits), 211 (admission), 221 (consular is-
suance), 66 Stat. at 166–67, 178–79, 181–82, 191–92. Aliens often
had to wait their turn for immigrant visas to become available be-
cause of annual limits on visa issuance. *See id.* § 201, 66 Stat. at
175–76, *codified as amended at* 8 U.S.C. § 1151.[4]

Second, an alien lawfully admitted to the United States in one
status could, while here, adjust to LPR status. Under INA
§ 245(a), an alien "lawfully admitted to the United States as a
bona fide nonimmigrant," and who so entered the country, could
petition for adjustment to LPR status upon certain showings re-
lated to immigrant visas. *Id.* § 245(a), 66 Stat. at 217. But an alien's
parole from detention pending exclusion proceedings was not "an
admission of the alien," *id.* § 212(d)(5), 66 Stat. at 188, and thus
did not allow the alien to petition to adjust to LPR status.

---

[3] One exception was made, providing that LPR aliens were not "regarded"
as "making an entry into the United States for purposes of the immigration
laws" if they did not intend or reasonably expect to depart from the United
States in the first place. *Id.*; *see Rosenberg v. Fleuti*, 374 U.S. 449 (1963) (inter-
preting that clause). The need for that exception confirms that the term "en-
try" itself refers to a physical movement into the country.

[4] Certain immediate relatives of U.S. citizens, however, have been ex-
empted from immigrant-visa quotas. *E.g.*, *id.* § 101(a)(27)(A), 66 Stat. at 169
("nonquota immigrants"); *id.* § 201(c), 66 Stat. at 176.

In 1960, Congress expanded § 245(a)'s adjustment-of-status process to cover, not just aliens "admitted" to the country, but rather any alien (other than an alien crewman) who "was inspected and admitted or paroled into the United States." Act of July 14, 1960, Pub. L. No. 86-648, § 10, 74 Stat. 504, 505, *codified as amended at* 8 U.S.C. § 1255(a). The Senate committee report made clear that this broader eligibility language would not help those who had entered the country surreptitiously, reflecting that parole "into the United States" was a way of entering the country:

> The wording of the amendment is such as not to grant eligibility for adjustment of status to alien crewmen and to aliens *who entered the United States surreptitiously*. The amendment does not change in any way the qualitative or quantitative requirements of the basic immigration laws and does not give any alien any benefit which is not available to him under the Immigration and Nationality Act.

S. Rep. No. 86-1651 at 17 (1960) (emphasis added). The eligibility language added by that amendment persists in INA § 245(a) today. 8 U.S.C. § 1255(a).

Under those provisions, if an alien entered the country without inspection (i.e., surreptitiously), the alien was not eligible to receive LPR status through § 245(a) adjustment. Instead, to receive LPR status, the alien had to use the INA's first process—leave the country, obtain an immigrant visa at a U.S. consulate or embassy abroad, and then be admitted as an LPR under that visa at a U.S. port of entry. The greater burden of departing to pursue consular process abroad, as compared to adjusting status in place under § 245(a), set up a disincentive to illegal entry.

### 2. Current law after Illegal Immigration Reform and Immigrant Responsibility Act of 1996

In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Pub. L. No. 104-208, 110 Stat. 3009-546. It made numerous changes to the INA.

a. *Inadmissibility rather than excludability.*—IIRIRA eliminated some (but not all) differences in the treatment of aliens who

had entered the country illegally as opposed to aliens who were inspected at the border or a port of entry. For one, "Congress intended to eliminate the anomaly under which illegal aliens who have entered the United States without inspection gain equities and privileges in immigration proceedings that are not available to aliens who present themselves for inspection at a port of entry." *Ortega-Lopez v. Barr*, 978 F.3d 680, 682 (9th Cir. 2020) (quotation marks omitted).[5]

Congress thus modified several INA provisions to turn on a new distinction between aliens who had been admitted to the country and those who had not (and were thus "applicants for admission"). IIRIRA §§ 301–03, 110 Stat. 3009-575 to -587. Congress defined "admitted" and "admission" to have both a geographical and a legal aspect: they require both a physical entry into the United States and an immigration officer's inspection and authorization of that entry as lawful. *Id*. § 301(a), 110 Stat. at 3009-575, *amending* 8 U.S.C. § 1101(a)(13)(A) ("The terms 'admission' and 'admitted' mean, with respect to an alien, the lawful entry of the alien into the United States after inspection and authorization by an immigration officer."). Congress then replaced the idea of "excludability" with "inadmissibility." *Id*. § 308, 110 Stat. at 3009-614 to -625. It rests on similar grounds but applies, not just to aliens seeking to enter the country, but to aliens who entered the country without inspection. *Id*. § 301(c), 110 Stat. at 3009-578 to -579, *amending* 8 U.S.C. § 1182(a)(6).[6]

---

[5] Under prior law, the government had the burden in a deportation hearing "to prove that any alien who had entered the United States met the requirements for deportation." *Id*. But an "alien who was stopped at the border or a port of entry (even if subsequently paroled into the United States) . . . had the burden of proof at an exclusion hearing." *Id*.

[6] The term "entry" is no longer defined in 8 U.S.C. § 1101. But IIRIRA preserves the INA's definition of "entry" for some titles, IIRIRA § 1, 110 Stat. at 3009-546, and elsewhere continues to use the word to refer to a physical movement into this country at a specific time and place. *E.g.*, IIRIRA § 301(a), 110 Stat. at 3009-575 (amending 8 U.S.C. § 1101(a)(13)(C)(vi) to refer to aliens "attempting to enter at a time or place other than as designated by immigration officers"). So the concept of "entry" into the country has not been removed

Congress next created "a unified procedure, known as a 'removal proceeding,' for exclusions and deportations alike." *Judulang v. Holder*, 565 U.S. 42, 46 (2011). Among other things, "an inadmissible alien who is unable to demonstrate two years of continuous presence within the United States [can] be removed from the United States with the same limited procedure afforded those who are, in the most literal and practical sense, on the threshold of initial entry." *Xi v. INS*, 298 F.3d 832, 838 (9th Cir. 2002); *see* 8 U.S.C. § 1225(b)(1)(A)(iii). That allowance, along with IIRIRA's definition of "applicants for admission" to include illegal entrants, forecloses some procedural benefits that previously came from an illegal entry.

IIRIRA kept the grounds that make aliens in this country "deportable" as opposed to "inadmissible" in the first place, thus providing "two separate lists of substantive grounds . . . sometimes overlapping and sometimes divergent." *Judulang*, 565 U.S. at 46. "The list of offenses related to inadmissibility remained in 8 U.S.C. § 1182(a), and the list of offenses related to deportability remained in 8 U.S.C. § 1227(a)." *Ortega-Lopez*, 978 F.3d at 682. As before, aliens who were admitted into the country and now face a charge of deportability can be arrested and then either held in custody, released on secured bond, or paroled with conditions. 8 U.S.C. § 1226(a).

An alien's parole into the United States under INA § 212(d)(5) is still not an "admission" into the country. *Id.* § 1101(a)(13)(B) ("An alien who is paroled under section 1182(d)(5) of this title . . . shall not be considered to have been admitted."). Rather, § 212(d)(5) parole continues to be a temporary release from presumed detention upon entering the country without clear admissibility. *Id.* § 1182(d)(5)(A) (requiring that, after the purposes of parole have been served, "the alien shall forthwith return or be

---

from the INA. *See United States v. Gaspar-Miguel*, 947 F.3d 632, 634 (10th Cir. 2020) (holding that the term's "settled meaning" applies because the INA "still makes numerous references to 'entry,' including in the new definition of 'admission' itself "); *see also Neder v. United States*, 527 U.S. 1, 21 (1999) (noting that Congress is assumed to use the established meaning of terms).

returned to the custody from which he was paroled" for "his case to be dealt with in the same manner as that of any other applicant for admission").

That presumed custody from which an alien is paroled under INA § 212(d)(5) arises from Congress's direction to inspect all unadmitted aliens and detain those who are not clearly entitled to be admitted. *Id.* § 1225(b)(2)(A) ("in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained"). Not every such alien can be or is detained in reality. *Biden v. Texas*, 597 U.S. 785, 792 (2022). So the parole statute concerns only a detention presumed at law.

Defendants argue that INA § 212(d)(5) allows the Secretary to parole into the United States an alien who entered the country illegally. Defendants call that "parole in place," which they often shorten to "parole" (dropping the statute's prepositional phrase). Plaintiffs disagree, arguing that the "into the United States" limitation on INA § 212(d)(5) parole authority limits that authority to allowing the movement into the country of aliens coming from abroad. That view, plaintiffs argue, is reinforced by parole's place in the overall statutory scheme.

b. *Grounds of inadmissibility.*—After IIRIRA's amendments, two provisions of INA § 212 dictate aliens' inadmissibility on account of current or past unlawful presence in this country.

First, INA § 212(a)(6) broadly declares that aliens who are in this country are inadmissible if they entered illegally. 8 U.S.C. § 1182(a)(6) ("Illegal entrants and immigration violators"). It provides: "An alien present in the United States without being admitted or paroled, or who arrives in the United States at any time or place other than as designated by the Attorney General, is inadmissible." *Id.* § 1182(a)(6)(A)(i).[7] The only exception to that

---

[7] One may wonder whether the second clause makes the first redundant, but the clauses do independent work by focusing on different types of proof.

rule is for aliens who have self-petitioned for status under the Violence Against Women Act (VAWA) and meet other criteria. *Id.* § 1182(a)(6)(A)(ii).

Second, INA § 212(a)(9) declares that, after illegal entrants leave the country, they are inadmissible for a waiting period calculated based on the length of their unlawful presence here. *Id.* § 1182(a)(9)(B). Non-LPR aliens who were unlawfully present in this country for more than 180 days but less than a year, and who voluntarily depart before removal proceedings begin, must wait three years to be deemed admissible:

> Any alien (other than an alien lawfully admitted for permanent residence) who — (I) was unlawfully present in the United States for a period of more than 180 days but less than 1 year, voluntarily departed the United States . . . prior to the commencement of proceedings under section 1225(b)(1) of this title or section 1229a of this title, and again seeks admission within 3 years of the date of such alien's departure or removal, . . . is inadmissible.

*Id.* § 1182(a)(9)(B)(i). Unlawful presence of a year or more produces an even longer, 10-year period of inadmissibility after an alien's departure or removal:

> Any alien (other than an alien lawfully admitted for permanent residence) who . . . (II) has been unlawfully present in the United States for one year or more, and who again seeks admission within 10 years of the date of such alien's departure or removal from the United States, is inadmissible.

*Id.*

---

The first clause creates inadmissibility determinable from immigration records: the absence of admission or parole. The second clause independently creates inadmissibility based on a different type of fact: when and where an alien entered the country. Under the first clause, if an alien was not admitted or paroled, there is no need to inquire into the alien's time or place of entry. If an alien was admitted or paroled, however, the second clause still renders the alien inadmissible if he or she arrives in the country at a time or place other than as designated for the admission or parole.

Section 212(a)(9)'s waiting periods for admissibility are subject to tolling provisions and exceptions. *Id.* § 1182(a)(9)(B)(iii)–(iv). They also may be waived for an alien who is the spouse or child of a citizen or an LPR, but only if the spouse or child shows "that the refusal of admission to such immigrant alien would result in extreme hardship to the citizen or lawfully resident spouse or parent of such alien." *Id.* § 1182(a)(9)(B)(v).[8] Those waiting periods cannot be waived based on their consequences for U.S.-citizen family members other than extreme hardship. *Id.*

The term "unlawful presence" as used in § 212(a)(9) includes both presence without being admitted or paroled in the first place and, even if an alien was admitted or paroled, presence after the period of authorized stay expires:

> For purposes of this paragraph, an alien is deemed to be unlawfully present in the United States if the alien [1] is present in the United States after the expiration of the period of stay authorized by the Attorney General or [2] is present in the United States without being admitted or paroled.

*Id.* § 1182(a)(9)(B)(ii). The word "or" before the second phrase means that, even if an alien is present during a period of stay authorized by the Attorney General, "unlawful presence" still exists if the alien has not been "admitted or paroled." For example, temporary protective status (TPS) is status that confers removal protection and employment authorization. *Id.* § 1254a(a). As a form of removal protection, TPS may or may not be a "period of stay authorized by the Attorney General." Either way, however, TPS is not an admission or parole into the United States. *Sanchez v. Mayorkas*, 593 U.S. 409, 418 (2021) (holding that 8 U.S.C. § 1255(a) does "not make [petitioner], or other TPS recipients who entered the country unlawfully, LPR-eligible").

---

[8] The government may also cancel the removal of and adjust to LPR status up to 4,000 aliens per year if their removal would "result in exceptional and extremely unusual hardship to the alien's spouse, parent, or child, who is a citizen of the United States or [an LPR alien]" and other predicates exist. 8 U.S.C. § 1229b(b)(1), (e)(1).

Although parole into the country is not regarded as an admission, 8 U.S.C. § 1182(d)(5)(A), an alien's presence under an unexpired term of parole does prevent incurring "unlawful presence" for purposes of the three- or ten-year post-departure admissibility bar. *Id.* § 1182(a)(9). Similarly, the pre-departure admissibility bar is not triggered by an alien's presence after entering the country under a term of parole, at the time and place designated for that entry. *Id.* § 1182(a)(6).

Because those two admissibility bars impose immigration consequences for an alien's illegal entry, their inapplicability to paroled aliens makes sense if parole refers to a lawful type of *entry*. But tension exists between those admissibility bars' exclusion of paroled aliens and defendants' view that "parole into the United States" is a mere *status* that can be granted to aliens who entered the country illegally. *Cf. Sanchez*, 593 U.S. at 415 (holding that being "inspected and admitted or paroled into the United States" is a "legal-entry requirement").

c. *Obtaining LPR status.*—As before IIRIRA, the INA still defines two general ways in which aliens may obtain LPR status.[9] The first is applying for an immigrant visa at a U.S. consulate or embassy abroad, waiting for it, and then being admitted under that visa at a U.S. port of entry. 8 U.S.C. §§ 1101(a)(9) (consular officer), 1153 (allocation of immigrant visas), 1181 (admission), 1201 (consular issuance).

The second is adjusting to LPR status while in this country. One adjustment-of-status process now exists for some illegal entrants who are related to U.S. citizens, but eligibility to adjust status on that basis requires a petition filed by April 30, 2001. *Id.* § 1255(i)(1)(B)(i). Given the time since that deadline, the adjustment-of-status process relevant here is instead the general one of INA § 245(a), which is available to only two categories of alien: (1) "an alien who was inspected and admitted or paroled into the

---

[9] Not counted here are specialized processes like that of 8 U.S.C. § 1159, added by the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102.

United States" and (2) "any other alien having an approved petition for classification as a VAWA self-petitioner." *Id.* § 1255(a).

Aliens who entered illegally (and are not VAWA self-petitioners) thus cannot use the § 245(a) adjustment-of-status process. Instead, they can obtain LPR status only through the INA's first process—leaving the country, applying for an immigrant visa abroad, waiting for one, and then being admitted to the country under that visa at a port of entry.

The unavailability of § 245(a) adjustment of status was already a significant consequence of an alien's illegal entry. IIRIRA then increased the extent of that consequence, for aliens with qualifying lengths of unlawful presence, by adding the three- and ten-year post-departure admissibility bars of § 212(a)(9). For those aliens, unless they qualify for an exemption or extreme-hardship waiver, admissibility (and thus an immigrant visa) now takes a minimum of three or ten years regardless of how soon a visa could otherwise issue. *See id.* § 1182(a) ("aliens who are inadmissible under the following paragraphs are ineligible to receive visas").

An alien who is paroled into the United States under INA § 212(d)(5) and abides by the time and place provisions of that parole does not face those barriers to obtaining LPR status. Because the alien was "inspected and admitted or paroled into the United States," that requirement for INA § 245(a) adjustment of status is met. *Id.* § 1255(a). And the two admissibility bars cited above are not triggered if an alien enters the United States at the time and place allowed by a grant of parole and does not exceed the period of authorized stay. So INA § 245(a)'s provisions requiring admissibility are not a barrier to adjustment of status. *See id.* § 1182(a)(6), (a)(9)(B).

Tension between those provisions exists if an alien (1) enters this country illegally, triggering the admissibility and LPR restrictions under the cited immigration laws, but (2) is deemed paroled "into the United States" in place based on the Executive Branch's objection to the burdens of those restrictions, not based on the case for the alien's presence here (which by definition

- 14 -

already exists). That tension underlies plaintiffs' arguments here.

    d. *Other benefits of parole.*—Parole under INA § 212(d)(5) allows access to other benefits, apart from avoiding the cited admissibility and LPR barriers:

- The Social Security Act prohibits benefit payments to aliens if they are not lawfully present in the country. IIRIRA § 503, 110 Stat. at 3009-671, *adding* 42 U.S.C. § 402(y). Parole under INA § 212(d)(5) allows those payments. 20 C.F.R. § 416.1618(a), (b)(2).

- Parole under INA § 212(d)(5) also allows certain Medicare benefits. 42 U.S.C. § 1395c (Medicare eligibility is concurrent with Social Security eligibility under that title's subchapter II, which is subject to 42 U.S.C. § 402(y)).

- Certain public benefits are conditioned on whether aliens are present in the country under a provision of law. 8 U.S.C. §§ 1611(a), 1641(b); *see infra* Part II.A.2.c.

- State-residency-based benefits in postsecondary education are prohibited for aliens not "lawfully present" in the country. IIRIRA § 505(a), 110 Stat. at 3009-672. Parole under INA § 212(d)(5) removes that bar to those benefits.

- By regulation, parole under INA § 212(d)(5) allows access to employment authorization. 8 C.F.R. § 274a.12(c)(11).[10]

---

[10] That work authorization removes consequences of employment for both employed aliens and their employers. First, it removes immigration consequences for aliens who are unable to adjust to LPR status under INA § 245(a) based on defined periods of "unauthorized employment." 8 U.S.C. § 1255(c), (k)(2)(B), *added by* Immigration and Nationality Amendments of 1976, Pub. L. No. 94-571, § 6, 90 Stat. 2703, 2705–06. Second, it removes liability for employers. *Id.* § 1324a(a), (h)(3) (making it unlawful to employ an "unauthorized alien," a term that excludes an alien "authorized to be so employed by . . . the Attorney General"), *added by* Immigration Reform and Control Act of 1986 (IRCA), Pub. L. No. 99-603, tit. I, § 101(a)(1), 100 Stat. 3359, 3360, 3368.

    Aliens paroled into the United States under INA § 212(d)(5) were added as a class eligible to apply for employment authorization by a 1981 regulation. Employment Authorization; Revision to Classes of Alien Eligible, 46 Fed. Reg. 55,920 (Nov. 13, 1981) (formerly 8 C.F.R. § 109.1(b)(4)). That addition was founded on the Attorney General's authority under INA § 212(d)(5) to parole

That work authorization, in turn, allows aliens to obtain Social Security cards. 42 U.S.C. § 405(c)(2)(B)(i)(I).

No one here questions the validity of any of those provisions. They are simply relevant for the proposition that INA § 212(d)(5) parole has attendant legal benefits and is not mere executive inaction or failure to detain an alien.

   e.   *Criteria for granting parole.*—Given parole's importance in the regime just described, "Congress, in IIRIRA, specifically narrowed the executive's discretion under § 1182(d)(5)(A) to grant 'parole into the United States.'" *Cruz-Miguel v. Holder*, 650 F.3d 189, 199 (2d Cir. 2011).

   To wit, IIRIRA replaced "for emergent reasons or for reasons deemed strictly in the public interest" with "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit," such that INA § 212(d)(5) now reads:

   The Attorney General may [with two exceptions] in his discretion parole into the United States temporarily under such conditions as he may prescribe *only on a case-by-case basis for urgent humanitarian reasons or significant public benefit* any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States.

---

an alien "under such conditions as he may prescribe," which was taken as including an authority to lift independent legal burdens on employers as opposed to just setting conditions on an alien's freedom from confinement. *Id.* at 55,921. The Executive Branch has since declined to act on an argument that it exceeded its statutory authority insofar as that regulation applies to aliens whose employment authorization is not a "condition of their admission or subsequent change to one of the indicated classes" in the regulation's subsection (a). Employment Authorization, 51 Fed. Reg. 39,385 (Oct. 28, 1986).

IIRIRA § 602 ("Limitation on use of parole"), 110 Stat. at 3009-689, *codified at* 8 U.S.C. § 1182(d)(5)(A) (IIRIRA's replacement language italicized).

One court has noted that "this change was animated by concern that parole under § 1182(d)(5)(A) was being used by the executive to circumvent congressionally established immigration policy." *Cruz-Miguel*, 650 F.3d at 199 n.15 (citing H.R. Rep. No. 104-469, pt. 1, at 140–41 (1996)). The committee report cited by that court states:

> The text of section 212(d)(5) is clear that the parole authority was intended to be used on a case-by-case basis to meet specific needs, and not as a supplement to Congressionally-established immigration policy. In recent years, however, parole has been used increasingly to admit entire categories of aliens who do not qualify for admission under any other category in immigration law, with the intent that they will remain permanently in the United States. This contravenes the intent of section 212(d)(5), but also illustrates why further, specific limitations on the Attorney General's discretion are necessary.

H.R. Rep. No. 104-469, at 140.[11]

The INA then directs, in the parole provision's next subparagraph, that the Attorney General "may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee under section 1157 of this title." 8 U.S.C. § 1182(d)(5)(B).[12] That repeats

---

[11] That committee report issued on March 4, 1996, when the current version of H.R. 2202 listed specific grounds that would constitute an "urgent humanitarian reason" or "reason deemed strictly in the public interest." H.R. 2202, 104th Cong. § 524 (House reference change, Sept. 20, 1995). That language did not make it into IIRIRA. Instead, H.R. 2202 later proposed the same amendment that was made in IIRIRA § 602. *See* H.R. 2202, 104th Cong. § 191 (Senate engrossed amendment, May 2, 1996).

[12] Added by the Refugee Act of 1980, § 201(f)(3), 94 Stat. at 108.

the parole provision's focus on a case-by-case decision. That case-by-case requirement also underlies plaintiffs' claims here.

### 3. Specialized actions regarding parole

Congress and the Executive Branch have, over the years, taken more specialized action regarding INA § 212(d)(5) parole. Relevant actions and their bearing on this case are noted below.

a. *Special authorization of refugee parole.*—In 1960, coinciding with World Refugee Year, the President signed into law a joint resolution granting the Attorney General authority to parole certain refugees "under the terms" of § 212(d)(5), declaring:

> That under the terms of section 212(d)(5) of the Immigration and Nationality Act the Attorney General may parole into the United States, pursuant to such regulations as he may prescribe, an alien refugee-escapee defined in section 15(c)(1) of the Act of September 11, 1957 (71 Stat. 643) if such alien (1) applies for parole while physically present within the limits of any country which is not Communist, Communist-dominated, or Communist-occupied, (2) is not a national of the area in which the application is made, and (3) is within the mandate of the United Nations High Commissioner for Refugees.

Act of July 14, 1960, § 1, 74 Stat. at 504. That law did not amend INA § 212(d)(5). But it did grant authority to parole the specified aliens under § 212(d)(5)'s terms, subject to certain additional terms. *See id.* §§ 2(a) (quantity limit), 3 (two-year limit), 74 Stat. at 504–05. That one-off expansion of parole authority may provide precedent for a 2019 law concerning military-family members.

b. *1998 INS counsel's opinion on parole in place.*—Two years after IIRIRA's amendments, an Immigration and Naturalization Service (INS) attorney issued an opinion concluding that INA § 212(d)(5) parole may be granted to aliens who already entered the country, not just aliens arriving here. Mem. from Paul W. Virtue, INS General Counsel, to INS Officials, Authority to Parole Applicants for Admission Who Are Not Also Arriving Aliens, Legal Op. No. 98-10, 1998 WL 1806685 (Aug. 21, 1998). The memo reasoned

- 18 -

that the Attorney General's parole authority is not limited to aliens entering the country because aliens who already entered, illegally, are also "applicants for admission" after IIRIRA. *Id.* at *1–2.

The memo did not analyze the prepositional phrase in the statutory term "parole into the United States" and whether it carries forward its pre-IIRIRA meaning of *entry* into the country. *See id.* Nor did the memo analyze how parole's role in other INA provisions fits with the author's view that parole "into the United States" can cover illegal entrants. Instead, the memo simply stated that "[a]ny release of an applicant for admission from custody, without resolution of his or her admissibility, is a parole," *id.* at *2, which the memo assumed was equivalent to an INA § 212(d)(5) parole into the United States. That memo, defendants argue, shows that their interpretation is longstanding.

c.  *2002 transfer of immigration authority.*—Today, as since its creation, the language of INA § 212(d)(5) grants parole authority to "the Attorney General." 8 U.S.C. § 1182(d)(5)(A). But the Homeland Security Act of 2002 assigned many immigration functions to the Secretary of Homeland Security,[13] including as follows:

> The Secretary shall be responsible for . . . (4) Establishing and administering rules, in accordance with section 236 of this title, governing the granting of visas or *other forms of permission, including parole, to enter the United States* to individuals who are not a citizen or an alien lawfully admitted for permanent residence in the United States.

6 U.S.C. § 202(4) (emphasis added). The Act thus included parole as a form of permission "to enter the United States." That, in turn,

---

[13] *See* Pub. L. No. 107-296, § 402, 116 Stat. 2135, 2177–78, *codified at* 6 U.S.C. § 202 (transferring border, maritime, and transportation duties); *id.* § 451(b)(5), 116 Stat. at 2195, *codified at* 6 U.S.C. § 271(b)(5) (transferring adjudication functions); *id.* § 1102, 116 Stat. at 2273–74, *amending* 8 U.S.C. § 1103 (giving the Secretary of Homeland Security authority to administer many immigration laws, except as to powers and functions conferred upon the Attorney General); *id.* § 1517, 116 Stat. at 2311, *codified at* 6 U.S.C. § 557 (providing that references in federal law to any officer whose functions have been transferred to DHS or another officer shall be deemed to refer to DHS or the other officer).

may support plaintiffs' view that the INA § 212(d)(5) power to grant "parole into the United States" means the same thing after IIRIRA as it did before—entry into the country.

d.  *2013 memo on military-family parole.*—In 2013, a DHS component (USCIS) issued a memo authorizing "parole in place" for spouses, parents, and children of current military members and veterans. Admin. R. 4328–36. The memo relied on the INS counsel's prior opinion that INA § 212(d)(5) authorizes parole of aliens who are unlawfully present in the country. *Id.* at 4329 ("Although it is most frequently used to permit an alien who is outside the United States to come into U.S. territory, parole may also be granted to aliens who are already physically present in the U.S. without inspection or admission. This latter use of parole is sometimes called 'parole in place.'") (citing INS counsel's opinion).

DHS stated that, "Generally, parole in place is to be granted only sparingly." *Id.* at 4330. DHS then told its adjudicators: "Absent a criminal conviction or other serious adverse factors, parole in place would generally be an appropriate exercise of discretion" for a spouse, child, or parent of a military veteran or active-service member. *Id.* As to the required case-by-case finding of urgent humanitarian reasons or significant public benefit from an alien's parole, DHS stated: "Military preparedness can potentially be adversely affected if active members of the U.S. Armed Forces and individuals serving in the Selected Reserve of the Ready Reserve, who can be quickly called into active duty, worry about the immigration status of their spouses, parents and children." *Id.* at 4329. DHS did not make any similar preparedness finding as to veterans, noting instead that they are owed a duty of support and care and "can face stress and anxiety because of the immigration status of their family members." *Id.*

e.  *2019 law on military-family parole in place.*—Six years later, in the National Defense Appropriations Act for Fiscal Year 2020 (NDAA 2020), Congress reacted positively to DHS's parole-in-place policy for military families but avoided any direct declaration about its legality. Instead, Congress instructed DHS to "consider"

whether military-family unity is a significant public benefit justify-ing parole in place for military-family members (with DHS having announced its views on the issue in 2013) and then expressed Congress's sense of the "importance" of such authority and that the parole in place granted by DHS has positive effects:

**SEC. 1758. PAROLE IN PLACE FOR MEMBERS OF THE ARMED FORCES AND CERTAIN MILITARY DEPENDENTS.**

(a) IN GENERAL.—In evaluating a request from a covered individual for parole in place under section 212(d)(5) of the Immigration and Nationality Act (8 U.S.C. 1182(d)(5)), the Secretary of Homeland Security shall consider, on a case-by-case basis, whether granting the request would enable military family unity that would constitute a significant public benefit.

(b) SENSE OF CONGRESS.—It is the sense of Congress that—

(1) parole in place reinforces the objective of military family unity;

(2) except as required in furtherance of the missions of the Armed Forces, disruption to military family unity should be minimized in order to enhance military readiness and allow members of the Armed Forces to focus on the faithful execution of their military missions and objectives, with peace of mind regarding the well-being of their family members; and

(3) the importance of the parole in place authority of the Secretary of Homeland Security is reaffirmed.

(c) COVERED INDIVIDUAL DEFINED.—In this section, the term "covered individual" means an alien who—

(1) is a member of the Armed Forces;

(2) is the spouse, son, or daughter of a member of the Armed Forces;

> (3) is the parent of a member of the Armed Forces who supports the request of such parent for parole in place; or
>
> (4) is the widow, widower, parent, son, or daughter of a deceased member of the Armed Forces.

NDAA 2020, Pub. L. No. 116-92, § 1758, 133 Stat. 1198, 1860–61 (2019), *codified at* 8 U.S.C. § 1182 note.

Defendants argue that this law affirms a preexisting authority under INA § 212(d)(5) to "parole into the United States" aliens who have already entered the United States—and to do so on the basis of family unity. Plaintiffs respond that this law creates a conspicuous contrast to INA § 212(d)(5) by expressly mentioning parole "in place" and implicitly granting authority to issue it (for a narrow class of military-related aliens).

### B.  The challenged Rule

On June 18, 2024, the President "announced that DHS would take action to preserve the unity of U.S. citizens and their noncitizen spouses and noncitizen stepchildren who currently cannot access LPR status without first departing the United States." Implementation of Keeping Families Together, 89 Fed. Reg. 67,459, 67,460 (Aug. 20, 2024) (KFT Rule or the Rule). In furtherance of that directive, DHS issued a rule creating a process to allow aliens to be granted "parole in place" if they illegally entered the country and are qualifying spouses or stepchildren of U.S. citizens. *Id.*

Elsewhere, the agency has acknowledged that "Parole is not to be used to circumvent normal visa processes and timelines."[14] The express aim of the Rule, however, is to allow aliens to "apply for adjustment of status to that of an LPR, rather than having to depart the United States to pursue an immigrant visa" by waiting abroad for the prescribed time of inadmissibility. *Id.* at 67,459–60 & n.10 (explaining the visa processes and timelines circumvented).

---

[14] DHS, U.S. Customs and Border Protection, Fiscal Year 2002 Report to Congress: Parole Requests 2 (July 12, 2023), https://www.dhs.gov/sites/default/files/2023-08/23_0712_cbp_fy22_parole_requests.pdf.

The Rule thus claims significant public benefit precisely because normal visa processes and timelines are avoided. *Id.* at 67,461–62 (stating that "exercise of the parole authority in this manner" will enable aliens to remain in the country and seek adjustment to LPR status while here, "thus promoting" the identified significant public benefits); *id.* at 67,475 (noting that "a primary goal of establishing this proposed process is to remove a barrier to an immigration benefit," namely, work authorization and adjustment to LPR status under INA § 245(a)).

To be eligible for parole in place under the KFT Rule, an applicant must meet five criteria:

(1) be an alien present in this country without admission or parole (i.e., an illegal entrant);[15]

(2) have a valid marriage to a U.S. citizen dating to on or before June 17, 2024,[16] or have a parent who entered into such a marriage before the applicant's 18th birthday;

(3) have been continuously present in this country:

   (a) in the case of a spouse of a U.S. citizen, since June 17, 2014, (i.e., for over 10 years) or

   (b) in the case of a stepchild of a U.S. citizen, since June 17, 2024, (i.e., for about three months or more) and have been unmarried and under age 21 as of that date;

---

[15] The term "Illegal entrants," 8 U.S.C. § 1182(a)(6) (boldface removed), corresponds to the part of § 1182(a)(6) addressing aliens "present in the United States without being admitted or paroled." Aliens present without admission or parole are also "unlawfully present" as that term is defined in 8 U.S.C. § 1182(a)(9). *See supra* p. 12. As such, rather than follow the Rule's use of the opaque acronym PWAP, the court shortens "alien present without admission or parole" to "illegal entrant" or "unlawfully present alien" unless context requires otherwise. *See* Admin. R. at 4331 ("Ordinarily, the only way for an alien to be present in the United States without admission or parole . . . is to have entered without inspection [i.e., illegally] at some point in the past."). For consistency with the trial evidence, the court also sometimes uses the terms "undocumented immigrants" or "unauthorized immigrants" to refer to unlawfully present aliens who are permanently residing here.

[16] Aliens so married on June 17, 2024, but who are now widow(er)s are also eligible, under certain conditions. 89 Fed. Reg. at 67,470.

- 23 -

(4) have no disqualifying criminal history; and

(5) submit biometrics and pass security and safety vetting.

*Id.* at 67,469–70. If those criteria are met, the Rule directs that DHS officials may grant parole in place if merited as a matter of discretion. *Id.* at 67,465. The Rule then constrains the exercise of that discretion, declaring that granting parole in place to aliens eligible under the Rule's criteria "will achieve" or "will generally provide" significant public benefits. *Id.* at 67,459, 67,465.

Specifically, the KFT Rule claims five "significant public benefits" from granting parole in place to aliens eligible under the Rule's criteria. *Id.* at 67,465–69. Four of these flow from aliens' receiving new legal treatment attendant to parole, not simply from aliens' presence in the country (which already exists):

(1) family unity, which the Rule finds promoted because a grant of INA § 212(d)(5) parole would remove the need to use the depart-and-wait-abroad process to apply for an immigrant visa (which would impede unity with family here);

(2) U.S. economic and labor interests, which the Rule finds promoted because parole enables aliens to receive employment authorization and thus work lawfully;

(3) diplomatic and international interests, which the Rule finds advanced because allowing aliens "access to protection, services and employment" under a grant of parole shows "partnership and commitment" to other countries that want those benefits for their nationals in this country; and

(4) reduced governmental resources spent on consular processing since aliens paroled in place are able (under the Rule's view) to pursue LPR status without consular process abroad, and on removal proceedings since paroled aliens may have their removal proceedings terminated.

*Id.* The fifth claimed significant public benefit is a pair of possibilities relating to public safety:

(5) (a) The possibility that requiring aliens to submit identify-
ing information "may," after security checks, identify
threats to security or safety.

(b) The possibility that aliens granted parole "may be"
more willing to report crimes because parole reduces the
risk of deportation.

*Id.* Both of those possibilities would exist equally as to all aliens
offered parole upon furnishing identification, regardless of their
spousal or stepchild relationship to a U.S. citizen. The Rule does
not require a case-by-case finding that an alien's parole "will"
achieve either benefit, as in the case of an alien entering the coun-
try to testify in a criminal case.

As to the mechanics of receiving parole, the Rule requires al-
iens to submit an application (new Form I-131F) along with its re-
quired documentation and filing fee. *Id.* at 67,472. KFT Rule pa-
role will generally last for three years because "a three-year grant
of parole will provide an appropriate amount of time to obtain ad-
justment of status." *Id.* at 67,476. That confirms DHS's view that
the claimed significant public benefit—to which the duration of
parole must be keyed, 8 U.S.C. § 1182(d)(5)(A)—comes from al-
iens' receipt of a new immigration status, not their presence.

In issuing the Rule, DHS dispensed with notice-and-comment
procedure for two reasons, stating that (1) the Rule is a mere "gen-
eral statement of policy" and (2) the Rule involves a "foreign af-
fairs function of the United States," 5 U.S.C. § 553(a)(1). 89 Fed.
Reg. at 67,488–89. Plaintiffs challenge both conclusions.

Finally, the Rule states that the Office of Management and
Budget (OMB) approved a request for emergency authorization
of the new Form I-131F under the Paperwork Reduction Act. *Id.*
at 67,489. Plaintiffs argue that the Rule fails to allege the required
emergency circumstances, making the Rule infirm for failing to
follow the non-emergency procedures of that Act.

### C. Procedural history

Plaintiffs are the State of Texas and 15 other States. They are now supported by seven additional States as amici curiae. Defendants are DHS, OMB, their leaders, and related federal officials.

Plaintiffs' complaint alleges that the KFT Rule exceeds statutory authority under 8 U.S.C. §§ 1182 and 1255 (Counts 1–5 and 10); exercises a dispensing power prohibited by the Take Care Clause (Count 9); is arbitrary, capricious, or an abuse of discretion within the meaning of the APA (Count 6); and issued without notice-and-comment procedure required by the APA and the Paperwork Reduction Act (Counts 7–8).

After filing this case, plaintiffs moved for a stay of the Rule's implementation, a temporary restraining order, and a preliminary injunction. Defendants appeared in the case and proposed discovery on standing and, contingently, the filing of an administrative record and briefing on the merits of a preliminary injunction.

To avoid an irreparable change in the status quo that would foreclose possible judicial relief, and because the balance of the equities supported it, the court ordered a temporary stay of, and restraint on, parole issuance under the Rule. The court also ordered expedited discovery and briefing on the motion for a preliminary injunction. *See* 28 U.S.C. § 1657 (requiring expedition). And the court gave notice that it would advance the trial and consolidate it with the hearing on a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a)(2).[17]

The court of appeals then paused proceedings here and extended this court's temporary relief while that court reviewed a

---

[17] *See generally* Samuel L. Bray, *The Purpose of the Preliminary Injunction*, at 31 & n.168 (forthcoming 78 Vand. L. Rev. (2025)), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4922379; Morton Denlow, *The Motion for a Preliminary Injunction: Time for a Uniform Federal Standard*, 22 Rev. Litig. 495, 533–34 (2003) ("Often the matters litigated in the preliminary injunction hearing will be identical to those raised at a trial on the merits. If the court conducts a full-blown evidentiary hearing and must go through the exercise of preparing findings of fact and conclusions of law, it is a waste of judicial resources to repeat this exercise at a later date.").

denial of intervention, which it affirmed. The court of appeals' stay of proceedings here meant that this court's temporary relief expired on its own terms but that proceedings here could not proceed to the scheduled prompt hearing on a preliminary injunction. Consequently, after the court of appeals lifted its stay of proceedings here, this court reimposed the unreached case deadlines on a new schedule, again expedited, and reimposed its temporary stay and restraining order until the new hearing date. *See Connell v. Dulien Steel Prods., Inc.*, 240 F.2d 414, 418 (5th Cir. 1957) (addressing the reach of temporary relief while a court decides legal matters controlling entitlement to a preliminary injunction: "Orderly procedure requires that the trial court be given the opportunity of passing on these legal matters at the time of the hearing of the motion for preliminary injunction.").

No party moved to postpone trial, so the case proceeded to a bench trial. The court now issues its memorandum of decision.

### D.  Standards for fact-finding

After a bench trial, a court must "find the facts specially and state its conclusions of law separately." Fed. R. Civ. P. 52(a)(1). No particular format is required for the findings and conclusions, so long as they are entered separately from the final judgment. *Id.* (providing that a court's findings and conclusions may be given orally or in an opinion or memorandum of decision); *see Gulf King Shrimp Co. v. Wirtz*, 407 F.2d 508, 515 (5th Cir. 1969) ("Findings may be sufficient if they permit a clear understanding of the basis of decision of the trial court, irrespective of their mere form or arrangement.") (quotation marks omitted).

In finding the facts, a district court may draw reasonable inferences from the evidence. *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 155 (1972). Any inadmissible evidence is ignored. *Harris v. Rivera*, 454 U.S. 339, 346 (1981). Plaintiffs bear the burden in this civil case to establish, by a preponderance of the evidence, the facts necessary for the relief that they seek.

The parties stipulated that all witness testimony would be presented without live examination and instead through the

declarations attached to the parties' trial briefs (there being no declarations attached to the responses). Doc. 92. And the parties stipulated that the exhibits attached to their trial briefs and responses could be offered without a sponsoring witness. *Id.*

The court admitted plaintiffs' exhibits B, C, D, and E and defendants' exhibits B, C, and D. The administrative record has been received and is cited as "Admin. R." The court has carefully considered those documents, all trial briefs, responses, replies, amicus briefs, the Rule itself, and the authorities cited therein.

## II. Findings of fact and conclusions of law

The court first addresses jurisdiction (Part II.A), then the merits of plaintiffs' claims (Part II.B), and then relief (Part II.C).

### A. Jurisdiction

The court has a duty to consider its jurisdiction at all times. *See* Fed. R. Civ. P. 12(b)(1), (h)(3). Here, jurisdiction is disputed based on (1) conditions on the APA's waiver of sovereign immunity from suit, (2) Article III subject-matter jurisdiction based on plaintiffs' standing, and (3) statutory subject-matter jurisdiction based on a jurisdiction-stripping statute. The court follows the Fifth Circuit in starting with whether the Rule "is a reviewable final agency action because that analysis contextualizes the standing inquiry." *Texas v. EEOC*, 933 F.3d 433, 441 (5th Cir. 2019).

#### 1. Sovereign immunity

Sovereign immunity renders the United States and its departments and agents in their official capacities immune from suit. Sovereign immunity is jurisdictional in nature. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). So cases falling outside of a waiver of sovereign immunity must be dismissed as beyond the court's jurisdiction.

Plaintiffs rely on the APA's waiver of sovereign immunity, which is stated in the second sentence of 5 U.S.C. § 702: "An action in a court of the United States seeking relief other than money damages and stating a claim that an agency or an officer or employee thereof acted or failed to act in an official capacity or

under color of legal authority shall not be dismissed nor relief therein be denied on the ground that it is against the United States or that the United States is an indispensable party." *See generally Bowen v. Massachusetts*, 487 U.S. 879, 896, 899 (1988) (reviewing the amendment that added § 702's second sentence, including an "especially convincing" summary by Judge Bork).

This case seeks only injunctive relief, not monetary relief. So it meets the waiver sentence's first requirement. And plaintiffs' claims here complain of official-capacity conduct. So they meet the waiver sentence's second requirement.

The Fifth Circuit holds that the "suffered legal wrong . . . or is adversely affected or aggrieved" standard and the "agency action" standard from § 702's first sentence are also "requirements for establishing a waiver of sovereign immunity." *Ala.-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 489 (5th Cir. 2014). And the Fifth Circuit holds that, when a cause of action arises under the APA as opposed to a "statutory or non-statutory cause of action that arises completely apart from the general provisions of the APA," the "final agency action" standard from 5 U.S.C. § 704 is a further requirement of a waiver of sovereign immunity. *Id.*[18] For the reasons given below, the Rule is "final agency action," and the zone-of-interests gloss on the "adversely affected or aggrieved" test is satisfied here. As explained below, the Rule also does not fall within the narrow exception that preserves sovereign immunity for matters "committed to agency discretion by law."

### a. Final agency action

1. A "rule" under the APA is a general agency statement of future effect, designed to prescribe law, policy, or agency

---

[18] *See generally Amin v. Mayorkas*, 24 F.4th 383, 389 n.2 (5th Cir. 2022) (suggesting that the circuit's view treating the finality requirement as jurisdictional is out of step with Supreme Court rulings); *Muniz-Muniz v. U.S. Border Patrol*, 741 F.3d 668, 672 (6th Cir. 2013) ("we now join all of our sister circuits who have [addressed the issue] in holding that § 702's waiver of sovereign immunity extends to all non-monetary claims against federal agencies and their officers sued in their official capacity, regardless of whether plaintiff seeks review of 'agency action' or 'final agency action' as set forth in § 704").

procedure. 5 U.S.C. § 551(4). The term includes substantive rules, which must be issued with notice-and-comment procedure, *DOL v. Kast Metals Corp.*, 744 F.2d 1145, 1152–53 (5th Cir. 1984), and non-substantive rules, which concern topics such as "internal agency organization or procedures; non-binding agency policy statements; and guidance documents interpreting existing rules," *Apter v. HHS*, 80 F.4th 579, 590 (5th Cir. 2023) (quotation marks omitted).

The KFT Rule announces the agency's interpretation of legal provisions, *see* 8 U.S.C. §§ 1182(d)(5)(A) and 1255(a), and speci-fies agency policy on the examination of applications for parole into the United States. It is thus a "rule" and therefore "agency action." 5 U.S.C. § 551(13). That much is undisputed.

2.   Defendants do dispute the finality of that agency action. Two conditions generally must be met for action to be "final":

> First, the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which rights or obligations have been determined, or from which legal consequences will flow.

*Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations and quo-tation marks omitted). "The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality require-ment as flexible." *EEOC*, 933 F.3d at 441 (ellipsis and quotation marks omitted).

The Rule meets the first condition of finality. It is not merely a proposed measure. It states what DHS "will begin" doing. 89 Fed. Reg. at 67,459. Marking the consummation of the agency's decisionmaking, the Rule was issued to "establish[]" a process for granting parole-in-place requests, *id.* at 67,460; to announce DHS's "best reading of the statute," *id.* at 67,461; and to guide agency officials in the "exercise of the parole authority" under that law, *id.* The Rule is not pending further agency review and is

a definitive statement of the agency's position. It meets *Bennett*'s first prong.

3.  The Rule also meets *Bennett*'s second prong, for several reasons. First, it obligates DHS personnel to act on a particular understanding of the scope of legal authority by announcing that INA § 212(d)(5) allows paroling aliens already present in the United States "in place." *Id.* at 67,462 ("Parole authority"). That language does not leave DHS personnel free to deny parole requests based on a different view of INA § 212(d)(5). Rather, the Rule obligates DHS staff to act on a particular understanding of a legal norm, with direct consequences for whether many aliens obtain immigration relief or not. As the Fifth Circuit explained in *Texas v. EEOC*: "Courts consistently hold that an agency's guidance documents binding it and its staff to a legal position produce legal consequences or determine rights and obligations, thus meeting the second prong of *Bennett*." 933 F.3d at 441.

The Rule also interprets legal norms by announcing that "parole in place, under INA section 212(d)(5)(A), 8 U.S.C. 1182(d)(5)(A), satisfies" INA § 245(a)'s threshold requirement of being "inspected and admitted or paroled into the United States." 89 Fed. Reg. at 67,462–63 ("Parole in Relation to Adjustment of Status Eligibility"). The agency did insert a disclaimer that the Rule "does not change or eliminate the eligibility criteria for adjustment of status to that of an LPR." *Id.* at 67,460. But the court cannot credit that disclaimer. Defendants do not point to any other published rulemaking asserting that INA § 245(a)'s requirement of being inspected and admitted or paroled "into the United States" is not a legal-entry requirement (albeit one that Congress can waive or deem satisfied in other laws). And, regardless of whether that position is new or not, the Rule interprets a legal norm because its view of INA § 245(a) binds DHS personnel applying that provision. *See EEOC*, 933 F.3d at 442.

The Rule then defines the conditions under which parole "will generally provide a significant public benefit," 89 Fed. Reg. at 67,465, as INA § 212(d)(5) requires on a case-by-case basis for an

alien's parole into the United States. Defendants argue that DHS inserted qualifiers, such as "generally," that leave its examiners free to disagree in specific cases or exercise "unfettered" discretion to deny parole. But it is more likely than not that, as employees of a government agency acting under directions to preserve family unity, *id.* at 67,460, agency staff will not read the Rule as allowing them to disregard the agency's stated conclusion that a "significant public benefit" as § 212(d)(5) uses the term includes granting parole in place to aliens meeting the Rule's family-relationship and other eligibility criteria. At a minimum, the Rule imposes a presumption no less impactful than the presumptions in 8 C.F.R. § 212.5(b) that certain aliens are eligible for parole. The Rule thus satisfies *Bennett*'s second prong for the independent reason that it limits examiner discretion in interpreting legal norms regarding that showing. *EEOC*, 933 F.3d at 442.

Lastly, the Rule requires DHS staff to process parole-in-place applications using new forms and processes, again creating obligations binding them. And that new process affects legal rights by creating an alternative pathway to LPR status. The Rule itself so proclaims: "*Absent this process*, applying for LPR status requires noncitizens who are present without admission or parole (PWAP) to depart the United States and remain abroad for an indefinite period . . . ." 89 Fed. Reg. at 67,466 (emphasis added).

### b.  Zone of interests

The APA confers a right of judicial review on any entity "adversely affected or aggrieved by agency action." 5 U.S.C. § 702. As noted, the Fifth Circuit treats that standard as limiting the APA's waiver of sovereign immunity and thus as jurisdictional.

That right of judicial review is one of the Act's "generous review provisions" that courts construe "not grudgingly but as serving a broadly remedial purpose." *Ass'n of Data Processing Serv. Orgs. v. Camp*, 397 U.S. 150, 156 (1970). But the Supreme Court has supplied a "gloss on the meaning of § 702" by adding, to standing law's bare minimum requirement of an injury in fact, the "additional requirement that the interest sought to be protected

by the complainant be arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 396 (1987) (quotation and alteration marks omitted).

In *Data Processing*, the Supreme Court "approved the trend toward the enlargement of the class of people who may protest administrative action." *Id.* at 397 (quotation, alteration, and ellipsis marks omitted). The zone-of-interests test "is not meant to be especially demanding." *Id.* at 399. In particular, "there need be no indication of congressional purpose to benefit the would-be plaintiff." *Id.* at 399–400; *accord Data Processing*, 397 U.S. at 157 (holding that this test does not require that an agency act under laws that "in terms protect a specified group").

Rather, the zone-of-interests test is a guide for applying Congress's intent to make agency action presumptively reviewable. *Clarke*, 479 U.S. at 399. "In cases where the plaintiff is not itself the subject of the contested regulatory action, the test denies a right of review if the plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Id.*

Under those standards, the plaintiff States are within the zone of interests of the laws that they allege the Rule violates. For one, the Fifth Circuit has held that a State's claim of financial burden from immigration brings it within the zone of interests of the INA. *Texas v. United States (DACA Case)*, 50 F.4th 498, 521 (5th Cir. 2022) ("The INA encompasses [the States'] concerns about the financial burdens of illegal immigration.").[19] There, the Fifth Circuit reasoned: "It's clear that the INA aimed, at least in part, to protect States from just those kinds of fiscal harms. The States' objectives are consistent with the INA's, so they pass the lenient

---

[19] Several cases are assigned short names herein because their captions, even if not identical, are largely not distinguishing. *See Gen. Land Off. of State of Tex. v. Biden (Border Wall Case)*, 71 F.4th 264, 271 (5th Cir. 2023) (assigning several such short names); *see also, e.g., Juilliard v. Greenman (Legal Tender Case)*, 110 U.S. 421 (1884) (so named in official reporter).

zone-of-interests test." *Id.* (quotation and alteration marks omitted); *accord Texas v. Biden (MPP Case II)*, 20 F.4th 928, 975 (5th Cir. 2021) ("It's clear that the INA aimed, at least in part, to protect States from just those kinds of harms.") (citing *Demore v. Kim*, 538 U.S. 510, 517–22 (2003)), *rev'd on other grounds*, 597 U.S. 785; *Texas v. United States (DAPA Case)*, 809 F.3d 134, 163 (5th Cir. 2015) (same conclusion), *aff'd by an equally divided Court*, 579 U.S. 547 (2016) (per curiam).

The plaintiff States' interest in border control is also within the zone of interests of the INA. Of course, that is only a quasi-sovereign interest: "When a State enters the Union, it surrenders certain prerogatives." *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007). But the Supreme Court has held that "pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration." *Arizona v. United States*, 567 U.S. 387, 397 (2012) (citing several public interests regarding immigration control). That independently brings the States within the zone of interests relevant here. *E.g.*, *New Mexico v. McAleenan*, 450 F. Supp. 3d 1130, 1174 n.5 (D.N.M. 2020) ("[P]arties such as state and local governments that can show that the United States' parole decisions were made contrary to 'significant public benefit' under 8 U.S.C. § 1182(d)(5)(A), are at least 'arguably' within the statute's zone of interests.").

### c.  Commission to agency discretion by law

Defendants argue that any waiver of sovereign immunity under 5 U.S.C. § 702 does not apply because the entire chapter 7 is inapplicable when agency action "is committed to agency discretion by law." 5 U.S.C. § 701(a)(2); *see Lundeen v. Mineta*, 291 F.3d 300, 304–05 (5th Cir. 2002) (holding that this provision is jurisdictional, as an exception from the sovereign-immunity waiver).

That exception is "very narrow." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 410 (1971). It applies only "if no judicially manageable standards are available for judging how and when an agency should exercise its discretion." *Heckler v. Chaney*,

470 U.S. 821, 830 (1985). "The mere fact that a statute grants broad discretion to an agency does not render the agency's decisions completely unreviewable under the 'committed to agency discretion by law' exception unless the statutory scheme, taken together with other relevant materials, provides absolutely no guidance as to how that discretion is to be exercised." *Perales v. Casillas*, 903 F.2d 1043, 1051 (5th Cir. 1990) (quoting *Robbins v. Reagan*, 780 F.2d 37, 45 (D.C. Cir. 1985) (per curiam)).

That narrow exception does not apply here. INA § 212(d)(5) creates both discretion and direction. It does give discretion to parole some aliens into the United States. But it also gives direction on how that discretion can be exercised: only to parole aliens into the United States, for a specified reason on a case-by-case basis, for a temporary duration. 8 U.S.C. § 1182(d)(5)(A). Similarly, the procedural-rights statutes invoked by plaintiffs provide judicially manageable standards for reviewing the agency's exercise of rule-making authority.

Moreover, the INA § 245(a) clause invoked here does not confer discretion at all. It simply requires that, for adjustment to LPR status, an alien have been "inspected and admitted or paroled into the United States." 8 U.S.C. § 1255(a). Review of the Rule's interpretation of that provision can proceed as with all other judicial review of statutory interpretation.

### 2.  Article III jurisdiction

As the party invoking federal jurisdiction, the plaintiff has the burden of proving the facts necessary to establish its standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 411–12 (2013). Standing has three elements. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). First, the plaintiff must have suffered an injury in fact—the invasion of a legally protected interest that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical. *Id.* Second, that injury must be fairly traceable to the defendant's challenged conduct. *Id.* And, third, it must be likely, as opposed to merely speculative, that the plaintiff's injury will be redressed by a favorable judicial decision. *Id.* at 561.

### a. Stipulation limiting injury evidence to Texas

The 16 plaintiff States have limited their standing and irreparable-injury evidence to Texas. Doc. 36 at 1. But the Fifth Circuit holds that the presence of even one party with standing is sufficient to authorize a judicial decision binding upon all parties challenging the same defendant's action on the same legal theory—what the Fifth Circuit calls the same "claim." *Texas v. Rettig*, 987 F.3d 518, 528 (5th Cir. 2021) ("If one plaintiff has standing for a claim, then Article III is satisfied as to all plaintiffs.").

That rule controls here. The 15 States without proof of injury seek the same relief on the same legal theories as does Texas. Under circuit precedent, they need not prove their standing so long as Texas proves its own. So only Texas's standing is analyzed.

### b. General principles of standing law

Texas's claimed injuries fall into three categories:

(1) Costs triggered by a change in the legal status of aliens who would remain in Texas without the Rule but whose receipt of parole triggers eligibility for state-run benefits.

(2) Costs incurred based on the continued presence and activities in Texas of aliens who, but for the Rule, would have voluntarily emigrated from this country.

(3) Costs incurred on account of future immigration into Texas encouraged by a broader message behind the Rule.

Doc. 1 at 14–15. The court analyzes each theory separately below, accepting the first and second but not the third. Some generally applicable principles of law are first reviewed.

*First*, each standing theory depends on the actions of third-party aliens based on the Rule.[20] The Supreme Court has held that such a causal chain makes a plaintiff's standing harder to show

---

[20] Standing theory 1 concerns aliens who would stay in Texas even without the Rule but who would use state-run public benefits made available by parole under the Rule. Standing theory 2 concerns aliens whose receipt of parole in place under the Rule would cause them to stay in Texas when they otherwise would not. Standing theory 3 concerns aliens abroad who would illegally enter Texas due to a message behind the Rule.

than when the defendant acts directly on the plaintiff. *Lujan*, 504 U.S. at 561–62 (stating that, when a plaintiff's asserted injury "arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed" to show standing than when the regulation is of the plaintiff directly).

In such a challenge to the regulation of a third party, "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction." *Id.* at 562. Because the existence of essential elements of standing depends on the choices made by independent actors, it becomes the plaintiff's burden to prove "facts showing that those choices have been or will be made in such manner as to produce causation and permit redressability of injury." *Id.* In those cases, "standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Id.* (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)); *accord United States v. Texas (Enforcement Priorities)*, 599 U.S. 670, 679 n.3 (2023) (noting that harm too attenuated from the defendant's conduct is not cognizable).

Standing in such cases may be harder to prove. But it is not a black swan. Standing still exists if the evidence proves "that third parties will likely react in predictable ways" to the defendant's challenged conduct. *Dep't of Comm. v. New York*, 588 U.S. 752, 768 (2019). Certainty is not required, so long as the likely reaction "does not rest on mere speculation." *Id.*

Likewise with redressability, which focuses on the causal connection "between the alleged injury and the judicial relief requested." *Allen*, 468 U.S. at 753 n.19. It also requires a substantial likelihood, but not a certainty, of the required connection. If there is "a likelihood that the requested relief will redress the [plaintiff's] injury," the redressability requirement is satisfied. *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 103 (1998); *accord Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000) (requiring that "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision").

*Second*, standing law focuses on the significant risk of future injury, not whether it is ultimately realized. For example, in *Davis v. FEC*, 554 U.S. 724 (2008), a political candidate had standing to challenge a law that gave his opponent a conditional funding benefit because, at the time of suit, it was likely that the condition would occur and that the opponent would claim the benefit. *Id.* at 729, 734. The opponent did not ultimately claim the benefit. But standing existed based on the significant risk of that harm to the plaintiff, not whether it ultimately materialized. *Id.* at 734–35.

That principle forecloses defendants' argument that standing does not exist because the Rule does not itself confer parole but merely creates a process for conferring that benefit. The law in *Davis v. FEC* also merely created a process for benefits to be awarded to the plaintiff's challenger, if a condition was met. But those benefits did not have to be actually awarded before the plaintiff had standing. Likewise here.

Put differently, a claimed injury from the defendant's conduct "need not be actualized" to satisfy Article III. *Id.* at 734. A "future injury" can suffice, so long as it is "certainly impending, *or* there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 (2014) (emphasis added); *see also Clapper*, 568 U.S. at 414 n.5 (noting that plaintiffs need not "demonstrate that it is literally certain that the harms they identify will come about").

As another example, in a census case, the Supreme Court held that residents of 13 States had standing "on the basis of the expected effects" of the challenged census conduct "on intrastate redistricting" because particular jurisdictions "were *substantially likely* . . . [to] suffer vote dilution in state and local elections." *Dep't of Comm. v. U.S. House of Reps.*, 525 U.S. 316, 332–33 (1999) (emphasis added). That substantially likely event was years away at the time of the plaintiffs' complaint, when standing must exist. *See id.* at 320 (citing district-court decisions in 1998 concerning the 2000 census, alleged to cause undercounts affecting

representation in elections after 2000). But it still showed Article III standing.

*Third*, the particular number of steps in the causal chain producing the plaintiff's harm is not itself the inquiry. What matters is not the number of steps, but whether the proof shows that the claimed harm is substantially likely as opposed to speculative. For example, several States had standing to challenge the Department of Commerce's design for the 2020 census based on a three-step causal chain: (1) the Department adds a citizenship question to the census, (2) causing the response rate of third-party census recipients in the plaintiff States to decrease more than in other States, (3) causing other government agencies to reduce the federal funding sent to the plaintiff States under formulas that use census-derived data. *Dep't of Comm.*, 588 U.S. at 759–60, 767–68 (citing district-court findings); *New York v. Dep't of Comm.*, 351 F. Supp. 3d 503, 596–99 (S.D.N.Y. 2019) (relevant district-court findings). That causal chain involved, not one, but two types of third parties to the litigation: census recipients and funds-granting agencies.

As that decision shows, proximate causation is not a requirement of Article III standing. The actions most proximate to the plaintiff States' expected loss of funds were those of census recipients and then funds-granting agencies. But the census-design choice was still a cause in fact, and the record there made its consequence to the plaintiff States fairly predictable. As the Supreme Court has elsewhere explained: "Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 134 n.6 (2014); *accord Block v. Meese*, 793 F.2d 1303, 1309 (D.C. Cir. 1986) (Scalia, J.) (noting that standing "requires no more than *de facto* causality").

The Fifth Circuit has thus repeatedly found standing to challenge agency action based on proof of how regulated (or regulable) third parties will predictably respond. *See, e.g.*, *Border Wall Case*,

71 F.4th at 271–75 (recognizing Texas's standing based on an agency action's predictable consequences on aliens' participation in state-funded programs); *DACA Case*, 50 F.4th at 517–20 (same); *MPP Case II*, 20 F.4th at 966–69 (same; reversed on other grounds); *Texas v. Biden (MPP Case I)*, 10 F.4th 538, 545–49 (5th Cir. 2021) (same); *DAPA Case*, 809 F.3d at 151 (same).

So have other circuits. *See Competitive Enter. Inst. v. FCC*, 970 F.3d 372, 384–85 (D.C. Cir. 2020) (collecting cases on multi-step causal chains and noting that an "entire line of cases finds redressability, as well as causation, in comparable circumstances turning on third-party conduct that is voluntary but reasonably predictable"); *New Jersey v. EPA*, 989 F.3d 1038, 1048–49 (D.C. Cir. 2021) (finding standing based on regulated third parties' conduct); *Mendoza v. Perez*, 754 F.3d 1002, 1009, 1011 (D.C. Cir. 2014) (same); *Nuclear Info. & Res. Serv. v. NRC*, 509 F.3d 562, 567 (D.C. Cir. 2007) (same); *Tozzi v. HHS*, 271 F.3d 301, 309 (D.C. Cir. 2001) (same); *see also Int'l Longshoremen's & Warehousemen's Union v. Meese*, 891 F.2d 1374, 1376, 1379 (9th Cir. 1989) (finding standing to challenge the grant of a benefit to a third party based on the predictable effects of the grant on the plaintiff).

*Fourth*, standing law allows reliance on third-party incentives as part of the proof showing their likely behavior. That was part of the plaintiff States' proof in *Department of Commerce v. New York*. 588 U.S. at 762 (noting the acts from which aliens would be predictably discouraged); 351 F. Supp. 3d at 588–89 (relying on some aliens' incentive to give a wrong answer or no answer to a citizenship question). Likewise with *Davis v. FEC*, which turned on the assumption that the plaintiff's political opponent was sufficiently incentivized to take advantage of a benefit once it became available (although he ultimately did not). 554 U.S. at 735. The Supreme Court did not require proof that the challenged conduct *required* or *coerced* the third party's harm-causing choice—just proof allowing a fair prediction of the third-party response.

So too with the recent decision in *Corner Post, Inc. v. Board of Governors of Federal Reserve System*, 144 S. Ct. 2440 (2024). The

plaintiff there was a retailer that accepted debit cards. *Id.* at 2448. The challenged Federal Reserve rule governed the maximum fee that a card network could set, but was not required to set, for retailers to pay to banks. *Id.* Based on the predictable effect that card networks would set the fee at the maximum amount, given past fees and the "significant incentive" to attract banks by raising fees, *id.*, the standing of retailers challenging the rule was so obvious as to barely be disputed in prior litigation and to be undisputed thereafter. *See NACS v. Bd. of Govs. of Fed. Reserve Sys.*, 958 F. Supp. 2d 85, 88–90, 98–99 (D.D.C. 2013).

The proof of the predictable reactions of third parties can include not only their incentives but also any other evidence upon which fact-finders may rely, such as statistics and common-sense inferences. *See MPP Case II*, 20 F.4th at 966–67 (noting the district court's reliance on statistics); *see also Affiliated Ute Citizens*, 406 U.S. at 155 ("reasonable inferences may be drawn [by] the District Court, as the trier of fact"). That proof can also include an agency's own pronouncements. *NRDC v. NHTSA*, 894 F.3d 95, 104–05 (2d Cir. 2018) ("the required nexus between inappropriately low penalties and harm to Petitioners is established by the agency's own pronouncements"); Fed. R. Evid. 801(d)(2).

*Fifth*, the standing analysis "consider[s] only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *DAPA Case*, 809 F.3d at 155 (holding that Texas's increased costs of issuing more driver's licenses created standing regardless of whether the drivers would generate auto-registration income for Texas or increase Texas's tax revenues). Other courts of appeals similarly hold that standing is not an accounting exercise. *E.g.*, *Denney v. Deutsche Bank AG*, 443 F.3d 253, 265 (2d Cir. 2006) ("the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing"); *NCAA v. New Jersey*, 730 F.3d 208, 223 (3d Cir. 2013) ("A plaintiff does not lose standing to challenge an otherwise injurious action simply because he may also derive some benefit from it. Our standing exercise is not

an accounting exercise."), *abrogated on other grounds by Murphy v. NCAA*, 584 U.S. 453 (2018).

For example, courts accepted the plaintiff States' standing in *Department of Commerce v. New York* without analyzing whether, as the defendants argued, "even if Plaintiffs have proved these losses are likely to occur, they do not count as Article III injuries because they may be 'offset' by gains that turn up elsewhere in the federal funding scheme." 351 F. Supp. 3d at 609. Consistent with that approach, this court does not undertake to examine whether any costs that are predictably imposed by regulated third parties are offset by benefits of a different nature. A related point applies to redressability; the focus is on redressing the harm that gives standing to sue, not on other possible injures. *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his *every* injury.").

The no-dissimilar-offsets rule avoids the complexity of trying to value all of the various costs and benefits resulting from a regulatory decision. In *Massachusetts v. EPA*, for instance, that approach avoided the need to ask whether the value of Massachusetts' loss of coastal land over a century-long time horizon—due to predicted global warming caused by a higher level of vehicle emissions of greenhouse gases absent EPA regulation—would be offset by the value of potential benefits to the State, whether cheaper transportation, increased mobility that contributes to faster development of environment-protecting technologies over the same time horizon, or even a longer growing season in Massachusetts. *See* 549 U.S. at 515–21 (no offset analysis); *id.* at 543–45 (Roberts, C.J., dissenting) (noting the "complexities of global warming" and the possibility that "someone is bound to invent something" to reduce the effect of greenhouse gases); Control of Emissions from New Highway Vehicles and Engines, 68 Fed. Reg. 52,922, 52,925 (Sept. 8, 2003) (noting commenters' arguments that global warming would increase agricultural production).

Yet the no-dissimilar-offsets rule may mean that state standing can exist based on both the benefits and the burdens to the States of immigration policies. *See, e.g.*, *Regents of Univ. of Calif. v. DHS*, 279 F. Supp. 3d 1011, 1033–34 (N.D. Cal. 2018) (holding that reduced tax payments and education contributions from resident aliens showed state standing); *MPP Case I*, 10 F.4th at 546–48 (holding that increased state costs from providing licenses and educational and healthcare services created state standing).

Some might argue that such a rule does not achieve the desired ends of standing law. Others might respond that such a rule appropriately allows States to at least seek redress for violations of law, even if not policy disagreements, in important areas in which they have surrendered policy control (e.g., cross-state pollution, national borders). *See Massachusetts*, 549 U.S. at 519 ("When a State enters the Union, it surrenders certain sovereign prerogatives."); *Arizona*, 567 U.S. at 397 (noting that the "pervasiveness of federal regulation does not diminish the importance of immigration policy to the States," which "bear[] many of the consequences of unlawful immigration").

But any such debate about the wisdom of the rules cited above is for the Fifth Circuit or the Supreme Court to decide. *See DAPA Case*, 809 F.3d at 161 (dismissing concern about standing doctrines because other principles serve to limit suits). This court's role is to apply binding precedent, which recognizes state standing based on an increase in state-program costs from third parties' predictable response to agency action, without trying to measure whether those costs are offset by benefits of a different nature.

*Sixth*, Article III does not empower the federal judiciary to adjudicate complaints about the Executive Branch's failure to make more arrests or bring more prosecutions. *Enforcement Priorities*, 599 U.S. at 676–86 (holding that Texas lacks standing to challenge guidelines for prioritizing the arrest and removal of aliens). That rule reflects the lack of a history or tradition of such adjudications, *id.* at 677, as well as the "Article II problems raised by judicial review of the Executive Branch's arrest and prosecution policies"

given the lack of meaningful standards for judicial review of that branch's discretion to allocate limited enforcement resources, *id.* at 679–80.

Even in a challenge to a policy of enforcement discretion, however, "the standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions." *Id.* at 682. The court does not see the need to adjudicate whether that has occurred here.

Moreover, "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis." *Id.* at 683. As shown by the word "could," the Supreme Court there declined to rule on such a question because it was not presented. *Id.* ("Again, we need not resolve the Article III consequences of such a policy."). The Court then carved out, as "categorically different" from a case implicating "only one discrete aspect of the executive power"—discretion over initiating enforcement action—other cases in which federal courts routinely adjudicate "justiciable cases involving statutory requirements or prohibitions on the Executive." *Id.* at 684.

Because *Enforcement Priorities* expressly carved out and declined to change the law on the issue of standing to seek enforcement of statutory requirements for conferring legal status or benefits—as opposed to Executive Branch decisions not to pursue more arrests or prosecutions—it leaves prior precedent on the former issue controlling. And Fifth Circuit precedent holds that a federal court can, where the plaintiff carries its burden of showing standing under the rules noted above, adjudicate a challenge to the legality of an executive policy of "both nonprosecution and the conferral of benefits." *Id.* at 683 (citing *DAPA Case*, 809 F.3d at 154).

That Fifth Circuit holding controls here. This case does not seek an order compelling more arrests or removal proceedings. It does not seek any order compelling the government to separate

anyone from their family. Rather, plaintiffs challenge a final rule governing the grant of affirmative immigration relief, with attendant benefits. Those claims do not intrude upon the Executive Branch's Article II discretion to allocate limited resources by declining to initiate certain enforcement proceedings. The claims call upon courts to apply substantive and procedural limits enacted by Congress to govern changes in legal status.

That is true even of Texas's second standing theory, which is premised on a but-for world in which more aliens leave Texas without the challenged Rule than with it. That standing theory is not based on the Executive Branch's initiation of more enforcement proceedings. It is based on the incentives under otherwise applicable law enacted by Congress, prompting aliens who are not admitted or paroled into this country, and who desire LPR status, to depart and apply abroad for an immigrant visa.

*Enforcement Priorities* distinguished *Massachusetts v. EPA* on the basis that it "involved a challenge to the denial of a statutorily authorized petition for rulemaking, not a challenge to an exercise of the Executive's enforcement discretion." *Id.* at 685 n.6. This case falls on the *Massachusetts v. EPA* side of that divide. Plaintiffs are not challenging the Executive Branch's discretion to decline enforcement actions. Plaintiffs are challenging a rulemaking directing DHS officials on how to confer parole and LPR status under immigration law. And Congress, in the APA, has authorized judicial review of such rulemaking. To be sure, the APA is not limited to any particular subject matter, as was the statute in *Massachusetts v. EPA*. But that is irrelevant because Congress has equally acted to authorize judicial review. *Utah v. Evans*, 536 U.S. 452, 460 (2002) (citing the APA, in analyzing standing, as the "law [that] permitted courts to review Census Bureau decisions").

A concurring opinion in *Enforcement Priorities* argued that the Court should have examined whether States deserve "special solicitude" in the standing analysis, while noting that even one dollar's worth of harm is enough for any type of plaintiff to show a concrete injury. 599 U.S. at 688–89 (Gorsuch, J., concurring)

(citing *Dep't of Comm.*, 588 U.S. 752). That concurrence was not the controlling opinion of the Court. So this court does not understand it as overruling any aspect of Fifth Circuit precedent.

In any event, as the concurrence noted, the Supreme Court has allowed States to challenge an Executive Branch policy that would predictably cause them monetary harm even though "special solicitude" has not played a major role in recent decisions. *Id.* (noting that "even one dollar's worth of harm is traditionally enough to qualify as concrete injury under Article III") (quotation and alteration marks omitted); *see Dep't of Comm.*, 588 U.S. at 766–68 (finding standing with no mention of special solicitude).

Because the controlling opinion in *Enforcement Priorities* did not address the concept of "special solicitude" one way or the other, this court is not free to reconsider the Supreme Court's or Fifth Circuit's reliance on the concept. Likewise, this court does not understand the Supreme Court's general reference to its examination of history and tradition in standing opinions as empowering this court to reconsider standing precedent writ large. *See Enforcement Priorities*, 599 U.S. at 677.

Yet, even if that were called for, this court is unsure how any new examination of history and tradition would unfold. *Enforcement Priorities* itself looked outside the immigration context at hand and drew heavily on a decision on standing in the context of a criminal prosecution. *Id.* (citing *Linda R.S. v. Richard D.*, 410 U.S. 614 (1973)). So it appears that a history-and-tradition analysis would not be limited to immigration or to civil actions.

It is also unclear what level of generality applies to any de novo analysis of history and tradition. It may matter that the law has historically distinguished between private wrongs and public wrongs. *See Huntington v. Attrill*, 146 U.S. 657, 668–69 (1892) (citing 3 William Blackstone, Commentaries § 2). And it may matter that public wrongs are those "which affect the whole community, considered as a community," *id.*, and vindicate "interests generally shared, such as . . . general compliance with regulatory law," Ann Woolhandler & Caleb Nelson, *Does History Defeat Standing*

*Doctrine?*, 102 Mich. L. Rev. 689, 693 (2004).[21] So if restrictions on immigration exists to benefit (as judged by Congress) the community at large, suits to enforce those restrictions may sound in the law of public wrongs.

If that matters, it may then matter that the law has historically allowed public officials to sue for criminal or civil remedies for public wrongs without evidence of special harm. *Id.* at 700 ("Public authorities could get courts involved in suppressing such nuisances, either by imposing criminal punishments on those responsible or by issuing injunctions against ongoing violations of the public rights."); *see, e.g.*, *Mayor, etc. of Georgetown v. Alexandria Canal Co.*, 37 U.S. (12 Pet.) 91, 99–100 (1838) (rejecting standing because the particular plaintiffs there were not "parties competent in court to represent the interests of the citizens of Georgetown," but recognizing in a challenge to congressionally chartered action that, although "the instances of its exercise are rare," it is "now settled, that a court of equity may take jurisdiction in cases of public nuisance, by an information filed by the attorney general"). That ability of public law officers stood in contrast to the inability of private citizens to sue over undifferentiated harm to them from public wrongs. *See* Woolhandler & Nelson, *supra*, at 700; *see, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 396 (2023) (doubting the standing of individual teachers to sue over undifferentiated burdens to them from illegal immigration).

The special ability of the attorney general of an affected community to sue for equitable remedies for a public wrong, without the evidence of special injury that a private plaintiff would need,

---

[21] That article's authors note the Supreme Court's decision on whether a duty owed to the public could be invoked only by a "government law-officer" or also by a private citizen without special injury who stands in the shoes of such a legal officer. *Union Pac. R.R. Co. v. Hall*, 91 U.S. 343, 355 (1875) (reaching the latter conclusion because the statute authorizing suit did not limit the class of petitioners). But, putting aside the relator issue, there seems to have been little debate that violation of a legal duty that flows to the community at large sounds in a public wrong that public legal officers can sue over without special injury. Woolhandler & Nelson, *supra*, at 708 (citing *In re Wellington*, 33 Mass. (16 Pick.) 87, 105 (1834) ("[I]t is for the public officers exclusively to apply, where public rights are to be subserved.")).

may in turn identify the history and tradition surrounding the idea that States, acting through their Attorneys General, have "special solicitude" in suing to remedy certain wrongs, including those allegedly caused by federal actors if within a waiver of sovereign immunity. *See Mayor, etc. of Georgetown*, 37 U.S. at 99–100.

In contrast to public-rights suits, "states generally could not bring cases to vindicate the private rights of their citizens." Woolhandler & Nelson, *supra*, at 716. So the historical distinction between private wrongs and public wrongs may further explain the lack of state standing in cases like *Massachusetts v. Mellon* and *Florida v. Mellon* as compared to the existence of state standing in cases like *Massachusetts v. EPA. Compare Massachusetts v. Mellon*, 262 U.S. 447 (1923) (analyzing citizens' own rights and state suits to enforce "their rights" as *parens patriae*), *Florida v. Mellon*, 273 U.S. 12 (1927) (relying on *Massachusetts v. Mellon* in reasoning that the State was not suing over a sufficiently "quasi sovereign" wrong, as opposed to suing *parens patriae* to enforce its citizens' private rights in their inheritances), *and* Woolhandler & Nelson, *supra*, at 717 (further discussing *Massachusetts v. Mellon*), *with id.* at 723 (describing the contrasting rule that "the government can maintain litigation over public rights that do not fit that description" of involving personal or property rights).

In any analysis of history and tradition, it is also unclear what time frame would apply. It may suffice that "unregulated but adversely affected parties . . . traditionally have brought, and regularly still bring, APA suits challenging agency rules." *Corner Post*, 144 S. Ct. at 2460 (Kavanaugh, J., concurring). Or it may be that a supportive history needs to precede the rise of the modern administrative state, as with the public-wrong-versus-private-wrong distinction noted above. *See generally* Cass R. Sunstein, *What's Standing After Lujan?: Of Citizen Suits, 'Injuries,' and Article III*, 91 Mich. L. Rev. 163, 168–70, 181–83 (1992) (describing the use of the word "standing" over time).

This discussion only highlights potentially relevant questions; it does not purport to be a thorough review. But those open

questions about a history-and-tradition analysis strike this court as further reasons why *Enforcement Priorities* is not best read as giving district courts license to reexamine standing precedent across the board. Those doctrinal questions are instead for appellate courts to resolve in any appropriate reexamination of standing precedent. *See, e.g.*, *State Oil Co. v. Khan*, 522 U.S. 3, 20 (1997) ("[I]t is this Court's prerogative alone to overrule one of its precedents."). This court's role is merely to apply and find the facts called for by that precedent.

### c.   Costs from change in residents' legal status

Texas's first standing theory alleges costs incurred on account of aliens who would reside in Texas either with or without the Rule, but whose new legal status—a grant of parole under the Rule—would occasion new costs borne by Texas. Doc. 1 at 14–15.

Those alleged costs are not population-change costs, so they are not subject to defendants' objection that the Rule's effect on Texas's population count is not factually predictable or legally cognizable. Rather, the costs asserted in this theory are costs triggered by the legal status granted under the KFT Rule to aliens who would stay in Texas, albeit unlawfully, without the Rule.

As the mirror image of the subset of Rule beneficiaries who would otherwise voluntarily emigrate (addressed in the second standing theory), this subset of aliens who would not voluntarily emigrate represents the large majority of Rule beneficiaries. Plaintiffs agreed at trial, and the Rule itself so states: "In the baseline, the vast majority of this population would remain in the country [without lawful presence]." 89 Fed. Reg. at 67,486. So the court addresses this standing theory first.

The parties further agreed at trial that a significant percentage of Rule beneficiaries live in Texas. The court does not need to put an exact number on that percentage, as even "a dollar or two" of fairly predictable costs as a result of agency action show standing. *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 289 (2008). But the court does take judicial notice of the federal government's own prior estimate that, even by 2000, Texas had 14.9%

of the unauthorized immigrants in the United States.[22] And the court also takes judicial notice of DHS's 2023 Yearbook of Immigration Statistics, which gives Texas's percentage of aliens obtaining LPR status over each of the past five years as over 10%.[23] So the court can readily find that Texas's percentage of KFT Rule beneficiaries is at least 10%.

The court also accepts DHS's estimate that the Rule "will benefit an estimated 500,000 noncitizen spouses and 50,000 noncitizen stepchildren." 89 Fed. Reg. at 67,466. The actual number may well be higher, but finding a precise number is again not required. Multiplying those figures, the court finds a minimum of 50,000 spousal beneficiaries and 5,000 stepchild beneficiaries in Texas, far from a de minimis amount. Without parole, the "vast majority" of those aliens would remain present (as the Rule states) and lack eligibility for the benefits discussed below. That is the baseline for a but-for comparison of Texas's costs due to the Rule.

Texas complains that the impending change in those aliens' immigration status, allegedly in violation of law, will cause Texas additional costs that it cannot recover from the federal government. Doc. 1 at 13–15. Specifically, Texas cites four state-run benefits programs as turning on lawful immigration status: SNAP, TANF, Medicaid, and CHIP. *Id.*; Doc. 79 at 43. The court need address only the first to find standing on this theory.

*SNAP costs.* The Supplemental Nutritional Assistance Program (SNAP) is a joint federal–state program that provides qualifying low-income individuals with monetary benefits to improve their nutrition. 7 U.S.C. § 2011. The federal government provides complete funding to States for the value of all benefits but

---

[22] Office of Policy and Planning, U.S. Immigration & Naturalization Service, *Estimates of the Unauthorized Immigrant Population Residing in the United States: 1990 to 2000*, at 8 tbl. A, https://www.dhs.gov/xlibrary/assets/ statistics/publications/Ill_Report_1211.pdf. Although not admitted, the court observes that the Leighton Ku declaration offered by amicus curiae CHIRLA relies on a similar estimate, by the Migration Policy Institute, that 15.7% of unauthorized immigrants in the country live in Texas. Doc. 96-1 at 7–8.

[23] Tbl. 4, *available at* https://ohss.dhs.gov/topics/immigration/yearbook-immigration-statistics/yearbook-2023.

reimburses the States for only 50% of administrative costs. *Id.* § 2025(a). The States bear the other 50% of administrative costs. *Id.* Administrative costs include those of judging eligibility, issuing benefits, and reviewing reports. 7 C.F.R. §§ 273.10, 273.12, 274.2.

SNAP eligibility is governed by the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. No. 104-193, tit. IV, 110 Stat. 2105, 2260–77 (1996), which was enacted to restrict aliens' access to public benefits. 8 U.S.C. § 1601(2) (stating immigration policy). That Act classifies aliens into two general categories: "qualified aliens" and "non-qualified aliens." *Id.* § 1641. Qualified aliens include aliens lawfully admitted for permanent residence and aliens paroled under INA § 212(d)(5) for a period of at least one year. *Id.* § 1641(b).

Non-qualified aliens are, with some exceptions not relevant here, ineligible for specified benefits. *See id.* § 1611(a), (b). Qualified aliens can be eligible for specified benefits, including SNAP. Generally, if qualified aliens entered the country after August 22, 1996, they must be in qualified status for five years to be eligible for SNAP benefits, although exceptions exist. *Id.* § 1613(a); *accord* 89 Fed. Reg. at 67,478 (so noting); 7 C.F.R. § 273.4(a)(6)(iii) (general rule that qualified aliens "must be in a qualified status for 5 years before being eligible to receive SNAP benefits"). The KFT Rule provides for a "three-year grant" of INA § 212(d)(5) parole, 89 Fed. Reg. at 67,476, making recipients "qualified aliens."

KFT Rule beneficiaries who entered the country after August 22, 1996, would thus generally become SNAP eligible five years after receiving parole. It is fairly predictable and substantially likely that SNAP benefits will be utilized among that group, as many will have incomes leading to SNAP enrollment even after work authorization (as with Americans generally).[24]

---

[24] The Rule argues that, upon receipt of work authorization, beneficiaries "may no longer need or qualify for" SNAP benefits. 89 Fed. Reg. at 67,478; *see* Doc. 77 at 26 (same argument). That is indeed possible as to some beneficiaries, but SNAP will still be utilized among the group. If work authorization negated the financial need for SNAP, no American would need the program.

Because parole under the KFT Rule lasts three years, whereas most SNAP benefits are delayed for five years, defendants argue that increased SNAP-administration costs are not cognizable. Doc. 77 at 25–26, 50. Yet the Rule itself credibly predicts that its beneficiaries will (as the Rule intends) use that "time to obtain adjustment of status" to LPR. 89 Fed. Reg. at 67,476. The court agrees and finds that Rule beneficiaries are substantially likely to do so. And LPR status is a "long-term" status, *id.* at 67,466, that keeps one a "qualified alien." The question presented is thus whether standing law considers fairly predictable, substantially likely additional costs to Texas in five years due to the Rule.

Defendants cite *Lujan*, Doc. 77 at 26, but *Lujan* does not establish a temporal limit on when an injury must accrue. It concerned "some day" intentions without any idea "*when* the some day will be," 504 U.S. at 564, not a ticking clock for known costs. *Lujan* would indeed defeat state standing based on possible costs of a single grant of parole to a single alien, just as it would defeat a state challenge to the failure to regulate a single car's greenhouse-gas emissions. But consequences not predictable at the granular level can become sufficiently predictable when agency action is far-reaching. *See Massachusetts*, 549 U.S. at 523–25.

The increased cost to Texas of administering SNAP for these additional beneficiaries is substantially likely and impending after five years, far shorter than the century-long time horizon for the loss of coastline in *Massachusetts v. EPA*. And substantially likely harms are generally cognizable despite a delayed onset. The Supreme Court in *Department of Commerce v. U.S. House of Representatives* thus found standing based on the substantial likelihood of harm in elections that would occur years after that case began. 525 U.S. at 333–34. Nor must substantially likely harm be actualized. The Supreme Court in *Davis v. FEC* thus found standing because a third party was sufficiently incentivized to take advantage of a conditional benefit once it became available in the future. 554 U.S. at 734 (holding that a substantially likely injury "need not be

actualized" to satisfy Article III). So this time-delayed increase in state costs due to the Rule supports standing.

In any event, "qualified aliens" who are minors are eligible for SNAP immediately. 7 C.F.R. § 273.4(a)(6)(ii)(J). The court finds that a great majority of alien stepchildren granted parole under the KFT Rule will be minors. *See* 89 Fed. Reg. at 67,470 (no minimum age requirement and maximum age requirement of age 21 as of June 17, 2024). Upon receiving KFT Rule parole, those minors' eligibility for SNAP will immediately occasion at least some additional administration costs for Texas.

Defendants lastly argue that, to the extent that Texas has costs of administering public benefits to paroled aliens, they are attributable to the State's own choices concerning eligibility for participation in those programs. Doc. 77 at 26 (citing *Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) (per curiam)). But the Fifth Circuit has repeatedly rejected that argument in this context based on more recent Supreme Court decisions, holding that being put to a "Hobson's choice" of spending more money or changing state policy to exclude lawfully present aliens does not make an injury "self-inflicted." *DAPA Case*, 809 F.3d at 157–59 & n.63, 163; *accord MPP Case II*, 20 F.4th at 972.

Regardless, defendants do not show that Texas could legally change SNAP eligibility to exclude aliens granted parole under the KFT Rule (or any other parolees). Federal law does allow a state to exclude some "qualified aliens" from designated federal programs. 8 U.S.C. § 1612(b)(1). But SNAP is not such a program. *Id.* § 1612(b)(3). The SNAP regulations thus provide: "The State agency must base SNAP eligibility solely on the criteria contained in the Act and this part." 7 C.F.R. § 273.2(a)(1).

*Other public benefits.* Plaintiffs point to three other public-benefits programs as likewise made available by a grant of parole under the KFT Rule: Temporary Assistance to Needy Families, 42 U.S.C. § 601 *et seq.*, Medicaid, 42 U.S.C. § 1396a *et seq.*, and the State Children's Health Insurance Program, 42 U.S.C. § 1397aa *et seq.* Those programs are aimed at similar populations and are also

subject to PWRORA (as distinguished from Emergency Medicaid and CHIP Perinate, which are not limited to qualified aliens and are part of Texas's second standing theory). Given the court's finding that the KFT Rule's substantially likely effect on Texas's SNAP-administration costs supports this first standing theory, the court need not address those similar programs.

### d. Costs from decreased voluntary emigration

Texas also complains of costs incurred on account of the presence of Texas-resident aliens who, but for parole in place under the KFT Rule, would depart the country and remain abroad—the baseline for a but-for comparison of Texas's costs in this category. Although this subset of Rule beneficiaries is much smaller, Texas has shown that they exist and that their continued presence due to the Rule would impose at least some costs on Texas. In analyzing this second theory, the court addresses only voluntary emigration based on the departure incentives created by Congress's enactments. The court does not rely on any population change from current removal proceedings that would be forestalled by parole.

First, it is substantially likely that a small minority of Rule beneficiaries would voluntarily depart and remain abroad, without parole in place, to seek consular processing of an immigrant visa or to work lawfully abroad. The best proof of that is the agency's own pronouncements. *NRDC*, 894 F.3d at 104 (crediting "the agency's own pronouncements"); Fed. R. Evid. 801(d)(2).

The KFT Rule claims that its parole-in-place process "*will promote* family unity *by enabling* U.S. citizen spouses and children *to remain* with their noncitizen family members" in this country. 89 Fed. Reg. at 67,462 (emphases added). The agency's reasons for that finding are persuasive. At least some unlawfully present aliens would leave the country and thus their families here to obtain LPR status via the only process available to them without parole in place: departing and waiting abroad for an embassy or consulate to issue an immigrant visa. *Id.* at 67,460 & n.10 (explaining that illegal entrants "must therefore depart the United States and seek an immigrant visa at a U.S. embassy or consulate abroad,"

including by remaining abroad for the applicable waiting period based on the duration of their unlawful presence here). And, to obtain LPR status without parole in place, the large majority of aliens eligible for KFT Rule parole would be required to wait for 10 years, based on having a year of more of unlawful presence here.[25]

The Rule thus predicts that parole in place "*will promote* family unity *by allowing* certain noncitizens who have long lived in the United States to apply for permanent residence, if otherwise eligible, in the United States *without separating* them from their U.S. citizen spouses." *Id.* at 67,465 (emphases added). If departures causing family separation were not substantially likely as to at least some Rule-eligible aliens, the agency would not have claimed that the Rule would prevent that separation.

That prediction was not peripheral to the agency's action. It was DHS's very reason for regulating, as reflected in the Rule's title. The agency expressly acted in furtherance of the President's directive "*to preserve the unity* of U.S. citizens and their noncitizen

---

[25] All illegal entrants eligible for KFT Rule parole as spouses of U.S. citizens must have been physically present in this country for 10 years or more, placing them well beyond the one year of unlawful presence that triggers the 8 U.S.C. § 1182(a)(9) waiting period of 10 years. That is over 90% of Rule-eligible aliens (500,000 of 550,000). The other class of Rule-eligible aliens are stepchildren of U.S. citizens, who must have been present in this country unlawfully since June 17, 2024. Although some such aliens may have begun their unlawful presence within a year of a future grant of KFT Rule parole, there is no logical reason why the illegal entries of stepchildren would have grouped specifically around early 2024, leading to the common-sense inference that most Rule-eligible stepchildren aliens would be unlawfully present for a year or more as of the grant of any KFT Rule parole, making them also subject to an otherwise applicable 10-year waiting period without such parole.

As DHS notes, a small percentage of those departures would be only for a short time because some aliens qualify for the extreme-hardship waiver to the § 1182(a)(9) waiting period. *Id.* at 67,460 n.11. But, as DHS essentially admits, the percentage of self-departures of that negligible duration would be quite small due to both waiver-processing limits, *see id.* (so conceding), and the limited scope of the extreme-hardship waiver under § 1182(a)(9)'s bar. Likewise, only a small subset of Rule-eligible stepchildren would have less than six months of unlawful presence, such that they need to depart only to clear the § 1182(a)(6) illegal-entry bar, as opposed to satisfying a § 1182(a)(9) waiting period based on the duration of unlawful presence.

spouses and noncitizen stepchildren who currently cannot access LPR status *without first departing* the United States." *Id.* at 67,460 (emphases added). That prediction comports with the importance to aliens of obtaining LPR status, even after a lengthy period of unlawful presence. It also comports with the economic motivation to work lawfully abroad to better provide for expanding families here or families moved abroad, for aliens who cannot work lawfully in this country. 89 Fed. Reg. at 67,466 ("[T]his process will provide these noncitizens the ability to work lawfully, which will . . . provide stable, consistent support to their U.S. citizen family members . . . ."). So the agency's own pronouncements support the finding that at least some aliens who meet the Rule's criteria would, absent the ability to receive parole in place under the Rule, depart the country and remain abroad for a lengthy period.

Defendants' suggestion that some aliens might obtain parole in place through other processes, even if the KFT Rule were vacated, is unavailing. Legally, the Fifth Circuit has rejected the notion that a plaintiff State's otherwise concrete injury is made "conjectural" or "hypothetical" by the possibility that the harm might be imposed in another way. *MPP Case II*, 20 F.4th at 971 (rejecting that argument, even though "[t]here would always remain some possibility that any given parolee would have been paroled even" without the challenged action) (emphasis omitted). And, factually, because DHS was aware of that possibility, it does not undercut the persuasive force of DHS's own finding that the Rule itself "will promote" family unity "by allowing" aliens to remain with their family in this country. 89 Fed. Reg. at 67,465.[26]

---

[26] The court need not rely on plaintiff's tendered Exhibit F, the declaration of State Demographer Lloyd Potter. He simply reiterates points ascertainable from the Rule itself, such as that unauthorized immigrants with stronger ties here are less likely than others to voluntarily emigrate, although some would still do so. The Rule itself claims only that the "vast majority" of Rule beneficiaries would stay in the country without KFT parole, 89 Fed. Reg. at 67,486, leaving at least a small minority who would not, as the Rule elsewhere predicts, *id.* at 67,461–62 (stating that KFT parole "will provide" the significant public benefit of "enabling U.S. citizen spouses and children to remain with their noncitizen family members").

Second, Texas has further shown that it will incur concrete harm on account of increased costs of providing educational and healthcare services to that additional alien population.

*Educational services.* The KFT Rule covers stepchildren of a citizen if they were under the age of 21 as of June 17, 2024, they were continuously present in the country since that date, and their parent married a U.S. citizen while the stepchildren were minors. 89 Fed. Reg. at 67,469–70. The Rule has no minimum-age requirement for stepchildren beneficiaries other than being present in the country since June 17, 2024, and having a parent old enough to marry a U.S. citizen by then. The court thus infers that much of this population is of public-school age. The court also infers that most of those children would pursue a publicly funded education, which States are constitutionally required to provide. *Plyler v. Doe*, 457 U.S. 202 (1982). Plaintiffs have thus shown that at least some alien stepchildren in Texas would, as a substantially likely result of the Rule, be in Texas and receive a state-funded education that they would not be present to receive without the Rule. And the court credits the declaration of Amy Copeland as proving that the average funding entitlement from Texas state and local sources for 2024 is $10,107 per student per year of attendance. Pls.' Exh. C at 1.[27]

*Healthcare services.* Some of the small minority of illegal entrants who would have left Texas without the Rule will also, while remaining here due to KFT parole, use state-funded healthcare services or benefits. *Cf. MPP Case II*, 20 F.4th at 972 ("[A]t least some [additional] immigrants will certainly seek healthcare

---

[27] Defendants argue that Copeland's testimony is not credible because her earlier declaration put the yearly cost at $10,836 per student per year (a slightly higher amount). Doc. 99 at 7–8 n.3. Of course, if the court credits that higher amount—which defendants themselves say is "supported by" the discovery in the case—Texas's educational costs only go up. And the small discrepancy has no effect on Copeland's credibility both because (1) it is entirely immaterial given that plaintiffs are not seeking damages, but simply to show *some* monetary cost, and (2) the reason for the change is evident in Copeland's testimony that her figures are "estimates" corresponding to "projections" that are "adjusted as actual data becomes available" and, thus, obviously change as the months go by. Pls.' Exh. C at 3.

services from the State."). The court credits the testimony of Susan Bricker, who identifies four categories of Texas-funded healthcare provided to unlawfully present aliens: (1) Texas Emergency Medicaid; (2) Texas Family Violence Program; (3) CHIP Perinatal Coverage; and (4) uncompensated medical care from Texas public hospitals. Pls.' Exh. D at 3. Bricker establishes that those programs and services are provided across the population of unlawfully present aliens, *id.* at 2–5, which includes aliens eligible for KFT Rule parole. *Cf. DACA Case*, 50 F.4th at 517 ("Federal law requires the State to provide emergency Medicaid to noncitizens and public education to all children, regardless of their immigration status.").

Because those healthcare programs and services are not dependent on immigration status, the total costs to Texas of providing them will be higher with more aliens in Texas (i.e., with aliens having received KFT Rule parole) than with fewer such aliens in Texas (i.e., with some aliens departing without KFT Rule parole). Because the alien population in Texas will be at least somewhat larger with the Rule than in a but-for world without the Rule, the Rule will predictably cause an increase in Texas's costs for those healthcare programs and services.[28]

---

[28] Amicus curiae CHIRLA tenders a declaration that treats KFT Rule beneficiaries as a monolithic whole and asserts, as a binary matter, that "they" would not leave the country without KFT Rule relief. Doc. 96-1 at 6. That reasoning is not persuasive, as explained above. If no KFT Rule beneficiaries would otherwise leave their family in this country, the Rule could not claim to be keeping families together. The declaration's assertion that Texas has not provided "any evidence that these financial costs would be lessened if the KFT process did not exist" rests on that unpersuasive assertion of no voluntary emigration. *Id.*

The declaration then invokes the possibility that some KFT Rule beneficiaries would obtain employer-provided health insurance or would be eligible for federal credits that lower Texas's costs. But the declaration does not account for the but-for world in which, without the Rule, some Rule-eligible aliens do not remain in Texas at all. Nor does the declaration explain the basis for its assumption that Rule beneficiaries with work authorization would no longer be eligible for any of the four healthcare programs or services cited by Bricker. The work authorization attendant to KFT Rule parole does not guarantee a particular income, as to exclude all KFT Rule beneficiaries from the ambit of those programs and services. *See id.* at 7.

*Law-enforcement costs.* Texas also argues that it will suffer an increase in law-enforcement costs from incarcerating unlawfully present aliens who commit crimes. Although the Fifth Circuit has approved standing based on Texas's costs of providing certain benefits and services to an increased alien population, *MPP Case II*, 20 F.4th at 972–73, it has not approved of standing based on the possible commission of crime by aliens. And other courts have rejected an increased-crime standing theory. *See, e.g.*, *Arpaio v. Obama*, 797 F.3d 11, 22 (D.C. Cir. 2015) ("crime is notoriously difficult to predict"). Costs of that nature are not necessary to this second standing theory and are not considered.

### e.  Costs from future immigration

Texas's third and final standing theory is that, regardless of costs related to any Rule-eligible alien, the Rule's implementation sends a message that encourages immigration by aliens who are currently abroad, which creates future costs to Texas. "Certainly, access to governmental social services and integration into the community rather than detention may encourage immigration." *Texas v. Garland*, 719 F. Supp. 3d 521, 564 (N.D. Tex. 2024), *appeal pending*, No. 24-10386 (5th Cir.). But courts have rejected standing on the basis that agency action sends a "broader message [that] might incentivize immigration into Texas and its attendant costs." *Id.*

The court sees no need to consider this standing theory given that Texas's first and second standing theories cover each class of alien eligible for relief under the Rule, which is all that the court can set aside, enjoin enforcement of, or declare rights as to here. Standing requires redressability, and the court cannot set aside or enjoin possible broader messages telegraphed by agency action.

### 3.  Statutory jurisdiction

Statutory subject-matter jurisdiction is conferred by 28 U.S.C. § 1331 because this is a civil action arising under the Constitution and laws of the United States. Statutory jurisdiction is also conferred by 28 U.S.C. § 1346(a)(2) because this is a civil action

arising under the Constitution and laws of the United States and seeking nonmonetary relief.

Defendants suggest that statutory jurisdiction to hear this case is stripped by clause (ii) of 8 U.S.C. § 1252(a)(2)(B). That subparagraph (B) states that "no court shall have jurisdiction to review —(i) any judgment regarding the granting of relief under section 1182(h), 1182(i), 1229b, 1229c, or 1255 of this title, or (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title."

Defendants' argument founders on the distinction between the discretionary grant or denial of an alien's request for parole into the country, *see* 8 U.S.C. § 1182(d)(5), and rulemaking binding the agency's own staff regarding the scope of their authority, *see* 6 U.S.C. § 202(4). One decision acts on aliens, granting or denying immigration relief. The other acts on agency officials, cabining or delimiting their authority.

That distinction controls under 8 U.S.C. § 1252. The Fifth Circuit holds that § 1252 does not bar judicial review of entire programs for granting immigration relief. *MPP Case II*, 20 F.4th at 977 (rejecting the defendants' argument that "an *entire program*—operating across an international border and affecting thousands or millions of people and dollars—is rendered unreviewable by § 1252(a)(2)(B)(ii)"). Rather, "the entirety of the text and structure of § 1252 indicates that it operates only on denials of relief for individual aliens." *Id*. Other courts agree. *E.g.*, *Roe v. Mayorkas*, No. 22-cv-10808, 2023 WL 3466327, at *8–9 (D. Mass. May 12, 2023) (holding that § 1252(a)(2)(B)(ii) bars review of "individual parole determination[s]" but does not bar review of the agency's own "changes in policy"). That holding applies here.

### B.  Merits of plaintiffs' claims

The court now turns to its conclusions on the merits of plaintiffs' claims for relief.

### 1. Parole "into the United States"

Plaintiffs claim that the Rule is not in accordance with law and exceeds the agency's statutory authority because INA § 212(d)(5) allows only for paroling aliens "into the United States," not granting parole in place to aliens who are already here. Doc. 1 at 39; *see* 8 U.S.C. § 1182(d)(5)(A). Similarly, plaintiffs claim that the Rule is not in accordance with law and exceeds the agency's statutory authority because INA § 245(a) does not allow adjustment to LPR status unless an alien was "admitted or paroled into the United States," as opposed to being paroled in place. Doc. 1 at 39; *see* 8 U.S.C. § 1255(a). The court agrees that the KFT Rule is "not in accordance with law" and is "in excess of statutory . . . authority" for those reasons. 5 U.S.C. § 706(2)(A), (C).

Both § 212(d)(5) and § 245(a) of the INA speak of parole "into the United States," not parole "in place." As shown by statutory text, structure, history, and purpose, that limiting phrase refers to a legal *entry* into this country. Other laws may, of course, specially deem such an entry to have occurred. *See, e.g.*, 8 U.S.C. § 1255(g), (h)(1); NDAA 2020 § 1758. But INA § 212(d)(5) does not itself do so or authorize that fiction.

*Text.* It is a "basic canon of statutory construction that identical terms within an Act bear the same meaning." *Lexon Ins. Co. v. FDIC*, 7 F.4th 315, 324 (5th Cir. 2021) (quoting *Est. of Cowart v. Nicklos Drilling Co.*, 505 U.S. 469, 479 (1992)). If Congress used "paroled into the United States" in INA § 245(a) to mean a physical entry into the United States, then the nearly identical phrase "parole into the United States" in INA § 212(d)(5) must mean the same thing. Defendants themselves agreed at trial.

And the Supreme Court has already held that INA § 245(a)'s "inspected and admitted or paroled into the United States" requirement is a "legal-entry requirement." *Sanchez*, 593 U.S. at 415; *see id.* at 418 (denying INA § 245(a) adjustment to an alien who had a form of immigration relief but had entered the country unlawfully). Secretary Mayorkas—a party to this case as well— explained in *Sanchez* that INA § 245(a)'s phrase "inspected and

admitted or paroled into the United States" applies only to aliens "who entered the United States lawfully." Resp. Br. 2, *id.*; *accord* S. Rep. No. 86-1651 at 17 (so stating in amending § 245(a)); *see supra* p. 7.

The Secretary correctly observed that interpreting "admitted" in "inspected and admitted or paroled into the United States" as an entry requirement "fits naturally in Section 1255(a), in particular, which provides that the admission must follow an 'inspection' and be made 'into the United States,' 8 U.S.C. 1255(a)—a prepositional phrase 'expressing motion from without to a point within.'" Resp. Br. 16, *Sanchez*, 593 U.S. 409 (quoting 8 *The Oxford English Dictionary* 9 (2d ed. 1989)).

That perfectly describes how to interpret "paroled into the United States" in INA § 245(a). Likewise, the term "into the United States" in the parole statute also occurs in a provision assuming that an alien has been inspected for admission. 8 U.S.C. § 1182(d)(5)(A) (stating that the alien shall be returned to "the custody" from which he was paroled); *id.* § 1225(a)(3), (b)(2) (inspection and detention mandates for applicants for admission).

The court also agrees that "into the United States" is a prepositional phrase with the ordinary, natural meaning of a physical movement from a point outside the United States to a point within the United States. *See Sanchez*, 593 U.S. at 415 ("entry requirement"); *Taveras v. Att'y Gen.*, 731 F.3d 281, 290–91 (3d Cir. 2013) (holding that "into the United States" in 8 U.S.C. § 1101 means "physically crossing a border," not "figuratively entering the United States" by receiving a new legal status). That meaning applies to the same prepositional phrase as it occurs in both § 245(a) and § 212(d)(5) of the INA. In short, the Secretary's interpretation of "into the United States" three years ago remains as persuasive today. And it undermines defendants' argument that their reading here should be given greater weight as longstanding. *Cf.* Doc. 77 at 33.

*Structure.* That ordinary reading of § 245(a) and § 212(d)(5) of the INA is confirmed by the broader structure of the INA. As the

government explained in *Sanchez*, the INA creates a distinction between a lawful *entry* into the United States and lawful *status* in the United States. The INA's term for "permission to be present in the United States" is "lawful status." Resp. Br. 16, *Sanchez*, 593 U.S. 409 ("'[L]awful status,' by contrast, is not a historical event but rather a legal condition held by the noncitizen."). In other words, parole "into the United States" is an event (an authorized entry into the country), not merely a lawful status.

That conclusion also makes sense of the way that parole is treated in the pre-departure and post-departure admissibility bars of 8 U.S.C. § 1182(a)(6) and (a)(9). Because they impose immigration consequences for an illegal entry, each defines its consequences to exclude paroled aliens (during the term of parole). *See supra* pp. 10–13. That makes sense if parole into the United States is a lawful type of entry. *See* 6 U.S.C. § 202(4) (citing parole as among the "forms of permission . . . to enter the United States"). The contrary view—that parole into the United States is a status that can be granted to aliens who are already here illegally—would create disharmony between those provisions' scope and their effect. And disharmony in interpretation must be avoided. *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) ("A court must therefore interpret the statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into [a] harmonious whole.") (citations and quotation marks omitted).

In addition, the existence of statutory exceptions to INA § 245(a)'s requirement that an alien be "inspected and admitted or paroled into the United States" shows that Congress knows how, when it so intends, to lift the lawful-entry requirement. For example, in subsections (g) and (h) of INA § 245, 8 U.S.C. § 1255(g), (h)(1), Congress provided that "special immigrant[s] described in section 1101(a)(27)(K)" of title 8, based on honorable military service, and "special immigrant" juveniles described in section 1101(a)(27)(J) of title 8, "shall be deemed, for purposes of subsection (a), to have been paroled into the United States." Similarly, NDAA 2020 expressly describes "parole in place" and

can colorably be read as implicitly authorizing that special relief for the limited class defined there. *See supra* pp. 21–23.

Congress thus knows how to deem satisfied or lift the "into the United States" limitation on the INA § 212(d)(5) parole authority when Congress wants to allow broader relief. That confirms that this limitation means what it says in § 212(d)(5) itself. *Cf. INS v. Cardoza-Fonseca*, 480 U.S. 421, 432 (1987) ("Congress chose to maintain the old standard in § 243(h), but to incorporate a different standard in § 208(a). Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation and alteration marks omitted).

Lastly, the two types of parole under immigration law differ because only one of them is a type of legal entry. INA § 212(d)(5) "parole into the United States" satisfies the legal-entry requirement to adjust to LPR status under INA § 245(a) because it is a release with authorization to enter the country. In contrast, INA § 242(a) "conditional parole" is a release from custody pending any removal proceeding, and thus applies even to aliens detained after illegally entering the country. 8 U.S.C. § 1226(a). Defendants' reading would blur the distinction between the two. If parole other than a lawful entry could satisfy INA § 245(a)'s lawful-entry requirement (absent a special provision deeming or directing that result), then INA § 242(a) parole from custody would also seem to satisfy that requirement

*History and purpose.* The court's reading is consistent with what Secretary Mayorkas previously recognized as "the almost-70-year-old INA requirement that generally only noncitizens who *came here lawfully* may become permanent residents." Resp. Br. 25, *Sanchez*, 593 U.S. 409 (emphasis added). As the court notes above, Congress has long directed that the Executive Branch shall inspect every alien seeking to enter the country and detain those not clearly entitled to be admitted, while allowing that the Executive Branch may parole an alien into the United States

temporarily, for limited reasons, to be returned to custody when the purposes of that parole end. *See supra* Part I.A.1.

Defendants' position depends entirely on IIRIRA's amendments. IIRIRA did expand the definition of "applicant for admission" to include illegal entrants. But IIRIRA did not amend INA § 212(d)(5) to remove the "into the United States" limitation on the parole authority granted there. Nor did IIRIRA amend INA § 245(a) to remove that same limitation on what types of entry allow access to that provision's adjustment-to-LPR process. So text alone defeats defendants' argument.

But history and purpose confirm that defendants' view stretches legal interpretation past its breaking point. *See generally TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, 581 U.S. 258, 263 (2017) ("The history of the relevant statutes provides important context for the issue in this case."). Parole "into the United States" was always understood, until IIRIRA, as excluding illegal entrants. Even defendants' cited authority agrees. *Ortega-Cervantes v. Gonzales*, 501 F.3d 1111, 1117 (9th Cir. 2007) (Fletcher, J.) ("Parole *into* the United States meant just that.").

And the purpose of IIRIRA's expansion of "applicants for admission" was to *deny* aliens additional benefits on account of an illegal entry. *See Ortega-Lopez*, 978 F.3d at 682 ("Congress intended to eliminate [this] anomaly . . . ."); *see also Cruz-Miguel*, 650 F.3d at 200 (noting "the context of the larger statutory scheme" of IIRIRA). What is more, IIRIRA added the admissibility waiting periods in 8 U.S.C. § 1182(a)(9), which have only limited exceptions and deliberately run from an unlawfully present alien's *departure* from the country. So it would be quite the leap to conclude that IIRIRA's amendment of a definition of a different term in a separate section of the INA, for the purpose of penalizing illegal border-crossings, implicitly changed the longstanding, natural, and otherwise internally consistent meaning of "into the United States" in INA §§ 212(d)(5) and 245(a). Yet that is what defendants argue.

Interpretive canons do not stretch that far. When Congress intends to implicitly change the settled meaning of a term in one statutory section by amending a separate term's definition in a separate section, "it ordinarily provides a relatively clear indication of its intent in the text of the amended provision." *TC Heartland*, 581 U.S. at 268. Thus, "the modification by implication of the settled construction of an earlier and different section is not favored." *United States v. Madigan*, 300 U.S. 500, 506 (1937).

Defendants fail to explain why Congress would have utilized their chain of inferences to reach their preferred reading by changing the definition of "applicants for admission," instead of several obvious alternatives such as adding "or parole in place" (as Congress did in NDAA 2020). Secretary Mayorkas himself, in discussing pre- and post-IIRIRA law in *Sanchez*, saw no reason why Congress would create a new pathway to lawful permanent residence for aliens who enter the country without inspection. Resp. Br. 35, *Sanchez*, 593 U.S. 409 ("Then, as now, someone who had entered the United States without inspection would not be considered 'an alien who was inspected and admitted or paroled into the United States.'"). Neither does this court.

To be sure, the courts in *Ortega-Cervantes* and *Cruz-Miguel* may have "see[n] nothing that would preclude the government" from treating unlawfully present aliens as capable of being paroled under INA § 212(d)(5). *Ortega-Cervantes*, 501 F.3d at 1116; *see Cruz-Miguel*, 650 F.3d at 198. But the court finds that dictum unpersuasive, as it did not address the principles discussed above.

Defendants also cite their past practice of granting parole in place under INA § 212(d)(5), pursuant to the 1998 INS Counsel memorandum. But the court has already explained that memorandum's interpretive shortcomings. It did not give force to the prepositional phrase "into the United States." It wrongly assumed that every release from custody pending immigration proceedings is a parole "into the United States," which would contravene the holdings of even *Ortega-Cervantes* and *Cruz-Miguel* that INA § 242(a) parole is not parole "into the United States." And it did

not consider the interpretive canons cited above or why IIRIRA would have chosen such an obscure way to create such a gaping exception to the deterrence that IIRIRA was otherwise creating.

Lastly, amici curiae emphasize the perceived policy benefits of a power to parole aliens "in place" under INA § 212(d)(5). Doc. 98 at 27–34 (economic benefits); Doc. 96 at 32–34 (relieving hardship); Doc. 95 at 10–14 (job opportunities; tax revenues); Doc. 91 at 13–21 (dangers of consular processing). But just because one wishes that a provision does more than it says, a court "does not get to say that the something it does it not enough." *Sanchez*, 593 U.S. at 418. Although "providing relief to aliens with strong ties to the United States" and "promoting family unity" are some of the INA's goals, "they are not the INA's only goals, and Congress did not pursue them to the *n*th degree." *Holder v. Martinez Gutierrez*, 566 U.S. 583, 594 (2012).

## 2.   "Case-by-case" for "significant public benefit"

Plaintiffs also claim that the KFT Rule is unlawful because it designates the unity of illegal entrants with their families here as a "significant public benefit" achieved by allowing parole in place under INA § 212(d)(5) and the consequent adjustment to LPR status. Doc. 1 at 37–38. Plaintiffs argue that, although family unity is significant to aliens and their families, the law requires a benefit to the "public" at large that is "significant" given the "case-by-case" details of a given alien's situation. Doc. 79 at 15–23.

The text and history of the statute do indicate a distinction between (1) private benefits to aliens that may, collectively, be in the public interest, and (2) significant benefits to the public, directly, from a specific alien's parole into the United States.[29] An

---

[29] Before IIRIRA, INA § 212(d)(5) spoke of parole "in the public interest," which could more readily refer to family unity. *See supra* p. 4 (pre-IIRIRA law); *see* 8 U.S.C. § 1254a(c)(2)(A) (allowing waiver of certain provisions for humanitarian purposes, "to assure family unity, or when it is otherwise in the public interest"). But IIRIRA expressly limited the scope of that provision by requiring a "significant public benefit" or urgent humanitarian reason on a "case-by-case basis," with the term of parole expiring when that benefit or humanitarian reason ends. *See supra* p. 16.

analogous distinction exists between states suing *parens patriae* to vindicate private citizens' rights (a suit that may be in the public interest but is hard to justify) and suing to vindicate public rights themselves (a traditional state power). *See supra* pp. 47–48.

That distinction is reinforced by the merits of the first claim. If parole *into* the United States means just that—an authorized movement into the country—then the requisite "urgent humanitarian reasons or significant public benefit" must arise from aliens becoming physically present in the country (e.g., to obtain medical care, visit a dying relative, or testify or be prosecuted in a criminal case), rather than simply from obtaining a new and lawful immigration status. 8 U.S.C. § 1182(d)(5)(A).

The KFT Rule thus has an invalid focus. Even if family unity is a "significant public benefit," as defendants argue, it is not a benefit created by parole "in place" because aliens granted that relief are already present here. Because the significant public benefit must come from an alien's *movement into* the country, as opposed to merely from changing a present alien's legal status, the Rule's claim of public benefits here is misdirected. LPR eligibility, work authorization, satisfying other countries' desire for legalization, reduced government resources spent on consular processing of immigrant visas, and parolees' increased comfort in encountering police all come from aliens' change in *legal status*, not simply from aliens' presence in the country.

On the other hand, if defendants were right that parole "into the United States" is a mere euphemism for a transition in legal status, from unlawful to lawful, then presumably the requisite "urgent humanitarian reasons or significant public benefit" could also arise merely from that change in legal status. So it is perhaps understandable that the Rule justifies its grant of parole in place on those grounds. *E.g.*, 89 Fed. Reg. at 67,475 (acting because parole "remove[s] a barrier to an immigration benefit"); *id.* at 67,476 (setting the parole term as three years to allow enough time to complete other immigration process available with new legal

status). But that does not carry the day because the legal assumption underlying that justification is erroneous.[30]

As the court has rejected the Rule's reading of parole "into the United States," it also concludes that the Rule focuses on the wrong thing in identifying "significant public benefits"— the benefits of aliens' new legal status, rather than their presence in this country. The Rule exceeds statutory authority and is not in accordance with law for this reason as well.

### 3.  "Temporary" parole

Plaintiffs next claim that the KFT Rule exceeds statutory authority because the statute allows an alien's parole into the United States only "temporarily," until "the purposes of such parole shall . . . have been served." 8 U.S.C. § 1182(d)(5)(A). The gravamen of this claim, however, is that the statute does not allow paroling aliens for the purpose of removing a barrier to *permanent* resident status. Doc. 1 at 40 (complaining that the Rule's "explicitly stated intent" is allowing beneficiaries to remain permanently in the United States). That essentially repeats the claim for relief just discussed, so the court does not see the need to resolve this claim separately.

### 4.  Circumvention / Take Care Clause / capricious

Plaintiffs also allege that the Rule (1) exceeds statutory authority because it circumvents Congress's requirements for adjustment of status after an illegal entry; (2) in doing so, dispenses with immigration law in violation of the Take Care Clause; and (3) is arbitrary and capricious because it is pretext for such a circumvention of law and fails to consider reliance interests in the government's turning of square corners in immigration law. Doc. 1 at 40–45, 49–51. It is not necessary to reach those additional

---

[30] The KFT Rule's final claimed "significant public benefit" is from the mere *application* of aliens for parole in place, since applicants may furnish information that identifies public-safety and national-security threats. 89 Fed. Reg. 67,469. That possibility exists based on simply *offering* parole to all aliens, and the court does not see how that could be called a benefit of paroling a specific alien, determined on a case-by-case basis, on any view.

claims because plaintiffs' first and second statutory claims succeed and justify the same relief.

### 5. Procedural-rights claims

Lastly, plaintiffs argue that the KFT Rule is infirm procedurally because it issued without APA notice-and-comment procedure and relied on an invalid waiver of Paperwork Reduction Act procedure. *Id.* at 46–49. Given that these claims would not support a broader remedy than do plaintiffs' successful claims of lack of statutory authority, the court does not address the procedural-rights claims. *E.g.*, *NFIB v. OSHA*, 595 U.S. 109, 120 (2022) (resolving motion on statutory-authority grounds without discussing notice-and-comment claim).

## C. Remedies

As relief, plaintiffs seek a judgment vacating and setting aside the KFT Rule, a declaratory judgment that it exceeds statutory authority, and a permanent injunction. Doc. 1 at 52. Each remedy is addressed below.

### 1. Vacatur of the Rule

The APA directs that a court "shall . . . set aside" agency action found to be not in accordance with law or in excess of statutory authority or limitations. 5 U.S.C. § 706(2). Although debate continues over the meaning of that direction, Fifth Circuit precedent is clear that to "set aside" agency action means to vacate it: to "formally nullify and revoke" the agency action. *Data Mktg. P'ship, LP v. DOL*, 45 F.4th 846, 859 (5th Cir. 2022); *Franciscan All., Inc. v. Becerra*, 47 F.4th 368, 374–75 (5th Cir. 2022) ("Vacatur is the only statutorily prescribed remedy for a successful APA challenge to a regulation."); *accord Corner Post*, 144 S. Ct. at 2460 (Kavanaugh, J., concurring) ("the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules, including in suits by unregulated plaintiffs who are adversely affected by an agency's regulation of others").

Defendants argue that any vacatur should be limited to only portions of the Rule. Doc. 77 at 69. But the error in the Rule's

foundational interpretive views does not leave any part of the Rule to be validly implemented. The Rule provides for granting parole "in place" under INA § 212(d)(5) for the purpose of allowing aliens to become lawfully present and thus adjust to LPR status under INA § 245(a) and receive other benefits. The lack of statutory authority to do so affects the entirety of the Rule. *See DACA Case*, 50 F.4th at 529 (examining "the seriousness of the deficiencies of the action," i.e., whether they could be remedied by the agency).[31]

Defendants also argue that any vacatur should be limited to the Rule's application to "individuals residing in Texas" or in the plaintiff States. Doc. 77 at 69. It is unclear exactly how that would work given the freedom to move between States in our Nation. In any event, the Fifth Circuit holds that the statutory remedy of "setting aside agency action under § 706 has 'nationwide effect,' is 'not party-restricted,' and 'affects persons in all judicial districts equally.'" *Braidwood Mgmt., Inc. v. Becerra*, 104 F.4th 930, 951 (5th Cir. 2024) (citations omitted); *id.* at 952 ("[W]e do not read our precedent to require consideration of the various equities at stake before determining whether a party is entitled to vacatur.").

Defendants finally argue that vacatur of the Rule would exceed Article III authority. Doc. 77 at 68–69. But although the federal courts' judicial power "does not include the power to veto statutes," vacatur "operates on the status of agency action in the abstract." *Braidwood*, 104 F.4th at 951 & nn.91, 94 (citing debate on Article III's effect on remedies in a justiciable case).

Indeed, the "default rule" is that vacatur is the appropriate remedy when agency action exceeds statutory authority. *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir. 2023) (en banc); *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989) (noting that,

---

[31] Although it is not clear that a further consideration applies when an infirmity cannot be cured by proceedings on remand, the court also considers "the disruptive consequences of the vacatur," *id.*, and finds them minimal because the issuance of parole in place under the Rule has been stayed since shortly after the Rule's effective date. Doc. 27 at 3–5 (noting the court's concerns with the Rule's legality and thus creating reliance interests).

"[w]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated"). Defendants have preserved their point, but any debate about Article III limits on the "set aside" remedy authorized by statute is for higher courts to decide. *See R.J. Reynolds Tobacco Co. v. FDA*, No. 6:20-cv-00176, 2022 WL 17489170, *18–21 & n.195 (E.D. Tex. Dec. 7, 2022) (this court's opinion so noting and discussing the effect of the congressional delegation to federal courts); T. Elliot Gaiser et al., *The Truth of Erasure: Universal Remedies for Universal Agency Actions* (May 16, 2024), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4830962; *cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring) (authority at a maximum when acting under congressional delegation).

### 2.  Declaratory and injunctive relief

The Declaratory Judgment Act allows a reviewing court to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a). Any such declaration "shall have the force and effect of a final judgment or decree." *Id.* If necessary, a court may later grant an injunction to enforce its declaratory judgment. *Id.* § 2202; *Powell v. McCormack*, 395 U.S. 486, 499 (1969). A declaratory judgment is not precluded by the availability of vacatur or an injunction. Fed. R. Civ. P. 57 ("The existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").

The court finds it proper to exercise its discretion to issue a declaratory judgment here. As a baseline, the Fifth Circuit has repeatedly affirmed even injunctions that prohibit the Executive Branch from implementing unlawful agency action in the immigration context. *DACA Case*, 50 F.4th at 530–31; *MPP Case II*, 20 F.4th at 1001–03; *DAPA Case*, 809 F.3d at 186–88. As to the possibility of such relief here, the court has already discussed irreparable injury as part of standing. And the other equities do not foreclose an injunction. Parole in place under the KFT Rule is undoubtedly of importance to many parties, but its unlawfulness bars considering those interests. *MPP Case II*, 20 F.4th at 1003

("that whole line of reasoning [opposing an injunction] is based on the notion that [the agency action] was a lawful exercise of autonomy"); *DAPA Case*, 809 F.3d at 187 ("But those are burdens that Congress knowingly created, and it is not our place to second-guess those decisions."); *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022) (recognizing "no public interest in the perpetuation of unlawful agency action"). The Fifth Circuit has also affirmed that an injunction of all applications of nationwide rule-making is appropriate where there is "a substantial likelihood that a geographically-limited injunction would be ineffective," which can exist more often in immigration cases because "the Constitution requires 'an uniform Rule of Naturalization.'" *DAPA Case*, 809 F.3d at 187–88 (emphasis omitted).

That being said, it is "anticipated that [defendants] would respect the declaratory judgment" here, forestalling any need to enter the more explicitly coercive remedy of an injunction. *Poe v. Gerstein*, 417 U.S. 281, 281 (1974). Plaintiffs do suggest (Doc. 100 at 63) that defendants may end-run the court's vacatur of the Rule by directing agency personnel, in some other form, to act on the same statutory interpretations in granting parole in place to the same or a similarly situated class of illegal entrants. The Supreme Court has indeed recognized a federal court's power to enjoin related action that end-runs its rulings preventing harm:

> A federal court has broad power to restrain acts which are of the same type or class as unlawful acts which the court has found to have been committed or whose commission in the future unless enjoined, may fairly be anticipated from the defendant's conduct in the past. But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged.

*NLRB v. Express Pub. Co.*, 312 U.S. 426, 435–36 (1941). But the exercise of that power can await another day. The court does not presently perceive a substantial likelihood of such conduct. So the court chooses not to enforce its declaratory judgment with an injunction at this time. *See Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985). Plaintiffs may, of course, seek an injunction should defendants threaten to depart from the declaratory judgment. *See* 28 U.S.C. § 2202.

### III. Conclusion

The court makes the findings of fact stated above and concludes that plaintiffs are entitled to relief on Counts 1–3 of their complaint. A final judgment will issue forthwith, so any pending motions are denied as moot.

*So ordered by the court on November 7, 2024.*

J. CAMPBELL BARKER
United States District Judge